**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>CONSUMER END-USER CASES | **Civil Action Case No. 13-MD-2481 (KBF)**<br><br>**CONSOLIDATED AMENDED CLASS ACTION  COMPLAINT**<br><br>**JURY  TRIAL DEMANDED** |

## INTRODUCTION

Plaintiffs Daniel Javorsky, David Kohlenberg, and Brick Pizzeria LLC (collectively "Plaintiffs") bring, on behalf of themselves and all others similarly situated, upon knowledge as to themselves and their own acts, upon information and belief as to all other matters, and based on the investigation of counsel, this class action for damages, injunctive relief, and other relief pursuant to federal and state antitrust laws, state unfair competition laws, state consumer protection laws, and the common law of unjust enrichment, demand a trial by jury, and allege as follows:

## I.    NATURE OF THE ACTION

1.      This is a proposed class action lawsuit against The Goldman Sachs Group, Inc., GS Power Holdings LLC, Metro International Trade Services LLC, JPMorgan Chase & Company, Henry Bath & Son, Ltd., Henry Bath LLC, Glencore Xstrata plc, Glencore Ltd., Pacorini Metals AG. Pacorini Metals USA LLC, The London Metal Exchange Limited, and LME Holdings Limited, and unnamed co-conspirators (all as defined below, and collectively "Defendants"), who have, from at least May 1, 2009, or at such earlier or later date as discovery may show, until the effects of the anticompetitive conduct cease to affect the market (the "Class Period"), engaged in acts and practices, in combination, conspiracy, or agreement with one another, or individually, to restrain trade in, and to restrict the deliverable supply of, aluminum stored in LME-approved warehouses.  Defendants engaged in the acts and practices alleged herein with the purpose and effect of increasing the price of aluminum and Aluminum Consumer Products and profiting thereby, as well as from increased storage fees for increased amounts of stored aluminum.  The acts and practices alleged herein violate federal and state antitrust laws and state unfair competition laws.

2.      As a direct and proximate cause of the acts and practices alleged in this complaint, Defendants have injured Plaintiffs and the Class in the form of supra-competitive prices for Aluminum Consumer Products (i.e., products made in whole or in part from aluminum and intended for end-use by consumers) ("Aluminum Consumer Products").

3.      As more fully set forth herein, Defendants' scheme involved (1) the Warehousing Defendants acquiring a substantial portion of warehouses approved by LME for the storage of exchange-traded aluminum, and (2) Defendants utilizing a series of strategies to restrict aluminum delivered from those warehouses and increase the rents paid to the warehouses by metal owners.  These practices substantially increased the prices paid by direct purchasers of aluminum and by manufacturers of Aluminum Consumer Products and, accordingly, the prices paid by end-users of those products, i.e., Plaintiffs and the Classes.

4.      As described more fully herein, Defendants' strategies included: (1) providing aluminum producers and owners with significant financial incentives to store aluminum in LME-approved warehouses instead of releasing that aluminum to the open market; (2) agreeing to treat certain LME rules requiring warehouses to deliver a minimum specified quantity of aluminum daily as a rule setting a maximum, rather than a minimum, quantity to be released; (3) shuttling the minimum quantities of aluminum they did release between their own warehouses instead of releasing it to the market; and (4) making knowingly false or incomplete statements in an attempt to justify Defendants' agreed upon conduct and the resulting injuries to Plaintiffs and the public. Defendants' practices had the effect of limiting the supply of, and increasing the price of, aluminum, and of increasing Defendants' storage revenues.

5.      Many factors plausibly suggest the existence of a conspiracy among and between the Goldman Defendants and LME Defendants and involving the other Defendants.  These include:

    a.   First, neither Goldman Sachs nor the LME, nor any of the other Defendants, acting alone, or without the knowledge, consent, agreement, and acquiescence of the others, could successfully restrict LME warehouse supplies, lengthen delivery periods, increase daily storage costs and load-out fees, and offer incentive payments to increase aluminum storage;

    b.   Second, the Goldman and LME Defendants and the other Defendants shared common, large financial incentives to inflate LME warehouse storage and restrict load-out and delivery.  The Goldman Defendants earned hundreds of millions of dollars in storage and other fees.  The other Defendants also earned significant revenues from ownership of LME warehouses, and the LME Defendants shared in approximately 1.1 percent of all LME warehouse revenues.  The Goldman Defendants and other financial firms that owned LME warehouses were the largest shareholders of Defendant LME Holdings and directed large amounts of trading business to the LME.  The LME Defendants had an additional financial incentive to inflate storage costs and revenues at the Detroit warehouses because of the secondary inflationary effect that would spill over to storage costs and revenues at other LME warehouse locations;

    c.   Third, Defendants' actions have given rise to a historically unprecedented increases and all-time high levels in the Midwest Premium and Platts MW

Premium prices of aluminum (defined herein) that cannot be explained by fundamental economic supply and demand and must have been the result of the conspiracy. Even as premiums began to fall after reaching the all-time highs, they have remained at artificially high, anticompetitive levels to the present time. Aluminum prices are historically inversely related to supply. In times of plentiful supply, the Midwest Premium is low or even negative (discounts), which occurred in periods of high supplies during the early 1990s. During the Class Period, aluminum supplies increased to levels that exceeded even the high supplies in the early 1990s, and the amount stored in LME warehouses increased to all-time highs. Nevertheless, the Midwest Premium did not decline, as economic factors would indicate, but instead increased to record high levels, reflecting a historically anomalous pricing pattern. Indeed, during the first two weeks of January 2014 the Midwest Premium spiked to a record high of 20.5 cents per pound despite there being an excess of metal in storage. The spike made the premium account for just under a quarter of the "all in" cost of buying a ton of aluminum – much higher than the historic average which hovered around 10 percent;

d. Fourth, Defendants' actions have caused a historically unprecedented and anomalous increase in the amount of aluminum stored in LME-approved warehouses. During times of economic recovery, such as the period from 2010 to 2013, aluminum demand and usage was increasing as industrial activity increased. This should have resulted in net outflow of aluminum from warehouses to meet the growing demand, and in a decrease in the amount of

aluminum stored in the warehouses.  Instead, during the same period of strong economic recovery, the supplies of aluminum trapped in the LME Detroit warehouses have increased to all-time record levels.  While the amount of aluminum stored LME non-Detroit warehouses in the United States declined by 50%, the amount stored in LME Detroit warehouses increased by more than 60% to approximately 1.5 million tons, or approximately 90% of an entire year's worth of U.S. aluminum production and 75% of the total LME aluminum storage in the United States—a result that cannot be explained by normal economic supply and demand factors and can only be explained by the conspiracy to artificially restrict supply in the warehouses and prolong the delivery and load-out time periods;

e.  Fifth, the Goldman and LME Defendants have caused a historically unprecedented lengthening and delay in the delivery times of aluminum from the LME Detroit warehouses in a manner inconsistent with the normal workings of competitive supply and demand.  By June 2013, the time between the customer order for delivery and the actual deliver had increased to sixteen months.  The increase in delivery times occurred despite public complaints that the Goldman and LME Defendants were hoarding aluminum supplies and causing inflation of aluminum prices;

f.  Sixth, the Goldman and LME Defendants engaged in highly unusual and historically unprecedented increases to the per-metric-ton daily storage costs for the LME Detroit warehouses and in the load-out or "FoT" (Free on Truck) charges.  Given the increasing demand for delivery of aluminum out of the

warehouses, the demand for storage was necessarily decreasing, and there was no independently economic justification for increasing the storage costs. Nevertheless, the Goldman and LME Defendants increased the charges by more than one-third and three times the charges by similar non-LME warehouses;

g.  Seventh, with the knowledge and consent of the LME Defendants, the Goldman Defendants have offered financial incentives of up to $250 per ton for the storage of aluminum at the LME Detroit warehouses for long periods, in order to increase even further the amount of aluminum storage;

h.  Eighth, the Goldman, LME, and other Defendants had a further financial incentive to inflate warehouse storage revenues: they were seeking a buyer for the LME.  The prospect of increasing warehouse revenues enabled Defendants to project cash flows and sell the LME to Hong Kong Exchanges & Clearing, Ltd. ("HKEx") for $2.15 billion.  Goldman Sachs' stake in the LME was valued at $208 million at that purchase price;

i.  Ninth, multiple government agencies, including the European Union, the Commodities Futures Trading Commission, and the Department of Justice, have announced they are investigating or considering investigating Defendants' warehousing practices;

j.  Tenth, further plausibly indicating the existence of the agreements alleged herein, Goldman Sachs' head aluminum trader, Scott Evans, departed Goldman Sachs after the announcement of the EU investigation;

k.  Eleventh, Defendant LME has made inconsistent and implausible statements in denial of its role in the conspiracy, and later reversed those statements and engaged in after-the-fact purported corrective measures.  Before HKEx acquired it, and while under the leadership of CEO Martin Abbot, LME stated that the load out queues of greater than sixteen months were due to the economic environment, and that LME was not required to change its agreements to reduce the queues.  After the acquisition, LME stated that queues were not causing price increases and urged purchasers of aluminum to stop buying and paying the high prices.  Then, after Abbot's resignation as CEO in June 2013, LME reversed itself and admitted that the long queues had caused increases in prices, and LME proposed a change to the load-out rules that would require warehouses with queues of at least 100 days to deliver at least 1500 tons per day more than brought in;

l.  Twelfth, in July 2013, Defendant Goldman Sachs, under pressure from U.S. investigations, took an after-the-fact corrective action by announcing the suspension of incentive payments for warehouse storage.  And, on July 31, 2013, Goldman Sachs announced it would agree to release aluminum stored in its LME Detroit warehouses;

m.  Thirteenth, during the entire Class Period, all Defendants had opportunities to conspire, most notably through having representatives sit as LME Warehousing Committee members.  Henry Bath & Son, Ltd., Pacorini, and Metro International all have committee members on the LME Warehousing Committee and the LME has a secretary listed for the same committee;

8

n.  Fourteenth, after news reports surfaced regarding the manipulation of aluminum, Defendants Goldman and JPMorgan announced their intentions to sell or spin off their warehouses and exit the commodities business entirely;

o.  Fifteenth, the LME and Goldman Defendants have continued their course of conduct notwithstanding public complaints that Defendants were causing inflated aluminum prices.  With full knowledge that they were inflating such prices, Defendants have modified their conduct only superficially in order to appear to respond to the public protests.  But Defendants have continued the basic conduct that has caused record inflations in the Midwest Premium and/or Platts MW Premium prices;

p.  Sixteenth, Defendant JPMorgan had a financial incentive and opportunity to join the conspiracy and did join the conspiracy.  JPMorgan was the largest LME shareholder with approximately 1.4 million ordinary shares (approximately 11%).  JPMorgan also owned LME-approved warehouses and benefitted from increased storage costs.  During the Class Period, JPMorgan owned LME warehouses in Baltimore, Chicago, New Orleans, Liverpool, Hull (Immingham), Bilbao, Trieste, Antwerp, Rotterdam, Singapore, Busan, Gwangyang, and Johor (Pasir Gudang).  Other large shareholders of LME Holdings included Metdist 9.39%, UBS 4.26%, Citigroup 2.32%, Merrill Lynch 2.32% Morgan Stanley 2.32%, Koch Metals 2.32%, and Jeffries Bache 1.93%.  Glencore was a .4% owner of "B" shares in the LME.  JPMorgan benefitted as a shareholder from the sale of the LME;

q.  Seventeenth, Defendants Pacorini/Glencore also own LME warehouses, owned equity shares in the LME, made incentive payments for storage, mimicked Defendant Goldman's behavior, and entered a similar agreement with the LME and Goldman to restrain supplies in LME Detroit warehousing, inflate premium prices, provide inefficient low quality load-out services, and inflate storage revenues; and,

r.  Eighteenth, Defendants Goldman Sachs, Glencore/Pacorini, and JPMorgan benefitted from the restraints of trade at their and other LME warehouses and from the trading of aluminum and aluminum derivatives on the LME and elsewhere on the basis of information derived from their roles on the LME and from their LME warehouse operations.

6.  As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Aluminum Consumer Products during the Class Period, and have thereby suffered antitrust injury to their business or property.

7.  As a result of the activities described herein, Defendants:

a.  Caused damage to the residents of the states identified herein;

b.  Caused damage in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state; and

c.  Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state and/or engaging in other persistent courses of conduct in each such state.

8.    The conspiracy described herein affected adversely every person nationwide, and, more particularly, consumers in each of the states identified in this complaint who indirectly purchased Aluminum Consumer Products for end use.  Defendants' conspiracy has resulted in an adverse monetary effect on consumer indirect-purchasers in each state identified herein.

9.    Prices of Aluminum Consumer Products in each state identified in this complaint were raised to supra-competitive levels by Defendants and their co-conspirators.  Defendants knew that commerce in Aluminum Consumer Products in each of the states identified herein would be adversely affected by implementing their conspiracy and scheme to monopolize.

## II.    JURISDICTION AND VENUE

10.    This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26 and 18 U.S.C. § 2201 for violations of Section 1 of the Sherman Act for declaratory and injunctive relief, as well as under various state laws.

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 28 U.S.C. §§ 1331 and 1337.

12.    This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the United States district courts for any multi-state class action where the aggregate amount in controversy exceeds five million dollars, exclusive of interest and costs, and where the citizenship of any member of the class is different from that of any Defendant.

13.    This Court has subject matter jurisdiction of the pendant state law claims under 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over each Defendant by virtue of its or its subsidiaries' (a) business activities, (b) substantial aggregate contacts with, and/or (c) engagement in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons in this District.

15.    Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.    The activities of Defendants and their unnamed co-conspirators, as discussed herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on interstate trade and commerce of the United States, and on intrastate trade and commerce of the several states whose laws were violated as alleged herein.

### III.    PARTIES

17.    Plaintiff Daniel Javorsky is a California resident who indirectly purchased Aluminum Consumer Products, for end use and not for resale, at prices intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff's indirect purchases of aluminum include, but are not limited to, beverages in aluminum cans and aluminum foil.

18.    Plaintiff David Kohlenberg is a California resident who indirectly purchased Aluminum Consumer Products, for end use and not for resale, at prices intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff's indirect purchases of aluminum include, but are not limited to, beverages in aluminum cans and aluminum foil.

19.    Plaintiff Brick Pizzeria LLC is a California corporation that indirectly purchased Aluminum Consumer Products, for end use and not for resale, at prices intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff's indirect purchases of aluminum include, but are not limited to, pots and sauté pans, construction materials (including ductwork), sheet pans, and hotel pans.

20.    Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is, and at all times material was, a multinational investment banking firm incorporated in Delaware with headquarters at 200 West Street, New York, New York 10282.   Goldman Sachs provides investment banking, securities, and investment management and financial services to corporations, financial institutions, governments, and high net-worth individuals.  Goldman Sachs produced net revenues in 2012 of $34.2 billion and net earnings of $7.5 billion.  It has traded extensively in commodities, including aluminum, on the LME and has been a shareholder of LME holdings prior to the beginning of the Class Period.

21.    Defendant GS Power Holdings LLC ("GS Power") is a wholly owned subsidiary of Goldman Sachs incorporated in Delaware and with headquarters at 85 Broad Street, New York, New York 10004.

22.    Defendant Metro International Trade Services LLC ("Metro International") is a wholly owned subsidiary of Mitsi Holdings LLC, which is, in turn, a wholly owned subsidiary of GS Power Holdings LLC.  Metro International is incorporated in Delaware and has headquarters at 6850 Middlebelt Road, Romulus, Michigan 48174.  Metro International is, according to its website, "a leading global warehouse operator, specializing in the storage of non-ferrous metals for the London Metal Exchange."  Metro International operated twenty-nine of the thirty-seven LME-listed storage facilities in Detroit, Michigan (as of March 8, 2013).  Defendant Goldman

Sachs acquired Metro International through its subsidiary GS Power's purchase of Metro International in February 2010 for $550 million.

23.     Goldman Sachs, GS Power Holdings, and Metro International are hereinafter referred to as the "Goldman Defendants".

24.     Defendant JPMorgan Chase & Company ("JPMorgan") is a multinational banking and financial services holding company incorporated in Delaware and with headquarters at 270 Park Avenue, New York, New York 10017.  JPMorgan provides various financial services and is the largest bank in the United States by assets.  JPMorgan acquired the Henry Bath Group in February 2010.

25.     Defendant Henry Bath & Son, Ltd. is a London-based company that stores and ships exchange-traded metal, including aluminum, around the world. It is a corporate parent of defendant Henry Bath LLC, and is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom. A registered agent for service of process is located in Baltimore, MD.

26.     Defendant Henry Bath LLC ("Henry Bath") is a Delaware limited liability company with headquarters at 2500-A Broening Highway, Baltimore, Maryland 21224.  Henry Bath is a subsidiary of Henry Bath & Son Ltd, which operates as an indirect subsidiary of J.P. Morgan Ventures Energy Corporation, which is, in turn, a wholly owned subsidiary of JPMorgan.  Henry Bath owns and operates warehouses that store and ship exchange-traded metals and agricultural commodities, including aluminum.

27.     Together, JPMorgan, Henry Bath and Henry Bath & Son are referred to as JPMorgan.

28.     Defendant Glencore Xstrata plc (collectively with its predecessor Glencore International plc, "Glencore") is a United Kingdom public liability company with headquarters at Baarermattstrasse 3, CH-6340 Baar, Switzerland.  Glencore is, according to its website, "one of the world's largest global diversified natural resources companies."  Glencore engages in the production, storage, transportation, and marketing of various commodities, including aluminum, and derivatives that derive their value from underlying asset prices of commodities.  In August 2010, Glencore acquired the metals warehousing business of Pacorini Group and has owned it and all of its subsidiaries since.  Glencore has offices in the United States.

