UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                            :     13 MD 2481 (KBF)

IN RE ALUMINUM WAREHOUSING    :
ANTITRUST LITIGATION               :

                            :    **CONSOLIDATED AMENDED CLASS**

                            :    **ACTION COMPLAINT**

This Document Relates To:      :

                            :

DIRECT PURCHASER CASES      :

                            :    **JURY TRIAL DEMANDED**
------------------------------------------------------x

**LOVELL STEWART HALEBIAN
JACOBSON L.L.P.**
61 Broadway, Suite 501
New York, NY 10006
Tel:    (212) 608-1900
Fax:   (212) 719-4677

**GRANT & EISENHOFER, P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel:    (646) 722-8500
Fax:   (646) 722-8501

**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:    (619) 231-1058
Fax:   (619) 231-7423

## TABLE OF CONTENTS

I.   Summary of Allegations ....................................................................................1

    A.   The London Metal Exchange Defendants and the Goldman Defendants...............1

        1.   Overview of Violations and Admissions ......................................................1

        2.   The Benchmark Price For First Level Purchases of Aluminum In The United States ...................................................................................................4

        3.   The LME And Goldman Defendants' Agreement Caused Record High Midwest Premium Prices When Such Prices Should Have Been Very Low, And Record High LME Detroit Warehouse Aluminum Supplies When Such Supplies Should Have Been Very Low ...................................5

        4.   The LME and Goldman Defendants' Mutual Motives For Their Multiple Agreements ......................................................................................9

        5.   The LME And Goldman Defendants' Agreements In Unreasonable Restraint Of Trade......................................................................................10

            a.   Such Defendants Agree Both To The LME Minimum Load-Out Rule, And Its Resulting Price Inflation Effects And Other Anticompetitive Effects ........................................................10

            b.   The Goldman Defendants' Incentive Payment Agreements..........13

            c.   The LME And Goldman Defendants Agree To Reject Their Own Paid Consultant's Recommendation, And To Make Only Superficial Changes To The Minimum Load-Out Rule ...............15

            d.   The LME and Goldman Defendants' Agreement To Increase Storage Rates and Load-Out Charges To Help Generate Billions Of Dollars In Revenues ...............................................................17

        6.   Anticompetitive Effects Of Violations .....................................................18

        7.   False Statements........................................................................................22

        8.   Plausible Indications Of The Agreements .................................................22

    B.   Warehouse Defendants .......................................................................................29

II.     Jurisdiction And Venue.................................................................................29

III.    Parties...........................................................................................................31

        A.      Plaintiffs...........................................................................................31

        B.      Defendants .......................................................................................35

        C.      Jane Doe Defendants.......................................................................41

IV.     Substantive Allegations ..............................................................................41

        A.      LME Aluminum Forward Contracts................................................41

        B.      Defendants' Unlawful Agreements..................................................43

LME Statements Pursuant To The Agreement; LME Partial Admissions ...................58

        C.      The LME Defendants' Monopoly Power .........................................66

        D.      The Goldman Defendants' Monopoly Power ...................................69

        E.      Relevant Market...............................................................................69

        F.      Effects On Interstate Commerce And Injury To Plaintiffs And Class
                Members ...........................................................................................74

        G.      Allegations of Antitrust Injury To Plaintiffs And The Class.................76

        H.      Class Allegations .............................................................................77

V.      Claims For Relief.........................................................................................79

As And For A First Claim For Violations Of Section 1 Of The Sherman Act Against
The LME, Goldman, And Jane Doe Defendants ........................................................79

As And For A Second Claim For Violations Of Section 2 Of The Sherman Act Against The
LME, Goldman, And Jane Doe Defendants ................................................................82

As And For A Third Claim For Violation Of Section 1 Of The Sherman Act Against All
Defendants ..................................................................................................................83

    A.      The Warehouse Defendants Controlled The LME During The Class Period........85

    B.      Warehouse Defendants' Collective Control of the LME and Collusion With One Another Allowed Them To Manipulate The Supply And Price Of Aluminum ...................................................................................................87

    C.      By Manipulating The Supply And Price Of Aluminum, Warehouse Defendants Generated Profits For Themselves, Through Derivatives Trading And Storage Fees, And Injured Plaintiffs ..................................................................90

As And For A Fourth Claim For Violations Of Section 2 Of The Sherman Act Against All Defendants .................................................................................................108

As And For A Fifth Claim Against Defendants..........................................................109

Violation of The Michigan Antitrust Reform Act, MCL §§ 445.773, *et seq.*. ...........................109

As And For A Sixth Claim Against Defendants .......................................................110

Violations of New York Donnelly Act New York General Business Law § 340, et seq. ...........110

As And For A Seventh Claim Against Defendants ...................................................111

Violation of Certain Other State Antitrust Statutes ..................................................111

As And For An Eighth Claim Against Defendants....................................................112

Violation of Certain State Unfair Trade Practices Acts...........................................112

Prayer For Relief .......................................................................................114

Demand For Jury........................................................................................114

The Direct Purchaser Plaintiffs ("Plaintiffs") complain, upon knowledge as to themselves and their own acts, and upon information[1] and belief as to all other matters, as follows:

## I.      SUMMARY OF ALLEGATIONS

**A.      The London Metal Exchange Defendants and the Goldman Defendants**

**1.      Overview of Violations and Admissions**

1.      In violation of Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C §§1 and 2, and State laws, the Goldman Sachs Defendants (*see* ¶¶116-123) ("Goldman"), the London Metal Exchange Defendants (*see* ¶¶124-130) ("LME") and other Defendants (as defined in ¶143) have, from May 1, 2009 forward (the "Class Period"), combined, conspired or agreed with one another and other persons to inflate aluminum prices, restrain aluminum supplies in LME Detroit Warehousing (as defined in ¶19), and provide extremely inefficient, low quality load out and other services.  This includes in the essential facility of warehousing.

2.      The purposes of the antitrust laws have been to reduce prices, increase product, improve efficiency, and improve quality. By agreeing intentionally to inflate prices, restrain supplies, and cause very inefficient and low quality load out and other services, Defendants have violated and defeated all four purposes of the antitrust laws.

3.      There were repeated and ongoing public complaints from 2010 forward that the LME and Goldman Defendants were inflating aluminum prices and restraining supplies.  *See* ¶¶157-175.  Based upon the repeated public complaints and other information, the LME and

---

[1] The information is based upon the investigation of counsel from publicly available information about aluminum prices, the Midwest premium and Midwest Transaction Prices, data on aluminum load-in and aluminum load-outs, other statistics, news articles, Defendants' statements, Congressional testimony, analysis, and other sources, including other complaints herein.

Goldman Defendants had complete notice and knowledge that they were inflating aluminum prices, restraining supplies and injuring the persons who paid those inflated prices.

4.      With such notice and knowledge, the LME and Goldman Defendants have, in order to mutually profit themselves and their owners or affiliates, specifically intended to continue and they did agree to inflate prices, restrain supplies, provide inefficient low quality services, and injure persons, like Plaintiffs, who have paid such inflated prices.

5.      (a) In response to these public complaints, a number of long-time LME warehouse operators were uncomfortable during the Class Period with the long times it took to extract aluminum from certain LME warehouses, with the tactics of those warehouses, and with the lack of response.  *See* ¶14.

(b) Offers of logistical services or other assistance were made to reduce the waiting times, and the high amounts of supplies restrained in warehouses, and ameliorate the complaints.  This included during meetings of the LME Warehouse Committee which advises the LME Executive Committee.

(c) These offers were rejected by the LME CEO as "unnecessary" and because the LME "had things under control."

(d) Plaintiffs have good grounds to believe and do allege that the LME's rejection of long-time warehouses' concerns and offers to help reduce the highly anomalous restraints of aluminum supplies, were made pursuant to the agreements alleged herein between the Goldman and LME Defendants.

(e) Pursuant to these unlawful agreements, Defendants continued to provide increasingly more inefficient service in order to generate increasingly greater supra-competitive

2

revenues.  This included from the sale of the LME, which had earlier never achieved more than $15,000,000 in profits in a year, for $2.2 billion in the latter part of 2012.

6.      However, after the successful completion of the sale of the LME and the commencement of governmental administrative or Congressional investigations, the LME reversed certain of its false statements, and the LME and Goldman Defendants reduced or abandoned certain parts of their anticompetitive conduct. ¶¶230-256.

7.      There was no change in market conditions that occurred or prompted these reversals and reductions.  On the contrary, market conditions were similar to those when the false statements were made. What did change was that Defendants had successfully completed their sale of the LME, and had apprehended potential civil or government antitrust claims arising from the government investigations.  *Id.*

8.      In that changed context, the LME and Goldman Defendants intentionally agreed to reduce the degree of their anticompetitive conduct in order to try to escape or reduce their antitrust liability.  Thereby, such Defendants belatedly and effectively admitted some of the falsity in the LME's prior statements.  Defendants had intentionally used such false statements to inflate aluminum prices, restrain aluminum supplies, provide inefficient and low quality warehousing or other services, and injure Plaintiffs.

### 2.      The Benchmark Price For First Level Purchases of Aluminum In The United States

9.      Aluminum is the most abundant metal on earth.  In contrast to the plentitude of sources of aluminum, there (a) is only one venue for exchange traded aluminum futures or aluminum forward contracts in the United States, which is the LME; and (b) there is not a plentitude of ways to price the purchase of primary aluminum from smelters and others.

10.     On the contrary, under the regime in which the LME has had monopoly power over exchange traded aluminum futures and forward contracts in the United States, the common and standardized way in which aluminum has been priced and sold in the United States, during the Class Period has been as follows.

11.     There was a benchmark price consisting of the LME price plus a premium for delivery in the local market.  The sum of these has been called the "all in" price and is also called the "Midwest Transaction Price" by Platts Metals Daily.   That is, contracts for the purchase and sale of aluminum in the United States have used a benchmark pricing term that has two parts.  First is the LME price.  Second is the "local" premium.

12.     In the Midwest and other parts of the United States, Plaintiffs and other first level purchasers of aluminum from smelters (or from Defendants or co-conspirator parties to Defendants' unlawful agreements in unreasonable restraint of trade), have paid a common, standardized benchmark price consisting of the LME price plus the Midwest premium or Platts MW premium (or a premium described by similar names.  The sum of these two payments and any additional premium has been called the "Midwest Transaction Price."

13.     In the remaining areas of the United States, purchasers have paid a common and standardized benchmark price consisting of the LME price plus a premium that typically is higher than the Midwest Premium.

**3.      The LME And Goldman Defendants' Agreement Caused Record High Midwest Premium Prices When Such Prices Should Have Been Very Low, And Record High LME    Detroit Warehouse Aluminum Supplies When Such         Supplies Should Have Been Very Low**

14.     (a) Because price is inversely related to supply, the Midwest premium tends to be low in times of plentiful supply of aluminum.  This occurred in times of very high supplies

4

during the early 1990s.  *See* Chart below.  Those high supplies built up due to the collapse of the former Soviet Union.

      (b) When those supplies were released there were no abuses by warehouse companies.  Rather, long-time LME warehouse companies worked to provide customer service rather than to make agreements with the LME to restrain supplies, inflate prices and increasingly inflate storage revenues through increasingly inefficient services.

      (c) However, during the Class Period, aluminum warehouse inventory supplies did not decrease.  Instead, due to Defendants' unlawful conduct, they continued increasing to all-time high levels of warehouse inventory supply.  These record supplies far exceeded even those inventory supply levels reached during the early 1990's, and presented the opposite pattern of dissipation after the supply build up.



15.     Because price is inversely related to supply, these all-time record high aluminum

inventory supplies during the Class Period should have produced for Plaintiffs and Class

members the benefit of low Midwest and other premiums.

16.     However, due to Defendants' abuses of their monopoly powers and

anticompetitive agreements to inflate prices and supplies, the Midwest premium price has

followed a historically anomalous pattern during the Class Period.  In fact, it has behaved in

exactly the opposite manner that supply, demand and transportation costs indicated. First, the

Midwest Premium did not decrease.  Second, on the contrary, it increased to all-time record

levels.



17.     Moreover, LME Warehouses are supposed to provide an aluminum  storage

repository of "last resort".  That is, during times of an economic downturn, the last resort is to

ship aluminum into LME warehousing. LME warehouse aluminum supplies should increase

during an economic downturn.  Conversely, during times of economic recovery, LME

warehouses supplies should **decrease**.

18.     Accordingly, during the economic recovery of 2010-2013, LME warehouse aluminum supplies should have decreased substantially.  In fact, the sum total of aluminum supplies in LME Warehouses in the United States in locations other than Detroit, did decrease substantially.

19.     However, during the Class Period, the LME and Goldman Defendants intentionally and unlawfully inflated aluminum prices so as to successfully divert into, build up and restrain large amounts of aluminum in warehousing of exchange-traded aluminum in the U.S. including in the Midwest and greater Detroit, Michigan area ("LME Detroit Warehousing").

20.     As a direct result, instead of decreasing substantially along with non-Detroit LME Warehouse supplies in the United States, the aluminum supplies in LME Detroit Warehouses have, contrary to the economic purposes and historical patterns for LME warehouses, anomalously increased during 2010-2013 while the remaining U.S. LME warehouse supplies have decreased.



21.     In fact, as a result of Defendants unlawful conduct, the aluminum supplies in

LME Detroit Warehousing increased to all-time record levels precisely when they should have

been substantially decreasing.



### 4.   The LME and Goldman Defendants' Mutual Motives For Their Multiple Agreements

22.    On the LME portion of its revenues, an LME warehouse's revenues are generated by (i) the amount of the daily storage charge multiplied by (ii) the amount of metal in storage multiplied by (iii) the amount of days the metal is held in storage. In addition, the LME warehouse receives the amount of the load out charge at the time of load out.  The LME and Goldman Defendants' agreements inflated each of the foregoing components of their revenues.

23.    As a result of these agreements, Goldman generated hundreds of millions of dollars per year in supra-competitive revenues during this regime of artificially high storage rates for grossly inefficient services and artificially long delays in loading out record high amounts of aluminum.

24.     The LME shared approximately 1% of these revenues.

25.     Extraordinary increases in such rates and revenues to reward increasing inefficiencies in load-outs imposed increasing deadweight restraints on the economy.  They also reflected Defendants' extreme monopoly pricing power and very unreasonable restraints of trade.

26.     In addition to the supra-competitive storage revenues and load-out revenues, Defendants also stood to gain extraordinary revenues from the sale they were attempting to make during 2011-2012 of the LME. The LME earned only $15 million per year at most. Yet Defendants were seeking to sell the LME for in excess of $1 billion.

27.     In fact, as a result of the performance of their agreements alleged herein, Defendants were able successfully to sell the LME for in excess of $2 billion during late 2012. This resulted in $208 million consideration being paid to Goldman for its 9.5% equity stake in the LME and $260 million being paid to Defendant JPMorgan for its 11.0% stake in the LME.

28.     In order to inflate their respective and joint revenues, including through such successful sale of the LME, the LME and Goldman Defendants agreed during the Class Period in numerous ways to cause and did cause the highly anomalous price and supply increases alleged in the section above.

### 5.     The LME And Goldman Defendants' Agreements In Unreasonable Restraint Of Trade

#### a.     Such Defendants Agree Both To The LME Minimum Load-Out Rule, And Its Resulting Price Inflation Effects And Other Anticompetitive Effects

29.     First, the LME and Goldman Defendants made a "get paid more to do less" inefficiency agreement for load-out services in the essential facility of warehousing.

30.     Specifically, Goldman and the LME agreed that Goldman would engage in an extremely inefficient, low quality of load-out service.  Such service was far less costly than the

load-out services provided by non-LME warehouses.  It was also less costly than even the inefficient load-out services provided by non-Detroit LME warehouses in the United States.

31.   Between 2009 and March 31, 2012, this agreement for inefficient load-outs specified a minimum load-out per day from all of the 37 warehouses in the greater Detroit area of a gross, sum total of 1,500 tons.

32.   The LME and Goldman Defendants' foregoing agreement was unreasonable for multiple independently sufficient reasons. These reasons include the following aspects of the agreement:

  a.   the minimum applied to all the warehouses in greater Detroit rather than per *warehouse*;

  b.   this minimum was not based upon a percentage per day of warehouse capacity or warehouse supply;

  c.   therefore, this agreement would pay Goldman thirty seven times more than it would pay the operator of an LME warehouse in a city with only one LME warehouse for the provision by Goldman of load-out services that were thirty seven times more inefficient than the already inefficient level of load out services provided by the single LME warehouse in a city with only one warehouse;

  d.   the 1,500 tons per day minimum did **not** net out load-ins;

  e.   the absence of a per warehouse requirement, the failure to consider load-ins, and other omissions specifically invited a warehouse owner to shuttle aluminum from warehouse to warehouse in order to be able to say that it satisfied the minimum;

  f.   during the Class Period, the LME and Goldman Defendants transformed this agreement to make **minimum** per day per city load-outs into an agreement, in

11

times of already high storage, that the minimum load-out would also be the **maximum** load-out per day per city;

g.  if allowed to continue in the conditions alleged herein, the foregoing agreement inherently would and it did

- inflate aluminum prices;

-- cause delays in load-outs of 16 months from the day that a load was ordered;

--- trap in LME Detroit Warehousing an amount of aluminum equal to almost 90% of the amount of aluminum produced annually in the entire United States; and

---- cause most steps that could be taken to ameliorate the anticompetitive effects of this agreement to eventually exacerbate such restraints including by lengthening the amounts of the delays in removing aluminum from LME Detroit Warehousing.

33.     Thus, as the LME and Goldman Defendants' agreements inflated LME Detroit Warehousing aluminum supplies, they also inflated the Midwest Premium.



34.     Also as a result of the LME and Goldman Defendants' agreement alleged herein,

the Midwest Transaction Price and the "all in" prices for first level direct purchases of primary

aluminum have been higher than they would have been during the Class Period in the absence of

such agreements.  In this regard, Defendants have knowingly made false statements that

increases in the Midwest Premium supposedly have been precisely offset by supposed decreases

in LME prices.  This is especially false in the real world.  It is also false even in the types of

mathematical models used by banks during 2004-2007 to justify mortgage securitization by the

supposed absence of any significant risks of any substantial defaults.

**b.      The Goldman Defendants' Incentive Payment Agreements**

35.     Subsidized and (mis-)incentivized by their anticompetitive agreements with the

LME Defendants and the resulting actual and prospective supra-competitive revenues, the

13

Goldman Defendants --- with the knowledge, consent and agreement (and to the profit) of the LME Defendants --- made a second level of agreements in unreasonable restraint of trade.

36.     In this second level of agreements, the Goldman Defendants overbid other market participants and further inflated aluminum prices as a means to attract and divert additional aluminum into Goldman's long term storage in LME Detroit Warehousing.

37.     Specifically, Goldman offered and paid incentives of up to $250 or more per ton to firms to store aluminum in LME Detroit Warehousing for long term storage.  These incentive payments caused the inflation of aluminum prices as a prior and necessary step in order for Goldman to outbid others and attract and divert aluminum into the LME Detroit Warehousing. *See* ¶33 above (alleging line graphs of the amounts of aluminum in LME Detroit Warehousing and the amounts of the Midwest Premium).

38.     This second level of anticompetitive agreements has further "inextricably intertwined" the injuries that the LME and Goldman Defendants have intentionally caused through their aluminum price inflation with such Defendants' other anticompetitive aspects of their agreements.  This includes the agreements to restrain aluminum supplies in LME Detroit Warehousing.

