## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

U S DISTRICT COURT SDNY

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | Master Action No. 13-md-02481-KBF |
| This Document Relates to: | |
| *D-Tek Manufacturing v. Goldman Sachs Group, Inc.*, No. 1:13-cv-06567-KBF | |
| *Team Ward, Inc. v. Goldman Sachs Group, Inc.*, No. 1:13-cv-09062-KBF | |
| *Master Screens Inc. v. Goldman Sachs Group, Inc.*, No. 1:13-cv-09097-KBF | |
| *Welk-Ko Fabricators, Inc. v. Goldman Sachs Group, Inc.*, No. 1:14-cv-00159-KBF | |
| *Big River Outfitters, LLC v. Goldman Sachs Group, Inc.*, No. 1:14-cv-00178-KBF | |
| *Seating Constructors USA, Inc. v. The Goldman Sachs Group, Inc.*, No. 1:14-cv-00191-KBF | |
| *F&F Custom Boats, LLC v. Goldman Sachs Group, Inc.*, No. 1:14-cv-00199-KBF | |

## COMMERCIAL END USERS'
## CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ALLEGATIONS ................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................6

III.    PARTIES ...................................................................................................................8

      A.      Plaintiffs......................................................................................................8

      B.      Defendants ................................................................................................11

IV.     SUBSTANTIVE ALLEGATIONS .........................................................................19

      A.      Industry Background..................................................................................19

      B.      The Warehousing Defendants Conspire with the LME to Reap Exorbitant
                Storage Fees, Increase the Midwest Premium and Benefit From Financing
                Deals ..........................................................................................................22

      C.      Defendants Agree to Stockpile Aluminum ...............................................26

      D.      The Defendants Agree to Treat Minimum Load-Out Requirements as
                Maximums .................................................................................................28

      E.      The Defendants' Conduct Inflated the Midwest Premium .......................34

      F.      The Warehousing Defendants Conspired to Create a Contango ..........................48

      G.      The Warehousing Defendants Look to Profit from Their Scheme .......................52

      H.      The Midwest Premium Cannot Effectively Be Hedged ........................................56

      I.      The Warehousing Defendants Work in Concert to Build Warehouse
                Queues and Drive Up Premiums in North American and Europe ........................57

      J.      Defendants Had Notice and Knowledge of Plaintiffs' Antitrust History .............61

      K.      Government Investigations of Defendants' Conduct................................................64

      L.      The Warehousing Defendants' Planned Exit of the Scheme ................................65

V.      THE LME'S MONOPOLY POWER .......................................................................71

VI.     THE GOLDMAN DEFENDANTS' MONOPOLY POWER ...........................................73

VII.    THE RELEVANT MARKETS....................................................................................75

VIII.  EFFECTS OF INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND THE CLASS .................................................................................... 76

IX.  ANTITRUST INJURY ........................................................................................ 76

X.  CLASS ACTION ALLEGATIONS .................................................................... 77

XI.  FIRST CLAIM FOR RELIEF: INJUNCTIVE RELIEF PURSUANT TO SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT ................................................................................................................. 79

XII.  SECOND CLAIM FOR RELIEF AS AGAINST LME AND GOLDMAN DEFENDANTS: INJUNCTIVE RELIEF PURSUANT TO SECTION 2 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT .................................. 83

XII.  THIRD CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE ANTITRUST STATUES ..................................................... 84

XIV.  FOURTH CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES ............................................................................. 89

XII.  FIFTH CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS, FOR VIOLATIONS OF MICHIGAN ANTITRUST REFORM ACT, MCL §§ 445.771, ET SEQ., ON BEHALF OF MEMBERS OF THE DAMAGES CLASS ......... 91

PRAYER FOR RELIEF ................................................................................................. 93

DEMAND FOR JURY TRIAL ..................................................................................... 94

## COMPLAINT

Plaintiffs Welk-ko Fabricators, Inc., Quicksilver Welding Services, Inc., Lexington Homes, Inc., Seating Constructors USA, Inc., F&F Custom Boats, LLC, D-Tek Manufacturing, Big River Outfitters, LLC d/b/a SeaArk Boats, Master Screens Inc. and Team Ward, Inc., d/b/a WarEagle Boats ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Goldman Sachs Group, Inc. ("Goldman"), GS Power Holdings LLC ("GS Power"), Metro International Trade Services LLC ("Metro" and together with Goldman and GS Power, the "Goldman Defendants"), JPMorgan Chase & Company ("JPM"), Henry Bath & Son, Ltd., Henry Bath, LLC (together "Henry Bath"), Glencore Xstrata PLC ("Glencore"), and Pacorini Metals USA, LLC ("Pacorini" and together with Goldman, Metro, JPM, Henry Bath and Glencore, the "Warehousing Defendants"), the London Metal Exchange Limited, and LME Holdings Limited (together the "LME" or "LME Defendants") (collectively "Defendants"). The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.     SUMMARY OF ALLEGATIONS

1.     In violation of Section 1 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1, and multiple States' laws, Defendants combined, conspired and agreed with one another to limit and restrain the availability of primary aluminum in the United States for the purpose of earning supracompetitive storage fees increasing the price Plaintiffs pay for

---

[1]     Counsel's investigation includes an analysis of publicly available pricing information, news articles, statements made during Congressional hearings on the manipulation of the aluminum market, and other statistics, consultation with experts, and additional analysis.

aluminum and, at the same time, increasing the profits of the metals trading operations of JPM, Glencore and Goldman and/or their affiliates (referred to herein as their "Trading Desks").

2.      In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and multiple States' laws, the Goldman Defendants and the LME Defendants, each (a) anti-competitively abused their individual corporate monopoly powers and (b) separately and additionally agreed with one another and others to acquire and maintain such monopoly power to their mutual benefit.

3.      The LME is a metals trading exchange that also controls a large network of metal storage warehouses throughout the United States and Europe.  A significant amount of primary aluminum—standard ingot and ingot in the form of t-bars and sows—is stored in LME-approved warehouses prior to being delivered to the mills and extruders that process the ingots and billets into semi-fabricated aluminum.  Virtually all future trading takes place through LME-approved warehouses, and the LME benchmark price forms part of the basis for the price of aluminum bought and sold through other sources.  In addition, because the instruments conferring ownership over metal guarantees the owner a specific grade and quality of metal manufactured by a specific person, aluminum from such warehouses is greatly preferred by processors.

4.      Beginning in February 2010, Goldman, JPM and Glencore acquired several large metals warehousing businesses.  Together with the LME, Goldman, JPM and Glencore conspired to amass vast amounts of aluminum in specific LME-approved warehouses with the purpose and effect of removing the metal stored in those warehouses from the market for primary aluminum. The Warehousing Defendants (particularly Goldman) offered aluminum producers incentives to use its LME-approved warehouses and agreed to treat LME rules governing minimum "load out" requirements as maximums, and transport aluminum from warehouse to warehouse instead of delivering it to purchasers.  They also agreed that the minimum (applied as a maximum) load out

requirement would apply to all warehouses owned by a single firm in an area, so that, for example, Goldman's maximum delivery in Detroit was 1,500 tons total. In Detroit alone, the amount of aluminum stored in LME-approved warehouses increased from 695,980 tons in June 2009 to 1.36 million tons in December 2012. Aluminum purchasers who had waited only six weeks for delivery before February 2010 were subject to sixteen-month delays by July 2013. If shipments of aluminum to consumers had not been constrained by these unlawful agreements, aluminum could be identified by the warehouse owner and scheduled for delivery to the owner in two business days.

5.      The object of Defendants' conspiracy was to constrict the supply of primary aluminum available for trading on the spot market in order to put upward pressure on the price of aluminum, to benefit positions the Warehousing Defendants held in the futures market for aluminum and to support the contango (a market condition in which current prices are lower that futures prices) that had developed shortly before the Warehousing Defendant sentered the market for metal warehousing services.

6.      The Defendants succeeded in increasing the cost of primary aluminum on the spot market through an increase in the "premium" that aluminum purchasers pay in addition to the benchmark LME Official Price for aluminum. In the United States, for many years the pricing in aluminum sales contracts has been based on the LME benchmark price plus a "premium" representing the logical costs of delivering the metal from the suppliers to the midwestern United States. This premium is widely known as the "Midwest Premium."[2]  While sales contracts may

---

[2]  "Midwest Premium" includes Midwest Transaction Price, Platts MW Premium or a similar term referring to the same premium. The Midwest Premium represents the full logistical cost of moving metal from a supplier's warehouse or plant (transportation, storage, insurance and finance costs) to the consumer in the Midwest of the United States.

not expressly identify the premium as the "Midwest Premium," it is generally described by market participants as the Midwest Premium.

7.      Defendants' agreement directly impacted the Midwest Premium, causing it to nearly *double* between January 2010 and January 2013—rising from $0.055/lb in January 2010 to more than $0.115/lb by January 2013—while market analysis shows that the *actual* logistical costs of delivery *decreased* during the same period.  This unprecedented increase resulted from the Defendants' agreement to manipulate warehouse inventories and, specifically, the artificially extended delivery delays that the Defendants created for the purpose of increasing the Midwest Premium.

8.      Expert analysis prepared at the request of Plaintiffs' counsel of LME-approved warehouses in Detroit, where a significant number of LME-approved warehouses are located, confirms that aluminum inventory and warehouse queues have been kept at artificially high levels, which caused the Midwest Premium to be artificially inflated.  The Midwest Premium should have averaged $0.068/pound from February 1, 2010 through August 19, 2013, instead of its actual average of $0.087/pound during the same time period, an increase of approximately 28%.

9.      Plaintiffs and Class members are purchasers of semi-fabricated aluminum, such as rolled sheet aluminum, aluminum wire and rods, and aluminum extrusions.  Plaintiffs and Class members fashion these semi-fabricated aluminum forms into a variety of different products, such as computer rack and storage equipment, aluminum hull boats, and custom sheet metal.  They and other commercial end users of aluminum pay the Midwest Premium as a component of the price they pay for aluminum.

10.     Defendants' conspiracy to concentrate warehouse inventories and, specifically, to artificially extend delivery delays, and suppress the supply of aluminum drove up the Midwest Premium and artificially inflated the price of aluminum throughout the United States in violation of federal antitrust laws and numerous state antitrust and consumer protection laws, as alleged herein.

11.     Defendants have injured Plaintiffs and others who purchased aluminum in the United States at inflated prices by, *inter alia*, diverting aluminum from productive uses into warehouses controlled by one or more Defendants and then engaging in anticompetitive conduct that had the purpose and effect of (1) restricting the amount of aluminum supply leaving Defendants' warehouses and entering the market, lengthening warehouse queues and increasing the cost of sourcing, i.e., purchasing or retrieving, the aluminum from the warehouses, and (2) inflating the Midwest Premium that commercial end users such as Plaintiffs must pay to purchase aluminum. The scheme allowed the Defendants generally, and Goldman and LME in particular, to reap exorbitant warehousing fees and profit from aluminum holdings tied to the ever-increasing Midwest Premium, and enabled the Trading Desks to profit from positions in the aluminum market, including those tied to variations in current and future aluminum prices through recurring financing deals. Defendants have tampered with, and artificially inflated the price of aluminum and have reaped substantial profits from their anticompetitive conduct. Defendants' conduct proximately and foreseeably caused Plaintiffs and members of the Class to suffer injuries by forcing them to pay artificially inflated prices for aluminum throughout the Class Period.

12.     Conduct that is legal for firms without significant market power can be illegal under federal and state laws if engaged in by firms with significant market power. Likewise, a

strictly private transaction, ordinarily permitted under the antitrust laws, can be illegal with respect to public prices or essential services.  Goldman and the LME were monopolies.  Each held an essential facility and exercised power over the public prices for aluminum.  To that end, the Goldman Defendants and the LME each created, maintained and profited from their monopoly power through the manipulation of the aluminum market and prices, including: (1) monopolizing LME-approved warehousing of aluminum in the United States; (2) stockpiling aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage rents and therefore premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to benefit the  aluminum-based derivative trading of Goldman, JPM, Glencore and ohters, in unreasonable and unlawful restraint of trade.

13.    Plaintiffs bring this action on behalf of themselves and similarly situated commercial end users who purchased aluminum in the United States from February 1, 2010 forward.

14.    Plaintiffs bring this class action lawsuit pursuant to federal antitrust laws and to recover damages under state antitrust, unfair competition and consumer protection laws, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all other similarly situated Class members sustained as a result of the Defendants' illegal conduct.

## II.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 1, 2, and 26.  This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28

U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the members of the Class (as defined herein) exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of the Class are citizens of a state different from some Defendants.

16.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 15 U.S.C. §§1, 2, 7, 15, 22 and 26.  Defendants are found in, reside in or transact business in this District.  Moreover, a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this District.  Defendants affirmed these points in moving for transfer to this District.

17.    Defendants' illegal conduct with respect to aluminum has substantially affected commerce throughout the United States, the inward bound foreign commerce of the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting the price of aluminum in the United States and in each of the states identified herein.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the sale of aluminum and their ownership of aluminum warehouses.  Defendants traded and/or distributed aluminum and owned lucrative aluminum warehouses, thereby purposefully profiting from access to commercial end users in each such state.  As a result of the activities described herein, Defendants have:

a) Caused damage to the residents of every state, including the states identified herein;

b) Caused damage in every state, including each of the states identified herein, by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

c) Engaged in persistent courses of conduct within every state and/or derived

substantial revenue from the sale of aluminum; and

d) Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in every state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the sale of aluminum in each such state.

