

RECEIVED
MAR 12 2014
U.S.D.C. S.D.N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

This Document Relates To:

*Agfa Corporation and Agfa Graphics, N.V. v.*
*The Goldman Sachs Group, Inc.,*
Case No. 1:14-cv-0211-KBF (S.D.N.Y.)

CASE NO. 13 MD 2481 (KBF)

**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Agfa Corporation and Agfa Graphics, N.V. (together, "Plaintiff" or

"Agfa") allege for its Amended Complaint, with knowledge as to its own actions and

events, and upon information and belief as to other matters, as follows:

### NATURE OF THE ACTION

1.      This is an action brought to recover for injuries sustained by Plaintiff as a result

of Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1 and New

York's Donnelly Law, N.Y. General Business Law §340 *et seq*. Plaintiff alleges that purchase

prices for aluminum[1] for physical delivery were artificially inflated to supra-

competitive levels as a result of Defendants' collusion and manipulation, particularly the

Platts Midwest Premium.[2] The Defendants are: (1) banks and trading companies which

own, control, and operate the London Metals Exchange ("LME")-certified warehouses

for the storage of metals, including aluminum, and the companies through which the

---

[1]     As used in this Amended Complaint, "aluminum" means aluminum purchased in the
form of ingots, billets, pigs, sows, sheets, rolls, cables, and rods.

[2]     The Platts Midwest Premium "was originally created to cover the freight from Baltimore
to the Midwest. It now incorporates supply and demand of the North American-specific market
to complement the LME aluminum contract." *See* Press Release, CME Group Announces the
First Aluminum Midwest Premium Contracts Traded (August 9, 2013).

warehouses are owned and operated (collectively, the "Warehouse Defendants"); and (2) the LME, which is the vehicle used by the other Defendants to effectuate their collusion.

2.      Plaintiff's information and belief is based on publicly available sources and analysis thereof, including: (1) publicly available press releases, news articles, and other media reports; and (2) data made publicly available by the LME.  Except as alleged in this Complaint, neither Plaintiff nor other members of the public have access to the underlying facts relating to Defendants' improper activities.   Rather, that information lies exclusively within the possession, custody, or control of Defendants and other insiders, which prevents Plaintiff from further detailing Defendants' misconduct.   Moreover, potential and actual government investigations, including by the United States Department of Justice ("DOJ") and the Commodity Futures Trading Commission ("CFTC"), which issued notice of an investigation and recently subpoenaed at least one of the Defendants,[3] as well as by the United Kingdom's Financial Conduct Authority ("FCA"),[4] concerning aluminum price manipulation could yield information from Defendants' internal records or personnel that bears significantly on Plaintiff's claims.  Plaintiff thus believes further evidentiary support for its allegations will come to light after a reasonable opportunity for discovery.

3.      Aluminum is the most widely used non-ferrous metal.  Some of the main industries that rely on aluminum to manufacture products include household and consumer products, automotive, aircraft, trucking, rail car, marine, packaging, construction, electrical

---

[3]     Jamila Trindla and Tatyana Shumsky, *U.S. Probes Metals Warehouse Firms*, THE WALL STREET JOURNAL (July 25, 2013).

[4]     *See FCA Considers Investigation of Metals Warehousing-Sources*, REUTERS, http://uk.reuters.com/article/2013/07/31/uk-lme-europe-idUKBRE96U0Y320130731.    (Last viewed March 11, 2014).

equipment, computer and information industries, printing and graphics communications industries, as well as other industries.

4.    Aluminum is usually sold pursuant to a formula rather than a price certain determined by the buyer and seller.  The formula price is expressed using various standardized components: the "LME Official Price"[5] plus the base delivery premium (in the United States, the Platts Midwest Premium), plus incremental delivery premiums for delivery outside the Midwest, and additional premiums for shaping the aluminum.

5.    From a date unknown, but reasonably believed to be at or around early 2010, Defendants have engaged in a conspiracy to manipulate the price of aluminum for physical delivery in the United States by converting the physical market for aluminum into a *de facto* speculators' market, causing it to be dominated by traders and arbitrageurs (including Defendants themselves) at the expense of commercial and industrial aluminum purchasers.  This created supra-competitive prices for the Midwest Premium charged to aluminum purchasers through the following methods and means: Defendants (1) hoarded aluminum in LME-certified warehouses and other warehouses while at the same time agreeing to artificially limit the supply of aluminum that leaves LME-certified warehouses; (2) swapped supplies of aluminum between and among warehouses in transactions with other banks, hedge funds, and traders, including Defendants themselves and/or their subsidiaries and affiliates, with no legitimate economic rationale to add to the artificial scarcity and conceal the conspiracy; (3) restricted the supply of aluminum available for delivery by offering incentives for owners of aluminum to continue

---

[5]    The LME Official Price is the last bid and offer price quoted during the second "Ring session" on days when LME aluminum trading occurs.  *See* http://www.lme.com/en-gb/pricing-and-data/pricing/official-price/ (last viewed March 11, 2014).  Like other metals traded on the LME, aluminum is traded in Ring sessions, which are five-minute trading sessions that are "representative of global supply and demand." http://www.lme.com/trading/venues-and-systems/ring/ (last viewed March 11, 2014).

storing their aluminum in their warehouses rather than releasing it into the market; and (4) used the LME rule-making process to establish sham "standards," providing the instrumentality by which Defendants could reach anticompetitive agreements while at the same time deflecting scrutiny of their practices.

6.     The LME is a key player in this conspiracy because it oversees 719 metals warehouses around the globe,[6] including some 38 such warehouses within the Eastern District of Michigan,[7] many of which house aluminum, and – that aside – its aluminum warehousing rules, implemented and manipulated by Defendants as set forth below, functioned as a collusive agreement among Defendants and their co-conspirators. The LME's vast global storage network currently holds over five million tonnes[8] of aluminum in LME-certified warehouses worldwide. This is more than the amount of aluminum consumed in the United States in an entire year. Rather than acting as an honest and responsible supervisory body of the LME warehouses to ensure an efficient market for aluminum, the LME was, until recently, owned and controlled in large part by the Warehouse Defendants and their co-conspirators, and its rules and Defendants' manipulation of them enabled Defendants' conspiracy.

7.     Despite the massive quantities of aluminum stored in LME warehouses, purchasers of aluminum have experienced queues of up to one year to receive aluminum from

---

[6]     David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013); *see also* http://www.lme.com/ trading/warehousing-and-brands/warehousing/approved-warehouses/ (last viewed March 11, 2014).

[7]     *Id.* at 23-24.

