# ROBBINS GELLER
# RUDMAN & DOWD LLP

| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

April 17, 2014

<u>VIA ECF</u>

The Honorable Judge Katherine B. Forrest
United States District Court for the
   Southern District of New York
500 Pearl St., Courtroom 15A
New York, NY 10007-1312

      Re:    *In re Aluminum Warehousing Antitrust Litigation*, No. 13 MD 2481 (KBF)

Dear Judge Forrest:

      Plaintiffs[1] in the above-captioned matter respectfully submit this letter brief in response to Defendants London Metal Exchange (the "LME") and LME Holdings' ("Holdings") motion to stay discovery.  On February 24, 2014, Plaintiffs served their first request for production of documents on the LME and Holdings, in accordance with the Court's Scheduling Order of February 6, 2014.  Dkt. No. 154. The LME and Holdings have refused to respond to any of Plaintiffs' discovery requests – or even meaningfully meet and confer about them – claiming without merit that the LME is immune from this Court's jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") and that the Court lacks personal jurisdiction over Holdings. Plaintiffs request that the Court order the following:

> **The LME and Holdings' motion to stay discovery is denied.  Both Defendants shall immediately meet and confer with Plaintiffs and shall begin producing documents responsive to Plaintiffs' First Set of Requests for Production of Documents to Defendants London Metal Exchange Limited and LME Holdings Limited, dated February 24, 2014, no later than May 2, 2014.  They shall continue producing documents on a rolling basis, and shall complete production no later than June 13, 2014.**

      1.      **The LME is not an "agency or instrumentality of a foreign state" under 28 U.S.C. §1603, and is therefore not immune from suit.**  As defined by the FSIA, "[A]n 'agency or instrumentality of a foreign state' means any entity – (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section §1332 (c) and (e) of this title [28 USCS §1332 (c) and (e)] nor created under the laws of any third country."  28 U.S.C. §1603.  Here, the first part of the second prong is in dispute; whether the LME "is an organ of a foreign state or political subdivision thereof."

      In the Second Circuit, "although there is no specific test for 'organ' status under the FSIA, various factors are relevant: (1) whether the foreign state created the entity for a national purpose; (2) whether the

---

[1]   The Direct Purchaser Plaintiffs ("DPPs") (class and direct action), the Commercial End User Plaintiffs and the Consumer End User Plaintiffs join in this response.

Robbins Geller
Rudman & Dowd LLP

The Honorable Katherine B. Forrest
April 17, 2014
Page 2

foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (internal citation omitted). The LME was not created by the British government, but was formed by private traders after the completion of the Suez Canal to handle copper imports from Chile and the Malay. Today, after being acquired in 2013 from JP Morgan, Goldman Sachs and others, the LME is a subsidiary of a publicly traded Hong Kong based company, HKEx Group (JP Morgan and Goldman Sachs continue to hold B-shares in Holdings.) The British government does not require the hiring of public employees by the LME, and the British government does not pay the salary of the LME's workers. The British government has not  granted exclusive rights to the LME to operate as the metal exchange within the U.K.[2]

While the British government does regulate the LME, it does not "actively supervise" it within the meaning of *Filler* and other cases that have interpreted the FSIA. *Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274 (5th Cir. 2007), is instructive. In that case, the University of Texas ("UT") sued the Nippon Telegraph and Telephone Corporation ("NTT") alleging that it misappropriated a UT patent. The Fifth Circuit held that NTT was not entitled to sovereign immunity, in part because the Japanese government did not actively supervise NTT. *Id.* While the Japanese government required government authorization for a wide variety of NTT transactions, such supervision was akin to that of the SEC, and not the kind of government supervisory authority that is "active." *Id.* at 279-80. The same holds true here. To the extent that the British government supervises the LME, it does so passively as a regulator, at most like the SEC or CFTC does here.

Moreover, despite the LME's current assertion that the U.K. "has granted statutory immunity to the LME," it is not immune from this suit. Rather, as the LME has itself recognized in other contexts, the U.K. Financial Services and Markets Act of 2000 ("FSMA") merely protects the LME from liability when it is engaged in purely regulatory functions. In 1999, the LME advised Parliament that under the FSMA as proposed, "immunity from civil suit would be heavily circumscribed. Exchanges would still be open to legal challenge that particular actions had been taken for commercial, not regulatory purposes or were taken in bad faith."[3]

Plaintiffs challenge the LME's commercial conduct taken in bad faith in restraint of trade in the U.S. Specifically, Plaintiffs challenge the LME's commercial conduct in performing agreements with, among others, the Goldman Defendants ("Goldman") that provided the LME with approximately 1% of the rental revenues.

---

[2]   For instance, The London Bullion Market Association is an exchange trading precious metals, and the Minor Metals Trade Association trades various metals such as Cadmium and Rhenium.

[3]   *See* http://www.publications.parliament.uk/pa/jt199899/jtselect/jtfinser/328/328ap60.htm.  LME's representations are embodied in the final language of FSMA §291, recognizing only immunity for regulatory acts.

