**Margaret M. Zwisler**
Direct Dial: 202-637-1092
margaret.zwisler@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

April 18, 2014

**VIA ECF**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re:   *In re Aluminum Warehousing Antitrust Litig.*, No. 1:13-md-02481-KBF

Dear Judge Forrest:

I write in response to the Court's Order of April 16, 2014 asking defendants The London Metal Exchange ("the LME") and LME Holdings ("Holdings") to respond to two questions. First, I confirm that Holdings does not intend to assert that this Court lacks subject matter jurisdiction over it under the Foreign Sovereign Immunities Act (the "Immunities Act"), 28 U.S.C. § 1602 *et seq*.  But Holdings will be moving to dismiss on the ground that the Court lacks personal jurisdiction over it.  Holdings has no employees anywhere, let alone in the United States, and does not transact any business here.

Second, the Court asked the LME to "provide a summary of their arguments as to 28 U.S.C. § 1605(a)(2) as it relates to the LME's FSIA defense."  This portion of the Immunities Act is known as the "commercial activities" exception, and it is plaintiffs' burden to prove that this exception applies.  An entity claiming sovereign immunity must make a *prima facie* case that it meets the Act's definition of a "foreign state," which includes "an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Upon such a *prima facie* showing, the entity is "presumptively immune from the jurisdiction of United States courts," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993), and "the plaintiff has the burden of going forward with evidence showing that under the FSIA's exceptions the defendant lacks immunity."  *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 242 (2d Cir. 2002); *accord Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001).

Plaintiffs' response to the LME's motion to stay makes two things clear:  (1) the LME's proof as summarized in its April 14 letter states a *prima facie* case for immunity and (2) plaintiffs cannot satisfy their burden to prove the commercial activity exception.  Thus a stay of discovery is warranted.  Because the LME's arguments on the inapplicability of the commercial activity exception are related to its presentation of a *prima facie* case of organ status, the LME

addresses both points here.  We note that plaintiffs are inappropriately seeking relief in their opposition to the LME's motion to stay when they never moved to compel against LME.

None of the arguments that plaintiffs raise in their letter comes close to defeating the LME's *prima facie* case for "organ" status.  First, the fact that the LME is a private entity and that its direct parent, Holdings, and indirect parent, Hong Kong Exchanges and Clearing Limited, are also private entities is irrelevant to the issue of whether the LME is an organ.  An entity is entitled to immunity where it is *either* an "organ of a foreign state" *or* "a majority of [its] shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(2).  The LME is immune because it is an "organ of a foreign state" so it does not have to prove that the UK government owns it.  Second, plaintiffs' claim (unsupported by any evidence, as case law in this Circuit requires) that the FCA does not actively supervise the LME is just wrong, as the evidence that the LME will submit with its motion, and an analysis of the governing statute in the UK, will show.  It is not remotely like the hands-off, passive approach of the Japanese government in *Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274 (5th Cir. 2007).  Indeed, the FCA has two case officers whose *full-time* job is to actively supervise the LME.

Finally, plaintiffs' argument that the statutory immunity accorded to the LME in the UK does not support organ status because it would not apply to the conduct that they allege is wrong both legally and factually.  The fact that the UK government accords statutory immunity to the LME for *any* conduct is persuasive evidence that it is an organ of that government for sovereign immunity purposes.  *See, e.g., Alperin v. Vatican Bank*, 360 F. App'x 847, 849-50 (9th Cir. 2009) (Vatican Bank's immunity under Italian law proves organ status).  This Court need not decide whether the LME would have statutory immunity in the UK for the conduct at issue in this case, in order to conclude that the existence of that immunity supports the LME's instrumentality status under the Immunities Act.

In any event, the LME *is* immune from liability in the UK for the very conduct that plaintiffs challenge here.  Plaintiffs argue without any legal support that the LME would not have statutory immunity in the UK because the conduct that they allege is "commercial" and not part of the LME's "regulatory functions," and because the LME supposedly engaged in that conduct in "bad faith."  But the conduct that they allege does not qualify as "bad faith" within the meaning of UK law.  *Melton Medes Ltd. v. Sec. and Inv. Bd.* [1995] Ch 137.  And two English courts have expressly held that the LME's regulation of its warehouses, including the very load-out rule that plaintiffs say is the basis for the conspiracy in this case, *is* part of its regulatory functions and is *not* commercial.

