UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | MDL No. 2481<br><br>Master Docket No.<br>13-md-2481-KBF-RLE |
| This Document Pertains To:<br><br>ALL CASES | |

**DEFENDANTS HENRY BATH LLC AND JPMORGAN CHASE & CO.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS THE AMENDED COMPLAINTS**

COVINGTON & BURLING LLP
Robert D. Wick (*rwick@cov.com*)
Neil K. Roman (*nroman@cov.com*)
Henry Liu (*hliu@cov.com*)
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000

*Attorneys for Defendants Henry Bath LLC
and JPMorgan Chase & Co.*

Dated: April 22, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    A.    Henry Bath and JPMorgan. ................................................................................. 3

    B.    The Aluminum Queues in Detroit. ....................................................................... 3

    C.    The Allegations Against Henry Bath and JPMorgan. ........................................... 5

ARGUMENT .............................................................................................................................. 7

I.    PLAINTIFFS HAVE NOT STATED A SHERMAN ACT CLAIM AGAINST
    HENRY BATH OR JPMORGAN. ................................................................................ 7

    A.    Plaintiffs Fail to Allege a Plausible Antitrust Claim Against Henry Bath. ........... 8

    B.    Plaintiffs Fail to Allege a Plausible Antitrust Claim Against JPMorgan. ............. 13

    C.    Plaintiffs Fail to Allege a Plausible Section Two Monopolization Claim
    Against Henry Bath or JPMorgan. ........................................................................ 17

II.   PLAINTIFFS HAVE NOT STATED A STATE LAW CLAIM AGAINST
    HENRY BATH OR JPMORGAN. ................................................................................ 18

CONCLUSION ........................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

CASES

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..............................................................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................ *passim*

*Boyd v. AWB Ltd.*,
544 F. Supp. 2d 236 (S.D.N.Y. 2008)...................................................................14

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993)...................................................................................13

*Carter v. Variflex, Inc.*,
101 F. Supp. 2d 1261 (C.D. Cal. 2000) ...........................................................18, 19

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
No. 11 Md. 2213(RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) .................14

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)..............................................................17, 19

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007).........................................................................7, 8, 11, 14

*In re Florida Cement & Concrete Antitrust Litig.*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) ..................................................................17

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007)..................................................................17

*Hinds Cnty. v. Wachovia Bank*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009).............................................................7, 8, 17

*IHS Dialysis Inc. v. DaVita, Inc.*,
No. 12 Civ. 2468(ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013)....................8

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
713 F. Supp. 2d 286 (S.D.N.Y. 2010)....................................................................14

*Kramer v. Pollock-Krasner Found.*,
890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................................10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
935 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................................15

*Mayor & City of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)..................................................................8, 9, 14

*MetLife Securities, Inc. v. Bedford*,
456 F. Supp. 2d 468 (S.D.N.Y. 2006)...................................................17

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
541 F. Supp. 2d 487 (D. Conn. 2008)....................................................7

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002) ..................................................18

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003)...................................................10

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
738 F. Supp. 2d 505 (D. Del. 2010).....................................................17

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003) ..................................................18

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ..............................................................11

*In re Trilegiant Corp.*,
No. 3:12-CV-00396 (VLB), 2014 WL 1315244 (D. Conn. Mar. 28, 2014)............................19

*TV Commc'ns Network, Inc. v. Turner Network Television*,
964 F.2d 1022 (10th Cir. 1992) ..........................................................18

OTHER AUTHORITIES

European Commission, *State Aid No. N 422/2009 & N 621/2009* (Dec. 14, 2009),
*available at* http://ec.europa.eu/eu_law/state_aids/comp-2009/n422-09.pdf. ....................16

Financial Times, *Wall Street Falls Out of Love with Commodities Trading*, (Aug. 4,
2013), *available at* http://www.ft.com/ intl/cms/s/0/4d1f8f7a-faf0-11e2-87b9-
00144feabdc0.html#axzz2zGt9iudB...................................................16

Defendants Henry Bath LLC ("Henry Bath") and JPMorgan Chase & Co. ("JPMorgan") submit this memorandum of law in support of their motion to dismiss all five operative complaints against them.[1] All five complaints should be dismissed for the reasons set forth in the joint motions to be filed on behalf of all defendants and in the separate motions that will be filed by the Goldman Sachs and other defendants. This memorandum sets forth additional, independent reasons for dismissing the claims against Henry Bath and JPMorgan.

## PRELIMINARY STATEMENT

Henry Bath and JPMorgan occupy a fundamentally different position than other defendants in these cases: they have no connection to the warehouse queues at the heart of the complaints. Henry Bath is a warehouse business licensed by the London Metal Exchange ("LME") to store aluminum that trades on the Exchange. JPMorgan is Henry Bath's ultimate corporate parent. In contrast to Plaintiffs' allegations against other defendants, Plaintiffs never allege that long waiting periods or "queues" for obtaining aluminum exist at warehouses operated by Henry Bath. Nor do Plaintiffs offer any well-pleaded allegations connecting Henry Bath or JPMorgan to queues at warehouses operated by other defendants.

