**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

IN RE ALUMINUM WAREHOUSING      :       MDL No. 2481
ANTITRUST LITIGATION                  :

                                            :      Master Docket No.
This Document Relates To:         :    13-md-2481-KBF-RLE

ALL ACTIONS                         :

                                            :

                                            :

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**JOINT MOTION TO DISMISS ALL FEDERAL AND STATE**
**ANTITRUST CLAIMS FOR LACK OF ANTITRUST STANDING**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF THE ALLEGATIONS ............................................1

ARGUMENT ........................................................................................................................4

I.   PLAINTIFFS DO NOT ALLEGE THAT THEY HAVE SUFFERED
     ANTITRUST INJURY ...........................................................................................6

     A.   Antitrust Injury Is Limited To Consumers Or Competitors In The Allegedly
          Restrained Market Or Instrumentalities Of The Alleged Scheme ..........................6

     B.   Plaintiffs' Own Allegations Confirm That They Are Neither Consumers Nor
          Competitors In The Market Where The Challenged Conduct Occurred ................8

     C.   Plaintiffs Have Not Alleged That They Were Instrumentalities Of
          Defendants' Purported Schemes ...........................................................................11

     D.   Plaintiffs' Failure To Allege That Their Supposed Injuries Result From A
          Competition Reducing Aspect Of Defendants' Conduct Is Also Fatal To
          Their Standing ........................................................................................................13

II.  PLAINTIFFS ALSO LACK STANDING BECAUSE THEY ARE NOT
     EFFICIENT ENFORCERS OF THE ANTITRUST LAWS ..............................15

     A.   Plaintiffs Lack Standing Because Their Alleged Injuries Are Indirect And
          Remote ...................................................................................................................17

     B.   Plaintiffs Lack Standing Because There Are More Efficient Enforcers Of
          The Antitrust Laws ................................................................................................21

     C.   The Other Two Efficient Enforcer Factors Also Weigh Against Standing ..........22

III. THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW ANTITRUST
     CLAIMS FOR THE SAME REASONS ...............................................................23

     A.   Fourteen States And The District Of Columbia Have Applied Federal
          Antitrust Precedent When Interpreting Their Own Laws .....................................24

     B.   Ten States Have Harmonization Statutes ..............................................................25

     C.   Four States Follow a Judicially-Created Harmonization Doctrine .......................26

     D.   Arkansas, Wyoming And Minnesota Courts Would Apply Antitrust Injury
          And Proximate Cause Principles To Dismiss The Claims Alleged Here .............26

CONCLUSION ....................................................................................................................27

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ambook Enterprises v. Time Inc.*,
    612 F.2d 604 (2d Cir. 1979) ................................................................... 21

*Associated General Contractors of California, Inc. v. California
    State Council of Carpenters*, 459 U.S. 519 (1983) ............................. passim

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ...................................................................... 4, 26

*Avedisian v. Quinnipiac Universtity*,
    387 F. App'x 59 (2d Cir. 2010) ............................................................. 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 11

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982) ....................................................................... 5, 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................. 6

*Caruna v. General Motors Corp.*,
    204 F. App'x 511 (6th Cir. 2006) ...................................................... 7, 12

*Crimpers Promotions v. HBO, Inc.*,
    724 F.2d 290 (2d Cir. 1983) ................................................................. 12

*Daily v. Parker*,
    152 F.2d 174 (7th Cir. 1945) ............................................................... 24

*Daniel v. American Board of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005) ..................................................... 13, 15, 21

*de Atucha v. Commodity Exchange, Inc.*,
    608 F. Supp. 510 (S.D.N.Y. 1985) ................................................ 7, 8, 20

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ............................................................................. 24

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ......................................................... 4, 6, 16, 21

*Gross v. New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997) ........................................................................ 22

*Ho v. Visa U.S.A. Inc.*,
   No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004) .......................... 25

*In re Libor-Based Financial Instruments Antitrust Litigation*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) .............................................................. 6, 9, 15

*In re Refrigerant Compressors Antitrust Litigation*,
   No. 2:09–md–02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ........................ 25

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ............. 15, 20, 23

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ................................................................................ passim

*Loeb Industries v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ....................................................................... 20, 21

*Lorix v. Crompton Corp.*,
   736 N.W.2d 619 (Minn. 2007) ........................................................................... 27

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 11

*Mid-West Paper Products Co. v. Continental Group, Inc.*,
   596 F.2d 573 (3d Cir. 1979) .............................................................................. 22

*National ATM Council v. Visa*,
   922 F. Supp. 2d 73 (D.D.C. 2013) ...................................................................... 11

*Norris v. Hearst Trust*,
   500 F.3d 454 (5th Cir. 2007) .............................................................................. 7

*Ocean View Capital, Inc. v. Sumitomo Corp. of America*,
   No. 98-civ-4067 (LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ......... 7, 8, 20, 22

*Owens Corning v. RJ Reynolds Tobacco Co.*,
   868 So. 2d 331 (Miss. 2004) .............................................................................. 26

*Paycom Billing Services, Inc. v. MasterCard International, Inc.*,
   467 F.3d 283 (2d Cir. 2006) ...................................................................... 6, 13, 15, 16

*Peterson v. Visa U.S.A. Inc.*,
   No. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005) .......................... 25

*Port Washington Teachers' Association v. Board of Education of Port
    Washington Union Free School District*, 478 F.3d 494 (2d Cir. 2007) ................................... 11

*Reading Industries, Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980) ............................................................................................... passim

*Serpa Corp. v. McWane, Inc.*,
    199 F.3d 6 (1st Cir. 1999) ............................................................................................................ 7

*Sigmapharm v. Mutual Pharmaceutical Co., Inc.*,
    454 F. App'x 64 (3d Cir. 2011) ............................................................................................ 12, 13

*Southard v. Visa U.S.A., Inc.*,
    734 N.W.2d 192 (Iowa 2007) ..................................................................................................... 25

*Stark v. Visa U.S.A. Inc.*,
    No. 03-055030, 2004 WL 1879003 (Mich. Cir. Ct. Jul. 23, 2004) .......................................... 25

*Strax v. Commodity Exchange, Inc.*,
    524 F. Supp. 936 (S.D.N.Y. 1981) ............................................................................................... 7

*Vinci v. Waste Management, Inc.*,
    36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) ............................................................................... 25

*Virgin Atlantic Airways v. British Airways Plc*,
    257 F.3d 256 (2d Cir. 2001) ....................................................................................................... 14

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ............................................................................................................ 7

## ADDITIONAL AUTHORITIES CITED IN APPENDICES

## CASES

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
    135 F.3d 740 (11th Cir. 1998) ............................................................................................... App. 3

*American Council of Certified Podiatric Physicians & Surgeons v. American
    Board of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999) ........................................ App. 1

*Avery Freight Lines, Inc. v. Alabama Public Service Commission*,
    104 So.2d 705 (1958) ............................................................................................................ App. 4

*Baptist Health v. Murphy*,
    373 S.W.3d 269 (Ark. 2010) ................................................................................................. App. 5

*Beckler v. Visa U.S.A., Inc.*,
    No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004) ............................ App. 1

iv

*Bergstrom v. Noah*,
   974 P.2d 520 (Kan. 1999)......................................................................... App. 1

*Boisjoly v. Morton Thiokol, Inc.*,
   706 F. Supp. 795 (D. Utah. 1988) ........................................................... App. 3

*Buckley v. Bell*,
   703 P.2d 1089 (Wy. 1985) ....................................................................... App. 5

*Byre v. City of Chamberlain*,
   362 N.W.2d 69 (S.D. 1985)..................................................................... App. 1

*City of Tuscaloosa v. Harcos Chemicals., Inc.*
   158 F.3d 548 (11th Cir. 1998)................................................................. App. 4

*Continental Guest Services Corp. v. International Bus Services, Inc.*,
   92 A.D.3d 570 (N.Y. App. Div. 2012) .................................................... App. 1

*Cornelison v. Visa U.S.A. Inc.*,
   Hearing Transcript, No. 03-CV-011323 (S.D. Cir. Ct. 2004) ............... App. 1

*Doe v. Tenent Healthsystem Medical, Inc.*,
   No. 20000-CP-10-001888, 2001 WL 35947233
   (S.C. Ct. Common Pleas Sept. 13, 2001) ............................................... App. 4

