UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
:
:
IN RE ALUMINUM WAREHOUSING        :   MDL No. 2481
ANTITRUST LITIGATION              :
                                  :   Master Docket No.
This Document Relates To:         :   13-md-2481-KBF-RLE
                                  :
ALL ACTIONS                       :
                                  :
                                  :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT THE LONDON METAL EXCHANGE'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS ALL
<u>COMPLAINTS ON SOVEREIGN IMMUNITY GROUNDS</u>**

LATHAM & WATKINS LLP
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*

Dated:  April 23, 2014

## TABLE OF CONTENTS

                                                    **Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

I.      ORGANIZED UNDER THE LAWS OF THE UNITED KINGDOM, THE LME IS A SEPARATE LEGAL ENTITY FROM THE GOVERNMENT, IT IS NOT A CITIZEN OF THE UNITED STATES, AND IT IS NOT CREATED UNDER THE LAWS OF A THIRD COUNTRY ...............................................................................3

II.     THE LME IS AN AGENCY OR INSTRUMENTALITY OF THE UNITED KINGDOM ......................................................................................................................3

        A.     The LME Is Charged By Statute To Perform A Vital Public Function As An Extension Of The Government ..........................................................................4

        B.     Under UK Law, The LME's Adoption And Implementation Of Its Warehousing Rules Involves A Public Function And Is Subject To Judicial Review Under Principles Of Public Law ....................................................7

        C.     The LME Is Statutorily Immune From Suits For Damages In The Discharge Of Its Regulatory Functions......................................................................9

        D.     The UK Government Actively Supervises The LME Through The FCA .............11

        E.     Courts Have Granted Sovereign Immunity Status To Entities Similar To The LME ...............................................................................................................12

CONCLUSION..............................................................................................................................15

# TABLE OF AUTHORITIES

Page

## CASES

*Alperin v. Vatican Bank*,
    360 F. App'x 847 (9th Cir. 2009) .................................................................................. 4, 9

*Bailey v. Grand Trunk Lines New England*,
    805 F.2d 1097 (2d Cir. 1986) ............................................................................................ 3

*California Department of Water Resources v. Powerex Corp.*,
    533 F.3d 1087 (9th Cir. 2008) ...................................................................................... 4, 12

*Dole Food Co. v. Patrickson*,
    538 U.S. 468, 478 (2003) .................................................................................................. 5

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
    322 F.3d 635 (9th Cir. 2003) ............................................................................................ 6

*Filler v. Hanvit Bank*,
    378 F.3d 213 (2d Cir. 2004) ......................................................................................... 2, 4

*Gates v. Victor Fine Foods*,
    54 F.3d 1457 (9th Cir. 1995) ..................................................................... 3, 12, 14, 15

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010) ............................................................................................................ 3

*In re 650 Fifth Avevnue & Related Properties*,
    881 F. Supp. 2d 533 (S.D.N.Y. 2012) ........................................................................ 2, 3

*Kelly v. Syria Shell Petroleum Development BV*,
    213 F.3d 841 (5th Cir. 2000) ............................................................................................ 4

*Kern v. Oesterreichische Elektrizitaetswirtschaft AG*,
    178 F. Supp. 2d 367 (S.D.N.Y. 2001) .............................................................................. 3

*Melton Medes Ltd. v Securities & Investment Board*,
    [1995] Ch 137 ..................................................................................................................... 9

*Mireskandari v. Mayne*,
    No. CV 12-03861, 2013 WL 2041013 (C.D. Cal. May 14, 2013) ............................ 12, 13, 14

*Murphy v. Korean Asset Mangement Corp.*,
    421 F. Supp. 2d 627 (S.D.N.Y. 2005) ............................................................................... 4

*Nichol v. Gateshead Metropolitan Borough Council*
  (1988) 87 LGR 435 CA .................................................................................................. 8

*Peninsula Asset Mangement (Cayman), Ltd. v. Hankook Tire Co., Ltd.*,
  476 F.3d 140 (2d Cir. 2007) ........................................................................................... 6

*R (Medway Council) v. Secretary of State for Transport*
  [2002] EWHC2516 (Admin) ........................................................................................... 9

