**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
               :

IN RE ALUMINUM WAREHOUSING     :       MDL No. 2481
ANTITRUST LITIGATION             :

This Document Relates To:            :    Master Docket No.
                              :    13-md-2481-KBF-RLE

ALL ACTIONS                      :
               :
               :
               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## DECLARATION OF NICHOLAS DAVID ONG-SENG IN SUPPORT OF THE LONDON METAL EXCHANGE'S MOTION TO DISMISS ALL COMPLAINTS

      I, Nicholas David Ong-Seng, declare under penalty of perjury that the following is true and correct, to the best of my knowledge, information and belief:

      1.      I am the Managing Director: Regulation and Compliance (previously known as the Executive Director: Regulation and Compliance) of The London Metal Exchange ("the LME"), the defendant in this action.  I have held this position since 2 September 2013.  I have personal knowledge of the LME's statutory and regulatory background and its relationship with the Financial Conduct Authority (the "FCA").  I submit this declaration in support of the LME's motion to dismiss based on the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604.

**History of the LME**

      2.      The LME was established in 1877 and is the world center for industrial metals trading and price-risk management.  It operates futures and options markets in eleven industrial base metals, including aluminum.  The LME is headquartered at 56 Leadenhall Street, London, EC3A 2DX, United Kingdom.

3.      The LME's registered office is located in England/Wales.  Attached hereto as Exhibit A is a true and correct copy of the LME's Certification of Incorporation On Re-Registration of a Limited Company as Unlimited, dated Dec. 13, 2012.

**The LME's Status as a Recognised Investment Exchange under UK Law**

4.      The LME is a "recognised investment exchange" ("RIE") within the meaning of section 285 of the Financial Services and Markets Act 2000, as amended ("FSMA").  This means that it is "an investment exchange in relation to which a recognition order is in force."  Recognition orders are granted by the FCA pursuant to Section 290 of FSMA.  Attached hereto as Exhibit B is a true and correct copy of excerpts of the FSMA.

5.      The Securities and Investment Board granted the LME RIE status on April 25, 1988.  Attached hereto as Exhibit C is a true and correct copy of an Order, Securities and Investment Board, dated Apr. 25, 1988.  This status was confirmed by the Financial Services Authority on December 3, 2001.  Attached hereto as Exhibit D is a true and correct copy of Letter, "LME Status Under FISMA," dated Dec. 3, 2001.

6.      The Securities and Investment Board was renamed The Financial Services Authority (the "FSA") in 1997.  The FSA was renamed the FCA pursuant to section 6 of the Financial Services Act of 2012, which amended the FSMA.  The FCA is a statutorily created body that is charged with regulating the financial services industry in the United Kingdom, *see* FSMA § 1-2, and it is accountable to Parliament through Her Majesty's Treasury, FSMA Schedule 1.

7.      The FSMA provides that one of its regulatory objectives is to maintain market confidence in the UK financial system, including financial markets and exchanges.  FSMA § 3.  Another objective is to "contribut[e] to the protection and enhancement of the stability of the UK

financial system."  FSMA § 3A.  The statute empowers the Treasury to impose regulations upon RIEs to achieve those objectives.  FSMA § 286(1), (6).

8.     Pursuant to this aspect of FSMA, the Treasury has adopted requirements for continued recognition as an RIE, which are known as the "Recognition Requirements." Financial Services and Markets Act 2000 (Recognition Requirement for Investment Exchanges and Clearing Houses) Regulations 2001 (2001/995), as amended ("Recognition Requirements"). To be recognized, an exchange must comply with the Recognition Requirements.  Attached hereto as Exhibit E is a true and correct copy of excerpts of the Recognition Requirements.

9.     As an RIE, the LME has a responsibility to uphold standards on its investment exchange in accordance with the Recognition Requirements.  The LME's status as an RIE means that the FCA was satisfied that the LME fulfils its regulatory obligations under the FSMA and the Recognition Requirements.

10.    Under the Recognition Requirements, the LME has the obligation under UK law to maintain an orderly market and afford proper protection to investors on the LME. Recognition Requirements, sch., ¶ 4(1).  *See* Exhibit E.  This is accomplished through the LME's making of transparent and non-discretionary rules, keeping those rules under review, and, where appropriate, consulting the LMEs' users about possible changes to the rules.  *See id*. ¶ 7.

11.    Whenever the LME proposes a change to its rules, it must give the FCA notice of such proposals "without delay."   FSMA § 300B(1); *see also id.* § 293(1).  In reviewing the proposed change, the FCA can require the LME to provide it with additional information about the proposed change.  *See id*. § 300B(3)(b).  If the FCA finds that the proposed change does not pursue a "reasonable regulatory objective" or is "disproportionate to the end to be achieved," then the FCA has the "power to disallow" the proposed change.  *Id*. § 300A.

12.     The LME is also charged under the Recognition Requirements with the additional regulatory obligations of, *inter alia*:

     a.    monitoring and enforcing the LME users' compliance with its rules. Recognition Requirements, sch., ¶ 8(1)(a).

     b.    establishing procedures to investigate and resolve "complaints arising in connection with the performance of, or failure to perform, any of [the LME's] regulatory functions."  Recognition Requirements, sch., ¶¶ 9(1), 8(2)(a).

     c.    promoting and maintaining high standards of integrity and fair dealing in the carrying on of regulated investment activity and cooperating with the FCA and other supervising entities in the promotion and maintenance of these standards.  Recognition Requirements, sch., ¶ 6.

13.     Under section 296 of the FSMA, "[t]he Authority may direct the body to take specified steps for the purpose of securing the body's compliance with" either "the recognition requirements" or "any obligation of the kind in question."  *Id.* § 296(2)(a)-(b).  "This section applies if it appears to the Authority that a recognised body" either "has failed, or is likely to fail, to satisfy the recognition requirements" or "has failed to comply with any other obligation imposed on it by or under this Act."  *Id.* § 296(1)(a)-(b).  Moreover, "[i]f it appears to the Authority that a recognised body" either "is failing, or has failed, to satisfy the recognition requirements" or "is failing, or has failed, to comply with any other obligation imposed on it by or under the Act, it may make an order revoking the recognition order for that body even though the body does not wish the order to be made."  *Id.* § 297(2)(a)-(b).

14.     As an RIE, the LME, its officers and its staff are immune from suits for damages in the discharge of the LME's regulatory functions, except if bad faith is proven.   FSMA § 291(1).

15.     UK courts have held that because the LME's regulation is "woven into a system of governmental control of investment business," the LME is amenable to judicial review in the courts of the United Kingdom for actions taken in its regulatory capacity.   *R v. The London Metal Exch. ex parte Albatros Warehousing Ltd. BV* (unpublished Mar. 30, 2000), ¶¶ 28-29; *see also R v. The London Metal Exchange ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin), ¶ 3.   Attached hereto as Exhibit F is a true and correct copy of the *Albatros Warehousing* decision.   Attached hereto as Exhibit G is a true and correct copy of the *Rusal* decision.

## Active Supervision by the Financial Conduct Authority

16.     The FCA closely and continuously supervises the LME's discharge of its regulatory obligations under the FSMA.   This involves regular communication and meetings between the LME and the FCA on a wide range of issues.

17.     I have seen first-hand the close and continuous supervision by the FCA of the LME.   The resources deployed by the FCA in its supervision of the LME include two case officers designated full-time to the supervision of the LME, as well as their managers.

18.     These two case officers liaise with various senior staff members at the LME and their teams on a regular basis through in-person meetings, calls and communications.

19.     In addition, the full-time case officers' direct line Manager of Derivatives, the Head of Department for Market Infrastructure and Policy and, ultimately, the Director of the Markets Division at the FCA, also interact with the LME.

20.     The FCA also conducts standing monthly  meetings with the LME on a range of different areas including Compliance, Warehousing, IT, Finance, Human Resources, Market Operations, Strategy, Business Development as well as conducting meetings with the Chief Executive and the Chairman of the LME.   At each meeting, the LME updates the FCA on various issues identified by the FCA.

21.     As a part of  this close and continuous supervision of the LME, the FCA has used its authority to request information from the LME.  *See* FSMA § 293(2).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information and belief.

Executed on April 17, 2014

Nicholas David Ong-Seng

EXHIBIT A



# CERTIFICATE OF INCORPORATION
# ON RE-REGISTRATION OF A LIMITED COMPANY
# AS UNLIMITED

Company No. 2128666

The Registrar of Companies for England/Wales hereby certifies that

## THE LONDON METAL EXCHANGE LIMITED

formerly registered as limited has this day been re-registered under the Companies Act 2006 as unlimited, under the name of

## THE LONDON METAL EXCHANGE

and its registered office is situated in England/Wales.

Given at Companies House on 13th December 2012



**Companies House**



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES

EXHIBIT B

***Status:*** This version of this Act contains provisions that are prospective.

***Changes to legislation:*** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)



# Financial Services and Markets Act 2000

## 2000 CHAPTER 8

An Act to make provision about the regulation of financial services and markets; to provide for the transfer of certain statutory functions relating to building societies, friendly societies, industrial and provident societies and certain other mutual societies; and for connected purposes.                    [14th June 2000]

Be it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

---

**Annotations:**

**Modifications etc. (not altering text)**

C1    Act restricted (11.8.2001) by S.I. 2001/2659, **art. 2(4)(c)**

Act excluded (1.12.2001) by S.I. 2001/2617, **arts. 2(b)**, 10(9); S.I. 2001/3538, **art. 2(1)**

Act: specified provisions excluded (1.12.2001) by S.I. 2001/2957, **arts. 1**, 13(8)(b); S.I. 2001/3538, **art. 2(1)**

Act restricted (1.12.2001) by S.I. 2001/3646, **arts. 2(7)(b)**, 4(6)(b), 6(4)(b), 7(4)(c), 8(4)(b), 9(4)(b)

Act applied (with modifications) by S.I. 1994/188, **reg. 4** (as amended (1.12.2001) by S.I. 2001/3649, **arts. 1**, 454)

C2    Act modified (18.7.2002 for certain purposes and 21.8.2002 otherwise) by The Electronic Commerce Directive (Financial Services and Markets) Regulations 2002 (S.I. 2002/1775), regs. 1, **17**

C3    Act extended (E.W.S) (1.1.2003) by 2000 c. 39, s. 15(2); S.I. 2002/2711, **art. 2** (subject to arts. 3-5)

C4    Act: power to modify, exclude or apply conferred (N.I.) (10.8.2004) by Open-Ended Investment Companies Act (Northern Ireland) 2002 (c. 13 (N.I.)), **ss. 1(2)(l)(3)(b)(f)(4)**, 4; S.R. 2004/333, **art. 2**

C5    Act extended (18.2.2004) by The Insurers (Reorganisation and Winding Up) Regulations 2004 (S.I. 2004/353), **regs. 2(5)**, 3

C6    Act extended (5.5.2004) by The Credit Institutions (Reorganisation and Winding up) Regulations 2004 (S.I. 2004/1045), **reg. 2(5)**

C7    Act extended by The European Communities (Lawyer's Practice) Regulations 2000 (S.I. 2000/1119), reg. 14, Sch. 3 Pt. 1 (as amended (16.9.2004) by The European Communities (Lawyer's Practice) (Amendment) Regulations 2004 (S.I. 2004/1628), **reg. 6**

**Status:** This version of this Act contains provisions that are prospective.
**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

**C8**   Act modified (31.10.2004) by The Financial Services and Markets Act 2000 (Transitional Provisions) (Mortgages) Order 2004 (S.I. 2004/2615), arts. 1(2)(b), 5, **Sch. para. 5**

**C9**   Act modified (31.12.2004) by The Insurance Accounts Directive (Lloyd's Syndicate and Aggregate Accounts) Regulations 2004 (S.I. 2004/3219), **reg. 16(4)**

**C10**   Act modified (14.1.2005) by The Financial Services and Markets Act 2000 (Transitional Provisions) (General Insurance Intermediaries) Order 2004 (S.I. 2004/3351), arts. 1(2)(b), 5, **Sch. para. 5**

**C11**   Act restricted (E.W.) (1.3.2007) by National Health Service Act 2006 (c. 41), **ss. 71(8)**, 277

**C12**   Act modified (6.4.2007) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) Order 2006 (S.I. 2006/1969), arts. 1(3), 7, **Sch. para. 5**

**C13**   Act modified (30.6.2008 for certain purposes and 1.1.2009 otherwise) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) (No. 2) Order 2007 (S.I. 2007/3510), arts. 1(2), **8(1)(2)**, **9**

**C14**   Act modified (1.7.2009 for certain purposes and 30.6.2010 otherwise) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) Order 2009 (S.I. 2009/1342), arts. 1(2), 34, Sch. paras. 4, **5**

---

## PART I

### THE REGULATOR

**1**        **The Financial Services Authority.**

(1) The body corporate known as the Financial Services Authority ("the Authority") is to have the functions conferred on it by or under this Act.

(2) The Authority must comply with the requirements as to its constitution set out in Schedule 1.

(3) Schedule 1 also makes provision about the status of the Authority and the exercise of certain of its functions.

[^F1^(4) Section 249 of the Banking Act 2009 provides for references to functions of the Authority (whether generally or under this Act) to include references to functions conferred on the Authority by that Act (subject to any order under that section).]

**Annotations:**

**Amendments (Textual)**
**F1**   S. 1(4) added (17.2.2009 for certain purposes and 21.2.2009 otherwise) by Banking Act 2009 (c. 1), **ss. 249(4)**, 263(1) (with s. 247); S.I. 2009/296, **arts. 2, 3**, Sch. para. 9

**Modifications etc. (not altering text)**
**C15**   S. 1(3) extended (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8, **Sch. 2 para. 2**

*The Authority's general duties*

**2**        **The Authority's general duties.**

(1) In discharging its general functions the Authority must, so far as is reasonably possible, act in a way—

**Status:** This version of this Act contains provisions that are prospective.

**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

    (a)   which is compatible with the regulatory objectives; and

    (b)   which the Authority considers most appropriate for the purpose of meeting those objectives.

(2) The regulatory objectives are—

    (a)   market confidence;

[**F2**(ab)   financial stability;]

    **F3**(b)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    (c)   the protection of consumers; and

    (d)   the reduction of financial crime.

(3) In discharging its general functions the Authority must have regard to—

    (a)   the need to use its resources in the most efficient and economic way;

    (b)   the responsibilities of those who manage the affairs of authorised persons;

    (c)   the principle that a burden or restriction which is imposed on a person, or on the carrying on of an activity, should be proportionate to the benefits, considered in general terms, which are expected to result from the imposition of that burden or restriction;

    (d)   the desirability of facilitating innovation in connection with regulated activities;

    (e)   the international character of financial services and markets and the desirability of maintaining the competitive position of the United Kingdom;

    (f)   the need to minimise the adverse effects on competition that may arise from anything done in the discharge of those functions;

    (g)   the desirability of facilitating competition between those who are subject to any form of regulation by the Authority.

[**F4**(h)   the desirability of enhancing the understanding and knowledge of members of the public of financial matters (including the UK financial system).]

(4) The Authority's general functions are—

    (a)   its function of making rules under this Act (considered as a whole);

    (b)   its function of preparing and issuing codes under this Act (considered as a whole);

    (c)   its functions in relation to the giving of general guidance (considered as a whole); and

    (d)   its function of determining the general policy and principles by reference to which it performs particular functions.

(5) "General guidance" has the meaning given in section 158(5).

---

**Annotations:**

**Amendments (Textual)**

**F2**   S. 2(2)(ab) inserted (8.4.2010) by Financial Services Act 2010 (c. 28), **ss. 1(2)**, 26(1)(a)

**F3**   S. 2(2)(b) omitted (12.10.2010) by virtue of Financial Services Act 2010 (c. 28), **ss. 2(2)(a)**, 26(3); S.I. 2010/2480, **art. 2**

**F4**   S. 2(3)(h) inserted (12.10.2010) by Financial Services Act 2010 (c. 28), **ss. 2(2)(b)**, 26(3); S.I. 2010/2480, **art. 2**

**Modifications etc. (not altering text)**

**C16**   S. 2(4)(a) restricted (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), Sch. 2 paras. 9, **11**

**Status:** This version of this Act contains provisions that are prospective.
**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

> **C17**   S. 2(4)(c) restricted (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), **Sch. 2 paras. 13-16**

*The regulatory objectives*

### 3      Market confidence.

(1) The market confidence objective is: maintaining confidence in [**F5**the UK financial system].

(2) [**F6**In this Act "the UK financial system"] means the financial system operating in the United Kingdom and includes—

    (a)    financial markets and exchanges;

    (b)    regulated activities; and

    (c)    other activities connected with financial markets and exchanges.

> **Annotations:**
>
> **Amendments (Textual)**
> **F5**   Words in s. 3(1) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 2(2)**
> **F6**   Words in s. 3(2) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 2(3)**

### [**F7**3A    Financial stability

> **Annotations:**
>
> **Amendments (Textual)**
> **F7**   S. 3A inserted (8.4.2010) by Financial Services Act 2010 (c. 28), **ss. 1(3)**, 26(1)(a)

(1) The financial stability objective is: contributing to the protection and enhancement of the stability of the UK financial system.

(2) In considering that objective the Authority must have regard to—

    (a)    the economic and fiscal consequences for the United Kingdom of instability of the UK financial system;

    (b)    the effects (if any) on the growth of the economy of the United Kingdom of anything done for the purpose of meeting that objective; and

    (c)    the impact (if any) on the stability of the UK financial system of events or circumstances outside the United Kingdom (as well as in the United Kingdom).

(3) The Authority must, consulting the Treasury, determine and review its strategy in relation to the financial stability objective.]

### 4      Public awareness.

**F8**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Amendments (Textual)**

**F8** S. 4 omitted (12.10.2010) by virtue of Financial Services Act 2010 (c. 28), **ss. 2(3)**, 26(3); S.I. 2010/2480, **art. 2**

---

## 5 The protection of consumers.

(1) The protection of consumers objective is: securing the appropriate degree of protection for consumers.

(2) In considering what degree of protection may be appropriate, the Authority must have regard to—

    (a) the differing degrees of risk involved in different kinds of investment or other transaction;

    (b) the differing degrees of experience and expertise that different consumers may have in relation to different kinds of regulated activity;

[**F9**(ba) any information which the consumer financial education body has provided to the Authority in the exercise of the consumer financial education function;]

    (c) the needs that consumers may have for advice and accurate information; and

    (d) the general principle that consumers should take responsibility for their decisions.

[**F10**(3) Sections 425A and 425B (meaning of "consumers") apply for the purposes of this section.]

---

**Annotations:**

**Amendments (Textual)**

**F9** S. 5(2)(ba) inserted (12.10.2010) by Financial Services Act 2010 (c. 28), **ss. 2(4)**, 26(3); S.I. 2010/2480, **art. 2**

**F10** S. 5(3) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 4**

**Modifications etc. (not altering text)**

**C18** S. 5(3) modified (18.6.2001) by S.I. 2001/1821, **arts. 1(1)**, 3(4)

---

## 6 The reduction of financial crime.

(1) The reduction of financial crime objective is: reducing the extent to which it is possible for a business carried on—

    (a) by a regulated person, or

    (b) in contravention of the general prohibition,

to be used for a purpose connected with financial crime.

(2) In considering that objective the Authority must, in particular, have regard to the desirability of—

    (a) regulated persons being aware of the risk of their businesses being used in connection with the commission of financial crime;

***Status:** This version of this Act contains provisions that are prospective.*
***Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)*

    (b)   regulated persons taking appropriate measures (in relation to their administration and employment practices, the conduct of transactions by them and otherwise) to prevent financial crime, facilitate its detection and monitor its incidence;

    (c)   regulated persons devoting adequate resources to the matters mentioned in paragraph (b).

(3) "Financial crime" includes any offence involving—

    (a)   fraud or dishonesty;

    (b)   misconduct in, or misuse of information relating to, a financial market; or

    (c)   handling the proceeds of crime.

(4) "Offence" includes an act or omission which would be an offence if it had taken place in the United Kingdom.

(5) "Regulated person" means an authorised person, a recognised investment exchange or a recognised clearing house.

*[F11Enhancing public understanding of financial matters etc*

---

**Annotations:**

**Amendments (Textual)**

    **F11**   S. 6A and preceding cross-heading inserted (8.4.2010) by Financial Services Act 2010 (c. 28), **ss. 2(5),** 26(1)(b)

---

**6A       Enhancing public understanding of financial matters etc**

(1) The Authority must establish a body corporate ("the consumer financial education body") whose function ("the consumer financial education function") is to enhance—

    (a)   the understanding and knowledge of members of the public of financial matters (including the UK financial system); and

    (b)   the ability of members of the public to manage their own financial affairs.

(2) The consumer financial education function includes, in particular—

    (a)   promoting awareness of the benefits of financial planning;

    (b)   promoting awareness of the financial advantages and disadvantages in relation to the supply of particular kinds of goods or services;

    (c)   promoting awareness of the benefits and risks associated with different kinds of financial dealing (which includes informing the Authority and other bodies of those benefits and risks);

    (d)   the publication of educational materials or the carrying out of other educational activities; and

    (e)   the provision of information and advice to members of the public.

(3) Schedule 1A makes further provision about the consumer financial education body.]

---

***Status:*** *This version of this Act contains provisions that are prospective.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

---

*Corporate governance*

**7      Duty of Authority to follow principles of good governance.**

   In managing its affairs, the Authority must have regard to such generally accepted principles of good corporate governance as it is reasonable to regard as applicable to it.

*Arrangements for consulting practitioners and consumers*

**8      The Authority's general duty to consult.**

   The Authority must make and maintain effective arrangements for consulting practitioners and consumers on the extent to which its general policies and practices are consistent with its general duties under section 2.

| Annotations: |
|---|
| **Modifications etc. (not altering text)**<br>   C19   S. 8 excluded (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8, **Sch. 2 para. 5** |

**9      The Practitioner Panel.**

   (1) Arrangements under section 8 must include the establishment and maintenance of a panel of persons (to be known as "the Practitioner Panel") to represent the interests of practitioners.

   (2) The Authority must appoint one of the members of the Practitioner Panel to be its chairman.

   (3) The Treasury's approval is required for the appointment or dismissal of the chairman.

   (4) The Authority must have regard to any representations made to it by the Practitioner Panel.

   (5) The Authority must appoint to the Practitioner Panel such—
      (a)   individuals who are authorised persons,
      (b)   persons representing authorised persons,
      (c)   persons representing recognised investment exchanges, and
      (d)   persons representing recognised clearing houses,
   as it considers appropriate.

**10      The Consumer Panel.**

   (1) Arrangements under section 8 must include the establishment and maintenance of a panel of persons (to be known as "the Consumer Panel") to represent the interests of consumers.

   (2) The Authority must appoint one of the members of the Consumer Panel to be its chairman.

   (3) The Treasury's approval is required for the appointment or dismissal of the chairman.

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

(4) The Authority must have regard to any representations made to it by the Consumer Panel.

(5) The Authority must appoint to the Consumer Panel such consumers, or persons representing the interests of consumers, as it considers appropriate.

[**F12**(5A) The Secretary of State may direct the Authority to appoint as a member of the Consumer Panel a person specified by the Secretary of State who—

    (a) is a non-executive member of the National Consumer Council, and

    (b) is nominated for the purposes of this subsection by the National Consumer Council after consultation with the Authority.

(5B) Only one person may, at any time, be a member of the Consumer Panel appointed in accordance with a direction under subsection (5A); but that does not prevent the Authority appointing as a member of the Consumer Panel any person who is also a member of the National Consumer Council.

(5C) A person appointed in accordance with a direction under subsection (5A) ceases to be a member of the Panel on ceasing to be a non-executive member of the National Consumer Council.]

(6) The Authority must secure that the membership of the Consumer Panel is such as to give a fair degree of representation to those who are using, or are or may be contemplating using, services otherwise than in connection with businesses carried on by them.

[**F13**(7) Sections 425A and 425B (meaning of "consumers") apply for the purposes of this section, but the references to consumers in this section do not include consumers who are authorised persons.]

---

**Annotations:**

**Amendments (Textual)**
**F12**  S. 10(5A)-(5C) inserted (21.12.2007) by Consumers, Estate Agents and Redress Act 2007 (c. 17), **ss. 39**, 66(2) (with s. 6(9)); S.I. 2007/3546, **art. 3**, Sch.
**F13**  S. 10(7) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 5**

**Modifications etc. (not altering text)**
**C20**  S. 10(7) modified (18.6.2001) by S.I. 2001/1821, **arts. 1(1)**, 3(4)

---

**11        Duty to consider representations by the Panels.**

(1) This section applies to a representation made, in accordance with arrangements made under section 8, by the Practitioner Panel or by the Consumer Panel.

(2) The Authority must consider the representation.

(3) If the Authority disagrees with a view expressed, or proposal made, in the representation, it must give the Panel a statement in writing of its reasons for disagreeing.

---

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

---

*Reviews*

### 12    Reviews.

(1) The Treasury may appoint an independent person to conduct a review of the economy, efficiency and effectiveness with which the Authority has used its resources in discharging its functions.

(2) A review may be limited by the Treasury to such functions of the Authority (however described) as the Treasury may specify in appointing the person to conduct it.

(3) A review is not to be concerned with the merits of the Authority's general policy or principles in pursuing regulatory objectives or in exercising functions under Part VI.

(4) On completion of a review, the person conducting it must make a written report to the Treasury—

    (a)    setting out the result of the review; and

    (b)    making such recommendations (if any) as he considers appropriate.

(5) A copy of the report must be—

    (a)    laid before each House of Parliament; and

    (b)    published in such manner as the Treasury consider appropriate.

(6) Any expenses reasonably incurred in the conduct of a review are to be met by the Treasury out of money provided by Parliament.

(7) "Independent" means appearing to the Treasury to be independent of the Authority.

---

**Annotations:**

**Modifications etc. (not altering text)**
**C21**   S. 12 modified (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8, **Sch. 2 para. 6**

---

### 13    Right to obtain documents and information.

(1) A person conducting a review under section 12—

    (a)    has a right of access at any reasonable time to all such documents as he may reasonably require for purposes of the review; and

    (b)    may require any person holding or accountable for any such document to provide such information and explanation as are reasonably necessary for that purpose.

(2) Subsection (1) applies only to documents in the custody or under the control of the Authority.

(3) An obligation imposed on a person as a result of the exercise of powers conferred by subsection (1) is enforceable by injunction or, in Scotland, by an order for specific performance under section 45 of the [M1]Court of Session Act 1988.

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Marginal Citations**

**M1**   1988 c. 36.

---

*Inquiries*

**14        Cases in which the Treasury may arrange independent inquiries.**

(1) This section applies in two cases.

(2) The first is where it appears to the Treasury that—

    (a)   events have occurred in relation to—

        (i) a collective investment scheme, or

        (ii) a person who is, or was at the time of the events, carrying on a regulated activity (whether or not as an authorised person),

    which posed or could have posed a grave risk to [**F14**the UK financial system] or caused or risked causing significant damage to the interests of consumers; and

    (b)   those events might not have occurred, or the risk or damage might have been reduced, but for a serious failure in—

        (i) the system established by this Act [**F15**, or by any previous statutory provision,] for the regulation of such schemes or of such persons and their activities; or

        (ii) the operation of that system.

(3) The second is where it appears to the Treasury that—

    (a)   events have occurred in relation to listed securities or an issuer of listed securities which caused or could have caused significant damage to holders of listed securities; and

    (b)   those events might not have occurred but for a serious failure [**F16** in—

        (i) the regulatory system established by Part 6 or by any previous statutory provision concerned with the official listing of securities; or

        (ii) the operation of that system.]

(4) If the Treasury consider that it is in the public interest that there should be an independent inquiry into the events and the circumstances surrounding them, they may arrange for an inquiry to be held under section 15.

[**F17**(5) Sections 425A and 425B (meaning of "consumers") apply for the purposes of this section.]

(5A) "Event" does not include any event occurring before 1st December 2001 (but no such limitation applies to the reference in subsection (4) to surrounding circumstances).

(6) **F18** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(7) "Listed securities" means anything which has been admitted to the official list under Part VI.

**Status:** This version of this Act contains provisions that are prospective.

**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Amendments (Textual)**

**F14**  Words in s. 14(2)(a) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 6(2)**

**F15**  Words in s. 14(2)(b)(i) inserted (7.6.2005) by Inquiries Act 2005 (c. 12), **ss. 46(2)**, 51(1) (with ss. 44, 50); S.I. 2005/1432, **art. 2**

**F16**  Words in s. 14(3)(b) substituted (7.6.2005) by Inquiries Act 2005 (c. 12), **ss. 46(3)**, 51(1) (with ss. 44, 50); S.I. 2005/1432, **art. 2**

**F17**  S. 14(5) substituted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 6(3)**

**F18**  S. 14(6) omitted (8.4.2010) by virtue of Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 6(4)**

---

**15**      **Power to appoint person to hold an inquiry.**

(1) If the Treasury decide to arrange for an inquiry to be held under this section, they may appoint such person as they consider appropriate to hold the inquiry.

(2) The Treasury may, by a direction to the appointed person, control—

    (a)  the scope of the inquiry;

    (b)  the period during which the inquiry is to be held;

    (c)  the conduct of the inquiry; and

    (d)  the making of reports.

(3) A direction may, in particular—

    (a)  confine the inquiry to particular matters;

    (b)  extend the inquiry to additional matters;

    (c)  require the appointed person to discontinue the inquiry or to take only such steps as are specified in the direction;

    (d)  require the appointed person to make such interim reports as are so specified.

**16**      **Powers of appointed person and procedure.**

(1) The person appointed to hold an inquiry under section 15 may—

    (a)  obtain such information from such persons and in such manner as he thinks fit;

    (b)  make such inquiries as he thinks fit; and

    (c)  determine the procedure to be followed in connection with the inquiry.

(2) The appointed person may require any person who, in his opinion, is able to provide any information, or produce any document, which is relevant to the inquiry to provide any such information or produce any such document.

(3) For the purposes of an inquiry, the appointed person has the same powers as the court in respect of the attendance and examination of witnesses (including the examination of witnesses abroad) and in respect of the production of documents.

(4) "Court" means—

    (a)  the High Court; or

    (b)  in Scotland, the Court of Session.

