UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x
                                         :
In re ALUMINUM WAREHOUSING               :
ANTITRUST LITIGATION                     :    MDL No. 2481
                                         :    Master Docket No.
                                         :    13-MD-2481 (KBF)
----------------------------------------  :
                                         :
This Document Relates To:                :
                                         :
      ALL ACTIONS                        :
                                         :
---------------------------------------- x


MEMORANDUM OF LAW IN SUPPORT OF MOTION
BY PACORINI METALS USA, LLC
TO DISMISS THE AMENDED COMPLAINTS

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
John M. Nannes
John H. Lyons (admitted *pro hac vice*)
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7500
Facsimile: (202) 661-9191

*Attorneys for Pacorini Metals USA, LLC*

April 23, 2014

...
...

**TABLE OF CONTENTS**

Page

I.  Applicable Law ................................................................................................................. 2

II.  The Complaints Should Be Dismissed as to Pacorini USA ........................................... 4

    A.  The Direct Purchaser Plaintiffs' Complaint Fails to State a Claim .............................. 4

    B.  The Other Complaints Fail to State a Claim .............................................................. 10

III.  Conclusion ..................................................................................................................... 12

## TABLE OF AUTHORITIES

### CASES

**PAGE**

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................... passim

*Hinds County, Miss. v. Wachovia Bank N.A.,*
   620 F. Supp. 2d 499 (S.D.N.Y. 2009).................................................................................3

*In re Elevator Antitrust Litigation,*
   502 F.3d 47 (2d Cir. 2007).............................................................................................2,3

*In re Lithium Ion Batteries Antitrust Litigation,*
   No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014)................................3

*In re Parcel Tanker Shipping Services Antitrust Litigation,*
   541 F. Supp. 2d 487 (D. Conn. 2008)................................................................................3

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................................3

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.,*
   709 F.3d 129 (2d Cir. 2013).........................................................................................2, 8

Pacorini Metals USA, LLC ("Pacorini USA") submits this memorandum of law in support of its motion for dismissal of all of the Plaintiffs' claims against it.[1] The three complaints filed as class actions and the two filed as individual actions are lengthy, to be sure, and contain numerous allegations about some of the Defendants, but the allegations as to Pacorini USA are too few, too generalized, too conclusory, and too speculative to state a cause of action under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), and decisions in this Circuit and District applying *Twombly*.

Pacorini USA operates warehouses in the United States that store products and commodities, including aluminum. The complaints allege that certain practices by warehouses have created queues for delivery of aluminum in the Detroit area that have adversely affected Plaintiffs, but the complaints do not specifically allege that Pacorini USA engaged in those practices or that it had queues there. Some of the complaints allege that behavior by aluminum traders adversely impacted prices for aluminum, but the complaints do not allege that Pacorini USA is a trader. And the one allegation in the complaints that might conceivably be read as applicable to Pacorini USA – that warehouses agreed to follow minimum load-out rules promulgated by the London Metal Exchange ("LME") but not to load out more than the minimum – fails under *Twombly* because there is no direct evidence of such an agreement and loading out the minimum is just as consistent with lawful unilateral conduct "prompted by common perceptions of the market," *Id*. at 554, as some of Plaintiffs' own allegations explicitly (though presumably inadvertently) acknowledge.

---

[1] Pacorini USA also submits that the complaints against it should be dismissed for reasons contained in the joint motions filed by it and other Defendants. This memorandum focuses on issues of particular application to Pacorini USA.

I. <u>Applicable Law</u>

The Court is obviously familiar with *Twombly* and its progeny, and extended discussion of the applicable law would be duplicative of memoranda that will be before the Court in connection with other motions to dismiss being filed in this proceeding. But a few concepts are worth emphasizing because of their particular relevance to this motion.

