**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                      :
                                                                      :
IN RE ALUMINUM WAREHOUSING                    :          MDL No. 2481
ANTITRUST LITIGATION                          :
                                              :        Master Docket No.
This Document Relates To:                     :       13-md-2481-KBF-RLE
                                              :
ALL ACTIONS                                   :
                                              :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANT THE LONDON METAL EXCHANGE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS ALL COMPLAINTS ON THE MERITS

LATHAM & WATKINS LLP
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*

Dated:  April 24, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF THE ALLEGATIONS ...............................................................2

    The LME Allegedly Conspired With Three Of Its Minority Shareholders And
    Their Warehousing Affiliates ...............................................................................2

    The LME Allegedly Conspired To Set Insufficient Warehousing Rules ............4

    The LME Allegedly Conspired To Build Up Queues At Metro's Warehouses .................5

    The LME Allegedly Conspired Not To Address The Queues Adequately ......................6

    The Alleged Conspirators' Claimed Motivation For The Conspiracy...............................7

ARGUMENT .........................................................................................................8

I.    AS A MATTER OF LAW, PLAINTIFFS HAVE NOT ALLEGED A
    CONSPIRACY BETWEEN THE LME AND ANY OF THE DEFENDANTS ...............8

    A.    Since The LME Is Not A Competitor Of The Other Defendants, Plaintiffs
        Must Allege The Legal Requirements Of A Hub-And-Spokes Conspiracy
        To State A Claim For A Horizontal Conspiracy Involving The LME ...................8

    B.    Plaintiffs Do Not Allege A Rim To Any Wheel...................................................11

    C.    The Complaints Do Not Plausibly Allege That The Other Defendants
        Controlled The LME.............................................................................................13

II.    PLAINTIFFS HAVE NOT ALLEGED FACTS THAT PLAUSIBLY SUPPORT
    THE CLAIM THAT THE LME MONOPOLIZED SOME RELEVANT MARKET ......15

    A.    Plaintiffs' Relevant Market Allegations, Such As They Are, Are Deficient.........15

    B.    Plaintiffs Do Not Explain How The LME Has Monopoly Power Even If
        They Had Alleged A Cognizable Relevant Market ...............................................16

    C.    Plaintiffs Have Not Alleged That The LME Willfully Acquired Or
        Maintained Its Alleged Monopoly Power Through Exclusionary Conduct .........18

III.    PLAINTIFFS' CLAIM THAT THE LME CONSPIRED WITH THE GOLDMAN
    DEFENDANTS IN INVENTING, MANAGING AND EXECUTING THE
    ALLEGED SCHEME THAT IS THE SUBJECT OF THESE COMPLAINTS IS
    UNTENABLE ON ITS FACE.............................................................................................18

CONCLUSION.......................................................................................................20

# TABLE OF AUTHORITIES

Page

## CASES

*Cancall PCS LLC v. Omnipoint*, *Corp.*,
    2001 WL 293981 (S.D.N.Y. Mar. 26, 2001).................................................................... 18

*Coniglio v. Highwood Services, Inc.*,
    495 F.2d 1286 (2d Cir. 1974) ............................................................................................ 18

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ............................................................................................ 12

*Hack v. President & Fellows of Yale College*,
    237 F.3d 81 (2d Cir. 2000) ................................................................................................ 17

*Howard Hess Dental Labs. Inc. v. Dentsply International, Inc.*,
    602 F.3d 237 (3d Cir. 2010) .............................................................................................. 10

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ........................................................................................ 10, 11

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) .......................................................................................................... 10

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .......................................................................................... 11

*MRO Communications, Inc. v. AT&T Co.*,
    205 F.3d 1351, 1999 WL 1178964 (9th Cir. Dec. 13, 1999) ................................................ 17

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ............................................................................................... 9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) .............................................................................................. 17

*R v. The London Metal Exch. ex parte United Co. Rusal PLC*,
    [2014] EWHC 890 (Admin) ................................................................................................ 7

*Reudy v. Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010) ............................................................................ 16

*Search International, Inc. v. Snelling & Snelling, Inc.*,
    2001 U.S. App. LEXIS 30625 (5th Cir. Dec. 5, 2001) ..................................................... 19

*Sky Angel U.S., LLC v. National Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013)..................................................................................... 15

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) ........................................................................................... 17

*Tampa Electric Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ........................................................................................... 17

*Tidmore Oil Co. v. BP Oil Co.*,
   932 F.2d 1384 (11th Cir. 1991) ......................................................................... 19

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ............................................................................... 15

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ............................................................................... 9

*United States v. E. I. Du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ........................................................................................... 16

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ..................................................................................... 16, 18

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967) ..................................................................................... 13, 14

*United States v. Topco Associates, Inc.*,
   405 U.S. 596 (1972) ........................................................................................... 14

*Vedder Software Group Ltd. v. Insurance Services Office, Inc.*,
   545 Fed. Appx. 30, 2013 U.S. App. LEXIS 21118 (2d Cir. Oct. 18, 2013) ........... 13

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*,
   540 U.S. 398 (2004) ........................................................................................... 18

*Viazis v. American Association of Orthodontists*,
   314 F.3d 758 (5th Cir. 2002) ............................................................................. 10

