UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re ALUMINUM WAREHOUSING ANTITRUST LITIGATION | : : : | No. 13 MD 2481 (KBF)  CLASS ACTION |
| This Document Relates To:    ALL ACTIONS. | : : : : : : : | PLAINTIFFS' JOINT OPPOSITION TO LONDON METAL EXCHANGE'S MOTION TO DISMISS ALL COMPLAINTS ON SOVEREIGN IMMUNITY GROUNDS |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT .........................................................................................................4

        A.      The LME Is Not an Agent or Instrumentality of the United Kingdom ..................4

                1.      The United Kingdom Did Not Create the LME for a National
                        Purpose..........................................................................................5

                2.      The United Kingdom Does Not "Actively Supervise" the LME
                        Within the Meaning of the FSIA ...............................................9

                3.      The United Kingdom Does Not Require the LME to Hire Public
                        Employees and the United Kingdom Does Not Pay the Salaries of
                        LME Employees ...........................................................................11

                4.      The LME Holds No Exclusive Right.........................................11

                5.      Treatment of LME Under UK Law Does Not Transform the LME
                        Into an Agent or Instrumentality of a Foreign Sovereign .........................12

                        a.      The Two UK Decisions on Which the LME Relies Do Not
                                Demonstrate the Kind of Treatment Required for Sovereign
                                Immunity.......................................................................12

                        b.      The Limited Immunity Provided by the FSMA Does Not
                                Demonstrate the Kind of Government Treatment Required
                                for Sovereign Immunity Under the FSIA .....................................14

        B.      Even Assuming that the LME Were an Agent or Instrumentality of a
                Foreign State the Conduct Plaintiffs Challenge Falls Within the
                Commercial Activity Exception ........................................................................15

                1.      Plaintiffs' Claims Are Based Upon Commercial Activity Carried
                        on by the LME in the United States...........................................16

                2.      Plaintiffs' Claims Are Based Upon Acts Outside the United States
                        in Connection with Commercial Activity that Caused Direct
                        Effects in the United States.......................................................22

III.    CONCLUSION....................................................................................................23

- i -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adler v. Fed. Republic of Nigeria,*
    107 F.3d 720 (9th Cir. 1997) ...............................................................................21

*Alperin v. Vatican Bank,*
    360 F. App'x 847 (9th Cir. 2009) ..................................................7, 11, 12, 14

*Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.,*
    478 F.3d 274 (9th Cir. 2007) .....................................................2, 8, 9, 10

*California Dep't of Water Res. v. Powerex Corp.,*
    533 F.3d 1087 (9th Cir. 2008) .............................................................8, 9

*Commercial Bank of Kuwait v. Rafidain Bank,*
    15 F.3d 238 (2d Cir. 1994).........................................................................23

*European Cmty. v. RJR Nabisco, Inc.,*
    814 F. Supp. 2d 189 (E.D.N.Y. 2011) ..........................................................5

*European Cmty. v. RJR Nabisco, Inc.,*
    No. 11-2475-cv, 2014 U.S. App. LEXIS 7593
    (2d Cir. Apr. 23, 2014)..............................................................................9

*Filler v. Hanvit Bank,*
    378 F.3d 213 (2d Cir. 2004).................................................... *passim*

*Gates v. Victor Fine Foods,*
    54 F.3d 1457 (9th Cir. 1995) .....................................................................5

*In re 650 Fifth Avenue and Related Properties*
    881 F. Supp. 2d 533, 550 (S.D.N.Y. 2012)..............................................4

*In re 650 Fifth Ave. and Related Props.,*
    No. 08 Civ. 10934(KBF),
    2014 U.S. Dist. LEXIS 54412 (S.D.N.Y. Apr. 18, 2014)......................20

*In re Terrorist Attacks on Sept. 11, 2001,*
    538 F.3d 71 (2d Cir. 2008)........................................................................12

*Kelly v. Syria Shell Petroleum Dev. B.V.,*
    213 F.3d 841 (9th Cir. 2000) ................................................................2, 4

*Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea,*
    962 F. Supp. 2d 152 (D.D.C. 2013) ........................................................23

- ii -

**Page**

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) (Friendly, J.),
   *aff'd, Merrill Lynch Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982)...........................................................................................6

*Mireskandari v. Mayne*,
   No. CV 12-03861 JGB,
   2013 U.S. Dist. LEXIS 71221 (C.D. Cal. May 14, 2013) ....................................5, 8

*Murphy v. Korea Asset Mgmt. Corp.*,
   421 F. Supp. 2d 627 (S.D.N.Y. 2005),
   *aff'd* 190 F. App'x 439 (2d Cir. 2006)........................................................... *passim*

*Peninsula Asset Mgmt. v. Hankook Tire*,
   476 F.3d 140 (2d Cir. 2007)...............................................................................10, 12

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
   551 U.S. 224 (2007)..................................................................................................9

*Prewitt Enters. v. OPEC*,
   No. CV-00-W-0865-S,
   2001 U.S. Dist. LEXIS 4141 (N.D. Ala. Mar. 22, 2001)........................................20

*Refco, Inc. v. Galadari*,
   755 F. Supp. 79 (S.D.N.Y. 1991) ...........................................................................14

*Republic of Argentina v. Weltover*,
   504 U.S. 607 (1992)......................................................................................3, 20, 22

*Southway v. Cent. Bank of Nigeria*,
   198 F.3d 1210 (10th Cir. 1999) ..............................................................................16

*Standard Oil Co. v. United States*,
   221 U.S. 1 (1911)....................................................................................................20

*Strax v. Commodity Exch., Inc.*,
   524 F. Supp. 936 (S.D.N.Y. 1981) ..........................................................................15

*Strobl v. New York Mercantile Exch.*,
   582 F. Supp. 770 (S.D.N.Y. 1984),
   *aff'd*, 768 F.2d 22 (2d Cir. 1985) ..............................................................................6

940697_1

Page

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
  No. 97-cv-6124 (JGK),
  1999 U.S. Dist. LEXIS 7236 (S.D.N.Y. May 17, 1999),
  *aff'd* 199 F.3d 94 (2d Cir. 1999) ..........................................................................................10

*Weissman v. NASD*,
  500 F.3d 1293 (11th Cir. 2007) ..........................................................................................15

## STATUTES, RULES AND REGULATIONS

7 U.S.C.
  §5..............................................................................................................................................6
  §25(b).......................................................................................................................................6

28 U.S.C.
  §1603........................................................................................................................................4
  §1603(b)...............................................................................................................................1, 2
  §1605...................................................................................................................................3, 15
  §1605(a)(2) ..................................................................................................................... *passim*

## SECONDARY AUTHORITIES

Financial Services and Markets Act of 2000 ..........................................................................2
  §2(2)..........................................................................................................................................6
  §19.............................................................................................................................................6
  §22.............................................................................................................................................6
  §285...........................................................................................................................................6
  §287(1).....................................................................................................................................11
  §287(4).....................................................................................................................................11
  §290..........................................................................................................................................11
  §291(1) ...............................................................................................................................14, 15
  §291(3)................................................................................................................................14, 15
  §292..........................................................................................................................................11

Foreign State Immunity Act.......................................................................................... *passim*

*Cannock Chase Dist. Council v. Kelly*,
  [1978] 1 WLR 1 ......................................................................................................................15

*R (A) v. P'ships in Care Ltd.*,
  [2002] 1 WLR 2610  ..............................................................................................................12

