**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                          :
IN RE ALUMINUM WAREHOUSING                          :          MDL No. 2481
ANTITRUST LITIGATION                                :        Master Docket No.
                                                    :        13-md-2481-KBF-RLE
This Document Relates To:                           :
                                                    :
ALL ACTIONS                                         :
                                                    :
                                                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT THE LONDON METAL EXCHANGE'S**
**REPLY TO PLAINTIFFS' JOINT OPPOSITION TO ITS**
**MOTION TO DISMISS ALL COMPLAINTS ON SOVEREIGN IMMUNITY GROUNDS**


LATHAM & WATKINS LLP
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*

Dated:  May 23, 2014

## TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................................1

I.     PLAINTIFFS FAILED TO REBUT THE LME'S SHOWING THAT IT IS
PRESUMPTIVELY IMMUNE ...............................................................................1

     A.    Plaintiffs Have No Evidence To Dispute That The LME Is Charged By
Statute To Perform A Vital Public Function As An Extension Of The
Government...............................................................................................1

     B.    Plaintiffs' Effort To Downplay The LME's Treatment Under Foreign Law
Is Unavailing............................................................................................4

          1.    Plaintiffs Do Not Dispute That The UK Government Has Granted
The LME Statutory Immunity For Its Regulatory Activities.....................4

          2.    Plaintiffs Do Not Dispute That UK Law Treats The LME As A
Public Body When It Performs Its Regulatory Functions .........................5

     C.    Plaintiffs Offer Nothing To Dispute The LME's Evidence That The FCA
Actively Supervises It................................................................................7

II.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO SHOW THAT
THE COMMERCIAL ACTIVITIES EXCEPTION APPLIES...........................9

     A.    Plaintiffs Have Not Demonstrated That Their Claims Are Based On A
Commercial Activity That The LME Carried On In The United States...............10

          1.    Plaintiffs' Claims Are Based On The LME's Market Regulation,
Not Its Purportedly Commercial Conduct ..................................................10

          2.    The LME's Market Regulation Is Paradigmatic Non-Commercial
Activity .......................................................................................................12

               a.    A Foreign Sovereign's Market Regulation Is Not
Commercial Activity As A Matter Of Law ...................................12

               b.    The LME Is Regulating Its Market When It Regulates
Approved Warehouses ..................................................................14

               c.    Plaintiffs' Arguments About The LME's Supposed
Financial Motives Are Irrelevant To Whether Its Conduct
Is Commercial ..............................................................................18

i

3.     The LME's Market Regulation Takes Place In The UK, Not In The U.S. ........................................................................................................20

B.     Plaintiffs Have Not Shown That Their Claims Are Based On Conduct That The LME Engaged In Outside The U.S. That Caused A Direct Effect In The U.S. ........................................................................................................20

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adler v. Federal Republic of Nigeria,*
   107 F.3d 720 (9th Cir. 1997) ..................................................................... 17

*Alperin v. Vatican Bank,*
   360 F. App'x 847 (9th Cir. 2009)........................................................... 1, 3, 5

*Antares Aircraft, L.P. v. Federal Republic of Nigeria,*
   999 F.2d 33 (2d Cir. 1993) ....................................................................... 20

*Board of Regents of University of Texas System v. Nippon Telephone*
   *and Telegraph Company,*
   478 F.3d 274 (5th Cir. 2007) .................................................................... 3, 8

*California Department of Water Resources v. Powerex Corp.,*
   533 F.3d 1087 (9th Cir. 2008) ..................................................................... 3

*Carpenter v. Republic of Chile,*
   610 F.3d 776 (2d Cir. 2010)...................................................................... 18

*Community Finance Group, Inc. v. Republic of Kenya,*
   778 F. Supp. 2d 983 (D. Minn. 2011), *aff'd,* 663 F.3d 977 (8th Cir. 2011) ....................... 12, 13

*EIE Guam Corp. v. Long Term Credit Bank of Japan Ltd.,*
   322 F.3d 635 (9th Cir. 2003) ...................................................................... 4

*European Community v. RJR Nabisco, Inc.,*
   __ F.3d __, No. 11-2475-cv, 2014 WL 1613878 (2d Cir. Apr. 23, 2014) ................................. 8

*Gates v. Victor Fine Foods,*
   54 F.3d 1457 (9th Cir. 1995)........................................................... 3, 4, 6, 9, 10

*Good v. Fuji Fire & Marine Insurance Company, Ltd.,*
   271 F. App'x 756 (10th Cir. 2008).............................................................. 14

*Guirlando v. T.C. Ziraat Bankasi A.S.,*
   602 F.3d 69 (2d Cir. 2010) ............................................................... 10, 21, 24

*Kato v. Ishihara,*
   360 F.3d 106 (2d Cir. 2004) ..................................................................... 17

*Melton Medes Ltd. v. Securities & Investment Board,*
   [1995] Ch 137 ...................................................................................... 4

*Mireskandari v. Mayne*,
   No. CV 12-03861, 2013 WL 2041013 (C.D. Cal. May 14, 2013) .......................................... 1, 5

*Prewitt Enterprises, Inc. v. OPEC*,
   No. CV-00-W-0865-S, 2001 U.S. Dist. LEXIS 4141 (N.D. Ala. Mar. 22, 2001) .................... 17

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ........................................................................................................ 12, 18, 21

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ...................................................................................................... 9, 10, 11, 20

*Southway v. Central Bank of Nigeria*,
   198 F.3d 1210 (10th Cir. 1999) ................................................................................................ 17

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*,
   204 F.3d 384 (2d Cir. 2000) ...................................................................................................... 20

*Tucker v. Whitaker Travel, Ltd.*,
   620 F. Supp. 578 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1140 (3d Cir. 1986) .................................. 13

*USX Corp. v. Adriatic Insurance Co.*,
   345 F.3d 190 (3d Cir. 2003) ........................................................................................................ 4

*Virtual Countries, Inc. v. Republic of South Africa*,
   300 F.3d 230 (2d Cir. 2002) .............................................................................................. 9, 21, 24

## STATUTES

28 U.S.C. § 1603(d) ...................................................................................................................... 18

28 U.S.C. § 1605(a)(2) .................................................................................................................. 10

Plaintiffs have not come close to rebutting the LME's prima facie showing that it is an agency or instrumentality of the government of the United Kingdom entitled to presumptive immunity from suit in the U.S. under the Foreign Sovereign Immunities Act (the "Immunities Act").  Nor have plaintiffs met their burden to come forward with sufficient evidence to show that the commercial activities exception applies to the LME's conduct at issue in this case. Plaintiffs have not shown that their claims are "based on" any commercial conduct in which the LME engaged in the U.S., nor have they shown that the LME's challenged conduct outside the U.S. caused a "direct effect" on them in the U.S.  The Court should dismiss all claims against the LME for lack of subject matter jurisdiction.

