UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
IN RE ALUMINUM WAREHOUSING               :
ANTITRUST LITIGATION                            :    MDL No. 2481
                                                       :    Master Docket No.
This Document Relates To:                       :    13 MD 2481 (KBF)
                                                       :
*Agfa Corporation and Agfa Graphics, N.V.*   :
*v. The Goldman Sachs Group, Inc., et al.*,   :
Case No. 1:14-cv-0211-KBF (S.D.N.Y.)        :
                                                       :
and                                                  :
                                                       :
*Mag Instrument, Inc. v. The Goldman Sachs*  :
*Group, Inc.*, Case No. 1:14-cv-00217-KBF     :
(S.D.N.Y.)                                          :
                                                       :
-------------------------------------------------------X

## JOINT CONSOLIDATED MEMORANDUM OF MAG AND AGFA
## IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS

Dated:  May 27, 2014                    *Counsel listed on following page*

SCOTT+SCOTT, ATTORNEYS-AT-LAW, LLP
707 Broadway, Suite 1000
San Diego, California  92101
Telephone:  619-233-4565
Facsimile:  619-233-0508

SCOTT+SCOTT, ATTORNEYS-AT-LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York  10174
Telephone:  212-223-6444
Facsimile:  212-223-6334

SIMMONS BROWDER GIANARIS ANGELIDES &
BARNERD LLC
One Court Street
Alton, Illinois  62002
Telephone:  618-259-2222
Facsimile:  618-259-2251

PEIFFER ROSCA ABDULLAH CARR & KANE,
LLP
201 St. Charles Avenue, Suite 4610
New Orleans, Louisiana 70170
Telephone: 505-586-5259
Facsimile: 505-586-5250

SCHNEIDER WALLACE COTTRELL KONECKY
LLP
180 Montgomery Street, Suite 2000
San Francisco, California  94104
Telephone:  415-421-7100
Facsimile:  415-421-7105

SCHNEIDER WALLACE COTTRELL KONECKY
LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone:  480-428-0144
Facsimile:  480-505-8036

THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, California  92101
Telephone:  619-687-6611
Facsimile:  619-687-6610

NICOLL DAVIS & SPINELLA LLP
95 Route 17 South, Suite 316
Paramus, New Jersey  07652
Telephone:  201-712-1616
Facsimile:  201-712-9444

*All are counsel for Mag Instrument, Inc.,
Agfa Corporation, and Agfa Graphics, N.V.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

STATEMENT OF FACTS ........................................................................................................ 4

APPLICABLE LEGAL STANDARD ..................................................................................... 13

ARGUMENT .............................................................................................................................. 13

I.      PLAINTIFFS HAVE ANTITRUST STANDING .......................................................... 13

    A.      Plaintiffs Have Suffered Antitrust Injury ............................................................ 15

        1.      SUPREME COURT AND CIRCUIT COURT PRECEDENT DOES NOT RESTRICT
                ANTITRUST STANDING TO CONSUMERS AND COMPETITORS ................................ 15

        2.      PLAINTIFFS PLAUSIBLY ALLEGE ANTITRUST INJURY ................................................ 17

    B.      Plaintiffs Are Efficient Enforcers of the Antitrust Laws.................................... 22

        1.      PLAINTIFFS' INJURIES ARE DIRECTLY THE RESULT OF DEFENDANTS' CONDUCT
                WHICH ARTIFICIALLY INFLATED THE MIDWEST PREMIUM AND ARE NOT
                REMOTE ................................................................................................................ 22

        2.      PLAINTIFFS ARE EFFICIENT ENFORCERS OF THE ANTITRUST LAWS BECAUSE
                THEY ARE DIRECT PURCHASERS IN THE PHYSICAL MARKET FOR ALUMINUM
                WHO PAID ARTIFICIALLY INFLATED MIDWEST PREMIUMS ................................. 25

        3.      PLAINTIFFS' INJURIES ARE NOT SPECULATIVE AND ARE OF THE TYPE
                COMMONLY PROVED IN AN ANTITRUST ACTION .................................................. 27

II.     PLAINTIFFS STATE  MORE THAN PLAUSIBLE CLAIMS UNDER SECTION 1 OF THE
        SHERMAN ACT ...................................................................................................... 27

    A.      The Applicable Standard Under Twombly ........................................................ 31

    B.      Plaintiffs Allege Direct Evidence of an Agreement in Violation of Section 1 . 35

    C.      Plaintiffs Properly Allege A Plausible Horizontal Conspiracy ......................... 36

        1.      PLAINTIFFS PROPERLY ALLEGE PARALLEL CONDUCT ........................................... 37

2.     PLAINTIFFS' ALLEGATIONS OF PARALLEL CONDUCT ARE ACCOMPANIED BY
COGNIZABLE CIRCUMSTANTIAL EVIDENCE ........................................................ 43

3.     PLAINTIFFS ALLEGE PLUS FACTORS ........................................................ 47

D.    Plaintiffs Establish Per Se Violations of Section 1 of the Sherman Act ........... 52

E.    Alternatively, Defendants' Output Restrictions Are Subject to a "Quick Look"
Analysis ..................................................................................................... 53

F.    Plaintiffs Plausibly Allege JPMorgan's, Henry Bath's, and Pacorini's
Concerted Participation in the Agreement to Restrict Aluminum Output ..... 54

III.   PLAINTIFFS ADEQUATELY PLEAD VIABLE STATE LAW CLAIMS ................................... 56

A.    Mag and Agfa Plead Viable State Antitrust Law Claims ................................. 57

B.    Mag Pleads Viable California Common Law and Statutory Consumer
Protection Claims ...................................................................................... 60

1.     MAG ADEQUATELY PLEADS ITS CALIFORNIA CLAIM FOR INTENTIONAL
INTERFERENCE WITH CONTRACT (COUNT III) ..................................................... 60

2.     MAG ADEQUATELY PLEADS ITS CALIFORNIA CLAIMS FOR INTERFERENCE WITH
PROSPECTIVE ECONOMIC RELATIONSHIP (COUNTS IV AND V) ........................... 63

3.     MAG ADEQUATELY PLEADS ITS CLAIM FOR VIOLATION OF CALIFORNIA'S
UNFAIR COMPETITION LAW (COUNT VI) ............................................................ 65

IV.   IF ANY PORTION OF DEFENDANTS' MOTIONS IS GRANTED AS TO MAG OR AGFA,
PLAINTIFFS REQUEST LEAVE TO AMEND ................................................................ 68

CONCLUSION ........................................................................................................ 68

# TABLE OF AUTHORITIES

*Page*

## Cases

*Allied Tube & Conduit Corp. v. Indian Head,*
  486 U.S. 492, 108 S.Ct. 1931 (1988) ..................................................................... 38

*Am. Tobacco Co. v. United States,*
  328 U.S. 781, 66 S.Ct. 1125 (1946) ...................................................................... 31

*American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
  190 F.3d 1051 (9th Cir. 1999) ............................................................................... 16

*Anderson News, L.L.C. v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 846 (2013).................................... *passim*

*Anderson v. Bessemer City,*
  470 U.S. 564, 105 S.Ct. 1504 (1985) ..................................................................... 33

*Apex Oil Co. v. DiMauro,*
  822 F.2d 246 (2d Cir. 1987) ........................................................................... 31, 55

*Arista Records, LLC v. Doe 3,*
  604 F.3d 110 (2d Cir. 2010) ................................................................................. 33

*Arizona v. Maricopa County Medical Society,*
  457 U.S. 332, 102 S.Ct. 2466 (1982) ..................................................................... 35

*Ashcroft v. Iqbal,* 556 U.S.
  662, 129 S.Ct. 1937 (2009).................................................................................. 13

*Associated General Contractors of California v. California
  State Council of Carpenters,*
  459 U.S. 519, 103 S.Ct. 897 (1983) ..................................................... 14, 16, 22, 27

*ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ................................................................................... 13

*Avenarius v. Eaton Corp.,*
  898 F. Supp. 2d 729 (D. Del. 2012) ....................................................................... 37

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 127 S.Ct. 1955 (2007) ................................................................ *passim*

*Blue Shield of Virginia v. McCready,*
  457 U.S. 465, 102 S.Ct. 2540 ........................................................................ *passim*

*Bogan v. Hodgkins,*
  166 F.3d 509 (2d Cir. 1999) ................................................................................. 53

*Bose v. Interclick, Inc.,*
2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) ................................................................ 61

*Boykin v. KeyCorp,*
521 F.3d 202 (2d Cir. 2008) ................................................................ 33

*Byars v. SCME Mortgage Bankers, Inc.,*
99 Cal. App. 4th 1134 (2003) ................................................................ 66

*Cal. Dental Ass'n v. Federal Trade Commission,*
526 U.S. 756, 119 S.Ct. 1604 (1999) ................................................ 35, 53, 54

*Carpet Group Int'l v. Oriental Rug Importers Ass'n,*
27 F.3d 62 (3d Cir. 2000) ................................................................ 17

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Telephone Co.,*
20 Cal. 4th 163 (1990) ................................................................ 66

*Chattanooga Foundry & Pipe Works v. City of Atlanta,*
203 U.S. 390 (1906) ................................................................ 27

*Conergy AG v. MEMC Electronic Materials, Inc.,*
651 F. Supp. 2d 51 (S.D.N.Y. 2009) ................................................................ 58

*Continental Ore Co. v. Union Carbide and Carbon Corp.,*
370 U.S. 690, 82 S.Ct. 1404 (1962) ................................................ 31, 54

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752, 104 S.Ct. 2731 (1984) ................................................................ 52

*Crimpers Promotion Inc. v. Home Box Office, Inc.,*
724 F.2d 290 (2d Cir. 1983) ................................................ 3, 16, 18

*Davis v. Nadrich,*
174 Cal. App. 4th 1 (Cal. Ct. App. 2009) ................................................................ 61

*Evergreen Partnering Group, Inc. v. Pactiv Corp.,*
720 F.3d 33 (2013) ................................................................ *passim*

*Freedom Holdings v. Spitzer,*
447 F. Supp. 2d 230 (2004) ................................................................ 53

*Gatt Communications, Inc. v. PMC Associates, L.L.C.,*
711 F.3d 68 (2d Cir 2013) ................................................................ 17

*Gross v. New Balance Athletic Shoe, Inc.,*
955 F. Supp. 242 (S.D.N.Y. 1997) ................................................................ 26

*Hawaii v. Standard Oil Co.,*
405 U.S. 251, 92 S.Ct. 885 (1972) ................................................................ 14

*Hinds County, Miss. v. Wachovia Bank, N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010) ................................................................. 51

*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009) ................................................................. 61

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720, 97 S.Ct. 2061 (1977) ................................................................... 26

*In re Blood Reagents Antitrust Litig.*,
    756 F. Supp. 2d 623 (E.D. Pa. 2010) .................................................................. 51

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012) ...................................................... 17, 21

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ................................................................................. 13

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3d Cir. 2004) ............................................................................... 47

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139 (S.D.N.Y. 2008) ........................................................................ 59

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................. 59

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ................................................................... 37, 47, 53

*In re Libor-Based Financial Instruments Antitrust Litig.*,
    935 F.Supp.2d 666 (S.D.N.Y. 2013) .................................................................. 21

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................................ 52

*In re Pool Products Distribution Market Antitrust Litigation*,
    MDL No. 2328, 2013 WL 6670020 (E.D. La. Dec. 18, 2013) ............................ 48

*In re Publication Paper Antitrust Litigation*,
    690 F.3d 51 (2d Cir. 2012) ................................................................................. 53

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) ........................................................................ 59

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .............................................................................. 48

*J'Aire Corp. v. Gregory*,
    598 P.2d 60 (Cal. 1979) ..................................................................................... 65

vi

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ............................................................................................ 62

*Lange v. TIG Ins. Co.*,
    68 Cal App. 4th 1179 (1998) ..................................................................................... 65

*Leegin Creative Leather Prods. v. PSKS*,
    551 U.S. 877, 127 S.Ct. 2705 (2007) ........................................................................ 52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    ___ U.S. ___, 135 S.Ct. 1377 (2014) .................................................................. 14, 16

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ................................................................. 17, 25, 26, 27

*Madison/Graham Color Graphics, Inc. v. Graphic Press*,
    No. G 034973, 2007 WL 478173 (Cal. Ct. App. Feb. 15, 2007) ............................. 65

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*,
    334 U.S. 219, 68 S.Ct. 996 (1948) ............................................................................ 14

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S.Ct. 1348 (1986) ........................................................................ 33

*Mayor and City Council of Baltimore Maryland v. Citigroup, Inc.*,
    709 F.3d 120 (2nd Cir. 2013) ........................................................................ 36, 37, 47

*Meredith Corporation v. SESAC LLC*,
    No. 09 Civ. 9177, 2014 WL 812795 (S.D.N.Y. March 3, 2014) ............................. 52

*Michelman v. Clark-Schwebel Fiber Glass Corp.*,
    534 F.2d 1036 (2d Cir. 1976) .................................................................................... 36

*Monex Deposit Co. v. Gilliam*,
    680 F. Supp. 2d 1148 (C.D. Cal 2010) ...................................................................... 63

*Monsanto Co. v. Spray-Rite*,
    465 U.S. 752, 104 S.Ct. 1464 (1984) .................................................................. 30, 33

*Nat'l Society of Professional Engineers v. United States*,
    435 U.S 679, 98 S.Ct. 1355 (1978) ........................................................................... 52

*NCAA v. Board of Regents of University of Oklahoma*,
    468 U.S. 85, 104 S.Ct. 2948 (1984) .............................................................. 35, 52, 53

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ................................................................................ 23, 30

*Northern Pacific Railway Co. v. United States*,
    356 U.S. 1, 78 S.Ct. 514 (1984) ................................................................................ 52

*Norwest Mortgage, Inc. v. Superior Court,*
  72 Cal. App. 4th 214 (1999) ................................................................ 67

*Novell, Inc. v. Microsoft Corp.,*
  505 F.3d 302 (4th Cir. 2007) .............................................................. 17

*Ocean View Capital, Inc. v. Sumitomo Corporation of America,*
  No. 98 CIV. 4067(LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) .............. 24

*Panthera Railcar LLC v. Kasgro Rail Corp.,*
  No. C12-06458, 2013 WL 1996318 (N.D. Cal. May 13, 2013) .................... 65

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .......................................................................... 59

*Plasticware, LLC v. Flint Hills Resources, LP,*
  852 F.Supp.2d 398 (S.D.N.Y. 2012) ................................................... 61

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,*
  507 F.3d 117 (2d Cir. 2007) ....................................................... 3, 16, 18

*Province v. Cleveland Press Publ'g Co.,*
  787 F.2d 1047 (6th Cir. 1986) ........................................................... 17

*Quelimane Co. v. Stewart Title Guaranty Co.,*
  19 Cal. 4th 26 (1998) ....................................................................... 62

*Re/Max Int'l, Inc. v. Realty One, Inc.,*
  173 F.3d 995 (6th Cir.1999) .............................................................. 48

*Reading Industrial, Inc. v. Kennecott Copper Corp.,*
  631 F.2d 10 (2nd Cir. 1980) ............................................................. 24

*Reeves v. Hanlon,*
  33 Cal. 4th 1140 (2004) .................................................................... 62

*Ross v. American Express Co.,*
  Nos. 04 Civ. 5723 and
  05 Civ. 7116, 2014 WL 1396492 (S.D.N.Y. April 10, 2014) .................. 31, 53, 54

*Scheuer v. Rhodes,*
  416 U.S. 232, 94 S.Ct. 1683 (1974) ................................................... 35

*Sebastian Int'l, Inc. v. Russolillo,*
  162 F. Supp. 2d 1198 (C.D. Cal. 2001) ............................................... 61

*Shoemaker v. Myers,*
  52 Cal. 3d 1 (Cal. 1990) ................................................................... 64

*Starr v. Sony BMG Music Entm't,*
   592 F.3d 314 (2d Cir. 2010) ................................................................. 13, 51, 52

*Texaco Inc. v. Dagher,*
   547 U.S. 1, 126 S.Ct. 1276 (2006) ................................................................. 52

*Ticconi v. Blue Shield of California Life & Health Ins. Co.,*
   160 Cal. App. 4th 528 (2008) ................................................................. 66

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001) ................................................................. 34, 36

*Ullmannglass v. Oneida, Ltd.,*
   86 A.D. 3d 827, 927 N.Y.S. 2d 702 (App. Div., 3d Dep't 2011) ................................. 64

*United States v. Andreas,*
   216 F.3d 645 (7th Cir. 2000) ................................................................. 20

*United States v. Paramount Pictures, Inc.,*
   334 U.S. 131, 68 S.Ct. 915 (1948) ................................................................. 32, 55

*United States v. Snow,*
   462 F.3d 55 (2d Cir. 2006) ................................................................. 36

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940) ................................................................. 20

*Winchester Mystery House, LLC v. Global Asylum, Inc.,*
   210 Cal. App. 4th 579 (2012) ................................................................. 63

## Statutes, Rules and Regulations

7 U.S.C.
   § 1. ................................................................. 65

15 U.S.C.
   § 1 ................................................................. 27, 31
   § 15 ................................................................. 14

California Business  & Professions Code
   § 16700 ................................................................. 56
   §16770 ................................................................. 56
   § 17200. ................................................................. 59, 65, 66

New York General Business Law
   § 340. ................................................................. 56, 58, 59

Federal Rules of Civil Procedure
    Rule 8 .................................................................................... 31, 32, 61
    Rule 12(b)(6) ................................................................................ 13, 38
    Rule 15 ........................................................................................... 61, 67

## Other Authorities

ABA Section of Antitrust Law,
    *Proof of Conspiracy Under Federal Antitrust Laws* (2010) .................................................... 48

ABA Section of Antitrust Law,
    Proving Antitrust Damages: Legal and Economic Issues (2d ed. 2010) ....................... 27

Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure*
    § 1202 (3d ed. 2004) ............................................................................... 32

## INTRODUCTION AND SUMMARY OF ARGUMENT

Mag Instrument, Inc. ("Mag"), Agfa Corporation and Agfa Graphics, N.V. (collectively, "Agfa," and, together with Mag, "Plaintiffs"), are major commercial purchasers of physical aluminum.   Plaintiffs proceed as individual, direct action plaintiffs here. They assert Sherman Act Section 1 claims alleging that Defendants Goldman Sachs and its Metro warehousing entity, JPMorgan and its Henry Bath warehousing entity, Glencore and its Pacorini warehousing entity, and the London Metal Exchange ("LME") entered into an illegal conspiracy to restrain trade in the market for physical aluminum that directly resulted in increased prices paid for the commodity by Plaintiffs—who are actual users of aluminum.   Plaintiffs allege that Defendants exploited the aluminum market contango that prevailed during the recent recession by luring large quantities of the metal into their warehouses and then hoarding it there; this, Plaintiffs allege, created a classic output restriction.  The result was that queues for metal delivery from Defendants' warehouses stretched from six weeks to **sixteen months** and, despite ample supply to meet organic demand, the price of aluminum was, as a result, artificially inflated.   This inflated price included all-time record highs for the Platts Midwest Premium, an industry-standard delivery pricing component applied to aluminum purchases.   The Midwest Premium applies to aluminum purchased throughout the United States—**even when the metal does not come from a warehouse**. Plaintiffs assert in their complaints, moreover, that Defendants used the LME as their platform for this conspiracy, as they gained control of over 75% of the LME-certified U.S. warehouses and, to the extent the LME imposed purported warehouse load-out minimums, Defendants (a) controlled that rule-making process, (b) set those minimums at commercially unreasonable low values, (c) treated the load-out "minimums" as de facto maximums, and (d) subverted the requirements anyway through sham warrant cancellations and a "shuffle" of aluminum between and among Defendants' own warehouses rather than for delivery to actual users of the metal.

