**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

x
:
IN RE ALUMINUM WAREHOUSING    :  No. 13-md-2481 (KBF)
ANTITRUST LITIGATION    :  No. 14-cv-03121 (KBF)
:
---
:  <u>CLASS ACTION</u>
This Document Relates To:    :
Commercial End User Plaintiffs    :
:
:
---
x

**MEMORANDUM OF COMMERCIAL END USERS IN OPPOSITION TO MOTION OF
WAREHOUSING DEFENDANTS AND FINANCIAL FIRM DEFENDANTS TO DISMISS
PLAINTIFFS' ANTITRUST CLAIMS FOR FAILURE TO STATE A CLAIM (ECF NO. 316)
AND IN OPPOSITION TO THE LONDON METAL EXCHANGE'S MOTION TO DISMISS ALL
COMPLAINTS ON THE MERITS (ECF NO. 333)**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  COUNTER PRELIMINARY STATEMENT OF FACTS .................................................. 1

    A.  Aluminum Warehousing System ......................................................................... 2

    B.  Defendants' Ability to Manipulate the Aluminum Warehousing
       System ................................................................................................................ 8

    C.  Events Showing Manipulation of the Aluminum Storage Market ........................ 8

    D.  Factual Gaps That Discovery Could Fill In ..................................................... 12

II.  APPLICABLE STANDARDS IN THE SECOND CIRCUIT ..................................... 13

III.  DEFENDANTS' *TWOMBLY* CONTENTIONS ARE WITHOUT MERIT ..................... 16

    A.  Plaintiffs Plausibly Allege Conspiracy Among The Defendants ......................... 16

       1.  Plaintiffs Allegations of Agreement Are Sufficient ................................. 16

       2.  Plaintiffs Do Not Need To Allege Direct Evidence of a
          Horizontal Conspiracy ............................................................................ 19

       3.  Plaintiffs Allege Illustrative Examples of Parallel Conduct
          and Additional Circumstances to Establish Plausibility ......................... 20

       4.  The LME was a Willing Participant and Benefited from the
          Conspiracy ............................................................................................. 25

       5.  Plaintiffs' Complaint Does Not Mention "A Hub-and-
          Spoke Conspiracy," But Does Provide A Basis For Such
          Characterization ..................................................................................... 31

    B.  Defendants' Conspiracy Is A *Per Se* Violation of Section 1 of the
       Sherman Act ...................................................................................................... 33

IV.  Defendants' Contentions Against Plaintiffs' Sherman Act Section 2 Claims
    Are Meritless ............................................................................................................ 37

    A.  Monopolization and allegations of monopoly power ......................................... 37

    B.  Monopoly power can be proven with direct or circumstantial
       evidence ............................................................................................................ 37

i

C.      Plaintiffs' Complaint Alleges Both Direct And Circumstantial
        Evidence Of Defendants' Willful Acquisition, Maintenance And
        Abuse Of Monopoly Power ................................................................... 40

D.      Plaintiffs have clearly and concisely alleged an attempt to
        monopolize and a conspiracy to monopolize ........................................ 46

V.      Plaintiffs State A Claim Under State Antitrust Law ........................................... 47

VI.     CONCLUSION ................................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)........................................................................27

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010)........................................................................14

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
456 U.S. 556 (1982)........................................................26, 27, 35

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)........................................13, 14, 16

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987)........................................................20

*Appraisers Coalition v. Appraisal Institute*,
845 F. Supp. 592 (N.D. Ill. 1994) ...............................................47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................13, 46

*In re Automotive Parts Antitrust Litig.*,
No. 2:12–cv–00301, 2014 WL 1746121 (E.D. Mich. April 30, 2014)............... 22-23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................. *passim*

*Cape Cod Food Prods. v. Nat'l Cranberry Ass'n*,
119 F. Supp. 900 (D. Mass. 1954) ...............................................39

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012)................................................. *passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 9 CR 32690, MDL 2031, 2013 WL 212908 (N.D. Ill. Jan. 18, 2013)...................... 36-37

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ........................................................33

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
598 F. Supp. 2d 394 (S.D.N.Y. 2008)..............................................46

iii

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ..............................................................45

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)............................................................17, 18

*EmigraGrp., LLC v. Fragomen, Del Rey, Bernsen & Lowewy, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009).................................................47

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
    624 F.3d 106 (2d Cir. 2010)................................................................13

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..........................................47-48

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001) ..............................................................45

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)..............................................................................39

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)............................................................38-39

*Gordon v. Hunt*,
    558 F. Supp. 122 (S.D.N.Y. 1983).......................................................36

*Hinds County, Miss. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)............................................15, 22

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209, 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ...........13

*IHS Dialysis Inc. v. Davita, Inc.*,
    No. 12 Civ. 2468 (ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013)....37

*In re Ins. Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010)................................................................33

*LaFlamme v. Societe Air Fr.*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ................................................23

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980)................................................................36

*In re Magnesium Oxide Antitrust Litig.*,
    Civ. No. 10–5943 (DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011)....17

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)...................................................................19, 25

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
470 F. Supp. 1256 (S.D.N.Y. 1979)...............................................................36

*Optivision Inc. v. Syracuse Shopping Ctr., Assoc.*,
472 F. Supp. 665 (N.D.N.Y. 1979)................................................................39

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010).....................................................22, 23

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002).............................................. 15, 32-33, 37, 38

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*,
No. CV-08-42, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ............................24

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
364 U.S. 656 (1961)..................................................................................27, 35

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........................................................................39

*Robertson v. Sea Pines Real Estate Cos., Inc.*,
679 F.3d 278 (4th Cir. 2012) ................................................................. 14-15

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)......................................................................................46

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010).........................................................14, 18, 22, 24

*State Oil Co. v. Khan*,
522 U.S. 3 (1997).....................................................................................35, 36

*Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*,
738 F. Supp. 2d 505 (D. Del. 2010)...............................................................23

*In re Tableware Antitrust Litig.*,
363 F. Supp. 2d 1203 (N.D.Cal.2005) ...........................................................23

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006).........................................................................................35

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)............................................................... 19-20, 45

*Toys "R" Us, Inc. v. FTC,*
    221 F.3d 928 (7th Cir. 2000) ...............................................................38, 40

*U.S. v. Consol. Laundries Corp.,*
    291 F. 2d 563 (2d Cir. 1961).........................................................................47

*U.S. v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956) ................................................................ 15, 37-38, 42

*U.S. v. General Motors Corp.,*
    384 U.S. 127 (1966) .......................................................................................29

*U.S. v. Grinnell Corp.,*
    384 U.S. 563 (1966) ...........................................................................15, 38, 39

*U.S. v. Masonite, Corp.,*
    316 U.S. 265 (1942) .......................................................................................29

*U.S. v. Perez,*
    489 F.2d 51 (5th Cir. 1973) ...................................................................25-26

*U.S. v. Taylor,*
    562 F.2d 1345 (2d Cir. 1977).................................................................25-26

*U. S. v. Apple Inc.,*
    952 F. Supp. 2d 638 (S.D.N.Y. 2013)........................................................29

*U. S. v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ......................................................................37

*Vedder Software Group, ltd. v. Insurance Services. Office, Inc.,*
    545 F. App'x 30 (2d Cir. 2013) ...................................................................21

**Statutes**

15 U.S.C. § 1 .......................................................................................................25

7 U.S.C. §§ 1 *et seq.*..........................................................................................36

**Other Authorities**

Fed. R. Civ. P. 8(a) ............................................................................................16

Fed. R. Civ. P. 12(b)(6).............................................................13, 14, 42, 47

2A Areeda et al., Antitrust Law ¶ 531a ........................................................40

2A Areeda et al., Antitrust Law ¶ 501 ..........................................................39

## I.     COUNTER PRELIMINARY STATEMENT OF FACTS

Instead of explaining why the 215 factual paragraphs in Commercial End User Plaintiffs' ("Commercial End Users" or "Plaintiffs") complaint[1] are insufficiently detailed, Defendants instead turn their motion to dismiss into a factual debate about the cause of movements in aluminum prices. If things are as benign as Defendants claim, one would not expect powerful aluminum purchasers to testify about Defendants' anticompetitive practices before the U.S. Senate Banking Committee. Nor would one expect investigations by the European Commission, British Parliament's Treasury Select Committee, U.S. Commodity Futures Trading Commission, and U.S. Department of Justice.  Nor would one expect news stories recounting the lazy shuffle of aluminum from one warehouse to another. Even a single reading of Plaintiffs' facts should demonstrate that the case against the Defendants is not only plausible, but very likely. As the Complaint alleges, Defendants conspired to inflate the price of aluminum and warehouse storage fees for their economic benefit and at the expense of Plaintiffs and other consumers in aluminum markets.

The Complaint alleges in great detail how the aluminum market was not operating as it should. The LME imposed certain contractual conditions on the Warehousing Defendants.  One was that the proper functioning of the market through the liquidity and elasticity of stocks of metal under warrant should not be artificially constrained by warehouses' giving exceptional inducements to store or imposing unreasonable charges for withdrawing metals, or delaying

---

[1]   *See* Commercial End Users' Corrected Consolidated Class Action Complaint, Case No. 1:14-cv-03121-KBF (ECF No. 1); Master Docket No. 1:13-md-2481-KBF (ECF No. 242), hereinafter referred to as "Complaint," or "CEU CAC."

unreasonably the dispatch of metal.[2]   Each warehouse was also required to report its stocks to the LME on a daily basis, which had the power to take disciplinary action against its members for violating these conditions.   But as the Complaint alleges, instead of wielding its powers to promote a competitive and efficient market, the LME instead conspired with the Defendants to artificially inflate aluminum prices by increasing warehouse queues and the Midwest Premium, to the detriment of Plaintiffs.

A.      **Aluminum Warehousing System**

Virtually all aluminum futures trading takes place through the LME and LME-approved warehouses.   LME warrants for aluminum are bearer documents relating to one specified lot of aluminum in a LME-approved warehouse.   The LME benchmark price is part of the basis of the price of aluminum bought and sold through other sources.   CEU CAC ¶ 3.   Because the instruments conferring ownership over metal guarantee the owner a specific grade and quality of metal manufactured by a specific person, aluminum from such warehouses is greatly preferred by processors.   CEU CAC ¶ 3.   During the Class Period, the LME controlled over 97 percent of the aluminum forward and futures contract trading in the United States.   CEU CAC ¶ 52.   With this complete monopoly, the LME Defendants had the ability to control the flow of aluminum from LME-approved warehouses as well as the storage rates charged by LME-approved warehouses.   CEU CAC ¶ 183.   The Warehousing Defendants controlled approximately 75 percent of the LME-approved warehouses in the United States.   CEU CAC ¶ 37.   This market share gave them such control over aluminum stored in LME-approved warehouses as to allow them to control the price of aluminum, including the Midwest Premium, which represents the

---

[2]   *See* Terms and conditions applicable to all LME listed warehouse companies, Clause 9.3.2, http://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Warehousing%20 Agreement.pdf.

logistical costs of delivering aluminum from suppliers to the Midwestern United States.  CEU CAC ¶ 6.  The Midwest Premium is unhedgeable.  CEU CAC ¶¶ 136, 137.

