UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re ALUMINUM WAREHOUSING    :    MDL No. 2481
ANTITRUST LITIGATION           :    Master Docket No. 13-md-2481 (KBF)

-------------------------------------------------------:

This Document Relates To:          :

    Direct Purchaser Actions     :

    1:14-cv-03116-KBF         :

-------------------------------------------------------X

**DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO MOTION BY THE LONDON METALS EXCHANGE AND GOLDMAN SACHS DEFENDANTS TO DISMISS CLAIMS AGAINST THEM ON THE MERITS AND FOR ASSERTED LACK OF STANDING**

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ........................................................................1

    A. Plaintiffs Have Plausibly Alleged That The LME And Goldman Defendants Combined, Conspired Or Agreed In Violation Of Section 1 of the Sherman Act. ........................................................................................1

        1. The LME And Goldman Defendants' Agreed Upon Restraint Incentivized Smelters And Other Market Participants Intentionally To Agree To Divert Their Aluminum To Detroit In Order To Further Exceed The Publicly Known Maximum Load-Out And Build Up A Restrained Stockpile Of Aluminum The Daily Output, Or Load-Out Of Which Was Agreed To Be Severely Restrained Or Restricted ...........................................4

    B. Plaintiffs Plausibly Allege Claims Against The Goldman Defendants And The LME Defendants For Violation of Section 2 of the Sherman Act...........8

    C. Plaintiffs Have Standing Under Section 15 of the Sherman Act To Bring Damages Claims Against The LME And Goldman Defendants For These Violations Of Sections 1 And 2 Of The Sherman Act.................................................9

STATEMENT OF FACTS ...............................................................................10

    A. Prior to the Class Period, the LME Acted in a Commercially Reasonable, Market Neutral Manner As A Storage Place of "Last Resort" ..............................10

        1. By Acting In That Manner, The LME Caused Its Aluminum Forward Contract To Capture 97-99% Of The Volume In Exchange Traded Aluminum Contracts And Become Part Of The Standard Benchmark Price For Contracts To Purchase Or Sell Aluminum In The United States..........................................................................13

    B. During The Class Period, the LME and Goldman Defendants Have Acted In A Commercially Unreasonable Manner And As A Storage Place of First Resort ....13

        1. The LME And Goldman Defendants Have Consistently Acted In Parallel To Restrain Aluminum Supplies, Inflate Aluminum Prices, And Provide The LME And Goldman Defendants With Dramatically Increasing Rental Revenues From The Provision Of Increasingly Inefficient Load-Out And Other Warehouse Services.............................................................14

        2. The Historically Anomalous Pattern of Storage at LME Detroit Warehousing In Aluminum During the Class Period Was Contrary to History and Contrary to Contemporaneous Experiences of Other LME Warehouses ........17

i

3.  The Historically Anomalous Storage At Detroit, Caused Record Inflation Of The MW Premium Price Which Were Historically Anomalous Because the MW Premium Should Have Been Falling ......................................................19

4.  The Common Financial Motive of the LME and the Goldman Defendants To Increase Their Rental Revenues ...............................................................21

5.  The Common Financial Motive of the LME And the Goldman Defendants To Increase Revenues From The Sale of The LME ......................................21

6.  The LME And Goldman Reject The Advice And Help Of Longtime LME Warehouse Owners That Would Reduce The Load-Out Delays And Reduce The Price Inflation ...........................................................................................22

7.  The LME and Goldman Reject the Advice of Their Own Paid Consultant That Would Have Reduced The Load-Out Delay and Reduce the Price Inflation...........................................................................................................22

8.  The LME And Goldman Agree To Inflate The Storage Rental Rate As A Supposed *Quid Pro Quo* For The (Non-) Reduction In The Load-Out Delays And Amount Of Metal Restrained Thereby ........................................23

9.  Goldman And The LME Agree That Goldman Will Make Incentive Payments In Order To Divert More Aluminum Into LME Detroit Warehousing And Thereby Create A Positive Feedback Loop In Which The Amounts Of Aluminum And Duration Of The Delay In Extracting That Aluminum Will Increase ...................................................24

10.  Defendants' Inconsistent Statements And Abandonment Of Their Anticompetitive Conduct When Congressional Investigations Begin.............25

ARGUMENT   .......................................................................................................................27

I.      ACCEPTED AS TRUE AND CONSTRUED IN THE MANNER MOST FAVORABLE TO PLAINTIFFS, PLAINTIFFS' FACT ALLEGATIONS GO FAR BEYOND *TWOMBLY* AND RAISE AN INFERENCE OF AGREEMENT .............27

II.     PLAINTIFFS HAVE PLAUSIBLY ALLEGED A COMBINATION, CONSPIRACY OR AGREEMENT AMONG THE LME AND GOLDMAN DEFENDANTS, IN VIOLATION OF SECTION 1 ...................................................31

A.  Plaintiffs Have Plausibly Pleaded an Agreement Between Goldman and the LME to Restrict Maximum Load-Outs.................................................................31

B. Plaintiffs Have Plausibly Pleaded An Agreement Between Goldman And The LME For Goldman To Pay Incentives For Aluminum Storage In Detroit ................................................................................................33

III.    THE LME AND GOLDMAN DEFENDANTS SEEK TO AVOID THE BLATANTLY ANTI-COMPETITIVE EFFECT OF THEIR AGREEMENTS BY SETTING UP STRAW MAN ARGUMENTS ...................................................34

A. Contrary To Defendants, Plaintiffs Do Not Allege That the LME And Goldman Defendants Were In Some Vertical Relationship, But Do Allege That They Entered Into A *Per Se* Illegal Price-Fixing Agreement ........................................34

1. Defendants Fail To Demonstrate That The LME's Involvement In The Conspiracy Renders *Per Se* Analysis Inappropriate .......................................38

2. Contrary To Defendants, Plaintiffs Do Not Allege A "Hub and Spoke" Conspiracy ...........................................................................................42

3. The LME's "Control" Arguments Are Another Straw Man and Are Otherwise Unavailing ............................................................................................44

B. Even Were Defendants' Conduct Appropriately Evaluated Under the Rule of Reason, Which It Is Not, Plaintiffs Have Adequately Alleged Anticompetitive Impact on a Relevant Market ...............................................................47

IV.    CONTRARY TO DEFENDANTS, PLAINTIFFS HAVE PLAUSIBLY PLEADED CLAIMS UNDER SECTION 2 ....................................................50

A. Plaintiffs Have Alleged Monopoly Power and a Relevant Market .......................52

1. Direct Evidence of Monopoly Power and Anticompetitive Effects ...............53

2. Relevant Market ................................................................................56

B. Plaintiffs Have Alleged that The LME And Goldman Defendants Improperly Acquired or Maintained Monopoly Power Through Anticompetitive Conduct ..........................................................................................63

C. Plaintiffs have Alleged a Conspiracy to Monopolize ...........................................69

V.    DEFENDANTS HAVE NOT MET THEIR BURDEN TO COMPEL DISMISSAL OF PLAINTIFFS' STATE LAW CLAIMS ...........................................69

iii

VI.  DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT
     PLAINTIFFS LACK ANTITRUST STANDING ......................................................71

     A.  Plaintiffs Adequately Allege That They Have Suffered Antitrust Injury .............72

         1.  The Artificially Inflated Prices Paid By the Plaintiffs in the
             Physical Market Flow Directly From Defendants' Anticompetitive
             Conduct and Are the "Quintessential" Antitrust Injury That the
             Antitrust Laws Were Intended To Prevent ......................................................74

         2.  Defendants' Arguments Regarding Antitrust Injury Are Misinformed...........75

     B.  An Examination Of the *AGC* Factors Demonstrates That Plaintiffs Are
         Efficient Enforcers of the Antitrust Laws .............................................................79

         1.  Plaintiffs' Injury Is Directly Caused By Defendants' Antitrust Violations.....80

         2.  Plaintiffs are Sufficiently Motivated to Serve as Private Attorneys
             General Here ................................................................................................82

         3.  Plaintiffs' Damages Are Not Speculative .......................................................83

         4.  With Respect To Plaintiffs' Claim For Damages, There Will Be
             Little Risk For Duplicative Recovery Or A Complex Apportionment of
             Damages.........................................................................................................85

VII.  FEDERAL STATUTORY ANTITRUST STANDING DOES NOT APPLY TO
      STATE LAW ................................................................................................................85

      A.  *AGC* Factors Do Not Apply Absent a Clear Directive from Those States'
          Legislatures or Highest Courts.............................................................................85

      B.  Proximate Cause Principles Do Not Mandate Dismissal Under Arkansas,
          Minnesota, and Wyoming Law...............................................................................88

CONCLUSION.....................................................................................................................90

# TABLE OF AUTHORITIES

**Cases**

*AD/SAT, a Division of Skylight, Inc. v. Associated Press,*
    181 F.3d 216 (2d Cir.1999)................................................................. 62

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988) ....................................................................... 76

*Anderson News LLC et al. v. American Media Inc.,*
    680 F.3d 162 (2d Cir. 2012)............................................................... 28

*Aryeh v. Canon Business Solutions, Inc.,*
    55 Cal. 4th 1185 (2013)............................................................... 70, 93

*Associated General Contractors of Cal., Inc. v.*
    *California State Council of Carpenters,*
    459 U.S. 519 (1983)........................................................... 10, 71, 77

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................ *passim*

*Bergstrom v. Noah,*
    266 Kan. 829 (Kan. 1999)........................................................... 70, 94

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982) ....................................................................... 10

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
    369 F.3d 212 (2d Cir. 2004)........................................................ 51, 72, 79

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.,*
    651 F.2d 122 (2d Cir. 1981)............................................................... 59

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) .............................................................. 72, 78, 79

*Buckley v. Bell,*

703 P.2d 1089 (Wy. 1985) ........................................................................... 89, 99

*Bunker's Glass Co. v. Pilkington PLC*,
206 Ariz. 9 (2003) ..................................................................................... 92

*Burckhardt v. Burckhardt*,
42 Ohio St. 474 (1885) ............................................................................. 89

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) .................................................................................... 86

*Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc.*,
996 F.2d 537 (2d Cir. 1993) .............................................................. 35, 49, 50

*Caruna v. Gen. Motors Corp.*,
204 F. App'x 511 (6th Cir. 2006) ............................................................. 74

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ............................................................... 57, 61

*Chicago Board of Trade v. United States*,
246 U.S. 231 (1918) .................................................................................. 45

*City of Groton v. Connecticut Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981) ..................................................................... 68

*City of Mishawaka, Ind. v. Am. Elec. Power Co., Inc.*,
616 F.2d 976 (7th Cir. 1980) .................................................................... 68

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) ............................................................................. 94

*Concord Assoc., L.P. v. Entertainment Properties Trust*,
12 Civ. 1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) .................... 35

*Conley v. Gibson*,
355 U.S. 41, 47, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957) .............................. 28

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .................................................................................. 68

*Cont'l Guest Servs. Corp. v Int'l Bus Servs., Inc.*,
    92 A.D.3d 570 (N.Y. App. Div. 1st Dep't 2012)................................................................ 98

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ................................................................................................ 56

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
    724 F.2d 290 (2d Cir. 1983)................................................................ 10, 72, 73

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002)................................................................................ 43

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*,
    470 F. Supp. 2d 485, 485 (E.D. Pa. 2006) ...................................................... *passim*

*Edwards v. Arthur Andersen LLP*,
    44 Cal.4th 937 (2008)................................................................................................ 70

*Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*,
    129 F.3d 240 (2d Cir. 1997)................................................................................ 69

*Elkins v. Microsoft Corp.*,
    817 A.2d 9 (Vt. 2002) ................................................................................ 70, 98

*F.T.C. v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) ................................................................................ 48, 56, 62

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990) ................................................................................................ 36

*Four B. Corp. v. Daicel Chem. Indus., Ltd.*,
    253 F. Supp. 2d 1147 (D. Kan. 2003) .................................................................. 94

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) .............................................................. 67

*Freeman Indus. v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) ................................................................ 70, 98

*Fricke-Parks Press, Inc. v. Fang*,
  149 F.Supp.2d 1175 (N.D.Cal. 2001) ................................................................. 32

*Fucile v. Visa U.S.A., Inc.*,
  No. S1560-03 Cnc, 2004 Vt. Super. LEXIS 42 (Dec. 27, 2004) ............................ 99

*Gatt Commc'ns, Inc. v. PMC Associates, L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)...................................................................................... 71

*Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.*,
  386 F.3d 485 (2d Cir. 2004)............................................................................. 50, 57

*Group Health Plan, Inc. v. Phillip Morris, Inc.*,
  68 F. Supp. 2d 1064 (D. Minn. 1999) ..................................................................... 89

*Gunter Harz Sports, Inc. v. United States Tennis Ass'n*,
  511 F.Supp. 1103 (D.Neb. 1981) ............................................................................ 41

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006).................................................................................... 62

*Ho v. Visa U.S.A., Inc.*,
  16 A.D.3d 256 (N.Y. App. Div. 2005)..................................................................... 96

*Holder v. Archer Daniels Midland Co.*,
  No. 96-2975, 1998 D.C. Super. LEXIS 39 (Nov. 4, 1998)...................................... 93

*Howe v. Microsoft Corp.*,
  656 N.W.2d 285 (N.D. 2003)................................................................................... 97

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................... 76, 85, 87, 93

*In re Copper Antitrust Litig.*,
  No. 99–C–621–C, 2000 WL 34230131 (W.D. Wisc. Jul. 12, 2000) ....................... 75

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012)........................................................ *passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litigation*,

767 F. Supp. 2d 880 (N.D. Ill. 2011) ................................................................................. 78, 83

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) .............................................................................................. 79, 82

*In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms., Inc.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) ...................................................................................... 94

In *re Digital Music Antitrust Litig.*,
06 MD 1780, 2011 WL 2848195 (S.D.N.Y. July 18, 2011) ..................................................... 75

*In re eBay Seller Antitrust Litig.*,
545 F. Supp. 2d 1027 (N.D. Cal. 2008) ................................................................................... 64

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...................................................................................... 42

*In re G-Fees Antitrust Litig.*,
584 F. Supp. 2d 26 (D.D.C. 2008) ........................................................................................... 90

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ............................................................................................. 82

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................................... 84

*In re Graphics Processing Units Antitrust Litig.*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) ........................................................................ *passim*

*In re High-Tech Employee Antitrust Litig.*,
856 F.Supp.2d 1103 (N.D.Cal. 2012) ...................................................................................... 45

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ..................................................................................................... 44

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
935 F.Supp.2d 666 (S.D.N.Y. 2013) ........................................................................................ 75

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
962 F.Supp.2d 606 (S.D.N.Y. 2013) ........................................................................................ 75

*In re Nasdaq Market-Makers Antitrust Litig.*,
    894 F.Supp. 703 (S.D.N.Y. 1995) ................................................................. 5, 33

*In re Neurontin Antitrust Litig.*,
    MDL No. 1479, 2013 WL 4042460 (D.N.J. Aug. 8, 2013) ..................................... 63

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-MD-2143 RS, 2011 U.S. Dist. LEXIS 101763,
    (N.D. Cal. Aug. 3, 2011) ........................................................................... 86

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) ...................................................... 51, 59

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    946 F. Supp. 2d 554 (E.D. La. 2013) .................................................. 86, 92, 93

*In re Publication Paper Antitrust Litigation*,
    690 F.3d 51 (2d Cir. 2012) ......................................................................... 34

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ...................................................................... 28

*In re TFT-LCD Antitrust Litig*.,
    586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) ............................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 110635
    (N.D. Cal. Sept. 28, 2011) ......................................................................... 88

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009) ................................................................. 93

*Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*,
    23 F. Supp. 2d 771 (N.D. Ohio 1998) ....................................................... 88, 89

*Jacobi v. Bache & Co., Inc.*,
    520 F.2d 1231 (2d Cir. 1975) ...................................................................... 41

*Justice v. Nat'l Collegiate Athletic Ass'n*,

577 F.Supp. 356 (D.Ariz. 1983) ................................................................. 42

*Kassner v. 2nd Avenue Delicatessen Ind.,*
496 F.3d 229, 243-44 (2d Cir. 2007) ....................................................... 90

*Klor's Inc. v. Broadway–Hale Stores, Inc.,*
359 U.S. 207 (1959) ................................................................................. 76

*Knowles v. Visa U.S.A.,*
No. CV-03-707, 2004 Me. Super. LEXIS 227 (Oct. 20, 2004) ................. 95

*Laughlin v. Evanston Hosp.,*
133 Ill. 2d 374 (1990) .............................................................................. 94

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) ................................................................................. 37

*Lexmark International, Inc. v. Static Control Components, Inc.,*
134 S. Ct. 1377 (2014) .................................................................... 77, 86, 88

*Loeb Indus., Inc. v. Sumitomo Corp.,*
306 F.3d 469 (7th Cir. 2002) ............................................................ *passim*

*Lorix v. Crompton,*
736 N.W. 2d 619 (Minn. 2007) ......................................................... 88, 96

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................................. 71

*N. Am. Soccer League v. Nat'l Football League,*
670 F.2d 1249 (2d Cir. 1982) ............................................................. 49, 50

*National Collegiate Athletic Ass'n v.*
*Board of Regents of University of Oklahoma,*
468 U.S. 85 (1984) ........................................................................ 35, 41, 76

*National Society of Professional Engineers v. United States,*
435 U.S. 679 (1978) ................................................................................. 48

*Norris v. Hearst Trust,*

500 F.3d 454 (5th Cir. 2007) ............................................................................... 73

*Northern Pac. R. Co. v. United States*,
    356 U.S. 1 (1958) .............................................................................................. 38

*Novell, Inc. v. Microsoft Corp*.,
    505 F.3d 302 (4th Cir. 2007) ............................................................................. 72

*Ocean View Capital v. Sumitomo Corp. of America*,
    No. 98 Civ. 4067, 1999 WL 1201701 (S.D.N.Y. Dec.15, 1999) ................................ 75, 77, 97

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
    Nos. MDL 1303, 99–C–801–C, 2000 WL 576238
    (W.D.Wisc. May 9, 2000) ................................................................................... 75

*Orr v. Beamon*,
    77 F. Supp. 2d 1208 (D. Kan. 1999) ................................................................... 94

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
    868 So. 2d 331 (Miss. 2004) .............................................................................. 96

*People v. Schwartz*,
    No. 1557/86, 1986 WL 55321 (N.Y. Sup. Ct. Oct. 18, 1986) ................................ 70

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ....................................................................... 43, 52, 53

*Peterson v. Visa U.S.A. Inc.*,
    No. 03-8080, 2005 D.C. Super. LEXIS 17 (Apr. 22, 2005) .................................... 93

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007) ......................................................................... 72, 73

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980) ................................................................................ 77

*Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*,
    381 F.3d 717 (7th Cir. 2004) ............................................................................. 63

*Ricci v. Chicago Mercantile Exchange*,

409 U.S. 289 (1973) ......................................................................................... 37, 40

*Ross v. American Exp. Co.*, 04 Civ. 5723(WHP),
2014 WL 1396492 (S.D.N.Y. Apr. 10, 2014) ................................................ 31

*Samsung Electronics Co. v. Panasonic Corp.*,
No. 12-15185, 2014 U.S. App. LEXIS 6256 (9th Cir. Apr. 4, 2014) .................. 93

*Sanner v. Bd. of Trade of City of Chicago*,
62 F.3d 918 (7th Cir. 1995) ............................................................................ 76

*Seligson v. New York Produce Exchange*,
378 F.Supp. 1076 (S.D.N.Y. 1974) ................................................................ 38

*Serpa Corp. v. McWane, Inc.*,
199 F.3d 6 (1st Cir. 1999) ............................................................................... 73

*Silver v. New York Stock Exchange*,
373 U.S. 341 (1963) ........................................................................... 38, 39, 40, 41

*Sky Angel U.S., LLC v Natl. Cable Satellite Corp.*,
947 F Supp. 2d 88, 102 (D.D.C. 2013) ........................................................... 46

*Slayton v. American Express Co.*,
604 F.3d 758 (2d Cir. 2010) ........................................................................... 27

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 L.Ed.2d 247 (1993) .......................................................... 55, 74, 78

*Starr v. Sony BMG Music Entertainment*,
592 F.3d 314 (2d Cir. 2010) ..................................................................... 27, 28, 31

*State ex rel. Bryant v. R & A Inv. Co.*,
336 Ark. 289 (1999) .................................................................................. 89, 92

*State of California ex rel. Van de Kamp v. Texaco, Inc.*,
46 Cal. 3d 1147 (1988) .................................................................................. 87

*Strobl v. New York Mercantile Exchange*,
768 F.2d 22 (2d Cir. 1985) ............................................................................. 64

*Sumitomo Corp. of America v. Ocean View Capital, Inc.*,
    539 U.S. 903 (2003) ................................................................................ 75

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................... 47, 57, 60, 63

*Todorov v. DCH Healthcare Auth.*,
    921 F.2d 1438 (11th Cir. 1991) ............................................................ 71

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) ................................................................... 57

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ............................................................... 59

*Tucker v. Apple Computer, Inc.*,
    493 F. Supp. 2d 1090 (N.D. Cal. 2006) ............................................. 67

*U. S. v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ..................................................................... 53, 56, 62

*U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012) ................................................ 54

*U.S. Gypsum Co. v. Ind. Gas Co., Inc.*,
    350 F.3d 623 (7th Cir. 2003) ............................................................... 71

*U.S. v. Perez*,
    489 F.2d 51 (5th Cir. 1973) .................................................................. 43

*U.S. v. Sealy, Inc.*,
    388 U.S. 350 (1967) .............................................................................. 46

*U.S. v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) .............................................................................. 31

*U.S. v. Topco Assoc., Inc.*,
    405 U.S. 596 (1972) .............................................................................. 46

*United States Trotting Ass'n v. Chicago Downs Ass'n,*
   665 F.2d 781 (7th Cir. 1981) .................................................................... 41

*United States v. Borden Co.,*
   28 F.Supp. 177 (N.D.Ill.) ......................................................................... 38

*United States v. Borden Co.,*
   308 U.S. 188 (1930) .................................................................................. 36

*United States v. Grinnell Corp.,*
   384 U.S. 563, 570-71 (1966) ............................................................... 45, 64

*United States v. Trenton Potteries Co.,*
   273 U.S. 392 (1927) .................................................................................. 36

*Vedder Software Group Ltd. v. Insurance Services Office, Inc.,*
   545 Fed.App'x 30, 32-33 (2d Cir. 2013) .................................................. 46

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) .................................................................................. 43

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
   257 F.3d 256 (2d Cir. 2001) ..................................................................... 67

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
   857 F.2d 55 (2d Cir. 1988) ....................................................................... 80

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
   627 F.3d 85 (3d Cir. 2010) ....................................................................... 73

*Wallis v. Ford Motor Co.,*
   362 Ark. 317 (2005) ............................................................................ 87, 91

## Statutes

15 U.S.C. §15 ................................................................................................ 10

15 U.S.C. §1 .................................................................................................... 1

740 Ill. Comp. Stat. 10/7 .............................................................................. 94

D.C. Code § 28-4509(a) .................................................................................. 92

Or. Rev. Stat. § 646.715(2) ............................................................................. 96

W. Va. Code § 142-9-1.1 ................................................................................ 97

W. Va. Code § 142-9-1.6 ................................................................................ 97

**Other Authorities**

2A Phillip E. Areeda, et al.,
   Areeda & Hovenkamp's Antitrust Law (2002) ............................................. 52, 62

5B Charles Wright & Arthur Miller,
   Federal Practice and Procedure § 1357 (3d ed. 2010 supp.) .................................... 27

Dustin Walsh,
   *Aluminum Bottleneck*, Crain's Detroit Business (June 26, 2011) ........................... 58

*Examining Financial Holding Companies: Should Banks Control Power Plants,*
   *Warehouses and Oil Refineries:* hearing before the Senate Committee on Banking
   Financial Institutions and Consumer Protections 113th Cong. (July 12, 2013)
   (statement of Tim Weiner) ...................................................................... 40

Herbert Hovenkamp,
   Federal Antitrust Policy: The Law of Competition and its Practice ....................... 62

http://www.lme.com/~/media/Files/Brochures/Guide%20to%20the%20LME%20V2%20WEB.p
   df............................................................................................ 12

http://www.lme.com/en-gb/metals/non-ferrous/aluminium/production-and-consumption/ ......... 11

http://www.lme.com/metals/reports/stocks/queue/ .................................................. 4, 20

http://www.lme.com/trading/warehousing-and-brands/warehousing/warehousing-studies/ ........ 32

https://twitter.com/LME_news/status/407825672573177857 ...................................... 11

Kocieniewski, David, *A Shuffle of Aluminum, but to Banks, Pure Gold*,
   NY TIMES (July 20, 2013) .................................................................... 66

LME Nov. 2013 Consultation .......................................................................................... 26, 68, 69

Modelling Market Fundamentals: A Model of the Aluminum Market, Gilbert, Christopher L.,
    Journal of Applied Econometrics, Vol. 10, No. 4 (Oct – Dec., 1995) ..................................... 61

Notice of LME Consultation (Nov. 2013) ................................................................................. 60

# I.    PRELIMINARY STATEMENT

The Direct Purchaser Plaintiffs ("Plaintiffs") have plausibly alleged (1) that the Goldman Defendants[1] and the London Metals Exchange ("LME") Defendants[2] made agreements with one another and others, and individually acted in an anticompetitive, restrictive or exclusionary manner, in violation of Sections 1 or 2 of Sherman Antitrust Act, 15 U.S.C. §1 *et seq.,* ("Sherman Act") and State laws; and (2) that Plaintiffs have standing under Section 15 of the Sherman Act to sue for the money damages they suffered as a result of those violations. *Compare* Second Corrected Consolidated Amended Class Action Complaint, ECF No. 271 ("Complaint" or "¶") *e.g.*, First, Second and Fifth - Eighth Claims *with* Argument Pts. I-III (plausibly alleged violations) *and* Pt. IV (Plaintiffs have standing).[3]

---

[1] The Goldman Sachs Group, Inc., GS Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC, and Metro International Trade Services LLC are referred to herein as "Goldman."