29.     Glencore Ltd. is a wholly owned subsidiary of Glencore, which resides at 301 Tresser Boulevard, Stamford, CT, 06901.  It has been registered with the Connecticut Secretary of State since 1985.  Glencore's CEO Ivan Glasenberg is one of Glencore, Ltd.'s four directors. Arisotelis Mistakidis, a long-time Glencore senior executive in its metals trading business is another.  As of March 22, 2013, Glasenberg and Mistakidis were reported by Glencore to own more than 20% of the company's shares.

30.     Defendant Pacorini Metals AG ("Pacorini") is, according to its website, "a leading provider of LME warehousing and logistics services to producers, consumers, financiers and traders of base metals."  Pacorini Metals AG is headquartered at Baarerstrasse 53/55, CH-6300 Zug, Switzerland.

31.     Defendant Pacorini Metals USA LLC ("Pacorini USA") is a Louisiana limited liability company with headquarters at 5736 Citrus Boulevard, Suite 104, New Orleans, Louisiana 70123.  Pacorini USA operates as a wholly owned subsidiary of Pacorini and owns and operates LME-approved warehouses in the United States that store aluminum, among other metals.

32.     Together, Glencore Xstrata, Glencore Ltd., Pacorini Metals, and Pacorini USA are referred to as Glencore.

33.     Defendant The London Metal Exchange Limited ("LME") is a United Kingdom futures exchange corporation that, according to its website, is responsible for more than 80 percent of the global non-ferrous metals trading market.  LME provides facilities along with management and regulatory structures for trading in LME contracts.  The LME is headquartered at 56 Leadenhall Street, London EC3A 2DX, United Kingdom.   LME does business in the United States and in this District, including through holding meetings in the United States, conducting storage operations through its approved warehouses, and in many other ways.

34.     Defendant LME Holdings Limited is a corporation that, until December 6, 2012, owned the LME, the largest portion of LME Holdings Limited was owned by Defendant Goldman and other leading American banks including JPMorgan, Citigroup, Merrill Lynch, and Morgan Stanley. On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing, Ltd.  ("HKEx").

35.     The Warehouse Defendants consist of all Defendants other than the LME Defendants.

36.     Defendants Does 1–25 are other entities or persons, who own warehouses, have similar financial interests as Defendants, or have otherwise participated as co-conspirators with Defendants in the agreement.  The true names and capacities, whether individual, corporate, associate, or otherwise of the Doe Defendants are unknown to Plaintiffs, who therefore sue such Defendants by fictitious names.  Plaintiffs will amend this complaint to show such Defendants' true names or capacities when the same has been ascertained.  Plaintiffs are informed and believe and thereon allege that each of the Doe Defendants participated in, furthered, and/or combined,

conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the price of physical aluminum and the Midwest Transaction Premium to artificial levels.

## IV.    AGENTS AND CO-CONSPIRATORS

37.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

38.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

39.    Whenever in this complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## V.    FACTUAL ALLEGATIONS

### A.    The Aluminum Industry and the LME

#### 1.  Aluminum Manufacturing

40.    Aluminum is the most abundant metal in Earth's crust, but is not found freely in nature.  Primary producers of aluminum, such as Alcoa Inc. and Century Aluminum Co., mine bauxite, extract alumina from the bauxite, and refine alumina into aluminum, which is then processed into formed shapes for various consumer products.

41.     Aluminum is one of the few products and industries left in America that truly impacts every community in the country.  Annually, the United States' aluminum industry produces about $40 billion in aluminum products and exports and represents the second largest metals market in the world.

42.      Because aluminum is a light-weight, high-strength, corrosion-resistant, and readily recyclable material, it is an essential ingredient for making countless products across any number of industries.  Unlike precious metals such as gold and silver, which are often purchased for investment rather than commercial use, aluminum is notable for its industrial uses. Transportation, aerospace, defense, building and construction, food and beverage packaging, transmission of electricity, consumer durables, machinery, and equipment all depend to a significant degree on a consistent supply of competitively priced aluminum.

43.     Aluminum is also used in a broad range of consumer goods, including car parts, soda and beer cans, food packaging, foil, pots and pans, automobiles, airplanes, rockets, appliances, computers, sports equipment, and much more.

44.     Aluminum is typically traded on the LME in the form of bars, rods, or ingots.

**2.   Role of Warehousing in the Sale of Aluminum**

45.     Aluminum storage facilities, such as those owned by Defendants, have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum stored within their warehouses.

46.     The LME is the world's largest market in options and futures for non-ferrous metals such as aluminum.  Only select firms—among them large financial firms including Defendants—have access to the exchange.  The LME is the single major, if not the only, venue in the United States for exchange-traded aluminum futures or aluminum forward contracts.

47.    In 1978, the LME began facilitating the purchase and sale of meals through futures, options, and other financial instruments.  It does not itself engage in physical trading.

48.    The LME has a multi-tiered membership structure, and only member firms may trade contracts on the LME.  The LME's members owned, governed, and controlled it until the HKEx Group acquired it in December 2012.

49.    J.P. Morgan Securities plc, an indirect subsidiary of Defendant JPMorgan, is a "Category 1—Ring Dealing" member; Goldman Sachs International, an indirect subsidiary of Defendant Goldman Sachs, is a "Category 2—Associate Broker Clearing" member; and Glencore (UK) Limited, an indirect subsidiary of Defendant Glencore, is a "Category 5— Associate Trade" member.

50.    The LME is a self-regulating organization.  Both the U.K. Financial Conduct Authority and the U.S. Commodities Futures Trading Commission have expressed uncertainty regarding their ability to regulate the LME.

51.    The LME certifies a network of storage warehouses and sets rules for their operation.  In exchange for its certification and other services, LME is paid 1.1% of all storage fee receipts paid to LME-certified warehouses.

52.    LME operates one of the world's largest networks of aluminum storage warehouses, and concentrates its warehouses in large industrial cities.  For example, in Detroit, Michigan, LME has certified approximately thirty-four warehouses for aluminum storage. Twenty-nine of those warehouses are owned by Defendant Metro International, a subsidiary of Defendant Goldman Sachs.

53.    Owners of warehoused aluminum possess warrants evidencing their ownership. A warrant is a document of title, issued by a warehousing company, for a specific lot of metal

held within an LME-approved warehousing facility.  Warehousing companies issue warrants

when checking aluminum into a warehouse for storage, and cancel them when they receive an

order for load-out.  Each warrant is for a specific tonnage and brand and is not interchangeable.

LMEsword is the electronic transfer system for LME warrants.  Warrants trade on the LME, and

aluminum producers may house aluminum in LME warehouses and then sell warrants to buyers

on the LME.

54.    At the expiration of an LME aluminum forward or futures contract, delivery of

warrants for aluminum in an LME-approved warehouse must be made by sellers (or "shorts")

who have not liquidated (i.e., traded out of their contract) to buyers (or "longs") who have not

liquidated.

55.    Once a warrant for a metals purchase issues, the owner generally pays the LME-

approved rent for storing the lot in an LME-approved warehouse.

56.    To take possession of warehoused aluminum, the warrantholder must make a

request to move the metal and the warehouse then schedules delivery of the metal itself.  The

warrantholder remains liable for the cost of storage until the warehouse delivers the aluminum to

the warrantholder seeking delivery.  Accordingly, if the warehouse does not timely ship the

aluminum to the warrantholder, the warrantholder must continue paying rent to the warehouse

until such delivery occurs.

### 3.    The LME Warehouse Rules

57.    The LME Warehousing Committee bears responsibility for making

recommendations on warehousing policy issues to the LME's Executive Committee.  The

LME's Executive Committee, in turn, possesses the authority to approve matters relating to the

Rules & Regulations of the LME.  Defendants Goldman Sachs, JPMorgan, and Glencore,

through their subsidiaries, each have representatives on the LME Warehousing Committee, including the President of Goldman Sachs' Metro, Chris Wibbelman; the CEO of Glencore's Pacorini, Peter Marc Waszkis; and Group General Manager of JP Morgan's Henry Bath & Son Ltd., Graham Hawkins.[1]

58.      One such rule governs minimum "load-outs," and requires LME-approved warehouses to deliver or load-out a minimum tonnage of aluminum each day.

59.      Prior to April 2012, the minimum load-out rule required warehouse owners to load out 1500 tons of aluminum per city, per day.  It did not require netting load-outs against load-ins, and applied to all warehouses in a particular city collectively, rather than to each individual warehouse.

60.      In April 2012, the minimum load-out rule changed to require 3000 tons of load-out per day.  However, it still did not require netting load-outs against load-ins, and still applied to all warehouses in a particular city collectively, rather than to each individual warehouse. However, under either requirement, only a fraction of the aluminum each warehouse takes in, and a fraction of the aluminum sought by buyers, is released, resulting in a significant stockpile of aluminum in LME-certified warehouses.

61.      Because the minimum load-out rule did not require netting load-outs against load-ins, it permitted accumulation of aluminum in LME-approved warehouses.

---

[1] *See* London Metal Exchange, *Warehousing Committee: Terms of Reference*, http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf; *Warehousing Committee*, London Metal Exchange, http://www.lme.com/en-gb/about-us/corporate-structure/committees/warehousing-committee/.

62.    Moreover, because the rule permitted aggregation of load-outs from all warehouses in a particular city, it significantly limited its efficacy in cities with multiple aluminum warehouses.  For example, it meant that each of Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day.  By owning many large warehouses in the same city, operators could easily meet the LME-imposed per city target, while allowing only a small fraction of the aluminum they take in ever to reach consumers.  In addition, the LME rules did not prohibit load-out shipped to another warehouse from being counted in satisfaction of the purported minimum load-out requirement.

63.    The minimum load-out requirement was supported by Goldman Sachs, JPMorgan, and Glencore in their roles as owners of the LME and members of the LME Warehousing Committee. Through their participation on the Warehousing Committee, Defendants were able to coordinate identical terms governing each's relationship with the LME.

### 4.  The Midwest Premium

64.    When aluminum is released from warehousing, it must be shipped to downstream users for manufacturing into aluminum products.

65.    The Midwest Premium is the cost of freight and handling to ship aluminum from LME-approved warehouses to the Midwest United States.  The premium is added to exchange benchmarks and covers a purchase of a specific quantity of aluminum in a particular location, reflecting supply and demand on the physical market.

66.    The U.S. Midwest Premium for aluminum was originally created to cover the freight from Baltimore to the Midwest.  It now incorporates supply and demand of the North American-specific market to complement the LME aluminum contract.

67.    In the past three years, the Midwest Premium has increased from $0.04/pound to nearly $0.13/pound.  Indeed, in the first two weeks of January 2014, the Midwest Premium hit a record high of $.205/pound.  This increase caused the Midwest Premium to account for nearly twenty five percent of the "all-in" cost of buying a ton of aluminum—compared to the historic average of around ten percent.[2]  The Midwest Premium is now a larger component of the aluminum consumer's cost and risk as wait times for aluminum from LME-approved warehouses have continued to climb.

68.    Because price is inversely related to supply, in times of plentiful aluminum supplies, the Midwest Premium is low.  During the Class Period, aluminum supplies increased, due to Defendants' unlawful conduct, to all-time high levels of supply, which should have produced a low Midwest Premium price.

69.    However, due to Defendants' anticompetitive agreements to inflate and distort prices, during the Class Period, the Midwest Premium increased to all-time highs, despite the record supply of aluminum on the market, and generally remained in a range of historically high levels throughout the Class Period.

B.    **Defendants' Anticompetitive Scheme**

   1. **Defendants Acquire LME-Approved Warehouses**

70.    In early 2009, it reportedly took approximately six weeks to extract metal, including aluminum, from LME Detroit warehousing.

---

[2] Josephine Mason, *U.S. Aluminum Premium Surge Sparks Interest in CME Contract*, Reuters, Feb. 3, 2014, http://www.reuters.com/assets/print?aid=USL2N0L81QA20140203.

71.      Starting later in 2009, unusual and historically anomalous patterns first began to develop in LME Detroit Warehousing.

72.      These patterns greatly increased after Goldman and the other Defendants began purchasing warehousing facilities.  Goldman Sachs purchased Metro International in February 2010.  In March 2010, Trafigura purchased North European Marine Services, Limited and its subsidiaries.  In July 2010, JPMorgan acquired Henry Bath.  Finally, in September 2010, Glencore acquired Pacorini.

73.      This pattern showed a gradual steady buildup of the total number of warrants with rare spikes of multiple warrant cancellations causing downward moves in the total outstanding warrants.  This pattern was not observed in other warehouses.

74.      Of the 157 LME-approved warehouses in the United States, Goldman Sachs owns 70 (44.59 percent), Glencore owns 50 (31.84 percent), JPMorgan owns 11 (7.01 percent), and Trafigura owns 3 (1.91 percent)—collectively, 85.35 percent.

75.      Defendants currently own or operate a majority of LME-approved warehouses in seven of the nine regions in which LME-approved warehouses exist in the United States. Defendants own or operate fifty five of fifty six warehouses in New Orleans, Louisiana (98.2 percent); thirty two of thirty eight warehouses in Detroit, Michigan (84.2 percent); all seventeen warehouses in Mobile, Alabama (100 percent); seven of sixteen warehouses in Baltimore, Maryland (43.75 percent); fifteen of sixteen warehouses in Chicago, Illinois (93.75 percent); four of six warehouses in Toledo, Ohio (66.67 percent); all three warehouses in Long Beach and Los Angeles, California (100 percent); and one of three warehouses in St. Louis, Missouri (33.33 percent).  Only in Owensboro, Kentucky, do Defendants not own or operate warehouses.

76.     Thus, these acquisitions placed ownership, warehousing, and control of LME policy and trading in the hands of Defendants.  As one expert put it, "[o]wnership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices."[3]  Because Defendants (specifically, Goldman Sachs and JPMorgan) are large financial companies that trade metal commodities (including aluminum), significant conflicts of interest arise due to those same global financial titans controlling the vast majority of the warehouses that store the very commodities they trade.

77.     These acquisitions also created substantial incentives for Defendants to increase the volume of aluminum stored in LME-approved warehouses and the length of time it is stored there, as they derive rental income from such storage.  In addition, Defendants profited from trading LME or other aluminum on the basis of the information they learned as owners/operators of LME warehouses or otherwise.  Because Defendants entered into the aluminum market as both traders and participants in the chain of supply through their purchase of LME-approved aluminum warehouses, they are and were able to manipulate and exploit the aluminum market in order to directly benefit themselves and their trading clients, with whom they share profits.

78.     In addition to purchasing most of the LME warehouses in the United States, Defendants, including Goldman Sachs, JPMorgan, and Glencore, owned more than 20% of the shares of stock in the LME prior to its acquisition by HKEx Group in 2012.

---

[3] Testimony of Professor Saule Omarova before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23, 2013.

79.    Thus, Defendants' anticompetitive scheme, as described below, was supported by Defendants Goldman Sachs, JPMorgan, Glencore, and others in their roles as owners of the LME, owners/operators of LME warehouses, and members of the LME Warehousing Committee.  The inherent conflicts of interest that arise due to this arrangement were recognized by the LME itself, as noted in the Warehousing Committee's Terms of Reference: "Committee members must not abuse their Committee status and must set aside any potential conflict of interest in their decision-making processes.  Where Committee members find themselves in a position of conflict of interest in relation to any matter to be discussed at a Committee meeting, they should consider whether it is appropriate for them to absent themselves from the part of the meeting at which that matter is discussed."

80.    As Defendants' acquisitions of LME-approved aluminum warehouses placed ownership, warehousing, and control of LME policy and trading in the hands of Defendants, experts noted: "Ownership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices."[4]

81.    By both trading on the derivatives market and participating in the physical market, Goldman Sachs and JPMorgan are able to manipulate the inventory and prices of aluminum and profit through their derivative positions.  At the end of July 2013 Senate hearing, Joshua Rosner recounted testimony offered to the United Kingdom's House of Commons about these advantages:

---

[4] Testimony of Professor Saule Omarova before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23, 2013.

> [O]n the London Metal Exchange there are four very large companies that own the very warehouses that people deliver metal into. J.P. Morgan is one of them. They own a company called Henry Bath. They are, therefore, a ring-dealing member of the exchange and they also own the warehouse. That is restrictive. They were also reported, at one point, to have had 50% of the stock of the metal on the London Metal Exchange. That is manipulative.

82.     These acquisitions of LME-approved warehouses created substantial incentives for Defendants to increase the volume of aluminum stored in LME-approved warehouses and the length of time it is stored there, as they derive rental income from such storage.

### 2. Defendants' Agreements to Restrict Supply and Increase Prices

83.     The LME certifies, approves and makes agreements with the owners of its warehouses.

84.     Following acquisition of LME-certified warehouses, the Warehousing Defendants entered into agreements containing a variety of anticompetitive provisions with the LME and with each other. The LME has continuously acquiesced, consented, and otherwise agreed to these provisions and to the Warehousing Defendants' interpretations of them.

85.     *First*, as described above, since February 2010, the Goldman Defendant have owned more than 80% of the warehouse space of LME Detroit Warehousing.

86.     Part of the LME's agreement with Goldman's Metro and Glencore's Pacorini and JPMorgan's Henry Bath were reflected in (a) LME Warehouse Notice Terms and Conditions and (b) LME Warehouse Notice Disciplinary Handbook.

87.     In 2009–2012, the LME agreement with Goldman specified a minimum daily metal load out of 1500 tons per city per day.[5]

88.     This load-out term of the LME-Goldman agreement applied to all the warehouses in a city rather than per warehouse.  It was not based upon a percentage per day of warehouse capacity or warehouse supply.  The 1500 tons did not net out load-ins.  Each of the foregoing aspects of this term of the agreement was unreasonable.

89.     These aspects made the Goldman-LME agreement an extremely unreasonable restraint of trade.  The agreement required, in effect, that each of Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day, whereas warehouses in another city with only one warehouse had to release a minimum of 1500 tons per day.