39.     Through both levels of agreements, the LME and Goldman Defendants intentionally sought to and did create a positive feedback loop.  In such feedback loop, higher LME Detroit supplies and slower load-outs empowered higher incentive payments.  This caused higher supplies and slower load-outs which empowered higher incentive payments which caused higher LME Detroit supplies and slower load-outs, etc.

40.     (a) Thus, Defendants' price inflating incentive payment agreements intentionally restrained significant amounts of aluminum in long term storage in LME Detroit Warehousing and thereby prolonged the unreasonable load-out delays.

(b) There are steps and conduct involving a non-monopolist or strictly private transaction which may be permitted under the antitrust laws but which are prohibited when taken by a monopolist or with respect to public prices or essential services.  The LME and Goldman each was a monopolist. Each held an essential facility.  Each held power over the public prices for aluminum.

(c) Here it would have been an unlawful and unreasonable restraint of trade for anyone, and it was especially deleterious and unlawful for the LME or Goldman, to agree to make these agreements.

(d) It was also an exclusionary, restrictive and extremely anticompetitive abuse of their respective monopoly powers for Goldman (with the LME's acquiescence and consent) to use its monopoly to inflate prices in order to restrain and tie up significant amounts of aluminum for long time periods in Detroit.

c.     **The LME And Goldman Defendants Agree To Reject Their Own Paid Consultant's Recommendation, And To Make Only Superficial Changes To The Minimum Load-Out Rule**

41.     As the LME and Goldman Defendants adhered to and continued to perform their agreements during the Class Period, the amount of aluminum stored in LME Detroit Warehousing and the amount of time it took to load such aluminum out of LME Detroit Warehousing continued to increase to extraordinary levels.

42.     This provoked an increasingly high degree of complaints from the public during 2010-2013 the LME and Goldman Defendants were restraining aluminum supplies and inflating aluminum prices.

43.     In response to these complaints, the LME and Goldman Defendants further agreed to make superficial changes in their agreements. They intended these changes to assuage public complaints but allow such Defendants to continue their price inflation and unreasonable restraints of trade.

44.     For one example, such Defendants had performed internal analyses and retained a paid consultant, Europe Economics, to perform analyses.  Based upon such analyses, the LME and Goldman Defendants determined that they would not reduce the supplies restrained in nor the delays in obtaining aluminum from LME Detroit Warehousing, if they amended their load-out agreement, effective April 1, 2012, to increase the minimum load-out from 1,500 tons to 3,000 tons per day for LME Detroit Warehousing.

45.     Accordingly, such Defendants rejected the recommendation of their own paid consultant, Europe Economics, to require 1,500 tons minimum load-outs per day per 300,000 tons stored in a city.  That recommendation would have increased the minimum load-outs in Detroit to 6,000-7,500 tons per day.

46.     Instead, the LME and Goldman Defendants mutually agreed upon a superficial amendment to their minimum load-out agreement for Detroit from 1,500 to 3,000 tons per day, and further agreed that this modification would NOT be implemented until April 1, 2012.

47.     This modification, as the LME and Goldman Defendants well knew, would thus take effect only **after** the load-out delays and amounts of supplies in LME Detroit Warehousing

16

had grown to such an extent that the change to 3,000 tons per day would not reduce the delays or the amounts of aluminum in LME Detroit storage.

48.     Thereby, the LME and Goldman Defendants mutually agreed not just to this inadequate change in the anticompetitive minimum load-out rule.  Such Defendants also mutually demonstrated their continuing agreement to cause the price inflation, all the other anticompetitive effects, and the injuries to Plaintiffs and the Class alleged herein.  This, notwithstanding the notices to them from numerous public complaints.

49.     By thus prolonging the all-time record high amounts of aluminum stored in, and the all-time record delays in taking aluminum out of, LME Detroit Warehousing, the LME and Goldman Defendants ensured that

        (a) their extremely high supra-competitive storage revenues from LME Detroit Warehousing would continue, and

        (b) the projected sale value of the LME would remain high during times when Defendants were actively seeking to sell the LME to new owners.

> **d.     The LME and Goldman Defendants' Agreement To Increase Storage Rates and Load-Out Charges To Help Generate Billions Of Dollars In Revenues**

50.     Moreover, using their rejection of their own paid consultant's explicit recommendation and their public superficial modification of the minimum load-out rule as a rationale, the LME and Goldman Defendants announced that they had also agreed to further increases in (a) the required storage rates for LME Detroit Warehousing, and (b) the load-out charges.

51.     These increases in the storage rates and the load-out rates, in reality, ensured that the Goldman Defendants' and the LME Defendants' projected storage revenues from providing

inefficient services would actually increase after April 1, 2012.  Such increases also tended to

ensure that the projected sale value of the LME would also increase.  All of the foregoing were

to the mutual financial benefit of the LME and Goldman Defendants.

52.     Exacerbating the anticompetitive extent, effects, incentives, and pernicious

consequences of their foregoing agreements, the LME and Goldman Defendants further agreed

during the Class Period on very substantial increases in the daily storage costs for LME Detroit

Warehousing, and in the load out charge therefor (sometimes called the Free on Truck (or

"FoT") charge).

53.     Thereby, such Defendants agreed to increase the storage charges from 35¢ to 48¢

per day per ton during the Class Period, *i.e.,* by more than 33 $^{1/3}$% from 2009 to 2013.  The 48¢

per day per ton is three times the competitive rates charged by non-LME warehouses for

efficient, high quality warehousing services.

54.     Also, the load-out charges later grew to in excess of $39.00 per ton, which far

exceeded competitive rates at non-LME warehouses.  Indeed, $39.00 per ton is the equivalent of

approximately 77 days' worth of the grossly inflated LME Detroit Warehousing storage rates.

### 6.     Anticompetitive Effects Of Violations

55.     The New York Times reported in June 2013 that the Goldman Defendants

shuttled aluminum from warehouse to warehouse in order to use up and satisfy the minimum

load-out rule without actually loading aluminum out of the LME Detroit Warehousing.

56.     Based upon this article, witness statements therein, and investigation, Plaintiffs

have good grounds to believe and do allege that the Goldman Defendants, by themselves or with

the Warehouse Defendants (as defined in the Third Claim, ¶346) or the Jane Doe Defendants,

agreed to and did slow the actual amounts of aluminum loaded out from LME Detroit
Warehousing and prolonged the delays in removing aluminum from LME Detroit Warehousing.

57.     (a) In times of economic improvement from 2010-2013, the amount of aluminum
stored in LME non-Detroit warehouses in the U.S. **decreased** substantially.

(b) Distorting the U.S. economy, Goldman's foregoing agreements with the LME
and their "incentive payment" agreements with others, have caused the amount of aluminum
trapped in LME Detroit Warehousing to increase, not decrease.  In fact, such aluminum supplies
increased by more than 60% to more than 1.5 million tons of aluminum in LME Detroit
Warehousing.

(c) This constituted almost 90% of an entire year's production of aluminum in the
United States. It also made up approximately 75% of the LME aluminum in storage in the United
States.

(d) As a result of the large amount of aluminum in storage in Goldman's LME
Detroit Warehousing and such Defendants' unlawful agreements, it reportedly took by June 2013
as long as sixteen months for a customer to receive their aluminum from the time they order such
aluminum to be loaded out of the Detroit warehouse until the time of actual delivery.

58.     These delays and large contra-economic trend supply increases have restrained
and trapped such a large portion of the available U.S. supplies of aluminum that they have been
inflating aluminum prices throughout the Class Period.  Despite repeated public complaints since
late 2010 or early 2011 that the LME and Goldman Defendants were inflating aluminum prices,
they knowingly persisted in continuing to perform their agreements.  They thereby caused the
inflation of the Platts MW Premium or Midwest Premium prices for aluminum to repeated all-
time record highs:

19

| February 2010 | 6.1430 ¢ per pound |
|---|---|
| February 2011 | 6.3500 ¢ per pound |
| June 2011 | 8.8056 ¢ per pound |
| February 2013 | 11.6500 ¢ per pound |
| Post May 2013 | 13.0¢ per pound |
| Post announcement of LME reforms and Goldman's apology (¶¶233-248) | 11.0¢ per pound |

59.     The violative conduct of Goldman and the LME have had multiple anticompetitive effects and caused multiple unreasonable and pernicious restraints of trade or commerce.  These include, but are not limited to the following:

(a)  all-time record Midwest premium prices for aluminum at times when the Midwest premium should have been very low;

(b)  higher levels of "all in" aluminum prices or Midwest Transaction Prices existed than should have existed and, in the absence of the unlawful conduct alleged herein, would have existed;

(c)  all-time record amounts of aluminum were stored in LME warehouses at times when the amounts of the LME aluminum supplies should have been low;

(d)  substantial increases in LME aluminum supplies occurred at times when the LME aluminum supplies should have been decreasing;

(e)  all-time record delays of sixteen months or more in removing aluminum from LME Detroit Warehousing occurred at times when there should have been no delays;

(f)  the uneconomic restraint of almost 90% of an entire year's worth of U.S. production of aluminum in the LME Detroit Warehousing and subject to a load-out time of in excess of 16 months;

(g)  the further restraint that, in the absence of appropriate LME relief (which has never been ordered), the projected load-out times for this hoard of aluminum in Detroit

20

would actually increase when the LME warrants for the aluminum in LME Detroit
Warehousing are cancelled in order to order load-outs, *i.e.,* the restraint of trade
inherently includes a further restraint that the load-out delays eventually will become
worse;

(h) thus, despite Defendants' various reductions in their anticompetitive conduct alleged
below, the amount of aluminum restrained in Detroit grew by year-end 2013 to 1.5
million tons, and the Midwest Premium, after initially falling for four months, then
capitulated and increased dramatically at year end 2013 and in early 2014;

(i) commercial users and consumers of aluminum who source aluminum through LME
forward contracts and warehouses have been so thoroughly driven and restrained
from participating in the LME Detroit Warehousing that their participation reportedly
was virtually non-existent by July –August 2013;

(j) grossly supra-competitive LME warehouse storage and load-out rates for extremely
inefficient and low quality LME warehouse load out and other services; and

(k) storage rates that are approximately three times the competitive storage rates charged
by non-LME warehouses that provide high quality warehouse load-out and other
services.

60.    With full knowledge that they were inflating such prices and causing all the other
anticompetitive effects alleged herein, the LME and Goldman Defendants agreed to continue to
perform their agreement and continue to cause the foregoing alleged price inflation and other
anticompetitive effects.

61.     The foregoing agreement of the LME and Goldman Defendants and their purposes and effects were extremely anticompetitive and reflected the extreme monopoly and market powers that the LME and Goldman possessed.

### 7.     False Statements

62.     In the LME's words in the latter part of 2012, changes with "bazooka" impact would be made to correct load-out delays. This continued various earlier favorable statements that the LME had made in order to assuage market participants.

63.     After the sale of the LME had closed however, the LME Defendants changed their position.  In response to the complaints about high prices, the LME stated, per Chris Evans, in New York during January 2013, that purchasers of aluminum supposedly should simply stop paying the high prices.  In effect, the LME told the victims to starve themselves of aluminum (and, impliedly, to lay off workers) so that Goldman and the LME could continue and increase their supra-competitive revenues, price inflation and other anticompetitive conduct and effects.

64.     Contrary to the LME's classic monopolistic and anticompetitive statements, however, Plaintiffs and users of aluminum who have complained about Defendants' practices do not have to further restrain trade and lay off their workers so that Defendants' unlawful agreements and abuses of their monopoly powers alleged herein, may continue.

65.     Indeed, after such statement by the LME in January 2013 in New York, investigations accelerated and disclosures were made of shuttling aluminum from warehouse to warehouse in Detroit.  Defendants then agreed to reduce and reverse various of their conduct, and apologized rather than blaming the victim.

### 8.     Plausible Indications Of The Agreements

22

66.     Multiple facts alleged herein plausibly indicate that the LME Defendants and the Goldman Defendants did enter their alleged agreements in restraint of trade.  Some but not all of such facts include those alleged below.

67.     **First**, plausibly indicating the existence of such agreements, portions thereof are reflected in written LME documents and releases, or have been acknowledged in statements to the public by the LME or Goldman.

68.     (a) **Second**, further adding to the plausibility of the existence of such agreements, Defendants have had a shared, common financial motive to make such agreements.  The LME reportedly receives approximately 1.0% of the total storage fees charged by LME warehouses. This includes 1.0% of revenues realized from the LME Detroit Warehousing.

(b) For most of the Class Period, the largest shareholders of the Defendant LME Holdings Limited were the Goldman Defendants, and other financial firms which owned LME approved warehouses.  The Goldman Defendants and these other financial firms could and did direct, as traders and as intermediaries, large amounts of business to the LME (or away from the LME).

(c) In entering and successfully performing the unlawful agreement alleged herein, the LME had a strong financial motive to inflate their storage revenues not only for LME Detroit Warehousing, but, for other warehousing as well.

69.     **Third**, such prospect of increasing revenues for the LME supplied Defendants with an additional motive to make the agreements here.  That was, Defendants were looking to sell the LME from Defendant LME Holdings Inc., to a new buyer.  The prospect of increasing warehouse revenues arose from a shift that Goldman (as a "master of the universe" investment bank) was encouraging in the function of the U.S. economy.  That shift was to enrich warehouses

23

and banks rather than efficiently market commodities.  This incipient shift enabled Defendants to project cash flows and sell the LME to Hong Kong Exchanges & Clearing Ltd. ("HKEx") for $2.2 billion.  Goldman's stake in the LME was valued at $208 million at that purchase price.  Defendant JPMorgan's stake was valued at $260 million.  *See* below.

70.     Defendant JP Morgan was the largest LME shareholder with approximately 1.4 million ordinary shares (10.9%).  JPMorgan also owned LME approved warehouses.  During the Class Period, JP Morgan owned LME warehouses in Baltimore, Chicago, New Orleans, Liverpool, Hull (Immingham), Bilbao, Trieste, Antwerp, Rotterdam, Singapore, Busan, Gwangyang, and Johor (Pasir Gudang).

(b) Other large shareholders of LME Holdings included Goldamn 9.5%, Metdist 9.39%, UBS 4.26%, Citigroup 2.32%, Merrill Lynch 2.32% Morgan Stanley 2.32%, Koch Metals 2.32%, and Jeffries Bache 1.93%.  Glencore was a .4% owner of "B" shares in the LME.

71.     **Fourth**, also plausibly indicating the agreements alleged herein, Goldman's and the LME's parallel conduct has caused a historically anomalous and unprecedented movement to all time record levels in the Midwest Premium and Platts MW Premium aluminum prices.  No fundamental economic forces exist to cause such record increases. On the contrary, the economic circumstances of plentiful supplies indicated that no premium or a low premium (**NOT** all –time record high premiums) should exist.

72.     **Fifth**, as the direct and Defendants' specifically intended result of the price inflation, that the LME and Goldman purposely caused, they effected economically anomalous and historically unprecedented increases in the amounts of the aluminum supplies in LME Detroit Warehousing. This occurred in economic conditions of a business "recovery" in which large decreases in such supplies should have occurred.

24

73.     **Sixth**, also indicating the plausibility of the existence of Defendants' agreement, the LME and Goldman continued their course of highly unusual parallel conduct notwithstanding an extremely high degree of public complaints that Defendants were causing inflated aluminum prices.  With full knowledge that they were inflating such prices, Defendants have modified such course of conduct only to the most superficial extent in order to rationalize some response to the public protests.  But Defendants have continued to cause record inflations in the Midwest Premium or Platts MW Premium.

74.     **Seventh**, Defendants have engaged, sometimes jointly and sometimes individually, in a series of highly unusual parallel acts that could not be taken without one another's consent.  These joint, coordinated or individual steps were required to provide and have provided the mutual benefits alleged herein.

75.     **Eighth**, further plausibly indicating an agreement, government investigations of Defendants' conduct began to be announced by the European Union in November 2012.

76.     **Ninth**, further plausibly indicating the existence of the agreements alleged herein, Goldman's head aluminum trader Scott Evans, departed Goldman after the announcement of the European Union investigation.

77.     **Tenth**, further adding to such plausibility, Goldman, shortly after the announcement of such EU investigation, began to try to sell its LME Detroit Warehousing.

78.     **Eleventh**, the LME, before the acquisition by HKEx, and while still under the leadership of CEO Martin Abbott, argued that the LME Detroit Warehouse load-out queues of greater than sixteen months were part of the economic environment, and that it was not the LME's place to change its agreements so as to reduce them.  Even after such acquisition by HKEx and after promising statements from the new owners about reform, the LME stated the

queues were not causing price increases and that persons in Plaintiffs' positions should simply stop paying the high prices. *See* ¶63 (Chris Evans' statements made in this District).

79.     **Twelfth**, after Mr. Abbott's resignation as the LME's Chief Executive in June 2013, the new LME regime (under HKEx's ownership) partially reversed itself and admitted that the long queues had caused increases in the Midwest premium price. It proposed changes in load-out rules that would force warehouses with queues of at least 100 days (*i.e.*, Defendant Metro) to deliver metal out at a rate of at least 1,500 tons per day **more than** is brought in.

80.     **Thirteenth**, in July 2013 Goldman, under the foregoing intensifying investigations by U.S. authorities and after the LME's change in the load-out rates, announced that it was suspending the incentive payments it had made to attract metal to their LME Detroit Warehousing.

81.     **Fourteenth**, after further increases in U.S. government scrutiny, on July 31, 2013, Goldman announced that it would offer to release some of the aluminum in its LME Detroit Warehousing only to "consumers" holding cancelled warrants.

82.     During the time of Defendants' partial reversals and reductions in the degree of their anticompetitve conduct between late June and October 2013, supply-demand conditions remained roughly similar to the period before. In these conditions, the Midwest Premium reversed its long period of increases. It fell by more than 10%.

83.     However, two pernicious aspects of Defendants' agreement in restraint of trade were (a) the restraints had driven commercial consumers of aluminum away from using the LME Detroit Warehousing, and (b) most steps to correct the large supply build up in Detroit would lengthen the load-out delays.

84.     Also, actual and prospective demand for aluminum in the United States was increasing by at least October 2012.  It continued to increase thereafter.  The actual increases are reflected in, for example, increased GDP growth.  The prospective improvements are reflected in, for example, actual and rumored announcements by automakers that they would switch the bodies of their autos from steel to aluminum.

85.     Such increases in demand were occurring while the LME and Goldman Defendants continued to agree to refuse to implement the recommendations of their paid consultant, Europe Economics, to calculate the minimum load-out based on 1,500 tons for each 300,000 tons in storage.  Moreover, the amount of aluminum in Detroit increased in late 2013 to 1.56 million tons.  This meant that the load-out would have been 7,500 tons per day under the recommendation of Defendants' own paid consultant, Europe Economics.  Instead, the only change by the LME and Goldman Defendants was to provide for load-outs of 1,500 tons per day in excess of load-ins effective April 1, 2014.

86.     The foregoing increases in demand and continued restraint of supply occurred in the context of a North American deficit in production versus consumption of 1.9 million tons per year.  This resulted in a dependence on aluminum imports to satisfy current commercial consumption needs for aluminum.  This supply was threatened during the latter half of 2013 by the Glencore Defendants' restraints of increasing amounts of LME warehouse aluminum in Vlissingen, Holland.  *See* Third Claim.

87.     In addition to the increased restraints by the Warehouse Defendants of aluminum during October-December 2013, the worldwide supply-demand balance for aluminum reportedly shifted from a net surplus to a net deficit.  This further threatened aluminum imports into the United States.