## III.    PARTIES

### A.    Plaintiffs

18.    Plaintiff Big River Outfitters, LLC d/b/a SeaArk Boats ("SeaArk") is an Arkansas limited liability company with its principal place of business in Monticello, Arkansas. SeaArk specializes in building all-welded aluminum fishing boats. SeaArk purchased processed aluminum in Arkansas for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, SeaArk purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

19.    Plaintiff D-Tek Manufacturing ("D-Tek") is a California corporation with its principal place of business is in Santa Clara, California. D-tek specializes in the production, import and installation of machinery. D-Tek purchased processed aluminum in California for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, D-Tek purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

20.    Plaintiff F&F Custom Boats, LLC ("F&F") is an Arkansas corporation with its principal place of business in Monticello, Arkansas. F&F specializes in custom made aluminum boats, boat repairs and boat designs. F&F purchased processed aluminum in Arkansas for use in

its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, F&F purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

21.    Plaintiff Lexington Homes, Inc. ("Lexington") is a Mississippi corporation with its principal place of business in Lexington, Mississippi.  Lexington is a builder of HUD Code manufactured housing using a variety of materials including processed aluminum. Lexington purchased processed aluminum in Mississippi for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, Lexington purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

22.    Plaintiff Master Screens Inc. d/b/a Tropical Enclosures ("Master Screens") is a Florida corporation with its principal place of business in Jacksonville, Florida. Master Screens specializes in creating custom designs for patio and swimming pool enclosures. Master Screens purchased processed aluminum in Florida for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, Master Screens purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

23.    Plaintiff Quicksilver Welding Services, Inc. ("Quicksilver") is a Florida corporation with its principal place of business in Freeport, Florida.  Quicksilver fabricates custom built boat towers, home railings and artworks using a variety of materials including processed aluminum. Quicksilver purchased processed aluminum in Florida for use in its business activities at prices artificially and intentionally inflated by Defendants' conduct

throughout the Class Period, as alleged herein.  Specifically, Quicksilver purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

24.    Plaintiff Seating Constructors USA, Inc. ("Seating") is a Florida corporation with its principal place of business in Brooksville, Florida. Seating designs, manufactures and installs aluminum seating bleachers. Plaintiff purchased processed aluminum in Florida for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, Seating purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

25.    Plaintiff Team Ward, Inc. d/b/a War Eagle Boats ("War Eagle") is an Arkansas boat builder with its principal place of business in Monticello Arkansas.  War Eagle specializes in the manufacture of aluminum hull boats designed for hunting and fishing.  War Eagle purchased processed aluminum in Arkansas for its manufacturing operations at prices artificially, intentionally and directly inflated by the conduct of Defendants throughout the Class Period as alleged herein. Specifically, War Eagle purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

26.    Plaintiff Welk-ko Fabricators, Inc. ("Welk-ko") is a Michigan corporation with its principal place of business in Livonia, Michigan. Welk-ko specializes in custom sheet metal fabrication. Welk-ko fabricates pushbutton, multi-door enclosures, test stands, rack panels, chassis, cabinets, consoles, indoor and outdoor signage, and structural steel fabrication using a variety of materials, including processed aluminum. Welk-ko purchased processed aluminum in Michigan for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Specifically, Welk-ko

purchased processed aluminum pursuant to terms containing a price based, in any part, on the Midwest Premium.

**B.    Defendants**

27.    Defendant LME is the only global exchange on which industrial metals are traded.  Trading on the LME includes buyers and sellers in both the market for physical delivery of aluminum and financial traders, who have no intention of actually taking physical delivery of any aluminum.  The LME is headquartered at 56 Leadenhall Street, London EC3A 2DX, United Kingdom, and does business in the United States and in this District by, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S. According to the LME's website, "[the LME] is the world centre for industrial metals trading and price-risk management.  More than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the *global benchmark*."  As part of its business,  the LME operates a global network of more than 700 approved warehouses that extends across 14 countries and 36 separate locations for the delivery, storage and collection of LME-approved brands of metal traded on the exchange, including aluminum.  LME approved warehouses are located throughout the United States.

28.    Defendant LME Holdings Limited is a corporation that, until December 6, 2012, owned the LME.  On December 6, 2012, the LME was acquired by the Hong Kong Exchanges & Clearing.  Until the sale, JPM was the largest shareholder of LME Holdings with approximately 11% of its ordinary shares, and Goldman was its second largest shareholder with approximately 9.5% of its shares.  Goldman and JPM were expected to earn an estimated $436 million from the sale.

29.     Defendant Goldman is one of the largest investment banking, securities and investment management firms in the world, providing a broad array of financial services. Goldman is located at 200 West Street, New York, New York 10282.  Throughout the Class Period, Goldman traded extensively in commodities, including aluminum, on the LME and was a shareholder of LME Holdings.  Goldman has a commodity products division in its Institutional Client Services Division that trades in commodities for its own account for corporate capital appreciation and to hedge risk.

30.     Defendant Metro is an LME-certified warehousing company that specializes in the storage of metals, including aluminum, for the LME.  Metro was acquired by Goldman in February 2010 and operates as a subsidiary of GS Power Holdings LLC.  As of March 8, 2013, Metro operated 29 out of a total of 37 LME-approved storage facilities in the Detroit metropolitan area.  Metro is located at 6850 Middlebelt Road, Romulus, Michigan 48174. Metro's Michigan facilities house approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America.

31.     Defendant GS Power Holdings LLC is an intermediate subsidiary of Goldman that is the immediate parent of Metro and is located at 85 Broad Street, New York, New York 10004.

32.     Defendant JPM is a global financial services firm operating in more than 60 countries and with assets of approximately $2.4 trillion.  JPM is located at 270 Park Avenue, New York, New York 10017.  Throughout the Class Period, JPM traded extensively in commodities, including aluminum, on the LME and was a shareholder of LME Holdings.  JPM's commodities trading business operates primarily under its Corporate and Investment Bank umbrella, which provides market making, hedging and financing for clients in the commodities

markets.  JPM also trades commodities in its Chief Investment Office, which is in its Corporate and Private Equity division. JPM acquired Henry Bath's network of aluminum warehouses as part of its purchase of RBS Sempra in 2010.  By early 2012, JPM had drawn up a strategy to build the metals stockpiles at its warehouses, and, according to traders, was directing aluminum supplies into its own warehouses in Rotterdam and Chicago.  Though it is unclear what percentage of metal held in the Henry Bath warehouses was owned by JPM's traders, it was high enough to alarm the U.S. Federal Reserve and to make it difficult for JPM to classify the warehouses as a strictly passive investment. According to media reports, the Federal Reserve pressured JPM to dilute the amount of metal held by its own traders in Henry Bath warehouses.

33.    Defendant Henry Bath is a UK-based metals warehousing company that owns and operates LME-approved aluminum storage networks, including in the United States, with locations in Baltimore, Chicago and New Orleans.  It is recognized as one of the dominant warehouses of the LME.   Henry Bath, like other operators of LME-certified warehouses, including Goldman, is represented on the Warehousing Committee of the LME, which helps to establish rules for the warehousing of exchange traded aluminum in the U.S.  In effect, JPM as 100% owner of Henry Bath has a "seat at the table" when it comes to establishing rules for LME-approved warehouses.  Henry Bath recently expanded its presence in the United States by nearly tripling the size of its lease in Baltimore to almost one million square feet of storage space.

34.    Defendant Henry Bath LLC is an international logistics provider specializing in the storage and shipping of exchange traded metals and soft commodities around the globe. Henry Bath LLC, a subsidiary of Henry Bath, is a limited liability company organized under the

laws of Delaware and having its principal place of business at 2500-A Broening Highway, Baltimore, Maryland 21224.

35.    Defendant Glencore is a diversified natural resource company located in Baar, Switzerland.  The company is an integrated producer and marketer of commodities, including metals and minerals such as copper, nickel, zinc/lead, alloys, alumina/aluminum and iron ore.  It has interests in controlled and non-controlled industrial assets including mining, smelting, refining and warehousing operations.  Throughout the Class Period, Glencore traded extensively in commodities, including aluminum, on the LME and was a shareholder of LME Holdings. Glencore is divided into two primary divisions: (i) Industrial; and (ii) Marketing.  The latter is the commodity trading arm of the business, which is primarily used to hedge the commodity exposure of the company.  The "marketing" takes place in each sub-segment of the company. According to its 2012 Annual Report, Glencore's metals and minerals business segment is responsible for managing hedging and industrial investment activities relating to metals and minerals.

36.    Defendant Pacorini is a leading LME warehousing company with U.S.-based LME-approved warehouses in Detroit, Baltimore, Chicago, Los Angeles, Mobile, and New Orleans.  Pacorini is a limited liability company located at 2200 Broening Highway, Suite 200, Baltimore, Maryland 21224.  Glencore purchased Pacorini in August 2011.

37.    In the United States, the Warehousing Defendants own approximately 75% of all LME-approved warehouses. These warehouses are located in: Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Long Beach, California; Los Angeles, California; Mobile, Alabama; New Orleans, Louisiana; Owensboro, Kentucky; St. Louis, Missouri; and Toledo, Ohio.

38.    Currently, of the LME-approved warehouses in the U.S., Goldman owns 66, Glencore owns 50, and JPM owns 11.

39.    The Warehousing Defendants currently own or operate a majority of LME-approved warehouses in seven of the nine regions in which LME-approved warehouses exist in the United States. They own or operate 54 of 56 warehouses in New Orleans, Louisiana; 31 of 38 warehouses in Detroit, Michigan; all seventeen warehouses in Mobile, Alabama; 16 warehouses in Baltimore, Maryland; 15 warehouses in Chicago, Illinois; 3 of 5 warehouses in Toledo, Ohio; and 1 of 3 warehouses in St. Louis, Missouri.  At other times during the Class Period, the Warehousing Defendants owned a larger number of warehouses in several of these jurisdictions.

40.    Throughout the Class Period, the Warehousing Defendants' membership on key LME committees allowed them to discuss and implement the rule interpretations restricting the supply of aluminum to the market.  In particular, Sergio Garbin (Pacorini), Marc Waszkis (Pacorini), Graham Hawkins (Henry Bath), Mike Dudley (International Commodity Services Limited, the London agent for all Henry Bath Group companies) and Chris Wibbelman (Metro) all worked on the Warehousing Committee, where they played an important role in setting the rules and regulations that govern the operations of LME-approved warehouses, which included Defendants' own warehouse operations.  According to the LME's website, the Warehousing Committee assists "with the formation of working groups to advise [the LME's Executive Committee] on warehousing issues (e.g. structure of warehouse agreement, location policy, capacity constraints) … [and] [makes] recommendations to [the LME's Executive Committee] on warehousing related policy issues."  Among other things, the Committee makes recommendations to the LME Board regarding warehousing requirements, including, for example, minimum delivery requirements and storage fees.  According to the Warehousing

15

Committee's Terms of Reference, the Warehousing Committee meets at least four times a year and more frequently when appropriate to satisfy its obligations to the LME and its Executive Committee. Thus, throughout the Class Period, the Warehousing Defendants held positions of authority on the Warehousing Committee, enabling them to work jointly to ensure that the committee took no action to defeat their conspiracy to increase prices for primary aluminum or to propose rules that would affect its longevity or success in driving up the Midwest Premium.

41.    The potential for conflict of interest for the Defendants who are members of the Warehousing Committee in their roles as commodity traders, commodity owners, warehouse owners, and as Warehouse Committee members and LME owners, is noted in the Warehousing Committee's Terms of Reference: "Committee members must not abuse their Committee status and must set aside any potential conflict of interest in their decision-making processes. Where Committee members find themselves in a position of conflict of interest in relation to any matter to be discussed at a Committee meeting, they should consider whether it is appropriate for them to absent themselves from the part of the meeting at which that matter is discussed."

42.    The Warehousing Defendants were also able to shape LME policy and practices through their membership on other critical LME committees. Representatives of JPM (Neil Clift) and Goldman (Ben Green) worked collaboratively on the LME Trading Committee, which met at least once every two months, and possibly more frequently, to consider all aspects of trading on the Ring, LMEselect and on the telephone and to, among other things, make recommendations to the Executive Committee on trading related policy issues and "generally promoting the use of LME contracts."[3] In addition, Goldman's Rohan Khurana served on the

---

[3] JPM also had a representative, Gavin Rankine, on the Ring Dealers Committee, which is a sub-committee of the Trading Committee responsible for considering all aspects of trading on the Ring in order to make recommendations to the Trading Committee.

LME Aluminum Committee, which is responsible for "overseeing the Primary Aluminum, Aluminum Alloy and NASAAC brand application procedures," recommending to the Executive Committee the listing and delisting of approved brands and the approval of producer and brand name changes, and "making recommendations to [the Executive Committee] on policy issues related to the LME Primary Aluminum, Aluminum Alloy and NASAAC contract." More recently, Sam Hainsworth of JPM and Andrew Caplan of Glencore joined the Aluminum Committee, which meets at least four times a year.

43.    During the Class Period Ben Green of Goldman chaired the Traded Options Committee, which is a sub-committee of the LME Board responsible for, among other things, generally promoting the use of LME contracts and making recommendations to the Executive Committee on trading related policy issues.   Goldman also had a representative, Stephen Branton-Speak, on the LME's Audit & Risk Committee during the Class Period.

44.    The relationships between each of the Warehousing Defendants and the LME are illustrated in the three charts below:

**Goldman**



**J.P. Morgan**



**Glencore**



45.    The acts charged have been done by some or all of the Defendants and their co-conspirators. Alternatively, the acts charged were authorized ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Industry Background

46.    Aluminum originates as an oxide called alumina.  Mining companies extract deposits of bauxite ore.  Alumina refiners refine the bauxite into pure alumina.  Then aluminum producers smelt the alumina into aluminum through an electrolytic reduction process.  They then shape the aluminum into ingots and/or value added products such as and billet, slab, and wire rod.  Aluminum in these forms is called "primary aluminum."

47.    Aluminum producers sell primary aluminum to purchasers in the physical market and the financial market.  The price is generally composed of the 3 month average official LME price for aluminum—the last bid and offer price quoted during the LME's second daily trading session—and the Midwest Premium.

48.    Semi-fabricators of aluminum such as rolling mills, wire and roll companies and extruders purchase primary aluminum and process it into rolled sheet aluminum, aluminum wire and rod cables, aluminum extrusions, and other semi-fabricated forms.  They either sell the semi-fabricated aluminum directly to commercial end users like the Plaintiffs or to service centers, charging a price that is generally composed of the LME price, the Midwest Premium, and costs related to the conversion of the aluminum into its semi-fabricated form.  Service centers add finishes like treads, polish, color or unique cuts and then sell to commercial end users, typically adding the cost of their finishing work to the sale price.

49.    Commercial end users like Plaintiffs fashion the semi-fabricated aluminum into products like computer rack and storage equipment, aluminum hull boats, fencing, aluminum seating bleachers, and custom sheet metal.