[8]     "Tonne" is a metric ton (1000 kilograms). A tonne is about 2,204 lbs. or 110.2% of the American ton.

these warehouses.[9]  And because of the link between the LME warehouses and the broader physical market for aluminum, the "Midwest Premium," a stated component of the price for the delivery of aluminum throughout the United States (and sometimes, as discussed below, outside the United States), has risen to unprecedented levels.  As *The New York Times* put it, given the aforementioned "formula used to set the price of aluminum on the spot market, the [warehouse-related] delays also increase the prices nearly all manufacturers pay for aluminum ***even when they buy metal that was not stored in a warehouse***."[10]

8.     As set forth below, absent collusion, it defies economic explanation for purchasers of aluminum to experience such queues and to pay such high Midwest Premiums given the large quantities of aluminum that would – absent Defendants' conduct – be available for delivery.

9.     Defendants' collusive and manipulative acts took place in substantial part in the United States, and were conducted by persons and entities subject to the laws of the United States, including its states and territories and affected the pricing of millions, if not billions, of dollars' worth of aluminum purchased in the United States.

## JURISDICTION AND VENUE

10.     This action was filed in the United States District Court for the Eastern District of Michigan, where it ultimately was assigned Case No. 2:13-cv-14617-DML-MAR (E.D. Mich.).  Thereafter, it was transferred to the United States District Court for the Southern District of New York as a part of MDL No. 2481, *In re Aluminum Warehousing Antitrust Litigation*, and was

---

[9]     Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

[10]     David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, THE NEW YORK TIMES (Aug. 12, 2013) (emphasis added).

assigned individual case number 1:14-cv-00211-KBF (S.D.N.Y.). Unless otherwise indicated, references hereafter to "this District" and "this Court" refer to the transferor court, the U.S. District Court for the Eastern District of Michigan.

11.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

13.     This Court may exercise supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. §1367.

14.     This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this District.

15.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because at all times material to this complaint the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

16.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES

**Plaintiff**

17.     Agfa is a multinational company that develops, produces, and distributes equipment and supplies for the newspaper, commercial printing, and graphics communications industries.   The company has a production facility in the United States.   Plaintiff Agfa Corporation is a business entity organized under the laws of Delaware and maintains its United States headquarters at 611 River Drive, Elmwood Park, New Jersey 07407.   Agfa Corporation is a wholly-owned subsidiary of Plaintiff Agfa Graphics, N.V., a Belgian company.   At all times material to this complaint, Agfa purchased aluminum from integrated producers Alcoa, Novelis, and Hydro, and/or their respective affiliates.   During the time material to this complaint, Agfa has purchased well over $100 million of aluminum for use in its manufacturing activities in the United States alone; it has purchased significantly more aluminum for its overseas operations.   Agfa uses the aluminum it purchases for, *inter alia*, the production of lithographic printing plates.   As further described below, Agfa's aluminum purchases have incorporated the LME Official Price (described below) and the Midwest Premium.

**Defendants**

18.     **Goldman Sachs**: Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is an international financial company headquartered at 200 West Street, #200, New York, New York 10282, and conducts business within this District.   Goldman Sachs trades physical aluminum and other base metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.   Goldman Sachs has been the owner of Defendant Metro since February 2010.

19. **Metro**: Defendant Metro International Trade Services LLC ("Metro") is a limited liability company organized under the laws of Michigan and headquartered at 6850 Middlebelt Road, Romulus, Michigan 48174, and conducts business within this District. It owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan (located in this District); Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store, among other metals, aluminum.

20. **JPMorgan**: Defendant JPMorgan Chase & Co. ("JPMorgan") is an international financial company headquartered at 270 Park Avenue, New York, New York 10017, and conducts business within this District. JPMorgan engages in the storage, transportation, marketing, or trading of commodities, including aluminum and other metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum. JP Morgan has been the owner of Defendant Henry Bath since July 2010.

21. **Henry Bath**: Defendant Henry Bath LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, and is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom. It owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store, among other metals, aluminum.

22. **Glencore**: Defendant Glencore Xstrata, PLC (and its predecessor Glencore International, PLC, collectively, "Glencore") is a public limited company organized under the

laws of the United Kingdom and headquartered at Baarermattstrasse 3, CH-6340 Baar, Switzerland. Glencore is a commodities trading and mining company that engages in the production, storage, transportation, marketing, or trading of aluminum and other metals as well as trading derivative products that derive their value from the underlying asset prices of aluminum. Glencore has been the owner of Pacorini USA and Pacorini BV (collectively, "Pacorini") since September 2010.

23.     **Pacorini**: Defendant Pacorini Metals USA LLC ("Pacorini USA") is a limited liability company organized under the laws of Louisiana and headquartered at 5736 Citrus Boulevard, Suite 104, New Orleans, Louisiana 70123. It owns and operates LME-certified warehouses in the United States, including warehouses in Detroit, Michigan (located in this District); Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana that store, among other metals, aluminum. Non-defendant co-conspirator Pacorini Metals Vlissingen BV ("Pacorini BV") is a *besloten vennootschap* (private limited liability company) organized under the laws of the Kingdom of the Netherlands and headquartered at Engelandweg 55 Port No. 1199 4389 PC, Vlissingen-Oost, Netherlands. It owns and operates LME-certified warehouses in Rotterdam and Vlissingen in the Netherlands that store, among other metals, aluminum. Glencore has been the owner of Pacorini USA and Pacorini BV (collectively, "Pacorini") since September 2010.

24.     Defendants Goldman Sachs, JPMorgan, and Glencore through respectively, Metro, Henry Bath, Pacorini, and other entities, were engaged in the aluminum warehousing business. Defendants Goldman Sachs, JPMorgan, and Glencore were also engaged in commodities trading and trading of derivative products that derive their value from the underlying asset prices of aluminum at all relevant times.

25.    **LME**: Defendant the London Metal Exchange Ltd. ("LME") is a corporation organized under the laws of the United Kingdom and headquartered at 56 Leadenhall Street, London, England.    On December 6, 2012, the stock of the LME's parent company, LME Holdings Ltd., was acquired by Hong Kong Exchanges and Clearing Limited which owns the HKEx Group, an integrated exchange group based in Hong Kong.

a.    The LME is the world's largest non-ferrous metals market and "a private trade association"[11] for Defendants here.  More than 80% of all global non-ferrous metal futures business is transacted through its trading platforms.  The non-ferrous metals exchanged through the LME are aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt, and molybdenum. The LME handles total trading volumes of about $61 billion per day.  The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds, and traders, rather than users of aluminum.

b.    Until its acquisition by the HKEx Group in December 2012, the LME was owned, controlled, and governed by its members.    J.P. Morgan Securities PLC (a subsidiary of JPMorgan) is a "Category 1" member of the LME, Goldman Sachs International (a subsidiary of Goldman Sachs) is a "Category 2" member of the LME, and Glencore (UK) Ltd. (a subsidiary of Glencore) is a "Category 5" member of the LME.

c.    Prior to the acquisition, the members/shareholders of the LME were much more involved in the management of the LME than is typical of shareholders in a corporation.  Much of the work of the LME is conducted through committees of members and/or their affiliates.    For example, the LME's Warehousing Committee includes

---

[11]    David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, THE NEW YORK TIMES (August 12, 2013) (emphasis added).

executives from Metro, Henry Bath, and Pacorini (or their affiliates).  And, again, JPMorgan and Glencore affiliates sit on the LME's Aluminum Committee.

       d.    As of the acquisition by the HKEx Group, JP Morgan and Goldman Sachs were the two largest shareholders in the LME.

       e.    The LME certifies and purports to supervise a global network of more than 700 warehouses for the storage of metals, including the Metro, Henry Bath, and Pacorini USA warehouses in the United States.

       f.    Through its various activities, the LME is the agent of its aluminum producer members and affiliates for warehouse rules for storage and load-out and other functions related to the activities alleged herein which affect prices, including the Midwest Premium and supply of aluminum for physical delivery.