ROBBINS GELLER
Rudman & Dowd LLP

The Honorable Katherine B. Forrest
April 17, 2014
Page 3

Dkt. No. 271, DPPs' Complaint, ¶¶5, 24, 26.  The LME's revenues and profits were produced by anticompetitively inflated rental rates (approximately three times normal commercial rates) and anticompetitively extended rental times (as long as 500 days to load out aluminum that it would take a few days to load out) that the LME and Goldman agreed upon.  *Id.*, ¶¶ 53, 59, 248.  When warehouse companies on the LME Warehousing Committee offered to send logistical help to Goldman to aid the load-out of aluminum from Detroit and ameliorate the adverse publicity for the LME, the LME Chairman dismissed the proposal out of hand.  This is strong evidence that LME and the Goldman Defendants, acting in concert, had the market power to superimpose on U.S. trade increasingly higher costs for increasingly poorer service producing increasingly higher revenues for the LME.  *Id.*, ¶¶4, 5.  The LME, per its spokesman, Chris Evans, stated, in New York (the one in the United States) that, if U.S. aluminum consumers did not like paying the high premiums that were being caused by Defendants' agreement in restraints of trade, then they should stop buying that U.S. aluminum. *Id.*, ¶¶63, 78, 242.  When the LME was sold, the Goldman and JP Morgan Defendants received more than $400,000,000, despite the fact that the LME's profits have never been more than $15 million.  *Id.*, ¶¶70, 352-353.

      2.      **The conduct at issue is "commercial activity" having "an effect on the United States," and thus not within the scope of the FSIA.**  The FSIA contains an exception for "'commercial activity'" defined as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. §1603(d). The commercial conduct must have a "direct effect" on the U.S. 28 U.S.C. §1605(a).  Here, Plaintiffs allege that during the class period, "the LME and Goldman Defendants intentionally and unlawfully inflated aluminum prices so as to successfully divert into, build up, and restrain large amounts of aluminum in warehousing of exchange-traded aluminum in the U.S. including in the Midwest and greater Detroit, Michigan area." to generate higher revenue from long-term storage.[4]  Dkt. No. 271, ¶¶19, 22-24.

      3.      **Defendants' jurisdiction, standing and other arguments are baseless**.  Defendants' other challenges to Plaintiffs' complaints are similarly baseless and do not justify a stay on discovery.  First, the Court has personal jurisdiction over Holdings.  *See, e.g.*, Dkt. No. 271, DPPs' Complaint, ¶¶19, 68-70, 127, 130, 406; Dkt. No. 242, Commercial End User Plaintiffs' Complaint, ¶¶15, 28, 51-52, 86; Dkt. No. 227, Consumer End User Plaintiffs' Complaint, ¶¶34, 51-52.  At a minimum, Plaintiffs should be entitled to conduct limited jurisdictional discovery.  *See, e.g.*, *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) (once a plaintiff has "shown a reasonable basis for assuming jurisdiction," "a plaintiff may be allowed limited discovery with respect to the jurisdictional issue").

---

[4]   *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607  (1992).  There, the Supreme Court held that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."  *Id.* at 614.  In determining that Argentina's actions constituted commercial activity, the Court adopted a restrictive view of sovereign immunity, holding that sovereign immunity refers to powers that cannot also be exercised by private citizens, rather than powers peculiar to sovereigns.  *See also Saudi Arabia v. Nelson*, 507 U.S. 349, 350 (1993) (citing *Weltover*, 504 U.S. at 614).

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Katherine B. Forrest
April 17, 2014
Page 4

Their standing arguments as well, are directly refuted by Plaintiffs' allegations. *See, e.g.*, Dkt. No. 271, ¶¶1, 4, 5, 11-15, 19, 22-24, 27, 31-34, 58-59, 63, 65, 68-70, 92, 105-115 (DPPs purchased aluminum at prices inflated by Defendants' anticompetitive conduct); *id.*, ¶¶309-319 (injury to DPPs and class members). Defendants' assertion that DPPs have failed to allege elements of their claims is equally groundless. *See, e.g.*, *id.*, ¶¶278-308 (monopoly power and relevant markets); *id.*, ¶¶342-413 (federal claims); Dkt. No. 242, Commercial End User Plaintiffs' Complaint, ¶¶183-198 (monopoly power and relevant markets); *id.*, ¶¶216-235 (federal claims); Dkt. No. 227, Consumer End User Plaintiffs' Complaint, ¶¶157-169 (monopoly power and relevant markets), *id.*, ¶¶195-216 (federal claims).

Finally, for reasons outlined in Plaintiffs' oppositions to Defendants' letters requesting a stay, that extraordinary remedy is not justified here. *See, e.g.*, Dkt. Nos. 285, 288, 297, 298, 299. Plaintiffs will be prejudiced if the stay is granted and the motions to dismiss ultimately denied, because Plaintiffs will not be able to complete discovery in sufficient time to comply with the deadlines for filing their class certification motion and completing discovery.

Respectfully submitted,

| | | | |
|---|---|---|---|
| /s/ *Bonny E. Sweeney* | /s/ *Walter W. Noss* | /s/ *Joseph H. Meltzer* | /s/ *Douglas G. Thompson* |
| **Robbins Geller Rudman** | **Scott + Scott LLP** | **Kessler Topaz Meltzer** | **Finkelstein Thompson LLP** |
| **  & Dowd LLP** | | **  & Check, LLP** | |

/s/ *Christopher Lovell*
**Christopher Lovell**
**  Lovell Stewart Halebian**
**Jacobson LLP**

/s/ *Linda P. Nussbaum*
**Linda P. Nussbaum**
**  Grant & Eisenhofer P.A**

| | | | |
|---|---|---|---|
| Interim Co-Lead Counsel for Direct Purchaser Plaintiffs | Counsel for Direct Action Plaintiffs Mag Instrument, Inc. and Agfa Corp. | Interim Co-Lead Counsel for Commercial End User Plaintiffs | Interim Co-Lead Counsel for Consumer End User Plaintiffs |

cc:     All Counsel of Record (via ECF)