In *R v. The London Metal Exch. Ltd. ex parte Albatros Warehousing Ltd. BV* (unpublished March 30, 2000), an LME-approved warehouse sought "judicial review" of a decision by the LME's Appeal Committee that imposed a £200,000 fine against the warehouse for breach of the LME's rules regarding warrants.  *Id.* ¶¶ 7-16.  In the United Kingdom, "judicial review" is a particular type of court proceeding that can be brought only against a "public body" to challenge the process that led to a decision, and not its substance.[1]  In *Albatros*, the LME

---

[1] *See* http://www.judiciary.gov.uk/you-and-the-judiciary/judicial-review.

argued that it was not subject to judicial review because it is a private entity and its discipline of its warehouses was a private activity, but Mr. Justice Richards (now Lord Justice Richards of the Court of Appeal) sitting in the High Court of Justice, Queen's Bench Division, rejected that argument. The court noted that the "essential question" was whether the LME was performing a "public function" when it disciplined the warehouse. *Albatros Warehousing* at ¶ 23. The court observed that where an entity has been "woven into the fabric of government regulation" or where there has been a "privatisation of government itself," that entity's decisions will be subject to judicial review. *Id*. at ¶¶ 24-25. The court held that when the LME is "engaged in the process of regulation," the LME is "performing a function that can properly be said to be woven into a system of governmental control of investment business." *Id*. at ¶ 27. Because the regulation of warehouses was "necessary for the provision of the requisite safeguards to investors and the promotion and maintenance of the standards laid down in Schedule 4" of the Financial Services Act of 1986 (the precursor to the current regulatory scheme), the court concluded that the LME was performing a public function in disciplining the warehouse, and that its decision was subject to judicial review and not to regular civil procedures that would govern a commercial dispute. *Id*. at ¶¶ 28-29.

The *Albatros* conclusion that the LME performs a regulatory function when it manages its warehouses was recently confirmed by another High Court Judge sitting in the same court. *See R v. The London Metal Exch. ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin). There, Rusal, a leading producer of aluminum, sought judicial review of the LME's adoption of a change in its warehousing rules designed to eliminate the queues at its warehouses that are the subject of the complaints in this case. The court evaluated the fairness of the LME's rule-making process under standards set out in cases judging the actions of indisputably public agencies such as a borough council, the City of Westminster, and the UK Secretary of State for Transport. *Id.* at ¶¶ 66-69 (citing, *inter alia*, *Nichol v. Gateshead Metro. Borough Council* (1988) 87 LGR 435 CA; *R (Medway Council) Secretary of State for Transport* [2002] EWHC2516 (Admin); *R (Montpeliers & Trevors Ass'n) v. City of Westminster* [2005] EWHC 16 (Admin)). Thus, in the United Kingdom, the LME's consultation on, and adoption and implementation of, its warehousing rules, including the exact load-out rule that underlies plaintiffs' claims here, is part of its public regulatory function and subject to judicial review in the Administrative Court in the same way as are the actions or decisions of other governmental bodies. It necessarily follows that the LME's performance of this public function was not a commercial activity and that therefore the LME is entitled to statutory immunity for it in the UK.

Because the LME's regulation of its warehouses is part of its public function, plaintiffs will never be able to meet their burden to prove that the commercial activity exception applies. "Commercial activity" is "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). As the Second Circuit explained, "'[t]he FSIA asks not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 91-92 (2d Cir. 2008) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992)), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

LATHAM&WATKINS LLP

Plaintiffs say that they will attempt to prove the commercial activity exception by showing that "the LME and Goldman Defendants intentionally and unlawfully inflated aluminum prices so as to successfully divert into, build up, and restrain large amounts of aluminum in warehousing of exchange-traded aluminum in the U.S. including in the Midwest and greater Detroit, Michigan area to generate higher revenue from long-term storage." Apr. 17 Ltr at 3 (internal quotations omitted). But the defendant's alleged motive for engaging in the conduct is irrelevant to whether it is "commercial activity" within the meaning of the FSIA. *In re Terrorist Attacks on September 11, 2001*, 538 F.3d at 92. "'[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.'" *Id.* (quoting *Weltover*, 504 U.S. at 614). Conversely, when the foreign government *is* acting as a market regulator, its acts are not commercial and are immune. In the UK, the LME is inarguably regulating the market when it regulates its warehouses and therefore it is not engaged in commercial activity when it does so.

We are confident that next week, when the Court reads the LME's motion to dismiss and the cases cited therein, including *Mireskandari v. Mayne*, No. Civ. 12-3861, 2013 WL 2041013 (N.D. Cal. May 14, 2013), the Court will conclude that the LME is entitled to sovereign immunity. In *Mayne*, the court held that a similarly organized private UK entity, the Law Society of England and Wales, is an organ of the UK. That case is directly on point—except that, unlike the LME, the Law Society does *not* enjoy statutory immunity under UK law, and thus the LME has an even stronger case that it is immune from this Court's jurisdiction.

Respectfully submitted,

*/s/ Margaret M. Zwisler*
Margaret M. Zwisler

cc:     All Counsel of Record (via ECF)