The complaints in these cases all revolve around queues for delivery of aluminum from a single LME warehouse company – the Metro warehouse in Detroit. According to the complaints, in early 2010, Metro began using aggressive tactics to attract and retain aluminum at its Detroit warehouse facilities, ultimately acquiring over 70% of the LME aluminum in the

---

[1] The five operative complaints are (1) the First Level Purchasers' (*i.e.*, the so-called "Direct Purchasers") Second Corrected Amended Complaint ("FLP" complaint), ECF No. 271, (2) the Commercial End Users' Corrected Amended Complaint ("Commercial" complaint), ECF No. 242, (3) the Consumer End Users' Amended Complaint ("Consumer" complaint), ECF No. 227, (4) Mag Instrument, Inc.'s Amended Complaint ("Mag" complaint), ECF No. 226, and (5) Agfa Corporation's Amended Complaint ("Agfa" complaint), ECF No. 272.

United States.  After amassing these large stocks of aluminum, Metro allegedly forced customers who wished to retrieve their aluminum to wait in delivery queues of up to sixteen months.  All of the harm allegedly suffered by Plaintiffs arises in one way or another from these queues.

Although Plaintiffs assert that the queues are the product of a multi-defendant "conspiracy," their factual allegations are far more consistent with unilateral conduct by Metro.  Metro, for example, is the only defendant accused of having aluminum queues in the United States.  Metro is also accused of accumulating so much aluminum in Detroit that it allegedly acquired a "monopoly" on LME aluminum – an allegation strongly suggestive of unilateral conduct.  Plaintiffs nevertheless assert that numerous named and unnamed defendants conspired with Metro to "hoard" and "trap" aluminum at its warehouses.

Even assuming that these conspiracy allegations are sufficient against other defendants, they clearly fall short against Henry Bath and JPMorgan.  Plaintiffs do not accuse Henry Bath or JPMorgan of engaging in the core conduct that allegedly defined the conspiracy:  hoarding aluminum in LME warehouses.  To the contrary, Detroit is the only city in the United States at which warehouses allegedly hoarded aluminum, and Plaintiffs acknowledge that Henry Bath has never had warehouses in Detroit.  Furthermore, it makes no economic sense that Henry Bath or JPMorgan would have conspired to help Metro achieve a "monopoly" in the LME warehouse business; such a monopoly could only have been achieved at the expense of competing warehouses such as Henry Bath.

Unable to state a plausible conspiracy claim against Henry Bath, Plaintiffs are reduced to speculating that futures traders affiliated with JPMorgan might have somehow participated in a conspiracy.  These allegations are patently defective.  Plaintiffs fail to identify a single instance in which JPMorgan traders allegedly hoarded aluminum or conspired with another defendant.  In

addition, none of the vague allegations about JPMorgan's trading activity suggests that the alleged conduct was anything other than unilateral action undertaken in JPMorgan's own independent interest.

Once Plaintiffs' conclusory allegations of "conspiracy" are stripped away, the remaining allegations fail to state a plausible claim that either Henry Bath or JPMorgan participated in the alleged conspiracy. To the contrary, the specific *facts* alleged in the complaints all support the opposite conclusion. All claims against Henry Bath and JPMorgan should therefore be dismissed.

## BACKGROUND

### A. Henry Bath and JPMorgan.

Henry Bath is a warehouse business that operates LME warehouses in Baltimore, Chicago, and New Orleans. (FLP ¶¶ 70, 140; Commercial ¶¶ 33-34; Mag ¶ 20; Agfa ¶ 21.)[2] It has never owned or operated warehouses in Detroit. (*Id.*) Pursuant to LME requirements, Henry Bath does not own or trade aluminum; rather, its business is limited to providing warehouse services to third parties. *See* LME Warehouse Terms & Conditions § 1.5.2 (cited in FLP ¶ 158).

Henry Bath was a small component of a large commodities business acquired by a JPMorgan subsidiary in 2010. (FLP ¶ 379; Commercial ¶ 59.) Plaintiffs do not allege that JPMorgan participates in LME warehousing other than through its ownership of Henry Bath.

### B. The Aluminum Queues in Detroit.

Although the complaints contain conclusory allegations of a multi-defendant "conspiracy" to restrain aluminum at LME warehouses, the specific facts alleged in the

---

[2] Henry Bath's corporate parent, Henry Bath & Son Limited, operates LME warehouses in the United Kingdom, Spain, and Dubai, none of which is alleged to have queues. Henry Bath & Son Limited has not been served and is not subject to personal jurisdiction in this Court.

complaints all revolve around a single warehouse company in a single city: the Metro warehouse in Detroit.