*Donovan v. Digital Equipment Corp.*,
   883 F. Supp. 775 (D.N.H. 1993) ............................................................ App. 3

*Drs. Steur & Latham, P.A. v. National Medical Enterprises., Inc.*,
   672 F. Supp. 1489 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988)............... App. 4

*ERI Max Entertainment, Inc. v. Streisand*,
   690 A.2d 1351 (R.I. 1997)....................................................................... App. 3

*Ex parte Rice*,
   67 So. 2d 825 (1953) ............................................................................... App. 4

*Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*,
   Nos. 09–CV–00852, 11–CV–00162, 2012 WL 3841397 (E.D. Wis. Sept. 5, 2012)..... App. 3, 5

*Fucile v. Visa U.S.A. Inc.*,
   No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004).......................... App. 1

*Gutnayer v. Cendant Corp.*,
   116 F. App'x 758 (7th Cir. 2004)............................................................ App. 2

*Ho v. Visa U.S.A. Inc.*,
No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004),
*aff'd* 16 A.D.3d 256 (N.Y. App. Div. 2005) .................................................... App. 1

*In re Credit/Debit Card Tying Cases*,
No. J.C.C.P. No. 4335, 2004 WL 2475287 (Cal. Ct. App. Oct. 14, 2004) ....................... App. 1

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007)...................................................... App. 1, 2, 4

*In re Magnesium Oxide Antitrust Litigation*,
Civ. No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ............................... App. 1, 2, 3, 4

*In re Motor Vehicles Canadian Export Antitrust Litigation*,
235 F.R.D. 127 (D. Me. 2006) ................................................................ App. 1

*In re Plavix Indirect Purchaser Antitrust Litigation*,
No. 1:06-cv-226, 2011 WL 335034 (S.D. Ohio Jan. 31, 2011) ................................ App. 1, 3, 5

*In re Refrigerant Compressors Antitrust Litigation*,
No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ....................... App. 1, 2, 3

*In re South Dakota Microsoft Antitrust Litigation*,
707 N.W.2d 85 (S.D. 2005)................................................................... App. 1

*International Brotherhood of Teamsters, Local 734 Health & Welfare*
*Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ...................................... App. 2

*Johnson v. Pacific Lighting Land Co.*,
817 F.2d 601 (9th Cir. 1987) ................................................................ App. 1

*Kanne v. Visa U.S.A., Inc.*,
723 N.W.2d 293 (Neb. 2006) ................................................................ App. 1

*Kessel v. Monongalia County General Hospital Co.*,
648 S.E.2d 366 (W. Va. 2007) .............................................................. App. 2

*Knowles v. Visa U.S.A., Inc.*,
No. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) ................................ App. 1

*Laughlin v. Evanston Hospital*,
550 N.E.2d 986 (Ill. 1990)................................................................... App. 2

*Lawrinenko v. Cedar Valley Medical Specialists, P.C.*,
No. LACV117529, 2012 WL 7992872 (Iowa Dist. Ct. Dec. 28, 2012)............................ App. 1

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) ............................................................... App. 5

*Luscher v. Bayer AG*,
  No. 2004-014835, 2005 WL 6959406 (Ariz. Super. Ct. Sept. 16, 2005)........................... App. 1

*McCluney v. Zap Professional Photography, Inc.*,
  663 So. 2d 922 (Ala. 1995) ................................................................................................ App. 4

*Medical Savings Insurance Co. v. HCA, Inc.*,
  No. 2:04CV156FTM-29DNF, 2005 WL 1528666 (M.D. Fla. June 24, 2005) ................. App. 3

*Mellen v. Lane*,
  659 S.E.2d 236 (S.C. Ct. App. 2008) ................................................................................ App. 4

*N.C. Steel, Inc. v. National Council on Compensation Ins.*,
  472 S.E.2d 578 (N.C. Ct. App. 1996) , *aff'd in part and rev'd
  in part on other grounds*, 496 S.E.2d 369 (N.C. 1998)..................................................... App. 4

*Nass-Romero v. Visa U.S.A., Inc.*,
  279 P.3d 772 (N.M. Ct. App. 2012) ................................................................................... App. 1

*Northwest Medical Laboratories, Inc. v. Blue Cross & Blue Shield of Oregon, Inc.*,
  794 P.2d 428 (Or. 1990) ..................................................................................................... App. 3

*Ocean View Capital, Inc. v. Sumitomo Corp. of America*,
  No. 98 CIV. 4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ..................................... App. 3

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) .............................................................................................. App. 3

*Orr v. Beamon*,
  77 F. Supp. 2d 1208 (D. Kan. 1999) .................................................................................. App. 1

*Owens Corning v. RJ Reynolds Tobacco Co.*,
  868 So. 2d 331 (Miss. 2004) ............................................................................................... App. 4

*Peterson v. Visa U.S.A., Inc.*,
  No. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005) ..................................... App. 1

*Princeton Insurance Agency, Inc. v. Erie Insurance Co.*,
  690 S.E.2d 587 (W.Va. 2009) ............................................................................................ App. 2

*Reitz v. Canon U.S.A.*,
  695 F. Supp. 552 (S.D. Fla. 1988)...................................................................................... App. 3

*Rundgren v. Bank of New York Mellon*,
  777 F. Supp. 2d 1224 (D. Haw. 2011)................................................................................ App. 2

*Smith v. Citizens & Southern National Bank of South Carolina*,
  128 S.E.2d 112 (S.C. 1962).................................................................................................. App. 4

*Southard v. Visa U.S.A. Inc.*,
   734 N.W.2d 192 (Iowa 2007) ............................................................................ App. 1

*Stark v. Visa U.S.A. Inc.*,
   No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) ............................ App. 1

*Strang v. Visa*,
   No. S1560-03, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ...................................... App. 1

*Tennessee Medical Association v. Blue Cross Blue Shield of Tennessee, Inc.*,
   229 S.W.3d 304 (Tenn. Ct. App. 2007) ................................................................. App. 1

*Toltec Watershed Improvement District v. Johnston*,
   717 P.2d 808 (Wy. 1986) ................................................................................ App. 5

*Vinci v. Waste Management, Inc.*,
   36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) ........................................................... App. 1

*Vitacost.com, Inc. v. Gaia Herbs, Inc.*,
   No. 06-81141-CIV-MIDDLEBROOKS/JOHNSON,
   2007 WL 286262 (S.D. Fla. Jan. 29, 2007) ............................................................ App. 3

*Wrobel v. Avery Dennison Corp.*,
   No. 05CV1296, 2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006) .................................... App. 1

**STATUTES**

740 Ill. Comp. Stat 10/11 .................................................................................. App. 2

Ariz. Rev. Stat. § 44-1412 ................................................................................. App. 1

D.C. Code § 28-4515 ....................................................................................... App. 1

Fla. Stat. § 542.32 ......................................................................................... App. 3

Haw. Rev. Stat. § 480-3 .................................................................................... App. 2

Iowa Code § 553.2 .......................................................................................... App. 1

Mass. Gen. Laws Ch. 93, § 1 .............................................................................. App. 3

Mich. Comp. Laws § 445.784(2) .......................................................................... App. 1

N.H. Rev. Stat. § 356:14 ................................................................................... App. 3

N.M. Stat. § 57-1-15 ....................................................................................... App. 1

Neb. Rev. Stat. § 59-829 ................................................................................... App. 1

Nev. Rev. Stat. § 598A.050 ................................................................................ App. 2

Or. Rev. Stat. § 646.715(2) ............................................................................... App. 3

R.I. Gen Laws § 6-36-2(b) ................................................................................. App. 3

S.D. Codified Laws § 37-1-22 ........................................................................... App. 1

Utah Code § 76-10-926 ...................................................................................... App. 3

W. Va. Code § 47-18-16 .................................................................................... App. 2

**INTRODUCTION AND STATEMENT OF THE ALLEGATIONS**[1]

Plaintiffs' tale is one of different markets.  Plaintiffs claim that the London Metal

Exchange ("the LME"), a Recognised Investment Exchange in London for futures trading in

industrial metals, conspired with three warehouse operators, Metro, Henry Bath and Pacorini

("warehouse defendants") and their affiliated financial firms or trading companies, Goldman

Sachs, JPMorgan and Glencore, to delay the delivery of aluminum from LME warehouses.[2]

According to plaintiffs, the defendants hatched this supposed scheme to allow the warehouses

(and by extension the LME) to collect more rent from companies that stored aluminum in the

warehouses.[3]  Plaintiffs further speculate that the alleged scheme allowed financial firms and

---

[1]     Defendants the LME and LME Holdings are separately moving to dismiss the complaints
on the grounds that the Court lacks jurisdiction over the claims against them.  Those defendants
join this motion only in the alternative, in the event that the Court concludes that it has
jurisdiction.  They do not waive their jurisdictional arguments.  *See* Fed. R. Civ. P. 12(b).  All
defendants are separately moving to dismiss on alternative grounds as well.