*R (Montpeliers & Trevors Ass'n) v. City of Westminster*
  [2005] EWHC 16 (Admin) .............................................................................................. 9

*R v. The London Metal Exch. ex parte United Co. Rusal PLC*,
  [2014] EWHC 890 (Admin) .............................................................................. 8, 13, 14

*R v. The London Metal Exch. Ltd. ex parte Albatros Warehousing Ltd. BV*
  (unpublished March 30, 2000) ................................................................................ passim

*Refco, Inc. v. Galadari*,
  755 F. Supp. 79 (S.D.N.Y. 1991) ................................................................................. 10

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ........................................................................................................ 2

*USX Corp. v. Adriatic Insurance Co.*,
  345 F.3d 190, 209 (3d Cir. 2003) ................................................................................... 5

## STATUTES

5 U.S.C. § 701 ......................................................................................................................... 7

28 U.S.C. § 1603(a) ................................................................................................................ 2

28 U.S.C. § 1603(b) ............................................................................................................ 2, 5

28 U.S.C. § 1604 ................................................................................................................ 1, 2

## OTHER AUTHORITIES

FSMA §§ 1-2 .......................................................................................................................... 6

FSMA §§ 2-6 .......................................................................................................................... 6

FSMA § 3 ................................................................................................................................ 5

FSMA § 3A ............................................................................................................................. 5

FSMA § 3A(1) ........................................................................................................................ 6

FSMA § 19 .................................................................................................................... 4

FSMA § 285(1)(a) ................................................................................................... 6, 12

FSMA § 286(1) ........................................................................................................... 5

FSMA § 286(6) ........................................................................................................... 5

FSMA § 290A ............................................................................................................. 6

FSMA § 290A(1) ........................................................................................................ 5

FSMA § 291 .............................................................................................................. 14

FSMA § 291(1) ........................................................................................................... 9

FSMA § 291(2) ........................................................................................................... 9

FSMA § 293(1) ......................................................................................................... 11

FSMA § 293(2) ......................................................................................................... 15

FSMA § 296 .............................................................................................................. 12

FSMA § 297 ....................................................................................................... 12, 13

FSMA § 300A ..................................................................................................... 11, 14

FSMA § 300B(1) ...................................................................................................... 11

*http://www.judiciary.gov.uk/you-and-the-judiciary/judicial-review* ............................................. 7

**PRELIMINARY STATEMENT**

The London Metal Exchange ("the LME") is, as plaintiffs allege, the world center for industrial metals trading and price-risk management. Its exchange involves futures and options trading in eleven industrial base metals, including aluminum. Although there are cases in which plaintiffs in the U.S. have attempted to state antitrust claims against entities or individuals who trade on the LME, the LME itself has never before been a defendant in a U.S. litigation.

Plaintiffs' complaints here against the LME do not state a claim under the Sherman Act, or any of the state laws that they invoke. But a threshold, and dispositive issue, is that the LME is an agency or instrumentality of the government of the United Kingdom, and is therefore immune from the jurisdiction of this Court under the Foreign Sovereign Immunities Act (the "Immunities Act"), 28 U.S.C. § 1604. The LME operates as an investment exchange today solely because the government of the United Kingdom authorizes it do so. The UK government and English courts recognize that the LME performs a vital public function to maintain an orderly market and to protect investors and therefore they treat the LME like other public bodies when it performs its regulatory functions. In fact, the public function that the LME performs is so important that the UK government has granted statutory immunity to the LME from liability for its activities. These facts alone are enough to grant the LME sovereign immunity in the U.S.

But the LME's case for immunity is even stronger because the manner in which an entity is treated under its own laws is an important component of its status as an instrumentality of its government under the Immunities Act. English courts have expressly held that the very conduct that plaintiffs challenge here—the LME's regulation of its warehouses—is a part of the LME's "public function" that is "woven into a system of governmental control of investment business" in the United Kingdom. *R v. The London Metal Exch. Ltd. ex parte Albatros Warehousing Ltd.*

*BV* (unpublished Mar. 30, 2000), ¶¶ 27-29 ("*Albatros Warehousing*").[1] That means the LME is immune from liability in the UK for the specific conduct that plaintiffs challenge in this lawsuit. Because the Immunities Act is "the sole basis for obtaining jurisdiction" over foreign agencies and instrumentalities, this Court lacks subject-matter jurisdiction over the LME and the claims against it must be dismissed. 28 U.S.C. § 1604; *see, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533, 545-46 (S.D.N.Y. 2012) (Forrest, J.).