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

**17      Conclusion of inquiry.**

(1) On completion of an inquiry under section 15, the person holding the inquiry must make a written report to the Treasury—

    (a)   setting out the result of the inquiry; and

    (b)   making such recommendations (if any) as he considers appropriate.

(2) The Treasury may publish the whole, or any part, of the report and may do so in such manner as they consider appropriate.

(3) Subsection (4) applies if the Treasury propose to publish a report but consider that it contains material—

    (a)   which relates to the affairs of a particular person whose interests would, in the opinion of the Treasury, be seriously prejudiced by publication of the material; or

    (b)   the disclosure of which would be incompatible with an international obligation of the United Kingdom.

(4) The Treasury must ensure that the material is removed before publication.

(5) The Treasury must lay before each House of Parliament a copy of any report or part of a report published under subsection (2).

(6) Any expenses reasonably incurred in holding an inquiry are to be met by the Treasury out of money provided by Parliament.

**18      Obstruction and contempt.**

(1) If a person ("A")—

    (a)   fails to comply with a requirement imposed on him by a person holding an inquiry under section 15, or

    (b)   otherwise obstructs such an inquiry,

the person holding the inquiry may certify the matter to the High Court (or, in Scotland, the Court of Session).

(2) The court may enquire into the matter.

(3) If, after hearing—

    (a)   any witnesses who may be produced against or on behalf of A, and

    (b)   any statement made by or on behalf of A,

the court is satisfied that A would have been in contempt of court if the inquiry had been proceedings before the court, it may deal with him as if he were in contempt.

---

**Status:** This version of this Act contains provisions that are prospective.
**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

## PART II

### REGULATED AND PROHIBITED ACTIVITIES

*The general prohibition*

**19        The general prohibition.**

(1) No person may carry on a regulated activity in the United Kingdom, or purport to do
so, unless he is—

    (a)   an authorised person; or

    (b)   an exempt person.

(2) The prohibition is referred to in this Act as the general prohibition.

*Requirement for permission*

**20        Authorised persons acting without permission.**

(1) If an authorised person carries on a regulated activity in the United Kingdom, or
purports to do so, otherwise than in accordance with permission—

    (a)   given to him by the Authority under Part IV, or

    (b)   resulting from any other provision of this Act,

he is to be taken to have contravened a requirement imposed on him by the Authority
under this Act.

(2) The contravention does not—

    (a)   make a person guilty of an offence;

    (b)   make any transaction void or unenforceable; or

    (c)   (subject to subsection (3)) give rise to any right of action for breach of
statutory duty.

(3) In prescribed cases the contravention is actionable at the suit of a person who suffers
loss as a result of the contravention, subject to the defences and other incidents
applying to actions for breach of statutory duty.

---

**Annotations:**

**Modifications etc. (not altering text)**

**C22**   S. 20 excluded (1.12.2001) by S.I. 2001/2636, **arts. 1(2)(b)**, 62(1)-(4); S.I. 2001/3538, **art. 2(1)**
S. 20 applied (1.12.2001) by S.I. 2001/2636, **arts. 1(2)(b)**, 62(5); S.I. 2001/3538, **art. 2(1)**
S. 20 modified (31.10.2001) by S.I. 2001/3374, art. 1, **Sch. para. 2**

**C23**   S. 20 modified (31.10.2004) by The Financial Services and Markets Act 2000 (Transitional
Provisions) (Mortgages) Order 2004 (S.I. 2004/2615), arts. 1(2)(b), 5, **Sch. para. 2**

**C24**   S. 20 modified (14.1.2005) by The Financial Services and Markets Act 2000 (Transitional Provisions)
(General Insurance Intermediaries) Order 2004 (S.I. 2004/3351), arts. 1(2)(b), 5, **Sch. para. 2**

**C25**   S. 20 modified (6.4.2007) by The Financial Services and Markets Act 2000 (Regulated Activities)
(Amendment) Order 2006 (S.I. 2006/1969), arts. 1(3), 7, **Sch. para. 2**

**C26**   S. 20 modified (30.6.2008 for certain purposes, otherwise 1.1.2009) by The Financial Services and
Markets Act 2000 (Regulated Activities) (Amendment) (No. 2) Order 2007 (S.I. 2007/3510), arts.
1(2), **7(1)(2)**

14

*Financial Services and Markets Act 2000 (c. 8)*
*Part II – Regulated And Prohibited Activities*
*Document Generated 2014-04-03*

**Status:** This version of this Act contains provisions that are prospective.
**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

**C27** S. 20 modified (1.7.2009 for certain purposes, otherwise 30.6.2010) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) Order 2009 (S.I. 2009/1342), **arts. 1(2)**, 34, {Sch. paras. 1, 2}

**Commencement Information**

**I1** S. 20 wholly in force at 1.12.2001; s. 20 not in force at Royal Assent see s. 431(2); s. 20(3) in force for certain purposes at 25.2.2001 by S.I. 2001/516, art. 2(b), **Sch. Pt. 2**; s. 20 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

*Financial promotion*

**21      Restrictions on financial promotion.**

(1) A person ("A") must not, in the course of business, communicate an invitation or inducement to engage in investment activity.

(2) But subsection (1) does not apply if—

    (a)   A is an authorised person; or
    (b)   the content of the communication is approved for the purposes of this section by an authorised person.

(3) In the case of a communication originating outside the United Kingdom, subsection (1) applies only if the communication is capable of having an effect in the United Kingdom.

(4) The Treasury may by order specify circumstances in which a person is to be regarded for the purposes of subsection (1) as—

    (a)   acting in the course of business;
    (b)   not acting in the course of business.

(5) The Treasury may by order specify circumstances (which may include compliance with financial promotion rules) in which subsection (1) does not apply.

(6) An order under subsection (5) may, in particular, provide that subsection (1) does not apply in relation to communications—

    (a)   of a specified description;
    (b)   originating in a specified country or territory outside the United Kingdom;
    (c)   originating in a country or territory which falls within a specified description of country or territory outside the United Kingdom; or
    (d)   originating outside the United Kingdom.

(7) The Treasury may by order repeal subsection (3).

(8) "Engaging in investment activity" means—

    (a)   entering or offering to enter into an agreement the making or performance of which by either party constitutes a controlled activity; or
    (b)   exercising any rights conferred by a controlled investment to acquire, dispose of, underwrite or convert a controlled investment.

(9) An activity is a controlled activity if—

    (a)   it is an activity of a specified kind or one which falls within a specified class of activity; and

---

**Status:** This version of this Act contains provisions that are prospective.

**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

---

(b)   it relates to an investment of a specified kind, or to one which falls within a specified class of investment.

(10) An investment is a controlled investment if it is an investment of a specified kind or one which falls within a specified class of investment.

(11) Schedule 2 (except paragraph 26) applies for the purposes of subsections (9) and (10) with references to section 22 being read as references to each of those subsections.

(12) Nothing in Schedule 2, as applied by subsection (11), limits the powers conferred by subsection (9) or (10).

(13) "Communicate" includes causing a communication to be made.

(14) "Investment" includes any asset, right or interest.

(15) "Specified" means specified in an order made by the Treasury.

---

**Annotations:**

**Modifications etc. (not altering text)**

C28   S. 21(1) modified (31.10.2001) by S.I. 2001/3374, art. 1, **Sch. para. 6**

C29   S. 21(1) modified (31.10.2004) by The Financial Services and Markets Act 2000 (Transitional Provisions) (Mortgages) Order 2004 (S.I. 2004/2615), arts. 1(2)(b), 5, **Sch. para. 6**

C30   S. 21(1) modified (14.1.2005) by The Financial Services and Markets Act 2000 (Transitional Provisions) (General Insurance Intermediaries) Order 2004 (S.I. 2004/3351), arts. 1(2)(b), 5, **Sch. para. 6**

C31   S. 21(1) modified (6.4.2007) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) Order 2006 (S.I. 2006/1969), arts. 1(3), 7, **Sch. para. 6**

C32   S. 21(2) modified (30.6.2008 for certain purposes, otherwise 1.1.2009) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) (No. 2) Order 2007 (S.I. 2007/3510), arts. 1(2), **8(1)(3)**

C33   S. 21(2) modified (1.7.2009 for certain purposes, otherwise 30.6.2010) by The Financial Services and Markets Act 2000 (Regulated Activities) (Amendment) Order 2009 (S.I. 2009/1342), **arts. 1(2)**, 34, {Sch. paras. 1, 3}

**Commencement Information**

I2   S. 21 wholly in force at 1.12.2001; s. 21 not in force at Royal Assent see s. 431(2); s. 21 in force for certain purposes at 25.2.2001 by S.I. 2001/516, art. 2(b), **Sch. Pt. 2**; s. 21 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

---

*Regulated activities*

**22       The classes of activity and categories of investment.**

(1) An activity is a regulated activity for the purposes of this Act if it is an activity of a specified kind which is carried on by way of business and—

(a)   relates to an investment of a specified kind; or

(b)   in the case of an activity of a kind which is also specified for the purposes of this paragraph, is carried on in relation to property of any kind.

(2) Schedule 2 makes provision supplementing this section.

*Financial Services and Markets Act 2000 (c. 8)*
*Part II – Regulated And Prohibited Activities*
*Document Generated 2014-04-03*

***Status:*** *This version of this Act contains provisions that are prospective.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

(3) Nothing in Schedule 2 limits the powers conferred by subsection (1).

(4) "Investment" includes any asset, right or interest.

(5) "Specified" means specified in an order made by the Treasury.

---

**Annotations:**

**Modifications etc. (not altering text)**

**C34**   S. 22 applied (1.9.2002) by 1974 c. 39, **s. 16(6E)(a)** (as inserted (1.9.2002) by 2001/544, arts. 2(2)(b), 90(2))

314

Financial Services and Markets Act 2000 (c. 8)
Part XVIII – Recognised Investment Exchanges and Clearing Houses
Chapter VI – Investigations
Document Generated  2014-04-03

*Status:* This version of this Act contains provisions that are prospective.

*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

# Part XVIII

## Recognised Investment Exchanges and Clearing Houses

**Annotations:**

**Modifications etc. (not altering text)**

C505   Pt. 18 applied in part (with modifications) (12.12.2011) by (The Recognised Auction Platforms Regulations 2011 (S.I. 2011/2699), **reg. 7**, Sch. 2

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 28 of 143

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

315

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

## CHAPTER I

### EXEMPTION

#### *General*

**285    Exemption for recognised investment exchanges and clearing houses.**

(1) In this Act—

  (a)    "recognised investment exchange" means an investment exchange in relation
      to which a recognition order is in force; and

  (b)    "recognised clearing house" means a clearing house in relation to which a
      recognition order is in force.

(2) A recognised investment exchange is exempt from the general prohibition as respects
any regulated activity—

  (a)    which is carried on as a part of the exchange's business as an investment
      exchange; or

  (b)    which is carried on for the purposes of, or in connection with, the provision
      of clearing services by the exchange.

(3) A recognised clearing house is exempt from the general prohibition as respects any
regulated activity which is carried on for the purposes of, or in connection with, the
provision of clearing services by the clearing house.

**286    Qualification for recognition.**

(1) The Treasury may make regulations setting out the requirements—

  (a)    which must be satisfied by an investment exchange or clearing house if it is to
      qualify as a body in respect of which the Authority may make a recognition
      order under this Part; and

  (b)    which, if a recognition order is made, it must continue to satisfy if it is to
      remain a recognised body.

(2) But if regulations contain provision as to the default rules of an investment exchange
or clearing house, or as to proceedings taken under such rules by such a body, they
require the approval of the Secretary of State.

(3) "Default rules" means rules of an investment exchange or clearing house which
provide for the taking of action in the event of a person's appearing to be unable, or
likely to become unable, to meet his obligations in respect of one or more market
contracts connected with the exchange or clearing house.

(4) "Market contract" means—

  (a)    a contract to which Part VII of the [M33]Companies Act 1989 applies as a result
      of section 155 of that Act or a contract to which Part V of the [M34]Companies
      (No. 2)(Northern Ireland) Order 1990 applies as a result of Article 80 of that
      Order; and

  (b)    such other kind of contract as may be prescribed.

[[F398](4A) If regulations under subsection (1) require an investment exchange to make
information available to the public in accordance with—

316

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

> (a)   Article 29.1 of the markets in financial instruments directive and the Commission Regulation, or
>
> (b)   Article 44.1 of that directive and that Regulation,
>
> the regulations may authorise the Authority to waive the requirement in the circumstances specified in the relevant provisions.

(4B) The "relevant provisions" for the purposes of subsection (4A) are—

> (a)   in a case falling within paragraph (a) of that subsection, Article 29.2 of the markets in financial instruments directive and the Commission Regulation, and
>
> (b)   in a case falling within paragraph (b) of that subsection, Article 44.2 of that directive and that Regulation.

(4C) If regulations under subsection (1) require an investment exchange to make information available to the public in accordance with—

> (a)   Article 30.1 of the markets in financial instruments directive and the Commission Regulation, or
>
> (b)   Article 45.1 of that directive and that Regulation,
>
> the regulations may authorise the Authority to defer the requirement in the circumstances specified, and subject to the requirements contained, in the relevant provisions.

(4D) The "relevant provisions" for the purposes of subsection (4C) are—

> (a)   in a case falling within paragraph (a) of that subsection, Article 30.2 of the markets in financial instruments directive and the Commission Regulation, and
>
> (b)   in a case falling within paragraph (b) of that subsection, Article 45.2 of that directive and that Regulation.

(4E) "The Commission Regulation" means Commission Regulation 1287/2006 of 10 August 2006.]

(5) Requirements resulting from this section are referred to in this Part as "recognition requirements".

[**F399**(6) In the case of an investment exchange, requirements resulting from this section are in addition to requirements which must be satisfied by the exchange as a result of section 290(1A) before the Authority may make a recognition order declaring the exchange to be a recognised investment exchange.]

---

**Annotations:**

**Amendments (Textual)**

**F398**   S. 286(4A)-(4E) inserted (6.12.2006) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) (Modification of Powers) Regulations 2006 (S.I. 2006/2975), **reg. 8**

**F399**   S. 286(6) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 2**

**Marginal Citations**

**M33**   1989 c. 40.

**M34**   S.I. 1990/1504 (N.I. 10).

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

317

---

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

---

*Applications for recognition*

## 287    Application by an investment exchange.

(1) Any body corporate or unincorporated association may apply to the Authority for an order declaring it to be a recognised investment exchange for the purposes of this Act.

(2) The application must be made in such manner as the Authority may direct and must be accompanied by—

    (a)   a copy of the applicant's rules;

    (b)   a copy of any guidance issued by the applicant;

    (c)   the required particulars; and

    (d)   such other information as the Authority may reasonably require for the purpose of determining the application.

(3) The required particulars are—

    (a)   particulars of any arrangements which the applicant has made, or proposes to make, for the provision of clearing services in respect of transactions effected on the exchange;

    (b)   if the applicant proposes to provide clearing services in respect of transactions other than those effected on the exchange, particulars of the criteria which the applicant will apply when determining to whom it will provide those services [F400;

    (c)   a programme of operations which includes the types of business the applicant proposes to undertake and the applicant's proposed organisational structure;

    (d)   such particulars of the persons who effectively direct the business and operations of the exchange as the Authority may reasonably require;

    (e)   such particulars of the ownership of the exchange, and in particular of the identity and scale of interests of the persons who are in a position to exercise significant influence over the management of the exchange, whether directly or indirectly, as the Authority may reasonably require.]

[F401(4) Subsection (3)(c) to (e) does not apply to an application by an overseas applicant.]

---

**Annotations:**

**Amendments (Textual)**

F400    S. 287(3)(c)-(e) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 3(a)**

F401    S. 287(4) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 3(b)**

**Commencement Information**

I83    S. 287 wholly in force at 3.9.2001; s. 287 not in force at Royal Assent see s. 431(2); s. 287(2) in force for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, **Sch.**; s. 287 in so far as not already in force at 3.9.2001 by S.I. 2001/2632, art. 2, **Sch. Pt. 2**

318

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

**288      Application by a clearing house.**

(1) Any body corporate or unincorporated association may apply to the Authority for an order declaring it to be a recognised clearing house for the purposes of this Act.

(2) The application must be made in such manner as the Authority may direct and must be accompanied by—

    (a)   a copy of the applicant's rules;

    (b)   a copy of any guidance issued by the applicant;

    (c)   the required particulars; and

    (d)   such other information as the Authority may reasonably require for the purpose of determining the application.

(3) The required particulars are—

    (a)   if the applicant makes, or proposes to make, clearing arrangements with a recognised investment exchange, particulars of those arrangements;

    (b)   if the applicant proposes to provide clearing services for persons other than recognised investment exchanges, particulars of the criteria which it will apply when determining to whom it will provide those services.

---

**Annotations:**

**Commencement Information**

I84   S. 288 wholly in force at 3.9.2001; s. 288 not in force at Royal Assent see s. 431(2); s. 288(2) in force for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, **Sch.**; s. 288 in force in so far as not already in force at 3.9.2001 by S.I. 2001/2632, **art. 2 Sch. Pt. 2**

---

**289      Applications: supplementary.**

(1) At any time after receiving an application and before determining it, the Authority may require the applicant to provide such further information as it reasonably considers necessary to enable it to determine the application.

(2) Information which the Authority requires in connection with an application must be provided in such form, or verified in such manner, as the Authority may direct.

(3) Different directions may be given, or requirements imposed, by the Authority with respect to different applications.

**290      Recognition orders.**

(1) If it appears to the Authority that the applicant satisfies the recognition requirements applicable in its case, the Authority may make a recognition order declaring the applicant to be—

    (a)   a recognised investment exchange, if the application is made under section 287;

    (b)   a recognised clearing house, if it is made under section 288.

[F402(1A) In the case of an application for an order declaring the applicant to be a recognised investment exchange, the reference in subsection (1) to the recognition requirements applicable in its case includes a reference to requirements contained in any directly

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

319

*Status: This version of this Act contains provisions that are prospective.*
*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

applicable Community regulation made under the markets in financial instruments directive.

(1B) In the case mentioned in subsection (1A), the application must be determined by the Authority before the end of the period of six months beginning with the date on which it receives the completed application.

(1C) Subsection (1B) does not apply in the case of an application by an overseas applicant.]

(2) The Treasury's approval of the making of a recognition order is required under section 307.

(3) In considering an application, the Authority may have regard to any information which it considers is relevant to the application.

(4) A recognition order must specify a date on which it is to take effect.

(5) Section 298 has effect in relation to a decision to refuse to make a recognition order—

    (a)    as it has effect in relation to a decision to revoke such an order; and

    (b)    as if references to a recognised body were references to the applicant.

(6) Subsection (5) does not apply in a case in which the Treasury have failed to give their approval under section 307.

---

**Annotations:**

**Amendments (Textual)**
**F402**  S. 290(1A)-(1C) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 4**

**Commencement Information**
**I85**  S. 290 wholly in force at 1.12.2001; s. 290 not in force at Royal Assent see s. 431(2); s. 290 in force for specified purposes at 3.9.2001 by S.I. 2001/2632, art. 2(2), **Sch. Pt. 2**; s. 290 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

---

[**F403290A** **Refusal of recognition on ground of excessive regulatory provision**

---

**Annotations:**

**Amendments (Textual)**
    **F403**  S. 290A inserted (20.12.2006) by Investment Exchanges and Clearing Houses Act 2006 (c. 55), **ss. 4**, 5(2)

---

(1) The Authority must not make a recognition order if it appears to the Authority that an existing or proposed regulatory provision of the applicant in connection with—

    (a)    the applicant's business as an investment exchange, or

    (b)    the provision by the applicant of clearing services,

imposes or will impose an excessive requirement on the persons affected (directly or indirectly) by it.

(2) The reference in section 290(1) (making of recognition order) to satisfying the applicable recognition requirements shall be read accordingly.

---

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

(3) Expressions used in subsection (1) above that are defined for the purposes of section 300A (power of Authority to disallow excessive regulatory provision) have the same meaning as in that section.

(4) The provisions of section 300A(3) and (4) (determination whether regulatory provision excessive) apply for the purposes of this section as for the purposes of section 300A.

(5) Section 298 has effect in relation to a decision under this section to refuse a recognition order—

    (a) as it has effect in relation to a decision to revoke such an order, and

    (b) as if references to a recognised body were references to the applicant.

(6) This section does not apply to an application for recognition as an overseas investment exchange or overseas clearing house.]

## 291 Liability in relation to recognised body's regulatory functions.

(1) A recognised body and its officers and staff are not to be liable in damages for anything done or omitted in the discharge of the recognised body's regulatory functions unless it is shown that the act or omission was in bad faith.

(2) But subsection (1) does not prevent an award of damages made in respect of an act or omission on the ground that the act or omission was unlawful as a result of section 6(1) of the [M35]Human Rights Act 1998.

(3) "Regulatory functions" means the functions of the recognised body so far as relating to, or to matters arising out of, the obligations to which the body is subject under or by virtue of this Act.

---

**Annotations:**

**Modifications etc. (not altering text)**
C506 S. 291 modified (22.2.2008) by The Northern Rock plc Transfer Order 2008 (S.I. 2008/432), **art. 20**
C507 S. 291 modified (29.9.2008 at 8.00 a.m.) by The Bradford & Bingley plc Transfer of Securities and Property etc. Order 2008 (S.I. 2008/2546), **art. 39**

**Marginal Citations**
M35 1998 c. 42.

---

## 292 Overseas investment exchanges and overseas clearing houses.

(1) An application under section 287 or 288 by an overseas applicant must contain the address of a place in the United Kingdom for the service on the applicant of notices or other documents required or authorised to be served on it under this Act.

(2) If it appears to the Authority that an overseas applicant satisfies the requirements of subsection (3) it may make a recognition order declaring the applicant to be—

    (a) a recognised investment exchange;

    (b) a recognised clearing house.

(3) The requirements are that—

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

321

---

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

(a) investors are afforded protection equivalent to that which they would be afforded if the body concerned were required to comply with recognition requirements [**F404**, other than any such requirements which are expressed in regulations under section 286 not to apply for the purposes of this paragraph**]**;

(b) there are adequate procedures for dealing with a person who is unable, or likely to become unable, to meet his obligations in respect of one or more market contracts connected with the investment exchange or clearing house;

(c) the applicant is able and willing to co-operate with the Authority by the sharing of information and in other ways;

(d) adequate arrangements exist for co-operation between the Authority and those responsible for the supervision of the applicant in the country or territory in which the applicant's head office is situated.

(4) In considering whether it is satisfied as to the requirements mentioned in subsection (3) (a) and (b), the Authority is to have regard to—

(a) the relevant law and practice of the country or territory in which the applicant's head office is situated;

(b) the rules and practices of the applicant.

(5) In relation to an overseas applicant and a body or association declared to be a recognised investment exchange or recognised clearing house by a recognition order made by virtue of subsection (2)—

(a) the reference in section 313(2) to recognition requirements is to be read as a reference to matters corresponding to the matters in respect of which provision is made in the recognition requirements;

(b) sections 296(1) and 297(2) have effect as if the requirements mentioned in section 296(1)(a) and section 297(2)(a) were those of subsection (3)(a), (b), and (c) of this section;

(c) section 297(2) has effect as if the grounds on which a recognition order may be revoked under that provision included the ground that in the opinion of the Authority arrangements of the kind mentioned in subsection (3)(d) no longer exist.

---

**Annotations:**

**Amendments (Textual)**
**F404**  Words in s. 292(3)(a) inserted (6.12.2006) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) (Modification of Powers) Regulations 2006 (S.I. 2006/2975), **reg. 9**

**Commencement Information**
**I86**  S. 292 wholly in force at 1.12.2001; s. 292 not in force at Royal Assent see s. 431(2); s. 292(1) in force and s. 292(2)-(5) in force specified purposes at 3.9.2001 by S.I. 2001/2632, art. 2(2), **Sch. Pt. 2**; s. 292 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

[F405*Publication of information by recognised investment exchange*

| Annotations: |
| --- |
| **Amendments (Textual)** |
| **F405** S. 292A and cross-heading inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 5** |

## 292A    Publication of information by recognised investment exchange

(1) A recognised investment exchange must as soon as practicable after a recognition order is made in respect of it publish such particulars of the ownership of the exchange as the Authority may reasonably require.

(2) The particulars published under subsection (1) must include particulars of the identity and scale of interests of the persons who are in a position to exercise significant influence over the management of the exchange, whether directly or indirectly.

(3) If an ownership transfer takes place in relation to a recognised investment exchange, the exchange must as soon as practicable after becoming aware of the transfer publish such particulars relating to the transfer as the Authority may reasonably require.

(4) "Ownership transfer", in relation to an exchange, means a transfer of ownership which gives rise to a change in the persons who are in a position to exercise significant influence over the management of the exchange, whether directly or indirectly.

(5) A recognised investment exchange must publish such particulars of any decision it makes to suspend or remove a financial instrument from trading on a regulated market operated by it as the Authority may reasonably require.

(6) The Authority may determine the manner of publication under subsections (1), (3) and (5) and the timing of publication under subsection (5).

(7) This section does not apply to an overseas investment exchange.]

*Supervision*

## 293    Notification requirements.

(1) The Authority may make rules requiring a recognised body to give it—

    (a)    notice of such events relating to the body as may be specified; and

    (b)    such information in respect of those events as may be specified.

(2) The rules may also require a recognised body to give the Authority, at such times or in respect of such periods as may be specified, such information relating to the body as may be specified.

(3) An obligation imposed by the rules extends only to a notice or information which the Authority may reasonably require for the exercise of its functions under this Act.

(4) The rules may require information to be given in a specified form and to be verified in a specified manner.

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

323

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

(5) If a recognised body—

    (a)   alters or revokes any of its rules or guidance, or

    (b)   makes new rules or issues new guidance,

it must give written notice to the Authority without delay.

(6) If a recognised investment exchange makes a change—

    (a)   in the arrangements it makes for the provision of clearing services in respect of transactions effected on the exchange, or

    (b)   in the criteria which it applies when determining to whom it will provide clearing services,

it must give written notice to the Authority without delay.

(7) If a recognised clearing house makes a change—

    (a)   in the recognised investment exchanges for whom it provides clearing services, or

    (b)   in the criteria which it applies when determining to whom (other than recognised investment exchanges) it will provide clearing services,

it must give written notice to the Authority without delay.

(8) Subsections (5) to (7) do not apply to an overseas investment exchange or an overseas clearing house.

(9) "Specified" means specified in the Authority's rules.

---

**Annotations:**

**Commencement Information**

  **I87**   S. 293 wholly in force at 1.12.2001; s. 293 not in force at Royal Assent see s. 431(2); s. 293 in force for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, **Sch.**; s. 293 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

---

[**F406 293A** **Information: compliance of recognised investment exchanges with directly applicable Community regulations**

---

**Annotations:**

**Amendments (Textual)**

  **F406**   S. 293A inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 6**

---

The Authority may require a recognised investment exchange to give the Authority such information as it reasonably requires in order to satisfy itself that the exchange is complying with any directly applicable Community regulation made under the markets in financial instruments directive.]

**294** **Modification or waiver of rules.**

(1) The Authority may, on the application or with the consent of a recognised body, direct that rules made under section 293 or 295—

***Status:*** This version of this Act contains provisions that are prospective.
***Changes to legislation:*** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

    (a)   are not to apply to the body; or

    (b)   are to apply to the body with such modifications as may be specified in the direction.

(2) An application must be made in such manner as the Authority may direct.

(3) Subsections (4) to (6) apply to a direction given under subsection (1).

(4) The Authority may not give a direction unless it is satisfied that—

    (a)   compliance by the recognised body with the rules, or with the rules as unmodified, would be unduly burdensome or would not achieve the purpose for which the rules were made; and

    (b)   the direction would not result in undue risk to persons whose interests the rules are intended to protect.

(5) A direction may be given subject to conditions.

(6) The Authority may—

    (a)   revoke a direction; or

    (b)   vary it on the application, or with the consent, of the recognised body to which it relates.

---

**Annotations:**

**Modifications etc. (not altering text)**
**C508** S. 294 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(10); S.I. 2001/3538, **art. 2(1)**

**Commencement Information**
**I88** S. 294 wholly in force at 3.9.2001; s. 294 not in force at Royal Assent see s. 431(2); s. 294(2) in force for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, **Sch.**; s. 294 in force in so far as not already in force at 3.9.2001 by S.I. 2001/2632, **art. 2 Sch. Pt. 2**

---

**295    Notification: overseas investment exchanges and overseas clearing houses.**

(1) At least once a year, every overseas investment exchange and overseas clearing house must provide the Authority with a report.

(2) The report must contain a statement as to whether any events have occurred which are likely—

    (a)   to affect the Authority's assessment of whether it is satisfied as to the requirements set out in section 292(3); or

    (b)   to have any effect on competition.

(3) The report must also contain such information as may be specified in rules made by the Authority.

(4) The investment exchange or clearing house must provide the Treasury and the [[F407]OFT] with a copy of the report.

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

325

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

---

**Annotations:**

**Amendments (Textual)**
**F407**  Words in s. 295 substituted (1.4.2003) by Enterprise Act 2002 (c. 40), ss. 278, 279, **Sch. 25 para. 40(9)**; S.I. 2003/766, **art. 2**, Sch. (with art. 3)

**Commencement Information**
**I89**  S. 295 wholly in force at 1.12.2001; s. 295 not in force at Royal Assent see s. 431(2); s. 295 in force for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, Sch.; s. 295 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

---

**296**   **Authority's power to give directions.**

(1) This section applies if it appears to the Authority that a recognised body—

    (a)  has failed, or is likely to fail, to satisfy the recognition requirements; or

    (b)  has failed to comply with any other obligation imposed on it by or under this Act.

[**F408**(1A) This section also applies in the case of a recognised body which is a recognised investment exchange if it appears to the Authority that the body has failed, or is likely to fail, to comply with any obligation imposed on it by any directly applicable Community regulation made under the markets in financial instruments directive.]

(2) The Authority may direct the body to take specified steps for the purpose of securing the body's compliance with—

    (a)  the recognition requirements; or

    (b)  any obligation of the kind in question.