The Supreme Court ruled in *Twombly* that a complaint must state a "plausible" claim for relief in order to survive a motion to dismiss. 550 U.S. at 556-57. Importantly, the Supreme Court rejected the notion that allegations in the nature of "labels," "conclusions, or "formulaic recitation[s] of the elements of a cause of action" can suffice. *Id.* at 555. This is especially important in antitrust cases because parallel conduct that is alleged to be unlawful can equally be the product of lawful unilateral decision-making. *Id*. at 554. Thus, unless a plaintiff comes forward with allegations sufficient to establish a plausible claim, the complaint must be dismissed.

The Second Circuit has followed suit. "To survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007). "The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation…. A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013) (citation omitted) ("*Citigroup*").

It follows from these cases that the allegations in a complaint must be sufficient as to a particular defendant in order for the plaintiff to proceed against that defendant. *See In re Elevator*, 502 F.3d at 50 (there must be "specification of … particular activities by any particular

2

defendant") (internal quotation marks and citation omitted); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (plaintiffs "must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy") (internal quotation marks and citation omitted).  This concept has been applied in two contexts that are particularly relevant here.

First, broad group pleading – lumping all defendants together without specific allegations tying a particular defendant to purported misconduct – does not satisfy *Twombly*.  A complaint must allege "specifics with respect to the acts of a particular defendant or defendants." *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008)*; see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("*TFT-LCD*") (a complaint need not contain "elaborate detail" but must "include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy").

Second, such groupings are also inappropriate when applied to members of the same corporate family.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *13  (N.D. Cal. Jan. 21, 2014) (dismissing complaint against U.S. subsidiaries absent adequate allegations of conscious participation by the subsidiaries in the alleged conspiracy).  Lumping together corporate affiliates under the umbrella name of the parent "is insufficient to put specific defendants on notice of the claims against them." *TFT-LCD*, 586 F. Supp. 2d at 1116, 1117.

As demonstrated below, Plaintiffs' allegations are insufficient under these standards to state a claim against Pacorini USA.

II. <u>The Complaints Should Be Dismissed as to Pacorini USA</u>

Three class action complaints and two individual complaints have been filed in this proceeding. The class action complaints have been filed on behalf of three groups: Direct Purchaser Plaintiffs ("DPPs"), ECF No. 271, Commercial End User Plaintiffs ("Commercial Plaintiffs"), ECF No. 242, and Consumer End User Plaintiffs ("Consumer Plaintiffs"), ECF No. 227; the individual actions have been filed by Mag Instrument, Inc., ECF No. 226, and Agfa Corporation/Agfa Graphics, N.V., ECF No. 272. It is logical to start with the DPP Complaint, as it is longer than the others, is filed by the group of plaintiffs claiming to be closest to the top of the distribution chain, and has the most named plaintiffs.[2]

A. <u>The Direct Purchaser Plaintiffs' Complaint Fails to State a Claim</u>

It would be an understatement to say that the DPP's allegations are focused largely upon what the DPPs call the "Goldman Defendants" and the "LME Defendants." Most of the allegations in the DPP Complaint relate to Plaintiffs' contention that the Goldman Defendants had monopoly power with respect to "warehousing LME aluminum in the Detroit Michigan area or, in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area or, in the alternative, for warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the

---

[2] The term "Direct Purchaser Plaintiffs" is certainly a misnomer in this context. The DPP Complaint alleges misconduct by warehouses (e.g., incentive payments to attract aluminum, agreements not to load out aluminum in excess of LME requirements, and creation of queues at warehouses in Detroit), but the DPPs do not allege that they purchased warehousing services from Pacorini USA or from any other defendant for that matter. Instead, the DPPs claim that they directly purchase physical aluminum (or "may have" purchased physical aluminum) from "Jane Doe Defendants" (DPP Comp. ¶¶105-115). Perhaps that is why they often refer to themselves as "First Level Purchasers" instead of direct purchasers (*see, e.g.*, DPP Comp. ¶¶9 (heading), 12).