*Western Parcel Express v. UPS of America, Inc.*,
   190 F.3d 974 (9th Cir. 1999) ............................................................................. 17

## OTHER AUTHORITIES

ABA Section of Antitrust Law, Antitrust Law Developments (7th ed. 2012) ................. 9

# PRELIMINARY STATEMENT[1]

Plaintiffs have filed (collectively) almost 400 pages of complaint allegations. In language variously indignant and hyperbolic, plaintiffs construct a parade of horribles that supposedly caused them all to lose vast amounts of money. At the center of this drama, as they describe it, is the London Metal Exchange ("the LME"), a 140-year old commodities exchange for non-ferrous metals. Since it would be implausible in the extreme (if not impossible) for the LME to have itself caused the losses that plaintiffs are claiming, plaintiffs have identified others whom, they say, engaged with the LME in an elaborate scheme to raise the price of the physical aluminum that plaintiffs purchased in one form or another, even though the scheme, as described, has nothing to do with that market. The primary villains of the piece are alleged to be the so-called "warehouse defendants," Metro, Pacorini and Henry Bath, who store the aluminum that is the subject of the futures contracts traded on the financial market that is the LME. Since 2010, these warehouse defendants were owned by entities related to Goldman, JP Morgan and Glencore, the other set of alleged malefactors, who were 3 of 45 members of the LME (the "member defendants").

Plaintiffs allege no direct evidence of a conspiracy between the LME and either the member defendants or the warehouse defendants, and no facts that permit the inference that the LME is the hub of a conspiracy among either of the other sets of defendants. Plaintiffs also allege no facts that plausibly suggest that the LME is a sham entity, controlled by the member defendants or the warehouse defendants. Plaintiffs also fail to allege any facts defining a legally cognizable relevant market or any facts supporting a claim of monopolization. Thus, plaintiffs

---

[1]      The LME submits this motion separately because it is contemporaneously moving to dismiss all complaints on the ground that it is an instrumentality of the government of the United Kingdom and this Court lacks subject matter jurisdiction. Doc. Nos. 320-22. If the Court grants the jurisdictional motion, it need not reach the arguments presented here.

fail to state any antitrust claim against the LME as a matter of law, and their state law claims fail for the same reasons.

<u>**STATEMENT OF THE ALLEGATIONS**</u>

Plaintiffs allege the following, which the LME (reluctantly) is forced to accept as true for purposes of this motion:

**The LME Allegedly Conspired With Three Of Its Minority Shareholders And Their Warehousing Affiliates**

1.      The LME is a global commodities exchange for options and futures contracts in industrial metals, including aluminum, that is located in London, England.[2]  "As part of its business, the LME operates a global network of more than 700 approved warehouses that extends across 14 countries and 36 separate locations for the delivery, storage and collection of LME-approved brands of metal traded on the exchange, including aluminum.  LME approved warehouses are located throughout the United States."[3]

2.      LME Holdings ("Holdings") was the parent entity of the LME until defendant the Hong Kong Exchanges & Clearing, Ltd. ("HKEx") acquired the LME in December 2012.[4]

3.      Defendants Goldman Sachs, JPMorgan Chase & Co. and Glencore (the "member defendants") are firms that trade on the LME.  Collectively they owned about 20 percent of Holdings' stock until HKEx acquired the LME in December 2012.[5]

---

[2]      First Level Purchasers' ("FLP") (i.e., the so-called "Direct Purchasers") "Second Corrected Consolidated Amended Class Action Complaint" ("FLP Compl.") ¶¶ 124-25; "Commercial End Users' Corrected Consolidated Class Action Complaint" ("Commercial Compl.") ¶ 27; "Consumer End-User Cases Consolidated Amended Class Action Complaint" ("Consumer Compl.") ¶ 33; Agfa Amended Complaint ¶ 25; Mag Instrument Amended Complaint ¶ 24.

[3]      Commercial Compl. ¶ 27.

[4]      FLP Compl. ¶ 127; Commercial Compl. ¶ 28.

[5]      FLP Compl. ¶¶ 69-70, 116, 132, 137; Commercial Compl. ¶¶ 28-29, 32, 35, 78;

4.      A number of other firms that trade on the LME were also shareholders of Holdings before HKEx bought the LME, including other large financial firms like Citigroup, Merrill Lynch, UBS and Morgan Stanley.  Those firms collectively owned a larger share of Holdings than the member defendants, but none of them is alleged to be involved in the conspiracy.[6]

5.      Goldman, JPM and Glencore each purchased warehouse companies in 2010, defendants Metro International, Henry Bath and Pacorini, respectively (the "warehouse defendants").  The warehouse defendants own about 86 percent of the LME-approved aluminum warehouses in the United States.[7]

6.      Metro, Henry Bath and Pacorini had representatives on the LME's Warehousing Committee, which "recommended" warehousing policies to the LME's Executive Committee.[8] Goldman and JPM also had representatives on other LME committees.[9]

7.      Even collectively, the defendants' representatives did not constitute the majority of any of these LME committees.  For example, as plaintiffs' own cited document confirms, there were nine other companies represented on the LME's Warehousing Committee (compared to the defendants' three representatives).[10]  None of those nine other companies is alleged to be a

---

Consumer Compl. ¶¶ 20, 24, 28, 78; Agfa Compl. ¶ 25; Mag Compl. ¶ 24.