940697_1

**Page**

*R. v. The London Metal Exch. ex parte Albatros Warehousing Ltd. BV*,
   (unpublished March 30, 2000)..................................................................................13

*R (Gamesa Energy UK Ltd.) v. The Nat'l Assembly for Wales*,
   [2006] EWHC 2167 ..................................................................................................12

*R. v. The London Metal Exch. ex parte United Co. Rusal PLC*,
   [2014] EWHC 890 ........................................................................................... *passim*

*Society of Lloyd's v. Laws & Ors*,
   [2003] EWHC 873 ....................................................................................................15

*Three Rivers Dist. Council v. Bank of Eng.*,
   [2006] EWHC 816 ....................................................................................................15

## I.     INTRODUCTION

Plaintiffs[1] respectfully submit this Joint Opposition to the London Metal Exchange's ("LME") Motion to Dismiss All Complaints on Sovereign Immunity Grounds.  Dkt. No. 321.  This Court should deny the LME's motion for two reasons.  First, the LME has not made the required prima facie showing that it is an "agen[t] or instrumentality" of the government of the United Kingdom ("UK"), as it is required to do under the Foreign State Immunity Act ("FSIA").  28 U.S.C. §1603(b).[2]  Second, even if the LME could demonstrate that it is an "agent or instrumentality" of the United Kingdom, the conduct plaintiffs challenge falls within the commercial activity exceptions specified by the FSIA.  28 U.S.C. §1605(a)(2).[3]

The LME is not an "agent or instrumentality" of the UK, under the five factor test relied upon by the Second Circuit in *Filler v. Hanvit Bank*, 378 F.3d 213, 216 (2d Cir. 2004) (the "*Filler* factors*"):

> (1)     The LME was not created by the UK government for a national purpose;
>
> (2)     The LME is not "actively supervised" by the UK government;
>
> (3)     The UK does not require the LME to hire public employees, and does not pay the salaries of LME employees;
>
> (4)     The LME holds no exclusive right in the UK; and

---

[1]     This Opposition is submitted on behalf of the Direct Purchaser Plaintiffs (class plaintiffs and direct action plaintiffs), Commercial End User Plaintiffs, and Consumer End User Plaintiffs.

[2]     The LME must first make a prima facie showing that it is an agent or instrumentality of a foreign state.  If, and only if, it makes that prima facie showing, do plaintiffs then have the "'burden of going forward'" with evidence showing that one of the FSIA exceptions applies.  *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005), *aff'd* 190 F. App'x 439 (2d Cir. 2006).  If plaintiffs come forward with sufficient evidence to carry their burden of production, the burden of persuasion shifts back to the LME, which must meet that burden by a preponderance of the evidence.  *Id.*

[3]     Plaintiffs do not believe discovery is required to defeat this motion, but should the Court find shortcomings in plaintiffs' proof, discovery is requested.

(5)    The LME's treatment under UK law does not justify treating it as an immune foreign sovereign.

*Id.* (quoting *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (9th Cir. 2000)).

Indeed, the LME does not even attempt to satisfy three of the five criteria.  It is undisputed that: (1) the UK did not "'creat[e the LME] for a national purpose'"; (2) the UK does not require the LME to hire public employees or pay the salaries of LME employees; and (3) the LME does not hold any "'exclusive righ[t]'" in the UK.[4]  *Id.*

As to the two factors that the LME does address (active supervision by the UK government and treatment under UK law), its arguments do not withstand scrutiny.  The "active supervision" cited by the LME is nothing more than the "passive oversight" rejected as insufficient in *Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279-80 (9th Cir. 2007). And contrary to the LME's overstatement of its very limited immunity under the Financial Services and Markets Act of 2000 ("FSMA"), the LME is subject to private damages suits for bad faith and other conduct like that which is alleged by plaintiffs.

Second, even if the LME demonstrates it is an "agent or instrumentality" of the United Kingdom under the *Filler* factors, the specific, warehouse-related conduct plaintiffs challenge here falls within at least two of the commercial activity exceptions specified by the FSIA.  28 U.S.C. §1603(b); 28 U.S.C. §1605(a)(2).  Plaintiffs' claims are "based upon a commercial activity carried on in the United States" by the LME, as well as an act "outside the territory of the United States in connection with a commercial activity of the [LME] elsewhere and that act causes a direct effect in

---

[4]    Here, as elsewhere, emphasis is added and citations are omitted, unless otherwise noted.  All references to "Sweeney Decl." are to the Exhibits attached to the Declaration of Bonny E. Sweeney in Support of Plaintiffs' Joint Opposition to London Metal Exchange's Motion to Dismiss All Complaints on Sovereign Immunity Grounds, filed concurrently.  All references to "Ong-Seng Decl." are to the Exhibits attached to the Declaration of Nicholas David Ong-Seng in Support of the London Metal Exchange's Motion to Dismiss All Complaints, filed April 23, 2014.

the United States." 28 U.S.C. 1605(a)(2).  Plaintiffs' claims are based on the LME's warehousing business in the United States.  Through its contractual relationships with more than 150 US warehouses and the marketing of its products and services here, the LME carried on extensive, profit-maximizing, commercial activity in the United States.  In sum, the LME's challenged conduct here is nothing like the exercise of powers "peculiar to sovereigns," which are accorded immunity under the FSIA.  *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992); 28 U.S.C. §1605.

Plaintiffs satisfy another commercial activity exception under the FSIA because the LME's unlawful agreements with the Goldman Defendants and others to provide poor load-out services, restrain large amounts of aluminum in LME Detroit Warehousing and inflate aluminum prices caused "direct effects" in the United States.[5]  These unreasonable restraints of trade:  (a) increased the prices that plaintiffs and other members of the three proposed classes paid for aluminum; (b) restrained in LME Detroit Warehousing approximately 90% of an entire year's US production of aluminum; (c) inflated the Goldman and LME Defendants' rental revenues in the US for increasingly poor services; and (d) inflated the value of the LME, thereby enriching principal shareholders of the LME including the Goldman Defendants (and JP Morgan and other United States entities) by hundreds of millions of dollars.[6]

---

[5]    *See* Second Corrected Consolidated Amended Class Action Complaint ("SCCACAC"), ¶¶3-5, 14-20, 29-34, 156-211, 223, 333, 362-364, 395-399; Commercial End Users' Corrected Consolidated Class Action Complaint ("Commercial End Users' Complaint"), ¶¶1-2, 4, 11-12, 60-61, 67-68, 70, 82, 88-90, 156-157, 188-189; Consumer End-Users' Consolidated Class Action Complaint (Dkt. No. 227); Mag Complaint, ¶¶1, 5, 6-9, 24, 47, 67, 75-86, 100; Sweeney Decl., Ex. 1 (LME's paid consultant's recommendation on reducing queues); *id.*, Ex. 2 (LME takes steps to fix queues); *id.*, Ex. 3 (Goldman discussing queues and how to fix the problem through the LME); *id.*, Ex. 4 (LME approved U.S. warehouses).