## ARGUMENT

I.   **PLAINTIFFS FAILED TO REBUT THE LME'S SHOWING THAT IT IS PRESUMPTIVELY IMMUNE**

   A.   **Plaintiffs Have No Evidence To Dispute That The LME Is Charged By Statute To Perform A Vital Public Function As An Extension Of The Government**

Plaintiffs argue, without any evidence, that the government of the United Kingdom has not charged the LME with performing any national purpose, and that it instead merely granted the LME a license to operate that is no different from "a lawyer, a meat packing plant, [or] a push cart peddler."[1]  Plaintiffs' Joint Opposition to London Metal Exchange's Motion to Dismiss All Complaints on Sovereign Immunity Grounds ("Opp.") at 6.  Plaintiffs dispute that the LME

---

[1]      Plaintiffs also make much of the fact that the UK government did not originally "create" the LME in 1877.  Opp. at 5.  But the Court must assess organ status at time of suit, not at the time an entity was created.  <u>Alperin v. Vatican Bank</u>, 360 F. App'x 847, 850 (9th Cir. 2009).  The UK government did not "create" the Law Society of England and Wales either, and it was found to have sovereign immunity because subsequently passed statutes imposed public function obligations on it.  <u>Mireskandari v. Mayne</u>, No. CV 12-03861, 2013 WL 2041013, at *10 (C.D. Cal. May 14, 2013)</u> (Solicitors created the Law Society in 1825, but the UK statutory obligations imposed in 1974.).  The FSMA similarly imposed public functions upon the LME.

is statutorily charged with maintaining the orderly function of the market or with protecting investors on the exchange; they say that only the Financial Conduct Authority ("FCA") has these responsibilities, not the LME.  Opp. at 7.  The Court does not need to look any further than the governing legislation itself to easily dispose of this argument.

The Recognition Requirements, promulgated by the UK Treasury, expressly charge **the LME** with "protect[ing] the orderly functioning of the market and the interests of investors" on the exchange.[2]  To be sure, the FCA also has a statutory obligation to maintain market confidence and financial stability,[3] but the LME, as a Recognised Investment Exchange ("RIE"), has its own separate obligations to regulate its market.

Plaintiffs dispute that the LME is a market regulator, and instead claim that it merely has "permission to conduct business in a regulated environment."  Opp. at 7.  But their own evidence directly contradicts this claim.  The FCA itself expressly states that "RIEs are considered the front-line regulators of the markets they operate."[4]  And the legislative history of the Financial Services and Markets Act 2000 ("FSMA") confirms that, through the regulatory scheme, the FCA actually delegates some of its responsibility for maintaining market confidence and financial stability to the RIEs.[5]  Indeed, it is for this reason that the UK government decided to

---

[2]     Declaration of Mark Bradley (May 22, 2014) ("Bradley Decl."), Ex. E, Financial Services and Markets Act of 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001 (2001/995), sch. ¶¶ 4(1), (2), as amended ("Recognition Requirements"); *see also* Declaration of Nicholas David Ong-Seng (Apr. 17, 2014) ("Ong-Seng Decl."), Ex. E (same); LME's Memorandum of Law in Support of Motion to Dismiss All Complaints on Sovereign Immunity Grounds ("Mem.") at 4-6.

[3]     Bradley Decl., Ex. B, Financial Services and Markets Act 2000, as amended, §§ 2-6.

[4]     Declaration of Bonny E. Sweeney (May 12, 2014) ("Sweeney Decl."),  Ex. 17 at 4; *see also* Bradley Decl. ¶ 46, Ex. L, FCA, Regulating the Commodity Markets: A Guide To the Role of the FCA at 4 (same).

[5]     Bradley Decl., Ex. C, Financial Services and Markets Bill, comments of Lord McIntosh of Haringey, HL Deb 30 March 2000, vol 611, col 975.

give RIEs the exact same level of statutory immunity from suit that the FCA itself possesses.  *Id.,* Ex. D, Financial Services and Markets Bill, comments of Lord Fraser of Carmyllie, HL Deb 16 March 2000, vol 610, col 1785-1786 (stating that, because part of the FCA's statutory obligations are "discharged" by the RIEs, the RIEs should have the same level of statutory immunity as the FCA); *compare* Bradley Decl., Ex. B, FSMA § 291 (immunity for RIEs) *with id.*, sch. 1ZA ¶ 25 (immunity for FCA).[6]

Contrary to plaintiffs' claim (Opp. at 8-9), it does not matter that the LME is privately owned or that it may perform some commercial functions in addition to its statutorily-mandated public market regulation functions.[7]  An entity's "involvement in commercial affairs does not automatically render [it] non-governmental."  *Alperin v. Vatican Bank*, 360 F. App'x 847, 849-50 (9th Cir. 2009) (Vatican bank was entitled to immunity even though it engaged in some commercial activity.); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995) (same for Alberta Pork board).  The Court must look at the picture holistically, *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1102 (9th Cir. 2008), and, here, the holistic picture is that the

---

[6]     *Board of Regents of University of Texas System v. Nippon Telephone and Telegraph Company*, 478 F.3d 274, 279 (5th Cir. 2007) ("*Nippon Telephone*") is inapposite.  No statute charged Nippon with performing a public function.  To the contrary, the statute required Nippon to perform a *commercial* function in *competition* with other telephone companies because Nippon had previously been a monopolist.  *Id.*

[7]     Plaintiffs falsely claim that the LME's Articles of Association state that its purpose is to promote its ultimate parent HKEx.  *E.g.*, Opp. at 5 n.9.  But the section of the document they cite is about duties of Directors and it merely says that *one* goal of the LME "*may*, if and to the extent that the Directors consider it appropriate . . . *include* promoting the success of the HKEx Group."  Sweeney Decl. Ex. 8 ¶ 54.1 (emphasis added).  Plaintiffs cite no evidence that the LME Board has ever adopted this purpose, and they ignore that the rest of the section makes clear that, even if adopted, that goal cannot "override any duties of the Directors under applicable law or regulations," *id.*, which of course would include the FSMA and the Recognition Requirements, not to mention the Directors' duties under the UK Companies Act 2006.