1

Plaintiffs paid these inflated prices when they purchased aluminum, including (as they allege in their complaints) procurements made directly from integrated aluminum producers like Alcoa and Norsk Hydro.

Defendants have moved to dismiss Plaintiffs' complaints[1] under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]  Defendants argue that Plaintiffs lack antitrust standing and that they fail to state a claim in that, Defendants say, Plaintiffs do not plausibly allege their conspiracy claims.  Neither argument has merit.  As to antitrust standing, Defendants found their argument on a red herring.  They suggest that because Mag and Agfa are not consumers of warehousing services or Defendants' competitors in that industry, and because Mag and Agfa are not traders of commodities warrants in Defendants' futures arbitrage game (which Defendants built on the back of the physical aluminum market, as Plaintiffs allege in their complaints), Plaintiffs somehow lack standing to assert claims based on a price manipulation that they themselves suffered in the pricing of physical metal.  This argument is not supported by the law.  The Supreme Court has never restricted antitrust standing to consumers or competitors in the restrained market, *see Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct.

---

[1] Plaintiffs' substantially identical operative complaints are Mag's Amended Complaint [Dkt. 226] (hereafter "Mag Compl.") and Agfa's Amended Complaint [Dkt. 272] (hereafter "Agfa Compl.").

[2] Defendants' web of motions, all of which are brought under Rule 12(b)(6), include:  (1) Warehouse Defendants and Financial Firm Defendants' Motion To Dismiss Plaintiffs' Antitrust Claims For Failure To State a Claim ("Warehouse and Financial Firm Defendants' Failure to State a Claim Motion") [Dkt., at 316 and 317]; (2) Defendants' Joint Motion To Dismiss State Law Claims ("Joint State Law Claims Motion") [Dkt., at 341 and 342]; (3) Defendants' Joint Motion To Dismiss All Federal and State Antitrust Claims For Lack Of Antitrust Standing ("Joint Standing Motion") [Dkt., at 312 and 314]; (4) Defendants Henry Bath LLC and JPMorgan Chase & Co.'s Motion To Dismiss the Amended Complaints ("JPMorgan/Bath Motion") [Dkt., at 309 and 310]; (5) Pacorini Metals USA, LLC's Motion To Dismiss the Amended Complaints ("Pacorini Motion") [Dkt., at 331 and 332]; and (6) Defendant the London Metals Exchange's Motion To Dismiss All Complaints On the Merits ("LME Motion") [Dkt., at 333 and 334] (collectively, the "Motions to Dismiss").  In the interests of economy and for the convenience of the Court and parties, Plaintiffs have filed this consolidated opposition rather than separately responding to each motion to dismiss.

2540, 2544 (1982), and, even if the market at issue were the warehousing market or the futures trading market—which it is not—Defendants' argument has been steadily rejected not only by the Second Circuit, *see Crimpers Promotion Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983) and *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007), but also by the Third, Fourth, Sixth, Seventh, and Ninth Circuits.   In fact, Plaintiffs' allegations establish that they are first-level purchasers of physical aluminum, which they procure directly from producers, and no amount of speculation by Defendants as to attenuated purchase chains can alter this. Moreover, Plaintiffs allege a price manipulation injury of the type the antitrust laws were designed to protect against, and Plaintiffs are the quintessential efficient enforcers of those laws.

Plaintiffs more than "plausibly" allege the conspiracy of which they complain, easily "nudg[ing]" their claim across the line from conceivable to plausible, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007).   Plaintiffs offer both direct evidence of agreement among Defendants to restrain aluminum supply as well as allegations of parallel conduct accompanied by circumstantial evidence of conspiracy. Indeed on both this score and as to antitrust standing, rather than addressing the sufficiency of Mag's and Agfa's claims, Defendants seem content to instead argue against some non-existent, hypothetical complaint—of Defendants' own creation—that can best be described as an amalgamation of the three consolidated class complaints in this MDL, with only fleeting references to Mag's and Agfa's pleadings.   To that end, Defendants improperly argue disputed facts outside the complaints as a basis for dismissal of Mag's and Agfa's claims and urge the Court to draw inferences in their favor rather than in Plaintiffs' favor.   But the sufficiency of Mag's and Agfa's complaints can be measured only by the allegations made in those complaints, and not by

comparison to other complaints filed by other litigants.[3]  On this score, the complaints are more than adequate to survive these motions.

Finally, Defendants' overlapping motions offer makeweight arguments aimed at Plaintiffs' state law antitrust claims and at Mag's statutory and common law claims. These, too, should be denied.  As to the state law antitrust claims, Defendants offer no argument beyond those they level against the Sherman Act claim and, as to the consumer and common law claims, Defendants are just wrong on the law or ignore Mag's otherwise sufficient allegations.

This Court should deny in their entirety Defendants' Motions to Dismiss as to Mag and Agfa.

## STATEMENT OF FACTS

### Aluminum

Aluminum is a lightweight, non-ferrous metal used extensively in the manufacture of numerous products.  (Mag Compl., ¶¶ 3, 29; Agfa Compl., ¶¶ 3, 30 ). Large integrated producers, such as Norsk Hydro and Alcoa, mine and refine alumina into aluminum before shaping it into ingots, rolls, and other forms.  (Mag Compl., ¶¶ 30-31; Agfa Compl., ¶¶ 31-32).  This is primary aluminum.  (Mag Compl., ¶ 31; Agfa Compl., ¶ 32).  Primary aluminum is generally purchased from one of four sources, an integrated producer, an independent mill, a trader or distributor, or from warehouses, including LME-certified warehouses.  (Mag Compl., ¶ 32; Agfa Compl., ¶ 33).  From 2008 to 2012, the global aluminum market was in surplus with supply greater than demand.  (Mag Compl., ¶¶ 33-36; Agfa Compl., ¶¶ 34-37).

---

[3] For instance, JPMorgan and Henry Bath invite the Court to view the class plaintiffs' Section 2 monopolization claim as evidence of Goldman/Metro's "unilateral" conduct, undercutting the conspiracy claims as to JPMorgan/Bath.  *See* JPMorgan/Bath Motion. But Mag and Agfa make no Section 2 claim and this argument amounts to an impermissible attempt to have the Court draw the least favorable inference as to Mag's and Agfa's complaints.

**Plaintiffs Mag and Agfa**

Plaintiffs purchase primary aluminum directly from integrated aluminum producers, Norsk Hydro and Alcoa.  (Mag Compl., ¶ 16; Agfa Compl., ¶ 17).  Plaintiff Mag uses aluminum to produce flashlights.  (Mag Compl., ¶ 16).  Plaintiff Agfa uses it to produce, among other things, lithographic printing plates.  (Agfa Compl., ¶ 17).  Both Plaintiffs purchase aluminum pursuant to longstanding contracts which incorporate the LME Official Price and premiums, including the Midwest Premium.  (Mag Compl., ¶ 16; Agfa Compl., ¶ 17).  The use of contracts based on LME Official Price and Midwest Premium is standard for the purchase of aluminum for physical delivery.  (Mag Compl., ¶ 4; Agfa Compl., ¶ 4).

**The LME And Its Warehouses**

The LME is the world's largest non-ferrous metals market and a private trade association.  (Mag Compl., ¶ 24; Agfa Compl., ¶ 25).  More than 80% of all global non-ferrous metal futures business, including aluminum, is transacted through its platforms.  (Mag Compl., ¶ 24; Agfa Compl., ¶ 25).  Daily trading activities at the LME determines both the LME Official Price and LME Cash Price for aluminum.  (Mag Compl., ¶¶ 37-38, 40; Agfa Compl., ¶¶ 38-39, 41).  The prices are used as a global benchmark for physical contracts for delivery of aluminum.  (Mag Compl., ¶ 38; Agfa Compl., ¶ 39).

The LME also certifies and purports to supervise a global network of more than 700 warehouses, including about 200 in the United Sates.  (Mag Compl., ¶¶ 6, 24e, 42; Agfa Compl., ¶¶ 6, 25e, 43).  The LME warehouses are a critical part of the global and United States supply for aluminum.  (Mag Compl., ¶¶ 44-45; Agfa Compl., ¶¶ 45-46).  They represent a supplier of last resort for consumers who need aluminum to keep their plants operating.  (Mag Compl., ¶ 45; Agfa Compl., ¶ 46).

Historically and at times relevant to this action, the LME was actively managed by its members/shareholders.  (Mag Compl., ¶ 24; Agfa Compl., ¶ 25).  The LME conducted much of its work through its committees, such as the LME Warehousing

Committee and the Aluminum Committee.  (Mag Compl., ¶ 24; Agfa Compl., ¶ 25).
LME members sat on and controlled these committees.  (Mag Compl., ¶ 24; Agfa
Compl., ¶ 25).   Among its operations, the LME, through its member-controlled
committees, set rules relating to warehousing, including rules relating to the loading
out of aluminum.  (Mag Compl., ¶¶ 24, 47; Agfa Compl., ¶¶ 25, 48).

**Defendants Goldman Sachs, JPMorgan, and Glencore Gain Control of the LME and
LME Warehouses**

In 2010, Defendants Goldman Sachs, JPMorgan, and Glencore acquired control of
Defendants Metro, Henry Bath, and Pacorini, respectively.  (Mag Compl., ¶¶ 17, 19, 21;
Agfa Compl., ¶¶ 18, 20, 22).  These acquisitions gave Defendants control of over 75% of
LME-certified warehouses in the United States, including key warehouses in the
aluminum supply chain located in Detroit, Michigan.  (Mag Compl. ¶ 42; Agfa Compl.,
¶ 43).   Through affiliates, Defendants also gained control of global LME-certified
warehouses, including key warehouses in the global aluminum supply chain in Detroit,
Michigan and Vlissingen, Netherlands.  (Mag Compl., ¶¶ 6, 17-22, 61-62; Agfa Compl.,
¶¶ 6, 18-23, 62-63).

Defendants' 2010 acquisitions provided them with a substantial ownership
interest in Defendant LME.  (Mag Compl., ¶ 24; Agfa Compl., ¶ 25).  Equally important,
Defendants gained seats on the LME's Warehousing and Aluminum Committees.  (Mag
Compl., ¶ 24; Agfa Compl., ¶ 25).   Through their ownership interests, seats on key
committees, and control over the vast majority of LME-certified warehouses,
Defendants actively managed Defendant LME, including setting its warehousing rules.
(Mag Compl., ¶ 24; Agfa Compl., ¶ 25).  Defendants used the LME to implement their
conspiracy.  (Mag Compl., ¶¶ 1, 6, 47; 75-86; Agfa Compl., ¶¶ 1, 6, 47, 76-87).

Defendants' acquisition of warehousing operations and control of the LME was
done so that Defendants could "make prices" in the market for aluminum.  (Mag
Compl., ¶ 55; Agfa Compl., ¶ 56).  Defendant JPMorgan's Head of Global Commodities,

Blythe Masters, succinctly described the rationale for the acquisitions of the vast majority of LME-certified warehouses and control over the LME by financial firms:

> Just being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . ***We need to be active in the underlying physical commodity markets in order to understand and make prices.***

(Mag Compl., ¶ 55; Agfa Compl., ¶ 56).

As Plaintiffs allege, Defendants' activities in the underlying physical market for aluminum (a supply restraint) made the Midwest Premium, a key component in the price of physical aluminum, soar.

**The Amount of Aluminum Stored in Warehouses Soars**

During the global financial crisis of 2008, demand for physical aluminum sharply decreased. (Mag Compl., ¶¶ 52-53; Agfa Compl., ¶¶ 53-54). As a result, inventories of aluminum stored in warehouses increased. (Mag Compl., ¶¶ 52-53; Agfa Compl., ¶¶ 53-54). Even after the conditions that led to the 2008 crisis ended, the amount of aluminum being stored in warehouses continued to rise. (Mag Compl., ¶¶ 52-53; Agfa Compl., ¶¶ 53-54). From July 2008 to April 2013, the amount of aluminum stored in LME warehouses worldwide rose from about 1.1 million tonnes to 5.5 million tonnes. (Mag Compl., ¶¶ 48-51; Agfa Compl., ¶¶ 49-52). This amount is more than the total amount of aluminum consumed in the United States in one year. (Mag Compl., ¶ 6; Agfa Compl. ¶ 7). In the United States, aluminum stored in LME warehouses rose from about 463,000 tonnes in 2007 to about 2.3 million tonnes at the end of 2012. (Mag Compl., ¶¶ 48-51; Agfa Compl., ¶¶ 49-52).

**The Defendants Agree to Restrain Supply of Aluminum By Hoarding It In Their Warehouses**

Utilizing the LME and its warehousing rules, Defendants conspired to restrict the supply of aluminum by hoarding it in LME warehouses. Defendants hoarded aluminum in their LME and other warehouses. (Mag Compl., ¶¶ 48-53; Agfa Compl.,

¶¶ 49-54).   Despite historically high levels of aluminum in their warehouses, Defendants agreed to release as little of the aluminum supply stored in their warehouses to customers as possible.  (Mag Compl., ¶¶ 5-9; Agfa Compl., ¶¶ 5-9).

Defendants used the LME's warehousing rules to establish and carry out their agreement to restrict supply.  (Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70).  Prior to April 2012, LME rules imposed a minimum load out rule of 1,500 tonnes per day per company per city.  (Mag Compl., ¶ 66; Agfa Compl., ¶ 67).  This rule was intended only to be a minimum requirement, such that Defendants with large stores of aluminum were free to load out as much aluminum per day as they wanted.  (Mag Compl., ¶¶ 67-68; Agfa Compl., ¶¶ 68-69).  Defendants agreed to and did, in fact, treat the LME minimum load-out rule of 1,500 tonnes per day as a de facto load-out cap.  (Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70).  No matter how many warehouses they owned in a given city, Defendants agreed to load out a grand total of only 1,500 tonnes of aluminum per day.  (Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70).

To provide perspective, one warehouse with just two forklifts is estimated to be able to load out 1,920 tonnes of aluminum per day.  (Mag Compl., ¶ 68; Agfa Compl., ¶ 69).   Defendant Goldman Sachs, through Defendant Metro, operated some 27 warehouses in Detroit, meaning it could load out tens of thousands of tonnes of aluminum per day if it was operating efficiently—and if it wanted to do so.  (Mag Compl., ¶ 68; Agfa Compl., ¶ 69).

By agreeing to treat the LME minimum load out rule as a de facto load-out cap, Defendants restrained the supply of aluminum released to consumers, causing queues to form in certain key locations in the aluminum supply chain, such as Detroit, Michigan and Vlissingen, Netherlands.  (Mag Compl., ¶¶ 61-62, 69; Agfa Compl., ¶¶ 62-63, 70).  Notably, these queues did not exist prior to Defendants' obtaining control over the vast majority of LME warehouses.  (Mag Compl., ¶¶ 48, 69; Agfa Compl., ¶¶ 49, 70).

Defendants also kept their aluminum inventories high by offering incentive payments.  (Mag Compl., ¶¶ 5, 63-65; Agfa Compl., ¶¶ 5, 64-66).  Defendants paid aluminum producers and traders to store their aluminum in Defendants' warehouses.  (Mag Compl., ¶¶ 63; Agfa Compl., ¶¶ 64).  Defendants Goldman and Glencore are reported to have engaged in this conduct in Detroit, Michigan and Vlissingen, Netherlands, respectively.  (Mag Compl., ¶¶ 64-65; Agfa Compl., ¶¶ 65-66).  Detroit and Vlissingen are key warehousing centers in the global aluminum supply chain.  (Mag Compl., ¶¶ 6, 61-62; Agfa Compl., ¶¶ 6, 62-63).

In order to further restrict the amount of aluminum being released from their warehouses, Defendants also engaged in sham transfers of aluminum.  (Mag Compl., ¶¶ 5, 87-92; Agfa Compl., ¶¶ 5, 88-93).  Though their agreement to treat the LME minimum load-out rules as a load-out cap was sufficient to create a backlog, Defendants went one step further.  (Mag Compl., ¶ 87; Agfa Compl., ¶88).  Defendants swapped aluminum between and among their warehouses in transactions with other banks, hedge funds, and traders, including Defendants themselves and their affiliates, in order to create artificial scarcity.  (Mag Compl., ¶ 91; Agfa Compl., ¶ 92).  Defendants avoided releasing aluminum to consumers by moving aluminum from one LME-certified warehouse to another LME-certified warehouse (or to non-certified warehouses) under their control.  (Mag Compl., ¶¶ 88-90; Agfa Compl., ¶¶ 89-91).  Because the aluminum "left" an LME-certified warehouse, Defendants could claim to be complying with the LME load-out rules even though they never actually released the aluminum to consumers.  (Mag Compl., ¶ 92; Agfa Compl., ¶ 93).

Defendants also cancelled warrants to increase the backlog of aluminum in their warehouses.  (Mag Compl., ¶¶ 54-59; Agfa Compl., ¶¶ 55-60).  When aluminum is checked into an LME warehouse for storage, an LME warrant is issued.  (Mag Compl., ¶ 44; Agfa Compl., ¶ 45).  An LME warrant for aluminum is a standardized bearer document of title for a specific brand of metal (*e.g.*, aluminum) in a specified location

and warehouse.  (Mag Compl., ¶ 44; Agfa Compl., ¶ 45).  These warrants are freely tradable.  (Mag Compl., ¶ 44; Agfa Compl., ¶ 45).