By owning the LME-approved warehouses for aluminum, Defendants can control the amount of aluminum flowing in and out of their warehouses. Defendants can attract aluminum into their warehouses by offering aluminum producers a premium.  Defendants can restrict the outflow of aluminum from their warehouses by agreeing to depress the daily "load-out" rate to a bare minimum.  Thus, by conspiring, Defendants can divert aluminum to certain LME-approved warehouses (widening the funnel on the intake end), and locking in the aluminum in these warehouses by agreeing to artificially depress the load-out rate (narrowing the funnel on the output end).  As more aluminum enters the LME-approved warehouses and as more warrants are cancelled, the backlog of warrants increases and a queue forms. The queue length represents the number of calendar days that a metal owner must wait for a scheduled delivery slot.  The longer the queue, the more aluminum that is trapped in the warehouse, the more one has to pay the Warehousing Defendants in storage fees, the higher the Midwest Premium becomes, and the more Plaintiffs have to pay for aluminum.  During the Class Period, the LME heard a number of complaints about increasing queues for aluminum in LME-approved warehouses.  Consumers complained that Defendants tampered with the price paid for aluminum in the United States by inflating warehouse storage fees and queue length.  The longer queues and higher storage fees enabled Goldman to offer even greater premiums to producers to store aluminum in its LME-approved warehouses with already long queues, thereby exacerbating the problem.

For this conspiracy to work, Defendants had to accomplish several things.  First, the Warehousing Defendants had to agree to maintain their storage fees at artificially high levels. One potential threat was the LME. With the growing complaints over higher aluminum prices

arising from the longer queues, the LME, if it were truly concerned about promoting market efficiency, could have required the Warehousing Defendants to provide rebates for the aluminum trapped in the longer queues.  But the LME did not do so.  If the LME had quickly interceded the conspiracy would have failed. Instead, as the Complaint alleges, the LME received 1.10 percent of the daily rent collected on LME warrants, and thus profited from the Warehousing Defendants' agreement to inflate the storage fees; thus under the Warehousing Defendants' influence, the LME refrained from responding to consumer concerns.

Another potential threat was that warehouses without queues could compete with warehouses with queues by offering lower storage fees, quicker and better services and, of course, no queues.  Absent collusion, warehouses without queues would have had the economic incentive to charge lower rents in order to attract aluminum to its warehouse.   But the Warehousing Defendants acted contrary to their unilateral economic self-interest, and did not attempt to steer aluminum from the warehouses with queues to warehouses without queues or with shorter queues by offering lower storage fees.   Instead, they acted consistent with an agreement to tamper with the Midwest Premium, and inconsistent with each warehouse owner's unilateral economic self-interest. Rents for LME-approved warehouses without queues moved broadly in line with the rents of the warehouses with long queues.  As the Complaint alleges, the Warehousing Defendants conspired to inflate the daily fee for storing aluminum in LME-approved warehouses.  LME-approved warehouses commanded a large storage fee premium over non-approved warehouses.  "In 2013, the rate increased to $0.48 per ton per day [in Midwest warehouses] . . . . the 2013 LME daily rate far exceeds the rental rates charged in non-LME warehouses[.]"  CEU CAC ¶ 88.

4

For this conspiracy to work, Defendants also had to agree to restrict the number of LME-approved warehouses.  Defendants' conspiracy would fail if new warehouses diverted aluminum away from the warehouses with queues forming.  But, as the Complaint alleges, entry into the LME-approved warehouse market is possible only after securing the approval of the Defendants. *See* LME Policy Regarding The Approval Of Warehouses, Revised 1 April 2014, https://www.lme.com/~/media/Files/Warehousing/Approval%20process/LME%20policy%20for%20warehouses.pdf. ("Warehouse companies will be considered for listing in an existing or new location subject to completion of a warehouse agreement application form supported by evidence of insurance, capital adequacy and other documents as detailed by the LME from time to time.") ("The LME, respecting such confidentiality as it deems necessary and appropriate, will undertake its own enquiries, as it sees fit, from its members/trade entities etc. to evaluate any applications prior to submission to EXCOM for consideration.").  By controlling the LME approval process for warehouses, the Warehousing Defendants could prevent any maverick from disrupting their conspiracy.

Third, for the conspiracy to succeed, the Defendants had to agree to the maximum load-out requirements.  Defendants would not significantly profit from their inflated storage fees if the aluminum remained in warehouses for only a few hours or days.  Thus, if the warehouse owner charges a fee of 51 cents per ton per day, the more days the aluminum is trapped in the warehouse, the more profit the warehouse owner makes, and the greater the cost of aluminum.  Ordinarily, exchange-licensed commodity warehouses exist so that when one exercises a trade, one is trading a commodity of a standard grade, quantity and quality.  The warrant that is traded covers a specific lot of aluminum.  Hence, it should take a few computer keystrokes to determine that a particular warrant covers ownership rights over metal located in hypothetical Row 5,

5

Shelf 2, Space 3 in a particular warehouse, and a few hours for the warehouse personnel to confirm that fact and to arrange delivery.  Thus, if the warehouse owners loaded out as much aluminum as they physically could, queues would rarely form.  Certainly one would not expect waiting in line for months.  Even if a queue developed in one warehouse, one would expect the LME to take measures to prevent the manipulation of aluminum prices through longer queues. The LME, for example, could significantly increase the minimum load-out requirements of the warehouses with longer queues; or if that was not possible, could limit the amount of aluminum that could flow into warehouses with long queues.  But the LME, under Defendants' control, prevented the market from operating efficiently.  Defendants wanted longer queues, since additional days in the queue meant more storage fees.  Thus, the Defendants agreed among themselves to artificially depress the maximum load-out requirements.  They did this in two ways: by agreeing that the LME's minimum load-out requirements would become the maximum, and that the minimum-as-the-maximum amount would be spread across all the warehouses a Defendant owned in one city.  This meant that only a trickle of aluminum could leave every day.

Finally, the Defendants needed the support of aluminum producers.  If customers are complaining about months of delay in getting aluminum out of LME-approved warehouses (and paying higher premiums as a result), one would expect customers to circumvent the LME altogether and buy directly from the smelters producing aluminum.  If enough buyers purchased directly from the smelters, then the LME-approved warehouses would eventually empty (as little aluminum, if any, would enter the warehouse doors).  But as the Complaint alleges, the aluminum producers believed that they benefited from the longer queues in the LME-approved warehouses, as they associated the longer queues with a higher Midwest Premium, and thus a higher achievable price for their metal.  This is especially true when a larger Midwest Premium

6

increased the compensation of the aluminum producers' sales teams and when the producers' corporate sales were benchmarked to LME prices, so that a higher Midwest Premium improved the aluminum producers' financial results.   The producers also received direct incentive payments from the Warehousing Defendants.  This allowed the producers to receive an upfront payment, and then sell the warrant for their aluminum as soon as possible after the aluminum was transferred to an LME warehouse.  CEU CAC ¶¶ 70-73, 139.

Control over the flow of aluminum through the LME-approved warehouses created a dream for traders in the know, allowing Defendants to manipulate the premium paid for aluminum without fear that anyone could hedge against it.  Normally, in trading markets, traders wanting to hedge against a price increase or decrease can take the opposite position – *i.e.*, a trader who is long the market can hedge her position by shorting that position in the event the market goes down instead of up.

Who did not benefit from the scheme?  Aluminum users such as Plaintiffs, who are unable to effectively minimize the size of the Midwest Premium or to pass along all of the inflated premium to their customers.  Plaintiffs and Class members purchase semi-fabricated aluminum, such as rolled sheet aluminum, aluminum wire and rods, and aluminum extrusions. Plaintiffs and Class members fashion these semi-fabricated aluminum forms into a variety of different products, such as computer rack and storage equipment, aluminum hull boars, and custom sheet metal.  They and other commercial end users of aluminum generally pay the Midwest Premium as a component of the price they pay for aluminum.  CEU CAC ¶ 9. Plaintiffs, as the LME recognized, could not effectively hedge against the Defendants' manipulation of the Midwest Premium, as there was no readily available premium hedging

market.  Thus for the Plaintiffs, an increasing premium directly and adversely impacted their margins.

**B.      Defendants' Ability to Manipulate the Aluminum Warehousing System**

The Complaint does not end with allegations of a conspiracy.  It goes further and specifically alleges how throughout the Class Period, the Warehousing Defendants' membership on key LME committees allowed them to formulate and implement rule interpretations restricting the supply of aluminum.  In particular, Sergio Garbin (Pacorini), Marc Waszkis (Pacorini), Graham Hawkins (Henry Bath/JPM), Mike Dudley (International Commodity Services Limited, the London agent for all Henry Bath Group companies/JPM) and Chris Wibbelman (Metro/Goldman) all worked on the Warehousing Committee, where they played an important role in setting the rules and regulations that govern the operations of LME-approved warehouses, which included Defendants' own warehouse operations.  CEU CAC ¶ 40.

The Complaint alleges that the Warehousing Defendants were also able to shape LME policy and practices through their membership on other critical LME committees.  Representatives of JPM (Neil Clift) and Goldman (Ben Green) worked collaboratively on the LME Trading Committee, which met at least once every two months.  This group made recommendations to the Executive Committee on trading related policy issues and "generally promoting the use of LME contracts."  CEU CAC ¶ 42.

**C.      Events Showing Manipulation of the Aluminum Storage Market**

Finally, the Complaint alleges the real-world effects that the conspiracy had.  In Detroit alone, the amount of aluminum stored in LME-approved warehouses increased from 695,980 tons in June 2009 to 1.36 million tons in December 2011.  Aluminum purchasers who had waited only six weeks for delivery before February 2010 were subject to sixteen-month delays by July

2013.  If shipments of aluminum to consumers had not been constrained by these unlawful agreements, aluminum could be identified by the warehouse owner and scheduled for delivery to the owner in two business days.  CEU CAC ¶ 4.