[2] The London Metal Exchange, Ltd., LME Holdings Limited, and Hong Kong Exchanges & Clearing, Ltd. ("HKEx") are referred to herein collectively as the "LME."

[3] This Memorandum responds to the arguments by the Goldman or LME Defendants in

   (A) The Memorandum Of Warehouse Defendants And Financial-Firm Defendants In Support Of Their Motion To Dismiss Plaintiffs' Antitrust Claims For Failure To State A Claim, ECF No. 317 (except as to Claims III and IV);

   (B) Defendant The London Metal Exchange's Memorandum Of Law In Support Of Its Motion To Dismiss All Complaints On The Merits ECF No. 334 *passim*; and

   (C) Defendants' Memorandum Of Law in Support Of Their Joint Motion To Dismiss All Federal And State Antitrust Claims For Lack Of Antitrust Standing ECF No. 314 *passim*.

   Plaintiffs' responses to the other dismissal arguments are set forth in Direct Purchaser Class Plaintiffs' And Commercial End User Class Plaintiffs' Joint Opposition To Defendants' Joint Motion To Dismiss State Law Claims and Plaintiffs' Memorandum In Opposition As To Individual Rule 12(b)(6) Motions To Dismiss By Henry Bath LLC & JPMorgan Chase & Co. [ECF No. 310]; Pacorini Metals USA, LLC [ECF No. 332]; And Glencore Ltd. [ECF No. 339].  *Compare* ECF No. 317 pp. 1-32 *with* Plaintiffs' Memorandum In Opposition As To Individual Rule 12(b)(6) Motions To Dismiss By Henry Bath LLC & JPMorgan Chase & Co. [ECF No. 310]; Pacorini Metals USA, LLC [ECF No. 332]; And Glencore Ltd. [ECF No. 339] And As To All Defendants' Regarding State Antitrust Law Claims.

   Direct Purchaser Plaintiffs oppose dismissal of their state antitrust and unfair trade practices claims and refer the Court to Direct Purchaser Class Plaintiffs' And Commercial End

A. **Plaintiffs Have Plausibly Alleged That The LME And Goldman Defendants Combined, Conspired Or Agreed In Violation Of Section 1 Of The Sherman Act.**

Goldman owned 9.5% of the LME.  ¶¶27, 69. The LME approved the Goldman Defendants to operate twenty-nine (29) LME warehouses in the Detroit Michigan area.  ¶¶122, 159.  The LME received 1.1% of Goldman's revenues from such warehouses.  ¶¶24, 68.  LME warehousing rental revenues are determined by (i) the amount of the daily storage charge multiplied by (ii) the amount of metal in storage, multiplied by (iii) the amount of days the metal is held in storage.  ¶22.

Thus, delays in loading metal out of Detroit warehouses inflate the LME and Goldman Defendants' rental revenues from such metal.  Moreover, the LME Defendants have admitted/asserted (A) that delays in loading aluminum out of LME Detroit Warehousing have been causing increases in the Platts MW premium or Midwest premium component of the benchmark price for aluminum in the United States (*see* ¶¶11-14, 263) [4], and (B) that the LME's

---

User Class Plaintiffs' Joint Opposition To Defendants' Joint Motion To Dismiss State Law Claims Plaintiffs' Memorandum In Opposition As To Individual Rule 12(b)(6) Motions To Dismiss By Henry Bath LLC & JPMorgan Chase & Co. [D.E. 310]; Pacorini Metals USA, LLC [D.E. 332]; And Glencore Ltd. [D.E. 339] for arguments in support of all state law claims.

[4] *E.g.*, the LME has stated:

> … the fundamental role of the queues in increasing premiums and thus creating price discovery issues must surely mean that the most logical course of action is to address the existence of those queues.  This will allow the LME to better deliver a market of last resort to physical metals users. This is the core intent of the Proposal [to change the minimum load-out rule], and the Exchange affirms this aim.

¶263.  Aluminum producers blatantly assert this as well.  Indeed, they go further and assert that the length of the load-out queues for LME Detroit Warehousing have inflated not only the Midwest premium, but the "all-in" price of aluminum. ¶¶230-231 (Alcoa), ¶266 (Rusal). Aluminum consumers have been complaining since 2010 that dramatic changes by the LME and the Goldman Defendants in the market neutral, storage place of last resort manner in which the LME had historically operated, have caused repeated increases to increasingly high all-time

minimum load-out rule has caused the long delays in removing aluminum from LME Detroit warehouses. *Id.*

In a 180 degree reversal of the commercially reasonable, market neutral, storage place of "last resort" conduct of the LME in aluminum from 1978 until the May 2009 start of the Class Period (see Statement of Facts "A" below), the LME and Goldman Defendants made and performed during the Class Period an agreement that had four core parts.

**First,** in order to inflate all of the foregoing three determinants (¶22) of their respective and joint storage revenues, the LME and Goldman Defendants combined, conspired or agreed to provide increasingly inefficient, low quality LME Detroit Warehouse services in order to restrain increasingly large amounts of aluminum for increasingly long periods of time at increasingly higher storage rates.  ¶¶1-5, 30, 69, 93.  As Defendants also agreed, their greatly inflated storage revenues helped enable the Defendants to sell the LME for $2.2 billion in late 2012. ¶¶5, 69.  As a 9.5% shareholder in the LME, Goldman received $208 million from such sale. ¶27.

An important portion of this part of the LME-Goldman agreement involved a grossly unreasonable and artificially low minimum load-out of 1,500 tons per day for **all** of Goldman's twenty-nine warehouses in Detroit through April 1, 2012 and specified higher amounts thereafter.  ¶¶31, 122, 163-165.   The LME and Goldman Defendants agreed that this extremely inefficient minimum load out would also be construed to be the maximum load-out from Detroit. ¶¶32, 168-169.

---

record levels in the Platts MW premium, as well as increases in the "all-in" prices for aluminum. ¶¶156-173.

**Second,** the LME and Goldman agreed that Goldman would make, and the LME would and did publicly support, Goldman's incentive payments to divert aluminum from persons in the position of Plaintiffs and other first level purchasers of aluminum (¶320) into Goldman's LME Detroit Warehousing.  ¶¶35-40, 242.  This not only structurally transformed LME Detroit Warehousing from a market neutral storage place of last resort into a storage place of first resort. It did so when Defendants had agreed to add to that storage place, a publicly well-known, agreed upon output restriction. That restriction was the extremely inefficient, artificially low minimum/maximum load-out agreement between Goldman and the LME.

Anyone with an interest in restraining aluminum supplies and inflating aluminum prices then had an incentive to accept, directly or indirectly, Goldman's incentive payment in order to sell and divert their aluminum into a place from which it could not be withdrawn for an extended period of time.  These incentive payments caused ever-growing amounts of aluminum to be stored in Detroit, which enabled Defendants increasingly to exceed the ability of their maximum daily load-out term to remove of aluminum from Goldman's warehouses on a timely basis. ¶¶31-32, 36-37, 122, 213, 223; *see infra.*

   1.  **The LME And Goldman Defendants' Agreed Upon Restraint Incentivized Smelters And Other Market Participants Intentionally To Agree To Divert Their Aluminum To Detroit In Order To Further Exceed The Publicly Known Maximum Load-Out And Build Up A Restrained Stockpile Of Aluminum The Daily Output, Or Load-Out Of Which Was Agreed To Be Severely Restrained**

Specifically, Defendants restrained what has grown to be almost 1,600,000 tons of metal in Detroit. http://www.lme.com/metals/reports/stocks/queue/.  This is more than 80% of U.S. annual aluminum production.  ¶86. The load-out delay for such aluminum was disclosed last week to have now grown to 683 days.  *Id.*  That is, in order to inflate their storage revenues and the LME sales price, these Defendants have by now restrained in Detroit almost one year's U.S.

4

production of aluminum, and caused the time it takes to load-out aluminum ordered for removal today, to grow to almost two years.

As this excess of the amounts of the aluminum restrained in Detroit over the grossly inefficient maximum load-out rule grew, the actual and prospective amounts of Detroit Warehouse rental revenues of the LME and Goldman Defendants snowballed. If the almost 1.6 million tons of metal today were evenly distributed among the LME's 147 approved warehouses in the United States, it could be loaded out in seven days.  ¶22.  At approximately 48¢ per ton per day, this would produce $5,376,000 in rental revenues: 48¢ per ton x 1,600,000 tons x 7 days. The LME would receive 1.1% of this or approximately $59,136.  But because the aluminum is all concentrated in Detroit, and is subject to the grossly inefficient minimum load-out agreement there, it will instead take many hundreds of days to load-out this aluminum including 683 days to load-out that aluminum ordered to be removed today.

Accordingly, the Goldman Defendants stand to make hundreds of millions of dollars in **just** future rental revenues from Defendants' agreed-upon, on-going restraint.  Because the metal storage is all concentrated in Detroit and subject to the agreed upon artificially low maximum load-out rule, the LME stands to make in **just** future revenues, storage revenues on each ton of metal of as much as almost 100 times more (683 days vs. 7 days) then the LME would make if the metal were evenly distributed among warehouses.  *Compare* ¶¶5, 22, 69. That is, Goldman, the LME and aluminum market participants (such as producers) **all** financially benefit from the non-market neutral Detroit load-out restraints.  And the Jane Doe Defendants may exploit those restraints by specifying that aluminum be shipped to LME warehousing in order to further exceed the load-out maximum. This prolongs the storage delays, increases the amount of restrained supplies, and causes further increases in Platts MW premium aluminum prices.

However, after a Congressional investigation began in June 2013, (a) the LME announced that it would seek to change dramatically the minimum load-out rule, and (b) Goldman announced that it would wholly suspend the incentive payments which it had been making to divert aluminum from persons in the positions of Plaintiffs and others, into Detroit in order to take further financial advantage of the load-out agreement by further exacerbating the load-out delays.  *Compare* ¶¶79, 80, 252, 253 *with In re Nasdaq Market-Makers Antitrust Litig.*, 894 F.Supp. 703, 712 (S.D.N.Y. 1995) (parallel changes in the degree of anticompetitive conduct after government investigation announced, and absent other changes in market conditions plausibly indicates the existence of a prior agreement to engage in such anticompetitive conduct).

**Third**, the LME and Goldman Defendants agreed to inflate aluminum prices.  Plaintiffs have alleged, in painstaking detail, as follows.  The LME and Goldman Defendants' highly unusual parallel abandonment of their foregoing steps when the Congressional investigation commenced, did **NOT** occur because this was the first time that such Defendants learned that their steps were inflating the prices that persons in the positions of Plaintiffs paid. ¶¶157-175. Nor was such parallel abandonment due to any change in market conditions.  ¶7.

On the contrary, the LME and Goldman Defendants knew from repeated specific public complaints beginning in 2010 and continuing thereafter, as follows.   ¶¶157-175. Their restraints of increasing amounts of aluminum in LME Detroit Warehousing, and the diversion of additional aluminum into Detroit via the incentive payments, were inflating (a) the delays in loading aluminum out of Detroit, and (b) the Platts MW premium component of the benchmark price of aluminum in the U.S., *i.e.,* inflating the prices paid by Plaintiffs and others.  ¶¶3, 40, 58, 73, 92.

With full knowledge of the price-inflation and supply/output restriction injuries they were inflicting upon persons in the position of Plaintiffs, the LME and Goldman Defendants not only continued to make and perform their agreement.  ¶¶3,4, 35, 60, 73, 191, 283, 293. They also repeatedly increased the degree of their supply restraining, price increasing conduct. *Id.*  Because the Goldman and LME Defendants knew full well that they were increasingly inflating prices, increasingly restraining supplies and increasingly injuring persons in Plaintiffs' position, Defendants knowingly further agreed to and intended these anticompetitive effects of their agreement.  ¶¶58, 71, 73-74, 172.

**Fourth**, while performing this third core part of their agreement, the sophisticated LME and Goldman Defendants also and more fundamentally knew as follows.  In sourcing, processing and moving commodities from the earth to the consumer, any frictions or inefficiencies or outright restraints typically increase the cost to the community of consuming such commodity. Within the process of the movement of aluminum from the earth to the consumer, the LME occupied an extremely sensitive position.  This position directly impacted (a) both components of the standard benchmark price in the United States for the purchase and sale of aluminum (¶¶11-14), and (b)the output or available supplies of aluminum for sale from LME Detroit warehouses.

The LME and Goldman Defendants specifically knew that, if they caused the LME to operate in a non-market neutral manner, market participants who desired to move prices or restrain supplies in the direction caused by the LME's change, would likely participate.  ¶¶94, 224-232.  Thus, by offering their anticompetitive combination of an artificially low maximum load-out service and incentive payments to share part of the supra-competitive rental revenues in Detroit, the LME and Goldman agreed to become market players.  ¶¶36, 224-232.  They

7

provided price inflation and supply restraint services as the other side or by-product of their increasingly inefficient and poor load-out services.[5]  The LME and Goldman Defendants agreed with various Jane Doe Defendants to provide aluminum price inflation and aluminum output restraints in consideration for the payment of supra-competitive rental revenues.  ¶¶94, 224-232. As a result of this fourth part of the LME-Goldman agreement, certain types of market participants (such as aluminum smelters) diverted aluminum into LME Detroit Warehousing. This diversion further inflated prices and insured that large amounts of aluminum remained in a place with an output restriction.  That meant that the aluminum could not realistically be sold for consumption for an extremely long period of time.  See Statement of Facts *infra*.

*****

In the foregoing circumstances, Plaintiffs' plausible allegations of the LME-Goldman agreement make out, especially at the motion to dismiss stage, a strong claim for a price increasing, supply restraining *per se* violation of Section 1 of the Sherman Act.  Argument Pt. II-III *infra.*  To any extent that any part of the agreement may not constitute a *per se* violation, Plaintiffs have plausibly alleged an unreasonable restraint and a rule of reason violation. *Id.*

---

[5] That is, as the LME and Goldman Defendants well knew, the minimum load-out rule was susceptible, if the LME Detroit Warehouses began to act as a storage place of first resort, of acting as an output or sales restriction to encourage the continuing build-up of a stockpile of aluminum that was not readily saleable.  Market participants were encouraged to try to cause aluminum to be stored in Detroit with precisely the purpose of further exceeding the minimum load-out permitted under the LME-Goldman agreement.

Thereby, these participants would join Goldman and the LME in prolonging the load-out delays, increasing the amounts of aluminum restrains, and inflating price.  Plaintiffs have not had the discovery yet to know who, in fact, accepted, directly or indirectly, the incentive payments. But the LME's and Goldman's agreement for Goldman to make incentive payment agreements with other market participants was not market neutral.  It increasingly restrained supply. It increasingly inflated prices.  It increasingly, knowingly, and intentionally favored one part of the market over another.

Indeed, the scenario pleaded by Plaintiffs includes long term anticompetitive conduct that was knowingly causing record and historically anomalous prices and record restraints of supply in order to generate increasingly supra-competitive revenues for the LME and Goldman Defendants for the provision of increasingly poor services.  *E.g.,* ¶¶1-3.

### B.  Plaintiffs Plausibly Allege Claims Against The Goldman Defendants And The LME Defendants For Violation Of Section 2 Of The Sherman Act.

Plaintiffs plausibly allege, as the LME has indirectly admitted (fn 4 *supra*), that the LME and Goldman Defendants each had the power to inflate, and did inflate aluminum prices and the power to restrain and did restrain the supply (or output) of aluminum available for sale. Argument Pt. IV *infra*.  This demonstrates Defendants' possession of monopoly power.  *Id.* Plaintiffs plausibly allege that Defendants intentionally and knowingly abused this market power in order to profit themselves, divert the available supply of aluminum, restrain same, inflate prices and otherwise intentionally injure persons in the positions of Plaintiffs.  *Id.*  This more than alleges a violation by Defendants of Section 2 of the Sherman Act.

Additionally, although not required, Plaintiffs also allege that the LME and Goldman each possessed monopoly power in a relevant market.  *Id.*  Each intentionally abused that power to inflate the prices that Plaintiffs paid and restrict output in the supplies of aluminum available to persons in the position of Plaintiffs.  *Id.*  Plaintiffs further plausibly allege an agreement, attempt and conspiracy to monopolize by each or both of the LME and Goldman Defendants, in violation of Section 2. *Id.*

### C.  Plaintiffs Have Standing Under Section 15 of the Sherman Act To Bring Damages Claims Against The LME And Goldman Defendants For These Violations Of Sections 1 And 2 Of The Sherman Act.

Plaintiffs made first level purchases of primary aluminum directly from aluminum smelters. ¶¶9, 105-115.  Plaintiffs allege that the prices that they paid to purchase such aluminum

during the Class Period were directly, knowingly and intentionally inflated by the Goldman

Defendants, the LME Defendants, and the Jane Doe Defendants in violation of the antitrust laws.

Complaint *e.g.*, First and Second Claims.

Section 15 of the Sherman Act permits any person to sue for a violation that injures a

person in their property.  15 U.S.C. §15.  As construed by the courts, Section 15 is satisfied, at

the very least, where a Plaintiff plausibly alleges that they suffered direct injuries from the

violation, their injury was inextricably intertwined with the violation, or the Defendants intended

to injure them by the violation. *See, Associated General Contractors of Cal., Inc. v. California*

*State Council of Carpenters*, 459 U.S. 519, 540-45 (1983*)("AGC"); Blue Shield of Va. v.*

*McCready*, 457 U.S. 465, 482 (1982) ("*McCready*"); *Crimpers Promotions Inc. v. Home Box*

*Office, Inc.,* 724 F.2d 290, 292 (2d Cir. 1983) ("*Crimpers*").

Here, Plaintiffs satisfy all three tests. Argument Pt. IV.  In *McCready*, the conspirators

did not know of Ms. McCready in particular, but they knew that the performance of their

unlawful agreement was necessarily causing injury to persons in the position of Ms. McCready.

Far more than in *McCready*, here the Defendants well knew from public reports and otherwise

that they were inflating the prices paid and restraining the supplies available to persons in the

positions of Plaintiffs.

Plaintiffs are also the first level purchasers of aluminum from smelters, and have *AGC*

standing for this separate reason under *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 481

(7th Cir. 2002).[6]

## STATEMENT OF FACTS

---

[6] Also, Plaintiff Ampal purchased primary aluminum directly from Defendant Glencore Ltd.

Aluminum is a metallic element, with symbol Al, and the most abundant metal on earth. Complaint ¶9. Aluminum is used in beverage containers, in transportation vehicles (including planes, trains and cars), as wiring for conducting electricity, and for construction or use in pipes.

### A. Prior to the Class Period, The LME Acted In A Commercially Reasonable, Market Neutral Manner As A Storage Place Of "Last Resort"

The LME started trading aluminum forward contracts during 1978.  See http://www.lme.com/en-gb/metals/non-ferrous/aluminium/production-and-consumption/.  The aluminum producers and consumers then used in their contracts to sell or purchase aluminum, other means of pricing aluminum other than the LME aluminum price.  Thus, LME trading volume was very low for a long time until it gradually began to increase.  ¶¶14, 145.  The ways in which the LME grew its aluminum trading through May 2008, were as follows.

Although LME forward contracts call for the delivery of aluminum, 99% of the contracts result in liquidation through trading and without delivery.  ¶149.  If the contract is satisfied through delivery, then the short (the person obligated to make delivery) delivers a warrant.  ¶148. That warrant represents specified aluminum in a specified warehouse and represents a specified grade (which is at least 99.7% pure aluminum). ¶146.  The long may remove that aluminum from the warehouse by both **cancelling** the warrant and ordering the load-out.

Just as delivery on LME aluminum contracts has been rare, so shipments of aluminum into LME warehouses has been made as a "last resort". ¶17.  As part of the LME trading and operations, the LME approves and registers warehouses throughout the United States and the World.  ¶¶126, 156.   What the LME calls "our warehouses" (presently 154 warehouses) in the United States are approved by the LME as warehouses.   ¶356.  LME warrants may issue in respect of metals stored in such warehouses, and may be delivered in satisfaction of an LME

contract. *Compare* ¶¶145-155 *with* LME Official Twitter Account,

https://twitter.com/LME_news/status/407825672573177857.

The LME and "our warehouses" largely acted, through 2008, in a commercially reasonable, market neutral manner so as not to inflate prices and instead function as a storage place of "last resort." ¶¶9-13, 17, 124, 155.  *Compare* London Metals Exchange, A Guide To The LME,

http://www.lme.com/~/media/Files/Brochures/Guide%20to%20the%20LME%20V2%20WEB.pdf *with* Complaint ¶14.

For example, there were notable spikes in the amounts of aluminum stored in LME warehouses.  But, until 2009, all of those spikes dissipated quickly.



The first spike, in 1991-1993 resulted from the collapse of the Soviet Union and the early 1990s recession.   The second spike, during 2001, resulted from the economic slowdown, especially after September 11, 2001.

Consistent with its market neutral storage place of "last resort" function, as the economy improved in each of the foregoing circumstances, the amount of the buildup in the LME aluminum stocks quickly dissipated.  ¶¶14-17.  In order to accommodate the rapid load-outs of aluminum from LME warehouses as the economy improved, LME warehouses acted in a commercially reasonable manner to load out 10,000 tons of aluminum or more per day. *E.g.,* ¶168.

1.  **By Acting In That Manner, The LME Caused Its Aluminum Forward Contract To Capture 97-99% Of The Volume In Exchange Traded Aluminum Contracts And Become Part Of The Standard Benchmark Price For Contracts To Purchase Or Sell Aluminum In The United States.**

By the start of the Class Period in May 2009, 97-99% of the trading in exchange based aluminum forward or futures contracts in the United States was LME aluminum forward contract trading.  ¶¶145, 278, 306.

Also by the start of the Class Period, the standard benchmark price term in contracts to purchase aluminum from smelters and others in the United States was the LME aluminum forward contract price **plus** a premium price.  The premium was typically the Platts Metals Week or the Midwest Premium. ¶¶11-14.  The LME price plus the Platts MW premium constituted the "all in" price, and were frequently referred to as the "Midwest Transaction Price" in contracts to purchase or sell aluminum in the United States.  *Id.*

B.  **During The Class Period, The LME And Goldman Defendants Have Acted In A Commercially Unreasonable Manner And As A Storage Place Of First Resort**

In the serious recession caused by the financial crisis during 2008, LME aluminum storage quadrupled very rapidly to almost twice as high as the previous high level during the 1990s.  ¶14 (see chart above).  By the May 2009 start of the Class Period, the aluminum in LME Detroit Warehousing had greatly increased to approximately 460,000 tons.  ¶206.  After this extraordinary increase, when the economy improved during 2010-2014, the amounts of aluminum at **non**-Detroit LME warehouses in the United States did, consistent with LME history, decline.  ¶¶20, 57, 207.  But the amounts of aluminum stored in the LME Detroit Warehousing, did not decline. ¶21.  Instead, they anomalously continued to increase while supplies elsewhere declined.  *Id.* This continued increase was (1) contrary to history (¶20); (2) contrary to contemporaneous non-Detroit LME warehouse experience in the U.S. (¶¶18, 20); and (3) contrary to the economic trend of improvement from 2010 forward.  ¶¶18, 20.