90.     This unreasonable term restrained trade and aluminum load-outs precisely in the place where aluminum was most consumed, held and concentrated in warehouses: Detroit.

91.     This term and similar ones with Pacorini/Glencore and JPMorgan unreasonably restrained trade in large warehouse centers such as Detroit, Baltimore, and Vlissingen, Holland.

92.     **Second**, Defendants, through their membership on the Warehousing Committee, agreed to treat the minimum load-out rule as a de facto maximum load-out rule, releasing no more aluminum from their warehouses than required by the rule regardless of demand and regardless of load-in rates.  As one observer described it:

---

[5] *See* Memorandum from the London Metal Exchange to All Members, Changes to LME Policy for Approval of Warehouses in Relation to Loading Out Rates (July 15, 2011), http://213.174.201.6/notices/12003.asp.

LME warehouse rules . . . essentially create a funnel, with a wide end at entry and a very narrow end exiting out.  At the wide end, there is a massive supply of metal going into these warehouses, at the rate of tens of thousands of metric tons per day.  At the narrow end, the LME warehouses, such as those in Detroit, use minimum load-out rates as maximums . . . .  Just imagine a big garage door marked "in" and the small front door of your house marked "out."  A lot more metal goes into the warehouse than comes out.[6]

93.    Defendants could easily have loaded out far more than the minimum.  As described in a July 2011 *Reuters* article, a single warehouse in Detroit with two doors, two forklifts, and an eight-hour working day could move out as much as 1920 tons of metal every day.[7]

94.    Defendants' agreement to treat the minimum load-out rules as maximums constitutes a horizontal contract, combination, and/or conspiracy and a *per se* restraint of trade under the Sherman Act and its state-court analogs.  Even in isolation, each Warehousing Defendants' agreements with the LME are improper and anticompetitive.

95.    ***Third***, because the load-out rules failed to require load-outs to be netted against load-ins, Defendants were able to further restrict supply and increased storage times by transferring aluminum between their own warehouses rather that delivering it to customers.  As the *New York Times* observed, "nearly all of the metal that Metro [warehouse] moves is not

---

[6] Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, Testimony before U.S. Senate.
[7] Pratima Desai, Clare Baldwin, Susan Thomas & Melanie Burton, *Goldman's New Money Machine: Warehouses*, Reuters, July 29, 2011, http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729.

delivered to customers . . . . Instead, it is shuttled from one warehouse to another."[8] In practice, this meant that:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses. Two or three times a day, sometimes more, the drivers make the same circuits. They load in one warehouse. They unload in another. And then they do it again.[9]

96.    This process—which one former warehouse forklift driver described as a "merry-go-round of metal"—prevented the shuffled aluminum from reaching the market to satisfy pent-up demand, instead keeping the aluminum in Defendant's warehouses.[10]

97.    From 2009 to 2013, for example, the amount of aluminum stored in non-LME certified warehouses declined by approximately 50%, while the amount of aluminum stored in LME-certified warehouses increased by approximately 60%. The following chart documents the continuous climb in aluminum stored within LME-approved warehouses[11]:

---

[8] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, N.Y. Times, July 20, 2013.

[9] *Id.*

[10] *Id.*

[11]    *Charts    &    Data    –    Spot*, Kitco    Metals, http://www.kitcometals.com/charts/aluminum_historical_large.html (last visited Mar. 12, 2014).



98.     Defendants' agreement to terms permitting such shuttling between LME warehouses in the same city is a horizontal contract, combination, and/or conspiracy and a *per se* restraint of trade under the Sherman Act and its state-court analogs.  Even in isolation, each Warehousing Defendants' agreements with the LME are improper and anticompetitive.

99.     ***Fourth***, Defendants used their supra-competitive profits to pay substantial financial incentives to aluminum producers and owners to store aluminum in Defendants' warehouses instead of releasing it to the market—as much as $250 a ton or more.  These incentives provided metal owners with immediate cash, and made it more profitable to maintain aluminum in Defendants' warehouses.  Moreover, because these incentives lowered metal owners carrying costs, financial institutions and other owners could make a profit by purchasing aluminum, storing it in Defendants' warehouses and paying the storage costs, and contracting to sell the aluminum in the future on terms allowing them to recoup their storage costs.  This further

reduced the supply of aluminum available to the market, and increased the amount of aluminum in Defendants' warehouses.

100.    Through this diversion strategy, Defendants have secured control over an estimated 1.5 million tons of aluminum currently sitting in LME-certified Detroit warehouses. This represents approximately 50% of the LME aluminum stored in the United States.  The incentive payments have also, as a necessary and intended result, (a) increased aluminum prices including the Midwest Premium and Platts MW Premium prices, and (b) added to the prospective, growing queue and the anticipated delays in removing aluminum from LME Detroit warehousing.

101.    In effect, Goldman Sachs and the other Defendants created a positive feedback loop, in which the more aluminum that Defendants could divert into their warehouses and the more inefficient they could be in loading-out the aluminum, the more they could afford to pay in incentive payments.  Such payments further divert aluminum into and restrain the aluminum supplies in long term storage in LME-approved warehouses owned and operated by Defendants. The Midwest Premium or the Platts MW Premium price was significantly less than $115 per ton at the start of the Class Period.  Due to the unlawful conduct alleged in this complaint, it has increased to $400 and more per ton in 2014.[12]

102.    In addition, Defendants' incentive payments have benefitted Defendants financially by increasing the storage revenues for aluminum.  This increased revenue to the LME

---

[12] Josephine Mason, *U.S. Aluminum Premium Surge Sparks Interest in CME Contract*, Reuters, Feb. 3, 2014, http://www.reuters.com/assets/print?aid=USL2N0L81QA20140203 (noting Midwest Premium price at "a record high of 20.5 cents per lb."; each metric ton equates to 2200 pounds (0.205 x 2200 = $451 per metric ton)).

enabled the sale of the LME to HKEx Group for consideration based upon such revenue.  HKEx

Group paid $2.15 billion for the LME; at that purchase price, Defendant Goldman Sachs' stake

in the LME was valued at $208 million.  Defendant JPMorgan was, at that time, the largest LME

shareholder, with approximately 1.4 million ordinary shares (approximately 11%).  Thus,

Defendants and the LME shared the benefits of their conspiracy.

103.    ***Thus***, as described more fully below, as a direct result that is inextricably

intertwined with the foregoing conduct, Defendants agreed to inflate the price of aluminum to

all-time record highs and, more generally, to raise and then maintain aluminum prices at supra-

competitive levels via artificial supply constraints.  The following chart demonstrates the effect

of Defendants anticompetitive agreements on the MW Premium price, with prices spiking to all-

time highs during the Class Period:



104.    An agreement to inflate revenues and prevent access to and alienability of

aluminum through gross inefficiency, in an industrial center with multiple warehouses, is

inherently suspect under the law.  In these circumstances, Defendants' agreements were

extremely restrictive, anticompetitive, exclusionary, and unreasonable throughout the Class Period.

105.    Because Defendants and others are large financial companies that trade metal commodities (including aluminum), metals analysts have commented on the significant conflicts of interest that arise due to those same global financial titans controlling the vast majority of the warehouses that store the very commodities they trade.

106.    Veteran metals analyst Robin Bhar with Credit Agricole in London stated that Defendants' agreements have made "a mockery of the market."  "It's a shame," he continued, "This is an anti-competitive situation.  It puts [some] companies at an advantage, and clearly the rest of the market at a disadvantage.  It's a real, genuine concern.  And I think the regulators have to look at it."

107.    For most of the LME's operating history, its warehouses represented a small percentage of global aluminum supplies.  However, because of Defendants' scheme, the amount of aluminum held in LME-approved warehouses has soared, exploding from 1.2 million tons in July 2008 to 6 million tons in April 2013.

108.    Aluminum in U.S. warehouses increased similarly.  In Detroit alone, the amount of aluminum stored in LME-certified warehouses rose from 900,000 tons to 1.49 million tons between 2010 and 2012.

109.    During the Class Period, stockpiles of warehoused aluminum should have declined as the United States economy was in a period of recovery following a crushing recession.  At such times, the supply of warehoused aluminum should shrink as surplus aluminum warehoused during the recession made its way back into the recovering marketplace.

### 3. Defendants' Scheme Increases Delivery Time and Storage Costs for Aluminum

110.    Prior to Goldman Sachs' purchase of Metro International, the average wait for aluminum contracts to be fulfilled was six weeks.  After the purchase, the wait has increased to over sixteen months, according to *The New York Times*.[13]

111.    The historically unprecedented amount of aluminum stored in LME-approved warehouses, coupled with historically long wait times for the fulfillment of aluminum deliveries, would not occur under normal circumstances.  Large inventories indicate that there is ample supply of aluminum available for immediate delivery.

112.    From July 2009 to July 2011, Coca-Cola Co. and Novelis Inc., among other major aluminum users, complained over the increasing delays in wait times of aluminum delivery, prompting the LME in April 2012 to double the minimum load-out rate from 1500 tons to 3000 tons.  While the LME purportedly intended the new delivery rate to lower the cost of buying physical aluminum supplies and to ease the supply bottleneck, nearly one and a half years later there still is a multi-month backlog of warehouse orders and correspondingly high prices.

113.    In June 2013, the Beer Institute, a trade group that represents beer makers, joined a growing chorus of companies complaining about long waits for metals in LME-approved warehouses.  The Beer Institute urged the LME to take necessary steps to alleviate the warehouse backlog and to end "practices that are interfering with normal supply and demand dynamics" that have "led to a complete disconnect between LME aluminum prices and actual aluminum prices

---

[13] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, N.Y. Times, July 20, 2013.

and prevent[ed] brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[14]

114.    In July 2013, at the U.S. Senate Committee on Banking, Housing, and Urban Affairs hearing described in more detail below, Timothy Weiner, Global Risk Manager of Commodities/Metals at MillerCoors LLC, expressed the concern of his company over U.S. bank holding companies effectively controlling all key elements of the LME.  Mr. Weiner testified that "[a]luminum users like MillerCoors are being forced to wait in some cases over 18 months to take physical delivery due to the LME warehouse practices or pay the high physical premium to get aluminum today . . . .  It is only with aluminum purchased through the LME that our property is held for an extraordinary period of time, with the penalty of paying additional rent and premiums to the warehouse owners, until we get access to the metal we have purchased."[15]

115.    Dave Smith, Coca-Cola's procurement manager, stated: "This situation has been organized artificially to drive [aluminum] premiums up."  "It takes two weeks to put aluminum in, and six months to get it out."

116.    In response to these and many other complaints, the LME and other Defendants engaged Europe Economics, a paid consultant, to analyze the problems with aluminum load-out delays from LME warehouses and other issues.  Europe Economics recommended that the LME

---

[14] Joe Richter & Agnieska Troszkiewicz, *Beer Companies Press LME to Cut Aluminum Warehouse Backlogs*, Bloomberg News, June 23, 2013.
[15] Hearing on Examining Financial Holding Companies: Should Banks Control Power Plants, Warehouses and Oil Refineries?, Senate Committee on Banking Financial Institutions and Consumer Protections (statement of Tim Weiner, Global Risk Manager, Commodities/Metals, MillerCoors               LLC),               July               23,               2013, http://www.banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=9b58c6 70-f002-42a9-b673-54e4e05e876e.

amend the minimum load-out rule to require a minimum load-out of 1500 tons per day per 300,000 tons of metal stored at each warehouse location. For LME Detroit warehouses in 2011 and 2012, this proposed load-out rule would require Defendants to ship between approximately 6000 and 7500 tons of aluminum per day, at a minimum. LME and Defendants agreed not to implement their own paid consultants' recommendation.

117.    While ignoring their paid consultants' recommendations, the LME Defendants made favorable statements indicating that meaningful changes would be implemented to correct this problem. These favorable statements encouraged market participants to continue to use the LME. And Goldman Sachs stated that it observed its obligations under its agreement with and the rules of the LME. But, in reality, the LME and Goldman Defendants agreed to abuse their monopoly power so as both to increase storage rates and increase the delays in obtaining aluminum while allowing the Goldman Defendants to make purchases and diversions of aluminum so as to restrain more metal within LME warehousing.

**C.    Defendants' Conduct Increased the Price of Aluminum**

118.    Purchasers of plain aluminum in the United States generally pay a price reflecting the total of two standardized pricing components: the Midwest Aluminum Premium (described below) and the LME price upon order placement.

119.    Defendants' scheme (1) artificially decreased the supply of aluminum, thereby artificially driving up aluminum prices, and (2) raised the Midwest Aluminum Premium.

120.    The Midwest Aluminum Premium reflects, among other things, the costs of financing, storage, and freight for delivering aluminum from LME-approved warehouses to the Midwestern United States.

121.     Because storage costs are a key element of the Midwest Aluminum Premium, Defendants' scheme to delay delivery of aluminum artificially inflated that premium.  The longer that aluminum is stored in Defendants' LME-approved warehouses, the higher the cost of storage.

122.     In January 2010, the Midwest Aluminum Premium was approximately 5.5 cents per pound.  By January 2013, the Midwest Aluminum Premium had more than doubled in price to approximately 11.5 cents per pound.[16]  During the first two weeks of January 2014, the Midwest Premium hit a record high of $.205/pound.[17]

123.     Combined with the effects of Defendants' unlawful load-out agreements, the long-term storage deals secured by Defendants mean that only a small fraction of aluminum inventories are available to downstream markets.  This artificial shortage has resulted in substantial price increases.  For example, premiums for physical aluminum in the U.S. Midwest hit a record high of $210 per ton in May 2013, an increase of approximately 50% over prices in late 2012.  In Europe, premiums are at record levels above $200 per ton, double the levels seen in January 2010.

124.     Under typical circumstances, an increasing supply of aluminum stored in LME-approved warehouses would exert downward pressure on the price of the Midwest Aluminum Premium.

---

[16] Mike Southwood, *US Midwest Premiums – The Method Behind the Madness*, CRU, Feb. 21, 2013, http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums.

[17] Josephine Mason, *U.S. Aluminum Premium Surge Sparks Interest in CME Contract*, Reuters, Feb. 3, 2014, http://www.reuters.com/assets/print?aid=USL2N0L81QA20140203.

125.    Under the foregoing circumstances, Defendants' agreements were extremely restrictive, anticompetitive, and unreasonable throughout the entire Class Period.

**D**.    **Defendants' Conduct Gave Rise to Multiple Complaints and Government Investigations**

126.    Defendants' activities have been the subject of many private complaints and government investigations.  Despite these complaints Defendants continued to restrain supply and inflate prices.  Defendants had direct and indirect knowledge that they were inflating aluminum prices and injuring persons that paid those prices.

127.    In November 2012, the European Union's Enterprise and Industry Directorate General began a review of LME warehousing arrangements following complaints about accessing aluminum from LME warehouses and abnormally high premiums.

128.    The Department of Justice reportedly began a preliminary probe into the aluminum warehousing industry in July 2013.  The U.S. Securities and Exchange Commission is also considering regulatory responses to Defendants' manipulation of the aluminum markets.

129.    In August 2013, Reuters reported that the U.S. Commodity Futures Trading Commission had subpoenaed Glencore, JPMorgan, and Goldman Sachs, demanding information about their warehousing practices.

130.    Britain's Financial Conduct Authority is reportedly also considering a probe of Defendants' warehousing practices.

131.    Further, United States Senator Sherrod Brown (D-Ohio) has indicated his intent to hold Senate committee hearings on the matter.

132.    An official at MillerCoors told a Senate committee that the difficulty in obtaining aluminum had cost it and other companies $3 billion in 2012 alone.

133.    Nick Madden, the chief procurement officer for Atlanta-based Novelis (which is owned by India's Hindalco Industries, Ltd. and is the world's biggest maker of rolled aluminum products) stated that Defendants' activities are "driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal . . . in Detroit warehouses."  Madden estimated that, due to Defendants' delivery delays caused by their unreasonable minimum (actually maximum) load-out agreements with the LME, the U.S. benchmark physical aluminum price has increased approximately $20 to $40 per ton.

134.    During the first six months of 2011, Metro International warehouses in Detroit received 364,175 tons of aluminum and delivered only 171,350 tons.  Such supply bottlenecks led a senior metals analyst to comment in 2011, "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate . . . the infrastructure is there."  Nick Madden, the chief procurement officer for Novelis further noted: "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate and so we feel there's a lot more they can do on the output side to push up the [load out] rates."

135.    Jorge Vazquez, a senior vice president at Harbor Intelligence, in addressing Defendants' restricted and anticompetitively slow load-out rates of aluminum from LME-certified Detroit warehouses stated that "one of the factors that, without a doubt, is behind record high Midwest premiums" is the slow load-out rates.

136.    Industry analysts were not alone in noticing Defendants' anticompetitive agreements and historically slow load-out rates.  In 2011, Coca-Cola Company lodged a complaint with the LME in response to Defendants' creation of supply bottlenecks to artificially

raise aluminum prices.  Dave Smith, Coca-Cola's procurement manager stated: "This situation has been organized artificially to drive premiums up.  It takes two weeks to put aluminum in [to an LME warehouse], and six months to get it out."  On February 1, 2013, Novelis, the world's top aluminum can manufacturer, "lost patience with the LME's failure to tackle access problems at the warehouses . . . and says it will seek a solution elsewhere."

137.    Despite industry analysts and some of the world's largest purchasers of aluminum publically decrying Defendants' anticompetitive activities, Defendants continued to perform their agreements, further inflating prices and continuing to reap the profits from their unlawful activities.

138.    In an ineffective effort to ameliorate the stream of complaints from aluminum consumers and industry analysts, LME increased the minimum (although, in reality, interpreted by LME and Defendants as a maximum) load-out rate to 3000 tons per city per day (from the previous 1500 ton minimum).  This change was effective April 1, 2012.  But LME and Defendants' changes were nothing more than a public stunt to blunt the criticism being volleyed toward them.  Industry experts agreed that "the recommendations won't change anything. . . . [t]he problem will still be there six, nine months down the line."