27

88.     Also, during December 2013-January 2014, reports circulated of short covering by unnamed traders.  As a consequence of all the foregoing, the Midwest Premium resumed and extended its increases during November 2013-January 2014.  The Midwest Premium has since been decreasing, and the deferred prices for Midwest Premium nine months out are still lower.  However, the Midwest Premium remains artificially inflated due to Defendants' unlawful conduct alleged herein.

89.     Also, the Midwest Transaction Price or the "all in" price for aluminum in the United States has also remained higher than it otherwise would have been due to Defendants' unlawful conduct alleged herein.

90.     **Section 1 Violations**.  The Goldman Defendants' agreements with one another, the LME Defendants and the Jane Doe Defendants constitute *per se* violations of Section 1 of the Sherman Act as well as extremely unreasonable agreements, conspiracies or combinations in restraint of trade, which were designed to and did directly fix, maintain and inflate the prices of aluminum.

91.     **Section 2 Violations**.  The London Metal Exchange Defendants and the Goldman Defendants have each anti-competitively abused their respective monopoly powers in violation of Section 2 of the Sherman Act.  Separately and additionally, they have also agreed, in violation of Section 2, with one another and others to abuse such monopoly power to their mutual benefit.

92.     **Injury and Damages**.

(a) By inflating prices (including the Midwest Premium or Platts MW premium price), by restraining aluminum supplies the LME Detroit Warehousing, by diverting aluminum from productive uses into the LME Detroit Warehousing, and by their inefficiencies and other conduct, Defendants have directly and intentionally injured persons, such as Plaintiffs, who

purchased aluminum at the inflated prices, including the Midwest Premium or Platts MW premium prices.

(b) As a direct result of Defendants' foregoing violations, Defendants have inflated their revenues from the LME Detroit Warehousing.

### B.    Warehouse Defendants

93.    In violation of Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C §§1 and 2, and State laws, the Warehouse Defendants (as defined in the Third Claim, ¶346),combined, conspired or agreed with one another and the other Defendants and other persons to inflate aluminum prices, restrain aluminum supplies in LME Warehousing and provide extremely inefficient, low quality load out and other services.  This includes in the essential facility of warehousing.  *See* Third Claim *infra*.

94.    **Jane Doe Defendants.**  The Jane Doe Defendants are persons who, (a) entered agreements in restraint of trade with the other Defendants, (b) shipped aluminum directly to LME Detroit Warehousing in order, in whole or in part, to fix, maintain, or inflate the Midwest Premium, or (c) otherwise combined, conspired, or agreed with Defendants or others in order to inflate prices and/or restrain aluminum supplies and/or to profit therefrom.

95.    The Defendants' unlawful agreements and conduct inflated the prices paid by Plaintiffs and had other deleterious consequences.  *See* Third Claim.

## II.    <u>JURISDICTION AND VENUE</u>

96.    This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

97.    The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the laws of the several states.

98.     This Court has subject matter jurisdiction over Plaintiff's claims under the laws of the several states pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), in that this is a class action in which the members of the Class (as defined herein) exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of the Class are citizens of a state different from some Defendants.

99.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

100.    Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

101.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airlines, wires, wireless spectrum, and the U.S. mail, to effectuate their illegal  conspiracy to monopolize and otherwise retrain trade.

102.    Defendants' manipulation, conspiracy and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act.

103.    Defendants' conduct had a substantial effect on the intrastate commerce of each of the fifty United States and its territories.

104.    This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their

coconspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in this District.   The conspiracy to monopolize and otherwise retrain trade alleged herein was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

### III.   PARTIES

#### A.   Plaintiffs

105.   Plaintiff Ampal, Inc. ("Ampal") is located in Flemington, New Jersey.  During the Class Period, Ampal made first level direct purchases of primary aluminum ingot pursuant to written contracts, in which the purchase price for such aluminum was based upon the Midwest Transaction Price and the Midwest Premium or Platts MW Premium prices.  Ampal also may have directly purchased primary aluminum from a Jane Doe Defendant at such prices.  Ampal was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Ampal has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

106.   Plaintiff Admiral Beverage ("Admiral") is headquartered in Worland, Wyoming. Admiral, by way of assignment from Crown Holdings, Inc. ( "Crown Holdings"), made first level direct purchases of primary aluminum pursuant to written contracts in which the purchase price for such aluminum was based upon Midwest Premium or Platts MW Premium prices. Admiral, by way of assignment from Crown Holdings, may also have purchased primary aluminum directly from Jane Doe Defendants based upon such prices.  Admiral was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Admiral has directly

31

suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

107.    Plaintiff Central Aluminum Company ("Central Aluminum") is located in Columbus, Ohio.  During the Class Period, Central Aluminum made first level direct purchases of primary aluminum billet pursuant to written contracts, in which the purchase price for aluminum was based upon the Midwest Transaction Price and the Midwest Premium or Platts MW Premium prices.  Central Aluminum was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Central Aluminum has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

108.    Plaintiff Claridge Products and Equipment, Inc. ("Claridge Products") is located in Harrison, Arkansas.  During the Class Period, Claridge Products made first level direct purchases of primary aluminum billet pursuant to written contracts, in which the purchase price for aluminum was based upon Midwest Premium or Platts MW Premium prices and the Midwest Transaction Price.  Claridge Products also may have purchased primary aluminum directly from a Jane Doe Defendant at such prices.  Claridge Products was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Claridge Products has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

109.    Plaintiff Custom Aluminum Products, Inc. ("Custom Aluminum") is located in South Elgin, Illinois.  During the Class Period, Custom Aluminum made first level direct purchases of primary aluminum billet pursuant to written contracts in which the purchase price

for aluminum was based upon Midwest Premium or Platts MW Premium prices and Midwest Transaction Price.  Custom Aluminum may also have made purchases directly from Jane Doe Defendants at such prices.  Custom Aluminum was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Custom Aluminum has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

110.    Plaintiff Extruded Aluminum Corporation ("Extruded Aluminum") is located in Belding, Michigan.  During the Class Period, Extruded Aluminum made first level direct purchases of primary aluminum billet pursuant to written contracts in which the purchase price for aluminum was based upon the Midwest Premium or Platts MW Premium prices.  Further, Extruded Aluminum may also have directly purchased primary aluminum from a Jane Doe Defendant based upon such prices.  Extruded Aluminum was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Extruded Aluminum has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

111.    Plaintiff International Extrusions, Inc. ("International Extrusions") is located in Garden City, Michigan.  During the Class Period, International Extrusions made first level direct purchases of primary aluminum billet pursuant to written contracts in which the purchase price for aluminum was based upon the Midwest Transaction Price, the Midwest Premium or Platts MW Premium prices.  Plaintiff International Extrusions may also have directly purchased primary aluminum from a Jane Doe Defendant based upon such prices.  International Extrusions

also purchased primary aluminum from persons who were obtaining aluminum from the LME warehouses and experienced delays in receiving that aluminum. International Extrusions was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period. International Extrusions has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

112.    Plaintiff Pierce Aluminum Company ("Pierce") is located in Franklin, Massachusetts. During the Class Period, Pierce made first level direct purchases of primary aluminum pursuant to written contracts in which the purchase price for the aluminum was based upon the Midwest Transaction Price, the Midwest Premium or the Platts MW Premium price. Further, Plaintiff Pierce also may have directly purchased primary aluminum from a Jane Doe Defendant based upon such prices. Pierce was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period. Pierce has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

113.    Plaintiff Superior Extrusion, Inc. ("Superior Extrusion") is located in Gwinn, Michigan. During the Class Period, Superior Extrusion made first level direct purchases of primary aluminum pursuant to written contracts, in which the purchase price for the aluminum was based upon Midwest Transaction Price, and the Midwest Premium or Platts MW Premium prices. Further, Plaintiff Superior Extrusions may also have directly purchased primary aluminum from a Jane Doe Defendant based upon such prices. Plaintiff Superior Extrusions also purchased primary aluminum from persons who were obtaining aluminum from the LME warehouses and experienced delays in receiving that aluminum. Superior Extrusion was

damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Superior Extrusion has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

114.     Plaintiff Talan Products Inc. ("Talan") is located in Cleveland, Ohio.  During the Class Period, Talan made first level direct purchases of primary aluminum ingot and billet pursuant to written contracts in which the purchase price for aluminum was based upon Midwest Premium or Platts MW Premium prices [and Midwest Transaction Price].  This includes purchases of formerly LME warranted aluminum.  Talan also may have directly purchased primary aluminum from Jane Doe Defendants at such prices.  Talan was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period. Talan has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

115.     Plaintiff Thule, Inc. ("Thule") is located in Seymour, Connecticut.  During the Class Period, Thule made first level direct purchases of primary aluminum pursuant to written contracts in which the purchase price for the aluminum was based upon the Midwest Transaction Price, the Midwest Premium or the Platts MW Premium price.  Further, Plaintiff Thule also may have directly purchased primary aluminum from a Jane Doe Defendant based upon such prices.  Thule was damaged in its property or business by purchasing aluminum based upon prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Thule has directly suffered antitrust injury by transacting in the market in which Defendants were intentionally inflating prices.

   **B.**     **Defendants**

116.    **Goldman Defendants.**  Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a leading global investment banking, securities, and investment management firm that provides a wide range of financial services to a substantial and diversified client base.  Goldman Sachs is a Delaware corporation headquartered at at 200 West Street, New York, New York 10282.

117.    Goldman Sachs was a shareholder of the LME during the Class Period, until the LME was acquired by HMEx.

118.    Defendant GS Power Holdings LLC ("GS Power Holdings") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware limited liability company located at 85 Broad Street, New York, NY 10004.

119.    Defendant MCEPF Metro I, Inc. ("MCEPF Metro I") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware corporation with a registered address of 160 Greentree Drive, Suite 101, Dover, DE 19904.

120.    Defendant Mitsi Holdings LLC ("Mitsi") is a Delaware limited liability corporation located at 39533 Woodward Ave., Suite 170, Bloomfield Hills, Michigan 48304. It is co-co-owned by GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

121.    Defendant Metro International Trade Services LLC ("Metro International") is a Delaware limited liability corporation with a registered address at 39533 Woodward Ave., Suite 170, Bloomfield Hills, Michigan 48304. Its headquarters are located at 6850 Middlebelt Road, Romulus, Michigan 48174. Metro International is owned directly by Mitsi and operates as a subsidiary of Goldman Sachs, which owns Mitsi through its ownership of GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

122.   Metro International is a global warehouse operator, specializing in the storage of non-ferrous metals, including aluminum, for the London Metal Exchange.  Metro International is an LME-approved warehouse.  Metro International was acquired by Goldman in February 2010. As of March 8, 2013, Goldman, through Metro International, sowned and operated 29 out of a total of 37 LME-listed storage facilities and more than 80% of the LME warehouse space in greater Detroit, Michigan.[2] Metro International also has a seat on the LME's Warehousing Committee, which makes recommendations on warehousing-related policy issues, plays a role in developing the rules and regulations governing the warehouses, and advises the executive committee.

123.   Goldman Sachs, GS Power Holdings, MCEPF Metro I, Mitsi, and Metro International are referred to herein as the "**Goldman Defendants**."

124.   **LME Defendants.**  Defendant London Metal Exchange Limited ("LME") is the world center for trading industrial metals and more than 80% of all non-ferrous metals futures business is transacted on the LME's trading platforms. The LME brings together industrial and financial participants to create a market for buyers and sellers, and provides producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of rising and falling world metal prices.

125.   The LME also has a large network of storage units for its traded commodities, including aluminum. The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and in this District by, among other things, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of

---

[2] Metro International also owns additional LME-approved warehouses in Chicago, IL, Mobile, AL, Toledo, OH, and New Orleans, LA.

warehouses in the U.S. According to the LME's website, "[the LME] is the world centre for industrial metals trading and price-risk management.

126.    More than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the global benchmark."3 Among its various functions, the LME maintains a large network of storage units for its traded commodities, such as aluminum. LME approved warehouses are located across the United States.

127.    Defendant LME Holdings Limited ("LME Holdings") is a corporation that, until December 6, 2012, owned the LME.  The largest portion of LME Holdings was owned by Defendant Goldman and other leading American banks including JPMorgan, Citigroup, Merrill Lynch, and Morgan Stanley.  On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing, Ltd.

128.    Defendant Hong Kong Exchanges & Clearing, Ltd.  ("HKEx") is a Hong Kong corporation headquartered in Hong Kong.  It owns, operates, and controls the LME and has done so since acquiring it.  Both HKEx CEO Charles Li and HKEx Chairman of the Board Chow Chung Kong are directors of both the LME and LME Holdings.  Romnesh Lamba and Garry Jones, HKEx's Co-heads of Global Markets, of which the LME is now a division, both sit on the boards of both the LME and LME Holdings, as well.

129.    HKEx is located at One International Finance Centre, 1 Harbour View Street, Central, Hong Kong, and does business in the United States and in this District by, among other things, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S. through the LME.

---

3 *See* London Metal Exchange, London Metal Exchange: Home, available at
http://www.lme.com/

130.    The LME, LME Holdings, and (after December 5, 2012) HKEx are referred to herein collectively as the "**LME**."

131.    **Glencore Defendants.**   Defendant Glencore Xstrata, PLC is a public limited company organized under the laws of the United Kingdom and headquartered at Baarermattstrasse 3, CH-6340 Baar, Switzerland.  Glencore International, PLC is the predecessor of Glencore Xstrata, PLC.

132.    Glencore is a commodities trading and mining company that engages in the production, storage, transportation, marketing, or trading of aluminum and other metals as well as trading derivative products that derive their value from the underlying asset prices of aluminum.  The company was created through a merger of Glencore and Xstrata on May 2, 2013.  Glencore has more than 90 offices in 50 countries, including the United States.

133.    Defendant Pacorini Metals AG ("PMAG"), whose principal place of business is located in Zug, Switzerland, and which is owned and controlled by Glencore, is a leading provider of LME-certified warehousing throughout the world, including the United States, where it operates through its wholly-owned subsidiary, Defendant Pacorini Metals USA LLC ("PMUSA").

134.    In September 2010, Glencore acquired Pacorini.  Defendant PMUSA is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.  It owns and operates LME-approved warehouses in the United States, including warehouses in Los Angeles, CA; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Mobile, Alabama; and New Orleans, Louisiana that store aluminum.

135.    Defendant Glencore Ltd. is a wholly owned subsidiary of Glencore, which resides at 301 Tresser Boulevard, Stamford, CT, 06901.  Glencore's CEO Ivan Glasenberg is one of

Glencore, Ltd.'s four directors.  Arisotelis Mistakidis, a long-time Glencore senior executive in its metals trading business is another.  As of March 22, 2013, Glasenberg and Mistakidis were reported by Glencore to own more than 20% of the company's shares.

136.    Glencore, Glencore Ltd., PMAG, and PMUSA are referred to herein collectively as "**Glencore**."

137.    **JPMorgan Defendants.**  Defendant JPMorgan Chase & Co. is an investment bank and financial services firm incorporated in Delaware with its principal place of business at 270 Park Ave., New York, NY.

138.    In February 2010, JP Morgan acquired Henry Bath & Son Ltd., a UK based metals warehousing company that owns and operates 93 metal warehouses and storage facilities, which also is on the Warehousing Committee of the LME.  In effect, JPMorgan as 100% owner of Henry Bath has a "seat at the table" when it comes to establishing rules for LME regulated warehouses.

139.    Defendant Henry Bath & Son, Ltd. Is a London-based company that stores and ships exchange-traded metal, including aluminum, around the world.  It is a corporate parent of defendant Henry Bath LLC, and is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom. A registered agent for service of process is located in Baltimore, MD.

140.    Defendant Henry Bath LLC is an international logistics provider specializing in the storage and shipping of exchange traded metals and soft commodities around the globe. Henry Bath LLC is organized under the laws of Delaware, has its principal place of business at 2500-A Broening Highway, Baltimore, MD, and is a subsidiary of Henry Bath & Son, Ltd.

141.    JPMorgan, Henry Bath & Son, Ltd., and Henry Bath LLC are referred to herein

collectively as "**JPMorgan**."

C.    **Jane Doe Defendants**

142.    Jane Doe Defendants 1-20 are other persons who own warehouses, have similar financial interests as the Defendants, are parties to the contracts in restraint of trade as well as co-conspirators or others who joined the combination, and have otherwise entered in the agreement.

143.    The expressly named defendants and the Jane Doe Defendants are referred to herein collectively as "**Defendants**."

144.    The acts charged have been done by some or all of the Defendants and their co-conspirators. Alternatively, the acts charged were authorized ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

IV.    <u>**SUBSTANTIVE ALLEGATIONS**</u>

A.    **LME Aluminum Forward Contracts**

145.    The LME has provided for forward contract trading in aluminum since 1978. Prior to and after February 2010, the LME captured approximately 97-99% of the volume of aluminum forward and futures contract trading on organized exchanges in the United States.

146.    At the expiration of an LME aluminum forward contract, delivery of warrants for aluminum in a LME warehouse must be made by sellers (or "shorts") who have not liquidated (*i.e.*, traded out of their contract) to buyers (or "longs") who have not liquidated.  A warrant is the document of title to aluminum stored in an LME registered warehouse, and makes warranties about such aluminum.  Warrants take the form of centrally-maintained electronic records under the LME's SWORD system.  Each warrant is for a specific tonnage (25 metric tons +/- 1%) and a single LME registered brand, and is not interchangeable.

147.    To order the load-out of LME aluminum, the owner must first cancel the LME warrant.

148.    The LME aluminum forward contracts do require at expiration of trading, the long (the buyer) to pay for, and the short (the seller) to deliver warrants for aluminum in LME warehouses at specified times. But such physical warrant delivery occurs on less than 1% of the contracts traded.

149.    More than 99% of the LME aluminum contracts are satisfied or liquidated by offset by trades.  That is, a person one contract long (buyer) sells one contract, and a person one contract short (seller), buys one contract for the same LME date.  Thereby, they "offset" or "liquidate" or cancel their previous obligation to the LME clearing house.

150.    The difference between the purchase price and the sale price, constitutes the loss or gain on the LME forward contract transaction.

151.    Price discovery for aluminum occurs through this trading on 99+% of the LME contracts traded.  There are approximately 255 trading days per year. The LME price discovery happens primarily through the trading process and expectations of macro-economic events, supply, demand, etc.

152.    With respect to the less than 1% of the LME aluminum forward contracts that result in deliveries, the short (seller) has the choice of what warrant to deliver.  There is an on-going swapping and trading of warrants for aluminum in different warehouses.  Further, deliveries are sometimes taken by longs in order to engage in "warrant sifting".  That is, some warrants that are more expensive in warrant trading are, from time to time, delivered in satisfaction of LME short positions.  Through the warrant sifting, warrant swapping, and other

means, longs may receive delivery of warrants in respect of aluminum that satisfy their commercial local consumption needs for aluminum.

153.    The price of LME forward contracts is influenced, to some extent, by the least valuable warrant in all the LME warehouses because the short may choose to deliver that warrant.

154.    But LME forward contracts for aluminum are determined by many other influences.  These include the fundamentals of supply and demand, trading perceptions in the market, and other influences (including the bidding up of LME prices by longs to liquidate through trading and avoid the least valuable warrant).

155.    In the United States, aluminum is sold pursuant to a benchmark price consisting of the LME price plus a local premium. The local premium is referred to as the Midwest Premium in Michigan, Ohio, Wisconsin, Indiana, Illinois, Minnesota, contiguous and other areas of the U.S.   Actual transaction premiums samples are taken by surveys.  The most common during the Class Period was the Platts MW premium, published by Platts Metals Week.  The Published Platts Midwest Transaction Price is the sum of the LME price plus the Platts MW Midwest Premium and any other premium.  The US premium is referred to as the Platts MW premium or the Midwest Premium or similar terms.