50.    Historically, aluminum producers sold their stock directly to semi-fabricators.  The LME was a market of last resort where producers would go to sell their stock in times of oversupply and where purchasers would go to buy metal in times of extreme shortage.  Now a substantial percentage of primary aluminum is stored in LME-approved warehouses before delivery.

51.    The LME facilitates the purchase and sale of physical aluminum stored in its network of approved warehouses through the sales of futures, options and other financial instruments.

52.     The LME has long provided for forward contract trading in aluminum. Before and after February 2010, the LME captured approximately 97-99% of the volume of aluminum forward and futures contract trading on organized exchanges in the United States.

53.     At the expiration of an LME aluminum forward contract, delivery of warrants for aluminum in a LME warehouse must be made by sellers (or "shorts") who have not liquidated (*i.e.*, traded out of their contract) to buyers (or "longs") who have not liquidated. An LME warrant is a standardized document issued by an LME-approved warehouse that identifies who has the right of possession of a particular lot of aluminum. It gives the owner the right to take delivery of a specific brand of aluminum in a specific location in a specific warehouse. LME warrants are freely tradable and are the instruments that underpin LME paper futures transactions. For LME futures contracts, delivery of a warrant represents delivery of the corresponding physical aluminum. A warrant takes the form of centrally-maintained electronic records under the LME's SWORD system. Each warrant is for a specific tonnage and brand and is not interchangeable.

54.     When a LME aluminum forward contract matures, the seller must deliver the warrant to the purchaser, assuming neither has liquidated or traded out of the contract. But delivery occurs on less than 1% of the contracts traded. More than 99% of the contracts are satisfied or liquidated by offset through trades. That is, a person with a long position (buyer) sells one contract, and a person with a short position (seller) buys one contract. Thereby, they "offset" or "liquidate" or cancel their previous obligation to the LME clearing house.

55.     The difference between the purchase price and the sale price, constitutes the loss or gain on the LME forward contract transaction.

56.    In the United States, aluminum is sold pursuant to a benchmark price consisting of the LME price plus a local premium referred to as the "Midwest Premium."  Most contracts for the purchase or sale of aluminum in the U.S. contain these two components.  The Midwest Premium reflects the full logistical cost of moving metal from the suppliers warehouse/plant to the consumer in the Midwest United States (transportation, storage, insurance and finance costs) the customer pays to a seller to deliver the aluminum.

57.    Platts publishes the Midwest Premium, based upon what is described as "a daily survey of spot buyers and sellers, using a representative sample of producers, traders and different types of end users."  Platts sets these benchmark prices in various markets, including energy and metals, including aluminum.  Platts, *Methodology and Specifications Guide: Metals*, p.2. http://www.platts.com/IM.Platts.Content/methodologyreferences/methodologyspecs/metals.pdf. Using this survey information,  Platts calculates a single price for the metal. The difference between this single, all-in spot price and the LME price is the premium, which Platts then publishes.  Platts will derive premiums for different markets.  The U.S. premium is referred to as the Platts MW or the Midwest Premium.

### B.    The Warehousing Defendants Conspire with the LME to Reap Exorbitant Storage Fees, Increase the Midwest Premium and Benefit From Financing Deals

58.    Prior to entry of the Warehousing Defendants into the metals warehousing market, the global financial crisis of 2008 produced an arbitrage opportunity in the aluminum market.  At the time, the supply of aluminum was plentiful due to the downturn in demand (related to lower production in the recession) and aluminum futures prices exceeded spot prices—a situation known as a market "contango."  Due to historically low interest rates, savvy

traders were able to purchase aluminum at the spot price, finance the aluminum purchased at a low interest rate, pay to warehouse and insure it, and sell it on the futures market at a higher price.

59.     The Warehousing Defendants moved swiftly to capitalize on the contango.  In a February 2010 deal, JPM acquired Henry Bath as part of a larger transaction in which it bought a significant portion of RBS Sempra Commodities' business for $1.6 billion.  Three days later, Goldman announced that it was acquiring Metro in a deal purportedly worth $550 million. Glencore then bought metals warehousing assets of Pacorini for $209 million in August 2011. Thus in a sixteen month period starting in February 2010, the Warehousing Defendants effectively took control of the LME-approved aluminum warehousing market in North America and Europe, as demonstrated in the following diagram:



60.     The warehouse acquisitions not only gave the Warehousing Defendants the ability to control a critical component in the distribution of the aluminum in the United States, it also gave them the ability to influence LME warehousing policy through their membership on committees that advised the LME regarding storage fees and minimum delivery requirements. As a result, they were able to manipulate the LME warehousing system in a way that would maximize their income stream from warehouse storage fees, estimated by the *New York Times* to be a "quarter-billion dollars a year." *See* David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES, July 20, 2013 (the "July 20 NY Times Report").

61.     After acquiring Metro, Goldman began stockpiling aluminum in its Detroit LME-approved warehouses by offering primary aluminum producers incentives to use capture metal units in their LME-approved warehouses and by transporting aluminum from warehouse to warehouse. The Defendants' creation of an artificially low supply, the increase in the amount of time it took for aluminum owners to actually take possession of their aluminum from the warehouses, and an increased demand for aluminum inflated the price of aluminum for all purchasers because it directly impacted the Midwest Premium, a component of the price paid by purchasers of primary and semi-fabricated aluminum.

62.     Commodities are a substantial part of both Goldman's and JPM's trading portfolio. They enter into various types of commodities derivatives, including futures contracts, swaps (contracts requiring counterparties to exchange liquidity), and options (contracts where the buyer has the right but not the obligation to purchase from or sell to the option writer commodities, currencies or financial instruments). JPM has been the world commodities leader, increasing the value of its commodities earnings from $514 million in 2010 to over $2 billion in 2011 and 2012.

Goldman has also realized large profits from its commodities business, with reports of 2012 revenue up to $1.25 billion.

63.    Having access to and being involved in the physical markets provides a perspective and certain advantages that are unavailable to non-warehouse owners. By both trading on the derivatives market and participating in the physical market, Goldman and JPM are able to manipulate the inventory and prices of aluminum and profit through their derivative positions. At the July 2013 Senate hearing, Joshua Rosner recounted testimony offered to the United Kingdom's House of Commons about these advantages:

64.    "[O]n the London Metal Exchange there are four very large companies that own the very warehouses that people deliver metal into. J.P. Morgan is one of them. They own a company called Henry Bath. They are, therefore, a ring-dealing member of the exchange and they also own the warehouse. That is restrictive. They were also reported, at one point, to have had 50% of the stock of the metal on the London Metal Exchange. That is manipulative."

65.    The Warehousing Defendants' acquisition of a substantial percentage of the LME-approved warehouses in the United States and Europe also gave them insight into commodities prices, benefitting the trading positions of their Trading Desks. As explained by Jason Schenker, president and chief economist at Prestige Economics, "Information is worth money in the trading world and in commodities, the only way you get it is by being in the physical market. . . . So financial institutions that engage in commodities trading have a huge advantage because their ownership of physical assets gives them insight in physical flows of commodities."

66.    In contrast to securities markets, commodities markets are particularly vulnerable to so-called market power-based manipulation that may not involve fraud or deceptive conduct.

As Professor Saule T. Omarova explained in testimony before the U.S. Senate, large traders with integrated financial and physical metals operations like Goldman, JPM and Glencore are able "to control the supply of aluminum to commercial users and, as a result, to control prices." They can "significantly move prices of futures and underlying physical commodities not only by 'cornering' the market in a particular product but also by placing very large sell/buy orders in excess of available liquidity. This salience of market power in commodities market manipulation underscores the potential dangers."

67.     Indeed, The Financial Times reported that on the day JPM bought into the warehousing business, Blythe Masters, the head of JPM's commodities business, stated, "Just being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture" and admitted that JPM purchased commodities assets, including the LME warehouses, "in order to understand and *make* prices."

### C.    Defendants Agree to Stockpile Aluminum

68.     The warehouses charge storage fees to aluminum purchasers, and the LME collects 1.1% (recently increased from 1%) of storage fees paid to its approved warehouses.

69.     The Defendants sought to maximize their income from these storage fees, even after demand for aluminum increased as the U.S. economy began to recover, by building warehouse inventories and extending warehouse "queues," which is, in essence, the time it takes for metal to be taken out of a warehouse, namely the time from when a warrant is canceled to the time that the metal is delivered to its owner.

70.     When a warrant is "cancelled" it is added to the load-out queue but the owner continues to pay daily storage fees to the Warehousing Defendants. Because cancelled warrants

have consistently exceeded the daily load-out rate throughout the Class Period as a result of the Warehousing Defendants' manipulations, the delivery queue has correspondingly grown, increasing the storage fees paid to Defendants.

71.    In a deliberate effort to hoard aluminum and create queues, the Warehousing Defendants, and Goldman in particular, offered financial incentives to primary aluminum producers and traders to store aluminum in their LME-approved warehouses.  The Warehousing Defendants, with the consent and agreement of the LME, offered incentives to aluminum producers and traders to attract and divert more aluminum into their warehouses.  The incentive payments allowed the Warehousing Defendants, in particular Metro, to amass a huge stockpile of aluminum, from which it derived substantial income from storage fees.

72.    Aluminum producers were incentivized to funnel at least a portion of their aluminum to Defendants' LME-approved warehouses in Detroit in order to extend warehouse queues and, as alleged further *infra*, increase the Midwest Premium.  Aluminum producers also were motivated by other financial benefits, including (1) obtaining a better shipping rate with rail companies based on the volume of aluminum shipped and (2) realizing an immediate cash infusion from selling to an LME warehouse (which pays cash before the metal is shipped) as opposed to the 30-day delay for payment from direct transactions with purchasers of primary aluminum.

73.    As demand for aluminum increased, the Warehousing Defendants' LME warehouses in Detroit started offering higher cash incentives to producers to entice them to store their aluminum in the warehouses, rather than sell it on the open market.  In early 2010, Metro paid incentives of $60 per ton, but increased them to $120 per ton by the end of the year.  In

2011, Metro offered incentives of approximately $150 per ton, and up to $180 per ton in 2012. By January 2013, Metro was paying incentives of $210 to $215 per ton.

74.     The incentive payments have, as a necessary and intended result, (a) increased aluminum prices including the Midwest Premium, and (b) added to the prospective, growing queue and the anticipated delays in removing aluminum from LME Detroit Warehousing.

75.     The Warehousing Defendants', and in particular Goldman's, ability to pay increasing incentives was a function of their increasing inventories. The more aluminum the Warehousing Defendants could divert into their warehouses and the more inefficient Defendants could be in loading out aluminum, the more that the Warehouse Defendants could afford to pay in incentive payments. This was a continuous cycle such that, as inventories grew, the Warehousing Defendants had the ability to pay higher incentives commensurate with that growth.

76.     The incentives offered by the Warehousing Defendants worked. In Detroit, a critical mass of aluminum developed, as the amount of aluminum stored in LME-approved warehouses rose from 695,650 tons in June 2009 to 1.36 million tons in December 2011. During that time, 1.4 million tons entered the warehouses for a net build-up of 669,250 tons. By stockpiling aluminum in the Detroit LME-approved warehouses, Defendants could stockpile a critical mass of primary aluminum and set the conditions to inflate the Midwest Premium and thereby profit from it through their trading activities.

### D.     The Defendants Agree to Treat Minimum Load-Out Requirements as Maximums

77.     While increasing the stockpile of aluminum in the Detroit LME-approved warehouses, the Defendants took additional steps to artificially restrict the supply of aluminum into the market even as demand was rising.

78.    In February 2010, LME rules required warehouses to release a minimum of 1,500 tons of aluminum each day. This daily minimum, referred to by the LME as the "load out rate," applied to all of a company's warehouses in a particular city, not to each warehouse individually. Metro, for example, was required to release a total of 1,500 tons of aluminum from its 27 Detroit warehouses each day. Because the minimum was not tied to the amount of aluminum brought into a warehouse on any given day, the Defendants could take in aluminum as rapidly as it was produced but only had to send out 1,500 tons per day for all of their warehouses in a particular city.

79.    The Defendants agreed to treat the daily minimum as a daily *maximum* in order to restrict the supply of aluminum into the market for physical delivery, boost their income from storage fees, and increase the Midwest Premium. The minimum load-out requirement (actually, maximum) was supported by Goldman, JPM, and Glencore in their roles as owners of the LME. For most of the Class Period, the largest shareholders of the Defendant LME Holdings Limited were the financial firms which owned LME approved warehouses. Defendant JPM was the largest LME shareholder (approximately 10.9%) and defendant Goldman was the second largest LME shareholder (approximately 9.5%). Other large shareholders of LME Holdings included Metdist 9.39%, UBS 4.26%, Citigroup 2.32%, Merrill Lynch 2.32% Morgan Stanley 2.32%, Koch Metals 2.32%, and Jeffries Bache 1.93%. Glencore was a .4% owner of "B" shares in the LME.

80.    The minimum load-out requirement (actually maximum) was also supported by Goldman, JP Morgan and Glencore as members of the LME Warehousing Committee. It was in their best interest as warehouse owners to maintain the low load-out.

81.    The Defendants also agreed that transfers of aluminum from one warehouse to another would count toward the 1,500 ton load-out requirement, and so shuffled aluminum from one warehouse to another rather than delivering it to purchasers.

82.    According to The New York Times, Metro warehouse workers reported that they routinely saw the same truck drivers making three or more round trips each day among warehouses owned by Goldman.   Tyler Clay, a forklift driver who worked at Metro's warehouses called the process "a merry-go-round of metal." He said that while aluminum was delivered to Metro's warehouses in huge loads by rail car, it left in a relative trickle by truck.

83.    Since 2010, the LME has continuously acquiesced, consented, and otherwise agreed to (a) the daily "maximum" interpretation of the load-out rate and (b) the shuffling of aluminum from one warehouse to another rather than delivering it to purchasers.   Indeed, in entering and successfully performing the unlawful agreements alleged herein, the LME had a strong financial motive to inflate their storage revenues (1.170% of the total storage fees charged by LME Warehousing) not only for the LME Detroit Warehousing, but, indirectly, for other warehousing as well.