26.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

### CO-CONSPIRATORS

27.    Various other persons, firms, and corporations, unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

28.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

29.     Whenever reference is made to any act of any corporation, limited liability company, or other entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, or control of the entity's business or affairs.

**FACTUAL ALLEGATIONS**

**A.     The Structure of the Market for Aluminum**

30.     Aluminum is a lightweight, soft, and ductile non-ferrous metal ubiquitous in the manufacture of a wide array of products, such as vehicles (*e.g.*, airplanes and automobiles), packaging materials (*e.g.*, beverage cans), and construction materials (*e.g.*, window frames and siding).

31.     Aluminum enters the stream of commerce when large, integrated producers of aluminum (such as Alcoa and Alcan) mine the mineral-rich rock bauxite, extract alumina from the bauxite, and refine the alumina into aluminum through an electrometallurgical process. These producers then shape the aluminum into ingots, billets, sows, pigs, sheets, rolls, and other forms.  Some producers also mill aluminum of the type described below.

32.     Other companies, known as independent mills, including independent rolling companies, cable companies, and extruders, acquire primary aluminum[12] from aluminum

---

[12]     Primary aluminum is aluminum tapped from electrolytic cells or pots during the electrolytic reduction of metallurgical alumina (aluminum oxide).  *See* http://www.world-aluminium.org/statistics/ (last viewed March 11, 2014).

producers and roll, draw, or extrude the aluminum into milled aluminum, including sheets, rods, or other forms for sale.

33.     Generally, a purchaser of aluminum in the United States purchases from one of four sources: a producer, an independent mill, a trader or distributor, and/or from aluminum stock held in warehouses, including LME-certified warehouses.

34.     About 44 million tonnes of aluminum were produced worldwide in 2011, with United States production accounting for about two million tonnes.[13]

35.     In that same year, primary aluminum consumption in the United States totaled about four million tonnes, mostly used for the manufacture of vehicles, packaging materials, and construction materials.[14]

36.     From 2008 through 2012, the relationship between global production and demand for aluminum was relatively stable, with the market tending toward surplus:

### Aluminum Production-Consumption Balance 2008-13 (Million Tonnes)

|  | **2008** | **2009** | **2010** | **2011** | **2012** | **2013 (e)** |
|---|---|---|---|---|---|---|
| **Production** | 40 | 37.5 | 42.3 | 44.7 | 46.2 | 51 |
| **Consumption** | 37.6 | 35.4 | 41.3 | 42.8 | 45.8 | 50.4 |
| **Balance** | 2.4 | 2.1 | 1 | 1.9 | 0.4 | 0.6 |

---

[13]     United States Geological Survey Resources Program, "Aluminum," January 2012.

[14]     *Id.*



37.    In summary, there has been no organic shortage during this period in the amount of aluminum produced.   To the contrary, there is a substantial over-supply of aluminum, especially considering the vast supplies of aluminum held in warehouses, as explained below.

**B.    Aluminum Pricing**

38.    Commercial and industrial contracts for the physical delivery of aluminum in the United States express the price for aluminum using a formula with various standardized components: the "LME Official Price," plus the Midwest Premium, plus additional fees and premiums, such as for shaping aluminum into a particular form. As discussed below, and as relevant to Plaintiff Agfa, some non-U.S. aluminum purchases also incorporate these same standardized pricing components.

39.     The LME Official Price is defined as the "last bid and offer price quoted during the second Ring session"[15] of the LME and is quoted for cash (*i.e.* spot purchase), three and 15 months delivery, and three forward December prompts.[16]  The LME Official Price is "used as the global benchmark for physical contracts" for delivery of aluminum.[17]  In the United States, the LME Official Price quoted for cash (the "LME Cash Price") is typically the variant used in contracts for the purchase and delivery of aluminum.

40.     The Midwest Premium is supposed to reflect the transport and holding costs incurred by the seller to deliver the aluminum to the Midwest.  The Midwest Premium fluctuates, however, not only in response to changes in transport and holding costs but also in response to changing supply and demand dynamics for physical delivery of aluminum. Notwithstanding its name, the Midwest Premium is charged throughout the United States (and, sometimes, abroad).  The Midwest Premium is reported by the publishing company Platts from commercial data collected from industry buyers and sellers by Platts reporters.

41.     The LME Cash Price is determined daily by open outcry by the marginal buyer and seller at a specific moment in time using standardized LME contracts covering spot material located in LME warehouses.  The LME thus provides a price discovery mechanism for a standard aluminum exchange contract, but this price does not include the costs of delivery from a seller to a purchaser.

---

[15]     Among the trading platforms offered by the LME is open-outcry trading on a London trading floor that is known as the "Ring."  The LME organizes the trading day into two sessions. Each metal traded on the LME is allotted one or more five-minute sub-sessions in each such session.  There is also a "kerb" sub-session during which all of the LME metals may be traded.

[16]     www.lme.com/prices_published_official_and_settlement_price.asp  (last  viewed  on March 11, 2014).

[17]     *Id.*

42.    The Midwest Premium is compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot aluminum on a given day for delivery to Midwest points on a given day.  It reflects current offers for immediately available aluminum for delivery from United States and foreign producers, traders, and holders of warehoused aluminum, and these offers incorporate the fluctuating delivery, storage, finance, and insurance costs incurred by these competing suppliers of aluminum.

## C.    The Role of LME-Certified Warehouses

43.    The LME certifies a global network of more than 700 metals warehouses, with close to 200 located in the United States.  Defendants Metro, Henry Bath, and Pacorini collectively own and operate more than 75% of the LME-certified warehouses in the United States.

44.    To become LME-certified, a warehouse operator must show adequate evidence of insurance and financial capacity.  The warehouses themselves must also meet requirements relating to proximity to highways, railroads, and/or waterways and the capacity to offload a specified daily minimum tonnage, as set forth below.