According to the complaints, there were no unreasonable delays associated with obtaining aluminum from LME warehouses before February 2010, when Metro was acquired by Goldman Sachs. (FLP ¶¶ 172(b), 384-385; Commercial ¶¶ 103-104; Agfa ¶ 62; Mag ¶ 61.) Following the February 2010 acquisition, however, Metro allegedly used a three-part strategy to "hoard" and "trap" aluminum at its warehouses in Detroit: (1) it loaded aluminum out of its warehouses unreasonably slowly, (2) it paid rich cash incentives to customers who brought it more aluminum, and (3) it shuttled aluminum back and forth between its own warehouses in an effort to lengthen its delivery queues.[3] The result was queues of up to sixteen months for delivery of aluminum from Metro in Detroit. (FLP ¶ 57(d); Commercial ¶¶ 89-90; Consumer ¶ 5(e).)

Plaintiffs allege that these tactics enabled Metro to achieve a "critical mass" of aluminum and a "self-perpetuating feedback loop" that drove its stocks of aluminum higher and higher. (FLP ¶ 333; *see also id.* ¶¶ 39, 215-216, 395; Commercial ¶¶ 74-75; Consumer ¶ 101.) Specifically, Plaintiffs assert that the more aluminum Metro attracted, the longer its queues grew, which in turn enabled it to pay even larger incentives for aluminum. (*Id.*) Through this process, Metro allegedly attracted 75% of all LME aluminum in the United States, thus achieving an alleged "monopoly" on LME aluminum. (FLP ¶¶ 57(b)-(c), 287-290, 311(b), 417; Commercial ¶¶ 12, 191-192; Consumer ¶¶ 5(d), 166-167, 223.)

---

[3]     *See, e.g.*, FLP ¶¶ 36-37, 55-56, 160-168, 174, 293; Commercial ¶¶ 61, 70, 72, 81, 193; Consumer ¶¶ 5(e), 87-90, 95; Agfa ¶¶ 62, 65, 67, 89-91; Mag ¶¶ 61, 64, 66, 88-90.

Although Metro's alleged monopoly was highly profitable for Metro and its owners (FLP ¶ 23), the complaints make clear that Metro's gains came at the expense of other warehouses. In particular, as Metro's stocks in Detroit grew larger and larger, stocks of aluminum dwindled everywhere else. (*See* Commercial ¶ 97 ("aluminum inventories were moving away from warehouses in other areas of the U.S. and a critical mass of metal was forming in Detroit"); *id.* ¶ 98 ("between 2010 and 2013 the amount of aluminum stored in non-Detroit LME warehouses in the U.S. declined by approximately 70%"); Consumer ¶ 5(d) ("the amount of aluminum stored in LME non-Detroit warehouses in the United States declined by 50%"); FLP ¶ 20 ("aluminum supplies in LME Detroit Warehousing have . . . anomalously increased during 2010-2013 while the remaining U.S. LME warehouse supplies have decreased"); *see also* Mag ¶ 61; Agfa ¶ 62.)

Consistent with Plaintiffs' allegations that Metro acquired a monopoly on LME aluminum, Metro is the only U.S. warehouse, and Detroit is the only U.S. location, at which Plaintiffs allege that aluminum was restrained. (*See* Commercial ¶¶ 97-98, 105-106, 110; FLP ¶¶ 1, 18-20, 161-162; Consumer ¶¶ 5(d), 71, 223.)

## C. The Allegations Against Henry Bath and JPMorgan.

In stark contrast to their allegations against Metro, Plaintiffs never allege that Henry Bath or JPMorgan hoarded or trapped aluminum. They do not allege, for example, that Henry Bath had queues at its warehouses, that it offered large incentives to attract aluminum, or that it owned or operated warehouses in Detroit. To the contrary, Plaintiffs acknowledge that Henry Bath had warehouses only in Baltimore, Chicago, and New Orleans (*supra* at 3), and further acknowledge that no unreasonable delays existed at LME warehouses in those cities. (*See, e.g.*, Commercial ¶ 106 (alleging that delivery speeds at LME warehouses slowed substantially in Detroit in February 2010, but increased or stayed the same in Baltimore, Chicago, and New Orleans); *id.* at

¶ 110 ("The only striking differences occur in Detroit."); FLP ¶ 162 ("This pattern was not observed in other LME warehouses.").)

Consistent with these allegations, the First Level Purchasers never directly assert that Henry Bath or JPMorgan entered into a conspiratorial agreement with another defendant. Rather, for the first 350 paragraphs of their complaint, the First Level Purchasers focus exclusively on an alleged conspiracy between the LME and the Metro/Goldman defendants. (FLP ¶¶ 1-350.) When the First Level Purchasers finally get around to addressing Henry Bath and JPMorgan near the end of their complaint, they fail to accuse those defendants of entering into a collusive agreement. Specifically, consecutive paragraphs of the First Level Purchaser complaint assert (i) that Metro and Goldman "colluded with other Warehouse Defendants and the LME to restrain supplies of aluminum" and (ii) that Glencore and its Pacorini warehouse "entered a similar agreement with the LME and Goldman," *but conspicuously omit any such allegation against Henry Bath or JPMorgan*. (*Id.* ¶¶ 350-353.) Instead, the latter defendants are merely accused of "benefitt[ing] from the *other* Defendants' agreements in restraint of trade." (*Id.* ¶ 353, emphasis added.)