     Plaintiffs have inappropriately grouped corporate affiliates together for pleading
purposes, and have made allegations regarding groups of corporate affiliates, rather than with
respect to each named defendant.  *See, e.g.*, First Level Purchasers' ("FLP") (*i.e.*, the so-called
"Direct Purchasers") "Second Corrected Consolidated Amended Class Action Complaint" ("FLP
Compl.") ¶¶ 123 (defining "Goldman Defendants" to include Goldman Sachs Group, Inc., GS
Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC, and Metro International Trade
Services LLC); 130 (defining "LME" to include the LME, LME Holdings Limited, and Hong
Kong Exchanges & Clearing, Ltd. (after December 5, 2012)); 136 (defining "Glencore" to
include Glencore Xstrata, PLC, Glencore Ltd., Pacorini Metals AG, and Pacorini Metals USA
LLC); 141 (defining "JPMorgan" to include JPMorgan Chase & Co., Henry Bath & Son, Ltd.,
and Henry Bath LLC).  While the instant brief utilizes plaintiffs' "corporate grouping"
allegations in order to summarize plaintiffs' allegations, it should not be read to endorse or
concede in any way the appropriateness of plaintiffs' "corporate grouping" allegations.

[2]     FLP Compl. ¶¶ 1, 345; "Commercial End Users' Corrected Consolidated Class Action
Complaint" ("Commercial Compl.") ¶¶ 1, 217; "Consumer End-User Cases Consolidated
Amended Class Action Complaint" ("Consumer Compl.") ¶¶ 1, 196; Agfa Amended Complaint
("Agfa Compl.") ¶¶ 1, 124; Mag Instrument Amended Complaint ("Mag Compl.") ¶¶ 1, 114.

[3]     FLP Compl. ¶ 23; Commercial Compl. ¶ 68; Consumer Compl. ¶ 5(b); Agfa Compl.
¶ 110; Mag Compl. ¶ 109.  Plaintiffs allege that the LME earned 1% of the rent that the
warehouse defendants collected.  FLP Compl. ¶ 24; Commercial Compl. ¶ 67; Consumer Compl.
¶ 5(b); Agfa Compl. ¶ 87; Mag Compl. ¶ 86.

trading companies to profit from futures trading based on financial market conditions that the alleged aluminum queues supposedly fostered.[4]  Plaintiffs claim that this conduct violates the Sherman Act and various state laws.

The threshold problem with plaintiffs' theory (wholly apart from being factually baseless in the real world) is that these plaintiffs have no legally cognizable connection to any of the alleged misconduct.  They therefore lack standing to bring their antitrust claims.  Plaintiffs do not allege that they store metal in the defendants' warehouses, that they are competing warehouse companies, or even that they trade on the LME.  Plaintiffs instead allege that they participate in the physical market for aluminum—a market entirely separate from the supposed "markets" for warehousing of LME-exchange traded aluminum and for trading of aluminum futures contracts in which defendants operate.[5]

Each plaintiff group alleges that it is one constituent in a very long supply chain in the physical market for aluminum.  The First Level Purchasers (*i.e.*, the misleadingly self-titled "Direct" Purchaser Plaintiffs, and the individual plaintiffs Agfa Corporation, Agfa Graphics and Mag Instrument, Inc.) claim to purchase "primary aluminum" from largely unidentified aluminum smelters.[6]  This is not alleged to be LME exchange-traded aluminum; it is separately-sourced aluminum of abundant supply that comes to plaintiffs without passing through the LME warehouse system.  The Commercial End Users, further down the physical market chain, claim

---

[4]    FLP Compl. ¶¶ 355, 378; Commercial Compl. ¶ 5; Consumer Compl. ¶ 5(r); Agfa Compl. ¶ 61; Mag Compl. ¶ 60.

[5]    Defendants dispute that plaintiffs' alleged "markets" are legally relevant markets for purposes of their antitrust claims and reserve the right to challenge those markets at another time, including in the separate motions that defendants will file by the April 25, 2014 deadline. However, for purposes of assessing the plaintiffs' standing, it is not necessary for the Court to resolve whether they have plausibly alleged relevant markets.  Thus, defendants do not raise those arguments here.

[6]    FLP Compl. ¶¶ 105-11, 113, 115; Agfa Compl. ¶¶ 17, 31; Mag Compl. ¶¶ 16(a), 30.

to purchase "processed aluminum" from unidentified sources—perhaps from the First Level Purchasers, perhaps from one of the many other intermediaries in the chain, they simply do not say.[7]  They take their "processed aluminum" and make it into products, like boats, storage equipment, and swimming pool enclosures.[8]  The Consumer End Users are at the very bottom of the chain.  They claim to purchase consumer goods that contain aluminum, such as soda cans, aluminum foil, and pots and pans.[9]

All of the plaintiffs' antitrust claims fail as a matter of law because no plaintiff has established that it has standing to assert them.  First, plaintiffs have not alleged antitrust injury.  Plaintiffs do not participate in the supposed "market" where they claim that the antitrust misconduct occurred—the warehousing of LME exchange-traded aluminum, or even in the purported "market" for trading of aluminum futures contracts—and instead participate in a separate market for physical aluminum.  To be sure, plaintiffs allege that the supposed conspiracy indirectly *affected* the price that they paid in the physical market by supposedly inflating the benchmark that their sellers used to set their price (the so-called "Platts Midwest Premium").  But even if that were true, it is irrelevant to antitrust injury.  Only consumers or competitors of the defendants in the allegedly restrained market, or instrumentalities necessary to effect the ends of the conspiracy, can establish antitrust injury (and even many of those cannot).  Plaintiffs do not claim to be consumers or competitors of the named defendants in the allegedly restrained markets, nor do they claim to be instrumentalities of the alleged misconduct, and thus are not within the class of persons that the antitrust laws were designed to protect.

---

[7]      *See, e.g.*, Commercial Compl. ¶¶ 9, 18-26.

[8]      Commercial Compl. ¶¶ 9, 18, 20, 22, 25.

[9]      *See, e.g.*, Consumer Compl. ¶¶ 2, 8, 17-19.

Second, even if plaintiffs had alleged antitrust injury, they would still lack standing to assert their antitrust claims because they are not proximately connected to any of the purported antitrust misconduct and none of their alleged injuries flow *directly* from it. Indeed, plaintiffs' supposed injury results from a long, convoluted chain of events, many of which are entirely speculative, that allegedly caused their independent sellers to charge them more than they otherwise would have charged in the absence of the challenged conduct. If plaintiffs' fanciful conspiracy were true, there would be an identifiable group of more direct victims whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement: the owners of the aluminum that allegedly paid excessive warehouse rents as a result of the warehouse queues. Plaintiffs do not have standing in these circumstances.

The Court should dismiss all plaintiffs' antitrust claims, both federal and state, as a matter of law.

## ARGUMENT

All of plaintiffs' antitrust claims fail first and foremost because they have not alleged—and could never allege—antitrust standing. The doctrine of antitrust standing "prevents private plaintiffs from 'recover[ing] damages under § 4 . . . merely by showing injury causally linked to an illegal presence in the market.'" *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*") (internal quotations omitted). Antitrust standing is thus a "threshold question," and its absence warrants dismissal. *See Gatt*, 711 F.3d at 75 (affirming dismissal after "focus[ing] on this threshold question of antitrust standing").