## ARGUMENT

The Immunities Act provides that "foreign states" are presumptively immune from the jurisdiction of United States courts. 28 U.S.C. § 1604; *Nelson*, 507 U.S. at 355. The statute defines a "foreign state" to include "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is in turn defined as an entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*Id*. § 1603(b). That is, foreign entities that are distinct from the foreign state itself and are not corporate citizens of one of the United States will be entitled to presumptive immunity under the Immunities Act if they are either an "organ" of a foreign state or are majority owned by a foreign state. *See Filler v. Hanvit Bank*, 378 F.3d 213, 219 (2d Cir. 2004).

---

[1] Declaration of Nicholas David Ong-Seng (Apr. 17, 2014) ("Ong-Seng Decl."), Ex. F.

I.  **ORGANIZED UNDER THE LAWS OF THE UNITED KINGDOM, THE LME IS A SEPARATE LEGAL ENTITY FROM THE GOVERNMENT, IT IS NOT A CITIZEN OF THE UNITED STATES, AND IT IS NOT CREATED UNDER THE LAWS OF A THIRD COUNTRY**

As is demonstrated from the LME's certification of incorporation, the LME is organized under the laws of England and Wales, is a separate entity from the United Kingdom, not a citizen of the United States, and not created under the laws of a third country. Ong-Seng Decl., Ex. A. *See Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100 (2d Cir. 1986) (citizenship under the FSIA is "in accordance with 28 U.S.C. § 1332(c)"); *Hertz Corp. v. Friend*, 559 U.S. 77, 80, 92-93 (2010) (For the purposes of § 1332(c), an entity is a citizen of the state in which it is incorporated or where it has its "principal place of business." "[P]rincipal place of business is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. . . . And in practice it should normally be the place where the corporation maintains its headquarters.") (internal quotation marks omitted). The LME thus satisfies the first and third prongs of the "agency or instrumentality" test.

II. **THE LME IS AN AGENCY OR INSTRUMENTALITY OF THE UNITED KINGDOM**

"'Congress intended the terms "organ" and "agency or instrumentality" to be read broadly.'" *Kern v. Oesterreichische Elektrizitaetswirtschaft AG*, 178 F. Supp. 2d 367, 373 (S.D.N.Y. 2001) (quoting *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995)). In this Circuit, there is no mechanical test for determining whether an entity qualifies as an "organ of a foreign state" in the language of the statute. As this Court has previously stated, there are certain relevant factors that courts can consider, but "[n]o one factor is dispositive or should be given particular weight." *In re 650 Fifth Ave.*, 881 F. Supp. 2d at 549-50. These factors include:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public

3

employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign state law.

*Id.* (citing *Filler*, 378 F.3d at 217).

In evaluating a foreign entity's instrumentality status, courts have eschewed the mechanical application of these factors, *Murphy v. Korean Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 645 (S.D.N.Y. 2005), in favor of a holistic view of the foreign agency or instrumentality, *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1102 (9th Cir. 2008). *See also Kelly v. Syria Shell Petroleum Dev. BV*, 213 F.3d 841, 847 (5th Cir. 2000) ("Although the . . . factors provide a helpful framework, we will *not* apply them mechanically or require that all five support an organ-determination.") (emphasis in original). Moreover, "[a] showing of organ status may be based exclusively on foreign law." *Alperin v. Vatican Bank*, 360 F. App'x 847, 849-50 (9th Cir. 2009) (Vatican bank was entitled to immunity based in part on it being immune from suit in Italy).

Looking holistically at the LME's status under UK law, it is clear that the LME qualifies as an instrumentality of the state within the meaning of the Immunities Act.