[**F409**(2A) In the case of a recognised investment exchange other than an overseas investment exchange, those steps may include—

    (a)  the granting to the Authority of access to the premises of the exchange for the purpose of inspecting—

        (i) those premises; or

        (ii) any documents on the premises which appear to the Authority to be relevant for the purpose mentioned in subsection (2);

    (b)  the suspension of the carrying on of any regulated activity by the exchange for the period specified in the direction.]

(3) A direction under this section is enforceable, on the application of the Authority, by an injunction or, in Scotland, by an order for specific performance under section 45 of the **M36**Court of Session Act 1988.

(4) The fact that a rule made by a recognised body has been altered in response to a direction given by the Authority does not prevent it from being subsequently altered or revoked by the recognised body.

326

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Amendments (Textual)**
**F408**  S. 296(1A) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 7(a)**
**F409**  S. 296(2A) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 7(b)**

**Modifications etc. (not altering text)**
**C509**  S. 296 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(11); S.I. 2001/3538, **art. 2(1)**

**Marginal Citations**
**M36**  1988 c. 36.

---

## 297   Revoking recognition.

(1) A recognition order may be revoked by an order made by the Authority at the request, or with the consent, of the recognised body concerned.

(2) If it appears to the Authority that a recognised body—

    (a)    is failing, or has failed, to satisfy the recognition requirements, or

    (b)    is failing, or has failed, to comply with any other obligation imposed on it by or under this Act,

it may make an order revoking the recognition order for that body even though the body does not wish the order to be made.

[**F410**(2A) If it appears to the Authority that a recognised body which is a recognised investment exchange—

    (a)    has not carried on the business of an investment exchange during the period of twelve months beginning with the day on which the recognition order took effect in relation to it,

    (b)    has not carried on the business of an investment exchange at any time during the period of six months ending with the relevant day, or

    (c)    has failed, or is likely to fail, to comply with any obligation imposed on it by a directly applicable Community regulation made under the markets in financial instruments directive,

it may make an order revoking the recognition order for that body even though the body does not wish the order to be made.

(2B) The "relevant day", for the purposes of paragraph (b) of subsection (2A), is the day on which the power to make an order under that subsection is exercised.

(2C) Subsection (2A) does not apply to an overseas investment exchange.]

(3) An order under this section ("a revocation order") must specify the date on which it is to take effect.

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

(4) In the case of a revocation order made under subsection (2) [**F411**or (2A)], the specified date must not be earlier than the end of the period of three months beginning with the day on which the order is made.

(5) A revocation order may contain such transitional provisions as the Authority thinks necessary or expedient.

---

**Annotations:**

**Amendments (Textual)**
**F410**  S. 297(2A)-(2C) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 8(a)**
**F411**  Words in s. 297(4) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 8(b)**

**Modifications etc. (not altering text)**
**C510**  S. 297 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(11); S.I. 2001/3538, **art. 2(1)**

---

## 298   Directions and revocation: procedure.

(1) Before giving a direction under section 296, or making a revocation order under section 297(2) [**F412**or (2A)], the Authority must—

    (a)  give written notice of its intention to do so to the recognised body concerned;

    (b)  take such steps as it considers reasonably practicable to bring the notice to the attention of members (if any) of that body; and

    (c)  publish the notice in such manner as it thinks appropriate for bringing it to the attention of other persons who are, in its opinion, likely to be affected.

(2) A notice under subsection (1) must—

    (a)  state why the Authority intends to give the direction or make the order; and

    (b)  draw attention to the right to make representations conferred by subsection (3).

(3) Before the end of the period for making representations—

    (a)  the recognised body,

    (b)  any member of that body, and

    (c)  any other person who is likely to be affected by the proposed direction or revocation order,

may make representations to the Authority.

(4) The period for making representations is—

    (a)  two months beginning—

        (i) with the date on which the notice is served on the recognised body; or

        (ii) if later, with the date on which the notice is published; or

    (b)  such longer period as the Authority may allow in the particular case.

(5) In deciding whether to—

    (a)  give a direction, or

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

***Status:*** *This version of this Act contains provisions that are prospective.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

(b)   make a revocation order,

the Authority must have regard to any representations made in accordance with subsection (3).

(6) When the Authority has decided whether to give a direction under section 296 or to make the proposed revocation order, it must—

    (a)   give the recognised body written notice of its decision; and

    (b)   if it has decided to give a direction or make an order, take such steps as it considers reasonably practicable for bringing its decision to the attention of members of the body or of other persons who are, in the Authority's opinion, likely to be affected.

(7) If the Authority considers it essential to do so, it may give a direction under section 296—

    (a)   without following the procedure set out in this section; or

    (b)   if the Authority has begun to follow that procedure, regardless of whether the period for making representations has expired.

(8) If the Authority has, in relation to a particular matter, followed the procedure set out in subsections (1) to (5), it need not follow it again if, in relation to that matter, it decides to take action other than that specified in its notice under subsection (1).

---

**Annotations:**

**Amendments (Textual)**
F412   Words in s. 298(1) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 9**

**Modifications etc. (not altering text)**
C511   S. 298 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(11); S.I. 2001/3538, **art. 2(1)**

**Commencement Information**
I90   S. 298 wholly in force at 1.12.2001; s. 298 not in force at Royal Assent see s. 431(2); s. 298 in force for specified purposes at 3.9.2001 by S.I. 2001/2632, **art. 2 Sch. Pt. 2**; s. 298 in force in so far as not already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

---

**299     Complaints about recognised bodies.**

(1) The Authority must make arrangements for the investigation of any relevant complaint about a recognised body.

(2) "Relevant complaint" means a complaint which the Authority considers is relevant to the question of whether the body concerned should remain a recognised body.

**300     Extension of functions of Tribunal.**

(1) If the Treasury are satisfied that the condition mentioned in subsection (2) is satisfied, they may by order confer functions on the Tribunal with respect to disciplinary proceedings—

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

   (a) of one or more investment exchanges in relation to which a recognition order under section 290 is in force or of such investment exchanges generally, or

   (b) of one or more clearing houses in relation to which a recognition order under that section is in force or of such clearing houses generally.

(2) The condition is that it is desirable to exercise the power conferred under subsection (1) with a view to ensuring that—

   (a) decisions taken in disciplinary proceedings with respect to which functions are to be conferred on the Tribunal are consistent with—

      (i) decisions of the Tribunal in cases arising under Part VIII; and

      (ii) decisions taken in other disciplinary proceedings with respect to which the Tribunal has functions as a result of an order under this section; or

   (b) the disciplinary proceedings are in accordance with the Convention rights.

(3) An order under this section may modify or exclude any provision made by or under this Act with respect to proceedings before the Tribunal.

(4) "Disciplinary proceedings" means proceedings under the rules of an investment exchange or clearing house in relation to market abuse by persons subject to the rules.

(5) "The Convention rights" has the meaning given in section 1 of the [M37]Human Rights Act 1998.

| Annotations: |
| --- |
| **Marginal Citations** |
| **M37**  1998 c. 42. |

*[[F413]Power to disallow excessive regulatory provision*

| Annotations: |
| --- |
| **Amendments (Textual)** |
| **F413**  S. 300A and preceding cross-heading inserted (20.12.2006) by Investment Exchanges and Clearing Houses Act 2006 (c. 55), **ss. 1**, 5(2) (with s. 5(3)) |

### 300A   Power of Authority to disallow excessive regulatory provision

(1) This section applies where a recognised body proposes to make any regulatory provision in connection with its business as an investment exchange or the provision by it of clearing services.

(2) If it appears to the Authority—

   (a) that the proposed provision will impose a requirement on persons affected (directly or indirectly) by it, and

   (b) that the requirement is excessive,

the Authority may direct that the proposed provision must not be made.

(3) A requirement is excessive if—

330

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

(a)   it is not required under [**F414**EU] law or any enactment or rule of law in the United Kingdom, and

(b)   either—

(i) it is not justified as pursuing a reasonable regulatory objective, or

(ii) it is disproportionate to the end to be achieved.

(4) In considering whether a requirement is excessive the Authority must have regard to all the relevant circumstances, including—

(a)   the effect of existing legal and other requirements,

(b)   the global character of financial services and markets and the international mobility of activity,

(c)   the desirability of facilitating innovation, and

(d)   the impact of the proposed provision on market confidence.

(5) In this section "requirement" includes any obligation or burden.

(6) Any provision made in contravention of a direction under this section is of no effect.

---

**Annotations:**

**Amendments (Textual)**
**F414**  Word in s. 300A(3)(a) substituted (22.4.2011 with application in accordance with art. 3 of the amending S.I.) by virtue of The Treaty of Lisbon (Changes in Terminology) Order 2011 (S.I. 2011/1043), **art. 6(2)-(5)**

---

**300B     Duty to notify proposal to make regulatory provision**

---

**Annotations:**

**Amendments (Textual)**
**F415**  Ss. 300B-300E inserted (20.12.2006) by Investment Exchanges and Clearing Houses Act 2006 (c. 55), **ss. 2**, **3**, **5(2)** (with s. 5(3))

---

(1) A recognised body that proposes to make any regulatory provision must give written notice of the proposal to the Authority without delay.

(2) The Authority may by rules under section 293 (notification requirements)—

(a)   specify descriptions of regulatory provision in relation to which, or circumstances in which, the duty in subsection (1) above does not apply, or

(b)   provide that the duty applies only to specified descriptions of regulatory provision or in specified circumstances.

(3) The Authority may also by rules under that section—

(a)   make provision as to the form and contents of the notice required, and

(b)   require the body to provide such information relating to the proposal as may be specified in the rules or as the Authority may reasonably require.

---

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)*

---

**300C    Restriction on making provision before Authority decides whether to act**

(1) Where notice of a proposal to make regulatory provision is required to be given to the
Authority under section 300B, the provision must not be made—

    (a)  before that notice is given, or

    (b)  subject to the following provisions of this section, before the end of the initial
period.

(2) The initial period is—

    (a)  the period of 30 days beginning with the day on which the Authority receives
notice of the proposal, or

    (b)  if any consultation period announced by the body in relation to the proposal
ends after that 30-day period, the end of the consultation period.

(3) If before the end of the initial period the Authority notifies the body that it is calling
in the proposal, the provisions of section 300D (consideration by Authority whether
to disallow proposed provision) apply as to when the provision may be made.

(4) If—

    (a)  before the end of the initial period the Authority notifies the body that it is
not calling in the proposal, or

    (b)  the initial period ends without the Authority having notified the body that it
is calling in the proposal,

the body may then make the proposed provision.

(5) Any provision made in contravention of this section is of no effect.

**300D    Consideration by Authority whether to disallow proposed provision**

(1) This section applies where the Authority notifies a recognised body that it is calling
in a proposal to make regulatory provision.

(2) The Authority must publish a notice—

    (a)  giving details of the proposed provision,

    (b)  stating that it has called in the proposal in order to consider whether to disallow
it, and

    (c)  specifying a period during which representations with respect to that question
may be made to it.

(3) The Authority may extend the period for making representations.

(4) The Authority must notify the body of its decision whether to disallow the provision
not later than 30 days after the end of the period for making representations, and must
publish the decision and the reasons for it.

(5) The body must not make the provision unless and until—

    (a)  the Authority notifies it of its decision not to disallow it, or

    (b)  the 30-day period specified in subsection (4) ends without the Authority
having notified any decision.

(6) If the Authority notifies the body of its decision to disallow the provision and that
decision is questioned in legal proceedings—

    (a)  the body must not make the provision until those proceedings, and any
proceedings on appeal, are finally determined,

332

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated  2014-04-03*

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

(b)   if the Authority's decision is quashed and the matter is remitted to it for reconsideration, the court may give directions as to the period within which the Authority is to complete its reconsideration, and

(c)   the body must not make the provision until—

(i) the Authority notifies it of its decision on reconsideration not to disallow the provision, or

(ii) the period specified by the court ends without the Authority having notified any decision.

(7) Any provision made in contravention of subsection (5) or (6) is of no effect.

**300E    Power to disallow excessive regulatory provision: supplementary**

(1) In sections 300A to 300D—

(a)   "regulatory provision" means any rule, guidance, arrangements, policy or practice, and

(b)   references to making provision shall be read accordingly as including, as the case may require, issuing guidance, entering into arrangements or adopting a policy or practice.

(2) For the purposes of those sections a variation of a proposal is treated as a new proposal.

(3) Those sections do not apply to an overseas investment exchange or overseas clearing house.]]

*Other matters*

**301    Supervision of certain contracts.**

(1) The Secretary of State and the Treasury, acting jointly, may by regulations provide for—

(a)   Part VII of the [M38]Companies Act 1989 (financial markets and insolvency), and

(b)   Part V of the [M39]Companies (No. 2)(Northern Ireland) Order 1990,

to apply to relevant contracts as it applies to contracts connected with a recognised body.

(2) "Relevant contracts" means contracts of a prescribed description in relation to which settlement arrangements are provided by a person for the time being included in a list ("the list") maintained by the Authority for the purposes of this section.

(3) Regulations may be made under this section only if the Secretary of State and the Treasury are satisfied, having regard to the extent to which the relevant contracts concerned are contracts of a kind dealt in by persons supervised by the Authority, that it is appropriate for the arrangements mentioned in subsection (2) to be supervised by the Authority.

(4) The approval of the Treasury is required for—

(a)   the conditions set by the Authority for admission to the list; and

(b)   the arrangements for admission to, and removal from, the list.

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

(5) If the Treasury withdraw an approval given by them under subsection (4), all regulations made under this section and then in force are to be treated as suspended.

(6) But if—

    (a)   the Authority changes the conditions or arrangements (or both), and

    (b)   the Treasury give a fresh approval under subsection (4),

the suspension of the regulations ends on such date as the Treasury may, in giving the fresh approval, specify.

(7) The Authority must—

    (a)   publish the list as for the time being in force; and

    (b)   provide a certified copy of it to any person who wishes to refer to it in legal proceedings.

(8) A certified copy of the list is evidence (or in Scotland sufficient evidence) of the contents of the list.

(9) A copy of the list which purports to be certified by or on behalf of the Authority is to be taken to have been duly certified unless the contrary is shown.

(10) Regulations under this section may, in relation to a person included in the list—

    (a)   apply (with such exceptions, additions and modifications as appear to the Secretary of State and the Treasury to be necessary or expedient) such provisions of, or made under, this Act as they consider appropriate;

    (b)   provide for the provisions of Part VII of the [M40]Companies Act 1989 and Part V of the [M41]Companies (No. 2)(Northern Ireland) Order 1990 to apply (with such exceptions, additions or modifications as appear to the Secretary of State and the Treasury to be necessary or expedient).

**Annotations:**

**Marginal Citations**
**M38**  1989 c. 40.
**M39**  S.I. 1990/1504 (N.I. 10).
**M40**  1989 c. 40.
**M41**  S.I. 1990/1504 (N.I. 10).

---

***Status:*** *This version of this Act contains provisions that are prospective.*

***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)*

---

# S C H E D U L E S

## SCHEDULE 1

Section 1.

### THE FINANCIAL SERVICES AUTHORITY

| Annotations: |
| --- |
| **Modifications etc. (not altering text)**<br>**C690** Sch. 1 extended (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8, **Sch. 2 para. 2** |

## PART I

### GENERAL

| Annotations: |
| --- |
| **Modifications etc. (not altering text)**<br>**C691** Sch. 1 Pt. 1 modified (15.12.2007) by The Transfer of Funds (Information on the Payer) Regulations 2007 (S.I. 2007/3298), **reg. 4(4)**<br>**C692** Sch. 1 Pt. 1 applied (27.11.2008) by Counter-Terrorism Act 2008 (c. 28), ss. 62, 100(2), **Sch. 7 para. 41(1)** (with s. 101(2), Sch. 7 para. 43) |

*Interpretation*

1      (1) In this Schedule—

   **F610** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   "non-executive committee" means the committee maintained under paragraph 3;

   "functions", in relation to the Authority, means functions conferred on the Authority by or under any provision of this Act.

   (2) For the purposes of this Schedule, the following are the Authority's legislative functions—

   (a)    making rules;

   (b)    issuing codes under section 64 or 119;

   (c)    issuing statements under section 64, 69, 124 or 210;

   (d)    giving directions under section 316, 318 or 328;

   (e)    issuing general guidance (as defined by section 158(5)) [**F611**or guidance under section 158A].

*Status: This version of this Act contains provisions that are prospective.*
*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

---

**Annotations:**

**Amendments (Textual)**
**F610** Sch. 1 para. 1(1): definition of "the 1985 Act" omitted (1.10.2009) by virtue of The Companies Act
2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009 (S.I. 2009/1941),
art. 2(1), **Sch. 1 para. 181(5)(a)** (with art. 10)
**F611** Words in Sch. 1 para. 1(2)(e) inserted (6.12.2006) by The Financial Services and Markets Act 2000
(Markets in Financial Instruments) (Modification of Powers) Regulations 2006 (S.I. 2006/2975) {reg.
12}

*Constitution*

2     (1) The constitution of the Authority must continue to provide for the Authority to have
—

        (a)    a chairman; and
        (b)    a governing body.

    (2) The governing body must include the chairman.

    (3) The chairman and other members of the governing body must be appointed, and be
liable to removal from office, by the Treasury.

    (4) The validity of any act of the Authority is not affected—
        (a)    by a vacancy in the office of chairman; or
        (b)    by a defect in the appointment of a person as a member of the governing
body or as chairman.

---

**Annotations:**

**Modifications etc. (not altering text)**
**C693** Sch. 1 Pt. I para. 2(3) modified (18.6.2001) by S.I. 2001/1821, **arts. 1(1)**, 2(2)

*Non-executive members of the governing body*

3     (1) The Authority must secure—
        (a)    that the majority of the members of its governing body are non-executive
members; and
        (b)    that a committee of its governing body, consisting solely of the non-
executive members, is set up and maintained for the purposes of discharging
the functions conferred on the committee by this Schedule.

    (2) The members of the non-executive committee are to be appointed by the Authority.

    (3) The non-executive committee is to have a chairman appointed by the Treasury from
among its members.

*Functions of the non-executive committee*

4     (1) In this paragraph "the committee" means the non-executive committee.

    (2) The non-executive functions are functions of the Authority but must be discharged
by the committee.

**Status:** This version of this Act contains provisions that are prospective.

**Changes to legislation:** There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

(3) The non-executive functions are—

(a) keeping under review the question whether the Authority is, in discharging its functions in accordance with decisions of its governing body, using its resources in the most efficient and economic way;

(b) keeping under review the question whether the Authority's internal financial controls secure the proper conduct of its financial affairs; and

(c) determining the remuneration of—

(i) the chairman of the Authority's governing body; and

(ii) the executive members of that body.

(4) The function mentioned in sub-paragraph (3)(b) and those mentioned in sub-paragraph (3)(c) may be discharged on behalf of the committee by a sub-committee.

(5) Any sub-committee of the committee—

(a) must have as its chairman the chairman of the committee; but

(b) may include persons other than members of the committee.

(6) The committee must prepare a report on the discharge of its functions for inclusion in the Authority's annual report to the Treasury under paragraph 10.

(7) The committee's report must relate to the same period as that covered by the Authority's report.

*Arrangements for discharging functions*

5  (1) The Authority may make arrangements for any of its functions to be discharged by a committee, sub-committee, officer or member of staff of the Authority.

[**F612**(2) But—

(a) in exercising the legislative functions mentioned in paragraph 1(2)(a) to (d) [**F613**or in determining or reviewing its strategy in relation to the financial stability objective**]**, the Authority must act through its governing body; and

(b) the legislative function mentioned in paragraph 1(2)(e) may not be discharged by an officer or member of staff of the Authority.**]**

(3) Sub-paragraph (1) does not apply to the non-executive functions.

**Annotations:**

**Amendments (Textual)**

**F612** Sch. 1 para. 5(2) substituted (12.7.2007) by The Regulatory Reform (Financial Services and Markets Act 2000) Order 2007 (S.I. 2007/1973), **art. 14**

**F613** Words in Sch. 1 para. 5(2)(a) inserted (8.4.2010) by Financial Services Act 2010 (c. 28), ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 34(2)**

**Modifications etc. (not altering text)**

**C694** Sch. 1 para. 5 extended (18.6.2001) by S.I. 2001/1821, **arts. 1(1)**, 2(1)(b)(c)

**C695** Sch. 1 para. 5(1) excluded by Serious Organised Crime and Police Act 2005 (c. 15), s. 71(6B) (as inserted (6.4.2010) by Coroners and Justice Act 2009 (c. 25) {ss. 113(4)}, 182(5) (with s. 180); S.I. 2010/816, **art. 2**, Sch. para. 6)

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 50 of 143

482
Financial Services and Markets Act 2000 (c. 8)
SCHEDULE 1 – The Financial Services Authority
Document Generated 2014-04-03

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

*Monitoring and enforcement*

6      (1)  The Authority must maintain arrangements designed to enable it to determine
            whether persons on whom requirements are imposed by or under this Act [**F614**,
            or by any directly applicable [**F615**Community regulation or decision] made under
            the markets in financial instruments directive [**F616**or the UCITS directive],] are
            complying with them.

       (2)  Those arrangements may provide for functions to be performed on behalf of the
            Authority by any body or person who, in its opinion, is competent to perform them.

       (3)  The Authority must also maintain arrangements for enforcing the provisions of, or
            made under, this Act [**F617**or of any directly applicable [**F615**Community regulation or
            decision] made under the markets in financial instruments directive [**F616**or the UCITS
            directive]].

       (4)  Sub-paragraph (2) does not affect the Authority's duty under sub-paragraph (1).

---

**Annotations:**

**Amendments (Textual)**

**F614**   Words in Sch. 1 para. 6(1) inserted (1.4.2007 for certain purposes, otherwise 1.11.2007) by The Financial
           Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126),
           regs. 1(2), 3(5), **Sch. 5 para. 23(a)**

**F615**   Words in Sch. 1 para. 6(1)(3) substituted (1.7.2011) by The Undertakings for Collective Investment in
           Transferable Securities Regulations 2011 (S.I. 2011/1613), **reg. 2(32)(a)**

**F616**   Words in Sch. 1 para. 6(1)(3) inserted (1.7.2011) by The Undertakings for Collective Investment in
           Transferable Securities Regulations 2011 (S.I. 2011/1613), **reg. 2(32)(b)**

**F617**   Words in Sch. 1 para. 6(3) inserted (1.4.2007 for certain purposes, otherwise 1.11.2007) by The Financial
           Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126),
           regs. 1(2), 3(5), **Sch. 5 para. 23(b)**

**Modifications etc. (not altering text)**

**C696**   Sch. 1 para. 6 modified (18.7.2002 for certain purposes and 21.8.2002 otherwise) by The Electronic
           Commerce Directive (Financial Services and Markets) Regulations 2002 (S.I. 2002/1775), regs. 1, **12(2)**

**C697**   Sch. 1 Pt. I para. 6(2) applied (with modifications) (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8,
           **Sch. 2 para. 3**

---

*Arrangements for the investigation of complaints*

7      (1)  The Authority must—

            (a)   make arrangements ("the complaints scheme") for the investigation of
                  complaints arising in connection with the exercise of, or failure to exercise,
                  any of its functions (other than its legislative functions); and

            (b)   appoint an independent person ("the investigator") to be responsible for the
                  conduct of investigations in accordance with the complaints scheme.

       (2)  The complaints scheme must be designed so that, as far as reasonably practicable,
            complaints are investigated quickly.

       (3)  The Treasury's approval is required for the appointment or dismissal of the
            investigator.

**Status:** *This version of this Act contains provisions that are prospective.*

**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

(4) The terms and conditions on which the investigator is appointed must be such as, in the opinion of the Authority, are reasonably designed to secure—

    (a)    that he will be free at all times to act independently of the Authority; and

    (b)    that complaints will be investigated under the complaints scheme without favouring the Authority.

(5) Before making the complaints scheme, the Authority must publish a draft of the proposed scheme in the way appearing to the Authority best calculated to bring it to the attention of the public.

(6) The draft must be accompanied by notice that representations about it may be made to the Authority within a specified time.

(7) Before making the proposed complaints scheme, the Authority must have regard to any representations made to it in accordance with sub-paragraph (6).

(8) If the Authority makes the proposed complaints scheme, it must publish an account, in general terms, of—

    (a)    the representations made to it in accordance with sub-paragraph (6); and

    (b)    its response to them.

(9) If the complaints scheme differs from the draft published under sub-paragraph (5) in a way which is, in the opinion of the Authority, significant the Authority must (in addition to complying with sub-paragraph (8)) publish details of the difference.

(10) The Authority must publish up-to-date details of the complaints scheme including, in particular, details of—

    (a)    the provision made under paragraph 8(5); and

    (b)    the powers which the investigator has to investigate a complaint.

(11) Those details must be published in the way appearing to the Authority to be best calculated to bring them to the attention of the public.

(12) The Authority must, without delay, give the Treasury a copy of any details published by it under this paragraph.

(13) The Authority may charge a reasonable fee for providing a person with a copy of—

    (a)    a draft published under sub-paragraph (5);

    (b)    details published under sub-paragraph (10).

(14) Sub-paragraphs (5) to (9) and (13)(a) also apply to a proposal to alter or replace the complaints scheme.

**Annotations:**

**Modifications etc. (not altering text)**
**C698**  Sch. 1 Pt. I para. 7(1)(a) restricted (19.7.2001) by S.I. 2001/2326, **arts. 1(1)(a)**, 18(3)
**C699**  Sch. 1 Pt. I para. 7(2)-(14) applied (19.7.2001) by S.I. 2001/2326, **arts. 1(1)(a)**, 18(2)(a)

**Commencement Information**
**I123**  Sch. 1 Pt. I para. 7 wholly in force at 3.9.2001; Sch. 1 Pt. I para. 7 not in force at Royal Assent see s. 431(2); Sch. 1 Pt. I para. 7 in force for specified purposes at 19.7.2001 by S.I. 2001/2364, **art. 2(2)** (with

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 52 of 143

484                                      *Financial Services and Markets Act 2000 (c. 8)*
                                         *SCHEDULE 1 – The Financial Services Authority*
                                         *Document Generated  2014-04-03*

***Status:*** *This version of this Act contains provisions that are prospective.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

art. 3); Sch. 1 Pt. I para. 7 in force in so far as not already in force at 3.9.2001 by S.I. 2001/2632, art. 2(2), **Sch. Pt. 2**

*Investigation of complaints*

8    (1) The Authority is not obliged to investigate a complaint in accordance with the complaints scheme which it reasonably considers would be more appropriately dealt with in another way (for example by referring the matter to the Tribunal or by the institution of other legal proceedings).

(2) The complaints scheme must provide—

    (a)   for reference to the investigator of any complaint which the Authority is investigating; and

    (b)   for him—

        (i) to have the means to conduct a full investigation of the complaint;

        (ii) to report on the result of his investigation to the Authority and the complainant; and

        (iii) to be able to publish his report (or any part of it) if he considers that it (or the part) ought to be brought to the attention of the public.

(3) If the Authority has decided not to investigate a complaint, it must notify the investigator.

(4) If the investigator considers that a complaint of which he has been notified under sub-paragraph (3) ought to be investigated, he may proceed as if the complaint had been referred to him under the complaints scheme.

(5) The complaints scheme must confer on the investigator the power to recommend, if he thinks it appropriate, that the Authority—

    (a)   makes a compensatory payment to the complainant,

    (b)   remedies the matter complained of,

or takes both of those steps.

(6) The complaints scheme must require the Authority, in a case where the investigator—

    (a)   has reported that a complaint is well-founded, or

    (b)   has criticised the Authority in his report,

to inform the investigator and the complainant of the steps which it proposes to take in response to the report.

(7) The investigator may require the Authority to publish the whole or a specified part of the response.

(8) The investigator may appoint a person to conduct the investigation on his behalf but subject to his direction.

(9) Neither an officer nor an employee of the Authority may be appointed under sub-paragraph (8).

(10) Sub-paragraph (2) is not to be taken as preventing the Authority from making arrangements for the initial investigation of a complaint to be conducted by the Authority.

*Status:* This version of this Act contains provisions that are prospective.
*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Modifications etc. (not altering text)**
  **C700**  Sch. 1 Pt. I para. 8 power to apply conferred (19.7.2001) by S.I. 2001/2326, **arts. 1(1)(a)**, 18(2)(b)

**Commencement Information**
  **I124**  Sch. 1 Pt. I para. 8 wholly in force at 3.9.2001; Sch. 1 Pt. I para. 8 not in force at Royal Assent see s.
          431(2); Sch. 1 Pt. I para. 8 in force for specified purposes at 19.7.2001 by S.I. 2001/2364, **art. 2(2)** (with
          art. 3); Sch. 1 Pt. I para. 8 in force in so far as not already in force at 3.9.2001 by S.I. 2001/2632, art.
          2(2), **Sch. Pt. 2**

---

*Records*

9      The Authority must maintain satisfactory arrangements for—

  (a)   recording decisions made in the exercise of its functions; and

  (b)   the safe-keeping of those records which it considers ought to be preserved.

*Annual report*

10    (1) At least once a year the Authority must make a report to the Treasury on—

  (a)   the discharge of its functions;

  (b)   the extent to which, in its opinion, the regulatory objectives have been met;

  (c)   its consideration of the matters mentioned in section 2(3); and

  (d)   such other matters as the Treasury may from time to time direct.

(2) The report must be accompanied by—

  (a)   the report prepared by the non-executive committee under paragraph 4(6);
        and

  (b)   such other reports or information, prepared by such persons, as the Treasury
        may from time to time direct.

(3) The Treasury must lay before Parliament a copy of each report received by them
    under this paragraph.

(4) The Treasury may—

  (a)   require the Authority to comply with any provisions of [**F618**the Companies
        Act 2006] about accounts and their audit which would not otherwise apply
        to it; or

  (b)   direct that any such provision of that Act is to apply to the Authority with
        such modifications as are specified in the direction.

(5) Compliance with any requirement imposed under sub-paragraph (4)(a) or (b) is
    enforceable by injunction or, in Scotland, an order under section 45(b) of the **M78**Court
    of Session Act 1988.

(6) Proceedings under sub-paragraph (5) may be brought only by the Treasury.