Midwest Premium or the Platts MW premium" (DPP Comp. ¶307), and that the LME Defendants had monopoly power with respect to "[t]he market for providing exchange traded aluminum forward or futures contracts, including to approved warehouses for exchange-traded aluminum in the United States" (DPP Comp. ¶306(a)). The DPPs allege that the Goldman Defendants and the LME Defendants, along with "Jane Doe" Defendants, violated Section 2 of the Sherman Act. The DPPs also allege that the same Defendants conspired to inflate the "prices for aluminum in the United States, including, the Midwest Transaction Price, Midwest Premium or Platts premium component of prices" in violation of Section 1 of the Sherman Act (DPP Comp. ¶329). Other counts of the DPP Complaint charge the "Warehouse Defendants" with a violation of Section 1 of the Sherman Act (DPP Comp. ¶345) and charge "All Defendants" with a violation of Section 2 for monopolization, agreement to monopolize, and attempt to monopolize (although the allegations as to "Warehouse Defendants" are phrased in an ambiguous "and/or" manner) (DPP Comp. ¶¶409-410).[3]

The DPP Complaint contains numerous allegations about conduct by the Goldman Defendants and the LME Defendants. However, other than identifying Pacorini USA as a warehouse operator in the U.S. that was acquired by Glencore in 2010 (DPP Comp. ¶133-134),[4]

---

[3] The DPPs have also alleged violations of various state laws, but those allegations are addressed in joint motions being filed by Defendants.

[4] The allegations in the DPP Complaint refer variously to Defendants Glencore Xstrata, PLC, Glencore Ltd., and Pacorini entities (DPP Comp. ¶¶131-135). Then, in a catch-all definition, the DPP Complaint indicates "Glencore, Glencore Ltd., PMAG, and PMUSA are referred to herein collectively as "**Glencore**." (DPP Comp. ¶136). Thus, with respect to allegations as to "Glencore" that follow in the DPP Complaint, the DPPs mush together allegations without clearly indicating whether the allegations concern activities by Pacorini USA or some other "Glencore" entity. This effort to attribute conduct from one related entity to another without specific allegations does not satisfy a plaintiff's obligations under *Twombly*. *See* pp. 2-3, *supra*.

the next reference to Pacorini USA won't be found until ¶346 of the Complaint, which in and of itself is an indication of the paucity of allegations against Pacorini USA; and even when the DPPs do get around to Pacorini USA, there are no specific allegations as to conduct by Pacorini USA, but rather simply incorporation by reference of all the preceding allegations – allegations that do not specify conduct by Pacorini USA either.

The DPP Complaint employs a definitional sleight-of-hand to mask the absence of specific allegations against Pacorini USA. The key definition in the DPP Complaint is the definition of "Warehouse Defendants," which includes Pacorini USA but also includes entities that are not warehouses at all:

> "The Warehouse Defendants consist of the Goldman Defendants (through its wholly owned subsidiary Metro International), the JPMorgan Defendants (through its wholly owned subsidiaries Henry Bath & Son, Ltd. and Henry Bath LLC), and the Glencore Defendants (through its wholly owned subsidiary [sic] Pacorini Metals AG and Pacorini Metals, USA, LLC)." (DPP Comp. ¶346)

Through this device, the DPPs make allegations of conduct by the "Warehouse Defendants" that do not involve Pacorini USA. Thus, when the DPPs allege conduct by the "Warehouse Defendants," that is not a proxy for an allegation of conduct by Pacorini USA. Indeed, the specific allegations about conduct by the "Warehouse Defendants" often pertain to entities other than Pacorini USA:

> The DPP Complaint alleges that the "Warehouse Defendants" caused "delivery delays" (DPP Comp. ¶363), but the only specific reference is to conduct by the Goldman Defendants, and there are no specific allegations of delivery delays by Pacorini USA.