[6]      FLP Compl. ¶ 70(b); Commercial Compl. ¶ 78; Consumer Compl. ¶ 5(p).

[7]      FLP Compl. ¶¶ 122, 134, 138, 355-56; Commercial Compl. ¶ 59; Consumer Compl. ¶¶ 22, 24, 28; Agfa Compl. ¶ 55; Mag Compl. ¶ 54.

[8]      FLP Compl. ¶¶ 122, 138, 360-61; Commercial Compl. ¶ 40; Consumer Compl. ¶ 57; Agfa Compl. ¶ 25(c); Mag Compl. ¶ 24(c).

[9]      Commercial Compl. ¶¶ 42-43; Agfa Compl. ¶ 25(c); Mag Compl. ¶ 24(c).  Plaintiffs also allege that a JPM and Glencore representative joined the LME's Aluminum Committee "more recently."  Commercial Compl. ¶ 42.

[10]      *See, e.g.*, FLP Compl. ¶ 360 n.7 (citing http://www.lme.com/en-gb/about-us/corporate-structure/committee/warehousing-committee/); Consumer Compl. ¶ 57 n.1 (citing same).

conspirator.

8.      Plaintiffs do not allege that any of the warehouse or member defendants were members of the LME's Executive Committee or that they controlled the LME Board of Directors.  As the "Warehousing Committee Terms of Reference" that plaintiffs cite make clear, the Warehousing Committee has no power to implement warehousing rules.  Only the Executive Committee or the LME Board has power to do so.[11]

**The LME Allegedly Conspired To Set Insufficient Warehousing Rules**

9.      Since long before the member defendants acquired the warehouse defendants in 2010 until March 31, 2012, the LME's warehousing rules required that LME-approved warehouses load out daily at least 1,500 tons of aluminum.  This requirement (a) applied collectively to all of a warehouse company's warehouses in an area, rather than to each of the company's individual warehouses, (b) was not based on a warehouse's capacity or supply and (c) did not net out a company's load-ins.[12]

10.      This minimum load-out rule supposedly "was supported by" the member defendants "in their roles as owners of the LME and members of the LME Warehousing Committee," even though the rule was set years before they acquired the warehouse defendants.[13]

11.      The warehouse defendants (indeed all of the LME-approved warehouses) entered

---

[11]      *See, e.g*, FLP Compl. ¶ 360 n.7 (citing "Warehousing Committee Terms of Reference" at http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf); Consumer Compl. ¶ 57 n.1 (citing same).

[12]      FLP Compl. ¶¶ 31, 32(a)-(d), 163-64; Commercial Compl. ¶ 77; Consumer Compl. ¶¶ 59, 87-88; Agfa Compl. ¶¶ 67-68, 95 n.46 (citing Dustin Walsh, *Aluminum Bottleneck:  Coke's complaint: 12% of global stockpile held here, boosting prices*, Crain's Detroit Business (June 26, 2011)); Mag Compl. ¶¶ 66-67.

[13]      FLP Compl. ¶ 364; Commercial Compl. ¶ 78; Consumer Compl. ¶¶ 63, 79.

into warehousing contracts with the LME in which they agreed to abide by the LME's warehousing rules, including the load-out rule.[14]

12.     Since at least 2010, Metro warehouses in the Detroit area did not load out more than the LME's 1,500 ton daily requirement.[15]   The LME "acquiesced, consented, and otherwise agreed" to Metro's failure to load out any more than the LME rule said that it had to do.[16]

**The LME Allegedly Conspired To Build Up Queues At Metro's Warehouses**

13.     At some unspecified time (plaintiffs do not say whether it was before or after Goldman acquired Metro), Metro began paying aluminum producers incentives of up to $250 per ton to store their aluminum in its Detroit-area warehouses, rather than store it in other warehouses or sell it on the open market.[17]   The LME acquiesced in Metro's payment of these incentives.[18]

14.     Some aluminum owners received incentive payments from Metro and, as a result, sold some portion of their aluminum to traders who put it "on warrant" in the LME system.   In addition, either "JPM, Glencore, Goldman *or* the other warrant purchasers" allegedly cancelled warrants resulting in increased queues.[19]

15.     These events collectively caused a backlog or "queue" in getting aluminum out of

---

[14]     FLP Compl. ¶¶ 156, 158, 361; Consumer Compl. ¶¶ 83, 86.

[15]     FLP Compl. ¶ 168; Commercial Compl. ¶ 78; Consumer Compl. ¶ 92; Agfa Compl. ¶ 67; Mag Compl. ¶ 66.

[16]     FLP Compl. ¶ 169; Commercial Compl. ¶ 82; Consumer Compl. ¶ 84.

[17]     FLP Compl. ¶¶ 37, 212-14, 296; Commercial Compl. ¶¶ 70, 72, 193; Consumer Compl. ¶¶ 5(g), 99; Agfa Compl. ¶¶ 64-65; Mag Compl. ¶¶ 63-64.

[18]     FLP Compl. ¶¶ 35, 283(h); Commercial Compl. ¶ 70; Consumer Compl. ¶ 5(g).