[6]    SCCACAC, ¶¶5-10, 22-28, 49-54, 69-70, 186, 197, 211, 219-223, 235, 251, 261, 276-286, 310, 317-318, 329, 332-333, 339-340, 349-353, 356-358, 371, 406; Commercial End Users' Complaint, ¶¶67-75, 86, 127, 182; Consumer End Users' Complaint, ¶¶5-9, 70-82, 99-102; Sweeney Decl., Ex. 5; Sweeney Decl., Ex. 6 ("HKEx raises $1bn after sealing LME deal," acquiring LME for

## II.   ARGUMENT

### A.   The LME Is Not an Agent or Instrumentality of the United Kingdom

The FSIA grants limited immunity to a foreign sovereign and to "an agency or instrumentality of a foreign state." 28 U.S.C. §1603. To determine whether an entity is an "agent or instrumentality" of a foreign state for purposes of FSIA immunity, the Second Circuit has adopted the following five-factor balancing test:

(1)    whether the foreign state created the entity for a national purpose;

(2)    whether the foreign state actively supervises the entity;

(3)    whether the foreign state requires the hiring of public employees and pays their salaries;

(4)    whether the entity holds exclusive rights to some right in the [foreign] country; and

(5)    how the entity is treated under foreign state law.

*Filler*, 378 F.3d at 217 (quoting *Kelly*, 213 F.3d at 846-47).

Recognizing that it does not satisfy most of the *Filler* factors, the LME urges this Court to disregard them. LME Br. at 4, 9.[7] The LME contends that its limited immunity under the FSMA alone is sufficient to justify a finding that the LME is an agent or instrumentality of a foreign state and so entitled to immunity. *Id.* However, as this Court held in *In re 650 Fifth Avenue and Related Properties*, "[n]o one factor is dispositive or should be given particular weight." 881 F. Supp. 2d 533, 550 (S.D.N.Y. 2012). Rather, "*Filler* invites district courts to engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in

---

$2.2bn); Sweeney Decl., Ex. 7 ("Valuing the London Metal Exchange" (discussing profits to LME stakeholders from fees, including rental fees)).

[7]    *See* Dkt. No. 321 (Defendant the London Metal Exchange's Memorandum of Law in Support of its Motion to Dismiss All Complaints on Sovereign Immunity Grounds) ("LME Br.").

940697_1

favor of, or against, the entity claiming FSIA immunity." *Murphy*, 421 F. Supp. 2d at 641; *see also*

*Mireskandari v. Mayne*, No. CV 12-03861 JGB (MANx), 2013 U.S. Dist. LEXIS 71221, at *26

(C.D. Cal. May 14, 2013) (whether the defendant is granted immunity in its home country "carries

little weight").   Examined as a whole, it is clear that the LME cannot tip the balance in favor of a

finding that it has made out a prima facie case for immunity.[8]

### 1.   The United Kingdom Did Not Create the LME for a National Purpose

As the LME concedes, it was not "created" by the United Kingdom government for a

"national purpose."  LME Br. at 3-4.  Rather, metal merchants established the LME in 1877 to

regulate the flow of raw materials into Great Britain.  The LME has been privately held continuously

since that time, and continues to operate for the sole purpose of advancing the private interests of its

shareholders.[9]  Not only is the LME itself a private entity; its direct parent (LME Holdings Limited)

and indirect parent (Hong Kong Exchanges and Clearing Limited) are also private.  LME Br. at 5

n.2.

The LME also fails to satisfy the "national purpose" prong of the first *Filler* factor, because

the LME was not "'created for a quintessential government purpose' such as the preservation of

countries' financial industries."  *European Cmty. v. RJR Nabisco, Inc.*, 814 F. Supp. 2d 189, 202-03

---

[8]      The LME's heavy reliance on *Mireskandari* and *Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995), is unavailing.  In *Mireskandari*, the Law Society was a "public-interest regulator" the purpose of which was to set, promote and secure "in the public interest" standards of professional performance for lawyers.  Unlike the LME, it was not a privately-owned corporation operated for the benefit of its shareholders.  *Mireskandari*, 2013 U.S. Dist. LEXIS 71221, at *27.  Similarly, in *Gates*, the Alberta Hog Producers Development Corporation was established pursuant to statute for the purpose of advancing the province's interest in marketing hogs.  54 F.3d at 1459, 1461-62.

[9]      *See, e.g.*, Sweeney Decl., Ex. 8, LME's Articles of Association, §54.1 (purpose of the LME is to "[p]romot[e] the success of the HKEx Group as a whole or any one or more members of the HKEx Group."); Sweeney Decl., Ex. 9, New Articles of Association of LME Holdings Ltd. at 8(a) (same).

- 5 -

(E.D.N.Y. 2011); *see, e.g.*, *Murphy*, 421 F. Supp. 2d at 642 (rescuing Korean financial institutions by purchasing and disposing of non-performing loans was a national purpose).

Attempting to sidestep this critical and undisputed fact, the LME asserts that it is "able to operate as an exchange today solely because the government has authorized it to do so," relying on its status as a "recognized investment exchange" under the FSMA.  LME Br. at 4-5.  But this authorization is the equivalent of an operating license.  The fact that a lawyer, a meat packing plant, a push cart peddler, or any other for-profit enterprise is authorized to conduct its business – in the UK or otherwise – provides no basis for sovereign immunity.

The FSMA merely provides an application process through which any qualified business can obtain permission to operate an investment exchange.  It requires any business that has received such permission (*i.e.*, been granted status as a "recognized investment exchange") to comply with certain rules in order to protect consumers, reduce financial crime, and maintain market confidence and financial stability.  *See, e.g.*, Ong-Seng Decl., Ex. B, FSMA, §§19, 22, 285 (prohibiting any person from engaging in a business relating to certain kinds of investments without authorization or exemption under the FSMA); *id.*, Ex. B, FSMA, §2(2) (the regulatory objectives of the Financial Services Authority, now the FCA, are market confidence, financial stability, the protection of consumers, and the reduction of financial crime).[10]  It follows that the LME is merely one of many "regulated" businesses worldwide that must operate in compliance with rules promulgated by governments. But it has never been the law that the mere existence of the regulations turns every

---

[10]   Similarly, commodity exchanges in the United States are required to be registered with the Commodity Futures Trading Commission and are the first line of prevention of manipulation. However, they are not immune from suit.  *Compare Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.), *aff'd, Merrill Lynch Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 384-85 (1982), *and* 7 U.S.C. §5 (expressly requiring registration) *with Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985), *and* 7 U.S.C. §25(b) (expressly empowering private rights of action against commodity exchanges).

regulated private business into a government instrumentality created for a national purpose.  Such a result would swallow the limited exemption of the FSIA.

Nor is the LME "charged with" protecting investors and the orderly functioning of the market, as the LME claims.  LME Br. at 6.  Rather, that duty falls to the Financial Conduct Authority ("FCA").  *See* Ong-Seng Decl., Ex. B, FSMA, Part I (description of duties of "The Regulator," now known as the FCA).  The statutory provision on which the LME erroneously relies makes clear that the FCA regulates recognized investment exchanges in order to protect investors and market stability.  *See* Ong-Seng Decl., Ex. E, Recognition Requirements for Investment Exchanges and Clearing Houses, Sch. 4(1) ("The exchange must ensure that business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors.").  But this is no different from regulation of any other commercial entity: the LME is obligated to comply with the rules established in the FSMA in order to maintain its ability to conduct its business in the UK.  *See* Ong-Seng Decl., Ex. D (the LME is a recognized investment exchange for purposes of the FSMA).