UK government has made very clear that it has charged the LME with performing a vital public function.[8]

**B.    Plaintiffs' Effort To Downplay The LME's Treatment Under Foreign Law Is Unavailing**

**1.    Plaintiffs Do Not Dispute That The UK Government Has Granted The LME Statutory Immunity For Its Regulatory Activities**

Plaintiffs cannot dispute that the UK government has granted the LME statutory immunity from suits for damages based on its regulatory activities.  Instead, they seek to downplay the importance of that immunity by claiming that it is limited to the LME's performance of its regulatory functions and does not apply if the LME acted in "bad faith."[9] Opp. at 14-15.  But plaintiffs ignore that the UK government placed those same limitations (which are common and uncontroversial) on the identical immunity that it granted to the FCA itself.  *Compare* Bradley Decl., Ex. B, FSMA § 291 (immunity for RIEs) *with id.*, sch. 1ZA ¶ 25 (immunity for FCA).  Indeed, the statutory immunity that the Ninth Circuit found compelling in *Gates* was limited to acts performed "in good faith."  *Gates*, 54 F.3d at 1461.

---

[8]    Because the Court must analyze the LME holistically, it is irrelevant that the LME holds no exclusive right and that the UK government does not pay its employees' salaries.  Opp. at 11-12.  Courts have held that an entity "may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants."  *See, e.g.*, *EIE Guam Corp. v. Long Term Credit Bank of Japan Ltd.*, 322 F.3d 635, 641 (9th Cir. 2003) (citations omitted); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 212-13 (3d Cir. 2003) (Irish insurance company was an organ under the Immunities Act despite not being required to hire public employees.).  And numerous cases have found organ status without evidence that the foreign entity possessed exclusive rights.  *See, e.g.*, *USX*, 345 F.3d at 213 (Irish insurance company was an organ under the Immunities Act despite the fact that the company had "no special obligations or privileges under Irish law.").

[9]    The Court need not resolve whether the conduct that plaintiffs allege here would constitute "bad faith" within the meaning of UK law because that is not relevant to whether the LME is an organ of the UK government within the meaning of the Immunities Act.  Nonetheless none of the UK cases that plaintiffs cite (Opp. at 15) suggests that the conduct at issue here would qualify as "bad faith."  Indeed, none of those cases even deals with the application of Section 291 of the FSMA or its precursor; only the case that the LME cited does that.  *See* Mem. at 9 (citing *Melton Medes Ltd. v. Sec. & Inv. Bd.* [1995] Ch 137).

Plaintiffs have not cited and the LME is not aware of any case that has ever denied organ status to a foreign entity whose own home country has granted it *any* form of statutory immunity. That is because there is perhaps no better indication that the foreign government views an entity as performing a public function than its grant of statutory immunity to it. *Id.* (Statutory immunity from suit is a "protection normally afforded to governmental actors."). Again, the legislative history is instructive. The UK government granted the LME statutory immunity because "[l]ike the FSA [now FCA], the exchanges will have to take difficult regulatory decisions, sometimes very rapidly and perhaps without all the information about a situation which subsequently will be available . . . . They need to be able to devote their mind to the proper running of the market and not to be distracted by legal action."[10]

Plaintiffs' suggestion that *Mireskandari* found that "whether the defendant is granted immunity in its home country 'carries little weight'" is disingenuous. Opp. at 5. That court was merely explaining that the *absence of immunity under UK law* did not preclude it from finding that the Law Society was an organ under the Immunities Act. *Mireskandari*, 2013 WL 2041013, at *9. And, of course, it is irrelevant that U.S. exchanges may not have statutory immunity under U.S. law (cases cited Opp. at 6 n.10, 15) because "[a] showing of organ status may be based exclusively on foreign law." *Alperin*, 360 F. App'x at 849-50.

### 2.      Plaintiffs Do Not Dispute That UK Law Treats The LME As A Public Body When It Performs Its Regulatory Functions

Plaintiffs argue that *Albatros* and *Rusal* "do not demonstrate the kind of treatment required for sovereign immunity" because those cases merely confirm that the LME can be subject to judicial review as a public body when it performs regulatory functions, but, plaintiffs

---

[10]      Bradley Decl., Ex. C, Financial Services and Markets Bill, comments of Lord McIntosh of Haringey, HL Deb 30 March 2000, vol 611, cols 972-973.

say, the conduct at issue in their complaint is not regulatory.  Opp. at 12-14.  Plaintiffs miss the point.  Whether the conduct at issue in this case qualifies as market regulation or commercial activity is irrelevant to the question of whether the LME is as an agency or instrumentality of the UK government.   That question is relevant to whether the commercial activities exception applies (and as discussed below it does not), but it has nothing to with the issue of organ status in the first instance.  *Gates*, 54 F.3d at 1461 (Fact that entity engaged in some commercial conduct does not preclude finding of organ status.).   The organ status inquiry asks whether the UK government treats the LME like a public body.  *Albatros* and *Rusal* confirm that it does when the LME is performing its important public function to regulate its market.

Plaintiffs attempt to distinguish *Albatros* because that case involved judicial review of the LME disciplining one of its approved warehouses.  Opp. at 13.  But plaintiffs ignore the key aspect of *Albatros*:  in order to determine whether the LME was subject to judicial review at all, the court first had to determine "whether *the regulation of warehouses*, at least as regards the issue of warrants, is sufficiently connected with [its] public function to bring it within the scope of judicial review, *or* whether it relates only to the LME's other functions *and is directed only at the protection of the commercial interests of the LME.*"[11]  The court held that the LME was subject to judicial review because the conduct was not commercial and instead was a regulatory "function that can properly be said to be woven into a system of government control of investment business or integrated into a system of statutory regulation."  Bradley Decl., Ex. Q, *Albatros*, ¶ 27. Indeed, the court held that the LME would be in violation of its statutory obligations if it failed properly to regulate approved warehouses.  *Id.* ¶ 28.

---

[11]     Bradley Decl., Ex. Q, *R v. The London Metal Exch. Ltd. ex parte Albatros Warehousing Ltd. BV* (unpublished Mar. 30, 2000) ("*Albatros*"), ¶ 28  (emphases added).