To cancel a warrant means the underlying aluminum has been earmarked for delivery from the warehouse.  (Mag Compl., ¶ 44; Agfa Compl., ¶ 45).  The aluminum is then placed in queue for delivery.  (Mag Compl., ¶ 44; Agfa Compl., ¶ 45).  Defendants engaged in "dubious" transactions acquiring and then cancelling warrants, all with the intended result of increasing the backlog for aluminum.  (Mag Compl., ¶¶ 44, 57-58; Agfa Compl., ¶¶ 45, 58-59).   Once the aluminum is transferred into another warehouse controlled by Defendants or their affiliates, a new warrant can be issued, only to be once again cancelled.  (Mag Compl., ¶¶ 57-58; Agfa Compl., ¶¶ 58-59).  Notably, warrant cancellations skyrocketed after Defendants Goldman, JPMorgan, and Glencore acquired control over LME warehouses.  (Mag Compl., ¶ 59; Agfa Compl., ¶ 60).  Warrant cancellations far exceeded the legitimate need for physical aluminum.  (Mag Compl., ¶ 58; Agfa Compl., ¶ 59).

In the face of criticisms about warehouse queues, Defendants caused the LME to commission a study.   (Mag Compl., ¶¶ 75-86; Agfa Compl., ¶¶ 76-87).   Given Defendants' ownership interests in and control over the LME, the study specifically excluded from its scope "[b]roader issues surrounding allegations of manipulations and the entrance of large financial players [Defendants Goldman Sachs, JPMorgan, and Glencore]."  (Mag Compl., ¶ 77; Agfa Compl., ¶ 78).  The study reported that the unprecedented queues were damaging and responsible for increasing premiums.  (Mag Compl., ¶ 78; Agfa Compl., ¶ 79).  The study recommended increasing load out minimums even while admitting that proposed increases would still result in long queues.  (Mag Compl., ¶ 79; Agfa Compl., ¶ 80).

After the study, the LME changed its loading out requirements.  (Mag Compl., ¶ 81; Agfa Compl., ¶ 82).  Although it did not go as far as recommended by the study, the LME did increase its minimum load out rules.  (Mag Compl., ¶¶ 81-82; Agfa Compl.,

¶¶ 92-83).  The new rules effective April 2012, required larger warehouse companies to load out 3,000 tonnes per day.  (Mag Compl., ¶ 81; Agfa Compl., ¶ 82).  This amount was still far less than what Defendants could load out in one day if they were operating efficiently.  (Mag Compl., ¶ 82; Agfa Compl., ¶ 83).  Defendants once again treated the new minimum rule as a cap and continued to shift inventories between warehouses to avoid releasing aluminum to consumers.  (Mag Compl., ¶¶ 83-84; Agfa Compl., ¶¶ 84-85).  For its part, the LME benefited from having aluminum trapped in warehouses as it received 1% of the Defendants' warehouse rental revenues.  (Mag Compl., ¶ 86; Agfa Compl., ¶ 87).  As a result, aluminum queues persisted and supply continued to be restrained.  (Mag Compl., ¶¶ 83-86; Agfa Compl., ¶¶ 84-87).

Plaintiffs allege the above conduct was against Defendants' self-interest and defies explanation absent collusion.  (Mag Compl., ¶¶ 104-105; Agfa Compl., ¶¶ 105-106).  Absent collusion, Defendants could not operate their warehouses as a black hole for aluminum because competitors would operate efficiently, allowing customers quick access to aluminum and low rents.  (Mag Compl., ¶¶ 104-105; Agfa Compl., ¶¶ 105-106).

**Defendants' Agreed-Upon Hoarding Causes The Midwest Premium To Increase**

The Midwest Premium is supposed to reflect actual transport and holding costs incurred by the seller of physical aluminum to deliver it.  (Mag Compl., ¶¶ 39, 41; Agfa Compl., ¶¶ 40, 42).  Notwithstanding its name, the Midwest Premium is charged throughout the United States and in other parts of the world.  (Mag Compl., ¶ 39; Agfa Compl., ¶ 40).  The Midwest Premium is reported by Platts based upon information collected from buyers and sellers.  (Mag Compl., ¶¶ 39, 41; Agfa Compl., ¶¶ 40, 42).

The Midwest Premium reflects the immediately available aluminum price for delivery from the U.S. and foreign producers, traders, and holders of warehoused aluminum.  (Mag Compl., ¶ 41; Agfa Compl., ¶ 42).  After Defendants gained control over LME warehouses, the Midwest Premium began to rapidly increase, reaching all-

time highs.   (Mag Compl., ¶¶ 70-73, 106-09; Agfa Compl., ¶¶ 71-74, 107-10).   The Midwest Premium increased to all-time highs even though there are record amounts of aluminum sitting in Defendants' warehouses.   (Mag Compl., ¶¶ 70-73, 106-09; Agfa Compl., ¶¶ 71-74, 107-110).   Midwest Premiums increased directly as a result of Defendants' agreement to restrain the supply of aluminum by hoarding it in their warehouses.   (Mag Compl., ¶¶ 70-73, 106-09, 111-12; Agfa Compl., ¶¶ 71-74, 107-10, 113-14).

**Plaintiffs Pay The Increased Midwest Premiums**

As part of their contracts with aluminum producers, Plaintiffs paid and pay the Midwest Premium.   (Mag Compl., ¶¶4, 16; Agfa Compl., ¶¶ 4, 17).   Defendants' actions have caused the Midwest Premium to increase to record levels.   (Mag Compl., ¶¶ 106-09; Agfa Compl., ¶¶ 107-110).   Plaintiffs have been forced to pay these record level premiums in order to obtain aluminum for their operations.   (Mag Compl., ¶ 111; Agfa Compl., ¶ 113).

**In The Face Of Intense Scrutiny and Government Investigation Defendants Seek to Exit The Warehousing Industry**

Defendants' restraint of aluminum has not gone unnoticed.   (Mag Compl., ¶¶ 93-99; Agfa Compl., ¶¶ 94-100).   Some of the world's largest purchasers and users of aluminum have publicly complained about Defendants' activities.   (Mag Compl., ¶¶ 94-95; Agfa Compl., ¶¶ 95-96).   They have also complained directly to the LME.   (Mag Compl., ¶ 93; Agfa Compl., ¶ 94).

In the United States, both the CFTC and DOJ are reportedly investigating Defendants.   (Mag Compl., ¶¶ 98-99; Agfa Compl., ¶¶ 99-100).   In the United Kingdom, a committee of Parliament has referred the issue to the Office of Fair Trading.   (Mag Compl., ¶ 97; Agfa Compl., ¶ 98).

In the face of media and regulatory scrutiny combined with new ownership of the LME that is now not beholden to Defendants, Defendants have sought to exit the

warehousing and/or commodities business.  (Mag Compl., ¶ 100; Agfa Compl., ¶ 101).  In late July, 2013, JPMorgan planned to exit (and has since exited) the physical commodities business, including metals warehousing.  (Mag Compl., ¶ 101; Agfa Compl., ¶ 102).  On July 31, 2013, Goldman Sachs issued a statement in response to *The New York Times* announcing several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues.  (Mag Compl., ¶ 101; Agfa Compl., ¶ 102).  Since the time Plaintiffs filed their amended complaints, Goldman has now also announced its plans to exit the warehousing industry.

### APPLICABLE LEGAL STANDARD

***In reviewing a motion to dismiss brought pursuant to Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff.  *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570, 127 S.Ct. 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009).  To survive a Rule 12(b)(6) motion in the context of a Sherman Act Section 1 claim, "a plaintiff need only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'"  *Starr v. Sony BMG Music Entertainment*, 592 F. 3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting same).

### ARGUMENT

## I.   PLAINTIFFS HAVE ANTITRUST STANDING

"Section 4 of the Clayton Act provides a treble-damages remedy to '*[a]ny person*

who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.'" *McCready*, 457 U.S. at 472, 102 S.Ct. at 2544 (quoting 15 U.S.C. § 15) (emphasis in original).  The Supreme Court observed that Section 4's broad language reflects Congress' expansive remedial purpose in creating "a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Id.*  The Supreme Court has repeatedly recognized "'[t]he statute does not confine its protections to consumers, or to purchasers, or to competitors, or to sellers…. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.* (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 1006 (1948);  *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 135 S.Ct. 1377, 1386 (2014) (holding that all plaintiffs whose injuries were proximately caused by defendant's antitrust violations had standing to sue under the Clayton Act).  Of course, the Supreme Court recognized that Congress did not intend to allow every person "tangentially affected" by an antitrust violation, *McCready*, 457 U.S. at 477, 102 S.Ct. at 2547, or whose injury "might conceivably be traced" to an antitrust violation to recover threefold damages.  *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 891 (1972).  The Court explained there comes a point when the "ripples of harm" from an antitrust violation become too remote.  *McCready,* 457 at 476-77, 102 S.Ct. at 2547.  Nevertheless, the Court explained "the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective." *Id.* at 477, 102 S.Ct. at 2547.

One year after *McCready*, the Supreme Court decided *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897 (1983) ("*AGC*").  In *AGC*, the Supreme Court set forth factors to consider when determining whether a plaintiff has antitrust standing under Section 4, including: (1)

whether plaintiffs' injury is of the type the antitrust laws were intended to forestall, *id*. at 540, 103 S.Ct. at 909; (2) the directness or indirectness of the injury, *id*.; (3) whether the injury is speculative, *id*. at 542, 103 S.Ct. at 911; (4) the potential for duplicative recovery or complex apportionment of damages, *id*. at 545, 103 S.Ct. at 912; and (5) the existence of more direct victims of the alleged conspiracy. *Id*.

The Second Circuit has categorized the *AGC* factors in two ways. *See Port Dock*, 507 F.3d at 121-22. First, a private antitrust plaintiff must plausibly allege it suffered an injury of the type the antitrust laws were intended to forestall. *Id*. Second, a private antitrust plaintiff must show that it is an "efficient enforcer" to assert a private antitrust claim, *i.e.*, the remaining four *AGC* factors above. *Id*. Plaintiffs have properly alleged both.

### A.    Plaintiffs Have Suffered Antitrust Injury

Defendants argue that (1) antitrust injury is limited to consumers or competitors in the restrained market; (2) Plaintiffs have not alleged that they are consumers or competitors in the restrained market; (3) Plaintiffs were not instrumentalities of Defendants' conspiracy; and (4) Plaintiffs' injuries are not the result of competition-reducing aspects of Defendants' conspiracy. As shown below, each of Defendants' arguments is incorrect. Plaintiffs have properly alleged antitrust injury.

> 1.    *Supreme Court and circuit court precedent* does not *restrict antitrust standing to consumers and competitors*

Contrary to Defendants' argument, Supreme Court precedent makes clear that antitrust standing is not limited solely to competitors or consumers in the market restrained by defendants' antitrust violations. *McCready*, 465 U.S. at 472, 102 S.Ct. at 2545 (stating that the "statute does not confine its protections to consumers, or to purchasers, or to competitors, or to sellers") (internal quotations omitted). In *AGC*, the Court noted that a plaintiff that is a participant (consumer or competitor) in the market restrained by defendants' misconduct may, as a general matter, be presumed to have

suffered the type of direct injury sufficient to establish standing.  *AGC*, 459 U.S. at 538, 103 S.Ct. at 908-9.  Nevertheless, the Court did not hold, as Defendants argue, that standing is limited to only competitors and consumers in the restrained market. Instead, the Supreme Court emphasized that antitrust standing depends on a number of factors other than simply a plaintiff's participation in the restrained market.  *AGC*, 459 U.S. at 545, 103 S.Ct. at 912.  In *McCready*, the Supreme Court held that any private party "whose property loss is directly or proximately caused by" a violation of the antitrust laws has standing.  *McCready*, 457 U.S. at 471, 102 S.Ct. at 2544.  The Supreme Court recently reemphasized this point.  *Lexmark*, ___ U.S. at ___, 135 S.Ct. at 1386 (Section 4 claim available to "plaintiff whose injuries were proximately caused by a defendant's antitrust violation.").

Consistent with Supreme Court precedent, the Second Circuit has not limited antitrust standing only to consumers or competitors in the restrained market.   In *Crimpers Promotion Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983), the Court found antitrust standing even though plaintiff did not directly compete with defendants.  The plaintiff had standing because the harm it suffered was "inextricably intertwined" with and was the "intended consequences of, defendants' alleged antitrust violations."  *Id*. at 292, 294-95.  The Second Circuit rejected as "oversimplified" the flipside of Defendants' argument – that simply being a competitor confers antitrust standing.  *Port Dock*, 507 F.3d at 122.  *Port Dock* instructs that a court "can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges."  *Id.*

Second Circuit case law is consistent with numerous other Circuits that have recognized Supreme Court precedent does not limit standing to consumers or competitors in the restrained market.  *See American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("it is not [plaintiff's] status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's

alleged unlawful conduct and the plaintiff's harm…."); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) ("*McCready* . . . recognizes that different injuries in distinct markets may be inflicted by a single antitrust conspiracy…."); *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) (antitrust standing not dependent on plaintiff's status as a consumer or competitor in the restrained market); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310-14 (4th Cir. 2007) (finding the Supreme Court rejected the utility of a bright line rule that only consumers or competitors have antitrust standing); *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 27 F.3d 62 (3d Cir. 2000) (same).

Applying these principles, a court in this District recently rejected similar arguments that a plaintiff who participated in a derivatives market could not establish antitrust injury because it did not trade in the closely-related physical market where the antitrust violation was alleged to have occurred. *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012). The court held that the injuries alleged in the derivatives market were actionable under Section 4 of the Clayton Act, noting the close relationship between the artificial market conditions in the physical market and the plaintiffs' losses in the derivatives market. *Id.* Because the injuries in the derivatives market "stem[] from a competition-reducing aspect or effect of the defendants' behavior," the plaintiffs were "'within the target area of the defendants' alleged anticompetitive behavior.'" *Id.*

As demonstrated above, antitrust standing is not limited solely to the consumers or competitors in the restrained market. Defendants' argument is contrary to well-established law.

### 2.  *Plaintiffs plausibly allege antitrust injury*

In *Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013), the Second Circuit recently articulated its process for determining whether a plaintiff alleges antitrust injury. First, the plaintiff "must identify the practice

complained of and the reasons such a practice is or might be anticompetitive." *Id.* (quoting *Port Dock*, 507 F.3d at 122)).  Second, the Court looks at the actual injury to the plaintiff and the ways in which plaintiff is worse off as a result of a defendant's conduct.  *Id.*  Finally, the Court compares the anticipated anticompetitive effect of the specific practice at issue with the actual injury the plaintiff alleges."  *Id.* (citing *Port Dock*, 507 F.3d at 122).[4]  Comparing each of the three steps with Plaintiffs' complaints demonstrates that they have properly alleged antitrust injury.

> (a)   Defendants' horizontal conspiracy to restrain the supply of aluminum and thereby fix prices

Here, the antitrust practice complained of is Defendants' conspiracy to manipulate the price of aluminum, particularly the Midwest Premium.  (Mag Compl., ¶¶ 5-6, 54-99, 106-09; Agfa Compl., ¶¶ 5-6, 55-100, 107-10).  Defendants accomplished their price manipulation by agreeing to restrain the supply of aluminum in LME-certified warehouses controlled by them.  *Id.*  LME warehouses are a critical part of the global supply chain for aluminum.  (Mag Compl., ¶¶ 6, 42-47; Agfa Compl., ¶¶ 6, 43-48).  They represent the supplier of last resort for consumers who need to keep plants operating.  (Mag Compl., ¶ 45; Agfa Compl., ¶ 46).

Defendants profited from their agreement to manipulate the price of aluminum in several ways.  First, agreeing to restrain the supply of aluminum in their warehouses allowed them to collect more rent.  This benefitted their warehousing operations. Plaintiffs alleged Defendants agreed not to compete by using the LME to impose sham load out standards and by treating the minimum load out rates as maximum rates. (Mag Compl., ¶¶ 66-69, 75-86; Agfa Compl., ¶¶ 67-70, 76-87).  Defendants went even further in their efforts to restrain aluminum supply, simply shifting aluminum around

---

[4] In *Crimpers*, the Second Circuit stated the same concept in a slightly different manner looking at whether the harm a plaintiff suffered was "inextricably intertwined" with, and was the "intended consequence" of, the defendants' alleged antitrust violations. *Crimpers*, 724 F. 2d at 294.

in their own warehouses to meet the sham LME load out rules. (Mag Compl., ¶¶ 87-92; Agfa Compl., ¶¶ 88-93). As a result, aluminum continued to stockpile in warehouses controlled by Defendants throughout the world.[5] (Mag Compl., ¶ 61 and Agfa Compl., ¶ 62 (United States); Mag Compl., ¶ 62 and Agfa Compl., ¶ 63 (Europe)). Given the large stockpile of aluminum available in warehouses, vast quantities of aluminum should have been available for immediate delivery. (Mag Compl., ¶ 51; Agfa Compl., ¶ 52).

Faster loading out of aluminum is indisputably a method in which warehouse operators could compete. A party storing aluminum in a warehouse would seek to do so at the lowest cost and in a place where it could reasonably access the aluminum. Defendants' agreement thus reduces competition among their warehouse operations. This is significant given Defendants' control over 75% of the LME-certified warehouses in the United States. (Mag Compl., ¶ 42; Agfa Compl., ¶ 43).