The Complaint highlights the expert analysis--prepared at the request of Plaintiffs' counsel--of LME-approved warehouses in Detroit, where a significant number of LME-approved warehouses are located.  The analysis confirms that aluminum inventory and warehouse queues have been kept at artificially high levels, which caused the Midwest Premium to be artificially inflated.  The Midwest Premium should have averaged $0.068/pound from February 1, 2010 through August 19, 2013, instead of its actual average of $0.087/pound during the same time period, an increase of approximately 28%."  CEU CAC ¶ 8.

The scheme allowed the Defendants generally, and Goldman and the LME in particular, to reap exorbitant warehousing fees and profit from aluminum holdings tied to the ever-increasing Midwest Premium, and enabled the Trading Desks of the Defendants to profit from positions in the aluminum market, including those tied to variations in current and future aluminum prices through recurring financing deals.

The Complaint also alleges how the Defendants' anticompetitive actions were so abnormal they caused sophisticated purchasers to complain.  In sworn testimony before the Senate Banking Committee in July 2013, Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, joined by the Coca-Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products, testified that the extended warehouse delays do "not happen with any of the other commodities we purchase.  When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities.  It is only with

9

aluminum purchased through the LME that our property is held for an extraordinary period of time . . . [or we] pay the high physical premium to get aluminum today."  CEU CAC ¶¶ 156-157. Weiner estimated that the LME warehouse rules have imposed an additional $3 billion expense on companies that purchase aluminum and that because of the Warehousing Defendants' continued treatment of minimum release requirements as maximums the flow of aluminum into the market continues to be restricted.  Complaints concerning the warehouse delays from Weiner and other purchasers of aluminum fell on deaf ears at the LME, which dismissed proposals to alleviate backlogs.  CEU CAC ¶ 157.

Finally, the Complaint alleges how specific Defendants' anticompetitive actions violated the antitrust laws.  Since late 2010 or early 2011 when public complaints of artificially inflated aluminum prices began, the LME has maintained its monopoly power by:  (i) not basing their agreements with warehouse owners (and the minimum load-out rates) on a percentage of the metal capacity or metals stored in each warehouse; (ii)  making agreements that encouraged the Warehousing Defendant to shuttle metal from warehouse to warehouse; (iii) using anti-competitive low minimum load-out rates; (iv) consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage; (v) failing to ensure that no Warehousing Defendant acquired a critical mass of metal to manipulate and/or influence prices; (vi) approving the Warehousing Defendants' charges and practices; (vii) allowing repeated increases in the Warehousing Defendants' charges; (viii) allowing the Warehousing Defendants to pay incentives to divert aluminum into, and restrain and engross more aluminum in, LME Warehousing; (ix) allowing the Warehousing Defendants to artificially build LME warehouse inventories, lengthen queues and drive up premiums in order to foster, maintain and take

advantage of the contango in the aluminum market; (x) making statements to deter companies that purchased aluminum from challenging such practices.  CEU CAC ¶ 187.

The LME has held the monopolist position of controlling (a) exchange-traded aluminum forward or futures contracts trading in the U.S., (b) warehousing of exchange-traded aluminum in the U.S. including in the Midwest and the greater Detroit, Michigan area ("LME Detroit Warehousing"), and (c) the rules for the determination of aluminum prices.  CEU CAC ¶ 188. The LME's monopoly over the trading of aluminum forward or futures contracts in the United States during the Class Period included capturing approximately 97-99% of the trading in such contracts.  CEU CAC ¶ 189.  There is no indication that the behavior of the LME, while under the influence of the Warehousing Defendants, made economic sense in that it led to pro-competitive efficiencies, such as greater market transparency, greater innovation or better financial products and services to clients.  CEU CAC ¶ 190.  Instead, its actions led to commercially absurd results, such as waits of 16 months to deliver aluminum that could have been delivered in no more than two business days.

During the Class Period, Goldman has held the sensitive position of having a monopoly over LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME Detroit Warehousing.  Goldman purchased, at the start of the Class Period, warehouses with more than 80% of the storage space in the Detroit area.  Goldman continued to own those warehouses throughout the Class Period. Overall, Goldman's warehouses comprised more than 80% of the LME-certified U.S.  Warehousing space. Goldman was able to control the output of LME approved aluminum from U.S. Warehousing by controlling the rate at which it loaded out aluminum.  CEU CAC ¶ 191-192.  Moreover, Goldman agreed with the LME to convert the minimum into a maximum.  Goldman reportedly further abused the power to control

prices by shuttling aluminum from one warehouse to another within the Detroit area in order to use up the minimum quota without actually causing any output of aluminum from the warehouses to the public. Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into LME Detroit Warehousing. CEU CAC ¶ 193.

Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman, JPM and the LME have agreed to abuse their monopoly power in order to anticompetitively and restrictively divert aluminum into, and limit unreasonably the free alienability of aluminum stored, in LME Detroit Warehousing. Their conduct has inflated aluminum prices including the Midwest Premium as well as the storage fees paid directly to the Goldman Defendants, and indirectly to the LME. CEU CAC ¶ 194.

### D. Factual Gaps That Discovery Could Fill In

In a properly functioning market the Warehousing Defendants could not artificially constrain the outflow of aluminum from their warehouses. Under a properly functioning market, queues and premiums should not widen, newspapers should not investigate the minimum "load-out" rate, and powerful customers, like MillerCoors, should not complain about having to pay higher premiums because aluminum is inexplicably trapped in warehouses. But despite the complaints and scrutiny, the LME and the Warehousing Defendants held firm. Thus discovery will help plaintiffs learn why the LME bent itself to the will of the Warehousing Defendants. Plaintiffs would expect to learn whether Goldman and JPM officials informed their traders to expect a spike in aluminum prices or the Midwest Premium, what Goldman and the other trader defendants said to each other about the reasons for effecting changes in LME storage and withdrawal rules and about mutually beneficial incentives policies to lure more aluminum off the

market.  These inquiries would include, among other things, records of the LME itself, including from LME-related meetings, records showing whether the Defendants met at rump sessions of these meetings, or at dinner afterwards, communications by the people attending the meetings and others in their firm.  In other words, Plaintiffs will be seeking all of the records normally sought in a horizontal price-fixing case.

With respect to the Section Two allegations, Plaintiffs will be seeking records reflecting how the Defendants used the LME and its rules to attain and maintain its monopoly and control price and output.

## II.    APPLICABLE STANDARDS IN THE SECOND CIRCUIT

"On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in plaintiffs' favor." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209, 2013 WL 1223844, at *8 (S.D.N.Y. Mar. 27, 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible . . . [But, t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184-85 (2d Cir. 2012), *cert. denied, Curtis Circulation Co. v. Anderson News, LLC*, 133 S. Ct. 846 (2013).  "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations

to make the complaint's claim plausible." *Anderson News, L.L.C.*, 680 F.3d at 189.  Finding the alternative theory of Defendants' unilateral action "plausible" is an improper basis for dismissing a case on a 12(b)(6) motion.  *Anderson News, L.L.C..*, 680 F.3d at 190; *see also*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) ("While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tends to rule out the possibility that the defendants were acting independently, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made.") (internal citations omitted)).

It is incorrect to argue that to overcome a 12(b)(6) motion, "a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior."  *Starr* 592 F.3d at 325 (internal citations omitted).  In an antitrust case, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment."  *Anderson News, L.L.C.* 680 F.3d at 184.  A plaintiff must only show that there is a theory, backed by some facts, tending to show that collusion was plausible.  So long as it does so, at the pleadings stage, the court does not weigh plausibilities, but rather sets the case for discovery.

When competing firms act within ruling councils of a joint enterprise and skew the rules to affect a competition-distorting restraint not needed to achieve the joint venture's legitimate ends, dismissal of an injured party's Section 1 claim is reversible error. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 201-202 (2010).  *Accord, Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 285 (4th Cir. 2012) ("The relevant functional inquiry is whether there is

14

a conspiracy between separate economic actors pursuing separate economic interests.") (internal quotations and citation omitted).

A few rulings on motions to dismiss after *Twombly* have opined that the notice elements of the rule must be satisfied by a complaint that details the "who, what, when and where" of the alleged conspiracy.  Of course, detail is not lacking here.  In any event, judges in this District and this Circuit have declined to insist on any particular level of detail.  *See, e.g.*, *Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (denying motion to dismiss because plaintiffs do not need "to specify the who, when or where of each allegation of conspiratorial conduct," but are required to allege "simply a factual basis sufficient to establish a plausible inference of an anticompetitive agreement among defendants.").

With regard to a Sherman Act Section 2 case, stating a monopolization claim requires plausibly alleging "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  Monopoly power is defined as "the power to control prices or exclude competition," *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956), and can be shown using direct evidence of anticompetitive effects or by defining a relevant market and showing defendants' market share. *PepsiCo, Inc.*, 315 F.3d at 107.

## III.  DEFENDANTS' *TWOMBLY* CONTENTIONS ARE WITHOUT MERIT

### A.  Plaintiffs Plausibly Allege Conspiracy Among The Defendants

#### 1.  Plaintiffs' Allegations of Agreement Are Sufficient

A review of the Complaint will show that the notice standards of Federal Rule of Civil Procedure 8 are amply met here.  Under Fed. R. Civ. P. 8(a), pleadings must contain:  "(1) a short and plain statement of the grounds for the court's jurisdiction . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought . . ."  The Compliant omits no date, place, culprit, or bad act.

The Defendants adopted policies and practices that led to a wholly unnecessary shortage and price spike.  Defendants have now filed a brief spelling out the unlikely thesis that the price spike was sheer bad luck, perhaps combined with panic and widespread bad judgment.  Warehouse and Financial-Firm Def.'s Mot. Dismiss Br. ("W&FF MTD Br.") p. 1-5.  Given the degree of obvious disquiet in the aluminum market, this assertion cannot be viewed credibly.  Indeed, the majority of the people who complained to the LME have suggested that the problems were either entirely or partially queue-related.  The ones who argued to the LME that the problem was not related to queues were, in fact, the Defendant warehouse operators who directly benefited from the queues and the aluminum producers who loaded their aluminum into the warehouses in exchange for higher premiums.  Thus, as even the LME recognized, queues play a role in the problem.  Regardless, the *Twombly* standard requires the trial court to determine whether plaintiffs' claims are plausible, not whether the alternative explanations are more convincing.  *Anderson News, L.L.C.* 680 F.3d at 190.  Facts indicating the plausibility of collusion or anticompetitive single firm conduct entitle plaintiffs to obtain hidden records that can be adjudged in the summary judgment context or by a jury.