1. **The LME And Goldman Defendants Have Consistently Acted In Parallel To Restrain Aluminum Supplies, Inflate Aluminum Prices, And Provide The LME And Goldman Defendants With Dramatically Increasing Rental Revenues From The Provision Of Increasingly Inefficient Load-Out And Other Warehouse Services**

As the amounts of aluminum restrained in LME warehouses increased, the duration of the time period of such restraint also increased.  This was because of an unreasonable load-out rule and the LME and Goldman Defendants' associated agreement and conduct.  The LME minimum load-out rule was enacted during 2004.  Memorandum Of Warehouse Defendants And Financial-Firm Defendants In Support Of Their Motion To Dismiss Plaintiffs' Antitrust Claims For Failure To State A Claim, ECF No. 317, p. 11.   The total LME warehouse aluminum supplies then were a small fraction of what they were in 2009.  ¶14.   Again, by 2009, the amount of aluminum stored in LME warehouses had grown to more than twice as much as the highest it had ever been before.  *Id*.  Even in the radically different commercial circumstances existing in 2004, the LME

minimum load-out rule had been commercially unreasonable compared to competitive warehouses or even the minimum load-out rules used in other commodity regimes.[7]

The LME minimum load-out rule became especially unreasonable when the amounts of aluminum in the LME warehouses (a) increased to five times what it had earlier been in 2004 when the load-out rule was promulgated, and (b) thereafter began to concentrate in Detroit. Nonetheless, between 2009 and March 31, 2012, LME and Goldman Defendants' agreement for inefficient load-outs specified a minimum load-out per day from all of Goldman's twenty nine warehouses in the greater Detroit area of a gross, sum total of 1,500 tons per day.  ¶31. This was unreasonable for multiple independently sufficient reasons. ¶32.  These reasons include the following aspects of the agreement:

    a. The minimum applied to all the warehouses in greater Detroit rather than per warehouse. ¶32 (a).  The per city minimum made no sense whatsoever, because, in a normal commercial environment determined by competitive or economic

---

[7] For example, the Commodity Credit Corp. ("CCC") Rule 7, CFR part 1423.11 Delivery and shipping standards for cotton warehouses, states:

    (a) Unless prevented from doing so by severe weather conditions, fire, explosion, flood, earthquake, insurrection, riot, strike, labor dispute, acts of civil or military authority, non-availability of transportation facilities or any cause beyond the control of the warehouse operator that renders performance impossible, the warehouse operator will:

      (1) Deliver stored cotton without unnecessary delay.

      (2) Be considered to have delivered cotton without unnecessary delay if, for the week in question, the warehouse operator has made available for shipment at least 4.5 percent of their applicable storage capacity in effect during the relevant week of shipment.

Applicable storage capacity is considered to be the higher of CCC approved **capacity** or the **maximum** number of bales stored at any time during the applicable crop year.

    LME Detroit Warehousing currently has 1.56 million tons of actual stock which is less than storage capacity.  Under the CCC Rule, even the 1.56 million tons would mean that Goldman's Detroit warehouses had to load-out approximately 67,500 tons per week, *i.e.,* 13,500 tons per business day.  This is nine times as much as the grossly inefficient 1,500 tons per day.

inputs, the rate at which a warehouse may load-out aluminum does not depend on whether there is another warehouses in that city.

b.  This minimum was not based upon a percentage per day of warehouse capacity or warehouse supply. ¶32 (b).

c.  Therefore, this agreement would pay Goldman twenty-nine times more than it would pay the operator of an LME warehouse in a city with only one LME warehouse for the provision by Goldman of load-out services that were twenty nine times more inefficient than the already inefficient level of load out services provided by the single LME warehouse in a city with only one warehouse. ¶32 (c).

d.  The 1,500 tons per day minimum did not net out load-ins (as the LME now proposes to do). *Compare* ¶32 (d) *with* ¶265.

e.  The absence of a per warehouse requirement, the failure to consider load-ins, and other omissions specifically invited a warehouse owner to shuttle aluminum from warehouse to warehouse in order to be able to say that it satisfied the minimum. ¶32 (e).

f.  By engaging in the commercially unreasonable conduct of ignoring the five-fold increase in aluminum supplies since the 1,500 ton minimum load out rule was enacted, the LME and Goldman Defendants transformed this agreement to make minimum per day, per city load-outs into an agreement, in times of extraordinarily high storage, that Goldman could still load-out only the minimum, *i.e.,* such Defendants agreed that the minimum load-out would also be the maximum load-out per day, per city.  ¶32 (f).

g. If allowed to continue in the conditions alleged herein, the foregoing agreement inherently would and it did

- inflate aluminum prices;

- cause delays in load-outs of 16 months from the day that a load out was ordered;

- trap in LME Detroit Warehousing an amount of aluminum equal to more than 85% of the amount of aluminum produced annually in the entire United States; and

- cause most steps that could be taken to ameliorate the anticompetitive effects of this agreement to eventually exacerbate such restraints, including by lengthening the amounts of the delays in removing aluminum from LME Detroit Warehousing. ¶32 (g).

Again, as the LME and Goldman Defendants well knew, including from public complaints, increases in the queue increased the Platts MW premium prices of aluminum. *Compare* ¶263 *with* ¶¶156-173. Thus, as the LME and Goldman Defendants' agreements inflated the delays in accessing LME Detroit Warehousing aluminum supplies, they also inflated the Midwest Premium. ¶33.

**2. The Historically Anomalous Pattern Of Storage At LME Detroit Warehousing In Aluminum During The Class Period Was Contrary To History And Contrary To Contemporaneous Experiences Of Other LME Warehouses.**

The extraordinary increase in LME warehouse aluminum caused by the 2008-2009 recession did, consistent with history, decline in **non**-Detroit LME warehouses in the United States. ¶¶20, 57, 207. But the amount of aluminum stored in the LME Detroit Warehousing, did not decline. ¶21. Instead, it continued to increase while supplies elsewhere declined. *Id.* This continued increase was (1) contrary to history (¶20) and (2) contrary to contemporaneous non-

Detroit LME warehouse behavior in the U.S. (¶¶18, 20), and (3) contrary to the economic trend of improvement from 2010 forward.  ¶¶18, 20.

As a result of the foregoing, an increasingly high percentage of the LME aluminum stored in the United States has increasingly tended to be concentrated and be stored in Detroit.



¶20. The anomalous increases in LME Detroit Warehouses occurred because, rather than loading out 10,000 tons per day (or doubling that amount to account for the fact that LME warehouse supplies were twice as high as the prior peak during the 1990s), the Goldman Defendants made the four part agreement with the LME Defendants described at pp. 2-8 *supra*.

Thus, the LME and Goldman Defendants engaged in the highly unusual, parallel conversion of the minimum load-out rule into a maximum daily load-out regardless of commercial circumstances or the quadrupling of the supplies in the LME Detroit warehouses. This was a mutual, naked exercise of market power to serve mutual financial self-interest.  It occurred in a service --- the service of load-outs from Goldman's LME Detroit Warehouses --- exclusively controlled by the LME and Goldman Defendants.  In this service, they had no competitors.

3.  **The Historically Anomalous Storage At Detroit, Caused Record Inflations Of The MW Premium Price Which Were Historically Anomalous Because the MW Premium Should Have Been Falling**

As the amounts of aluminum stored in Detroit have increased, the Midwest premium should have **de**creased.  ¶¶17-20. This is because the much greater supply in the Midwest should be associated with lower Midwest premiums. *Id.* Contrary to historical experience and economic theory, however, the increases in the amount of aluminum in LME Detroit Warehousing did **not** cause the Platts MW premium to decline.  Instead, as the amount of aluminum stored in LME Detroit Warehousing has increased, the Platts MW premium or Midwest premium component of the aluminum price (see fn 5 *supra* and Complaint ¶¶11-13 quoted therein) has anomalously soared above its previous record of $110 per ton, and continued to increase to one record high after another.  ¶¶33, 58.



Complaint ¶33. The reason for this anomalous increase in the price was the Defendants' four part

agreement described at pp. 2-8.  More particularly, as the LME aluminum concentrated in

Detroit, the amounts of the delays in extracting that aluminum from Detroit greatly increased.

This **decreased** the **available** aluminum. Again, in order to load-out aluminum from an LME

warehouse, the owner of a warrant must first cancel the warrant and request load-out.  As of last

week, the LME states that the duration of time from the cancellation of the warrant until the

aluminum may be received is, presently, **683 days**.

http://www.lme.com/metals/reports/stocks/queue/.  Lacking the LME's new disclosures,

Plaintiffs earlier alleged (and analysts earlier had believed) that the amount of delays in the time

from the cancellation of the warrant until the aluminum is actually loaded out and received had grown to in excess of 500 days.  *E.g.,* ¶248.

### 4. The Common Financial Motive Of The LME And The Goldman Defendants To Increase Their Rental Revenues.

The Goldman and LME Defendants had a shared, common financial motive to make such agreements.  ¶¶68, 305.  Again, an LME warehouse's revenues are generated by (i) the amount of the daily storage charge multiplied by (ii) the amount of metal in storage multiplied by (iii) the amount of days the metal is held in storage. ¶22. In addition, the LME warehouse receives the amount of the load out charge at the time of load out.  *Id.*  Goldman generated hundreds of millions of dollars per year in supra-competitive revenues during this regime of artificially high storage rates for grossly inefficient services and artificially long delays in loading out record high amounts of aluminum.  ¶23.  The LME shared approximately 1.1% of these revenues.  ¶24.

For most of the Class Period, the largest shareholders of the Defendant LME Holdings Limited were the Goldman Defendants, and other financial firms which owned LME approved warehouses.  ¶68.  The Goldman Defendants and these other financial firms could and did direct, as traders and as intermediaries, large amounts of business to the LME (or away from the LME). *Id.* Having "captured" the business of producers and consumers of aluminum through their use of the LME price as a component of their benchmark contracts, the LME and its top executives were incentivized to accommodate large shareholders like Goldman.

### 5. The Common Financial Motive Of The LME And The Goldman Defendants To Increase Revenues From The Sale Of The LME

In addition to the supra-competitive storage revenues and load-out revenues, Defendants also stood to gain extraordinary revenues from the sale they were attempting to make during 2011-2012 of the LME. ¶¶26, 69.  The LME earned only $15 million per year at most.  ¶26.  In

fact, as a result of the performance of their agreements alleged herein, Defendants were able

successfully to sell the LME for in excess of $2 billion during late 2012.  ¶27, 69.  This resulted

in $208 million consideration being paid to Goldman for its 9.5% equity stake in the LME and

$260 million being paid to Defendant JPMorgan for its 11.0% stake in the LME.  *Id.*

6. **The LME And Goldman Reject The Advice And Help Of Longtime LME Warehouse Owners That Would Reduce The Load-Out Delays And Reduce The Price Inflation**

Again, because price is inversely related to supply, the Midwest premium tends to be low

in times of plentiful supply of aluminum.  ¶14.  This occurred in times of very high supplies

during the early 1990s.  *Id.* When those supplies were released, there were no abuses by

warehouse companies.  Rather, long-time LME warehouse companies worked to provide

customer service and load-out 10,000 tons per day rather than to make agreements with the LME

to restrain supplies, inflate prices and increasingly inflate storage revenues through increasingly

inefficient services.  ¶¶14, 168, 283.

During 2010-2012, in response to the public complaints, a long-time LME warehouse

operator was uncomfortable with (a) the long times it took to extract aluminum from certain

LME warehouses, (b) the tactics of those warehouses, and (c) the lack of response from the

LME.  ¶5.  Accordingly, it made offers of logistical services or other assistance to reduce the

waiting times, and the high amounts of supplies restrained in LME Detroit warehouses, and

thereby ameliorate the public complaints.  *Id.* This included during meetings of the LME

Warehouse Committee, which advises the LME Executive Committee.  *Id.* These offers were

rejected by the LME CEO as "unnecessary" and because the LME "had things under control."

*Id.*

7. **The LME And Goldman Reject The Advice Of Their Own Paid Consultant That Would Have Reduced The Load-Out Delay And Reduced The Price Inflation**

Also in response to the public complaints, the LME and Goldman Defendants performed internal analyses and retained a paid consultant, Europe Economics, to perform analyses.  ¶44. Defendants rejected the recommendation of their own paid consultant, Europe Economics, to require 1,500 tons minimum load-outs per day per 300,000 tons stored in a city. ¶45. That recommendation would have increased the minimum load-outs in Detroit to 6,000-7,500 tons per day.  Instead, the LME and Goldman Defendants mutually agreed upon a superficial amendment to their minimum load-out agreement for Detroit from 1,500 to 3,000 tons per day, and further agreed that this modification would NOT be implemented until April 1, 2012.  ¶46.

This increase of 1,500 tons per day constituted only 25%-33% of the recommended increase of 4,500-6,000 tons per day.  As market participants contemporaneously and publicly predicted, this token increase did, in fact, fail to reduce and instead continued to inflate the all-time record high amounts of aluminum stored in, and the all-time record delays in taking aluminum out of LME Detroit Warehousing.  ¶¶47-48, 192-202.  Thus, by calculating and agreeing to continue their restraint of trade, the LME and Goldman Defendants ensured that (a) their extremely high supra-competitive storage revenues from LME Detroit Warehousing would not only continue, but increase, and (b) the projected sale value of the LME would remain high during times when Defendants were actively seeking to sell the LME to new owners.   ¶¶26, 49, 51, 197.  The LME Defendants publicly stated that their token increase would solve the problem but the LME knew, from at least their paid consultants' study and market participants' contemporaneous predictions, that this was false. ¶¶41-49, 85, 176,192-202.

**8.  The LME And Goldman Agree To Inflate The Storage Rental Rate As A Supposed *Quid Pro Quo* For The (Non-) Reduction In The Load-Out Delays And Amount Of Metal Restrained Thereby.**

Using their rejection of their own paid consultant's explicit recommendation and their public superficial modification of the minimum load-out rule as a rationale, the LME and Goldman Defendants announced that they had also agreed to further increases in (a) the required storage rates for LME Detroit Warehousing, and (b) the load-out charges.  ¶50.

These increases in the storage rates and the load-out rates, in reality, ensured that the Goldman Defendants' and the LME Defendants' projected storage revenues from providing inefficient services would actually increase after April 1, 2012.  ¶51.  Such increases also tended to ensure that the projected sale value of the LME would also increase. *Id.*  Exacerbating the anticompetitive extent, effects, incentives, and pernicious consequences of their foregoing agreements, the LME and Goldman Defendants further agreed during the Class Period on very substantial increases in the daily storage costs for LME Detroit Warehousing (from 35¢ to 48¢ per day per ton during the Class Period), and in the load out charge therefor (sometimes called the Free on Truck (or "FoT") charge).  ¶¶52, 53, 54, 203-206. All of the foregoing were to the mutual financial benefit of the LME and Goldman Defendants.

**9. Goldman And The LME Agree That Goldman Will Make Incentive Payments In Order To Divert More Aluminum Into LME Detroit Warehousing And Thereby Create A Positive Feedback Loop In Which The Amounts Of Aluminum And Duration Of The Delay In Extracting That Aluminum Will Increase**

As discussed at pp. 6-9 *supra*, the LME and Goldman Defendants agreed that Goldman would make, and the LME would and it did publicly support, incentive payment agreements. ¶¶35-41. This included an upfront incentive payment (which eventually grew to as much as $250 per ton) to firms to divert aluminum into LME Detroit Warehousing and store it there. *Id.* Conjoined with their steps recounted above, this meant that Defendants were agreeing to engage in an anticompetitive combination of (a) imposing the artificially low maximum load-out rule, (b) charging grossly supra-competitive rental revenues (more than three times the competitive

24

rates) for services that were far more inefficient than those provided by a competitive warehouse, and (c) reaching into the market in which Plaintiffs purchased aluminum to offer a combination of a cash payment and an unlawful service (supply restraint and price inflation) that outbid the Plaintiffs for aluminum in the market in which Plaintiffs were operating. *See* pp. 6-9 *supra*.

This combination of consideration enabled the LME and Goldman Defendants intentionally to create a positive feedback loop in which higher LME Detroit supplies and slower load-outs empowered higher incentive payments by Goldman. ¶¶39, 215, 333. This caused higher supplies and slower load-outs which empowered higher incentive payments which caused higher LME Detroit supplies and slower load-outs, etc. *Id.* Goldman's payments of these incentives has thus benefited the LME financially by increasing the storage revenues of Goldman and the LME, by helping to enable the sale of the LME for higher consideration based upon such increased revenues, and in other ways. ¶219.

However, Goldman's incentive payments and supply restraint services inflated aluminum prices as a prior and necessary step for Goldman to (outbid Plaintiffs and others and) divert the additional aluminum from consumption into the LME Detroit Warehousing. This continued to inflate the "cushion" of LME aluminum supplies in Goldman's Detroit Warehousing over the artificially low maximum load-out applicable to Goldman's LME Detroit Warehousing. Such increased cushion generated more actual and prospective supra-competitive revenues for the LME and Goldman Defendants. But, in order to increase the "cushion", Goldman and the LME had further directly injured Plaintiffs. This, again, "inextricably intertwined" the LME and Goldman Defendants' violation with Plaintiffs' injuries.

### 10. Defendants' Inconsistent Statements And Abandonment Of Their Anticompetitive Conduct When Congressional Investigations Begin

Also more consistent with the existence of an agreement between the LME and Goldman Defendants than legitimate individual decision making, are the following facts.  The LME made various statements at different times to rationalize the continuation of its conduct but such statements contradict one another.  ¶¶6-8, 62-65, 73, 314.  The LME stated that its changes to the minimum load-out rule would correct the problem.  ¶¶62, 208. They did not.  Instead, they allowed the problems to increasingly grow worse. The LME had stated that the extreme load-out delays were not such a problem and that increases in the Detroit warehousing rental revenues were an appropriate *quid pro quo* for any increases in the minimum load-out rate.  ¶¶203-204, 210, 333.

But then the LME contradicted itself, in Autumn of 2012, shortly before the closing of the sale of the LME, by stating that the load-out delays were a major problem that had to be addressed with a "bazooka".  ¶¶62, 252. However, after the closing of the sale of the LME, an LME spokesman, Chris Evans, stated in New York as follows.  The load-out delays and incentive payments were not a problem.  Rather, they were expressions of fundamental market circumstances such that aluminum consumers who did not like paying the Midwest premium should simply stop buying aluminum.  ¶¶63, 78, 242.

But then Congressional investigations began approximately five months after the statement by Mr. Evans that aluminum consumers should simply stop buying aluminum.  The LME then again reversed itself.  It stated that it would dramatically change the minimum load-out rule. And this time Goldman stated that it would suspend all incentive payments.  ¶¶80, 253, 257, 265. There had been no change in market circumstances between the time of Mr. Evans' statement and the later reversals. ¶7.  Finally, contrary to its earlier statements publicly supporting incentive payments, the LME has more recently stated that "artificially creat[ing] a

queue by the use of incentives," constitutes "abusive behavior."  Pepperman Decl., Ex. 7 (LME Nov. 2013 Consultation) ¶37.

This temporizing, internally contradicting, flip flopping series of statements helped achieve the objective of the LME and Goldman Defendants to inflate their collective revenues. This included through the sale of the LME.  The LME then tried, through Mr. Evans' statements to continue those supra-competitive revenues shortly after the sale of the LME had closed.  This conduct by the LME and Goldman is best cohered by their pursuit of a prior agreement as alleged herein.  Such conduct strongly contra-indicates any legitimate individual decision making.

**ARGUMENT**

**I.     ACCEPTED AS TRUE AND CONSTRUED IN THE MANNER MOST FAVORABLE TO PLAINTIFFS, PLAINTIFFS' FACT ALLEGATIONS GO FAR BEYOND *TWOMBLY* AND RAISE AN INFERENCE OF AGREEMENT**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the fact allegations of a complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d. Cir. 2010).

Despite their sophistication, the LME and Goldman Defendants failed to construct their arguments by taking as true the fact allegations in the Complaint and drawing reasonable inferences in favor of Plaintiffs. On the contrary, Defendants have largely avoided Plaintiffs' allegations and the reasonable inferences therefrom.  Defendants frequently construct a straw man distortion of the Complaint that fits a particular line of argument that Defendants wish to make.  For this reason alone, Defendants have not begun to meet their movants' burden on a

motion to dismiss.[8]  Because Defendants may not raise matters for the first time in a reply brief,[9]

Defendants' motions should be denied.

Although Plaintiffs have no burden here, Federal Rule of Civil Procedure 8(a)(2)

provides that a Complaint:

> requires only 'a short and plain statement of the claim showing that the pleader is
> entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim
> is and the grounds upon which it rests,' *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.
> Ct. 99, 2 L.Ed.2d 80 (1957).

*Twombly*, 550 U.S. at 555.  *Twombly* announced the "retirement" of *Conley*'s formulation that a

Complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that a

plaintiff can prove "no set of facts in support of his claims which would entitle him to relief."  *Id.*

at 561-63.  In its place, *Twombly* required that the complaint be plausible, *i.e.,* that it allege

"enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement."  *Id*. at 556.   *Twombly* continued *Conley*'s other well-settled "general standards."  *Id*.

There is a low bar for pleading a plausible agreement under Section 1 of the Sherman

Act.  *Compare* ***Anderson News LLC et al. v. American Media Inc***., 680 F.3d 162, 185 (2d Cir.

2012) (Plaintiffs' inference does not have to be more plausible than the Defendants' inference; it

just has to be a plausible inference of agreement) *with* ***Starr v. Sony BMG Music***

***Entertainment***, 592 F.3d 314, 321 (2d Cir. 2010) (only plausibility, not probability, is required);

*and* ***In re Text Messaging Antitrust Litig***., 630 F.3d 622, 629 (7th Cir. 2010) *cert. denied*, 131 S.

Ct. 2165, 179 L. Ed. 2d 937 (U.S. 2011) (plausible means only a non-negligible chance that an

---

[8] *Compare* 5B Charles Wright & Arthur Miller, **FEDERAL PRACTICE AND PROCEDURE** § 1357
(3d ed. 2010 supp.) ("All federal courts are in agreement that the burden is on the moving party
to prove that no legally cognizable claim for relief exists.") *with Slayton v. American Express
Co*., 604 F.3d 758, 773 (2d Cir. 2010).
[9] *Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993) ("Arguments may not be made for the
first time in a reply brief")

agreement was made).

*Twombly* held that the plaintiffs there "came close" but did not "nudge" their claims across the line into pleading a plausible conspiracy to divide markets. But the *Twombly* plaintiffs alleged (1) parallel (2) lawful (3) continued (4) inaction by the former baby bell telephone companies (5) which were separately owned and did not have overlapping structures to make the individual decisions (6) resulting in a continuation of what had been a normal telephone market. (7) The telephone companies engaged in the parallel continuation, rather than substantial abandonment, of their earlier parallel conduct after the lawsuit was started. *Id*. at 566-569.

In stark contrast, Plaintiffs here allege (1) overlapping ownership, and (2) overlapping decision making and control between the LME and Goldman Defendants (3) accompanied by highly unusual conduct by the LME (4) which caused (a) historically anomalous all time record prices and a radical structural transition of the LME from a market neutral storage place of last resort into a price inflating supply restraining storage place of first resort, and (b) repeated public complaints that gave Goldman and the LME full knowledge of the price inflating, supply restraining and other anticompetitive consequences of their agreement.

Also the opposite of *Twombly*, Plaintiffs allege (5) mutually shared rental revenues which were greatly inflated by the agreed upon restraint, (6) which also helped to inflate the $2.2 billion sales price of the LME from which Goldman reaped $208 million (the bonuses of the LME top executives from the sale have not yet been learned from discovery), and that (7) the realization of such joint revenues was accomplished through a succession of parallel, highly unusual steps by the Goldman and LME Defendants each which was more consistent with the alleged agreement then any legitimate individual conduct.

Further unlike *Twombly*, these steps allegedly included (8) the statements by the LME that it had corrected the problem by marginally increasing the minimum load-out rule in consideration for increases in the storage rental rate when, as market participants warned and the LME and Goldman mutually knew and intended, the changes were 25%-33 1/3% as much as those recommended by such Defendants' own paid consultant and, accordingly, were guaranteed to prolong the load-out delays, further inflate the amounts of the restrained supplies, and further inflate aluminum prices. (9) The LME and Goldman Defendants similarly engaged in the highly unusual parallel conduct of rejecting the advice and offered help of long-term warehouse companies that would have reduced the load-out delays, the aluminum price increases, and the growing public criticism (¶¶4-5). (10) The LME made a succession of temporizing statements at various times that conflict with one another, were designed to achieve the conspiracy's objectives of the moment and contra-indicate any consistent, principled, legitimate conduct explanation. (11) Both Defendants engaged in the parallel highly unusual abandonment of substantial portions of their anticompetitive conduct after the Congressional investigation began and when no changes in the market circumstances had occurred. *See* Statement of Facts *supra*.

Finally, also unlike in *Twombly*, (12) incentive payments were made and publicly defended by Goldman and the LME Defendants when the artificially low minimum load-out rule had created an output restriction. (13) But the LME more recently stated that such incentive payments to take advantage to a minimum load-out were "abusive". Pepperman Decl., Ex. 7 (LME Nov. 2013 Consultation) ¶37. This combination of restraints incentivized market participants with an interest in higher prices or restrained/stockpiled supplies to ship their aluminum to Detroit in order to further exacerbate the load-out delays, further increase the amounts of aluminum that were restrained, and further inflated aluminum prices.

30

Thereby, these market participants further inflated the Goldman and LME Defendants'

mutual supra-competitive revenues from providing these price inflating, supply restraining,

extremely inefficient load-out services.

Because the far lesser facts in *Twombly* got the plaintiff there "close" to alleging

plausibility, the far greater allegations here easily give rise to an inference of an unlawful

agreement, combination or conspiracy between the LME and Goldman.

## II.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED A COMBINATION, CONSPIRACY OR AGREEMENT AMONG THE LME AND GOLDMAN DEFENDANTS, IN VIOLATION OF SECTION 1

*Starr*, 592 F.3d at 323 ("plus factors" place the parallel conduct "in a context that raises a

suggestion of a preceding agreement, not merely parallel conduct that could just as well be

independent action"); *Ross v. American Exp. Co*., 04 Civ. 5723(WHP), 2014 WL 1396492

(S.D.N.Y. Apr. 10, 2014) (parallel conduct can be probative of illegal agreement).