139.    In effect, LME and Defendants' minor change to their agreement failed to address the actual sources of industry and consumer complaints, because to do so would have been to reduce Defendants' monopoly and reduce the unlawful profits they were collecting.  Specifically, LME and Defendants continued to (1) interpret the minimum load-out figure as a maximum load-out figure, (2) enforce the minimum load-out figure on a city-wide rather than warehouse-wide basis, and (3) permit metal shuttled between various LME-approved warehouses to count towards the daily minimum (actually maximum) load-out figure.

140.    Thus, despite publically acting as though they were attempting to remedy their past anticompetitive practices, Defendants blatantly continued their unlawful actions unabated. In fact, in exchange for agreeing to increase the minimum (in reality, maximum) load-out rate, Defendants secured LME's agreement to increase storage rates, furthering Defendants' unlawful and anticompetitive scheme.

141.    In 2010, Defendants charged forty cents per ton per day to store aluminum at LME-certified Detroit warehouses.  However, storage rates quickly increased, to 41 cents per ton per day in 2011, and to 45 cents per ton per day in 2012.  By 2013, the storage rate at LME-certified Detroit warehouses had jumped to 48 cents per ton per day.

142.    Defendants' substantially increased storage rates far exceed competitive storage rates.

143.    In addition, effective April 1, 2012, Goldman Sachs increased their charges for loading-out aluminum from its LME-approved Detroit warehouses by 9% to $35.95 per ton.

144.    Publically, Defendants argued that such substantial rate increases were necessary to reduce the substantial load-out delays caused by Defendants (detailed above).  However, and as detailed above, load-out delays from LME-certified warehouses continued to increase throughout 2012, even as storage rates climbed.

145.    As of June 2013, the wait for aluminum load-out from LME warehouses had climbed to 469 calendar days and growing towards 500 days.

**E.  Defendants Significantly Changed Their Practices in the Wake of News Reports About Their Activities**

146.    Following a *New York Times* investigatory piece describing Defendants' activities, including the practice of shuttling aluminum between warehouses, JPMorgan

42

announced plans to leave the physical commodities business entirely and Goldman Sachs significantly changed its practices.

147.    In July 2013, JPMorgan divested its physical commodities operations.

148.    In July 2013, Goldman Sachs indicated it was "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."  It further announced that it:

(a)    "[S]upports the recently proposed rule change by the LME that is intended to cut existing queues by increasing substantially the amount of daily net outflows of metal at large LME locations";

(b)    "[S]uggest that the LME establish a system to prioritize end users so that they always have access to a minimum load out rate"; and

(c)    "[S]upport[s] enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue."

149.    Additionally, in July 2013, and only under threat of government investigation, Goldman Sachs suspended incentive payments it previously made to keep aluminum stored in its LME-certified warehouses on a long term basis.

150.    Notably, LME and Defendants' actions in June and July of 2013 directly contradict their conduct from July 2010 until July 2013.  In fact, LME and Defendants' recent actions prove that either or both entities could and should have acted immediately to reduce wait times and respond to the complaints about their anticompetitive and unlawful agreements and activities.

151.    However, Defendants intentionally collaborated to inflate aluminum prices by restricting supply, inflating aluminum storage prices, and maintaining supra-competitive revenues that were generated by such unlawful restraints of trade.  Not until threatened by government investigation did Defendants act to ameliorate their unlawful restraints of trade.

152.    The LME has now stated in its *Result of Consultation on Changes to LME Policy Regarding the Approval of Warehouses in Relation to Delivery Rates* that:

> [T]he effect of the queues is to increase this [Midwest] premium as a proportion of the "all-in" free metal price [that is, the sum of the LME price and the MW Premium price].  While the LME does not believe that the effect of queues is indicative of economic or market failure, the Consultation has clearly indicated that the existence of the increased premium that excessive queues cause creates significant difficulties for the metals community in respect of both discovery of the "all-in" price, and effective hedging of that price.  Accordingly, it is appropriate to take action to address this issue.

> [T]he fundamental role of the queues in increasing premiums and thus creating price discovery issues must surely meant that the most logical course of action is to address the existence of those queues.[18]

153.    Accordingly, in November 2013, the LME amended its rules to provide, as this complaint alleges it should have done in 2010 or earlier, that the minimum load-outs should be net of the load-ins.  Specifically, "the daily delivery tonnage is for deliveries out only and does not include deliveries in."[19]  However, despite the LME's rule change, in the first two weeks of

---

[18] Memorandum from London Metal Exchange to All Members, Warehouse Companies and London Agents, Result of Consultation on Changes to LME Policy Regarding the Approval of Warehouses in Relation to Delivery Out Rates (Nov. 7, 2013), http://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/13%20326%20A312%20W125%20RESULT%20OF%20CONSULTATION%20ON%20CHANGES%20TO%20LME%20POLICY%20REGARDING.pdf.

[19] *LME Policy Regarding the Approval of Warehouses* (revised Apr. 1, 2013), *available at* Case No. 2:13-cv-14067 (Dkt. No. 1, ¶¶ 77, 111).

2014, the Midwest Premium price "almost doubled," "hitting a record high of 20.5 cents per lb."[20]

**F.  Defendants' Unlawful Agreements and Anticompetitive Scheme Cause Harm to Consumers**

154.    As a result of Defendants' actions, the supply of aluminum has been artificially restricted and the cost of aluminum and Aluminum Consumer Products has risen to artificial and supra-competitive levels or was prevented from falling to competitive levels; the precise amount of the price impact of Defendants' conduct will be determined at trial.

155.    Prices for aluminum sold to downstream markets out of LME warehouses have risen as a result of Defendants' anticompetitive scheme, carried out with the full acquiescence and participation of LME, which has restricted supplies available to manufacturers of aluminum products and raised the cost to manufacturers of Aluminum Consumer Products.

156.    Moreover, with more aluminum sold into the LME warehouse system as a result of Defendants' diversion strategy, less is available for purchase from non-LME warehouse sources, such as aluminum producers (e.g., Alcoa).  And what is available from non-LME sources costs more than it would absent Defendants' scheme because less supply is available to meet inelastic demand, and because non-LME buyers must compete with the incentive payments Defendants pay to divert aluminum to their LME warehouses.

**G.    Relevant Markets**

157.    As Defendants engaged in a horizontal restraint of trade that directly restricted the supply and inflated the price of aluminum, Defendants committed a *per se* violation of Section 1

---

[20] Josephine Mason, *U.S. Aluminum Premium Surge Sparks Interest in CME Contract*, Reuters, Feb. 3, 2014, http://www.reuters.com/assets/print?aid=USL2N0L81QA20140203.

of the Sherman Act, 15 U.S.C. § 1, and its state analogs.  Accordingly, Plaintiffs are not required to allege a relevant market for those claims.

158.    Notwithstanding the prior paragraph, for Plaintiff's Section 2 Sherman Act claims, 15 U.S.C. § 2, and to the extent Plaintiffs would be required to allege the existence of one or more relevant markets, Plaintiffs allege the following interrelated and intertwined markets: (1) the market for facilitating exchange trading of aluminum forward and futures contracts in the United States, including the approval and regulation of warehouses to store the exchange-traded aluminum (the LME dominates this market with a 95% or better market share) (the "aluminum trading market"); (2) the market in the Detroit, Michigan area, or, in the alternative, in other areas of the United States in which aluminum is bought and sold based on the Midwest Premium or Platts MW Premium, for storing aluminum in, and delivering aluminum from, warehouses (the LME and other Defendants dominate this market, with Goldman Sachs alone owning more than 80% of the warehouse storage space in the Detroit area, and storing more than 50% of the aluminum located in areas that transact based on the Midwest Premium or Platts MW Premium prices) (the "aluminum warehousing market"); (3) the market in the United States for the purchase of aluminum, directly or indirectly, at prices based on, related to, or influenced by the Midwest Premium or Platts MW Premium, by manufacturers of Aluminum Consumer Products for resale (the "aluminum manufacturers market"); and (4) the market in the United States for the sale of Aluminum Consumer Products to consumers for end-use and not for resale (including relevant sub-markets, if necessary) (the "aluminum consumer end-user market").

159.    In the United States, the Warehouse Defendants own approximately 75% of all LME-approved warehouses.  These warehouses are located in: Detroit, Michigan; Baltimore,

Maryland; Chicago, Illinois; Long Beach, California; Los Angeles, California; Mobile, Alabama; New Orleans, Louisiana; Owensboro, Kentucky; St. Louis, Missouri; and Toledo, Ohio.  The Warehouse Defendants currently own or operate a majority of LME-approved warehouses in seven of the nine regions in which LME-approved warehouses exist in the United States.

160.    Aluminum is a metallic element that has many applications and uses in virtually all segments of the economy, including transportation, packaging, construction, consumer durable goods, and many others.  Aluminum use, measured in quantity or value, exceeds that of all other metals except iron.  Aluminum has no close substitutes in the manufacture or sale of consumer aluminum products that significantly constrain its pricing due to its many unique characteristics, including light weight, malleability and ease of machining and casting, corrosion resistance, and durability.  There are also no close substitutes for storing aluminum in the United States in LME-approved warehouses and no other products or services significantly constrain its pricing.

161.    The relevant geographic market is the continental United States.

**H.    Defendants' Monopoly Power**

162.    Defendants have had monopoly power in the Relevant Markets alleged above.

163.    The LME controlled as much as 99% of the aluminum forward and futures contract trading in the United States during the Class Period.  Competitors have been unable to start competing contracts because of the agreements that LME and Defendants (and their respective subsidiaries) have made between themselves and others that incentivize the intermediaries to direct business to LME and Defendants.  LME has the ability to control the output of aluminum from LME-approved warehouses and the storage rates of such LME-approved warehouses.

164.    LME maintains the sole right to approve the certification of any LME warehouse, including in the United States, and has a monopoly control over the selection of warehousing for exchange-traded aluminum in the United States.

165.    The foregoing monopoly power extends to approving storage rates, load-out rates, and other matters.

166.    Defendants have had monopoly power by purchasing and controlling more than 80% of the LME-approved aluminum warehousing space.  Defendants can control the output of LME-approved aluminum from their warehouses by controlling the rate at which they load-out aluminum above the agreed upon minimum load-out rate.

167.    With knowledge since approximately late 2010 of the public complaints that they were inflating aluminum prices, Defendants have abused their monopoly power as alleged herein.  This includes, but is not limited to, failing to base their agreements with warehouse owners and the minimum load-out rates on a percentage of the metal capacity or metals stored in each warehouse by not requiring netting of incoming aluminum; by using anti-competitively low minimum load-out rates; by allowing Defendants to pay incentives to divert into, and restrain and engross more aluminum in LME-approved warehouses; and by allowing Defendants to shuttle aluminum from one warehouse to another within the same city in order to satisfy the minimum LME quota without actually causing any output of aluminum from the warehouses to the public.

168.    Defendants (and their subsidiaries) have abused their monopoly power, the LME (and its subsidiaries) has abused its monopoly power, and Defendants and the LME have agreed to abuse their monopoly power in order to anti-competitively and restrictively divert aluminum into and limit unreasonably the free alienability of aluminum stored in LME-approved

warehousing.    Thereby Defendants have inflated aluminum prices including the Midwest

Premium price as well as the storage costs paid directly to Defendants, part of which is paid to

LME.

169.    Unless enjoined as alleged herein, Defendants' ongoing agreement in restraint of

trade and abuse and conversion of their monopoly power will spread to other LME warehouses,

further exacerbating the anticompetitive impact on the U.S. economy.

## VI.    CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves and as a class action under the

provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the members of the

following Plaintiff classes (collectively "Classes") from May 1, 2009 to the present:[21]

a.    For violations of the federal antitrust laws and the Michigan state antitrust laws.

> All persons and entities in the United States that, during the Class
> Period, purchased Aluminum Consumer Products indirectly for end
> use and not for resale, excluding all Defendants, their officers,
> directors, and executives, and any unnamed co-conspirators
> (hereinafter "Nationwide Class").

b.    For violations of the California state antitrust and unfair competition laws.

> All persons and entities in California that, during the Class Period,
> purchased Aluminum Consumer Products indirectly for end use and
> not for resale, excluding all Defendants, their officers, directors, and
> executives, and any unnamed co-conspirators (hereinafter "California
> Class").

c.    For violations of multi-state antitrust laws.

> All persons and entities in Arizona, the District of Columbia, Iowa,
> Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada,

---

[21] Plaintiffs reserve the right to amend the definition of the Classes.  Excluded from the Classes
are Defendants, their officers and directors, and unnamed co-conspirators.

New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin that, during the Class Period, purchased Aluminum Consumer Products indirectly for end use and not for resale, excluding all Defendants, their officers, directors, and executives, and any unnamed co-conspirators (hereinafter "Multi-State Antitrust Class").

d.  For violations of multi-state unfair competition laws.

All persons and entities in Alaska, Arkansas, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Kansas, Louisiana, Maine, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, Utah, Vermont, and West Virginia that, during the Class Period, purchased Aluminum Consumer Products indirectly for end use and not for resale, excluding all Defendants, their officers, directors, and executives, and any unnamed co-conspirators (hereinafter "Multi-State Consumer Protection Class").

e.  For violations of multi-state monopolization laws.

All persons and entities in Arkansas, the District of Columbia, Florida, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Utah, Vermont, West Virginia, and Wisconsin that, during the Class Period, purchased Aluminum Consumer Products indirectly for end use and not for resale, excluding all Defendants, their officers, directors, and executives, and any unnamed co-conspirators (hereinafter "Multi-State Monopolization Class").

170.    Members of the Classes are so numerous that joinder would be impracticable. Though the exact number and their identities are unknown, Plaintiffs believe that there are tens of thousands of Class members geographically dispersed throughout the United States.

171.    Plaintiffs' claims are typical of those of members of the Classes.  Plaintiffs and Class members paid more for aluminum and Aluminum Consumer Products because of Defendants' wrongful conduct.

50

172.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that Plaintiffs' interests are aligned with those of the Class members.  Plaintiffs have no interests that are adverse to, in conflict with, or are antagonistic to the interests of the Class. Plaintiffs have retained counsel competent and experienced in the prosecution of class action and antitrust litigation to represent themselves and the Classes.

173.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because individual joinder of all damaged Class members is impractical. Allowing this case to proceed as a class action will permit a large number of similarly situated, geographically dispersed persons and entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.  Absent a class action, it would not be feasible for Class members to seek redress or relief for the violations of law alleged herein. Further, individual litigation presents the potential for inconsistent or contradictory judgments that would magnify the delay and expense to all parties and the courts.  A class action presents fewer case management difficulties.

174.    There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members of the Classes, including, but not limited to:

    a.  Whether Defendants and their unnamed co-conspirators engaged in a conspiracy among themselves to fix, raise, maintain, or stabilize prices of aluminum sold throughout the United States;

    b.  The identity of the participants in the alleged conspiracy;

c.  The duration of the alleged conspiracy and the nature of the acts, deeds, or transactions performed by Defendants and their unnamed co-conspirators in furtherance of the conspiracy;

d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.  Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

f.  Whether the alleged conduct of Defendants violated the various state laws alleged in this complaint;

g.  Whether the alleged conduct of Defendants constitutes unjust enrichment;

h.  Whether the alleged conduct of Defendants and their unnamed co-conspirators caused injury to the property or business of Plaintiffs and Class members;

i.  The effect of Defendants' alleged conspiracy on the price of aluminum purchased during the Class Period;

j.  The appropriate measure of damages sustained by Plaintiffs and the Classes; and,

k.  The appropriate nature of injunctive or other equitable relief.

## VII.  ANTICOMPETITIVE EFFECTS & ANTITRUST INJURY

175.    Defendants' acts and practices, as alleged in this complaint, have had a substantial anticompetitive effect on interstate commerce in the United States by foreclosing competition among themselves, restricting the supply of deliverable aluminum, and inflating the cost for both the storage of aluminum and the purchase of aluminum by producers of Aluminum Consumer Products.  Plaintiffs and the Classes have suffered anticompetitive impact and actual injury by paying artificially inflated and anticompetitive prices for consumer products made from aluminum.

176.    The acts and practices of Defendants, as alleged in this complaint, have had the purpose, tendency, and effect of unlawfully raising the price of aluminum and Aluminum Consumer Products throughout the United States.

177.    No legitimate pro-competitive efficiencies justify Defendants' conduct or outweigh their substantial anticompetitive effects.

178.    Absent Defendants' acts and practices, the price of aluminum and Aluminum Consumer Products would have been lower during the Class Period.

179.    The unlawful conduct of Defendants has caused multiple anticompetitive effects and unreasonable restraints of trade throughout United States commerce including, but not limited to, the following:

    i.   All-time record Midwest Premium prices and, more generally, inflated Midwest Premium prices for aluminum at times when the Midwest Premium should have been lower and perhaps even negative;

   ii.   Higher "all in" aluminum prices;

 iii.   All-time record amounts of aluminum stored in LME warehouses at times when the stored aluminum should have been released for delivery due to an increase in demand for delivery;

 iv.   Substantial increases in LME warehouse aluminum supplies at times when the LME aluminum supplies in warehouses should have been decreasing;

   v.   All-time record delays of sixteen months or more in load-out of aluminum from LME Detroit warehousing at times when there should have been no delays;

vi.  Uneconomic restraint and hoarding of approximately an entire year's worth of U.S. production of aluminum in the LME Detroit warehousing and subject to load-out times of in excess of sixteen months;

vii.  Supra-competitive, inflated LME warehouse storage and load-out fees and charges for inefficient and low quality LME warehouse load out and other services;

viii.  Storage and load-out fees and charges that are approximately three times the competitive charges by non-LME warehouses that provide high quality warehouse load-out and other services;

ix.  Misallocation of resources by the hoarding of aluminum supplies in LME warehouses when supplies should have been made available to manufacturers for production of aluminum products.

x.  Uneconomic and artificially-created excess levels of the Midwest and Platts MW premiums paid for aluminum by manufacturers of aluminum products because of the manipulated and artificially low availability of deliverable supply from LME warehouses resulting from the drastic rationing of delivery orders by the LME warehouses; and

xi.  Reduction in output of Aluminum Consumer Products and increase in the prices of Aluminum Consumer Products because manufacturers were unable to obtain needed aluminum input on a timely basis and at reasonable market prices.