**B.      Defendants' Unlawful Agreements**

156.    The LME certifies, approves and makes agreements with the owners of its warehouses, including Metro and Goldman during the Class Period.

157.    In February 2010, Goldman, through Defendant GS Power Holdings, purchased Defendant Metro International.  Metro owned LME Detroit warehouses with more than 80% of

the warehouse space of LME Detroit Warehousing.  Defendants Goldman and GS Power Holdings have since owned and controlled Defendant Metro International.

158.    Parts of the LME's agreement with Goldman were reflected in (a) LME Warehouse Notice Terms and Conditions and (b) LME Warehouse Notice Disciplinary Handbook.

159.    Continuing through the present, Goldman, through Metro International, still owns and operates 29 out of a total of 37 LME-listed storage facilities and more than 80% of the LME warehouse space in greater Detroit.

160.    During early 2009, prior to Goldman's foregoing purchase, it reportedly took approximately six weeks to extract metal, including aluminum, from LME Detroit warehousing.

161.    Starting later in 2009, Metro took steps to begin an unusual and historically anomalous patterns in LME Detroit Warehousing.  This pattern showed a substantial steady buildup of the total number of warrants with rare spikes of multiple cancellations of warrants that caused lesser downward moves in the total warrants outstanding in Detroit.

162.    This pattern was not observed in other LME warehouses.  Metro took steps to start this pattern in the latter part of 2009.  Goldman caused the pattern to continue and increase after February 2010.

163.    In 2010-March 31, 2012, the LME agreement with Goldman specified a minimum daily metal load out of 1,500 tons per *city* per day.

164.    This load-out term of the LME-Goldman agreement applied to all the warehouses in a city rather than per *warehouse*.  It was not based upon a percentage per day of warehouse capacity or warehouse supply.  The 1,500 tons did **not** net out load-ins.  Each of the foregoing aspects of this term of the agreement was unreasonable.

165.     Taken together, these aspects made the Goldman-LME agreement an extremely unreasonable restraint of trade.  The agreement required, in effect, that each of Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day.  Whereas an LME warehouses in another city in which there was only one warehouse had to release a minimum of 1,500 tons per day.

166.     This unreasonable term restrained trade and aluminum load-outs precisely in a place where aluminum was most consumed, held and concentrated in warehouses: Detroit.

167.     Further showing unreasonableness, the absence of a per warehouse requirement and the failure to consider load-ins specifically invited a warehouse owner to shuttle aluminum from warehouse to warehouse.  This would enable the owner to say that it satisfied the minimum without making a release or load-out of the minimum amount of metal.

168.     Worse, during 2010, Goldman transformed its agreement, as a warehouse owner, with the LME to make **minimum** per day per city load-outs of 1,500 tons into an agreement, in times of already high storage, to make a **maximum** load-out per day per city of 1,500 tons.  The 1,500 ton per day *minimum* requirement set by the LME was described internally at Metro as a daily *maximum*.  Former Metro employees described the artificial delays in extracting aluminum as part of the company's business plan strategy.  According to one former warehouse supervisor, had the company not placed a limit on the amount of aluminum delivered each day, Metro could have shipped out 10,000 tons of aluminum per day.

169.     The LME has continuously acquiesced, consented, and otherwise agreed to this "maximum" interpretation term of the agreement since 2010.  This maximum load-out agreement is a grossly unreasonable restraint of trade which greatly exacerbated the pre-existing unreasonableness of the 1,500 tons **per city**.

45

170.    An extremely pernicious aspect of these restraints of trade, was as follows  In order to significantly reduce the amount of large supplies restrained by this agreement, the delays in load-outs and inefficiency of service eventually had to be increased. This was because the load-out process could begin only with the cancellation of warrants.  The more warrants in excess of the minimum that were cancelled in order to reduce the supplies, the longer the delays in actually receiving the aluminum.

171.    Pursuant to and as a result of Defendants' foregoing unreasonable agreements, load-outs of aluminum in the LME Detroit Warehousing occurred during the Class Period at a small fraction ($1/6^{th} – 1/20^{th}$) of the rates at which such load-outs could efficiently occur.

172.    (a) An agreement to inflate revenues and prevent access to and alienability of aluminum through gross inefficiency, in an industrial center with multiple warehouses, is inherently suspect under the law.   In the circumstances here, Defendants' agreement was extremely restrictive, anticompetitive, exclusionary, and unreasonable throughout the Class Period.

(b) Defendants engaged in the highly unusual and parallel acts of causing and permitting such extreme inefficiency.  This includes through their consensual joint implementation and interpretation of their minimum load-out agreement so as to transform it into a maximum load-out agreement.

According to a former Metro employee, the company's approach to delivering metal did not develop until 2009/2010.  Prior thereto, employees were under intense pressure to get metal to customers on time.  Employees often worked overtime to meet customer deadlines.  As stated by one former employee:

> We had to stay late if they wanted their metal.  If a customer asked for one hundred warrants in two days, we'd have to stay late to make it happen.

46

173.     This sense of urgency came to a sudden halt, however.  Delivery of aluminum begin to be handled by "skeleton crews," overtime required prior approval, and employees were no longer permitted to work Saturdays as they had previously done.

174.     In addition to the foregoing unreasonable agreements in restraint of trade, Goldman has, according to reports in the New York Times on July 20, 2013 also done the following.  Goldman anti-competitively implemented its minimum (actually, maximum) load-out agreement with the LME in precisely the way the agreement was vulnerable to being interpreted. Reportedly, Goldman has loaded out aluminum from one LME Detroit warehouse and shipped it to another.  Reportedly, this has been interpreted to satisfy Goldman's daily minimum load-out agreement (actually, maximum load-out agreement) with the LME.

175.     Thereby, Goldman's shuttling of aluminum reportedly has intentionally further delayed owners of aluminum from extracting their aluminum from the LME Detroit Warehousing.  Such delays have further inflated the storage revenues of Goldman and the LME. This reported conduct also renders, at the least, misleading various statements made by Defendants about following their minimum (in reality, maximum) load-out agreement.

176.     In response to the drumbeat of repeated public complaints about Goldman's unreasonably slow load-outs since 2010, the LME has investigated warehousing (including LME Detroit Warehousing) practices and charges.  This includes by retaining outside consultants and otherwise.

177.     The LME's agreement with Goldman has been vulnerable to and has subsumed and/or included---and/or the LME Defendants' abuses of their monopoly power have permitted and contributed to---Goldman's reported steps to shuttle aluminum from one warehouse to

another in order to use up the daily minimum (in reality, maximum) load-out quota and release less aluminum out of the warehouse.

178.    More generally, the LME has financially benefitted from the shuttling, the overbidding, and the financing/storage agreements alleged above in numerous ways.

179.    By 2011, Defendants' unlawful agreement had had such deleterious effects that persons holding aluminum in LME Detroit Warehousing were being restrained, excluded and restricted from receiving their aluminum for an amount of time of approximately 180 days.  This was the amount of time from the day of order of the load-out, when the warrant was cancelled, that it took to extract aluminum from LME Detroit Warehousing.

180.    From the beginning of 2011 until June 30, 2011 Metro International warehouses in Detroit took in 364,175 tons of aluminum and delivered out 171,350 tons.

181.    Market participants at first privately and then publicly began to complain.

182.    By 2011, a senior analyst in the metals industry told Reuters "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate...the infrastructure is there."

183.    "I think it makes a mockery of the market. It's a shame," Robin Bhar, a veteran metals analyst at Credit Agricole in London said in June 2011. "This is an anti-competitive situation. It puts (some) companies at an advantage, and clearly the rest of the market at a disadvantage. It's a real, genuine concern. And I think the regulators have to look at it."

184.    Nick Madden the chief procurement officer for Atlanta-based Novelis, the world's largest aluminum can manufacturer noted in 2011 "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an

infinite rate and so we feel there's a lot more they can do on the output side to push up the (load out) rates."

185.    "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal…in Detroit warehouses," said Madden.

186.    Madden then estimated that the U.S. benchmark physical aluminum price is $20 to $40 per ton higher because of the backlog at the Detroit warehouse.  That premium was then forcing U.S. businesses to fork out millions of dollars more for the 6 million tons of aluminum they use annually.

187.    On June 21, 2011 Jorge Vazquez, a senior vice president at Harbor Intelligence, publicly addressed the Defendants' restrained, restricted and anticompetitively slow rate of load-outs of aluminum from the Detroit Warehousing.

188.    Specifically, Mr. Vazquez stated that "one of the factors that, without a doubt, is behind record high Midwest premiums" was such slow rate of load-outs.

189.     "This situation has been organized artificially to drive premiums up," said Dave Smith, Coca-Cola's procurement manager.  "It takes two weeks to put aluminum in, and six months to get it out."

190.    In 2011 Coca-Cola Co. lodged a complaint with the LME.  This complaint was in response to Goldman's creation of supply bottlenecks to artificially raise the price of aluminum in the open market.

191.    With full knowledge of the foregoing complaints by such companies of the upward impact that Defendants were having on the Midwest Premium or Platts MW Premium

49

and other prices, Defendants continued to perform their agreements and further inflated such Platts MW prices to one new record high level after another.

192.     This included by agreeing to subvert, and the LME and Goldman did subvert specific recommendations by their paid consultant, Europe Economics.

193.     Specifically, in response to the widespread public complaints during 2010-11, the LME retained Europe Economics to analyze problems with queues and delays in receiving metals from the LME Detroit warehouses and related issues.

194.     In order to end these problems, Europe Economics specifically and explicitly recommended that the LME amend the minimum load out rule so as to require that a minimum of 1,500 tons per day per 300,000 tons of metal in the warehouse location, be required to be loaded out. For LME Detroit Warehousing for 2011-12, this would have required 6,000-7,500 tons per day minimum.

195.     This recommendation was too low as, among other things, the LME's paid consultant, in part, told the LME what it wanted to hear.

196.     But, at least, Defendants' own paid consultant, Europe Economics, recommended that the agreement between and among the LME and Goldman and other warehouse owners be substantially amended in order to make the minimum load-out rule scale upwards commensurate to the scale upwards in the amount of metal in storage.

197.     However, during 2010-2012, Defendants were engaged, among other things, in efforts to sell the LME. Defendants had mutual self-interests to maintain and increase their respective revenues from LME warehouse storage rates.  Thereby Defendants would BOTH inflate their projected warehousing revenues and the projected consideration that should be paid for the sale of the LME.

198.     Accordingly, Defendants agreed not to implement even their own paid consultants' proposed solution to the problem.

199.     Instead, Defendants agreed to undertake a delayed amendment that would permit the high storage rent continue and, indeed, increase.   Effective April 1, 2012, the LME and Goldman agreed to change the minimum (actually, maximum) load-out to 3,000 tons per day for LME Detroit Warehousing.

200.     This was less than one half of the unreasonably low amount that Defendants' paid consultants recommended. As numerous analysts and participants contemporaneously predicted, this agreed upon small change was so far behind the curve that it would not, and it did not reduce the queues.  *See* below.

201.     For example, in 2011, a senior executive at a metals brokerage told Reuters "the recommendations won't change anything. The problem will still be there six, nine months down the line."

202.     After more than 16 months of public complaints, the LME continued to agree with Goldman (a) that the minimum load-out rule could be transformed into a maximum load-out rule, (b) that there should not be a shift to a percentage of metal storage capacity in **each** warehouse per day or per week, nor (c) netting of load-ins and (d) that there should be a per city requirement **not** a per warehouse requirement.

203.     **Agreement To Inflate Storage Charges.**  As a *quid pro quo* to Goldman for such increase in the maximum load-out agreement, the LME agreed to increase storage rates.  In fact, pursuant to and as a result of Defendants' agreements, the storage rental charge per ton per day at the LME Detroit Warehouses have increased from 35 cents to 38 cents in 2009, to 40 cents in 2010, to 41 cents in 2011, to 45 cents in 2012, and to 48 cents in 2013.

(a) As a result, Defendants' listed storage charges increased to much higher than competitive storage rates.

(b) Also coinciding with the increase in the minimum load-out rate effective April 1, 2012, the Goldman Defendants increased their charges for loading metal out from the Detroit Warehouses by 9% to $35.95 per ton.  Such Defendants agreed to a further increase thereafter.

204.    Defendants actually sought to justify the extraordinary 10% increase in storage rates from 41 cents to 45 cents per ton per day in 2012 and the further 3¢ storage increase in 2013 (a 20% increase in little over a year) as a *quid pro quo* for supposed reductions in the amount of delays in the load-outs of aluminum from LME Detroit Warehousing.

205.    The LME publishes the rental charges and FoT rates applicable to such warehouses.  For Detroit, in 2013-2014, the FoT rate was $39.95.  For Detroit and PMUSA, the current rental charge is 48 cents per ton per day.

206.    But as such Defendants well knew and intended, the length of the delays in extracting aluminum from Detroit warehousing reportedly increased significantly after March 2012.  So did the amount of aluminum in storage:

| End of February 2009 | 460,000 tons |
| End of February 2010 | 919,000 tons |
| End of February 2011 | 1,081,000 tons |
| End of February 2012 | 1,428,475 tons |
| End of September 2012 | 1,476,225 tons |
| January 2014 | 1,559,225 tons |

207.    But as the economic recovery progressed, aluminum supplies in non-Detroit Warehousing declined substantially.

208.    While subverting their paid consultants' recommendation, the LME Defendants had made favorable statements indicating that meaningful changes would be implemented to

correct this problem.  These favorable statements encouraged market participants to continue to use the LME.  And Goldman stated that it observed its obligations under its agreement with and the rules of the LME.

209.     In sum, precisely the opposite of acting to ameliorate the problem, the LME Defendants and the Goldman Defendants agreed to abuse their monopoly power so as both to increase the storage rates and INCREASE the delays in obtaining aluminum and allow the Goldman Defendants to make purchases and diversions of aluminum so as to restrain more metal in the LME Warehousing.

210.     Thus, contrary to Defendants' *quid pro quo* rationale for their increases in the storage and load-out charges that the amount in storage was going to decline, the amount in storage, contrary to strong economic trends, has not declined.

211.     In fact, as has been predicted, the backlog did not decline either.  On the contrary, according to Bloomberg, as of November 2012, withdrawals could take as long as 59 weeks in Detroit.  During 2013, the delays continued to increase. This is what outsiders had publicly predicted all along.  Defendants well knew and intended that this would happen in order to increase their revenues and profits, complete the sale of the LME, and for Defendants' other purposes.

212.     **Second Level Of Agreements To Restrain Aluminum In The LME Detroit Warehousing And Inflate Prices.**  Subsidized and incentivized by supra-competitive revenues from its agreements with the LME and the abuses of monopoly power alleged herein, Goldman has further restrained and distorted commerce.  It has done so by creating and making, directly and indirectly, a second series of agreements in restraint of trade ("incentive payment" agreements).

213.    Pursuant to these "incentive payment" agreements, Goldman has exacerbated its previously alleged abuses by offering so called "incentive payments" to induce companies and firms to divert aluminum from productive uses to long term storage at supra-competitive rates in Goldman's LME Detroit Warehouses.

214.    Goldman has made these agreements by, among other things, offering to pay as much as $250 or more per ton in upfront "incentive payments" to induce persons to commit aluminum to long-term storage with Goldman in LME Detroit Warehousing.

215.    **Positive Feedback Loop.**  Goldman's incentive payments have, as a necessary and intended result, (a) increased aluminum prices including the Midwest Premium, Platts MW Premium, and Midwest Transaction Prices of aluminum, and (b) added to the prospective, growing queue and the anticipated delays in removing aluminum from LME Detroit Warehousing.

216.    Thereby, Goldman has created a positive feedback loop in which the more aluminum that Goldman could divert into its warehouse and the more inefficient Goldman could be in loading out aluminum, the more that Goldman could afford to pay in incentive payments. Such payments further divert aluminum into and restrain and lock up the aluminum for long term storage in Goldman's LME Detroit Warehouses.  This lengthens the delays, which further increases Goldman's ability to make higher incentive payments, which further increases the aluminum in LME Detroit Warehouses, etc.

217.    The Midwest Premium or the Platts MW Premium was significantly less than $115 a ton during 2010. Due to the unlawful conduct alleged in this complaint, it has increased to $250 and more per ton.

54

218.     That is, in order to cause their agreed-upon restraint of aluminum supplies, Defendants have first had to cause and did cause substantial price inflation in the Midwest Premium or Platts MW Premium price.  Thereby, Defendants were able to attract more aluminum into the LME Detroit Warehousing. Also thereby, Defendants have intentionally injured those who pay the MW Premium or Platts MW Premium to purchase aluminum.  This injury was inextricably intertwined with and a prior part of Defendants' unreasonable restraints of trade alleged herein.

219.     Goldman's payments of these incentives has benefited the LME financially by increasing the storage revenues of Goldman and the LME, by helping to enable the sale of the LME for higher consideration based upon such increased revenues, and in other ways.

220.     Goldman's incentive payment agreements have been made, directly or indirectly, with Mitsubishi Corporation, Sumitomo Corporation of America, Gerald Metals Inc., and other firms.

221.     Plaintiffs and members of the Class purchased primary aluminum directly from Jane Doe Defendants or other producers of primary aluminum based upon the Midwest premium, Platts MW premium price, and Midwest Transaction Price.

222.     The parties to the incentive payment agreements did, Plaintiffs believe discovery will show, benefit from such agreements with Goldman.  Such persons did knowingly and intentionally agree with Goldman to the purposes and effects of those agreements.  Such purposes and effects were the inflation of aluminum prices (including the Midwest premium or Platts MW premium prices) and the long term restraint of primary aluminum in LME Detroit Warehousing.

223. The combination of artificial incentives to producers to divert aluminum into warehouses, subjecting that aluminum to lengthy withdrawal delays, and artificially inflating rental costs for aluminum purchasers has resulted in artificially increased prices for aluminum in the futures market and the spot market and substantially injured Plaintiffs.

224. The Jane Doe Defendants have entered, directly or indirectly, with Goldman the incentive payment agreements.

225. In entering these agreements in unreasonable restraint of trade, the Jane Doe Defendants have repeatedly agreed (and frequently insisted) that primary aluminum that Jane Doe produced, would be shipped by Jane Doe directly into LME Detroit Warehousing.

226. The Jane Doe Defendants did, in fact, repeatedly ship aluminum directly into LME Detroit Warehousing. This included shipments made that satisfied, directly or indirectly, Goldman's incentive payment agreements.

227. In making and performing these agreements and shipments, the Jane Doe Defendants had full knowledge of public complaints about the growing load out delays in Detroit, and the resulting, ever increasing inflation of aluminum prices, including the Midwest premium or the Platts MW premium prices for aluminum.

228. In entering such agreements and making such shipments, the Jane Doe Defendants further fully knew that the performance of such agreements (a) would restrain more aluminum supplies in Detroit for a long period, (b) would necessarily further increase aluminum prices, including the Midwest premium or the Platts MW premium price for aluminum, and (c) would create a positive feedback loop in which Goldman could pay more to divert and restrain more aluminum in LME Detroit Warehousing.

229.     That is, the Jane Doe Defendants well knew that the purpose and effect of these incentive agreements was to inflate aluminum prices, restrain aluminum for long periods in Detroit, and empower increasingly greater amounts of such incentive payments and restraints.

230.     One of the reasons for the increase in aluminum prices is that large quantities of aluminum were diverted from the commercial consumption.  Mr. Tim Reyes, the President of Materials Management for Alcoa confirmed that "… the fact that the inventory that exists today is not available to the marketplace largely is one of the reasons that premiums are being driven up as demand for the product grows." Tim Reyes, Alcoa President of Materials Management, Alcoa 2012 Investor Day, Reuters Transcript, November 7, 2012, p. 18.