84.    The Defendants did not alleviate or correct the problem of the extended queues. Instead, Goldman, JPM and Glencore, through their Trading Desks, sought to further restrict the flow of aluminum out of the Detroit LME-approved warehouses.   One way was to clog the already narrow funnel by cancelling warrants, which effectively added more aluminum to the queue, increasing delivery time, warehouse fees, and the Midwest Premium.

85.    Aluminum tied to financing transactions by Goldman's, JPM's and Glencore's Trading Desks account for a large proportion of cancelled warrants in some of Defendants' LME-approved warehouses.   When a warrant is cancelled, this means that the aluminum stored

in a warehouse and reflected by those warrants does not move, but, instead, sits, "waiting for the owner's instructions to the warehouse company for removal from the warehouse or possibly re-issue of warrants." As more traders cancel warrants, the volume of aluminum that seeks to leave the warehouse's narrow door (restricted by the load-out rate) increases. A problem arises where the volume of cancelled warrants exceeds the warehouse's artificially low load-out rate, so a queue forms. As traders cancel more warrants, the stockpile of aluminum waiting to be delivered increases, allowing the warehouses to continue to collect storage fees on each ton of aluminum the owner has asked be "loaded out" and delivered. The cancelled warrants for aluminum associated with financing transactions take up "load out" positions in the warehouse queue, even if they are merely being moved to an off-LME warehouse as fodder for another financing transaction. This further extends the queue, constrains the supply of aluminum available to end users, and increases the Midwest Premium.

86.     In a competitive market for aluminum warehousing services, it would not be possible for warehouse operators routinely to operate their warehouses in a manner that forced purchasers to wait as long as 16 months months for delivery of the stored aluminum. If operating normally, delivery could be requested and scheduled in two business days. Absent the Defendants' illegal agreements, LME-approved warehouse firms would have competed on delivery and service terms. However, since each of the Warehousing Defendants adhered to these agreements, better terms were not available.

87.     The prospect of increasing revenues for the LME afforded Defendants with an additional motive to make and carry out the unlawful agreements here. That prospect was the opportunity to sell LME. As shareholders of LME Holdings, Goldman, JPM and Glencore knew that the sale would be more attractive and profitable if the LME's warehouse revenues were

increased and LME Holdings could project higher cash flows. LME Holdings ultimately sold LME to Hong Kong Exchanges & Clearing Ltd. for $2.15 billion. Goldman's stake in the LME was valued at $208 million at that purchase price, and JPM's at $228 million.

88.    Defendants' conduct exacerbated an existing aluminum deficit in North America despite increased demand, as the following chart demonstrates:

**NORTH AMERICA PRIMARY ALUMINUM MARKET BALANCE**
(million mtons; negative balance indicates market deficit)



89.    The LME responded to public criticism of the lengthy delivery delays by increasing the minimum load out requirement to 3,000 tons on April 1, 2012. Yet the rules still did not prevent the Defendants from counting the "shuttling" of aluminum from warehouse to warehouse in that total. Neither the new load out rule was apparently applied to individual warehouses. Simultaneously, the Defendants agreed to increase storage fees to compensate for the change. Pursuant to agreements among the Defendants, the daily storage fee per ton in

Midwest warehouses increased from $0.40 in 2010 to $0.41 in 2011 to $0.45 in 2012. The 10%

increase between 2011 and 2012 was highly irregular because the prior increase was closer to

2%. In 2013, the rate increased to $0.48 per ton per day.   As shown by the chart below, the

2013 LME daily rate far exceeds the rental rates charged in non-LME warehouses:



90.     The rationale given to customers by the LME for the increases in storage fees at

LME-approved warehouses was that increases in minimum shipping requirements would lessen

demand for storage, justifying increases in storage fees by weight. Defendants knew, however,

that storage times would not in fact decrease but would increase as they have done throughout

the Class Period. For instance, according to the New York Times, from the time Goldman

acquired Metro, wait times to withdraw aluminum from Metro have grown from an average of

six weeks to more than sixteen months, a ten-fold increase.

91.     Metro is perfectly capable of locating and releasing specific lots of aluminum

quickly. According to a Metro forklift operator quoted in the New York Times, "It's all in rows.

… You can find and get anything in a day if you want. And if you're in a hurry, a couple of hours at the very most." But the delays allowed Metro to continue to charge a daily rent of 48 cents per ton, and ultimately collect "about a quarter-billion dollars a year in rent." As of June 2013, the wait for aluminum in Detroit LME-approved warehouses was reportedly 469 days. During this time, as alleged *supra*, the LME-approved warehouse owner collects storage fees on every ton of aluminum in the queue, even from the owner who has requested delivery.

####    E.    The Defendants' Conduct Inflated the Midwest Premium

92.    Defendants conduct during the Class Period caused a historically anomalous and unprecedented movement to all time record levels in the Midwest Premium. No fundamental economic forces exist to cause such record increases.

93.    Expert analysis commissioned by Plaintiffs' attorneys confirms that the Midwest Premium would have been significantly lower throughout the Class Period *but for* the conduct of the Defendants, which had the effect of artificially increasing the Midwest Premium during a period of time when the logistical cost of delivery should have either remained constant or gone *down*.

94.    Before the Warehousing Defendants entry into the aluminum warehousing market in 2010, the highest logistical cost for obtaining aluminum came from sourcing metal from Russia or the Middle East. Yet since 2010, the highest logistical cost has come from sourcing metal from LME-approved warehouses. As illustrated in the graphic below, the logistical cost of sourcing aluminum from Russia or the United Arab Emirates has actually decreased during the period that the Midwest Premium has nearly doubled:

**TOTAL LOGISTICAL\* COST THAT THE CONSUMER IN NORTH AMERICA FACES TO SOURCE METAL AND THE MIDWEST PREMIUM (end of month; cent/lb)**



Source: HARBOR Aluminum. *Includes freight cost delivered to consumer, finance cost and storage/FOT cost when consumer sources metal out of LME Detroit

95.    Market trends including the Baltic Dry Index (a measure of moving goods by sea) and the price of crude oil suggest that the logistical cost of delivery of aluminum (the measure that is *supposed to be* reflected by the Midwest Premium) should have decreased during this period.

96.    Yet the Defendants' colluded to increase incentive payments to producers to divert aluminum to specific LME-approved warehouses owned by Defendants, and to seek to lengthen warehouse queues by treating minimum load-out release requirements as maximums, inducing the cancellation of warrants orchestrating a "merry-go-round" of aluminum. The Defendants succeeded in causing the Midwest Premium to reach a record high by mid-2012 and to nearly double during the Class Period.

97.     The Defendants' agreed-upon conduct caused an artificial movement in both warehouse inventories and warehouse queues not explainable by the workings of the competitive market.  High inventories are usually an indication of low demand relative to supply, conditions that would not typically motivate warehouse owners to make large incentive payments to producers to store their aluminum.  Yet contrary to expectations in a normal market, Defendants offered and increased cash incentives to aluminum producers despite record inventories in the Detroit LME-approved warehouses.

98.     Moreover, aluminum inventories were moving away from warehouses in other areas of the U.S. and a critical mass of the metal was forming in Detroit:



**LME Aluminum Inventory for U.S. Warehouses**
January 2002 -- August 2013

Data Source: Harbor Aluminum Intelligence Unit.

99.     In fact, between 2010 and 2013 the amount of aluminum stored in non-Detroit LME warehouses in the U.S. declined by approximately 70%.

100.    This movement of aluminum, buoyed by Defendants' incentives payments to traders and producers and combined with the contrived warehouse delays, created an irregular positive correlation between increased inventories in Detroit and increases in the Midwest Premium.



**LME ALUMINUM INVENTORY LEAD TIMES AT DETROIT VS MIDWEST PREMUM**
(months vs cent/lb; maximum lead time for a warrant canceled today)

Source: HARBOR Aluminum

101.    The queue is a measure of the intensity of supply and demand in a particular region.  Delivery costs can be analyzed based on crude oil prices.  An examination of both of these factors in the context of the Detroit LME-approved warehouses owned by Goldman reveals a significant positive correlation between the warehouse inventories and queues and the Midwest Premium.

102.    The following chart shows the close relationship between aluminum inventories in the LME-approved warehouses Goldman owns in Detroit and the Midwest Premium, a relationship which started in late 2009 and has significantly strengthened since early 2010:

37



103.    There is also a significant positive correlation between the Midwest Premium and the delivery queue for Goldman's Detroit LME-approved warehouses since February 2010:



104.    The model below shows the effect of several variables on the Midwest Premium between January 2000 and early September 2013 and it is capable of explaining over ¾ of the movements in the Midwest Premium. The longer the queue in Detroit, the higher the Midwest Premium, particularly since February 1, 2010.  This relationship between premium and queue was not statistically significant before Goldman's acquisition of Metro in February 2010, but it became very important afterwards.  For example, the impact of the Detroit queue on the Midwest Premium is three times larger after Goldman acquired the Metro warehouses than before the acquisition.  Although higher crude oil prices also induce a higher premium, as would be expected, they only explain 7.4% of the total variation in the premium during this 13-year period.

## Model for Midwest Premium
### 1/4/2000 - 9/3/2013

**Dependent Variable: Midwest Premium**

| | Coefficient | Significance Level | Variance Decompostion |
|---|---|---|---|
| Constant | 4.648 | * | |
| Detroit Queue | 0.003 | | 24.1% |
| Crude Oil Price | 0.005 | * | 7.4% |
| Fixed Effect 8/9/2007 Onwards | -0.741 | * | 4.5% |
| Fixed Effect 2/1/2010 Onwards | 1.396 | * | 17.2% |
| Detroit Queue Fixed Effect 2/1/2010 Onwards | 0.009 | * | 24.4% |
| | | | 77.6% |
| Adjusted R-Squared | 77.6% | | |

Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg.

Note: * Refers to statistical significance at the 99% level or greater.

105.    The following two tables present the same model both before and after February 1, 2010. The first table shows that before February 1, 2010, there either was no queue in the Detroit warehouses or it was very short and did not play a role in the determination of the Midwest Premium. This is what would be expected under competitive circumstances, as recently recognized by the LME's CEO, Mr. Garry Jones in a press release: "The LME is aware of current market concerns in respect of high premiums in the aluminum market. **It is important to note that an element of premiums is the result of regional supply and demand, unrelated to the existence of queues**" This is in fact what Plaintiffs' expert finds prior to February 2010, but not afterwards. Prior to 2010, both the Detroit queue and crude oil prices lack predictive power over the premium during the same time period, as evidenced by the very low adjusted R-squared for this regression. These results drastically contrast with those in the second table, for which the same model is run using data for February 1, 2010 to September 3, 2013. The model has a very

high predictive power for the Midwest Premium, with an adjusted R-squared of 90.3%. It shows that starting in February 2010, a very strong and positive relationship between queue and premium emerges, contrary to what would normally be expected. The Detroit queue explains 75.6% of the movement in the Midwest Premium during that time period, a very significant contribution. Therefore, following Goldman's acquisition of Metro, the Detroit queue has been by far the largest contributing factor of movements in the Midwest Premium.

## Model for Midwest Premium
### 1/4/00 - 1/31/10

**Dependent Variable: Midwest Premium**

|  | Coefficient | Significance Level | Variance Decompostion |
|---|---|---|---|
| Constant | 4.618 | * | |
| Detroit Queue | 0.003 | | 0.1% |
| Crude Oil Price | 0.006 | * | 0.6% |
| Fixed Effect 8/9/2007 Onwards | -0.772 | * | 3.6% |
| | | | 4.2% |
| Adjusted R-Squared | 4.1% | | |

Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg.

Note: * Refers to statistical significance at the 99% level or greater.

| | Coefficient | Significance Level | Variance Decompostion |
|---|---|---|---|
| **Model for Midwest Premium** 2/1/10 - 9/3/13 | | | |
| Dependent Variable: Midwest Premium | | | |
| Constant | 5.752 | * | |
| Detroit Queue | 0.012 | * | 75.6% |
| Crude Oil Price | 0.000 | | 14.7% |
| | | | 90.3% |
| Adjusted R-Squared | 90.3% | | |

Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg.
Note: * Refers to statistical significance at the 99% level or greater.

106.    Further analysis confirms that Goldman kept the Detroit queue at artificially high levels during this time period.   Statistical tests were run to address whether there was a change in the amount of aluminum stock that leaves the Detroit warehouse as a proportion of the canceled warrants existent at that warehouse at the beginning of the day. Since February 1, 2010, that proportion is almost 70% lower than what it used to be prior to the acquisitions, a drastic and statistically significant reduction.   When less aluminum is released daily as a percentage of cancelled warrants, the time between the cancellation of the warrant and the delivery of the aluminum increases.   That is what happened in Detroit after February 2010, compared to the previous time period.

107.    In comparison, when the same statistical tests are run for other aluminum warehouses in the United States, the same drastic changes are not observed.  For Mobile, there is a statistically significant reduction in the proportion of stock released daily as a function of the initial daily inventories as well, but that effect is lower than in Detroit. For the St. Louis and Chicago warehouses, there is no statistically significant change in that proportion before and after February 2010, while for Baltimore and Long Beach there were statistically significant

increases in the proportion of stocks released. In sum, no other U.S. warehouse region observed the same drastic reduction in the amount of stocks released as a function of the daily cancelled warrants as Detroit since February 2010, and as a consequence, no other U.S. warehouse region saw the drastic increase in queues as observed in Detroit. A comparison of the actual queue for Detroit with respect to what it would have been but-for the significant reduction in the proportion of daily stock released as a function of cancelled warrants, shows that the Detroit queue should have been significantly lower than it actually was, since Goldman acquired Metro in February 2010. Since then, the actual queue is systematically and significantly higher than the but-for queue, because proportionally less stock was released daily and there were more canceled warrants than there would have otherwise been.

108.    The but-for calculation assumes that the daily rate of release of aluminum from the warehouses as a proportion of the canceled warrants that existed at the beginning of the day would have remained the same after February of 2010, as the rate from January 2009 through January 2010 (referred to as the "stock releasing rate"). This is a reasonable assumption in that it already takes into account possible changes in stock releasing rates after the financial crisis ended, and when queues were already starting to increase.