45.    The LME-certified warehouses are a critical part of the supply chain for aluminum in the United States (and indeed, globally) because, among other things, it is only in such warehouses that LME delivery warrants can be issued and cancelled.  To issue a warrant means that aluminum has been checked into such a warehouse for storage, and to cancel a warrant means that the aluminum has been earmarked for delivery from the warehouse.[18]  Thus, an LME warrant is a standardized document issued by the warehouse upon delivery of a lot of aluminum into the warehouse to indicate who has the right of possession of that lot of

---

[18]    http://www.karvycomtrade.com/downloads/karvySpecialReports/karvysSpecialReports_2009111811248.pdf (last viewed on March 11, 2014).

aluminum.  LME warrants are bearer documents of title, of a specified brand, of a specified metal (such as aluminum) in a specified location and warehouse and are the only standardized instruments of title for aluminum.  Because they are standardized, they are freely tradable and are the actual instrument that underpins a highly-leveraged volume of LME paper futures transactions.[19]  Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of physical aluminum.  Without a link to timely-deliverable metal, the viability of the LME price discovery mechanism would be lost, and fabricators and purchasers consequently would see no value to LME pricing.

46.    LME warehouses are vital links in the U.S. (and indeed, global) physical supply chain for another reason.  They represent the supplier of last resort for consumers who need to keep their plants operating and the destination of last resort for producers who need to raise cash.

47.    LME warrants are also critical to the financing of aluminum-related transactions. For the reasons set forth above, the LME warrant is considered first-class collateral.  The holder of an LME warrant can borrow money secured by that warrant on favorable terms.

48.    Defendants, through the LME, including by means of prior ownership and control of the LME and its certified warehouses, including by means of its various rules and standard-setting activities, and other means, agreed and conspired to fix, raise, elevate, maintain, or stabilize prices of aluminum sold in interstate commerce in the United States and, in particular, by collusion and manipulation with respect to the Midwest Premium as alleged herein.

---

[19]    *Id.*

**D.    The Amount of Aluminum Stored in LME Warehouses Soars**

49.    The LME warrant-warehouse system properly served the aforementioned roles for close to 135 years.   During that time, the aluminum tonnage in the LME warehouses represented a very small percent of global aluminum supplies, and the LME superintended the warehouses carefully to ensure that the LME's reputation as a readily-accessible and liquid market was robust.

50.    From the end of 2008 to the present, however, the amount of aluminum held in LME warehouses worldwide soared, from about 1.1 million tonnes in July 2008 to about 5.5 million tonnes in April 2013:



51.    Aluminum stored in U.S. LME warehouses also rose from 2005 to 2013 as shown in the following table and chart:

**U.S. LME Warehouse Aluminum Stocks 2005-12 (000 Tonnes)**

| 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|------|------|------|------|------|------|------|------|
| 209 | 228 | 463 | 1290 | 2200 | 2230 | 2360 | 2300 |



52.     That inventories of aluminum were increasing or staying constant at the same time that the Midwest Premium was also increasing defies economic logic: the large inventories of aluminum stored in warehouses indicates that there is (or should be) an ample supply of aluminum available for immediate delivery – and this should, in turn, produce a corresponding decrease in the premiums for such delivery.

**E.     The Financial Crisis of 2008**

53.     Initially, the increase in aluminum held in the warehouses was a result of the global financial crises that began in 2008.  Demand for aluminum decreased sharply as a result of that crisis, which led to increasing inventories of aluminum being stored in warehouses rather than being sold to consumers.  The crisis also led to a contraction in the availability of financing

19

for commodities-related transactions.  As a result, producers and others in the aluminum supply chain converted inventories of aluminum into cash and engaged in other transactions that resulted in large inventories of aluminum being held by traders and financial institutions.

54.     Although the heavily-oversupplied global conditions that had initially in 2008 led to the rapid increase in the amount of aluminum held in storage had ended, the amount of aluminum held in storage in U.S. LME warehouses continued to rise or remain steady.

**F.     The Entry of Banks and Traders into Warehousing and the Conversion of the Physical Market in Aluminum to a Vehicle for Speculation**

55.     In February 2010, Defendant Goldman Sachs acquired Defendant Metro.  In July 2010, Defendant JPMorgan acquired Defendant Henry Bath.   Finally, in September 2010, Defendant Glencore acquired Defendant Pacorini.

56.     As Blythe Masters, the head of JPMorgan's commodities business admitted, following JPMorgan's July 2010 warehouse purchases, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . .   We need to be active in the underlying physical commodity markets in order to understand ***and make prices***."[20]

57.     Indeed, the entry of these financial players into what had been a staid business caused a significant change in the behavior of the warehouses and the nature of the physical market for aluminum.

58.     Through the actions of Defendants and their co-conspirators, the physical market became a *de facto* speculators' market – one dominated by traders seeking arbitrage returns rather than those who actually consume aluminum.   Defendants and their co-conspirators

---

[20]     *Wall    St    falls    out    of    love    with    commodities    trading*, http://www.aluminiumleader.com/en/serious/news/2013/08/06/LME050813   (last   viewed   on March 11, 2014) (emphasis added).

created and profited from this market transformation by, among other things, offering substantial incentives to store aluminum in their warehouses and artificially restricting the removal of aluminum from those warehouses under the cover of LME rules, as set forth below.

59.    As a result, much of the activity in LME aluminum warehouses is now initiated by such traders and speculators.  As explained further below, according to an investigation by *The New York Times*, a large amount of the aluminum inventory held in Metro's Detroit warehouses is owned by banks, hedge funds, and traders – and these parties manipulate the supply of aluminum by purchasing inventories of aluminum, placing them under warrant at the LME warehouses, followed by dubious "transfers" to, in many cases, the Warehouse Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum has reached the next warehouse.[21]  Among other indicia of manipulation here is that the amount of aluminum warrants cancelled far exceeds any legitimate need for physical aluminum.[22]  This diverted aluminum from actual aluminum users and created an artificial shortage of aluminum and thus, the higher Midwest Premiums complained of herein.

---

[21]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[22]    According to the trade publication *American Metals Market* in a February 4, 2011 report, "[a] sharp increase in canceled aluminum warrants in London Metal Exchange-registered warehouses in Detroit is part of a 'revenue game' and not a true reflection of physical demand, market sources told *AMM* Friday.  Canceled warrants in Detroit jumped by nearly 45,000 tonnes overnight to 79,125 tonnes Thursday, rekindling the finger-pointing that followed September's 100,00-tonne increase and igniting chatter from traders about the real motives behind the move. A number of traders said the cancellations could be little more than 'warehousing games,' where one player cancels warrants to increase the queue at a warehouse[.]" http://www.amm.com/Article/2768946/Detroit-aluminum-warrant-cancellations -said-a-revenue-game.html?ArticleId=2768946 (last viewed March 11, 2014).