The remaining complaints likewise fail to tie Henry Bath or JPMorgan to a collusive agreement. Instead, they vaguely allege that an undifferentiated group of "Defendants" or "Warehouse Defendants" conspired to hoard aluminum in Detroit. (*See, e.g.*, Commercial ¶ 138; Consumer ¶¶ 3-4, 223; Agfa ¶¶ 107-110, 124-126; Mag ¶¶ 106-109, 114-116.) In the rare instances in which the complaints mention Henry Bath or JPMorgan by name, they offer no factual allegations about where, when, or how those entities supposedly joined a conspiracy. (*See, e.g.*, Commercial ¶¶ 4, 32-34, 78; Consumer ¶¶ 5(p), 5(r), 63, 79; Agfa ¶¶ 20-21, 55-56; Mag ¶¶ 19-20, 54-55.)

Unable to allege any facts connecting Henry Bath or JPMorgan to a *warehouse* conspiracy, Plaintiffs speculate that *futures traders* affiliated with JPMorgan might have participated in a conspiracy by cancelling aluminum warrants and placing the aluminum in delivery queues in Detroit. (FLP ¶ 397; Commercial ¶ 140.) They likewise speculate that JPMorgan traders might have traded on the basis of inside information obtained from Henry Bath. (FLP ¶¶ 354; Commercial ¶¶ 62-63; Consumer ¶ 81.) The complaints contain no specifics, however, that purport to link these allegations about trading activity to the hoarding of aluminum in Detroit. Nor do Plaintiffs offer any non-conclusory allegations suggesting that the alleged trading activity was anything more than unilaterally rational, unilaterally profitable conduct.

## ARGUMENT

## I. PLAINTIFFS HAVE NOT STATED A SHERMAN ACT CLAIM AGAINST HENRY BATH OR JPMORGAN.

A plaintiff who seeks to assert antitrust conspiracy claims "must make allegations that plausibly suggest that *each* Defendant participated in the alleged conspiracy." *Hinds Cnty. v. Wachovia Bank*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (emphasis added) (citations and quotations omitted). A complaint that describes a conspiracy in "general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (citation omitted). Thus, to survive a motion to dismiss, Plaintiffs must offer "specifics with respect to the acts of [each] particular defendant," *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008), including the "specific time, place, or person involved in the alleged conspiracies," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007).

As to each defendant, moreover, "averments of agreements made at some unidentified place and time . . . are insufficient to establish a plausible inference of agreement, and therefore to state a claim." *Hinds Cnty.*, 620 F. Supp. 2d at 518 (quoting *In re Elevator Antitrust Litig.*, 502 F.3d at 50). Furthermore, a "wholly conclusory statement" that defendants entered into an "agreement" is a legal conclusion, not a factual allegation. *Mayor & City of Baltimore, Md. v. Citigroup, Inc*., 709 F.3d 129, 135-36 (2d Cir. 2013). Accordingly, "a conclusory allegation of agreement at some unidentified point" does not state an antitrust claim. *Twombly*, 550 U.S. at 556-57.

For the reasons set forth below, Plaintiffs fail to meet these elementary pleading requirements with respect to Henry Bath and JPMorgan.

### A. Plaintiffs Fail to Allege a Plausible Antitrust Claim Against Henry Bath.

Although Plaintiffs assert in conclusory terms that Henry Bath conspired with other warehouses to "hoard" and "trap" aluminum at LME warehouses (*e.g*., Commercial ¶ 70; FLP ¶ 93), none of these allegations states a plausible claim against Henry Bath.

As an initial matter, the well-pleaded allegations in the complaints are more consistent with unilateral conduct by Metro than a conspiracy among warehouses. Metro, for example, is the only U.S. warehouse accused of having aluminum queues. (*Supra* at 5-6.) Similarly, Metro is the only warehouse specifically accused of shuttling aluminum among its own warehouses, paying rich incentives to attract aluminum, or achieving a "critical mass" of aluminum. (*Id*. at 4.) Finally, Metro is the only warehouse accused of achieving a "self-perpetuating feedback loop" and a "monopoly" in LME aluminum. (*Id.*)

Plaintiffs' allegations that Metro achieved a self-perpetuating feedback loop and a "monopoly" are in fundamental conflict with their allegations of a warehouse conspiracy. Why would other warehouses conspire with Metro to help it achieve a monopoly and a 75% share of

LME aluminum in the United States?  Plaintiffs' allegations thus sound more like aggressive tactics by a single defendant than a multi-defendant conspiracy.  *See IHS Dialysis Inc. v. DaVita, Inc.*, No. 12 Civ. 2468(ER), 2013 WL 1309737, at *9 (S.D.N.Y. Mar. 31, 2013) ("The majority of the allegations in the Amended Complaint describe unilateral conduct by DaVita, such [as] warehousing spaces and operating licenses . . . and engaging in various forms of 'inappropriate business conduct,' which does not fall within the scope of Section 1 of the Sherman Act.").