4

The test for antitrust standing in the Second Circuit derives from two Supreme Court cases: *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), and *AGC* (as recently clarified by *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)).  In *McCready*, the Supreme Court held that McCready, a subscriber to the Virginia Blue plan, had suffered antitrust injury as a result of a conspiracy between the Blue plan and the Neuropsychiatric Society of Virginia to boycott psychologists by not reimbursing subscribers for psychotherapy services provided by psychologists.  *Id.* at 467-70.  McCready had to pay for such services out of pocket.  *Id.* at 475.  The Court held that, although she was not a competitor in the restrained market, or even a customer (her employer was the customer), she suffered antitrust injury and had standing because her injury was a "necessary step" in the injury to the market for psychotherapy services; her injury was the instrumentality of that injury.  *Id.* at 479 ("Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends.  The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy.").

The following year, in *AGC*, 459 U.S. at 539-40, the Supreme Court first concluded that the union plaintiff there had not suffered antitrust injury because it was "neither a consumer nor competitor in the market in which trade was restrained."  In addition, the Court identified other infirmities in the union's standing:  (a) its alleged injury was indirect because the chain of causation contained several "somewhat vaguely defined" links; (b) there was a different "identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;" (c) the injury was speculative because the effects of the alleged conspiracy were indirect and could have been caused by independent factors; (d) if the

union recovered damages, there would be a risk of duplicative recovery because those more directly injured would have a claim; and (e) there would be too much complexity in apportioning damages among the allegedly affected entities. *Id.* at 540-45.

The Second Circuit has distilled these two cases by recognizing that antitrust standing has two principal elements, both of which plaintiffs must establish:  (1) plaintiffs must have suffered antitrust injury, and (2) they must be an "efficient enforcer" of the antitrust laws. *See, e.g.*, *Gatt*, 711 F.3d at 76.  If plaintiffs do not plausibly allege that they suffered an antitrust injury, they lack antitrust standing on that basis alone and a court need not consider the second part of the test—whether plaintiffs satisfy the required elements of the "efficient enforcer" test. *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 686 (S.D.N.Y. 2013) ("[P]laintiffs have not plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing.   We need not reach the *AGC* 'efficient enforcer' factors."). Furthermore, even if plaintiffs sufficiently allege antitrust injury, a court still must dismiss antitrust claims where, as here, the plaintiffs allege indirect and remote injuries and are not efficient enforcers of the antitrust laws. *Lexmark*, 134 S. Ct. at 1392; *Gatt*, 711 F.3d at 76; *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).

## I.    PLAINTIFFS DO NOT ALLEGE THAT THEY HAVE SUFFERED ANTITRUST INJURY

### A.    Antitrust Injury Is Limited To Consumers Or Competitors In The Allegedly Restrained Market Or Instrumentalities Of The Alleged Scheme

"An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Paycom*, 467 F.3d at 290 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Reading *AGC* and *McCready* together, federal courts of appeals have held that "the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in

the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 102 (3d Cir. 2010) (citations omitted); *see also Norris v. Hearst Trust*, 500 F.3d 454, 466-67 (5th Cir. 2007) (same); *Caruna v. Gen. Motors Corp.*, 204 F. App'x 511, 517 (6th Cir. 2006) (same); *Serpa Corp. v. McWane, Inc*., 199 F.3d 6, 13 (1st Cir. 1999) (same).

Courts in this Circuit follow these principles, particularly as to cases involving commodities exchanges; defendants have not located a single such case in which a court in this Circuit has granted standing to a plaintiff who was not a consumer or competitor in the market in which the challenged conduct occurred or an instrumentality of the defendants' scheme.  As Judge Preska aptly observed, "in this Circuit, courts consistently have held that in cases involving commodity exchange markets, only those who actually participate in the same market as the defendant have standing under the Clayton Act."  *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-civ-4067 (LAP), 1999 WL 1201701, at *6 (S.D.N.Y. Dec. 15, 1999) (*comparing de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985) (denying standing where defendant traded in different market than defendant), *with Strax v. Commodity Exch. Inc.*, 524 F. Supp. 936 (S.D.N.Y. 1981) (finding standing where plaintiffs traded in same market as defendants)); *see also Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 11-13 (2d Cir. 1980) (denying standing where plaintiff allegedly sustained injuries in different market from market in which defendants' conduct occurred).

In *Ocean View,* for example, the court denied standing to a manufacturer of copper wire that alleged that it was injured by a conspiracy to manipulate copper futures contracts.  Ocean View alleged that a conspiracy in the LME futures market affected the price that it paid in the physical (*i.e.*, "cash") market to buy the copper that it needed to make its products.  *Ocean View*,

1999 WL 1201701, at *1.  The court concluded that Ocean View did not have antitrust standing because it "did not participate in the LME futures market" and therefore was "not a participant in the 'relevant market.'"  *Id.* at *3.  "[T]he Sherman Act was not designed to protect plaintiff's interests with respect to defendants' activity on the LME."  *Id*.

### B.   Plaintiffs' Own Allegations Confirm That They Are Neither Consumers Nor Competitors In The Market Where The Challenged Conduct Occurred

Based on their own allegations, plaintiffs are neither consumers nor competitors in the purported "markets" where they allege that anticompetitive conduct occurred—the warehousing and futures trading markets.[10]  Plaintiffs do not allege that they stored aluminum in, or were the first to obtain aluminum from, any of the defendants' warehouses.  They do not allege that they trade on the LME.  They also do not allege that they compete in any way with any of the defendants in those spheres.  Instead, they merely allege that they purchase aluminum or aluminum products from separate sources in the separate physical market, and that the supposed conspiracy affected the price of aluminum in that separate market.  That is not sufficient.  *Ocean View*, 1999 WL 1201701 at *3; *de Atucha*, 608 F. Supp. at 519, 523-24; *Reading*, 631 F.2d at 11-13.

Plaintiffs' own allegations confirm that any supposed injury they have suffered flows from the intervening decisions of third-party sellers in the physical market, and not from defendants' alleged attempts to restrain the supposed warehousing market.  Plaintiffs allege that their injury flows from the decisions of sellers in the physical market to incorporate a benchmark

---

[10]   Plaintiff International Extrusions alleges that it bought aluminum "from persons who were obtaining aluminum from the LME warehouses and experienced delays in receiving that aluminum."  FLP Compl. ¶ 111.  And Plaintiff Talan Products alleges that it made "purchases of formerly LME warranted aluminum."  *Id.* ¶ 113.  But allegations that two plaintiffs made purchases in the physical market from unnamed sellers who themselves might at some point have participated in the warehousing market does not make International Extrusions and Talan consumers in the warehousing market.

(the Midwest Premium) into their pricing mechanism.[11]  Plaintiffs speculate that they paid a higher price for physical aluminum than they otherwise would have paid, because defendants' conduct in a separate market allegedly had the effect of increasing that benchmark.  They do not allege, however, that defendants forced or even could have forced sellers in the physical market to price their products in any particular way.  *See In re Libor*, 935 F. Supp. 2d. at 686 (antitrust injury must result from "competition-reducing aspect or effect of the *defendant's* behavior") (emphasis added).  This confirms that plaintiffs are not participants in the purported relevant markets, and are merely complaining that the challenged conduct in other supposed markets had an *incidental* effect in the physical aluminum market.  That is not antitrust injury.

A diagram of plaintiffs' allegations explains why plaintiffs have not alleged antitrust injury here:[12]

---

[11]     *See, e.g.*, FLP Compl. ¶¶ 11-12, 155; Commercial Compl. ¶¶ 6, 47-48, 56; Consumer Compl. ¶¶ 65, 118; Agfa Compl. ¶¶ 38-42; Mag Compl. ¶¶ 37-41.

[12]     *See, e.g.*, Commercial Compl. ¶¶ 46-48.