### A. The LME Is Charged By Statute To Perform A Vital Public Function As An Extension Of The Government

Under the Financial Services and Markets Act 2000 ("FSMA"), the United Kingdom prohibits a firm from operating as an investment exchange without the government's authorization, unless the firm qualifies for an exemption. Ong-Seng Decl., Ex. B, FSMA, § 19 ("The general prohibition."). Although the UK government did not create the LME when it first came into existence in 1877, the LME is able to operate as an exchange today solely because the

4

government has authorized it to do so.[2]  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (instrumentality status must "be determined at the time suit is filed").  Until last month, the LME was, for many years, the only authorized exchange in the UK for non-ferrous metals.

The UK government has authorized the LME to be a recognised investment exchange ("RIE") under section 285 of the FSMA.[3]  *See* Ong-Seng Decl. ¶¶ 4-5; Ex. C (1988 Recognition Order); Ex. D (2001 Recognition Order).  The FSMA provides that one of its regulatory objectives is to maintain market confidence in the UK financial system, including financial markets and exchanges.  Ong-Seng Decl., Ex. B, FSMA § 3.  Another objective is to "contribut[e] to the protection and enhancement of the stability of the UK financial system."  *Id*. § 3A.  The statute empowers the Treasury to impose regulations upon RIEs to achieve those objectives.  *Id*. § 286(1), (6).

Pursuant to this aspect of the FSMA, the Treasury has adopted requirements for continued recognition as an RIE.  Ong-Seng Decl. ¶¶ 7-8, Ex. E, Financial Services and Markets Act of 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001 (2001/995), as amended  ("Recognition Requirements").  To be considered for recognition, an exchange must apply and, after approval, must comply with the Recognition Requirements.  *See* Ong-Seng Decl., Ex. E, Recognition Requirements § 4; *id.*, Ex. B, FSMA

---

[2]     The fact that the LME is a private entity and that its direct parent, LME Holdings Limited, and indirect parent, Hong Kong Exchanges and Clearing Limited, are also private entities is irrelevant to the issue of whether the LME is an "organ of a foreign state."  An entity is entitled to immunity where it is *either* an "organ of a foreign state" *or* "a majority of [its] shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(2).  The LME is immune because it is an "organ of a foreign state" so it does not have to prove that the UK government owns it.  *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003) ("[S]ection 1603(b)(2) [of the FSIA] does not require a foreign state to have any ownership interest in an entity for it to be its organ.").

[3]     Prior to the passage of the FSMA, the LME operated as an RIE under section 37 of the Financial Services Act of 1986, repealed (the "1986 Act").  *See Albatros Warehousing* ¶ 2.

5

§ 290A(1). The FCA[4] has the power to grant or deny a recognition order to an applying entity. FSMA § 290A; *see also id.* § 285(1)(a) (defining an RIE as "an investment exchange in relation to which a recognition order is in force").

Under the Recognition Requirements, the LME is charged with "protect[ing] the orderly functioning of the market and the interests of investors" on the LME. Ong-Seng Decl. ¶ 10, Ex. E, Recognition Requirements, sch. ¶ 4(1). This is accomplished through the LME's making of transparent and non-discretionary rules, keeping those rules under review, and, where appropriate, consulting the LME's users about possible changes to the rules. *See id.* at ¶ 10. The LME's status as an RIE means that the FCA was satisfied that the LME fulfils its regulatory obligations under the Recognition Requirements.

Maintaining the stability of financial markets is a well-recognized public function that foreign governments perform. *See*, *e.g.*, *Peninsula Asset Mgmt. (Cayman), Ltd. v. Hankook Tire Co., Ltd.*, 476 F.3d 140, 143 (2d Cir. 2007) (discussing the "national purpose of examining, supervising, and investigating Korean financial institutions"); *see also EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003) ("[t]he Japanese government created the RCC to carry out Japanese national policy related to revitalization of the Japanese financial system"). Indeed, the Parliament of the United Kingdom enacted the FSMA precisely for "the protection and enhancement of the stability of the UK financial system." Ong-Seng Decl., Ex. B, FSMA § 3A(1).

---

[4] The FSMA refers to the Financial Services Authority. The Financial Services Authority became the FCA pursuant to Section 6 of the Financial Services Act of 2012. Ong-Seng Decl. ¶ 6. The FCA is a statutorily created body that is charged with regulating the financial services industry in the United Kingdom. *See* Ong-Seng Decl., Ex. B, FSMA §§ 1-2. Its objectives include maintaining market confidence and financial stability, protecting consumers, and reducing financial crime, *id.* §§ 2-6, and it is accountable to Parliament through Her Majesty's Treasury, *id.* sch. 1.