486

*Financial Services and Markets Act 2000 (c. 8)*
*SCHEDULE 1 – The Financial Services Authority*
*Document Generated  2014-04-03*

***Status:*** This version of this Act contains provisions that are prospective.
***Changes to legislation:*** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

---

**Annotations:**

**Amendments (Textual)**
**F618**  Words in Sch. 1 para. 10(4)(a) substituted (6.4.2008) by The Companies Act 2006 (Consequential Amendments etc) Order 2008 (S.I. 2008/948), arts. 2(2), 3(1), **Sch. 1 para. 213** (with arts. 6, 11, 12)

**Marginal Citations**
**M78**  1988 c. 36.

---

*Annual public meeting*

11    (1) Not later than three months after making a report under paragraph 10, the Authority must hold a public meeting ("the annual meeting") for the purposes of enabling that report to be considered.

(2) The Authority must organise the annual meeting so as to allow—

    (a)  a general discussion of the contents of the report which is being considered; and

    (b)  a reasonable opportunity for those attending the meeting to put questions to the Authority about the way in which it discharged, or failed to discharge, its functions during the period to which the report relates.

(3) But otherwise the annual meeting is to be organised and conducted in such a way as the Authority considers appropriate.

(4) The Authority must give reasonable notice of its annual meeting.

(5) That notice must—

    (a)  give details of the time and place at which the meeting is to be held;

    (b)  set out the proposed agenda for the meeting;

    (c)  indicate the proposed duration of the meeting;

    (d)  give details of the Authority's arrangements for enabling persons to attend; and

    (e)  be published by the Authority in the way appearing to it to be most suitable for bringing the notice to the attention of the public.

(6) If the Authority proposes to alter any of the arrangements which have been included in the notice given under sub-paragraph (4) it must—

    (a)  give reasonable notice of the alteration; and

    (b)  publish that notice in the way appearing to the Authority to be best calculated to bring it to the attention of the public.

*Report of annual meeting*

12    Not later than one month after its annual meeting, the Authority must publish a report of the proceedings of the meeting.

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

## PART II

### STATUS

---

**Annotations:**

**Modifications etc. (not altering text)**

C701   Sch. 1 Pt. 2 modified (15.12.2007) by The Transfer of Funds (Information on the Payer) Regulations 2007 (S.I. 2007/3298), **reg. 4(4)**

C702   Sch. 1 Pt. 2 applied (27.11.2008) by Counter-Terrorism Act 2008 (c. 28), ss. 62, 100(2), **Sch. 7 para. 41(1)** (with s. 101(2), Sch. 7 para. 43)

---

13      In relation to any of its functions—

    (a)   the Authority is not to be regarded as acting on behalf of the Crown; and

    (b)   its members, officers and staff are not to be regarded as Crown servants.

*Exemption from requirement of "limited" in Authority's name*

14      The Authority is to continue to be exempt from the requirements of [**F619**the Companies Act 2006] relating to the use of "limited" as part of its name.

---

**Annotations:**

**Amendments (Textual)**

F619   Words in Sch. 1 para. 14 substituted (1.10.2009) by The Companies Act 2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009 (S.I. 2009/1941), art. 2(1), **Sch. 1 para. 181(5)(b)** (with art. 10)

---

15      If the Secretary of State is satisfied that any action taken by the Authority makes it inappropriate for the exemption given by paragraph 14 to continue he may, after consulting the Treasury, give a direction removing it.

## PART III

### PENALTIES AND FEES

*Penalties*

16      (1) In determining its policy with respect to the amounts of penalties to be imposed by it under this Act, the Authority must take no account of the expenses which it incurs, or expects to incur, in discharging its functions.

    (2) The Authority must prepare and operate a scheme for ensuring that the amounts paid to the Authority by way of penalties imposed under this Act are applied for the benefit of authorised persons.

    (3) The scheme may, in particular, make different provision with respect to different classes of authorised person.

    (4) Up to date details of the scheme must be set out in a document ("the scheme details").

***Status:*** This version of this Act contains provisions that are prospective.
***Changes to legislation:*** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

(5) The scheme details must be published by the Authority in the way appearing to it to be best calculated to bring them to the attention of the public.

(6) Before making the scheme, the Authority must publish a draft of the proposed scheme in the way appearing to the Authority to be best calculated to bring it to the attention of the public.

(7) The draft must be accompanied by notice that representations about the proposals may be made to the Authority within a specified time.

(8) Before making the scheme, the Authority must have regard to any representations made to it in accordance with sub-paragraph (7).

(9) If the Authority makes the proposed scheme, it must publish an account, in general terms, of—

    (a)   the representations made to it in accordance with sub-paragraph (7); and

    (b)   its response to them.

(10) If the scheme differs from the draft published under sub-paragraph (6) in a way which is, in the opinion of the Authority, significant the Authority must (in addition to complying with sub-paragraph (9)) publish details of the difference.

(11) The Authority must, without delay, give the Treasury a copy of any scheme details published by it.

(12) The Authority may charge a reasonable fee for providing a person with a copy of—

    (a)   a draft published under sub-paragraph (6);

    (b)   scheme details.

(13) Sub-paragraphs (6) to (10) and (12)(a) also apply to a proposal to alter or replace the complaints scheme.

---

**Annotations:**

**Modifications etc. (not altering text)**

**C703** Sch. 1 para. 16 applied (with modifications) (6.3.2008) by The Regulated Covered Bonds Regulations 2008 (S.I. 2008/346), **reg. 37**

---

*Fees*

17    (1) The Authority may make rules providing for the payment to it of such fees, in connection with the discharge of any of its functions under or as a result of this Act, as it considers will (taking account of its expected income from fees and charges provided for by any other provision of this Act) enable it—

    (a)   to meet expenses incurred in carrying out its functions or for any incidental purpose;

    (b)   to repay the principal of, and pay any interest on, any money which it has borrowed and which has been used for the purpose of meeting expenses incurred in relation to its assumption of functions under this Act or the [M79]Bank of England Act 1998; and

    (c)   to maintain adequate reserves.

*Status:* This version of this Act contains provisions that are prospective.

*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)

(2) In fixing the amount of any fee which is to be payable to the Authority, no account is to be taken of any sums which the Authority receives, or expects to receive, by way of penalties imposed by it under this Act.

(3) Sub-paragraph (1)(b) applies whether expenses were incurred before or after the coming into force of this Act or the ^M80^Bank of England Act 1998.

(4) Any fee which is owed to the Authority under any provision made by or under this Act may be recovered as a debt due to the Authority.

---

**Annotations:**

**Modifications etc. (not altering text)**

C704   Sch. 1 para. 17 modified (1.12.2001) by S.I. 2001/3650, **arts. 1(a)**, 25(1)(2)

C705   Sch. 1 para. 17 applied (with modifications) (6.3.2008) by The Regulated Covered Bonds Regulations 2008 (S.I. 2008/346), reg. 46, **Sch. para. 5**

C706   Sch. 1 para. 17 modified (16.1.2009) by Building Societies (Funding) and Mutual Societies (Transfers) Act 2007 (c. 26), **ss. 3(15)**, 6(2); S.I. 2009/36, **art. 2**

C707   Sch. 1 para. 17 modified (2.3.2009) by The Payment Services Regulations 2009 (S.I. 2009/209), regs. 1(2)(a), **92(1)** (with reg. 3)

C708   Sch. 1 para. 17 extended (with modifications) (11.2.2010) by The Cross-Border Payments in Euro Regulations 2010 (S.I. 2010/89), **reg. 13**

C709   Sch. 1 para. 17 extended (with modifications) (9.2.2011 for certain purposes, otherwise 30.4.2011) by The Electronic Money Regulations 2011 (S.I. 2011/99), regs. 1(2)(a)(xiii)(b), **59** (with art. 3)

C710   Sch. 1 para. 17(1) modified (17.8.2001) by S.I. 2001/2617, arts. 2(a), 4(3), 8, Sch. 2 paras. 9, **10**

**Marginal Citations**

M79   1998 c. 11.

M80   1998 c. 11.

---

*Services for which fees may not be charged*

18        The power conferred by paragraph 17 may not be used to require—

(a)   a fee to be paid in respect of the discharge of any of the Authority's functions under paragraphs 13, 14, 19 or 20 of Schedule 3; or

(b)   a fee to be paid by any person whose application for approval under section 59 has been granted.

## PART IV

### MISCELLANEOUS

---

**Annotations:**

**Modifications etc. (not altering text)**

C711   Sch. 1 Pt. 4 modified (15.12.2007) by The Transfer of Funds (Information on the Payer) Regulations 2007 (S.I. 2007/3298), **reg. 4(4)**

C712   Sch. 1 Pt. 4 applied (27.11.2008) by Counter-Terrorism Act 2008 (c. 28), ss. 62, 100(2), **Sch. 7 para. 41(1)** (with s. 101(2), Sch. 7 para. 43)

***Status:*** This version of this Act contains provisions that are prospective.
***Changes to legislation:*** There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)

*Exemption from liability in damages*

19      (1)  Neither the Authority nor any person who is, or is acting as, a member, officer or member of staff of the Authority is to be liable in damages for anything done or omitted in the discharge, or purported discharge, of the Authority's functions.

(2)  Neither the investigator appointed under paragraph 7 nor a person appointed to conduct an investigation on his behalf under paragraph 8(8) is to be liable in damages for anything done or omitted in the discharge, or purported discharge, of his functions in relation to the investigation of a complaint.

(3)  Neither sub-paragraph (1) nor sub-paragraph (2) applies—

(a)  if the act or omission is shown to have been in bad faith; or

(b)  so as to prevent an award of damages made in respect of an act or omission on the ground that the act or omission was unlawful as a result of section 6(1) of the [M81]Human Rights Act 1998.

---

**Annotations:**

**Modifications etc. (not altering text)**

**C713**  Sch. 1 para. 19 extended (1.12.2001) by S.I. 2001/3650, **arts. 1(a)**, 24(6)

**C714**  Sch. 1 para. 19 modified (6.3.2008) by The Regulated Covered Bonds Regulations 2008 (S.I. 2008/346), **reg. 45**

**C715**  Sch. 1 para. 19 modified (2.3.2009) by The Payment Services Regulations 2009 (S.I. 2009/209), regs. 1(2)(a), **94** (with reg. 3)

**C716**  Sch. 1 para. 19 applied (11.2.2010) by The Cross-Border Payments in Euro Regulations 2010 (S.I. 2010/89), **reg. 15**

**C717**  Sch. 1 para. 19 extended (9.2.2011 for certain purposes, otherwise 30.4.2011) by The Electronic Money Regulations 2011 (S.I. 2011/99), regs. 1(2)(a)(xiii)(b), **61** (with art. 3)

**C718**  Sch. 1 para. 19(1) applied (1.12.2001) by S.I. 1995/1537, **reg. 23(1)** (as amended (1.12.2001) by S.I. 2001/3649, **arts. 1**, 509(b)(i))

**Marginal Citations**

**M81**  1998 c. 42.

---

[[F620]19A    For the purposes of this Act anything done by an accredited financial investigator within the meaning of the Proceeds of Crime Act 2002 who is—

(a)  a member of the staff of the Authority, or

(b)  a person appointed by the Authority under section 97, 167 or 168 to conduct an investigation,

must be treated as done in the exercise or discharge of a function of the Authority.]

---

**Annotations:**

**Amendments (Textual)**

**F620**  Sch. 1 para. 19A inserted (24.2.2003) by Proceeds of Crime Act 2002 (c. 29), ss. 456, 458(1), **Sch. 11 para. 38**; S.I. 2003/120, **art. 2**, Sch. (subject to arts. 3-7) (as amended by S.I. 2003/333, art. 14)

*Financial Services and Markets Act 2000 (c. 8)*
*SCHEDULE 1A – Further provision about the consumer financial education body*
*Document Generated  2014-04-03*
491

**Status:** *This version of this Act contains provisions that are prospective.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

### [F621*Amounts required by rules to be paid to the Authority*

**Annotations:**

**Amendments (Textual)**
  **F621**  Sch. 1 para. 19B and preceding cross-heading inserted (8.4.2010) by Financial Services Act 2010 (c. 28),
  ss. 24(1), 26(1)(g)(l), **Sch. 2 para. 34(3)**

19B        Any amount (other than a fee) which is required by rules to be paid to the Authority
           may be recovered as a debt due to the Authority.]

### *Disqualification for membership of House of Commons*

20         In Part III of Schedule 1 to the [M82]House of Commons Disqualification Act 1975
           (disqualifying offices), insert at the appropriate place—

               "Member of the governing body of the Financial Services Authority

                 . ”

**Annotations:**

**Marginal Citations**
  **M82**  1975 c. 24.

### *Disqualification for membership of Northern Ireland Assembly*

21         In Part III of Schedule 1 to the [M83]Northern Ireland Assembly Disqualification Act
           1975 (disqualifying offices), insert at the appropriate place—

               "Member of the governing body of the Financial Services Authority".

**Annotations:**

**Marginal Citations**
  **M83**  1975 c. 25.

**Status:**
This version of this Act contains provisions that are prospective.

**Changes to legislation:**
There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations.

**Changes and effects yet to be applied to :**

- s. 1A(6) word omitted by S.I. 2013/1773 Sch. 1 para. 2
- s. 1A(6)(ca) inserted by S.I. 2013/1773 Sch. 1 para. 2
- s. 1B(4) restricted by S.I. 2013/1881 art. 61(2)
- s. 1G modified by S.I. 2013/1881 art. 65(3)(a)
- s. 1G modified by S.I. 2001/544 art. 60LA(1)(3) (as inserted) by S.I. 2014/366 art. 2(33)
- s. 1G modified by S.I. 2001/544 art. 60S(1)(3) (as inserted) by S.I. 2014/366 art. 2(37)
- s. 1G(1)(c) word omitted by S.I. 2013/655 art. 3(2)(a)
- s. 1G(1)(e) and word inserted by S.I. 2013/655 art. 3(2)(b)
- s. 1H(2)(b) omitted by S.I. 2013/1881 art. 10(2)(a)
- s. 1H(7A) inserted by S.I. 2013/655 art. 3(3)
- s. 1H(8) words omitted by S.I. 2013/1881 art. 10(2)(b)
- s. 1H(8) words substituted by S.I. 2013/3115 Sch. 2 para. 2
- s. 1L modified by SI 2002/1775 reg. 12(2) (as amended) by S.I. 2013/472 Sch. 2 para. 77(7)(a)(i)
- s. 1L(1) applied (with modifications) by S.I. 2013/1882 art. 3(2)(a)
- s. 1L(2) applied (with modifications) by S.I. 2013/1882 art. 3(2)(b)
- s. 1L(2) word omitted by S.I. 2013/1773 Sch. 1 para. 3
- s. 1L(2)(aa) inserted by S.I. 2013/1773 Sch. 1 para. 3
- s. 1Q(5A)(5B) inserted by 2013 c. 33 s. 132
- s. 1IA and cross-heading inserted by 2013 c. 33 s. 2
- s. 2B(3)(a) word omitted by 2013 c. 33 s. 1(2)(a)
- s. 2B(3)(c) and word inserted by 2013 c. 33 s. 1(2)(b)
- s. 2B(4) words substituted by 2013 c. 33 s. 1(3)
- s. 2B(4A) inserted by 2013 c. 33 s. 1(4)
- s. 2H substituted by 2013 c. 33 s. 130(1)
- s. 2J(3) words substituted by 2013 c. 33 s. 1(5)(a)
- s. 2J(3A) inserted by 2013 c. 33 s. 1(5)(b)
- s. 2J(4) words substituted by 2013 c. 33 s. 1(5)(c)
- s. 3A(3)(a) word omitted by 2013 c. 33 s. 135(2)(a)
- s. 3A(3)(c) and word inserted by 2013 c. 33 s. 135(2)(b)
- s. 3B(1) word substituted by 2013 c. 33 s. 130(2)
- s. 3I(3)(a) words inserted by 2013 c. 33 Sch. 8 para. 4
- s. 3I(4)(a) word omitted by 2013 c. 33 s. 3(a)
- s. 3I(4)(c) and word inserted by 2013 c. 33 s. 3(b)
- s. 3M(3)(a) words substituted by S.I. 2013/3115 Sch. 2 para. 3(a)
- s. 3M(3)(c) omitted by S.I. 2013/3115 Sch. 2 para. 3(b)
- s. 20 modified by S.I. 2007/3510 art. 7(2)
- s. 20 modified by S.I. 2013/655 art. 10(3)
- s. 20(1) excluded by S.I. 2013/1773 reg. 76(2)
- s. 20(1) excluded by S.I. 2013/1773 reg. 78(4)
- s. 20(1) word substituted by 2012 c. 21 Sch. 9 para. 2(2)(c)
- s. 20(1) words inserted by 2012 c. 21 Sch. 9 para. 2(2)(a)
- s. 20(1)(a) substituted by 2012 c. 21 Sch. 9 para. 2(2)(b)
- s. 20(1A) excluded by S.I. 2013/1773 reg. 76(2)
- s. 20(1A) excluded by S.I. 2013/1773 reg. 78(4)
- s. 20(1A) inserted by 2012 c. 21 Sch. 9 para. 2(3)
- s. 20(2) substituted by 2012 c. 21 Sch. 9 para. 2(4)
- s. 20(3) words substituted by 2012 c. 21 Sch. 9 para. 2(5)
- s. 20(4)(5) inserted by 2012 c. 21 Sch. 9 para. 2(6)
- s. 21(2) modified by S.I. 2007/3510 art. 8(2)
- s. 21(2) modified by S.I. 2013/1881 art. 59(3)
- s. 22 applied by S.I. 2013/1046 rule 10(7)(a)

– s. 22 applied by S.I. 2013/1877 reg. 2(2)(a)
– s. 22 applied by 2003 c. 1 s. 554O(6) (as inserted) by S.I. 2013/1881 Sch. para. 9(c)
– s. 22 applied by 2007 c. 3 s. 564B(1A) (as inserted) by S.I. 2013/1881 Sch. para. 12(b)
– s. 22 applied by 2009 c. 4 s. 502(1A) (as inserted) by S.I. 2013/1881 Sch. para. 16(b)
– s. 22 applied by SI 2001/341 reg. 114(6) (as inserted) by S.I. 2013/1881 Sch. para. 22(b)
– s. 22 applied by SI 2001/497 reg. 113(6) (as inserted) by S.I. 2013/1881 Sch. para. 23(b)
– s. 22 applied by SI 2004/400 reg. 5(7) (as inserted) by S.I. 2013/1881 Sch. para. 25(b)
– s. 22 applied by SI 2007/2157 reg. 23(6) (as inserted) by S.I. 2013/1881 Sch. para. 31(5)(b)
– s. 22 applied by SI 2008/1741 reg. 112(5) (as inserted) by S.I. 2013/1881 Sch. para. 37(b)
– s. 22 applied by SI 2008/570 Sch. para. 11(2) (as substituted) by S.I. 2013/1881 Sch. para. 35
– s. 22 applied by SI 2008/700 Sch. para. 12(2) (as substituted) by S.I. 2013/1881 Sch. para. 36
– s. 22 applied by SI 2012/2079 reg. 2(1A) (as inserted) by S.I. 2013/1881 Sch. para. 44(a)(ii)
– s. 22 applied by SI 2013/380 Sch. 6 para. 11(9) (as inserted) by S.I. 2013/1881 Sch. para. 45(b)
– s. 22 applied by SSI 2011/141 Sch. 4 para. 1(2) (as substituted) by S.I. 2013/1881 Sch. para. 43(a)
– s. 22 heading substituted by 2012 c. 21 s. 7(1)(d)
– s. 22(1A) inserted by 2012 c. 21 s. 7(1)(a)
– s. 22(3) words inserted by 2012 c. 21 s. 7(1)(b)
– s. 22(6) inserted by 2012 c. 21 s. 7(1)(c)

- s. 285(2)(b) substituted by 2012 c. 21 s. 28(2)
- s. 285(3) words substituted by 2012 c. 21 s. 28(3)
- s. 285(3) words substituted by S.I. 2013/504 reg. 3(3)(b)
- s. 285(3A) inserted by S.I. 2013/504 reg. 3(3)(c)
- s. 285(4) inserted by 2012 c. 21 s. 28(4)
- s. 285A inserted by 2012 c. 21 s. 29(1)
- s. 285A(3)(c) words substituted by S.I. 2013/504 reg. 3(4)
- s. 286(1)(a) words substituted by 2012 c. 21 Sch. 8 para. 2(2)
- s. 286(4A) words substituted by 2012 c. 21 Sch. 8 para. 2(3)
- s. 286(4C) words substituted by 2012 c. 21 Sch. 8 para. 2(3)
- s. 286(4F) inserted by 2012 c. 21 s. 30
- s. 286(6) words substituted by 2012 c. 21 Sch. 8 para. 2(3)
- s. 287(1) words substituted by 2012 c. 21 Sch. 8 para. 3(2)
- s. 287(2) words substituted by 2012 c. 21 Sch. 8 para. 3(2)
- s. 287(3)(a) words inserted by 2012 c. 21 Sch. 8 para. 3(3)(a)
- s. 287(3)(b) words substituted by 2012 c. 21 Sch. 8 para. 3(3)(b)
- s. 287(3)(d) words substituted by 2012 c. 21 Sch. 8 para. 3(3)(c)
- s. 287(3)(e) words substituted by 2012 c. 21 Sch. 8 para. 3(3)(c)
- s. 288(1)(1A) substituted for s. 288(1) by S.I. 2013/504 reg. 3(5)(a)
- s. 288(1) words substituted by 2012 c. 21 Sch. 8 para. 4(2)
- s. 288(2) words substituted by 2012 c. 21 Sch. 8 para. 4(3)(a)
- s. 288(2) words substituted by S.I. 2013/504 reg. 3(5)(b)
- s. 288(2)(d) words substituted by 2012 c. 21 Sch. 8 para. 4(3)(b)
- s. 288(3)(b) words inserted by 2012 c. 21 Sch. 8 para. 4(4)
- s. 289(1) words substituted by 2012 c. 21 Sch. 8 para. 5
- s. 289(2) words substituted by 2012 c. 21 Sch. 8 para. 5
- s. 289(3) words substituted by 2012 c. 21 Sch. 8 para. 5
- s. 289(4) inserted by S.I. 2013/504 reg. 3(6)
- s. 290(1) substituted by S.I. 2013/504 reg. 3(7)(a)
- s. 290(1) words substituted by 2012 c. 21 Sch. 8 para. 6(2)(a)
- s. 290(1) words substituted by 2012 c. 21 Sch. 8 para. 6(2)(b)
- s. 290(1B) words substituted by 2012 c. 21 Sch. 8 para. 6(3)
- s. 290(1D) inserted by S.I. 2013/504 reg. 3(7)(b)
- s. 290(2) omitted by 2012 c. 21 Sch. 8 para. 6(4)
- s. 290(3) words inserted by S.I. 2013/504 reg. 3(7)(c)
- s. 290(3) words substituted by 2012 c. 21 Sch. 8 para. 6(5)
- s. 290(5) words inserted by S.I. 2013/504 reg. 3(7)(d)
- s. 290(6) omitted by 2012 c. 21 Sch. 8 para. 6(6)
- s. 290(7) words inserted by S.I. 2013/504 reg. 3(7)(e)
- s. 290A(1) words substituted by 2012 c. 21 Sch. 8 para. 7(2)(a)
- s. 290A(1) words substituted by 2012 c. 21 Sch. 8 para. 7(2)(b)
- s. 290A(1)(a) word omitted by 2012 c. 21 Sch. 8 para. 7(2)(c)
- s. 290A(1)(c) and word inserted by 2012 c. 21 Sch. 8 para. 7(2)(d)
- s. 290A(3) words substituted by 2012 c. 21 Sch. 8 para. 7(3)
- s. 290A(6) substituted by S.I. 2013/504 reg. 3(9)
- s. 292(1) word substituted by S.I. 2013/504 reg. 3(10)(a)
- s. 292(2) words substituted by 2012 c. 21 Sch. 8 para. 8

–  s. 292(2)(b) words inserted by S.I. 2013/504 reg. 3(10)(b)
–  s. 292(3)(c) words substituted by 2012 c. 21 Sch. 8 para. 8
–  s. 292(3)(d) words substituted by 2012 c. 21 Sch. 8 para. 8
–  s. 292(4) words substituted by 2012 c. 21 Sch. 8 para. 8
–  s. 292(5)(c) words substituted by 2012 c. 21 Sch. 8 para. 8
–  s. 292(6) inserted by S.I. 2013/504 reg. 3(10)(c)
–  s. 292A(1) word substituted by 2012 c. 21 Sch. 8 para. 9
–  s. 292A(3) word substituted by 2012 c. 21 Sch. 8 para. 9
–  s. 292A(5) word substituted by 2012 c. 21 Sch. 8 para. 9
–  s. 292A(6) word substituted by 2012 c. 21 Sch. 8 para. 9
–  s. 293(1)-(3) words substituted by 2012 c. 21 Sch. 8 para. 10(2)
–  s. 293(5) words substituted by 2012 c. 21 Sch. 8 para. 10(2)
–  s. 293(6) words substituted by 2012 c. 21 Sch. 8 para. 10(3)(c)
–  s. 293(6)(a) words inserted by 2012 c. 21 Sch. 8 para. 10(3)(a)
–  s. 293(6)(b) words substituted by 2012 c. 21 Sch. 8 para. 10(3)(b)
–  s. 293(7) words substituted by 2012 c. 21 Sch. 8 para. 10(4)(c)
–  s. 293(7)(a) words inserted by 2012 c. 21 Sch. 8 para. 10(4)(a)
–  s. 293(7)(b) words inserted by 2012 c. 21 Sch. 8 para. 10(4)(b)
–  s. 293(9) words substituted by 2012 c. 21 Sch. 8 para. 10(5)
–  s. 293A substituted by 2012 c. 21 Sch. 8 para. 11
–  s. 294(1) words substituted by 2012 c. 21 Sch. 8 para. 12
–  s. 294(2) words substituted by 2012 c. 21 Sch. 8 para. 12
–  s. 294(4) words substituted by 2012 c. 21 Sch. 8 para. 12
–  s. 294(6) words substituted by 2012 c. 21 Sch. 8 para. 12
–  s. 295(1) words substituted by 2012 c. 21 Sch. 8 para. 13(2)
–  s. 295(2) words substituted by 2012 c. 21 Sch. 8 para. 13(3)
–  s. 295(3) words substituted by 2012 c. 21 Sch. 8 para. 13(4)
–  s. 295(4) omitted by 2012 c. 21 Sch. 8 para. 13(5)
–  s. 296 heading words substituted by 2012 c. 21 Sch. 8 para. 14(8)
–  s. 296(1) words substituted by 2012 c. 21 Sch. 8 para. 14(2)
–  s. 296(1A) words substituted by 2012 c. 21 Sch. 8 para. 14(3)(a)
–  s. 296(1A) words substituted by 2012 c. 21 Sch. 8 para. 14(3)(b)
–  s. 296(2) words substituted by 2012 c. 21 Sch. 8 para. 14(4)
–  s. 296(2A) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(a)
–  s. 296(2A)(a) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(b)(i)
–  s. 296(2A)(a) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(b)(ii)
–  s. 296(2A)(b) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(c)
–  s. 296(3) words substituted by 2012 c. 21 Sch. 8 para. 14(6)
–  s. 296(4) words substituted by 2012 c. 21 Sch. 8 para. 14(7)
–  s. 297(1) words inserted by S.I. 2013/504 reg. 3(12)(a)
–  s. 297(1) words substituted by 2012 c. 21 Sch. 8 para. 15(2)
–  s. 297(1A) inserted by S.I. 2013/504 reg. 3(12)(b)
–  s. 297(2) words inserted by S.I. 2013/504 reg. 3(12)(c)
–  s. 297(2) words substituted by 2012 c. 21 Sch. 8 para. 15(2)
–  s. 297(2A) words inserted by S.I. 2013/504 reg. 3(12)(d)
–  s. 297(2A) words omitted by 2012 c. 21 Sch. 8 para. 15(3)(a)(ii)
–  s. 297(2A) words substituted by 2012 c. 21 Sch. 8 para. 15(3)(a)(i)
–  s. 297(2A)(a) words inserted by 2012 c. 21 Sch. 8 para. 15(3)(b)
–  s. 297(2A)(b) words inserted by 2012 c. 21 Sch. 8 para. 15(3)(b)
–  s. 297(2A)(c) words substituted by 2012 c. 21 Sch. 8 para. 15(3)(c)
–  s. 297(2C) words inserted by 2012 c. 21 Sch. 8 para. 15(4)
–  s. 297(5) words substituted by 2012 c. 21 Sch. 8 para. 15(5)
–  s. 297(6) inserted by S.I. 2012/916 reg. 2(10)
–  s. 297(6) words substituted by 2012 c. 21 Sch. 8 para. 15(5)
–  s. 298 applied (with modifications) by 1998 c. 40 s. 170B(9) (as inserted) by S.I. 2013/504 s. 170B(9)
–  s. 298(1) words inserted by 2012 c. 21 Sch. 8 para. 16(a)
–  s. 298(1) words substituted by 2012 c. 21 Sch. 8 para. 16(b)

- – s. 298(1)(b) omitted by 2012 c. 21 s. 32(2)
- – s. 298(1)(c) omitted by 2012 c. 21 s. 32(2)
- – s. 298(2)(a) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 298(3) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 298(3)(b) omitted by 2012 c. 21 s. 32(3)
- – s. 298(3)(c) omitted by 2012 c. 21 s. 32(3)
- – s. 298(4) substituted by 2012 c. 21 s. 32(4)
- – s. 298(5) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 298(6) words inserted by 2012 c. 21 Sch. 8 para. 16(a)
- – s. 298(6) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 298(6)(b) and word omitted by 2012 c. 21 s. 32(5)
- – s. 298(7) words inserted by 2012 c. 21 Sch. 8 para. 16(a)
- – s. 298(7) words substituted by 2012 c. 21 s. 32(6)
- – s. 298(7) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 298(8) words substituted by 2012 c. 21 Sch. 8 para. 16(b)
- – s. 299(1) words substituted by 2012 c. 21 Sch. 8 para. 17
- – s. 299(2) words substituted by 2012 c. 21 Sch. 8 para. 17
- – s. 300A heading words substituted by 2012 c. 21 Sch. 8 para. 18(b)
- – s. 300A(1) words substituted by 2012 c. 21 Sch. 8 para. 18(a)
- – s. 300A(2) words substituted by 2012 c. 21 Sch. 8 para. 18(b)
- – s. 300A(4) words substituted by 2012 c. 21 Sch. 8 para. 18(b)
- – s. 300B words substituted by 2012 c. 21 Sch. 8 para. 19
- – s. 300C heading words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300C(1) words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300C(2)(a) words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300C(3) words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300C(4)(a) words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300C(4)(b) words substituted by 2012 c. 21 Sch. 8 para. 20
- – s. 300D heading words substituted by 2012 c. 21 Sch. 8 para. 21(4)
- – s. 300D(1)-(4) words substituted by 2012 c. 21 Sch. 8 para. 21(2)
- – s. 300D(5)(a) words substituted by 2012 c. 21 Sch. 8 para. 21(2)
- – s. 300D(5)(b) words substituted by 2012 c. 21 Sch. 8 para. 21(2)
- – s. 300D(6) words substituted by 2012 c. 21 Sch. 8 para. 21(3)(a)
- – s. 300D(6)(b) words substituted by 2012 c. 21 Sch. 8 para. 21(3)(b)(i)
- – s. 300D(6)(b) words substituted by 2012 c. 21 Sch. 8 para. 21(3)(b)(ii)
- – s. 300D(6)(c)(i) words substituted by 2012 c. 21 Sch. 8 para. 21(3)(c)
- – s. 300D(6)(c)(ii) words substituted by 2012 c. 21 Sch. 8 para. 21(3)(c)
- – s. 300E(3) words substituted by S.I. 2013/504 reg. 3(13)
- – s. 301(2) words substituted by 2012 c. 21 Sch. 8 para. 22(2)
- – s. 301(3) words substituted by 2012 c. 21 Sch. 8 para. 22(3)(a)
- – s. 301(3) words substituted by 2012 c. 21 Sch. 8 para. 22(3)(b)
- – s. 301(4)(a) words substituted by 2012 c. 21 Sch. 8 para. 22(4)
- – s. 301(6)(a) words substituted by 2012 c. 21 Sch. 8 para. 22(4)
- – s. 301(7) words substituted by 2012 c. 21 Sch. 8 para. 22(4)
- – s. 301(9) words substituted by 2012 c. 21 Sch. 8 para. 22(4)

- Sch. 1 para. 6(1) words inserted by S.I. 2012/1906 art. 3(17)(a)
- Sch. 1 para. 6(3) words inserted by S.I. 2012/1906 art. 3(17)(b)
- Sch. 1 para. 6(1) words inserted by S.I. 2012/2554 reg. 2(16)(a)
- Sch. 1 para. 6(3) words inserted by S.I. 2012/2554 reg. 2(16)(b)

**Changes and effects yet to be applied to the whole Act associated Parts and Chapters:**

– Act excluded by 2012 c. 7 s. 134(5)
– Act excluded by 2008 c. 10 s. 8(1A) (as inserted) by S.I. 2013/1881 Sch. para. 14(a)
– Act modified by S.I. 2007/3510 art. 9
– Act modified by 1990 c. 41 s. 107(17) (as inserted) by S.I. 2013/1881 Sch. para. 2(3)

- s. 1Q modified by S.I. 2013/1881 art. 65(3)(b)
- s. 22A 22B inserted by 2012 c. 21 s. 9

–     s. 296A inserted by 2012 c. 21 s. 31
–     s. 296A heading words substituted by S.I. 2013/504 reg. 3(11)(a)
–     s. 296A(1) words substituted by S.I. 2013/504 reg. 3(11)(b)(i)
–     s. 296A(1)-(4) words substituted by S.I. 2013/504 reg. 3(11)(c)
–     s. 296A(1)(c) words omitted by S.I. 2013/504 reg. 3(11)(b)(ii)

**Commencement Orders yet to be applied to the Financial Services and Markets Act 2000**

Commencement Orders bringing legislation that affects this Act into force:

–     S.I. 2003/3142 art. 2-4 Sch. 1 2 commences (2003 c. 21)

EXHIBIT C

THE SECURITIES AND INVESTMENTS BOARD

RECOGNITION

OF

THE LONDON METAL EXCHANGE LIMITED

The Securities and Investments Board, in exercise of the powers conferred by section 37 of the Financial Services Act 1986, and now exercisable by the Board, hereby makes the following order:-

WHEREAS:-

1.   The London Metal Exchange Limited has applied to the Board for an order declaring it to be a recognised investment exchange for the purposes of the Act.