> The DPP Complaint alleges that the "Warehouse Defendants" trade in commodities as aluminum owners and trade commodities derivatives (DPP Comp. ¶¶371-372), but there are no allegations that Pacorini USA engages in trading at all, nor could there be because LME warehouses are prohibited from trading.[5]

---

[5] The LME Warehouse Notice Terms and Conditions cited by the DPPs (DPP Comp. ¶158) provide that a warehouse may not deal in contracts (i.e., trade).

And, even where the allegations are more specific, they do not pertain to Pacorini USA:

> The DPP Complaint alleges that the Goldman Defendants offered financial incentives to parties storing aluminum at their warehouses in the U.S. (DPP Comp. ¶¶35-40).  While the DPP Complaint alleges that *Pacorini BV* offered incentives at its warehouses *in the Netherlands* (DPP Comp. ¶366), there are no allegations that Pacorini USA offered incentives to store aluminum at its warehouses in the U.S.
>
> The DPP Complaint alleges that the Goldman Defendants "shuttled aluminum from warehouse to warehouse" (DPP Comp. ¶¶55-56), but there are no allegations that Pacorini USA did so.
>
> The DPP Complaint alleges that the Goldman Defendants created queues at their warehouses in Detroit that had the effect of increasing premiums for aluminum (DPP Comp. ¶384).  While the DPP Complaint alleges that there was a queue at *Pacorini BV* warehouses *in the Netherlands* (DPP Comp. ¶367), there are no allegations that there were queues for aluminum at Pacorini USA warehouses in Detroit.
>
> The DPP Complaint alleges that the Goldman Defendants changed their practices after news reports about warehousing activities (DPP Comp. ¶¶253, 257), but there are no allegations that Pacorini USA changed any of its practices.

This is reminiscent of the Sherlock Holmes story about the "dog that didn't bark."[6]  It is the absence of specific allegations about Pacorini USA that is telling here.

The DPPs do "allege that the Goldman Defendants, by themselves or with the Warehouse Defendants … agreed to and did slow the actual amounts of aluminum loaded out from LME Detroit Warehousing and prolonged the delays in removing aluminum from LME Detroit Warehousing" (DPP Comp. ¶56).  This was supposedly accomplished by an agreement to treat the *minimum* load-out requirement set by the LME as a *maximum* load-out requirement (DPP Comp. ¶168).  These allegations fail the *Twombly* test for two reasons.

First, the allegations are too general.  They lack any specificity about such an agreement.  When was it entered into:  when the LME first established a load-out rule in 2003, when the

---

[6] Arthur Conan Doyle, "Silver Blaze" (1892), *reprinted in* 1 Sherlock Holmes:  The Complete Novels and Stories 521, 544 (1986).

7

economic recession hit in 2008, when Goldman Sachs acquired its Metro warehouses in early 2010 or when Glencore acquired Pacorini in late 2010, or when the LME changed its load-out rule in 2012, or at some other time?  The DPP complaint refers to "Goldman transform[ing] its agreement, as a warehouse owner, with the LME to make **minimum** per day per city load-outs of 1,500 tons into an agreement, in times of already high storage, to make a **maximum** load-out per day per city of 1,500 tons." (DPP Comp. ¶168) (emphasis in original).  Who were the parties to the purported agreement:  just Goldman and the LME, or other warehouse entities, or their new owners?  What was the nature of the agreement:  the DPP Complaint does not allege that there were aluminum queues at all of the warehouses in the U.S., but only at the Metro warehouses in Detroit; if there were an agreement to limit load outs as the DPPs claim, wouldn't that lead to queues at more warehouses?  The answer to these questions, of course, is that one is left to guess.  And that is insufficient under *Twombly*, 550 U.S. at 565 n.10.  *See also* Citigroup, 709 F.3d at 135-36.