[19]     FLP Compl. ¶¶ 382-83, 396-97; Commercial Compl. ¶¶ 138-40; Agfa Compl. ¶¶ 92-93; Mag Compl. ¶¶ 91-92.

Metro's warehouses.[20]  The time required to extract aluminum from Metro's warehouses in the Detroit area increased, from about six weeks in early 2009 to about 16 months in June 2013.[21]

16.     Plaintiffs do not allege that Henry Bath or Pacorini paid incentives to aluminum producers or others to store their metal in Henry Bath's or Pacorini's U.S. warehouses.  Plaintiffs also do not allege that Henry Bath or Pacorini's U.S. warehouses have ever had aluminum queues.

**The LME Allegedly Conspired Not To Address The Queues Adequately**

17.     In response to complaints from the public about the buildup of queues at Metro's warehouses, in 2010, the LME retained an independent consulting firm, Europe Economics, to analyze warehousing practices.  In May 2011, Europe Economics recommended requiring warehouse companies to load-out daily at least 1,500 tons for every 300,000 tons the company stored in a city.  That recommendation would have increased the minimum load-out in Detroit to 6,000-7,500 tons per day.[22]

18.     The LME supposedly conspired with some or all of the other defendants (plaintiffs are unclear) not to accept Europe Economics recommendation in full and to instead only increase the minimum daily load-out from 1,500 to 3,000 tons, effective April 1, 2012.[23] The LME subsequently increased the minimum daily load-out to 3,500 tons, effective April 1,

---

[20]     FLP Compl. ¶ 215; Commercial Compl. ¶ 73; Consumer Compl. ¶ 100; Agfa Compl. ¶ 70; Mag Compl. ¶ 69.

[21]     FLP Compl. ¶¶ 57(d), 160; Commercial Compl. ¶ 4; Consumer Compl. ¶¶ 70, 145; Agfa Compl. ¶ 70; Mag Compl. ¶ 69.

[22]     FLP Compl. ¶¶ 193-94; Commercial Compl. ¶ 155; Consumers Compl. ¶ 116; Agfa Compl. ¶¶ 76-81; Mag Compl. ¶¶ 75-80.

[23]     FLP Compl. ¶¶ 44-46, 198-99; Commercial Compl. ¶¶ 88, 155; Consumers Compl. ¶¶ 116, 138; Agfa Compl. ¶ 82; Mag Compl. ¶ 81.

2013.[24]

19.     In October 2012, HKEx described the queues as a "level-one issue" and, after Martin Abbott, the LME's CEO, resigned in June 2013, the LME acknowledged "the fundamental role of the queues in increasing premiums and thus creating price discovery issues," and determined it was "appropriate to take action to address this issue."[25]  The LME attempted to change its warehousing rules so that, effective April 1, 2014, LME-approved warehouses with queues of more than 50 days had to load out daily at least 1,500 tons more than they load in.[26] However, aluminum producer Rusal successfully sued the LME in the U.K. to stop the LME from implementing that rule on the ground that the LME's process for adopting the rule (not its substance) was procedurally unfair.[27]

**The Alleged Conspirators' Claimed Motivation For The Conspiracy**

20.     The warehouse defendants allegedly profited from the alleged scheme because they received more rent from the companies that had to store their aluminum longer because it was stuck in the queues.[28]

21.     The LME is said to have profited from the alleged scheme in two ways.  First, it received increased revenue from warehouses because the LME is entitled to one percent of the storage revenues that its warehouses charge.[29]  Second, the LME profited because the artificial

---

[24]     FLP Compl. ¶ 245.

[25]     FLP Compl. ¶¶ 239, 250, 263; Commercial Compl. ¶ 170; Consumers Compl. ¶ 152.

[26]     Commercial Compl. ¶¶ 171-72; *see also* FLP Compl. ¶¶ 79, 85, 252; Consumer Compl. ¶ 5(k); Agfa Compl. ¶ 104; Mag Compl. ¶ 103.

[27]     E.g., Commercial Compl. ¶ 174; see also *R v. The London Metal Exch. ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin).

[28]     FLP Compl. ¶¶ 23, 366-68, 406; Commercial Compl. ¶¶ 68-70; Consumer Compl. ¶¶ 5(b), 5(q); Agfa Compl. ¶ 110; Mag Compl. ¶ 109.

[29]     FLP Compl. ¶¶ 24, 68(a); Commercial Compl. ¶ 67; Consumer Compl. ¶¶ 5(b), 51; Agfa

increase in rent revenue caused defendant HKEx to overpay for the LME when HKEx purchased the exchange in 2012 for $2.2 billion.[30]

22.     The member defendants supposedly profited from the scheme in two ways.  First, as minority shareholders in the LME, they profited when HKEx overpaid for the company in 2012.  Second the member defendants profited through futures contract trades that exploited market conditions supposedly influenced by the queues, known as the "contango."[31]  A contango exists when futures prices are higher than current prices.[32]

## ARGUMENT

I.     **AS A MATTER OF LAW, PLAINTIFFS HAVE NOT ALLEGED A CONSPIRACY BETWEEN THE LME AND ANY OF THE DEFENDANTS**

A.     **Since The LME Is Not A Competitor Of The Other Defendants, Plaintiffs Must Allege The Legal Requirements Of A Hub-And-Spokes Conspiracy To State A Claim For A Horizontal Conspiracy Involving The LME**

The LME is not a competitor of the warehouse defendants, despite plaintiffs' repeated assertions that it engaged in "parallel conduct" with those defendants as if that were surprising in light of their contractual relationship.  Much like a franchisor in the United States, the LME has written agreements with those warehousing companies (and with many other warehousing companies throughout the world) that permit the warehousing companies to hold themselves out as LME-approved warehouses for the storage of metals that are security for the LME warrants that are traded on the exchange.[33]  In return, the warehousing companies agree to conform to the

---

Compl. ¶ 87; Mag Compl. ¶ 86.