Satisfaction of the first *Filler* factor requires much more than mere permission to conduct business in a regulated environment.  In *Filler*, the Second Circuit agreed that the Korean Deposit Insurance Corporation was an organ of a foreign statute because it was formed by statute and presidential decree, it performed functions "traditionally performed by the government," had directors and its president appointed by the government, and many of its operations were overseen by the government.  378 F.3d at 217.  Similarly, in *Alperin v. Vatican Bank*, 360 F. App'x 847, 849 (9th Cir. 2009), the court found that the Vatican Bank was an agency or instrumentality of the Vatican where, among other things, it was "created by the Pope as a public and independent juridic entity that is responsible for managing assets placed in its care for the purpose of supporting

- 7 -

religious or charitable works." *See also California Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008) (defendant was owned by a government power agency, was charged with assisting that entity in marketing surplus power, played a role in treaty formation and implementation, did not pay taxes, and was required to rebate all profits to the government); *Murphy*, 421 F. Supp. 2d at 642 ("[t]here is overwhelming evidence in the record that [defendant] was established by the Republic of Korea for a national purpose, namely, to rescue Korean financial institutions"); *Mireskandari*, 2013 U.S. Dist. LEXIS 71221, at *27-*30 (although defendant was not originally formed by the government, it received its first Royal Charter in 1831, and was engaged in a "public activity to carry out a national policy of promoting a fair and well-regulated justice system that serves the public interest").

The FCA does not entitle the LME to immunity any more than the enabling statute in the Ninth Circuit's decision in *Nippon Telephone*, 478 F.3d 274 (9th Cir. 2007), entitled Nippon Telephone ("NTT") to immunity. Like the LME, NTT argued that it satisfied the first factor (*i.e.*, that it was created by the state for a national purpose) because it operated pursuant to an enabling statute. This, the Ninth Circuit held, was insufficient: "NTT contends its enabling statute obligates it to provide universal service to Japan. That statute is better understood, however, as prohibiting NTT from unilaterally terminating service to existing customers because, at its inception, NTT held a monopoly it no longer possesses." *Id.* at 279. Here too, the enabling statute on which the LME relies prohibits the LME from engaging in conduct potentially injurious to consumers and a competitive market. It does ***not*** charge the LME with carrying out any "national purpose."

The LME's commercial purpose and private ownership also weigh against a finding that it was created for a national purpose:

940697_1

> Although commercial status does not *per se* preclude finding national purpose, NTT's creation **clearly serves market ends, not a government function**, such as intervening to prevent "a public financial crisis."

*Id.* (emphasis added and in original).[11]  Like NTT, the LME's creation and continued operation

clearly serves market ends, not any government function.[12]  Thus, it is not true, as the LME asserts,

that its private status is "irrelevant" (LME Br. at 5 n.2).  Rather, that is a significant factor weighing

against a finding that it was created for a "national purpose."  *Cf., e.g., Powerex*, 533 F.3d at 1101-

02 ("'The relevant question is not *whether* Powerex earns a profit but where does that profit go?

Here it does not go to private shareholders[.]'") (quoting Justice Breyer's dissent with approval in

*Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 247 (2007)).

### 2. The United Kingdom Does Not "Actively Supervise" the LME Within the Meaning of the FSIA

The LME also fails to demonstrate that it is "actively supervise[d]" by the UK government.

A foreign state "actively supervises an organ when it appoints the organ's key officials and regulates

some of the activities the organ can undertake."  *European Cmty. v. RJR Nabisco, Inc.*, No. 11-2475-

cv, 2014 U.S. App. LEXIS 7593 at *39-*40 (2d Cir. Apr. 23, 2014).  The UK government does not

---

[11]     In sharp contrast to the LME, which is 100% privately owned, Nippon Telephone was 46% government owned.  478 F.3d at 279.

[12]     Commercial End Users' Complaint, ¶¶3, 27, 59-60, 67, 86; Mag Complaint, ¶24; Sweeney Decl., Ex. 8, LME's Articles of Association, §54.1; *id.*, Ex. 10 (The LME charges a host of fees, many of which go to its U.S. activities including rental fees, charges for transactions, annual fees for members.); *id.*, Ex. 11 (discussing increased profits of LME from increased fees); *id.*, Ex. 12 (JPMorgan owned 1.4 million shares of the LME and Goldman Sachs owned 1.23 million valued at $236.8 million and $208 million respectively); *id.*, Ex. 13 (Q:  "Does the LME profit from the warehouse system?" A: "The LME charges a stock levy on warehouse operators amounting to 1.1% of the daily rent collectable on LME warrants.  Additionally, the LME charges an annual warehouse listing fee of US $5,000 per warehouse company per good delivery point, and a one-off listing fee of US $4,000 for additional sheds. . . . It is true that more metal in LME licensed warehouses results in a higher stock levy. . . .").

appoint any of the LME's officers or directors, and no UK government officials are members of the LME board or Executive Committee.  *See* Sweeney Decl., Exs. 8, 14, 15.

Although the LME must comply with regulations by the FCA, mere regulation by a foreign government agency is not enough.  As discussed above, the FCA's regulation of the LME amounts to "passive oversight" rejected as insufficient in *Nippon Telephone*, 478 F.3d at 279-80.  Those cases that have found "active supervision" demanded much greater government involvement in the enterprise.  *See, e.g*., *Murphy*, 421 F. Supp. 2d at 643 (substantial evidence that Korea's Financial Supervision Commission directly supervised defendant, including by exercising *ex post* control over the election of the CEO, appointing or removing the state auditor, and participating in the management committee); *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-cv-6124 (JGK), 1999 U.S. Dist. LEXIS 7236 (S.D.N.Y. May 17, 1999), *aff'd* 199 F.3d 94 (2d Cir. 1999); *Peninsula Asset Mgmt. v. Hankook Tire*, 476 F.3d 140, 143 (2d Cir. 2007) (Republic of Korea not only extensively regulated the service but also appointed its governor and auditor).

Moreover, the FCA has itself publicly disclaimed any responsibility for regulating the LME, much less actively supervising it.  Shortly after the news broke about the lengthy queues at LME-approved warehouses, the FCA issued a release stating that ***"[t]he LME's warehousing arrangements are not directly regulated by the FCA*.**"  *See* Sweeney Decl., Ex. 16, FCA Statement on the London Metal Exchange (LME).  The FCA repeated that disclaimer in a recent publication, when it stated that "the operation of warehouses licensed by RIEs is not a regulated activity." Sweeney Decl., Ex. 17, FCA, *Regulating the Commodity Markets: a guide to the role of the FCA* (Feb. 12, 2014) at 4.

940697_1

### 3.    The United Kingdom Does Not Require the LME to Hire Public Employees and the United Kingdom Does Not Pay the Salaries of LME Employees

The LME also fails to satisfy the third *Filler* factor.  The UK does not require the LME to hire public employees and does not pay the salaries of LME employees.  Sweeney Decl., Exs. 8, 14, 15; *cf., e.g.*, *Alperin*, 360 F. App'x at 849 (the highest administrative level of the Bank was comprised of high-ranking government officials all appointed by the Vatican).

### 4.    The LME Holds No Exclusive Right

Nor can the LME claim that it holds any exclusive right in the UK.  The enabling statute permits "*[a]ny* body corporate or unincorporated association," including overseas applicants, to apply for an order declaring it to be a recognized investment exchange.  Ong-Seng Decl., Ex. B, FSMA, §§287(1), (4), 290, 292.  Indeed, many businesses have successfully taken advantage of that application process.  According to the FSMA website, there are currently six recognized investment exchanges in addition to the LME and nine recognized overseas investment exchanges.[13]  There are also additional metal exchanges in the UK, including the London Bullion Market and the London Platinum & Palladium Exchange.  *See generally* Sweeney Decl., Ex. 19 (London Bullion Market Association); *id.*, Ex. 20 (London Bullion Market Association, governance and regulation page, regulated under the FCA); *id.*, Ex. 21 (London Platinum & Palladium Exchange); *id.*, Ex. 22 (London Platinum & Palladium Exchange over the counter market guide, regulated under the FSA and the FSMA).