And, in *Rusal*, the court undertook judicial review of the LME's promulgation of the very same load-out rule that is at the heart of plaintiffs' complaint here.[12]   Plaintiffs dismiss this as immaterial because no party challenged whether that regulatory conduct was subject to judicial review.[13]  Opp. at 13.  But no one challenged that issue—including the court itself which surely could have done so—because *Albatros* is settled law in the UK.  It is so obvious in the UK that the LME's regulation of approved warehouses is a public regulatory function subject to judicial review, that the UK Court of Appeal, the UK's second highest court, recently granted the LME an expedited appeal of the *Rusal* decision because of the "onerous obligations" the decision places on a "*public body* conducting a consultation on complex issues in a politically sensitive area . . . as LME did in [that] case."[14]  Lord Justice Rupert Jackson of the Court of Appeal stated that the LME has a "real prospect of success" on its appeal.  *Id.*

### C.    Plaintiffs Offer Nothing To Dispute The LME's Evidence That The FCA Actively Supervises It

Plaintiffs argue that the FCA does not actively supervise the LME (Opp. at 9-10), but they offer no evidence to dispute the LME's evidence that the FCA closely and continuously supervises the LME through two fulltime dedicated case officers (and their managers), standing monthly meetings, requests for detailed reports, and almost-daily inquiries to which the LME must respond.  Mem. at 11-12 (citing Ong-Seng Decl. ¶¶ 16-20); *see also* Bradley Decl. ¶¶ 47-49.  The FCA's own REC Sourcebook describes its active supervision of RIEs.  Bradley Decl.

---

[12]    Bradley Decl., Ex. R, *R (on the application of United Company Rusal Plc) v. The London Metal Exch.* [2014] EWHC 890 (Admin), ("*Rusal*").

[13]    It is unclear what plaintiffs mean when they say that the conduct at issue in *Rusal* was "directly addressed by the enabling statute" as their citation to Schedule 4 of the FSMA, which governs a "treaty firm," has nothing to do with the LME.  *See* Opp. at 14 & n.14 (citing Sweeney Decl. Ex. 23).

[14]    Bradley Decl., Ex. BB, *The Queen on the Application of United Company Rusal v. The London Metal Exch.*, No. C1/2014/1404 (May 14, 2014) (emphasis added).

¶ 47, Ex. M, FCA REC Sourcebook § 4.  This active supervision is nothing like the "passive" oversight at issue in *Nippon Telephone*, 478 F.3d at 279-80, or any of the other cases that plaintiffs cite.

Plaintiffs' claim that "the FCA has itself publically disclaimed any responsibility for regulating the LME, much less actively supervising it" (Opp. at 10) is completely false.  The FCA merely has stated that it does not "directly" regulate LME-approved warehouses, but the FCA has not and could never disclaim responsibility for directly regulating and supervising the LME itself—the FCA's obligation to do so is set forth in its enabling statute.[15]  The FCA's statutorily-mandated supervision of the LME includes its active supervision of the LME's regulation of approved warehouses.  Bradley Decl. ¶¶ 43-49.  Again, plaintiffs' own evidence directly contradicts its argument that the FCA has disclaimed responsibility for supervising the LME.  The very first sentence of the FCA statement that plaintiffs selectively quote (Opp. at 10) says:  "The FCA *supervises* the London Metal Exchange (LME) as part of its oversight of recognised investment exchanges."  Sweeney Decl., Ex. 16 (emphasis added); *see also id.*, Ex. 18 ("The FCA recognises and supervises a number of Recognised Investment Exchanges (RIE) under the Financial Services and Markets Act 2000.").  And the FCA guide that plaintiffs cite makes clear that the FCA's principle focus is on supervising three RIEs, including the LME.  *Id.*, Ex. 17 at 3-4, 5.  In fact, the FCA's REC Sourcebook is dedicated to how it assesses whether the RIEs are complying with their statutory obligations, including to maintain an orderly market.[16]

The active supervision "factor does not require the foreign state to micro-manage every aspect of the organ's activities."  *European Cmty. v. RJR Nabisco, Inc.*, __ F.3d __, No. 11-

---

[15]   *E.g.,* Bradley Decl., Ex. B, FSMA § 3; *see also id.* §§ 285(1)(a), 290A, 293(1), 296, 297, 300A, 300B(1).

[16]   Bradley Decl. ¶ 66, Ex. M, REC Sourcebook.

2475-cv, 2014 WL 1613878, at *13 (2d Cir. Apr. 23, 2014).  Indeed, contrary to plaintiffs'
suggestion, it matters not that "[t]he UK government does not appoint any of the LME's officers
or directors, and no UK government officials are members of the LME [B]oard or Executive
Committee."  Opp. at 9-10.  Courts routinely find that an entity is actively supervised in the
absence of such appointments.  *See, e.g.*, *Gates*, 54 F.3d at 1461 (active supervision factor met
when government did not appoint an organ's officers, directs, board members, or executive
committee).

## II.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO SHOW THAT THE COMMERCIAL ACTIVITIES EXCEPTION APPLIES

Having clearly demonstrated that the LME is an agent or instrumentality of a foreign
state, the LME is presumptively immune from liability.  *Saudi Arabia v. Nelson*, 507 U.S. 349,
355 (1993).  As plaintiffs acknowledge (Opp. at 1 n.2), they now have "the burden of going
forward with evidence showing that, under exceptions to the [Immunities Act], immunity should
not be granted."  *Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir.
2002) (affirming grant of sovereign immunity where plaintiffs failed to demonstrate that
exception applied).

Plaintiffs have raised only one potential exception, the commercial activities exception.
The commercial activities exception provides that "[a] foreign state shall not be immune from
the jurisdiction of courts of the United States or of the States in any case . . . in which the action
is based upon" (1) "a commercial activity carried on in the United States by the foreign state;" or
(2) "an act outside the territory of the United States in connection with a commercial activity of
the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C.

§ 1605(a)(2).[17]  Plaintiffs have not met their burden of production with respect to either aspect of this exception.

> **A.    Plaintiffs Have Not Demonstrated That Their Claims Are Based On A Commercial Activity That The LME Carried On In The United States**

To satisfy the first part of the exception, plaintiffs had to show that their case is (1) "based upon" (2) some "commercial activity" by the LME that (3) had "substantial contact" with the United States.  *Nelson*, 507 U.S. at 356.  Each of these elements of the exception has specific legal meaning that plaintiffs completely ignore.  They have satisfied none of them.