Defendants' financial arms also profited from the increased prices of aluminum caused by their artificial supply restraint. After Defendants' collective takeover of LME warehousing in 2010, the nature of warehouses and the physical market for aluminum changed. (Mag Compl., ¶ 56; Agfa Compl., ¶ 57). Defendants pursued numerous financing deals using aluminum. (Mag Compl., ¶¶ 56-60; Agfa Compl., ¶¶ 57-61). Warrant cancellations increased in 2011 and then skyrocketed in 2012 (Mag Compl., ¶ 59; Agfa Compl., ¶ 60). The restricted supply ensured the Midwest Premium and aluminum pricing was artificially inflated. Through their control of the warehouses, Defendants kept the market in a contango state, where expected future prices are higher than current prices, allowing Defendants' financial arms to profit handsomely

---

[5] Global warehousing bottlenecks helped to implement Defendants' conspiracy. Without them a company, such as Plaintiff Agfa with operations in Belgium and the United States, could purchase aluminum from a warehouse, such as Vlissingen, Netherlands, and ship it to the United States. (*See* Mag Compl., ¶ 105; Agfa Compl., ¶ 106.)

from financing deals.  (Mag Compl., ¶ 60, Agfa Compl., ¶ 61).  Defendants' collective actions explained the candid statement made by Defendant JPMorgan's head of its commodities business:  "[j]ust being able to trade financial commodities is a serious limitation….  We need to be active in the underlying physical commodity markets in order to make price."  The phrase "make price" refers directly to manipulating the price of physical aluminum.

Having identified the Defendants' conduct that forms the basis of their complaints, Plaintiffs can easily demonstrate why the practice is anticompetitive. Supply constraints by horizontal competitors, such as alleged by Plaintiffs here, have long been deemed per se violations of the antitrust laws.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 (1940); *United States v. Andreas*, 216 F.3d 645, 666-69 (7th Cir. 2000).[6]

> (b)   Plaintiffs' actual injury is paying artificially high prices for aluminum, including the Midwest Premium

Plaintiffs' actual injury is paying higher prices for aluminum, including the Midwest Premium which is a component of their contract pricing.  (Mag Compl., ¶¶ 111-12; Agfa Compl., ¶¶ 113-14).  Unquestionably, Plaintiffs are worse off paying an artificially higher price for aluminum than a lower, competitively created price.

> (c)   The anticipated effect of a horizontal conspiracy to restrain aluminum is higher prices, which is precisely the injury Plaintiffs allege

Finally, the anticipated (and actual) anticompetitive effect of Defendants' practice at issue (restraining the supply of aluminum in warehouses) has been, among other things, increased prices for aluminum, including the Midwest Premium.  Plaintiffs have suffered antitrust injury directly as a result of Defendants' conduct.  Plaintiffs' injury is

---

[6] The Second Circuit's actual holdings in *Gatt* and *Port Dock* are easily distinguishable. In both *Gatt* and *Port Dock*, the defendants' anticompetitive conduct did not cause the plaintiffs' injuries.  Instead, the plaintiffs' injuries were caused by the defendants' decision to terminate their distribution relationships – something the defendants had the legal right to do.  *Gatt*, 711 F.3d at 77; *Port Dock*, 507 F.3d 123.

directly tied to Defendants' conduct, which spiked the Midwest Premium to all-time record high levels and kept all-in aluminum prices artificially high.  (Mag Compl., ¶ 71; Agfa Compl., ¶ 72).  Plaintiffs purchased aluminum directly from large producers pursuant to longstanding contracts which incorporated pricing based specifically on the current LME Official Price and other premiums, including the Midwest Premium (Mag Compl., ¶ 16a; Agfa Compl., ¶ 17).  Plaintiffs' formula pricing (LME plus premiums) is entirely consistent with the long-standing practice of how commercial and industrial contracts for the physical delivery of aluminum are priced.  (Mag Compl., ¶¶ 4, 37-41; Agfa Compl., ¶¶ 4, 38-42).   The Midwest Premium reflects offers for aluminum available for immediate delivery, incorporating, among other things, fluctuating delivery and storage costs.  (Mag Compl., ¶¶ 41, 106-109; Agfa Compl., ¶¶ 42, 107-110). Thus, Defendants' conspiratorial conduct, which restrained the supply of aluminum and impacted warehousing, directly impacted the Midwest Premium and therefore, the price Plaintiffs paid for aluminum pursuant to industry standard contracts.  Plaintiffs have alleged antitrust injury.  *See Crude Oil*, 913 F. Supp. at 57 ("alleged injury—losses from transacting in a market tainted by price manipulation—is 'of the type antitrust laws were intended to prevent'").

Defendants argue that Plaintiffs' injuries do not result from a competition-reducing aspect of Defendants' behavior.  In an effort to squeeze this case within the recent decision *In re Libor-Based Financial Instruments Antitrust Litig.*, 935 F.Supp.2d 666 (S.D.N.Y. 2013), Defendants badly mischaracterize Plaintiffs' allegations.  Defendants claim that the gravamen of Plaintiffs' allegations regarding minimum load out rules is a conspiracy "not to increase LME's minimum-load out rules…."  Defendants argue the setting of LME load out rules is not a competitive process.  Citing *In re Libor*, Defendants then conclude that because the setting of LME's minimum load out rules is not a competitive process, Plaintiffs cannot have sustained antitrust injury.

But while Plaintiffs do allege that Defendants used their control of the LME to

keep minimum load out rules below recommended levels, (Mag Compl., ¶¶ 81-82; Agfa Compl., ¶¶ 82-83), the core of Plaintiffs' allegation concerning the LME load-out rules is that Defendants, who are horizontal competitors, agreed to treat the minimum load out rule (a floor) as a maximum (ceiling or cap).   (Mag Compl., ¶¶ 67-70, 82-84; Agfa Compl., ¶¶ 68-71, 83-85).   Though Defendants theoretically were free to compete with each other by loading out more aluminum than was required by the LME minimum, they agreed not to do so.   This agreement restrained aluminum supply and caused the Midwest Premium (paid by Plaintiffs) to skyrocket.   The increased prices for aluminum also benefited Defendants' financing deals.   Thus, unlike *In re Libor*, Plaintiffs' injuries were the result of Defendants' anticompetitive agreement which reduced competition.[7]

### B.   Plaintiffs Are Efficient Enforcers of the Antitrust Laws

Defendants also argue that Plaintiffs lack antitrust standing because they are not efficient enforcers of the antitrust laws.   Applying the *AGC* factors, Defendants claim that (1) Plaintiffs' injuries are indirect and remote; (2) there is an identifiable group of more directly injured persons who are more efficient enforcers of the antitrust laws; and (3) Plaintiffs' injuries are speculative.[8]   Defendants' application of the *AGC* factors is flawed.   Proper consideration of the *AGC* factors as they relate to Plaintiffs' claims demonstrates that Plaintiffs are efficient enforcers of the antitrust laws.

#### 1.   *Plaintiffs' injuries are directly the result of Defendants' conduct which artificially inflated the Midwest Premium and are not remote*

Defendants first argue that Plaintiffs' injuries are indirect and remote. Defendants conjure a series of complicated diagrams and lengthy bullet point lists in an effort to demonstrate that some "convoluted chain of events" caused Plaintiffs' injuries. The reality is that Defendants' conduct had a direct and foreseeable impact on the prices

---

[7] The plaintiffs in *In re Libor* never alleged the defendants agreed to treat Libor as the maximum interest rate upon which they would lend money or offer other financial instruments.

[8] Defendants concede Plaintiffs' injuries are not duplicative of persons above them in the distribution chain.   *See* Joint Standing Motion, at 23.

Plaintiffs paid for aluminum.

Plaintiffs' injury here does not turn on speculative actions of innumerable market decision makers.  Defendants' conduct directly and foreseeably spiked the Midwest Premium to all-time record high levels and kept all-in aluminum prices artificially high, to Plaintiffs' detriment.  (Mag. Compl., ¶ 71; Agfa Compl., ¶ 72).  Plaintiffs purchased aluminum pursuant to contracts in which pricing was based on the LME Official Price and the Midwest Premium (Mag Compl., ¶ 16a; Agfa Compl., ¶ 17).  Plaintiffs' contracts reflect standard industry pricing formulae for physical delivery (Mag Compl., ¶¶ 4, 37-41; Agfa, Compl., ¶¶ 4, 38-42).  Defendants' conduct directly impacted the Midwest Premium and therefore, directly impacted the price Plaintiffs paid for aluminum.

Defendants' arguments about how Platts sets the Midwest Premium or that Plaintiffs were not required to use the Midwest Premium in purchasing aluminum are not appropriate for a motion to dismiss and do not withstand scrutiny in any event. Plaintiffs alleged that the Midwest Premium reflects offers for aluminum available for immediate delivery and incorporates fluctuating delivery and storage costs such that Defendants' conduct spiked it to record highs.  (Mag Compl., ¶¶ 39, 41, 70-73, 106-109; Agfa Compl., ¶¶ 40, 42, 71-74, 107-110).  Plaintiffs alleged that the use of the Midwest Premium in contracts for physical delivery of aluminum is industry standard.  (Mag Compl., ¶¶ 4, 36; Agfa Compl., ¶¶ 4, 37).  Given Plaintiffs' well-pleaded factual allegations, Defendants factual assertions to the contrary in a motion to dismiss must be rejected.  *See e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (stating that in considering a motion to dismiss, all factual allegations shall be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff).  Defendants ask the Court, impermissibly, to draw an inference in their favor, directly contradicting facts that Plaintiffs allege and that must be accepted as true.

Defendants rely on *Reading Industrial, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2nd Cir. 1980) to support their argument that Plaintiffs' injuries are indirect and remote, but *Reading* is distinguishable.  In *Reading*, the plaintiff, who was a purchaser of scrap copper, alleged that the defendants, who were manufacturers of refined copper, conspired to keep the price of refined copper *low*.  *Id.* at 11.  As a result, plaintiff alleged that other persons who bought copper directly from defendants were able to use their savings from defendants' low copper prices to bid up the price of scrap copper, which caused the price of scrap copper to be *high*.  *Id.* at 12.  The Second Circuit affirmed dismissal for lack of standing because it found that a complicated series of market interactions existed between defendants' actions in the refined copper market and plaintiff's alleged injuries of paying a higher price for scrap copper, requiring the reconstruction of innumerable decision-makers and forcing the court to engage in hopeless speculation.  Here, there is no complicated series of market interactions between Defendants' conduct and Plaintiffs' injuries.  Defendants restrained the supply of aluminum in warehouses directly causing the Midwest Premium to spike.

Defendants also rely upon *Ocean View Capital, Inc. v. Sumitomo Corporation of America*, No. 98 CIV. 4067(LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999).  Even if *Ocean View* were not a nullity,[9] subsequent decisions, including by the Seventh Circuit on the very issues in the very case, demonstrate why Plaintiffs here have antitrust standing.  *Ocean View*'s short decision denies antitrust standing with little analysis.  For example, *Ocean View* simply concludes that plaintiff did not satisfy the first prong of *AGC* without elaboration.  *Id.*, at *3.  *Ocean View* also concludes that plaintiff could not satisfy the second prong of *AGC*, because it was not a participant in the relevant market.  *Id.*  As demonstrated above, however, a lack of participation in the relevant market

---

[9] *See In re Copper Antitrust Litig.*, 99-C-621-C-, 2000 WL 3430131, at *15 (W.D. Wis. July 12, 2000) (S.D.N.Y.'s order ineffectual because case had been transferred by the time the Court issued its opinion).

alone is not sufficient to deny antitrust standing.

Contrary to the finding in *Ocean View*, the Seventh Circuit's extensive analysis of antitrust standing in *Loeb Industries v. Sumitomo Corp.* found that plaintiffs' injuries were direct and not remote for purpose of *AGC*.  In *Loeb*, purchasers of physical copper sued defendants who hoarded physical copper in order to manipulate the copper futures market.  Like this case, the plaintiffs in *Loeb* purchased copper directly from producers and not from defendants.  The Seventh Circuit noted that *McCready* recognizes that "different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus differently situated plaintiffs might be able to raise claims."  *Loeb*, 306 F.3d at 481.  The Seventh Circuit concluded that defendants' conduct caused harm in two separate markets.  In *Loeb*, as here, the injury did "not depend on the speculative actions of innumerable market decisions makers.  It flows directly from the contracts between Viacom and its supplier."  *Loeb*, 306 F.3d at 481.  Here, Plaintiffs' injuries flow directly from their contracts with their suppliers, which incorporate the Midwest Premium as part of the pricing – a pricing component that is standard in contracts for the delivery for physical aluminum.

> **2.**   *Plaintiffs are efficient enforcers of the antitrust laws because they are direct purchasers in the physical market for aluminum who paid artificially inflated Midwest Premiums*

Defendants argue that there are other more efficient enforcers of the antitrust laws.  Defendants point to persons who had aluminum trapped in warehouses as a result of Defendants' conduct.  While those persons may have claims against Defendants for excessive rents or otherwise, those are different claims for different injuries than the injury suffered by Plaintiffs, specifically, the payment of an artificially high Midwest Premium and artificially high all-in aluminum prices.

Defendants also argue that Plaintiffs are not efficient enforcers of the antitrust laws because they did not purchase aluminum directly from Defendants.  While not

cited by Defendants, their argument is really an attempt to raise *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061 (1977). *Illinois Brick*, however, does not establish an absolute rule requiring purchases directly from a defendant or coconspirator. Instead, it prevents duplicative recovery in the chain of distribution in one market. Defendants do not contend Plaintiffs acquired their aluminum from some other person who also claims to have paid an artificially inflated Midwest Premium. Moreover, to the extent Defendants claim a lack of privity, the Supreme Court has approved of numerous antitrust suits between parties not in privity. *See Loeb*, 306 F.3d at 482 (collecting cases).

Defendants argue that only a party that purchases directly from a coconspirator has standing to sue. Putting aside that this simply reargues that a person must be a consumer in the restrained market, which a person does not, the reasons underlying the cases cited by Defendants do not support this argument. For example, in *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242 (S.D.N.Y. 1997), the plaintiffs alleged that certain, but not all, retailers agreed with New Balance to fix the prices of New Balance shoes. The Court denied standing to persons who purchased only from non-conspiring retailers. Applying *AGC*, the Court concluded that for those persons "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors (*i.e.*, independent pricing decisions of non-conspiring retailers); and more direct victims of the alleged conspiracy exist in those who purchased directly from conspiring retailers…." *Id*. at 246-47. In contrast, Plaintiffs' injury is directly caused by Defendants' conduct which increased the aluminum price, including the Midwest Premium. There are no significant intervening causative factors.

Defendants' conspiracy operated and affected separate but related markets (warehousing and physical aluminum pricing). Plaintiffs are substantial purchasers of aluminum who were the first to pay an artificially inflated price for aluminum as a direct result of Defendants' anticompetitive conduct. There are no other parties better situated to challenge increased aluminum prices and premiums. Plaintiffs are efficient

enforcers of the antitrust laws.  *See Loeb*, 306 F. 3d at 485.

> 3.     *Plaintiffs' injuries are not speculative and are of the type commonly proved in an antitrust action*

Finally, Defendants argue that Plaintiffs' injuries are speculative because, once again, they depend on a complicated series of market interactions.  Plaintiffs' injury is not speculative and can be demonstrated with reasonable certainty.   As is typical in antitrust actions, Plaintiffs allege their injury consists of being overcharged for the price of something – here, aluminum.

The Supreme Court has recognized the overcharge method in price-fixing cases for over a century, calculating damages using the difference between the actual price and the price that would have prevailed absent the collusive conduct.  *See*, *e.g.*, *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (affirming overcharge damage methodology); *see* ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 199 (2d ed. 2010); 2A Philip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW ¶ 340b1 (3d ed. 2007) (the basic measure of damages in price-fixing cases is well-established: "After an illegal price-fixing conspiracy, one would compare the agreed price, or the actual price resulting from an agreed formula or other misbehavior, with the price that would have prevailed in the absence of the illegal conduct.").

The overcharge in this case consists of the inflated price of aluminum, including, specifically, the Midwest Premium.  It can be determined with a reasonable amount of certainty from the evidence in the case and from expert economic analysis.  It is far from speculative within the meaning of *AGC*.

## II.   PLAINTIFFS STATE  MORE THAN PLAUSIBLE CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT

Plaintiffs plausibly allege that Defendants entered into a "contract, combination ... or conspiracy, in restraint of trade or commerce" in violation of Section 1 of the Sherman Act.  *See* 15 U.S.C. § 1.  Accordingly, their Section 1 claims are not subject to

dismissal for failure to state a claim.  Plaintiffs allege in their Complaints *direct* evidence of an agreement among Defendants to impose output restrictions on the market for the physical delivery of aluminum to manipulate prices, including the Midwest Premium. In short, Plaintiffs allege that Defendants employed the LME, which they owned during much of the relevant period, as the vehicle to effectuate their collusion. (Mag Compl., ¶ 1; Agfa Compl., ¶ 1).  The LME was the agent of its members and their affiliates for agreements (disguised as LME rules) that govern warehouse storage, loading-out requirements and other functions related to activities that affect prices, including the Midwest Premium.  (Mag Compl., ¶ 24f; Agfa Compl., ¶ 25f).  Through their ownership and control of the LME and its various rules and standard-setting activities, Defendants agreed and conspired to fix prices of aluminum by employing the LME's loading-out rules as an output restriction.  (Mag Compl., ¶ 47; Agfa Compl., ¶ 48).  The LME's loading-out rules themselves, then, were in practice illegal agreements among Defendants.

Apart from Plaintiffs' direct allegations, Plaintiffs also allege detailed facts giving rise to a strong inference of a conspiracy in violation of Section 1. As more fully discussed below, those facts include parallel conduct among Defendants to hoard aluminum accomplished by: (1) acquiring ownership of approximately 75% of the U.S. metals warehouses and key warehouses in Rotterdam and Vlissingen in the Netherlands (Mag Compl., ¶¶ 17, 19, 21, 42; Agfa Compl., ¶¶ 18, 20, 22, 43); (2) jointly maintaining ownership of and membership in the LME for the purpose of manipulating and implementing the LME's rules in a manner that imposed output restrictions on the aluminum market (Mag Compl., ¶¶5, 6, 24b-f, 47, 66-69; Agfa Compl., ¶¶ 5, 6, 25b-f, 48, 67-70); (3) paying incentives to aluminum owners to attract aluminum inventories to Defendants' warehouses for the purpose of hoarding the aluminum and furthering the artificial shortage (Mag Compl., ¶¶ 5, 57, 58, 63-65; Agfa Compl., ¶¶ 5, 58, 59, 64-66);

and (4) shifting inventory among warehouses in order to comply with their own inadequate loading-out rules and thus withholding available aluminum from the market to meet demand (Mag Compl., ¶¶ 5, 58-59, 87-92; Agfa Compl., ¶¶ 5, 59-60, 88-93). Plaintiffs allege additional facts and circumstances that, taken together with their allegations of parallel conduct, give rise to a plausible inference of an illegal conspiracy among Defendants to restrict the output of aluminum and fix prices.