16

The many cases joined in this MDL follow on detailed investigations and revelations by some of the best financial reporters in the world.  *See, e.g.*, CEU CAC ¶ 90.  Numerous government investigations are underway.  CEU CAC ¶¶ 159, 161-163 (noting investigations by the European Commission, British Parliament's Treasury Select Committee, U.S. Commodity Futures Trading Commission, U.S. Department of Justice, and U.S. Senate Banking Committee).  Defendants' intentional strategies constricted the supply of primary aluminum available on the spot market, forcing key prices up to totally artificial levels, causing financial injury to many players in the aluminum market, including Plaintiffs.  CEU CAC ¶ 1, 5-7.  As Professor Saule T. Omarova explained in testimony before the U.S. Senate, large traders with integrated financial and physical metals operations like Goldman, JPM and Glencore are able "to control the supply of aluminum to commercial users and, as a result, to control prices."  They can "significantly move prices of futures and underlying physical commodities not only by 'cornering' the market in a particular product but also by placing very large sell/buy orders in excess of available liquidity."  CEU CAC ¶ 65.

Defendants compare Plaintiffs' allegations here to the allegations made in *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).  However, in *Elevator*, the plaintiffs merely alleged defendants' "anticompetitive wrongdoing in Europe."  *Id.* at 52.  Because there were no allegations "linking transactions in Europe to transactions and effects here" in the U.S., the court found the plaintiffs' "assertions of a worldwide conspiracy" insufficient.  *Id.*  Here, Plaintiffs' allegations are largely based on Defendants' misconduct and its impact in the U.S., and certainly "do not amount to a mere [']list of theoretical possibilities,[']" . . . or [']require the Court to assume the existence of the conspiracy.['] . . . Rather, they make the alleged conspiracy more plausible."  *In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10–5943 (DRD), 2011 WL

17

5008090, at *18 (D.N.J. Oct. 20, 2011) (distinguishing *Elevator* and *Hinds County, Mississippi v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 518 (S.D.N.Y.2009)).   Further, contrary to what the Defendants mischaracterize as "nothing more than a list of theoretical possibilities which one could postulate without knowing any facts whatever," W&FF MTD Br., p. 21, Plaintiffs here allege "enough factual matter (taken as true) to suggest that an agreement was made." *Starr*, 592 F.3d at 321 (citation omitted).

For example, the Complaint spells out how Defendants Goldman and JPM—clearly horizontal competitors—secured seats on the LME Warehousing Committee and then agreed to turn the rules in ways that would facilitate shortage creation.   CEU CAC ¶¶ 4, 33, 40, 77-82, 188.   Defendants' agreements to change or interpret rules are interdependent; the rules could not be altered without their agreement, as they both knew.

Acceptance, at the pleadings stage, of Defendants' explanation of their conduct would require this Court to hold that:   first, each Defendant unilaterally arrived at an interpretation of the LME rules that treated (a) the 1500 ton per day minimum shipment as a maximum; (b) applied the minimum as a requirement for a city rather than per warehouse; and (c) counted shipments between warehouses towards the 1500 ton minimum; and second, that the Defendants unilaterally adhered to these policies amidst many vociferous customer complaints and requests for legislative and executive investigation.   The English idiom "yes, and pigs can fly" comes to mind.   Thus, an innocent explanation of the shortage may be conceivable, but is highly implausible.   "The large increase in the amount of aluminum in the Defendants' Detroit LME-approved warehouses, the mass cancellation of warrants to create record-breaking queues, and the steady increase in premiums would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in restraint of trade."   CEU CAC ¶ 182.

18

### 2.    Plaintiffs Do Not Need To Allege Direct Evidence of a Horizontal Conspiracy

Defendants argue that Plaintiffs must allege direct evidence as to the "specific time, place, or person involved in the alleged conspiracies."  W&FF MTD Br. p. 21.   Even Defendants' own authorities contradict such a statement.  *See Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("a complaint may, alternatively, present circumstantial facts supporting the inference that a conspiracy existed"). Here, Plaintiffs allege that the Defendants moved swiftly together to capitalize on the contango and stockpile aluminum in North America and Europe within a sixteen-month period, that the Defendants agreed to treat the LME daily minimum "load-out" requirement as a daily maximum requirement, increased their storage fees in lock-step fashion, and further restricted the flow of aluminum through their trading desks.  CEU CAC ¶¶ 59, 78, 82, 83, 84.  Additionally, Plaintiffs allege that the LME was owned by financial firms that are Defendants in this case whose positions in the LME had been acquired between February 2010 and August 2011.  Plaintiffs further allege that the LME colluded with the Warehousing Defendants (or turned a blind eye toward the actions taken by its owners) to ensure that the market worked better for the Warehousing Defendants, resulting in coexisting, reinforcing shortages of tradable aluminum. CEU CAC¶¶3-5, 28, 59, 78, 82, 115, 116, 119, 127, 130.  These allegations are sufficient to infer a horizontal agreement among the Defendants.  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("[E]ven in the absence of direct 'smoking gun' evidence," a horizontal . . . agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices.").

### 3.  Plaintiffs Allege Illustrative Examples of Parallel Conduct and Additional Circumstances to Establish Plausibility

Plaintiffs not only sufficiently allege parallel conduct by the Defendants, but also allege "additional circumstances" to allow an inference of a conspiracy. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir. 1987).  For instance, Plaintiffs allege that the Warehousing Defendants conspired together to take control of the LME-approved aluminum warehousing market in North America and Europe within sixteen months.  Consequently, the Defendants were able to control a critical component in the distribution of the aluminum, boost income from storage fees, pursue better trading positions for their trading desks, and influence LME warehousing policy.  CEU CAC ¶¶ 59, 60, 64.  As Professor Omarova explained in Senate testimony, "[f]inancial institutions like Goldman Sachs can also use their warehouses to store vast quantities of physical metals in so-called 'financial' deals.  This strategy allows financial institutions to secure a guaranteed return.  Removing a large portion of physical metal from the market, however, creates artificial shortages of aluminum for commercial purchase and inflates its market price."  CEU CAC ¶ 126.  These allegations show that the Defendants had a strong common motive to conspire with each other to profit from the scheme.

In addition to allegations that the Defendants were capable of conspiring, Plaintiffs also allege that the Defendants conspired to benefit from their scheme through manipulating the LME warehousing system.  For example, Plaintiffs allege that the Defendants colluded to "increase incentive payments to producers to divert aluminum to specific LME-approved warehouses owned by Defendants," "treat[] minimum load-out release requirements as maximums," "shuffle[] aluminum from one warehouse to another rather than delivering it to purchasers," and "further restrict the flow of aluminum . . . by cancelling warrants."  CEU CAC ¶¶82, 83, 95.  The

20

cancellations resulted in the Midwest Premium increasing and the Warehousing Defendants' trading affiliates realizing a resultant gain on their physical aluminum positions.  In addition, "the contango was maintained and/or extended, and financing deals remained profitable for all of the Warehousing Defendants . . . ."  CEU CAC ¶ 141.  These allegations are very different from those in *Vedder Software Group, ltd. v. Insurance Services. Office, Inc.*, 545 F. App'x 30 (2d Cir. 2013).  In *Vedder*, the plaintiffs only identified one entity "and its affiliates as members of the conspiracy," and alleged no "plus factors" in support of a conspiracy claim.  *Id.* at 32-33.  Whether Plaintiffs allege "facts to support a contention that the LME conspired with the Warehousing Defendants to establish inadequate minimum load-out requirements," W&FF MTD Br. p. 27, is irrelevant, because no matter what the LME minimum load-out requirement was, Plaintiffs allege that Defendants agreed to treat the minimum load-out requirement as a "maximum" to restrict supply of aluminum for physical delivery.  CEU CAC ¶¶ 76-90.

Further, Plaintiffs allege that the Defendants paid even higher incentives as they diverted more aluminum into their warehouses and made delivery of aluminum less and less efficient. CEU CAC ¶ 74.  Consequently, when "the 2013 LME daily rate far exceeds the rental rates charged in non-LME warehouses" and when purchasers of aluminum in Detroit LME-approved warehouses were forced to wait "469 days," CEU CAC ¶¶ 88, 90, the Defendants were still able to attract an enormous amount of aluminum into their LME-approved warehouses.  Defendants' collusion clearly caused an "artificial movement in both warehouse inventories and warehouse queues not explainable by the working of the competitive market."  CEU CAC ¶ 96.  Although the Defendants tried to justify this artificial movement by explaining that entities who deposit aluminum "into an LME warehouse . . . [are] not likely to select an LME warehouse based on its load-out rate," W&FF MTD Br. p. 25, their explanation makes no sense.  It completely ignores

21

the fact that it was the Defendants' collusive actions, and resulting incentives, that caused producers to choose to deposit aluminum into the LME-approved warehouses, which then created a stockpile of aluminum in those warehouses.  *See* CEU CAC ¶¶71-73.

Defendant's argument that "governmental investigations, including subpoenas from the Commodity Futures Trading Commission ('CFTC') and a 'preliminary investigation' by the Department of Justice ("DOJ")" does not bolster the plausibility of the alleged conspiracy is baseless. Contrary to what Defendants argue here, courts have found government investigations bolster section 1 allegations.  W&FF MTD Br. p. 31.  In *Hinds County,* the court considered the complaint "in light of recent developments in state and federal investigations into the municipal derivatives industry," and concluded that "although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims."  790 F. Supp. 2d at 115.  In *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010), the court rejected a similar argument as the Defendants raise here, and found "the government investigations . . . while not determinative standing alone as to the plausibility of Plaintiffs' claims of conspiracy, do bolster the plausibility analysis and heighten the Court's expectation that 'discovery will reveal evidence of illegal agreement.'"  *Id.* at 1009 (citing *Twombly*, 550 U.S. at 556).  In *Starr*, the court pointed out that "a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice" were "plus factors" that bolstered allegations of parallel conduct.  592 F.3d at 324-25.  *See also In re Automotive Parts Antitrust Litig.*, No. 2:12–cv–00301, 2014 WL 1746121, at *5 (E.D. Mich. April 30, 2014) ("Plausible grounds were set forth in allegations about the government investigations, which were used to bolster the

plausibility of § 1 claims[.]"); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D.Cal.2005) ("A plaintiff may surely rely on governmental investigations . . . .").