### A.   Plaintiffs Have Plausibly Pleaded an Agreement Between Goldman and the LME to Restrict Maximum Load-Outs

Defendants argue as if Plaintiffs have pleaded only an agreement based upon the LME's

minimum load-out specification, asserting that such limited agreement would be "pro-

competitive" in that it "places no limits on the quantity of aluminum any warehouse loads out."

ECF No. 317 at 35.   Defendants mention the agreement to treat the *minimum* load-out

specification as the *maximum* load-out restraint only in connection with what they refer to as the

horizontal conspiracy section involving the different warehouse companies.  *Id*. at 17, 20, 22.

But Defendants have nothing to say about the four part agreement actually alleged.  *See* pp. 2-8

*supra.*

Defendants thus seek to avoid the actual agreements alleged. That agreement was to

inflate prices and restrain aluminum supplies, and was *per se* unlawful under Section 1. In *U.S. v.*

*Socony-Vacuum Oil Co.*, 310 U.S. 150, (1940) defendants, who were purchasing oil on the spot

market and "were in no position to control the market," nonetheless committed *per se* violations

of Section 1 by restricting supplies.

> [T]he fact that sales on the spot markets were still governed by some competition is of no
> consequence. For it is indisputable that competition was restricted through the removal
> by respondents of a part of the supply which but for the buying programs would have
> been a factor in determining the going prices on those markets.

*Id*. at 220-21.

Defendants have further avoided the many plausible indications of an LME-Goldman

agreement that go far beyond the express, written minimum load-out rule that is part of their

agreement.  These contextual factors include the facts that Goldman and the LME (a) rejected the

advice of their paid consultant, Europe Economics, to increase the load-out for Detroit to 6,000-

7,500 tons per day (¶¶44-45, 85, 194; http://www.lme.com/trading/warehousing-and-

brands/warehousing/warehousing-studies/ ); (b) turned down the advice, and offers of assistance,

from the traditional warehouse owners to reduce the waiting times, free up the unreasonably

large amounts of aluminum restrained in warehouses, and ameliorate customer complaints (¶5);

(c) knew about the customer complaints of price inflation (¶¶159-176); (d) offered shifting

rationalizations (¶63); (e) shared a common motive to concentrate aluminum in storage in Detroit

and thereby receive higher storage rental fees (¶¶22-24); (f) shared a common motive to gain

extraordinary revenues from the planned sale of the LME (¶¶26-27); and (g) caused historically

anomalous pricing.  *Compare* ¶¶16-21 *with Twombly,* 550 U.S. at 556, n.4 (parallel conduct to

cause historically anomalous pricing plausibly indicates an agreement).

Allegations that defendants conspired for mutually beneficial reasons would, if proven,

themselves be circumstantial evidence of a "conscious commitment to conspire." *Fricke-Parks*

*Press, Inc. v. Fang*, 149 F.Supp.2d 1175, 1184 (N.D.Cal. 2001).

### B.   Plaintiffs Have Plausibly Pleaded An Agreement Between Goldman And The LME For Goldman To Pay Incentives For Aluminum Storage In Detroit

Defendants similarly side-step Plaintiffs' allegations that the LME and Goldman further agreed that Goldman would pay cash incentives for storage of aluminum in LME Detroit Warehousing,  (¶¶35-40, 224-28), and agreed on very substantial increases in storage and load-out charges.  ¶¶52-54.  Defendants mischaracterize and avoid the allegations, arguing that such agreements were only "with unnamed Jane Doe defendants (presumably aluminum producers)." ECF No. 317 at 33.  This again denies and contradicts the Complaint, which plausibly alleges that the incentive payment agreements by the Goldman Defendants inflated the Midwest Premium in order to divert aluminum to Detroit, restrain more supplies there, increase delays in the load-outs, and increase rental revenues to the LME and Goldman Defendants.  The LME responded to public complaints about the incentive payment agreements by publicly defending the agreements and rejecting the complaints. ¶¶63, 78, 242.

Plaintiffs have alleged additional facts that, in context with the overall allegations of the Complaint, place the incentive payments in the context of a prior agreement between the LME and Goldman.  For example, as those Defendants apprehended lawsuits and Congressional investigation, the LME and Goldman made a number of parallel changes in their conduct, despite the fact that there had been no change in market conditions.  For example, Goldman abruptly suspended the practice of making incentive payments which had diverted large amounts of aluminum to its Detroit warehouses.  ¶80.  The LME proposed changes in the load-out rules to force warehouses with queues of at least 100 days (*i.e.,* Defendant Metro) to load-out at least 1,500 tons per day more than they loaded in. ¶79.  *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F.Supp. 703, 712 (S.D.N.Y. 1995) (changes in quotes for stocks after announcement of investigation raises inference of prior collusion on Nasdaq in quoting bid-ask spreads).

Defendants acknowledge that allegations of "a high level of interfirm communications" is among the circumstantial evidence and plus factors which support the inference of prior agreement.  ECF No. 317 at 23.  They argue, however, that Plaintiffs' allegations of Defendants' high level of interfirm communications, and the opportunity to have those communications through the LME Warehousing Committee, even together with the equity ownership of the LME by several Defendants, raise only the "mere opportunity to conspire" and  do not raise competition concerns.  *Id.* at 26-28.  But in light of the LME's and Goldman's avoidance of the Complaint's conspiracy allegations against them, and especially in the context of the aforementioned radical changes in the LME's and Goldman's market behavior and the historically anomalous aluminum prices, their concededly high degree of communications should factor into the *Twombly* analysis of plausibility of a prior agreement. *See In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 62-63 (2d Cir. 2012) (high degree of communication significant when there is no procompetitive justification for conduct).

Indeed, the scenario pleaded by Plaintiffs includes long term anticompetitive conduct that was knowingly causing record and historically anomalous prices, record restraints of supply and increasingly greater revenues for the LME and Goldman Defendants for the provision of increasingly poor services. In this scenario, any inference that interfirm communications between Goldman and the LME concerned **only** legitimate business would be implausible.

## III.   THE LME AND GOLDMAN DEFENDANTS SEEK TO AVOID THE BLATANTLY ANTI-COMPETITIVE EFFECT OF THEIR AGREEMENTS BY SETTING UP STRAW MAN ARGUMENTS

### A.   Contrary To Defendants, Plaintiffs Do Not Allege That the LME And Goldman Defendants Were In Some Vertical Relationship, But Do Allege That They Entered Into A *Per Se* Illegal Price-Fixing Agreement

The LME and Goldman Defendants further contradict the Complaint in arguing as follows.  What Defendants erroneously call the "minimum load-out agreement," erroneously

34

described as only between the LME and the warehouse defendants, and the agreement to pay incentives, erroneously described as made only "with unnamed Jane Doe defendants," supposedly constitute and allege only a "hub and spoke conspiracy" and "two vertical agreements."  ECF No. 317 at 32-33.

Plaintiffs have **not** alleged that the LME and Goldman are in a distribution relationship, or that the aluminum restrained by the LME and Goldman and the prices of which Goldman inflated, was passed from the LME to Goldman in a vertical chain of distribution.  The LME did not take possession of aluminum and transfer it to Goldman.  Nor did Goldman take possession of aluminum and transfer it to the LME.  The Court has no reason to take up Defendants' arguments.  As set forth below, Plaintiffs' allegations satisfy even the inapplicable standards that Defendants seek to superimpose.

The *per se* rule applies to the agreements alleged by Plaintiffs, both because they are horizontal, *e.g.*, ***National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma,*** 468 U.S. 85,  101 n. 21 (1984) ("the likelihood that horizontal price and output restrictions are anticompetitive is generally sufficient to justify application of the per se rule without inquiry into the special characteristics of a particular industry"), and because the known anticompetitive effects of the agreements was to inflate prices, restrain output, and charge increasingly higher storage rates for increasingly inefficient services.  *E.g., **Concord Assoc., L.P. v. Entertainment Properties Trust***, 12 Civ. 1667, 2014 WL 1396524 at *10 (S.D.N.Y. Apr. 9, 2014), citing ***Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc***., 996 F.2d 537, 542 (2d Cir. 1993) (*per se* analysis applies to "horizontal and vertical price-fixing").

Agreements to restrict available output displace competition and thus tend to force up prices. This constriction of supply is the essence of "price-fixing," whether accomplished by

agreeing upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered. For this reason, output restrictions have long been treated as *per se* violations.  *See **Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n**,* 493 U.S. 411, 432-33 (1990) (bar association's agreement to restrict provision of court-appointed legal services was price-fixing and *per se* illegal).  *See also, e.g., **United States v. Trenton Potteries Co**.,* 273 U.S. 392, 394 (1927) (combination to fix prices by limiting sales to special jobbers and restricting availability of product).  Where a Milk Dealers Bottle Exchange allegedly joined a price-fixing agreement among distributors and others by delaying and refusing to return milk bottles and containers to independent distributors which had refused to abide by a trade association's production restrictions, it was error to dismiss an indictment charging Section 1 violations.  ***United States v. Borden Co***., 308 U.S. 188 (1930), *reversing in part,* 28 F.Supp. 177 (N.D.Ill.).

Plaintiffs have not pleaded a vertical market relationship between the LME and Goldman Defendants.  Instead, Plaintiffs have pleaded that the entire aluminum producing and consuming commerce uses LME prices and the Midwest premium as the benchmark for aluminum prices, and the conduct and agreements of the LME and Goldman Defendants directly affect those prices.  Regarding  warehousing, the aluminum proceeds directly from the market participant to the warehouse, which operates pursuant to an agreement with the exchange.  Thus, the LME and Goldman occupy the same position in between aluminum producers and consumers, or other aluminum transactions, rather than a "vertical" relationship.  Because the LME is entitled to receive 1.1% of the rental revenues from Goldman and the other LME warehouses, and Goldman and other warehouses owned large equity in the LME, the LME functions at the same level of

movement of the product as the warehouses.  This is true for purposes of both sales and purchases.

Further, in decisions involving vertical distribution agreements, such as ***Leegin Creative Leather Products, Inc. v. PSKS, Inc.***, 551 U.S. 877, 885-86 (2007), the justification for not making an agreed-upon fixing of prices *per se* illegal is that a firm may want to recognize consumer preference for improving the quality of services, and thus enhance interbrand competition, in exchange for a higher price.  *Id*. at 890-91.  Plaintiffs expressly allege here that Goldman and the LME agreed to provide increasingly poor services in order to gain increasingly higher revenues and, in the bargain, raise their storage rates to more than three times the competitive rate using the false justification that they were supposedly going to reduce the restraints of supply and, accordingly, needed to raise the storage rates to compensate for such supposed reduction.  ¶¶1-5, 30, 69, 93.  With full knowledge and notice from repeated public complaints that the performance of this agreement was inflating Midwest premium prices and restraining aluminum supplies, both defendants persisted in enforcing their agreement knowing full well that the increases in the restraints of aluminum that profited such defendants from providing increasingly poor service, would cause further increases of prices and further restraints of supplies.

Unlike the vertical agreement considered in ***Leegin***, no purpose of the antitrust laws is furthered by the agreements here. At the pleading stage, Plaintiffs have alleged sufficient indicia of a horizontal relationship and sufficient indicia of knowing supply-restraining and price-increasing consequences, through increasingly inefficient services for increasingly supra-competitive revenues, that the alleged agreement may be treated as alleging a manifestly anti-

competitive *per se* agreement.[10]  But if the agreement is subject to review under the rule of

reason at the pleading stage, then there are no redeeming purposes of the alleged agreement

among the Goldman and LME Defendants, it nonetheless violates Section 1.

### 1. Defendants Fail To Demonstrate That The LME's Involvement In The Conspiracy Renders *Per Se* Analysis Inappropriate

It is well-settled that an exchange may be liable under the antitrust laws if it conspired

with outsiders, or if it attempted to use its power to monopolize. *United States v. Borden Co.*, 28

F.Supp. 177 (N.D.Ill.), *reversed in part on other grounds,* 308 U.S. 188 (1930) (sustaining

indictment charging conspiracy to fix prices and restrain milk supplies; Milk Dealers Bottle

Exchange allegedly restrained supply by delaying and refusing to return milk bottles and

containers to independent distributors which had refused to sell through Pure Milk Association's

limitations on milk production); *Seligson v. New York Produce Exchange*, 378 F.Supp. 1076,

1104 (S.D.N.Y. 1974) (sustaining under Section 1 allegations of Exchange's bad faith exercise

of emergency powers to close trading in violation of duty to maintain orderly market, allowing

prices to drop for several days before acting).

In *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), the Court declined to imply

antitrust immunity for actions by the New York Stock Exchange ("NYSE") in ordering members

(without notice or hearing) to remove private telephone connections to offices of non-members,

in what was essentially a group boycott.  The Court began its analysis by stating that "[i]t is plain

. . . that removal of the wires by collective action of the Exchange and its members would, had it

occurred in a context free from other federal regulation, constitute a *per se* violation of § 1 of the

---

[10] *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958) ("there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.")

Sherman Act." 373 U.S. at 347. The "other federal regulation" in *Silver* was the Securities Exchange Act.

> Our decision today recognizes that the action here taken by the Exchange would clearly be in violation of the Sherman Act unless justified by reference to the purposes of the Securities Exchange Act, and holds that that statute affords no justification for anti-competitive collective action taken without according fair procedures. Congress in effecting a scheme of self-regulation designed to insure fair dealing cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner.

*Id.* at 364 (footnotes omitted). The Court determined that the Securities and Exchange Commission ("SEC") had no authority to review specific instances of Exchange rules, which "obviate(d) any need to consider whether petitioners were required to resort to the Commission for relief before coming into court," *id.* at 358, and it further determined "the Exchange has plainly exceeded the scope of its authority under the Securities Exchange Act to engage in self-regulation and therefore has not even reached that threshold of justification under that statute for what would otherwise be an antitrust violation." *Id.* at 364.

*Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289 (1973) involved an antitrust challenge to the Chicago Mercantile Exchange ("CME") and others by an individual whose membership was transferred to another, allegedly in violation of CME rules and pursuant to a Section 1 conspiracy. The Court found that, unlike the SEC in *Silver*, the Commodity Exchange Commission ("Commission") had "administrative authority" to examine the dispute in light of the regulatory scheme and Exchange rules. While the Court made no determination as to antitrust immunity, it concluded that the antitrust action should be stayed until the Commission had an opportunity to act, noting:

> (1) that it will be essential for the antitrust court to determine whether the Commodity

39

Exchange Act or any of its provisions are incompatible with the maintenance of an antitrust action; (2) that some facets of the dispute between Ricci and the Exchange are within the statutory jurisdiction of the Commodity Exchange Commission; and (3) that adjudication of that dispute by the Commission promises to be of material aid in resolving the immunity question.

*Id*. at 580 (citations, internal quotes and footnote omitted).

As in *Silver*, and unlike in *Ricci*, the LME is not subject to "other federal regulation" which could immunize it from, or stay this Court's application of, scrutiny under the Sherman Act.  Indeed, the record on these motions demonstrates that even with regard to the United Kingdom, the FCA has publicly disclaimed any responsibility for regulating the LME.  ECF No. 367 at 10, citing Sweeney Decl. (ECF No. 368) Ex. 16 ("[t]he LME's warehousing arrangements are not directly regulated by the FCA"); *id*. Ex. 17 ("the operation of warehouses licensed by RIEs is not a regulated activity").  In his testimony to Senate Committee on Banking Financial Institutions and Consumer protection, Tim Weiner, Global Risk Manager of MillerCoors, stated that:

> There is no clear 'regulator' or oversight of the London Metal Exchange warehouses, the LME itself is a self-regulated entity. In addition to direct talks with the LME, both formal and informal, we have urged regulators in the United States, the United Kingdom and the European Union to give thoughtful consideration to the effect of LME business practices on the industries that rely on a supply of aluminum priced by reasonable market conditions. Specifically, we have asked the UK Financial Services Authority (recently reorganized as the Financial Control Authority) and the CFTC to regulate the LME system as it pertains to the commodity metals market. Both agencies have indicated they are uncertain whether they have the regulatory authority necessary.

*Examining Financial Holding Companies: Should Banks Control Power Plants, Warehouses and Oil Refineries:* hearing before the Senate Committee on Banking Financial Institutions and Consumer Protections 113th Cong. (July 12, 2013) (statement of Tim Weiner); *see* ¶251. In sum,

there is no regulatory safe harbor for the LME's blatantly anti-competitive conduct, either in its conspiracy with its members and others, or in the abuse of its monopoly power.

Relying on *Silver* and on *Jacobi v. Bache & Co., Inc.*, 520 F.2d 1231 (2d Cir. 1975), the Goldman Defendants (but not the LME Defendants) argue that the *per se* rule should not be applied "in the context of self-regulatory organizations such as securities exchanges."  ECF No. 317 at 36-37.[11]  Considering a challenge to NYSE rules prohibiting the automatic pass-through of certain service charges to registered representatives as part of their compensation, the Second Circuit in *Jacobi* read *Silver* "to mean that within the area of supervised self-regulation contemplated by the Securities Exchange Act, *per se* concepts are generally displaced" because the policies underlying the *per se* rule do not have "great force in relation to rules of securities exchanges which are 'germane' to performance of the duty of self-regulation." 520 F.2d at 1238-39, citing *Silver*, 373 U.S. at 356.  The Goldman Defendants' argument is thus completely reliant on the premise of "supervised self-regulation" of the LME's alleged conduct.  But the Goldman Defendants do not, and cannot, contend that the LME is either regulated by the SEC or subject to "other federal regulation."

This case is inapposite to *Jacobi* and *a fortiori* to *Silver*, neither of which involved naked horizontal price-fixing, market allocation and output restrictions.  Those cases provide no support to the Goldman Defendants' argument for the additional reason that the LME is a self-regulated entity not subject to oversight by the SEC or "other federal regulation." [12]

---

[11]  The LME Defendants "join [only] in that aspect of the Joint Defendants' Brief that establishes that the pleading deficiencies of plaintiffs' claims on the merits require dismissal of the state law antitrust claims as well.  Doc. No. 317 at 53 & Appendix 1."  ECF No. 334 at 20 n. 45.

[12]  Nor does this case involve cooperative activities (group boycotts) of sports organizations, as do the other cases on which the Goldman Defendants rely. *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781 (7th Cir. 1981); *Gunter Harz Sports, Inc. v. United States Tennis Ass'n*, 511 F.Supp. 1103 (D.Neb. 1981); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577

## 2. Contrary To Defendants, Plaintiffs Do Not Allege A "Hub and Spoke" Conspiracy

Plaintiffs have alleged a supply-restraining, price-inflating and revenue-inflating, quality-of-service reducing scheme among horizontally-situated firms at the same level of the chain of distribution: the Goldman Defendants, and the other Defendants, which load-in and load-out LME-certified aluminum, and the LME, which was not a distributor contracting with its separate and independent retailers, but rather a rule-setting organization that both was owned by Goldman and split revenues with Goldman, and created and maintained the warehousing terms that determined Goldman's conduct.  Plaintiffs' complaint, "when read in its entirety, does not merely accuse the defendants of operating through a hub-and-spoke conspiracy."  *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 691 (S.D.N.Y. 2012) (denying motions to dismiss: "This Complaint is not, therefore, properly judged solely through the lens of precedent addressing hub-and-spoke conspiracies.").

The LME proceeds from flawed premises in arguing that Plaintiffs have not alleged a conspiracy between the LME and any of the other Defendants.  ECF No. 334 at 8-15.  The LME's argument relies entirely on the fiction that "[s]ince the LME is not a competitor of the other Defendants, Plaintiffs must allege the legal requirements of a hub-and-spokes conspiracy to state a claim for a horizontal conspiracy involving the LME."  *Id*. at 8. This notion is untenable for at least the following reasons.

The LME's theory rests on its factually incorrect claim that "because the LME is vertically aligned to both of the other groups of defendants, plaintiffs are attempting to allege a type of conspiracy that is actually called a "hub and spokes" or "rimmed wheel" conspiracy."  *Id.*

---

F.Supp. 356, 380 (D.Ariz. 1983) (noting, however, that sports organizations "have been subjected to treatment under the *per se* rule when the purpose of a regulation is to eliminate business competition") (collecting cases).

at 9.  Contrary to the LME's prescription, Plaintiffs have not, and are not required to have, alleged such a conspiracy, and the Court should not apply that analogy to the facts of this case. "Conspiracies are as complex as the versatility of human nature," and are "not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical, molecular, or atomic forms."  *U.S. v. Perez*, 489 F.2d 51, 59 n.11 (5th Cir. 1973) (affirming conspiracy conviction), *cert. denied*, 417 U.S. 945 (1974); *see also U.S. v. Taylor*, 562 F.2d 1345, 1351 n.2 (2d Cir. 1977) (quoting *Perez*, affirming conspiracy conviction), *cert. denied*, 432 U.S. 909 (1977).

Defendants' authorities are inapposite.  In *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 103 (2d Cir. 2002), PepsiCo filed an action against its competitor, Coca-Cola, challenging Coca-Cola's enforcement of vertical loyalty provisions with its own distributors.  In affirming the district court's grant of summary judgment against PepsiCo's Section 1 claims, the Second Circuit found that there was "no evidence of direct communication among the [distributors]"; instead, there was only evidence that Coca-Cola assured its distributors that its loyalty provisions would be uniformly enforced and asked them to report violations.  *Id.* at 110.  Here, Plaintiffs challenge agreements among the Warehouse Defendants to fix aluminum prices.  While the exclusive distributorships at issue in *Pepsico* were "presumptively legal," *id.* 110, the price-fixing at issue here is the "supreme evil of antitrust: collusion."  *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) is irrelevant to this case. *Dickson* concerned agreements between a software manufacturer (Microsoft) and original equipment manufacturers ("OEMs") who used Microsoft's software.  The plaintiff only sought to hold Microsoft liable on a "rimless wheel" theory of hub-and-spoke liability, and did not argue

43

that the interactions among the OEMs were sufficient to demonstrate any unlawful understanding among them. *Id.* at 204 n.12. Here, Plaintiffs pursue a conspiracy to restrain output and fix prices in which the LME and Goldman Defendants colluded with each other and with the Warehouse Defendants.

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) only explains why Defendants' motions should be denied. There the Third Circuit reversed the district court's dismissal of a Section 1 claim regarding alleged bid rigging, explaining that the fact that an entity "vertically oriented to the insurers, appears to be a sine qua non of the alleged horizontal agreement is not necessarily an obstacle to plaintiffs' claim." *Id.* at 337. Defendants "cannot escape the per se rule [for certain horizontal restraints of trade] simply because their conspiracy depended upon the participation of a 'middle-man', even if that middleman conceptualized the conspiracy, orchestrated it . . . and collected most of the booty." *Id.* (edits in original, internal quotation omitted). The court nonetheless affirmed dismissal of the conspiracy claims because, unlike the allegations here, plaintiffs failed to raise additional plus factors suggesting that an inference of conspiracy from parallel conduct was plausible. *Id.* at 323 & n.22.

The "hub and spoke" argument is another straw man which contradicts and denies the Complaint, and does not support Defendant' motions to dismiss.

### 3.    The LME's "Control" Arguments Are Another Straw Man and Are Otherwise Unavailing

The LME raises another straw man in asserting that "the complaints do not plausibly allege that the other defendants controlled the LME;" "plaintiffs ***appear to allege*** that the LME is not a separate entity capable of independently conspiring with the other defendants, but that the other defendants 'controlled the LME' and caused it to adopt inadequate minimum load-out rules and otherwise to 'shape LME policy and practices.'" ECF No. 334 at 13-15 (quoting ¶¶ 355-70

(emphasis supplied)).  These assertions contradict and deny the Complaint, serving only to present an argument which the LME Defendants then attempt to dispute.

Plaintiffs have alleged that, although they are separate entities, the LME and Goldman Defendants, together with other Warehouse Defendants, formed a combination to restrain trade and restrict output, including to influence the LME Warehousing Committee and sway rulemaking in favor of their respective and collective interests.[13]  For example, Plaintiffs have plausibly alleged that: (i) "[f]or most of the Class Period, the largest shareholders of the Defendant LME Holdings Limited were the Goldman Defendants, and other financial firms which owned LME approved warehouses" (¶ 68(b)); (ii) Warehouse Defendants collectively owned approximately 20% of LME Holdings' stock and approximately 86% of *all* LME-approved warehouses in the U.S. (¶¶ 69-70); (iii) "Glencore, the world's largest metal trader, owned 27 of the 29 LME-registered warehouses in Vlissingen" (¶ 368); (iv) "LME warehousing regulations are drafted by the LME's Warehousing Committee . . . . Defendants, through their respective subsidiaries, each have at least one representative on the Warehousing Committee (¶ 360); (iv) Goldman's wholly owned subsidiary, Metro International, "has a seat on the LME's Warehousing Committee" (¶122); (v) Defendant JPMorgan, through its subsidiary Henry Bath & Son Ltd., also has a seat on the LME's Warehousing Committee" (¶138); (vi) "[t]hrough their ownership of – and rulemaking role in – Defendant LME, the Warehouse Defendants have been able to control he supply of aluminum, which in turn dictates the price of aluminum. By controlling the LME, Defendants collectively control the warehouse rules of the LME, including the minimum load-out rules, the maximum rental rate for aluminum storage, and who can own aluminum warehouses" (¶ 362); (vii) "[t]he minimum load-out requirement was supported by

---

[13]   Tellingly, the LME focuses on the Defendants' net ownership of LME Holdings (20%) instead of their influence over the Warehouse Committee.