180.  Because of Defendants' acts and practices, Plaintiffs and the Class have suffered injury to their business or property during the Class Period.  The injury sustained by Plaintiffs

and the Class is the payment of higher prices for Aluminum Consumer Products. There is a direct, measurable, and traceable link between Defendants' acts and practices alleged in this complaint and the prices that Plaintiffs and the Classes paid for Aluminum Consumer Products. Defendants' acts and practices caused the prices of aluminum and Aluminum Consumer Products to be inflated. For the vast majority of products made from aluminum, the cost of the aluminum is the largest component of the material cost incurred by Aluminum Product manufacturers. Producers and resellers of Aluminum Consumer Products passed on all or part of the overcharge for aluminum in the prices charged to consumer end-users of Aluminum Consumer Products.

181.    The aluminum warehousing, commercial direct and indirect purchaser, and consumer end-user markets are inextricably linked and intertwined in one continuous, unbroken chain of distribution, because the market for warehouse storage and delivery of aluminum exists to serve the markets for the manufacture and sale of Aluminum Consumer Products. Without the demand for aluminum at the manufacturer level and the demand for Aluminum Consumer Products at the consumer end-user level, aluminum has little to no value because it has no independent utility. Indeed, the demand for Aluminum Consumer Products creates the demand for aluminum, and hence the demand for its storage and delivery.

182.    Throughout the United States the price of aluminum input to manufacturers is directly related to, dependent on, and positively correlated to the Midwest Premium price. The higher the Midwest Premium price the more that direct and indirect purchasers must pay for their supply of aluminum for manufacturing purposes. Defendants' unlawful conduct had a direct and measurable effect in dramatically increasing the Midwest Premium paid by aluminum product manufactures for their aluminum input.

183.    The consumer end-user buys an Aluminum Product at the bottom of a vertical chain of distribution that begins at the top with the purchase of aluminum by the manufacturer of the product and ends at the consumer end-user who buys the product directly from a retail store or other outlet that sells the product.  Examples of direct resellers to the consumer market include, but are not limited to, retail stores specializing in home improvement goods, such as Home Depot and Lowes; general merchandisers, such as Target and Walmart; food markets, such as Safeway and Kroger; sporting goods stores, such as Dicks; and kitchen utensil stores, such as Williams-Sonoma or Bed, Bath & Beyond.  There are literally thousands of retail stores nationwide, big and small, that sell at least some Aluminum Consumer Products to consumers.

184.    The economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The markets for Aluminum Consumer Products are subject to vigorous price competition.  Producers of Aluminum Consumer Products often have thin net margins, and are therefore at the mercy of their input costs, such that increases in the price of aluminum as an input leads to corresponding increases in the cost of production for and the prices of their Aluminum Consumer Products.

185.    The producer of Aluminum Consumer Products is also not constrained by its competitors from passing on the overcharge.  Because each producer is also buying aluminum input at supra-competitive prices, no producer faces price competition from any other producer who is not paying the same overcharge for aluminum input.

186.    In addition, retail stores that sell Aluminum Consumer Products directly to consumers are generally subject to intense competition and low competitive margins, and they therefore can also be expected to also pass on all of their increased cost for Aluminum Consumer Products to the ultimate consumers.

187.    The inflated prices of aluminum at the top of the distribution chain have been passed on to Plaintiffs at the bottom of that chain.  Aluminum follows a traceable physical chain from the sale of the metal itself to manufacturers who use the metal to produce finished Aluminum Consumer Products; from the manufactures to distributors and retailers of Aluminum Consumer Products; and finally from the retailers to the consumers who ultimately purchase the products for end-use and not for further resale.

188.    Just as the aluminum can be physically traced through the supply and distribution chain, so can its price be traced to show that changes in the prices paid by producers of Aluminum Consumer Products are ultimately reflected in changes in the prices paid by the consumer purchasers of those products.

189.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise:

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum.  In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers.  The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers.  Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

Herbert Hovenkamp, *Federal Antitrust Policy, The Law of Competition and Its Practice* 624 (1994).  The anticompetitive effect and impact of the conspiratorial conduct of the Defendants and their co-conspirators was to raise the price of aluminum and, as a direct and foreseeable result, the price of Aluminum Consumer Products paid by consumer end-users.

190.  Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor

Emeritus and former Chair of the Business and Public Policy Group at the Haas School of

Business at the University of California at Berkeley) and the late Lawrence A. Sullivan

(Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law

of antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly

overcharges is not the exception: it is the rule."  As Professor Jeffrey K. McKie-Mason (Arthur

W. Burks Professor for Information and Computer Science and Professor of Economics and

Public Policy at the University of Michigan), an expert who presented evidence in a number of

the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the

judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge
> will be passed on by distributors to end consumers.  When the distribution
> markets are highly competitive, as they are here, all or nearly the entire
> overcharge will be passed on through to ultimate consumers… Both of
> Microsoft's experts also agree upon the economic phenomenon of cost pass
> through, and how it works in competitive markets.  This general phenomenon of
> cost pass through is well established in antitrust laws and economics as well.

*Microsoft I–V Cases*, J.C.C.P. No. 4106, Order re: Class Certification, at 13 (Cal. Sup. Ct. Aug.

29, 2000).

191.    Economists have developed techniques to isolate and understand the relationship

between one "explanatory" variable and a "dependent" variable in those cases when changes in

the dependent variable are explained by changes in a multitude of variables, even when all such

variables may be changing simultaneously.  That analysis—called regression analysis—is

commonly used in the real world and in litigation to determine the impact of a price increase on

one cost in a product (or service) that is an assemblage of costs.

192.    Regression analysis is one potential method by which to isolate and identify only

the impact of an increase in the price of aluminum on prices for Aluminum Consumer Products

even if such products contain other inputs whose prices may be changing over time.  A regression model can explain how variation in the price of aluminum affects changes in the price of purchased Aluminum Consumer Products.  In such models, the price of aluminum would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of aluminum impact the price of Aluminum Consumer Products controlling for the impact of other price-determining factors.

193.    The precise amount of the overcharge impacting the prices of Aluminum Consumer Products can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

194.    By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Aluminum Consumer Products than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FIRST CLAIM FOR RELIEF
### Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (on behalf of the Nationwide Class)

195.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

196.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants entered into and engaged in a

contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

197.    The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their unnamed co-conspirators.

198.    In particular, Defendants have combined and conspired to inflate prices of aluminum in the United States, which thereby inflated the price of Aluminum Consumer Products in the United States.

199.    The conduct of the Defendants is an unreasonable and unlawful restraint of trade, which is a *per se* violation of the federal antitrust laws.

200.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their unnamed co-conspirators did those things that they contracted, combined, or conspired to do, including but not limited to:

> (a)    Treating the LME's minimum load-out rate as a maximum in order to earn illegitimate profits from increased storage revenue due to artificially inflated wait times;

> (b)    Agreeing to terms permitting and then transferring metal between LME-approved warehouses in order to receive increased storage revenue from aluminum not delivered to customers; and

> (c)    Trading in metals futures and forwards while simultaneously agreeing to maintain artificially inflated levels of aluminum within their LME-approved warehouses.

201.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have been injured in their business and property and paid more for Aluminum Consumer Products than they would have paid absent Defendants' illegal conduct.

202.    Defendants' actions, as alleged herein, constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Pursuant to the Declaratory Judgment Act, Plaintiffs and the Class seek judgment and decree that Defendants have violated Section 1 of the Sherman Act.

203.    Defendants' violations are continuing in nature and/or are threatened to recur. Accordingly, Plaintiffs, on behalf of themselves and the Nationwide Class, request that the Court enjoin and restrain Defendants' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
### Violations of Section 2 of the Sherman Act (15 U.S.C. § 2)—Monopolization
### (on behalf of the Nationwide Class)

204.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

205.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s).

206.    Defendants possessed sufficient market power to raise the price of aluminum, including the Midwest Transaction Premium, in the United States.  During the Class Period, Defendants owned approximately 80% of U.S. LME-approved warehouses, and the LME also controlled approximately 97% of the aluminum futures and forward trading market in the United States and had the power to approve and regulate the warehouses that hold approximately 95% of the aluminum available for such trading.  Defendants' conduct caused substantial and

monopolistic price increases for both aluminum and the Midwest Transaction Premium, which demonstrates directly Defendants' market and monopoly power.

207.    Defendants have abused their monopoly power and have agreed with one another and other Defendants, to abuse their monopoly power.  They have done so in order to anti-competitively and restrictively limit unreasonably the free alienability of aluminum stored in warehousing and, thereby, inflate aluminum prices as well as the storage costs paid directly to Defendants.

208.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have been injured in their business and property and paid more for Aluminum Consumer Products than they would have paid absent Defendants' illegal conduct.

209.    Defendants' actions, as alleged herein, constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Pursuant to the Declaratory Judgment Act, Plaintiffs and the Class seek judgment and decree that Defendants have violated Section 2 of the Sherman Act.

210.    Defendants' violations are continuing in nature and/or are threatened to recur. Accordingly, Plaintiffs, on behalf of themselves and the Nationwide Class, request that the Court enjoin and restrain Defendants' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
**Violations of Section 2 of the Sherman Act (15 U.S.C. § 2)—Attempted Monopolization
(on behalf of the Nationwide Class)**

211.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

212.    Defendants' anticompetitive conduct has created a dangerous probability that Defendants will achieve monopoly power in the relevant markets described above.

213.    Defendants had and have a specific intent to achieve monopoly power in these relevant markets.

214.    Defendants have used their market power to impose on Plaintiffs and other indirect purchasers of Aluminum Consumer Products restraints and restrictions that have the purpose and effect of excluding competition from and limiting competitive opportunities of others in these relevant markets.  These restraints and restrictions imposed by Defendants make it difficult or impossible for others to enter these relevant markets or increase their market share by offering lower storage fees or other attractive terms to those purchasing aluminum warehouse storage services.

215.    As a direct and proximate result of Defendants' exclusionary conduct, output of aluminum from aluminum warehouses has been restricted, and prices for aluminum and/or Aluminum Consumer Products have been set at artificial, supra-competitive levels, and Plaintiffs and other members of the Nationwide Class have suffered and will suffer injury to their business or property by having to pay such artificially inflated, supra-competitive prices for Aluminum Consumer Products.  Plaintiffs' and Nationwide Class members' injuries are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

216.    Defendants' anticompetitive conduct threatens Plaintiffs and Class members with continuing loss or damage.

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 2 of the Michigan Antitrust Reform Act, MCL §§ 445.773, *et seq.***
**(on behalf of the Nationwide Class)**

217.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

218.    Defendants entered an agreement in unreasonable and extreme restraint of trade which intentionally, directly, and foreseeably inflated prices for aluminum in Michigan and in the United States, including, the Midwest Premium or Platts MW Premium component of aluminum prices.  This, in turn, inflated the price of aluminum products throughout Michigan and the United States.

219.    Defendants agreed to and did abuse their respective market power over essential areas of commerce involving warehousing and futures trading.

220.    Defendants' conduct constitutes an unlawful restraint of trade because it is a *per se* restraint of trade and an abuse of Defendants' market power over essential areas of commerce involving warehousing and futures trading in violation of Section 2 of the Michigan Antitrust Reform Act, MCL §§ 445.773, *et seq.*

221.    Defendants' illegal conduct substantially affected Michigan and interstate commerce.

222.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their property including that they had to pay artificially high Midwest Premium or Platts MW Premium prices for aluminum.  Absent injunctive relief, these violations may continue or reoccur.

223.    It is appropriate to apply Michigan antitrust law to direct purchases of aluminum in all fifty states because the illegal conduct was focused in Michigan and the key parties and witnesses to this unlawful conduct reside and do business in Michigan.  The primary method and means of the conspiracy was to hoard 75% of the United States' London Metal Exchange physical aluminum within warehouses that were located in Michigan.  Additionally, Defendant

Metro International Trade Services LLC is headquartered in Michigan. Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class.

## FIFTH CLAIM FOR RELIEF
**Violations of Sections 2 & 3 of the Michigan Antitrust Reform Act, MCL §§ 445.773, *et seq.***
**(on behalf of the Nationwide Class)**

224.     Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

225.     In violation of Sections 2 and 3 of Michigan Compiled Laws §§ 445.773, *et seq.*, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously defined and alleged herein.

226.     Defendants have abused their monopoly power in order anticompetitively and restrictively to limit unreasonably the free alienability of aluminum stored in Detroit warehousing and, thereby, inflate aluminum prices as well as the storage costs paid directly to Defendants.

227.     This conduct and its resulting impact on the market occurred in or affected Michigan and interstate commerce.

228.     As a direct and proximate result, Plaintiffs and Class members have been injured in their property in that they had to pay artificially high prices for aluminum. Unless injunctive relief, including structural injunctive relief is granted, these violations may continue to reoccur.

229.     It is appropriate to apply Michigan antitrust law to direct purchases of aluminum in all fifty states because the illegal conduct was focused in Michigan and the key parties and witnesses to this unlawful conduct reside and do business in Michigan. The primary method and means of the conspiracy was to hoard 75% of the United States' London Metal Exchange physical aluminum within warehouses that were located in Michigan. Additionally, Defendant

Metro International Trade Services LLC is headquartered in Michigan. Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class.

## SIXTH CLAIM FOR RELIEF
### Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*
### (on behalf of the California Class)

230.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

231.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants entered into and engaged in a continuing unlawful trust in restraint of trade and commerce in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq*.

232.    The continuing unlawful trust in restraint of trade and commerce of the Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their unnamed co-conspirators.

233.    In particular, Defendants have combined and conspired to inflate prices of aluminum in the United States, which inflated the price of Aluminum Consumer Products in the United States.

234.    The conduct of the Defendants is an unreasonable and unlawful restraint of trade which is a *per se* violation of the federal antitrust laws.

235.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things which they contracted, combined, or conspired to do, including:

    (a)    Treating the LME's minimum load-out rate as a maximum in order to earn illegitimate profits from increased storage revenue due to artificially inflated wait times; and

(b)    Agreeing to terms permitting and then transferring metal between LME-
approved warehouses in order to receive increased storage revenue from
aluminum not delivered to customers.

236.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the
California Class have been injured in their business and property and paid more for Aluminum
Consumer Products than they would have paid absent Defendants' illegal conduct.

237.    Pursuant to Cal. Bus. & Prof. Code § 16750, Plaintiffs and the California Class
seek treble damages, their cost of suit, including a reasonable attorneys' fee, and appropriate
injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(on behalf of the California Class)**

238.    Plaintiffs re-allege and incorporate each and every allegation set forth in the
paragraphs above.

239.    Defendants' violations of the laws of the United States and California as alleged
in this complaint constitute unlawful business practices within the meaning of Cal. Bus. & Prof.
Code §§ 17200, *et seq.*  Specifically, Defendants' conduct is unlawful because it violates the
Sherman Act, Clayton Act, Cartwright Act, and 18 U.S.C. § 1964(c).

240.    Defendants' conduct as alleged in this complaint also constitutes an unfair
business practice within the meaning of the Cal. Bus. & Prof. Code §§ 17200, *et seq*.
Defendants' conduct is substantially injurious to consumers and in violation of a legislatively-
declared policy of California.  Consumers have paid, and continue to pay, supra-competitive
prices for aluminum and Aluminum Consumer Products in California.  This injury to consumers
is not outweighed by any countervailing benefits to consumers or competition.  Defendants have

not articulated any legitimate reason for the conduct.  Further, consumers could not reasonably have avoided the injury from Defendants' and their unnamed co-conspirators' conduct.

241.    The conduct described herein also constitutes fraudulent or deceptive practices substantially affecting the conduct of trade or commerce in the State of California in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Defendants' conduct of artificially depressing the deliverable supply of aluminum was likely to deceive and mislead reasonable consumers with respect to the true supply and demand for and the supra-competitive pricing of aluminum and Aluminum Consumer Products.

242.    The conduct alleged herein is an "ongoing business practice" within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The unlawful, unfair, and deceptive business practices of Defendants, as described above, have injured, and present a continuing threat of injury, to Plaintiffs, the California Class, and members of the general public, in that Defendants' conduct has restrained and continues to restrain competition, and has caused and continues to cause payment of supra-competitive prices for Aluminum Consumer Products.

243.    As alleged in this complaint, Defendants have been unjustly enriched as a result of their wrongful conduct.  Plaintiffs, the California Class, and the general public are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such conduct, pursuant to Cal. Bus. & Prof. Code §§ 17203 & 17204.