231.     Mr. Reyes added "[T]here is a large sum of capital available in the world looking to purchase aluminum and stick it on the ground and it's competing with the physical demand which is leading to the premiums being driven up."  *Id.*

232.     Thereby (and by the steps alleged below and the other facts alleged herein), the Jane Doe Defendants associated themselves with Goldman's conduct, or agreed with and performed its agreements with Goldman (a) to inflate aluminum prices and restrain aluminum supplies in LME Detroit Warehousing, and (b) to increase perceptions among aluminum market participants that aluminum prices would increase.

233.     **Historically Anomalous Pricing.**  The Jane Doe Defendants knew very well that their conduct helped cause historically anomalous pricing. For one example, the Midwest premium or Platts MW premium price for aluminum soared to all time record levels after the Jane Doe Defendants began to enter and perform these agreements in unreasonable restraint of trade, and then doubled as the Jane Doe Defendants continued to enter and perform same.

234.   **Motive.**  Plaintiffs have good grounds to believe and do allege as follows.  The Jane Doe Defendants had an extremely large financial incentive to exacerbate and lengthen the amount of aluminum restrained in LME Detroit warehousing, the duration of the restraints in preventing aluminum from being released top the market, and the resulting increases in the prices for aluminum, including the Midwest premium or Platts MW premium prices.

235.   **Other Acts To Influence Platts MW Premium Prices**.  Further, the Jane Doe Defendants have made transactions for the sale of primary aluminum predicated on the term that such sales be reported to Platts.  The purpose of this term was to cause such MW Premium contained therein to be publicly reported to Platts. This includes, but is not limited to, transactions between December 2013 and early February 2014.

236.   **Opportunity to Conspire**.  The Jane Doe Defendants have discussed the subjects of Midwest Premiums and Platts MW premium prices with representatives of Goldman and the LME during the Class Period.

237.   By virtue of the foregoing, the Jane Doe Defendants have entered individual agreements and/or have reached an overall understanding or meeting of the minds with Goldman in unreasonable restraint of trade.  The specific purpose, effect and intent of these agreements was to inflate aluminum prices (including the Platts MW Premium or Midwest premium price) and restrain aluminum supplies in LME Detroit Warehousing.

238.   Two aluminum producers --- Alcoa Inc. and Rusal --- have made statements that changes in the minimum load-out rule would reduce aluminum prices.  Thereby, such producers have implicitly admitted that the present minimum load-out rule and the agreements relating to it, earlier had inflated aluminum prices for years.

**LME Statements Pursuant To The Agreement; LME Partial Admissions**

239.     As complaints from the public continued, Charles Li, the CEO of HKEx, which purchased the LME, stated in October 2012 that "If people have to wait a year [to remove aluminum from the warehouse], that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable."

240.     **Government Investigation.**  In November 2012, the European Union's Enterprise and Industry Directorate General started a review of the London Metal Exchange's warehousing arrangements with another EU body, the Internal Market and Services Directorate General, following complaints from the aluminum industry that load-out rates from LME-approved warehouses.

241.     During the week of January 7, 2013, the price buyers paid to obtain aluminum in the U.S. rose to a record high – the Midwest premium rose to 12 cents per pound.  The price climbed 48% over the previous 12 months.

242.     (a) Far from disassociating itself from Goldman's anticompetitive purchases and diversions agreements, the LME, per Chris Evans, peremptorily announced in New York during January 2013, that purchasers of aluminum should simply stop paying the high prices.  In effect, the LME encouraged users to starve themselves of aluminum and lay off their workers.  This classic monopolistic and anticompetitive encouragement was unlawful because Ford, Novelis, Coca Cola and other users of aluminum do not have to further restrain trade and lay off their workers so that Defendants' unlawful agreements and abuses of their monopoly powers alleged herein, may continue.

(b) Thus, the LME Defendants have not only acquiesced in, enabled and empowered Goldman's foregoing conduct.  The LME Defendants have agreed that Goldman

should engage and that the LME would support such conduct, and the LME has publicly supported same.

243.    On February 1, 2013, Novelis, the world's top maker of aluminum for beverage cans "lost patience with the LME's failure to tackle access problems at the warehouses…and says it will seek a solution elsewhere."

244.    As of February 18, 2013 reports indicated that it took more than 400 working days, to withdraw metal at the back of the queue in Detroit.

245.    Effective April 1, 2013, Goldman and the LME agreed to a further increase of 500 tons per day per city, from 3,000 to 3,500 tons.  Goldman and the LME then agreed to increase storage costs from 45 cents to 48 cents.  This represents a 6.6% increase in storage costs from 2012 to 2013 and a 33 1/3 plus% increase in storage costs from 2009 to 2013.

246.    As of February 26, 2013 Macquarie analyst Duncan Hobbs said the 2013 change in LME rules "will make no difference to access to dominant metal stocks in critical mass locations, such as aluminum in Detroit."  Thereafter, others made similar public statements.

247.    As a result of the LME's continued agreement with Goldman, the complaints that began in 2010 about LME Detroit Warehousing of aluminum continued into and after July 2013. These include publicly reported complaints by Coca-Cola, General Motors, Novelis (which is the world's top maker of aluminum for beverage cans), PepsiCo, Anheuser-Busch, MillerCoors and others.

248.    As of June 2013, the wait for aluminum in Detroit was reportedly 469 calendar days and growing towards 500 days.

249.    During June 2013, U.S. government investigations of Goldman-LME aluminum activities were threatened and efforts to have sworn testimony before Congress began.

250.     Also, in June 2013, Martin Abbott resigned as CEO of the LME.

251.     Testifying before a U.S. Senate Committee, Tim Weiner, MillerCoors Global

Risk Manager stated: "The current system does not work. It has cost MillerCoors tens of millions

of dollars in excess premiums . . . . [L]ast year alone [2012], the [London Metal Exchange]

warehouse rules have imposed an additional $3 billion expense on companies that purchase

aluminum.".  Testimony of Tim Weiner, Hearing on: Examining Financial Holding Companies:

Should Banks Control Power Plants, Warehouses, and Oil Refineries, Senate Committee on

Banking, Housing, and Urban Affairs—Subcommittee on Financial Institutions and Consumer

Protection, July 23, 2013. Available at http://www.banking.senate.gov.

252.     During July 2013, the LME (under HKEx's ownership) proposed changes in load-

out rules that would force warehouses with queues of at least 100 days (*i.e.*, Defendant Metro) to

deliver metal out at a rate of at least 1,500 tons per day **more than is brought in**.  Before the

LME's acquisition by HKEx and while still under the leadership of CEO Martin Abbott, the

LME had stated that the queues were part of the economic environment and that the LME should

not agree with its warehouse owners or persuade or order them, among other things, to net out

incoming aluminum.

253.     As a result of all the foregoing, and the increasing government scrutiny, in early

July 2013 Goldman suspended the incentive payments it made to attract metal to their LME

Detroit Warehousing.

254.     On July 30, 2013 U.S. Senator Debbie Stabenow expressed significant concerns

about the Defendants' conduct to Gary Gensler, Chairman of the U.S. Commodity Futures

Trading Commission:

> In Congressional testimony, buyers of aluminum allege that the current market
> price of aluminum is being skewed by those who own and profit from the storage

of metal at warehouses.  They allege that warehouse rules dictated by the London
Metal Exchange's Warehouse Rules and Regulations committee have been set by
and for the benefit of those who stand to profit from the rules, even if it works
against consumers and a fair market price.  They noted that the LME itself gets a
portion of the rent charged for storing metal at warehouses it oversees.
Additionally, they raised questions about companies that both help set the rules
dictating the flow of aluminum in and out of warehouses and also engage in the
futures and swaps markets implying a potential for price manipulation.  These are
serious allegations.  I am writing to encourage you to further review this issue and
clarify the role and responsibility of the [CFTC] to address the situation.

255.    In its statement on July 31, 2013, Goldman acknowledged, "In recent weeks, there

has been additional focus on metals warehouses as certain end users have complained about the

long wait times to get aluminum out of LME storage."  http://www.goldmansachs.com/media-

relations/in-the-news/current/goldman-sachs-physical-commodities-7-31-13.html   Admitting

that "consumers should not have to wait unusually long times to get the metal they store in

warehouses," Goldman now claims that it will be "contacting end users to offer to swap any

aluminum currently in the queue for immediately available aluminum so that they have access to

the metal they need to make or package their products."

256.    Goldman's Chief Operating Officer, Gary Cohn, stated on CNBC: "We feel

horrible for consumers if they can't get metal." *See* http://www.cnbc.com/id/100928939

(transcript); http://video.cnbc.com/gallery/?video=3000187032&play=1 (video).  Goldman's

Cohn was, however, careful claim ignorance as to actual delays and to avoid tough questions

posed by reporters.

257.    Goldman announced that in order to "address any concerns that the warehouses

are limiting the supply of aluminum," it will:

- "support the intent of the recently proposed rule change by the LME that will cut
  existing queues and prevent new queues from forming by increasing substantially
  the amount of daily net outflows of metal at large LME locations"

- "suggest that the LME establish a system to prioritize consumers so that they always have access to a minimum load out rate for end users"

- "support enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue.

258.    Goldman's professed feeling and promises are contrary to Goldman's agreement with the LME and conduct from 2010 until July 2013.

259.    Either the Goldman Defendants, on their own, or the LME Defendants, on their own, could since late 2010 or early 2011 have quickly have responded to these public complaints about, and could have ended Defendants' upward impact on aluminum prices, including the Midwest Premium or Platts MW Premium prices.

260.    For example, Goldman could quickly have lifted its artificial restraints on load-outs from its Detroit Warehousing.  For another example, as part of its approval of warehouses and/or its minimum load-out rule requirements, the LME Defendants could easily have taken multiple steps.

261.    Only by working cooperatively together in agreement as alleged herein, have Defendants, through their parallel individual and joint or mutual conduct, been able to continue to inflate prices and storage costs to their continued mutual profit.

262.    The LME and Goldman do not have discretion to agree to increase storage rates in order to maintain supra-competitive revenues that were being generated by prior unlawful restraints of trade.

263.    The LME has now stated in its Result of Consultation on Changes to LME Policy Regarding the Approval of Warehouses in Relation to Delivery Rates that:

….the effect of the queues is to increase this [Midwest] premium as a proportion of the "all-in" free metal price [that is, the sum of the LME price and the MW premium].  While the LME does not believe that the effect of queues is indicative of economic or market failure, the Consultation has clearly indicated that the existence of the increased premium that excessive queues cause creates significant difficulties for the metals community in respect of both discovery of the "all-in" price, and effective hedging of that price. Accordingly, it is appropriate to take action to address this issue.

 … the fundamental role of the queues in increasing premiums and thus creating price discovery issues must surely mean that the most logical course of action is to address the existence of those queues".

www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/13%20326%20A312%2

0W125%20RESULT%20OF%20CONSULTATION%20ON%20CHANGES%20TO%20LME%

20POLICY%20REGARDING.pdf

264.    The LME statement is false insofar as (a) it says the effect of queues does not indicate a market and economic failure, or (b) implies that the increases in the Midwest Premium were somehow supposedly offset by decreases in the LME price.

265.    Accordingly, the LME has proposed to amend its rules to provide, as it was alleged in these actions that it should have provided in 2010-2011, that the minimum load-outs should be net of the load-ins. Specifically: "the daily delivery tonnage is for deliveries out only and does not include deliveries in", LME Policy Regarding the Approval of Warehouses, revised April 1, 2013; *see also* 2:13-cv-14067, Dkt. No. 1, ¶¶77, 111.

266.    Century Aluminum Company's CEO Mr. Michael Bless said, "any new rules of this kind are very likely to have a downward effect on premiums." Century Aluminum Earnings Conference Call – Final FD (July 30, 2013).  Rusal and Alcoa made similar statements.  The premise of the statements by aluminum producers that the changes proposed by the LME, if they reduce the queues, will cause the "all in" aluminum prices to decline is (a) that the build-up in the queues caused the "all in" price to increase, and (b) that such premium will decline **more**

than the LME price increases as a result of the rule changes.  This implies that the premium earlier increased more than the LME price decreased.

267.    After the LME tentatively announced its proposed rule change, aluminum producers, consumers and market participants were so desirous of some change that many actually applauded this half step in the right direction.  This included Rio Tinto, Aleris, and even Novelis.

268.    Aleris Corporation is both a producer and consumer.  It responded to the November 2013 proposed rule changes as follows: "all industry participants will benefit from a warehousing system that is drive by market-based supply and demand fundamentals." Michael Cowden, Aluminum market encouraged by LME rules, American Metal Market, Nov. 10, 2013.

269.    Rio Tinto Alcan, Inc., a large producer, responded that the November 2013 proposed rule changes was "an important step to address the recent market and economic forces that have combined to create a set of challenges in the warehousing aspects of LME's activities." Michael Cowden, Aluminum market encouraged by LME rules, American Metal Market, Nov. 10, 2013.

270.    The CFTC has directed Goldman Sachs and JPMorgan to preserve their emails, documents and instant messages from the last three years. CFTC commissioner Bart Chilton said that "the warehouses charge storage fees and the bottlenecks can impact prices and potentially move markets. That's not right."

271.    In August 2013, the CFTC sent subpoenas to Goldman Sachs, JP Morgan, Glencore, Pacorini, and perhaps others as part of an inquiry into metals prices. The subpoenas reportedly included more than thirty (30) areas of interest to the CFTC including one asking about "anything that relates to moving metal from one warehouse to another within the same

company...and procedures for loading out." It also reportedly asked for details on any trading based on prices on the LME and Platts, a unit of McGraw Hill that publishes price assessments of physical commodity markets including the Midwest Premium.

272.    That same month, the U.S. Department of Justice ("DOJ") also launched a preliminary investigation into the aluminum warehouse industry following complaints that warehouses owned by certain of the Defendants have led to supply shortages and billions of dollars in increased costs.

273.    The U.K. Financial Conduct Authority ("FCA") is also considering an investigation. European Union antitrust regulators are also monitoring Defendants' aluminum warehousing.

274.    The foregoing investigations are expected to yield information from Defendants' internal records (e.g., instant messages, e-mails, telephone records, aluminum trading data, etc.) that provide further support for Plaintiffs' claims.

275.    In the face of the media and regulatory scrutiny set forth above, many of the Defendants have agreed to modify their practices or, in the case of JPMorgan, planned to exit the warehousing business altogether: on or about July 26, 2013, JPMorgan announced plans to exit the physical commodities business, including metals warehouses.[4]

### C.    The LME Defendants' Monopoly Power

276.    The LME Defendants have had monopoly power through their ability to set prices, storage rates, and load-out rates.

277.    The LME Defendants have also had monopoly power through their ability to control the output of aluminum from the LME approved warehouses that refuse to provide

---

[4] *See, e.g., JPMorgan Mulls Physical Commodities Exit Amid U.S. Review*, REUTERS (July 26, 2013). **AGFA, fn. 50**

customer services and, instead, sought to load-out aluminum at a maximum of the minimum amount required by the LME.

278.    Separately, the LME Defendants have had monopoly power in the Relevant Markets.  The LME controlled between 97-99% of the aluminum forward and futures contract trading in the United States during the Class Period. Competitors have been unable successfully to start competing contracts because of the agreements that the LME Defendants make with the Goldman Defendants and others that incentivize the intermediaries to direct business to the LME Defendants.

279.    The LME has the right to approve any LME warehouse, including in the U.S., and has a monopoly control over selection of the warehousing for exchange-traded aluminum in the U.S.

280.    The LME also has monopoly power over approving exchange-traded warehouses in the Detroit, Michigan area.

281.    The foregoing monopoly power extends to approving (or failing to disapprove of) storage rates, load-out rates and other matters.

282.    With knowledge since late 2010 or early 2011 of public complaints that they were inflating aluminum prices, the LME Defendants have abused their monopoly power as alleged herein.

283.    The LME Defendants' anticompetitive, restrictive and exclusionary abuses include all those previously alleged herein.  These are not limited to, but include the following:

(a) by running interference for Goldman during LME Warehouse Committee meetings to deter and silence long-time LME Warehouse businesses that provide good services and do not create load-out queues;

67

(b) by refusing to base their agreements with warehouse owners and the minimum load-out rates on a percentage of the metal capacity or metals stored in each warehouse;

(c) by refusing to require netting of incoming aluminum;

(d) by using anti-competitively low minimum load-out rates;

(e) by consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage;

(f) by repeatedly investigating and approving the Goldman Defendants' charges and practices;

(g) by allowing repeated increases in the Goldman Defendants' charges;

(h) by allowing the Goldman Defendants to pay incentives to divert into, and restrain and engross more aluminum in LME Detroit Warehousing;

(i) by making statements to deter companies that purchased aluminum from challenging such practices; and

(j) by allowing Goldman to shuttle, or making agreements that encouraged Goldman to shuttle and that subsumed Goldman's shuttling aluminum from warehouse to warehouse.

284.    The LME has held the sensitive monopolist's position of controlling (a) exchange-traded aluminum forward or futures contracts trading in the U.S., (b) warehousing of exchange-traded aluminum in the U.S. including in the Midwest and the greater Detroit, Michigan area ("LME Detroit Warehousing"), and (c) the rules for the determination of aluminum prices.

285.    The LME has approved and made agreements with the LME certified warehouse owners.  These warehouses held, due to the unlawful conduct alleged herein, a growing portion

of the aluminum stored in the United States that exceeded on year's production by the entire United States.

286.    In a net deficit area like the United States, which must import far more than it produces, the LME warehouse aluminum supplies in the U.S. conferred very substantial pricing power on the LME.

**D.    The Goldman Defendants' Monopoly Power**

287.    During the Class Period, Goldman has held the sensitive position of having a monopoly over LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME Detroit Warehousing.

288.    Also, Goldman agreed with the Glencore Defendants, who held a significant amount of the non-Goldman LME Detroit warehouse space, to follow the practices alleged here. Glencore then began to copy those practices in Europe.

289.    Goldman purchased, at the start of the Class Period, warehouses with more than 80% of the storage space in the Detroit area. Goldman has continued to own same throughout the Class Period.

290.    Goldman's unlawful conduct alleged herein has leveraged that monopoly into a position in which Goldman, by itself, stores approximately well over 50% of the aluminum stored in warehouses located in those parts of the U.S. that transact based on the Midwest Premium or Platts MW Premium.

291.    Goldman, by itself or by virtue of its agreement with and influence over the LME and (as to Detroit) Glencore, has had monopoly power to set prices, set storage rates and control output in its LME warehouses.

292.    Separately, Goldman has thereby also had monopoly power in the Relevant Markets.  Goldman can control the output of LME approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed upon minimum load-out rate.

293.    With knowledge from public complaints since 2010 or early 2011 that it was inflating aluminum prices, Goldman has converted the minimum output into a maximum and agreed with the LME to convert the minimum into a maximum output.  This was exclusionary, restrictive and anticompetitive.

294.    This became increasingly exclusionary, restrictive and anticompetitive as the supplies in the warehouse and the length of the delays in removing same increased to all-time record levels.

295.    Goldman reportedly further abused its monopoly power by shuttling aluminum from one warehouse to another within the Detroit area in order to use up the minimum quota without actually causing any output of aluminum from the warehouses to the public.

296.    Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing.

297.    Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman and the LME have agreed to abuse their monopoly power in order anti-competitively and restrictively to divert aluminum into LME Detroit Warehousing in long-term contracts.