109.    The two graphs below display the but-for canceled warrants and inventories for the Detroit warehouses on a daily basis, based on the but-for assumption of daily stock release. The Detroit warehouses demonstrate a significantly higher actual than but-for canceled warrants, and also significantly higher actual than but-for inventory.



**Actual and But-For Canceled Warrants for Detroit**
August 9, 2007 -- August 19, 2013

Data Source: Harbor Aluminum Intelligence Unit
Notes: But-For Canceled Warrants are estimated presuming that from February 2010 onwards, the rate of daily release of aluminum from the Detroit warehouse would have been the same as the rate observed from January 2009 through January 2010.



Actual and But-for Beginning of the Day Inventory for Detroit
August 9, 2007 -- August 19, 2013

Data Source: Harbor Aluminum Intelligence Unit
Notes: But-For Canceled Warrants are estimated presuming that from February 2010 onwards, the rate of daily release of aluminum from the Detroit warehouse would have been the same as the rate observed from January 2009 through January 2010. These are then applied to estimate but-for beginning of the day inventories for Detroit.

110.    After determining the but-for canceled warrants and inventory, the same model is used to determine the but-for queues for Detroit, using coefficients estimated after the beginning of the financial crisis. This analysis confirms that the actual Detroit queue is systematically and significantly higher than the but-for queue.



**Actual and But-For Detroit Queue**
August 9, 2007 -- August 19, 2013

Data Source: Harbor Aluminum Intelligence Unit
Notes: But-For Canceled Warrants and Inventories are used to estimate But-For Detroit Queue.

111.    Plaintiffs' expert also estimated the but-for queues for each of the remaining U.S. warehouses following a similar procedure and found that in none of the other regions were there statistically significant differences between actual and but-for (i) canceled warrants, (ii) inventories, and (iii) queues.  The only striking differences occur in Detroit.  In fact, but-for values were just about equal to the actual values in the other regions.

112.    Following the but-for analysis for the queue, a similar but-for analysis reveals that Defendants' actions artificially inflated the Midwest Premium.  The analysis assumes that the relationships between the Midwest Premium and the Detroit queue, as well as between the Midwest Premium and crude oil price, remained the same since 2009.  What is different in the but-for world is the length of the Detroit queue, which is significantly longer in the but-for world than it otherwise would have been.  This means that but-for Defendants' actions, the

46

relationships between the Midwest Premium and the queue and crude oil would have remained the same, but Defendants' behavior affected the length of the queue, and in this way, the value of the Midwest Premium. The model used to estimate the but-for Midwest Premium is as follows:

### Modeling the Midwest Premium
#### 1/1/09 - 8/19/13

**Dependent Variable: Midwest Premium**

|  | Value | Significance Level |
|---|---|---|
| Constant | 3.69067 | * |
| Detroit Queue | 0.01182 | * |
| Crude Oil Price | 0.01948 | * |
|  |  |  |
| Adjusted R-Squared | 93.1% |  |

Data Sources: Harbor Aluminum Intelligence Unit and Bloomberg.
Note: * Refers to statistical significance at the 99% level or greater.

113.    The following diagram depicts the actual and but-for Midwest Premiums for January 1, 2009 through August 19, 2013. They are very close to each other from January 2009 through January 2010, but begin to diverge fairly significantly once Goldman buys Metro. Accordingly, since February 1, 2010, the average value for the actual Midwest Premium was $0.087 while the average value for the but-for Midwest premium was $0.068, *representing an increase of about 28%.*



**Actual and But-For Midwest Premium**
January 1, 2009 – August 19, 2013

Data Source: Harbor Aluminum Intelligence Unit.
Note: But-For Detroit Queue and Crude Oil prices are used to estimate But-For Midwest Premium.

### F.    The Warehousing Defendants Conspired to Create a Contango

114.    In the aluminum market, the cash or "spot" price is the current price in the market to purchase aluminum for the first deliverable prompt date.   The LME Official Price[4] is used as the global benchmark for physical contracts and LME cash contracts provide for physical delivery two business days forward from the trading day.

115.    By contrast, the aluminum futures price reflects supply and demand for aluminum at a specific date in the future.   A market 'contango' occurs when the spot or cash price for

---

[4] The LME Official Price, commonly used by the aluminum industry as a reference price for the day, is the last bid and offer prices quoted in the second "Ring" of the LME morning trading session.   The "Ring" literally refers to the circle of seats on the LME floor that brokers occupy when trading aluminum but is more commonly used to describe the periods of trading on the LME that are broken down in to five-minute sessions for each metal, including aluminum.

aluminum is lower than its futures price. In essence, a contango reflects that purchasers of aluminum are willing to pay more for the metal at a future date than the actual spot or cash price reflected in the LME Official Price.

116.    The LME warehouse system was designed to serve as a delivery option for aluminum producers and as a market of last resort for buyers. In the past when producers have had excess aluminum stock due to an unexpected downturn in demand they have been able to sell it to an LME-approved warehouse. In 2008 and 2009, in the midst of the U.S. economic crisis, there was an ample supply of aluminum in domestic storage facilities as manufacturing activity slowed due to a downturn in demand. As a result, the spot price for aluminum fell. Aluminum's futures price, however, remained propped up by manufacturers willing to pay a higher futures price to lock in an acceptable (albeit higher) cost to reduce risk to their profit margins. Thus, a contango developed in the aluminum market.

117.    This contango attracted investors including, on information and belief, the Warehousing Defendants, who were able to take advantage of historically low interest rates to enter into warehouse financing deals. Financiers were able to take advantage of low interest rates to finance the purchase of aluminum at the depressed spot price, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price.

118.    Although the contango initially resulted from the increased inventories and decreased demand that came with the economic crisis of 2008, it has been only through the Warehousing Defendants' manipulation of the aluminum warehousing market that the contango has been maintained and widened even as demand for aluminum has increased.

119.    Specifically, the steady, significant and concentrated aluminum buildups in the LME's Detroit warehouses considerably increased the supply of warrants in the LME system while at the same time the length of the queue in Detroit discouraged or weakened the demand for warrants.  This dichotomy, as the Warehousing Defendants well knew and understood it would, caused spot prices to weaken relative to futures prices, sustaining and even widening the profitable contango.  Thus, the Warehousing Defendants, acting in concert, distorted the market in a way that allowed them to capitalize on the spread between spot and future prices in their trading activities.

120.    By continuing to build their warehouse inventories and restricting delivery of physical aluminum, the Warehousing Defendants created conditions that allowed a wide contango to persist and/or increase during the Class Period.   Although the spreads are cyclical, by the middle of 2012, cash aluminum traded at a $40 per tonne discount or contango against the benchmark three-month contract versus the $22.50 discount seen at the start of the year.  Thus, Defendants actions dampened the natural cyclical volatility of a free market and fixed the price structure in a multi-year contango.

121.    Expert analysis prepared for Plaintiffs' attorneys demonstrates that a steady and profitable contango developed in lockstep with the Warehousing Defendants' acquisitions of aluminum warehouses.

122.    Starting in 2002 and leading up to the financial crisis in 2007-2008, there was great volatility in the difference between the futures price and the spot price, as it lurched between contango and backwardation. It was only during the financial crisis and thereafter, when the Warehousing Defendants began manipulating the market, that there was less volatility and a

more consistent contango. The following chart demonstrates this trend, with the basis representing the difference between the three month aluminum futures price and the spot price:



**3 Month Basis for Aluminum**
January 2002 -- August 2013

Data Sources: Harbor Aluminum Intelligence Unit.
Note: The 3 Month Basis is calculated as the aluminum futures price for a 3 month contract less the cash price of aluminum.

123. A steadier, more consistent contango indicates that returns on aluminum have been on average higher and more stable than they were prior to the financial crisis, which makes it very attractive to trade in aluminum, including for the Warehousing Defendants.

124. Prior to the financial crisis the average annual yields on 3 month USD LIBOR and those of the 3 month aluminum futures contango were highly positively correlated (with a correlation coefficient of 63%), differing by only 1.1%, a yield of 3.6% for LIBOR and 2.5% for aluminum. During the financial crisis these relationships changed dramatically. In fact, the two yields became negatively correlated (with a correlation coefficient of -93%), and the yield on aluminum became 4.5 times higher than that of LIBOR, at 8%, compared to 1.8% for LIBOR.

This gap has increased further since the Warehousing Defendants entered the warehousing business in February 2010, with the aluminum yield at 5.7%, now 19 times larger than the yield on LIBOR at 0.3%.



125.    As this analysis demonstrates, a consistent and profitable contango emerged when the Warehousing Defendants began to consolidate ownership of LME-approved aluminum warehouses.    On information and belief, this contango was an intended result of Defendants' coordinated effort to provide profitable financing opportunities to their Trading Desks.

**G.    The Warehousing Defendants Look to Profit from Their Scheme**

126.    The Defendants conspired to build the inventories of LME-approved warehouses in Detroit, depress the load-out rate, and lengthen warehouse queues to unprecedented level, in order to drive up the Midwest Premium and to maintain and even expand the market contango.

127.    As stated by Professor Omarova in Senate testimony, "Financial institutions like Goldman Sachs can also use their warehouses to store vast quantities of physical metals in so-called 'financing' deals.  This strategy allows financial institutions to secure a guaranteed return.  Removing a large portion of physical metal from the market, however, creates artificial shortages of aluminum for commercial purchase and inflates its market price."

128.    In short, the Warehousing Defendants positioned themselves to profit from their scheme given their positions in the aluminum market.  This included not only profits from storage fees but also, at a basic level, profiting from the increasing and unhedgeable Midwest Premium, by selling aluminum into the market at a higher premium than at which it was purchased.  Because the Midwest Premium continued to rise as a result of the Warehousing Defendants' actions, traders with positions in aluminum, including the Warehousing Defendants and their affiliates, could count on selling their metal at a profit.

129.    In addition to profit realized from selling aluminum at the artificially inflated Midwest Premium, which they helped create, the Warehousing Defendants and their affiliates also entered cyclical financing deals to take advantage of the consistent contango.

130.    As explained in a trade publication, "for those who actively trade in commodities — and that's all the new owners of the warehouses [including JPM, Goldman and Glencore] — actually having access to, and being involved in the physical markets, provides a perspective, and certain advantages, unavailable to others.  One of these advantages is the ability easily to cancel and un-cancel warrants, to take advantage not only of the difference in storage rates for on- and off-market metals, but with both speed and ease, of any changes to the structure of the metals' futures curves."

131.    According to Professor Omarova: "Metal warehousing operations are only one element in a large financial conglomerate's complex business strategy involving trading in metals and related financial contracts. Goldman is one of the largest traders of derivatives in the metals markets. Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. This directly implicates serious issues of market integrity. As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets. The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle. It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's structural market power."

132.    The Warehousing Defendants' cultivation of the contango did not occur by accident. When combined with the current historically low interest rates, the contango continues to spawn lucrative warehouse financing deals where banks, hedge funds and traders, including the Warehousing Defendants' Trading Desks, buy caches of aluminum from producers at the spot price and then sell it for future delivery at a profit. Because the contango is wide enough, banks and traders such as the Warehousing Defendants can finance the purchase of aluminum, pay for storage fees (to their affiliates in some cases) and other attendant costs for the duration of the futures contract and still realize a substantial profit given the gap between the spot and futures prices. The following chart demonstrates the profitability behind a warehouse financing deal, taking into account the prevailing storage rates at LME and non-LME warehouses:



133.    The relative costs associated with executing a financing deal to take advantage of a market contango thus vary depending on whether the party pays retail LME rents, LME Wholesale Daily Rent, or rent in a non-LME warehouse.  By owning the physical infrastructure, the Warehousing Defendants and their Trading Desks have been able to execute more profitable transactions due to their access to lower costs and ability to offset warehousing fees through storage fees, as well as their ability to influence premiums and, ultimately, the market contango.

134.    Thus as industry observers have recognized, if "the contango is out there, money is cheap and you are a bank that owns its own warehouse, all the ingredients of a sure, and profitable, trade are there."  Moreover, these financing deals can be repeated endlessly.  As long as the contango exists, the ability to profit is maintained.  Alternatively, if a trader is so inclined, they can sell their aluminum once a financing deal expires and realize an additional profit based on the increasing Midwest Premium.

135.    On information and belief, the Trading Desks of the Warehousing Defendants have taken advantage of the contango to enter into recurring financing agreements and generate substantial profits from market conditions that they helped to create and maintain. These market conditions include financing agreements relating to "on-warrant" aluminum stock stored in LME warehouses and "off-warrant" or stealth stock held in non-LME warehouses which incur lower storage costs and, thus, provide for greater profitability.

136.    The proliferation of these cyclical financing deals, with the depressed load-out rates, locked up a significant percentage of aluminum in the LME-approved warehouses, which reduced the supply available to the market for physical delivery. As a result of the combination of the financing deals and the aluminum trapped in LME warehouses only a fraction of the inventory stored inside the warehouses was available for physical delivery. Predictably, this drove the Midwest Premium higher. By the middle of 2012, the Midwest Premium rose about 10 cents a pound as a result of extended warehouse queues and "a persistently strong spread between cash and forward prices on the LME continu[ing] to tie up the metal in warehouses."[5]

## H.    The Midwest Premium Cannot Effectively Be Hedged

137.    Commercial end users of aluminum such as Plaintiffs have had to pay excessive, non-competitive prices for aluminum as a result of an inflated Midwest Premium. They had no effective way to anticipate this cost and, more importantly, to hedge against the Defendants' tampering with the Midwest Premium.

138.    In April of 2012, the Chicago Mercantile Exchange ("CME") launched a hedging product, but it failed to trade a single contract. Even though the CME subsequently announced that it had relaunched a hedging product for the Midwest Premium in August 2013 and that a

---

[5] See Chris Kelly, US Aluminum premiums soar to record above 10 cts/lb, *Reuters News*, May 8, 2012.

transaction for November and December of 2013 was executed, it remains to be seen whether the CME's hedging contract will provide a means for aluminum purchasers to manage price exposure due to the Defendants' tampering with the Midwest Premium.