60.    Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and exploded at the beginning of 2012, once the scheme set forth above was fully in place:



61.    Furthermore, when a commodities market is in contango (when the futures price is higher than the expected spot price), a holder of the commodity has an opportunity for profit if storage and financing costs for holding the commodity are less than the difference between the expected spot price and the futures price.  Where, as here, the same or related parties can simultaneously: (1) hold; (2) store; and (3) finance the commodity, there is a ripe opportunity – which the data shows was seized by Defendants – for aluminum market manipulation and collusion at the expense of bona fide purchasers of physical aluminum.  Defendants' use of

incentives for storage of aluminum in their warehouses also encourages such manipulation by lowering carrying costs.

62.      As one example of the magnitude of Defendants' conspiracy, from January through June 30, 2011 (mere months after Goldman Sachs' purchase of Metro), Metro warehouses in Detroit took in 364,175 tonnes of aluminum and delivered out 171,350 tonnes.[23] That represented 42% of inventory arrivals globally and 26% of the metal delivered out, according to LME data.[24]  Before Goldman Sachs bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories.[25]  Since Goldman Sachs' acquisition of Metro, the wait has grown more than ten-fold – to more than 16 months, according to *The New York Times*.[26]

63.      These same issues have been reported in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, and sister company Defendant Pacorini USA, is the dominant operator).  Queues of about a year have been reported for aluminum stored in Vlissingen.  Glencore has created those queues through a deliberate effort to hoard aluminum in those warehouses by payment of incentives.[27]  As of December 2012, the Vlissingen LME

---

[23]      Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, Reuters (July 29, 2011).

[24]      *Id.*

[25]      David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[26]      *Id.*

[27]      Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

warehouses stored more aluminum (1.44 million tonnes) than the LME Detroit warehouses (1.42 million tonnes).[28]

## G.    The Warehouse Defendants Offer Payments for Owners to Store Aluminum in Their Warehouses

64.    The Warehouse Defendants also ensure that their inventories remain high by paying aluminum producers and traders to deposit aluminum in their warehouses, and aluminum warrant owners to continue to store their aluminum in the Warehouse Defendants' warehouses.  Such payments indicate market manipulation in the current context.

65.    To wit, as reported by *The New York Times*, Defendant Metro has offered owners incentive payments of up to $230 a ton to continue to store their aluminum at Metro warehouses.[29]

66.    And Defendant Glencore has engaged in the same conduct in Vlissingen. According to Reuters, quoting a London-based trader, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen.  Then they deliver it to the market and whoever holds it can't actually get it out for a year."[30]

## H.    The Warehouses Impose a *De Facto* Uniform Load-Out Rate

67.    Despite the huge quantity of aluminum stored in the LME warehouses, the loading out rate prior to April 2012 was, on most days, barely above the then-required minimum under LME rules, 1500 tonnes per day per company per city for the largest warehouses.  The loading out rate after April 2012 (after the LME rule change discussed below) was barely above

---

[28]    Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*, Bloomberg (Dec. 14, 2012).

[29]    *Id*.

[30]    Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, Chicago Tribune (April 27, 2012).

the new required minimum of 3,000 tonnes per day.  The purported minimum LME aluminum loading out rate therefore operated as a *de facto* uniform or maximum loading out rate, as illustrated by this chart for the Detroit warehouses:



68.    Notably, this limit was ***per company*** and not ***per warehouse***.  If a company owned multiple warehouses in one city (for example, Metro's several warehouses in Detroit), all those warehouses together would need to out load only 1,500 tonnes per day.

69.    This was far less than the amount the warehouses owned by the Warehouse Defendants could load out if they were attempting to operate their warehouses with the goal of efficiency, rather than market manipulation.  It has been estimated that each warehouse using only two forklifts could load out as much as 1,920 tonnes per day.[31]  Thus, for example, the Metro warehouses in Detroit (which, by one count, number 27) could collectively deliver far more than this minimum.

---

[31]    Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

70.    As a result of the warehouses' excessively (and intentionally) slow loading-out rates, lengthy and persistent queues of over one year developed for delivery of aluminum as shown in the following chart.  ("Implied queue" is calculated by dividing the quantity of aluminum covered by canceled warrants by the minimum load-out rate.)



I.    **The Midwest Premium Reaches Unprecedented Highs**

71.    As shown in the attached charts, the Midwest Premium fluctuated between four and eight cents per pound ($90-$180 per tonne) during the period of 2004 through 2008, which was characterized by robust aluminum consumption and LME Cash Prices which peaked at about $3,000 per tonne.   In the period between 2008 and 2010, during the financial crisis, recession, and subsequent tepid recovery, the Midwest Premium reflected downward market pressure and fluctuated between three to six cents per pound ($65-$130 per tonne) at a time when the LME Cash Price was also much lower, fluctuating between $1,300-$2,200 per tonne.

72.    Starting in February 2011, a markedly different pattern emerged.  Economic conditions were still poor then, and there was a huge global surplus of aluminum.  Accordingly, the LME Cash Price began a decline from $2,600 to a recent low of $1,730.  The Midwest Premium, however, moved in the opposite direction.  Beginning in February 2011, the Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to rise during 2011 through 2013 to the then-current all-time record of 12 cents per pound ($265 per tonne) in July 2013.  In January 2014, the Midwest Premium surged to more than 209 cents per pound.  The Midwest Premium was a little over 3% of the LME Cash Price at the height of the bull market in 2008, but is now over 14% of the LME Cash Price – at a time when global surpluses of aluminum have never been higher.





73.    The Midwest Premium increased not only in an absolute sense but also as a percentage of the LME Cash Price:



74.    This increase in the Midwest Premium has been, and is, borne by purchasers of aluminum, and, as set forth below, is the result of Defendants' anticompetitive conduct.

Plaintiff could not have, until just this past week, protected itself had it tried from Defendants' concerted inflation of the Midwest Premium by, for example, purchasing a "hedge" position against a rising Midwest Premium. Until just recently, no major financial institution offered such a hedge for aluminum purchasers – even though, as explained before, Defendants Goldman Sachs and JPMorgan (among other major investment banks) are active participants in the market for commodities-related derivative instruments.

75.     Now, however, that the federal government is known to be investigating the manipulation of the aluminum market that is the subject of the instant Complaint, JPMorgan has announced its intention (shortly following the publication of the before-cited investigative piece by *The New York Times*) to exit the commodities business entirely,[32] and Goldman Sachs (also immediately following publication of the investigative piece by *The New York Times*) has belatedly instituted corrective actions concerning its aluminum warehousing practices,[33] it is apparently economically viable for hedge writers to offer hedge positions to aluminum purchasers concerning the Midwest Premium. This presumably is because hedge position writers now may have some assurance (where before they had none because of the pervasiveness of the instant conspiracy) that the Midwest Premium will not always move only in one direction (namely, up). On August 9, 2013, CME Group, "the world's leading and most diverse derivatives marketplace," announced that it recently wrote a derivatives "contract [that]

---

[32]     Steve Hargreaves, *JPMorgan to exit commodities business*, CNN MONEY (July 26, 2013).