In any event, even if Plaintiffs had adequately alleged that Metro conspired with other defendants, their allegations would still fall short of connecting Henry Bath (or JPMorgan) to the alleged conspiracy.  Detroit is the only city in the United States at which Plaintiffs allege that aluminum was restrained, and Plaintiffs admit that Henry Bath had no warehouses in Detroit. (*Supra* at 3, 5.)  Furthermore, Plaintiffs do not allege that queues existed anywhere in the world at warehouses affiliated with Henry Bath.  Plaintiffs thus allege that Henry Bath participated in a conspiracy to restrain aluminum in LME warehouses *without ever restraining aluminum at its own LME warehouses*.  This makes no more sense than alleging that a defendant participated in a price-fixing conspiracy without ever charging the prices fixed by the conspiracy.

The complaints therefore fail to satisfy basic tests of plausibility.  Under settled law, it would not be enough, "even at the pleadings stage," to allege that Henry Bath and other warehouses engaged in "parallel conduct."  *Citigroup*, 709 F.3d at 136.  Here, Plaintiffs have not alleged even that much:  they never assert that Henry Bath had queues at its warehouses, paid rich incentives for aluminum, or shuttled aluminum among its own warehouses.  (*Supra* at 4-6.) Similarly, it would not be enough to accuse Henry Bath of conduct that is equally susceptible of a unilateral or a conspiratorial explanation.  *See Citigroup*, 709 F.3d at 137.  Here, a unilateral

explanation is not just equally plausible; it is a far more likely explanation of the starkly different behavior that Plaintiffs attribute to Henry Bath and Metro.

The allegations against Henry Bath also defy economic sense. According to the complaints, the conspiracy caused aluminum stocks to grow dramatically at Metro warehouses in Detroit while sharply reducing stocks at other locations. (*Supra* at 5.) In fact, Plaintiffs allege that so much aluminum flooded into Metro's warehouses in Detroit that Metro achieved a monopoly – something it could only have done at the expense of competing warehouses like Henry Bath. (*Id*. at 4-5.) Plaintiffs thus accuse Henry Bath of conspiring to build up Metro's business at the expense of its own, an implausible allegation of the type that courts routinely dismiss. *See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 322 (S.D.N.Y. 2003) ("Courts have held that allegations of conspiracy that ignore commercial reality must be dismissed"); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) ("complaint fails to support the existence of a conspiracy" because the defendants "lack a rational motive to conspire").

Plaintiffs nevertheless assert that Henry Bath was part of a group of "Defendants" or "Warehouse Defendants" that conspired to convert the LME's minimum daily requirement for loading aluminum out of warehouses into a maximum. (FLP ¶¶ 345-346, 362-364; Commercial ¶¶ 78-79; Consumer ¶¶ 92, 200.) But Plaintiffs never identify when, where, or how Henry Bath supposedly participated in the alleged conspiracy. Indeed, the First Level Purchasers fail to make even a conclusory allegation that Henry Bath participated, asserting only that it "benefitted from the *other* Defendants' agreements in restraint of trade." (FLP ¶ 353 (emphasis added); *see also id*. ¶ 56 (alleging that "the Goldman Defendants, *by themselves or* with the Warehouse Defendants *or* the Jane Doe Defendants, agreed to and did slow the actual amounts of aluminum

loaded out from LME Detroit Warehousing" (emphasis added).)  Under settled law, such vague and equivocal allegations are insufficient to state an antitrust claim.  *See Twombly*, 550 U.S. at 557 ("conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *In re Elevator Antitrust Litig.*, 502 F.3d at 50 ("averments of agreements made at some unidentified place and time . . . are insufficient to establish a plausible inference of agreement"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (rejecting "vague allegations . . . that refer to 'defendants'" under *Twombly*).

Even if Plaintiffs had adequately alleged that Henry Bath and other warehouses had acted in parallel by treating the LME minimum as a maximum (and they have not), such parallel conduct would not matter.  As the complaints acknowledge, warehouses had strong *unilateral* incentives to "keep[] aluminum within the warehouses for as long as possible," because "they charge a daily rental rate for each ton of aluminum stored within their warehouses."  (Consumer ¶ 45; *see also id.* ¶ 56; Commercial ¶ 79 ("It was in their best interest as warehouse owners to maintain the low load-out").)  These unilateral incentives bar any inference that the defendants conspired with each other to do what was in their own independent self-interest.  *See Twombly*, 550 U.S. at 554 (rejecting allegations that are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").