The First Level Purchasers' naming of certain "Jane Doe" defendants does not alter these conclusions.   First, the First Level Purchasers' definition of "Jane Doe" defendants is incomprehensible.  It includes persons who may have (a) "entered agreements in restraint of trade with the other Defendants," (b) "shipped aluminum directly to LME Detroit Warehousing in order, in whole or in part, to fix, maintain, or inflate the Midwest Premium," *or* (c) "otherwise combined, conspired, or agreed with Defendants or others in order to inflate prices and/or restrain aluminum supplies and/or to profit therefrom."[13]  Because there is no conceivable way to discern who these Jane Does might be, there is no way that any allegations about them could

---

[13]     FLP Compl. ¶ 94; *see also id.* ¶ 142 (defining Jane Does as "other persons who own warehouses, have similar financial interests as the Defendants, are parties to the contracts in restraint of trade as well as co-conspirators or others who joined the combination, and have otherwise entered in the agreement").

plausibly support a finding of antitrust injury. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). In any event, the First Level Purchasers merely claim that they "*may* have directly purchased primary aluminum from a Jane Doe Defendant," not that they actually did so.[14] Hypothetical and speculative allegations that a party *may* have suffered injury are not enough to allege injury-in-fact under Article III of the Constitution, much less antitrust injury. *See, e.g.*, *Nat'l ATM Council v. Visa*, 922 F. Supp. 2d 73, 84-86 (D.D.C. 2013) (plaintiffs did not allege injury-in-fact by claiming that they "may" have completed a transaction that resulted in their payment of an overcharge); *see also Port Wash. Teachers' Ass'n v. Bd. of Educ. of Port Wash. Union Free Sch. Dist.*, 478 F.3d 494, 498 (2d Cir. 2007) (To meet "[t]he irreducible constitutional minimum of standing . . . there must be an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical . . . ." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted)).

## C. Plaintiffs Have Not Alleged That They Were Instrumentalities Of Defendants' Purported Schemes

The complaints also fail to allege that plaintiffs were instrumentalities or a "necessary step" to effectuate the supposed conspiracy. Plaintiffs assert at various points in their complaints that their alleged injury was "inextricably intertwined" with defendants' purported misconduct and that the conduct "necessarily" caused their supposed injury.[15] But none of these allegations suffices to state antitrust injury under an instrumentality theory.

The instrumentality exception is very narrow because the "central interest" of the Sherman Act is "in protecting the economic freedom of participants in the relevant market."

---

[14]     FLP Compl. ¶¶ 105-15 (emphasis added).

[15]     *See, e.g.*, FLP Compl. ¶¶ 38, 218, 228, 333(i); Commercial Compl. ¶ 225; Consumer Compl. ¶ 103.

*AGC*, 459 U.S. at 538.  The exception requires plausible allegations that plaintiffs' injury was *necessary to effectuate the alleged scheme*.  *McCready*, 457 U.S. at 479 (harm to plaintiff was "a necessary step in effecting the ends of the alleged illegal conspiracy"); *Caruna,* 204 F. App'x at 517 ("To merit standing under the inextricably intertwined category, a plaintiff must assert that defendants used him as a fulcrum, conduit or market force to injure competitors or participants in the relevant product or geographical markets.") (internal quotations and citation omitted).  If the scheme could have occurred without plaintiffs, then their alleged injury is not *antitrust injury* as a matter of law.

For example, in *Crimpers Promotions v. HBO, Inc.*, 724 F.2d 290, 291-92 (2d Cir. 1983), the Second Circuit concluded that a company organized to hold a trade show to bring together cable programmers and local TV stations had standing to assert an antitrust claim against the two dominant cable programmers, HBO and Showtime, for orchestrating a successful boycott of its trade show.  Relying on *McCready*, the Court found that defendants' boycott of the plaintiff's show was the very means by which the defendants sought to further their monopoly by keeping other programmers and TV stations apart.  *Id.* at 294-95.  The injury that the plaintiff suffered from its failed trade show was antitrust injury because it was necessary for defendants to boycott the trade show to effectuate their scheme.  *Id.*

In contrast, in *Sigmapharm v. Mutual Pharmaceutical Co., Inc.*, 454 F. App'x 64, 70 (3d Cir. 2011), the Third Circuit held that a plaintiff had not sufficiently alleged antitrust injury under an instrumentality theory.  SigmaPharm, a pharmaceutical developer, had a contract with one of the defendants to develop a particular drug and to earn a percentage of the profits from its sale.  *Id.* at 66.  It alleged that defendants conspired to restrict the sale of certain drugs and that it therefore could not achieve the benefit of its development agreement.  *Id.* at 67.   After

concluding that the plaintiff was neither a consumer nor a competitor in the relevant market, *id.* at 69, the court affirmed the dismissal because plaintiff did not "adequately plead that its injuries were the means by which defendants [sought] to achieve their anticompetitive ends;" indeed, "defendants could have effectuated their conspiracy even if [plaintiff] did not exist." *Id.* at 69-70 (internal quotations omitted).  It was not enough that the alleged conspiracy caused harm to the plaintiff by denying it royalty revenue that it otherwise would have received. *Id.* at 70.

Here, as in *SigmaPharm,* plaintiffs do not allege that their injury was a necessary means by which defendants effectuated the alleged conspiracy.  Nothing in any of the complaints plausibly alleges that plaintiffs' purchases in the physical market at supposedly inflated prices were necessary to achieve the purported goals of the alleged conspiracy:  (1) to increase warehouse rents or (2) to profit from aluminum futures trading.  Instead, plaintiffs simply repeat over and over again that defendants' conduct "necessarily" caused them to pay more for physical aluminum acquired through other sources.  But the mere fact that plaintiffs may have been "injured by acts that violate the antitrust laws is not enough to confer standing to sue." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438, 444-45 (2d Cir. 2005) (affirming dismissal of complaint where plaintiffs had not sufficiently alleged antitrust injury).

**D.**	**Plaintiffs' Failure To Allege That Their Supposed Injuries Result From A Competition Reducing Aspect Of Defendants' Conduct Is Also Fatal To Their Standing**

Plaintiffs also fail to allege antitrust injury (and hence standing) because they have not plausibly alleged that their injuries flow from a competition reducing aspect of defendants' conduct. *See, e.g.*, *Paycom*, 467 F.3d at 290 ("[T]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.") (emphasis in original).

Plaintiffs allege that the defendants were able to build up queues at Metro's warehouses through (1) Metro's payment of incentives to aluminum owners to store their aluminum at Metro's warehouses instead of its competitors' warehouses,[16] and (2) the purchase and cancellation of warrants on some of that aluminum by financial firms and trading companies.[17] But alleged injury flowing from the payment of incentives cannot be antitrust injury because paying incentives to attract business is lawful and *pro-competitive*, not anticompetitive.  *See Virgin Atl. Airways v. British Airways Plc*, 257 F.3d 256, 265 (2d Cir. 2001).  And plaintiffs do not allege that the financial firm and trader defendants were somehow failing to compete with each other when they supposedly acquired and cancelled warrants.  As a result, nothing that flows from the payment of incentives or warrant cancellations can be antitrust injury.

Plaintiffs also allege that, once queues had developed at Metro's warehouses, defendants conspired not to increase LME's minimum-load out rules so that Metro could maintain those queues by not loading out more than the required minimum.[18]  But plaintiffs do not and cannot allege that the setting of minimum load-out rules for LME warehouses by the LME was a competitive process.  They therefore have not alleged that the thing that supposedly caused their injury, *i.e.*, the purported conspiratorial setting of the load-out rates, resulted from any defendant's failure to compete with other defendants.

---

[16]     *See, e.g.*, FLP Compl. ¶¶ 215-32, 365, 381; Agfa Compl. ¶¶ 108, 110; Mag Compl. ¶¶ 107, 109; Commercial Compl. ¶¶ 61, 70, 72-73.

[17]     *See, e.g.*, FLP Compl. ¶¶ 395-97; Commercial Compl. ¶¶ 83-84, 95.  LME futures contracts are settled through the delivery of a "warrant" issued by an LME-approved warehouse. FLP Compl. ¶ 146; Commercial Compl. ¶¶ 53-54; Consumer Compl. ¶ 54.  An LME warrant is a bearer document of title that pertains to a specified lot of metal stored at a specified LME warehouse.  Mag Compl. ¶ 44; Agfa Compl. ¶ 45.  "To issue a warrant means that aluminum has been checked into such a warehouse for storage, and to cancel a warrant means that the aluminum has been earmarked for delivery from the warehouse."  Agfa Compl. ¶ 45.