### B. Under UK Law, The LME's Adoption And Implementation Of Its Warehousing Rules Involves A Public Function And Is Subject To Judicial Review Under Principles Of Public Law

UK courts have held that the very conduct at issue in this case—the appropriateness of the LME's conduct in regulating its warehouses—is a "public function" necessary to achieve the LME's statutorily-mandated public purpose. In *Albatros Warehousing*, *supra*, an LME-approved warehouse sought "judicial review" of a decision by the LME's Appeal Committee that imposed a £200,000 fine against the warehouse for breach of the LME's rules regarding warrants. *See* Ong-Seng Decl., Ex. F at ¶¶ 7-16. In the United Kingdom, "judicial review" is a particular type of court proceeding that can be brought only against a "public body" to challenge the process that led to a decision, and not its substance.[5] It is similar to the procedure available to a party "adversely affected or aggrieved by an agency action" for "judicial review" of that action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, in the U.S.

In the *Albatros* case, the LME argued that it was not subject to judicial review because it is a private entity and regulating its warehouses was private conduct, but that argument was rejected by Mr. Justice Richards (now Lord Justice Richards of the Court of Appeal) sitting in the High Court of Justice, Queen's Bench Division. The court noted that the "essential question" was whether the LME was performing a "public function" when it disciplined the warehouse. Ong-Seng Decl., Ex. F at ¶ 23. The court observed that where an entity has been "woven into the fabric of government regulation" or where there has been a "privatisation of government itself," that entity's decisions will be subject to judicial review. *Id.* at ¶¶ 24-25. The court held

---

[5] *See* http://www.judiciary.gov.uk/you-and-the-judiciary/judicial-review. "[J]udicial reviews are a challenge to the way in which a decision has been made, rather than the rights and wrongs of the conclusion reached." Because the UK court is reviewing the actions of a public body, judicial review "[i]s not really concerned with the conclusions of that process and whether those were 'right', as long as the right procedures have been followed." *Id.* The UK "court will not substitute what it thinks is the 'correct' decision." *Id.*

that when the LME is "engaged in the process of regulation," the LME is "performing a function that can properly be said to be woven into a system of governmental control of investment business." *Id*. at ¶ 27. Because the regulation of warehouses was "necessary for the provision of the requisite safeguards to investors and the promotion and maintenance of the standards laid down by Schedule 4" of the 1986 Act,[6] the court concluded that the LME was performing a public function in disciplining the warehouse, and that its decision was subject to "judicial review" and not to civil procedures. *Id*. at ¶¶ 28-29.

The *Albatros* conclusion that the LME performs a public function when it regulates its warehouses was recently confirmed by another High Court Judge sitting in the same court. *See R v. The London Metal Exch. ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin) ("*Rusal*"), attached as Ex. G to Ong-Seng Decl. There, Rusal, a leading producer of aluminum, challenged the LME's adoption of a change in its warehousing rules designed to reduce the queues at its warehouses that are the subject of the complaints in this case. The court again held (this time without challenge from the LME) that the LME's rule change was an aspect of its public function and therefore entitled to "judicial review." Ong-Seng Decl., Ex. G at ¶ 3 (Mr. Justice Phillips stating that "[i]t is not in dispute that the LME is subject to the principles of public law and amenable to judicial review").[7] The court evaluated the fairness of the LME's rule-making process under standards set out in cases judging the actions of indisputably public agencies such as a borough council, the City of Westminster, and the UK Secretary of State for Transport. *Id.* at ¶¶ 66-69 (citing, *inter alia*, *Nichol v. Gateshead Metro. Borough Council*

---

[6] Substantively identical standards to those laid out in Schedule 4 of the 1986 Act are now codified in the Schedule to the Recognition Requirements. *Compare* Ong-Seng Decl., Ex. E, Recognition Requirements, sch. *with* 1986 Act, sch. 4.