2.   That application was accompanied by a copy of the applicant's rules, a copy of any guidance issued by the applicant which was intended to have continuing effect and was issued in writing or other legible form, and particulars of arrangements made or proposed to be made by the applicant for the provision of clearing services.

3.   The Board has been furnished with all such information as it has required in connection with the application.

4.   The Board has sent to the Secretary of State a copy of the rules and of guidance and arrangements of which copies or particulars were furnished with the application together with any other information supplied with or in connection with the application.

5.   The Secretary of State has given leave to the Board to make this Order.

- 2 -

6.   It appears to the Board from the information furnished by the
investment exchange and having regard to other information in its
possession that the requirements of Schedule 4 to the Act for
recognition of the investment exchange are satisfied and that the
Board should exercise its discretion to grant recognition.

NOW, THEREFORE:-

1.   The Securities and Investments Board hereby declares The London
Metal Exchange Limited to be a recognised investment exchange for
the purposes of the Financial Services Act 1986.

2.   This Order takes effect on the date on which it is made.

By Order of the Board.

*Kenneth Berrill*

25th April, 1988

Certified as a true copy

Company Secretary

1019H

EXHIBIT D

Financial Services Authority

## Markets and Exchanges Division

Direct Line: 020 7676 65938
Local fax: 020 7676 65939
E-mail: ted.morris@fsa.gov.uk

**FSA**

Mr Alan Whiting
Head of Regulation & Compliance
The London Metal Exchange Ltd
56 Leadenhall Street
London EC3A 2DX

3 December 2001

File Ref: EXCH039

Dear Alan

### LME STATUS UNDER FISMA

I write to confirm that, at the date of this letter, 3 December 2001, The London Metal
Exchange Limited (the "LME") is a recognised investment exchange for the purposes of the
Financial Services and Markets Act 2000 (the "Act").

The Securities and Investment Board made an order under section 37(3) of the Financial
Services Act 1986 (the "FS Act") to declare the LME to be a recognised investment exchange
on 25 April 1988. Pursuant to Regulation 9(2) of The Financial Services and Markets Act 2000
(Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001
(SI 2001/995) an order under section 37(3) of the FS Act which was in force immediately
before commencement of the Act has effect after commencement as if it were a recognition
order made under section 290(1) of the Act.

Yours sincerely

Ted Morris,
Manager, Commodity Markets

EXHIBIT E

## S T A T U T O R Y   I N S T R U M E N T S

# 2001 No. 995

# FINANCIAL SERVICES AND MARKETS

## The Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001

| | | |
|---|---|---|
| *Made* - - - - | | *9th April 2001* |
| *Laid before Parliament* | | *10th April 2001* |
| *Coming into force in accordance with regulation 2* | | |

The Treasury, in exercise of the powers conferred on them by sections 286(1), 426, 427 and 428(3) of the Financial Services and Markets Act 2000(**1**), and with the approval of the Secretary of State under section 286(2) of that Act, hereby make the following Regulations:

**Citation**

   **1.** These Regulations may be cited as the Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001.

**Commencement**

   **2.** These Regulations come into force on the day on which sections 290(1) and 292(2) of the Act (which relate to the making of recognition orders) come into force.

**Interpretation**

   **3.** (1) In these Regulations—

   "the Act" means the Financial Services and Markets Act 2000;

   "the Companies Act" means the Companies Act 1989(**2**);

   "defaulter" and "default" are to be construed in accordance with section 188(2) of the Companies Act, and references to action taken under the default rules of an exchange or clearing house are to be construed in accordance with section 188(4) of that Act;

---

(**1**)  2000 c. 8.
(**2**)  1989 c. 40.

"exempt activities", in relation to a recognised body, means the regulated activities in respect of which the body is exempt from the general prohibition as a result of section 285(2) or (3) of the Act;

"facilities", in relation to a recognised body, means the facilities and services it provides in the course of carrying on exempt activities, and references to the use of the facilities of an exchange is to be construed in accordance with paragraph (2);

"financial crime" is to be construed in accordance with section 6(3) and (4) of the Act;

"the Financial Services Act" means the Financial Services Act 1986(**3**);

"investments" means investments of a kind specified for the purposes of section 22 of the Act;

"market contract" has the meaning given in section 286(4) of the Act (with reference, in the case of a recognised investment exchange, to section 155(2) of the Companies Act or article 80(2) of the Northern Ireland Order, or in the case of a recognised clearing house, to section 155(3) of the Companies Act or article 80(3) of the Northern Ireland Order) and references to a party to a market contract are to be construed in accordance with section 187 of the Companies Act;

"the Northern Ireland Order" means the Companies (No. 2) (Northern Ireland) Order 1990(**4**); and

"regulatory functions", in relation to a recognised body, has the meaning given in section 291(3) of the Act.

(2) In these Regulations, references to dealings on an exchange, or transactions effected on an exchange, are references to dealings or transactions which are effected by means of the exchange's facilities or which are governed by the rules of the exchange, and references to the use of the facilities of an exchange include use which consists of any such dealings or entering into any such transactions.

(3) In these Regulations, except in regulation 6, references to the performance of the functions of a recognised body are references to the carrying on by it of exempt activities together with the performance of its regulatory functions.

## Recognition requirements for investment exchanges

**4.** Parts I and II of the Schedule set out recognition requirements applying to bodies in respect of which a recognition order has been made under section 290(1)(a) of the Act, or which have applied for such an order under section 287 of the Act.

## Recognition requirements for clearing houses

**5.** Parts III and IV of the Schedule set out recognition requirements applying to bodies in respect of which a recognition order has been made under section 290(1)(b) of the Act, or which have applied for such an order under section 288 of the Act.

## Method of satisfying recognition requirements

**6.** (1) In considering whether a recognised body or applicant satisfies recognition requirements applying to it under these Regulations, the Authority may take into account all relevant circumstances including the constitution of the person concerned and its regulatory provisions and practices within the meaning of section 302(1) of the Act.

---

(**3**)  1986 c. 60.
(**4**)  S.I. 1990/1504 (N.I. 10).

(2)  Without prejudice to the generality of paragraph (1), a recognised body or applicant may satisfy recognition requirements applying to it under these Regulations by making arrangements for functions to be performed on its behalf by any other person.

(3)  Where a recognised body or applicant makes arrangements of the kind mentioned in paragraph (2), the arrangements do not affect the responsibility imposed by the Act on the recognised body or applicant to satisfy recognition requirements applying to it under these Regulations, but it is in addition a recognition requirement applying to the recognised body or applicant that the person who performs (or is to perform) the functions is a fit and proper person who is able and willing to perform them.

### Dealings and transactions not involving investments

**7.**  Nothing in these Regulations is to be construed as requiring a recognised investment exchange to limit dealings on the exchange to dealings in investments, or as requiring a recognised investment exchange or recognised clearing house to limit the provision of its clearing services to clearing services in respect of transactions in investments.

### Exchanges and clearing houses which do not enter into market contracts

**8.**  Nothing in Parts II or IV of the Schedule is to be taken as requiring a recognised investment exchange or recognised clearing house which does not enter into such contracts as are mentioned in section 155(2)(b) or (3) of the Companies Act to have default rules, or to make any arrangements, relating to such contracts.

### Effect of recognition under the Financial Services Act 1986

**9.** (1)  In this regulation, "commencement" means the beginning of the day on which subsections (2) and (3) of section 285 of the Act (exemption from the general prohibition for recognised investment exchanges and clearing houses) come into force.

(2)  Subject to paragraph (3), an order under section 37(3) of the Financial Services Act which was in force immediately before commencement has effect after commencement as if it were a recognition order made under section 290(1)(a) of the Act following an application under section 287 of the Act, declaring the body or association to which it relates to be a recognised investment exchange.

(3)  But if the order was made by virtue of section 40(2) of the Financial Services Act (recognition requirements for overseas investment exchanges and clearing houses), it has effect as if it were a recognition order made under section 292(2)(a) of the Act.

(4)  Subject to paragraph (5), an order under section 39(3) of the Financial Services Act which was in force immediately before commencement has effect after commencement as if it were a recognition order made under section 290(1)(b) of the Act following an application under section 288 of the Act, declaring the body or association to which it relates to be a recognised clearing house.

(5)  But if the order was made by virtue of section 40(2) of the Financial Services Act (recognition requirements for overseas investment exchanges and clearing houses), it has effect as if it were a recognition order made under section 292(2)(b) of the Act.

(6)  Where a recognition order has effect by virtue of this regulation, the Authority may not give a notice under section 298(1)(a) of the Act, giving notice of its intention to give a direction under section 296 or to make a revocation order under section 297(2) in relation to the recognised body concerned, earlier than one month after commencement.

(7)  Paragraph (6) is without prejudice to section 298(7) of the Act (which permits the Authority to give a direction under section 296 of the Act without following the procedure set out in section 298,

if the Authority considers it essential to do so), or to the continued effect of any notice which has effect as a notice given under section 298(1)(a) of the Act by virtue of regulation 10(4) below.

**Revocation of recognition: action taken before commencement**

10.—(1)  In this regulation—

(a)  "commencement" has the same meaning as in regulation 9 above, and

(b)  "relevant person" means—

(i)  in relation to action taken in respect of a body or association of the kind described in section 40(1) of the Financial Services Act(**5**) (overseas investment exchanges and clearing houses), the Treasury, or

(ii)  in any other case, the Authority.

(2)  This regulation applies to action taken by a relevant person before commencement pursuant to section 37(7) or 39(7) of the Financial Services Act(**6**) (which relate to revocation of recognition orders under that Act), or pursuant to subsections (2) to (9) of section 11 of that Act as they had effect by virtue of section 37(7) or 39(7).

(3)  Paragraphs (4) to (8) apply where a relevant person has given notice to a body or association under section 11(3) of the Financial Services Act of its intention to revoke a recognition order made under that Act in relation to that body or association, but has not notified the body or association of its determination whether to proceed to revoke that recognition order.

(4)  The notice has effect after commencement as if it were a notice given by the Authority under section 298(1)(a) of the Act, giving notice of the Authority's intention to revoke the recognition order which is treated as having effect in relation to the body or association by virtue of regulation 9 above.

(5)  If before commencement the relevant person has complied with—

(a)  the requirement in subsection (3) of section 11 of the Financial Services Act to bring the notice to the attention of members of the body or association in question, or

(b)  the requirement in that subsection to publish the notice to other persons likely to be affected,

the Authority is to be treated as having complied with the equivalent requirement in section 298(1) (b) or (as the case may be) (c) of the Act, in relation to the notice under section 298(1)(a) which has effect by virtue of paragraph (4).

(6)  Nothing in paragraph (4) or in the Act is to be treated as changing the length or affecting the continuity of the period within which, in accordance with the notice as originally given, representations might be made by any person to the relevant person pursuant to section 11(5) of the Financial Services Act, but any such representations are to be considered by the Authority as if they were representations made to it pursuant to section 298(3) of the Act.

(7)  For the purposes of the Authority's consideration whether to proceed to exercise the power to make a revocation order under subsection (2) of section 297 of the Act (but without prejudice to any exercise by the Authority of that power where it has given a new notice under section 298(1)(a) after commencement), that subsection is to be read as if the reference in paragraph (a) to recognition requirements were a reference to recognition requirements other than new recognition requirements,

---

(**5**)  The functions of the Secretary of State under sections 37, 39 and 40 of the Financial Services Act were transferred to the Financial Services Authority (previously known as the Securities and Investments Board Limited) by S.I. 1987/942, except in relation to bodies or associations of the kind described in section 40(1) of the Financial Services Act 1986 (overseas investment exchanges and clearing houses). In relation to such bodies, these functions of the Secretary of State were transferred to the Treasury by S.I. 1992/1315.

(**6**)  The effect of sections 37(7) and 39(7) of the Financial Services Act is modified by section 40(4)(b) of that Act (in relation to overseas investment exchanges and clearing houses), and section 156 of the Companies Act (in all cases).

and as if the reference in paragraph (b) to obligations were a reference to obligations other than new obligations.

(8)  A recognition requirement or obligation is to be treated as a new recognition requirement or obligation if its effect is not substantially the same as the effect of a requirement or obligation of the kind mentioned (or having effect as if mentioned) in section 37(7) (in the case of an investment exchange) or 39(7) (in the case of a clearing house) of the Financial Services Act (as those provisions had effect immediately before commencement).

(9)  Paragraph (10) applies where a relevant person has made an order ("the revoking order") under section 37(7) or 39(7) of the Financial Services Act, revoking a recognition order made in relation to a body or association under that Act, but either—

   (a)  the revoking order has not taken effect in accordance with section 11(2) of the Financial Services Act, or

   (b)  the revoking order has taken effect but contains transitional provisions pursuant to section 11(7) of the Financial Services Act which continued to have effect immediately before commencement.

(10)  The revoking order has effect after commencement as if it were a revocation order made by the Authority under section 297 of the Act, revoking (with effect from the date specified in the revoking order) the recognition order which is treated as having effect in relation to the body or association by virtue of regulation 9 above, and as if any such transitional provisions were included in the revocation order by virtue of section 297(5) of the Act.


*David Clelland*
*Clive Betts*
Two of the Lords Commissioners of Her
15th March 2001                                                    Majesty's Treasury


Approved,


*Kim Howells*
Parliamentary Under Secretary of State for
Consumers and Corporate Affairs,
9th April 2001                                    Department of Trade and Industry

**SCHEDULE**                    <span style="float:right">Regulations 4 and 5.</span>

# PART I

## Recognition requirements for investment exchanges

### *Financial resources*

**1.** (1)  The exchange must have financial resources sufficient for the proper performance of its functions as a recognised investment exchange.

(2)  In considering whether this requirement is satisfied, the Authority may (without prejudice to the generality of regulation 6(1)) take into account all the circumstances, including the exchange's connection with any person, and any activity carried on by the exchange, whether or not it is an exempt activity.

### *Suitability*

**2.** (1)  The exchange must be a fit and proper person to perform the functions of a recognised investment exchange.

(2)  In considering whether this requirement is satisfied, the Authority may (without prejudice to the generality of regulation 6(1)) take into account all the circumstances, including the exchange's connection with any person.

### *Systems and controls*

**3.** (1)  The exchange must ensure that the systems and controls used in the performance of its functions are adequate, and appropriate for the scale and nature of its business.

(2)  Sub-paragraph (1) applies in particular to systems and controls concerning—

    (a)  the transmission of information;

    (b)  the assessment and management of risks to the performance of the exchange's functions;

    (c)  the effecting and monitoring of transactions on the exchange;

    (d)  the operation of the arrangements mentioned in paragraph 4(2)(d) below; and

    (e)  (where relevant) the safeguarding and administration of assets belonging to users of the exchange's facilities.

### *Safeguards for investors*

**4.** (1)  The exchange must ensure that business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors.

(2)  Without prejudice to the generality of sub-paragraph (1), the exchange must ensure that—

    (a)  access to the exchange's facilities is subject to criteria designed to protect the orderly functioning of the market and the interests of investors;

    (b)  dealings in investments on the exchange are limited to investments in which there is a proper market;

    (c) appropriate arrangements are made for relevant information to be made available (whether by the exchange or, where appropriate, by issuers of the investments) to persons engaged in dealing in investments on the exchange;

    (d) satisfactory arrangements are made for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange (being rights and liabilities in relation to those transactions);

    (e) satisfactory arrangements are made for recording transactions effected on the exchange, and transactions (whether or not effected on the exchange) which are cleared or to be cleared by means of its facilities;

    (f) appropriate measures are adopted to reduce the extent to which the exchange's facilities can be used for a purpose connected with market abuse or financial crime, and to facilitate their detection and monitor their incidence; and

    (g) where the exchange's facilities include making provision for the safeguarding and administration of assets belonging to users of those facilities, satisfactory arrangements are made for that purpose.

(3) In sub-paragraph (2)(c), "relevant information" means information which is relevant in determining the current value of the investments.

*Disclosure by issuers of securities*

**5.** (1) In this paragraph—

"admission to trading", "securities" and "regulated market" are to be construed in accordance with regulation 2 of the Traded Securities (Disclosure) Regulations 1994(**7**);

"the obligation of disclosure" means the obligation imposed by regulation 3 of those Regulations;

"issuer" means a person who is subject to that obligation whose securities are admitted to trading on a regulated market which the exchange regulates and supervises; and

"the relevant securities" means securities in relation to which the obligation of disclosure arises.

(2) The rules of the exchange must enable the exchange, in the event of a failure by an issuer to comply with the obligation of disclosure,—

    (a) to discontinue the admission of the relevant securities to trading;

    (b) to suspend trading in the relevant securities;

    (c) to publish the fact that the issuer has failed to comply with the obligation of disclosure; and

    (d) to make public itself any information which the issuer has failed to publish.

(3) This paragraph is without prejudice to the requirement in paragraph 4(2)(c) above.

*Promotion and maintenance of standards*

**6.** (1) The exchange must be able and willing to promote and maintain high standards of integrity and fair dealing in the carrying on of regulated activities by persons in the course of using the facilities provided by the exchange.

(2) The exchange must be able and willing to cooperate, by the sharing of information or otherwise, with the Authority, with any other authority, body or person having responsibility in the

---

(**7**) S.I. 1994/188.

United Kingdom for the supervision or regulation of any regulated activity or other financial service, or with an overseas regulator within the meaning of section 195 of the Act.

*Rules and consultation*

**7.** (1)  The exchange must ensure that appropriate procedures are adopted for it to make rules, for keeping its rules under review and for amending them.

(2)  The procedures must include procedures for consulting users of the exchange's facilities in appropriate cases.

(3)  The exchange must consult users of its facilities on any arrangements it proposes to make for dealing with penalty income in accordance with paragraph 8(3) below (or on any changes which it proposes to make to those arrangements).

*Discipline*

**8.** (1)  The exchange must have effective arrangements for monitoring and enforcing compliance with—

    (a)  its rules (including rules in relation to the provision of clearing services in respect of transactions other than transactions effected on the exchange); and

    (b)  the arrangements made by it as mentioned in paragraph 4(2)(d) above.

(2)  Arrangements made pursuant to sub-paragraph (1) must include procedures for—

    (a)  investigating complaints made to the exchange about the conduct of persons in the course of using the exchange's facilities; and

    (b)  the fair, independent and impartial resolution of appeals against decisions of the exchange.

(3)  Where arrangements made pursuant to sub-paragraph (1) include provision for requiring the payment of financial penalties, they must include arrangements for ensuring that any amount so paid is applied only in one or more of the following ways—

    (a)  towards meeting expenses incurred by the exchange in the course of the investigation of the breach in respect of which the penalty is paid, or in the course of any appeal against the decision of the exchange in relation to that breach;

    (b)  for the benefit of users of the exchange's facilities;

    (c)  for charitable purposes.

*Complaints*

**9.** (1)  The exchange must have effective arrangements for the investigation and resolution of complaints arising in connection with the performance of, or failure to perform, any of its regulatory functions.

(2)  But sub-paragraph (1) does not extend to—

    (a)  complaints about the content of rules made by the exchange, or

    (b)  complaints about a decision against which the complainant has the right to appeal under procedures of the kind mentioned in paragraph 8(2)(b) above.

(3)  The arrangements must include arrangements for a complaint to be fairly and impartially investigated by a person independent of the exchange, and for him to report on the result of his investigation to the exchange and to the complainant.

(4)  The arrangements must confer on the person mentioned in sub-paragraph (3) the power to recommend, if he thinks it appropriate, that the exchange—

    (a)  makes a compensatory payment to the complainant,

    (b)  remedies the matter complained of,

or takes both of those steps.

(5)  Sub-paragraph (3) is not to be taken as preventing the exchange from making arrangements for the initial investigation of a complaint to be conducted by the exchange.

EXHIBIT F

**IN THE HGH COURT OF JUSTICE**                    CASE NO: CO/2470/98

**QUEENS BENCH DIVISION**

**CROWN OFFICE LIST**

**THE COUNTY COURT, AT SWANSEA**

**Thursday 30 March 2000**

Before:

**THE HO MR JUSTICE RICHARDS**

**THE QUEEN**

**V**

**THE LONDON METAL EXCHANGE LIMITED**    **RESPONDENTS**

**ALBATROS WAREHOUSING BV**                **CLAIMANT**

_____

(TRANSCRIPT OF THE HANDED DOWN JUDGMENT OF

SMITH BERNAL REPORTING LIMITED, 180 FLEET STREET

LONDON EC4A 2HD

TEL NO: 0171 421 4040,  FAX NO:  0171 831 8838

OFFICIAL SHORTHAND WRITERS TO THE COURT)

_____

COUNSEL: CLAIMANT: Miss P Baxendale QC and Mr J strachan instructed by Pitmans (sols)

RESPONDENT : The Hon Mr M Beloff QC and Miss D Rose instructed by Linklaters (Sols)

_____

**Judgment**

**As Approved by the Court**

Crown Copyright ©

- 1 -

**MR JUSTICE RICHARDS:**

1.    Albatros Warehousing BV ("Albatros") operates a warehousing business and is listed as such with the London Metal Exchange Limited ("the LME").  On 9 June 1998 the Appeal Committee of the LME imposed sanctions, including a fine of £200,000, on Albatros for two breaches of certain of the LME's rules.  By these proceedings Albatros seeks to quash that decision.  The main grounds advanced are that (1) the decision of the Appeal Committee was vitiated by bias, (2) the Appeal Committee erred by adducing new evidence of fact during the hearing, (3) in imposing the sanctions the Appeal Committee failed to have regard to material considerations, and (4) the sanctions imposed were grossly disproportionate and thereby Wednesbury unreasonable.  The application raises a threshold question whether the decision of the Appeal Committee is amenable to judicial review.

**Legal framework**

2.    The LME, a company limited by guarantee, is a "recognised investment exchange" within the meaning of the Financial Services Act 1986.  As a recognised investment exchange, it is "an exempted person as respects anything done in its capacity as such which constitutes investment business" (s.36(1)) and is thereby entitled to carry on investment business which would otherwise be prohibited by s.3.   "Investment business" is defined by s.1(1) and Schedule 1 to the Act.  It is common ground that Albatros's warehousing business does not itself count as investment business.

3.    A body's status as a recognised investment exchange depends upon the making of a recognition order by the Secretary of State, who may make an order if it appears to him that the requirements of Schedule 4 are satisfied (s.37(4)) and who may revoke an order if

it appears that any such requirement is not satisfied or that the exchange has failed to comply with any of the obligations to which it is subject under the Act (s.37(7)).  The material provisions of Schedule 4 are these:

"Safeguards for investors

2.(1)  The rules and practices of the exchange must ensure that business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors.

(2)  The exchange must -

(a)  limit dealings on the exchange to investments in which there is a proper market; and

(b)  where relevant, require issuers of investments dealt in on the exchange to comply with such obligations as will, so far as possible, afford to persons dealing in the investments proper information for determining their current value.

….

Investigation of complaints

4.  The exchange must have effective arrangements for the investigation of complaints in respect of business transacted by means of its facilities.

Promotion and maintenance of standards

5.  The exchange must be able and willing to promote and maintain high standards of integrity and fair dealing in the carrying on of investment business ….

Supplementary

6.(1)  The provisions of this Schedule relate to an exchange only so far as it provides facilities for the carrying on of investment business; and nothing in this Schedule shall be construed as requiring an exchange to limit dealings on the exchange to dealings in investments.

…."

4.  The LME has published Rules and Regulations which govern the conduct of LME members (who are contractually bound by them) and are aimed inter alia at meeting the

requirements of Schedule 4.  Warehouse operating companies are not members of the LME and are not governed by those Rules and Regulations, but are subject to similar contractual arrangements with the LME.  Whether those arrangements also serve to meet the requirements of Schedule 4 is one of the issues to be considered in relation to the amenability of the decision to judicial review.  The importance of the arrangements derives from the fact that trading on the LME is based on warrants, which are documents of title to a particular lot of metal, meeting particular specifications as to quality and description and stored in a particular warehouse.  Only approved (listed) warehouses are entitled to issue such warrants; and for that purpose they must comply with detailed requirements, including the carrying out of checks to ensure that the metal is of the requisite quality.

5.    The current contract between the LME and Albatros, dated 16 January 1996, provides for the listing of Albatros, which "agrees to be bound by the conditions, procedures and notes as laid down for Warehouse Companies as amended by the LME from time to time …".  Schedule C contains relevant conditions and procedural notes.  Conditions as to the issue of LME warrants are contained in Clause D of Schedule C.  They provide inter alia that Warehouse Companies must pay particular attention to the LME Special Contract Rules for Metals prevailing from time to time and must refuse to issue warrants if for any reason the metal or supporting documentation does not conform to the relevant Special Contract Rules.

6.    Provisions governing disciplinary action are contained in Clauses I to N of Schedule C.  They include:

"I. Enforcement of Conditions

a)     Allegations of misconduct or bringing into disrepute the LME or violations of the conditions laid down for Warehouse Companies shall be investigated by a Warehouse Disciplinary Committee consisting of Board Directors of the LME or other persons nominated by or under the authority of the Chief Executive of the LME.

….

J. Sanctions

The sanctions which may be imposed by a Warehouse Disciplinary Committee shall include one or more of the following: -

a)     the issue of a warning or reprimand;
b)     the imposition of a fine;
c)     the withdrawal either temporarily or permanently of listed Warehouse Company status;
d)     such other penalty as the Warehouse Disciplinary Committee shall think fit.

….