Second, the alleged conduct is just as consistent with unilateral behavior as with the DPPs' conclusory allegation of collusion.  Plaintiffs' own allegations establish this.  The DPP Complaint alleges that certain Defendants operated LME-approved warehouses that stored aluminum, that the warehouse operators earned rent when aluminum was stored in their warehouses, and that the Goldman Defendants made incentive payments to attract customers to store their aluminum at "Goldman's long term storage in LME Detroit Warehousing" (DPP Comp. ¶¶35-38).  Even if such allegations could be read as applicable to Pacorini USA, it is obviously in a storage company's economic interest to have its customers store their property in the company's storage facility for as long as possible because the storage company earns rent on a daily basis for as long as they do.  If the storage company has to pay incentives to persuade

8

customers to use its storage services, rather than a competitor's, that is usually called competition. And if the LME requires a storage company to load out a minimum volume of products daily, why would a storage company have an incentive to load out *more* and thereby forego rent it would otherwise earn? When the DPPs allege that other Defendants began "to mimic the Goldman/LME formula" (DPP Comp. ¶311(b)), they are conceding – presumably unintentionally – that what occurred does not indicate an agreement, but rather "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Mimicry does not violate the Sherman Act.

  The DPPs allege that warehouse owners should have competed on delivery time, i.e., loaded out more than the prescribed minimum in order to shorten delivery delays (i.e., queues) (DPP ¶369), but that is just as speculative as the allegations in *Twombly* that the local phone companies should have competed by expanding into one another's service territories. It does not take away from the fact that a storage company could logically – and unilaterally – determine that its economic interests would be best served by loading out only the minimum required by LME rules. Conduct that is just as consistent with lawful unilateral behavior as with a hypothesis of collusion is not sufficient to state a claim. *Twombly*, 550 U.S. at 554.

  Then, in their final federal claim, the DPPs charge all defendants with a violation of Section 2 of the Sherman Act for monopoly, agreement to monopolize, or attempt to monopolize (DPP Comp. ¶¶407-413). There are no factual allegations specific to this claim; the DPPs instead rely solely on conclusory statements of the elements of Section 2 offenses and on "the preceding allegations," but those allegations destroy the plausibility of this Section 2 claim. The DPPs allege throughout their Complaint that Metro – with 29 LME warehouses in Detroit – has engaged in various practices that have resulted in it having a monopoly in the Detroit area (DPP

¶¶293-296). If that is so, it is surely implausible that Pacorini USA – alleged to be one of Metro's competitors but having only two LME warehouses in Detroit – would be a party to an agreement intended to achieve a monopoly for Metro.[7] In short, this claim is factually unsupported, wholly conclusory, and implausible.

Taken as a whole – looking at the allegations as to Pacorini USA individually or collectively – the DPP Complaint cannot survive *Twombly*. The allegations as to Pacorini USA are either too few, too generalized, too conclusory, too speculative, or challenge conduct that is just as consistent with lawful unilateral behavior. The DPP Complaint against Pacorini USA should be dismissed.

B.  <u>The Other Complaints Fail to State a Claim</u>

The other complaints – filed by the Commercial Plaintiffs, the Consumer Plaintiffs, Mag Instrument, Inc., ("Mag") and Agfa Corp./Agfa Graphics N.V. ("Agfa") – fare no better. They essentially duplicate the allegations in the DPP Complaint and fail for the same reasons.

The allegations in these other complaints largely track the allegations in the DPP Complaint. There are the same allegations about delivery delays and queues (*see, e.g.*, Commercial Plaintiffs Comp. ¶¶68-69, Consumer Plaintiffs Comp. ¶110, Mag Comp. ¶¶69, 109, and Agfa Comp. ¶¶70, 110) and financial incentives (*see, e.g.*, Commercial Plaintiffs Comp. ¶74, Consumer Plaintiffs Comp. ¶99, Mag Comp. ¶63, and Agfa Comp. ¶64) but, just as in the DPP Complaint, those complaints do not contend that there were delivery delays or queues at Pacorini USA warehouses in Detroit or that Pacorini USA paid financial incentives for storage of