[30]     FLP Compl. ¶¶ 26-27; Commercial Compl. ¶¶ 28, 86; Consumer Compl. ¶¶ 5(h), 102; Agfa Compl. ¶ 25(d); Mag Compl. ¶ 24(d).

[31]     FLP Compl. ¶¶ 355, 378; Commercial Compl. ¶ 5; Consumer Compl. ¶ 5(r); Agfa Compl. ¶ 61; Mag Compl. ¶ 60.

[32]     *E.g.*, FLP Compl. ¶¶ 355, 378; Commercial Compl. ¶ 5.

[33]     FLP Compl. ¶¶ 156, 158, 361; Consumer Compl. ¶¶ 83, 86.

LME's rules and other obligations of the contracts.  And certainly, the LME is not a competitor of the member defendants; those defendants, along with other financial firms and traders, owned the LME until December 2012 when they sold the LME to HKEx.  So, the sense in which plaintiffs say that the LME engaged in some kind of nefarious "parallel conduct" with these defendants is something of a mystery.

Despite the lack of a competitive relationship between the LME and any of the other groups of defendants, plaintiffs assert that all of these parties, or some combination of them, engaged in what they repeatedly describe (as if repetition would make it true) as a horizontal conspiracy in restraint of trade.  But because the LME is vertically aligned to both of the other groups of defendants, plaintiffs are attempting to allege a type of conspiracy that is actually called a "hub and spokes" or "rimmed wheel" conspiracy, in which the spokes (here, the warehouse defendants or the member defendants) have similar agreements with, or act similarly in relation to, a hub (here, the LME).  ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 20-21 (7th ed. 2012).

A rimmed wheel conspiracy requires plaintiffs to allege more than that the spokes acted in parallel fashion with the hub.  *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 109-10 (2d Cir. 2002) (affirming summary judgment where plaintiffs proved only that the hub had told all its spokes that it would uniformly enforce a policy that affected all of them and they all complied with it as a result).  The "critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other."  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).  Without evidence of a conspiratorial connection among the spokes through the hub (the "rim"), all that plaintiffs would have alleged is that the LME has individual, vertical agreements with entities that (supposedly)

acted similarly, and that allegation does not state a per se illegal horizontal conspiracy as a matter of law. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254-56 (3d Cir. 2010) (affirming dismissal of a complaint attempting to state a hub and spokes horizontal conspiracy on the ground that, without allegations connecting the spokes through the hub, all that plaintiffs had alleged were bilateral vertical agreements).

So, to allege a horizontal conspiracy involving the LME, plaintiffs have to allege facts that plausibly suggest that the spokes were in a conspiracy with each other through the LME. Antitrust conspiracies can be alleged with direct evidence (*i.e.*, evidence that "explicitly refers to an understanding between the alleged conspirators," *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002)), but plaintiffs allege no such thing here.  Instead, along with a liberal sprinkling of the words "agreed" or "agreement" (which is plainly insufficient under *Twombly*), they plead only circumstantial evidence that, they claim, is probative of a conspiracy involving all of these variously situated parties.

The Third Circuit recently undertook an exhaustive analysis of the jurisprudence on hub-and-spokes conspiracies to determine the circumstantial evidence that plaintiffs must plead in order to state one.  *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 327-36 (3d Cir. 2010).  There, analyzing the evidence that caused the Supreme Court to affirm a finding of a hub and spokes conspiracy in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), the Court of Appeals concluded that the essential predicate that plaintiffs must allege in pleading such a conspiracy is that each spoke's allegedly similar conduct with respect to the hub "would have been economically self-defeating unless the other [spokes] did the same." *Insurance Brokerage*, 618 F.3d at 331.  Finding that none of the circumstantial evidence that plaintiffs alleged (such as similar contracts between the hub and each spoke; knowledge by each spoke that each had the

same deal with the hub; similar profit motives; and communications among the parties) were against the unilateral self-interest of either the hub or each spoke, the court affirmed dismissal of the hub and spokes claim.  *Id.* at 327-36.

An examination of the complaints below shows that plaintiffs do not even come close to alleging that the spokes acted against their unilateral self-interest with respect to the allegedly conspiratorial conduct, or anything else.