---

[13]    Sweeney Decl., Ex. 18, Recognised Investment Exchanges (are ICE Futures Europe (recognized in November 2001), BATS Trading Ltd. (recognized in July 2013), CME Europe Ltd. (recognized March 2014), ICAP Securities & Derivatives Exchange Ltd. (recognized July 2007), LIFFE Admin. and Management (RIE); and the London Stock Exchange plc (recognized November 2001).  *See id.* for Recognised Overseas Investment Exchanges.

The absence of any exclusive right is an important indicator that the LME is not an agent or instrumentality of the government of the UK.  *See*, *e.g.*, *Alperin*, 360 F. App'x at 849 (the Bank had "exclusive control over several obligations created and assigned by Vatican law"); *Murphy*, 421 F. Supp. at 644 (defendant had exclusive right to use special government fund to acquire and dispose of non-performing loans); *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 86 (2d Cir. 2008) (relief agency had exclusive right to receive and distribute charity to Bosnian Muslims); *Hankook Tire*, 476 F.3d at 143 (Cayman Islands organization had exclusive right to receive financial status reports from institutions under its supervision).

     5.     **Treatment of LME Under UK Law Does Not Transform the LME Into an Agent or Instrumentality of a Foreign Sovereign**

          a.     **The Two UK Decisions on Which the LME Relies Do Not Demonstrate the Kind of Treatment Required for Sovereign Immunity**

Under UK law, the conduct of any entity – private or public – can be challenged by means of "judicial review" if that conduct is regulatory in nature.  The inquiry is conduct-specific, and an entity may be subject to judicial review for certain kinds of conduct and not subject to judicial review for certain other kinds of conduct.  *See*, *e.g.*, *R (A) v. P'ships in Care Ltd.*, [2002] 1 WLR 2610 (decisions of private organizations contracted to carry out a public body's statutory functions may be reviewable); *R (Gamesa Energy UK Ltd.) v. The Nat'l Assembly for Wales*, [2006] EWHC 2167 (Admin) (decisions made in a commercial context that would appear to give rise to private law actions may also be judicially reviewable where they involve a sufficient element of public law).  Thus, a finding that some of the LME's conduct is subject to "judicial review" in a UK court does not mean that the UK government treats the LME as its "agent or instrumentality."

It is in this context that the LME incorrectly asserts that two UK decisions, including one that is unpublished, support its argument that its contractual relationships with warehouses outside of the

- 12 -

UK is a "public function" that justifies granting the LME sovereign immunity.  In *R. v. The London Metal Exch. ex parte Albatros Warehousing Ltd. BV* (unpublished March 30, 2000) ("*Albatros*"), the court held that the LME was performing a public function – and so subject to judicial review – when it disciplined an LME-approved warehouse that had breached contractually-imposed LME rules. Ong-Seng Decl., Ex. F (*Albatros*).  Specifically, the warehouse had issued warrants for two shipments of tin that did not meet LME standards because, among things, they were contaminated with arsenic.

Nothing in that case suggests that the alleged conduct here is the kind of regulatory/disciplinary action that would also be subject to judicial review.  Plaintiffs do not challenge the sanctions imposed by the LME on any warehouse for violating any rules.  Rather, plaintiffs challenge the LME's unlawful agreements in restraint of trade with the Goldman Defendants and others to increase the LME's warehouse rental fees and inflate the sale value of the LME by restraining aluminum supplies and deliveries, inflating aluminum prices, making false statements, and other conduct.  This can hardly be said to be "crucial to the proper conduct of investment business as well as for the LME's other functions."  Ong-Seng Decl., Ex. F, (*Albatros*), ¶28.

The *R. v. The London Metal Exch. ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin) ("*Rusal*") case provides even less support to the LME.  In that case, no party challenged the reviewability of the decision-making process at issue.  Ong-Seng Decl., Ex. G (*Rusal*), ¶3.  Thus, the statement on which the LME relies is dictum.  *Id.*; LME Br. at 9.  Moreover, even if it were not dictum, the conduct challenged by Rusal – whether the consultation process through which the LME

adopted new load-in and load-out rules was procedurally fair – was directly addressed by the enabling statute, in sharp contrast to the conduct plaintiffs challenge here.[14]

> **b.      The Limited Immunity Provided by the FSMA Does Not Demonstrate the Kind of Government Treatment Required for Sovereign Immunity Under the FSIA**

The "immunity" on which the LME relies so heavily is very limited, and is nothing like the immunity that courts employing a *Filler* analysis have found persuasive.  Under the FSMA, a recognized investment exchange is immune from "damages suits" for actions taken or omitted in the discharge of the recognized body's "[r]egulatory functions," *i.e.*, actions "relating to, or matters arising out of, the obligations to which the body is subject under or by virtue of this Act."  Ong-Seng Decl., Ex. B, FSMA §§291(1) & (3).  As this language and the LME's own cases demonstrate, legal challenges other than private suits for damages arising out of the LME's regulatory functions are ***not*** barred by the FSMA.  *Id.*; Ong-Seng Decl., Exs. F (*Albatros*) & G (*Rusal*).

This is a far cry from the broad immunity described in the cases on which the LME relies.  In *Vatican Bank*, the Bank was "immune from suit in Italy as a foreign sovereign."  *Alperin*, 360 F. App'x at 849.  In *Refco, Inc. v. Galadari*, 755 F. Supp. 79 (S.D.N.Y. 1991), the defendant, a Dubai receivership committee, was granted the same kind of immunity granted to courts in the United States.  *Id*. at 82.  Thus, even assuming FSMA immunity extended to the conduct plaintiffs challenge in this litigation, that limited-scope immunity would not be sufficient to demonstrate that the UK government treats the LME as its agent or instrumentality.

Moreover, even assuming the LME conduct plaintiffs challenge is "relating to, or matters arising out of, the obligations to which the body is subject under or by virtue of this Act," it is

---

[14]      Mag Complaint, ¶¶5-6, 75-86; Sweeney Decl., Ex. 23, FSMA Schedule 4; *see also* Ong-Seng Decl., Ex. G, ¶¶4(1), 61-63, 75 ("I have reached the above conclusion that the LME consultation was procedurally unfair . . . .").

doubtful that plaintiffs' claims would be barred in the UK under the FSMA.  Ong-Seng Decl., Ex. B, FSMA §§291(1) & (3).  *See, e.g.*, *Weissman v. NASD*, 500 F.3d 1293, 1298 (11th Cir. 2007) (NASDAQ does not enjoy immunity for "activity that is merely 'consistent with'" its delegated regulatory, adjudicatory, or prosecutorial duties.); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936 (S.D.N.Y. 1981) (holding that Congress intended the antitrust laws to apply to commodity markets).