> **1.    Plaintiffs' Claims Are Based On The LME's Market Regulation, Not Its Purportedly Commercial Conduct**

The starting point in the analysis is "identifying the *particular* conduct on which the [plaintiffs'] action is 'based' for purposes of the Act."  *Nelson*, 507 U.S. at 356 (emphasis added); *Gates*, 54 F.3d at 1464 ("[A] court must focus only on those *specific* acts that form the basis of the suit.").  The phrase "based upon" means "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357; *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (same).  If the supposedly commercial conduct does not constitute an element of plaintiffs' claim, the exception does not apply.  *Nelson*, 507 U.S. at 357, 363 (reversing denial of sovereign immunity because claim was not "based on" commercial conduct).

Plaintiffs purport to identify all sorts of supposedly commercial conduct in which the LME engages.  They say that the contracts that the LME enters into with approved warehouses in the U.S. are commercial (Opp. at 18-19); they say that the fees the LME charges for trading on

---

[17]    There is an additional aspect of the commercial activities exception, but plaintiffs do not argue that it applies here.  Opp. at 15-16 (citing 28 U.S.C. § 1605(a)(2) ("an act performed in the United States in connection with a commercial activity of the foreign state elsewhere")).

its exchange are commercial (*id.* at 17); they say that the 1.10% stock levy that LME charges approved warehouses is commercial (*id.* at 19); they say that the LME's effort to market itself to "clients" in the U.S. through conferences and "roadshows" is commercial (*id.* at 17);[18] and they say that the LME's "frequent trips to the U.S." and intention to open an office in the U.S. are commercial (*id.* at 17-18).  But this is all utterly beside the point because plaintiffs' claims are not "based on" any of this conduct; none of it is an element of their claims.  *Nelson*, 507 U.S. at 357.

Plaintiffs do not claim to have been injured, for example, by the LME breaching its contracts with approved warehouses, or by the LME's charging of fees for trading or charging a stock levy to approved warehouses, or by the LME's marketing in the U.S, or even by HKEx's acquisition of the LME.  Instead, as they essentially admit in their brief (Opp. at 19), and in any event their complaints make plain, plaintiffs claim to be injured by the LME setting the minimum load-out rule too low and then not forcing approved warehouses (particularly Metro) to load out more than the minimum.[19]  That is the LME portion of the conduct that plaintiffs say caused the queues that ultimately (through a convoluted chain of events, *see* discussion *infra*)

---

[18]   Plaintiffs incorrectly claim, with no evidence, that the U.S. "clients" that the LME services are warehouse companies.  Opp. at 18.  The evidence that plaintiffs cites about the LME's intention to provide better service to its U.S. "clients" refers to traders on the exchange, not to warehouse companies.  Bradley Decl. ¶ 88.

[19]   First Level Purchasers' ("FLP") (*i.e.*, the so-called "Direct Purchasers") "Second Corrected Consolidated Amended Class Action Complaint" ("FLP Compl.") ¶¶ 31, 32(a)-(e), 163-64; "Commercial End Users' Corrected Consolidated Class Action Complaint" ("Commercial Compl.") ¶ 77; "Consumer End-User Cases Consolidated Amended Class Action Complaint" ("Consumer Compl.") ¶¶ 59-63, 87-91; Agfa Amended Complaint ("Agfa Compl.") ¶¶ 67-69; Mag Instrument Amended Complaint ("Mag Compl.") ¶¶ 66-68.  *See also* FLP Compl. ¶¶ 215, 367, 397; Commercial Compl. ¶¶ 11, 73; Consumer Compl. ¶ 100; Agfa Compl. ¶ 70; Mag Compl. ¶ 69.

caused their sellers in the physical market to charge them more for aluminum.[20]   The sole question before the Court on this motion is whether the LME's setting of minimum load-out rules for approved warehouses is commercial conduct or market regulation.   Because it is indisputably market regulation, the conduct is, by definition, not commercial.

### 2.   The LME's Market Regulation Is Paradigmatic Non-Commercial Activity

#### a.   A Foreign Sovereign's Market Regulation Is Not Commercial Activity As A Matter Of Law

To determine whether conduct is "commercial" within the meaning of the Immunities Act, the Court asks "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.   Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"   _Republic of Argentina v. Weltover, Inc._, 504 U.S. 607, 614 (1992).   "[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.'"   _Id._   Conversely, when the foreign government _is_ acting as a market regulator, its acts are not commercial and are immune.   _Id._ ("[F]oreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity.").

Courts consistently hold that claims against foreign states for their alleged failure to regulate properly are not commercial activities under the Immunities Act.   In _Community Finance Group, Inc. v. Republic of Kenya_, for example, the court held that the commercial

---

20      _See, e.g._, FLP Compl. ¶¶ 105-11, 113, 115, 333; Agfa Compl. ¶¶ 5, 7, 17, 31; Mag Compl. ¶¶ 5, 7, 16(a), 30; Commercial Compl. ¶¶ 10, 18-26, 82; Consumer Compl. ¶¶ 2, 8, 17-19, 87, 92, 95.

activity exception was inapplicable to a claim against the Kenyan government for its alleged failure to properly regulate transactions in gold.  778 F. Supp. 2d 983, 986-87 & n.3 (D. Minn. 2011), aff'd, 663 F.3d 977 (8th Cir. 2011).  There, an agent of an American finance group travelled to Kenya with the intention of purchasing gold from a licensed foreign exchange bureau.  Id. at 985.  The plaintiff alleged that the Kenyan Department of Customs, members of the Kenyan administrative police and the Kenyan Central Bank were directly involved in the American group's purchase of gold and sought to sue them in U.S. court when the purchase failed to come through.  Id.  The court had little trouble dismissing these claims on sovereign immunity grounds:  "[i]nvestigation and regulation of commercial transactions are exercises of sovereign power, not acts of private players in the marketplace."  Id. at 986.

Similarly, in Tucker v. Whitaker Travel, Ltd., the plaintiffs sued the Commonwealth of the Bahamas and the Bahamian Ministry of Tourism for injuries they sustained while horseback riding on vacation in the Bahamas.  See 620 F. Supp. 578, 581 (E.D. Pa. 1985), aff'd, 800 F.2d 1140 (3d Cir. 1986).  The plaintiffs claimed that the Bahamian government regulated tourism and was therefore liable for its "failure to regulate horseback riding, failure to supervise or take action against the parties allegedly responsible for plaintiffs' accident, and refusal to assist [the plaintiffs] in their investigation of the accident."  Id. at 584.  The court dismissed those claims because "decisions about whether and how to regulate . . . are peculiarly governmental and may not be subjected to scrutiny in the United States courts."  Id.