Although Defendants – with no factual or legal basis – attempt artificially to limit the scope of the alleged conspiracy to the domestic aluminum market, Plaintiffs' allegations clearly describe an illegal agreement among Defendants not limited to the United States, but rather one that is necessarily international in scope in terms of its planning, implementation, and effect on the aluminum market. In this regard, Plaintiffs describe the interrelated nature of the structure of the aluminum market (Mag Compl., ¶¶ 29-36; Agfa Compl., ¶¶ 30-37), the aluminum price-discovery mechanism (Mag Compl., ¶¶ 37-41; Agfa Compl., ¶¶ 38-42) and the LME's international warehousing system (Mag Compl., ¶¶ 42-51; Agfa Compl., ¶¶ 43-52). The United States consumes approximately 4 million tonnes of aluminum annually. (Mag Compl., ¶ 34; Agfa Compl., ¶ 35). Each year, however, the United States produces only 2 million of the 44 million tonnes of aluminum produced worldwide. (Mag Compl., ¶ 33; Agfa Compl., ¶ 34). Thus, in the absence of artificially large U.S. inventories on hand, half of the aluminum consumed in the United States annually is internationally-produced and stored in foreign LME-certified warehouses or imported for storage in domestic LME-certified warehouses.

This international network of LME-certified warehouses is critical to the aluminum supply chain because, among other things, only in such warehouses can LME delivery warrants be issued and canceled. (Mag Compl., ¶ 44; Agfa Compl., ¶ 45). Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of physical aluminum. *Id*. Without a link to a timely

deliverable metal, the viability of the LME price discovery mechanism would be lost, and consumers consequently would find no value in LME pricing. *Id.*

As the intended result of Defendants' collusive implementation of the LME loading-out rules to impose output restrictions on the international aluminum supply, this international network of LME-certified warehouses became a black hole for aluminum. Specifically, Plaintiffs allege that Glencore and Pacorini paid incentives to attract aluminum to their Vlissingen warehouses (in exactly the same way that Metro attracted aluminum to its Detroit warehouses), and then restricted output of the aluminum, giving rise to unprecedented queues (again, exactly as occurred in Detroit). (Mag Compl., ¶ 62; Agfa Compl., ¶ 63). Given the international market for aluminum, Metro's conduct would by itself be insufficient for the alleged conspiracy to be viable.

In the face of these allegations, Defendants mount a challenge to the sufficiency of Mag's and Agfa's Complaints by failing to focus on the allegations specific to the Mag and Agfa Complaints, improperly arguing based on disputed facts outside the pleadings, and urging the Court to draw inferences in their favor rather than Plaintiffs' favor. This is prohibited on a motion to dismiss. *See e.g., New Jersey Carpenters*, 709 F.3d at 119 (stating that in considering a motion to dismiss, all factual allegations shall be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 846 (2013) (citing *Monsanto Co. v. Spray-Rite,* 465 U.S. 752, 766 n.1, 104 S.Ct. 1464, 1472 (1984)) (holding that at the motion to dismiss stage, the choice among plausible inferences or interpretations is left to the finder of fact). For example, asserting their own version of the facts, Defendants improperly refute Plaintiffs' factual allegations that Defendants controlled and dominated the LME to manipulate and implement its rules and rule-making process so as to fix aluminum prices.[10] Similarly, in the Motions

---

[10] Furthermore, with citations to only the Class Complaints and not Mag's or Agfa's Complaints, Defendants state that "Plaintiffs" concede that Defendants played a limited

to Dismiss, Defendants urge the Court to infer in their favor that Defendants' prior ownership of and membership in the LME was benign and played no role in the alleged price-fixing conspiracy, despite Plaintiffs' factual allegations supporting inferences to the contrary.  Defendants' proffered facts in this regard cannot be considered on a motion to dismiss, and the Court may not accept Defendants' proposed inferences over Plaintiffs'.

### A.     The Applicable Standard Under *Twombly*

Liability under Section 1 of the Sherman Act requires a "contract, combination ... or conspiracy, in restraint of trade or commerce."  *See* 15 U.S.C. § 1.  In that regard, a Section 1 plaintiff need not allege or prove a formal agreement to establish a conspiracy, as the "essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words."  *Ross v. American Express Co.*, Nos. 04 Civ. 5723 and 05 Civ. 7116, 2014 WL 1396492, at *23 (S.D.N.Y. April 10, 2014) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1139 (1946)).  Courts consider the existence of a conspiracy on the whole, taking into account the "totality of the evidence" as opposed to "dismembering it and viewing its separate parts."  *Ross*, 2014 WL 1396492, *24 (quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410 (1962)).  Moreover, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  *Ross*, 2014 WL 1396492, at *24 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)).  And acquiescence in an illegal scheme [in violation of Section 1] is as much a violation of the Sherman Act as the creation and promotion of one.  *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 49 n. 4 (2013) (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161, 68

---

role concerning the LME's minimum loading-out rules.  *See* Warehouse and Financial Firm Defendants' Failure to State a Claim Motion, p. 27.  Mag and Agfa concede nothing of the sort and indeed, allege the very opposite.

S.Ct. 915, 931 (1948)).

In alleging a conspiratorial agreement, Federal Rule of Civil Procedure 8 provides that a complaint "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965; . *Id. see also Anderson News*, 680 F.3d at 182. Conclusory allegations are not enough, as compliance with the Rule requires "allegations that are sufficient to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* at 182 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964). As such, "Rule 8(a) 'contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'" *Twombly,* 550 U.S. at 555 n. 3, 127 S.Ct. 1955, 1965 (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1202, at 94-95 (3d ed. 2004)). The complaint must set forth facts sufficient to support a facially plausible inference that defendant engaged in wrongdoing. *Anderson News*, 680 F.3d at 182. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949).

The Supreme Court in *Twombly* elaborated on what is required to properly allege an agreement of this sort, whether "tacit or express," at the motion to dismiss stage. *Twombly* does not require "detailed factual allegations" beyond the requirements of Rule 8 to survive a motion to dismiss, nor "heightened fact pleading of specifics." 550 U.S. at 555, 570, 127 S.Ct. at 1964, 1974. Moreover, *Twombly* does not broaden the scope of Rule 9. *Id.* at 569 n.14, 127 S.Ct. at 1973. And the standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556, 127 S.Ct. at 1965. Thus, Plaintiffs need only allege enough facts to "nudge [the] claim across the line from conceivable to plausible." *Id.* at 570, 127 S.Ct. at 1974. To that

end, a complaint must set forth "enough factual matter (taken as true) to suggest that an agreement was made [in violation of Section 1]."  *Id.* at 56, 127 S.Ct. at 1965 (parenthetical material in original).  Further, the *Twombly* plausibility standard does not preclude the pleading of facts based upon information and belief when the facts are exclusively in the possession and control of the defendant.  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir.2008)).  The requirement that a plaintiff's allegations plausibly suggest an illegal agreement is consistent with the requirement of Rule 8 "that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'"  *Id.* at 557, 127 S.Ct. at 1966.

In application, when evaluating a Section 1 claim at the pleading stage, *Twombly* does not authorize a court to require plaintiff to "show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment … [or] at trial." *Anderson News,* 680 F.3d at 184 (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 597–98, 106 S.Ct. 1348, 1361-62 (1986) and *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473).  "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News,* 680 F.3d at 184 (citing *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512 (1985)) (stating that "two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]").  Choosing among such plausible inferences or interpretations is left to the finder of fact.  *Anderson News*, 680 F.3d at 184 (citing *Monsanto,* 465 U.S. at 766 n. 11, 104 S.Ct. at 1472).  "[T]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion … [as] fact-specific question[s] cannot be resolved on the pleadings." *Anderson News,* 680 F.3d at 185 (citing *Todd v. Exxon Corp.,* 275 F.3d 191, 203 (2d Cir. 2001)).  Thus, "a court ruling on such a motion may not properly dismiss a

complaint that states a plausible version of events merely because the court finds a different version more plausible." *Anderson News*, 680 F.3d at 185.

In *Anderson News*, the Second Circuit held that the district court's plausibility inquiry was misdirected when it dismissed plaintiff's Section 1 claim on the grounds that "[u]nilateral parallel conduct [by the defendants wa]s completely plausible." *Id*. at 189-90.   The Court stated:

> [T]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible…. The plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible. The view of the district court here that "*it is plausible* that each of the publisher Defendants *unilaterally* stopped shipping magazines to Anderson rather than pay the Surcharge," was thus not a proper basis for finding that Anderson had not pleaded a claim that was plausible.

*Id*. (emphasis in original).   The Second Circuit further rejected the trial court's finding "that the possibility that each of the defendants had acted 'separately' … was '[t]he *most* plausible scenario.'" *Id*. (emphasis in original).   The court held that "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Anderson News*, 680 F.3d at 190.   *See also Evergreen*, 720 F.3d at 42 (citing *Anderson News*, 680 F.3d at 185) (stating that "at the pleading stage a district court may not choose between two plausible inferences that may be drawn from factual allegations, dismissing a complaint merely because it finds a different version more plausible").   Indeed, not that such is the case here, but "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and "that a recovery is very remote and unlikely." *Twombly* 550 U.S. at 556, 127 S.Ct. at 1965 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct.

1683, 1686 (1974)).

Plaintiffs do not allege mere "labels and conclusions" or a "formulaic recitation of the elements" of a Section 1 claim. *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. Rather, Plaintiffs' allegations are detailed and comprehensive and set forth more than enough factual material to indicate an illegal agreement here and "raise a reasonable expectation that discovery will reveal evidence of such an agreement." *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965. Plaintiffs' Complaints certainly "nudge" their Section 1 claims across the line from conceivable to plausible.

### B.   Plaintiffs Allege Direct Evidence of an Agreement in Violation of Section 1

Agreements between competitors (also known as horizontal agreements) to restrict output are *per se* violations of the antitrust laws.[11] *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 100, 104 S.Ct. 2948, 2959 (1984) ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high…"). The Supreme Court has recognized that agreements fixing price maximums – which superficially may appear to benefit consumers – are anticompetitive because, among other reasons, such agreements "may be a masquerade for an agreement to fix uniform prices, or it may in the future take on that character." *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 348, 102 S.Ct. 2466, 2475 (1982). An agreement to restrict output is functionally the same as an agreement to fix prices: where output is restricted, prices will naturally rise to limit demand to the reduced output. *Cal. Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756, 777, 119 S.Ct. 1604, 1616 (1999). Given this relationship between price and output, the Supreme Court's observation about maximum prices applies equally to output agreements: an output agreement that appears to mandate a minimum output may be in fact a disguised

---

[11] The *per se* nature of Defendant's Section 1 violation is more fully discussed below.

agreement for a uniform or maximum output. Thus, as Plaintiffs allege, the LME's purported "minimum" loading out obligation operated as a de facto agreement to artificially limit deliveries of aluminum to this minimum. (Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70). Thus, the LME's minimum loading-out obligation itself is direct evidence of an agreement among Defendants to restrict output, a *per se* violation of Section 1.

### C. Plaintiffs Properly Allege A Plausible Horizontal Conspiracy

Direct evidence of a conspiracy in violation of Section 1 of the Sherman Act is elusive, as "conspiracy by its nature is a secretive operation and it is a rare case where all aspects of a conspiracy can be laid bare in a court with precision." *Anderson News*, 680 F.3d at 183 (quoting *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006)). Therefore, antitrust conspiracies are typically alleged (and proven) through "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News*, 680 F.3d at 183 (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)). In alleging conspiracy by inference, a plaintiff must allege parallel conduct along with "context," or "setting," suggesting an agreement. *Anderson News*, 680 F.3d at 184 (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966). But, again, a plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment." *Anderson News*, 680 F.3d at 184. Providing "context" or "setting" has been interpreted by many courts to require additional circumstantial evidence and "plus factors" that, when considered along with parallel action, permit the inference of an illegal agreement. *Mayor and City Council of Baltimore Maryland v. Citigroup, Inc.*, 709 F.3d 120 (2nd Cir. 2013) (quoting *Todd*, 275 F.3d at 198). *But cf. Evergreen*, 710 F.3d at 46-47 (stating that judicial references to "plus factors" have invariably been culled from cases evaluating antitrust claims at the summary judgment or trial stage of litigation "when there is significantly more

information available regarding whether complex analyses of pricing structures and other information suggest an agreement…[Thus, the First Circuit is] wary of placing too much significance on the presence or absence of 'plus factors' at the pleading stage'"). Plus factors, of course, are essentially circumstances indicating that collusive action is more likely than independent.  *Avenarius v. Eaton Corp.* 898 F. Supp. 2d 729, 738 (D. Del. 2012) (citing *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).  In that regard, a plaintiff should allege facts that if true, establish at least one plus factor. *Citigroup*, 709 F.3d at 137 (quoting *In re Insurance*, 618 F.3d at 323).

Here, Plaintiffs properly allege parallel conduct by Defendants along with circumstantial evidence and plus factors, which together establish an inference of a horizontal conspiracy.

### 1.   *Plaintiffs properly allege parallel conduct*

Plaintiffs allege that the Financial Firm Defendants positioned themselves in concert to manipulate the price of aluminum for physical delivery in the United States and convert the physical market for aluminum into a *de facto* speculators' market for their own benefit and to the detriment of Plaintiffs.  (Mag Compl., ¶¶ 5, 57; Agfa Compl., ¶¶ 5, 58).  Specifically, Plaintiffs allege that the Financial Firm Defendants acquired ownership of approximately 75% of the LME-certified warehouses in the United States within seven months of each other. (Mag Compl., ¶¶ 17, 19, 21, 42; Agfa Compl., ¶¶ 18, 20, 22, 43).  Further, Defendants conceived of and implemented their conspiracy soon after acquiring their dominant position in the metals warehousing market, the effects of which soon thereafter manifested in the market.  (Mag Compl., ¶¶ 5, 7, 57-59, 62, 66-69, 70-71, 78; Agfa Compl., ¶¶ 5, 7, 58-60, 63, 67-70, 71-72, 79).

Plaintiffs also allege that each of the Financial Firm Defendants concertedly maintained ownership of and membership in the LME, whose aluminum warehousing rules were implemented and manipulated by Defendants, such that their relationship with the LME functioned as a collusive agreement among Defendants and their co-

conspirators.  (Mag Compl., ¶ 6; Agfa Compl., ¶ 6).  In that regard, Plaintiffs explain that prior to the LME's acquisition by HKEx Group in December 2012, it was owned and controlled by its members.  (Mag Compl., ¶ 24b; Agfa Compl., ¶ 25b).  In fact, the Financial Firm Defendants JPMorgan and Goldman Sachs were the two largest shareholders in the LME prior to its acquisition by HKEx.  (Mag Compl., ¶ 24d; Agfa Compl., ¶ 25d).  Moreover, the Financial Firm Defendants and their Warehousing Defendant subsidiaries actively participated in management of the LME – "much more so than is typical of shareholders in a corporation" – through participation on various LME committees.  (Mag Compl., ¶ 24c; Agfa Compl., ¶ 25c).  Thus, Plaintiffs Mag and Agfa do not allege that Defendants were merely members in a trade association or passive shareholders, but instead that Defendants actively managed the LME and established LME policy concerning aluminum sales in a conspiratorial way to increase aluminum prices artificially.  After all, Defendants controlled over 75% of the LME-certified warehouses.  (Mag Comp., ¶ 42; Agfa Compl., ¶ 43).  So while Defendants cite multiple cases holding that mere membership in the same trade association as one's codefendants does not establish a conspiracy, Plaintiffs here have alleged much more than merely passive membership.  Even still, "private standard setting trade associations have traditionally been objects of antitrust scrutiny[.]"  *Evergreen*, 720 F.3d at 49 (quoting *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500, 108 S.Ct. 1931, 1937 (1988)).

Also, Defendants' controverting factual assertions in their motions regarding Plaintiffs' purported minority ownership interests and limited participation in LME management are of no consequence at the motion to dismiss stage, and the Court may not accept Defendants' version of the facts over Plaintiffs' "[because] fact-specific question[s] cannot be resolved on the pleadings."  *See Anderson News,* 680 F.3d at 185 (citing *Todd*, 275 F.3d at 203) (holding that "on a Rule 12(b)(6) motion…fact-specific question[s] cannot be resolved on the pleadings).

Plaintiffs further allege that Defendants, acting together and with an illegal purpose, employed the LME, which they owned as co-venturers during much of the class period, as the vehicle to effectuate their collusion. (Mag Compl., ¶ 1; Agfa Compl., ¶ 1).  That is, through its various activities, the LME was the agent of its members and affiliates for warehouse rules for storage and load-out and other functions related to the activities that affect prices, including the Midwest Premium and supply of aluminum for physical delivery.   (Mag Compl., ¶ 24f; Agfa Compl., ¶ 25f). Defendants, through the LME – including by means of ownership and control of the LME, control of its certified warehouses, and the LME's various rules and standard-setting activities – agreed and conspired to fix, raise, elevate, maintain, or stabilize prices of aluminum.  (Mag Compl., ¶ 47; Agfa Compl., ¶ 48).  Primarily, Defendants used the LME rule-making process to establish sham "standards," providing the instrumentality by which Defendants could reach anticompetitive agreements while at the same time deflecting scrutiny of their practices.  (Mag Compl., ¶ 5; Agfa Compl., ¶ 5).

Having positioned themselves as described above, Defendants collusively imposed aluminum output restrictions on the market by agreeing among themselves to hoard aluminum in their LME-certified warehouses as well as non-LME "shadow" warehouses. (Mag Compl., ¶¶ 5, 92; Agfa Compl., ¶¶ 5, 93).  Plaintiffs allege that Defendants accomplished this in three ways: (1) agreeing amongst themselves to load out no more aluminum on a daily basis than the LME-required minimum, and using their positions as owners of the LME holding positions of control to concertedly refrain from creating and imposing upon themselves reasonable load-out requirements (Mag Compl., ¶¶ 5, 66-69; Agfa Compl., ¶¶ 5, 67-70); (2) paying incentives to aluminum owners to attract aluminum inventories to Defendants' warehouses to further the aluminum shortage (Mag Compl., ¶¶ 5, 57, 58, 63-65; Agfa Compl., ¶¶ 5, 58, 59, 64-66); and (3) shifting inventory among warehouses in order to feign compliance with their

own conspiracy-furthering load-out rules (Mag Compl., ¶¶ 5, 58-59, 87-92; Agfa Compl., ¶¶ 5, 59-60, 88-93).