Regardless, the authorities cited by the Defendants do not support their argument. *See LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) ("plaintiffs' allegations . . . occurred in August 1997, long before the class period here allegedly began in 2004, and plaintiffs fail to establish any probative connection . . . ." "public records reveal that the allegations involving actual guilty pleas referenced in the Complaint, (¶ 91), concerned unrelated markets . . . or only non-parties to this action . . ."); *Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (finding plaintiffs provided insufficient facts about the governmental investigations).

Defendants also argue that Plaintiffs' allegations of parallel conduct are implausible because the queues do not exist at "any LME warehouse in the United States other than at Metro's Detroit warehouses." W&FF MTD Br. p. 22. This misses the point and ignores Plaintiffs' allegations concerning Defendants' parallel conduct in acquiring and cancelling warrants both in Detroit and in Vlissingen. *See* CEU CAC ¶¶138-149. This conduct had the effect of increasing warehouse queues in both regions and, ultimately, increasing the Midwest Premium, which allowed the Defendants to profit from their physical aluminum trading positions. *Id*. Thus whether Plaintiffs allege that the "load-out rate was ever an issue at any other defendant's U.S. warehouses," W&FF MTD Br. p. 22, is immaterial.

Further, the case cited by the Defendants, *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, No. CV-08-42, 2013 WL 6481195, at *23 (E.D.N.Y. Sept. 20, 2013), is inapplicable. Unlike this case, the plaintiffs in *Precision* provided insufficient "basis for tying" certain defendants to a global conspiracy as those defendants only engaged in "imposition

23

of some, but not all, of the surcharges at issue in the global conspiracy claim." *Id.*  Further, the court explained that "the plaintiffs have provided no plausible basis for joining one of those defendants in a global conspiracy that connects the local conspiracies and not joining another." *Id*.

Thus, Plaintiffs' allegations are "placed in a context that raises a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557, as they show not only "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties . . ." *Id.* at 556 n.4, but also complimentary conduct among Defendants helping and/or cooperating with each other in order to benefit from the scheme, such as influencing LME policies through membership on the LME's Warehouse Committee, cancelling warrants to extend queues and increase the Midwest Premium, and allowing a wide contango to persist and/or increase during the Class Period.  CEU CAC ¶¶ 60, 64, 75, 83, 84, 116-120.

Contrary to Defendants' contention, Plaintiffs need not specifically plead all three "plus factors," *i.e.*, "common motive to conspire," actions against "individual economic self-interest," and "high level of inter firm communications," W&FF MTD Br. p. 23, because "these plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 n.6 (2d Cir. 2013).  *See also Starr*, 592 F.3d at 323-24.

### 4.     The LME was a Willing Participant and Benefited from the Conspiracy

Plaintiffs allege a conspiracy among horizontal competitor warehousing and financial firms that was agreed to by the LME and which benefited the LME.  LME participation in the scheme was substantial.  The LME derived significant benefits from the scheme from the start and the scheme would not have persisted without the LME's approval.

The LME is not in a vertical relationship with the Warehousing and Financial Firm Defendants.  The LME and Warehousing Defendants occupy the same position between producers and consumers.  The LME is entitled to receive 1.1% of the rental revenues from the LME warehouses, and, therefore, the LME is at the same level as the warehouses for purposes of product movement in both sales and purchases of aluminum.

The LME asserts that, to be liable for a Section 1 violation, Plaintiffs must prove either a Hub-and-Spoke conspiracy or that the LME is a mere instrumentality of the Warehousing and Financial Firm Defendants.  Def. LME Br. Mot. Dismiss Merits, Dkt. 334, pp. 8-15 ("LME Merits Br.").  The LME's assertion that there are no antitrust cases or doctrines under which it can be held liable disregards basic antitrust principles.  LME Merits Br. pp. 1-2.

To start with, the LME disregards the plain language of Section 1, which provides that "**[e]very** . . . conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1 (emphasis added).  "Conspiracies are as complex as the versatility of human nature," and are "not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical, molecular, or atomic forms."  *U.S. v. Perez*, 489 F.2d 51, 59 n.11 (5th Cir. 1973) (affirming conspiracy conviction), *cert. denied*, 417 U.S. 945 (1974); *see also U.S. v. Taylor*, 562 F.2d 1345, 1351 n.2 (2d Cir. 1977) (quoting *Perez,* affirming conspiracy

conviction), *cert. denied*, 432 U.S. 909 (1977).  The LME has not asserted any pro-competitive justification for its decisions permitting the Warehousing Defendants to amass vast quantities of aluminum in LME approved warehouses, and knowingly and intentionally inflating the price of aluminum.  Incredibly, the LME also "represented that it had no power to resolve the issue and suggested that purchasers simply stop paying the prices if they believe they are unfair."  CEU CAC ¶ 165.

The LME fails to discuss or even cite applicable precedents, such as *Am. Soc'y of Mech Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ("*ASME*").  In *ASME*, the Court held a standard-setting association liable, at the judgment stage of the case, for the anticompetitive acts of its member-agents because the association gave the member-agents "apparent authority" to act in its name, as officers of ASME committees.  The ASME members, while acting in their capacity as ASME agents, had the power to seriously injure competition.  *ASME*, 456 U.S. at 570-571 (noting "a standard-setting organization like ASME can be rife with opportunities for anticompetitive activity.  Many of ASME's officials are associated with members of the industries regulated by ASME's codes.").  The Court also pointed out that antitrust liability would be a "powerful incentive" for the organization to curb improper anticompetitive conduct, and serve as both a punishment for past violations and compensation for victims of antitrust violations.  *ASME*, *supra* at 572, 575.  Like ASME, the LME granted its members apparent authority, at the very least, to engage in anticompetitive behavior -- namely tying up aluminum supplies, which in turn raised consumer prices.  In *ASME*, the Court did "not delineate . . . the outer boundaries of the antitrust liability of standard-setting organizations for the actions of their agents committed with apparent authority."  *ASME*, at 577.  Like ASME, the LME can be held liable under antitrust laws for the anticompetitive activity of its warehouses and members.  LME

liability falls well within the boundaries established by the Supreme Court in *ASME* – boundaries that the Court stated were not themselves the outer boundaries of antitrust liability for a standard-setting organization.

Indeed, the LME's culpability is greater than ASME's, because the LME not only supervised inadequately but also received substantial benefits from the scheme, including fees from its authorized warehouses which increased as storage times increased.  As if this were not enough, the LME also increased the percentage basis for its fees during the midst of the conspiracy.  CEU CAC ¶ 67.  Thus, the LME's culpability satisfies even the more strict standards for antitrust liability advocated by the three-justice dissent in *ASME*.  The LME is clearly a self-interested party and Plaintiffs plausibly allege its willing participation in an anticompetitive scheme. When members of a supposedly neutral regulatory body pervert its rules to their advantage and the public's disadvantage, U.S. courts have been quick to find an antitrust violation.  *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (holding efforts to influence private association's standards an anticompetitive restraint on trade); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 660 (1961) (overturning dismissal due to unlawful conspiracy in association's refusal to approve a product for reasons unrelated to an objective standard)

The LME's consent to the Warehousing Defendants' collusive actions, and resulting incentives, caused producers to choose to deposit aluminum into LME-approved warehouses, which contributed to an unprecedented stockpile of aluminum in those warehouses.  CEU CAC ¶¶ 70-75.  This profited the LME in at least two ways:  (1) the LME took a 1.1% cut of this enormous and ever snowballing supracompetitive (in terms of both the cache's volume and the amount of the storage fee) hoard of aluminum and (2) the LME and its shareholders benefited

27

when HKE purchased LME at a price inflated by the supracompetitive profits that the LME enjoyed because it agreed to exclusionary, anti-competitive practices.  CEU CAC ¶¶ 67-70, 86.

The Warehousing Defendants paid incentives to divert aluminum into their warehouses and make delivery of aluminum less and less efficient.  These incentives permitted the LME and the other Defendants to attract an enormous amount of aluminum into their LME-approved warehouses, even when "the 2013 LME daily rate far exceeds the rental rates charged in non-LME warehouses" and when purchasers of aluminum in Detroit LME-approved warehouses were forced to wait "469 days."   CEU CAC ¶¶ 88, 90.   These incentives were paid by Goldman/JPM et al, and not by the LME. This practice generated a benefit of collusion enjoyed exclusively by the LME.  The LME got a 1.1% cut of supracompetitive warehouse storage fees applied to an aluminum hoard of supracompetitive size for a supracompetitively lengthy period of time subsidized by several of its member firms and which the LME was not required to subsidize.

The LME asserts that the Warehousing and Financial Firm Defendants could not have conspired because they (1) lacked a majority on the LME's Executive Committee or Warehousing Committee, and (2) had independent reasons to favor increasing their earnings from storage fees.  LME Merits Br., pp. 3, 12.  Although whether Goldman and JPM together lacked a majority is not yet clear, evidence could be gathered to determine this fact question.  By means of acquisitions and alliances, Goldman and JPM could well have commanded more than two votes on the key committees.  Evidence may also show many members of the LME were not major players on the US market and would defer to Goldman/Metro and JPM/Henry Bath on rules or applications for American warehouses.  Also, since the LME trades in eight different metals, it is likely that some member firms were interested primarily in metals other than

28

aluminum, and thus had little interest in what Metro and Henry Bath, the cat's paws for Goldman and JPM, were scheming to do.

Either confusing or conflating (1)  the self-interest of each Warehousing Defendant in the absence of unlawful agreement among its competitors with (2) the self-interest of each Warehousing Defendant in the presence of unlawful agreement that they will act in kind, the LME insists that "plaintiffs do not allege that the warehouse defendants' alleged decisions . . . were against their unilateral self-interest."  LME Merits Br. at 11.  In fact, Plaintiffs allege that each Warehousing Defendant's hoarding served its self-interest only because each firm can count on its rivals to do likewise.  Plaintiffs do not allege that each Warehousing Defendant acted in its self-interest in a competitive market without collusion among competitors.  Plaintiffs allege that, absent an unlawful agreement among Defendants, each Warehousing Defendant had an economic incentive to load out aluminum promptly and efficiently, in order to retain customers.