Goldman Sachs, JPMorgan, and Glencore in their roles as owners of the LME and members of the LME Warehousing Committee (¶ 364), and; (viii) "Defendants' ownership and control of the LME and LME warehouses, coupled with their role in the commodities market as aluminum owners (on their own behalf and on behalf of their clients) and aluminum futures traders, allowed them to influence the price of aluminum derivatives and reap additional profits" (¶371).

The cases the LME relies upon to refute their straw man argument are inapposite to Plaintiffs' allegations.  *U.S. v. Sealy, Inc.*, 388 U.S. 350, 352-54 (1967) (illicit territorial agreements involved licensee and licensor defendants which owned substantially all of licensor's stock and held five of the six board seats, but mandated no threshold ownership level for finding of horizontal agreement); *U.S. v. Topco Assoc., Inc.*, 405 U.S. 596 (1972) (buying cooperative was found to have conspired with its members to fix prices; members owned all of the cooperative's stock and had "complete and unfettered control over the operations;" no threshold ownership level  of the cooperative discussed); *Vedder Software Group Ltd. v. Insurance Services Office, Inc.*, 545 Fed.App'x 30, 32-33 (2d Cir. 2013) (upholding the dismissal of a Sherman Act § 1 claim where the plaintiff relied solely on parallel conduct without sufficient plus factors); *Sky Angel U.S., LLC v Natl. Cable Satellite Corp.*, 947 F Supp. 2d 88, 102 (D.D.C. 2013) (declining to find a combination where plaintiff identified only a single agent allegedly acting on behalf of defendant rested solely on allegations that alleged conspirators had representatives on defendant's board of directors).

Plaintiffs have plausibly alleged that the LME Defendants are separate entities which expressly agreed and combined with the Goldman Defendants and the Warehouse Defendants to, *inter alia*, restrict the supply of aluminum, increase queue times and delay delivery, charge supra-competitive storage rates, and establish bogus minimum load-out requirements which, in

practice, served as a ceiling instead of a floor.[14]   The LME Defendants' "control" arguments are unavailing.

### B.   Even Were Defendants' Conduct Appropriately Evaluated Under the Rule of Reason, Which It Is Not, Plaintiffs Have Adequately Alleged Anticompetitive Impact on a Relevant Market

To any extent that the agreement between the LME and Goldman Defendants that directly inflated the prices that Plaintiffs paid by expressly restraining the output of aluminum from LME Detroit Warehousing is somehow not a *per se* violation at the pleading stage, Plaintiffs have fully satisfied the standards for pleading an agreement to restrain trade in an unreasonable manner in violation of Section 1 of the Sherman Act.

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant [ ] market." ***Todd v. Exxon Corp***., 275 F.3d 191, 199-200 (2d Cir. 2001) (collecting cases). At the motion to dismiss stage, a plaintiff must plead a market that is "plausible" and "rational." *Id*. at 201 (citations omitted).  Defendants erroneously assert that Plaintiffs have not alleged a relevant market.  ECF No. 317 at 34. Plaintiffs have disclaimed any requirement to allege a relevant market here (¶302), but have alleged a relevant market (¶¶303-08), including a relevant market as to the LME and the Goldman Defendants:

---

[14]   *See, e.g.,* ¶¶ 29-34 (explaining the agreement by and between Goldman and the LME and the rationale therefor); ¶¶ 41-49 (describing the joint decision by and between Goldman and the LME to ignore the recommendations of their mutually retained consultant to increase the load-out requirements); ¶¶ 50-54 (detailing the agreement between Goldman and the LME to increase storage rates and load-out charges); ¶¶ 66-89 (providing at least fourteen (14) indicia and rationale evidencing the conspiratorial agreements between the Warehouse Defendants and the LME); ¶¶ 156-202 (explaining in great detail the relationship between the LME, Goldman and other Warehouse Defendants, including anti-competitive agreements between these entities and the industry's reaction to such collusion); ¶¶ 239-275 (highlighting statements and partial admissions made by the LME which further support an inference of collusion between the Defendants); ¶ 299 (describing the agreement between the Goldman and LME Defendants).

307.    **Relevant Market For the LME Defendants and the Goldman Defendants**. … The market for warehousing LME aluminum in the Detroit Michigan area or, in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area or, in the alternative, for warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the Midwest Premium or the Platts MW premium.

¶307.

Under the rule of reason approach, a restraint of trade is illegal only if it is unreasonable. The test of legality of such a restraint "is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918). On a motion to dismiss, however, the Court need not conduct a market analysis until it determines whether the *per se* or rule of reason analysis applies, *In re High-Tech Employee Antitrust Litig.*, 856 F.Supp.2d 1103, 1122 (N.D.Cal. 2012), citing *Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 462 (1986); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978), and such determination is more appropriately made at  the summary judgment stage than on motion to dismiss.  856 F.Supp.2d at 1122.

Defendants assert further that "Plaintiffs do not even try to state a claim under the rule of reason."  ECF No. 317 at 39.  This is also incorrect.  Here, Plaintiffs have satisfied easily each and every element of what may ultimately prove to be relevant proof of the LME and Goldman Defendants' collusive conduct to cause substantial competitive harm, by alleging that, through their market power, the LME and Goldman Defendants were able to agree to provide increasingly inefficient services in order to charge increasingly higher amounts of rent for increasingly longer amounts of time for increasingly greater amounts of metal that was under

48

their control/power in the LME Detroit Warehousing.  More particularly, Plaintiffs satisfy each of the elements as follows.

1.       Effect of the restraint on prices, output, product quality and service.   Plaintiffs have plausibly alleged that that the agreement to restrain maximum load-outs and to increase storage rental rates directly caused the Midwest premium to rise, and reduced output and degraded service by trapping aluminum in LME Detroit warehousing for more than 500 (now 683) days.  ¶¶248, 283; *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 546-47 (2d Cir. 1993)(reduction in output and quality, raising prices).

2.       The purposes and nature of the restraint.   Plaintiffs have plausibly alleged that that the restraints on load-outs were intended to remove aluminum supply from the market, directly inflating the Midwest premium, and to increase storage rental revenues and the value to be recovered from the planned sale of the LME. ¶¶5, 50-54, 69; *N. Am. Soccer League v. Nat'l Football League,* 670 F.2d 1249, 1259 (2d Cir. 1982) (nature of restraint and its effect, actual or probable).

3.       The nature and structure of the relevant market, both before and after the restraint was imposed.   Plaintiffs have plausibly alleged that that the agreement to restrain maximum load-outs and to increase storage rental rates directly caused substantially longer queues and load-out times at LME Detroit Warehousing that had ever previously been experienced, as well as historically anomalous pricing.  ¶¶16-21; *N. Am. Soccer League,* 670 F.2d at 1259 (conditions before and after restraint).

4.       The number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed.   Plaintiffs have plausibly alleged

that that the agreement between the LME and Goldman Defendants to restrain maximum load-outs and to increase storage rental rates and reduced competition in the market for aluminum warehousing in Detroit as Goldman's share of aluminum warehouses in Detroit grew to more than 80% tying up 75% of all LME aluminum stored in the United States.  ¶¶57, 311.  Although the concentration of aluminum in warehouses owned by the Goldman Defendants raised revenues for Goldman and the LME Defendants, it substantially harmed competition by debasing warehousing services and creating waiting periods of 500 days to load-out aluminum from LME Detroit Warehousing.  ¶248; *N. Am. Soccer League*, 670 F.2d at 1259 (conditions before and after restraint).

    5.    <u>Whether the defendant possesses "market power."</u>  Although proof of market power is not required in Section 1 claims alleging reduced output, *see **Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.**,* 386 F.3d 485, 509 (2d Cir. 2004), Plaintiffs have plausibly alleged that that the agreement to restrain maximum load-outs and to increase storage rental rates has enabled the LME and Goldman Defendants to raise prices above those which would prevail in a competitive market.  ¶¶11-14, 263; ***Capital Imaging Assocs**.,* 996 F.2d at 546-47 (market power, reduction in output, raising prices).

    Plaintiffs have alleged *per se* violations of Section 1, and pleaded numerous facts demonstrating that the amount of agreed-upon minimum/maximum load-outs was an unreasonable restraint of trade, and effects of such agreements between the LME and Goldman were to unreasonably restrain trade.  This adequately pleads Section 1 violations under either *per se* or rule of reason analysis.

## IV.    CONTRARY TO DEFENDANTS, PLAINTIFFS HAVE PLAUSIBLY PLEADED CLAIMS UNDER SECTION 2

To state a claim for monopolization under section 2 of the Sherman Act, Plaintiffs must allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).  Plaintiffs have alleged both of these elements.  In addition, Plaintiffs must plead "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004).  Plaintiffs also have satisfied this requirement.[15]

The details of Defendants' conduct may prove to be complicated, but the overarching scheme alleged by Plaintiffs is conceptually straightforward.  The gravamen of Plaintiffs' complaint is that Goldman used its dominant position in the warehousing market to create an 18-month bottleneck in the delivery of physical aluminum, with the anticompetitive effects of inflating the revenues of Goldman and the LME, restraining aluminum, and inflating the Midwest Premium and aluminum prices.  Plaintiffs also allege that the LME conspired with Goldman to solidify Goldman's monopoly power and further inflate the Midwest Premium. The higher prices for aluminum paid by Plaintiffs are precisely the type of injury contemplated and condemned by the Sherman Act.  *See, e.g., McCready*, 457 U.S. at 482 ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury" actionable under the antitrust laws).

---

[15] Plaintiffs also have alleged a viable claim for attempted monopolization, which "must include factual allegations that: (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power in the relevant market." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 398 (E.D.N.Y. 2008) (internal quotation marks and citation omitted).

Plaintiffs' complaint is replete with factual allegations detailing the lengths to which Goldman went to amass stores of physical aluminum in its warehouses while simultaneously employing numerous stratagems to forestall the release of that aluminum into the market. Moreover, Goldman's power to manipulate prices through these actions is not speculative; the most sophisticated market participants—including the largest aluminum purchasers, the largest aluminum producers and aluminum industry analysts—agree that the excessive delays required to withdraw stockpiled aluminum from Goldman's warehouses have inflated the Midwest Premium.

Defendants nonetheless assert that Plaintiffs have alleged "*no* facts," ECF No, 317 at 40, and that the monopolization claims must be dismissed because Plaintiffs have failed to allege: (1) a relevant market; (2) improperly acquired or maintained monopoly power; and (3) anticompetitive conduct. *Id.* at 40-41. Defendants' arguments, which again misconstrue and ignore the central allegations of Plaintiffs' complaint, are unavailing.

## A.    Plaintiffs Have Alleged Monopoly Power and a Relevant Market

"The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'" *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d 101, 107 (2s Cir. 2002) (quoting 2A Phillip E. Areeda, et al., Areeda & Hovenkamp's Antitrust Law (2002), ¶501, at 85). This is precisely what Plaintiffs allege: (A) that Goldman used its Detroit warehouses to constrain the supply of physical aluminum the supra competitive profits to divert further aluminum into Detroit, all of which directly inflated aluminum prices, *See, e.g.,* ¶308 ("Goldman has restrained and pulled out of those markets significant supplies of aluminum which Defendants have restrained in LME Detroit Warehousing."); (B) that Goldman constrained load-outs from its warehouses to inflate delays in load-outs and therefore the storage charges; and (C) that LME and Goldman repeatedly raised storage charges.

"There are two ways a plaintiff can show the possession of monopoly power: (1) through direct evidence of anticompetitive effects or (2) by defining a relevant market and showing defendants' excess market share."  *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012) (citing *PepsiCo*, 315 F.3d at 107).  Plaintiffs have alleged both.

### 1.    Direct Evidence of Monopoly Power and Anticompetitive Effects

"Monopoly power is the power to control prices or exclude competition."  *U. S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Plaintiffs have alleged direct evidence of Goldman's power to set the load-out rate, which directly restrained supply and inflated the Midwest Premium, and aluminum prices.  *Crude Oil*, 913 F.Supp.2d at 52 (accepting allegations that market power to create anomalous prices is sufficient to allege the direct ability to control prices). And Defendants do not (and could not plausibly) argue that inflated prices for physical aluminum have any pro-competitive effect.  As pleaded by Plaintiffs, numerous market participants and observers—including Defendants themselves—recognized that by amassing huge stores of aluminum in its warehouses and restricting the release of that aluminum into the market Goldman caused the Midwest Premium to rise.

For example, the LME itself stated that the long queues at Goldman warehouses played a "fundamental role" in causing the Midwest Premium to increase.  ¶¶79, 263.  Similarly, a market analyst in 2011 stated that "without a doubt" the bottleneck at Goldman warehouses was causing record high Midwest Premiums. ¶187.  Novelis, the world's largest aluminum can manufacturer, noted in 2011 that the backlog to withdraw aluminum from "Detroit warehouses" was inflating prices by an estimated $20 to $40 per ton.  ¶¶184-186.  Similarly, Coca-Cola complained in 2011 that Goldman's warehousing activities had artificially inflated the price of physical aluminum. ¶¶189-90.  General Motors, Anheuser-Busch, MillerCoors and PepsiCo also have complained that long queues in Detroit are disrupting the market and increasing costs.  ¶247.  Alcoa and

Rusal, two of the world's largest aluminum producers, acknowledged in 2012 that physical aluminum tied up in warehouses and unavailable to the marketplace was driving up prices. ¶¶230-31; 266.  One analyst voiced widespread industry sentiment in lamenting the "anti-competitive situation" in Detroit that "makes a mockery of the market."  ¶183.  The mainstream and financial press have long chronicled the industry consensus that Goldman's warehousing activities in Detroit have driven up the price of physical aluminum in the Midwest, (*see, e.g.,* ¶¶55, 174, 211, 367, 383, 394), which in turn has prompted Congressional hearings (*see, e.g.,* ¶¶249, 254) and a CFTC investigation. ¶¶270-71.  All of these allegations evidence Goldman's monopoly power to cause anticompetitive effects.  *Crude Oil*, 913 F. Supp. 2d at 51.

In addition to these statements—which speak directly to Goldman's power to inflate the Midwest Premium—Plaintiffs have pointed to expert economic analysis demonstrating that after Goldman acquired its warehousing operations (but not before), 75.6% of the movement in the Midwest Premium can be explained by the long queues in Detroit. ¶385.  In other words, the most significant determinant of price changes in the Midwest Premium during the relevant time frame is the queues at Goldman warehouses.  The LME, after a 3 month investigation, reached the same conclusion.  ¶¶263 (recognizing the "fundamental role of the queues in increasing premiums").  This, too, is evidence of Goldman's monopoly power, *i.e.*, its ability to control price.

These are not "bare and conclusory allegations" of monopoly power.  *See Crude Oil*, 913 F. Supp. 2d at 52 ("Ascertaining the existence of market power is 'fact intense' and courts 'reserve dismissal on this issue for pleadings containing only bare and conclusory allegations.'") (quoting *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 245 (S.D.N.Y. 2012)).  Plaintiffs' allegations—observations by sophisticated market

participants; admissions by the LME; and economic evidence—taken as true (as they must be on Defendants' motion to dismiss) constitute powerful and direct indicia of anticompetitive effect and price control.

Notably, Defendants do not respond to any of Plaintiffs' allegations concerning Goldman's power to manipulate the Midwest Premium and aluminum prices.  Indeed, Defendants completely ignore the central complaint in this case, namely, that Goldman intentionally inflated the price of *physical aluminum*.  Instead, Defendants seek to divert the Court's attention from Plaintiffs' injury altogether.  They point the Court to the warehousing market, but pretend that it exists wholly untethered from the physical market.  Defendants argue, for example, that the relevant "question is whether Metro can control the supply of available warehouse space" and criticize Plaintiffs for failing to allege that "Metro can control the output of aluminum from smelters around the world."  ECF No. 317 at 46.  This completely misses the point, and again highlights the ways in which Defendants have avoided Plaintiffs' allegations.

Plaintiffs do not allege that there are shortages of warehousing or of global aluminum supply.  Indeed, there is an abundant supply of physical aluminum. ¶9.  That should mean a decreasing Midwest premium. ¶¶17-20.  But the Midwest premium has been anomalously increasing to repeatedly all-time record higher levels exactly when it should be decreasing. ¶¶16-21 (discussing anomalous aluminum supply and pricing patterns).  Plaintiffs have plausibly alleged—consistent with widespread industry sentiment—that the high prices and long delays are a direct result of a bottleneck intentionally created by Goldman in the warehousing market. This is a cognizable and sufficiently pleaded claim under §2 of the Sherman Act.  *Crude Oil*, 913 F. Supp. 2d at 57 ("Plaintiffs' alleged injury—losses from transacting in a market tainted by price manipulation—is 'of the type antitrust laws were intended to prevent.'") (quoting *Spectrum*

*Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)); 913 F.Supp.2d at 52 (finding that allegations of "complex scheme" in conjunction with power to control price were "neither bare nor conclusory").

### 2.    Relevant Market

Any commodity exchange has monopoly power to set rates for storage rental and load-outs.  The LME has become the worldwide price benchmark for 97-99% of exchange-traded forward and futures contacts in aluminum.  ¶¶11-13, 145, 155, 306(a).  The LME has also had the power to approve the warehouses holding 95-100% of the aluminum for such trading.  ¶306(a).  The LME's exercise of its monopoly power as alleged herein had much more far-reaching consequences for the market for physical aluminum in LME warehouses.  When the LME agreed with Goldman to the changes alleged (*see* pp. 3-8, *supra*), all in order to increase its income and sale value, the LME used that monopoly power to directly cause higher aluminum prices to consumers, including Plaintiffs.  ¶¶33-34, 58-59.

These allegations concerning the direct effect of Defendants' actions on the Midwest Premium and aluminum prices, standing alone, are sufficient to overcome Defendants' arguments relating to supposed infirmities with Plaintiffs' definition of a relevant market.  *See, e.g., E.I. du Pont de Nemours*, 351 U.S. at 393 ("Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under [section 2].").[16]  Nevertheless, Plaintiffs have alleged a relevant market that is sufficient to survive a Rule

---

[16] *See also FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 790 n.19 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market."); *Crude Oil*, 913 F. Supp.2d at 53

12(b)(6) challenge. "To survive dismissal, the relevant product market definition need only 'bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes" and be "plausible." *Crude Oil*, 913 F. Supp.2d at 54. (*quoting Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008)).  Here, Plaintiffs have alleged a plausible market. Moreover, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).

"[M]onopoly power may be inferred from high market share," and in this case Defendants' are alleged to control more than 80% of LME warehouses in Detroit.  ¶122.  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).  Defendants do not dispute that a market share of more than 80% supports an inference of monopoly power.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We have held that a market share of over 70 percent is usually 'strong evidence' of monopoly power.") (citation omitted).  Instead, Defendants attack the product and geographic components of the alleged relevant market.  In other words, Defendants argue that 80% is not the right market share because Plaintiffs have defined the market too narrowly.  This criticism is misplaced, both as a factual matter (because Plaintiffs' allegations are sound) and as a legal matter (because, at best, Defendants have identified potentially fruitful areas for discovery, not grounds for dismissal).

Plaintiffs have defined three possible relevant markets, as follows:

> The market for warehousing LME aluminum in the Detroit Michigan area
>
> or, in the alternative, for warehousing all LME and non-LME aluminum in the

---

("[B]ecause Plaintiffs have pleaded the possession of monopoly power through [defendant]'s ability to control prices, an inadequate relevant market definition is not fatal to Plaintiffs' section 2 claim.").

Detroit area or, in the alternative, for warehousing aluminum in Michigan, Ohio,

Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which

aluminum is purchased and sold based on the Midwest Premium or the Platts MW

premium.

¶307; *see id.* at ¶306 ("the market for warehouse storage of that portion of both LME warehouse

aluminum and non-LME warehouse aluminum that is located in areas in which purchase and sale

contracts for aluminum are based on the Midwest Premium or the Platts MW premium price").

The operative question is whether, when viewing Plaintiffs' allegations as a whole and

drawing all inferences in their favor, Plaintiffs have plausibly alleged that by controlling the

Detroit warehouses, Goldman was able to inflate the Midwest Premium; in other words, could

Goldman plausibly exercise the monopoly power alleged by Plaintiffs?  In answering this

question, Goldman's 80%+ share of LME warehouses in Detroit cannot be viewed in isolation.

Plaintiffs also have alleged that Goldman tied up nearly an entire year's worth of total U.S.

aluminum production in its Detroit warehouses, which constitutes approximately 75% of all

LME aluminum in the entire United States.  ¶¶57, 311.  Plaintiffs further allege that Goldman

has amassed in its Detroit warehouses well over 50% of *all* physical aluminum (LME and

otherwise) in the Midwest.  ¶290 ("Goldman, by itself, stores approximately well over 50% of

the aluminum stored in warehouses located in those parts of the U.S. that transact based on the

Midwest Premium or Platts MW Premium."); Pepperman Decl., Ex. 3 (Dustin Walsh, *Aluminum

Bottleneck*, Crain's Detroit Business (June 26, 2011)) ("Metro International warehouses the

largest aluminum cache in the world").[17]

---

[17] *See also* ¶306 ("The growing amount of aluminum in the LME warehouses in the United
States is estimated to constitute approximately 50% or more of the fluctuating total amounts of

The relevant question thus becomes, could Goldman plausibly exercise or be dangerously likely to acquire monopoly power to directly cause increases in the Midwest Premium and aluminum prices by amassing in its Detroit warehouses "well over 50%" of all physical aluminum in the areas subject to the Midwest Premium?  The answer is yes.  *See, e.g., Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (finding allegations of market power sufficient where Plaintiffs alleged market share of between 20% and 49%  in conjunction with direct evidence of anticompetitive effects); *In re Payment Card Interchange Fee*, 562 F. Supp. 2d at 402 (denying motion to dismiss, stating: "MasterCard's assertion that its market share is less than 30 percent market, while relevant, cannot be dispositive; if the [plaintiffs] prove their allegations they may succeed in demonstrating that MasterCard wields monopoly power (or is dangerously likely to acquire it) notwithstanding its limited share of the market.").[18]  *See also Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 130 (2d Cir. 1981) ("the District Court's instruction, precluding a finding of monopoly power if the defendants' market share was less than 50%, was erroneous.").  Defendants' counter-arguments, which focus on product definition (*i.e.*, reasonable interchangeability and cross-elasticity of demand) and geographic scope are misplaced.

Defendants' arguments are, again, premised on a misapprehension of Plaintiffs' complaint.  They argue that LME warehouses are not distinct from non-LME warehouses and that aluminum "can be stored essentially anywhere, including in a vacant lot."  ECF No. at 43. Putting aside the truth of this assertion (which is a factual question beyond the scope of the

---

aluminum stored by warehouses in the United States. That percentage is even higher for aluminum stored in places that transact at Midwest Premium or Platts MW premium prices.").
[18] *See id.* at 400 ("More fundamentally, a finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that the [plaintiffs] may succeed on their Section 2 claims. That is because market share and monopoly power are not the same thing; the former is merely evidence of the latter.").

complaint),[19] Plaintiffs do not complain that they have been injured in the warehousing market, per se.  Plaintiffs have not been deprived of warehousing space; they have been deprived of competitively priced aluminum.  In other words, even if Plaintiffs could find fairly priced warehouse space (in a vacant lot or elsewhere) they cannot find competitively priced aluminum to store there because Goldman has used its Detroit warehouses so as to inflate prices and, moreover, constrain the majority of all physical aluminum in the Midwest.[20]

Thus, for the purposes of analyzing reasonable interchangeability and cross-elasticity of demand, the relevant question is whether Plaintiffs—purchasers of physical aluminum—could substitute some other product to replace aluminum (not, as Defendants suggest, to replace warehouse space).  As the anomalous, all time record increases in Midwest premium prices attest, aluminum has no close substitutes that could restrain Goldman's ability to control the

---

[19] There are a variety of reasons that support the conclusion that LME warehouses operate in a distinct market from non-LME warehouses.  Sorting out these market definition arguments is "a deeply fact-intensive inquiry," *Todd*, 275 F.3d at 199, that is inappropriate to undertake on a motion to dismiss.  For example, in order to sell aluminum warrants on the LME, aluminum must be stored in an LME approved warehouse.  ¶380.  As recognized in the LME Consultation, the ability to pay high incentives to attract aluminum (as Goldman has done) is tied to the warehouse customer's ability to sell aluminum warrants.  In other words, non-LME warehouses cannot (and do not) compete to attract all of the same customers, particularly the large producers of aluminum (which explains, in part, how Goldman has been able to amass such an enormous store of aluminum in its Detroit LME warehouses).  *See, e.g.,* Pepperman Decl., Ex. 7 (Notice of LME Consultation (Nov. 2013)) ¶22 ("[A]s has been known for some time, there does exist a model of warehousing use (under which a metal owner warrants metal and then immediately sells that warrant) whereby competition between warehouses is conducted not on the basis of low Charges (which will be substantially paid by the buyer of the warrant, who does not control the choice of warehouse), but on the basis of high incentives (which are paid to the initial metal depositor, who does control the choice of warehouse).").