**EIGHTH CLAIM FOR RELIEF**
**Violations of Multi-State Antitrust and Restraint of Trade Laws**
**(on behalf of the Multi-State Antitrust Class)**

244.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

245.    Defendants have violated Arizona Revised Stat. Code §§ 44-1401, *et seq.*

246.    Defendants have violated District of Columbia Code Ann. §§ 28-4503, *et seq.*

247.    Defendants have violated Iowa Code §§ 553.1, *et seq.*

248.    Defendants have violated Kansas Stat. Ann. §§ 50-101, *et seq.*

249.    Defendants have violated 10 Maine Rev. Stat. §§ 1101, *et seq.*

250.    Defendants have violated Michigan Comp. Laws Ann. §§ 445.773, *et seq.*

251.    Defendants have violated Minnesota Stat. §§ 325D.52, *et seq.*

252.    Defendants have violated Mississippi Code Ann. §§ 75-21-1, *et seq.*

253.    Defendants have violated Nebraska Rev. Stat. §§ 58-801, *et seq.*

254.    Defendants have violated Nevada Revised Statutes Ann. §§ 598A.010, *et seq.*

255.    Defendants have violated New Hampshire Revised Stat. §§ 356:1, *et seq.*

256.    Defendants have violated New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

257.    Defendants have violated New York Gen. Bus. Law §§ 340, *et seq.*

258.    Defendants have violated North Carolina Gen. Stat. §§ 75-1, *et seq.*

259.    Defendants have violated North Dakota Cent. Code §§ 51-08.1-.01, *et seq.*

260.    Defendants have violated Oregon Revised Statutes §§ 646.705, *et seq.*

261.    Defendants have violated South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

262.    Defendants have violated Tennessee Code Ann. §§ 47-25-101, *et seq.*

263.    Defendants have violated Utah Code Ann. §§ 76-10-911, *et seq.*

264.    Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

265.    Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

266.    Defendants have violated Wisconsin Stat. §§ 133.01, *et seq.*

267.    As alleged in this complaint, as a direct and proximate result of Defendants'

unlawful conduct, Class members in each of these states have been injured in their businesses

and property in that they paid more for aluminum and Aluminum Consumer Products than they

would have paid absent Defendants' unlawful conduct.

## NINTH CLAIM FOR RELIEF
### Violations of Multi-State Consumer Protection and Unfair Competition Laws
### (on behalf of the Multi-State Consumer Protection Class)

268.     Plaintiffs re-allege and incorporate each and every allegation set forth in the

paragraphs above.

269.     Defendants have violated Alaska Stat. §§ 45.50.471, *et seq*.

270.     Defendants have violated Arkansas Rev. Stat. §§ 4-88-101, *et seq*.

271.     Defendants have violated District of Columbia Code §§ 28-3901, *et seq*.

272.     Defendants have violated Florida Stat. §§ 501.201, *et seq*.

273.     Defendants have violated Georgia Code Ann. §§ 10-1-390, *et seq*.

274.     Defendants have violated Hawaii Rev. Stat. Ann. §§ 480, *et seq*.

275.     Defendants have violated Idaho Code §§ 48-601, *et seq*.

276.     Defendants have violated Kansas Stat. §§ 50-623, *et seq*.

277.     Defendants have violated Louisiana Rev. Stat. §§ 51:1401, *et seq*.

278.     Defendants have violated 5 Maine Rev. Stat. §§ 205-A, *et seq*.

279.     Defendants have violated Mass. Gen. Laws. Ch. 93A §§ 1, *et seq*.

280.     Defendants have violated Missouri Rev. Stat. §§ 407.010, *et seq*.

281.     Defendants have violated Montana Code §§ 30-14-101, *et seq*.

282.     Defendants have violated Nebraska Rev. Stat. §§ 59-1601, *et seq*.

283.     Defendants have violated Nevada Rev. Stat. §§ 598.0903, *et seq*.

284.     Defendants have violated New Hampshire Rev. §§ 358-A:1, *et seq*.

285.     Defendants have violated New Mexico Stat. §§ 57-12-1, *et seq*.

286.     Defendants have violated New York Gen. Bus. Law §§ 349, *et seq*.

287.    Defendants have violated North Carolina Gen. Stat. §§ 75-1.1, *et seq*.

288.    Defendants have violated Rhode Island Gen. Laws §§ 6-13.1-1, *et seq*.

289.    Defendants have violated Utah Code §§ 13-11-1, *et seq*.

290.    Defendants have violated 9 Vermont Stat. §§ 2451, *et seq*.

291.    Defendants have violated West Virginia Code §§ 46A-6-101, *et seq*.

292.    As alleged in this complaint, as a direct and proximate result of Defendants' unlawful conduct, Class members in each of these states have been injured in their businesses and property in that they paid more for aluminum and Aluminum Consumer Products than they would have paid absent Defendants' unlawful conduct.

**TENTH CLAIM FOR RELIEF**
**Violations of State Anti-Monopolization Statutes**
**(on behalf of Multi-State Monopolization Class)**

293.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

294.    Defendants, during the Class Period, have illegally maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of the following state statutes:

295.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Arizona Revised Statutes §§ 44-1402, *et seq*.

296.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Arkansas Code §§ 4-75-310, *et seq*.

297.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of District of Columbia Code Annotated §§ 28-4503, *et seq*.

298.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Florida Statutes §§ 542.19, *et seq*.

299.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Hawaii Revised Statutes §§ 480-9, *et seq*.

300.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Iowa Code §§ 553.4, *et seq*.

301.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of 10 Maine Revised Statutes §§ 1102, *et seq*.

302.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Massachusetts General Laws ch. 93A §§ 5, *et seq*.

303.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Michigan Compiled Law Annotated §§ 445.772, *et seq*.

304.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Minnesota Annotated Statutes §§ 325D.52, *et seq*.

305.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Mississippi Code Annotated §§ 75-21-3, *et seq*.

306.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Nebraska Revised Statutes §§ 59-802, *et seq*.

307.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Nevada Revised Statutes §§ 598A.060, *et seq*.

308.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of New Hampshire Revised Statutes §§ 356:3, *et seq*.

309.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of New Mexico Statutes Annotated §§ 57-1-2, *et seq*.

310.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of New York General Business Laws §§ 340, *et seq*.

311.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of North Carolina General Statutes §§ 75-2.1, *et seq*.

312.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of North Dakota Century Code §§ 51-08.1-02, *et seq*.

313.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Oregon Revised Statutes §§ 646.730, *et seq*.

314.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Code of Laws of South Carolina §§ 39-3-120, *et seq*.

315.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of South Dakota Codified Laws §§ 37-1-3.2, *et seq*.

316.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Utah Code Annotated §§ 76-10-914, *et seq*.

317.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Vermont Statutes Annotated 9 §§ 2461c, *et seq*.

318.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of West Virginia Code §§ 47-18-4, *et seq*.

319.    Defendants have maintained a monopoly in the supply of aluminum and/or Aluminum Consumer Products in violation of Wisconsin Statutes §§ 133.03, *et seq*.

320.    Defendants' intentional and purposeful anticompetitive acts, described herein, were intended to maintain their monopoly in the market for the supply of aluminum and/or Aluminum Consumer Products and caused Plaintiffs and members of the Multi-State Monopolization Class to pay supra-competitive, artificially inflated prices for aluminum and/or Aluminum Consumer Products purchased in the states listed above.

321.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Multi-State Monopolization Class have been injured in their business or property in that they paid more for aluminum and/or Aluminum Consumer Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

322.    Plaintiffs and members of the Multi-State Monopolization Class are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including, but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

**ELEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of the Nationwide Class)**

323.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

324.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated aluminum warehouse rental prices and unlawful profits from or derived from artificially inflated prices for aluminum and/or Aluminum Consumer Products.

325.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the

overpayments made by Plaintiffs and the members of the Nationwide Class for Aluminum Consumer Products.

326.    Plaintiffs and the members of the Nationwide Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Nationwide Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Nationwide Class may make claims on a pro rata basis.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    That the Court issue an order certifying the Classes defined in this complaint.

B.    That Defendants' conduct to raise the price of aluminum be adjudicated and decreed to have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, pursuant to 18 U.S.C. § 2201(a), and that an injunction be issued pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, permanently enjoining and restraining Defendants from maintaining or renewing the anticompetitive conduct, monopolization or attempted monopolization, or adopting or following any practice, plan, program, or device having a similar purpose of effect;

C.    That Plaintiffs and the Classes recover treble or other damages or restitution as permitted by laws alleged in this complaint, and costs of suit, including reasonable attorneys' fees;

D.      That Plaintiffs and the Classes be awarded pre- and post-judgment

interest, and that the interest be awarded at the highest legal rate from and after the date of

service of this initial complaint in this action; and

E.      That Plaintiffs and the Classes have such further relief as the case may

require and the Court may deem just and proper under the circumstances.

DATED: March 12, 2014                           Respectfully submitted,

                                                By: _____
                                                        Keith L. Butler

                                                Michael G. McLellan
                                                Eugene J. Benick
                                                **FINKELSTEIN THOMPSON LLP**
                                                1077 30th Street, NW, Suite 150
                                                Washington, DC 20007
                                                Tel.: (202) 337-8000
                                                Fax: (202) 337-8090
                                                dthompson@finkelsteinthompson.com
                                                mmclellan@finkelsteinthompson.com
                                                ebenick@finkelsteinthompson.com

                                                Brian R. Strange
                                                Keith L. Butler
                                                John T. Ceglia
                                                **STRANGE & CARPENTER**
                                                12100 Wilshire Boulevard, Suite 1900
                                                Los Angeles, CA 90025
                                                Telephone: (310) 207-5055
                                                Facsimile: (310) 826-3210
                                                lacounsel@earthlink.net
                                                kbutler@strangeandcarpenter.com
                                                jceglia@strangeandcarpenter.com

                                                *Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: March 12, 2014

Respectfully submitted,

By: _____
       Keith L. Butler

Michael G. McLellan
Eugene J. Benick
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, NW, Suite 150
Washington, DC 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com

Brian R. Strange
Keith L. Butler
John T. Ceglia
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com
jceglia@strangeandcarpenter.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>CONSUMER END-USER CASES | **Civil Action Case No. 13-MD-2481 (KBF)**<br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that on March 12, 2014, a copy of Plaintiffs' Consolidated Amended

Class Action Complaint was served on all parties or their counsel of record via electronic mail.

DATED: March 12, 2014

Respectfully submitted,

By: _____
Keith L. Butler

Michael G. McLellan
Eugene J. Benick
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, NW, Suite 150
Washington, DC 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com

Brian R. Strange
Keith L. Butler
John T. Ceglia
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com
jceglia@strangeandcarpenter.com

*Attorneys for Plaintiffs*

1

## Service List

Plaintiff

| | | |
|---|---|---|
| Superior Extrusion Inc | represented by | Benjamin Martin Jaccarino |

Superior Extrusion Inc     represented by     Benjamin Martin Jaccarino
Lovell Stewart Halebian Jacobson
LLP
61 Broadway
Suite 501
New York, NY 10006
(212)-608-1900
Fax: (212)-719-4775
Email: bjaccarino@lshllp.com
*ATTORNEY TO BE NOTICED*

Christopher Lovell
Lovell Stewart Halebian Jacobson
LLP
61 Broadway
Suite 501
New York, NY 10006
(212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
*ATTORNEY TO BE NOTICED*

Craig M. Essenmacher
Lovell Stewart Halebian Jacobson
LLP
162 E. Main Street
Northville, MI 48167
248-615-1752
Fax: (248) 928-0909
Email: cessenmacher@lshllp.com
*ATTORNEY TO BE NOTICED*

David P. Germaine
Vanek, Vickers & Masini, P.C.,
55 W. Monroe, Suite 3500
Suite 4050
Chicago, IL 60606
(312)224-1500
Fax: (312)-224-1510
Email: dgermaine@vaneklaw.com
*ATTORNEY TO BE NOTICED*

Harold Gurewitz

Gurewitz & Raben, PLC
333 W. Fort Street
Suite 1400
Detroit, MI 48226
313-628-4733
Fax: 313-628-4701
Email: hgurewitz@grplc.com
*ATTORNEY TO BE NOTICED*

James J. Sabella
Grant & Eisenhofer
1201 N. Market Street
Suite 2100
Wilmington, DE 19801-2599
302-622-7000
Fax: 302-622-7100
Email: jsabella@gelaw.com
*ATTORNEY TO BE NOTICED*

James Joseph Sabella
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York, NY 10017
(646) 722-8500
Fax: (646) 722-8501
Email: jsabella@gelaw.com
*ATTORNEY TO BE NOTICED*

John Paul Bjork
Vanek Vickers & Masini
55 W. Monroe Suite 3500
Chicago, IL 60603
(312)-224-1500
Fax: (312)-224-1510
Email: jbjork@vaneklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joseph M Vanek
Vanek, Vickers & Masini PC
55 W. Monroe, Suite 3500
Chicago, IL 60603
312-224-1500
Fax: 312-224-1510
Email: jvanek@vaneklaw.com

*ATTORNEY TO BE NOTICED*

Linda P. Nussbaum
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York, NY 10017
(646) 722-8500
Fax: (212) 687-7714
Email: lnussbaum@gelaw.com
*ATTORNEY TO BE NOTICED*

Peter Anthony Barile , III
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York, NY 10017
(646) 722-8500
Fax: (646) 722-8501
Email: pbarile@gelaw.com
*ATTORNEY TO BE NOTICED*

Troy T. Gorman
Gorman Law Group, P.C.
162 E. Main Street
Northville, MI 48167
248-544-8000
Fax: 248-928-0909
Email: ttg@gormanlawgroup.com
*ATTORNEY TO BE NOTICED*

Plaintiff

Master Screens Inc                    represented by    Phillip Timothy Howard
                                                        HOWARD & ASSOCIATES PA -
                                                        TALLAHASSEE FL
                                                        8511 BULL HEADLEY RD
                                                        STE 405
                                                        TALLAHASSEE, FL 32312
                                                        850-298-4455
                                                        Fax: 850-216-2537
                                                        Email: tim@howardjustice.com
                                                        *ATTORNEY TO BE NOTICED*

Plaintiff

GRACE ADRIANNA FLETCHER         represented by    Phillip Timothy Howard
                                                        (See above for address)

*ATTORNEY TO BE NOTICED*

Plaintiff

River Parish Contractors, Inc.
*individually, and on behalf of all*
*others similarly situated*

represented by Daniel E. Becnel , Jr.
Becnel Law Firm, LLC
106 W. Seventh St.
P.O. Drawer H
Reserve, LA 70084
(504)-756-4840
Fax: (985)-536-1186
Email: mmoreland@becnellaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Jennifer L. Crose
Becnel Law Firm, LLC (Reserve)
106 W. Seventh St.
P. O. Drawer H
Reserve, LA 70084
985-536-1186
Email: jcrose@becnellaw.com
*ATTORNEY TO BE NOTICED*

Matthew B. Moreland
Becnel Law Firm, LLC (Reserve)
106 W. Seventh St.
P. O. Drawer H
Reserve, LA 70084
985-536-1186
Email: mattmoreland@cox.net
*ATTORNEY TO BE NOTICED*

Plaintiff

Viva Railings,LLC
*on Behalf of Themselves and all*
*Others Similarly Situated*

represented by Azra Zahoor Mehdi
The Mehdi Firm
One Market Spear Tower
S-3600
San Francisco, CA 94105
415-293-8039
Fax: 415-293-8001
Email: azram@themehdifirm.com
*ATTORNEY TO BE NOTICED*

Peter George Safirstein
Morgan & Morgan, P.C.
28 West 44th St., Ste 2001

New York, NY 10036
(212) 564-1637
Fax: (212) 564-1807
Email: psafirstein@forthepeople.com
*ATTORNEY TO BE NOTICED*

Plaintiff

Regal Recycling,Inc                    represented by  Azra Zahoor Mehdi
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       Peter George Safirstein
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

Plaintiff

D-Tek Manufacturing                    represented by  Adam E Polk
*on behalf of itelsef and all others*                 Girard Gibbs LLP
*similarly situated*                                   601 Calfornia Street 14th Floor
                                                       San Francisco, CA 94108
                                                       (415) 981-4800
                                                       Fax: (415) 981-4846
                                                       Email: aep@girardgibbs.com
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       Christina H. C. Sharp
                                                       Girard Gibbs LLP
                                                       601 California Street, Suite 1400
                                                       San Francisco, CA 94108
                                                       (415)-981-4800
                                                       Fax: (415)-981-4846
                                                       Email: chc@girardgibbs.com
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       Amanda Steiner
                                                       Girard Gibbs LLP
                                                       601 California Street, Suite 1400
                                                       San Francisco, CA 94108
                                                       (415) 981-4800
                                                       Fax: (415) 981-4846
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

Daniel Charles Girard
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415)-981-4800
Fax: (415)-981-4846
Email: dcg@girardgibbs.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Frederic Scott Fox , Sr
Kaplan Fox & Kilsheimer LLP (NYC)
850 Third Avenue
14th Floor
New York, NY 10022
(212) 687-1980
Fax: (212) 687-7714
Email: ffox@kaplanfox.com
*ATTORNEY TO BE NOTICED*

Jonathan K. Levine
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
Email: jkl@girardgibbs.com
*ATTORNEY TO BE NOTICED*

Kenneth A. Wexler
Wexler Toriseva Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312)-346-2222
Fax: (312)-346-0022
Email: kaw@wexlerwallace.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Peterson Industries, Inc.             represented by  Bonny E. Sweeney
*individually and on behalf of all*                   Robbins Geller Rudman & Dowd LLP
*others similarly situated*                            (SANDIEGO)
                                                       655 West Broadway
                                                       Suite 1900

San Diego, CA 92101
(619)231-1058
Fax: (619)231-7423
Email: bonnys@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Carmen A. Medici
Robbins Geller Rudman & Dowd LLP
(San Diego)
655 West Broadway
Suite 1900
San Diego, CA 92101
(619)231-1058,
Fax: (619)231-7423
Email: cmedici@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

David W. Mitchell
Robbins Geller Rudman & Dowd LLP
(SANDIEGO)
655 West Broadway
Suite 1900
San Diego, CA 92101
(619)-231-1058
Fax: (619)-231-231-7423
Email: davidm@csgrr.com
*ATTORNEY TO BE NOTICED*

Mark J. Dearman
Robbins Geller Rudman & Dowd LLP
(FL)
120 East Palmetto Park Road, Suite
500
Boca Raton, FL 33432
(561)-750-3000
Fax: (561)-750-3364
Email: mdearman@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Patrick Joseph Coughlin
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
(619)-231-1058
Fax: (619)-685-6920