298.    Also, Goldman limited unreasonably the free alienability of the aluminum so stored.  In order to do this, and also as a result of doing it, Goldman inflated aluminum prices

including the Midwest Premium or Platts MW Premium price as well as the storage costs paid

directly to the Goldman Defendants, part of which was paid to the LME.

299.    The Goldman and LME Defendants further abused their monopoly powers by

agreeing to (a) restrict the supply of aluminum shipped out of their warehouses; (b) increase

queue times and delay the delivery of aluminum out of their warehouses; (c) charge supra-

competitive storage rates; (d) treat the LME minimum load-out requirements as maximums

rather than minimums; (e) establish LME Warehousing Rules that permitted them to disguise

their scheme, including but not limited to calculating load-out minimums on a per "location"

(*i.e.*, city) rather than per warehouse basis and on a gross, rather than a net, basis; and (f)

artificially inflate or maintain U.S. aluminum prices and storage costs.

300.    Instead of serving as an impartial supervisory body of the LME warehouses to

ensure an efficient market for aluminum, the LME was, until recently, owned and controlled in

large part by Defendants and their co-conspirators.  The LME's aluminum warehousing rules, as

implemented and administered by Defendants, functioned as a collusive agreement among

Defendants and their co-conspirators and effected a departure from the good services provided

by reputable warehouse companies.

301.    Unless enjoined as alleged herein, Defendants' ongoing agreement in restraint of

trade and abuses of their monopoly power will spread to other LME warehouses, further

exacerbating the anticompetitive impact on the U.S. economy.

### E.    Relevant Market

302.    Plaintiffs disclaim any need to plead a relevant market on the Section 1 or Section

2 claims in this complaint.  The restraint of trade here directly inflated price, restricted supply,

anti-competitively restrained free alienability of aluminum, and otherwise constitutes a *per se*

violation of Section 1.  The monopoly power is adequately alleged through the powers to control prices, or control output, or otherwise.

303.    LME Detroit Warehousing is an essential facility.  Access by the market to aluminum stored in LME Detroit Warehousing is essential to the ability of the market, Plaintiffs and Class members to conduct business successfully in the United States.  This, in part, is because the U.S. has a very large deficit of aluminum consumption over production.  The U.S. consumes three times more than it produces.

304.    In these circumstances, as a practical matter, the benefits of efficient,  quality LME Detroit Warehousing services cannot be duplicated by Plaintiffs and Class members.

305.    At all times pertinent hereto, the LME and Goldman Defendants have controlled access to LME Detroit Warehousing.  As alleged herein, the LME and Goldman Defendants had common financial motives to inflate their storage revenues and restrain efficient access to LME Detroit Warehousing.  Defendants' actions as alleged herein, which were not justified by reasonable business requirements, exercised their ability to deny access to LME Detroit Warehousing on an efficient, quality service basis.

306.    **LME Defendants**.  The relevant markets are, in the alternative, one or more of the following:

 (a) The market for providing exchange traded aluminum forward or futures contracts, including to approved warehouses for exchange-traded aluminum in the United States. The LME has had 97-99% of the aluminum futures contract trading and has had the power to approve the warehouses holding 95-100% of the aluminum for such trading.

 (b) The market for warehouse storage of aluminum in the United States in LME warehouses or, in the alternative, the market for warehouse storage of that portion of both LME

warehouse aluminum and non-LME warehouse aluminum that is located in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium or the Platts MW premium price. The growing amount of aluminum in the LME warehouses in the United States is estimated to constitute approximately 50% or more of the fluctuating total amounts of aluminum stored by warehouses in the United States. That percentage is even higher for aluminum stored in places that transact at Midwest Premium or Platts MW premium prices.

(c) The LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S. Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S. The geographical market for the foregoing product markets is the entire United States or, in the alternative, is that part of the United States that prices its aluminum on the Midwest Premium or Platts MW premium, i.e., Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas.

307. **Relevant Market For the LME Defendants and the Goldman Defendants**. (a) The market for warehousing LME aluminum in the Detroit Michigan area or, in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area or, in the alternative, for warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the Midwest Premium or the Platts MW premium. The alternative geographical markets are the same as those contained in the alternative definitions of the product market.

308. Pursuant to its agreement with the LME, Goldman has gone into the market in which Plaintiffs and other Class members purchased aluminum at the Midwest Premium or Platts MW premium price, and has inflated prices in that market through Goldman's diversion

agreements. After and during such price increases, Goldman has restrained and pulled out of those markets significant supplies of aluminum which Defendants have restrained in LME Detroit Warehousing.

   **F.    Effects On Interstate Commerce And Injury To Plaintiffs And Class Members**

   309.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

   310.    Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the United States including by inflating aluminum prices, restraining aluminum, reducing the effective availability of the supplies of aluminum in LME Detroit Warehousing and beyond.

   311.    (a) Defendants' combinations of their foregoing unreasonable "get paid more to do less" agreements, and Goldman's overbidding and diversion agreements have reduced aluminum supplies and shifted the supply curve of aluminum available for sale.  As a result, there has been substantially less aluminum available for sale in the United States especially in Michigan, Ohio, Indiana, Wisconsin, Illinois, Minnesota, contiguous and other areas.  And there has been substantially more aluminum restrained in LME Detroit Warehousing incurring inflated storage rates.

      (b) Consistent with the essential services of warehouses, a large amount of aluminum built up in LME Detroit Warehousing during the 2008-2009 vicious slowdown in the economy.  If, during the economic recovery of 2010-2013, such aluminum had not been unreasonably restrained by Defendants' agreements in unreasonable restraint of trade, then the amounts stored in Detroit would normally have declined from approximately 900,000 to much less than 400,000 tons.  Instead, the amount of aluminum in storage has increased from

approximately 900,000 tons to well in excess of 1,500,000 tons such that almost 90% of an entire year's production in the United States of aluminum is now stored in the LME Detroit Warehousing.  Approximately 75% of the LME aluminum stored in the United States is restrained and stored in Detroit.  This directly encouraged others to begin to mimic the Goldman/LME formula which further distorted the U.S. economy.

312.    Also, Defendants' diversion agreements have increased demand for aluminum and shifted the aluminum demand curve by, in effect, creating a new "storage demand" to stockpile aluminum.  This has prevented aluminum from being efficiently sold for productive uses at competitive prices.  Instead, it has caused aluminum to be sold for productive uses only at inflated, higher prices.  And it has restrained aluminum uselessly in order to incur unnecessary storage bills for which low quality storage services were provided.

313.    Consistent with admissions  by Defendant LME that the long queues in obtaining aluminum from LME warehouses inflated the Midwest premium or Platts MW premium price for aluminum, Defendants' agreements have dramatically increased such Midwest premium or Platts MW premium and also increased the "all-in price" which is the sum of the premium and the LME price.

314.    Contrary to false statements and rationalizations by Defendants, Defendants' agreements had significant price increasing effects on not only the Midwest premium but the "all-in" aluminum prices.  These price increasing effects occurred, among other means, by shifting the demand curve; shifting the supply curve; and causing the location of the increase in the supply to be in locations (for example, LME Warehouses in Detroit) in which there were reduced expectations by participants in the aluminum market that such supplies would be made available for consumption.

315.     Both **the large increases in the amounts** of aluminum in storage in Defendants'

LME Detroit Warehousing and the repeated record-breaking increases in the Midwest Premium

or the Platts MW Premium, have been directly contrary to economic circumstances and due to

the artificial circumstances that Defendants have injected into the supply-demand curve for

aluminum by their agreements in unreasonable restraint of trade.

316.     Far from dissociating itself from Goldman's anticompetitive conduct, the LME

has, notwithstanding repeated public complaints that the Goldman/LME conduct was inflating

aluminum prices, continued to make and perform its agreements with Goldman.  The LME has

overridden the complaints by its high service warehouses.  Also, the LME has made positive

public statements since 2011 that have caused, continued to cause, and empowered Goldman to

exacerbate the price inflation, the restraints of aluminum supplies, and the other deleterious

conduct alleged herein.

317.     The Defendants agreed to and did abuse their respective monopoly powers over

these sensitive, essential areas of commerce.  Defendants did so in order to inflate their revenues,

profits, and aluminum prices, including the Midwest Premium or Platts MW Premium prices of

aluminum.

318.     As a direct result of Defendants' violations, Plaintiffs and the members of the

Class have been damaged in their property or business, and have paid supra-competitive prices.

**G.     Allegations of Antitrust Injury To Plaintiffs And The Class**

319.     The Defendants' restraint of trade and anticompetitive conduct had severe adverse

consequences on competition, prices, the quality of storage services, efficiency in storage

services, and the level of available output of aluminum.  Plaintiffs and other members of the

Class were deprived of normal, competitive aluminum prices.  Instead, they were subjected to

artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

### H.    Class Allegations

320.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following Class of persons:

> All persons who from May 1, 2009 forward (a) made a first level direct purchase of aluminum pursuant to a contract with a price term based, in **any** part, on the Midwest Transaction Price, Midwest Premium, the Platts MW Premium or similar terminology, including but not limited to an averaging over a period of days of any such premium or (b) purchased aluminum directly from a Defendant.

> Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.[5]

As used herein, a "first level purchase of aluminum" means a purchase of aluminum at the first level of sale outside the producer, *e.g.,* a purchase from a smelter or affiliate of a smelter.

321.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiffs, but can be readily ascertained.  Plaintiffs believe that there are hundreds of members of the Class.

322.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

---

[5] Plaintiffs reserve the right to amend the definition of the Class in the class motion or otherwise.

a.  Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

b.  Whether Defendants made agreements in unreasonable restraint of trade;

c.  Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Premium, or Platts MW Premium portion thereof;

d.  Whether such violations inflated such prices of aluminum;

e.  Whether such inflation caused antitrust injury to the property of Plaintiffs and Class members;

f.  Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

g.  Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

323.   Plaintiffs' claims are typical of the claims of the other members of the Class it seeks to represent.  Plaintiffs and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

324.   Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in complex antitrust class actions including involving exchange markets.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

325.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

326.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

327.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

### V.     CLAIMS FOR RELIEF

**AS AND FOR A FIRST CLAIM
FOR VIOLATIONS OF SECTION 1 OF THE
SHERMAN ACT AGAINST THE LME,
GOLDMAN, AND JANE DOE DEFENDANTS**

328.     Plaintiffs incorporate by reference the preceding allegations.

329.     In violation of Section 1 of the Sherman Act, Defendants entered an agreement in unreasonable and extreme restraint of trade which intentionally, directly and foreseeably inflated prices for aluminum in the United States, including, the Midwest Transaction Price, Midwest Premium or Platts premium component of prices.  This, in turn, inflated the price of aluminum products.

330.     Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

331.     The Defendants agreed to and did abuse their respective monopoly powers over essential areas of commerce involving warehousing and futures trading.

332.     Defendants made the foregoing agreements in order to engage in the anticompetitive conduct alleged herein, inflate aluminum prices, including the Midwest Premium or Platts MW Premium prices of aluminum, and thereby inflate Defendants' profits and revenues.  Defendants' agreements did so, and unreasonably restrained trade.

333.     The LME and Goldman Defendants abused all of their previously alleged agreements in order intentionally and purposely to restrain trade.  These agreements constituted unreasonable restraints of trade.  Such agreements included, but were not limited to, the following agreements.

(a) **Inefficiency Agreements**.  Defendants established a load-out minimum on a per city rather than a per warehouse basis such that, in industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(b) Defendants established the minimum load-out based upon an absolute number rather than percentage of capacity of the warehouses, or percentage of the supply in the warehouse basis.  Thus, in industrial centers the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(c) Defendants established a minimum load-out based upon a gross number rather than a net number that subtracted load-ins. Thus, the agreement could be perverted into self-perpetuating feedback loops of greater and greater backlogs and longer storage times.

(d) Defendants agreed to transform the minimum load-out requirement, in times of high storage, into a maximum load-out requirement.  Thereby, in commercial centers the

agreements could be perverted into self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

(e) Defendants agreed to a maximum load-out rate that was $1/6^{th} - 1/20^{th}$ of an efficient rate of load-outs such that Goldman and the LME could be rewarded for extreme inefficiency with the longer duration of storage revenues from each customer. Thereby, they could leverage such inefficiency into a self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

(f) Defendants agreed to terms that allowed Goldman to subvert even the extremely unreasonably high maximum load-out agreement, by shuttling aluminum back and forth from warehouse to warehouse.

(g) Defendants agreed to storage rates that were much higher than competitive storage rates and further agreed that *quid pro quo* increases in storage rates to even higher supra-competitive levels would be made in order to compensate for any reduction in the extreme unreasonableness of the minimum (in reality, the maximum) load-out rate.

(h) Defendants agreed to leverage their supra-competitive revenues obtained from all the foregoing by Goldman's diversion agreements alleged in (j) below, which further added to the aluminum in storage in LME Detroit Warehousing.  Thereby, in industrial centers, Defendants' agreements could be further perverted into self-perpetuating feedback loops of greater load-out backlogs, longer storage times, and cause continually higher aluminum prices.

(i) Defendants agreed, as a necessary, intended and direct effect and inextricably intertwined part of their foregoing conduct, to inflate prices for aluminum including the Midwest Premium or Platts MW Premium component of the aluminum price.  Defendants inflated such

prices to increasingly higher all-time record levels in an economic environment in which such levels made absolutely no sense whatsoever.

(j) **Incentive Payment / Diversion Agreements**.  In order to restrain aluminum supplies in LME Detroit Warehousing, Goldman had to overbid and drive up prices in the markets for physical aluminum that were based upon the Midwest Premium or Platts MW Premium.  As repeated public complaints told Defendants, Defendants' diversion agreements and other steps were inflating the Midwest Premium to all time record levels in order to attract aluminum in LME Detroit Warehousing.  That is, Defendants first injured and made targets of purchasers of aluminum at the Midwest Premium or Platts MW Premium price, in order to ship more aluminum into and restrain it in Detroit LME Warehousing.

334.    As a direct and foreseeable result, Plaintiffs and Class members were injured in their property including that they had to pay artificially high prices for aluminum, including Midwest Transaction Price, Midwest Premium or Platts MW Premium prices.  Absent injunctive relief, these violations may continue or reoccur in the future.

### AS AND FOR A SECOND CLAIM FORVIOLATIONS OF SECTION 2 OF THE SHERMAN ACT AGAINST THE LME, GOLDMAN, AND JANE DOE DEFENDANTS

335.    Plaintiffs incorporate by reference the preceding allegations.

336.    In violation of Section 2 of the Sherman Act, the LME and Goldman Defendants monopolized, attempted to monopolize.

337.    The Goldman Defendants have abused their monopoly power.

338.    The LME Defendants have abused their monopoly power.

339.    The Goldman Defendants and the LME Defendants have agreed with one another and other Defendants, to abuse their monopoly power.  They have done so through the

anticompetitive, exclusionary, and restrictive agreements and steps to inflate prices, and restrain supplies through inefficiency as alleged herein.

340.    This conduct and its resulting impact on the market, occurred in or affected interstate commerce.  Defendants possessed or had achieved a serious threat to possess monopoly power.

341.    As a direct and foreseeable result, Plaintiffs and Class members have been injured in their property in that they had to pay artificially high prices for aluminum. Unless injunctive relief, including structural injunctive relief is granted, these violations may continue or reoccur in the future.

**AS AND FOR A THIRD CLAIM**
**FOR VIOLATION OF SECTION 1**
**OF THE SHERMAN ACT**
**<u>AGAINST ALL DEFENDANTS</u>**

342.    As a direct and foreseeable result, Plaintiff and Class members were injured in their property including that they had to pay artificially high prices for aluminum, including Midwest Transaction price, Midwest Premium or Platts MW Premium prices.  Absent injunctive relief, these violations may continue or reoccur in the future.

343.    Plaintiffs incorporate by reference the preceding allegations.

344.    In the alternative or in addition to the foregoing allegations, Plaintiffs allege as follows.

345.    In violation of Section 1 of the Sherman Act, the Warehouse Defendants entered into an agreement in unreasonable restraint of trade which, intentionally, directly and foreseeably inflated prices for aluminum in the United States, including the Midwest Transaction Price, Midwest Premium or Platts MW Premium prices, and this, in turn, inflated the price of

aluminum products and distorted the price of aluminum derivatives, including LME aluminum futures.  *See* "First Claim," *supra* at ¶¶ 276-287 (alleging related restraints of trade).

346.    The Warehouse Defendants consist of the Goldman Defendants (through its wholly owned subsidiary Metro International), the JPMorgan Defendants (through its wholly owned subsidiaries Henry Bath & Son, Ltd. and Henry Bath LLC), and the Glencore Defendants (through its wholly owned subsidiary Pacorini Metals AG and Parconi Metals, USA, LLC).

347.    One public interest rationale for providing banks with access to low interest or virtually no cost borrowings from the Federal Reserve is that the banks will lend to businesses and individuals in the community.  Such lending stimulates economic growth, employment, and improvements in the standard of living of members of the community.

348.    Allowing banks to use their money to purchase or deal in commodities was sufficiently against the public interest that it was prohibited as a matter of law until recently.

349.    The agreement that the Warehouse Defendants have made to restrain commodities in their warehouses, inflate prices, and use their capital to take enormous advantage of the LME's inefficient minimum load-out rules has restrained trade and defeated the purposes of the antitrust laws in numerous respects.

350.    **Goldman Defendants.**  The Goldman Defendants own LME warehousing, made incentive payments to induce third parties to divert aluminum resources from productive uses to long term storage at LME warehouses in Detroit, and colluded with other Warehouse Defendants and the LME to restrain supplies of aluminum in order to inflate prices, provide inefficient low quality load-out services, inflate storage revenues, and profit on investments in aluminum derivatives. This inflated the prices paid by Plaintiffs and had other deleterious consequences.

351.   **Glencore Defendants.**  Glencore also owns LME warehousing, owned equity shares in the LME, made incentive payments, engaged Goldman Defendants' behavior, and entered a similar agreement with the LME and Goldman to restrain supplies in LME Detroit Warehousing, inflate premium prices, provide inefficient low quality load-out services, and inflate storage revenues. This inflated the prices paid by Plaintiffs and had other deleterious consequences.

352.   **JPMorgan Defendants.**  JPMorgan was the largest LME shareholder with approximately 1.4 million ordinary shares (approximately 11%).  JPMorgan also owned LME approved warehouses in Baltimore, Chicago, New Orleans, Liverpool, Hull (Immingham), Bilbao, Trieste, Antwerp, Rotterdam, Singapore, Busan, Gwangyang, and Johor (Pasir Gudang).

353.   Defendant JPMorgan benefitted from the other Defendants' agreements in restraint of trade by receiving a higher sales price for the LME.

354.   Defendants Goldman, Glencore, and/or JPMorgan profited from trading LME or other aluminum on the basis of their information from the warehousing operations and otherwise.

**A.     The Warehouse Defendants Controlled The LME During The Class Period**

355.   Within a few months of each other in 2010, the Warehouse Defendants entered the aluminum market both as traders and as participants in the supply chain through their collective purchase of approximately 86.5% of all LME-approved aluminum storage warehouses. The Warehouse Defendants entered the aluminum market at that time in order to take advantage of the contango (*i.e.*, a market condition wherein the futures price is above the present cash or spot price), as well as to manipulate and exploit the aluminum market in order to further expand

and extend that contango and the invaluable arbitrage opportunities it represented both for them directly and for their trading clients, with whom they shared arbitrage profits.