I.    **The Warehousing Defendants Work in Concert to Build Warehouse Queues and Drive Up Premiums in North America and Europe**

139.    As the Warehousing Defendants have found, the key component to maximizing the return on their warehouse assets is accumulating a critical mass of aluminum in the warehouse queues.  Upon information and belief, the extended Detroit queue resulted from a series of agreements between and among the Warehousing Defendants and key aluminum producers to funnel aluminum to LME-approved warehouses and then cancel massive numbers of warrants, creating and artificially extending queues in Detroit. This conduct has had the effect of maintaining the conditions for profitable financing transactions for the Warehousing Defendants, as well driving up the Midwest Premium for the benefit of the aluminum producers.

140.    As alleged above, aluminum producers are incentivized to funnel at least a portion of their stock into LME-approved warehouses in order to increase the Midwest Premium.  Thus, producers sell some of their stock to aluminum traders with the explicit or implicit understanding that the stock will be housed in LME-approved warehouses owned by the Warehousing Defendants.  Once the warehouse has been notified of the impending arrival of aluminum from the trader, the warehouse then often contacts another trader, including, upon information and belief, traders from one or more of the Warehousing Defendants, and facilitates a transaction in which the trader agrees to purchase warrants on the incoming aluminum (at the moment of arrival or later in time) with the explicit or implicit understanding that the trader will cancel those warrants and, thereby, increase the warehouse queues.

141.    This is the process by which the Detroit warehouse queues were grown to unprecedented levels.  Goldman attracted aluminum to its Metro warehouses from producers through incentive payments and the producers' inclination to funnel metal to LME-approved warehousing, where the effect would be to inflate the Midwest Premium. Goldman's warehousing subsidiary, Metro, often contacted various traders including, notably, traders affiliated with JPM, Glencore and Goldman itself, to inform them of opportunity to buy warrants on the aluminum entering the warehouse with the implicit or explicit understanding that cancel those warrants.  Once JPM, Glencore, Goldman or the other warrant purchasers required and cancelled their warrants, the queues increased exponentially.

142.    As a result of the cancellations, the Midwest Premium increased and the Warehousing Defendants' trading affiliates realized a resultant gain on their physical aluminum positions.  In addition, the contango was maintained and/or  extended, and financing deals remained profitable for all of the Warehousing Defendants, who had several appealing options to make money on their physical position in aluminum, including 1) selling aluminum at a higher premium, including "consignment stock: stored in a customer's warehouse; 2) entering a financing deal on-warrant initially (LME-based) and then off-warrant (off LME, where storage fees are significantly cheaper and, thus, the profit greater), before taking the aluminum to warehouses owned by their affiliates where they can reap warehouse incentives and storage fees; or 3) entering a financing deal on-warrant initially and then off-warrant before selling the aluminum on the physical market at an increased premium.

143.    After the Warehousing Defendants successfully established a critical mass of aluminum in Detroit, created massive queues through warrant cancellations, and reaped substantial profits through storage fees, an increased Midwest Premium, and financing deals,

they sought to duplicate the process in Europe, working in concert to attract aluminum and create and lengthen queues in Vlissingen, the Netherlands, the central hub of the aluminum market in Europe, which for years has been dominated by Glencore, Pacorini and Rusal.

144.    In late 2011, Glencore warranted more aluminum at its Pacorini warehouses in Vlissingen, creating significant inventory buildups at that location.   Then, in December 2011, JPM, which held a significant stake in the Europe inventory, cancelled warrants on 500,000 tonnes of aluminum and was said to be shifting metal to its own Henry Bath warehouses in Rotterdam.

145.    Thus, in one move, JPM created a log-jam in the Vlissingen queue and tightened the global supply of aluminum.  In fact, in 2012 and 2013, the Vlissengen queue was longer than the Detroit queue.   By driving up queues in Vlissingen almost overnight, the premiums in Vlissingen were also driven up much as they had in Detroit.

146.    The chart below shows the sudden and striking increase in queues in Vlissingen immediately following JPM's December 2011 mass cancellation of warrants.



Data Source: Harbor Aluminum Intelligence Unit

147.    Underlying LME prices are global because aluminum can be (and is) shipped and sourced globally, but premiums vary regionally.  However, large increases in premiums in one region necessarily affect premiums in other regions because producers and traders can always "follow the money" and sell to regions where premiums are most favorable.

148.    Thus, as a result of the Defendants' manipulation of the queue in Vlissingen, cancelled warrants in Detroit also increased and further drove queues in Detroit, which drove up the Midwest Premium and further increased the price of aluminum paid by Plaintiffs and members of the Class.

149.    In addition, as with the North American market, driven by queues in Detroit that were artificially created by the Warehousing Defendants, the mass cancellations in Vlissingen pushed up premiums and supported/and widened a contango market.  Thus, JPM was in position to profit handsomely from on-warrant and off-warrant financing deals and then either dumping

the cancelled aluminum in their own warehouses (and benefitting from incentives and storage fees) or selling the metal into the market at an increased premium.

150.    Commenting on JPM's movement of aluminum stocks into its own warehouses, Professor Omarova testified that "reports of JPMC moving large amounts of metal from other warehouses into its own suggest that the firm may be rebuilding its stocks and consolidating its warehousing business in key European locations.  This is likely to exacerbate the conflict within the aluminum industry over the unprecedented degree of power that the largest warehousing companies like Henry Bath and Metro exercise over global aluminum prices."

**J.**    **Defendants Had Notice and Knowledge of Plaintiffs' Antitrust Injury**

151.    There were repeated and ongoing public complaints from 2010 forward that Defendants were inflating aluminum prices and restraining supplies.

152.    For example, by 2011, a senior analyst in the metals industry told Reuters "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate ... the infrastructure is there."

153.    "I think it makes a mockery of the market. It's a shame," Robin Bhar, a veteran metals analyst at Credit Agricole in London said in June 2011. "This is an anti-competitive situation. It puts (some) companies at an advantage, and clearly the rest of the market at a disadvantage. It's a real, genuine concern. And I think the regulators have to look at it."

154.    Also in 2011, Coca-Cola Co. lodged a complaint with the LME.  This complaint was in response to Goldman's creation of supply bottlenecks to artificially raise the price of aluminum in the open market.  According to Dave Smith, Coca-Cola's procurement manager: "This situation has been organized artificially to drive premiums up. . . . It takes two weeks to put aluminum in, and six months to get it out."

155.    The chief procurement officer for Novelis, the world's largest producer of semi-fabricated aluminum, commented in July 2011, "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate and so we feel there's a lot more they can do on the output side to push up the (load out) rates." He added, "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal … in Detroit warehouses."  He estimated that the Midwest Premium had increased by $20 to $40 per ton because of the backlogs at the Detroit LME-certified warehouses, forcing U.S. businesses to pay millions of dollars extra for the 6 million tons of aluminum they use each year.

156.    In response to the widespread public complaints about the unreasonably slow load-outs during 2010-11, the LME investigated warehousing practices and charges.  In 2011, the LME hired Europe Economics to assess the chorus of purchaser complaints regarding warehouse delays. The resulting report noted that "Long queues were regarded as damaging, on the grounds that they inhibited arbitrage between the LME and the physical market, increased physical premiums and ***damaged the reputation*** of the LME."  Although the Europe Economics report contained a number of policy recommendations, including further discussion about the implementation of rent rebates for material that is 'stranded' in a queue,  the LME and the Warehousing Defendants refused to even adopt the recommendation to discuss the issue, citing a "feasibility issue."  In addition, the LME did not publish the full report, citing "proprietary information."

157.    In sworn testimony before the Senate Banking Committee in July 2013, Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, joined by the Coca-

Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products, testified that the extended warehouse delays do "not happen with any of the other commodities we purchase. When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities. *It is only with aluminum purchased through the LME that our property is held for an extraordinary period of time… [or we] pay the high physical premium to get aluminum today*." Weiner estimated that the LME warehouse rules have imposed an additional $3 billion expense on companies that purchase aluminum and that because of the Warehousing Defendants' continued treatment of minimum release requirements as maximums the flow of aluminum into the market continues to be restricted.

158.    Complaints concerning the warehouse delays from Weiner and other purchasers of aluminum fell on deaf ears at the LME, which dismissed proposals to alleviate backlogs. Weiner testified that the LME "dismissed out proposals [to alleviate backlogs.]"

159.    Based on the repeated public complaints, the report issued by the LME's own paid consultant and other information, Defendants had complete notice and knowledge that they were inflating aluminum prices, restraining aluminum supplies and injuring the persons who paid those inflated prices. With such notice and knowledge, Defendants have, in order to mutually profit themselves and their owners or affiliates, specifically intended to continue to perform their agreements and continue to inflate prices, restrain supplies and injure persons, like Plaintiffs, who have paid inflated prices for aluminum. In addition, with such notice and knowledge the Goldman Defendants and the LME Defendants have continued to abuse certain monopoly positions they, respectively, have created.

### K.    Government Investigations of the Defendants' Conduct

160.    The Defendants' scheme has attracted significant governmental and regulatory scrutiny.  For instance, in November 2012, Bloomberg News announced that the European Commission initiated a review of the Warehousing Defendants' conduct and contacted the LME. In November 2013, the British Parliament's Treasury select committee urged the UK's Financial Conduct Authority to investigate possible abuses in the metals market.

161.    After the announcement of the EC investigation, Goldman's head aluminum trader, Scott Evans, departed Goldman.

162.    The Commodity Futures Trading Commission also initiated a review and on July 18, 2013, the division of enforcement's Chicago office asked companies, including Goldman, JPM and Glencore, to "retain, preserve, and safeguard against destruction of all documents, communications, and other information and materials" concerning or relating to any warehouses that store physical metals against a futures contract.

163.    On November 15, 2013, the U.S. Department of Justice announced that it was investigating allegations of anti-competitive warehousing agreements among banks like Goldman and JPM that have been used to artificially inflate the cost of storing aluminum.

164.    On July 23, 2013 the U.S. Senate Banking Committee held hearings on the role of financial institutions in commodities markets.  In sworn testimony before the Senate, Weiner of MillerCoors, joined by the Coca-Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products, made the following statements about the aluminum market:

- Delivery delays do "not happen with any of the other commodities we purchase. When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities. ***It is only with aluminum purchased through the LME***

>> *that our property is held for an extraordinary period of time… [or we] pay the high physical premium to get aluminum today*."

- "My company and others estimate that last year alone, the LME warehouse rules have imposed an ***additional $3 billion expense*** on companies that purchase aluminum."

- "Although the LME has ordered strict minimum release requirements for warehouses controlled by LME members, ***those minimums are being treated as maximums*** and continue to ***restrict the flow*** of metal out to the market."

- "U.S. bank holding companies have ***effective control of the LME***, and they have ***created a bottleneck*** which limits the supply of aluminum. Aluminum prices in general and for can sheet in particular have ***remained inflated*** relative to the massive oversupply and record production."

- "[W]e have asked the UK Financial Services Authority (recently reorganized as the Financial Control Authority) and the CFTC to regulate the LME system as it pertains to the commodity metals market. Both agencies have indicated they are uncertain whether they have the regulatory authority necessary."

- In discussions with the LME, "[t]he LME dismissed our proposals [to alleviate backlogs]."

## L.    The Warehousing Defendants' Planned Exit of the Scheme

165.    Having reaped millions in profits from warehousing fees, sales of aluminum at inflated premiums and cyclical financing deals, some of the Warehousing Defendants have begun to wind down their participation in the aluminum market just as a push for material reforms of warehousing policy and regulatory scrutiny picks up.  On August 20, 2013, the Wall Street Journal reported that Goldman and JPM were seeking to sell their commodities assets. Specifically, JPM was said to be planning to "sell physical assets such as warehouses and power plants."  Similarly, Goldman was exploring a sale of its Metro warehouses.  There was no change in market conditions that occurred or prompted these reversals or reductions.  On the contrary, market conditions were the same.

166.    As the Midwest Premium buyers paid to obtain aluminum increased nearly 48% over the prior 12 months, on January 21, 2013, Chris Evans, the LME head of business development and a spokesman for the LME, said, "I'm not sure there is a solution that the LME can provide to the market.  Ultimately the solution has to come from the market itself."  This sentiment echoes similar comments in 2012, when the LME represented that it had no power to resolve the issue and suggested that purchasers simply stop paying the prices if they believe they are unfair: "It's not our job to change the market, it's our job to reflect the market and the fact that there are queues is an accurate reflection of too much cheap money chasing hard commodities."  As these comments reflect, the LME acquiesced in, empowered and enabled the anticompetitive conduct of the Warehousing Defendants, which served its own financial interest.

167.    On July 31, 2013, after years of reaping millions of dollars in illicit storage fees and untold amounts from commodities trading and financing transactions, Goldman conceded that it could ship aluminum more quickly than it had been, and offered a swap so that certain buyers mired in the warehouse queues could obtain their aluminum immediately.  Goldman's offer is likely to have little practical impact for purchasers of primary aluminum who have turned away from the LME warehouses due to the daunting queues.

168.    Throughout the Class Period, the Warehousing Defendants on their own, or the LME Defendants on their own could have meaningfully responded to these public complaints about Defendants' conduct and its inflation of aluminum prices.

169.    For example, Goldman could have lifted its artificial "load-out" restraints on shipments from its Detroit warehouses.  The LME could have taken multiple steps as part of its approval of warehouses and its minimum shipping rule requirements to alleviate the problem,

such as disallowing the netting of daily minimum requirements and warehousing incentives, or offering rental rebates for aluminum stranded in the warehouses.

170.    As part of the conspiracy, Defendants instead worked cooperatively together, through their individual and joint or mutual conduct, to ensure that despite the negative implications on the LME's reputation and contrary to the LME's independent economic self-interest, they continued to pocket exorbitant storage costs and tamper with the Midwest Premium to their continued mutual profit.

171.    The Warehousing Defendants' apparent exit from the aluminum storage market dovetails with changes in LME ownership (and with it proposed policy changes) and numerous regulatory inquiries both in the U.S. and abroad, as noted above.  On June 15, 2012, it was announced that the Hong Kong Exchange & Clearing ("HKE") was to buy the LME for $2.1 billion.  In October 2012, the HKE reported that it would pursue significant reforms aimed at ending the lengthy warehouse queues. CEO Charles Li promised to aim "a bazooka" at the problem of long queues and said that "[i]f people have to wait a year, that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable." As this quote reflects, the LME, as influenced by executives of the Warehousing Defendants serving on various committees, failed to act to ensure in orderly market, in the interest of legitimate buyers and sellers but, instead, put its own self-interest in increasing its revenues and the interest of the Warehousing Defendants in perpetuating the contango ahead of the interests of legitimate buyers and sellers.