[33]     *See*     http://www.platts.com/latest-news/metals/london/goldman-outlines-proposals-to-address-aluminum-21353455 ("In light of the concerns that end-users have raised about their access to aluminum they are holding in warehouses, Goldman 'is contacting end-users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products,' the company said.") (last viewed on March 11, 2014).

is the first Exchange product that enables the aluminum Midwest premium to be managed."[34] That aluminum purchasers, uniformly during almost the entire period of time material to this Complaint, could not obtain hedge or similar risk management protection against rising Midwest Premium levels indicates both the uniformity and depth of the antitrust injury inflicted on Plaintiff by Defendants' conduct here.

**J.    The LME's Whitewash of the Excessive Queues**

76.    Based on numerous complaints about warehouse queues for aluminum in the United States and elsewhere, the LME commissioned a study by European Economics, a leading consultancy.

77.    The full report, entitled "Assessment of Warehouse Minimum Loading Out Rates" has not been disclosed by the LME on the grounds that it contains proprietary information.  The executive summary of the report, however, was released on May 27, 2011.

78.    Tellingly, European Economics admitted in the executive summary that "[b]roader issues surrounding allegations of manipulation and the entrance of large financial players are beyond the scope of this report."[35]

79.    European Economics also acknowledged that the excessive queues were regarded as damaging "on the grounds that they inhibited arbitrage between the LME and the physical market, increased physical premiums and damaged the reputation of the LME," the queues that occurred in 2010 "were of an unprecedented length," and that "premiums have

---

[34]    Press Release, *CME Group announces the first Aluminum Midwest Premium contract traded* (Aug. 9, 2013).

[35]    Europe Economics, *Assessment of Warehouse Minimum Loading Out Rates, Executive Summary*, at 1.

increased in conjunction with the emergence of long queues" such that premiums were "greatly in excess of the cost of arbitraging between locations."[36]

80.    In the executive summary, European Economics recommended that the loading out requirement be increased to 1,500 tonnes per 300,000 tonnes of stock but admitted that even this requirement could result in queues of up to 200 days, which is "still longer than desirable for the LME system."[37]

81.    In a separate recommendation section from the report that was also released, European Economics opined that, given this potential maximum queue, "[i]t would be irresponsible for the LME as a regulator to maintain such a policy were lengthy, persistent queues to remain."[38]

82.    The LME eventually changed its loading out requirements such that larger warehouse companies (those with over 900,000 tonnes of metal stored) were required to load out 3,000 tonnes per day, effective April 2012.[39]  This was in fact less than the recommendation of European Economics as presented in the executive summary.  Under that recommendation, a warehouse company with over 900,000 tonnes stored would be required to load out 4,500 tonnes per day.  European Economics had acknowledged that, even under its more aggressive proposal, it was possible that unacceptably long queues would remain.

83.    The LME's new load-out requirement was still far less than the warehouses could load out if they were operating efficiently.

---

[36]    *Id.* at 1-2.

[37]    *Id.* at 5.

[38]    European Economics, *Assessments of Warehouse Minimum Loading Out Rates, Recommendations*, at 1.

[39]    Again, this requirement applies to the company as a whole in a particular location and not to each warehouse the company operates in that location.

84.    Again, the purported minimum load-out rate (to the extent that was even complied with at all) acted as a *de facto* uniform or maximum load-out rate, as illustrated in the chart above.  In addition, this rule change did little to solve the problem of persistent and lengthy queues:



85.    The LME load-out rules (both those in effect prior to April 2012 and those in effect after) were, and are, an agreement among and between those nominally-competing warehouse operators who are members of the LME, including the Warehouse Defendants, and the other Defendants in this matter, who, as noted before, until quite recently exercised actual ownership and effective control over the LME as concerns the matters at issue here; all such LME members are bound by the LME rules; and all of the LME-member Defendants here used their influence as members of the LME to shape those rules to their benefit and to the detriment of Plaintiff.

86.    As applied from September 2010 to the present, the LME load-out rules have had an anticompetitive effect and have unreasonably restrained trade or commerce in aluminum and function as a restriction on output.

87.    It is not surprising that the LME load-out rules became an output restriction agreement or that the LME failed to take any effective action to solve a problem that even its own consultants admitted was causing a substantial market distortion.  The LME was until recently wholly owned and controlled by its members (including Goldman Sachs, JPMorgan, and Glencore) and its warehousing rules are set by the operators of the warehouses themselves.  The LME also directly benefits from the scheme alleged herein because the Warehouse Defendants are required to pay 1% of their rental revenues to the LME.[40]

## K.    The Warehousing Defendants Evade the Ineffective Load-Out Rules by Shifting Inventory Between Warehouses

88.    Although the inadequate load-out rules (both before and after April 2012) would by themselves be sufficient to create a backlog given Defendants' hoarding of aluminum and the manipulation of the cancellation process by Defendants and their co-conspirators, the Warehouse Defendants evaded even those minimal rules by shifting inventories of aluminum from one LME-certified warehouse to another (or to non-certified warehouses) so as to appear to comply with the load-out rules while maintaining inventories.

89.    A *New York Times* article, which was based on an extensive investigation and contains quotes from individuals with direct knowledge of Metro's practices in Detroit, describes those practices:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses.  Two or three times a day, sometimes more, the drivers make the same circuits.  They load in one warehouse.  They unload in another.  And then they do it again.

---

[40]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

90.    One former Metro forklift driver, Tyler Clay, described this process as a "merry-go-round of metal."[41]

91.    The result is that, despite the LME's load-out rules, "nearly all of the metal that Metro moves is not delivered to customers . . . .  Instead, it is shuttled from one warehouse to another."[42]

92.    This "merry-go round" is not the result of ineptitude; rather, it is strategy by Defendants to create an artificial scarcity of aluminum available for physical delivery, thereby impacting the wider aluminum market, including the market for aluminum futures.  As set forth above, industry analysts and company insiders acknowledge that the vast majority of the aluminum being moved around Metro's warehouses is owned not by manufacturers or wholesalers, but by banks, hedge funds, and traders that store aluminum in the warehouses, cancel their warrants, and then re-warrant the aluminum for the purpose of manipulation.[43]  Furthermore, according to *The New York Times*' sources, "the longer waiting times are part of the company's strategy and help Goldman increase its profits from the warehouses."[44]

93.    In addition to shifting aluminum between LME-certified warehouses, Defendants have also moved aluminum to non-LME warehouses which they own or control.  According to the *Wall Street Journal*, as of October 2013 some 7 to 10 million tonnes of aluminum are being

---

[41]    *Id.*

[42]    *Id.*

[43]    *Id.*

[44]    *Id.*

housed in facilities known within the industry as "shadow warehouses."[45] The movement of aluminum from LME warehouses into shadow warehouses satisfies the LME's load-out requirements without ever releasing any aluminum into the market. This further restricts supply and drives up price.

**L.    Purchasers of Aluminum Have Complained About Defendants' Practices and Government Inquiries Are Ongoing**

94.    As a result of the conduct set forth above, large purchasers of aluminum have made formal complaints to the LME and other authorities.