Plaintiffs also assert that the conspiracy would have unraveled if "LME-approved warehouse firms would have competed on delivery and service terms."  (Commercial ¶ 85.) They argue, in other words, that Metro would have been forced to shorten its queues if other warehouses had been willing to deliver aluminum promptly.  (*See id.*; FLP ¶¶ 369-370.)  But no one disputes that Henry Bath *did* deliver aluminum promptly:  as the complaints acknowledge, it did not have queues at its warehouses.  Thus, under the logic of Plaintiffs' own allegations,

Henry Bath is not a plausible conspiracy member; rather, the absence of queues at Henry Bath's warehouses should have undermined the alleged conspiracy by attracting aluminum away from Metro.

Plaintiffs' assertion that competition should have reduced the queues at Metro fails for an additional reason:  they mistakenly assume that the speed at which a customer may retrieve aluminum from an LME warehouse is what drives the customer's decision about where to deposit aluminum.  Speed of retrieval might matter if a customer who deposits aluminum also expects to be the party who later will retrieve it.  As the complaints make clear, however, customers can deposit aluminum at Metro, pocket an incentive payment in exchange for the deposit, and then trade the resulting aluminum warrant on the LME, thus leaving a third party with the task of retrieving the aluminum.[4]  Under these circumstances, customers are likely to care only about the size of the incentive payments offered by Metro, not the speed at which it delivers aluminum.

Plaintiffs fare no better with their allegation that a Henry Bath representative sits on the LME Warehouse Committee, an advisory committee that makes recommendations to the LME. (*See* FLP ¶¶ 5, 360-361;  Commercial ¶ 33;  Consumer ¶ 57;  Agfa ¶ 25(c);  Mag ¶ 24(c).) Plaintiffs do not identify any anticompetitive conduct by either the Committee or the Henry Bath representative.  To the contrary, Plaintiffs admit that "long-time LME warehouse operators" – an apt description of Henry Bath – suggested during Committee meetings that action should be taken against the tactics and delivery queues of "certain warehouses."  (FLP ¶¶ 5(a)-(d), 283(a).)

---

[4]     *See, e.g.,* Consumer ¶¶ 53-56, 99; FLP ¶¶ 145-146, 152, 213-214; Commercial ¶¶ 51-53, 72-75; Mag ¶ 52; Agfa ¶ 53.  Furthermore, because LME futures contracts may be settled with LME warrants issued by any LME warehouse at the "seller's choice" (FLP ¶ 152), a party that buys aluminum warrants on the Exchange does not know at the time of the trade whether the aluminum will be located at Metro.

Plaintiffs assert that Committee meetings created "opportunities to conspire" (Consumer ¶ 5(m)), but a "mere opportunity to conspire does not by itself support the inference that . . . an illegal combination actually occurred." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993). Here, Plaintiffs offer no reason to believe that Henry Bath availed itself of an opportunity to conspire: they never allege that it restrained aluminum at its warehouses.

### B. Plaintiffs Fail to Allege a Plausible Antitrust Claim Against JPMorgan.

Unable to level a plausible conspiracy allegation at Henry Bath, Plaintiffs are reduced to asserting that futures traders affiliated with JPMorgan may have contributed to the alleged conspiracy. None of these allegations states a plausible antitrust claim.

Plaintiffs do not appear to allege that traders affiliated with JPMorgan participated in a horizontal conspiracy with other trading firms. Instead, they speculate that JPMorgan traders might have conspired with *Metro* by cancelling warrants for aluminum held at Metro and placing the aluminum in a delivery queue. (*See* FLP ¶ 397; Commercial ¶ 140.) For example, the First Level Purchasers allege that Metro "contacted various traders including . . . JPM, Glencore and Goldman . . . to offer them the opportunity to buy warrants [for] aluminum on condition that they also agree to cancel those warrants." (FLP ¶ 397.) Plaintiffs never allege, however, that JPMorgan accepted any such offer. Rather, they equivocally assert that *either* "JPM, Glencore, Goldman, *or* the other warrant purchasers obliged and cancelled their warrants." (*Id.*; *see also* Commercial ¶ 140.) As these allegations make clear, Plaintiffs lack any factual basis for alleging that traders associated with *JPMorgan* entered into a collusive agreement.

The allegations directed at JPMorgan's trading activity are further undermined by the absence of a well-pleaded allegation that its trading decisions were based on anything other than its own unilateral self-interest. An example will illustrate the point. The Commercial End-Users

allege that JPMorgan contributed to queues at an LME warehouse in the Netherlands (a warehouse unaffiliated with Metro) by cancelling warrants for aluminum held there. (Commercial ¶ 143.)  In the very next breath, however, Plaintiffs assert that cancelling the warrants left JPMorgan "in position to profit handsomely" by, for example, "selling the metal into the market at an increased premium." (*Id.* ¶ 148.)  There is no suggestion whatsoever that cancellation of the warrants made sense only as part of a conspiracy.  *See Twombly*, 550 U.S. at 554 (rejecting conspiracy allegations that are "just as much in line" with unilateral conduct); *Citigroup*, 709 F.3d at 138 (rejecting conspiracy allegations when "Defendants' alleged actions . . . made perfect business sense"); *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213(RPP), 2012 WL 6700236, at *20 (S.D.N.Y. Dec. 21, 2012) (rejecting allegations that indicate only that commodities trader "was engaged in some level of ordinary market activity").[5]