[18]     *See, e.g.*, Commercial Compl. ¶¶ 76-79; Agfa Compl. ¶¶ 67-70; Mag Compl. ¶¶ 66-69.

Two courts in this Circuit recently reached a similar conclusion in cases involving LIBOR manipulation.  Those courts dismissed antitrust claims for failing to allege antitrust injury because plaintiffs did not allege that their harm resulted from defendants' failure to compete.  *In re Libor*, 935 F. Supp. 2d. at 686; *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014).  Both cases involved allegations that a group of banks conspired to set artificial LIBOR rates.  *In re Libor*, 935 F. Supp. 2d at 681-84; *Laydon*, 2014 WL 1280464, at *1.  Various groups of plaintiffs claimed to have been injured by trading in financial instruments allegedly affected by defendants' LIBOR manipulation.  *Id.* Judge Daniels and Judge Buchwald each concluded that plaintiffs had not alleged antitrust injury because none of them alleged that defendants otherwise would have competed with each other to set LIBOR rates.  *In re Libor*, 935 F. Supp. 2d. at 688-89; *Laydon*, 2014 WL 1280464, at *8.  To the contrary, "the setting of the USD LIBOR benchmark is not competitive; rather it is a cooperative effort wherein otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate."  *Laydon*, 2014 WL 1280464, at *8.  Both courts concluded that, to plead antitrust injury, "[i]t is not sufficient that the plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have."  *Id.* (citing *In re Libor*).  Plaintiffs here likewise have not alleged that the setting of minimum load-out rates for LME warehouses was ever a competitive process.

## II.   PLAINTIFFS ALSO LACK STANDING BECAUSE THEY ARE NOT EFFICIENT ENFORCERS OF THE ANTITRUST LAWS

"A showing of antitrust injury is necessary, but not always sufficient to establish standing."  *Daniel*, 428 F.3d at 443.  Other considerations nevertheless may preclude standing. *Id.*; *see also Paycom*, 467 F.3d at 290 ("[e]ven if a plaintiff adequately alleges an antitrust injury,

it may still be held to lack [antitrust] standing.").  Relying on *AGC,* the Second Circuit has held

that courts must consider four additional factors in determining whether plaintiffs have standing

(what it calls the "efficient enforcer" test):

> (1) the directness or indirectness of the asserted injury;
>
> (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;
>
> (3) the speculativeness of the alleged injury; and
>
> (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (quoting *Paycom*, 467 F.3d at 290-91); *see also AGC*, 459 U.S. at 540-45.

Since *AGC,* courts have balanced all of these factors against each other to determine

standing, and the failure to satisfy any one factor has not necessarily been fatal to the plaintiffs'

claims.  Just last month, however, the Supreme Court made clear that either (a) the indirectness

of the *injury* that plaintiffs assert or (b) the remoteness of plaintiffs *themselves* to the challenged

conduct is each, by itself, fatal to standing, regardless of the other two factors.  *Lexmark*, 134 S.

Ct. at 1392.  As the Supreme Court explained, both of these elements are "requirements, which

must be met in every case" and not "mere factors to be weighed in the balance."  *Id.*  Where, as

here, the alleged injury is indirect and plaintiffs are not directly connected to the purported

violations, plaintiffs lack standing regardless how the other two factors play out.  *Id.*  In any

event, those final two factors also strongly weigh against standing in this case.

### A.    Plaintiffs Lack Standing Because Their Alleged Injuries Are Indirect And Remote

Plaintiffs must plausibly allege a direct "chain of causation" from defendants' conduct to plaintiffs' supposed injury.  *AGC*, 459 U.S. at 540.  "[V]aguely defined links" in the chain of causation are insufficient, *id.*, but there are many of those here.

Based on plaintiffs' own allegations (which are false in the real world but assumed to be true here), their alleged injury results from a convoluted chain of events that includes at least the following:

- One or more warehouse defendants offered financial incentives to aluminum owners as an inducement to store their metal in those defendants' warehouses resulting in an increase in aluminum inventory.[19]

- The financial firm and trader defendants purchased warrants on at least some of the aluminum in the warehouse defendants' warehouses and later cancelled some of those warrants.[20]

- The LME and some combination of the defendants (it is unclear whether plaintiffs are alleging that it was warehouse defendants, financial firms, traders or all of the foregoing) conspired to not increase the minimum load-out rule for LME warehouses.[21]

---

[19]    FLP Compl. ¶¶ 37, 212-14, 381; Commercial Compl. ¶¶ 61, 70-75; Consumer Compl. ¶¶ 5(g), 99; Agfa Compl. ¶¶ 58, 64-66; Mag Compl. ¶¶ 57, 63-65.

[20]    FLP Compl. ¶¶ 382-83, 395-97; Commercial Compl. ¶¶ 138-40; Agfa Compl. ¶ 92; Mag Compl. ¶ 91.  *See also* discussion *supra* n.17.

[21]    FLP Compl. ¶¶ 31, 32(a)-(e), 163-64; Commercial Compl, ¶ 77; Consumer Compl. ¶¶ 59-63, 87-91; Agfa Compl. ¶¶ 67-69; Mag Compl. ¶¶ 66-68.

- The warehouse defendants then did not load out more aluminum than the LME minimum load-out rule required.[22]

- These events collectively caused a backlog or queue in getting aluminum out of some, but not all defendants' warehouses; the aluminum owners could not get the metal out of certain warehouses quickly.[23]

- An independent third party, not alleged to be a conspirator, Platts Metals Week, published something called the "Midwest Premium" based on Platts' own "survey" of "spot buyers and sellers, using a representative sample of producers, traders and different types of end users."[24]

- The length of the queues in defendants' warehouses relates somehow, in some unexplained way, to the premium that Platts chooses to publish based on its survey sampling of unidentified producers, traders and end users.[25]

- When the queues increased in some but not all defendants' warehouses, it somehow caused Platts to report a higher Midwest Premium from its sampling of aluminum transactions.[26]

- Then some unidentified companies (who also are not alleged to be conspirators) chose to sell aluminum to the First Level Purchasers and Commercial End Users

---

[22]     FLP Compl. ¶¶ 32(f), 168; Commercial Compl. ¶ 78; Consumer Compl. ¶ 92; Agfa Compl. ¶¶ 67, 84; Mag Compl. ¶¶ 66, 83.

[23]     FLP Compl. ¶¶ 215, 367, 397; Commercial Compl. ¶¶ 11, 73; Consumer Compl. ¶ 100; Agfa Compl. ¶ 70; Mag Compl. ¶ 69.

[24]     Commercial Compl. ¶ 57; *see also* FLP Compl. ¶ 155; Agfa Compl. ¶ 40; Mag Compl. ¶ 39.

[25]     Commercial Compl. ¶ 57; FLP Compl. ¶ 155.

[26]     FLP Compl. ¶¶ 11, 215-18; Commercial Compl. ¶¶ 8, 57; Consumer Compl. ¶¶ 100, 120-21; Agfa Compl. ¶ 110; Mag Compl. ¶ 109.

in the physical market by pricing their aluminum in some unspecified manner that involves the Platts Midwest Premium.[27]

- Plaintiffs do not allege that those third parties had to use the Platts Premium as part of their pricing, so presumably they could have chosen to price their aluminum in some other manner that did not involve the Platts Premium.

- The First Level Purchasers and Commercial End Users were injured when they paid more for their aluminum than they would have paid if the Platts Midwest Premium were lower.[28]

- The Consumer End Users were injured when they bought things like soda cans and aluminum foil made by someone, somewhere above them in the physical market chain that paid a price based on the Platts Midwest Premium.[29]

This long attenuated chain is not remotely sufficient to allege the type of direct injury necessary to support standing, as multiple courts in this Circuit have found.  In *Reading*, for example, a refiner of copper scrap claimed that a conspiracy to fix the price of refined copper caused it to pay higher prices in the copper scrap market.  631 F.2d at 11-13.  The Second Circuit held that the plaintiff did not have standing to assert its claims because its theory of injury "depend[ed] upon a complicated series of market interactions between two sources of copper: the refined copper market in which defendants acted and the copper scrap market in which [plaintiff] allegedly sustained injuries."  *Id.* at 13.  Just like plaintiffs' claims here, the alleged injury in *Reading* was too remote because there were too many steps in the "attenuated economic

---

[27]    FLP Compl. ¶¶ 11-13, 105-11, 113, 115, 155; Commercial Compl. ¶¶ 18-26; Agfa Compl. ¶ 17; Mag Compl. ¶ 16(a).