[7] The only issue in *Rusal* was whether the LME's "consultation"—*i.e.*, the rule-making process—for LME's new 2014 proposed load-in load-out rules was done in a procedurally fair way.

(1988) 87 LGR 435 CA; *R (Medway Council) v. Secretary of State for Transport* [2002] EWHC2516 (Admin); *R (Montpeliers & Trevors Ass'n) v. City of Westminster* [2005] EWHC 16 (Admin)). Thus, in the United Kingdom, the LME's adoption and implementation of its warehousing rules is subject to judicial review in the Administrative Court like the public actions of other governmental bodies.

      **C.**    **The LME Is Statutorily Immune From Suits For Damages In The Discharge Of Its Regulatory Functions**

Under the same statute that Parliament adopted in 2000 that governs the LME's conduct as a recognised investment exchange, the LME is immune from suits for damages for anything done or omitted in the discharge of its public regulatory functions, absent a showing of bad faith, Ong-Seng Decl., Ex. B, FSMA § 291(1), a showing that requires malice in the sense of personal spite. *See Melton Medes Ltd. v Sec. & Inv. Bd.* [1995] Ch 137.[8]

In cases under the Immunities Act, the defendant's statutory immunity in its own country warrants a finding that the entity is also immune under the Immunities Act. In *Alperin v. Vatican Bank*, 360 F. App'x 847, 849-50 (9th Cir. 2009), for example, survivors and descendants of victims of the Holocaust, and associated organizations, brought suit against the Vatican Bank. The plaintiffs alleged that the Bank profited when proceeds from genocidal acts, such as slave labor, were funneled through it during World War II. The Bank submitted evidence showing its status, structure and role under Vatican law and claimed sovereign immunity under the Immunities Act. The Ninth Circuit first held that it is proper to evaluate the sovereign immunity of a foreign entity by looking exclusively to the manner in which Vatican law treated the Bank.

---

[8]     The LME also is not immune from a claim for damages under section 6 of the Human Rights Act 1998 which makes it unlawful for a "public authority" to act in a way which is incompatible with a Convention right. Ong-Seng Decl., Ex. B, FSMA § 291(2); The European Convention on Human Rights, incorporated in material part into the law of England and Wales by the Human Rights Act 1998.

9

*Id.* ("A showing of organ status may be based exclusively on foreign law."). It concluded that the Bank was immune from suit in the United States because, among other things, the Bank was created under Vatican law for the public purpose of managing assets for religious and charitable works and because it was immune from suit in Italy.

Similarly, in *Refco, Inc. v. Galadari*, 755 F. Supp. 79 (S.D.N.Y. 1991), Judge Motley analyzed a Dubai receivership committee's immunity under the laws of Dubai. There, a decree that formed the committee "provide[d] that 'no liability personal or otherwise shall attach to . . . the Committee.'" *Id.* at 82 (ellipsis in original). The Court found that this "immunity appears to be similar in nature to the immunity afforded courts in this country." *Id.* This fact contributed to the Court's holding that the committee was "clearly" an agency or instrumentality under the Immunities Act. *Id.*

As these cases demonstrate, this Court need not decide whether the LME would have statutory immunity in the UK for the precise conduct at issue in this case in order to conclude that the existence of *any* statutory immunity supports the LME's instrumentality status under the Immunities Act. But the LME's claim for sovereign immunity in the U.S. is made even stronger because English courts have held twice that the LME's regulation of the warehouses that store the aluminum that is the subject of futures contracts settled on its exchange is a public function in aid of the LME's statutory obligation to "protect the orderly functioning of the market and the interests of its investors." *See* Ong-Seng Decl., Ex. E, Recognition Requirements, sch. ¶ 4. Thus, the regulatory regime that the UK government has implemented would not permit these plaintiffs to pursue a claim for damages in the United Kingdom against the LME for the very conduct that is at issue in this United States litigation. The Immunities Act recognizes that the manner in which the defendant is treated in its own country should guide the Court's analysis of

whether plaintiffs can subject the LME to suit in this country, and under that principle, the LME is immune from suit here.