M. Appeal

a)     Any person and/or Warehouse Company who is found by a Warehouse Disciplinary Committee / LME Warehousing Committee to have committed an act of misconduct or violated the conditions and is dissatisfied with the Warehouse Disciplinary Committee's / LME Warehousing Committee's findings or decisions may, within seven days of receiving notice thereof, appeal in writing to the Board of Directors against the same and may make such written representations and supply such written information as he may consider relevant. Implementation of any decision appealed against shall be suspended pending the determination of the appeal.

b)     A Director of the LME or other persons may not participate in consideration of the appeal if they have participated in the finding or the decision of the Warehouse Disciplinary Committee / LME Warehousing Committee against which the appeal is made, or if they have any financial interest in the matter either personally or through any company with which they may be connected.

c)     The Board of Directors shall as soon as reasonably practicable after receiving notice of the appeal confirm or amend the Warehouse Disciplinary Committee's / LME Warehousing Committee's finding or decision and shall notify the appellant in writing accordingly. The Board of Directors may make such arrangements as they think fit to consider any such appeal.

d)      The appellant may appear before the Board of Directors and make such representations in support of his appeal as he may think fit, provided that no new evidence of fact may be adduced unless the Board of Directors are satisfied that there is good reason why such evidence was not adduced in the proceedings before the Warehouse Disciplinary Committee / LME Warehousing Committee.

e)      Notice of any appeal to the Board of Directors and of their decision shall be posted to the Exchange.
The decision of the Board of Directors on such an appeal shall be final."

## Factual background

7.      Albatros became an LME listed warehouse in 1992.  It has been in breach of the LME conditions on three previous occasions.  In 1993 it was admonished for issuing warrants for metals stored in a warehouse and compound which had not been approved by the LME.  In 1996 it was reprimanded for failing to maintain accurate records, failing properly to issue warrants and submitting incorrect stock returns on a number of occasions.  The breaches were considered sufficiently serious to justify the imposition of a financial fine, but there had been a 6 week suspension of the right to issue warrants and the committee took the view that the consequent loss of business was a sufficient financial sanction.  The third occasion was in 1997, when it was severely reprimanded for late payment of its stock levy.  An order to pay the costs of the investigation in the sum of £4,000 was suspended on condition that there were no material breaches of the contract for 12 months from 3 November 1997.

8.      The breaches that give rise to the present proceedings took place in May and August 1997, when Albatros issued warrants in respect of two shipments of tin which did not meet LME's standards.  It subsequently transpired that in breach of LME requirements the tin was contaminated with impurities, including unacceptable levels of arsenic,

- 6 -

contained brands which were not on the approved list, was not accompanied by a certificate of analysis within the quality specification, comprised tin from more than one country and was made up of mixed brands. The breaches came to light when a customer rejected the warranted tin on its delivery from Albatros's warehouse.

9.   Albatros has accepted that it was thereby in breach.  It says that it should have carried out its own independent checks before placing the tin on warrant and that it mistakenly relied on the representations of the shipper to the effect that the tin was of the requisite quality. It describes this as an error of judgment, not a deliberate flouting of the rules.  As soon as Albatros became aware of the problem, it notified the LME.   In consequence the LME cancelled warrants amounting to approximately 15% of total LME stocks of tin, resulting in a short-term shortage in supply.  This caused a significant disturbance in the market and exacerbated a backwardation in the price of tin (i.e. where the price for immediate delivery exceeds the future price).  Thereafter Albatros took steps to compensate traders who had suffered loss as a result of the breaches and to keep the LME informed of the position.

10.   In January 1998 a Warehouse Disciplinary Committee was appointed to investigate the matter. The statement of charges included eight charges (with sub-charges) relating to specific breaches of the rules and one charge that by its actions Albatros had brought the LME into disrepute.  The LME Executive sent the committee a written submission on the statement of charges.  The hearing before the committee, which was attended by Albatros without legal representation, took place on 23 March 1998.  Albatros pleaded guilty to six charges or sub-charges relating to specific breaches, namely 1.1 (breach of clause 1 of the Special Contract Rules for Tin, in that the warranted tin did not conform to the

contract specification), 1.2 (breach of the same clause, in that the warranted tin was not of approved brands), 2.1 (breach of the Special Rules Governing the Placing of Tin on Warrant, in that tin put on warrant was not accompanied by a certificate of analysis within the quality specification), 2.2 (breach of the same rules, in that each warrant was not made up of the production of one country), 2.3 (breach of the same rules, in that each warrant did not consist of one brand) and 5 (breach of the same rules and/or misrepresentation of the tin underlying the warrants, in that the warrants stated that tin was a particular brand which it was not).

11.   In its decision, also dated 23 March, the committee found Albatros guilty on the charges to which it had pleaded guilty, made no findings on the other charges relating to specific breaches, but held that Albatros had brought the LME into disrepute.  It stated that the offences were very serious breaches of contract in respect of two shipments, that it had closely considered delisting Albatros, but that bearing in mind the pleas of guilty it had decided not to delist but to impose a fine of £250,000.

12.   On 6 April Albatros lodged an appeal against the sanction imposed, but not against the findings of guilt.   The LME Executive submitted a response on 22 April.   The composition of the Appeal Committee was the subject of exchanges between the LME and Albatros, to which it will be necessary to make further reference.  The hearing before the Appeal Committee took place on 1 May.  On 8 June (as recorded in a letter of 9 June) the Appeal Committee decided to impose the following sanctions:  (1) a fine of £200,000, (2) a requirement that Albatros commission a management consultancy audit to ensure that its management and control systems were sufficiently robust to deliver LME standards and requirements in the future, (3) payment of costs in the sum of £1,650, and

(4) activation of the suspended order for payment of costs in the sum of £4,000 in respect of the previous disciplinary investigation.   The fourth sanction was subsequently withdrawn, having been imposed in error (since the new breaches took place <u>before</u> the date of the previous suspended costs order).   The second has been complied with and is no longer a live issue.   The matters still in dispute are (1) and (3) - the fine and the order for costs.

13.     On 11 June the LME issued a public notice setting out the Appeal Committee's findings. In a press statement the Chief Executive commented:

> "This announcement clearly demonstrates the Exchange's commitment to ensuring that warehousing companies approved by the LME meet the standards of performance expected by the LME's users and required by the LME itself."

14.     Written reasons for the Appeal Committee's decision were given at a much later date, after the commencement of the judicial review proceedings.   That delay and the document's reference to the subsequent withdrawal of the fourth sanction prompted the expression of doubts by Miss Baxendale QC for Albatros as to whether the document contains the actual contemporaneous reasons for the Appeal Committee's decision. On the basis of the information provided at the hearing by Mr Beloff QC for the LME, I am satisfied that it does.

15.     The written reasons set out the background to the appeal and then summarise the deliberations on which the decision was based.   Under the heading "the offences" the reasons stress the impact of the breaches and why such conduct was considered to have brought the LME into disrepute.   The Appeal Committee considered that it was appropriate to demonstrate to the market that such "gross errors" by a warehouse were

regarded extremely seriously and to take action such as to encourage all warehouses to have scrupulous regard to the validity of warrants issued.  The reasons then examine "factors which could mitigate the gravity of the offences".  The Appeal Committee concluded inter alia that Albatros's failure in so many respects, in relation to two separate shipments, made clear that it had not operated adequate systems and/or that its staff were not appropriately trained.  Further, evidence showed that the failure was not a mere oversight.  Account was taken of Albatros's pleas of guilty to some of the charges, but this was not considered to be a strong mitigating factor (they were late pleas and did not extend to the disrepute charge).  Consideration was given to Albatros's contention that the gravity of the offence had been mitigated by the steps taken to reduce the impact on third parties and that they had been commended by the LME's Chief Executive for such action.  Those points give rise to specific issues considered later in this judgment.  The reasons next examine "circumstances which could render a fine of £250,000 unduly harsh", including contentions advanced by Albatros as to its capacity to pay the fine, the fact that it had already committed approximately £170,000 through settlement negotiations and related actions, and the extent to which Albatros had been subject to previous disciplinary action.

16.   The last part of the written reasons records the Appeal Committee's findings.  The committee considered that the financial penalty of £250,000 imposed by the Warehouse Disciplinary Committee was in general circumstances appropriate given the seriousness of the offences.  It judged the penalty to be commensurate with previous penalties imposed by the LME for far less serious offences.  That aspect of its reasoning is another matter to which it will be necessary to return.  In the light of the information provided about Albatros's financial position, however, the Appeal Committee had decided to

reduce the fine to £200,000, which was considered to be well within the ability of the company to pay.  The committee was also extremely concerned about the ability of Albatros to deliver LME standards in the future, and it was for that reason that it decided to require Albatros to commission a management audit by an appropriate consultant. Finally the committee dealt with the question of costs and the activation of the suspended penalty.  It determined that a Notice should be issued announcing its findings and the sanctions imposed.  All the decisions were expressed to be unanimous.

**Is the decision amenable to review?**

17.   Mr Beloff submits that the application to this Court fails at the first hurdle on the ground that the decision of the Appeal Committee is not amenable to judicial review.  Although the LME might be amenable to judicial review in relation to its regulation of investment business, it is not so amenable in relation to the regulation of warehousing operations. Mr Beloff points to the following factors as supporting that conclusion:  (1) The LME is a private body, a company limited by guarantee. (2) The mode of regulation of warehousing is by contract, not e.g. by rules made under statutory authority.   (3) Warehousing is not itself an intrinsically necessary or universal feature of investment exchanges.  (4) The provision or regulation of warehousing is not required by the 1986 Act or other statutory provision.  (5) The requirements of Schedule 4 to the 1986 Act are applicable only in so far as the exchange provides facilities for the carrying on of investment business, which does not include warehousing: see paragraph 6(1), which was added by the Companies Act 1989 so as to clarify the limited scope of Schedule 4. Thus the Secretary of State could not withdraw recognition if the LME did not regulate warehousing.  (6) LME warrants are documents of title primarily and directly relevant to the sale of the commodities, not to investment business.  (7) The LME provides, in

- 11 -

addition to investment business, other important functions such as global reference prices and quality standards for metal.  It is in respect of those non-investment functions that the regulation of approved warehouses is important.

18.   The only factor telling in the opposite direction, he submits, is that the integrity of the warrants bears indirectly on investment business, to the extent that a proper market in e.g. futures and options depends ultimately on confidence in the warrants.  That, however, is insufficient to bring the regulation of warehousing within the scope of judicial review.

19.   Mr Beloff stresses that the jurisdictional point is taken not as a means of avoiding the grounds of challenge in the present case, all of which are resisted in any event on their merits, but because an analysis in terms of private rather than public law might involve differences in substantive law and remedies capable of affecting the outcome in other cases.

20.   Miss Baxendale, on the other hand, lays stress on the fundamental importance of warrants for the purpose of the LME's functions in respect of investment business as well as its other functions.  Warehousing may not be intrinsically necessary for investment exchanges, but it is necessary for the LME.  The reliability of warrants issued by warehouses is crucial.  The regulation of warehouses and of the issue of warrants by them is therefore an integral part of the LME regulatory regime, as is recognised in the LME's own documents and affidavits.  Without such regulation the LME would be unable to comply with the requirements of Schedule 4 to the 1986 Act.  Thus the regulation of warehousing is part of the structure relevant to the regulation of investment business even though warehousing itself is not investment business and warrants are not themselves financial instruments dealt with on the exchange.  Without such regulation by

the LME there would be regulation by government.  Nothing turns on the status of the LME as a private body or on the fact that regulation is achieved through contract.  Such features have not precluded judicial review of other regulatory bodies and would not preclude judicial review of the LME in respect of regulatory functions that are accepted to fall within the scope of the 1986 Act.  Accordingly there is no reason why they should preclude judicial review in respect of the regulation of warehousing.  Such regulation is the exercise of a public function in respect of which the LME is amenable to review.  That is reinforced by the fact that the LME is the world's largest market for trading in metals (though Miss Baxendale backed away from a contention that it has monopoly power).

21.   The passages in the LME's own documents on which Miss Baxendale relies include these from the written reasons for the Appeal Committee's decision:

> "World-wide acceptance of the LME's market system depended on all users of the market having full confidence that any warrant gave good title to metal meeting the contract specification.  Any event which undermined that confidence was damaging to the LME and an episode which publicly demonstrated unreliability of warrants on a large scale was seriously damaging.  It was also crucial to confidence in the market that statistics of metal stocks in LME approved warehouses were reliable as market users took trading decisions based on those stock figures" (para 8).

> "The Appeal Committee judged the penalty to be commensurate with previous penalties imposed by the LME for far less serious offences ….  Regulatory fines by all regulatory bodies had been increasing in recent years, overseen by the Financial Services Authority, in an effort to raise the level of compliance, investor protection and the integrity of the Recognised Investment Exchanges such as the LME" (para 18).

> "The LME had a legal responsibility under Schedule IV to the Financial Services Act 1986 to provide fair and proper markets in addition to its moral responsibility to all users of its markets" (para 20).

22.   Similarly, in an affidavit sworn by Mr Christopher Farrow, Chairman of the Appeal Committee, in support of an application for the removal of a stay that had been imposed at the time of the grant of leave to apply for judicial review, he states:

> "The LME has a legal responsibility to ensure fair and proper markets, the reliability of warehousing is an integral part of that and the audit requirement was imposed on Albatros in accordance with this duty" (para 15).

> "In these circumstances the Appeal Committee felt that in the light of the LME's responsibilities for the overall integrity of the market it was necessary to take steps to minimise the possibility that further breaches might occur" (para 17)

In a later affidavit Mr Farrow states:

> "The integrity of LME warrants is fundamental to the operation of the LME's metal markets" (para 6).

23.   Despite those competing submissions, I do not think that the broad principles are in dispute.  The essential question is whether, in exercising disciplinary powers over listed warehouses, the LME is performing a public function.  The fact that the powers are exercised pursuant to a contractual relationship between the LME and the warehouse is a factor telling against the performance of a public function but is far from decisive of the question.  It is necessary to make a broader assessment based on all the circumstances of the case and in particular on the extent to which the powers can be said to be woven into a system of governmental control.

24.   It is, I think, sufficient to refer to three authorities.  First, in R v. Panel on Takeovers and Mergers, ex parte Datafin Plc [1987] 1 QB 815, Lloyd LJ expressed the matter in this way:

> "… Of course the source of the power will often, perhaps usually, be decisive.  If the source of the power is a statute, or subordinate legislation

under a statute, then clearly the body in question will be subject to judicial review.  If, at the other end of the scale, the source of power is contractual, as in the case of a private arbitration, then clearly the arbitrator is not subject to judicial review ….

But in between these extremes there is an area in which it is helpful to look not just at the source of the power but at the nature of the power.  If the body in question is exercising public law functions, or if the exercise of its functions have public law consequences, then that may … be sufficient to bring the body within the reach of judicial review.  It may be said that to refer to 'public law' in this context is to beg the question.  But I do not think it does.  The essential distinction, which runs through all the cases to which we [were] referred, is between a domestic or private tribunal on the one hand and a body of persons who are under some public duty on the other …." (847A-D).

25.     In R v. Disciplinary Committee of the Jockey Club, ex parte Aga Khan [1993] 1 WLR 909, Sir Thomas Bingham observed that the effect of the decision in Datafin was "to extend judicial review to a body whose birth and constitution owed nothing to any exercise of governmental power but which had been woven into the fabric of public regulation in the field of take-overs and mergers" (921c).  By contrast, he held (at pages 923-924) that judicial review did not lie against the Jockey Club which, although regulating a significant national activity and exercising powers which affected the public and were exercised in the interests of the public, was not a public body and had not been woven into any system of governmental control of horseracing.  Hoffmann LJ (at pages 931-933) also stressed the need for the relevant power to be "governmental in nature", observing that in Datafin there was "a privatisation of government itself" and that bodies such as the Advertising Standards Authority and IMRO had been held to be amenable to review as "private bodies established by the industry but integrated into a system of statutory regulation".  He accepted that a body such as IMRO which exercised governmental powers was not any the less amenable to public law because it had contractual relations with its members.  But the Jockey Club was not exercising

governmental powers.  Control over its exercise of power had to be found in that case in the law of contract, which provided entirely adequate remedies.

26.  The need for care in determining whether the <u>particular</u> functions are public or private is exemplified by <u>R v. Lloyd's of London, ex parte Briggs</u> [1993] 1 Lloyd's Rep 176, in which it was held that judicial review did not lie to challenge a decision by Lloyd's agents to serve notice of a cash call on a number of Names.  Leggatt LJ stated (at page 185):

> "The fact is that even if the Corporation of Lloyd's does perform public functions, for example, for the protection of policy holders, the rights relied on in these proceedings relate exclusively to the contract governing the relationship between Names and their members' agents and, in some instances, their managing agents.  We do not consider that that involves public law ….
>
> Lloyd's is not a public body which regulates the insurance market.  As [counsel] remarked, the Department of Trade and Industry does that.  Lloyd's operates within one section of the market.  Its powers are derived from a private Act which does not extend to any person in the insurance business other than those who wish to operate in the section of the market governed by Lloyd's and who, in order to do so, commit themselves by entering into the uniform contract prescribed by Lloyd's.  In our judgment, neither the evidence nor the submissions in this case suggest that there is a public law element about the relationship between Lloyd's and the Names as places it within the public domain and so renders it susceptible to judicial review".

27.  In the present case the first step in the analysis, as it seems to me, must be the position of the LME within the system of investor protection established by the Financial Services Act 1986.  The Act provides for such protection in the case of investment exchanges not by laying down a comprehensive set of rules to be policed by a public body, but by laying down general criteria that must be met by an exchange in order to qualify for recognition and thereby for the right to carry on investment business.  It thereby leaves the function of detailed regulation to the exchange.  When engaged in the process of regulation necessary to meet the requirements of the 1986 Act, in particular those of Schedule 4, the

LME is in my judgment performing a function that can properly be said to be woven into a system of governmental control of investment business or integrated into a system of statutory regulation.  In respect of the performance of such a function it is amenable to judicial review despite the fact that it has a contractual relationship with those whom it regulates.  It is in a position similar to that of Lautro, which in R v. Lautro, ex parte Ross [1993] QB 17 was conceded by Mr Beloff to be a body whose decisions were susceptible to judicial review.  It is true that Lautro was recognised as a self-regulating organisation under the provisions of the 1986 Act dealing with authorised persons, whereas the LME is recognised as an investment exchange under the provisions dealing with exempted persons, but that difference does not appear to me to be capable of producing a different result as regards amenability to review.

28.  The next question is whether the regulation of warehouses, at least as regards the issue of warrants, is sufficiently connected with that public function to bring it within the scope of judicial review, or whether it relates only to the LME's other functions and is directed only at the protection of the commercial interests of the LME.  As to that, it is true that the 1986 Act does not regulate directly the physical trade in metal, warehousing or the issue of warrants, none of which counts as investment business.    But the provisions of Schedule 4 are in my view capable of biting indirectly on non-investment business if and to the extent that the regulation of non-investment business is necessary in order to meet the requirements laid down in respect of the conduct of investment business.  On the evidence before the court there is no escaping the fundamental importance of warrants for all aspects of the LME's operations.  I accept Miss Baxendale's submission that the reliability of warrants is crucial to the proper conduct of investment business as well as for the LME's other functions.  That is how the matter is seen by the LME itself, as is

apparent from the extracts I have quoted from the written reasons of the Appeal Committee and the evidence filed on behalf of the LME in these proceedings.  Whether the LME would be in breach of the requirements of Schedule 4 if it failed properly to regulate the issue of warrants is of course a matter of law on which the views of Directors of the LME are not determinative.  In my judgment, however, it would be.  Such regulation is necessary for the provision of the requisite safeguards to investors and the promotion and maintenance of the standards laid down by Schedule 4.

29.   I therefore hold that in exercising its disciplinary powers over Albatros in relation to breaches of the rules as to the issue of warrants, the Appeal Committee was performing a public function in respect of which its decision is amenable to judicial review.  On that basis I proceed to consider the substantive grounds of challenge to the decision.

**Bias**

30.   Albatros's first substantive ground of challenge is that the decision was vitiated by bias. The following matters are relied on:

(1)     One of the members of the Appeal Committee was Mr David King, the Chief Executive of the LME.  Mr King had been involved at the investigation stage and had spoken to Albatros about its conduct (see (2) below).  He then authorised the commencement of the disciplinary proceedings and appointed the members of the Warehouse Disciplinary Committee.

(2)     Mr King was a witness of fact on one issue before the Appeal Committee.  It arose out of a statement in Albatros's notice of appeal that in a telephone conversation with Mr Meeuwisse, Albatros's Chief Executive, Mr King had "commended the way in which

we had acted" in relation to the compensation of third parties affected by Albatros's breaches.  The response by the LME Executive stated: "Whilst Mr King does not recall giving any such general commendation the Executive submits that Mr King should be expected to have commended any suggestion that the dispute between Albatros and the Warrant holders be resolved."  To the extent indicated in that passage it is clear that Mr King had spoken to the Executive about this factual issue, though he had no other input to and was not in any true sense a party to the Executive's submissions.  In the event the Appeal Committee had before it a transcript of the telephone conversation between Mr King and Mr Meeuwisse and was able to form its own judgment on the factual issue.  Its written reasons deal with the matter as follows: "A transcript of the recorded telephone message clearly showed that the Chief Executive of the LME had not commended the way in which Albatros had acted."   Nonetheless it is submitted by Miss Baxendale that as soon as Mr King was called upon to give evidence in relation to the issue raised by Albatros he should have stood down from the Appeal Committee.

(3)  During the hearing before the Appeal Committee, Mr King asked one of the LME staff, a Mr Hall, about his experience and how this case compared with others.  Mr Hall replied that this was the worst case he had ever seen.  Albatros's solicitor then objected, suggesting that new evidence was being introduced.  The Chairman of the Committee, Mr Farrow, did not want to get embroiled in a debate about the admissibility of the question and therefore asked Mr King to withdraw it, which he did.  It is clear from the evidence that there had been no pre-arrangement between Mr King and Mr Hall about the question and answer and that the matter ended with the withdrawal of the question.  Nevertheless the exchange is relied on as giving rise to an impression of bias.

(4)     On the announcement of the Appeal Committee's decision, it was Mr King who issued the press statement to the effect that the announcement demonstrated the LME's commitment to ensuring that warehousing companies met the required standards.

(5)     Mr King had a direct pecuniary interest in the outcome of the appeal by virtue of his role as Chief Executive of the LME, since any money levied by way of a fine would be paid to the LME.  Similarly the other member of the Appeal Committee had such an interest by virtue of their status as Directors of the LME.

(6)     A number of general points are made about the composition of the Appeal Committee by one-off appointment from a limited pool of the Board of Directors, the inherent links between the Directors and the LME Executive (the prosecuting authority) and the inherent common causes shared by the Board of Directors and the LME Executive.

31.   It is common ground that the relevant legal principles as to bias are set out in the extremely helpful judgment of the Court of Appeal in Locabail (UK) Ltd v. Bayfield Properties Ltd [2000] 1 All ER 65.   Miss Baxendale relies first on automatic disqualification: see Locabail at page 70 paras 4 et seq.  She submits that Mr King and the Board of Directors were subject to automatic disqualification by virtue of (5) above, i.e. their pecuniary interest in the outcome of the appeal.  Further, she submits that Mr King was subject to automatic disqualification by virtue of his involvement as prosecutor, as shown by (1) to (3) above.  In relation to that she relies on the extension of the rule of automatic disqualification identified in R v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No.2) [1999] 2 WLR 272, as summarised in Locabail at pages 71-73 paras 11-14.  Finally Miss Baxendale relies on the general principle that a decision should be set aside if on examination of all the relevant

circumstances the court concludes that there was a real danger (in the sense of a real possibility) of bias: see <u>Locabail</u> at page 73 para 16 et seq. In support of that she relies on the overall effect of (1) to (6) above. She also cites <u>R v. Gaisford</u> [1892] QB 381, where a justice was held to be disqualified from adjudicating on a summons for failure to comply with a resolution that the justice himself had moved; <u>R v. Barnsley Metropolitan Borough Council, ex parte Hook</u> [1976] 1 WLR 1052, where it was held that the presence of the prosecutor (namely the market manager, who had also given evidence) throughout the deliberations of the relevant committee vitiated the committee's decision; and <u>Hannam v. Bradford Corporation</u> [1970] 1 WLR 937, where it was held that school governors who had dismissed a teacher should not have sat on a council sub-committee inquiring into whether the dismissal should be prohibited.

32.   Miss Baxendale does not seek to advance any independent submissions as to the effect of the European Convention on Human Rights (and Mr Beloff had signalled clearly and with good reason that any such submissions would be resisted). She does, however, rely on what is said in <u>Locabail</u> at page 74 para 17 as to the general similarity of outcome of the tests under the English common law and the Convention, and she cites <u>Piersack v. Belgium</u> (1982) 5 EHHR 169 as showing the outcome to be expected in the present case. In <u>Piersack</u> the impartiality of a trial court was held to be "capable of appearing open to doubt", so as to give rise to a violation of Article 6(1), in circumstances where the court was presided over by a judge who had previously been a senior official in the public prosecutor's department at the time when it decided to prosecute the applicant (and who, it seems, was not only entitled to revise the submissions of, and give advice to, the officials in charge of the file, but also played a certain part in the proceedings).

33.   Mr Beloff submits, and I accept, that the issue as to bias has to be examined within the framework of what Albatros expressly agreed by way of the rules and as regards the specific composition of the Appeal Committee.  Clause I of Schedule C to the contract by which Albatros agreed to be bound provides in terms that the members of the Warehouse Disciplinary Committee are to be nominated by or under the authority of the Chief Executive of the LME, i.e. Mr King.  It seems to me that the Chief Executive's role in authorising the commencement of disciplinary proceedings is implicit in that contractual provision.  Albatros likewise agreed to Clause M, which provides that the Appeal Committee is to consist prima facie of the Board of Directors, subject however to the exclusion of those who have participated in the finding or decision of the Warehouse Disciplinary Committee and those with a financial interest in the matter.  It is plainly not envisaged that the possibility of the imposition of a fine, one of the sanctions set out in Clause J, is to count as a financial interest for this purpose and thereby result in the exclusion of the entire Board of Directors.

34.   In practice, as Mr Beloff again points out, Albatros was given a full opportunity to object to the membership of the Appeal Committee.  By fax dated 31 March to the LME's Mr MacKay, Albatros identified a number of Directors who should not participate in the appeal decision. Mr MacKay's response dated 1 April took issue with one of those listed by Albatros but identified additional Directors who should be ruled out on the ground of a financial interest.  After further exchanges Albatros wrote on 6 April that "we have agreed that the following Board members only will be involved with the Appeal, due to conflicts of interest etc.".  The agreed list included Mr King (an ex-officio member of the Board) and the others who eventually sat on the Appeal Committee.  A question subsequently arose as to whether Mr King would sit, but that was only because of the

need to maintain an odd number.  If Mr Farrow sat, as in the event he did, then it was made clear that Mr King would also sit.

35.  Against that background there is plainly no substance to what I would term the institutional features relied on by Miss Baxendale as giving rise to bias.  That includes the role of Mr King in authorising the commencement of the disciplinary proceedings and appointing the Warehouse Disciplinary Committee, the inclusion of Mr King and other Directors of the LME on the Appeal Committee despite the fact that any fine would be payable to the LME, and the general points about the composition of the Appeal Committee and the links and common causes existing between the Directors and the Executive.  These are all matters to which Albatros had given its clear and unequivocal agreement under the terms of its contract with the LME.  Even if otherwise there might be some basis of objection on grounds of bias, Albatros had waived its right to object.  The case would meet the conditions for waiver summarised in <u>Locabail</u> at page 73 para 15 and page 78 para 26.  I would add, however, that none of those institutional features would in my view constitute bias in any event.  The rules make proper provision for the disqualification of any Director with a financial interest in the matter.  As to the fact that any fine would be payable to the LME, there is no evidence that the Directors would stand to gain individually from this and the suggested link seems to me to be too remote to give rise to a disqualifying interest.  If there is any relevant interest at all, it is so small as to come within the de minimis exception recognised in <u>Locabail</u> at page 71 para 10.

36.  In relation to Mr King the objection concerning his authorisation of proceedings forms part of a wider objection that he was the prosecutor in the case.  In my view, however, it would be wrong to regard him as having any substantive role as prosecutor.  His role in

relation to the commencement of the proceedings, as in relation to his appointment of the original committee, was an essentially administrative one.  It was the solicitor, Mr MacKay, who acted as prosecutor in the case.  He decided that there was a case to answer and recommended to Mr King that a committee be appointed.  He drafted the list of charges, the Executive's written submissions and all other "prosecution" documents, with no significant input or comment from Mr King.  Thus it was that Albatros took specific (though unsuccessful) objection to Mr MacKay's presence at the appeal hearing, on the ground that he had been the person responsible for presenting the case on behalf of the LME at the previous stage.  Accordingly I do not consider that Mr King's role can be equated with that of the justice who moved the motion in Gaisford, the market manager who was the prosecutor in Hook, the governors in Hannam or indeed the former member of the public prosecutor's department in Piersack.  Mr King did not have the kind of interest that would bring him within the scope of the extended rule as to automatic disqualification applied in Pinochet Ugarte (No.2).  Nor was his role in relation to the prosecution such as to create a real danger of bias if he participated in the appeal decision.  If I were wrong about any of those matters, I would hold that by its clear and unequivocal agreement to Mr King's membership of the Appeal Committee, Albatros had waived any objection on the ground of his involvement as prosecutor.  Albatros knew or (through its agreement to the rules) must be taken to have known of the functions of a Chief Executive in relation to the bringing of the prosecution.

37.   That leaves a number of specific objections based on Mr King's conduct in the course of the proceedings.  First there is the matter of his telephone conversation with Mr Meeuwisse in which he was said to have commended the way in which Albatros had acted as regards compensating third parties.  As to that, the point was at best of marginal

significance.  In the event, however, its resolution did not depend in any way on Mr King's recollection, since the Appeal Committee had before it, and based itself on, the actual transcript of the telephone conversation.  I reject the contention that Mr King should have stood down as soon as the issue was raised and that his continued participation thereafter vitiated the decision.

38.   Then there is the question that Mr King put to Mr Hall.  It was in my view a proper question.  It was not stage-managed as has been suggested on behalf of Albatros: there was no pre-arrangement between Mr King and Mr Hall. Moreover the question was withdrawn as soon as objection was taken to it.  Although Albatros's solicitor formed an adverse impression of the incident, on the evidence before the court the circumstances were not capable of creating or contributing to any real danger of bias.