---

[7] *See* DPP Comp. ¶356 note 6 (citing LME List of Active Approved Warehouses). While Plaintiffs contend that the "Warehouse Defendants currently own or operate" 31 of 35 warehouses in Detroit, the LME List reveals that Metro has 29 of those 31 and Pacorini has only two.

aluminum in its LME warehouses in Detroit or anywhere else in the U.S. for that matter.  They make the same allegation that the Defendants agreed to load out only the minimum required by LME rules (*see, e.g.*, Commercial Plaintiffs Comp. ¶78, Consumer Plaintiffs Comp. ¶94, Mag Comp. ¶66, and Agfa Comp. ¶67), but the Consumer Plaintiffs explain precisely why it was in each warehouse company's unilateral interest to load out as little aluminum as possible: "Aluminum storage facilities, such as those owned by Defendants, have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum stored within their warehouses." (Consumer Plaintiffs Comp. ¶45).  *See also* Commercial Plaintiffs Comp. ¶79 ("It was in their best interest as warehouse owners to maintain the low load-out.").  In all these respects, these other complaints are not materially different from the DPP Complaint.

There are some differences in the legal claims that are asserted.  The Commercial Plaintiffs charge the Goldman Defendants and the LME (but not the other Defendants) with a violation of Section 2 of the Sherman Act (Commercial Plaintiffs Comp. ¶¶232-234).  The Commercial Plaintiffs and the Consumer Plaintiffs do not seek damages under federal antitrust laws, though they do under various state laws.  The Mag and Agfa complaints do not allege any violation of Section 2 of the Sherman Act at all, though they do allege violations of California law.  But all of the violations alleged in these complaints are based on incorporation by reference of the preceding allegations.  Thus, they stand on no firmer ground than the similar allegations in the DPP Complaint.

The Commercial Plaintiffs Complaint does, however, contain some additional allegations about activities of certain Defendants in their capacity as traders of aluminum (the "contango" allegations).  Though using terms like "Warehousing Defendants' Trading Desks" and "Trading

11

Desks of the Warehousing Defendants" to describe this activity (Commercial Plaintiffs Comp. ¶¶131-132, 134), it is clear from the specific allegations that the Commercial Plaintiffs are actually referring to trading activity by *non-warehouse* Defendants. *See, e.g.*, Commercial Plaintiffs Comp. ¶131.

None of the trading allegations involve Pacorini USA. The Commercial Plaintiffs Complaint alleges that Pacorini USA "is a leading LME warehousing company…." (Commercial Plaintiffs Comp. ¶36). It does not allege that Pacorini USA trades aluminum, and there is no allegation in the Complaint that would warrant ascribing trading activity to it.[8] Therefore, the allegations in the Commercial Plaintiffs Complaint about trading do not provide a basis for suit against Pacorini USA.

Thus, the additional complaints by the Commercial Plaintiffs, the Consumer Plaintiffs, Mag, and Agfa do not fare any better under *Twombly* than the complaint filed by the DPPs.

### III. Conclusion

The complaints against Pacorini USA should be dismissed, and dismissal should be with prejudice. The various Plaintiffs have had two bites at the apple already: in more than two dozen separate complaints they filed beginning in August 2013 and in the five amended complaints that they filed as directed by this Court on March 12. If they had a factual basis for alleging that Pacorini USA had lengthy delivery delays or queues at LME warehouses in Detroit or made incentive payments to customers storing aluminum at Pacorini USA LME warehouses in Detroit, they certainly would have done so. They cannot fix the deficiencies that plague their complaints, and dismissal of the complaints as to Pacorini USA with prejudice is therefore warranted.

---

[8] As noted previously, *see* note 5, *supra*, LME warehouses are prohibited from trading.

Dated:   April 23, 2014
         New York, New York

        /s/ John M. Nannes
John M. Nannes
(john.nannes@skadden.com)
John H. Lyons (admitted *pro hac vice*)
(john.h.lyons@skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Pacorini Metals USA, LLC*

13