### B.      Plaintiffs Do Not Allege A Rim To Any Wheel

Plaintiffs' primary complaint is that the warehouse defendants conspired with the LME to treat the minimum load-out rule as a maximum, thereby resulting in the hoarding of aluminum (in the U.S. warehouses of only one of the defendants) and allegedly affecting the price that they paid for physical aluminum.  The LME was allegedly complicit in this treatment.  But plaintiffs do not allege that the warehouse defendants' alleged decisions to treat the minimum load-out rule as a maximum were against their unilateral self-interest.  Plaintiffs actually allege the exact opposite.  They say that the warehouse defendants "have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum stored within their warehouses."[34]  There is therefore no way to distinguish between unilateral and conspiratorial conduct among the warehouses, and thus no legal basis to infer an agreement among the warehouse defendants to put a rim on the wheel.  *Insurance Brokerage*, 618 F.3d at 332  ("in the circumstances alleged here, the rationality of each [spoke's] decision to enter into a 'strategic partnership' with the [hub] does not presuppose concerted action" because "[t]he opportunity to become [the hub's] . . . 'strategic partner' was an opportunity for the [spoke] to increase output, not reduce it").  *Cf. Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048

---

[34]      Consumer Compl. ¶ 45.

(9th Cir. 2008)  (allegations that banks merely followed rules set by consortium were insufficient to state a conspiracy among the banks and the consortiums).

There is similarly no basis to conclude that any conduct of the member defendants was against their independent self-interest.  The only action that plaintiffs allege that the member defendants took with respect to the LME was to approve the adoption of, or to "support" the supposedly inadequate load-out rules.[35]   But even putting to one side the fact that the LME's load out rules were adopted well before the member defendants acquired LME warehouses and became more stringent after the acquisitions, plaintiffs allege that each firm would have its own independent financial motive to support such rules because each owned a warehousing company and plaintiffs say that the warehousing companies could obtain more rent (*i.e.*, revenue) if they loaded out less metal.[36]   Plaintiffs have thus failed to allege that the member defendants acted against their own unilateral self-interest in their dealings with the LME about the rules, so they have not alleged a conspiracy between the LME and the member defendants as a matter of law either.

In the absence of allegations that the LME is the hub of a horizontal conspiracy among the other defendants, plaintiffs have alleged at most only a series of vertical agreements, none of which are independently alleged to restrain competition[37] and therefore plaintiffs do not state a Section 1 claim as a matter of law.  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002) (plaintiff's claim that an alleged vertical conspiracy between Microsoft and two computer

---

[35]     FLP Compl. ¶ 364; Commercial Compl. ¶ 78; Consumer Compl. ¶¶ 63, 79.

[36]     FLP Compl. ¶¶ 23, 122, 134, 138; Commercial Compl. ¶¶ 59, 68; Consumer Compl. ¶¶ 5(b), 22, 24, 28, 45; Agfa Compl. ¶¶ 55, 110; Mag Compl. ¶¶ 54, 109.

[37]     Plaintiffs attempt to allege that some agreement between the LME and the Goldman defendants adversely affects competition, but that attempt fails for additional reasons.  See Section III below.

manufacturers, Compaq and Dell, was an unreasonable restraint of trade failed because plaintiff was "unable, as a matter of law, to demonstrate, that Microsoft's agreements with Compaq and Dell, when considered individually, are capable of causing any substantial harm to competition").

### C. The Complaints Do Not Plausibly Allege That The Other Defendants Controlled The LME

Somewhat contradictorily, plaintiffs appear to allege that the LME is not a separate entity capable of independently conspiring with the other defendants, but that the other defendants "controlled the LME" and caused it to adopt inadequate minimum load-out rules and otherwise to "shape LME policy and practices."[38]  Because they supposedly controlled the LME, plaintiffs claim, the defendants used the LME as an instrumentality to conspire among themselves to set the warehousing rules that they wanted and to take other actions that allegedly injured plaintiffs.

Whether any of the defendants controlled the LME is a legal conclusion, not something that the Court must accept as true as a pleaded fact.  *Vedder Software Group Ltd. v. Insurance Services Office, Inc.*, 545 Fed. Appx. 30, 32-33, 2013 U.S. App. LEXIS 21118 (2d Cir. Oct. 18, 2013) (affirming dismissal of complaint and refusing to accept as true allegations that shareholders controlled decisions of public company).  Plaintiffs' allegations do not come close to stating a claim that the LME is a mere instrumentality of other defendants, and not an independent entity.

In *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), the Supreme Court held that Sealy, a company responsible for licensing the Sealy mattress trademark, had conspired with its shareholders to allocate exclusive sales territories.  The Court concluded that Sealy was not a separate entity, but rather just an "instrumentality" of its shareholders because its shareholders

---

[38]     FLP Compl. ¶¶ 355-70; Commercial Compl. ¶ 42.

exercised total control over the company's decision making.  *Id.* at 352-54.  The shareholders owned substantially all of the company's stock and appointed every person who made decisions for the company, including every director and every executive committee member.  *Id.* at 352-53.

The Court reached a similar conclusion in *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972).  There, Topco, a buying cooperative for small grocery stores, was found to have conspired with its members to fix prices.  *Id.* at 611-12.  The members, who owned all of the cooperative's stock, had "complete and unfettered control over the operations" of the cooperative, including comprising the entire board of directors and appointing all of the company's executives.  *Id.* at 598-99.