Further, plaintiffs allege that the LME made false statements in furtherance of its agreement to restrain aluminum and inflate aluminum prices, rental revenues and the LME sales revenues, demonstrating the "bad faith" that is exempted from immunity under §291.  *Society of Lloyd's v. Laws & Ors* [2003] EWHC 873 (Comm), ¶198 ("bad faith" in §291 has a "perfectly clear meaning as a number of authorities confirm," meaning "dishonesty or lack of genuine honest belief") (citing *Cannock Chase Dist. Council v. Kelly* [1978] 1 WLR 1 ("dishonesty")); *Three Rivers Dist. Council v. Bank of Eng.* [2006] EWHC 816 (Comm) (dishonesty/deliberately doing something known to be wrong).[15]

## B.   Even Assuming that the LME Were an Agent or Instrumentality of a Foreign State the Conduct Plaintiffs Challenge Falls Within the Commercial Activity Exception

Even assuming the LME could make out a prima facie case that it is an agent or instrumentality of the UK government, the FSIA's commercial exception applies.  Under §1605, a foreign state is not immune from suit in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside

---

[15]    *See* SCCACAC, ¶¶62-65; *see also, e.g.*, Sweeney Decl., Ex. 24 ("The Exchange believes that the existing increase in delivery out rates that took effect on 1 April 2012 goes as far as is reasonable to address the effect on the aluminum market of long aluminum queues in some locations.  Such queues are the result of broader macro-economic forces at play in the aluminum industry.").

the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. §1605(a)(2).  The LME is stripped of any immunity under the first and third of these commercial activity exceptions.

### 1.  Plaintiffs' Claims Are Based Upon Commercial Activity Carried on by the LME in the United States

Because plaintiffs' claims are based upon for-profit, commercial activity carried on by the LME in the United States, the LME is not immune to suit under the FSIA.  *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1218 (10th Cir. 1999) ("'Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed.'").  Plaintiffs' claims are based on the LME's unlawful agreements with the Goldman Defendants and others to increase the LME's rental revenues from the United States and inflate the sale value of the LME for its owners (including in the United States) by providing increasingly poor services, and restraining increasingly large amounts of aluminum for increasingly long periods of time.[16]  The LME was able to enter into and benefit from these unlawful agreements because of its monopoly power, extensive contractual relationships with LME-listed warehouses in the United States, and through its many contacts with US based Goldman and JP Morgan – principal LME shareholders with 9.5% and 11.0% ownership interests, respectively – were primary decision-makers on the LME Warehousing Committee during the relevant period.[17]

---

[16]  SCCACAC, ¶¶3-5, 14-20, 29-34, 156-211, 223, 333, 362-364, 395-399; Consumer End Users' Complaint, ¶¶5-9, 70-82, 99-102; *see generally* Ong-Seng Decl., Ex. G, *Rusal* Decision Factual Background, ¶¶14-60 & ¶14 (stocks of metal accumulated in Baltimore and Detroit warehouses), & ¶15 (queues formed), & ¶16 (the queues restrained aluminum so that the owners could not access it and increased rent payments to warehouses which inflated the all-in price for aluminum).

[17]  SCCACAC, ¶¶27, 122, 138, 352, 355-370; Consumer End Users' Complaint, ¶¶49, 57, 63, 78-80; Mag Complaint, ¶¶6, 24, 86; Sweeney Decl., Ex. 25, Warehousing Committee Membership (members of the warehousing committee include Metro International Trade Services LLC, Henry

The LME is a for-profit business that generates revenues from the trading that takes place on its exchange, storage rents, and other services that it provides to persons seeking metals price risk transfer, price discovery, and metals sourcing, sale or storage.[18]  The LME devotes substantial time and resources to selling these services to individuals and businesses in the United States, through commercial conferences, "roadshows" and other appearances.[19]  A particular focus of the LME's for-profit efforts is promoting what the LME calls "our warehouses," which includes **more than 150** LME-listed warehouses operating in the United States, including defendant warehouses Metro International Trade Services, LLC, Henry Bath LLC and Pacorini Metals USA, LLC.[20]

The LME's warehousing activities in the U.S. are extensive and decidedly commercial.  As recently as March 14, 2014, for instance, the CEO of the LME admitted that the LME has an "ever-increasing number of [United States] clients," a "constant interface with [United States] regulators," and "make[s] a number of frequent trips" to the United States in service of its clients.  In order to

Bath & Son Ltd. and Glencore Xstrata, plc's subsidiary Pacorini Metals Vlissingen BV; *id.*, Ex. 26, Warehousing Committee Terms of Reference ("The Committee is responsible for . . .[c]onsidering, from a logistical perspective, and at the discretionary request of [the Executive Committee], proposals for listing or delisting LME good delivery locations" and "[m]aking recommendations to [the Executive Committee] on warehousing related policy issues.").

[18]  *Compare e.g.*, Sweeney Decl., Ex. 27 (news article discussing the LME's latest quarterly profits) *with* Sweeney Decl., Ex. 8, the LME Articles of Association, §54.1 (purpose of the LME is to "[p]romot[e] the success of the HKEx Group as a whole or any one or more members of the HKEx Group").

[19]  *See, e.g.*, SCCACAC, ¶¶63, 65, 242; Sweeney Decl., Ex. 28, The London Metal Exchange, North American Roadshow, February 2014; *id.*, Ex. 29, CRU North American Aluminum Trends 2014 (held in Miami with the LME's Head of Business Development, Matthew Chamberlain spoke). Although the Roadshow was conducted during this ongoing litigation and no doubt sanitized to portray things in the best light for the LME's legal positions, the LME expressly states there in that it is seeking to "commercialise further" and make more profits more rapidly.  Sweeney Decl., Ex. 28, February 2014 Roadshow at 38.

[20]  *See* Sweeney Decl., Ex. 30, LME Official Twitter Account ("here [is] a list of our warehouse locations"); *id.*, Ex. 28, February 2014 Roadshow at 31.

- 17 -

940697_1

"increase its physical presence and engage with clients," the LME plans to open a permanent physical office in the United States. According to LME CEO Garry Jones, in an interview he gave at the Futures Industry Association annual conference in Boca Raton, Florida: "It's something we are planning but when we press the button depends when in the year we want to do it, when people are available, and so on. It won't happen tomorrow but it will happen. . . . You can't have offices everywhere, but the LME's parent Hong Kong Exchanges & Clearing (HKEx) also works closely with the USA. The goal is to get closer to the clients. The LME is moving from a member-owned structure to a commercially international exchange, and we have to engage fully with our clients."[21]

In order to store LME-warranted metal the LME's "clients," *i.e.*, warehouse companies, must meet certain criteria established by the LME, and must be approved by the LME.[22] The approval process requires each company that seeks to become LME-licensed to submit a detailed application demonstrating that it meets all the LME-established criteria, and to submit to a physical inspection by the LME. *Id.* After a warehouse is approved and before it can store LME-warranted metal, an LME-approved warehouse must enter into a standard warehousing agreement with the LME.[23] That

---

[21]     *See* Sweeny Decl., Ex. 33, Andrea Hotter, LME Plans to Open an Office in the USA, Metal Bulletin (Mar. 14, 2014).

[22]     Ong-Seng Decl., Ex. G (*Rusal*), ¶12; Sweeney Decl. Ex. 31, LME Policy Regarding the Approval of Warehouses ("Warehouse companies will be considered for listing in an existing or new location subject to completion of a warehouse agreement application form supported by evidence of insurance, capital adequacy and other documents as detailed by the LME . . . "); Sweeney Decl., Ex. 34, London Metal Exchange Warehouse Agreement. Ong-Seng Decl., Exs. G (*Rusal*), ¶12; F (*Albatros*), ¶4 (warehouses are not members of the LME but are subject to contractual requirements).