To the same effect is Good v. Fuji Fire & Marine Insurance Co., Ltd., where the court held that a claim that Japanese ministries "fail[ed] to prevent the actions of private parties [which] caused serious loss to all investors in America who hold stock in Japanese Insurance

Companies . . . refer[red] to Japan's sovereign regulatory activity rather than commercial activity." 271 F. App'x 756, 758 (10th Cir. 2008) (internal quotation marks omitted).

> ### b.   The LME Is Regulating Its Market When It Regulates Approved Warehouses

The LME has a statutorily-mandated obligation to maintain an orderly market and to protect investors on its exchange.   Bradley Decl. ¶¶ 18-20.   It fulfills these obligations by regulating its price discovery and price convergence functions, a vital and integral part of which is the LME's warehousing system.   *Id.* ¶ 20.   As set forth in more detail in the accompanying Bradley Declaration, the LME fulfills its obligation to maintain an orderly financial market by ensuring that its processes and methods for the trading of contracts on the exchange permit the discovery of the price for aluminum (and other metals) that is the result of global supply and demand conditions.   *Id.* ¶ 21.   Because this LME price is used as a global reference price the LME carefully regulates the conduct that results in its discovery.   *Id.* ¶ 22-26.

The LME's obligation to maintain an orderly market requires that its price discovery maintain a correct relationship to the actual price of metal, called price convergence.   Price convergence refers to keeping the LME price in line with the physical market price (also known as the "spot price").   *Id.* ¶ 27.   The fact that LME futures contracts can be physically settled (*i.e.*, physical metal *could*, in theory, be delivered to the buyer but in reality, historically less than 1% of metal goes to physical settlement), plays a vital role in attempting to ensure price convergence between the LME price and the all-in physical market price.   *Id.* ¶ 28.

To maintain the credible possibility of physical delivery of metal, the LME approves a network of warehouses and storage facilities around the world.   Warehouse companies must meet strict criteria before the LME approves them to handle metals.   *Id.* ¶ 35.   This transparent system of approved LME warehouses engenders trust among the traders on the LME system

because they know that the metal that is the subject their trades is secure and of certain quality. *Id.* ¶ 40.

The LME's regulatory obligation to maintain an orderly market requires it to ensure that approved warehouses do not conduct their business in a manner that adversely affects the LME's price discovery and price convergence functions. *Id.* ¶ 43. The LME executes its statutory obligation through strict regulation of approved warehouses. *Id.* ¶¶ 49-61. Indeed, it has long been settled in the UK that the LME's regulation of approved warehouses is part of its obligation to regulate and maintain an orderly market, and therefore is not commercial conduct. Bradley Decl., Ex. Q, *Albatros*, ¶¶ 27-29 (the LME's regulation of warehouses is "necessary for the provision of the requisite safeguards to investors and the promotion and maintenance of the standards laid down by [the precursor to Recognition Requirement sch. ¶ 4]").

The FCA itself recognizes that the LME must regulate approved warehouses to fulfill its statutory obligations to maintain an orderly market. The FCA considers RIEs like the LME "front-line regulators of the markets they operate." *Id.*, Ex. L, Regulating the Commodity Markets at 4. The FCA "has a formal interest in warehousing in relation to commodity markets because of the role it plays in ensuring that those RIE derivatives contracts which incorporate warehouse arrangements are anchored to the price of the underlying product and have effective settlement arrangements." *Id.* For this reason, the FCA finds it important that RIEs "have contractual relationships with the warehouses and have terms and conditions by which the warehouses must abide." *Id.* Indeed, the FCA has stated that it has "engaged with the LME to ensure [that] changes [to the LME's warehousing rules], including the Linked Load-in and Load-out rule, are consistent with [the LME's] regulatory obligations." *Id.* ¶ 48, Ex. K, "FCA Statement on the London Metal Exchange (LME)" (Nov. 7, 2013). The FCA and the LME

15

discuss the topic of warehousing extensively at their standing monthly meetings, and met numerous times to discuss the LME's July 2013 consultation related to changes to its load-out rules.  Bradley Decl. ¶ 48; *see also id.* ¶¶ 77-79.

Warehouse queues can negatively impact the LME's price discovery and price convergence functions because metal owners pay rent to warehouse operators when their metal is in the warehouse, and, if a metal owner wants to cancel the warrant, and take the metal out of the LME-approved warehouse and put it somewhere where the rent is cheaper, that owner has to take into account the rent that it has to pay until its metal can get out of a queue.  For this reason, the LME regulates the minimum amount of metal that approved warehouses must load out each day, and has done so through formal rules since at least 2003.  *Id*. ¶¶ 68-69.

The LME's statutory obligation to maintain an orderly market includes obligations that require the LME to use fair procedures in discharging its regulatory functions, including an obligation to publish proposed rules and consult with the market before adopting or changing them, including the rules that govern approved warehouses.  *Id.* ¶ 63.  A party who believes that the LME failed to follow proper consultation procedures before implementing or amending a rule can challenge the rule in a judicial review proceeding in UK court.  *Id.* ¶ 66.  If the UK court concludes that the LME failed to follow proper procedures, it can quash the proposed rule.  *Id.*

A recent example is the judicial review proceeding that Rusal brought to challenge the procedures that the LME used to adopt a proposed increase to the minimum amount of metal that an LME-approved warehouse is required to load-out per day.  *See* Bradley Decl., Ex. R, *Rusal*, ¶¶ 1-5.  The court concluded that the procedures that the LME used to consult the marketplace about the rule were unfair and quashed the LME's decision to implement the rule.  *Id.* ¶ 104. The UK Court of Appeal recently granted the LME permission to appeal that decision on an

expedited basis because, if it stood, it would place "onerous obligations on [a] public body" like the LME.  Bradley Decl., Ex. BB, *The Queen on the Application of United Company Rusal v. The London Metal Exch.*

Plaintiffs dispute that the LME is engaged in market regulation when its regulates its approved warehouses because private companies in the U.S. also impose rules on parties that wish to do business with them.  Opp. at 21.  Private companies in the U.S. may impose rules on parties that wish to do business with them; however, before a private company imposes a new term of doing business with it, the company does not have to do an extensive and lengthy consultation of the advisability of the rule with the entire marketplace, publicly disclose in immense detail the results of that consultation and reasoning behind the decision being made, and then be subject to having its decision quashed by a court because its public consultation process was not robust enough and therefore was not fair conduct by a public body.  *See <u>Kato v. Ishihara</u>*, 360 F.3d 106, 111 (2d Cir. 2004) (Court must ask is the conduct "typical of a private party engaged in commerce"?).  When a private party wants to change its rules, it merely changes its rules.  The LME as an RIE must consult the market.