First, Defendants, in concert and allegedly pursuant to an agreement to this end, employed the purported minimum load-out rate as a *de facto* uniform or maximum load-out rate.  Plaintiffs allege that Defendants never loaded out more than the LME minimum even after the LME moderately increased the minimum requirement to a still inadequate level.   (Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70).   Plaintiffs provide specific data on inventory levels that show Defendants' hoarding, as well evidence of industry complaints regarding the unprecedented inability to obtain aluminum from Defendants in a timely manner.  (Mag Compl., ¶¶ 57, 61-62, 66-69; Agfa Compl., ¶¶ 58, 62-63, 67-70).  Plaintiffs explain that in Detroit alone, Metro could have loaded out almost 30 times the amount to which it restricted itself had it operated only two forklifts per warehouse.  (Mag Compl., 68; Agfa Compl., ¶ 69).   In this regard, the LME load-out rules (in effect both before and after the minimum loading-out requirement was increased) were an agreement among Defendants through their ownership and effective control over the LME with regard to load-out rules.  (Mag Compl., ¶ 84; Agfa Compl., ¶ 85).

Further, the Complaints allege that through their ownership and control of the LME, Defendants concertedly refrained from imposing upon themselves load-out rules that would adequately serve aluminum consumers.  As Plaintiffs allege, Defendants' own consultant reported that the excessive queues were damaging "on the grounds that they inhibited arbitrage between the LME and the physical market, increased physical premiums and damaged the reputation of the LME." (Mag Compl., ¶ 78; Agfa Compl., ¶ 79).  The consultant explained that the queues occurring in 2010 "were of an unprecedented length," and that "premiums have increased in conjunction with the emergence of long queues" such that premiums were "greatly in excess of the cost of arbitraging between locations."   *Id*.   Accordingly, the consultant recommended an

increase in the loading out requirement while admitting that even its proposed modest increase could result in excessively long queues, further opining that "[i]t would be irresponsible for the LME . . . to maintain [such insufficient loading-out requirements] were lengthy, persistent queues to remain." (Mag Compl., ¶¶ 79-80; Agfa Compl., ¶¶ 80-81).

Rather than accept the consultant's modest recommendations, Defendants, together through the LME, approved a lesser increase in the minimum loading-out requirement, which was still far less than the Warehouse Defendants could load out had they operated efficiently. (Mag Compl., ¶¶ 81-82; Agfa Compl., ¶¶ 82-83). Again, all LME members are bound by the LME rules, and the LME-member Defendants here used their influence as members of the LME to shape those rules to their benefit and to the detriment of Plaintiffs. (Mag Compl., ¶ 84; Agfa Compl., ¶ 85).

Second, Plaintiffs allege that Defendants restricted the supply of aluminum available for delivery by offering incentives to owners of aluminum to entice them to store and continue storing their aluminum in Defendants' warehouses rather than releasing it into the market. (Mag Compl., ¶¶ 5, 57, 63; Agfa Compl., ¶¶ 5, 58, 64). Specifically, Plaintiffs allege that Defendant Metro offered owners incentive payments of up to $230 per ton to continue storing their aluminum at Metro warehouses. (Mag Compl., ¶ 64; Agfa Compl., ¶ 65). In addition, the Complaints allege that Defendants Glencore and Pacorini engaged in the same conduct in Vlissingen, quoting a London-based trader to say, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen. Then they deliver it to the market and whoever holds it can't actually get it out for a year." (Mag Compl., ¶ 65; Agfa Compl., ¶ 66).

Finally, Plaintiffs allege that Defendants swapped aluminum inventories among LME warehouses and "shadow" warehouses in transactions with other banks, hedge funds, and traders, including Defendants themselves or their affiliates, with no

legitimate economic rationale, but instead for the purpose of creating and adding to the artificial scarcity and concealing their conspiracy.  (Mag Compl., ¶¶ 5, 92; Agfa Compl., ¶¶ 5, 93).  Plaintiffs allege that Defendants concertedly evaded even the *de minimis* minimum loading-out rules by shifting inventories of aluminum from one LME-certified warehouse to another or to non-certified warehouses, feigning compliance with the loading-out rules while actually maintaining inventories.  (Mag Compl., ¶ 87; Agfa Compl., ¶ 88).  Plaintiffs explain that Defendants accomplished this by purchasing inventories of aluminum, placing them under warrant at LME warehouses, followed by dubious "transfers" to, in many cases, the Warehouse Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum reached the next warehouse.  (Mag Compl., ¶¶ 87-92; Agfa Compl., ¶¶ 88-93).  Plaintiffs, in their Complaints, provide specific industry data regarding live and canceled warrants to illustrate Defendants' scheme.  In that regard, the data shows that due to Defendants' inventory-shifting scheme, warrant cancellations came to far exceed any organic need for physical aluminum. (Mag Compl., ¶¶ 58-59; Agfa Compl., ¶¶ 59-60).

Further, Plaintiffs quote a *New York Times* article, which was the product of an extensive investigation and quotes from those with first-hand knowledge, to describe those practices:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses.  Two or three times a day, sometimes more, the drivers make the same circuits.  They load in one warehouse.  They unload in another.  And then they do it again.

(Mag Compl., ¶¶ 88-91; Agfa Compl., ¶¶ 89-92).  The result is that, "nearly all of the metal that Metro moves is not delivered to customers . . . .  Instead, it is shuttled from one warehouse to another."  (Mag Compl., ¶ 90; Agfa Compl., ¶ 91).  Plaintiffs allege that Defendants' purpose in this scheme was to create and further the artificial scarcity of aluminum available for physical delivery, thereby impacting the wider aluminum

market, including the market for aluminum futures.  (Mag Compl., ¶ 91; Agfa Compl., ¶ 92).   That is precisely what Defendants accomplished because now, as Plaintiffs allege, the vast majority of the aluminum moved is owned not by manufacturers or wholesalers, but by banks, hedge funds, and traders that store aluminum in the warehouses, cancel their warrants, and then re-warrant the aluminum for the purpose of manipulation. (Mag Compl., ¶ 91, Agfa Compl., ¶ 92).

> 2.  *Plaintiffs' allegations of parallel conduct are accompanied by cognizable circumstantial evidence*

The circumstantial evidence alleged in the Complaints indicating a conspiracy among Defendants is significant.  Plaintiffs explain that the LME warrant-warehouse system properly functioned for 135 years, during which time aluminum inventories in LME warehouses represented a very small percent of global aluminum supplies.  (Mag Compl., ¶ 48; Agfa Compl., ¶ 49).  That is, the LME for a long time carefully supervised the warehouses such that the LME's reputation as a readily-accessible and liquid exchange properly was robust.  (Mag Compl., ¶ 48; Agfa Compl., ¶ 49).  It was only after the Financial Firm Defendants' entry into the aluminum warehousing industry that delivery queues and the Midwest premium skyrocketed (Mag Compl., ¶¶ 5-9, 48-51, 54-69, 75-99, 104-112; Agfa Compl., ¶¶ 5-9, 49-52, 55-70, 76-100, 105-122), inciting vigorous protestation from aluminum consumers and prompting government investigations.  (Mag Compl., ¶¶ 93-95; Agfa Compl., ¶¶ 94-96).  Plaintiffs allege that absent Defendants' conduct, it defies economic explanation for purchasers of aluminum to endure the excessive queues described in the Complaints (reaching 20 times the duration of pre-conspiracy queues) and to pay such high Midwest Premiums given the large quantities of aluminum that were available for delivery during the time period in question.  (Mag Compl., ¶¶ 8, 51, 61, 104-105; Agfa Compl., ¶¶ 8, 52, 62, 105-106).

More specifically, Plaintiffs allege that shortly after Goldman Sachs' purchase of Metro, Metro's Detroit warehouses loaded out half the aluminum they took in. (Mag

Compl., ¶ 61; Agfa Compl., ¶ 62). From a global perspective, Metro took in 42% of global inventory arrivals during this time but released only 26% of metal delivered out. *Id*. Before Goldman Sachs bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories. *Id*. After Goldman Sachs' acquisition of Metro, the wait increased more than twenty-fold to more than 16 months. *Id*. The same phenomenon occurred in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, and sister company Defendant Pacorini USA, is the dominant operator). Queues reportedly reached one year for aluminum stored in Vlissingen. (Mag Compl., ¶ 62; Agfa Compl., ¶ 63). Glencore created those queues through a deliberate effort to hoard aluminum in those warehouses by, among other things, the payment of incentives. *Id*.

Plaintiffs also explain that warrant cancellation activity began to increase only after Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and that warrant cancellation activity exploded at the beginning of 2012 once their conspiracy was fully implemented (Mag Compl., ¶ 59; Agfa Compl., ¶ 60). Plaintiffs provide industry data on warrant cancellation illustrating this point. (Mag Compl., ¶ 20; Agfa Compl., ¶¶ 22-23). This drastic and unprecedented increase in warrant cancellation activity is powerful circumstantial evidence of Defendants' sham transfer scheme, which was implemented to impose aluminum output restrictions and thereby create a price-inflating shortage of aluminum that benefitted Defendants but damaged Plaintiffs.

Plaintiffs further provide a detailed, cogent analysis to show that the increase in aluminum inventories and the Midwest Premium can only be explained by the existence of a concerted effort among Defendants – who controlled 75% of the U.S. metals warehouses – to impose output restrictions on the aluminum market. In that regard, the Complaints allege that it defies economic logic that inventories of aluminum increased or remained constant at the same time that the Midwest Premium

increased.   Plaintiffs explain that the large inventories of aluminum stored in warehouses indicated that there was an ample supply of aluminum available for immediate delivery.   This should have produced a corresponding decrease in the premiums for such delivery.  (Mag Compl., ¶ 51; Agfa Compl., ¶ 52).  Plaintiffs further explain that the increase in aluminum inventories was initially a result of the 2008 global financial crisis, as demand for aluminum decreased sharply then.  (Mag Compl., ¶ 52; Agfa Compl., ¶ 53).  But when the global financial conditions that initially led to the rapid increase in the amount of aluminum held in storage had ended, the amount of aluminum held in storage in U.S. LME warehouses continued to rise or remain steady (Mag Compl., ¶ 53; Agfa Compl., ¶ 54), causing aluminum purchasers to endure unprecedented queues at LME-certified warehouses. (Mag Compl., ¶ 7; Agfa Compl., ¶ 7).   The increase in aluminum inventories, despite improvement in global financial conditions, and the long queues for stored aluminum when huge stores of aluminum existed, is further circumstantial evidence of Defendants' conspiracy.

Plaintiffs also allege that the Midwest Premium for the physical delivery of aluminum increased coincident with simultaneous decreases in the LME Cash Price – a phenomenon explained only by the existence of a concerted effort among Defendants to restrict the output of aluminum into the market.   Plaintiffs allege that the Midwest Premium fluctuated between four and eight cents per pound from 2004 through 2008 when aluminum consumption was robust and LME Cash Prices peaked at about $3,000 per tonne.  (Mag Compl., ¶ 70; Agfa Compl., ¶ 71).  During the financial crisis from 2008 and 2010 and the subsequent weak recovery, the Midwest Premium reflected downward market pressure such that it fluctuated between three and six cents per pound.   *Id*.   During this same period, the LME Cash Price was also much lower, fluctuating between $1,300 and $2,200 per tonne.   *Id*.   However, explain Plaintiffs, in February 2011 (just after Defendants purchased their warehousing interests), a markedly different and economically inexplicable pattern emerged.   (Mag Compl., ¶

71; Agfa Compl., ¶ 72).    Economic conditions remained poor, leaving a huge global surplus of aluminum.  *Id.*  As expected, the LME Cash Price began a decline from $2,600 to a recent low of $1,730.  *Id.*  The Midwest Premium, however, moved in the opposite direction.  *Id.*  Beginning in February 2011, the Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and continued to rise during 2011 through 2013 to 12 cents per pound in July 2013.  *Id.*  In January 2014, the Midwest Premium surged to an all-time high of more than 20 cents per pound.  *Id.*  To put that in perspective, the Midwest Premium was a little over 3% of the LME Cash Price at the height of the bull market in 2008, but increased to over 14% of the LME Cash Price at a time when global surpluses of aluminum have never been higher.  *Id.*  Plaintiffs provide specific data evidencing these increases.  (Mag Compl., ¶¶ 25-26; Agfa Compl., ¶¶ 27-28).  As Plaintiffs allege, there is no economic explanation for this divergence between (1) market conditions and aluminum inventories and (2) aluminum prices and the Midwest Premium other than Defendants' concerted stranglehold on the aluminum supply.

Plaintiffs explain, in summary, that in a competitive aluminum warehousing market, Defendants could not possibly operate their warehouses in a manner such that customers were forced to wait months for delivery of stored aluminum.  (Mag Compl., ¶ 104; Agfa Compl., ¶ 105).  In a competitive market, warehouse owners operating efficiently would attract business away from intentionally inefficient warehouse operators.  *Id.*  That is, Defendants could not independently engage in the practices described in the Complaints absent a conspiracy.  (Mag Compl., ¶ 105; Agfa Compl., ¶ 106).  If any of Defendants acted alone, as concerns aluminum warehousing, rival warehouse owners in other parts of the United States and the rest of the world would take away their business.  *Id.*

Finally, Plaintiffs allege that it is no coincidence that in the face of media and regulatory scrutiny over the acts alleged in Plaintiffs' Complaints, and perhaps even

more significantly, the purchase of the LME by a reputable exchange operator that is not beholden to LME members, many of the Defendants agreed to change their practices or, in the case of JPMorgan, exited the commodities (including aluminum) business altogether.  (Mag Compl., ¶ 100; Agfa Compl., ¶ 101).  Specifically, Plaintiffs allege that in late July, 2013, JPMorgan planned on exiting (and has since exited) the physical commodities business including metals warehousing based in part on increased regulatory scrutiny of its metals warehousing practices.  (Mag Compl., ¶ 101; Agfa Compl., ¶ 102).  On July 31, 2013, Goldman Sachs issued a statement in response to *The New York Times* announcing several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues.  (Mag Compl., ¶ 101; Agfa Compl., ¶ 102).  Most notably, shortly after the LME came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing excessive queues to load out more aluminum than they load in.  (Mag Compl., ¶ 103; Agfa Compl., ¶ 104).  As Plaintiffs allege, these were steps Defendants could have taken long before complaints of excessive queues first surfaced.  (Mag Compl., ¶¶ 102-03; Agfa Compl., ¶¶ 103-104).

### 3.     *Plaintiffs allege plus factors*

Plaintiffs must allege at least one plus factor in support of parallel behavior allegations.  *Citigroup*, 709 F.3d at 137 (quoting *In re Insurance*, 618 F.3d at 323).  There is no finite or exhaustive list of plus factors.  *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 360 (3d Cir. 2004).   Nevertheless, plus factors identified by courts and commentators include "(1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4) market concentration and structure conducive to collusion; (5) pretextual explanations

for anticompetitive conduct; (6) sharing of price information; (7) signaling; and (8) involvement in other conspiracies." *In re Pool Products Distribution Market Antitrust Litigation*, MDL No. 2328, 2013 WL 6670020, at *10 (E.D. La. Dec. 18, 2013) (citing ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws*, at 69–91 (2010) (collecting cases)). In addition, the Second Circuit recognizes the existence of government investigations as a plus factor providing context to parallel behavior allegations. *See Starr*, 592 F.3d 314. The allegation that conspirators' actions were against their independent self-interests absent an agreement "is generally considered the most important 'plus factor.'" *In re Pool Products*, at *10 (citing *Proof of Conspiracy*, at 70). *See also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir.1999) (stating "this plus factor [action against self-interest] will consistently tend to exclude the likelihood of independent conduct"). Here, Plaintiffs allege plus factors, including the most persuasive plus factor, *i.e.*, that Defendants' actions would be against their self-interest if undertaken independently, but were beneficial when pursued in concert.

> (a)   Plaintiffs allege that Defendants acted against their economic self-interest if acting independently

The *raison d'etre* of a metals warehouse is to receive, house, and release raw metals to customers in a manner that satisfies consumer demand, and to profit therefrom. At base, it is a customer service industry. A warehouse owner in pursuit of customer satisfaction, repeat business and longevity as opposed customer dissatisfaction, industry uproar and short-term gains will endeavor to operate its warehouses efficiently and effectively to meet demand and maintain its competitive standing among other warehouse operators who are themselves pursuing success through customer satisfaction. Absent collusion among warehouse owners, it would be economic suicide for an independent owner to operate its warehouses as black holes in which metals are deposited by producers and owners only to trickle out in response to

consumer demand.  Doing so would be counter to that owner's self-interest because, just as Plaintiffs allege, there would be an exodus of business away from that owner's warehouses.  (Mag Compl., ¶¶ 104-05; Agfa Compl., ¶¶ 105-106).

Here, Plaintiffs allege that no Defendant acting independently would survive operating its warehouses as Defendants are alleged to have collectively done. *Id.* At most, any such Defendant would reap only short-term gains from rental income derived from inventories currently held or arriving near in time to the implementation of the confiscatory business plan.  Only through concerted action to make all (or most) warehousing options equally inefficient and unattractive could Defendants derive any economic benefit from a business plan so devoid of any benefit to consumers.

In analyzing Plaintiffs' allegations of plus factors, Defendants mischaracterize the allegations by contending that Plaintiffs acknowledge that "aluminum storage facilities, such as those owned by Defendants, have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum within the warehouses for as long as possible."  This is certainly an allegation central to both Complaints, *but an allegation made in the context of an alleged conspiracy*.  That is, Plaintiffs indeed allege that Defendants have an interest in hoarding aluminum because they can collect rental fees on that aluminum, *but only so long as all Defendants hoard aluminum such that consumers are deprived of meaningful warehousing alternatives*. Only through a concerted willingness to weather consumer dissatisfaction and ultimately, consumer outrage, could Defendants benefit from hoarding aluminum.  Nowhere do Plaintiffs allege or concede that hoarding aluminum to reap rental fees would be beneficial to any Defendant acting independently.

In an unpersuasive attempt to argue that it would in fact be in the self-interest of any single Defendant independently to hoard aluminum, Defendants assert that loading out more than the LME minimum, *i.e.*, responding to consumer demand, would

require additional costs "for both labor and equipment such as forklifts."   Again, this is terribly short-sighted business sense for anyone who is in the metals warehousing business for the purpose of operating a successful warehousing business.  It is akin to arguing that a hamburger stand should not make hamburgers because it would have to incur the cost of purchasing ground beef and hiring cooks.  The fact of the matter is that no metals warehouse operator acting independently could remain in business by refusing to incur the cost of labor and equipment necessary to perform essential warehousing activities in complete disregard for consumer demand.