Moreover, while the Warehousing/Financial Firm Defendants may have independently favored increased earnings, that desire does not exclude the possibility of carrying out a scheme with competitors to manipulate the aluminum market for even greater revenue for all Defendants, a scheme which Defendants clearly had the capacity to carry out.  It is "of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest."  *U.S. v. General Motors Corp.*, 384 U.S. 127, 142 (1966); *see also U.S. v. Masonite, Corp.*, 316 U.S. 265, 276 (1942) ("the fact that there were business reasons which made the arrangements desirable to the appellees . . . would be no more a legal justification for price-fixing than were the 'competitive evils' in the *Socony-Vacuum* case."); *U. S. v. Apple Inc.*, 952 F. Supp. 2d 638, 698 (S.D.N.Y. 2013) ("It is not surprising that Apple chose to further its own independent, economic interests.   Such a

motivation, however, does not insulate a defendant from liability for illegal conduct." (citing *General Motors*, 384 U.S. at 142)).

Contrary to what the LME contends, both parts of the scheme depended on multi-firm cooperation.  LME Merits Br., p. 12.  First, if aluminum spot prices were rising, the market would become attractive to speculators, who would buy the commodity and then have to warehouse it.  CEU CAC ¶¶ 58-64.  The price of aluminum was driven up by concerted attention to hoarding aluminum and creating artificial delivery queues, creating conditions at key locations such as Detroit where aluminum pricing was determined.  CEU CAC ¶¶ 67-90.  Second, Goldman and JPM not only traded aluminum on the LME, but also acquired LME-certified aluminum warehousing in 2010.  CEU CAC ¶¶ 17, 29-34.  Because Goldman and JPM both traded and participated in the physical market, they could coordinate their shortage-creating tactics, "manipulat[ing] the inventory and prices of aluminum and profit through their derivative positions."  CEU CAC ¶ 63.

Furthermore, in a competitive warehousing market, the LME approved warehouses would compete with each other for customers, with respect to both price and load-out efficiency.  If individual warehouse owners sought to increase storage revenues by suppressing load-out rates, other warehouses would seek a competitive advantage by offering efficient load-out service.  CEU CAC ¶ 85.  By agreeing that the LME minimum load-out requirement would be treated as a maximum, the Warehousing Defendants were able to collectively suppress load-out rates without concern about losing market share.

30

5.      **Plaintiffs' Complaint Does Not Mention "A Hub-and-Spoke Conspiracy," But Does Provide A Basis For Such Characterization**

Defendants argue that Plaintiffs failed to plead a hub-and-spoke conspiracy, "with the LME as the hub and the warehouse defendants as spokes."  W&FF MTD Br. p. 32; *see also*, LME Merits Br. p. 8.  Plaintiffs allege that the Defendants met, discussed and agreed upon warehousing policies at LME committee meetings.  Moreover, the Warehousing Defendants were specifically charged with setting LME policy such as the minimum "load-out" rule, and Defendants agreed upon interpretations of those policies to restrict output from these warehouses, more fully described below, so as to gain power over the trading price.  It is extremely implausible that those interpretations (treating the minimums as maximums, applying those maximums to an entire city rather than a warehouse) were arrived at independently.  Indeed, the MillerCoors executive testified how the LME's structure is "unprecedented" in enabling the Warehousing Defendants to comprise the LME Warehouse Rules and Regulations Committee.  Thus, the Warehousing Defendants agreed through the LME to inflate storage fees and queue lines for the purpose of inflating the Midwest Premium.  The Complaint alleges how after the queue times reached unprecedented levels, prompting the outcry of consumers, the Warehousing Defendants through the LME agreed not to undertake measures to dramatically shorten the queues.  Thus there is a horizontal restraint with the Warehousing Defendants agreeing through the LME to inflate the Midwest Premium.  What is not known are the intriguing details of what the particular executives of Defendants said in these LME meetings— especially when the LME was under pressure from irate customers such as MillerCoors to take corrective action.  Plaintiffs look to discovery to fill in these details to see how brazen the Defendants actually were to justify continuing their anticompetitive restraints.

31

Consequently plaintiffs did not plead a hub-and-spoke conspiracy.  Under a classic hub-and-spoke conspiracy, the hub approaches each competitor individually, and tells each competitor of the contemplated conspiracy, that the other competitors would be invited to join the conspiracy, and that cooperation of all the competitors was essential for the conspiracy to work.  Each competitor gives its adherence to the conspiracy and agrees to participate in it.  Here the spokes (the Warehousing Defendants) effectively controlled the hub (LME).  Even if the LME were an independent hub, the allegations in the Complaint are sufficient to establish a horizontal agreement that connects the spokes.  Plaintiffs allege that Defendants acquired large warehouse businesses to secure membership on the LME's Warehouse Committee within the same general time period.  CEU CAC ¶¶ 59-61.  The LME no doubt informed the Warehousing Defendants of the growing queues.  Each Warehousing Defendant knew that the queue problem could persist only if each Defendant cooperated by not undertaking any corrective measures that would cause the maximum load-out rate to increase, and the storage fees to decline.

Also, Plaintiffs allege that Defendants cancelled a large number of warrants when Metro provided information and opportunities to traders affiliated with the Defendants, and that Defendants duplicated the process of stockpiling aluminum in Europe.  CEU CAC ¶¶ 140-44.  As Professor Omarova testified, "reports of JPMC moving large amounts of metal from other warehouses into its own suggest that the firm may be rebuilding its stocks and consolidating its warehousing business in key European locations.  This is likely to exacerbate the conflict within the aluminum industry over the unprecedented degree of power that the largest warehousing companies like Henry Bath and Metro exercise over global aluminum prices."  CEU CAC ¶ 149.

The cases cited in support of Defendants' arguments are all easily distinguishable.  In *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002), the plaintiffs alleged "insufficient

evidence of a horizontal agreement to withstand summary judgment." *PepsiCo*, 351 F.3d at 110. More importantly, the *PepsiCo* case dealt with "exclusive distributorships—which are presumptively legal," *Id.,* whereas in this case, Plaintiffs are challenging a conspiracy among the Defendants to "limit and restrain the availability of primary aluminum in the United States for the purpose of earning supracompetitive storage fees, increasing the price Plaintiffs pay for aluminum and, at the same time, increasing the profits of the metals trading operations of JPM, Glencore and Goldman and/or their affiliates." CEU CAC ¶ 1. In *Dickson v. Microsoft Corp.,* 309 F.3d 193 (4th Cir. 2002), the plaintiffs did not even try to argue "that it [wa]s able to meet the test for establishing a 'rim' between the OEM Defendants and Microsoft." *Id.*, at 203. In *In re Ins. Brokerage Antitrust Litigation,* 618 F.3d 300 (3d Cir. 2010), the plaintiffs argued "the very nature of the contingent commission agreements between the broker and each of its insurer-partners implies an agreement among the brokers." *Id.,* at 327.

## B.   Defendants' Conspiracy Is A *Per Se* Violation of Section 1 of the Sherman Act

Movants say that the LME rules that set the minimum "load-out" amount of metal to be released each day are "pro-competitive," because they ensured that "each warehouse location loads out a minimum amount of aluminum each day if a sufficient number of warrants is cancelled and places no limits on the quantity of aluminum any warehouse loads out," and because "[w]ithout such a minimum load-out requirement, a warehouse operator would have an economic incentive to load out metal as slowly as possible in order to maximize the rent it collects and minimize its costs." W&FF MTD Br. p. 35. But what the Complaint charges here is that horizontal competitors Goldman, JPM, and Glencore agreed to treat the minimums as maximums, thus sabotaging the ostensible policy. CEU CAC ¶¶ 4, 76-90. And, by interpreting

the minimum to mean a "maximum" of 1,500 tons as a per-city rather than a per-warehouse obligation, Defendants put a very tight squeeze on supply in a way that was not compelled by the LME rules.

For example in February 2010, LME rules required warehouses to release a minimum of 1,500 tons of aluminum each day.  This daily minimum, referred to by the LME as the "load-out rate," applied to all of a company's warehouses in a particular city, not to each warehouse individually.  Metro, for example, was required to release a total of 1,500 tons of aluminum from its 27 Detroit warehouses each day.  Because the minimum was not tied to the amount of aluminum brought into a warehouse on any given day, the Defendants could take in aluminum as rapidly as it was produced but only had to send out 1,500 tons per day for all of their warehouses in a particular city.  CEU CAC ¶ 77.  The Defendants also agreed that transfers of aluminum from one warehouse to another would count toward the 1,500 ton load-out requirement, and so shuffled aluminum from one warehouse to another rather than delivering it to purchasers.  CEU CAC ¶ 80.

Further, by collusively increasing incentives for more aluminum deposits, these Defendants created a feed-back strategy to create a shortage and artificially inflate aluminum prices, a trend which would lure more long-term purchases and thus more deposits to their mutual profit.  Such concerted market manipulation for profit is certainly *per se* illegal under the Sherman Act or equivalent state laws.  As Plaintiffs noted below, no market manipulation case has ever been dismissed on the pleadings. Market failures of exchange systems leading to giant gains and losses are rare enough to cry out for a full examination.

The Warehousing Defendants' alternative argument is even weaker.  Defendants argue that their tampering with the aluminum price structure should be evaluated under the rule of

reason defense rather than the *per se* standard.  But reasonableness for a commodity exchange is defined by the legitimate purposes of such a joint venture, such as keeping supply and demand balanced and avoiding price spikes.  U.S. courts have not been kind to ventures that allow their key members to corrupt the legitimate function of the entity.  *See ASME,* 456 U.S. at 576 (holding non-profit ASME liable for the anticompetitive actions of its members); *Radiant Burners, Inc.,* 364 U.S. at 660 (overturning dismissal due to unlawful conspiracy in association's refusal to approve a product for reasons unrelated to an objective standard).

The actions taken to restrict the supply of aluminum in the United States, such as the minimum/maximum withdrawal requirement, amounts to plain manipulation for the purpose of raising prices and creating a monopoly.  Defendants profited from the lack of stewardship by earning increased storage fees, and by reaping trading profits from using the advance knowledge they had of what their plan would do.  Thus, the scheme charged here could never be defended as reasonable.  In any event, a defense argument for rule of reason treatment can never provide a basis for dismissal on the pleadings, since it requires a full factual analysis.

Defendants' argument that courts should presumptively apply the rule of reason analysis, W&FF MTD Br. p. 34-35 is unsupported by their authorities.  In *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), the court held that it was not *per se* illegal for a lawful, economically integrated joint venture to set the prices for the product it sells.  In that case, Texaco and Shell Oil agreed to pool resources and share risks and profits in a joint venture, which yielded cost efficiencies from the integration of assets.  Moreover, the formation of the joint venture was approved under an FTC consent decree.  So that case dealt with a different issue, namely if a lawful, economically integrated joint venture cannot determine the price of its product, who can? *State Oil Co. v. Khan*, 522 U.S. 3 (1997) is also inapposite.  There the Court considered the legal

standard for evaluating maximum resale price maintenance. The Court made clear that application of the rule of reason was appropriate when "economic impact of certain practices is not immediately obvious." *State Oil*, 522 U.S. at 10. Here, prices went up rather than being capped.