[20] As discussed throughout, Defendants' arguments that Plaintiffs' injuries are not actionable because they are in a different market are without merit.  *See, e.g., Crude Oil*, 913 F. Supp. 2d at 54 (S.D.N.Y. 2012) ("the parties have pointed to no authority indicating that a section 2 claim cannot be sustained where monopoly power in the relevant market enables defendants to control prices in a different but closely related market").

Midwest Premium; aluminum cans must be made out of aluminum.[21]  In fact, the elasticity of demand for aluminum is extraordinarily low and becoming negative.  Modelling Market Fundamentals: A Model of the Aluminum Market, Gilbert, Christopher L., Journal of Applied Econometrics, Vol. 10, No. 4 (Oct – Dec., 1995), pp. 385-410, 399.

Defendants' only response is to assert that Plaintiffs cannot "state a monopolization claim against Metro by proposing a product market for all aluminum in the United States."  ECF No. 317 at 44.  But this is a straw man; Defendants abruptly shift from attacking the narrowest possible market definition (LME warehouses in Detroit) to the broadest possible (all aluminum in the United States).  But that does not do justice to Plaintiffs' allegations. Plaintiffs have alleged that Goldman inflated the Midwest Premium and even in the broadest market definition alleged, have limited the geographic scope to "areas in which aluminum is purchased and sold **based on the Midwest Premium.**"  ¶307.  This "bear[s] a rational relation to the methodology courts prescribe to define a market for antitrust purposes" and is "plausible." *Chapman*, 546 F.3d at 237; *see id.* at 238 (relevant market definition need only be "theoretically reasonable" at motion to dismiss stage).

Plaintiffs' alleged market definitions are all the more plausible in light of what has actually occurred in the real world.  As discussed above, there is widespread consensus that Goldman's warehousing activities in Detroit have, in fact, inflated the Midwest Premium.  And this has not been a transitory effect; the price inflation has persisted over a long period of time.

---

[21] Defendants appear to concede that Aluminum has no close substitutes.  *See, e.g.*, ECF No. 317 at 44.  Defendants instead suggest that Plaintiffs who need aluminum can go elsewhere, *e.g.,* to "smelters and various intermediaries."  *Id.*  But this misses the point; even if the aluminum is bought from another source, this, at best, only allows the purchaser to circumvent the long delays it would take to get aluminum out of a Goldman warehouse—it does not circumvent the higher price.  Plaintiffs have alleged that Goldman has inflated the Midwest Premium, which applies to **all** purchases of physical aluminum in the Midwest, whether from a Goldman warehouse or elsewhere.

¶385 (alleging inflated Midwest Premium for nearly three years).  *See AD/SAT, a Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir.1999) (per curiam) ("[T]ransitory power may safely be ignored by antitrust law" because market forces would end that power fairly quickly) (quoting 2A Phillip E. Areeda et al., Antitrust Law, ¶506d, at 103).  If, as Defendants' suggest, undermining Goldman's power were as simple as opening a new warehouse or shipping aluminum from another source, any supracompetitive price inflation would have quickly dissipated through natural market forces and the Midwest Premium would have returned to competitive levels long ago.  But that is not what has happened.[22]  This underscores the wisdom of not requiring a rigorous market definition when there is direct evidence of anticompetitive effects.  *E.I. du Pont de Nemours*, 351 U.S. at 393 ("Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under [section 2].");  *Indiana Federation of Dentists*, 476 U.S. at 460-61("proof of actual detrimental effects, such as a reduction of output obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects") (internal quotation marks and citation omitted).

Where, as here, Plaintiffs have clearly alleged anticompetitive effects and the power to control prices, the motion to dismiss must be denied.  Accordingly, the entirety of Plaintiffs allegations—which also lay out the contours of the market, and bear a plausible relation to the

---

[22] *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006) (recognizing that a relevant geographic market for antitrust purposes is some geographic area in which a firm can increase its price without 1) large numbers of its customers quickly turning to alternative supply sources outside the area; or 2) producers outside the area quickly flooding the area with substitute products) (citing Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice (Hovenkamp) § 3.6, at 113 (2d ed. 1999)).  Here, Goldman has maintained supracompetitive prices for nearly three years in the geographic market alleged by Plaintiffs without customers finding alternative supply sources and without other producers flooding the market.

anticompetitive effects alleged—are more than sufficient to survive Defendants' motion to dismiss. *See, e.g., Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share").[23]  As recognized by this Court in *Crude Oil*, "Plaintiffs' relevant market definition is not so implausible as to warrant dismissal, especially where they plead [defendant]'s ability to control prices.  At best, [defendant] identifies fruitful areas for discovery, such as the degree to which [there] are reasonable substitutes for [the relevant product] and whether [supply] on the other side of the planet is 'readily available' [in the alleged geographic market]." 913 F. Supp. 2d at 54.  As the Second Circuit cautioned in *Todd*, the market definition in this case requires "a deeply fact-intensive inquiry."  275 F.3d at 199.  Dismissal at the pleading stage would be inappropriate.

**B.**    **Plaintiffs Have Alleged that The LME And Goldman Defendants Improperly Acquired or Maintained Monopoly Power Through Anticompetitive Conduct**

Defendants' assertion that Plaintiffs "do not allege…anticompetitive conduct" defies credibility.  ECF No. 317 at 48.  The bulk of Plaintiffs' complaint is devoted to chronicling Defendants' various alleged anticompetitive actions that were undertaken with the explicit objective of restraining additional aluminum supplies by which Defendants knowingly inflated the prices for delivery of physical aluminum paid by the Midwest premium.  Goldman's ability to manipulate the Midwest Premium is not "a consequence of a superior product, business

---

[23] *See also In re Neurontin Antitrust Litig.*, MDL No. 1479, 2013 WL 4042460, *3 (D.N.J. Aug. 8, 2013) (denying summary judgment where plaintiffs produced direct evidence of anticompetitive effects in conjunction with "the approximate contours of the relevant market, at least roughly," and although the parties disputed "the boundaries of that market," summary judgment was not appropriate because "market definition is a question of fact").

acumen, or historic accident," but rather, is the result of a "willful acquisition." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Moreover, the anticompetitive effect alleged by Plaintiffs— restrained supplies and an inflated Midwest Premium—were the intended and well known objectives of Goldman.  Standing alone, they are proof of the anticompetitive nature of the alleged conduct.  *See, e.g., Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir. 1985) ("price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws").

The warehousing market and the pricing mechanism for the delivery of aluminum in the Midwest (*i.e.*, the Midwest Premium) worked efficiently until 2004.  During the Great Recession of 2008 and 2009, when economic theory predicts that quantities of warehoused aluminum would be relatively high, Metro (before Goldman took over) stored approximately 900,000 tons of aluminum (as of Feb. 2010).  ¶¶206, 311.  Since Goldman acquired Metro, and after the economy began to recover, the stores of aluminum in the Detroit warehouses have skyrocketed to 1.56 million tons (an increase of nearly 70% over recessionary levels) and queues formerly stretched out to more than 16 months (more than a tenfold increase over recessionary levels), and now have reached 683 days, *i.e.,* twenty two months.  This notwithstanding that historical practice and economic theory show that the amount of warehoused aluminum should have declined during the recovery.  ¶¶57, 206, 311.  At the same time, queues at the Goldman warehouses became the primary determinant of the Midwest Premium.  ¶385.

These basic (and largely undisputed) factual allegations about economically anomalous market phenomena are tied directly to the Goldman Defendants and support a reasonable inference of anticompetitive conduct.  In any event, Plaintiffs do not merely point to market anomalies.  The complaint also details the great lengths to which Goldman went ***to create*** these

64

anomalies.  ¶16 ("[D]ue to Defendants' abuses of their monopoly powers and anticompetitive agreements to inflate prices and supplies, the Midwest premium price has followed a historically anomalous pattern during the Class Period. In fact, it has behaved in exactly the opposite manner that supply, demand and transportation costs indicated.").  In order to create an aluminum bottleneck in its Detroit warehouses and thereby drive up prices, Plaintiffs allege the following: Goldman had motive and intent to restrain aluminum supplies, diver aluminum into Detroit, and inflate the price of physical aluminum[24]; Goldman exploited LME rules in order to delay the release of aluminum into the market[25]; Goldman intentionally attracted additional and outsized

---

[24] *See* ¶19 ("Goldman Defendants intentionally and unlawfully inflated aluminum prices"); ¶38 ("injuries that the LME and Goldman Defendants have intentionally caused through their aluminum price inflation"); ¶39 ("Goldman Defendants intentionally sought to and did create… higher LME Detroit supplies and slower load-outs"); ¶218 ("in order to cause their agreed-upon restraint of aluminum supplies, Defendants have first had to cause and did cause substantial price inflation in the Midwest Premium or Platts MW Premium price"); ¶237 ("The specific purpose, effect and intent of these agreements was to inflate aluminum prices…and restrain aluminum supplies in LME Detroit Warehousing"); ¶333 (detailing motive and strategy to inflate Midwest Premium); ¶345 ("intentionally, directly and foreseeably inflated prices for aluminum in the United States, including the Midwest Transaction Price, Midwest Premium or Platts MW Premium prices"); ¶355 ("The Warehouse Defendants entered the aluminum market at that time in order to take advantage of the contango (*i.e.*, a market condition wherein the futures price is above the present cash or spot price), as well as to manipulate and exploit the aluminum market in order to further expand and extend that contango and the invaluable arbitrage opportunities it represented both for them directly and for their trading clients, with whom they shared arbitrage profits."); ¶380 ("In order for the Warehouse Defendants to maintain, expand, and exploit the aluminum 'contango,' while simultaneously profiting from increased and extended warehouse rents, the Warehouse Defendants needed to keep the inventory at LME warehouses as high as possible.").

[25] Goldman has treated all 27 of the Detroit LME warehouses it acquired as a single warehouse, and thus applied the LME's minimum load out rate of 1,500 tons per day to the entirety of its Detroit LME holdings.  At the same time, Goldman has not treated those 27 warehouses as a single entity in calculating a net load out rate.  In other words, Goldman has counted aluminum going out the door of one of its Detroit warehouses toward the 1,500 minimum, even when that aluminum is merely being transferred to another of Goldman's Detroit warehouses. Indeed, some estimates believe that the vast majority of aluminum "loaded out" of Goldman warehouses is, in reality, just moved to another Goldman warehouse.  *See, e.g.,* ¶32 (manipulating LME rules to constrain aluminum); ¶165 ("Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day"); ¶175 ("Goldman's shuttling of

stockpiles of aluminum into the Detroit warehouses[26]; and Goldman coordinated trading and

financing activities in order to further constrain the release of aluminum into the market.[27]

---

[26] aluminum reportedly has intentionally further delayed owners of aluminum from extracting their aluminum from the LME Detroit Warehousing"); ¶216 ("positive feedback loop" created by growing queue allows for higher incentive payments and higher prices); ¶295 ("Goldman reportedly further abused its monopoly power by shuttling aluminum from one warehouse to another within the Detroit area in order to use up the minimum quota without actually causing any output of aluminum from the warehouses to the public."); ¶363 ("merry-go-round of metal" intended to delay release from warehouses). *See also* Kocieniewski, David, *A Shuffle of Aluminum, but to Banks, Pure Gold*, NY TIMES (July 20, 2013) (cited in ¶¶379, 383) (estimating that as much as 90% of the aluminum moved each day is transferred from one Goldman warehouse to another).

[26] Goldman's manipulation of LME rules to create a bottleneck at its warehouses drove up the prices of physical aluminum, allowing it to collect outsized rents and profit from contango financing and trading deals, which in turn allowed Goldman to pay high incentives to attract even more aluminum into its warehouses, thus compounding the bottleneck—and thereby driving prices even higher. *See, e.g.,* Pepperman Decl., Ex. 7 (LME Notice of Consultation (Nov. 2013)) at ¶23 ("The ability of warehouses to pay incentives, and hence the motivation to levy high Charges, is significantly (although by no means totally) linked to the existence of queues."). *See also* ¶37 ("Goldman offered and paid incentives of up to $250 or more per ton to firms to store aluminum in LME Detroit Warehousing for long term storage"); ¶40 ("Defendants' price inflating incentive payment agreements intentionally restrained significant amounts of aluminum in long term storage in LME Detroit Warehousing and thereby prolonged the unreasonable load-out delays."); ¶¶213-14 (using incentive payments to induce companies and firms to divert aluminum from productive uses into long term storage at supra-competitive rates in Goldman's LME Detroit Warehouses); ¶215 ("Goldman's incentive payments have, as a necessary and intended result, (a) increased aluminum prices including the Midwest Premium, Platts MW Premium, and Midwest Transaction Prices of aluminum, and (b) added to the prospective, growing queue and the anticipated delays in removing aluminum from LME Detroit Warehousing."); ¶223 ("The combination of artificial incentives to producers to divert aluminum into warehouses, subjecting that aluminum to lengthy withdrawal delays, and artificially inflating rental costs for aluminum purchasers has resulted in artificially increased prices for aluminum in the futures market and the spot market and substantially injured Plaintiffs."); ¶296 ("Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing."); ¶365 ("In addition to the extremely low minimum load-out requirements, Defendants' anticompetitive scheme was furthered by offering financial incentives, to third parties who already stored aluminum in their warehouses, to maintain their aluminum deposits in Defendants' warehouses rather than release it into the market.").

[27] *See* ¶¶379-383 (alleging, and as supported by a New York Times investigation, that Goldman's trading and financing activities in the physical market were used to tie up physical aluminum and exacerbate queues in Detroit); ¶393 ("Trading Desks of the Warehousing Defendants have taken advantage of the contango to enter into recurring financing agreements

In reality, Defendants do not dispute that the conduct alleged by Plaintiffs occurred. Rather, they argue that all of the conduct undertaken to amass huge stores in Detroit was perfectly legal, even pro-competitive. ECF No. 317 at 49.  Such arguments are wrong in at least three respects.  First, evaluation of whether conduct is anticompetitive or pro-competitive requires a fact-intensive inquiry that is inappropriate on a motion to dismiss.  *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008) ("This argument is misplaced. A procompetitive benefit may rebut a prima facie case. However, to survive dismissal Plaintiffs are required only to establish a prima facie case."); *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) ("the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage").[28]

Second, Defendants' arguments require the Court to evaluate each alleged anticompetitive act in a vacuum, whereas on a motion to dismiss the Court must view all of Plaintiffs' allegations together.  *See, e.g., Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (denying motion to dismiss monopolization claim notwithstanding defendant's argument that the "series of practices" identified by plaintiff were "neither exclusionary nor anticompetitive" and concluding that all of the identified conduct had to be viewed together).  *See also City of Mishawaka, Ind. v. Am. Elec. Power Co., Inc.*, 616 F.2d 976, 986 (7th Cir. 1980) ("The utility would have us consider each separate aspect of its conduct separately and in a vacuum. If we did, we might agree with the utility that no one aspect standing

---

and generate substantial profits from market conditions that they helped to create and maintain."); ¶396 (Goldman coordinates traders to purchase aluminum and keep it tied up in the Detroit warehouses); ¶397 (orchestrating cancelled warrants in order to exacerbate the length of queues at Detroit warehouses); ¶398 (using financing transactions to keep aluminum tied up in Detroit warehouses).

[28] Notably, the lone case cited by Defendants in support of this argument—*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001)—is a summary judgment opinion.

alone is illegal. It is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor."); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981) (citing with approval "monopoly broth" idea and recognizing that "Sherman Act plaintiffs 'should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Finally, Defendants are simply wrong on the merits.  For example, Defendants argue that paying large incentives to attract and keep aluminum in the Detroit warehouses should be viewed as a pro-competitive price discount off of future rent.  ECF No. 317 at 49.  Even if that is true in some circumstances (and such facts are beyond the scope of the Complaint), it is not true with respect to a very important segment of the market: aluminum producers.  As alleged by Plaintiffs and recognized in the LME Consultation, producers of aluminum typically sell their aluminum as soon as possible after they have collected the incentive payment from Goldman.  In other words, producers load aluminum into an LME warehouse (in this case, usually into Goldman's warehouses in order to collect the large incentive payment) and then sell the warrants for that aluminum on the LME as soon as possible.  The producer that collects the incentive pays little if any rent to Goldman.  Instead, the purchaser of the warrants—who had no say in choosing the Goldman warehouse and does not receive the incentive "discount"—pays the rent.[29]  Thus, the

---

[29] *See, e.g.,* ¶223; Pepperman Decl., Ex. 7 (LME Nov. 2013 Consultation) ¶22 ("[A]s has been known for some time, there does exist a model of warehousing use (under which a metal owner warrants metal and then immediately sells that warrant) whereby competition between warehouses is conducted not on the basis of low Charges (which will be substantially paid by the buyer of the warrant, who does not control the choice of warehouse), but on the basis of high incentives (which are paid to the initial metal depositor, who does control the choice of warehouse)"); *id*. at Ex. 11 ¶5.2.2.2 ("the original owner will only pay rent for a matter of days—

68

payment of incentives does not serve as rent discount, but rather, is designed and employed to divert excessive amounts of aluminum into the Detroit warehouses and thereby further exacerbate the queues to get aluminum out of those warehouses.  Even the LME has recognized that the conduct at issue here, "artificially creat[ing] a queue by the use of incentives," constitutes "abusive behavior."  Pepperman Decl., Ex. 7 (LME Nov. 2013 Consultation) ¶37.  In sum, viewing all of Plaintiffs' allegations together and drawing all inferences in their favor, Goldman's alleged conduct is plainly anticompetitive.

### C.      Plaintiffs Have Alleged a Conspiracy to Monopolize

A conspiracy claim "under section 2 must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  *Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (citation and quotation marks omitted).  Plaintiffs' allegations fully satisfy this standard.

### V.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO COMPEL DISMISSAL OF PLAINTIFFS' STATE LAW CLAIMS

Defendants summarily assert—with no authority—that Plaintiffs' state law claims must fail "for the same reasons [as the federal antitrust claims]."  ECF No. 317 at 53.

Defendants present two arguments why the state law antitrust claims should be dismissed, both of which are incorrect.  First, Defendants say that 18 of the 32 states have statutes requiring courts to construe state antitrust law harmoniously with federal law.  However, harmonization clauses do not necessarily require consistency between the construction of state law and the construction of federal antitrust law.  *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 485 (E.D. Pa. 2006) ("[T]he harmonization clause in the VCFA does not

---

and, as such, the majority of the warehouse economics will be borne by the buyer of the warrant").

require consistency between construction of the VCFA and construction of the Clayton Act and Sherman Act."); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1087 (N.D. Cal. 2007) (harmonization provisions do not mean that federal antitrust standing doctrine applies to state law claims). Rather, one must look at the explicit intent of the state legislatures, and state courts, on the specific issues Defendants argue in their motion—such as plausibility, parallel conduct, and so forth.[30]

Second, Defendants argue that in 13 other states, courts have held that state law should be "interpreted consistently" with federal antitrust law. Defendants in effect ask the Court to assume that state law antitrust claims rise or fall with the concurrent federal claim. That is not the law. For example, the California, Kansas, Tennessee, and Vermont Supreme Courts have expressly stated that federal antitrust law should not necessarily be harmonized with state antitrust law. *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century.") (citations omitted); *Bergstrom v. Noah*, 266 Kan. 829, 845 (Kan. 1999) (federal "authority is not binding upon any court in Kansas interpreting Kansas antitrust laws."); *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 519-20 (Tenn. 2005) ("Tennessee does not have a statutory 'harmony clause'"); *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002) ("Nowhere in [Vermont state law] is there any requirement that the definition of who may sue under the Act

---

[30] Indeed, some states' antitrust laws are more extensive than the Sherman Act and prohibit a broader swath of conduct. *See, e.g., People v. Schwartz*, No. 1557/86, 1986 WL 55321, at *2 (N.Y. Sup. Ct. Oct. 18, 1986) (stating that "the sweep of the Donnelly Act is broader than the Sherman Act"); *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 948-950 (2008) (rejecting federal court's attempt to create a "narrow-restraint" exception to California's prohibition of noncompetition agreements).

[VCFA] must be consistent with the definition of who may sue under federal antitrust law."); *see also D.R. Ward*, 470 F. Supp. 2d at 499-500 ("The [Tennessee Trade Practices Act] does not contain a clause requiring or permitting courts to interpret the TTPA consistent with federal law.").

## VI.   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFFS LACK ANTITRUST STANDING

The facts pleaded here demonstrate that Plaintiffs may maintain a cause of action under the Clayton Act against defendants for their violations of the Sherman Act, for treble damages and injunctive relief.[31]  In order to establish standing under Section 4 of the Clayton Act, Plaintiffs must demonstrate that they meet the requirements of "antitrust standing" in addition to the traditional constitutional standing requirements.[32]  That is, Plaintiffs must demonstrate (1) that they have suffered "antitrust injury," and (2) that they are the proper plaintiffs to assert the claim, as required by the analytical framework set forth by the Supreme Court in *Associated General Contractors*.  *See Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-45 (1983) (hereinafter "*AGC*").  *Accord Gatt Commc'ns, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).  Plaintiffs readily meet the standards.

---

[31] A showing of antitrust injury alone is sufficient to establish antitrust standing to sue for injunctive relief under Section 16 of the Clayton Act.  *See U.S. Gypsum Co. v. Ind. Gas Co*., Inc., 350 F.3d 623 (7th Cir. 2003); *Todorov v. DCH Healthcare Auth*., 921 F.2d 1438, 1448 (11th Cir. 1991).

[32] As in all federal actions, Plaintiffs must also plead facts demonstrating Article III standing.  Here, there is no dispute that Plaintiffs have been injured by paying an inflated price for aluminum in the physical market.  Their Article III standing is therefore secure.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that Article III standing is established when a plaintiff has suffered a redressable injury in fact, entitling the federal courts to hear such a "case or controversy" under Article III).

### A.      Plaintiffs Adequately Allege That They Have Suffered Antitrust Injury

The "antitrust injury" requirement mandates that Plaintiffs plead an injury "of the type the antitrust laws were intended to prevent ... flow[ing] from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (internal quotation marks and citation omitted).  Thus, to establish antitrust injury, "a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels,* 369 F.3d at 220 (citing *Brunswick Corp.*, 429 U.S. at 489).

Defendants cite several out-of-circuit cases for the proposition that "the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends."  ECF No. 314 at 6-7.  Defendants cite no Second Circuit decision in support of such proposition.  In *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122 (2d Cir. 2007), an antitrust case not cited by Defendants, the Second Circuit rejected as "oversimplified" a rule which would determine antitrust injury for standing purposes by reference to whether the plaintiff was a customer or competitor, citing, *inter alia*, *Novell, Inc. v. Microsoft Corp*., 505 F.3d 302, 310-14 (4th Cir. 2007) (declining to adopt bright line rule that only consumers or competitors have antitrust standing).  "We can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges."  507 F.3d at 122.

Similarly, in *Crimpers,* 724 F.2d at 292, antitrust standing was upheld where the plaintiff

was not a consumer and "did not directly compete with [the defendants] in buying and selling

cable programming," but the harm it suffered was "inextricably intertwined" with, and was the

"intended consequence" of, the defendants' alleged antitrust violations. *Compare also* Final

Brief of *Amicus Curiae* Netscape Communications Corp. in Support of Affirming the District

Court's Judgment for Appellee Sun Microsystems, Inc., 2003 U.S. 4th Cir. Briefs LEXIS 114,

*20-21 (July 2, 2003) (accurately stating the result in *Crimpers* exactly as set forth in the

*Crimpers* proposition described above).

Indeed, the Second Circuit explained in *Port Dock & Stone Corp.* that two of those cases,

*Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) and *Serpa Corp. v. McWane, Inc.*, 199 F.3d

6 (1st Cir. 1999), involved dealer termination issues not applicable here:

> Where a defendant is alleged to have acquired other firms in order to achieve monopoly
> power at the manufacturing level of a product market, dealers or distributors terminated
> in the aftermath do not have standing to assert claims under section 2 of the Sherman Act
> or section 7 of the Clayton Act for monopolization at the manufacturing level.  Dealers in
> this situation lack standing because their particular injury was not caused by an exercise
> of the defendant's newly acquired power to raise prices.

507 F.3d at 123 (citations omitted).

Defendants' other cases are also inapposite.  *W. Penn Allegheny Health Sys., Inc. v.

UPMC*, 627 F.3d 85 (3d Cir. 2010) (class of those suffering injury limited to consumers and

customers "as a general matter;" supplier of hospital services to insurers did not suffer antitrust

injury from reduction in competition in downstream insurance market where it sold its services,

or from insurer's refusal to refinance loan where supplier had other options and faced no

prepayment penalty, but supplier *did* suffer antitrust injury from insurer's payment of

collusively-depressed reimbursement rates, since any reduction in insurer's premiums which

may have resulted from such lower reimbursements would have been achieved only by

diminishing quality and availability of hospital services); *Caruna v. Gen. Motors Corp.*, 204 F. App'x 511 (6th Cir. 2006) (sole shareholder's investment and employment losses were indirect and not "inextricably intertwined" with those of the corporation, which was directly injured by alleged violation).