Email: patc@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Paul Jeffrey Geller
Robbins Geller Rudman & Dowd LLP
120 E. Palmetto Park Road, Ste. 500
Boca Raton, FL 33432
(561)-750-3000
Fax: (561)-750-3364
Email: pgeller@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Robert M. Rothman
Robbins Geller Rudman & Dowd
LLP(LI)
58 South Service Road
Suite 200
Melville, NY 11747
631-367-7100
Fax: (631) 367-1173
Email: rrothman@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Samuel Howard Rudman
Robbins Geller Rudman & Dowd
LLP(LI)
58 South Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

Plaintiff

Claridge Products and Equipment,
Incorporated
*individually and on behalf of all
others similarly situated*

represented by  Edith M. Kallas
Whatley, Drake & Kallas, LLC (NYC)
1540 Broadway, 37th Floor
New York, NY 10036
(212) 447-7070
Fax: (212) 447-7077
Email: ekallas@wdklaw.com
*ATTORNEY TO BE NOTICED*

Joe R. Whatley , JR.
Whatley, Drake & Kallas, LLC (NYC)

1540 Broadway, 37th Floor
New York, NY 10036
(212)-447-7070
Fax: (212)-447-7077
Email: jwhatley@whatleykallas.com
*ATTORNEY TO BE NOTICED*

John G. Emerson , Jr.
Emerson Poynter LLP
830 Apollo Lane
Houston, TX 77058
(281) 488-8854
Fax: (281) 488-8867
Email:
jemerson@emersonpoynter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

William T. Crowder
Emerson Poynter LLP
1301 Scott Street
Little Rock, AR 72202
501-907-2555
Fax: (501) 907-2556
Email:
wcrowder@emersonpoynter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Plaintiff

Thule, Inc.
*individually and on behalf of all*
*others similarly situated*

represented by  Bonny E. Sweeney
(See above for address)
*ATTORNEY TO BE NOTICED*

Carmen A. Medici
(See above for address)
*ATTORNEY TO BE NOTICED*

David W. Mitchell
(See above for address)
*ATTORNEY TO BE NOTICED*

Mark J. Dearman
(See above for address)
*ATTORNEY TO BE NOTICED*

Patrick Joseph Coughlin
(See above for address)
*ATTORNEY TO BE NOTICED*

Paul Jeffrey Geller
(See above for address)
*ATTORNEY TO BE NOTICED*

Robert M. Rothman
(See above for address)
*ATTORNEY TO BE NOTICED*

Samuel Howard Rudman
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

Ampal Inc.                    represented by  Linda P. Nussbaum
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Benjamin Martin Jaccarino
(See above for address)
*ATTORNEY TO BE NOTICED*

Christopher Lovell
(See above for address)
*ATTORNEY TO BE NOTICED*

David P. Germaine
(See above for address)
*ATTORNEY TO BE NOTICED*

Dean M Harvey
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415)-956-1000
Fax: (415)-956-1008
Email: dharvey@lchb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Eric B. Fastiff
Lieff, Cabraser, Heimann &

Bernstein,LLP
275 Battery Street
29th Floor
San Francisco, CA 94111-3339
(415)-956-1000
Fax: (415) 956-1008
Email: efastiff@lchb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Harold Z. Gurewitz
Gurewitz & Raben, PLC
333 W. Fort Street
Suite 1400
Detroit, MI 48226
313-628-4733
Fax: 313-628-4701
Email: hgurewitz@grplc.com
*ATTORNEY TO BE NOTICED*

James Joseph Sabella
(See above for address)
*ATTORNEY TO BE NOTICED*

John Paul Bjork
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joseph M Vanek
(See above for address)
*ATTORNEY TO BE NOTICED*

Lin Y Chan
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415)-956-1000
Fax: (415)-956-1008
Email: lchan@lchb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Peter Anthony Barile , III
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Custom Aluminum Products Inc.                represented by    Linda P. Nussbaum
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              Benjamin Martin Jaccarino
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              Christopher Lovell
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              Craig M. Essenmacher
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              David P. Germaine
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              Harold Gurewitz
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              James Joseph Sabella
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              John Paul Bjork
                                                              (See above for address)
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              Joseph M Vanek
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              Peter Anthony Barile , III
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Extruded Aluminum Inc.                       represented by    Linda P. Nussbaum
                                                              (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Benjamin Martin Jaccarino
(See above for address)
*ATTORNEY TO BE NOTICED*

Christopher Lovell
(See above for address)
*ATTORNEY TO BE NOTICED*

David P. Germaine
(See above for address)
*ATTORNEY TO BE NOTICED*

James Joseph Sabella
(See above for address)
*ATTORNEY TO BE NOTICED*

John Paul Bjork
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joseph M Vanek
(See above for address)
*ATTORNEY TO BE NOTICED*

Peter Anthony Barile , III
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

International Extrusions Inc.            represented by   Linda P. Nussbaum
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         Benjamin Martin Jaccarino
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         Christopher Lovell
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

Craig M. Essenmacher
(See above for address)
*ATTORNEY TO BE NOTICED*

David P. Germaine
(See above for address)
*ATTORNEY TO BE NOTICED*

Harold Z. Gurewitz
(See above for address)
*ATTORNEY TO BE NOTICED*

James Joseph Sabella
(See above for address)
*ATTORNEY TO BE NOTICED*

John Paul Bjork
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joseph M Vanek
(See above for address)
*ATTORNEY TO BE NOTICED*

Peter Anthony Barile , III
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Team Ward Inc.
*individually and on behalf of all*
*others similarly situated doing*
*business as War Eagel Boats*

represented by Edward W. Ciolko
Kessler Topaz Meltzer & Check, LLP
(PA)
280 King of Prussia Road
Radnor, PA 19087
(610)-667-7706
Fax: (610)-667-7056
Email: eciolko@ktmc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joseph H. Meltzer
Kessler Topaz Meltzer & Check, LLP
(PA)
280 King of Prussia Road
Radnor, PA 19087

(610)667-7706 x1210
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Plaintiff

Everett Aluminum Inc                    represented by  Robert J. Bonsignore
*on behalf of itself and all others*                    Bonsignore & Brewer
*similarly situated*                                     23 Forest Street
                                                         Medford, MA 02155
                                                         (781) 391-9494
                                                         *ATTORNEY TO BE NOTICED*

Plaintiff

Pierce Aluminum Company, Inc.           represented by  Bonny E. Sweeney
*Individually and on Behalf of All*                     (See above for address)
*Others Similarly Situated*                             *ATTORNEY TO BE NOTICED*

                                                        Carmen A. Medici
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        David W. Mitchell
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        Mark J. Dearman
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        Patrick Joseph Coughlin
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        Paul Jeffrey Geller
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        Robert M. Rothman
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        Samuel Howard Rudman
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

Theodore M. Hess-Mahan
Hutchings, Barsamian, Cross and
Mandelcorn, LLP
110 Cedar St.
Wellesley Hills, MA 02481
781-431-2231
Fax: 781-431-8726
Email: thess-
mahan@hutchingsbarsamian.com
*ATTORNEY TO BE NOTICED*

Plaintiff

David J Kohlenberg                    represented by    Brian R. Strange
Strange and Carpenter
12100 Wilshire Boulevard
Suite 1900
Los Angeles, CA 90025
310-207-5055
Fax: 310-826-3210
Email: lacounsel@earthlink.net
*ATTORNEY TO BE NOTICED*

Brian Russell Strange
Starfield & Payne, P.C.
P.O. Box 880
Fort Washington, PA 19034
(310) 207-5055
Fax: (310) 826-3210
Email: lacounsel@earthlink.net
*ATTORNEY TO BE NOTICED*

Craig E. Hilborn
Hilborn & Hilborn
999 Haynes
Suite 205
Birmingham, MI 48009
248-642-8350
Email: Craig@hilbornlaw.com
*ATTORNEY TO BE NOTICED*

John Theodore Ceglia
Strange & Carpenter
12100 Wilshire Blvd.
Suite 1900
Los Angeles, CA 90025

310-207-5055
Fax: 310-826-3210
Email:
jceglia@strangeandcarpenter.com
*ATTORNEY TO BE NOTICED*

Keith Lawrence Butler
Strange & Carpenter
12100 Wilshire Blvd.
Suite 1900
Los Angeles, CA 90025
310-207-5055
Fax: 310-826-3210
Email:
kbutler@strangeandcarpenter.com
*ATTORNEY TO BE NOTICED*

Plaintiff

| | | |
|---|---|---|
| Welk-Ko Fabricators, Inc. | represented by | Brendan H. Frey<br>Mantese Honigman Rossman &<br>Williamson, P.C.<br>1361 E. Big Beaver Road<br>Troy, MI 48083<br>248-457-9200<br>Fax: 248-457-9201<br>Email: bfrey@manteselaw.com<br>*ATTORNEY TO BE NOTICED* |

David F. Hansma
Mantese and Rossman
1361 E. Big Beaver Road
Troy, MI 48083
248-457-9200
Fax: 248-457-9201
Email: dhansma@manteselaw.com
*ATTORNEY TO BE NOTICED*

David M. Honigman
Mantese Honigman Rossman &
Williamson, PC
1361 East Big Beaver Road
Troy, MI 48083
248-457-9200
Fax: 248-457-9201
Email: dhonigman@manteselaw.com
*ATTORNEY TO BE NOTICED*

Gerard V. Mantese
Mantese Assoc.
1361 E. Big Beaver Road
Troy, MI 48083
248-457-9200
Fax: 248-457-9201
Email: gmantese@manteselaw.com
*ATTORNEY TO BE NOTICED*

Jessica Ann Perez
Pendley, Baudin & Coffin, L.L.P.
24110 Eden Street
Plaquemine, LA 70764
(225)-687-6396
Fax: (225)-687-6398
Email: jperez@pbclawfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joel Davidow
Kile Goekjian Reed & McManus Pllc
1200 New Hampshire Ave, Suite 570
Washington, DC 20036
(202) 263-0806
Fax: (202)-659-8822
Email: joel@cuneolaw.com
*ATTORNEY TO BE NOTICED*

Jonathan Watson Cuneo
Cuneo Gilbert & LaDuca, LLP
620 Fifth Avenue
6th Floor
New York, NY 10020
(202) 789-3960
Fax: 202 789 1813
Email: jonc@cuneolaw.com
*ATTORNEY TO BE NOTICED*

Patrick Wayne Pendley
Pendley, Baudin & Coffin L.L.P.
24110 Eaden Street
P.O. Drawer 71
Plaquemine, LA 70765
(225) 687-6396
Fax: (225) 687-6398

Email: cyarbrough@pbclawfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Yifei Li
Cuneo Gilbert & Laduca, LLP
507 C Street Ne
Washington D.C., DC 20002
(571)-319-6195
Email: evelyn.li@cuneolaw.com
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Tyler Sales Inc.                    represented by   Brendan H. Frey
*Doing Business as Norther Metals,*                  (See above for address)
*Inc.*                                               *ATTORNEY TO BE NOTICED*

                                                     David F. Hansma
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     David M. Honigman
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     Gerard V. Mantese
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     Jessica Ann Perez
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     Joel Davidow
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     Jonathan Watson Cuneo
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     Patrick Wayne Pendley
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

Yifei Li
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Quicksilver Welding Services, Inc.          represented by     Brendan H. Frey
(See above for address)
*ATTORNEY TO BE NOTICED*

David F. Hansma
(See above for address)
*ATTORNEY TO BE NOTICED*

David M. Honigman
(See above for address)
*ATTORNEY TO BE NOTICED*

Gerard V. Mantese
(See above for address)
*ATTORNEY TO BE NOTICED*

Jessica Ann Perez
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joel Davidow
(See above for address)
*ATTORNEY TO BE NOTICED*

Jonathan Watson Cuneo
(See above for address)
*ATTORNEY TO BE NOTICED*

Patrick Wayne Pendley
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Yifei Li
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Lexington Homes, Inc.          represented by    Brendan H. Frey

(See above for address)
*ATTORNEY TO BE NOTICED*

David F. Hansma
(See above for address)
*ATTORNEY TO BE NOTICED*

David M. Honigman
(See above for address)
*ATTORNEY TO BE NOTICED*

Gerard V. Mantese
(See above for address)
*ATTORNEY TO BE NOTICED*

Jessica Ann Perez
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joel Davidow
(See above for address)
*ATTORNEY TO BE NOTICED*

Jonathan Watson Cuneo
(See above for address)
*ATTORNEY TO BE NOTICED*

Patrick Wayne Pendley
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Yifei Li
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

Breezin Metal Works, Inc.                    represented by    Brendan H. Frey
(See above for address)
*ATTORNEY TO BE NOTICED*

David F. Hansma
(See above for address)
*ATTORNEY TO BE NOTICED*

David M. Honigman
(See above for address)
*ATTORNEY TO BE NOTICED*

Gerard V. Mantese
(See above for address)
*ATTORNEY TO BE NOTICED*

Jessica Ann Perez
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joel Davidow
(See above for address)
*ATTORNEY TO BE NOTICED*

Jonathan Watson Cuneo
(See above for address)
*ATTORNEY TO BE NOTICED*

Patrick Wayne Pendley
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Yifei Li
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

Talan Products, Inc.          represented by   Alyson L. Oliver
                                              950 W. University Drive
                                              Suite 200
                                              Rochester, MI 48307
                                              248 327-6556
                                              Fax: 248-436-3385
                                              Email: notifications@oliverlg.com
                                              *ATTORNEY TO BE NOTICED*

                                              Daniel E. Gustafson
                                              Gustafson Gluek PLLC
                                              650 Northstar East
                                              608 Second Avenue South
                                              Minneapolis, MN 55402
                                              (612) 333-8844

Fax: (612) 339-6622
Email:
dgustafson@gustafsongluek.com
*ATTORNEY TO BE NOTICED*

David A Goodwin
Gustafson Gluek. PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612)-333-8844
Fax: (612)-339-6622
Email:
dgoodwin@gustafsongluek.com
*ATTORNEY TO BE NOTICED*

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
Fax: (717) 892-1200
Email: dnast@nastlaw.com
*ATTORNEY TO BE NOTICED*

Erin C Burns
RodaNast P.C.
801 Estelle Drive
Lancaster, PA 17601
215-923-9300
Fax: 215-923-9302
Email: eburns@nastlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Big River Outfitters, LLC                    represented by   Abraham Singer
                                                              Kitch Drutchas Wagner Valitutti &
                                                              Sherbrook
                                                              One Woodward Avenue
                                                              Suite 2400
                                                              Detroit, MI 48226
                                                              (313) 965-7445
                                                              Email: Abraham.Singer@kitch.com
                                                              *ATTORNEY TO BE NOTICED*

                                                              Alan Mcquarrie Mansfield

Whatley Kallas, LLP
10200 Willow Creek Road, Suite 160
San Diego, CA 92131
(619) 308-5034
Fax: (855) 274-1888
Email:
amansfield@whatleykallas.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Christopher W. Cantrell - MDL NOT
ADMITTED
Doyle Lowther LLP
10200 Willow Creek Road
Suite 150
San Diego, CA 92131
858 935-9960
*ATTORNEY TO BE NOTICED*

David Gregory Scott
Law Office of David G. Scott, PLLC
652 Cash Road Sw
Camden, AR 71701
(870)-836-8900
Fax: (870)-836-5900
Email: david@davidgscott.com
*ATTORNEY TO BE NOTICED*

James R. Hail - MDL NOT
ADMITTED
Doyle Lowther LLP
10200 Willow Creek Road
Suite 150
San Diego, CA 92131
858 935-9960
*ATTORNEY TO BE NOTICED*

John Emerson - MDL NOT
ADMITTED
Emerson, Poynter,
830 Apollo Lane
Houston, TX 77058
281-488-8854
Fax: 281.488.8867
Email:
jemerson@emersonpoynter.com

*ATTORNEY TO BE NOTICED*

William J. Doyle , II
Doyle Lowther LLP
10200 Willow Creek Rd, Ste 150
San Diego, CA 92101
858-935-9960
Fax: 858-939-1939
Email: bill@doylelowther.com
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Seating Constructors USA, Inc.            represented by   David J. Guin
Guin, Stokes & Evans, LLC
505 20th Street North, Suite 1000
Birmingham, AL 35203
(205)-226-2282
Fax: (205)-226-2357
Email: davidg@gseattorneys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Tammy Mcclendon Stokes
Guin, Stokes & Evans, LLC
505 20th Street North, Suite 1000
Birmingham, AL 35203
(205)-226-2282
Fax: (205)-226-2282
Email: tammys@gseattorneys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Charles R. Watkins
Guin, Stokes & Evans, LLC
321 South Plymouth Court, Suite 1250
Chicago, IL 60604
(312)-878-8391
Fax: (205)-226-2282
Email: charlesw@gseattorneys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

S. Thomas Wienner
Weinner, Gould,

950 W. University Drive
Suite 350
Rochester, MI 48307
248-841-9400
Email: twienner@wiennergould.com
*ATTORNEY TO BE NOTICED*

Plaintiff

F&F Custom Boats, LLC                    represented by    Abraham Singer
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           Alan Mcquarrie Mansfield
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           Christopher W. Cantrell - MDL NOT
                                                           ADMITTED
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           David Gregory Scott
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           James R. Hail - MDL NOT
                                                           ADMITTED
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           William J. Doyle , II
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

Plaintiff

AGFA Corporation                         represented by    Derek Y. Brandt
                                                           Simmons Browder Gianaris Angelides
                                                           & Bardnerd LLC
                                                           One Court Street
                                                           Alton, IL 62002
                                                           (618) 259-2222
                                                           Fax: (618) 259-2251
                                                           Email: dbrandt@simmonsfirm.com
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