356.    Currently, the Warehouse Defendants collectively own 128 (86.5%) of the 148 LME-approved aluminum storage warehouses in the U.S. Of those, the Goldman Defendants own 67 (45.3%), Glencore owns 50 (33.8%), and JPMorgan owns 11 (7.4%).[6]

357.    The Warehouse Defendants currently own or operate a majority of LME-approved warehouses in seven of the nine regions in which LME-approved warehouses exist in the United States. Defendants currently own or operate:

- Fifty-four of fifty-five warehouses in New Orleans, Louisiana (98.2%);

- Thirty-one of thirty-five warehouses in Detroit, Michigan (88.6%);

- All seventeen warehouses in Mobile, Alabama (100%);

- Six of sixteen warehouses in Baltimore, Maryland (37.5%);

- Thirteen of fifteen warehouses in Chicago, Illinois (86.7%);

- Three of five warehouses in Toledo, Ohio (60%);

- Each of the two warehouses in Los Angeles, California (100%); and

- One of three warehouses in St. Louis (33.3%), Missouri.

358.    In addition to owning most of the LME's warehouses in the United States, the Warehouse Defendants owned more than 20% of the LME's stock prior to the acquisition of the LME by HKEx Group in late 2012.  Prior to this acquisition, the members/shareholders of the LME were much more involved in the management of the LME than is typical of shareholders in

---

[6]    *See* LME List of Active Approve Wearhouses, *available at:*
https://www.lme.com/~/media/Files/Warehousing/Approved%20warehouses/LME%20Listed%20Warehouses.pdf.

a corporation. Much of the work of the LME is conducted through committees of members and/or their affiliates.

359.    Much of the work of the LME is conducted through committees of members and/or their affiliates.

360.    LME warehousing regulations are drafted by the LME's Warehousing Committee, which is made up of the executives of various banks, trading companies and storage companies.  Defendants, through their respective subsidiaries, each have at least one representative on the Warehousing Committee: President of Goldman Sachs' Metro International, Chris Wibbelman; CEO of Glencore's Pacorini, Peter Marc Waszkis; and Group General Manager of JPMorgan's Henry Bath & Son Ltd., Graham Hawkins.[7]

361.    The Warehousing Committee bears responsibility for "[m]aintaining contact with industry, trade and trade associations;" "[a]ssisting the Executive, as appropriate, with the formation of working groups to advise EXCOM on warehousing issues (e.g., structure of warehouse agreement, location policy, capacity constraints);" and "[m]aking recommendations to EXCOM on warehousing related policy issues."[8]  Each LME-certified warehouse must abide by the rules and regulations set by the LME's Warehousing Committee, including the "LME Policy Regarding the Approval of Wearhouses."[9]

B.      **Warehouse Defendants' Collective Control of the LME and Collusion With One Another Allowed Them To Manipulate The Supply And Price Of Aluminum**

---

[7]  *See* http://www.lme.com/en-gb/about-us/corporate-structure/committees/warehousing-committee/; *see also,* http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf.

[8]  *Id.*

[9]  Policy available at: http://www.lme.com/~/media/Files/Warehousing/Approval%20process/LME%20policy%20for%20warehouses.pdf.

362.    Through their ownership of – and rulemaking role in – Defendant LME, the Warehouse Defendants have been able to control the supply of aluminum, which in turn dictates the price of aluminum.  By controlling the LME, Defendants collectively control the warehousing rules of the LME, including the minimum load-out rules, the maximum rental rate for aluminum storage, and who can own aluminum warehouses. Further, Defendants' control of the LME also created substantial incentives for Defendants to increase the volume of aluminum stored in LME-approved warehouses and the length of time aluminum is stored there, as they derive substantial rental income from such storage.

363.    The Warehouse Defendants' delivery delays have been described by one former Metro forklift driver, Tyler Clay, as a "merry-go-round of metal."[10]  Prior to April of 2012, the London Metal Exchange required the Warehouse Defendants to move only a minimum of 1,500 metric tons of aluminum per day out of their warehouses. This limit was per company per city— not per warehouse. For example, all of Goldman's twenty-seven Detroit warehouses together were only required to ship out a combined 1,500 tons of aluminum per day. The purpose of this rule purportedly was to prevent long queues at warehouses by incentivizing timely metal deliveries. However, the Warehouse Defendants have treated this minimum delivery requirement as a de facto maximum.

364.    The minimum load-out requirement was supported by Goldman Sachs, JPMorgan, and Glencore in their roles as owners of the LME and members of the LME Warehousing Committee.

---

[10]    *See* http://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html.

365.    In addition to the extremely low minimum load-out requirements, Defendants'
anticompetitive scheme was furthered by offering financial incentives, to third parties who
already stored aluminum in their warehouses, to maintain their aluminum deposits in
Defendants' warehouses rather than release it into the market.

366.    For example, Glencore (through Pacorini BV) offered financial incentives to
parties storing aluminum at its warehouses in Vlissingen, Netherlands, which caused delays in
the delivery of aluminum from that location.

367.    Queues of about a year have been reported for aluminum stored in Vlissingen.
Glencore has created those queues through a deliberate effort to hoard aluminum in those
warehouses by payment of incentives.[11]   As of December 2012, the Vlissingen LME warehouses
stored more aluminum (1.44 million tons) than the LME Detroit warehouses (1.42 million
tons).[12]   According to Reuters, quoting a London-based trader, "[f]resh material is being bid
slightly because Pacorini are paying big incentives to get metal there, in Vlissingen. Then they
deliver it to the market and whoever holds it can't actually get it out for a year."[13] The New York
Times also revealed that Defendant Metro offers owners financial incentives of up to $230 a ton,
and then Metro moves their metal from one warehouse to another.[14]

368.    Glencore, the world's largest metal trader, owned 27 of the 29 LME-registered
warehouses in Vlissingen. Even with the new minimum load-out quotas, there is a wait time of
212 working days. As a result of the extended wait times for aluminum, Glencore's warehousing

---

[11] Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*,
CHICAGO TRIBUNE (April 27, 2012).
[12] Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*,
BLOOMBERG (Dec. 14, 2012).
[13] Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*,
CHICAGO TRIBUNE (April 27, 2012).
[14]   *See* http://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html?pagewanted=3.

unit made $31 million in profit in 2010. It is also estimated that Glencore, through Pacorini, makes $150 million a year in rental charges just from aluminum backlog in its Vlissingen warehouses.

369.    In a competitive market for aluminum warehousing services, it would not be possible for warehouse operators routinely to operate their warehouses in such a manner that customers would be forced to wait several months for delivery of the stored materials. In a competitive market, warehouse operators that could operative efficiently would instead attract business away from (intentionally) inefficient warehouse operators like the Warehouse Defendants.

370.    For example, while Defendant Goldman's subsidiary Metro International owns the vast majority of the warehouse space for aluminum in Detroit, and Defendant Glencore's subsidiary Pacorini owns the vast majority of the warehouse space for aluminum in Vlissingen, neither could separately engage in the practices set forth above absent a conspiracy. Despite the historical importance of these warehouses, if Metro or Pacorini were acting alone, rival warehouse owners in other parts of the United States and the rest of the world (absent a conspiracy) would take business away from their warehouses. Other aluminum warehouses are located by design at major transportation hubs. Although shipping from overseas warehouses would entail additional costs, such costs are negligible compared to the current cost of aluminum and the ever-increasing Midwest Premium.

**C.    By Manipulating The Supply And Price Of Aluminum, Warehouse Defendants Generated Profits For Themselves, Through Derivatives Trading And Storage Fees, And Injured Plaintiffs**

371.    Defendants' ownership and control of the LME and LME warehouses, coupled with their role in the commodities market as aluminum owners (on their own behalf and on

behalf of their clients) and aluminum futures traders, allowed them to influence the price of aluminum derivatives and reap additional profits.

372.    Commodities derivatives are a substantial part of the Warehouse Defendants' respective trading portfolios. They enter into various types of commodities derivatives, including futures contracts, swaps (contracts requiring counterparties to exchange liquidity), and options (contracts where the buyer has the right but not the obligation to purchase from or sell to the option writer commodities, currencies or financial instruments). JPMorgan has been the world commodities leader, increasing the value of its commodities earnings from $514 million in 2010 to over $2 billion in 2011 and 2012. Goldman Sachs has also realized large profits from its commodities business, with reports of 2012 revenue up to $1.25 billion.

373.    The potential for conflicts of interest between the Defendant-members of the Warehousing Committee in their roles as commodity traders, commodity owners, warehouse owners, and as Warehouse Committee members and LME owners, is noted in the Warehousing Committee's Terms of Reference: "Committee members must not abuse their Committee status and must set aside any potential conflict of interest in their decision-making processes. Where Committee members find themselves in a position of conflict of interest in relation to any matter to be discussed at a Committee meeting, they should consider whether it is appropriate for them to absent themselves from the part of the meeting at which that matter is discussed."[15] Warehouse Defendants recognized this conflict of interest and elected to take advantage of it for their own financial gain, and at the expense of the Class.

---

[15]    Available at:
https://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf.

374.     Defendants' collective acquisition of approximately 86.5% of LME-approved
aluminum warehouses in the U.S. placed ownership, warehousing, and control of LME policy
and trading in the hands of Defendants. As one expert put it, "(o)wnership of the key LME
warehouses by large commodity traders with integrated financial and physical metals operations
allows them to control the supply of aluminum to commercial users and, as a result, to control
prices."[16]

375.     Having access to and being involved in the physical markets provides a
perspective and certain advantages that are unavailable to non-warehouse owners. By both
trading on the derivatives market and participating in the physical market, Goldman Sachs and
JPMorgan are able to manipulate the inventory and prices of aluminum and profit through their
derivative positions. At the July 2013 Senate hearing, Joshua Rosner recounted testimony offered
to the United Kingdom's House of Commons about these advantages:

> [O]n the London Metal Exchange there are four very large companies that own the
> very warehouses that people deliver metal into. J.P. Morgan is one of them. They
> own a company called Henry Bath. They are, therefore, a ring-dealing member of
> the exchange and they also own the warehouse. That is restrictive. They were also
> reported, at one point, to have had 50% of the stock of the metal on the London
> Metal Exchange. That is manipulative.

376.     Likewise, while testifying before the Senate Committee on Banking, Housing,
and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23,
2013, Professor Saule Omarova stated "[o]wnership of the key LME warehouses by large

---

[16] Testimony of Professor Saule Omarova before the Senate Committee on Banking, Housing,
and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23,
2013.

commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices."

377.    Likewise, Professor Omarova continued in his Senate Testimony,

[M]etal warehousing operations are only one element in a large financial conglomerate's complex business strategy involving trading in metals and related financial contracts. Goldman is one of the largest traders of derivatives in the metals markets. Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. This directly implicates serious issues of market integrity. As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets. The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle. It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's structural market power.

378.    With ownership of hundreds of LME warehouses, a substantial ownership interest of the LME itself, and immense access to capital, the Warehouse Defendants had the tools to manipulate the spot price for aluminum, control the supply of aluminum available for delivery, and inflate the delivery cost of aluminum. As such, Defendants had the ability to and did shift both the spot price and futures price for aluminum to maintain "contango," thereby guaranteeing a profit for themselves and their trading clients in the futures or forward contracts market for aluminum.  More precisely, "contango" is an economic term that describes the situation in which a commodity's futures price is higher than its current spot price. Because Goldman, JPMorgan and Glencore had access to cheap financing at a time when financing was unavailable to many speculators, the aluminum contango of 2008-2010 has been termed by some analysts as a "super-contango."

379.    The Warehouse Defendants recognized these profit opportunities and entered the aluminum market full force in 2010 in order to gain an "edge" in their commodities derivatives

business.[17]  Defendant JPMorgan did so by acquiring Defendant Henry Bath, a metal warehousing giant and world leading logistics provider specializing in the storage and shipping of exchange traded metals, as part of a $1.7 billion deal to purchase a significant portion of RBS Sempra Commodities.  That deal was initially announced on or about February 16, 2010, and completed on or about July 1, 2010.  On the day the transaction closed, Blythe Masters, the Head of Global Commodities at JPMorgan Chase, stated: "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . **We need to be active in the underlying physical commodity markets in order to understand and make prices**."[18]

380.    In order for the Warehouse Defendants to maintain, expand, and exploit the aluminum "contango," while simultaneously profiting from increased and extended warehouse rents, the Warehouse Defendants needed to keep the inventory at LME warehouses as high as possible.  Ownership of LME warehouses was crucial to accomplishing this goal because only LME-certified warehouses can issue and cancel LME delivery warrants. LME warrants give their holder the right of possession to a specific amount of metal held within an LME-approved facility. These warrants are freely tradable and serve as the underlying collateral for LME futures and forward contracts used to trade and hedge aluminum. What this means for purposes of the Warehouse Defendants is that by purchasing LME warehouses, they took control of the

---

[17]   Kocieniewski, David, *A Shuffle of Aluminum, but to Banks, Pure Gold*, NY TIMES (July 20, 2013), *available at*: http://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html?pagewanted=1&_r=0&smid=tw-share ("By controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say. That, in turn, can give them an edge when trading commodities.")

[18] *Wall St falls out of love with commodities trading*, http://www.aluminiumleader.com/en/serious/news/2013/08/06/LME050813 (last viewed on March 12, 2014).

aluminum stores that collateralize LME aluminum futures. Additionally, ownership of LME-certified warehouses gave the Warehouse Defendants resulting ownership interests in the LME.

381.    The Warehouse Defendants ensured that their inventories remained high by paying aluminum producers and traders to deposit aluminum in their warehouses, and aluminum warrant owners to continue to store their aluminum in the Warehouse Defendants' warehouses. Such payments indicate market manipulation in the current context.

382.    Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and exploded at the beginning of 2012, once the scheme set forth above was fully in place.

383.    As a result, much of the activity in LME aluminum warehouses was now initiated by such traders and speculators. According to the investigation by The New York Times, a large amount of the aluminum inventory held in Metro's Detroit warehouses is owned by banks, hedge funds, and traders – and these parties manipulate the supply of aluminum by purchasing inventories of aluminum, placing them under warrant at the LME warehouses, followed by dubious "transfers" to, in many cases, the Warehouse Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum has reached the next warehouse.[19] Among other indicia of manipulation, the amount of aluminum warrants cancelled far exceeds any legitimate need for physical aluminum. This diverted aluminum from actual aluminum users and created an artificial shortage of aluminum and thus, the higher Midwest Premiums complained of herein.

**D.    Economic Evidence Demonstrates the Warehouse Defendants' Restraints of Trade and Anticompetitive Effects**

---

[19]    *See* Kocieniewski, David, *supra* at n. 17.

384.    The model below shows the effect of several variables on the Midwest Premium between January 2000 and early September 2013 and it is capable of explaining over ¾ of the movements in the Midwest Premium. Clearly, the longer the queue in Detroit, the higher the Midwest Premium, particularly so since February 1, 2010.  This relationship between premium and queue was not statistically significant before Goldman's acquisition of Metro in February 2010, but it became very important afterwards. For example, the impact of the Detroit queue on the Midwest Premium is three times larger after Goldman acquired the Metro warehouses than before the acquisition.  Although higher crude oil prices also induce a higher premium, as would be expected, they only explain 7.4% of the total variation in the premium during this 13-year period.

| Model for U.S. Aluminum Premium | | | |
|---|---|---|---|
| 1/4/2000 - 9/3/2013 | | | |
| Dependent Variable: U.S. Aluminum Premium | | | |
| | Coefficient | Significance Level | Variance Decompostion |
| Constant | 4.648 | * | |
| Detroit Queue | 0.003 | | 24.1% |
| Crude Oil Price | 0.005 | * | 7.4% |
| Fixed Effect 8/9/2007 Onwards | -0.741 | * | 4.5% |
| Fixed Effect 2/1/2010 Onwards | 1.396 | * | 17.2% |
| Detroit Queue Fixed Effect 2/1/2010 Onwards | 0.009 | * | 24.4% |
| | | | 77.6% |
| Adjusted R-Squared | 77.6% | | |
| Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg. | | | |
| Note: * Refers to statistical significance at the 99% level or greater. | | | |

385.    The following two tables present the same model both before and after February 1, 2010 separately.  The first table shows that before February 1, 2010, there either was no queue in the Detroit warehouses or it was very short and did not play a role in the determination of the

Midwest Premium. This is what would be expected under competitive circumstances, as recently recognized by the LME's CEO, Mr. Garry Jones in a press release: "The LME is aware of current market concerns in respect of high premiums in the aluminum market. **It is important to note that an element of premiums is the result of regional supply and demand, unrelated to the existence of queues."**[20]  This is in fact what Plaintiffs' expert finds prior to the acquisition in February 2010, but no longer subsequently.  Prior to 2010, both the Detroit queue and crude oil prices lack predictive power over the premium during the same time period, as evidenced by the very low adjusted R-squared for this regression.  These results drastically contrast with those in the second table, for which the same model is run using data only from February 1, 2010 to September 3, 2013.  The model has a very high predictive power for the Midwest Premium, with an adjusted R-squared of 90.3%. After the acquisitions, a very strong and positive relationship between queue and premium emerges, contrary to what would normally be expected.  The Detroit queue explains 75.6% of the movement in the Midwest Premium during that time period, a very significant contribution. Therefore, following Metro's acquisition by Goldman, the Detroit queue has been by far the largest contributing factor of movements in the Midwest Premium.

---

[20]   *Available at:* http://www.lme.com/en-gb/news-and-events/press-releases/press-releases/2014/02/lme-announces-next-steps-in-warehouse-reforms-programme/.

| Model for U.S. Aluminum Premium 1/4/00 - 1/31/10 | | | |
|---|---|---|---|
| **Dependent Variable: U.S. Aluminum Premium** | | | |
| | Coefficient | Significance Level | Variance Decompostion |
| Constant | 4.618 | * | |
| Detroit Queue | 0.003 | | 0.1% |
| Crude Oil Price | 0.006 | * | 0.6% |
| Fixed Effect 8/9/2007 Onwards | -0.772 | * | 3.6% |
| | | | 4.2% |
| Adjusted R-Squared | 4.1% | | |
| Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg. | | | |
| Note: * Refers to statistical significance at the 99% level or greater. | | | |

| Model for U.S. Aluminum Premium 2/1/10 - 9/3/13 | | | |
|---|---|---|---|
| **Dependent Variable: U.S. Aluminum Premium** | | | |
| | Coefficient | Significance Level | Variance Decompostion |
| Constant | 5.752 | (*) | |
| Detroit Queue | 0.012 | (*) | 75.6% |
| Crude Oil Price | 0.000 | | 14.7% |
| | | | 90.3% |
| Adjusted R-Squared | 90.3% | | |
| Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg. | | | |
| Note: * Refers to statistical significance at the 99% level or greater. | | | |

386.    The two graphs below display the but-for canceled warrants and inventories for LME Detroit warehouses on a daily basis, based on the but-for assumption of daily stock release. The Detroit warehouses demonstrate a significantly higher actual than but-for canceled warrants, and also significantly higher actual than but-for inventory.



387.     After determining the but-for canceled warrants and inventory, the same model is used to determine the but-for queues for Detroit, using coefficients estimated after the beginning of the financial crisis.  This analysis confirms that the actual Detroit queue is systematically and significantly higher than the but-for queue.



Actual and But-For Detroit Queue
August 9, 2007 -- August 19, 2013

Data Source: Harbor Aluminum Intelligence Unit
Notes:  But-For Canceled Warrants and Inventories are used to estimate But-For Detroit Queue.