172.    After it formally acquired the LME on December 6, 2012, HKE reiterated its reform-minded focus, proposing a new requirement that LME warehouses experiencing long delays release more metal than they take in.  The LME at first announced a slightly refined

version of this proposal in October 2013, whereby "warehouses with queues longer than 100 days would be forced [to] deliver more metal out, depending on the size of the inflows of new stock."

173.    The actual guidelines to be implemented in April 2014, however, are far more stringent.    On November 6, 2013, the LME released its revised guidelines that require warehouses with waiting times of 50 days or longer to load out more metal than they take in.    In addition, the LME will commission a full external review of its warehousing operations and create a new Physical Market Committee to provide members of the physical metals markets with better representation in the LME's governance.    The LME will continue to review its warehousing system every six months.

174.    Despite pledging to expedite the release of metal from its queues, the Defendants have failed to do so.    The Detroit LME-approved warehouses are not releasing more metal but have been, in fact, continuing to release aluminum at the minimum load out rate.



175.    The HKE's proposed rule changes have prompted objections by producers such as Alcoa and Rusal because they have become dependent on inflated premiums.  Rusal, the world's biggest aluminum producer, urged the LME to postpone suggested rule changes aimed at speeding up withdrawals of warehoused metals.[6]  Its chief executive, Oleg Deripaska referred to the LME proposal as "an unprecedented intervention and one that Rusal strongly objects to."[7]  Similarly, Alcoa Inc., the biggest U.S. aluminum company, said that such reforms should be delayed or not implemented and, in a letter to British and U.S. regulators, called the LME proposal a "misguided" effort that would disrupt the market.  Alcoa executives specifically noted

a "decline in premiums" corresponding to the announcement of the LME proposal and blamed the decline on the LME's "market intervention."

176.    As the producers' concern reflects, by eliminating the lengthy queues at LME-approved warehouses, the bloated premiums that producers have enjoyed in the off-LME market will fall.  Yet it also contains the unmistakable tacit admission that the lengthy warehouse queues caused the Midwest Premium (and the incentive payments enjoyed by producers) to be higher than they otherwise would have been.

177.    It is estimated that Alcoa and Rusal have reaped $1.4 billion in revenues from higher fees as a result of long warehouse queues.  It is estimated that Alcoa could have received, between January 1, 2011 and September 2013, $1.7 billion in revenue from premiums on the sale of primary or raw aluminum.  This is $649 million more that it would have received if premiums were at their average, non-manipulated rate from before the Warehousing Defendants entered the market.

178.    Similarly, from the first quarter of 2011 through the second quarter of 2013, Rusal garnered $2.1 billion in revenues resulting from inflated premiums, when revenues should have been approximately $790 million less.  When combined with the estimated $1.8 billion in revenues that another major global aluminum producer, Rio Tinto PLC, has reportedly posted over the past ten quarters, it has been reported that Alcoa, Rusal and Rio Tinto have earned in the aggregate $5.6 billion in premium revenue in 2011, 2012 and the first half of 2013, up from $2.95 billion in the comparable period through the first half of 2010.

179.    In fact, in June 2013, as alleged previously in this complaint, the Detroit queue started a downward trend.  The outflow from the Detroit warehouses coincided with a drop in the Midwest Premium and a drastic drop in incentive payments to producers.

180.    But "[n]ot everyone agrees that the change in the LME rules will necessarily have a negative impact [on producers]."  Oleg Mukhamedshin, deputy chief executive of Rusal, argues that "any fall in the premium ought to be offset by a rise in the LME price.  If queues were to fall…the stock of aluminum [sic] available to the market would also fall, leading to an increase in prices."  Mr. Mukhamedshin notes that "the effective price should be pretty much the same…Price-wise nothing is going to change."

181.    In other words, the Warehousing Defendants and the LME, through concerted action, added an artificial and non-hedgeable cost to the Midwest Premium, which increased the cost to purchasers of aluminum, including commercial end users.  The premiums created an artificial market effect on aluminum producers who have come to rely on the premiums.

182.    Correcting the distortion by eliminating queues (and thereby reducing warehouse storage fees) will create a temporary correction in market prices as aluminum prices paid to producers recalibrate to a healthy market status quo and premiums revert to their organic levels. By then, however, the Warehousing Defendants will have completed their aluminum play and extracted their profits at the expense of customers.

183.    The large increase in the amount of aluminum in the Defendants' Detroit LME-approved warehouses, the mass cancellation of warrants to create record-breaking queues, and the steady increases in premiums would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in restraint of trade.

## V.    THE LME'S MONOPOLY POWER

184.    Throughout the Class Period, the LME has maintained monopoly power in the Relevant Markets alleged in Section VII, below.  The LME controlled between 97-99% of the aluminum forward and futures contract trading in the United States during the Class Period.

Competitors have been unable to successfully compete because of the agreements that the LME Defendants make with the Warehousing Defendants and others  that incentivize producers to direct business to the LME Defendants.  The LME Defendants have the ability to control the output of aluminum from the LME-approved warehouses and the storage rates of LME approved warehouses.

185.    The LME has the right to approve any LME warehouse, including in the U.S., and has monopoly control over selection of the warehousing for exchange-traded aluminum in the U.S.

186.    The LME also has monopoly power over approving exchange-traded warehouses in the Detroit, Michigan area.

187.    The foregoing monopoly power extends to approving storage rates, load-out rates and other matters decided by the LME's Warehouse Committee.

188.    With knowledge since late 2010 or early 2011 of public complaints that they were artificially inflating aluminum prices, the LME has abused their monopoly power as alleged herein .  This includes but is not limited to: (i) not basing their agreements with warehouse owners (and the minimum load-out rates) on a percentage of the metal capacity or metals stored in each warehouse; (ii) not requiring netting of incoming aluminum and allowing the Warehousing Defendants to "shuttle", or making agreements that encouraged the Warehousing Defendants to shuttle metal from warehouse to warehouse; (iii) using anti-competitive low minimum load-out rates; (iv) consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage; (v) failing to ensure that no Warehousing Defendants got a critical mass of metal to manipulate and/or influence prices; (vi) approving the Warehousing Defendants' charges and practices; (vii) allowing repeated increases in the

Warehousing Defendants' charges; (viii) allowing the Warehousing Defendants to pay incentives to divert into, and restrain and engross more aluminum in LME Warehousing; (ix) allowing the Warehousing Defendants' to artificially build LME warehouse inventories, lengthen queues and drive up premiums in order to foster, maintain and take advantage of the contango in the aluminum market; (x) making statements to deter companies that purchased aluminum from challenging such practices; and by the other steps alleged herein.

189.     The LME has held the sensitive monopolists' position of controlling (a) exchange-traded aluminum forward or futures contracts trading in the U.S., (b) warehousing of exchange-traded aluminum in the U.S. including in the Midwest and the greater Detroit, Michigan area ("LME Detroit Warehousing"), and (c) the rules for the determination of aluminum prices.

190.     The LME's monopoly over the trading of aluminum forward or futures contracts in the United States during the Class Period included capturing approximately 97-99% of the trading in such contracts.  The LME has approved and made agreements with the LME certified warehouse owners.  These warehouses held, due to the unlawful conduct alleged herein, a growing portion of the aluminum stored in the United States.

191.     Nor is there any indication that the behavior of LME, while under the influence of the Warehousing Defendants, made economic sense in that it led to pro-competitive efficiencies, such as greater market transparency, greater innovation or better financial products and services to clients.

## VI.     THE GOLDMAN DEFENDANTS' MONOPOLY POWER

192.     During the Class Period, Goldman has held the sensitive position of having a monopoly over LME-approved warehousing space for deliveries on LME aluminum and other

metals contracts in LME Detroit Warehousing. Goldman purchased, at the start of the Class Period, warehouses with more than 80% of the storage space in the Detroit area. Goldman has continued to own those warehouse throughout the Class Period. Goldman's unlawful conduct alleged herein has leveraged that monopoly into a position in which Goldman, by itself, stores well over 50% of the aluminum in LME-approved warehouses.

193.    Goldman has had monopoly power in the Relevant Markets. Goldman's warehouses compose more than 80% of the LME certified U.S. Warehousing space. Goldman can control the output of LME approved aluminum from U.S. Warehousing by controlling the rate at which it loads-out aluminum.

194.    With knowledge from public complaints since 2010 or early 2011 that it was inflating aluminum prices, Goldman has converted the minimum output into a maximum and agreed with the LME to convert the minimum into a maximum. Goldman reportedly further abused such power by shuttling aluminum from one warehouse to another within the Detroit area in order to use up the minimum quota without actually causing any output of aluminum from the warehouses to the public. Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing.

195.    Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman and the LME have agreed to abuse their monopoly power in order to anti-competitively and restrictively divert aluminum into and limit unreasonably the free alienability of aluminum stored, in LME Detroit Warehousing. Their conduct has inflated aluminum prices including the Midwest Premium as well as the storage fees paid directly to the Goldman Defendants, and indirectly to the LME.

196.    Unless enjoined, Goldman's and the LME's ongoing agreement in restraint of trade and abuse and conversion of their monopoly power will spread to other LME warehouses, further exacerbating the anticompetitive impact on the U.S. economy.

## VII.    THE RELEVANT MARKETS

197.    Plaintiffs disclaim the need to plead a relevant market on its Sherman Act, Section 1 claim (and the equivalent State law claims).    The restraint of trade alleged herein directly inflated price, restricted supply, anti-competitively restrained the free alienability of aluminum and otherwise constitutes a *per se* violation of Section 1.

198.    To the extent relevant, the relevant markets of the LME include, in the alternative, one or more of the following: (a) the market for warehousing LME aluminum in the United States; and (b) the market for providing exchange traded aluminum forward or futures contracts, including to approve warehouses for exchange-traded aluminum in the United States.  LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S.  Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S.  The geographical market for the foregoing markets is the United States.

199.    The Relevant Markets of the Goldman Defendants include, in the alternative: (a) the market for aluminum in the United States; (b) the market for warehousing all LME and non-LME aluminum in the United States; or (c) the market for warehousing LME aluminum in the United States and other areas in which aluminum is purchased and sold based on the Midwest Premium Price or any price based on or derived therefrom.  The alternative geographical markets are the same as those contained in the alternative definitions of the product market.  Pursuant to its agreement with the LME, Goldman has manipulated the market in which Plaintiffs and other

Class members purchased aluminum and have inflated prices in that market through anticompetitive conduct and agreements.

## VIII.  EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND THE CLASS

200.   Defendants' unlawful acts alleged herein substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

201.   Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the U.S. including by inflating primary and seni-fabricated aluminum prices and restricting the supply of primary and semi-fabricated aluminum.

202.   For example, Defendants' unlawful agreement has caused purchasers of both primary and semi-fabricated aluminum in the United States to pay an unlawfully and artificially inflated premium to purchase their aluminum.

203.   As a result of Defendants' violations, Plaintiffs and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices for aluminum.

## IX.  ANTITRUST INJURY

204.   The restraint of trade and anticompetitive conduct alleged herein and engaged in by Defendants has had severe adverse consequences on the availability and price of aluminum. Plaintiffs and other members of the Class were deprived of normal, competitive semi-fabricated aluminum prices.  They were subjected to artificially inflated prices and price-trends as a direct, foreseeable and intended result of the Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## X.    CLASS ACTION ALLEGATIONS

205.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons and entities who from February 1, 2010 forward (the "Class Period") purchased semi-fabricated aluminum from aluminum mills, extruders, wire and rod producers or service centers pursuant to a contract with a price term based, in any part, on the Midwest Premium (or a similar term referring to the same premium) in the following states: Alabama, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Damages Class").

> All persons and entities who during the Class Period purchased semi-fabricated aluminum from aluminum mills, extruders, wire and rod producers or service centers pursuant to a contract with a price term based, in any part, on  the Midwest Premium (or a similar term referring to the same premium) throughout the United States (the "Injunctive Class").

206.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

207.    The Classes are so numerous that joinder of all members is impracticable.  Upon information and belief, the proposed Classes include hundreds, if not thousands, of individuals and entities.

208.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

209.    Plaintiffs' claims are typical of the claims of the members of both Classes.  As alleged herein, Plaintiffs and members of the Classes were injured by the Defendants' same course of unlawful conduct.

210.    There are questions of law and fact common to the Classes, including but not limited to:

- Whether Defendants made agreements in unreasonable restraint of trade;

- Whether Defendants combined, conspired and agreed to restrain supplies or tamper with and inflate the prices of aluminum;

- Whether Defendants' wrongful conduct inflated the price of aluminum;

- Whether the Defendants' conduct violated Section 1 of the Sherman Act;

- Whether the Defendants' conduct violated Section 2 of the Sherman Act and related state antitrust laws on monopolization, attempts to monopolize and conspiracy to monopolize;

- Whether the alleged conspiracy violated state antitrust statutes;

- Whether the alleged conspiracy violated state consumer protection and unfair competition statutes;

- Whether Defendants' conduct caused antitrust injury to the property of Plaintiffs and Class members;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

211.    Plaintiffs will fully and adequately protect the interests of all Class members. Plaintiffs have retained counsel experienced in complex antitrust class actions including class actions involving complex financial transactions and complex schemes in violation of antitrust laws.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Classes.

212.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Classes have a high degree of similarity and are cohesive.  Plaintiffs anticipate no special difficulty in the management of this matter as a class action.

213.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

214.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

215.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

216.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.     FIRST CLAIM FOR RELIEF: INJUNCTIVE RELIEF PURSUANT TO SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT

217.     Plaintiffs incorporate the preceding allegations by reference.

218.     Defendants and unnamed conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).   Defendants' agreement to manipulate warehouse inventories and

queues to directly, foreseeably, artificially and intentionally tamper with and inflate prices for aluminum in the U.S., including the Midwest Premium component of aluminum prices, was a violation of the Sherman Act.