95.    For example, Coca Cola filed a complaint with the LME in June 2011, accusing Goldman Sachs of creating supply bottlenecks at the Detroit warehouses to artificially raise the price of aluminum. In that complaint, Coca Cola stated that it takes more than seven months to access aluminum from the Detroit warehouses.[46]

96.    More recently, the Beer Institute, a trade group representing beer brewers, filed another complaint with the LME. According to a statement released by the Beer Institute in conjunction with the complaint, Defendants' rules and practices "are interfering with normal supply and demand dynamics" and have "led to a complete disconnect between LME aluminum prices and actual aluminum prices and prevent brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[47]

---

[45]    Tatyana Shumsky, *Millions of Tons of Metals Stashed in Share Warehouses*, THE WALL STREET JOURNAL (December 23, 2013). Available http://online.wsj.com/ news / articles / SB10001424052702304244904579276830893405644.

[46]    Dustin Walsh, *Aluminum Bottleneck: Coke's complaint: 12% of global stockpile held here, boosting prices*, CRAIN'S DETROIT BUSINESS (June 26, 2011).

[47]    Joe Richter and Agnieszka Troskiewicz, *Beer Companies Press LME to Cut Aluminum Warehouse Backlogs*, BLOOMBERG (June 23, 2013).

97.     The now-owner of the LME, HKEx Group, had such concerns about the warehouse backlogs that it at one time threatened to scuttle its proposed purchase because of this issue.  Prior to the acquisition being consummated, HKEx's CEO, Charles Li, stated that the problem caused him "sleepless nights."[48]

98.     Defendants' conduct has also sparked government investigations.  In May 2011, the Science and Technology Committee of the House of Commons of the Parliament of the United Kingdom reported a concern that "the ownership of metals storage warehouses by a dominant dealer on the London Metals Exchange" (apparently referring to JPMorgan) may be anticompetitive and referred this concern to the Office of Fair Trading.[49]

99.     *The Wall Street Journal* recently reported that the CFTC and the DOJ have begun investigations of price manipulation and collusion involving the metals warehousing industry and that the CFTC has sent evidence preservation notices to some warehouse owners.[50]

100.    On November 15, 2013, *Law360* reported that U.S. Assistant Attorney General William Baer confirmed to a subcommittee of the House Judiciary Committee the existence of an investigation into anti-competitive aluminum warehousing agreements among banks like Goldman and JPMorgan.[51]

---

[48]     *LME Week: Charles Li signals ownership of LME, its problems and its future*, METAL BULLETIN (Oct. 18, 2012).

[49]     www.parliament.uk, Science and Technology Committee, "Fifth Report: Strategically important metals," ¶¶79-81 (May 2011).

[50]     Jamila Trindla and Tatyana Shumsky, *U.S. Probes Metals Warehouse Firms*, THE WALL STREET JOURNAL (July 25, 2013).

[51]     Alex Lawson, *DOJ Probing Goldman, JPMorgan Aluminum Storage Deals*, LAW360 (Nov. 15, 2013).

**M.    Defendants Change Their Practices or Plan to Exit the Market Immediately After Facing Scrutiny of These Practices**

101.    In the face of the media and regulatory scrutiny set forth above, and perhaps even more significantly, the purchase of the LME by a reputable exchange operator that is not beholden to LME members, many of the Defendants have agreed to change their practices or, in the case of JPMorgan, planned to exit the warehousing business altogether.

102.    In late July, 2013, it was widely reported that JPMorgan was planning on exiting the physical commodities business, including metals warehouses, based in part on increased regulatory scrutiny.[52]

103.    On July 31, 2013, Goldman Sachs issued a statement in response to *The New York Times* article cited in this Complaint and announced several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues. Of course, these steps could have and should have been taken several months ago, when complaints about excessive queues first surfaced.  It is significant that Goldman Sachs only announced these steps after its practices were widely exposed by *The New York Times*.

104.    Most importantly, only a few months after it came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing excessive queues to load out more aluminum than they load in.[53]  Again, there is no legitimate

---

[52]    *See, e.g., JPMorgan Mulls Physical Commodities Exit Amid U.S. Review*, REUTERS (July 26, 2013).

[53]    *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, BLOOMBERG (July 1, 2013).

reason why this obvious action could not have been taken when the complaints about the excessive queues first surfaced.

**N.    Defendants' Conduct Defies Explanation in the Absence of Collusion**

105.    In a competitive market for aluminum warehousing services, it would not be possible for warehouse operators routinely to operate their warehouses in such a manner that customers would be forced to wait several months for delivery of the stored materials.  In a competitive market, warehouse operators that could operate efficiently would instead attract business from (intentionally) inefficient warehouse operators like the Warehouse Defendants.

106.    For example, while Metro owns the vast majority of the warehouse space for aluminum in Detroit and Pacorini owns the vast majority of the warehouse space for aluminum in Vlissingen, neither could separately engage in the practices set forth above absent a conspiracy.  Despite the historical importance of these warehouses, if Metro or Pacorini were acting alone, rival warehouse owners in other parts of the United States and the rest of the world (absent a conspiracy) would take business away from their warehouses.  Other aluminum warehouses are located by design at major transportation hubs.  Although shipping from overseas warehouses would entail additional costs, such costs are negligible compared to the cost of aluminum and the ever-increasing Midwest premium.

**O.    The Link Between Hoarding of Aluminum and Increased Midwest Premiums**

107.    The Warehouse Defendants' hoarding of aluminum, as facilitated by the LME, has caused a substantial increase in the Midwest Premium through a number of inter-related mechanisms.

108.    First, the Warehouse Defendants used incentives, as described above, to induce producers and owners of aluminum to place the aluminum into storage rather than releasing it into the market.  This artificially decreased the amount of aluminum available for delivery and

correspondingly artificially increased the premium for such delivery (*i.e.*, the Midwest Premium).

109.    Second and relatedly, the LME warehouses historically served as the supplier of last resort for consumers of aluminum.  By effectively ending that role, Defendants reduced consumers' options for purchasing aluminum, which further restricted the supply of aluminum for physical delivery.

110.    Third, the Warehouse Defendants' hoarding of aluminum and resulting queues for delivery of aluminum increased the rents that accumulated while the aluminum was in the queue. These increased rents were reflected in the Midwest Premium; driving it up even higher.

### INJURY TO PLAINTIFF

111.    As previously alleged, Defendants' collusion and manipulation affected the pricing of millions of dollars' worth of aluminum in the United States.

112.    Agfa develops, produces, and distributes equipment and supplies for the newspaper, commercial printing, and graphics communications industries.  In conjunction with this, Agfa's business involves, *inter alia*, the use of large quantities of aluminum to produce lithographic printing plates.