Plaintiffs' warrant cancellation allegations fail for two additional reasons.  First, warrant cancellation involves a vertical relationship between a warehouse customer and a warehouse, not a horizontal relationship between warehouses.  Under settled law, vertical antitrust claims are reviewed under the rule of reason, *see, e.g.*, *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 291 (S.D.N.Y. 2010), but as explained in the Goldman Sachs

---

[5]    Nor do Plaintiffs offer any well-pleaded allegations that link the purported conduct in the Netherlands to warehouse queues in Detroit.  "Allegations of anticompetitive wrongdoing in Europe – absent any evidence of linkage between such foreign conduct" and the conduct at issue – is irrelevant to an antitrust conspiracy in the United States.  *In re Elevator Antitrust Litig.*, 502 F.3d at 52; *see also Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 244-46 (S.D.N.Y. 2008) (holding that foreign conduct cannot state a Sherman Act claim unless it has a direct and immediate effect on domestic commerce).

memorandum, Plaintiffs do not attempt to plead vertical, rule-of-reason antitrust violations (*see, e.g.*, FLP ¶ 302; Commercial ¶ 196; Consumer ¶ 157).

Second, Plaintiffs do not allege that trading firms *compete with each other* when they cancel aluminum warrants; nor do they allege that a breakdown in such competition resulted in their injury. Thus, any injury attributable to warrant cancellation activity would not be an "antitrust injury" that flows from a reduction in competition. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (plaintiffs can recover for antitrust violations only where "the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688-89 (S.D.N.Y. 2013) ("[I]t is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have.").[6]

Plaintiffs counter that JPMorgan had a motive to conspire: it allegedly owned about eleven percent of the LME's stock, and the LME allegedly benefited from Metro's conduct because of its one percent levy on storage fees earned by LME warehouses. (FLP ¶¶ 24, 352; Commercial ¶¶ 28, 67; Consumer ¶ 5(p); Agfa ¶ 87; Mag ¶ 86.) These allegations suggest at most that JPMorgan had a 0.11% stake in Metro's revenues – eleven percent of the LME's one percent levy – which is hardly a plausible reason to cede an alleged monopoly to a direct competitor of Henry Bath. Plaintiffs' speculation that the one percent levy inflated the price at

---

[6]     Plaintiffs' vague speculation that JPMorgan might have engaged in manipulative trading conduct relating to the contango in the aluminum market (*e.g.*, FLP ¶¶ 354, 375; Commercial ¶¶ 58-59) fails for the same reasons as their warrant cancellation allegations. The allegations are vague and conclusory; they are entirely consistent with unilateral conduct; and they fail to establish antitrust injury. Furthermore, warrant cancellation is the only specific mechanism for "manipulating the contango" that Plaintiffs ever identified in the complaints.

which the LME was sold to the Hong Kong Exchange (FLP ¶ 27) does not alter this conclusion. Even setting aside the dubious premise that the LME was helped rather than hurt by warehouse queues that allegedly eroded the value of LME futures contracts as a hedging device (*e.g.*, Commercial ¶¶ 136-137), the fact remains that any benefit to JPMorgan from an impact on LME's share price was indirect and infinitesimal, whereas the damage done to Henry Bath was direct and substantial.

Plaintiffs also assert that there is something suspicious about the fact that JPMorgan acquired Henry Bath in July 2010, near the time that Goldman Sachs acquired Metro. (*E.g.*, Consumer ¶ 72; Commercial ¶ 59.) Plaintiffs' own allegations rebut this assertion. As the complaints make clear, Henry Bath was merely a small component of a large, global commodities business that a JPMorgan subsidiary acquired from the Royal Bank of Scotland. (*Id.*; FLP ¶ 379.) Furthermore, the timing of the acquisition was driven by a December 2009 European Commission decision ordering the Royal Bank of Scotland to divest its commodities business.[7] Finally, whereas delivery of aluminum from Metro warehouses allegedly *slowed* after the Goldman Sachs acquisition, delivery speeds *increased or stayed the same* after the JPMorgan acquisition at all three locations in which Henry Bath has warehouses (Baltimore, Chicago and New Orleans). (Commercial ¶¶ 105-106.)[8]

---

[7]     *See* European Commission, *State Aid No. N 422/2009 & N 621/2009*, at ¶¶ 58, 93 & n.58 (Dec. 14, 2009), *available at* http://ec.europa.eu/eu_law/state_aids/comp-2009/n422-09.pdf.