[28]    FLP Compl. ¶ 92; Commercial Compl. ¶ 11; Agfa Compl. ¶ 113; Mag Compl. ¶ 111.

[29]    Consumer Compl. ¶¶ 2, 6, 180-85.

causality" chain, and "other market variables could have intervened to affect [the] pricing decisions" that resulted in the price that the refiner of cooper scrap ultimately paid.  *Id.* at 12.

The court reached the same conclusion in *de Atucha*, 608 F. Supp. at 515-16.  There, de Atucha purchased silver futures contracts on the LME and, three months later, sold those contracts for a loss.  De Atucha alleged that the price he paid for the futures contracts on the LME was artificially inflated because certain defendants conspired to restrain trade in the United States silver futures market.  *Id.* at 511-13.  (The LME was not alleged to be a conspirator.)  The court concluded that the alleged injury was indirect and did not support standing because it depended on a complicated series of interactions between the market where the challenged conduct occurred—the United States silver futures market—and the market where de Atucha allegedly suffered an injury—his purchase of futures on the LME.  *Id.* at 518.

In *Ocean View*, 1999 WL 1201701 (discussed *supra*), the court likewise concluded that, because the plaintiff copper manufacturer did not allege an injury "directly flowing from defendants' restraint on competition," his claim was not cognizable under antitrust law.  *Id.* at *4.  Similar to what plaintiffs allege here, Ocean View alleged that "because the United States copper cash market is affected by the LME futures market, defendants' actions on the LME futures market had an adverse effect on it."  *Id.*  But the court concluded that this "tenuous causal chain of events" was indirect and did not support standing.  *Id.*; *see also Laydon*, 2014 WL 1280464, at *8-9 (plaintiffs did not have standing because they alleged no "*direct,* clearly traceable means by which Defendants' alleged manipulation of one benchmark led to a loss to him on contracts linked to an entirely separate benchmark") (emphasis added).[30]

---

[30]     In their opposition to defendants' motions to stay discovery, plaintiffs told the Court that they intend to rely on *Loeb Industries v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), but that case does not support standing here.  The plaintiffs in *Loeb* alleged that they were injured by

Plaintiffs' failure to allege an injury directly connected to the alleged antitrust misconduct is, by itself, fatal to all of their antitrust claims.  *Lexmark*, 134 S. Ct. at 1392.

### B.      Plaintiffs Lack Standing Because There Are More Efficient Enforcers Of The Antitrust Laws

There is yet another independent reason to deny standing:  even if plaintiffs' antitrust theories were correct, there is an identifiable group of more directly injured persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement. *AGC*, 459 U.S. at 542.  In other words, there clearly would be more "efficient enforcers" of the antitrust laws than these plaintiffs.  *Gatt*, 711 F.3d at 79; *see also Daniel*, 428 F.3d at 444.

Plaintiffs allege that defendants' conduct generated warehouse queues that allowed the warehouse defendants (and by extension the LME) to collect more rent from companies whose aluminum was "trapped" in LME warehouses.[31]  Thus, at a minimum, there would be at least one group of more "efficient enforcers," namely the companies that supposedly paid more warehouse rent than they would have been required to pay absent a delivery queue.  The existence of these more efficient enforcers is sufficient, by itself, to deny standing to plaintiffs on their antitrust claims.  *Lexmark*, 134 S. Ct. at 1392.[32]

Consistent with this conclusion, courts in this Circuit have held that only a party that purchases directly from a conspirator has standing to bring an antitrust claim.  *See, e.g.*, *Ambook*

---

anticompetitive conduct focused directly on benchmark prices determined in the futures market. *Id.* at 497-98.  Here, by contrast, plaintiffs merely allege that warehouse queues had an indirect *effect* on an alleged pricing benchmark, a far more indirect theory of causation.  Furthermore, it is far from clear whether *Loeb* remains good law after *Lexmark* or that courts in this Circuit adhere to the reasoning in *Loeb*.  In *Ocean View*, for example, the court analyzed the same issues as *Loeb* and reached a contrary conclusion.

[31]      FLP Compl. ¶¶ 23-24, 58; Commercial Compl. ¶¶ 67-68; Consumer Compl. ¶ 5(b); Agfa Compl. ¶¶ 87, 110; Mag Compl. ¶¶ 86, 109.

[32]      In *Lexmark*, the Court referred to this standing element as "[t]he proximity or remoteness of the party to the alleged injurious conduct."  134 S. Ct. at 1392.

*Enters. v. Time Inc.*, 612 F.2d 604, 620 (2d Cir. 1979) (Friendly, J.) (holding that "summary judgment was properly granted in favor of all defendants in respect of [plaintiff's] dealings with [persons] not named as defendants"); *Ocean View*, 1999 WL 1201701, at *7 (dismissing antitrust claim as "not actionable" where plaintiff "does not allege that it purchased copper from either [defendant]," but rather "alleges that [defendants' conduct] inflated the price of copper generally"); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997) ("[T]he factors outlined by the Supreme Court in *AGC* weigh against finding that consumers who purchased from non-conspiring retailers have standing to assert an antitrust claim."). By way of analogy, if plaintiffs had alleged a conspiracy among certain aluminum smelters to cut their production of aluminum, only those purchasers who purchased from a *conspiring* smelter would have antitrust standing. Purchasers who bought from a non-conspiring smelter that raised its prices due to a general price increase caused by the conspiracy would have no standing to sue. *See Ocean View*, 1999 WL 1201701, at *7; *Gross*, 955 F. Supp. at 247; *see also Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 587 (3d Cir. 1979).

Here, plaintiffs are even further removed from the alleged antitrust violations than a hypothetical purchaser of aluminum from a non-conspiring smelter. Not only do plaintiffs fail to allege that they purchased from a conspirator, but they allege that the anticompetitive conduct took place in purported "markets" distinct from the physical aluminum market in which they purchased. It follows *a fortiori* that plaintiffs' claims are barred by the existence of "more direct victims of the alleged conspiracy" in the form of "those who purchased directly from [allegedly] conspiring [parties]." *Gross*, 955 F. Supp. at 247.

### C.    The Other Two Efficient Enforcer Factors Also Weigh Against Standing

Although the Court need not consider them, the last two efficient enforcer factors also weigh against granting these plaintiffs standing.

First, plaintiffs' injuries are purely speculative.  "Where the 'theory of antitrust injury depends upon a complicated series of market interactions,' the damages are speculative." *Laydon*, 2014 WL 1280464, at *10 (quoting *Reading*, 631 F.2d at 13).  As the above purported chain of causation reflects, there are multiple independent actors and multiple independent decisions made at each level of the chain.  At any point, any of these decision makers could break the causal chain, rendering plaintiffs' theory entirely speculative.  *Reading*, 631 F.2d at 14 (denying standing where claims were "based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change").

Second, the Commercial and Consumer End Users' injuries are clearly duplicative of damages suffered by those above them in the chain, and it would be nearly impossible for the Court to apportion damages properly.  There are multiple steps in the chain between the producers of aluminum and the Commercial End Users, including presumably the First Level Purchasers themselves.  And there are innumerable steps between the producers and the Consumer End Users.  Indeed, the Consumer End Users do not even allege that they purchased anything based on the Platts Midwest Premium; they simply speculate that someone above them in the chain might have done so.[33]

## III.  THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW ANTITRUST CLAIMS FOR THE SAME REASONS

In addition to their Sherman Act claims, plaintiffs assert a variety of state law antitrust claims.[34]  All of these claims fail for the same reason that the federal claims fail—plaintiffs have not alleged antitrust injury, and they do not satisfy the efficient enforcer test.

---

[33]    Consumer Compl. ¶¶ 2, 6, 180-85.

[34]    FLP Compl. ¶¶ 415, 421, 427; Commercial Compl. ¶¶ 242-68, 298; Consumer Compl. ¶¶ 220, 225, 231, 239, 245-66, 295-319.