### D. The UK Government Actively Supervises The LME Through The FCA

The government of the United Kingdom, through the FCA, closely and continuously supervises the LME's discharge of its public, regulatory functions under the FSMA, including the rules that are at issue in this case. Ong-Seng Decl. ¶ 16. The FCA has assigned two fulltime case officers to actively supervise the LME. *Id.* at ¶ 17. These officers liaise with various senior staff members at the LME and their teams on a regular basis through in-person meetings, calls and communications. *Id*. at ¶ 18. In addition, the fulltime case officers' direct line manager, the Head of Department for Market Infrastructure and Policy and, ultimately, the Director of Markets at the FCA, also interact with the LME. *Id.* at ¶ 19.

In addition to the dedicated case officers' daily supervision of the LME through regular communication and in-person meetings, the FCA has standing monthly meetings with the LME on a range of different areas, including compliance and warehousing. *Id*. at ¶ 20. The FCA also regularly meets with other senior LME officials, including the Chief Executive Officer and Chairman of the LME. *Id*. At each meeting, the LME updates the FCA on various issues identified by the FCA. *Id.*

In addition to the close and continuous supervision of the LME, the FCA has substantial authority over the LME that it can exercise through three significant means. Ong-Seng Decl. ¶¶ 11, 13. First, the FSMA requires the LME to give the FCA written notice of any proposed changes to the LME's rules "without delay." Ong-Seng Decl., Ex. B, FSMA § 300B(1); *see also id.* § 293(1). The FCA has the "power to disallow" any such change if it finds that the rule does not further the LME's regulatory objectives. *See id.* § 300A. Second, the FCA has the "power" to "direct" the LME to take "specified steps" in order to bring the LME into compliance with its

11

regulatory obligations, should the FCA find that the LME is in danger of failing to meet its obligations under the FSMA or Recognition Requirements. *See id.* § 296. Third, if the FCA finds that the LME had failed to meet any of its obligations, the FCA can revoke the LME's status as an RIE. *See id.* § 297; *see also id.* § 285(1)(a). This active supervision supports a finding of sovereign immunity under the Immunities Act. *See Gates*, 54 F.3d at 1461.

### E.    Courts Have Granted Sovereign Immunity Status To Entities Similar To The LME

The characteristics of the LME have been found by other courts to warrant a finding of immunity. For example, the Central District of California has held that a private UK entity that regulates its constituency and is actively supervised by the UK government is an instrumentality of the United Kingdom entitled to sovereign immunity in *Mireskandari v. Mayne*, No. CV 12-03861, 2013 WL 2041013 (C.D. Cal. May 14, 2013). The Law Society[9] is a legal entity that is charged with the supervision and regulation of solicitors in England and Wales. *Id.* at *2. The "key consideration" in applying the Immunities Act factors was whether the Law Society "engages in a public activity to carry out national policy." *Id.* at *8; *see also id.* ("[A]n entity is an organ of a foreign state . . . if it engages in a public activity on behalf of the foreign government." (quoting, *inter alia*, *Powerex*, 533 F.3d at 1098) (internal quotation marks omitted)). *Compare Mireskandari*, 2013 WL 2041013, at *8, *with Albatros Warehousing* ¶ 23 ("The essential question is whether, in exercising disciplinary powers over listed warehouses, the LME is performing a public function.").

---

[9]    *Mireskandari* dealt with the organ status of both the Law Society and the Solicitors Regulation Authority "an independent, but not legally distinct, entity of [the Law Society that] is charged with carrying out [the Law Society's] regulatory functions." 2013 WL 2041013, at *10. The court, however, treated the Law Society in conjunction with the Solicitors Regulation Authority for the purposes of its organ analysis. *Id*. This brief does the same, and references to the "Law Society" in this brief are collectively to the Law Society and the Solicitors Regulation Authority.