39.   Finally, I see no valid basis of objection to the press release.  It was entirely proper for the Chief Executive to issue a press release in such circumstances.  His doing so flowed from his position as Chief Executive and did not compromise, and was not compromised by, his membership of the Appeal Committee.  There is nothing in the terms of the press release that might reasonably be taken to suggest some lack of impartiality by Mr King. What is said is a fair reflection of the reasons why the Appeal Committee considered that such a large fine was appropriate.

40.   I do not think it necessary to deal specifically with the Convention.  I have mentioned the one authority relied on as in some way illuminating the position.  But the Convention either produces the same result as the common law or, if it produces a different result, cannot assist Albatros in the present case.  The application of Article 6 to disciplinary proceedings when the Human Rights Act 1998 comes into force may well give rise to

additional considerations in a case such as the present because of the need for a tribunal to be <u>independent</u> as well as impartial, thereby taking one beyond questions of bias. That, however, is not something for decision now.

41.   For the reasons I have given, I reject Albatros's submission that the decision of the Appeal Tribunal was vitiated by bias.

**Fresh evidence**

42.   The submissions made under this head are based primarily on the fact that the Appeal Committee, in deciding the appropriate sanction, had regard to two previous disciplinary decisions without giving Albatros notice of the point or giving it any proper opportunity to deal with it.   A secondary matter on which reliance is placed is the questioning of Mr Hall by Mr King in the course of the hearing; but for reasons already given in the context of bias, nothing turned on that questioning and I do not think it necessary to deal further with it.

43.   The Appeal Committee's written reasons state:

> "The Appeal Committee judged the penalty to be commensurate with previous penalties imposed by the LME for far less serious offences.   A £100,000 fine had been imposed on a warehouse for the far less serious offence of placing aluminium on warrant in compounds and there had been a recent £90,000 fine imposed on an LME Member firm for the mis-reporting of large positions."

44.   Miss Baxendale submits that reliance on those two previous decisions amounted to a breach of paragraph (d) of Clause M of Schedule C, which provides that the appellant may make such representations as he thinks fit "provided that no new evidence of fact may be adduced" without good reason why it was not adduced in the proceedings before the Warehouse Disciplinary Committee.   I reject that submission.   The provision in

question is clearly aimed at the appellant and the previous decisions are not "new evidence of fact".

45.   The further submission made is that it was procedurally unfair to rely on the previous decisions without giving Albatros notice or an opportunity to comment.  Had Albatros been given such an opportunity, it would have pointed out that the first of the decisions related to two separate (though obviously related) companies and that 75% of the fine of £100,000 was suspended on condition that they did not materially breach the conditions of the contracts between them and the LME for a period of 12 months.

46.   I do not consider it inherently unfair for a body such as the LME, when considering the appropriate sanction for breach of its rules, to take into account its own published disciplinary decisions without giving a party to disciplinary proceedings notice and a specific opportunity to comment on them.  Such decisions amount to published precedents the potential relevance of which is obvious.  Those who are subject to disciplinary proceedings know or ought to know of their existence and are free to make such reference to them as they wish in the course of their own submissions.  That is not to say that fairness would never require the giving of an opportunity to comment.  The individual circumstances of the present case, however, do not require it.  The analogy with court proceedings was explored in the course of argument.  In my judgment it is not generally incumbent on a sentencing court (or a court hearing an appeal against sentence) to give a party notice of reported decisions which the court is minded to take into account when determining the appropriate sentence, though there may be circumstances where it would be right to draw attention to a particular authority before relying on it.  To the extent that the analogy is helpful, it tells against Albatros.

47.   Moreover there is no reason to believe that the Appeal Committee was unaware of the fact that, in one of the cases referred to, 75% of the fine of £100,000 was suspended; nor, therefore, is there any reason to believe that representations on behalf of Albatros as to the nature of the sanction in that case might have affected the Appeal Committee's judgment about the appropriate sanction in the case of Albatros.  What is given in the written reasons does not purport to be a complete statement of what the Appeal Committee considered in relation to that earlier case.  It is obviously only a summary.

48.   I do not accept an additional submission by Mr Beloff that the precedents did not form the basis of the decision, which was taken on independent grounds, but were put forward as justifying a decision already taken on those other grounds.  On a fair reading of the written reasons the previous decisions are relied on as a strand in the overall reasoning by which the decision is reached.  But in view of the conclusion that I have already reached as to the absence of unfairness in the approach taken by the Appeal Committee, nothing turns on this point.  I reject Albatros's case under the head of fresh evidence.

**Failure to have regard to material considerations**

49.   The first matter raised under this head is the submission that the Appeal Committee failed to have proper regard to previous fines imposed by it on other warehouses or traders, so as to create consistency and fairness in its approach to regulation and breaches of conditions.  The submission rests in part on the suggestion that the Appeal Committee misdirected itself as to the true nature of the previous fine of £100,000 to which I have referred in considering the issue of fresh evidence.  To a substantial extent I have dealt with the point in that context, observing in particular that what appears in the written reasons is simply a summary of the previous decision rather than a full exposition of it.

Although the submission is elaborated in the present context, I think it sufficient to record that in my judgment there was no misdirection in any of the respects alleged and there was no failure to take the circumstances of the previous case into consideration.

50.  The other aspect of the submission as to previous fines is that Albatros has adduced, for the purposes of the present proceedings, details of fines in a number of other cases (post-dating as well as pre-dating the decision under challenge) and contends that the Appeal Committee failed to have regard to them or to carry out a proper exercise of comparison between the circumstances of those other cases and of the present case.  I have been referred to some of the details of the previous cases in order to show their potential relevance to the level of fine for Albatros.  In my view there was no obligation on the Appeal Committee to take into account the details of the previous cases on which Albatros chooses now to rely.  It was certainly entitled to look at previous cases and to take them into account in the way that it did - the point considered under the head of fresh evidence.  But it was not required to do so or to go further than it did.  If Albatros wished to put forward previous cases in support of its contention that the level of fine imposed by the Warehouse Disciplinary Committee was too high, it was free to do so; and the Appeal Committee would then have been bound to take them into account.  The very fact that Albatros did not adopt that course may tell one something about the significance or otherwise of the cases in question.  Leaving that aside, however, I am satisfied that any failure by the Appeal Committee to take into account previous cases on which Albatros had placed no reliance in support of its appeal was incapable of vitiating the decision reached.

51.    A separate submission is that the Appeal Committee failed to take any proper account of Albatros's willingness to compensate traders affected by the breaches.  The argument advanced by Albatros in support of its appeal had been that, although Albatros was legally protected under the FENEX conditions, it chose not to avail itself of that protection but to act in the interests of LME brokers by compensating the majority of those affected.  The submissions of the LME Executive had cast substantial doubt on the strength of that point as a mitigating factor, whilst also observing that any exclusion of liability under the FENEX conditions did not affect Albatros's responsibility to the LME for breach of the conditions contained in its contract with the LME.  The written reasons for the Appeal Committee's decision deal with the matter in this way:

> "Albatros also claimed that they were not bound by the conditions of the LME Warehouse Contract in so far as they imposed obligations which were in conflict with the limits of responsibility contained in the FENEX, the Dutch forwarding Conditions which operate in the Port of Rotterdam.  The Appeal Committee did not accept this claim.  Albatros had signed the Warehouse Contract with the LME without qualification and its obligations under the Contract relating to disciplinary matters were not reduced by the FENEX terms of business."

52.    That is a clear misunderstanding of the argument put forward by Albatros, as Mr Beloff has conceded.  It is submitted by Miss Baxendale that the Appeal Committee thereby failed to have regard to a material consideration and expressed the matter in a way which was liable adversely to affect its consideration of Albatros's position.

53.    I do not think that this admitted error was sufficient to vitiate the Appeal Committee's decision.  Looking at the written reasons as a whole, I am satisfied that the Appeal Committee did take into account Albatros's claim to have compensated the majority of those affected and that its misunderstanding of the argument that such compensation

went beyond Albatros's legal obligations was not a material factor in the overall decision as to the level of fine.

**Grossly disproportionate sanction**

54.    The final ground advanced by Albatros is that the sanction imposed, in particular a fine of £200,000 and costs, was grossly disproportionate to the offences.  It was unprecedented and far in excess of any fines imposed in other cases.  As to the power of the court to interfere in such a case, reliance is placed on R v. Admiralty Board of the Defence Council, ex parte Coupland (Division Court, 18 July 1995, unreported), which applied R v. St Alban's Crown Court, ex parte Cinnamond [1981] QB 480.  Those cases show that the underlying principle is, or is equivalent to, that of Wednesbury unreasonableness.  Miss Baxendale did not seek to put her submissions on any basis other than that the fine in this case was so disproportionate as to be Wednesbury unreasonable.

55.    She submitted that the sanction was grossly disproportionate in the light of (1) the nature of the offences themselves, (2) the fact that they arose from mistakes and there was no dishonesty or deliberate breach by Albatros, (3) the level of fines and other sanctions imposed in the past in respect of similar or other breaches by LME warehouses, (4) the fact that the mistakes, once they came to light, were quickly and readily admitted by Albatros, (5) Albatros's pleas of guilty to all relevant charges except that of bringing the LME into disrepute, (6) the steps taken by Albatros to mitigate the effects of its mistake and to offer to compensate traders who had suffered loss, (7) the financial loss suffered by Albatros as a result of taking such steps, (8) the low level of profits which Albatros derived from its position as an LME listed warehouse and the severe effects such a large fine would have on it, (9) the consequences of the imposition of the fine coupled with the

costs of the management consultancy audit in terms of Albatros's continuing viability as an LME warehouse, and (10) the costs of the management consultancy audit itself.

56.     The factual basis for those points is developed in Albatros's evidence, especially the affidavit of Mr Meeuwisse.  The points are also considered in the LME's evidence, in particular in the form of a commentary in Mr Farrow's second affidavit.   I have considered the relevant material but do not propose to set out further details.

57.     In my judgment the Appeal Committee was entitled to take a very serious view of Albatros's conduct in this case.  The committee was exercising an important regulatory function, as is reflected in my finding that its decision is amenable to judicial review.  It was an expert body which was well placed to assess the needs of the market, the impact of a breach of the rules and what was required in order to deter future breaches and secure confidence in the market.  The court does not have the same expertise in such matters.  I have already referred to the reasons why the committee took a particularly serious view of Albatros's conduct and decided that a severe sanction was appropriate.  They are reasons of substance and were given careful consideration. The committee had regard to the various points of mitigation advanced by Albatros and even reduced the fine by £50,000 because of Albatros's financial position.   The previous cases relied on by Albatros were all very different factually and were less serious than the present case.

58.     In light of those considerations I have come to the clear view that there is no basis for intervention by the court in relation to the level of fine imposed in this case.  It cannot be said that it was a grossly disproportionate sanction or that the decision to impose it was Wednesbury unreasonable.

**Conclusion**

59.     Although I hold that the decision of the Appeal Committee is amenable to judicial review, Albatros has failed to persuade me that the decision was unlawful in any of the respects put forward.  The application for judicial review is therefore dismissed.

**Ruling on orders consequential upon the judgment** (this ruling does not form part of the judgment itself but follows on for convenience)

1. I have handed down the judgment while out on Circuit.  By consent of the parties, consequential orders have been the subject of written submissions so as to make it unnecessary for the parties to attend at court.  I am grateful to counsel for their submissions and for their typographical corrections to the draft judgment.

2. **The application for judicial review is dismissed.**

3. **The applicant is to pay three-quarters of the respondent's costs, to be subject to detailed assessment if not agreed.**  The order reflects the fact that, although the applicant was ultimately unsuccessful, it did win on the threshold issue of amenability to review, which required substantial preparation and took up a substantial amount of time in court.  That is a matter properly taken into account as part of the overall circumstances in the exercise of the court's discretion as to costs under CPR Rule 44.3. I do not consider that the debate over the written reasons ought to affect the costs order. Nor do I consider that the applicant's conduct of the proceedings was such as to justify requiring it to pay the whole of the respondent's costs despite the fact that it won on the amenability issue. In particular, the costs of setting aside the stay (in respect of which the applicant's conduct was indeed open to criticism) were awarded to the respondent in any event and it is not appropriate to impose a further penalty for the applicant's conduct.

4. **Permission to appeal refused.**  In my view an appeal does not have a realistic prospect of success on any of the issues in respect of which I have decided against the applicant.

The case does not raise points of principle of such importance that they ought to be considered by the Court of Appeal even in the absence of a realistic prospect of success. The financial hardship faced by the applicant is not a good or sufficient reason for granting permission to appeal.

EXHIBIT G



Neutral Citation Number: [2014] EWHC 890 (Admin)

Case No: CO/17678/2013

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 27/03/2014

**Before** :

**MR JUSTICE PHILLIPS**
- - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |
|---|---|
| **THE QUEEN**<br>**(on the application of**<br>**UNITED COMPANY RUSAL PLC)** | **Claimant** |
| **- and -** | |
| **THE LONDON METAL EXCHANGE** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Monica Carss-Frisk QC and James Segan** (instructed by **Macfarlanes LLP**) for the
**Claimant**
**Michael J Beloff QC and Simon Pritchard** (instructed by **Latham & Watkins LLP**) for the
**Defendant**

Hearing dates: 26th and 27th February 2014
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Mr Justice Phillips:**

1.   On 1 July 2013 the Defendant ("the LME") issued a consultation notice inviting comments from participants in the international metals market on a change the LME proposed to make to the rules for LME approved warehouses. The proposal was that, where a warehouse had a wait-time (or "queue") for delivery of metal in excess of 100 days, the amount of metal which the warehouse could load-in would be linked to (and limited by) the amount which it loaded out. The formula governing the linkage was designed to reduce the queue at the affected warehouse by one day for every two business days the new rule applied ("the Proposal").

2.   The consultation period ended on 30 September 2013. On 7 November 2013 the LME announced its decision to implement a new rule for its warehouses with effect from 1 April 2014 in the terms proposed in the consultation notice, save that the threshold for the application of the linkage formula would be 50 days rather than the proposed 100 days ("the Rule").

3.   In these proceedings the Claimant ("Rusal"), a leading global producer of aluminium and alumina, seeks to challenge the LME's consultation process and its subsequent decision. It is not in dispute that the LME is subject to the principles of public law and amenable to judicial review.

4.   Rusal contends (and the LME does not dispute) that the implementation of the Rule will result in an immediate, if short-term, fall in the global open market (or "all-in") price of aluminium, potentially causing hardship to metal producers such as Rusal, with the potential for longer term damage through the closure of smelters.  In that context, Rusal's grounds of challenge are:

   (1)   that the consultation process was procedurally unfair, principally because the LME consultation notice did not identify (let alone explain the reason for discounting) the main alternative option for reducing warehouse queues, namely, banning warehouses from charging rent for the period metal is held in a queue (or otherwise capping the amount of rent so charged), an alternative which Rusal asserts would cause significantly less damage to metal producers.

   (2)   that the LME's decision to implement the Rule was made without adequate consideration of or inquiry into relevant matters, including the effect the Rule would have on the all-in price of metal and the consequent effect on metal producers, the LME having made a deliberate decision not to consider that factor.

   (3)   that the decision was a breach of Rusal's human rights, being a disproportionate interference with Rusal's right to peaceful enjoyment of its possessions (namely, its goodwill or economic interests) or was otherwise discriminatory as between metal producers and warehouse operators.

5.   On 7 January 2014 Carr J. directed that the Claimant's application for permission to bring judicial review proceedings, and the substantive hearing if permission is granted, be listed together for a "rolled up" hearing. The case was argued before me on that basis.

The factual background

6.    Although certain aspects were only clarified during the course of the hearing in supplementary witness statements from officers of the LME, the background to and progress of the consultation and the LME's decision are not now disputed in any significant respect and are summarised below.

The LME

7.    The LME, established in 1877, is the world's premier base metals market. It operates futures and options markets in eleven industrial base metals. For eight of those metals, including aluminium, the daily LME official prices have become the accepted reference prices for the world trade in those metals.

8.    The LME is a Recognised Investment Exchange ("RIE") within the meaning of section 285 of the Financial Services & Markets Act 2000 ("FSMA"). As an RIE, the LME has a responsibility to uphold standards on its exchange in accordance with the FSMA Recognition Requirements Regulations 2001, including (pursuant to paragraph 4(2) of Schedule 1 to the Regulations) ensuring that it has (i) rules and procedures to provide for fair and orderly trading and (ii) satisfactory arrangements for securing the timely discharge of the rights and liabilities of the parties to transactions effected on the exchange.

9.    The LME provides three main functions: (a) a price-discovery mechanism for the metals traded; (b) a price-hedging mechanism for producers and consumers of metals traded; and (c) a source of last resort for the physical delivery of those metals.

10.   The LME is an on-exchange forwards market. This means that LME contracts are based on physical settlement by the transfer of ownership of metals stored in LME approved warehouses. Although only a very small proportion of LME trades actually result in physical settlement, the possibility of physical delivery (out of one or more than 700 LME approved warehouses worldwide) results in price convergence between the LME price and the price of physical metal, so that the LME price is truly reflective of supply and demand.

11.   Consignments of metal enter the LME system on delivery to an LME approved warehouse, at which point the warehouse issues a bearer document, known as a warrant, for each lot of LME-approved metals. The size of a lot is defined per metal, and in the case of aluminium, is 25 tonnes. LME warrants are used as the means of delivering metal under LME contracts.

12.   LME-warranted metal can only be stored in LME approved warehouses. Warehouse companies must meet strict criteria before they are approved by the LME. Once approved, a warehouse company enters a warehousing agreement with the LME on standard terms and individual warehouse buildings are licensed by the LME. There are currently more than 700 LME approved warehouses across 36 locations in 15 countries. The total metal delivered in and out of these warehouses exceeded 8.7 million tonnes in 2013.

13.   The LME price, which is used as the global benchmark for physical contracts, is a price for metal traded 'in-warehouse'. This entails that the additional costs associated with

making delivery of "free metal" outside the constraints of the LME system are not reflected in the LME price, with the result that the physical market price for aluminium will be higher than the LME price. The physical market price of aluminium, known as the "all in" price, is therefore made up of the LME price plus a premium.

<u>The emergence of problems with warehouse queues</u>

14.    The international financial crisis of 2008 led to a sharp fall in industrial demand for metal, particularly from the motor car industry in the United States, and resulted in a huge surplus of aluminium. Stocks of that metal accumulated in various warehouses, particularly in Rotterdam, Baltimore and Detroit. This was exacerbated by increased investment in commodities, being held as a hedge against exposure to financial products, leading to yet further increases in stocks of aluminium held at LME approved warehouses.

15.    These factors resulted in substantial queues developing at certain warehouses so that a warrant-holder who presents a warrant for cancellation (in exchange for delivery of the lot of metal to which the warrant related) will have to wait for weeks or even months for the metal to be loaded out. The problem is exacerbated by the fact that a seller of metal on the LME is entitled to (and usually will) settle the trade by delivering to the buyer the "worst warrant" held by the seller in respect of the relevant metal, that is to say, the warrant representing metal at the back of the queue.

16.    It is recognised that the growth of long queues, seen particularly in five major LME approved warehouses, has several damaging effects on the LME system. First, by denying owners reasonable access to their metal, queues undermine the role of the LME as a market of last resort. Second, the cost of paying rent to the warehouses in respect of the period during which the metal is held in a queue causes the LME price to be discounted even further from the all-in price, resulting in an increased divergence between the LME price and the all-in price of metal, thus damaging the role of the LME in discovering the true market price of metal. Third, the delay in physical settlement of LME trades gives rise to regulatory issues. Those factors, taken individually and in combination, risk damaging the LME's reputation.

<u>The Europe Economics report</u>

17.    In 2010, following numerous complaints about the length of queues at LME warehouses, the LME commissioned Europe Economics to prepare an independent assessment of whether the requirements in the LME warehouse contract for rates of physical delivery-out were satisfactory. Europe Economics carried out research between September 2010 and February 2011 and produced a report for the LME dated 12 May 2011 ('the EE Report').

18.    The EE Report set out in detail the damaging effect of long queues on price discovery. It explained that the representativeness of the LME price is dependent on arbitrage (or the possibility of arbitrage) with the physical market, ensuring that the LME price and physical prices will converge. Unduly lengthy queues for the delivery of metal increase the cost of arbitrage in three ways: (a) rent must be paid during the time in which the metal is in the queue; (b) the length of the queue is uncertain and (c) the inconvenience of being obliged to wait for delivery gives rise to other costs such as the difficulty of arranging delivery for a date further into the future.

19.   In other words, the EE Report explained, because of the impediments to arbitrage caused by queues, the value of warranted metal in LME warehouses concerned is lower than it would otherwise be in relation to the value of metal physically delivered. The result is an increase in physical premiums, which now contain a component attributable to warehouse queues. This may be damaging to the price discovery process because (a) the reduction in value due to queues is not related to features of the physical metal market, but is a function of warrant cancellations and LME loading-out requirements; and (b) fluctuations in the LME price will be related to unpredictable changes in the length of queues as well as changes in physical supply and demand.

20.   The EE Report addressed five main policy options that the LME might consider to address the problem, the first four seeking to impose controls on stocks or load-out rates. The fifth option was to '*invite warehouses to offer rent rebates*' for metal held up in long queues. Although referred to as "inviting rebates", the proposal was in fact to ban or cap rent for metal in a long queue.

21.   The EE Report recorded that this option was suggested by some stakeholders on the basis that it would help to remove the warehouse companies' incentives not to deliver metal promptly while, at the same time, compensating the owners of metal for the inconvenience of the delay. Europe Economics noted that, while there was no great demand for such rebates, some stakeholders expressed interest in them and they could, in principle, help to address the problems.

22.   After discussing the option, Europe Economics recorded the argument that the LME was, under existing legislation, prevented from interfering in pricing and that, even if legislation did not prevent the LME from requiring rent rebates, their universal and enforceable imposition would require a change in the warehousing agreements.  Such a change would have to occur by agreement with warehouses, rather than by imposition, and would require extensive negotiation, the conclusion of which would not be guaranteed to be successful.  The EE Report concluded that, while rent rebates would in principle address the issue of queues, it was not clear that they were enforceable. Significant discussion would be needed to establish the scope of this policy option to be successfully introduced.

23.   The EE Report was not published in full, but the LME did publish the Recommendations section, together with an Executive Summary. The principal recommendation was that loading-out requirements be implemented applying higher delivery out requirements to warehouses with stocks above 300,000 tonnes and that these requirements should be reviewed formally at intervals of six months. Should persistent and lengthy queues continue, the level of stocks at which higher loading-out requirements apply should be progressively lowered.

24.   As for rent rebates, the Executive Summary stated that they *"could address some aspects of the problem, though they are subject to some significant feasibility issues which could hamper their effectiveness"*. The Recommendations section proposed that *"rent rebates be discussed, bearing in mind that their effectiveness is contingent on their application to warehouses with long and persistent queues"*.

   The LME's implementation of the EE Report Recommendations and its effect

25.    The LME duly adopted the primary solution proposed in the EE Report by increasing minimum load-out rates with effect from 1 April 2012, although the increased minimum load-out rate was lower than that suggested.

26.    As further recommended, the LME continued to review the queues at warehouses following the implementation of the increased load out-rate. The issue was discussed at an Aluminium Committee meeting on 11 June 2012 (attended by a representative of Rusal). Following that meeting, email correspondence (to which Rusal was again a party) expressed the view that "*the adjustments in minimum load-out rate in April have proven to be insufficient to resolve the issue. The queues are now even longer and the warehouses continue to increase their incentive offer, adding further up pressure to local premia in the over supplied global market…*".

27.    In June 2012 the LME's Executive Committee produced a report entitled "*LME Warehouse Analysis - Description and Appraisal of the Proposals*". The report set out various proposals for solving the issue of warehouse queues, but did not include banning/capping rent in its list of nine proposals. The LME explained in its Skeleton Argument that the option of banning/capping rents was not listed because (as confirmed in the second statement of Diarmuid O'Hegarty, the Deputy Chief Executive and former General Counsel of the LME) that option had been considered and consistently discounted as a viable option by the LME in the light of advice obtained from internal and external counsel in 2000, 2005, 2007 and 2012 and having sought the views of the European Commission in 2000 and 2007.

28.    The Executive Committee Report concluded that the only current realistic option was to "*change load-out rates to a policy of the larger of current policy levels OR a monthly total equal to the monthly delivered in tonnage (basis size warehouse)*".

29.    Concerns as to effect of queues continued to be expressed, including a report in the Financial Times on 13 September 2012 that Rusal saw a problem in the fact that the LME did not reflect the real market and was warning of the risk of other exchanges launching competing aluminium contracts.

30.    On 21 December 2012 the Chief Executive of the LME, Martin Abbott, stated in a letter to Rusal that the LME believed that the existing measures to reduce queues went "*as far as it's reasonable to address the effect on the aluminium market of long aluminium queues in some locations. Such queues are the result of broader macro-economic forces at play in the aluminium industry. The LME has said on many occasions that the proper role of the LME is to reflect the effect of those macro-economic forces and not to try to distort them*".

31.    In the later half of 2012 Hong Kong Exchanges and Clearing Limited ("HKEx") agreed to acquire the LME, the acquisition completing on 6 December 2012, following which HKEx's Chief Executive, Mr Charles Li, joined the Board of the LME. Matthew Chamberlain, who had been advising HKEx on the acquisition, had already joined the LME as its Head of Strategy and Implementation in October 2012.

32.    It seems that the LME's view as to whether it should consider further intervention to deal with warehouse queues evolved following (and perhaps because of) HKEx's acquisition. By early 2013 it had been agreed between Mr Li and Mr Abbott that Mr Chamberlain should undertake a fresh review of the options available.

Mr Chamberlain's review in early 2013

33. On January 2013 Mr Chamberlain produced a memorandum entitled "*LME Warehousing-Perimeters of a Post-Completion Review*", setting out certain "key principles", the third of which was as follows:

> "*The review should take an "ab inito" view of the various suggestions which have been made by users to both HKEx and the LME. Although many of these have been considered and rejected in the context of both the LME's internal work and the Europe Economics Report, it would be important to present a clear view of why these potential solutions are not desirable or feasible.*"

34. The memorandum noted that the LME had broad powers over the warehouses under the terms of the warehouse agreement, but also noted that one of the constraints on any proposed approach was UK and EU competition law, stating "*any solution which envisaged limiting warehouse incentives or capping metal deposited into any particular warehouse would likely be illegal under competition law.*"

35. Mr Chamberlain set out five categories into which the options he considered to be available to the LME could be placed, none of which related to the banning/capping of rents. The last category he listed was "*Linkage between load-in and load-out.*" In his first witness statement Mr Chamberlain explained that the suggestion of linking loading-in and loading-out had been made by Mr Li. This is further apparent from the following:

(a) an email from Mr Chamberlain to LME's Management dated 28 March 2013 in which he stated "*I am working here on the basis that we are presenting only two options, namely (i) status quo and (ii) the Charles solution. I haven't heard that there's any other approach in which we feel sufficiently strongly that we wish to table it – but pls say if you disagree on this.*"

(b) a further email dated 7 April 2013, circulating drafts of the materials for the Board, Mr Chamberlain stated as follows: "*Just to remind everyone, the idea is to provide (i) an overview of the current situation, (ii) an analysis of Charles' proposed solution, (iii) a comparison between that solution and the status quo.*"

36. The results of Mr Chamberlain's review were presented to the LME's Board on 24 April 2013 (the evening before the April meeting of the Board) with the aid of a slide deck entitled "*LME Warehousing – Situation Review and Potential Solution*". The introduction noted that key dangers to the LME of continued queues and no further solutions were reputational and the risk of increased regulatory scrutiny. While it was recognised that the LME might be unable to implement changes that meaningfully impact the economics or the substance of the issue, the Board was asked to approve further consulting the market on a specific proposal; "the linked load-in and load-out" solution.

37. The review contained a section entitled "*Universe of Potential Solutions*", listing nine potential responses to queues, but not referring to the possibility of banning/ capping rents. The slides addressed the linked load-in and load-out solution in detail. The final

slide, which charted the path forward, indicated that, if the Board decided to consult the market, the *only* two outcomes would be implementing a new rule introducing the linkage of load-in and load-out or withdrawing any proposal and continuing to monitor the situation thereafter.

## The April 2013 Board meeting

38.    At the April 2013 board meeting the Board decided in principle to consult on the linked load-in and load-out solution.

39.    According to both the Chairman of the Board, Sir Brian Bender, and Mr Chamberlain, the Board considered whether it would be valid to take into consideration the fact that a solution would have negative consequences for metal producers such as Rusal by decreasing the all-in price of metal. On the basis that the LME's regulatory duty was to maintain an orderly market and not to achieve a certain price for the benefit of any particular part of the market, the Board concluded that it should not give any significant weight to any such negative consequences.

## The Board meeting of June 2013

40.    Mr Chamberlain made a further presentation to the Board at its meeting on 14 June 2013 in which he recommended consulting the market on the implementation of the linked load-in load-out solution, save that the target queue length should be 30 days rather than 100. Mr Chamberlain is recorded as having outlined the possible options available to the Board as being *"to implement the Proposal; to implement the Proposal with modifications as a result of the consultation; or not to implement the Proposal"*.

41.    The Board agreed to commence the consultation, but with the market being asked to comment on a target queue length of 100 calendar days and not the 30 days suggested by Mr Chamberlain.