Plaintiffs allege that the defendants "controlled" the LME based on three things: (a) prior to the LME's sale to HKEx in 2012, the defendants collectively owned 20% of Holdings' stock; (b) the defendants had representatives on the LME's Warehousing Committee, and they also participated on other LME committees such as the Aluminum Committee and the Trading Committee; and (c) the defendants collectively own approximately 86% of the LME-approved warehouses in the U.S.[39]

These allegations do not permit the legal conclusion that the LME is completely controlled by the other defendants, and therefore they do not support a claim that the LME was a conspiratorial vehicle under *Sealy* and *Topco*.  Indeed, plaintiffs' own allegations contradict the suggestion that the defendants *could* have controlled the LME.  Plaintiffs allege that other entities that are not alleged to be part of the conspiracy owned **80%** of Holdings, including

---

[39]    FLP Compl. ¶¶ 69-70, 355-61; Commercial Compl. ¶¶ 28, 40-44, 59, 78; Consumer Compl. ¶¶ 57, 78; Agfa Compl. ¶¶ 25, 55; Mag Compl. ¶¶ 24, 54.

several other large financial firms that owned at least as much of Holdings as the defendants.[40] And plaintiffs also allege that the LME committees on which the defendants sat (1) are comprised of a majority of firms not alleged to be conspirators, and (2) have no actual power to do anything except make "recommendations" to the LME's independent Executive Committee.[41] *Cf. Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013) ("[M]erely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1."). Thus, plaintiffs have not established that the case can proceed on the basis of a theory that the LME is a sham entity.

## II.   PLAINTIFFS HAVE NOT ALLEGED FACTS THAT PLAUSIBLY SUPPORT THE CLAIM THAT THE LME MONOPOLIZED SOME RELEVANT MARKET

### A.   Plaintiffs' Relevant Market Allegations, Such As They Are, Are Deficient

Plaintiffs allege that the LME monopolized a supposedly relevant market that is either (a) the market for warehousing LME aluminum in the United States or Detroit, or (b) the market for providing exchange traded aluminum forward or futures contracts, including to approved warehouses, in the United States.[42]   To plead a relevant market, plaintiffs must allege facts that permit an inference, at least, that one of those markets is plausible.  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.") (internal quotations omitted).

---

[40]   FLP Compl. ¶¶ 69-70; Commercial Compl. ¶ 78; Consumer Compl. ¶ 5(p).

[41]   FLP Compl. ¶¶ 122, 360 n.7 (citing http://www.lme.com/en-gb/about-us/corporate-structure/committee/warehousing-committee/ and "Warehousing Committee Terms of Reference" at http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf), 361.

[42]   FLP Compl. ¶ 306; Commercial Compl. ¶ 197; Consumer Compl. ¶ 158.

Plaintiffs' complaint is barren of any allegations that the LME's futures contracts offerings are not interchangeable with the contracts of other exchanges, or that no other exchange could enter the market to offer aluminum contracts secured by physical aluminum stored in their own warehouse systems.  Similarly, plaintiffs do not allege that LME-approved warehouses are not in competition with other warehouse storage facilities not affiliated with the LME.  So plaintiffs do not come close to satisfying the pleading standard for a relevant market, even if they had pled one market instead of three.  *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010) (rejecting plaintiffs' attempt to plead alternative markets and "rely on the finder of fact to work out the details of those markets later").

**B.      Plaintiffs Do Not Explain How The LME Has Monopoly Power Even If They Had Alleged A Cognizable Relevant Market**

Even if they had alleged a plausible relevant market, plaintiffs also have to allege both that the LME possesses monopoly power in that market ("the power to control prices or exclude competition" (*United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956))), and that the LME willfully acquired or maintained that power.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Plaintiffs' allegations on these issues are not remotely sufficient to state a claim because they do not say that the LME can control prices or exclude its own competition in any "market" that they assert.  Their idea that the LME has monopoly power in a "market" defined as exchange traded aluminum forward or futures contracts to approved warehouses necessarily would require plaintiffs to plausibly allege that the LME can block its own potential rivals from setting up competing futures and forward contracts supported by their own systems of approved warehouses; the complaints contain nothing to support the idea that the LME could stop a competing exchange.  Without allegations that the "market" in which the LME supposedly has

monopoly power has barriers to the entry of new competitors, plaintiffs have simply not alleged that the LME has monopoly power in that "market" at all.  *MRO Commc'ns., Inc. v. AT&T Co.*, 205 F.3d 1351, 1999 WL 1178964, at *2 (9th Cir. Dec. 13, 1999)  ("Neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent barriers to new entry or expansion.").

Similarly, plaintiffs' allegation that the LME has monopoly power in a "market" defined as the market for warehouse storage of aluminum in the United States in LME warehouses is meaningless from an antitrust standpoint.[43]  That "power" arises out of the contracts between it and the warehouses.  "Power" that arises from rights derived from contractual arrangements cannot serve as the basis for a monopolization claim.  *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000)[44] (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("Economic power derived from contractual arrangements. . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.").