[23]     This information is based off limited discovery conducted to date. Plaintiffs subpoenaed all the LME-approved warehouses in the US and have received some documents from those warehouses that were already produced to the CFTC. This process has been delayed slightly because of coordination efforts with defendants, after they served many of their own subpoenas. Plaintiffs have not yet received any documents form the major US aluminum warehouses, as no defendants have produced any documents to date.

standard agreement provides, among other things, detailed requirements a warehouse operator must follow in order to be approved by the LME.[24]  In addition to complying with all of the LME's requirements, the warehouse must also agree to remit 1.1 % of its rental storage fees as a "stock levy fee" to the LME.[25]  During the proposed class period, LME-approved warehouses in the United States remitted tens of millions of dollars to the LME.[26]  Thus, the LME has a direct, commercial profit interest that is positively correlated with the amount and length of time that aluminum is stored.

As a monopolist with the power to set load-in and load-out rules[27] (and with an incentive to increase rental fees by increasing load-out delays), the LME had sufficient market power to agree with Goldman and other Defendants that minimum load-out rules could be transformed (contrary to

---

[24]     *See* Sweeney Decl., Ex. 34, London Metal Exchange Warehouse Agreement at 7 (§5.1.4) ("Each Warehouse must fix its rent rates and FOT charges annually in respect of each 12 month period commencing 1 April . . . the Exchange may, at its discretion, require the Warehouse to provide within 10 Business Days, a comprehensive, written explanation of the economic circumstances which, in the view of the Warehouse, necessitate the change in its rent rates and/or FOT charges."); *id.* at 11 (§7.3.3) (allowing the LME to make records requests); *id.* (§7.3.4) (allowing the LME to conduct inspections); *id.* at 13-14 (§9.1) (requiring the payment of fees to the Exchange); *id.* at 15 (§9.3.4) ("The Exchange shall have the power to compel Warehouses to provide any information [to the LME] including, without limitation, details of all inducements paid to attract the load-in of metal, and details of the provenance of loaded-in metal, including information about metal which may have been held previously in that Warehouse, or in another facility operated by the same Warehouse or member of the Warehouse's group.  On the basis of such information, the Exchange may, at its discretion, impose additional load-out requirements on a Warehouse which the Exchange considers to have intentionally created or caused, or attempted to create or cause, a queue by the use of inducements or any other method.").

[25]     *See* LME Fees ("A stock levy fee [is] 1.10% of the daily rent collectable on LME warrants"); Ong-Seng Decl., Ex. G (*Rusal*), ¶¶63.

[26]     SCCACAC, ¶¶22-26, 203-207, 244-248, 406; Consumer End Users' Complaint, ¶51; *see also* Sweeney Decl., Ex. 4, "A Shuffle of Aluminum, but to Banks, Pure Gold," (noting that at July 2013 rates, Goldman could collect about a quarter-billion dollars in rent from aluminum alone).

[27]     *See, e.g.*, Sweeney Decl., Ex. 24, Notice from LME Chief Executive to All Members, Warehouse Companies and London Agents dated December 20, 2012 (regarding changes to LME policy for approval of warehouses in relation to loading out rates).

practice) into maximum load-out rules that would and did restrain the equivalent of up to 90% of one year's aluminum production in LME Detroit Warehousing and thereby inflated the LME's rental fees and value. This commercial conduct conjoined with this unlawful agreement – all carried out by the LME and Goldman in the United States – removes any immunity the LME would otherwise be entitled to by virtue of its purported status as an "agent or instrumentality" of a foreign state.

By entering into unlawful agreements to increase the LME's share of storage rental fees and inflate the value of the LME by increasing load-out delays and diverting to and building up, large stocks of aluminum in LME-approved warehouses, the LME was not exercising any power "'peculiar to sovereigns,'" but was performing "particular actions" in the commodities markets which are the "***type*** of actions by which a private party engages in 'trade and commerce.'" *Weltover*, 504 U.S. at 614 (emphasis in original). More particularly, "there can be no sovereign immunity" regarding "agreements to restrict output and thereby affect prices of a commodity vital to United States trade and commerce. These acts are plainly commercial in nature because they are acts that, while illegal, can be performed by private persons as well as sovereign states. Indeed, such restraints have played out during the entire history of enforcement under the Sherman Act." *Prewitt Enters. v. OPEC*, No. CV-00-W-0865-S, 2001 U.S. Dist. LEXIS 4141, at *20-*21 (N.D. Ala. Mar. 22, 2001) (citing *Standard Oil Co. v. United States*, 221 U.S. 1 (1911); *Weltover*, 504 U.S. at 613; *see also In re 650 Fifth Ave. and Related Props.*, No. 08 Civ. 10934(KBF), 2014 U.S. Dist. LEXIS 54412, at *54 (although considering attachment provisions of §1610(a)(7), noting that under §1605(a)(2) "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce," and further noting that leasing may constitute "commercial activity").

The LME may argue that the commercial activity exception does not apply because it was "performing a public function" when it adopted load-in and load-out rules governing LME-listed warehouses in the United States, relying on the *Albatros* and *Rusal* decisions. Ong-Seng Decl., Exs. F (*Albatros*) & G (*Rusal*). But as this Court has already recognized, those cases are inapposite to the commercial exception inquiry. Sweeney Decl., Ex. 32, April 25, 2014 Hrg. Tr. at 27-28, 38. Monopolists and countless other private companies in the United States impose or agree to impose detailed obligations on contracting parties that wish to do business with them. A business cannot get a loan, lease space, or accept credit cards unless it submits applications to a bank, landlord and credit card company and agrees to abide by those commercial entities' requirements. That power or agreement to impose standardized terms from which monopolist and the contracting parties profit is quintessentially commercial conduct that cannot be transformed into government regulation or government conduct by the fact that the LME was setting and collecting its rental revenues and other fees in connection with operating a market. Because the LME's conduct is ***not unique*** to sovereigns it is therefore not immune from suit. *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 725 (9th Cir. 1997) ("There is nothing uniquely sovereign about . . . a contract . . . .").[28]

---

[28]     Further, the challenged LME conduct marks a departure from the LME's pre-Class Period conduct. Prior to the Class Period, the LME acted as a storage place of last resort in a market-neutral manner. It did not agree with its warehouses to become a storage place of first resort and it did not agree with the Goldman Defendants or other warehouses to transform LME rental revenues into enormous supracompetitive profit streams by withholding aluminum and profiting on rent from customers for more than 500 days from the time load-out is requested. As a result of the LME's unlawful agreement with the Goldman Defendants and others, the large build-up of aluminum stocks during the recession did not dissipate as it had previously under normal good economic conditions. *See* charts in SCCACAC, ¶¶14, 20, 21. On the contrary, the LME aluminum stocks continued to grow during the economic recovery and directly inflated aluminum prices as a result. *Id.*; *see e.g.*, chart in SCCACAC, ¶33. Pursuant to its agreement with Goldman, the LME rejected the advice of long time LME warehouse owners, made false statements, and otherwise acted in bad faith to transform the LME into a storage place of first resort, restrain aluminum, inflate aluminum prices, and otherwise distort the markets in order to benefit the LME and its owners' financial interests in higher rent and a higher sales price for the LME. SCCACAC, ¶¶4, 5, 69.

- 21 -

    **2.**    **Plaintiffs' Claims Are Based Upon Acts Outside the United States in Connection with Commercial Activity that Caused Direct Effects in the United States**

The LME's immunity argument also fails because plaintiffs' claims are based on actions the LME took outside the United States in connection with commercial activity that caused direct effects in the United States.  28 U.S.C. §1605(a)(2).  The LME entered into an unlawful agreement (outside the United States) with the Goldman Defendants and others in order to further the LME's and its co-conspirators' commercial objectives of increasing rental revenues, and thereby the LME's sale value.