Because the LME's conduct at issue here is clearly market regulation, plaintiffs reliance on *<u>Prewitt Enterprises, Inc. v. OPEC</u>*, No. CV-00-W-0865-S, 2001 U.S. Dist. LEXIS 4141 (N.D. Ala. Mar. 22, 2001) is misplaced.  Opp. at 20.  No party in that case even argued, much less offered evidence to prove, that the agreements at issue were part of statutorily-mandated market regulation.  And *<u>Southway v. Central Bank of Nigeria</u>*, 198 F.3d 1210 (10th Cir. 1999), and *<u>Adler v. Federal Republic of Nigeria</u>*, 107 F.3d 720 (9th Cir. 1997) (Opp. at 16, 21), which both dealt with a different prong of the commercial activities exception, merely stand for the

uncontroversial proposition that entering into a private contract can qualify as commercial activity.

### c. Plaintiffs' Arguments About The LME's Supposed Financial Motives Are Irrelevant To Whether Its Conduct Is Commercial

Plaintiffs argue that the LME's regulation of approved warehouses transformed into commercial conduct in 2010 because the regulation became designed to "increase the LME's rental revenues from the United States and inflate the sale value of the LME for its owners." Opp. at 16. Plaintiffs say that, because the LME charges approved warehouses a stock levy of 1.1%, the LME had "an incentive" to increase "the amount and length of time that aluminum is stored" at approved warehouses, and that it did so by setting insufficient load-out rules. Opp. at 19. But the LME's supposed *motive* for regulating its approved warehouses in a particular way is irrelevant to whether its conduct is commercial. _Weltover_, 504 U.S. at 614 (it is irrelevant whether "the foreign government is acting with a profit motive"). The Immunities Act itself provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Here, the nature of the act is unquestionably market regulation, regardless of whatever fanciful ill motive plaintiffs try to ascribe to it.

Although the issue of motive is legally irrelevant here, the LME notes that plaintiffs' theory is factually baseless. Contrary to plaintiffs' claim, the LME's conduct since 2010 does not "mark[] a departure" from its conduct before 2010. Opp. at 21 n.28. With respect to the load-out rules themselves, the only thing the LME has done differently since 2010 is to *increase* the amount that approved warehouses must load out each day, conduct that is directly at odds with a supposed intention to keep more metal in the warehouses. Bradley Decl. ¶¶ 68-80. And with respect to the stock levy, the LME has charged the same 1.1% rate since December 2002.

*Id.* ¶ 83.   *Cf. Carpenter v. Republic of Chile*, 610 F.3d 776, 779 (2d Cir. 2010) (finding "frivolous" the argument that fee charged to enter the consulate of the Republic of Chile was commercial conduct).   The stock levy is designed to cover the costs and expenses associated with regulating the approved warehouses, including visiting, auditing and inspecting them.   Bradley Decl. ¶ 82.   Because the stock levy is a flat rate based on the daily rent collectable on LME warrants, the revenue that the LME receives from the levy obviously fluctuates with the amount of metal stored in approved warehouses.   *Id.* ¶¶ 83-84.   But that means in times of short supply, when less metal is warehoused, the LME receives less revenue.   *Id.*   If the LME really wanted to increase the revenues that it received from its stock levy to make itself more attractive to HKEx as plaintiffs claim, the LME certainly would not have had to enter into some elaborate, convoluted conspiracy with the Goldman defendants and others to create queues at *one* warehouse company in the U.S.   The LME could have merely increased the rate of its stock levy, which applies to all approved warehouses, a reasonable act given that it has not been raised in more than 11 years.   *Id.* ¶ 83.   In any event, the idea that the tiny increase in revenue that the LME generated from its stock levy between 2010 and the sale to HKEx in 2012—only approximately £1.5 million—had any impact on HKEx's decision to buy the company for $2.2 billion is implausible on its face.   *See id.* ¶ 86.   The stock levy has never generated more than £9 million in any year since 2003, and generated less than £2 million each year from 2003-2008 before the financial crisis hit and caused more aluminum to flow into LME-approved warehouses.   *Id.*   The LME would not jeopardize the entire purpose of its existence—to be a reliable and reputable source of price discovery for a global reference price—to try to generate a few million additional pounds from the stock levy, and it did not do so.   *Id.* ¶ 87.

### 3.      The LME's Market Regulation Takes Place In The UK, Not In The U.S.

Finally, plaintiffs have not demonstrated that the conduct on which their claims are based had "substantial contact" with the United States.  _Nelson_, 507 U.S. at 356.  The LME performs its market regulation functions in the UK, not in the U.S.  Bradley Decl. ¶ 67.

### B.      Plaintiffs Have Not Shown That Their Claims Are Based On Conduct That The LME Engaged In Outside The U.S. That Caused A Direct Effect In The U.S.

As a fallback, plaintiffs alternatively claim that they have satisfied the aspect of the commercial activities exception that requires them to show that their claims are "based on" "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  Opp. at 22-23.  "This exception contains two requirements:  (1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act."  _Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp._, 204 F.3d 384, 388 (2d Cir. 2000).

Plaintiffs do not identify what act the LME supposedly engaged in outside the U.S. (other than some vague supposed agreement with the Goldman defendants), nor do they say how that supposed act was "in connection with" some legally cognizable commercial activity.  Instead, they merely repeat their legally deficient (and factually implausible) theory that the LME engaged in conduct with the motive of "increasing rental revenues, and thereby the LME's sale value."  Opp. at 22.  In any event, plaintiffs clearly have not met their burden to show that _any_ conduct in which the LME engaged outside the U.S. caused a "direct effect" on them in the U.S.

"[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception."  _Antares Aircraft, L.P. v. Fed._

_Republic of Nigeria_, 999 F.2d 33, 36 (2d Cir. 1993).  The foreign sovereign's act must have caused a "direct effect" on them in the U.S.  "'An effect is direct if it follows as an _immediate_ consequence of the defendant's activity."  _Virtual Countries_, 300 F.3d at 236 (quoting _Weltover_, 504 U.S. at 618) (alteration omitted; emphasis added).  There cannot be any "intervening element" between "the foreign state's commercial activity and the effect."  _Guirlando_, 602 F.3d at 74 (internal quotation marks omitted).  Importantly, "'the requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state."  _Id._ at 75 (quoting _Virtual Countries_, 300 F.3d at 238).