Defendants argue further that not only would it be economically logical for a warehouse company to unilaterally load out aluminum as slowly as possible in order to maximize rental income, but doing so would go essentially unnoticed by consumers because depositing owners of the aluminum are not the same parties that withdraw the aluminum and thus, depositors care little about what happens to the aluminum after they deposit it in a metals warehouse.  Obviously, this unwarranted focus on input ignores the remainder of the market, *i.e.*, consumers who seek to withdraw the aluminum.  As such, Defendants' attempt to minimize Plaintiffs' allegations in this way fails as well.[12]

(b)       Plaintiffs allege opportunity and common motive to conspire

Plaintiffs allege that Defendants had the opportunity to conspire to manipulate aluminum prices by way of their ownership of the LME, their participation on various LME committees and their use of the LME rule-making process to establish "sham" standards for loading out aluminum.  (Mag Compl., ¶¶ 5-6, 47; Agfa Compl., ¶¶ 5-6,

---

[12] Defendant LME argues in its motion that Plaintiffs have failed to alleged a hub-and-spoke or rimmed wheel conspiracy.  *See* LME Motion at 8-13.  The crux of Defendant LME's argument is that Plaintiffs cannot allege a rimmed wheel because they do not allege Defendants acted contrary to their self-interest.   As demonstrated above, Plaintiffs more than sufficiently allege that Defendant LME was the platform (hub) through which the other Defendants (spokes) effectuated the conspiracy.  Furthermore, Plaintiffs adequately allege that Defendants acted against their self-interest and that Defendant LME benefitted financially from Defendants' unlawful agreement.

48).   Moreover, Plaintiffs allege that Defendants had the common motive to reap excessive warehousing fees (including the LME) and greater returns from trading activities.  (Mag Compl., ¶¶ 5, 57, 84, 86; Agfa Compl., ¶¶ 5, 58, 85, 87).  In that regard, Plaintiffs detail the contango in the market created and fostered by Defendants for the purpose of enhancing profits from trading activities.  (Mag Compl., ¶ 60; Agfa Compl., ¶ 61).

> (c)   Plaintiffs allege the existence of government and regulatory investigations as plus factors

Defendants cite to *Hinds County, Miss. v. Wachovia Bank, N.A.*, 708 F. Supp. 2d 348, 361 (S.D.N.Y. 2010), to argue that allegations of government investigations "do not bolster the plausibility of an inadequately pled conspiracy and therefore cannot cure plaintiffs' pleading deficiencies." *See* Warehouse and Financial Firm Defendants' Failure to State a Claim Motion, at 31.   But, more accurately, the Court in *Hinds* stated, "although government investigations ***may bolster*** § 1 allegations, they may not constitute the entirety of non-conclusory allegations against § 1 defendants." *Hinds*, 708 F. Supp. 2d at 361 (emphasis added).   The Second Circuit has held that parallel government investigations provide context, *i.e.*, factual enhancement or plus factors, to support a finding of plausibility.  *Starr*, 592 F.3d 314.   In *Starr*, the court analyzed six factual allegations contained in plaintiff's complaint, which the court found "taken together, place the parallel conduct 'in context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* at 324 (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).   As to the sixth factual allegation, the court acknowledged that "defendants' price-fixing is the subject of a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice.  *Id.* at 324.  *See also e.g. In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) (citing *Starr*, 592 F.3d at 324 and quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1965) (stating "[a]dd to this the existence of a

parallel criminal investigation – an allegation demonstrating that the government believes a crime may have occurred – and the result is 'enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement'"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008-09 (E.D. Mich. 2010) (citing *Starr*, 592 F.3d at 324) (holding that government investigations and guilty pleas support the plausibility of a nationwide conspiracy).

Here, Plaintiffs set forth other non-conclusory allegations of parallel conduct and therefore, Plaintiffs' further allegations of government investigations are a plus factor providing the additional context or factual enhancement contemplated in *Twombly*. Accordingly, Plaintiffs' allegations of government investigations into Defendants' conduct described in the Complaints support the plausibility that Defendants' alleged parallel conduct is the product of a collusive agreement and not independent action.

### D.     Plaintiffs Establish *Per Se* Violations of Section 1 of the Sherman Act

Agreements that are *per se* illegal under the Sherman Act are those that are so "plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S.Ct. 1276, 1279 (2006) (quoting *Nat'l Society of Professional Engineers v. United States*, 435 U.S 679, 692, 98 S.Ct. 1355 (1978)). Accordingly, a *per se* analysis does not require plaintiff to define a market and prove market power through a full blown rule of reason analysis. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740 (1984) (citing *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514 (1984)). However, application of the *per se* rule is appropriate only after courts have had experience addressing the type of restraint at issue. *Leegin Creative Leather Prods. v. PSKS*, 551 U.S. 877, 886-87, 127 S.Ct. 2705, 2713 (2007). Courts have long held that an agreement is subject to a *per se* analysis when "the practice [at issue] facially appears to be one that would always or almost always tend to restrict competition and decrease output." *NCAA*, 468 U.S. at 100, 104 S.Ct. at 2959. *See also Meredith Corporation v. SESAC LLC*, No.

09 Civ. 9177, 2014 WL 812795, at *16 (S.D.N.Y. March 3, 2014) (citing *Leegin*, 551 U.S. at 886, 127 S.Ct. at 2713) (holding that agreements that would almost always tend to restrict competition and decrease output are illegal *per se*); *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 61 (2d Cir. 2012) (stating that a horizontal agreement among competitors to fix prices "categorically constitutes an unreasonable restraint, and, accordingly, is unlawful *per se*").

Here, the allegations are that Defendants acted through prior agreement to impose output restrictions on the aluminum supply for their benefit and to the detriment of Plaintiffs. (Mag and Agfa Compls., *generally*). Plaintiffs' allegations, accepted as true as required at this stage of the litigation, describe a practice long held to be subject to a *per se* analysis. On its face, Defendants' practice of hoarding aluminum is a practice that will "always or almost always tend to restrict competition and decrease output." *NCAA*, 468 U.S. at 100, 104 S.Ct. at 2959. And, Defendants' concerted restraint on output by hoarding aluminum supplies lacks any "redeeming social benefits." *See Freedom Holdings v. Spitzer*, 447 F. Supp. 2d 230, 249 (2004). Only Defendants benefitted from their manipulation of the aluminum supply as evidenced by the market's collective outrage as alleged in the Complaints.

### E. Alternatively, Defendants' Output Restrictions Are Subject to a "Quick Look" Analysis

Some practices restraining output may be "highly suspicious" yet "sufficiently idiosyncratic that judicial experience with them is limited." *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 317 (3d Cir. 2010) (quoting 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1910a (2d ed. 2005)). In such instances, courts have recognized an intermediate review referred as the "quick look" analysis. *Ross*, 2014 WL 1396492, at *41 (citing *Bogan v. Hodgkins*, 166 F.3d 509, 514 n. 6 (2d Cir. 1999)). A quick look analysis "allows the condemnation of a 'naked restraint' on price or output without an 'elaborate industry analysis.'" *Ross*, 2014 WL 1396492, at *42 (quoting *Cal. Dental*, 526 U.S at 763,

119 S.Ct. at 1609).  This type of review is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *Ross*, 2014 WL 1396492, at *41 (quoting *Cal. Dental*, 526 U.S at 770, 119 S.Ct. at 1612).  In that regard, little more than a cursory examination of the restraint will reveal that the principal effect of the restraint is anticompetitive and that case, competitive harm is presumed. *Id*. at 770, 119 S.Ct. at 1613.  Ultimately, "it carries the day [under the quick look analysis] when the great likelihood of anticompetitive effects can easily be ascertained. *Id*.

Here, at a minimum, Defendants' alleged practices are highly suspicious naked restraints on output.  It takes little understanding of economics and no elaborate industry analysis to conclude that Defendants' practices alleged in the Complaint have the principal effect of anticompetitive harm.  Indeed, there is nothing procompetitive about Defendants' alleged practice of acquiring and hoarding aluminum.

### F.      Plaintiffs Plausibly Allege JPMorgan's, Henry Bath's, and Pacorini's Concerted Participation in the Agreement to Restrict Aluminum Output

In an effort to minimize the allegations against them, and in direct contravention of Supreme Court directive, JPMorgan, Henry Bath, and Pacorini in their separately filed Motions to Dismiss urge the Court to ignore the totality of Mag's and Agfa's allegations against them to instead deconstruct the alleged conspiracy and view its component parts separately to conclude that Plaintiffs' allegations are insufficient.  But the Court must view the allegations in their entirety.  *Continental Ore*, 370 U.S. at 699, 82 S. Ct. at 1410 (holding that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").  *See also Ross*, 2014 WL 1396492, at *24 (quoting *Continental Ore*, 370 U.S. at 699, 82 S.Ct. at 1410) (same holding).  The Court must "look at the whole picture and merely at the individual figures in it."  *Contintental Ore*, 370 U.S. at 699, 82 S. Ct. at 1410.

Viewed accordingly, the allegations against JPMorgan, Henry Bath, and Pacorini are more than sufficient to link them with the conspiracy at this stage of the litigation.  *See Ross*, 2014 WL 1396492, at *24 (quoting *Apex Oil*, 822 F.2d at 257) (holding that "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."); *Evergreen*, 720 F.3d at 49 n. 4 (citing *Paramount Pictures*, 334 U.S. at 161, 68 S.Ct. at 931 (1948) (holding that acquiescence in an illegal scheme [in violation of Section 1] is as much a violation of the Sherman Act as the creation and promotion of one).

Plaintiffs allege that JPMorgan, Pacorini's parent Defendant Glencore, and Goldman acquired over 75% of the LME-certified warehouses in the U.S within seven months of each other.  (Mag Compl., ¶¶ 17, 19, 21, 42; Agfa Compl., ¶¶ 18, 20, 22, 43).  Pacorini specifically operated warehouses in Detroit and its sister company's warehouse in Vlissingen, Netherlands suffered long queues.  (Mag Compl., ¶¶ 22, 62; Agfa Compl., ¶¶ 23, 63).  Further, JPMorgan was a member of the LME and until it was acquired by HKEx, JPMorgan and Goldman Sachs were the two largest shareholders in the LME.  (Mag Compl., ¶¶ 6, 24d; Agfa Compl., ¶¶ 6, 25d).  Plaintiffs further allege that JPMorgan, Henry Bath, and Pacorini actively participated in management of the LME through various LME committees.  (Mag Compl., ¶ 24c; Agfa Compl., ¶ 25c).  Specifically, Plaintiffs allege that JPMorgan, Henry Bath, and Pacorini (or its affiliates) served on the Aluminum Committee and the Warehousing Committee, respectively.  *Id.*

Plaintiffs allege that the LME receives 1% of all rental revenues from all LME-certified warehouses.  (Mag Compl., ¶ 86; Agfa Compl., ¶ 87).  Thus, as an LME shareholder, JPMorgan financially benefitted from excessive rental fees derived from artificially lengthy queues at all LME-certified warehouse, not just Henry Bath warehouses.  To perpetuate those revenue generating queues, JPMorgan participated in establishing new minimum loading-out requirements that were less than the increase recommended by the LME's own consultant and clearly insufficient to meet market demand.  (Mag Compl., ¶¶ 75-86; Agfa Compl., ¶¶ 76-87).

Plaintiffs allege that the effects of the conspiracy manifested shortly after JPMorgan, Pacorini and its co-defendants entered the metals warehousing business and gained control of the LME.  (Mag Compl., ¶¶ 5-9, 48-51, 54-69, 75-99, 104-112; Agfa Compl., ¶¶ 5-9, 49-52, 55-70, 76-100, 105-122).  Plaintiffs provide aggregate data (which necessarily includes Henry Bath and Pacorini warehouses) on warrant cancellations relative to issuances, illustrating the restriction on aluminum output and the resulting excessive queues in general.  (Mag Compl., ¶¶ 54-59, p. 19 n. 26, chart on p. 20; Agfa Compl., ¶¶ 55-60; p. 21 n. 22, chart on p. 22).  This data is also important from a temporal perspective as it reveals that warrant cancellations increased significantly shortly after Defendants, including JPMorgan and Pacorini parent Glenocore, acquired their warehousing interests.  *Id*.  The timing of the increase in warrant cancellation activity is of little surprise in light of Blythe Masters' post-acquisition public announcement that under her guidance JPMorgan intended to "make prices" in the metals market.  (Mag Compl., ¶ 55; Agfa Compl., ¶ 56).  At this stage of the litigation, and for purposes of plausibly inferring JPMorgan's participation in the conspiracy, the import of Masters' disclosure in this regard cannot be overstated.

Finally, Plaintiffs allege the existence of government investigations into JPMorgan's, Henry Bath's and Pacorini's conduct with regard to the matters alleged in the Complaints, and JPMorgan's eventual exit from the commodities market in the face of industry outrage and regulatory investigations.  (Mag Compl., ¶¶ 98-99; Agfa Compl., ¶¶ 99-100).  *See Starr*, 592 F.3d 324 (holding that parallel government investigations provide context, *i.e.*, factual enhancement or plus factors, to support a finding of plausibility).

## III.   PLAINTIFFS ADEQUATELY PLEAD VIABLE STATE LAW CLAIMS

Finally, Defendants offer a set of confusingly overlapping motions to dismiss certain state law claims.  The arguments Defendants offer, however, find no better footing than do the arguments aimed at Mag's and Agfa's federal claims as addressed

above.   Indeed, as to Plaintiffs' state law antitrust claims, Defendants make no argument at all beyond the arguments they advance against the federal law claims; and, as to Mag's common law and statutory consumer protection claims, Defendants either misstate the applicable law, ignore the actual allegations Mag makes, or both. These motions, too, should be denied.

### A.    Mag and Agfa Plead Viable State Antitrust Law Claims

Mag's Second Claim for Relief asserts violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770 (Mag Compl., ¶¶ 120-126); Agfa's Second Claim for Relief asserts violations of New York's Donnelly Act, General Business Law § 340 *et seq.* (Agfa Compl., ¶¶ 130-136).   Defendants' web of motions appears to address these claims in (potentially) three different places:  First, the Goldman, Glencore, and Pacorini defendants attack these claims as a part of the Warehouse and Financial Firm Defendants' Failure to State a Claim Motion; Second, the JPMorgan/Bath defendants address the state law antitrust claims in the JPMorgan/Bath Motion; and, finally, all Defendants join—in yet another motion, the Joint State Law Claims Motion —to assert that the Michigan and New York antitrust claims should be dismissed as to out-of-state purchasers.[13]

As to Mag and Agfa, these motions all should be denied.  In the first two motions (the Warehouse and Financial Firm Defendants' Failure to State a Claim Motion and the JPMorgan/Bath Motion), Defendants offer literally no rationale for dismissal of the state antitrust law claims beyond the very arguments they aim at Plaintiffs' Sherman Act claims.  *See* Warehouse and Financial Firm Defendants' Failure to State a Claim Motion, at  53 (California and New York state laws "should be interpreted consistently with federal antitrust law"); JPMorgan/Bath Motion, at 18 (state antitrust law claims "should be dismissed for the same reasons as [the] federal antitrust claims").   These

---

[13] LME joins only in this final motion (the Joint State Law Claims Motion) and apparently does not otherwise move to dismiss the state antitrust law claims.

arguments should be rejected for the reasons discussed above in connection with the federal antitrust claims, *see* Sections I & II, *supra*.

That leaves the third motion (the Joint State Law Claims Motion).  To the extent this motion is directed at state *antitrust* law claims it does not suggest that it is directed at the claims asserted by Mag or Agfa, *see* Joint State Law Claims Motion, at 10, 11 n.3 (making no mention of California's Cartwright Act, and specifically identifying Fifth and Sixth claims of First Level Purchasers as well as several other class plaintiff claims, but no Mag or Agfa claims). Indeed, if this motion were directed at Mag's or Agfa's state antitrust claims, it would create an even more confusing overlap with the first two motions, in which all Defendants other than LME collectively *do* specifically address Mag's and Agfa's state antitrust law claims.  Nonetheless, even if this motion does implicate Agfa's Donnelly Act claim, it should be denied.  Defendants argue that the Donnelly Act claim should be dismissed "as to out-of-state purchasers," but this is not the law.  As an initial matter, Defendants expend significant effort arguing to this Court that *they* have not sold anything to Agfa or to any other plaintiff (*e.g.*, Joint Standing Motion), so it is, at best, incongruous for them to hide behind the argument that any aluminum purchaser's procurements were (or were not) made in any particular place. But more importantly, this case is about *Defendants'* conduct and the impact of their conspiracy to restrict the supply of physical aluminum.  *See supra*, at 6-11.  Defendants Goldman and JPMorgan are companies headquartered in New York (Agfa Compl., ¶¶ 18, 20) and their conduct, although it affected the aluminum market more broadly, unquestionably is subject to the laws of this State.  N.Y. G.B.L. § 340 (Donnelly Act applies to contracts in restraint of trade "in the conduct of any business, trade or commerce … in this state"); *see also Conergy AG v. MEMC Electronic Materials, Inc.*, 651 F. Supp. 2d 51, 61-62 (S.D.N.Y. 2009) (Donnelly Act not applicable where, among other things, neither plaintiff nor defendants were New York entities).   Agfa alleges that Defendants executed their conspiracy in order that they could "make prices" in the

market for aluminum and enhance profits from trading activities (Agfa Compl, *e.g.*, ¶¶ 56, 61).  The reasonable inference to be drawn from these allegations is that the conduct was rooted, and the decision-making took place, to a great extent in New York, where Goldman and JPMorgan are headquartered.  Indeed, in seeking transfer of the pending actions to this Court, LME argued to the J.P.M.L. that "the situs of the corporate defendants' operations [i.e., New York] … is likely to be the 'center of gravity' of the case going forward."  *See* LME Response to Motion to Transfer, JPML Docket [ECF No. 38], at 6-8.  JPMorgan/Bath joined in this request.  *See* JPMorgan Response to Motion to Transfer, JPML Docket [ECF No. 39].  This conduct unquestionably is subject to New York law. *See* N.Y. G.B.L. § 340.