Lastly we note the Defendants' failure to support their *Twombly* motions with truly analogous precedents, *i.e.,* commodity manipulation antitrust cases that the courts dismissed on the pleadings. No such precedents are supplied. Study of the Defendants' table of cases reveals no such case. The reason is clear: before and after *Twombly*, commodity manipulation scandals have been followed by antitrust suits seeking damages for the increased commodity prices. Courts around the country have found the complaints in those cases sufficient to overcome a *Twombly* motion to dismiss. When lawsuits follow an unexpected commodity shortage and resultant price spike, American courts have been willing to presume that manipulation is at least a plausible explanation and that, since such scheme requires alliances and camouflage, Sherman Act litigation using all tools of discovery is the least injured buyers are entitled to expect when they sue for redress. *See*, *e.g.*, *Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) (reinstating claims brought under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, that had been dismissed in *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 470 F. Supp. 1256 (S.D.N.Y. 1979)); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012) (sustaining commodity traders' Sherman Act § 2 monopolization claims against other traders for price manipulation of West Texas Intermediate grade crude oil); *Gordon v. Hunt*, 558 F. Supp. 122, 124 (S.D.N.Y. 1983) (denying motion to dismiss complaint in connection with price manipulation in silver market); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CR 32690, MDL 2031, 2013 WL 212908 (N.D. Ill. Jan. 18, 2013) (sustaining direct

purchasers' Sherman Act § 1 and California's Cartwright Act claims against all Defendants in connection with milk futures manipulation).

## IV.   Defendants' Contentions Against Plaintiffs' Sherman Act Section 2 Claims Are Meritless

The Complaint outlines a detailed scheme that exceeds all of the pleading standards applicable to monopolization, attempt to monopolize and conspiracy to monopolize counts.  As outlined below, Plaintiffs have alleged that the Defendants have willfully acquired and maintained monopoly power and have provided extensive evidence of both direct and circumstantial evidence of such power.  Plaintiffs have alleged that the Defendants have controlled prices and excluded competition as well as pleading that several closely-related markets are affected by the Defendants' exercise of that power.  Essentially, the Defendants used their monopolistic control of the market for aluminum traded on the LME exchange to limit output in that market and gain power over price in the market for aluminum.

### A.   Monopolization and allegations of monopoly power

To state a claim under Section 2 of the Sherman Act, Plaintiffs must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident.  *PepsiCo.* 315 F.3d at 105 (*quoting Grinnell Corp.*, 384 U.S. at 570-71); *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012); *IHS Dialysis Inc. v. Davita, Inc.*, No. 12 Civ. 2468 (ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013).

### B.   Monopoly power can be proven with direct or circumstantial evidence

Monopoly power is the power to control prices or exclude competition in a given market. *U. S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *E.I. du Pont de Nemours & Co.*,

351 U.S. at 391, *Grinnell,* 384 U.S. at 571.   There are two ways a plaintiff can show the possession of monopoly power:   (1) through direct evidence of anticompetitive effects or (2) circumstantially by showing Defendant's large market share in a relevant market.   *In re Crude Oil Futures*, 913 F. Supp. at 51; *PepsiCo*, 315 F.3d at 107; *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).

Defendants feign ignorance of the concept of "abuse of monopoly power" after citing to cases that explain monopoly power and how it is abused.   *Compare* LME Merits Br., p. 20 ("'abuse'" (whatever that means) their 'monopoly power'") with LME Merits Br., p. 16, citing *U.S. v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (monopoly power is "the power to control prices or exclude competition"); *Grinnell*, 384 U.S. at 570-71 ("the willful acquisition or maintenance of [monopoly power] as distinguished from growth or development as a consequence of a superior product, business, acumen, or historic accident.").   The abuse of monopoly power may be inferred not only by the predominant share of the market, but also by "the power to control prices or exclude competition."   *Id.* at 571   (citing *du Pont*, 351 U.S. at 391.

Whether monopoly power is established by direct or circumstantial evidence, "[t]he pertinent inquiry in a monopolization claim . . . is whether the Defendant engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power."   *Crude Oil*, 913 F. Supp. 2d at 51 (*quoting PepsiCo*, 315 F.3d at 108) (ellipsis in original).   Here Plaintiffs pleaded and described monopoly power both ways:   first, by alleging and describing Defendants' control over prices or the exclusion of competition; and, second, by detailing circumstantial evidence of Defendants' market power, namely the large share of a relevant market.   *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,

38

386 F.3d 485, 500 (2d Cir. 2004) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998)).   The relevant market in a case alleging monopolization can be as large as the nation or as small as a community.   *See, e.g., Optivision Inc. v. Syracuse Shopping Ctr., Assoc.*, 472 F. Supp. 665, 677 (N.D.N.Y. 1979) (citations omitted).   A nationwide market for commodities can constitute a market for purposes of Section 2.   *Cape Cod Food Prods. v. Nat'l Cranberry Ass'n*, 119 F. Supp. 900, 908 (D. Mass. 1954).

Plaintiffs offer detailed explanations of a complex scheme with anticompetitive effects. *See Crude Oil*, 913 F. Supp. 2d at 52.   The scheme to acquire and maintain a dominant position in the trading market through the LME warehouses gave Defendants power to control prices in the physical market for aluminum.   This is the type of anticompetitive behavior antitrust laws are designed to prevent.   *See du Pont*, 351 U.S. at 389.   More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level.   2A Areeda et al., Antitrust Law ¶ 501, at 85 (1995).   Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear.   *See Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("proof of actual detrimental effects, such as a reduction of output obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects") (internal quotation marks and citation omitted).

When a plaintiff has direct proof of a defendant's monopoly power, it is somewhat superfluous to require that plaintiff to offer additional, circumstantial evidence of monopoly power.   It is only because direct proof of monopoly power is rarely available, that courts typically examine market structure in search of circumstantial evidence of monopoly power. 2A Areeda et al., Antitrust Law ¶ 531a, at 156; *see also*, e.g., *Grinnell*, 384 U.S. at 57.

39

Defendants ignore Judge Diane Wood's admonition in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000), and suggest that anticompetitive effects in a market cannot be shown unless a plaintiff first proves that it has a large market share.  This, however, as Judge Wood explained, has things backwards.  *See Toys "R" Us,* 221 F.3d at 937.  The share a firm has in a relevant market is only one (indirect) way of estimating market power, which is the ultimate consideration.  *Id.* (*citing*, *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1336 (7th Cir.1986)).

### C.   Plaintiffs' Complaint Alleges Both Direct And Circumstantial Evidence Of Defendants' Willful Acquisition, Maintenance And Abuse Of Monopoly Power

Claims that a commodity exchange abused its monopoly power have been sustained where the pleadings alleged that the organization aided or allowed some of its members to use dominance in any market to distort competition, artificially reduce supply or choice, or raise prices above normal market levels.  *Crude Oil*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012).  In this case, Plaintiffs sufficiently pled that the LME is a monopoly.  CEU CAC ¶27 ("Defendant LME is the only global exchange on which industrial metals are traded."); CEU CAC ¶¶ 3, 27, 37 (LME "controls a large network of metal storage warehouses throughout the United States" and virtually all futures trading of aluminum takes place through LME-approved warehouses while Warehousing Defendants own approximately 75% of LME-approved warehouses).  Plaintiffs also alleged that the LME has the power to control prices, but allowed some of its members to distort competition, artificially reduce supply, and raise prices above normal levels.  CEU CAC ¶¶ 3, 4, 40-42, 70, 82, 88, 155.

Like any commodity exchange, the LME has monopoly power to set rates for storage rental and load-outs at its authorized warehouses.  CEU CAC ¶¶ 183-186.  The LME has also

captured 97-99% of all U.S. aluminum forward and futures contracts.  CEU CAC ¶ 189.  The aluminum for the forward and futures contracts is stored at LME approved warehouses.  As alleged in Plaintiffs' Complaint, the LME has abused its monopoly power.

The LME has had notice for years that the large quantity of aluminum amassed at its approved warehouses was causing an increase in the Midwest Premium.  CEU CAC ¶ 187.  The LME has also known that it held the authority and ability to reduce the queues at LME approved warehouses.  The LME disregarded the increase in the Midwest Premium that its warehouses were causing, and therein abused its monopoly power by:

(a) Not basing minimum load-out rates on a percentage of the metal capacity or metals stored in each LME approved warehouse;

(b) Not requiring netting of incoming aluminum and allowing the Warehousing Defendants to move aluminum from one warehouse to another and count the movement against their minimum load-out rate;

(c) Setting anticompetitive, low minimum load-out rates;

(d) Consenting to collective interpretations of the minimum load-out rate as a maximum during times of high storage;

(e) Failing to ensure that no LME approved warehouse owner amassed a critical supply of metal, allowing the warehouse owner to manipulate and/or influence prices;

(f) Allowing repeated increases in the Warehousing Defendants' storage charges for aluminum, a percentage of which went to the LME;

(g) Allowing warehouses to pay incentives to divert aluminum into LME approved warehouses, which was an intentional break with the LME's historical role as the aluminum storage option of last resort;

41

(h)  Allowing the Warehousing Defendants to artificially build LME warehouse inventories, lengthen queues and drive up premiums in order to foster, maintain and take advantage of the contango in the aluminum market; and,

(i)  Making statements to deter companies that purchased aluminum from challenging the LME's and Warehousing Defendants' practices.

CEU CAC ¶ 187.   There is no pro-competitive justification for the LME's actions, which furthered the steady increase in the Midwest Premium.   Thus, even if the LME can show it initially acquired monopoly power innocently, the facts alleged demonstrate that the LME has now taken acts to abuse its monopoly power.   Standing alone, these allegations of Defendants' direct effect on the Midwest Premium are sufficient to overcome Defendants' arguments relating to supposed infirmities with Plaintiffs' definition of a relevant market.   *See, e.g., E.I. du Pont de Nemours,* 351 U.S. at 393 ("Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under [section 2].").   Nevertheless, Plaintiffs have alleged a relevant market that is sufficient to survive a Rule 12(b)(6) challenge. "To survive dismissal, the relevant product market definition need only 'bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes" and be "plausible." *Crude Oil*, 913 F. Supp. 2d at 54 (quoting *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 237 (2d Cir. 2008)).