> **1.      The Artificially Inflated Prices Paid By the Plaintiffs in the Physical Market Flow Directly From Defendants' Anticompetitive Conduct and Are the "Quintessential" Antitrust Injury That the Antitrust Laws Were Intended To Prevent**

The Complaint plainly sets forth an antitrust injury.  First, it is clear that Plaintiffs have suffered an injury-in-fact in the form of paying artificially inflated prices for the purchase of aluminum in the physical market.  ¶¶105-115.

Second, the rise in price was a direct result of Defendants' conduct in restricting the amount of aluminum leaving their warehouses.  ¶¶186, 212-14, 216, 223, 363, 350, 371-83.  The LME admitted as much when it stated that "the effect of the queues is to increase this [Midwest] premium as a proportion of the 'all-in' free metal price [that is, the sum of the LME price and the MW premium]" and that the load-out queues at the LME warehouses played a "fundamental role" "in increasing premiums."  ¶263.  Moreover, the inflation of price was an effect that Defendants intended to achieve with their anticompetitive scheme.  ¶378.

Third, the injury that Plaintiffs suffered—losses stemming from artificial prices caused by the Defendants' antitrust violations—has been recognized as "a quintessential antitrust injury."  *Crude Oil*, 913 F. Supp. 2d at 57.  Such losses, which are the result of "transacting in a market tainted by price manipulation – [are] 'of the type antitrust laws were intended to prevent.'"  *Id.* (quoting *Spectrum Sports,* 506 U.S. at 458).

### 2.    Defendants' Arguments Regarding Antitrust Injury Are Misinformed

Defendants argue that the Plaintiffs lack standing to assert antitrust claims because they do not trade in the same market that the Defendants monopolized.[33]  This argument is misplaced both factually and legally.  First, Plaintiffs explicitly allege that Defendants inflated the price of *physical aluminum* by controlling the rate at which *physical aluminum* was released from their warehouses.  Only by wearing blinders can Defendants draw the line between markets that they are suggesting.  Plaintiffs allege that Defendants exploited their power in the warehouse market to manipulate the supply of physical aluminum; as a factual matter it makes no sense to suggest, as Defendants do, that Plaintiffs' injury is somehow attenuated from the conduct at issue.  Second, as a legal matter, Defendants are simply wrong.  The law has long recognized that injuries in distinct but closely related markets may be inflicted by a single anticompetitive scheme and are not, by virtue of being in a different market, immune to prosecution under the antitrust laws.[34]

---

[33] In doing so, Defendants mistakenly rely upon *Ocean View*, an opinion that was rendered ineffectual since it was issued after the case was transferred to a different court by the Judicial Panel on Multidistrict Litigation.  *See In re Copper Antitrust Litig.*, No. 99–C–621–C, 2000 WL 34230131, at *15 (W.D. Wisc. Jul. 12, 2000) (holding that "that order was ineffectual because the case had been transferred to this court at the time the court issued its opinion. Revisiting the issues raised by defendants, I denied their motion to dismiss for lack of antitrust standing in an order dated May 9, 2000.") (citing *Ocean View Capital v. Sumitomo Corp. of America*, No. 98 Civ. 4067, 1999 WL 1201701 (S.D.N.Y. Dec.15, 1999); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, Nos. MDL 1303, 99–C–801–C, 2000 WL 576238 (W.D.Wisc. May 9, 2000)).

After such transfer, the *Ocean View* case and the standing issues therein were eventually decided with exactly the opposite result by *Loeb Industries v. Sumitomo Corp.*, 306 F.3d 469, 483, 489 (7th Cir. 2002), *cert. denied sub nom. Sumitomo Corp. of America v. Ocean View Capital, Inc.*, 539 U.S. 903 (2003).

[34] *See, e.g., McCready*, 457 U.S. at 477 (holding that the plaintiff had standing, even though she was not a participant in the market for defendant's services; plaintiff had established that she suffered harm (out-of-pocket payments) that was distinct from the harm suffered by

In *Loeb*, the Seventh Circuit held that first level purchasers of refined copper,[35] whose purchase contracts specified as the price term the Commodity Exchange Inc. ("Comex") copper futures price, had antitrust standing to sue persons who inflated prices in a different market, the LME.  Both the copper commodity futures traders on the Comex, and, as here, the first level purchasers of copper in the cash market, had antitrust standing because the injuries suffered by "traders who purchased inflated futures contracts from the defendants are distinct from any harm inflicted on [first purchasers] when [they] paid inflated cash prices."  306 F.3d at 481-82.  *Loeb* applied the reasoning of *McCready*, which "recognizes that different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus that differently situated plaintiffs might be able to raise claims," 306 F.3d at 481, and found that plaintiffs who purchased physical copper were in a "separate but related" market; and that the "damage from the defendants' conduct was felt in two separate markets: the futures market and the physical copper market."  306 F.3d at 481-84.

---

market participants such as plaintiffs' employer (*e.g.*, paying higher wages to compensate for inferior health benefits)); *Loeb*, 306 F.3d at 481 ("*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)."); *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) (holding that injuries incurred in the futures market were not duplicative or more direct than cash market injuries; injuries in each market were distinct and compensable under the antitrust laws and the opportunity for recovery in one market did nothing to alleviate the harm in the other).  Other cases also demonstrate that the Supreme Court has been willing to entertain suits between plaintiffs and defendants not in privity with each other.  *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988) (plastic conduit manufacturer suing competitor steel conduit manufacturer); *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85 (1984) (university suing association that prohibited it from entering a television contract); *Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207 (1959) (store suing competitor over refusal to deal).

[35] Only initial sales of copper were properly compensable antitrust injuries; money expended on the purchase of previously sold scrap copper could not be recouped in damages.  *Loeb*, 306 F.3d at 490.

Thus, Defendants strive to distinguish *Loeb* on multiple grounds.  ECF No. No. 314 at

20-21 n. 30.  Once again, these attempts support rather than contraindicate Plaintiffs' standing.

For but one example, Defendants mistakenly rely on *Lexmark Intern., Inc. v. Static Control*

*Components, Inc*., 134 S.Ct. 1377 (2014), (ECF No. 314, *passim*), a case involving only a false

advertising claim under the Lanham Act.  Surveying the "lay of the land," the Court identified

"three competing approaches to determining whether a plaintiff has standing to sue under the

Lanham Act:" (1) "antitrust standing or the [*Associated General Contractors*] factors in deciding

Lanham Act standing," (2) "a categorical test, permitting Lanham Act suits only by an actual

competitor," and (3) a "'reasonable interest' approach" used by the Second Circuit.  *Id*. at 1385

(bracketed material in original).  To the extent relevant here, *Lexmark's* teaching is that the

analysis of "antitrust standing" is separate and different from any "categorical test" focusing only

on an "actual competitor."

Defendants also suggest, without explanation, that *Loeb's* reasoning may not apply in this

Circuit.  ECF No. 314 at 20-21 n. 30.  But the decisions in this Circuit citing to *Loeb* have all

cited *Loeb* with apparent approval, including one by Chief Judge Loretta Preska, who authored

the original *Ocean View* decision.  *In re Digital Music Antitrust Litig.*, 06 MD 1780, 2011 WL

2848195 at *6 (S.D.N.Y. July 18, 2011) (Preska, C.J.) (the *Loeb* facts involved an example of the

type of  "physical and economic nexus between the alleged violation and the harm to the

plaintiff" that supports antitrust standing); *see also In re LIBOR-Based Financial Instruments*

*Antitrust Litig*., 962 F.Supp.2d 606, 612 (S.D.N.Y. 2013); *In re LIBOR-Based Financial*

*Instruments Antitrust Litig*., 935 F.Supp.2d 666, 721 (S.D.N.Y. 2013).  Defendants' reliance on

*Reading Indus., Inc. v. Kennecott Copper Corp*., 631 F.2d 10 (2d Cir. 1980) is also misplaced in

light of *Loeb*, which distinguished *Reading* as depending

'upon a complicated series of market interactions,' including the actions and pricing decisions of refiners, fabricators, dealers, speculators, and consumers of copper.  *Id.* at 13.  Such 'conjectural theories of injury and attenuated economic causality' were enough to render Reading's injury indirect.  *Id.* at 14.

631 F.2d at 488.

A court in this district, when faced with arguments similar to those made by Defendants here, denied the defendant's motion to dismiss and rejected the notion that the plaintiffs "[could] not establish antitrust injury because they did not trade in the physical market [that the defendant] allegedly monopolized."  *See In re Crude Oil,* 913 F. Supp. 2d at 57.  In *Crude Oil,* the defendant used a dominant position in the physical market for West Texas Intermediate crude oil (WTI) to manipulate the prices of oil futures contracts.  The plaintiffs traded in the futures market and suffered from the defendant's price manipulation, but the defendant argued that the plaintiffs lacked standing because their injury was not in the market alleged to have been monopolized.  The court held that both requirements for antitrust injury, as set out in *Brunswick*, were met.  First, because of the "close relationship between the cash and futures markets," antitrust injury in one market could flow from monopolistic conduct in another market.  *Id.* at 57. Second, the alleged injury – "losses from transacting in a market tainted by price manipulation— is 'of the type antitrust laws were intended to prevent.'"  *Id.* (quoting *Spectrum Sports*, 506 U.S. at 458 ("The purpose of [Section 2] is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.").

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litigation*, 767 F. Supp. 2d 880, 906-07 (N.D. Ill. 2011) reached the same conclusion on a mirror image of the *Crude Oil* facts.  In *Dairy Farmers*, the plaintiffs included purchasers of physical milk and cheese products, whereas the defendants were alleged to have manipulated the price of milk futures on the Chicago

Mercantile Exchange. In ruling on the motion to dismiss, the court rejected the defendants' argument that "only Plaintiffs who purchased milk futures have standing to bring a claim for monopolization," and held that standing was established with respect to all "plaintiffs whose injuries stem from the anticompetitive effects on the milk futures market," including purchasers of milk futures *as well as* purchasers of physical milk and cheese products who entered into contracts whose value was directly tied to the price of milk futures. *See id.* Notably, the court refused to adopt a blanket rule that barred Section 2 claims brought by persons whose injuries were incurred outside the relevant market. *Id.* at 907.[36]

### B.   An Examination of the *AGC* Factors Demonstrates That Plaintiffs Are Efficient Enforcers of the Antitrust Laws

In addition to pleading antitrust injury, the law requires Plaintiffs to demonstrate that they are the proper plaintiff to pursue the alleged antitrust violations and thus are "efficient enforcers" of the antitrust laws. Plaintiffs do so by alleging facts showing that (1) the injury was directly caused by the defendants' misconduct; (2) the damages are not speculative; (3) there is little potential for duplicative recovery or complex apportionment of damages; and (4) there are no other "more direct" victims of the alleged misconduct. *See AGC*, 459 U.S. at 540-45 (1983); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687-88 (2d Cir. 2009) (citing *AGC*,

---

[36] Defendants' other arguments regarding antitrust injury are equally unavailing. Specifically, Defendants fault Plaintiffs' claims for failing to allege that Plaintiffs were "instrumentalities" of Defendants' anticompetitive conduct. But, such allegations are not necessary to establish Plaintiffs' antitrust injury. The law requires only for plaintiffs to establish an injury-in-fact that was caused by the defendant and is of the type that the antitrust laws were intended to prevent. *See Blue Tree Hotels*, 369 F.3d at 220. Plaintiffs have done so here. In addition, Defendants argue that Plaintiffs are required to allege that their injuries flow from a "competition-reducing" aspect of defendants' conduct. But this argument fails to recognize that the Supreme Court has stated bluntly that an antitrust plaintiff need not prove a lessening of competition in order to show antitrust injury. *See McCready*, 457 U.S. at 482 ("[A]s we made clear in a footnote to [*Brunswick*], a § 4 plaintiff need not "prove an actual lessening of competition in order to recover.") (citing *Brunswick*, 429 U.S. at 489, n.14).

459 U.S. at 540-45 ; *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988)).

### 1.      Plaintiffs' Injury Is Directly Caused By Defendants' Antitrust Violations

The first *AGC* factor addresses the issue of the directness of the harm – *i.e.*, whether there exists a chain of causation between a defendant's action and a plaintiff's injury or (in contrast) if the connection is based instead only on "somewhat vaguely defined links." *AGC*, 459 U.S. at 540.  Defendants' arguments regarding directness attempt to re-cast the allegations as a "convoluted chain of events," but they fail to recognize the bigger picture: that the prices paid by Plaintiffs were directly and explicitly based upon the Midwest Premium, which Plaintiffs allege was directly and intentionally inflated by Defendants.[37]

Plaintiffs are members of, and bring this case on behalf of, a plaintiff class, defined as follows:

> All persons who from May 1, 2009 forward (a) made a first level direct purchase of aluminum pursuant to a contract with a price term based, in any part, on the Midwest Transaction Price, Midwest Premium, the Platts MW Premium or similar terminology, including but not limited to an averaging over a period of days of any such premium or adjusting for a grade or type of aluminum or (b) purchased aluminum directly from a Defendant.

¶320.  Plaintiffs thus fall into two categories: (a) first-level direct purchasers of aluminum under contracts incorporating benchmark price premiums, and (b) direct purchasers of aluminum from a Defendant.

Plaintiffs purchased aluminum under contracts with pricing formulas that incorporate the Midwest Premium.  (*E.g.*, 12-13.)  The movements of price premiums correlate directly with increases in warehouse inventory, as the complaint vividly illustrates:

---

[37] ¶¶105-115, 186, 212-14, 216, 223, 363, 350, 371-83.



¶33.

Defendants' arguments notwithstanding, the chain between the unlawful restraints in aluminum warehousing and the harm suffered by Plaintiffs in aluminum purchasing is not long and should stand as no obstacle to Plaintiffs' standing.  At most, Plaintiffs allege a "chain" with three links:

> **Unlawful Agreement:**  Reinforcing output restrictions: (a) Goldman agreed with the LME to limit the output of aluminum from the LME Metro Detroit warehouses via a collection of "rules," including adherence to a maximum load-out rule that was portrayed as a minimum, (¶168); and (b) Goldman agreed with aluminum producers to pay them incentives in exchange for limiting output of aluminum by locking it away in its warehouses.  ¶215.

>> **Link One:**  Goldman actually limited the output of aluminum from its LME Metro Detroit warehouses by (i) adhering to the output restriction and (ii) making the incentive payments in exchange for taking in vastly more aluminum from producers than Goldman would load out;

**Link Two:**  The output restrictions caused LME Metro Detroit warehouse inventories (and delivery waiting queues) to skyrocket;

**Link Three:**  The increased inventories and queues inflated aluminum benchmark price premiums;

**Antitrust Injury:**  Plaintiffs purchased primary aluminum directly from smelters via contracts incorporating those inflated benchmark price premiums.

Plaintiffs clearly have established the directness element of *AGC.  See Loeb,* 306 F.3d at 484 (applying the same logic and concluding that first purchasers in the physical copper market, whose purchase price was based upon certain price indices, could sue commodities traders for inflating those price indices).

### 2. Plaintiffs are sufficiently motivated to serve as private attorneys general here

The Second Circuit has explained the standard by which to judge whether an antitrust plaintiff has sufficient motivation to sue under *AGC*:

> The second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws. "Inferiority" to other potential plaintiffs can be relevant, but it is not dispositive.

*DDAVP*, 585 F.3d at 689.  Thus, motivation is sufficient so long as plaintiffs are "significantly motivated due to their natural economic self-interest in paying the lowest price possible," even where other identifiable classes of plaintiffs might arguably be the "most motivated."  *Id.* Moreover, when it is the case that denying the plaintiffs a remedy may "leave a significant antitrust violation undetected or unremedied," *AGC*, 459 U.S. at 542, the second factor will support standing.  *DDAVP*, 585 F.3d at 689.

Defendants argue that standing should be denied Plaintiffs since there are firms that "paid more warehouse rent than they would have been required to pay absent a delivery queue."  ECF No. 314 at 21.  But an anticompetitive scheme can, and often does, have distinct anticompetitive effects either in multiple markets or multiple types of plaintiffs.  Accordingly, a proper plaintiff

may exist in more than one market.  The inflated rent paid by some customers is a distinct injury from the inflated price for physical aluminum paid by Plaintiffs.  *Accord Loeb*, 306 F.3d at 484 (concluding that "damage from the defendants' conduct was felt in two separate markets: the futures market and the physical copper market," and that there was a proper plaintiff for each market); *In re Dairy Farmers of America*, 767 F. Supp. 2d at 907 (recognizing purchasers of milk futures and purchasers of physical milk each had standing to assert an antitrust claim; "[E]ach group of plaintiffs in this case is in a unique position to vindicate the interests of the Sherman Act.").

Therefore, while Defendants may be able to identify what may be other proper plaintiffs in other affected markets, they are simply wrong to suggest that because some other potential plaintiff could sue for some other type of injury, the courthouse door should be closed to Plaintiffs.

### 3.      Plaintiffs' Damages Are Not Speculative

Plaintiffs have laid out substantial economic evidence in their complaint.  ¶¶384-408. This includes expert findings based on sophisticated economic models and regression analyses. The findings include a measurement of the calculation of actual and but-for premiums during the class period.  There is nothing speculative about Plaintiffs' damages:



As a general matter, some complexity is inherent in every antitrust plaintiff's estimate of the but-for price and resulting damages.  But the aluminum market is "not so complicated that one cannot estimate to a reasonable degree of accuracy the amount of damage a party has sustained." *Loeb*, 306 F.3d at 490.  Moreover, there have been great advances in computer-assisted economic analyses during the thirty years since *AGC* was decided.  These have become commonplace in antitrust litigation, and reduce many of the concerns regarding the complexity of damage calculations that may have influenced earlier decisions.  *See Loeb*, 306 F.3d at 493; *In re Graphics Processing Units*, 253 F.R.D. at 491 (noting the increased use of economic tools in antitrust cases).

Defendants' arguments regarding the speculative nature of Plaintiffs' damages are based entirely upon the premise that the causal chain involves too many levels of multiple independent actors.  Defendants reason that, at any point, any of the decision makers could break the causal chain, rendering Plaintiffs' damages entirely speculative.  But, as stated in the preceding section,

Plaintiffs' antitrust claims do not rest upon a complicated chain of causation.  Rather, the claims center upon the fact that Plaintiffs were directly purchasing at a price that was explicitly based upon an industry benchmark price that was directly impacted by Defendants' antitrust violations.

## 4. With Respect To Plaintiffs' Claim For Damages, There Will Be Little Risk For Duplicative Recovery Or A Complex Apportionment Of Damages

The fourth *AGC* factor, which addresses duplicative recovery and complex apportionment of damages, furthers the conclusion that Plaintiffs are proper plaintiffs.  Plaintiffs are, by definition, the first purchasers in the chain of distribution for physical aluminum.  As such, Plaintiffs' alleged overpayments are not the result of overpayments that were passed on from someone higher in the distribution chain.  Accordingly, there will be no risk of duplicative recoveries that are of the type contemplated in *Illinois Brick*.[38]  Defendants concede this point in their papers.  *See* ECF No. 314 at 23.

## VII. FEDERAL STATUTORY ANTITRUST STANDING DOES NOT APPLY TO STATE LAW

### A. *AGC* Factors Do Not Apply Absent a Clear Directive from Those States' Legislatures or Highest Courts

Defendants challenge Plaintiffs' statutory standing under state law by using the federal statutory standing analysis of *AGC*.  In *AGC*, the Supreme Court interpreted the "scope of the private remedy created by" Congress in Section 4 of the Clayton Act in order to understand the "class of persons who [could] maintain a private damages action under" that legislatively conferred cause of action.  *Lexmark,* 134 S.Ct. at 1381-82 (clarifying that *AGC* concerns statutory, not constitutional or prudential standing).  Thus, *AGC* standing analysis is specific to

---

[38] *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

the Clayton Act.[39]  Because *AGC* concerns statutory standing, at most, *AGC* applies to only those

state statutes where there is "a clear directive from those states' legislatures or highest courts" to

apply it.[40]  Otherwise, federal law should not be read into substantive state antitrust law.

*Graphics Processing Units*, 527 F. Supp. 2d at 1025; *see also California v. ARC Am. Corp.*, 490

U.S. 93, 105 (1989) (*AGC* did not impose a federal standard on state causes of action).  As

explained in *Graphics Processing Units*, 527 F. Supp. 2d at 1026:

> Standing under each state's antitrust statute is a matter of that state's law.  It
> would be wrong for a district judge, in *ipse dixit* style, to bypass all state
> legislatures and all state appellate courts and to pronounce a blanket and
> nationwide revision of all state antitrust laws.  The rule urged by the defense may
> (or may not) be sound policy but that is a matter for the state policy makers to
> decide, not for a federal judge to impose by fiat.

Defendants rely on "harmonization" to support their arguments, but these provisions

cannot be applied to override the explicit intent of the state legislatures.  *See Graphics*

*Processing Units*, 540 F. Supp. 2d at 1097 (harmonization provisions do not mean that *AGC*

factors apply).  The reasons are two-fold.  First, harmonization clauses do not require

consistency between the construction of state law and the construction of federal antitrust law.

---

[39] The *Lexmark* Court made explicit that it was reviewing only the Lanham Act claims and not
the antitrust claims.  *Id*. at 1385 n. 2.  To whatever extent this Court may deem *Lexmark*
applicable here, Plaintiffs have adequately pleaded that: (1) their interests "fall within the zone of
interests protected by the law invoked," and (2) their "injuries are proximately caused by
violations of the statute."  *Id*. at 1388-90.  Moreover, the zone of interest test "forecloses suit
only when a plaintiff's interests are so marginally related to or inconsistent with the purposes
implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff
to sue, and the "benefit of any doubt goes to the plaintiff."  *Id*. at 1389.

[40] *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal.
2008) (citing *In re Graphics Processing Units,* 527 F. Supp. 2d 1097); *In re Optical Disk Drive
Antitrust Litig.*, No. 10-MD-2143 RS, 2011 U.S. Dist. LEXIS 101763, at *44-46 (N.D. Cal. Aug.
3, 2011) (same); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 562-72
(E.D. La. 2013) (looking to the law of the states' highest courts and state law to determine if
federal standing rules apply); *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485,
494-95 (E.D. Pa. 2006) (*AGC* standing only applies if relevant state law adopts these factors).

*See D.R. Ward Constr.*, 470 F. Supp. 2d at 485.  Second, imposing an *AGC* standard to state laws permitting indirect purchaser actions "would severely limit the number of indirect purchasers who can bring suit under the statutory scheme, thereby rewriting the language of [the *Illinois Brick* repealer] and undermining the [state statute's] overarching remedial goal of reaching as broadly as possible to best protect consumers against antitrust violations." *Id*.  Consequently, nationwide application of *AGC*'s statutory standing analysis to various states' laws is inappropriate.  *See Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D.Cal. 2009) (no across-the-board approach to antitrust standing).  Therefore, courts have declined to apply *AGC* standing analysis where the states have at most harmonized federal and state antitrust law.

Here, the Court should not apply federal statutory standing requirements to state antitrust laws because the legislatures and highest courts in Alabama, Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Kansas, Massachusetts, Hawaii, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and Wyoming have *not* provided a clear directive that *AGC* standing requirements apply.[41]  Furthermore, the Minnesota Supreme Court and the New Hampshire Court of Appeals have explicitly held that *AGC* does *not* apply to claims brought under its laws.  The California, Kansas, Tennessee, and Vermont Supreme Courts have expressly stated that federal antitrust law should not necessarily be harmonized with state antitrust law.  Additionally, courts in Arkansas, Florida, Massachusetts, Mississippi, New Hampshire, North Dakota have analyzed antitrust standing under state law *without* use of *AGC* factors.  In sum, this Court should not bypass the legislatures and courts of thirty-two states and

---

[41] Supporting authority for all states mentioned herein is provided in Appendix A filed herewith. With respect to Iowa, Nebraska, New York, as stated above, Plaintiffs satisfy the *AGC* factors.

the District of Columbia and impose federal statutory antitrust standing requirements on state law.

> **B.      Proximate Cause Principles Do Not Mandate Dismissal Under Arkansas, Minnesota, and Wyoming Law.**

Similarly, proximate cause principles do not justify dismissal of Plaintiffs' claims under Arkansas, Minnesota, and Wyoming law.  Contrary to Defendants' position, *Lexmark* does not mandate the application of common law proximate cause principles to Plaintiffs' claims for states that do not apply *AGC* standing factors.  First, *Lexmark* was a Lanham Act false advertising suit for which the Supreme Court held that *AGC* statutory standing requirements did *not* apply to a different *federal* cause of action.  134 S.Ct. at 1386-87.