Garrett W. Wotkyns
Schneider Wallace Cottrell Brayton
Konecky, L.L.P.
8501 N. Scottsdale Road, Suite 270
Scottsdale, AZ 85253
(480) 428-0142
Fax: (866) 505-8036
Email:
gwotkyns@schneiderwallace.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Jason H Kim
Schneider Wallace Cottrell Brayton
Konecky LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
(415)-421-7100
Fax: (415)-421-7105
Email: jkim@schneiderwallace.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Todd Michael Schneider
Schneider Wallace Cottrell Brayton
Konecky LLP
180 Montgomery Street
Suite 2000
San Francisco, CA 94104
(415) 421-7100
Fax: (415) 421-7105
Email:
tschneider@schneiderwallace.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Christopher M. Santomassimo
Nicoll Davis & Spinella LLP
450 Seventh Avenue
Suite 2205
New York, NY 10123
(212) 262-6700
Email: csantomassimo@ndslaw.com
*ATTORNEY TO BE NOTICED*

John Robert Phillips
Simmons Firm
One Court Street
Alton, IL 62002
(618)-259-2222
Email: jphillips@simmonsfirm.com
*ATTORNEY TO BE NOTICED*

Joseph E. Viviano
Viviano, Pagano & Howlett PLLC
48 S. Main Street
Suite 2
Mount Clemens, MI 48043
586-469-1580
Fax: 586-469-1399
Email: joe@vivianolaw.com
*TERMINATED: 02/19/2014*

Kristen M. Anderson
Scott Scott, LLP (CA)
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
Fax: (619) 233-0508
Email: kanderson@scott-scott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Walter W. Noss
ScottScott LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619)-798-5301
Fax: 619-233-0508
Email: wnoss@scott-scott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Plaintiff

Admiral Beverage Corporation          represented by  Geoffrey Milbank Horn
                                                      Lowey Dannenberg Cohen & Hart,
                                                      P.C.
                                                      White Plains Plaza
                                                      One North Broadway
                                                      Suite 509

White Plains, NY 10601
(914) 997-0500
Fax: (914) 997-0035
Email: ghorn@lowey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Gerald Lawrence
Lowey Dannenberg Cohen & Hart,
PC(PA)
200 Barr Harbor Dr.
West Conshohocken, PA 19428
(610)-941-2760
Fax: (610)-862-9777
Email: glawrence@lowey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Peter Dexter St. Philip , Jr
Lowey Dannenberg Cohen & Hart,
P.C.
White Plains Plaza
One North Broadway
Suite 509
White Plains, NY 10601
914-997-0500
Fax: 914-997-0035
Email: pstphillip@lowey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Raymond Peter Girnys
Lowey Dannenberg Cohen & Hart,
P.C.
One North Broadway
White Plains, NY 10601
(914) 733-7251
Fax: (914) 997-0035
Email: rgirnys@lowey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Vincent Briganti
Lowey Dannenberg Cohen & Hart,
P.C.
White Plains Plaza

One North Broadway
Suite 509
White Plains, NY 10601
9149970500
Fax: 9149970035
Email: vbriganti@lowey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Patrick E. Cafferty
Caffert Clobes Meriwether & Sprengel
LLP, L.L.P.
30101 N. Main Street
Suite 565
Ann Arbor, MI 48104
(312) 782-4880
*ATTORNEY TO BE NOTICED*

Plaintiff

Central Aluminum Company                    represented by   Vincent J. Esades
Heins Mills & Olson, P.L.C.
3550 IDS Center
310 Clifton Avenue
Minneapolis, MN 55403
1-612-338-4605
Fax: (612)-338-4692
Email: vesades@heinsmills.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Dean M. Googasian
Googasian Law Firm
6895 Telegraph Road
Bloomfield Hills, MI 48301-3138
248-540-3333
Email: dgoogasian@googasian.com
*ATTORNEY TO BE NOTICED*

Joseph Richard Saveri
Joseph Saveri Law Firm, Inc.
505 Montgomery St. Suite 625
San Francisco, CA 94111
415-395-9940
Email: jsaveri@saverilawfirm.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

Kevin E. Rayhill
Joseph Saveri Law Firm, Inc.
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 500-6800
Fax: (415) 395-9940
Email: krayhill@saverilawfirm.com
*ATTORNEY TO BE NOTICED*

Thomas H. Howlett
Googasian Law Firm
6895 Telegraph Road
Bloomfield Hills, MI 48301-3138
248-540-3333
Fax: 248-540-7213
Email: thowlett@googasian.com
*ATTORNEY TO BE NOTICED*

Plaintiff

| | | |
|---|---|---|
| Hall Enterprises Metals, Inc. | represented by | Solomon B. Cera<br>Gold Bennett Cera & Sidener, LLP<br>595 Market Street, Suite 2300<br>San Francisco, CA 94015<br>(415) 777-2230 x2234<br>Fax: (415) 777-5189<br>Email: scera@gbcslaw.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

Plaintiff

| | | |
|---|---|---|
| Brick Pizzeria LLC<br>*behalf of themselves, and all others<br>similarly situated* | represented by | Douglas G. Thompson<br>Finkelstein,Thompson & Loughran<br>1050 30th, NW<br>Washington, DC 20007<br>(202) 337-8000<br>Fax: (202) 337-8090<br>Email:<br>dthompson@finkelsteinthompson.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>Eugene J. Benick<br>Finkelstein Thompson LLP<br>1077 30th Street, N.W., Suite 150 |

Washington, DC 20007
(202)-337-8000
Fax: (202)-337-8090
Email:
ebenick@finkelsteinthompson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Michael Glenn McLellan
Finkelstein Thompson LLP
1077 30th Street, N.W., Suite 150
Washington, DC 20007
(202)-337-8000
Fax: (202)-337-8090
Email:
mmclellan@finkelsteinthompson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Rosalee Belinda Connell Thomas
Finkelstein Thompson LLP
1077 30th Street, N.W., Suite 150
Washington, DC 20007
(301)-725-0034
Email: r_connell2004@yahoo.com
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

Mag Instrument Inc          represented by  Christopher M Burke
                                            Scott and Scott LLP
                                            4771 Cromwell Avenue
                                            Los Angeles, CA 90027
                                            213-985-1274
                                            Fax: 213-985-1278
                                            Email: cburke@scott-scott.com
                                            *ATTORNEY TO BE NOTICED*

                                            Daniel Jay Mogin
                                            The Mogin Law Firm P.C.
                                            707 Broadway, Suite 1000
                                            San Diego, CA 92101
                                            619-687-6611
                                            Fax: 619-687-6610
                                            Email: dmogin@moginlaw.com
                                            *ATTORNEY TO BE NOTICED*

David R Scott
Scott and Scott LLP
156 South Main Street
Colchester, CT 06415
860-537-5537
Fax: 860-537-4432
Email: drscott@scott-scott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Derek Y. Brandt
(See above for address)
*ATTORNEY TO BE NOTICED*

Garrett W Wotkyns
Schneider Wallace Cottrell Konecky
LLP
8501 North Scottsdale Road Suite 270
Scottsdale, AZ 85253
480-428-0142
Fax: 866-505-8036
Email:
gwotkyns@schneiderwallace.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Jason H Kim
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

John Robert Phillips
(See above for address)
*ATTORNEY TO BE NOTICED*

Kristen M. Anderson
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Max R Schwartz
Scott and Scott LLP
405 Lexington Avenue 40th Floor
New York, NY 10174
212-223-6444
Fax: 212-223-6334

Email: mschwartz@scott-scott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Thomas F Quilling
Wasserman and Wasserman LLP
1230 Crenshaw Boulevard Suite 103
Torrance, CA 90501
310-212-0735
Fax: 310-212-5044
Email: tom@wassermanlaw.com
*ATTORNEY TO BE NOTICED*

Todd M Schneider
Schneider Wallace Cottreel Brayton
Konecky LLC
180 Montgomery Street Suite 2000
San Francisco, CA 94104
415-421-7100
Fax: 415-421-7105
Email:
tschneider@schneiderwallace.com
*ATTORNEY TO BE NOTICED*

Walter W. Noss
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

SUNPORCH STRUCTURES, INC.          represented by  Darryl Bressack
Fink + Associates Law
100 West Long Lake Road
Suite 111
Bloomfield Hills, MI 48304
248-971-2500
Fax: 248-971-2600
Email:
dbressack@finkandassociateslaw.com
*ATTORNEY TO BE NOTICED*

David H. Fink
Fink + Associates Law
100 West Long Lake Road
Suite 111
Bloomfield Hills, MI 48304

248-971-2500
Fax: 248-971-2600
Email:
dfink@finkandassociateslaw.com
*ATTORNEY TO BE NOTICED*

Douglas A. Millen
Freed Kanner London & Millen LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
224-632-4500
Fax: 224-632-4521
Email: doug@fklmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Michael L. Silverman
Freed kanner London & Millen LLC
2201 Waukegon Road
Suite 130
Bannockburn, IL 60015
224-632-4500
Fax: 224-632-4521
Email: msilverman@fklmlaw.com
*ATTORNEY TO BE NOTICED*

Steven A. Kanner
Much, Shelist, Freed, Denenberg,
Ament & Rubenstein, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095
(312) 346-3100
*ATTORNEY TO BE NOTICED*

V.

Petitioner

Daniel Javorsky                represented by  Douglas G. Thompson
*behalf of themselves, and all others*          (See above for address)
*similarly situated*                            *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                Eugene J. Benick
                                                (See above for address)
                                                *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

Michael Glenn McLellan
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Rosalee Belinda Connell Thomas
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

Goldman Sachs Group, Inc.               represented by   Benjamin M. McGovern
                                                         Holland & Knight, LLP
                                                         10 St. James Avenue
                                                         Suite 12
                                                         Boston, MA 02116
                                                         617-619-9276
                                                         Fax: 617-523-6850
                                                         Email:
                                                         benjamin.mcgovern@hklaw.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         Gregory Lee Curtner
                                                         Schiff Hardin LLP (MI)
                                                         350 S. Main Street., Suite 210
                                                         Ann Arbor, MI 48104
                                                         (734) 222-1500
                                                         Fax: (734) 222-1501
                                                         Email: gcurtner@schiffhardin.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         JEROME WAYNE HOFFMAN
                                                         HOLLAND & KNIGHT LLP -
                                                         TALLAHASSEE FL
                                                         PO DRAWER 810
                                                         TALLAHASSEE, FL 32302-0810
                                                         850-224-7000
                                                         Fax: 850-224-8832
                                                         Email: jerome.hoffman@hklaw.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         Jeffrey Stephen Hurd
                                                         Sullivan & Cromwell LLP

125 Broad St.
New York, NY 10004
(212)-558-4612
Fax: (212)-291-9906
Email: jeffreyshurd@hotmail.com
*ATTORNEY TO BE NOTICED*

Jessica A. Sprovtsoff
Schiff Hardin LLP
350 S. Main Street
Suite 210
Ann Arbor, MI 48104
734-222-1518
Fax: 734-222-1501
Email: jsprovtsoff@schiffhardin.com
*ATTORNEY TO BE NOTICED*

Mark Aaron Cunningham
Jones Walker (New Orleans)
Place St. Charles
201 St. Charles Ave.
Suite 5100
New Orleans, LA 70170-5100
504-582-8536
Email:
mcunningham@joneswalker.com
*ATTORNEY TO BE NOTICED*

Richard C. Pepperman , II
Sullivan and Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212) 558-3493
Fax: (212) 558-3588
Email: peppermanr@sullcrom.com
*ATTORNEY TO BE NOTICED*

Suhana S. Han
Sullivan and Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212) 558-4647
Fax: (212) 558-3588
Email: hans@sullcrom.com
*ATTORNEY TO BE NOTICED*

Yavar Bathaee
Sullivan and Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212)-558-3166
Fax: (212)-291-9210
Email: bathaeey@sullcrom.com
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

GS Power Holdings LLC                represented by  Benjamin M. McGovern
(See above for address)
*ATTORNEY TO BE NOTICED*

Gregory Lee Curtner
(See above for address)
*ATTORNEY TO BE NOTICED*

JEROME WAYNE HOFFMAN
(See above for address)
*ATTORNEY TO BE NOTICED*

Jeffrey Stephen Hurd
(See above for address)
*ATTORNEY TO BE NOTICED*

Jessica A. Sprovtsoff
(See above for address)
*ATTORNEY TO BE NOTICED*

Mark Aaron Cunningham
(See above for address)
*ATTORNEY TO BE NOTICED*

Richard C. Pepperman , II
(See above for address)
*ATTORNEY TO BE NOTICED*

Suhana S. Han
(See above for address)
*ATTORNEY TO BE NOTICED*

Yavar Bathaee
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

Metro International Trade Services,          represented by   Benjamin M. McGovern
L. L. C.                                                     (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Gregory Lee Curtner
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            JEROME WAYNE HOFFMAN
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Jeffrey Stephen Hurd
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Jessica A. Sprovtsoff
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Mark Aaron Cunningham
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Richard C. Pepperman , II
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Robert A Sacks
                                                            Sullivan and Cromwell LLP
                                                            1888 Century Park East Suite 2100
                                                            Los Angeles, CA 90067-1725
                                                            310-712-6600
                                                            Fax: 310-712-8800
                                                            Email: sacksr@sullcrom.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            Suhana S. Han
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            Yavar Bathaee
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

Defendant

London Metal Exchange Limited    represented by    Jeffrey Hamilton Newhouse
Latham & Watkins LLP (DC)
555 Eleventh Street, Nw, Suite 1000
Washington, DC 20004
202-637-2200
Fax: 202-637-2201
Email: Jeffrey.Newhouse@lw.com
*ATTORNEY TO BE NOTICED*

Jennifer Lynn Giordano
Latham & Watkins LLP (DC)
555 Eleventh Street, Nw, Suite 1000
Washington, DC 20004
(202)-637-1013
Fax: (202)-637-2201
Email: jennifer.giordano@lw.com
*ATTORNEY TO BE NOTICED*

Margaret M. Zwisler
Latham & Watkins LLP (DC)
555 Eleventh Street, Nw, Suite 1000
Washington, DC 20004
(202) 637-1013
Fax: (202) 637-2201
Email: margaret.zwisler@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

William H. Horton
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road
10th Floor
Troy, MI 48084-5280
248-457-7000
Fax: 248-457-7001
Email: bhorton@gmhlaw.com
*ATTORNEY TO BE NOTICED*

William R. Sherman
Latham & Watkins LLP (DC)
555 Eleventh Street, Nw, Suite 1000
Washington, DC 20004
202-637-2200
Fax: 202-637-2201
Email: william.sherman@lw.com

*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

John Does 1-10

<u>Defendant</u>

JP Morgan Chase & Co                    represented by  Henry Liu
                                                        Covington & Burling LLP
                                                        1201 Pennsylvania Ave Nw
                                                        Washington, DC 20004
                                                        (202)-662-5536
                                                        Email: hliu@cov.com
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        GEORGE N MEROS , JR
                                                        GRAYROBINSON PA -
                                                        TALLAHASSEE FL
                                                        301 S BRONOUGH ST STE 600
                                                        TALLAHASSEE, FL 32301
                                                        850-577-9090
                                                        Fax: 850-577-3311
                                                        *ATTORNEY TO BE NOTICED*

                                                        John S. Playforth
                                                        Covington & Burling LLP
                                                        1201 Pennsylvania Avenue, Nw
                                                        Washington, DC 20004
                                                        (202)-662-5635
                                                        Fax: (202)-662-6291
                                                        Email: jplayforth@cov.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        Mark David Herman
                                                        Covington & Burling LLP
                                                        1201 Pennsylvania Avenue, Nw
                                                        Washington, DC 20004
                                                        (202)-662-5758
                                                        Fax: (202)-778-5758
                                                        Email: mherman@cov.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        Neil K. Roman

Covington & Burling, L.L.P. (DC)
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-5695
Fax: 202-778-5695
Email: nroman@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Robert D. Wick
Covington & Burling, L.L.P. (DC)
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-5487
Fax: (202)-778-5487
Email: rwick@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

GLENCORE XSTRATA INC

<u>Defendant</u>

Henry Bath LLC                    represented by   Henry Liu
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   John S. Playforth
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   Mark David Herman
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   Neil K. Roman
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   Robert D. Wick
                                                   (See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Defendant

THE LONDON METAL
EXCHANGE GS POWER
HOLDINGS LLC

Defendant

Unidentified Parties

Defendant

Glencore Xstrata PLC

Defendant

Pacorini Metals USA, LLC                    represented by    John M. Nannes
Skadden, Arps, Slate, Meagher &
Flom LLP
1440 New York Ave., Nw
Washington, DC 20005
(202)-371-7500
Fax: (202)-661-9191
Email: john.nannes@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Jay B. Kasner
Skadden, Arps, Slate, Meagher &
Flom LLP (NYC)
Four Times Square
42nd floor
New York, NY 10036
212 735 3000
Fax: 212 735 2000
Email: jkasner@skadden.com
*ATTORNEY TO BE NOTICED*

Thomas Jerome Nolan
Skadden, Arps, Slate, Meagher &
Flom, LLP (Los Angeles)
300 South Grand Avenue
34th Floor
Los Angeles, CA 90071
(213) 687-5250
Fax: (213) 687-5600
Email: thomas.nolan@skadden.com

*ATTORNEY TO BE NOTICED*

Defendant

Henry Bath & Son Limited

Defendant

Limited Metal Exchange Limited

Defendant

LME Holdings Limited                  represented by  William H. Horton
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

Defendant

The Goldman Sachs Group Inc.          represented by  Robert A Sacks
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

Defendant

John Does 1-20

Defendant

John Does 1-25

Defendant

MCEPF Metro I, Inc.

Defendant

MITSI Holdings LLC

Defendant

Pacorini Metals AG

Defendant

Nems (USA) Inc.
*TERMINATED: 01/24/2014*