388.    The model used to estimate the but-for Midwest Premium is as follows:

| Modeling the U.S. Aluminum Premium | | |
| --- | --- | --- |
| 1/1/09 - 8/19/13 | | |
| Dependent Variable: US Aluminum Premium | | |
| | Coefficient | Significance Level |
| Constant | 3.69067 | * |
| Detroit Queue | 0.01182 | * |
| Crude Oil Price | 0.01948 | * |
| | | |
| Adjusted R-Squared | 93.1% | |
| | | |
| Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg. | | |
| Note: * Refers to statistical significance at the 99% level or greater. | | |

389.    The following diagram depicts the actual and but-for Midwest Premiums for January 1, 2009 through August 19, 2013.  They are very close to each other from January 2009 through January 2010, but begin to diverge significantly once Defendant Goldman buys Metro International.  Accordingly, since February 1, 2010, the average value for the actual Midwest Premium was $0.087 while the average value for the but-for Midwest premium was $0.068, representing an increase of about 28%.



390.    Starting in 2002 and leading up to the financial crisis in 2007-2008, there was great volatility in the difference between the futures price and the spot price, as it lurched between contango and backwardation (*i.e.*, a market condition wherein the price of a futures contract is trading below the present cash or spot price). It was only during the financial crisis and thereafter, when the Warehousing Defendants began manipulating the market, that there was

less volatility and a more consistent contango.  The following chart demonstrates this trend, with the basis representing the difference between the three month aluminum futures price and the spot price.



**3 Month Basis for Aluminum**
January 2002 -- August 2013

Data Sources: Harbor Aluminum Intelligence Unit.
Note: The 3 Month Basis is calculated as the aluminum futures price for a 3 month contract less the cash price of aluminum.

391.    As this analysis demonstrates, a consistent and profitable contango emerged when the Warehousing Defendants began to consolidate ownership of LME-approved aluminum warehouses.  On information and belief, this contango was an intended result of Defendants' coordinated effort to provide profitable financing opportunities to their Trading Desks.

392.    The Warehousing Defendants' cultivation of the contango did not occur by accident.  When combined with the current historically low interest rates, the contango continues to spawn lucrative warehouse financing deals where banks, hedge funds and traders, including the Warehousing Defendants' Trading Desks, buy caches of aluminum from producers at the

spot price and then sell it for future delivery at a profit.  Because the contango is wide enough,

banks and traders such as the Warehousing Defendants can finance the purchase of aluminum,

pay for storage fees (to their affiliates in some cases) and other attendant costs for the duration of

the futures contract and still realize a substantial profit given the gap between the spot and

futures prices.  The following chart demonstrates the profitability behind a warehouse financing

deal, taking into account the prevailing storage rates at LME and non-LME warehouses:



393.   On information and belief, the Trading Desks of the Warehousing Defendants

have taken advantage of the contango to enter into recurring financing agreements and generate

substantial profits from market conditions that they helped to create and maintain.  These market

conditions include financing agreements relating to "on-warrant" aluminum stock stored in LME

warehouses and "off-warrant" or stealth stock held in non-LME warehouses which incur lower

storage costs and, thus, provide for greater profitability

394.   The proliferation of these cyclical financing deals, with the depressed load-out rates, locked up a significant percentage of aluminum in the LME-approved warehouses, which reduced the supply available to the market for physical delivery.[21]

395.   The return on their warehouse assets is accumulating a critical mass of aluminum in the warehouse queues.  Upon information and belief, the extended Detroit queue essentially resulted from a series of agreements between and among the Warehouse Defendants and key aluminum producers to funnel aluminum to LME-approved warehouses and then cancel massive numbers of warrants, creating and artificially extending queues in Detroit. This conduct has had the effect of maintaining the conditions for profitable financing transactions for the Warehouse Defendants, as well driving up the Midwest Premium for the benefit of the aluminum producers.

396.   As alleged above, aluminum producers are incentivized to funnel at least a portion of their stock into LME-approved warehouses in order to increase the Midwest Premium.  Thus, producers sell some of their stock to aluminum traders with the explicit or implicit understanding that the stock will be housed in LME-approved warehouses owned by the Warehousing Defendants.  Once the warehouse has been notified of the impending arrival of aluminum from the trader, the warehouse then contacts another trader, including, upon information and belief, traders from one or more of the Warehousing Defendants, and facilitates a transaction whereunder the trader agrees to purchase warrants on the incoming aluminum with the explicit or implicit understanding that the trader will cancel those warrants and, thereby, increase the warehouse queues.

---

[21]   *See* Agnieszka Troszkiewicz, *EU Plans to Discuss Metal Premiums and LME Warehouse Issue*, Reuters, Nov. 9, 2012, *available at*: http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html.

397.     This is the process by which the Detroit warehouse queues were grown to unprecedented levels.  Goldman attracted aluminum to its Metro warehouses from producers through incentive payments and the producers' inclination to funnel metal to LME-approved warehousing, where the effect would be to inflate the Midwest Premium.  Goldman's warehousing subsidiary, Metro, contacted various traders including, notably, traders affiliated with JPM, Glencore and Goldman itself, to inform them of the incoming aluminum and to offer them the opportunity to buy warrants on the aluminum on the condition that they also agree to cancel those warrants.  Once JPM, Glencore, Goldman or the other warrant purchasers obliged and cancelled their warrants, the queues increased exponentially.

398.     As a result of the cancellations, the Midwest Premium increased and the Warehousing Defendants' trading affiliates realized a resultant gain on their physical aluminum positions.  In addition, the contango was maintained and extended, and financing transactions remained profitable for all of the Warehousing Defendants, who had several appealing options, including: (1) entering a financing deal on-warrant initially (LME-based) and then off-warrant (off LME, where storage fees are significantly cheaper and, thus, the profit greater), before taking the aluminum to warehouses owned by their affiliates where they can reap warehouse incentives and storage fees; and (2) entering a financing deal on-warrant initially and then off-warrant before selling the aluminum on the physical market at an increased premium.

399.     After the Warehousing Defendants successfully established a critical mass of aluminum in Detroit, created massive queues through warrant cancellations, and reaped substantial profits through storage fees, an increased Midwest Premium, and financing deals, they sought to duplicate the process in Europe, working in concert to manipulate warehouse

inventories and queues in Vlissingen, the Netherlands, the central hub of the aluminum market in Europe, which for years has been dominated by Glencore, Pacorini and Rusal.

400.    In late 2011, Glencore warranted more aluminum at its Pacorini warehouses in Vlissingen, creating significant inventory buildups at that location.  Then, in December 2011, JPM, which held a significant stake in the Vlissingen inventory, cancelled warrants on 500,000 tonnes of aluminum and was said to be shifting metal to its own Henry Bath warehouses in Rotterdam.

401.    Thus, in one move, JPM created a log-jam in the Vlissingen queue and tightened the global supply of aluminum.  In fact, in 2012 and 2013, the Vlissengen queue was longer than the Detroit queue.  By driving up queues in Vlissingen almost overnight, the premiums in Vlissingen were also driven up much as they had in Detroit.

402.    The chart below shows the sudden and striking increase in queues in Vlissingen immediately following JPM's December 2011 mass cancellation of warrants.



403.    In violation of Section 1 of the Sherman Act, Defendants entered an agreement in unreasonable and extreme restraint of trade which intentionally, directly and foreseeably inflated prices for aluminum in the United States, including, the Midwest Transaction Price, Midwest Premium or Platts premium component of prices.  This, in turn, inflated the price of aluminum products.

404.    Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

405.    The Defendants agreed to and did abuse their respective monopoly powers over essential areas of commerce involving warehousing and futures trading.

406.    Defendants each have financially benefitted from the anticompetitive conduct described above.  Goldman Sachs (through Metro International), JPMorgan (through Henry Bath), and Glencore (through Pacorini) all received inflated rental costs associated with treating

LME load-out rules as a maximum instead of a minimum.  LME received a percentage of all aluminum storage revenues collected by its approved warehouses.  Moreover, because LME was, until the end of 2012, owned by banks, commodities traders, and warehouse owners, LME's members benefitted on multiple levels from this anticompetitive conduct.  In fact, more than 20% of LME Holdings (LME's parent company) was, before the 2012 sale to HKEx, held by Defendants Goldman Sachs and JPMorgan.  As a direct and foreseeable result of Defendants' anticompetitive conduct, Plaintiff and Class members were injured in their property, including that they had to pay artificially high prices for aluminum, including the Midwest Transaction Price, Midwest Premium or Platts MW Premium prices.

## AS AND FOR A FOURTH CLAIM
## FORVIOLATIONS OF SECTION 2 OF THE
## SHERMAN ACT AGAINST ALL DEFENDANTS
**(Monopoly, agreement to monopolize or attempt to monopolize against all Defendants)**

407.   Plaintiffs incorporate by reference the preceding allegations.

408.   In the alternative or in addition to the foregoing allegations, Plaintiffs allege as follows.

409.   In violation of Section 2 of the Sherman Act, the LME Defendants (including Defendant HKEx) and/or the Warehouse Defendants: (a) monopolized, attempted to monopolize, and/or conspired to monopolize; and (b) had the ability to control prices and/or output; and (c) otherwise had monopoly power for the reasons alleged herein.

410.   The LME Defendants, the Goldman Defendants, and/or the Warehouse Defendants, by themselves or together, also had monopoly power in the relevant markets.

411.   Such Defendants agreed between and among themselves or with one or more other Defendants to monopolize or attempt to monopolize or conspire to monopolize as alleged herein.

412.     Such Defendants specifically intended to achieve such monopoly.  Defendants did achieve or came extremely close to achieving such monopoly and had a dangerous probability of success.

413.     As a direct result, Defendants caused Plaintiffs injuries in their property including having to pay supra-competitive prices as previously alleged.

### AS AND FOR A FIFTH CLAIM
### AGAINST DEFENDANTS

**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MCL §§ 445.773, *et seq.***

414.     Plaintiffs incorporate by reference the preceding allegations.

415.     The aforementioned acts and practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Michigan Compiled Laws §§ 445.773, *et seq.*

416.     It is appropriate to apply Michigan antitrust law to direct purchases of aluminum in all fifty states because the illegal conspiracy, overt acts in furtherance thereof, and other anticompetitive conduct and overcharges occurred in Michigan.

417.     Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class of aluminum purchasers.  Much of the illegal conduct was focused in Michigan and key parties and witnesses to this unlawful conduct reside and do business in Michigan.  A primary method and means of the conspiracy was to hoard 75% of the United States' London Metal Exchange physical aluminum within warehouses that were located in Michigan.  Additionally, Defendant Metro International Trade Services LLC is headquartered in Michigan.

418.     This conduct and its resulting impact on the market occurred in or affected Michigan intrastate commerce.

419.    As a direct and proximate result, Plaintiff and members of the Class have been injured in their business and property in that they had to pay artificially high price premiums for primary aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

## AS AND FOR A SIXTH CLAIM
## AGAINST DEFENDANTS

### VIOLATIONS OF NEW YORK DONNELLY ACT
### NEW YORK GENERAL BUSINESS LAW § 340, et seq.

420.    Plaintiffs incorporate by reference the preceding allegations.

421.    The aforementioned acts and practices by Defendants were and are in violation of New York's Donnelly Act, New York General Business Law § 340, et seq.

422.    It is appropriate to apply New York antitrust law to direct purchases of aluminum in all fifty states because the illegal conspiracy, overt acts in furtherance thereof, and other anticompetitive conduct and overcharges occurred in New York.

423.    Key Defendants reside and conduct significant business in New York. Defendants Goldman Sachs and JPMorgan are headquartered in New York.  In addition, key third party aluminum producer Alcoa is headquartered in New York, NY.

424.    Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class of aluminum purchasers and had a significant impact on the intrastate commerce of New York.  By way of example, many Plaintiffs and members of the Class paid to Alcoa, in New York, prices for primary aluminum that were artificially inflated by the unlawful actions of Defendants Goldman and JPMorgan, also in New York.

425.     As a direct and proximate result, Plaintiff and Class members have been injured in their property in that they had to pay artificially high prices for aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

**AS AND FOR A SEVENTH CLAIM**
**AGAINST DEFENDANTS**

**VIOLATION OF CERTAIN OTHER STATE ANTITRUST STATUTES**

426.     Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

427.     By reason of the foregoing, Defendants have violated, and Plaintiff and members of the class are entitled to relief under:

    a.    Ala. Code. § 6-5-60(a).

    b.    Arizona Revised Statutes § 44-1401, et seq.

    c.    Ark. Code. Ann. §§ 4-75-211, et seq.

    d.    California Cartwright Act, California Business and Professions Code § 16700, et seq.

    e.    District of Columbia Code § 28-4501, et seq.

    f.    Hawaii Revised Statutes § 480-1, et seq.

    g.    Illinois Antitrust Act, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011 et seq.

    h.    Iowa Competition Law, Iowa Code § 553.1, et seq.

    i.    Kansas Statutes Annotated § 50-101, et seq.

    j.    Maine Revised Statutes, tit. 10, § 1101, et seq.

    k.    Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, et seq.

    l.    Mississippi Code Annotated § 75-21-1, et seq.

111

m.      Nebraska Revised Statutes § 59-801, et seq.

n.      Nevada Revised Statutes § 598A.010, et seq.

o.      New Mexico Antitrust Act, New Mexico Statutes Annotated § 57-1-1, et seq.

p.      North Carolina General Statutes § 75-1, et seq.

q.      North Dakota Uniform State Antitrust Act, North Dakota Century Code § 51-08.1-01, et seq.

r.      Oregon Revised Statutes § 646.705, et seq.

s.      Gen. Laws of Rhode Island Annotated, RI ST § 6-36-1, et seq.

t.      Code of Laws of South Carolina Annotated, S.C. Code Ann. § 39-3-10, et seq.

u.      South Dakota Codified Laws § 37-1-3.1, et seq.

v.      Tennessee Code Annotated § 47-25-101, et seq.

w.      Utah Code Annotated, §§ 76-10-3101, et seq.

x.      Vermont Statutes Annotated, tit. 9, § 2451, et seq.

y.      West Virginia Antitrust Act, West Virginia Code § 47-18-1, et seq.

z.      Wisconsin Wyo. Stat. Ann. § 40-4-101, *et seq*.Statutes § 133.01, et seq.

aa.      Wyo. Stat. Ann. § 40-4-101, et seq.

428.    As a direct and proximate result, Plaintiff and Class members have been injured in their property in that they had to pay artificially high prices for aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

## AS AND FOR AN EIGHTH CLAIM
## AGAINST DEFENDANTS

**VIOLATION OF CERTAIN STATE UNFAIR TRADE PRACTICES ACTS**

429.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

430.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the class are entitled to relief under:

        a.        Alaska Stat. § 45.50.531.

        b.        Ariz Rev. Stat. §§ 44-1521 *et seq.*

        c.        Arkansas Code §§ 4-88-101 *et seq.*

        d.        California Bus & Prof. Code §§ 17200 *et seq.*

        e.        Conn. Gen. Stat. § 42-110, et seq.

        f.        D.C. Code Ann. §28-3901 *et seq.*

        g.        Florida Stat. §§ 501.201 *et seq.*

        h.        Hawaii Rev. Stat. § 480-2.

        i.        Kan. Stat. Ann. §§ 50-623 *et seq.*

        j.        Mass. Gen. Laws chapter 93A §§ 1 *et seq.*

        k.        Mich. Comp. Laws § 445.901.

        l.        Minn. Stat. §§ 325F.69 *et seq.*

        m.        Miss. Code §§ 75-24-1 *et seq.*

        n.        Mo. Ann. Stat. 407.020.

        o.        Nebraska Rev. Stat. §§ 59-1601 *et seq.*

        p.        Nev. Rev. Stat. §§ 598.0903 et seq.

        q.        New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

        r.        New Mexico Stat. Ann. §§ 57-12-1 *et seq.*

     s.     N.Y. Gen. Bus. Law § 349 *et seq.*

     t.     North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

     u.     Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

     v.     S.C. Code Ann., §§ 39-5-10, *et seq.*

431.     As a direct and proximate result, Plaintiff and Class members have been injured in their property in that they had to pay artificially high prices for aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

(B)     For an order enjoining Defendants' challenged conduct, and declaring and adjudging that such conduct is unlawful

(C)     For a judgment awarding Plaintiffs and the Class damages against Defendants as a result of Defendants' unlawful conduct alleged herein, including treble damages and all other available damages whether punitive, exemplary or otherwise;

(D)     That this Court declare, adjudge, and decree that Defendants have committed violations of state antitrust laws alleged herein and award treble damages.

(E)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)     For any other and further relief as the Court may deem just and proper.

## VII.    <u>DEMAND FOR JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury on all issues so triable as well as those issues which an advisory jury may be appropriate.

Dated:          March 12, 2014

Respectfully submitted,

Christopher Lovell
LOVELL STEWART HALEBIAN & JACOBSON L.L.P.
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshjllp.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

Linda P. Nussbaum
GRANT & EISENHOFER, P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel:     (646) 722-8500
Fax:    (646) 722-8501
Email: lnussbaum@gelaw.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

Samuel H. Rudman
ROBBINS GELLER RUDMAN &
DOWD L.L.P.
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

116

Bonny E. Sweeney
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Fax: (619) 231-7423
Email: bonnys@rgrdlaw.com

*Interim Co-Lead Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct Purchaser
Class*

Robert J. Bonsignore
BONSIGNORE, LLC
193 Plummer Hill Road
Belmont, NH 03220
Cell: (781) 856-7650
rbonsignore@class-actions.us

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

John G. Emerson
EMERSON POYNTER LLP
The Rozelle-Murphy House
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
Fax: (501) 907-2556
john@emersonpoynter.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Solomon B. Cera
Gold Bennett Cera & Sidener, LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Fax: (415) 777-5189
sbc@gbcslaw.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
310 Clifton Avenue
Minneapolis, MN 55403
1-612-338-4605
Fax: (612)-338-4692
Email: vesades@heinsmills.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Dean M Harvey
Eric B. Fastiff
Lin Y Chan
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415)-956-1000
Fax: (415)-956-1008
Email: dharvey@lchb.com
Email: efastiff@lchb.com
Email: lchan@lchb.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Geoffrey Milbank Horn
Gerald Lawrence
Peter Dexter St. Philip , Jr.
Raymond Peter Girnys
Vincent Briganti
LOWEY DANNENBERG COHEN & HART, P.C.
White Plains Plaza
One North Broadway
Suite 509
White Plains, NY 10601
(914) 997-0500
Fax: (914) 997-0035
Email: ghorn@lowey.com
Email: glawrence@lowey.com
Email: pstphillip@lowey.com
Email: rgirnys@lowey.com
Email: vbriganti@lowey.com

*Member of Plaintiffs' Steering Committee for the Direct Purchaser Plaintiffs*

Peter George Safirstein
MORGAN & MORGAN, P.C.
28 West 44th St., Ste 2001
New York, NY 10036
(212) 564-1637
Fax: (212) 564-1807
Email: psafirstein@forthepeople.com

*Member of Plaintiffs' Steering Committee for the Direct Purchaser Plaintiffs*

Alyson L. Oliver
OLIVER LAW GROUP, P.C.
950 W. University Drive
Suite 200
Rochester, MI 48307
248 327-6556
Fax: 248-436-3385
Email: notifications@oliverlg.com

*Member of Plaintiffs' Steering Committee for the Direct Purchaser Plaintiffs*

David P. Germaine
John Paul Bjork
Joseph M Vanek
VANEK, VICKERS & MASINI, P.C.
55 W. Monroe, Suite 3500
Suite 4050
Chicago, IL 60606
(312)224-1500
Fax: (312)-224-1510
Email: dgermaine@vaneklaw.com
Email: jbjork@vaneklaw.com
Email: jvanek@vaneklaw.com

*Member of Plaintiffs' Steering Committee for the Direct Purchaser Plaintiffs*