219.    Each Defendant acted as part of, and in furtherance of, their contract, combination, or conspiracy ase authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

220.    Beginning at least as early as February 1, 2010, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices and premiums for aluminum sold in the United States.

221.    Defendants' anti-competitive acts were intentionally directed at the market for aluminum and aluminum warehousing and had a substantial and foreseeable effect on interstate commerce throughout the United States.

222.    Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the aluminum market.

223.    As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiffs and other members of the Class have been injured in their business and property.  Plaintiffs and other Class members have been harmed by being forced to pay higher prices for aluminum than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

224.    In formulating and carrying out their unlawful agreement, understanding, combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

225.    Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

a.  Price competition in the aluminum market has been restrained, suppressed and/or eliminated in the United States;

b.  Prices for aluminum have been fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States; and

c.  Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

226.    In furtherance of the unlawful conspiracy, Defendants and their co-conspirators have committed overt acts, including, *inter alia*:

• Agreeing to stockpile aluminum in LME-approved warehouses by paying increased incentives to aluminum producers/traders to store aluminum in LME-approved warehouses, thereby restricting the supply of aluminum and increasing demand and ultimately inflating the price of aluminum;

• Agreeing to further restrict supply and increase demand and inflate the price of aluminum by treating the LME load-out rules as maximums rather than minimums and shuffling aluminum among warehouses instead of delivering it to purchasers;

• Agreeing to manipulate LME-approved warehouse inventories and fees, by artificially extending warehouse queues by, among other things, cancelling warrants and shuttling aluminum among warehouses instead of delivering it to purchasers, all with the purpose and effect of tampering with, and inflating the Midwest Premium;

• Agreeing to unreasonably high storage fees and increases in the fees to compensate for increases in the load-out minimums; and

- Agreeing, as a necessary, intended and direct effect, inextricably intertwined with their other conduct, to inflate prices for aluminum in a market environment that should have seen price movement in the opposite direction.

227.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise or stabilize prices of aluminum. As a direct and proximate result of the illegal agreement, contract, combination, or conspiracy between Defendants, Plaintiffs and the members of the Class have been injured and damaged in their respective businesses and property.

228.    Defendants' conspiratorial agreement can be inferred, *inter alia*,

(a)    from their participation in and influence over the LME, including its committees;

(b)    from the Defendants' anticompetitive conduct, which constituted an important radical departure from prior business practice before the Class Period;

(c)    from Defendants' behavior, which if undertaken unilaterally, would be contrary to each Defendant's economic self-interest, since their behavior did not lead to pro-competitive efficiencies, and since it would have been irrational for any one Defendant to unilaterally engage in such risky conduct without the assurance that other Defendants would support such efforts;

(d)    from each Defendant's strong motive to collude;

(e)    from the blatant anticompetitive effects of their alleged agreement;

(f)    from the significant departure after 2009 in warehousing inventory levels, warehouse queues and delivery delays from specific LME-approved warehouses, and the ensuing historically anomalous and unprecedented movement to all time record levels in the Midwest Premium; and

(g)    because there is no evidence to explain Defendants' behavior other than a conspiracy to increase the price of aluminum.

229.    The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs and members of the Injunction Class

are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## XII.    SECOND CLAIM FOR RELIEF AS AGAINST LME AND GOLDMAN DEFENDANTS: INJUNCTIVE RELIEF PURSUANT TO SECTION 2 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT.

230.    Plaintiffs incorporate the preceding allegations by reference.

231.    Defendants monopolized, attempted to monopolized, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

232.    The Goldman Defendants have abused their monopoly power.  The LME Defendants have abused their monopoly power.  The Goldman Defendants and the LME Defendants have agreed with one another and the other Defendants, to abuse their monopoly power.  They have done so in order to anticompetitively and unreasonably limit the free alienability of aluminum stored in Detroit LME Warehousing and, thereby, restrain supply, inflate aluminum prices, and inflate the storage cost paid to Defendants.

233.    The Goldman Defendants and the LME each abused their respective monopoly positions, positions they created, through the manipulation of the aluminum market and prices, including: (1) monopolizing LME approved warehousing of aluminum in the United States; (2) stockpiling aluminum through incentives and through restricting the amount of aluminum that is delivered to aluminum purchasers; (3) increasing storage fees and premiums attached to the spot prices of aluminum; and (4) shuffling aluminum among warehouses to benefit Goldman's aluminum-based derivative trading, in unreasonable and unlawful restraint of trade.

234.    Alternatively or additionally, the LME Defendants and the Goldman Defendants jointly agreed between and among themselves or with one or more other Defendants to

monopolize or attempt to monopolize or conspire to monopolize either of the relevant markets previously alleged.

235.    The conduct and its resulting impact on the market for aluminum occurred in or affected interstate and international commerce.

236.    As a direct and foreseeable result, Plaintiffs and members of the Class have suffered injury to their business or property because they paid artificially high prices for aluminum that they would not have but for Defendants, and their co-conspirators, violations of law, which materially and proximately caused such injuries to Plaintiffs and the Class.  Unless injunctive relief, including structural injunctive relief is granted, these violations may continue to reoccur in the future.

## XIII.    THIRD CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE ANTITRUST STATUTES

237.    Plaintiffs incorporate the preceding allegations by reference.

238.    From at least as early as February 1, 2010, through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of aluminum in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of the various state statutes set forth below.

239.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to manipulate LME warehouse inventories, including artificially extending warehouse queues, to inflate the Midwest Premium, which caused artificially *supra* competitive prices for aluminum in the United States.

240.    In formulating and effectuating this conspiracy and these monopolies, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy,

including, participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

241.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to manipulate the aluminum market in order to benefit from exorbitant storage fees and trading positions.

242.    Plaintiffs assert these claims under the laws of their states of residence and as representatives of the proposed Class of commercial end users residing in states with indirect purchaser laws similar to their states such that the common questions of law and fact raised in this claim will predominate under Fed. R. Civ. P. 23(b)(3).

243.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Ala. Code. § 6-5-60, *et seq*.

244.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Arizona Rev. Stat. §§ 44-1401, *et seq*.

245.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Ark. Code. Ann. §§ 4-75-201, *et seq*.

246.    Defendants' engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts,  and conspired to monopolize in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*.

247.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of D.C. Code §§ 28-4501, *et seq.*

248.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Haw. Rev. Stat. §§ 480, *et seq.*

249.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Iowa Code §§ 553.1, *et seq.*

250.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*

251.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et seq.*

252.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Mich. Comp. Laws §§ 445.771, *et seq.*

253.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Minn. Stat. §§ 325D.49, *et seq.*

254.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

255.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Neb. Rev. Stat. §§ 59-801, *et seq.*

256.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Nev. Rev. Stat. §§ 598A.010, *et seq.*

257.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of N.M. Stat. Ann., §§ 57-1-1, *et seq.*

258.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*

259.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*

260.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq.*

261.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Or. Rev. Stat. §§ 646.705, *et seq*.

262.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of R.I. Gen. Laws §§ 6-36-1, *et seq*.

263.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of S.C. Code Ann. §§ 39-3-10, *et seq*.

264.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq*.

265.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

266.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Utah Code Ann. §§ 76-10-3101, *et seq*.

267.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq*.

268.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of W. Va. Code §§ 47-18-1, *et seq.*

269.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce, and a pattern of monopolistic acts in violation of Wis. Stat. §§ 133.01, *et seq.*

270.    Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy or agreement. Plaintiffs and members of the Class have paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

271.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs and the members of the Classes.

272.    Accordingly, Plaintiffs and the members of the Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's applicable law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## XIV.    FOURTH CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES

273.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

274.    From at least as early as February 1, 2010, through the present, Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of aluminum in violation of the following state consumer protection and unfair competition statutes.

275.    Plaintiffs assert this claim under the laws of their states of residence and as representative of the proposed Class of commercial end users residing in states with indirect purchaser laws similar to their states such that the common questions of law and fact raised in this claim will predominate under Fed. R. Civ. P. 23(b)(3).

276.    Defendants have violated Ariz Rev. Stat. §§ 44-1521 *et seq*.

277.    Defendants have violated Arkansas Code §§ 4-88-101 *et seq*.

278.    Defendants have violated California Bus & Prof. Code §§ 17200 *et seq*.

279.    Defendants have violated D.C. Code Ann. §28-3901 *et seq*.

280.    Defendants have violated Florida Stat. §§ 501.201 *et seq*.

281.    Defendants have violated Hawaii Rev. Stat. § 480-2.

282.    Defendants have violated Kan. Stat. Ann. §§ 50-623 *et seq*.

283.    Defendants have violated Mass. Gen. Laws chapter 93A §§ 1 *et seq*.

284.    Defendants have violated Mich. Comp. Laws § 445.901.

285.    Defendants have violated Minn. Stat. §§ 325F.69 *et seq*.

286.    Defendants have violated Miss. Code §§ 75-24-1 *et seq.*

287.    Defendants have violated Mo. Ann. Stat. 407.020.

288.    Defendants have violated Nebraska Rev. Stat. §§ 59-1601 *et seq*.

289.    Defendants have violated Nev. Rev. Stat. §§ 598.0903 *et seq*.

290.    Defendants have violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq*.

291.    Defendants have violated New Mexico Stat. Ann. §§ 57-12-1 *et seq*.

292.    Defendants have violated N.Y. Gen. Bus. Law § 349 *et seq*.

293.    Defendants have violated North Carolina Gen. Stat. §§ 75-1 *et seq*.

294.    Defendants have violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq*.

295.    Defendants' intentional and purposeful anti-competitive acts, described above, were intended to and did cause Plaintiffs and Class members to pay supracompetitive, artificially inflated prices for the aluminum they purchased in the states listed above.

296.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct.

297.    Plaintiff and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## XV.    FIFTH CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS, FOR VIOLATIONS OF MICHIGAN ANTITRUST REFORM ACT, MCL §§ 445.771, ET SEQ., ON BEHALF OF MEMBERS OF THE DAMAGES CLASS

298.    Plaintiffs incorporate the preceding allegations by reference.

299.    From at least as early as February 1, 2010, through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of aluminum in unreasonable restraint of trade and commerce and in violation of the Michigan Antitrust Reform Act, MCL §§ 445.771, *et seq.*

300.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to manipulate LME warehouse inventories, including artificially extending warehouse queues, to inflate the Midwest Premium, which caused artificially supracompetitive prices for aluminum in the United States.

301.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including, participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

302.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to manipulate the aluminum market in order to benefit from exorbitant rents and trading positions.

303.    Defendants and their co-conspirators also monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously defined and alleged herein.

304.    Defendants have abused their monopoly power in order to anticompetitively and restrictively limit, unreasonably, the free alienability of aluminum stored in Detroit warehousing and, thereby, inflate aluminum prices as well as the storage costs paid directly to Defendants.

305.    Defendants' illegal conduct was substantially carried out in Michigan and its resulting impact substantially affected Michigan and interstate commerce.

306.    Plaintiffs bring this claim on behalf of all members of the Damages Class.

307.    It is appropriate to apply Michigan antitrust law to members of the Damages Class located outside Michigan, because the illegal conduct was focused in Michigan and the key parties and witnesses to this unlawful conduct reside and do business in Michigan. The primary method and means of the conspiracy was to stockpile a substantial percentage of LME aluminum

in the United States in warehouses located in Michigan. Additionally, Defendant Metro is headquartered in Michigan. Defendants' conduct in Michigan caused substantial injuries to members of the Damages Class.

308. Plaintiffs and members of the Damages Class have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy or agreement, and by reason of Defendants' abuse of their monopoly power. Plaintiffs and members of the Class have paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the Michigan Antitrust Reform Act was designed to prevent and flows from that which makes Defendants' conduct unlawful.

309. In addition, Defendants have profited significantly from the conspiracy and abuse of monopoly power. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs and members of the Class.

310. Accordingly, Plaintiffs and members of the Class seek damages, to be trebled or otherwise increased as permitted by MCL §§ 445.771, *et seq.*, including costs of suit and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A. That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B. That the conduct alleged herein be declared, adjudged and decreed:

(i) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(ii) A *per se* violation of Section 1 of the Sherman Act;

(iii) A monopolization, attempt to monopolize, or conspiracy to monopolize in violation of Section 2 of the Sherman Act and Section 3 of the Clayton Act; and

(iv) An unlawful combination, trust, agreement, understanding or concert of action in violation of the state antitrust and unfair competition laws as set forth herein.

C.    That Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under state laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Costs and disbursements of the action;

E.    Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

F.    Pre- and post-judgment interest;

G.    Reasonable attorneys' fees;

H.    That Defendants be enjoined from the conduct challenged herein; and

J.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  March 12, 2014

Respectfully submitted,

**KESSLER TOPAZ
    MELTZER & CHECK, LLP**
Joseph H. Meltzer
Terence S. Ziegler
Kimberly A. Justice
John Q. Kerrigan
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056
Email: jmeltzer@ktmc.com
Email: tziegler@ktmc.com
Email: kjustice@ktmc.com
Email: qkerrigan@ktmc.com

*Interim Co-Lead Counsel for the Class*

**GIRARD GIBBS LLP**
John A. Kehoe
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
Email: jak@girardgibbs.com

*- and –*

Daniel C. Girard
Amanda M. Steiner
Dena C. Sharp
Adam E. Polk
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: dcg@girardgibbs.com
Email: as@girardgibbs.com
Email: chc@girardgibbs.com
Email: aep@girardgibbs.com

*Interim Co-Lead Counsel for the Class*

Dated:  March 12, 2014

CUNEO GILBERT & LaDUCA, LLP
Jonathan W. Cuneo
Joel Davidow
Yifei ("Evelyn") Li
507 C Street, N.E.
Washington, DC  20002
Telephone: (202) 789-3960
Email: jonc@cuneolaw.com
Email: joel@cuneolaw.com
Email: evelyn@cuneolaw.com

*Interim Co-Lead Counsel for the Class*

## **CERTIFICATE SERVICE**

I hereby certify that on March 12, 2014, the foregoing Amended Complaint was manually filed with the Clerk of the Court. The Clerk of the Court will post the Amended Complaint on the Court's CM/ECF system, which will send notification of such filing to all parties. Additionally, a copy of this Amended Complaint will be served on all counsel of record via email.

_____
John A. Kehoe