113.    Plaintiff has suffered antitrust injury from Defendants' conduct alleged above in the form of inflated Midwest Premiums.  The Midwest Premium is an element of the price paid by Plaintiff for the purchase of aluminum for delivery.  While the "base" price (LME Cash Price or its equivalent) of aluminum has decreased during some of the relevant times, absent Defendants' conduct, the Midwest Premium would have remained stable or, more likely, decreased in conjunction with the base price, thus resulting in lower net prices for Plaintiff.

114.    Plaintiff's injuries arise from the competition-reducing aspect of Defendants' conduct.  In the absence of such conduct, the LME warehouses would compete with one another with respect to offering efficient storage services and would not effectively hoard large quantities of aluminum, thus withholding it from the market.  This in turn would avoid the artificial shortage of aluminum available for immediate delivery and the corresponding artificial increase in the Midwest Premium.  In other words, Defendants' conduct impaired competition among suppliers of warehouse services and this in turn had a predictable and foreseeable effect on the market for aluminum for physical delivery because of the link between the LME warehouses and the larger aluminum market explained above.  Defendants' scheme worked only because the Warehouse Defendants were acting jointly and under the cover of the LME.

115.    At all times material to this complaint, Agfa has purchased aluminum directly from integrated producers Alcoa, Novelis, and Hydro and/or from their respective affiliates. Agfa's procurement, for deliveries both in the United States and abroad, is pursuant to global master supply agreements with those producers.

116.    During the times material to this Complaint, Agfa's domestic aluminum purchases have incorporated pricing based on the LME Official Price or its equivalent and the Midwest Premium.

117.    Accordingly, when the Midwest Premium has been artificially inflated due to Defendants' conduct as described above, Plaintiff has paid increased prices for aluminum, and has thereby been injured in its business or property.

118.    Agfa is an efficient enforcer of the antitrust laws in that by paying artificially inflated aluminum prices directly to integrated producers of aluminum, Agfa has suffered the most direct injury.  As the first-level purchaser of aluminum for its own industrial uses, Agfa is

directly injured by inflated aluminum prices and so is among the class of persons whose self-interest would motivate it to vindicate the public interest in antitrust enforcement. Moreover, Agfa's injury is concrete and not speculative, being tied as it is to artificially inflated pricing component benchmarks such as the Midwest Premium. Finally, as the direct purchaser, from integrated suppliers, of aluminum for its own use, there is no difficulty identifying or apportioning Agfa's damages in this action.

119.    As more fully described above, Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce, at least insofar as it has created an artificial shortage of aluminum supply and has artificially inflated the Midwest Premium.

120.    As described above, Agfa has, at times material to this Complaint, also purchased significant quantities of aluminum abroad pursuant to the same global supply agreements that govern its domestic procurement. These non-domestic purchases also incorporate, at least at times, the LME Official price and the Midwest Premium as pricing components.

121.    Accordingly, the domestic effects of Defendants' conduct as described above, *i.e.*, the artificial inflation of the Midwest Premium, also give rise to and have proximately caused injury to Agfa in relation to certain non-domestic purchases of aluminum as that benchmark is incorporated into purchases made abroad.

122.    Accordingly, when the Midwest Premium has been artificially inflated due to Defendants' conduct as described above, Plaintiff has paid increased prices for aluminum in connection with certain non-domestic purchases, and has thereby been injured in its business or property.

## FIRST CLAIM FOR RELIEF
### (Against All Defendants)
### Violations of Section 1 of the Sherman Act, 15 U.S.C. §1

123.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

124.    Beginning at a time unknown to Plaintiff, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

125.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive Midwestern Premiums.  Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

126.    Defendants' conspiracy, and the resulting impact on the market for aluminum, occurred in and affected interstate commerce.  Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

127.    The contract, combination or conspiracy has had the following effects, among others:

    a.    Prices given to Plaintiff for purchases of aluminum, particularly the Midwestern Premium price term were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

b.      Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

128.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury to its business or property.

129.    Plaintiff is entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act alleged herein.

### SECOND CLAIM FOR RELIEF
#### (Against All Defendants)
#### Violations of New York Donnelly Act, General Business Law §340, *et seq.*

130.    To the extent not inconsistent with this Second Claim for Relief, Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

131.    Beginning at a time unknown to Plaintiff, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, agreement, arrangement or combination whereby competition or the free exercise of activity in the conduct of business, trade, or commerce in the state of New York is or has been restrained, in violation of the Donnelly Act, N.Y. G.B.L. §340, *et seq*.

132.    The contract, agreement, arrangement or combination consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive Midwestern Premiums.

133.    Defendants' contract, agreement, arrangement or combination, and the resulting impact on the market for aluminum, occurred in and affected commerce in the state of New York.   Defendants' unlawful conduct was through mutual understandings, combinations or

agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

134.    The contract, agreement, arrangement or combination has had the following effects, among others:

a.    Prices given to Plaintiff for purchases of aluminum, particularly Midwestern Premium price term were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

b.    Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

135.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury to its business or property.

136.    Plaintiff is entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of law alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

B.    That the Court award Plaintiff damages in an amount according to proof against Defendants for Defendants' violation of the federal antitrust laws, to be trebled in accordance with those laws;

C.     That the Court award Plaintiff damages in an amount according to proof against Defendants for Defendants' violation of N.Y. G.B.L. §340 *et seq.*, to be trebled in accordance with those laws;

D.     That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

E.     That the Court award such other equitable and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury of all issues so triable.

DATED: March 12, 2014                SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

CHRISTOPHER M. BURKE (*pro hac vice*)
WALTER W. NOSS (*pro hac vice*)
KRISTEN M. ANDERSON (*pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619-233-4565
619-233-0508 (fax)

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT (DB 8053)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444
212-223-6334 (fax)

SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC
Derek Y. Brandt
John R. Phillips
One Court Street
Alton, IL  62002
(618) 259-2222

45

NICOLL DAVIS & SPINELLA LLP
Christopher M. Santomassimo
95 Route 17 South, Suite 316
Paramus, NJ 07652
Telephone: 201-712-1616

TODD M. SCHNEIDER
JASON H. KIM
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: 415-421-7100
415-421-7105 (fax)

GARRETT W. WOTKYNS
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone: 480-428-0144
480-505-8036 (fax)

DANIEL J. MOGIN
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92124
Telephone: 619-687-6611
619-687-6610 (fax)

JOSEPH C. PEIFFER
PEIFFER ROSCA ABDULLAH & CARR, L.L.P.
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Telephone: 505-586-5259
505-586-5250 (fax)

*Counsel for Plaintiffs Agfa Corporation and Agfa Graphics, N.V.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2014, the foregoing Amended Complaint was manually filed with the Clerk of the Court. The Clerk of the Court will post the Amended Complaint on the Court's CM/ECF system, which will send notification of such filing to all parties. Additionally, a copy of this Amended Complaint was served by email by Scott+Scott on lead counsel for all parties.

Walter W. Noss (*pro hac vice*)