[8]     Plaintiffs also cite a statement from the head of JPMorgan's commodities business that JPMorgan "need[s] to be active in the underlying physical commodity markets in order to understand and make prices." (FLP ¶ 379 (quoting Financial Times, *Wall Street Falls Out of Love with Commodities Trading*, (Aug. 4, 2013), *available at* http://www.ft.com/intl/cms/s/0/4d1f8f7a-faf0-11e2-87b9-00144feabdc0.html#axzz2zGt9iudB.) As the cited article makes clear, the statement refers merely to JPMorgan's ability to offer prices as a "market maker" in certain commodities derivatives.

Plaintiffs' last gasp is their allegation that the CFTC – but *not* the Antitrust Division – served a subpoena on JPMorgan relating to aluminum. (*See* FLP ¶ 271; Consumer ¶ 129.) Plaintiffs do not allege, however, that the CFTC is investigating antitrust violations or that it views JPMorgan as a target of its investigation. The CFTC subpoena thus "carries no weight in pleading an antitrust conspiracy claim." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also Hinds Cnty.*, 620 F. Supp. 2d at 514 ("investigations, inquiries, and subpoenas do not make the CAC's allegations plausible"); *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) ("proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence" and "not probative of the existence of an illegal agreement"); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010) ("The Court need not take judicial notice of these CIDs because they do not make the allegations contained in the DSCAC more plausible.").[9]

## C. Plaintiffs Fail to Allege a Plausible Section Two Monopolization Claim Against Henry Bath or JPMorgan.

Although Plaintiffs purport to assert Section 2 monopolization claims against Henry Bath and JPMorgan (*see* FLP ¶¶ 409-413; Consumer ¶¶ 205-210), they never suggest that either of those defendants attained or had a dangerous probability of attaining monopoly status. To the

---

[9] For the reasons set forth above, Plaintiffs have failed to state an antitrust claim against *either* JPMorgan or Henry Bath. But even if the Court were to conclude that Plaintiffs' allegations are adequate as to one of those defendants, dismissal of the other still would be warranted. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 390, 419 (S.D.N.Y. 2011) (dismissing parent company from antitrust action where "[t]here are no allegations that any Parent Company did anything actionable in the alleged antitrust conspiracy"); *MetLife Securities, Inc. v. Bedford*, 456 F. Supp. 2d 468, 472 (S.D.N.Y. 2006) ("a subsidiary cannot be held liable for the acts of its parent company based solely on the subsidiary's membership in the same corporate family").

contrary, the complaints make clear that Henry Bath accounted for only seven percent of LME warehouse capacity in the United States and was losing market share to Metro. (FLP ¶ 356; Consumer ¶¶ 5(d), 74; Commercial ¶¶ 38, 97-98.) The monopolization claims against Henry Bath and JPMorgan therefore depend on Plaintiffs' conclusory assertion that those defendants conspired to help *Metro* monopolize the LME warehouse business. These allegations make no economic sense and fail for the same reasons as their Section 1 claims. *See, e.g., TV Comm'ns Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1026 (10th Cir. 1992) (conspiracy to monopolize allegations are "implausible" when the "achievement of the goal of the conspiracy would actually be contrary to the interests of the [defendants]").

## II. PLAINTIFFS HAVE NOT STATED A STATE LAW CLAIM AGAINST HENRY BATH OR JPMORGAN.

In addition to their Sherman Act claims, Plaintiffs also contend that Henry Bath and JPMorgan are liable under (1) state antitrust laws, (2) state consumer protection laws, and (3) the common law of unjust enrichment and tortious interference. Each of these claims relies on the same implausible allegations that Henry Bath and JPMorgan conspired with other defendants to hoard and restrain aluminum in Detroit. Accordingly, Plaintiffs' state law claims should be dismissed for the same reasons as their federal antitrust claims. *See In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing state law claims "based on the same allegations" as the federal antitrust claims); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state common law and statutory claims fail as well."); *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000) ("Thus, in light of the

Court's findings under the Sherman Act, the Court finds that Variflex has failed to produce sufficient evidence to support its California unfair competition claim.").

Plaintiffs' consumer protection and common law claims should be dismissed for the additional reason that the complaints fail to identify specific conduct by *Henry Bath or JPMorgan* that supposedly violated those laws. *See, e.g.*, *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 409 ("[I]f failure to disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then *any* Section 1 antitrust case would automatically become a consumer-protection case. That is not the law." (citation and quotations omitted)); *In re Trilegiant Corp.*, No. 3:12-CV-00396 (VLB), 2014 WL 1315244, at *35 (D. Conn. Mar. 28, 2014) (dismissing state consumer protection claims where plaintiffs "have not attempted to explain how the Defendants' conduct fits into each of the undoubtedly varying elements of the statutory schemes").

## CONCLUSION

For the foregoing reasons, all claims against Henry Bath and JPMorgan should be dismissed.

Dated:  April 22, 2014                    Respectfully submitted,


s/ Robert D. Wick
Robert D. Wick (*rwick@cov.com*)
Neil K. Roman (*nroman@cov.com*)
Henry Liu (*hliu@cov.com*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000

*Attorneys for Defendant Henry Bath LLC &*
*JPMorgan Chase & Co.*