A federal court sitting in diversity must apply state law as declared by the state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Where the state's highest court has not yet spoken on an issue, a federal court "predict[s] how the state's highest court would resolve any identified uncertainty or ambiguity," including by looking to "rulings of the state's lower courts." *See Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 60 (2d Cir. 2010) (internal citations and quotations omitted); *Daily v. Parker*, 152 F.2d 174, 177 (7th Cir. 1945) ("In the absence of a state court ruling, [a federal court's] duty is tolerably clear. It is to decide, not avoid, the question."). Here, the Court should dismiss all of plaintiffs' state law antitrust claims because courts in those states would follow federal antitrust law on the issues of antitrust injury and standing: (1) the courts of fourteen states and the District of Columbia have applied federal antitrust law in interpreting their state statutes, including *AGC*; (2) ten states' legislatures have enacted statutes that harmonize state antitrust law with federal antitrust law; (3) four states' courts follow a judicially-created harmonization doctrine; and (4) three states would require plausible allegations of antitrust injury and proximate cause, if given the opportunity to address the issue.

### A.   Fourteen States And The District Of Columbia Have Applied Federal Antitrust Precedent When Interpreting Their Own Laws

Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Nebraska, New Mexico, New York, North Dakota, South Dakota, Tennessee, Vermont, and Wisconsin have directly applied federal antitrust law when interpreting their state statutes, including *AGC*.[35] For example, the Iowa Supreme Court has held that "the Iowa legislature did not intend to allow every person tangentially affected by a violation of the statute to have a remedy in damages," and thus applied *AGC* to determine whether any plaintiffs may recover under Iowa law.

---

[35]   *See* Appendix 1 for supporting authority.

*Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 198 (Iowa 2007). Similarly, in *Vinci v. Waste Management., Inc.*, 36 Cal. App. 4th 1811, 1814-15 (Cal. Ct. App. 1995), the California court applied *AGC* and held that a plaintiff did not have antitrust standing under California law, and in *Ho v. Visa U.S.A. Inc.*, No. 112316/00, 2004 WL 1118534, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2004), the New York court applied *AGC* and denied an indirect purchaser standing. *See also In re Refrigerant Compressors Antitrust Litig.*, No. 2:09–md–02042, 2013 WL 1431756, at *9-10 (California, Michigan and New York "apply the *AGC* test").

**B.    Ten States Have Harmonization Statutes**

Florida, Hawaii, Illinois, Massachusetts, Nevada, New Hampshire, Oregon, Rhode Island, Utah, and West Virginia have statutory "harmonization" provisions that require[36] (or at least permit)[37] that their antitrust laws be interpreted in the same manner as analogous federal antitrust law. Federal courts have relied on these state harmonization provisions to conclude that courts in these states would apply federal antitrust law, including *AGC*. *See, e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *9-10.[38]

---

[36]    Hawaii, Illinois, Nevada and West Virginia have harmonization provisions requiring that their state antitrust laws be interpreted consistently with federal antitrust law. *See* Appendix 2 for supporting authority.

[37]    Florida, Massachusetts, New Hampshire, Oregon, Rhode Island, and Utah have harmonization provisions permitting that their state antitrust laws be interpreted consistently with federal antitrust law. *See* Appendix 3 for supporting authority.

[38]    Courts in several states, including Michigan, with permissive harmonization provisions have held that *AGC* applies in determining whether indirect purchasers have antitrust standing. *See Peterson v. Visa U.S.A. Inc.*, No. 03-8080, 2005 WL 1403761, at *4 (D.C. Super. Ct. Apr. 22, 2005) (analyzing antitrust standing in District of Columbia under *AGC* in part because of "the express authorization in § 28-4515 to look to federal precedent"); *Stark v. Visa U.S.A. Inc.*, No. 03-055030, 2004 WL 1879003, at *4 (Mich. Cir. Ct. Jul. 23, 2004) (same under Michigan law).

### C.      Four States Follow a Judicially-Created Harmonization Doctrine

Alabama, Mississippi, North Carolina and South Carolina courts have created harmonization doctrines that permit this Court to look to federal law in construing state antitrust law.[39]   For example, in *Owens Corning v. RJ Reynolds Tobacco Co.*, 868 So. 2d 331, 343-44 (Miss. 2004), the Mississippi Supreme Court looked to federal antitrust law to determine whether a plaintiff had suffered antitrust injury under state antitrust law.  *Id.* at 344 ("'Antitrust injury' is narrowly defined by the legislative purpose of preventing anticompetitive conduct – *i.e.*, conduct that restrains the trade of buyers or sellers within a particular market.") (quoting *Atl. Richfield*, 495 U.S. at 334).

### D.      Arkansas, Wyoming And Minnesota Courts Would Apply Antitrust Injury And Proximate Cause Principles To Dismiss The Claims Alleged Here

Although courts in Arkansas and Wyoming have not expressly addressed whether their state antitrust statutes require plausible allegations of antitrust injury and proximate cause, both surely do.[40]   Indeed, proximate cause is a well-recognized principle across a wide variety of claims in both states.[41]   As the Supreme Court recently stated, courts should "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute."  *Lexmark*, 134 S. Ct. at 1390.  That is because "[f]or centuries, it has been a well-established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause."  *Id.* (internal quotations and citations omitted).  Thus, this Court should conclude that Arkansas and Wyoming would both apply the proximate cause principles of *AGC* and *Lexmark* to their state antitrust statutes.

Although Minnesota has declined to use the *AGC* test to determine standing, in a decision

---

[39]     *See* Appendix 4 for supporting authority.

[40]     *See* Appendix 5 for supporting authority.

[41]     *See* Appendix 5 for supporting authority.

pre-dating *Lexmark,* the Minnesota Supreme Court held that standing under its antitrust statute is governed by "foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law."  *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007). For the reasons set forth above, that standard is not met here.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all plaintiffs' federal and state antitrust claims because plaintiffs lack standing to assert them.

Dated:  New York, New York
         April 22, 2014

/s/ Richard Pepperman, II  (on consent)[42]      /s/ Margaret M. Zwisler

| | |
|---|---|
| Richard C. Pepperman, II | Margaret M. Zwisler (admitted *pro hac vice*) |
| (*peppermanr@sullcrom.com*) | (*margaret.zwisler@lw.com*) |
| Suhana S. Han (*hans@sullcrom.com*) | William R. Sherman |
| Joseph J. Matelis (*matelisj@sullcrom.com*) | (*william.sherman@lw.com*) |
| Yavar Bathaee (*bathaeey@sullcrom.com*) | Jennifer L. Giordano |
| SULLIVAN & CROMWELL LLP | (*jennifer.giordano@lw.com*) |
| 125 Broad Street | Jeffrey H. Newhouse |
| New York, New York 10004 | (*jeffrey.newhouse@lw.com*) |
| Telephone:  (212) 558-4000 | LATHAM & WATKINS LLP |
| Facsimile:  (212) 558-3588 | 555 Eleventh Street, N.W., Suite 1000 |
| | Washington, D.C. 20004 |
| *Attorneys for Defendants GS Power* | Telephone:  (202) 637-2200 |
| *Holdings, LLC, The Goldman Sachs* | Facsimile:  (202) 637-2201 |
| *Group, Inc. and Metro International Trade* | |
| *Services, L.L.C.* | *Attorneys for Defendant The London Metal* |
| | *Exchange and LME Holdings, Ltd.* |

---

[42]     Defendants besides the LME and LME Holdings use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/ Robert D. Wick  (on consent)
Robert D. Wick (*rwick@cov.com*)
Neil K. Roman (*nroman@cov.com*)
Henry Liu (*hliu@cov.com*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 662-5758
Facsimile: (202) 778-5758

*Attorneys for Defendants Henry Bath, LLC
and JP Morgan Chase & Co*

/s/ John M. Nannes  (on consent)
John M. Nannes
(*john.nannes@skadden.com*)
John H. Lyons (admitted *pro hac vice*)
(*john.h.lyons@skadden.com*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant Pacorini Metals USA,
LLC*

/s/ Eliot Lauer  (on consent)
Eliot Lauer *(elauer@curtis.com)*
Jacques Semmelman (*jsemmelman@curtis.com*)
Chelsea McLean (*chelsea.mclean@curtis.com*)
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY  10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*