There are numerous parallels between the Law Society and the LME.  For a start, both were chartered in the nineteenth century.  *Mireskandari*, 2013 WL 2041013, at *10.  The Law Society has since been granted "regulatory powers" under various acts of Parliament.  *See id*.  The LME's regulatory powers are also derived from an act of Parliament—the FSMA and implementing regulations, under which the LME is charged with maintaining a fair and orderly market for metal trading.  Ong-Seng Decl., Ex. E, Recognition Requirements, sch. ¶ 4(1); *see* Ong-Seng Decl., Ex. F, *Albatros Warehousing* ¶ 28.  In its regulation of solicitors, the Law Society is comparably "engaged in a public activity to carry out a national policy of promoting a fair and well-regulated justice system."  *Mireskandari*, 2013 WL 2041013, at *11.  The *Mireskandari* court's description of the Law Society as a "public-interest regulator" is akin to *Albatros Warehousing*'s finding that the LME performs a public function when acting in its regulatory capacity.  *Compare Mireskandari*, 2013 WL 2041013, at *10, *with* Ong-Seng Decl., Ex. F, *Albatros Warehousing* ¶ 29, *and also* Ong-Seng Decl., Ex. G, *Rusal* ¶ 3.

The UK government's supervision of the Law Society is also similar to the manner in which it supervises the LME.  Both the LME and the Law Society are "formally independent" from the government, but each is "accountable in their regulatory role" to the UK government: the Law Society is accountable to the Legal Services Board, *see Miresekandari*, 2013 WL 2041013, at *10; the LME is accountable to the FCA, *see* Ong-Seng Decl. ¶¶ 11, 13, 16-21.  Ultimately, the Legal Services Board can revoke the Law Society's status as an "approved regulator," *Miresekandari*, 2013 WL 2041013, at *10 (internal quotation marks omitted), just as the FCA can revoke the LME's status as an RIE, Ong-Seng Decl., Ex. B, FSMA § 297.  While the *Miresekandari* court did not delve into the specifics of the manner in which the Law Society is supervised, the LME is subject to the close and continuous supervision of the FCA.  *See* Ong-

Seng Decl. ¶¶ 16-21.  The one significant difference between the Law Society and the LME is that, unlike the LME, the Law Society does *not* enjoy immunity under UK law.  *Miresekandari*, 2013 WL 2041013, at *9.  That means the LME has an even stronger case for organ status than the Law Society did, and the Law Society was held immune from suit in the United States.

The LME also shares a number of the relevant characteristics that were found to justify organ status for Canada's Alberta Pork Producers Development Corporation ("Alberta Pork"). *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995).  Alberta Pork is a marketing board for the Alberta hog producers that was formed by procedures set forth in Alberta provincial law.  *See id*. at 1460.  Alberta Pork's board members enjoy the same immunity from liability as the LME and its board and staff do under the FSMA.  *Compare id*. at 1461 *with* Ong-Seng Decl., Ex. B, FSMA § 291.  In holding that Alberta Pork was an instrumentality of the government of Alberta, the Ninth Circuit also found relevant that those dissatisfied with a decision of Alberta Pork's board could take an appeal to a government-appointed body, *Gates*, 54 F.3d at 1461, in a similar fashion to the judicial-review mechanism recognized by *Albatros Warehousing* (¶ 29) and *Rusal* (¶ 3).

Like the LME is to the FCA (and the Law Society is to the Legal Services Board), Alberta Pork is accountable in its actions to the Alberta Agricultural Products Marketing Council.  *Gates*, 54 F.3d at 1460-61.  *Gates* found that the Marketing Council played an "active supervisory role" over Alberta Pork despite the fact that the Council did not exercise "day-to-day control" of Alberta Pork.  *Id*.  In supervising Alberta Pork, the Marketing Council has the power to require that Alberta Pork amend or repeal any of Alberta Pork's regulation.  *Id*. at 1461.  Analogously, the FCA has the "power to disallow" changes that the LME proposes to its rules. *See* Ong-Seng Decl., Ex. B, FSMA § 300A.  The FCA also has the power to request information

14

from the LME, *see id*. § 293(2), in much the same way as the Marketing Council "has the authority to require [Alberta Pork] to furnish it with any information and records that the Council desires." *Gates*, 54 F.3d at 1461.

In sum, the statutory regime under which the LME operates, and the treatment of the LME under UK law, establishes that the LME is an agency or instrumentality of the UK government when it performs its public functions, including the very public functions under challenge in these cases, and the LME is thus immune from suit under the Immunities Act.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of the plaintiffs' complaints against the LME because the Court does not have subjection matter jurisdiction over the LME.

Dated:  New York, New York
        April 23, 2014

Respectfully submitted,

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*