## The Consultation Notice of 1 July 2013

42.    On 1 July 2013 the LME published the Consultation Notice in respect of the Proposal.

43.    The Notice referred to Mr Chamberlain's internal review and the EE Report, but did not attach either document and, in particular, did not refer to the EE Report's conclusion that, while rent rebates would in principle address the issues of queues, it was not clear that they are enforceable. Indeed, the Notice did not discuss any of the alternative proposals for dealing with queues. The Notice stated as follows:

> *"In reviewing warehouse arrangements, the LME has previously considered a complete list of alternative policy options for delivery out rates, but it was not deemed appropriate to implement any option [other than increasing load-out rates] following feedback from the market. However, in light of the persistence of the situation due to continuing macro economic factors, and the negative impact on market participants, the LME has decided to revisit the most workable of these options, and open a consultation process with the industry as a whole."*

44.    The Notice further stated:

> *"In the interests of stimulating an informed debate and encouraging responses from all interested parties, the LME sets out in this Notice its preferred proposal (the "Linked Load-In/Load-Out proposal") for changes to the LME policy in relation to load-out rates, and seeks to lay out the potential positive and negative impacts of such a change. For the avoidance of doubt, the Board of the LME, while noting stated user opinions, has not yet formed a conclusive view on whether any action would be in the best interests of the market, and invites broad feedback on this topic. However, to the extent that action is taken, and following extensive review work, the LME believes that a proposal broadly consistent with that specified in this Notice would best balance the competing demands of LME members, the metals industry and warehouse operators."*

45.    There then followed a detailed explanation of the Proposal. The Notice concluded that, following the consultation period, the Board might decide to (i) enact the requirements set out in the paper (ii) enact modified versions of such requirements or different requirements, or (iii) not enact any new requirements. Mr Chamberlain, in his second statement served on the first day of the hearing, explained that the Board decided to add the words "or different requirements" to the draft paper presented at its 14 June 2013 meeting.

Responses to the consultation

46.    There were 33 written responses to the consultation and over 70 meetings took place with market participants. At least ten of the 33 written responses recommended pursuing the alternative option of banning or capping rents on queued metals. None of those responses addressed the legal obstacles to that solution which had been identified in the EE Report and upon which the LME had previously received advice.

47.    Rusal responded in writing on 19 September 2013. Rusal opposed the proposed change stating *"… the argument underlying the …. proposed rule change has not been clearly stated nor supported with Exchange data. Instead, the intent… to accelerate the transfer into the market of an additional two million tonnes of aluminium, accumulated and stored since the financial crisis, is an unprecedented intervention and one that Rusal strongly objects to"*. Rusal suggested alternative measures designed to improve transparency in the price setting process rather than reducing queues: it did not mention the alternative of banning/capping rents.

The LME's consideration of banning/capping rent for metal in queues

48.    The late evidence served by the LME referred to legal advice having been sought in 2013-2014 in relation to the competition law risks for the LME in banning/capping rent. In the course of argument Mr Beloff QC, leading counsel for the LME, confirmed that a further legal review of the competition law issues relating to controlling queues, in particular the issue of banning or capping rents, had commenced during the consultation period, prompted by the not insignificant number of responses received suggesting the banning or capping of rents as an alternative means of reducing queues.

49. On 24 September 2013 the LME consulted its Warehousing Committee regarding the possibility of banning rents in queues. Perhaps not surprisingly, given that the Committee comprised mostly but not entirely representatives of the warehousing companies (including those with long queues at their warehouses), the members of the Committee were not in favour of that solution.

The Board meeting of October 2013

50. On 25 October 2013 Mr Chamberlain made a presentation to the Board using slides entitled "*LME Warehousing – Consultation Process Summary.*"

51. The presentation recorded that there had been significant opposition to the Proposal from producers of aluminium who were *"clearly concerned as to the impact on all-in price available for their output"*. The presentation also contained a section on rents, stating:

> "M*any respondents have suggested that charges need to be capped (or incentives limited) as a primary policy initiative. Additionally, to the extent that Rule causes warehouses to increase rents, caps may also be required as a secondary response.*
>
> *However, legal obstacles to any such power still significant.*
>
> *Key Questions for the Board*
>
> *- is the Board happy for the Executive to continue investigating the LME's powers in this regard?* "
>
> *- does the Board however agree that action needs to be taken in advance of the above being known?*

52. The Presentation also included a slide entitled *"Limit rents in queues – Most commonly-proposed alternative approach",* recording that the limitation of rent in queues was cited by many respondents as a more effective approach, but that *"Legality unclear at this point, given interference in existing contracts implicitly entered-into by metals owners and warehouses."* The key questions for the Board were: *"Is the Board happy not to implement this approach at the current time?"* and *"Does the Board task the Executive with investigating the feasibility of this approach as a future policy option?"*

53. The presentation also recorded that there had been significant market focus on queues being reduced to acceptable lengths and recommended that the threshold be reduced from 100 to 50 days.

54. Subject to minor qualifications, the Board accepted the recommendations in Mr Chamberlain's presentation and, subject to any comments from the Financial Conduct Authority, authorised the implementation of the Rule.

The decision notice and the consultation report

55.    On 7 November 2013 the LME issued a notice setting out its decision to implement the Rule, accompanied by a report on the consultation.

56.    The report recognised that the effect of reducing queues, whilst leading to a rise in the LME price in the long term, was likely to lead in the short term to a reduction in the all-in price of metals, with consequent impact for both producers and stock holders. It was recognised that this effect could be further compounded by the discharge of metals from warehouses causing the market to anticipate a "*wall of supply*", thus further reducing prices and compounding short term cash flow issues for producers. However the report stated that it was not the role of the LME to achieve a given price for any market participant, and so this could not be a guiding consideration.

57.    In addition to considering the Proposal, the report also considered alternatives suggested by respondents. It recorded that a number of respondents had raised banning rent in queues, stating that "*of all the proposed alternative routes, the concept of banning queues does appear to be one of the most rational and deliverable*" and referring to the option as "*the only practical suggested alternative to the Proposal.*" The report went on to record that this approach has historically been considered by the LME and rejected for various practical reasons, including that it would be a retro-active measure as, if it was to be effective, it would have to apply to metal which was loaded-in under the old rules and that the rule might be open to manipulation by warrant holders seeking to obtain free storage.

58.    However, the report did not discount the option of banning or capping rents, but instead recommended that the LME "*commit to fully investigate the feasibility of banning the charging of rent in queues. To the extent that it could be practically implemented, reserved as a policy option for the Board to deploy if required.*"

59.    The report stated (apparently mistakenly) that competition law advice had last been obtained in 2005, but (correctly) recorded that a further review was now in progress, stating:

> "A*s explained above, the LME's position has been that an attempt to regulate rents or FOTs [Free on Truck – charges levied by warehouses for delivery] may be problematic under European Competition Law. However, in the light of the prevailing market conditions, regulatory developments and the potential impact of regulatory and political pressure, it seems appropriate to review the scope of the LME's ability to regulate rents and/or FOTs. The legal analysis of this topic is underway. However, the review is unlikely to be completed until 2014. Accordingly it is not advisable to delay the results of the Consultation pending completion of the review.*"

60.    The report concluded by recording the Board's resolution to introduce the Rule, but also recording that it was proposed to review the scope of the LME's powers under competition law to identify and define a set of further policy options for the Board, including the possibility of banning rent in queues.

Ground 1: Procedural Unfairness

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 133 of 143

Judgment Approved by the court for handing down.                                      Rusal v LME

61.  In *R v North and East Devon Health Authority, ex parte Coughlan* [2001] QB 213 Lord Woolf MR, giving the judgment of the Court of Appeal, summarised the requirements for a lawful consultation as follows:

> "*To be proper, a consultation must be undertaken at a time when the proposals are still at a formative stage; it must include sufficient reasons for particular proposals to allow those consulted to give intelligent consideration and an intelligent response; adequate time must be given for this purpose; and the product of consultation must be conscientiously taken into account when the ultimate decision is taken.*"

62.  In *R (Medway Council) Secretary of State for Transport* [2002] EWHC2516 (Admin) Maurice Kay J rejected the suggestion that the four requirements set out in *Coughlan* superseded the previously well-recognised general principle that fairness was a requirement of a lawful consultation process, pointing out that fairness is an aspect of what is "proper" – the word used in *Coughlan*. Maurice Kay J concluded that it is "*axiomatic that consultation, whether it is a matter of obligation or undertaken voluntarily, requires fairness*".

63.  Rusal contends that the LME's consultation was procedurally unfair in the following six respects:

>   (a) in failing to identify and provide information in relation to alternative options and the reasons why they had been discounted by the LME;

>   (b) in failing to disclose "key documents" referred to in the Consultation Notice: the EE Report and Mr Chamberlain's review;

>   (c) in failing to carry out a cost benefit analysis in respect of the Proposal;

>   (d) in consulting only the Warehousing Committee during the consultation period in relation to the option of banning/capping of rents;

>   (e) because the LME had a direct financial interest in rents (by reason of the  1.1% stock levy payable by the approved warehouses under their agreement with the LME which it did not disclose), giving rise to an appearance of bias:

>   (f) in failing to re-consult before implementing the Rule given the change of threshold from the 100 days referred to in the Proposal to one of 50 days.

(a) The LME's approach to alternative options

64.  Rusal contends that the failure of the LME to refer to and explain the reason for discounting viable alternatives to the Proposal in the Consultation Notice demonstrates both (i) that the consultation was not undertaken at a formative stage, the LME having closed its mind to any alternative option, and (ii) the LME did not give sufficient reasons to permit intelligent consideration and intelligent responses to the consultation. Rusal also contends that the Consultation Notice was misleading in that it suggested that other options had been rejected "*following feedback from the market*", whereas

certain of the options, including that of banning/capping rents, had apparently been discounted on the basis of advice as to competition law.

65.    The LME responds that it was not obliged to consult on every option, but was entitled to consult on its preferred option, being entirely open minded (as confirmed by Sir Brian Bender in his witness statement) as to whether to implement the Proposal, a modification of the Proposal or different requirements, or do nothing at all. The LME further contends that it was not obliged to refer to an option which it had consistently rejected on advice. But, in any event, consultees were able to, and did, provide responses which encompassed alternative options, including banning/capping rents.

66.    It is indeed well established that a public body is not obliged to consult on every possible option, but is entitled to put forward its preferred option as a proposal for consideration. In *Nichol v Gateshead Metropolitan Borough Council* (1988) 87 LGR 435 CA a local authority's scheme for the re-organisation of secondary education in its area was challenged on the basis that the authority had consulted on its proposal and did not outline other options which had been rejected, save by reference to earlier reports of its Education Committee which had considered those options. The first instance Judge had quashed the scheme. In overturning that decision, O'Connor LJ said:

> "... the Judge is in effect saying that the formative stage of these proposals was passed as soon as the Council selected a preferred option... this is in effect requiring a referendum; that is not what consultation means. Bearing in mind ...the desirability of proposals of some specificity ... I do not think it right to try to lay down any rules as to when proposals may be said to have passed the formative stage. I am, however, sure that consultation after the formulating and the deciding upon specific proposals to put out for consideration is plainly while the proposals which are to go to the Secretary of State are still at a formative stage.  "

and Sir George Waller stated:

> "In the present case it would not be helpful to put before parents all the original possibilities because the authority might then have to decide which of a variety of options, each with support, to accept.  When does the formative stage end? In my opinion it ends when the details of the plan have been decided and no alterations can be made."

67.    In *R (Kidderminster and District Community Health Council) v Worcestershire Health Council* [1999] EWCA Civ 1525 a health authority had narrowed down seven options for re-organising its emergency medicine and surgery services to a single preferred option before consulting on that option. The Court of Appeal rejected a challenge to the consultation, Simon Brown LJ stating:

> "If, as is clearly established (and is, in any event, only plainly common sense) an authority can go out to consultation upon its preferred option, per O'Connor LJ [in Nicol], or with regard to "a course it would seek to adopt if after consultation it had

> *decided that that is the proper course to adopt"* ….. *then it seems to me plain that it can choose not to consult upon the less preferred options. It does not, in other words, have to consult on all possible options merely because at some point they were developed, crystallised, canvassed and considered. "*

Auld LJ added:

> "*Here the authority, in its February 1998 consultation paper, indicated that, having considered no less than seven options, it had selected one of them as its preferred option as a proposal for consultation. Having reached the stage of retaining just one proposal under consideration, albeit in a formative state, the authority was entitled to proceed to consultation, as it did, within the terms of regulation 18(1). That provision did not require it to give focus to proposals which it no longer had under consideration. In any event, the process of consultation did not and designedly could not, preclude outright opposition to the one proposed, which opposition might prompt the authority to re-consider it and/or any of its discarded six options and/or to consider any new ones.*"

68.   In the *Medway* case (above), Maurice Kay J. also recognised that it was permissible for the Secretary of State for Transport to narrow the range of options within which he would consult and eventually decide so that, when consulting on the policy to be adopted by the Government for additional airport capacity in the South East, the Minister was, all things being equal, entitled to exclude the option of expansion at Gatwick. However, Maurice Kay J. went on to consider whether, in circumstances where the option of expansion at Gatwick was likely to re-emerge in future planning enquiries, if only as a preferred alternative solution, it was nevertheless unfair to exclude that option from the consideration, holding that:

> "*The question really becomes this: knowing that the Claimants will probably and legitimately wish to advocate Gatwick as an alternative solution at a later stage in the decision-making process, is it procedurally unfair of the Secretary of State to operate the consultation process in such a way that the Claimants lose their only real opportunity to present their case on Gatwick without their being in place a Government policy which, realistically, will present them with an insurmountable hurdle? In my judgment, when one considers the decision-making process as a whole, the answer is that to operate the consultation process in that way is indeed procedurally unfair.*"

69.   In *R (Montpeliers and Trevors Association) v. City of Westminster* [2005] EWHC 16 (Admin), the City had installed barriers preventing the use of two London squares by through traffic, but objections were made by a neighbouring authority and others in the area. The City commenced a public consultation on various options, but excluded the option of retaining the barriers, the option favoured by residents of the squares. Munby J held that the City had not consulted properly because "*an option which on any view*

*was of central significance .. had already been excluded from further consideration".* He further held, referring to the approach in *Medway*, that the process was unfair:

> "*Fairness in my judgment required that there should be a process of consultation in which those being consulted could express their views on* **all** *the various options. That never took place. It is no good ... saying, even if it is the case, that proponents of the retention of the barriers expressed views supportive of that contention in the course .. of the exercise."*

70.   In *Tinn v SST* [2006] EWHC 193 (Admin), Bean J. pointed out that the fairness challenge in *Medway* succeeded on a narrow basis and also emphasised that in *Montpelier* Munby J. had castigated the City for having treated the court and the claimants "*in a cavalier and almost contemptuous fashion*". At [32] he pointed out that "*in public law context is everything*", before expressing the view that:

> "*The requirement to consult while the proposals are at formative stage cannot mean that there must be a first round of consultation on whether to reduce the options consulted upon to one, and then a second round of consultation on that one.*"

71.   In *R (Vale of Glamorgan Council) v Lord Chancellor* [2001] EWHC 1532 (Admin), the Divisional Court re-emphasised the approach apparent from the   Court of Appeal decision in *Nichol* and *Kidderminster*, pointing out that [24]:

> "*… there is no general principle that a Minister entering into consultation must consult on all the possible alternative ways in which a specific objective might arguably be capable of being achieved. It would make the process of consultation inordinately complex and time consuming if that was so*."

Elias LJ, giving the judgment of the court, expressed the view at [25] that *Medway* was an exceptional case, as was *R (Madden) v. Bury MDC* [2002] EWHC (Admin) 1882. In *Madden* the local authority had consulted over the proposed closure of two care homes. Richards J. held that the consultation was unfair because "*a proper understanding of the true reasons for the proposed closure would require at the least a comparison with the other home that the council proposed to retain …*".   The case was regarded as exceptional by the Divisional Court because some reference to alternative closures was necessary in order to provide a proper explanation of the reasons for the proposed closure.

72.   Miss Carss-Frisk argued that the effect of the authorities referred to above is that, whilst a decision maker issuing a consultation is entitled to have a preferred option, there should be consultation on every <u>viable</u> option. She refers to the statement to that effect in section 9 of Chapter 7 of *De Smith's Judicial Review* 7th Ed., which cites *Medway* and *Montpelier* in support of the proposition.

73.   However, the broad proposition that there should be consultation on every viable option is clearly unsustainable in the light of the Court of Appeal and Divisional Court authorities referred to above, which are to exactly the opposite effect. The general rule is that a decision maker is entitled to narrow the options prior to consulting on the

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 137 of 143

Judgment Approved by the court for handing down.                                    Rusal v LME

preferred option, and need not consult on discarded options, provided the proposed course has not been decided upon and can still be altered as a result of the consultation. It seems clear that the need to deal with alternative options only arises where there are specific reasons why it would be unfair not to do so.

74.     Nevertheless, in my judgment the LME's consultation was one where, in the particular (and perhaps exceptional) context in which it arose, fairness demanded that the consultation should encompass what the LME in due course recognised to be "*the most practical suggested alternative to the Proposal*", that is to say, the banning or capping of rents. The reasons I have come to this view are as follows:

(a)  The consultation arose because the implementation of the prime recommendation in the EE Report (contained in the published Recommendations section) had not resolved the problem of queues. Requiring rent rebates was the only other option identified in the Recommendations as capable, in principle, of addressing queues. Indeed, the EE Report had recommended that the option be "discussed". Given its status as (apparently) the next obvious option referred to in the very report referred to in the second paragraph of the Consultation Notice, some explanation of the option, the result of the recommended discussions and the reason why the option had been discounted was necessary for a proper understanding of the LME's thinking in relation to the Proposal, just as reference to the alternative closure option was necessary in *Madden*.

(b)  Given previous references to the option, it was inevitable that responses to the consultation would propose or otherwise address banning/capping rents, but would be doing so in ignorance of (and possibly misled by the Consultation Notice as to) the very specific and technical reason why that option had been rejected. The fact that 10 responses proposed or supported the idea, but did not address possible contractual or competition law concerns, highlights the inherent unfairness of the process. It is certainly the case that the 10 responses were made without the information necessary to permit intelligent consideration and response. The procedure adopted by the LME also entailed that others who might have supported rent rebates, or contributed to the debate on legality, may have been unaware of the option and the issues which it engaged.

(c)  The unfairness of the above is further illustrated and increased by the fact that the LME recognised during the consultation period that further discussion and legal review of the option of banning/capping rents was necessary (and, indeed, was commenced during the consultation period). It is unclear, and no explanation was provided by the LME, as to why such discussions and review had not commenced earlier or the consultation postponed pending their completion. In my view it was patently unfair to continue with the consultation without informing the market that it was  simultaneously discussing and reviewing other options which had not even been referred to in the Consultation Notice.

(d)  Given that the LME recognised that the Proposal would likely result in losses being suffered by metal producers, but decided to discount that as a factor, fairness demanded that they should have the opportunity to consider and comment on an alternative that might cause them less damage. Whilst the LME may regard banning/capping rent as a possible further step to reduce queues in the future, metal producers will by then have suffered the full losses caused by the

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 138 of 143

Judgment Approved by the court for handing down.                                    Rusal v LME

introduction of the Rule: by failing to include banning/capping rents in the consultation, the LME has deprived the metal producers of any opportunity to reduce those losses. The situation is therefore analogous to that in *Medway*.

75.   I have reached the above conclusion that the LME consultation was procedurally unfair notwithstanding a number of further arguments advanced on its behalf by Mr Beloff as follows.

76.   First, it is said that LME was justified in not referring to the option of banning/capping rents because, given the significant risk of regulatory action in respect of which no comfort could be obtained, it was simply not and never could be a viable option. However, given that the LME has not disclosed any advice it has received in the past and is now engaged on what must be (given the time taken) an extensive review of the competition law issues with a view to considering the option in future, it is in my judgment simply not open to the LME to take that stance.

77.   Second, the LME relies on the fact that, although the competition law issues arising in relation to capping/banning rents were not referred to in the Consultation Notice, they had been referred to in an earlier report from Europe Economics which had been published in full in 2007, were identified in the May 2013 edition of Metal Bulletin Weekly and also in a Media Presentation accompanying but not referred to in the Consultation Notice.  However, the fairness of a consultation can only be judged on the basis of the consultation documents themselves. An otherwise unfair process cannot be rendered fair on the basis of speculation as to whether (some) consultees may have considered other information.

78.   Third, Mr Beloff points to the fact that under the relevant FSMA Recognition Requirements, the LME is required to satisfy the Financial Conduct Authority ("the FCA") as to its procedures for consulting users in relation to any proposed change in its rules, the FCA having regard to whether the LME publicises a formal consultation paper which includes clearly expressed reasons for the proposed changes and an appropriately detailed assessment of the likely costs and benefits. Mr Beloff relies on the fact that the regulatory requirement is to consult on a proposed change to rules (and not alternatives which are not proposed) and also on the fact that on 7 November 2013 the FCA issued a statement expressing its view that the Rule was consistent with the LME's regulatory obligations. However, neither the regulatory context nor regulatory approval seems to me to affect the court's task of assessing the fairness of the consultation. Further, it may well be that other options would also have met with FCA approval.

79.   Fourth, Mr Beloff emphasises that the test is not whether the consultation accorded with best practice, but *"whether the process was so unfair as to be unlawful"*: *R (JL & AT Baird) v. Environment Agenc*y [2011] EWHC 99 per Sullivan J at [51]. For the reasons set out above, I am of the view that the consultation in this case was indeed so unfair as to be unlawful.

(b) Non-disclosure of "key" documents

80.   Rusal contends that, in failing to disclose the full EE Report and Mr Chamberlain's review (each of which referred to legal issues arising from the banning or capping of

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 139 of 143

Judgment Approved by the court for handing down.                                    Rusal v LME

rents), the LME failed to provide sufficient information to enable an intelligent consideration and response to the consultation.

81.   As I have found above that the consultation was unfair in failing to refer to the option of banning/capping rents and to explain the issues arising in that regard, the failure to disclose documents which considered those matters was at most an aspect of that unfairness, but does not otherwise add to the debate. The decision not to disclose the documents in question would not, in my judgment, have in itself rendered the consultation unlawful if the LME had been entitled to consult solely on the Proposal.

### (c) Lack of risk or cost-benefit analysis

82.   Rusal contends that, although the LME recognised in paragraph 15 of the Consultation Notice that the Proposal required "*careful consideration and risk analysis*", it did not provide any detailed analysis of the significant impact the Proposal would likely have on the market, limiting itself to a broad warning of the possible risk of creating an artificial supply and demand dynamic in LME markets. Rusal's case is that the absence of detailed analysis entailed that consultees could not give the Proposal intelligent consideration.

83.   The parties adduced conflicting opinions from experts in consultation processes (whose evidence was not otherwise relied upon at the hearing before me) as to whether the "market impact" was a proper subject of the cost-benefit analysis to be expected of a body such as the LME issuing a consultation. In my view, opinions as to what might be expected in general are of little assistance in assessing the fairness of the particular consultation. In my judgment, given the range of interests, the substantial number of variables and the complexity of any assessment of the likely effect on prices and market dynamics, the LME could not fairly have been expected to provide a detailed analysis of the market impact of the Proposal. It is reasonably to have been expected that affected parties would assess the likely impact on their specific interests in the market.

### (d) Consulting only the Warehouse Committee on banning/capping rents

84.   As indicated above, the fact that the LME had discussions as to banning/capping rent with representatives of the warehouse companies during the consultation period was, in my judgment, an aspect of the unfairness of excluding that option from consideration in the consultation.

### (e) Apparent Bias of the LME

85.   Rusal acknowledged that the conflict of interest upon which it relies is inherent in the structure of the LME and its warehousing arrangements. Rusal further recognised the doctrine of "necessity", as explained in section 6 of chapter 10 of *De Smith* (above), extends to situations where "*the administrative structure makes it inevitable that there is an appearance of bias*", so that the decision-maker is not disqualified.

86.   Rusal contends, however, that the LME could and should have taken steps to address the appearance of bias, for instance, by setting up an independent advisory committee or other independent structure.

87.  However, the ultimate decision to accept or reject any independent recommendation would have to be taken by the LME itself (through its Board) and could not properly be delegated, entailing that any appearance of bias could not be displaced, precisely because it is inherent in the administrative structure of the LME. In my judgment the doctrine of necessity applied in this case and, given the necessity for the LME to act where it appeared to have a conflict, there was no obligation to adopt some half-way measure to mitigate the appearance of bias.

88.  But in any event the LME's stock levy, although only referred to in a footnote in the consultation report, is an integral part of the LME's structure, well known throughout the marketplace and is certainly known to Rusal. In those circumstances Rusal cannot sit back and then raise the issue of bias after the event, but must be taken to have waived its objection: see *De Smith* (above) paragraph 10-061.

   (f) Failure to consult on the reduction in the threshold

89.  Rusal contends that the reduction in the threshold at which the Rule would apply from 100 days to 50 days was a significant change, which will have the effect of further reducing premiums and releasing yet more metal onto the market. Rusal further complains (i) that the LME was plainly aware of the possibility of reducing the threshold (Mr Chamberlain having proposed 30 days initially) but acted unfairly in not specifically disclosing that possibility in the Consultation Notice and (ii) that the reduction was justified on the basis of the concerns as to the needs of physical users needing access to their metal, a significant change of rationale.

90.  Rusal's argument is that, even if the consultation was (contrary to my finding above) otherwise fair and lawful, the LME should not have implemented the Rule adopting the lower threshold without conducting a further consultation on that change.

91.  In *R (Smith) v. East Kent Hospital NHS Trust* [202] EWHC 2640 (Admin), the question arose as to whether a health authority was under an obligation to re-consult when it had made changes to its proposed plan for re-organisation.  Silber J held:

>      "*The concept of fairness should determine whether there is a need to re-consult if the decision-maker wishes to accept a fresh proposal but the courts should not be too liberal in the use of its power of judicial review to compel further consultation on any change. In determining whether there should be further re-consultation, a proper balance has to be struck between the strong obligation to consult on the part of the health authority and the need for decisions to be taken which affect the Health Service. This means that there should only be re-consultation if there is a fundamental difference between the proposals consulted on and those which the consulting party subsequently wishes to adopt.*"

92.  Whilst the change from 100 to 50 days might have a significant quantitative effect, it does not, in my judgment, entail that there is a fundamental difference between the Proposal and the Rule. The change is one of degree to just one factor in an otherwise unchanged scheme. The concept and mechanism of the solution are otherwise completely unaltered.

Case 1:13-md-02481-KBF   Document 322   Filed 04/23/14   Page 141 of 143

Judgment Approved by the court for handing down.                                    Rusal v LME

Ground 2: Failure to conduct a sufficient enquiry/failure to consider relevant matters

93.    Rusal makes four complaints under this heading.

   (a)  Failure to consider alternative options

94.    The LME's acceptance during the course of the hearing that it had commenced a fresh
       competition law review during the consultation period, prompted at least in part by the
       number of responses which supported banning/capping rents, is in my judgment
       tantamount to an admission that it had failed to make sufficient inquiry and failed
       to consider relevant matters prior to commencing the consultation. If those responses
       required further inquiry, it is difficult to see why such inquiry was not also required by
       the EE Report and Mr Chamberlain's memorandum, nor why such inquiry was not
       undertaken and completed prior to any consultation. I consider that on this basis also,
       which is closely linked to the procedural fairness arguments above, the consultation
       process was unlawful.

   (b) Failure to consider the effect of the Proposal on the all-in price

95.    Rusal objects to the LME's express decision not to take into account the depressing
       effect the Proposal would likely have on the all-in price of metal, to the disadvantage of
       metal producers such as Rusal. It is asserted that the LME's obligation to maintain an
       orderly market does not exclude and may in fact require that consideration be given to
       the effect of "major market intervention" specifically designed to affect prices.

96.    In my judgment, however, the LME's approach to dealing with queues cannot be
       criticised in this respect. In dealing with a recognised problem in the market, it was
       reasonable and indeed essential to approach the issue uninfluenced by the competing
       interests of buyers and sellers in the effect on price, unless such effect would be such as
       to damage the market. Given Rusal's own evidence as to the massive fluctuations
       which have been seen in the price of aluminium in recent years, the relatively minor
       and short term effect the Proposal is likely to have on prices does not appear to be of
       great significance. It would be improper for the LME to take into account which
       category of its users would win and which would lose in any such price effect.

97.    Rusal point to the fact that the LME, in paragraph 6.5.2.1.1 of the consultation report,
       *did* take into account the likely adverse effect of a price-drop on metal producers in
       explaining why it rejected the option of further increasing load-out rates. However, it
       is clear that the LME regarded this option as giving rise to a risk of such substantial price
       reductions that there would be long-term damage to the market as smelters went out of
       business, resulting in a reduction in supply and a longer term increase in prices.

   (c) Failure to consider profits made by warehouse owners

98.    Rusal contends that the LME Board could not properly and fairly take into account (as
       it was invited to do by Mr Chamberlain) the effect that  banning/capping rents would
       have on affected warehouses without first considering the profits the warehouses had
       already made from such rents, a step it did not take.

99.    However, in my judgment the more important question for the LME was whether the
       option would jeopardise the LME's system by causing warehouses to withdraw from

the LME network. The fairness or otherwise of profits being made by the warehouses was not a matter the LME should or could have considered, any more than it should or could have considered the effect of options on the profits of other market participants.

### (d) Failure to analyse the effect of reducing the threshold

100.  Rusal complains that the threshold of 100 days, itself described by the LME in the consultation report as "arbitrary in nature", was reduced without any assessment or analysis of the effect of so doing.

101.  However, the length of the threshold was considered on several occasions by the Board and arrived at on the basis of various factors, including responses to the consultation as to what delays were regarded as acceptable. In my judgment the LME was entitled to take a broad approach to selecting a threshold, not least because the threshold could be varied once its effect was seen in practice.

### Ground 3: Human rights

102.  In the course of oral argument Miss Carss-Frisk accepted that Rusal cannot succeed on its contentions based on the Human Rights Act unless it also succeeds on one of the first two grounds, the matters relied upon as constituting disproportionate interference with Rusal's possessions or discrimination being the very matters raised in grounds 1 and 2.

103.  In those circumstances it is not necessary or useful, even if I am wrong in my findings in relation to grounds 1 and 2 above, for me to consider the interesting but difficult question of whether causing a business a loss of future revenues is interference with "possessions" which qualify for protection under Article 1 of Protocol 1 to the ECHR.

### Conclusion

104.  In summary, I have found the LME's consultation to have been unfair and unlawful on the first two grounds advanced by Rusal. Although it has not been necessary for me to decide matters raised by the third ground, that ground is plainly arguable. I therefore grant permission to Rusal to bring proceedings for judicial review on all three grounds, allow the substantive application on grounds 1 and 2 and quash the LME's decision to implement the Rule.

**<u>Judgment Approved by the court for handing down.</u>**                              Rusal v LME