---

[43]     Plaintiffs do claim that unidentified potential competitors are foreclosed from offering competing aluminum futures contracts because the three member defendants referred their transactions to the LME.  FLP Compl. ¶ 278; Commercial Compl. ¶ 183; Consumer Compl. ¶ 163.  But this does not plausibly allege the LME's market power for multiple reasons.  First, it is circular.  Plaintiffs allege that there is essentially no other option for trading aluminum futures contracts in the U.S. than the LME, so the member defendants, by definition, have to use the LME.  But that says nothing about what would happen if a competitor emerged.  Second, plaintiffs do not allege that the three member defendants control any meaningful percentage of all aluminum futures trades, so there is no way for the Court to conclude that it is plausible that their decision to use the LME inhibits the development of a competitor.  *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (arrangements adversely affect competition only if they foreclose competitors from a substantial share of the relevant market).  Finally, the Court cannot infer anything about the LME's market power from the member defendants' decision to trade on the LME because it is entirely economically rational; the member defendants were shareholders in the LME and therefore could logically decide to support its business.  *Cf. Western Parcel Express v. UPS of Am.*, 190 F.3d 974, 976 (9th Cir. 1999) (exclusive dealing contracts can constitute a barrier to entry only where they illegitimately foreclose rivals from access to customers).

[44]     *Abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

**C.    Plaintiffs Have Not Alleged That The LME Willfully Acquired Or Maintained Its Alleged Monopoly Power Through Exclusionary Conduct**

Finally, even if plaintiffs had alleged that the LME currently has monopoly power, that would not be sufficient to state a Section 2 claim.  The mere possession of monopoly power, in and of itself, is not unlawful.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407 (2004).  But plaintiffs have not alleged that the LME achieved its market position by anything other than "superior product, business acumen, or historic accident" which of course are not actionable as anticompetitive conduct.  *Grinnell Corp.*, 384 U.S. at 571.  Their claim that the LME is wilfully maintaining its "monopoly power" requires them to allege that the LME has precluded any actual or potential competitors from offering competing futures contracts supported by their own warehouse system.  A defendant's conduct is not exclusionary, and does not harm competition as a matter of law, where it does not foreclose actual or potential competitors.  *Cf. Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1291-92 (2d Cir. 1974) (no exclusionary conduct where the fact that there were no actual or potential competitors in the market was not the result of defendants' allegedly anticompetitive conduct); *Cancall PCS LLC v. Omnipoint, Corp.*, 2001 WL 293981, at *4-5 (S.D.N.Y. Mar. 26, 2001) (no anticompetitive harm where no competitor was foreclosed because of exclusionary conduct).  There is absolutely nothing in any of these complaints that supports the notion that the LME has been able to block its own rivals from offering competing contracts, and thus the monopoly claims against the LME fail as a matter of law.

**III.    PLAINTIFFS' CLAIM THAT THE LME CONSPIRED WITH THE GOLDMAN DEFENDANTS IN INVENTING, MANAGING AND EXECUTING THE ALLEGED SCHEME THAT IS THE SUBJECT OF THESE COMPLAINTS IS UNTENABLE ON ITS FACE**

In something of a "Hail Mary" pass, plaintiffs, recognizing that their allegations of an overarching conspiracy between the LME and all of the defendants that they have named are,

charitably, implausible, try one more time.  The First Level Purchasers and Commercial End Users allege that the LME was able to accomplish the nefarious scheme that they describe, solely in conspiracy with the Goldman defendants.

It is true that plaintiffs are allowed to plead claims in the alternative, but this attempt to do so borders on the absurd.  Goldman owned 9.5% of the LME before the sale to HKEx. Plaintiffs do not explain how Goldman and the LME could have collaborated to adopt load-out rules (or to do anything else, actually) without regard to the views of the other 90% of the LME's owners.  Goldman's warehousing affiliate, Metro, is not alleged to control the LME either, because, of course, plaintiffs did not allege (nor could they) that Metro separately, or even in cahoots with it ultimate parent company, could force the LME to take some action not supported by its other 44 members or its Board, none of whom are alleged to be conspirators.

Instead, plaintiffs allege that Metro obeyed the letter of the rule that the LME adopted, and the LME is alleged to have acquiesced in Metro's failure to load-out more than the rule required.  In the complete absence of plausible allegations that the rule was the result of a conspiracy with the Goldman defendants, plaintiffs are essentially alleging that the LME conspired with Metro not to force Metro to do something other than what the rule required; this is not sufficient to state a conspiracy as a matter of law.  *Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384, 1389 (11th Cir. 1991) (defendant's exercise of a unilateral right under franchise contract which precluded plaintiff from opening an additional outlet in the market area did not constitute a separate "agreement" between the two parties that could restrain trade); *Search Int'l, Inc. v. Snelling & Snelling, Inc.*, 2001 U.S. App. LEXIS 30625, at *3-4 (5th Cir. Dec. 5, 2001) (rejecting plaintiffs' claim that defendant's exercise of a contractual right pursuant to an agreement was anything other than a unilateral action).

Finally, plaintiffs' allegation that the Goldman defendants and the LME conspired to assist the other to "abuse" (whatever that means) their "monopoly power" in their "own" markets requires legally sufficient allegations of a relevant market and monopoly power and anticompetitive conduct for each of these defendants, none of which appear in these complaints.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss all federal and state[45] antitrust claims against the LME because plaintiffs have failed to state a claim against it.

Respectfully submitted,

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*

Dated:  New York, New York
        April 24, 2014

---

[45]     The LME joins in that aspect of the Joint Defendants' Brief that establishes that the pleading deficiencies of plaintiffs' claims on the merits require dismissal of the state law antitrust claims as well.  Doc. No. 317 at 53 & Appendix 1.