This conduct caused multiple and significant direct effects in the United States.  Because the load-out delays and stockpiling of aluminum caused actual and perceived restraints on supply, the price of physical aluminum increased.  The Midwest premium prices paid by plaintiffs and other members of the proposed classes soared to all-time highs even though supplies were at record levels, far in excess of the highs of the 1990s.  SCCACAC, ¶¶14-21; Commercial End Users' Complaint, ¶¶61, 73, 91-112.  In addition, defendants Goldman Sachs, Metro International, and JP Morgan – all incorporated in Delaware with headquarters in New York and Detroit – profited enormously from the unlawful agreements, as the LME's value was so inflated by the unlawful agreement that it was purchased in late 2012 for $2.2 billion, enriching principal shareholders and co-conspirators Goldman Sachs and JP Morgan by $208 million and $236.8 million, respectively.[29]

This unquestionably commercial activity caused direct effects in the United States, and so is not immune from suit.  *Weltover*, 504 U.S. at 614 ("[w]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions

---

[29]    SCCACAC, ¶¶69, 406; Commercial End Users' Complaint, ¶28-32, 86, 127; Sweeney Decl., Ex. 12 (JPMorgan owned 1.4 million shares of the LME and Goldman Sachs 1.23 million valued at $236.8 million and $208 million respectively).  SCCACAC, ¶¶23, 27, 50-51, 69-70, 186, 217-219, 222-223, 251, 350, 352-355, 371-383, 391, 406.

are 'commercial' within the meaning of the FSIA."). *See also Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994) (agreements that required Iraqi Banks to make payments in U.S. dollars into accounts in New York City constituted "commercial activity" with "direct effects" in the United States); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152 (D.D.C. 2013) (where defendant breached contract for legal services and those services were primarily performed in the United States, that constituted commercial activity carried on in the United States).

## III.    CONCLUSION

For all of the foregoing reasons, this Court should deny the LME's Motion to Dismiss All Complaints on Sovereign Immunity Grounds.

DATED:  May 12, 2014                   Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       BONNY E. SWEENEY
                                       CARMEN A. MEDICI


                                              s/ Bonny E. Sweeney
                                       _____
                                             BONNY E. SWEENEY

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

- 23 -

940697_1

ROBBINS GELLER RUDMAN
  &DOWD LLP
PAUL J. GELLER
MARK DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Attorneys for Direct Purchaser Plaintiffs Ampal,
Inc., Admiral Beverage, Central Aluminum
Company, Claridge Products and Equipment,
Inc., Custom Aluminum Products, Inc., Extruded
Aluminum, Inc., International Extrusions, Inc.,
Talan Products Inc., and Thule, Inc.

DATED: May 12, 2014         GRANT & EISENHOFER P.A.
LINDA P. NUSSBAUM
PETER A. BARILE III


                          s/ Linda P. Nussbaum
                          LINDA P. NUSSBAUM

485 Lexington Avenue
New York, NY 10017
Telephone: 646/722-8500
646/722-8501 (fax)

Attorneys for Direct Purchaser Plaintiffs Ampal,
Inc., Admiral Beverage, Central Aluminum
Company, Claridge Products and Equipment,
Inc., Custom Aluminum Products, Inc., Extruded
Aluminum, Inc., International Extrusions, Inc.,
Talan Products Inc., and Thule, Inc.

DATED: May 12, 2014         LOVELL STEWART HALEBIAN
    JACOBSON LLP
CHRISTOPHER LOVELL
BENJAMIN M. JACCARINO
AMANDA N. MILLER


                          s/ Christopher Lovell
                          CHRISTOPHER LOVELL

- 24 -

940697_1

61 Broadway, Suite 501
New York, NY 10006
Telephone: 212/608-1900
212/719-4677 (fax)

Attorneys for Direct Purchaser Plaintiffs Ampal,
Inc., Admiral Beverage, Central Aluminum
Company, Claridge Products and Equipment,
Inc., Custom Aluminum Products, Inc., Extruded
Aluminum, Inc., International Extrusions, Inc.,
Talan Products Inc., and Thule, Inc.

DATED:  May 12, 2014          GIRARD GIBBS LLP
                              JOHN A. KEHOE


                                 s/ John A. Kehoe
                              JOHN A. KEHOE

                              GIRARD GIBBS, LLP
                              JOHN A. KEHOE
                              711 Third Avenue, 20th Floor
                              New York, NY 10017
                              Telephone: 212/798-1059
                              212/867-1767 (fax)

                              DANIEL C. GIRARD
                              AMANDA M. STEINER
                              ADAM POLK
                              601 California Street, 14th Floor
                              San Francisco, CA 94108
                              Telephone: 405/981-4800
                              415/981-4846 (fax)

                              Attorneys for Commercial End User Plaintiff D-
                              Tek Manufacturing

- 25 -

940697_1

DATED:  May 12, 2014

KESSLER TOPAZ MELTZER & CHECK, LLP
JOSEPH H. MELTZER
KIMBERLY A. JUSTICE
TERENCE S. ZIEGLER
J. QUINN KERRIGAN


s/ Joseph H. Meltzer
JOSEPH H. MELTZER

280 King of Prussia Rd.
Radnor, PA 19087
Telephone: 610/667-7706
610/667-7056 (fax)

Attorneys for Commercial End User Plaintiff
Team Ward, Inc.

DATED:  May 12, 2014

CUNEO GILBERT & LaDUCA, LLP
JONATHAN W. CUNEO
JOEL DAVIDOW
YIFEI LI


s/ Jonathan W. Cuneo
JONATHAN W. CUNEO

507 C. Street, NE
Washington, D.C. 20002
Telephone: 202/789-3960
202/789-1813 (fax)

Attorneys for Commercial End User Plaintiffs
Welk-Ko Fabricators, Inc., *et al.*

DATED:  May 12, 2014

FINKELSTEIN THOMPSON LLP
ROSALEE B.C. THOMAS
DOUGLAS G. THOMPSON JR.


s/ Douglas G. Thompson Jr.
DOUGLAS G. THOMPSON JR.

- 26 -

940697_1

1077 30th Street, NW, Suite 150
Washington, DC 20007
Telephone:  202/337-8000
202/337-8090 (fax)

STRANGE & CARPENTER
BRIAN R. STRANGE
KEITH BUTLER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: 310/207-5055
310/826-3210 (fax)

Attorneys for Consumer Indirect Purchaser
Plaintiffs Daniel Javorsky, Brick Pizzeria LLC
and David Kohlenberg

DATED:  May 12, 2014              SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                  CHRISTOPHER M. BURKE
                                  WALTER W. NOSS


                                     s/ Christopher M. Burke
                                  CHRISTOPHER M. BURKE

                                  707 Broadway, Suite 1000
                                  San Diego, CA  92101
                                  Telephone:  619/233-4565
                                  619/233-0508 (fax)

                                  Attorneys for Individual Plaintiffs Mag
                                  Instrument, Inc. and Agfa Corp.

## ECF CERTIFICATION

The filing attorney attests that she has obtained concurrence regarding the filing of this

document from the signatories to this document.

Dated: May 12, 2014              By:_____ s/ Bonny E. Sweeney_____
                                     BONNY E. SWEENEY

- 27 -

940697_1