Plaintiffs do not come close to showing that anything the LME itself did outside the U.S., without any intervening variables, directly and immediately caused them injury.  Even accepting everything that they allege in the complaint as true (although most of it is complete fiction), there is a long convoluted chain of events, in which multiple independent actors would have had to play a part, before plaintiffs were supposedly injured.  Based on their own complaints, this chain includes at least the following:

- One or more warehouse defendants offered financial incentives to aluminum owners as an inducement to store their metal in those defendants' warehouses, which the aluminum owners accepted, resulting in an increase in aluminum inventory.[21]

---

[21]   FLP Compl. ¶¶ 37, 212-14, 381; Commercial Compl. ¶¶ 61, 70-75; Consumer Compl. ¶¶ 5(g), 99; Agfa Compl. ¶¶ 58, 64-66; Mag Compl. ¶¶ 57, 63-65.

- The financial firm and trader defendants, and/or other traders on the LME, purchased warrants on at least some of the aluminum in the warehouse defendants' warehouses and later cancelled some of those warrants.[22]

- The LME and some combination of the defendants (it is unclear whether plaintiffs are alleging that it was warehouse defendants, financial firms, traders or all of the foregoing) conspired not to increase the minimum load-out rule for LME warehouses.[23]

- The warehouse defendants then did not load out more aluminum than the LME minimum load-out rule required.[24]

- These events collectively caused a backlog or queue in getting aluminum out of some, but not all defendants' warehouses.[25]

- An independent third party, not alleged to be a conspirator, Platts Metals Week, published something called the "Midwest Premium" based on Platts' own "survey" of "spot buyers and sellers, using a representative sample of producers, traders and different types of end users."[26]

---

[22]     FLP Compl. ¶¶ 382-83, 395-97; Commercial Compl. ¶¶ 139-41; Agfa Compl. ¶ 92; Mag Compl. ¶ 91.

[23]     FLP Compl. ¶¶ 31, 32(a)-(e), 163-64; Commercial Compl, ¶ 77; Consumer Compl. ¶¶ 59-63, 87-91; Agfa Compl. ¶¶ 67-69; Mag Compl. ¶¶ 66-68.

[24]     FLP Compl. ¶¶ 32(f), 168; Commercial Compl. ¶ 78; Consumer Compl. ¶ 92; Agfa Compl. ¶¶ 67, 84; Mag Compl. ¶¶ 66, 83.

[25]     FLP Compl. ¶¶ 215, 367, 397; Commercial Compl. ¶¶ 11, 73; Consumer Compl. ¶ 100; Agfa Compl. ¶ 70; Mag Compl. ¶ 69.

[26]     Commercial Compl. ¶ 57; *see also* FLP Compl. ¶ 155; Agfa Compl. ¶ 40; Mag Compl. ¶ 39.

- The length of the queues in defendants' warehouses relates in some unexplained way to the premium that Platts chooses to publish based on its survey sampling of unidentified producers, traders and end users.[27]

- When the queues increased in some but not all defendants' warehouses, it somehow caused Platts to report a higher Midwest Premium from its sampling of aluminum transactions.[28]

- Then some unidentified companies (who also are not alleged to be conspirators) chose to sell aluminum to the First Level Purchasers and Commercial End Users in the physical market by pricing their aluminum in some unspecified manner that involves the Platts Midwest Premium.[29]

- Plaintiffs do not allege that those third parties had to use the Platts Premium as part of their pricing, so presumably they could have chosen to price their aluminum in some other manner that did not involve the Platts Premium.

- The First Level Purchasers and Commercial End Users were injured when they paid more for their aluminum than they would have paid if the Platts Midwest Premium were lower.[30]

- The Consumer End Users were injured when they bought things like soda cans and aluminum foil made by someone, somewhere above them in the physical market chain that paid a price based on the Platts Midwest Premium.[31]

---

[27]   Commercial Compl. ¶ 57; FLP Compl. ¶ 155.

[28]   FLP Compl. ¶¶ 11, 215-18; Commercial Compl. ¶¶ 8, 57; Consumer Compl. ¶¶ 100, 120-21; Agfa Compl. ¶ 110; Mag Compl. ¶ 109.

[29]   FLP Compl. ¶¶ 11-13, 105-11, 113, 115, 155; Commercial Compl. ¶¶ 18-26; Agfa Compl. ¶ 17; Mag Compl. ¶ 16(a).

[30]   FLP Compl. ¶ 92; Commercial Compl. ¶ 11; Agfa Compl. ¶ 113; Mag Compl. ¶ 111.

Thus, even using plaintiffs own fanciful allegations, there is a long attenuated chain between the LME's purported act outside the U.S. (*i.e.*, maintaining supposedly inadequate load-out rules) and the effect that plaintiffs claim that act had in the U.S.  Under plaintiffs' own theory, there had to have been numerous "intervening elements" between the LME's act outside the U.S. and the increase in the Midwest Premium that plaintiffs say hurt them.  These include intervening acts by (1) producers/owners of aluminum to store their metal in the defendants' warehouses; (2) warehouse companies in the U.S. not to load out more than the minimum; (3) financial traders on the LME exchange to purchase and cancel LME warrants; (4) Platts in surveying, calculating and publishing premiums; and (5) the companies who chose to sell aluminum to the plaintiffs in the physical market based on the Platts Premium.  This means that the supposed effect is not "direct" as a matter of law.  *Virtual Countries*, 300 F.3d at 236 (no "direct effect" where foreign sovereign's "actions [merely] precipitate reactions by third parties, which reactions then have an impact on a plaintiff"); *Guirlando*, 602 F.3d at 74.[32]

---

[31]     Consumer Compl. ¶¶ 2, 6, 180-85.

[32]     Plaintiffs are wrong that the *benefit* Goldman and JP Morgan supposedly received from the alleged scheme constitutes a "direct effect" sufficient for jurisdiction.  Opp. at 22; *see Virtual Countries*, 300 F.3d at 241 (plaintiff failed to proffer sufficient evidence of direct effect on it). In any event, that supposed benefit would not be a direct result of the LME's conduct either because it would have depended on the intervening decision of HKEx about how much to pay for the LME.  Opp. at 22.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the LME's opening submission, the Court should dismiss all of the plaintiffs' complaints against the LME because the Court does not have subjection matter jurisdiction over the LME.

Respectfully submitted,

Dated: New York, New York
     May 23, 2014

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse
(*jeffrey.newhouse@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange*

25