The cases Defendants cite, which do not deal with the Donnelly Act in particular, do not require a different result.  Each of those cases deals with attempts to export the law of a single state (or of several states) to a nationwide class of consumers.  *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 274-78 (D. Mass. 2004) (evaluating whether court could apply single state's law to multi-state indirect purchaser class in manner consistent with Rule 23(b)(3)'s predominance requirement); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1027-1028 (N.D. Cal. 2007) (finding *Relafen* decision "persuasive" in evaluation of proposed nationwide class under California law); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139 (S.D.N.Y. 2008) (decertifying nationwide fraud class).  But Agfa proceeds on its own and not on behalf of any proposed class of far-flung plaintiffs, negating any potential Rule 23 complications and obviating any of the supposed Due Process Clause concerns raised by Defendants under, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  Moreover, because there does exist here a significant aggregation of contacts with New York, as two of the defendants are based there, there is no barrier to applying a New York law to their conduct.  *See* N.Y. G.B.L. § 340 (applying to "the conduct of any business, trade or commerce … in this state").

59

**B.      Mag Pleads Viable California Common Law and Statutory Consumer Protection Claims**

Mag asserts California common law claims for intentional interference with contract (Count III), intentional interference with economic relationship (Count IV), and negligent interference with economic relationship (Count V); along with a statutory consumer protection claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* (Count VI). Defendants move to dismiss the common law claims in the Joint State Law Claims Motion, at 16-20; they attack Mag's UCL claim in the same motion. *Id.* at 1-10.[14]  These motions should be denied as Mag easily pleads each claim.

*1.      Mag adequately pleads its California claim for intentional interference with Contract (Count III)*

Defendants' motion to dismiss Mag's Count III rests on the dubious assertions that Mag has not adequately pleaded the existence of its aluminum supply contract and that Mag cannot allege that Defendants "had knowledge of" Mag's contract.  In fact, Mag more than adequately pleads the existence of its aluminum procurement contract (and the terms relevant here), noting that "Throughout the relevant period [which is otherwise defined in the Complaint], Mag purchased aluminum pursuant to a long-standing supply contract calculated according to a fixed cost-plus formula using the then-current 'LME Official Price' for aluminum (as described below) and the Midwest Premium.  Mag purchased its aluminum from Norsk Hydro North America, Inc." (Mag

---

[14] In addition to taking part in the Joint Motion, the JPMorgan/Bath defendants argue broadly in their separate motion that "Plaintiffs have not stated a state law claim against Henry Bath or JPMorgan," but they make therein no argument specifically aimed at Mag's common law claims or its UCL claim.  *See* JPMorgan/Bath Motion, at 18 (referring, generically, to "state consumer protection laws," and to the "common law [claims] of unjust enrichment and tortious interference.").  To the extent JPMorgan/Bath make any argument beyond the arguments they join in the Joint State Law Claims Motion, it is limited to arguing a lack of specific allegations of conduct attributable to them.  *See* JPMorgan/Bath Motion, at 19.  This argument is addressed and disposed of *supra*, at Section II.F.

Compl., ¶ 16a).  Unable to avoid this, Defendants suggest, rather incredibly, that this level of detail is nonetheless insufficient to establish—*at the pleading stage*—that Mag in fact is a party to a valid contract pursuant to which it procures aluminum and that the Midwest Premium is a component of the pricing in that contract.  *See* Warehouse and Financial Firm Defendants' Failure to State a Claim Motion, at 16-17 ("Mag does not plead the date or duration of any contract, the quantities supplied under any contract, the delivery schedule, the shipping terms, the payment terms, or the pricing terms of any contract…").  But the cases cited by Defendants do not require more[15] and Mag's pleading provides Defendants with more than ample notice under Fed.R.Civ.P. 8(a) of the specific contract as to which Mag contends they interfered.  Mag is not required to attach the contract to its pleading and, where the contact is adequately identified in the pleading, it is difficult to know for what reason Defendants would contend that they require all of the additional details they now demand (or, had Mag pleaded those details, any other details Defendants might suggest were missing).  Further, to the extent that Mag's allegations as to the existence or identification of its contract are in any way deficient, these clearly are the type of allegations that easily could be amended to add additional detail.  Mag respectfully suggests that such is not necessary here, but to the extent the Court disagrees, Mag requests leave to amend, which should freely be

---

[15] Mag's allegation identifying its supply agreement is significantly more robust than the vague generalities found to be insufficient in the cases Defendants cite.  *See Plasticware, LLC v. Flint Hills Resources, LP*, 852 F.Supp.2d 398, 404 (S.D.N.Y. 2012) (general averment of "agreements" with customers not sufficient); *Bose v. Interclick, Inc.*, 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011) (plaintiff specified no individual contract "but just claim[ed] generally … contracts with various website operators"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 255 (S.D.N.Y. 2009) ("plaintiffs fail to identify a single specific client relationship").  Despite these citations, Defendants acknowledge that California law governs the substantive common law claims.  *See* ECF 342 at 16 (*citing Davis v. Nadrich*, 174 Cal. App. 4th 1, 10 (Cal. Ct. App. 2009) for elements of claim).

allowed under Rule 15.

As to the second argument, under California law, Defendants' knowledge of the contract need not be shown with exhaustive specificity. "[A] plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted[,]" *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001), and intent may "certainly be inferred" where the defendant knows that contractual relations with a third party exist, even where the defendant does not know the specific identity of the contractual party. *Id.* at 1204. The requirement may be satisfied where the defendant is "'on notice' as to the class of contracting [parties] with whom [plaintiff] has contractual relations, [such that] it can be reasonably inferred from such notice that Defendants had knowledge of the class of contractual relations potentially disrupted by their actions." *Id.* Mag alleges that Defendants engaged in intentional conduct. (Mag Compl. at, *e.g.*, ¶¶ 54-92). Where Defendants engage in a conspiracy to restrain commerce it should go as no answer to argue, as Defendants do, that they were not aware of all the intricacies and particulars of the specific commerce they restrained. Indeed, a plaintiff need not show that a defendant acted with specific intent to interfere with a contract, as the claim also may arise when the defendant:

> does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the [defendant's] independent purpose and desire but known to him to be a necessary consequence of his action. (Rest.2d Torts, § 766, com. j, p. 12.)

*Bujilian v. Utilitech Finance Co., LLC*, No. F053664, 2009 WL 2185450, at *8 (Cal. Ct. App. 5th Dist., July 23, 2009) (brackets in original, internal quotations omitted) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1135 (2003) and *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998)). Thus, a plaintiff need not prove (much less plead) that a defendant acted with a primary purpose of disrupting the

contract, but need only show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of their actions. *Bujilian,* 2009 WL 2185450, at *8 (quoting *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004) (citation omitted)).

Mag undoubtedly meets this standard. As noted above, Mag alleges that Defendants engaged in intentional conduct in the nature of a conspiracy. (Mag Compl., ¶¶ 54-92. Mag also alleges that, at least during the relevant period, Defendants were deeply involved in the aluminum warehousing, transportation, and trading industries such that Defendants would unavoidably understand the pricing impact of their conduct. *Id.*, ¶¶ 17-24. Defendants were members with substantial ownership interest in the LME, *id.*, ¶ 24, collectively operating more than 75% of the LME-certified warehouses in the United States. *Id.*, ¶ 42. Under all these allegations, and the reasonable inferences to be drawn therefrom, Defendants would have been "substantially certain" that the manipulation of the aluminum market that they intentionally engineered would disrupt ongoing procurements—such as Mag's procurements—of the physical metal. Plaintiff alleges as much, *id.*, ¶¶ 135-136, and so adequately pleads its claim for intentional interference with contract under California law.

### 2. *Mag adequately pleads its California claims for interference with prospective economic relationship (Counts IV and V)*

Defendants recycle these same arguments as to Mag's Counts IV and V, claiming that Mag fails to "specify some particular, existing business relationship" and fails to allege that Defendants knew of the relationship. Defendants' arguments to this effect fail for the same reasons discussed above.[16] To this, Defendants add the arguments that

---

[16] The only reasonable inference which may be drawn from Mag's allegations about its "long-standing supply contract," (Mag Compl., ¶ 16a, 134, 140), is that it has a "particular, existing business relationship" with that supplier. That Defendants may have been ignorant of the particulars does not defeat the claim. *See Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1162-63 (C.D. Cal 2010) (defendants' general knowledge that plaintiff had economic relationship with customers sufficient). Moreover, as with

Mag's claims fail because the interference claim must be based on a prospective economic benefit, as opposed to an existing agreement, and that the negligent interference claim fails because Mag "fails to plead adequately that Defendants had a duty of care to Mag."  These arguments fare no better and should be rejected.

Mag satisfies the requirement to plead a "prospective" economic relationship. The complaint specifies that Mag's purchases of aluminum were and are calculated according to a fixed cost-plus formula using the then-current LME Official Price for aluminum as well as the Midwest Premium. (Mag Compl., ¶¶ 16(a), 134, 140). Because the economic relationship pursuant to which Mag procures aluminum is based on dynamic pricing metrics—the very pricing metrics Mag alleges that Defendants manipulated—rather than some static price schedule, it is fair to say that Mag's ongoing economic relationship with its supplier is consistently prospective.  That is, each and every market manipulation Defendants engaged in had the effect of altering Mag's prospective economic relations—the pricing mechanism contained in Mag's contracts. *See, e.g., Ullmannglass v. Oneida, Ltd.*, 86 A.D. 3d 827, 830, 927 N.Y.S. 2d 702, 706 (App. Div., 3d Dep't 2011) (where contract automatically renewed, plaintiff adequately alleged harm to prospective contractual and business relations).

Defendants rely on a single case, *Shoemaker v. Myers*, 52 Cal. 3d 1 (Cal. 1990), but that case is easily distinguished.  *Shoemaker* involved a California state official suing his supervisors based on various theories including inducement of breach of contract and interference with a business relationship. 52 Cal. 3d at 7-8, 24.  The court found that "a

_____

intentional interference with contract, "the tort of intentional interference with prospective economic advantage does not require a plaintiff to plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage. Instead, to satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 596 (Cal. Ct. App. 2012).

state civil service employee, does not have a contract of employment" and thus cannot have a "prospective economic advantage." *Id*. at 24-25.  Mag, having adequately alleged the existence both of a contract (as to Count III) and of an existing business relationship (Counts IV and V) with a variable pricing mechanism, adequately pleads prospective economic advantage.

Defendants are correct that Mag's negligent interference claim (Count V), is viable "only when the defendant owes the plaintiff a duty of care." *Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C12-06458, 2013 WL 1996318, at * 4 (N.D. Cal. May 13, 2013) (citing *Lange v. TIG Ins. Co.*, 68 Cal App. 4th 1179, 1187 (1998) (quotation omitted)). This duty of care "may arise by statute, contract, the general character of the activity in which the defendant engaged, the relationship of the parties, 'or even the interdependent nature of human society.'"  *Madison/Graham Color Graphics, Inc. v. Graphic Press*, No. G 034973, 2007 WL 478173, at * 7 (Cal. Ct. App. Feb. 15, 2007) (quoting *J'Aire Corp. v. Gregory*, 598 P.2d 60, 62 (Cal. 1979)). Mag alleges that Defendants owed it a statutory duty of care, under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, to not manipulate the market for aluminum, a market in which Mag participates, and this Court can easily conclude that Defendants owe market participants a duty to refrain from manipulating commodities markets.

3.   *Mag adequately pleads its claim for violation of California's Unfair Competition Law (Count VI)*

Mag's Sixth Claim for Relief arises under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. §§ 17200 *et seq.*  Defendants move to dismiss, en masse, all Plaintiff's state law claims in the Joint State Law Claims Motion.[17]  Defendants' joint

---

[17]  In addition, though without specifically identifying Mag's UCL claim, JPMorgan/Bath appear to attempt a second bite at this apple in their separate motion to dismiss, arguing generally that claims asserted under "state consumer protection laws" should be dismissed.  *See* JPMorgan/Bath Motion, at 18-19.  To the extent the JPMorgan/Bath argument goes beyond the notion that "Plaintiffs' state law claims should be dismissed for the same reasons as their federal antitrust claims," *id.* at 18, it merely asserts that plaintiffs fail to identify specific conduct attributable to them.  *Id.* at

motion suffers from much the same infirmity as do the joint motions directed at antitrust standing and plausibility, referenced above.  Defendants are content to lump all the plaintiff complaints in the MDL together and to act as though no complaint can stand so long as some non-existent amalgamation of complaints can be shot down. Defendants make three principal arguments:  they assert that lists of consumer protection statutes fail to state a claim, that plaintiffs do not adequately plead proximate cause, and that specific individual state law claims fail for one of six other sub-reasons. We deal with these arguments in turn.

First, the criticism of Plaintiffs simply "listing" consumer protection statutes of course does not apply to Mag.  Mag, a California plaintiff (Mag Compl., ¶ 16), asserts its separately-denominated Sixth Claim for violation of California's UCL claim.  This is in no way comparable to the criticism of the FLP complaint simply listing 22 separate state statutes.

Second, Mag adequately pleads proximate cause.  Defendants' argument, they acknowledge, amounts to but an abbreviated re-hash of their motion to dismiss on the basis of purported lack of antitrust standing.  But for the reasons discussed *supra* at Section I, Mag does have standing to assert its claims and, accordingly, its UCL claim too is more than viable. In asserting its claims under both the "unfair" and the "unlawful" prongs of the UCL, Mag alleges, as it must, that it was injured "as a result of" Defendants' conduct.  (Mag Compl., ¶¶ 147(a) and (b), 148).  In fact, a business practice is "unfair" in a consumer UCL action, where "the conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'"  *Byars v. SCME Mortgage Bankers, Inc.*, 99 Cal. App. 4th 1134, 1147 (2003);  s*ee also Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular*

19. That argument is addressed in connection with the plausibility discussion, *supra* at Section II.F.

*Telephone Co.*, 20 Cal. 4th 163 (1990) (same standard for competitor case).   As to the "unlawful" prong, "[b]y proscribing any unlawful business practice section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech*, 20 Cal. 4th at 180 (internal quotations omitted).   Virtually any law can serve as the predicate.  *Ticconi v. Blue Shield of California Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 539 (2008).   Mag incorporates alleged violations of the Sherman Act, the Cartwright Act, and the Commodities Exchange Act.  (Mag  Compl., ¶ 147b).

Finally, of the six sub-reasons Defendants aim at the various state consumer protection claims, only one addresses California's UCL.   But that argument, that UCL claims require some wrongdoing within the state, is both wrong on the law and yet easily satisfied by Mag's allegations.   As to the law, Mag alleges that it is a California plaintiff.   (Mag Compl., ¶ 16).   The UCL applies to claims brought by California plaintiffs.  *See Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999) ("We conclude that … Category I members [California residents regardless of where the defendant's conduct occurred] … may assert UCL claims.")   This is bolstered by the reasonably drawn inference that Mag suffers its injury in California.   (Mag Compl., ¶ 147a) (alleging that Defendants' conduct "caused and continue[s] to cause Plaintiff to pay supra-competitive and artificially-inflated prices for aluminum"). What's more, Mag alleges that Defendant Metro actively warehouses aluminum in Long Beach, California.  (Mag.  Compl., ¶ 18).   Metro of course is alleged to be at the root of the conspiracy to hoard and choke delivery of aluminum from LME warehouses, a conspiracy which has affected aluminum pricing throughout interstate commerce. (Mag Compl., ¶ 39).   Accordingly, even if Mag were not a California plaintiff (which it is) suffering its injury in that state (which it does), its allegation that Metro operates LME warehouses in California, along with all reasonable inferences drawn in Mag's favor, easily respond to Defendants' argument that there must be wrongdoing within

the state.

## IV.  IF ANY PORTION OF DEFENDANTS' MOTIONS IS GRANTED AS TO MAG OR AGFA, PLAINTIFFS REQUEST LEAVE TO AMEND

In the event any portion of Defendants' motions to dismiss is granted as to Plaintiffs Mag and/or Agfa due to a failure to plead sufficient facts, Plaintiffs respectfully request leave to amend to cure any such deficiencies noted by the Court. Leave to amend should be freely granted pursuant to Fed. R. Civ. P. 15.

## CONCLUSION

For all the foregoing reasons, the Court should deny in their entirety Defendants' motions to dismiss as to Mag and Agfa.

DATED:  May 27, 2014                    Respectfully submitted,

                                        SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

                                        s/ Walter W. Noss
                                        CHRISTOPHER M. BURKE (*pro hac vice*)
                                        WALTER W. NOSS (*pro hac vice*)
                                        KRISTEN M. ANDERSON (*pro hac vice*)
                                        707 Broadway, Suite 1000
                                        San Diego, CA  92101
                                        Telephone:  619-233-4565

                                        SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                        DAVID R. SCOTT
                                        The Chrysler Building
                                        405 Lexington Avenue, 40th Floor
                                        New York, NY 10174
                                        Telephone:  212-223-6444

                                        SCHNEIDER WALLACE COTTRELL
                                        KONECKY LLP
                                        TODD M. SCHNEIDER
                                        JASON H. KIM
                                        180 Montgomery Street, Suite 2000
                                        San Francisco, CA 94104
                                        Telephone: 415-421-7100

                                        SCHNEIDER WALLACE COTTRELL
                                        KONECKY LLP
                                        GARRETT W. WOTKYNS
                                        8501 North Scottsdale Road, Suite 270
                                        Scottsdale, AZ 85253
                                        Telephone:  480-428-0144

SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC
DEREK Y. BRANDT
JOHN R. PHILLIPS
One Court Street
Alton, IL  62002
Telephone:  618-259-2222

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
707 Broadway, Suite 1000
San Diego, CA 92124
Telephone:  619-687-6611

PEIFFER ROSCA ABDULLAH
CARR & KANE, L.L.P.
JOSEPH C. PEIFFER
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Telephone:  505-586-5259

*Counsel for Plaintiffs Mag Instrument, Inc. and
Agfa Corporation and Agfa Graphics, N.V.*

NICOLL DAVIS & SPINELLA LLP
Christopher M. Santomassimo
95 Route 17 South, Suite 316
Paramus, NJ  07652
Telephone: 201-712-1616

*Counsel for Plaintiffs Agfa Corporation and Agfa
Graphics, N.V.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice list, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

                                 s/ Walter W. Noss
                                 SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                 707 Broadway, Suite 1000
                                 San Diego, CA 92101