Defendants argue that the Complaint fails to define a monopolized relevant market and thus must fail under the monopolization clause of the Sherman Act.   W&FF MTD Br. pp. 41-47. They are simply wrong.   First, the Complaint defines a high concentration in the relevant market, namely LME-authorized warehouse storage of aluminum, the supply of which affects the Midwest Premium.   CEU CAC ¶¶ 197-198.   Plaintiffs allege that Defendants had a monopoly on

warehousing of exchange-traded aluminum and they used that monopoly to affect the price of all aluminum through the manipulation of the Midwest Premium.   Aluminum stored in an unlicensed warehouse could not be traded, and there were barriers to entry for that aluminum to become licensed.  Second, this very argument was rejected by Judge Pauley in *Crude Oil*.  There, Judge Pauley held that monopoly power can be proved not only by reference to market definition and market share but also "through direct evidence of anticompetitive effects."  913 F. Supp. 2d at 51.  Here, as there, the Complaint details the contrived shortage and its monopolistic effect on supply and price structure.  Certainly, a monopolist who creates false scarcity for its own profit-maximizing reasons acts anticompetitively.

The Complaint outlines related markets analogous to those in *Crude Oil*, namely the "physical" or "cash" market for aluminum and the "futures" or "derivatives" market in which investors trade contracts for the future delivery of aluminum.  The Complaint specifically alleges that one or more of the following markets was affected:  "(a) the market for warehousing LME aluminum in the United States"; or "(b) the market for providing exchange traded aluminum forward or futures contracts, including to approve warehouses for exchange-traded aluminum in the United States."   CEU CAC ¶¶ 197.   It also specifically alleges that, for the Goldman Defendants, the affected markets are "(a) the market for aluminum in the United States; (b) the market for warehousing all LME and non-LME aluminum in the United States; or (c) the market for warehousing LME aluminum in the United States and other areas in which aluminum is purchased and sold based on the Midwest Premium Price or any price based on or derived therefrom."  CEU CAC ¶ 198.

Further, the Complaint outlines a complex scheme involving acquisitions in the physical market to affect the derivative market. As the court in *Crude Oil* explained, "it took two markets

to contango."   913 F. Supp. 2d at 54 (*citing Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 171 (S.D.N.Y.1989)) (relevant market for section 2 claim "consisted of [silver futures contracts] together with the supply of physical silver deliverable on those expiring contracts").  As in *Crude Oil*, the Complaint also details a willful scheme in which Defendants acquired a dominant position in the physical market for the purpose of manipulating the prices of derivatives. Additionally, as in *Crude Oil*, the Complaint outlines extensive evidence of price increases in the relevant markets caused by the anticompetitive conduct of the Defendants.  *See, e.g.,* CEU CAC ¶¶ 6, 7, 92-113.   Manipulating the supply of aluminum in the LME warehouses gave the Defendants power over the contango and that power over the contango gave them power over the price of aluminum.   CEU CAC ¶¶ 117-137.   These price increases are evidence of both the relevant markets and the Defendants' market power.   If there were competitive substitutes in these markets, they would have been purchased and the price would not have increased.   Here, discussions regarding substitutes are "fruitful areas for discovery" *Crude Oil*, 913 F. Supp. 2d at 54.

Moreover, the Complaint here, as in *Crude Oil*, outlines short term sacrifice to further anticompetitive objectives.   913 F. Supp. 2d at 56 (*citing Concord Boat v. Brunswick Corp*., 207 F.3d 1039, 1062 (8th Cir. 2000)).   The Defendants were so certain of their market power that they adhered to their collective action in the face of a firestorm of publicity and extensive complaints from major customers.   That the Defendants adhered to the same policies and maintained their absurdly restrictive rules and 16-month queues in the face of such complaints is itself powerful evidence that this conspiracy was strong as a fortress.   CEU CAC ¶¶ 151-158.

Even if this motion to dismiss hinged on market definition, fact-specific questions cannot be resolved on the pleadings. *Crude Oil*, 913 F.2d at 50.   "Because market definition is a deeply

44

fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant market." *Todd* 275 F.3d at 199-200 (2d Cir. 2001); *see also Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design,* 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (*citing Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery").

Plaintiffs, through their experts, have provided abundant evidence that the Defendants' conduct directly affected the price of aluminum through their manipulation of the Midwest Premium. The many charts in the Complaint demonstrate that the rise in that premium occurred when the anticompetitive conduct occurred, *i.e.*, the acquisition of LME-licensed warehouses and the creation of a bottleneck that caused warehouse queues. Aluminum, which the Complaint alleges could have been located and readied for delivery in two business days, took owners 16 months to "repatriate" from the warehouses where it had been held hostage. Defendants claim that customers like MillerCoors who have publicly complained about Defendants' anticompetitive actions, and the numerous other customer complaints, are somehow mistaken. Defendants claim that other market forces may have caused this market anomaly. Plaintiffs look forward to discovery to uncover why the LME, under Defendants' control, ignored these customer concerns. Plaintiffs also look forward to discovering the communications among Defendants that they expect will reflect Defendants' callous disregard of consumers, like the Plaintiffs, as they manipulated the price of aluminum. Plaintiffs also look forward to asking the executives of the Warehousing Defendants about what they did (certainly not promptly delivering aluminum to buyers) and to inquiring in what competitive market does it take

16 months for delivery of a homogenous commodity stored in a warehouse?  None that we can imagine.  Certainly, Defendants could not function effectively if it took them 16 months to obtain paper and printing ink.  Thus, there will be time for this Court to weigh the plausibilities.  But now is not the time.  *Iqbal*, 556 U.S. at 678.

In addition to the foregoing, Plaintiffs allege that potential competitors to the LME have been unable to successfully enter the market and compete.  CEU CAC ¶ 183.  Simply put, to successfully compete with a highly skilled, entrenched practitioner of exclusionary anti-competitive conduct such as the LME, a new entrant must invest in, purchase, and otherwise acquire the significant physical, human and technological infrastructure that the futures contract exchange and warehousing market requires.  That is a costly investment that deters entry and reduces the likelihood of profitable entry.

### D.   Plaintiffs have clearly and concisely alleged an attempt to monopolize and a conspiracy to monopolize

Plaintiffs have clearly and concisely alleged an attempt to monopolize.  The elements of attempted monopolization are "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993).  For a Section 2 conspiracy to monopolize claim, a plaintiff must allege "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  *Discover Fin. Servs. v. Visa U.S.A. Inc*., 598 F. Supp. 2d 394, 405 (S.D.N.Y. 2008) (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods*., Inc., 129 F.3d 240, 246 (2d Cir.1997)).  As noted above, the Complaint extensively outlines the Defendants' anticompetitive conduct, their concerted action, and their specific intent to monopolize.  CEU CAC ¶¶ 151-158.

46

It is not necessary for all Defendants to have monopoly power, because Plaintiffs have sufficiently alleged the Defendants participated in a conspiracy to monopolize.  *See e.g.*, *EmigraGrp., LLC v. Fragomen, Del Rey, Bernsen & Lowewy, LLP*, 612 F. Supp. 2d 330, 340 (S.D.N.Y. 2009) ("rigorous proof of a relevant market and of a dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize."); *see also U.S. v. Consol. Laundries Corp.*, 291 F. 2d 563, 573 (2d Cir. 1961) ("where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize"); *Appraisers Coalition v. Appraisal Institute*, 845 F. Supp. 592, 603 (N.D. Ill. 1994) ("individuals who are incapable themselves of monopolizing a market may be found liable under section 2 for intentionally joining others to do so.").

## V.      Plaintiffs State A Claim Under State Antitrust Law

Defendants' argument for dismissing Plaintiffs' state antitrust law claims fails for the same reason as their arguments for dismissing Plaintiffs' federal claims fail, as stated *supra* in § II, III, IV.  Moreover, Defendants' argument fails because states' harmonization statutes or case laws do not determine whether Plaintiffs have stated a claim under Fed. R. Civ. P. 12(b)(6).  Nor do those statutes and case laws determine whether Plaintiffs have stated "a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  It is inappropriate for a federal court to predict how a state's highest court would apply their antitrust statutes or case laws relying on the simple contention that the state has "statutes requiring courts to construe state antitrust law harmoniously with federal law," or that "courts have held (in the absence of a similar statutory provision) that state law should be interpreted consistently with federal antitrust law."  W&FF MTD Br. p. 53.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151-53 (N.D. Cal. 2009) (finding "no state court appellate decisions or compelling decisions from other

47

jurisdictions to provide this Court with guidance on how to "predict" how the highest court of each state would rule" in Arizona, Nebraska, Nevada, New Mexico, South Dakota and West Virginia).  Also, Commercial End User Plaintiffs bring claims only under state consumer protection and unfair competition laws of Florida, Massachusetts, and New Hampshire. No state law claim is brought under any laws of Illinois.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should deny the Warehousing and Financial-Firm Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims for failure to state a claim and should deny Defendant the London Metal Exchange's Motion to Dismiss on the Merits.

Dated: May 27, 2014                              Respectfully submitted,

                                                 /s/ Joseph H. Meltzer
                                                 **KESSLER TOPAZ MELTZER**
                                                 **& CHECK, LLP**
                                                 Joseph H. Meltzer
                                                 Terence S. Ziegler
                                                 Kimberly A. Justice
                                                 John Q. Kerrigan
                                                 280 King of Prussia Road
                                                 Radnor, PA  19087
                                                 Telephone: (610) 667-7706
                                                 Facsimile:   (610) 667-7056
                                                 jmeltzer@ktmc.com
                                                 tziegler@ktmc.com
                                                 kjustice@ktmc.com
                                                 jkerrigan@ktmc.com

                                                 *Co-Lead Counsel for Commercial End Users*

*/s/* John A. Kehoe (on consent)[3]
**GIRARD GIBBS LLP**
John A. Kehoe
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
jak@girardgibbs.com

Daniel C. Girard
Amanda M. Steiner
Adam E. Polk
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dcg@girardgibbs.com
as@girardgibbs.com
aep@girardgibbs.com

*Co-Lead Counsel for Commercial End Users*

*/s/* Jonathan W. Cuneo (on consent)
**CUNEO GILBERT & LaDUCA, LLP**
Jonathan W. Cuneo
Joel Davidow
Yifei "Evelyn" Li
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
evelyn.li@cuneolaw.com

*Co-Lead Counsel for Commercial End Users*

---

[3]   Commercial End User Plaintiffs use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

49