Second, as the *Lexmark* court emphasized, "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action."  *Id.* at 1390.  In the antitrust context, proximate cause does not require direct interaction between a defendant and a plaintiff; rather, all that is required is that price manipulation gets passed onto and harms plaintiffs.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 110635, at *40 (N.D. Cal. Sept. 28, 2011) (finding indirect purchasers established proximate cause).  Moreover, proximate cause is not a one size fits all concept.  Rather, "[s]tatutes and court interpretations of those statutes define the proximate cause elements of . . . antitrust claims."  *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 771, 783 (N.D. Ohio 1998).  Here, the Minnesota Supreme Court has explicitly held that the "*AGC* factors do not provide the benchmark for antitrust standing in Minnesota" and that the "boundaries of federal antitrust standing" are more restrictive than those applied to Minnesota state law.  *Lorix v. Crompton*, 736 N.W. 2d 619, 627-29 (Minn. 2007).  Arkansas does not use the *AGC* factors in evaluating standing, and its Supreme Court has declared that the Arkansas Deceptive Trade Practices Act is to be given "liberal

construction." *See Wallis v. Ford Motor Co.*, 362 Ark. 317, 328-29 (2005) (analyzing standing without mention of *AGC*); *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295 (1999). Moreover, Defendants have not identified a single case in Arkansas or Wyoming that applied proximate cause analysis to antitrust claims.

Third, as explained above, Plaintiffs have more than satisfied *AGC* standing requirements, so they have satisfied any purported less restrictive proximate cause inquiry.

Fourth, where, as here, Plaintiffs allege willful, illegal acts, "the damages are not so strictly confined to proximate consequences as when these elements do not exist. . . .  Where there is fraud or other intentional wrong, there is not the same strictness to exclude remote or uncertain damages . . . ." *Iron Workers*, 23 F. Supp. 2d at 783 (citing *Burckhardt v. Burckhardt*, 42 Ohio St. 474, 487 (1885) and Restatement (Second) of Torts § 435B).  Finally, the issue of whether Plaintiffs meet the requirements of proximate cause is a factual question inappropriate for disposition "without further factual development."  *Group Health Plan, Inc. v. Phillip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999) (declining to dismiss antitrust complaint on basis of failure to meet requirements of proximate cause without further factual development); *Buckley v. Bell*, 703 P.2d 1089, 1092 (Wy. 1985) ("The usual rule in Wyoming is that proximate cause of harm is a question for the trier of fact unless reasonable persons could not disagree.").  Proximate cause principles do not justify dismissal of Plaintiffs' claims.

## CONCLUSION

For the reasons and authorities set forth herein, and in each of the opposition memoranda submitted by plaintiffs in these coordinated actions, the motion by the LME and Goldman Defendants to dismiss Plaintiffs' claims that they combined, conspired or agreed with one another in violation of Section 1 of the Sherman Act and that each also violated Section 2 of the

Sherman Act, should be denied.  Similarly, Defendants' arguments that Plaintiffs lack standing to sue for money damages from these violations should be rejected.  Finally, such Defendants' arguments to dismiss the State law claims should be denied.

To any extent that the Court finds that any of Defendants' arguments have merit, Plaintiffs should be allowed to amend to re-plead.  *Kassner v. 2nd Avenue Delicatessen Ind.,* 496 F.3d 229, 243-44 (2d Cir. 2007) (ordinarily, leave to amend is permitted at least once).

May 27, 2014                               Respectfully submitted,

                                          /s/ *Christopher Lovell*_____
                                          Christopher Lovell
                                          Gary S. Jacobson
                                          Benjamin M. Jaccarino
                                          LOVELL STEWART HALEBIAN & JACOBSON L.L.P.
                                          61 Broadway, Suite 501
                                          New York, NY 10006
                                          Tel: (212) 608-1900
                                          Fax: (212) 719-4677
                                          Email: clovell@lshjllp.com
                                                 GSJacobson@lshllp.com
                                                 BJaccarino@lshllp.com

                                          *Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

                                          Linda P. Nussbaum
                                          Peter Barile
                                          Grant & Eisenhofer, P.A.
                                          485 Lexington Ave., 29th Floor
                                          New York, NY 10017
                                          Tel:     (646) 722-8500
                                          Fax:     (646) 722-8501
                                          Email: lnussbaum@gelaw.com
                                                 pbarile@gelaw.com

                                          *Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

Bonny E. Sweeney
Carmen Medici
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Fax: (619) 231-7423
Email: bonnys@rgrdlaw.com
          cmedici@rgrdlaw.com

*Interim Co-Lead Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct Purchaser
Class*

**PLAINTIFFS' APPENDIX A**

**AUTHORITY SHOWING THAT FEDERAL STATUTORY STANDING REQUIREMENTS DO NOT APPLY TO STATE ANTITRUST LAW**

| State | Authority |
|-------|-----------|
| Alabama | No clear directive from legislature or highest court applying *AGC*. *Compare with* cases cited in Defendants' Appendix 4 (ECF No. 314-4) (not dealing with *AGC* standing). |
| Arizona | State antitrust standing analysis does not incorporate *AGC* factors. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 16 (2003) (no cases showed "Arizona courts look to the federal courts for guidance on the threshold issue of who may bring a state-law-based claim in state court"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 567-68 (E.D. La. 2013) (noting *Bunker's Glass* permitted indirect purchaser suit without applying *AGC* factors); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 38 (D.D.C. 2008) (acknowledging *Bunker's Glass* holding). *Compare with Johnson v. Pac. Lighting Land Co.*, 817 F.2d 601, 604 (9th Cir. 1987) (pre-*Bunker's Glass* case noting that they found "no Arizona cases which address the question of antitrust injury posed here"); *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 1:06-cv-226, 2011 U.S. Dist. LEXIS 8940, at *16-17 (S.D. Ohio Jan. 31, 2011) (plaintiffs in that case incorrectly conceded that state courts were guided by federal law and the unique "alleged 'injury' [wa]s from the lawful patent and [plaintiff's] lack of access to it" was "not of the type the antitrust laws were intended to prevent"); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 U.S. Dist. LEXIS 50737, at *35-36 (E.D. Mich. Apr. 9, 2013) (noting split in authority and admitting that there was no authority from Arizona's "highest court[]" that applied *AGC* factors); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) (same). |
| Arkansas | State antitrust standing analysis does not incorporate *AGC* factors. *Wallis v. Ford Motor Co.*, 362 Ark. 317, 328-29 (2005) (analyzing standing without mention of *AGC*); *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295 (1999) (Arkansas Deceptive Trade Practices Act is to be given "liberal construction"). *Compare with Baptist Health v. Murphy*, 373 S.W.3d 269, 281-82 (Ark. 2010) (only applying proximate cause principles to tortious interference claims, not to ADTPA claims); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 11-CV-00162, 2012 U.S. Dist. LEXIS 125677, at *18 |

| | |
|---|---|
| | (E.D. Wisc. Sept. 5, 2012) (never deciding whether *AGC* applies to Arkansas); *Plavix*, 2011 U.S. Dist. LEXIS 8940, at *16-17 (plaintiffs in that case incorrectly conceded that state courts were guided by federal law and the unique "alleged 'injury' [wa]s from the lawful patent and [plaintiff's] lack of access to it" was "not of the type the antitrust laws were intended to prevent"). |
| California | No harmonization. *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." (citing *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147 (1988)); *Samsung Elecs. Co. v. Panasonic Corp.*, No. 12-15185, 2014 U.S. App. LEXIS 6256, at *15 n.4 (9th Cir. Apr. 4, 2014) (it is "no longer the law in California" "that the interpretation of California's antitrust statute [i]s coextensive with the Sherman Act."); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2013) (*AGC* does not apply to the Cartwright Act given *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 781-87 (2010)).<br>*Compare with* Defendants' Appendix 1 (ECF No. 314-1) (citing lower court authority that pre-dates *Aryeh*, 55 Cal. 4th 1185 (2013)). |
| District of Columbia | No clear directive from legislature or highest court applying *AGC*. D.C. Code § 28-4509(a) ("*Any* indirect purchaser in the chain of . . . distribution . . . upon proof of payment of . . . any . . . overcharge . . . *shall be deemed to be injured* . . . ." (emphasis added)); *Holder v. Archer Daniels Midland Co.*, No. 96-2975, 1998 D.C. Super. LEXIS 39, at *4-13 (Nov. 4, 1998) (applying *Illinois Brick* dissent's standing test); *Peterson v. Visa U.S.A. Inc.*, No. 03-8080, 2005 D.C. Super. LEXIS 17, at *5-9 (Apr. 22, 2005) (not applying *AGC* factors); *In re Graphics Processing Units Antitrust Litig.* ("*GPUs*"), 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (declining to apply *AGC* standing to the law of the District of Columbia).<br>*Compare with Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no controlling authority from the District of Columbia that applied *AGC* factors). |
| Florida | No clear directive from legislature or highest court applying *AGC*. *Pool Prods.*, 946 F. Supp. 2d at 568-69 (no "Florida case in which a court applied the *AGC* factors to determine standing under the FDUTPA"); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 158-60 (E.D. Pa. 2009) (permitting suit by indirect purchasers under the FDUTPA without applying *AGC* factors); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 107 (Fla. Ct. App. 1996) (acknowledging *AGC*, but finding that *AGC* "constru[ed] § 4 of the Clayton Act" and that "state causes of action are not pre-empted solely because they impose liability over and |

| | |
|---|---|
| | above that authorized by federal law"). *Compare with All Care Nursing Serv. v. High Tech Staffing Servs.*, 135 F.3d 740 (11th Cir. 1998) (not discussing *AGC*); *Reitz v. Canon U.S.A., Inc.*, 695 F. Supp. 552, 553-54 (S.D. Fla. 1988) (terminated *employee* did not have standing to bring suit against employer); *Vitacost.com, Inc. v. Gaia Herbs, Inc.*, No. 06-81141-CIV-MIDDLEBROOKS/JOHNSON, 2007 U.S. Dist. LEXIS 6393 (S.D. Fla. Jan. 26, 2007) (not referencing or employing full *AGC* factors and dismissing claim of seller who never distributed defendant's products); *Med. Sav. Ins. Co. v. HCA, Inc.*, No. 2:04-cv-156-FtM-29DNF, 2005 U.S. Dist. LEXIS 20206 (M.D. Fla. June 24, 2005) (not a state court). |
| Hawaii | No clear directive from legislature or highest court applying *AGC*. *Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 324 n.33 (Haw. 2010) (The Supreme Court of Hawaii has never "expressly applied the *AGC* analysis to unfair methods of competition claims arising under HRS chapter 480."). *Compare with Rundgren v. Bank of N.Y. Mellon*, 777 F. Supp. 2d 1224 (D. Haw. 2011) (not a state court opinion, not applying *AGC*, and dealing solely with statute of limitations issues). |
| Illinois | No clear directive from legislature or highest court applying *AGC*. 740 Ill. Comp. Stat. 10/7 ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."); *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 386-88 (1990) (did not apply *AGC*). *Compare with Gutnayer v. Cendant Corp.*, 116 F. App'x 758 (7th Cir. 2004) (not state court and not discussing *AGC*); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 827-28 (7th Cir. 1999) (not state court). |
| Kansas | No clear directive from legislature or highest court applying *AGC*. *Bergstrom v. Noah*, 266 Kan. 829, 845 (Kan. 1999) (federal "authority is not binding upon any court in Kansas interpreting Kansas antitrust laws."); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211-12 (D. Kan. 1999) (Kansas state courts have not directly addressed the applicability of *AGC* to the antitrust laws of that state); *Four B. Corp. v. Daicel Chem. Indus., Ltd.*, 253 F. Supp. 2d 1147, 1151-53 (D. Kan. 2003) (citing *AGC* but following Kansas state court decision holding indirect purchasers have standing to sue); *In re TFT-LCD Antirust Litig.* ("*LCDs*"), 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (*AGC* is inapplicable to claims under the Kansas antitrust statute); *GPUs*, 540 F. Supp. 2d at 1097 (same). *Compare with Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from Kansas's "highest court[]" that applied *AGC* factors); *DRAM*, 516 F. Supp. 2d at 1094-95 (same). |
| Massachusetts | No clear directive from legislature or highest court applying *AGC*. Mass. Gen. Laws ch. 93A, § 1(b) (including direct and indirect purchasers in definition of "trade or commerce" for purposes of Massachusetts Antitrust Act); *Ciardi v. F. Hoffmann La Roche, Ltd.*, 436 |

| | |
|---|---|
| | Mass. 53, 762 N.E.2d 303 (Mass. 2002) (finding indirect purchasers could bring antitrust claim without discussing *AGC* factors); *Moniz v. Bayer Corp.*, 484 F. Supp. 2d 228, 231 (D. Mass. 2007) (declining to apply *AGC* standing analysis to Massachusetts claims).<br><br>*Compare with Fond Du Lac Bumber Exch., Inc. v. Jui Li Enter. Co.*, No. 09-CV-00852, 2012 U.S. Dist. LEXIS 125677, at *18-20 (E.D. Wisc. Sept. 5, 2012) (non-state law case that rejected defendants' state law standing challenge because plaintiffs already satisfied *AGC*); *Plavix*, 2011 U.S. Dist. LEXIS 8940, at *16-17 (plaintiffs in that case incorrectly conceded that state courts were guided by federal law and the unique "alleged 'injury' [wa]s from the lawful patent and [plaintiff's] lack of access to it" was "not of the type the antitrust laws were intended to prevent"). |
| Maine | No clear directive from legislature or highest court applying *AGC*. *Flash Memory*, 643 F. Supp. 2d at 1152 (not applying *AGC* to Maine antitrust law); *GPUs II*, 540 F. Supp. 2d at 1097 (same).<br><br>*Compare with Knowles v. Visa U.S.A.*, No. CV-03-707, 2004 Me. Super. LEXIS 227 (Oct. 20, 2004) (plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers); *Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from Maine's "highest court[]" that applied *AGC* factors); *DRAM*, 516 F. Supp. 2d at 1094-95 (same). |
| Michigan | No clear directive from legislature or highest court applying *AGC*. *Flash Memory*, 643 F. Supp. 2d 1133, 1152-53 (2009) (Michigan's harmonization statute does not establish *AGC*  applies to Michigan antitrust claims); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943 (N.D. Ill. 2009) (same); *GPUs*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (same).<br><br>*Compare with Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) (unpublished) (plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943-44 (N.D. Ill. 2009) (rejecting *Stark* as indicating Michigan's Supreme Court would apply *AGC*); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. Podiatric Surgery, Inc.*, 185 F.3d 606, 619 n.4 (6th Cir. 1999) (does not show Michigan's highest court would apply *AGC*); *Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from Michigan's "highest court[]" that applied *AGC* factors); *DRAM*, 516 F. Supp. 2d at 1094-95 (same). |

| Minnesota | *AGC* does not apply.  *Lorix v. Crompton*, 736 N.W. 2d 619, 627-28 (Minn. 2007) ("*AGC* factors do not provide the benchmark for antitrust standing in Minnesota") |
|---|---|
| Mississippi | No clear directive from legislature or highest court applying *AGC*. *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 343-44 (Miss. 2004) (involved an attempt by an employer to recover from tobacco companies for the health effects suffered by employees, and does not endorse or apply the *AGC* factors); *Flash Memory*, 643 F. Supp. 2d at 1152-53 (declining to apply *AGC*); *GPUs II*, 540 F. Supp. 2d at 1097 (refusing to apply *AGC* to claims under Mississippi's antitrust act). *Compare with DRAM*, 516 F. Supp. 2d at 1094-95 (admitting that there was no authority from Mississippi's "highest court"). |
| Nevada | No clear directive from legislature or highest court applying *AGC*. *Flash Memory*, 643 F. Supp. 2d at 1153 (not applying *AGC* to Nevada antitrust law); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010) (same). *Compare with DRAM*, 516 F. Supp. 2d at 1094-95 (admitting that there was no authority from Nevada's "highest court"). |
| New Hampshire | No clear directive from legislature or highest court applying *AGC*. *LaChance v. US Smokeless Tobacco Co.*, 156 N.H. 881 (2007) (not applying *AGC*); *In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms., Inc.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012) (New Hampshire legislature intended for indirect purchasers to have standing). *Compare with Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 786 (D.N.H. 1994) (non-state court case that never found that *AGC* applies to New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*); *Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from New Hampshire's "highest court[]" that applied *AGC* factors). |
| New Mexico | No clear directive from legislature or highest court applying *AGC*. *LCDs*, 586 F. Supp. 2d at 1123 (declining to apply *AGC* to New Mexico law); *CRT*, 738 F. Supp. 2d at 1023 (same); *GPUs*, 540 F. Supp. 2d at 1097 ("no state court in New Mexico . . . has reached the question of whether AGC applies."). *Compare with Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 775 (N.M. Ct. App. 2012) (plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers) |
| New York | There is no clear directive from New York's highest court or state legislature that AGC applies.  *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008). Defendants' citation to *Ho v. Visa U.S.A., Inc.*, ultimately contradicts their position because on appeal the decision was upheld on proximate cause grounds and not on the *AGC* factors. 16 A.D.3d 256 (N.Y. App. |

| | |
|---|---|
| | Div. 2005) ("Whatever damages they suffered are barely in the zone of injury, and would be virtually impossible to calculate."). Defendants' other citation does not go as far as to adopt the *AGC* test, as it never applies the other four factors, but rather only cites to it on the limited basis of denying plaintiff power to act as a private attorney general. *Cont'l Guest Servs. Corp. v Int'l Bus Servs., Inc.*, 92 A.D.3d 570, 571-72 (N.Y. App. Div. 1st Dep't 2012). |
| North Carolina | State court decision that *AGC* does not apply.  *Teague v. Bayer AG*, 671 S.E.2d 550, 557 (N.C. Ct. App. 2009) (holding that "the *AGC* factors do not apply in determining . . . standing to sue under the North Carolina antitrust statutes."); *CRT*, 738 F. Supp. 2d at 1023 (not applying *AGC* to North Carolina indirect purchaser claims). <br><br> *Compare with* cases cited in Defendants' Appendix 4 (ECF No. 314-4) (not dealing with *AGC* or admitting that there was no authority to apply *AGC* from North Carolina's "highest court"). |
| North Dakota | No clear directive from legislature or highest court applying *AGC*. *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003) (upholding certification of an indirect purchaser class without mentioning of the *AGC* factors); *CRTs*, 738 F. Supp. 2d at 1023 (not applying *AGC* to North Dakota indirect purchaser claims). <br><br> *Compare with Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *2-3 (N.D. Dist. Ct. Aug. 23, 2004) (plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers); *DRAM*, 516 F. Supp. 2d at 1094-95 (admitting that there was no authority from North Dakota's "highest court"). |
| Oregon | No clear directive from legislature or highest court applying *AGC*.  Or. Rev. Stat. § 646.715(2) ("federal decisions interpreting the analogous Sherman Act provision" "not binding") <br> *Compare with N.W. Med. Labs., Inc. v. Blue Cross & Blue Shield*, 794 P.2d 428 (Or. 1990) (not dealing with standing issues); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957 (9th Cir. 1999) (non-state court decision); |
| Rhode Island | No clear directive from legislature or highest court applying *AGC*. *Compare with ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351 (R.I. 1997) (not dealing with antitrust standing); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98 CIV. 4067, 1999 U.S. Dist. LEXIS 19194 (S.D.N.Y. Dec. 15, 1999) (non-state court decision). |
| South Carolina | No clear directive from legislature or highest court applying *AGC*. *Compare with Mellen v. Lange*, 659 S.E.2d 236 (S.C. 2008) (not about antitrust and not applying *AGC*); *Smith v. Citizens & S. Nat'l Bank*, 128 S.E.2d 112, 114 (S.C. 1962) (not about antitrust and not applying *AGC*); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489 (D.S.C. 1987) (non-state court opinion). |

| | |
|---|---|
| South Dakota | No clear directive from legislature or highest court applying *AGC*. *LCDs*, 586 F. Supp. 2d at 1123 (declining to apply *AGC* to South Dakota law). *Compare with In re S.D. Microsoft Antitrust Litig.*, 707 N.W.2d 85, 99 (S.D. 2005) (addressing attorneys' fee allocation, not standing); *DRAM*, 516 F. Supp. 2d at 1094-95 (admitting that there was no authority from South Dakota's "highest court"). |
| Tennessee | No clear directive from legislature or highest court applying *AGC*. *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 519-20 (Tenn. 2005) ("Tennessee does not have a statutory 'harmony clause'"); *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 499-500 (E.D. Pa. 2006) (Tennessee Supreme Court would not apply *AGC*); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2013 U.S. Dist. LEXIS 80338, at *77-78 (E.D. Mich. June 6, 2013) (noting that Tennessee courts apply the substantial effects standard to determine standing); *GPUs II*, 540 F. Supp. 2d at 1097 (declining to apply *AGC* to Tennessee law and noting that Tennessee does not have a harmonization provision). *Compare with Tenn. Med. Ass'n v. Blue Cross Blue Shield of Tenn., Inc.*, 229 S.W.3d 304, 307 (Tenn. Ct. App. 2007) (citing *AGC*, but not stating that *AGC* is the standard for standing under Tennessee law). |
| Utah | No clear directive from legislature or highest court applying *AGC*.  Utah Code Ann. § 76-10-3109(7) ("It shall also be presumed, in the absence of proof to the contrary, that the injured persons who dealt indirectly with the defendant incurred at least 1/3 of the damages, and shall, therefore, recover at least 1/3 of the awarded damages."); Utah Code Ann. § 76-10-3109(8) ("There is a presumption, . . . that each level in a product's or service's distribution chain passed on any and all increments in its cost due to an increase in the cost of an ingredient or a component product or service that was caused by a violation of this chapter. This amount will be presumed, in the absence of evidence to the contrary, to be equal to the change in the cost, in dollars and cents, of the ingredient, component product, or service to its first purchaser."); *Flash Memory*, 643 F. Supp. 2d at 1153 (refusing to find that harmonization provisions alone warrant the application of *AGC* to state antitrust claims). *Compare with Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795 (D. Utah 1998) (non-state court opinion regarding *employee* suing employer for antitrust violations). |
| Vermont | No clear directive from legislature or highest court applying *AGC*. *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002) ("Nowhere in [Vermont state law] is there any requirement that the definition of who may sue under the Act [VCFA] must be consistent with the definition of who may sue under federal antitrust law."); *D.R. Ward Constr.*, 470 F. Supp. 2d at 501 ("This Court cannot conclude as a matter of law that the Vermont Supreme Court would adopt the <u>AGC</u> factors for determining standing under the VCFA."); *CRTs*, 738 F. Supp. 2d at 1023 (declining |

| | |
|---|---|
| | to apply *AGC* to Vermont state law). *Compare with Fucile v. Visa U.S.A., Inc.*, No. S1560-03 Cnc, 2004 Vt. Super. LEXIS 42 (Dec. 27, 2004) (plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers). |
| West Virginia | W. Va. Code § 142-9-1.1 ("The purpose of this rule is to allow persons who are indirectly injured by violations of the West Virginia Antitrust Act to maintain an action for damages . . . ."); W. Va. Code § 142-9-1.6 ("Construction. --  This rule shall be liberally construed to effectuate the beneficial purposes of the West Virginia Antitrust Act."); *GPUs*, 540 F. Supp. 2d at 1097 (noting that no state court in West Virginia has reached the question of whether *AGC* applies and rejecting defendants' harmonization argument); *LCDs*, 586 F. Supp. 2d at 1122-23 (same); *CRTs*, 738 F. Supp. 2d at 1023 (not applying *AGC* to West Virginia indirect purchaser claims). *Compare with Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 220 W. Va. 602, 648 S.E.2d 366 (2007) (not dealing with *AGC* standing); *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 690 S.E.2d 587 (W. Va. 2009) (not dealing with *AGC* standing); *Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from West Virginia's "highest court[]" that applied *AGC* factors). |
| Wisconsin | *Flash Memory*, 643 F. Supp. 2d at 1152-53 (refusing to apply *AGC* to Wisconsin antitrust claims); *LCDs*, 586 F. Supp. 2d at 1123 (it is "inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws [including Wisconsin] in the absence of a clear directive from those states' legislatures or highest courts"); *CRTs*, 738 F. Supp. 2d at 1023 (not applying *AGC* to Wisconsin indirect purchaser claims). *Compare with Strang v. Visa U.S.A., Inc.*, No. S1560-03, 2005 WL 1403769, at *3, n.7 (Wis. Cir. Ct. Feb. 8, 2005) (the plaintiffs were neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory that merchants passed on the cost of a tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers); *Refrigerant Compressors*, 2013 U.S. Dist. LEXIS 50737, at *35-36 (noting split in authority and admitting that there was no authority from Wisconsin's "highest court[]" that applied *AGC* factors); *DRAM*, 516 F. Supp. 2d at 1094-95 (same). |
| Wyoming | No clear directive from legislature or highest court applying *AGC*. *Buckley v. Bell*, 703 P.2d 1089, 1092 (Wy. 1985) ("The usual rule in Wyoming is that proximate cause of harm is a question for the trier of fact unless reasonable persons could not disagree."). *Compare with Toltec Watershed Improvement Dist. v. Johnston*, 717 P.2d 808, 814 (Wy. 1986) (action for tortious interference of contract, |

| | not antitrust action). |
|---|---|