# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

This Document Relates To:

ALL ACTIONS

:
:
:
:
:
:
:
:
:
:
:

MDL No. 2481

Master Docket No.
13-md-2481-KBF-RLE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SUPPLEMENTAL DECLARATION OF MARK BRADLEY
## IN SUPPORT OF THE LONDON METAL EXCHANGE'S
## MOTION TO DISMISS ALL COMPLAINTS

I, Mark Brendan Bradley, declare under penalty of perjury that the following is true and correct, to the best of my knowledge, information and belief:

1.      I am currently the Head of Market Surveillance at the London Metal Exchange ("LME").  I have been employed by the LME since 2006.  Part of my job responsibilities include ensuring that the LME is fulfilling its statutory and regulatory obligations to maintain an orderly market and to afford proper protection to investors on the LME.  In connection with this role, I am one of the LME's liaison contacts with the UK's Financial Conduct Authority ("FCA").  I submit this supplemental declaration in support of the LME's motion to dismiss based on the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604.  This declaration supplements the declaration that I submitted on May 22, 2014 (Doc. No. 387).

2.      I listened to the hearing on the LME's motion to dismiss this litigation on sovereign immunity grounds.  I am submitting this declaration to supplement the facts that the

LME presented in support of that motion and to clarify some facts that were discussed at the hearing.

### The Warehouse Agreement Is Regulatory, Not Commercial

3.      I understand from listening to the hearing on the LME's motion to dismiss that the Court has questions about the agreement between the LME and approved warehouses and how the agreement relates to the LME's statutory obligation to comply with the Recognition Requirements and to regulate its market.  The following is a description of the relevant documents and an explanation of the Recognition Requirements that show that the totality of the LME's agreement with warehouses relates to its regulatory function.

4.      When a warehouse company wants to become an LME-approved warehouse, the first thing it does is apply to the LME.  A true and correct copy of the LME's response to such an application is attached as Exhibit A.

5.      Among other things, in order to become an LME-approved warehouse, the warehouse company must sign a two-page document entitled "Warehouse Agreement".  A true and correct copy of the Warehouse Agreement is attached as Exhibit B.  The Warehouse Agreement is a standard form agreement and the LME does *not* individually negotiate *any aspect of it* with any warehouse company.  It is not a bilateral individually negotiated contract.  The Warehouse Agreement itself makes this clear:  "This Agreement is in standard form and is required to be signed in its standard form by all warehouse companies wishing to become or remain listed as LME Warehouses."  *Id.* ¶ 1.

6.      The Warehouse Agreement expressly incorporates and requires approved warehouses to abide by a set of Terms and Conditions as they may change from time to time.  Attached as Exhibit C is a true and correct copy of the "Terms and conditions applicable to all

LME listed warehouse companies" ("Terms and Conditions").  The Terms and Conditions form part of the Warehouse Agreement, and the term "Warehouse Agreement" will be used in the remainder of this Declaration to mean the Warehouse Agreement incorporating the Terms and Conditions.  Every LME-approved warehouse must agree to abide by these standard Terms and Conditions.  *See id.* § 1.1.1.  The LME does not individually negotiate *any aspect of* these Terms and Conditions with any warehouse company either.

7.      As is apparent from Exhibit C, it is the Terms and Conditions that specify the strict rules and regulations that LME-approved warehouses must follow that are incorporated into the two page document that is Exhibit B.  Although called an "agreement," we think of the Warehouse Agreement as a rulebook governing the conduct of warehouses.  This is because the Warehouse Agreement contains a standardized set of rules that apply globally to all LME-approved warehouses, and because breach of these rules can and has resulted in the LME taking disciplinary action against the LME approved warehouses.

8.      There was discussion at the hearing about how the LME's regulation of warehouses and, in particular, its load-out rules "bite on" its investment business, *i.e.*, help the LME fulfill its obligations under the Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001 (2001/995), as amended ("Recognition Requirements").  A true and correct copy of excerpts of the Recognition Requirements is attached as Exhibit D.  I work with these Recognition Requirements all of the time.

9.      Section 4 of the Schedule to the Recognition Requirements requires the LME to maintain an orderly market and afford proper protection to investors on the LME.  This includes, among other things, ensuring that the LME has "satisfactory arrangements" for "the safeguarding

3

and administration of assets belonging to users of [its] facilities" and "for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange."  Ex. D, Recognition Requirements, sch., ¶ 4(2)(d), (g).

10.     The FCA's REC Sourcebook confirms that, to determine whether a Recognised Investment Exchange ("RIE"), like the LME, has made satisfactory arrangements for safeguarding and administration of assets belonging to the users of its facilities, the FCA considers "whether the arrangements include satisfactory procedures to ensure that any rights arising in relation to the assets held as a result of any actions by the *issuers* of those assets (or other relevant persons) are held, transferred or acted upon in a timely and accurate manner in accordance with the instructions of the owners of those assets".  FCA REC Sourcebook ¶ 2.11.3(4).  A true and correct copy is attached as Exhibit E.

11.     The LME's regulation of warehouses is necessary in order to meet these and other Recognition Requirements.  The metal traded on the LME is represented by a warrant; a warrant is what passes between buyer and seller when a transaction goes to physical settlement on the LME.  The metal that is the subject of that warrant is specifically identified in the approved warehouses.  Everything that the LME does in relation to warehouses is for the sole purpose of ensuring that, when a buyer takes delivery of a warrant on the LME, he knows exactly what he is getting, and he gets it.  This is what is meant in the Recognition Requirements by the "safeguarding and administration of assets belonging to users of the exchange's facilities", and "satisfactory arrangements are made for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange."  Ex. D, Recognition Requirements, sch., ¶¶ 4(2)(d), (g); *id.* sch. ¶ 3(2)(e).  The

4

requirements of the Warehouse Agreement are designed around this purpose, *e.g.*, to take the first few requirements set out in the agreement by way of example:

a.  the requirements related to capital (clause 1.2) are to ensure a warehouse will not become insolvent and be unable to release metal represented by a warrant when needed;

b.  the requirements related to having a London Agent and LMEsword (clauses 1.3 and 1.4) are to ensure that the warehouse has satisfactory arrangements in place for creating warrants in respect of parcels of metal, for lodging warrants in the LMEsword Depository, and for withdrawing them when required;

c.  the "restrictions" (clause 1.5) are to ensure that timely delivery of the metal represented by warrants can occur, and that warehouses do not abuse confidential and market-sensitive information in their possession, which would threaten the orderly functioning of the LME's market, by dealing in warrants;

d.  the requirements related to putting metal on warrant (clause 2.1) are to ensure that the metal conforms to the minimum technical specifications set out by the LME Rules (referred to as the "Special Contract Rules"), so that the buyer knows what he is getting when he receives a warrant;

e.  the requirements related to the form of warrants (clause 2.2) are to ensure that warrants are standardised and fungible and conform to the requirements of the Exchange, so that the metal represented by the warrant can be easily located and delivered out to the buyer;

f.   the requirements related to the legal status of warrants (clause 2.3) are to ensure that warrants can operate effectively to transfer ownership of the metal represented by the warrant in any relevant jurisdictions;

g.   the requirements related to a warehouse's liability to warrant holders (clause 2.4) are to ensure that the warrant holders are confident that their metal is stored properly and thus the metal will be in an appropriate condition to secure the financial paper that the warrant holders are trading on the Exchange;

h.   the requirements related to replacement of warrants (clause 3.1) are to ensure that if a warrant is lost, there is a process for replacing it, so that timely discharge can occur.

Ex. C.

12.    There are many other examples embedded in the Warehouse Agreement that reflect the LME's obligation to regulate its warehouses to safeguard the interests of its investors.

13.    The Recognition Requirements that govern our conduct today have been in force since 2001.  These Recognition Requirements are different from those that were in effect at the time of the *Albatros* decision that was discussed at the hearing.  Attached as Exhibit F is a true and correct copy of Schedule 4 to the Financial Services Act 1986 ("1986 Schedule 4").  That is the "Schedule 4" that the *Albatros* court discusses.

14.    In 2001, the UK Treasury adopted the Recognition Requirements that are attached as Exhibit D.   It is these Recognition Requirements that specify the LME's regulatory obligations since 2001 and through to today, not the 1986 Schedule 4.

15.     The Recognition Requirements that I deal with every day are longer and more detailed than the 1986 Schedule 4.  In particular, the Recognition Requirements expressly require the LME to (1) "protect the orderly functioning of the market," (2) have "satisfactory arrangements" for "securing the timely discharge . . . of the rights and liabilities of the parties to transactions effected on the exchange;" and (3) have "satisfactory arrangements" for "the safeguarding and administration of assets belonging to users of [its] facilities".   Ex. D, Recognition Requirements, sch., ¶ 4(2)(a), (d), (g); *id.* ¶ 3(2)(e).  The 1986 Schedule 4 did not expressly impose any of these obligations on the LME.  *Compare* Ex. F, 1986 Schedule 4 *with* Ex. D, Recognition Requirements, sch., ¶ 4(2)(a), (d), (g); *id.* ¶ 3(2)(e).  It is because of these express obligations in the Recognition Requirements that the LME believes that all aspects of its regulation of approved warehouses are part of its public regulatory function, regardless of whether all or only some aspects would have been considered regulatory under the different statute in place when the *Albatros* case was decided.  In my mind, it is even more clear today that the LME's regulation of warehouses is part of its regulatory obligations than it was at the time of *Albatros*.  I believe that is why the Court in *Rusal* said that there was no dispute that the LME's load-out rule was subject to judicial review.

16.     At the hearing, I heard the Court state that it would be interested to hear the FCA's views on whether it considers the LME's regulation of warehouses, and the load-out rules in particular, a part of the LME's regulatory obligations under the Recognition Requirements. So, after the hearing, we approached representatives of the FCA to ask them for their views. Attached as Exhibit G is a true and correct copy of a letter that the LME received from the FCA in response.  This letter states that the FCA views the LME's regulation of its warehouses, including its regulation of metal load-out, as necessary for the LME "to meet its regulatory

obligations as a RIE," including its "obligations to ensure the fair, smooth and orderly functioning of its markets, the integrity of its markets, and the effectiveness of its price discovery arrangements."  Ex. G

### The LME's Warehouse Agreement Is Subject To Public Consultation

17.     As I described in my May 22 declaration at paragraphs 63-66, the Recognition Requirements obligate the LME to "ensure that appropriate procedures are adopted for it to make rules, for keeping its rules under review and for amending them."   Ex. D, Recognition Requirements, sch., ¶ 7(1).  The LME's procedures must also "include procedures for consulting users of the exchange's facilities in appropriate cases."  *Id.* ¶ 7(2).  The FCA's REC Sourcebook also obligates the LME to consult the market in appropriate cases.  May 22 Bradley Decl. ¶ 64, Ex. M.

18.     Because of the importance of warehouses to the LME's ability to maintain an orderly market, as I described in my previous declaration (May 22 Bradley Decl. ¶¶ 43-49), the implementation, operation and enforcement of the Warehouse Agreement is an integral part of the LME's regulatory function.  Thus, before the LME can make any material change to the Terms and Conditions, it must first publish the proposed changes, including the reasons for the changes, and consult with the market before actually adopting them.  The Terms and Conditions themselves reflect the LME's statutory obligation to consult users of its facilities in appropriate cases.  *See* Ex. C, Terms and Conditions §§ 9.11.3-4.  To clarify the discussion at the hearing, the LME must and does consult the market whenever it changes any material aspect of the Warehouse Agreement.[1]  If a warehouse objects to a rule change that the LME adopts after a

---

[1]     Section 9.11.3 has a narrow exception where the change "is considered to be an emergency and essential for the proper operation of the market".  Ex. C.  In these exceptional circumstances, the LME can change the terms of the Warehouse Agreement without consulting

consultation, the warehouse can challenge that rule through judicial review (which, as we have said previously, is a process reserved for inarguably public bodies) or the LME's complaints procedure discussed below, or delist itself from the LME system.

19.     Further, as set out in my May 22 declaration at paragraph 55, the LME has the authority to investigate and discipline its listed warehouses, and the Warehouse Agreement expressly incorporates the LME's handbook on enforcement and disciplinary procedures.  Ex. C, Terms and Conditions § 8.   The authority to investigate and discipline warehouses is an important part of ensuring compliance with the LME's regulatory obligations set out in the Recognition Requirements.   This is indicative of the "rulebook" nature of the Warehouse Agreement:   I am not aware of any supposedly "commercial" agreements which set out procedures for one party to investigate, and take enforcement action against, another party.

### The LME's Load-Out Rules Are An Aspect Of The LME's Fulfillment Of Its Obligations Under Section 4 Of The Schedule To The Recognition Requirements

20.     Consistent with the previous discussion, the LME's load-out rules are not a part of a commercial contract but are part of the LME's regulatory functions; in fact they are at the heart of it.  The LME's load-out rules flow directly from the requirements of Sections 3 and 4 of the Schedule to the Recognition Requirements because the "assets belonging to users of [the LME's] facilities" are the metal that is stored in LME-approved warehouses that underpin the financial contracts traded on the LME.  Ex. D, Recognition Requirements, sch., ¶¶ 3(2)(e), 4(2)(g).  And, in order to ensure "the timely discharge" "of the rights and liabilities of the parties to transactions" on the LME "by performance," the LME must ensure that users of the exchange can, if they so choose, physically settle LME futures contracts in a timely manner.  *Id.* ¶ 4(2)(d).

---

the market and those changes would be binding on all approved warehouses.  The LME would not individually negotiate any such emergency change with any warehouse.

This means that the load-out rules are integral to the LME's compliance with the Recognition Requirements.

21.     Even though physical settlement of contracts happens relatively rarely, the possibility that it could happen is a vital lynchpin in attempting to ensure that the LME price converges as much as possible with the all-in physical price of metal.

22.     The LME continues to review and adjust its load-out rules because warehouse queues can, if they grow large enough, cause the LME price to diverge from the all-in price.  The reason for that is, amongst other things, because owners of LME warrants have to pay rent while their metal is stored in an LME-approved warehouse.  Sellers of warrants on the LME have the option to settle an LME futures contract with the least valuable warrant and sometimes that means the warrant with the most rent attached to it.  Because sellers can settle futures contracts with warrants subject to significant rent obligations, purchasers of futures contracts on the LME are bidding less for those contracts because they feel that the warrants they may receive may be worth less.  This causes the LME price to diverge from the all-in price and therefore threatens the orderly functioning of the LME's market.  This is why the LME regulates the load-out of metal from its warehouses, and why the FCA has closely supervised the LME's regulation of the load-out rules as described in more detail below.

23.     I heard the Court ask at the hearing how the LME could have the responsibility to regulate approved warehouses if the FCA itself does not directly regulate warehouses.  In the Recognition Requirements, the UK Treasury imposed the obligation to regulate approved warehouses directly on the LME.  Ex. D.  The FSMA, in turn, obligates the FCA to supervise the LME's performance of that regulatory function.  *See* Ex. G.  Indeed, if the LME does not take steps to enable users of the exchange to discharge in a timely manner their rights and obligations

under LME contracts, the LME could be in violation of its obligations under the Recognition Requirements and the FCA could, among other options, order the LME to take specified steps or revoke the LME's status as an RIE.  Ex. H, FSMA §§ 296, 297.

**The Load-Out Rules Like Other Changes To The LME's Terms And Conditions Are Set Through Public Notice And Consultation Procedures Proving That They Are Part Of The LME's Regulatory Function**

24.      There was some confusion at the hearing about whether the actual rule requiring a minimum load-out of metal from approved warehouses is in the Warehouse Agreement or not.

25.      Clause 4.2 of the Terms and Conditions provides that "[t]he Warehouse is required to expedite delivery from warehouses at the minimum rates published from time to time by the Exchange in accordance with Clause 9.11.1."  Ex. C, Terms and Conditions § 4.2.  The same clause goes on to state that "[f]or the avoidance of doubt, any change to the minimum rates would constitute a material increase in the obligations of a Warehouse which would require consultation and notification in accordance with Clause 9.11.4"; this is an explicit acknowledgement that a change to the load-out rates is a material change that the LME could not effectuate unless it consults the market in accordance with the LME's statutory obligation to consult users of its facilities.  Clause 9.11.1 provides that the LME "may issue notices from time to time concerning any matter relevant to the performance by a Warehouse of its obligations under this Agreement."  *Id.* § 9.11.1.  Further, "[e]ach Warehouse shall comply with the terms of any such notice."  *Id.* § 9.11.2.

26.      The load-out rules that are the subject of this case are set forth in separate notices that the LME issued pursuant to Clauses 9.11.1 and 9.11.2 of the Terms and Conditions.  To fulfil the LME's consultation obligations under the Recognition Requirements, each of the changes that the LME has made to the load-out rules since their formal adoption in 2003 have

been the subject of a public notice and consultation process, as I detailed in my May 22 declaration at paragraphs 68-80 and exhibits S-BB.

27.     A party who believes that the LME failed to follow proper notice and consultation procedures before issuing a change to its load-out rules can challenge the changes in a judicial review proceeding in the UK court.  Rusal did this in 2013 in connection with the LME's proposal to introduce a new rule that links the amount of metal a warehouse must load-out to the amount of metal it loads in, known as the "LILO rule."  *See R v. The London Metal Exchange ex parte United Co. Rusal PLC*, [2014] EWHC 890 (Admin) ("*Rusal*"), attached as Ex. R to my May 22 declaration.  If the UK court concludes that the LME failed to follow proper procedures in changing its load-out rules, it can quash the proposed changes, as the Queen's Bench Division of the Administrative Court in the UK High Court of Justice did in the *Rusal* case.  *See id.* ¶ 104.

28.     The LME has consulted with the FCA, has issued public notices and has consulted on every change (including the pending proposed change) to the load-out rules since formally adopting them in 2003.

## Any Purported Agreement About When, How Or Whether To Regulate Warehouses Would Be Part Of The LME's Regulatory Function

29.     I understand that plaintiffs claim in this case that the LME conspired with the warehousing defendants to treat the minimum load-out rule as a maximum, and that such an agreement would somehow be outside the LME's regulatory functions.  I have been with the LME since 2006 and I have never heard of such an agreement.  But an agreement like that would not be outside the LME's regulatory functions in any case.

30.     All that warehouses are obliged to do under the Warehouse Agreement is load out the minimum.  Thus, plaintiffs' claim is really saying that, if the LME had not conspired with the warehousing defendants, the LME would have forced warehouses to load out more than the

minimum.  But there is no way that the LME could do that, without discussing it with the FCA, publishing the proposed changes and consulting with the market just as the LME did with each of the four changes that it has made to the load-out rules since 2010.  And the LME's consultation process would be subject to judicial review in a UK court to determine whether it was fair.  Indeed, during the recent judicial review proceedings of the LILO consultation, Rusal argued that, instead of adopting the LILO rule, the LME should cap approved warehouse rents.  The UK court found that the LME should provide more information to the market on the rent-capping issue and quashed the LILO rule.  May 22 Bradley Decl., Ex. R, *Rusal* ¶ 74.

31.     Put another way, if the LME made an unlawful agreement with the other defendants not to exercise its best judgment in its regulation of warehouses, plaintiffs' claim would still be based upon the LME's regulatory conduct, not its commercial conduct.  The ultimate decision about whether, how and/or when to regulate warehouses always remains with the LME as the regulator of our market under the Recognition Requirements.  Plaintiffs' allegation that the LME did something wrong by supposedly "agreeing" that approved warehouses did not need to load out more than the minimum amount that the LME's rules require is the exact same thing as saying that the LME should have noticed, consulted on and made subject to judicial review a different rule.  To me that means that plaintiffs' claim is based upon our alleged malfeasance in the execution of our regulatory function.

32.     If so, then plaintiffs should have taken advantage of the complaints procedure that I discussed at paragraph 66 of my May 22 declaration.  To the extent that a person has concerns about the LME's behavior, the Recognition Requirements require the LME to have in place a process for addressing those issues.  Ex. D, Recognition Requirements, sch., ¶ 9.

33.     The LME has precisely those procedures in place, including an independent Complaints Commissioner.  Attached as Exhibit I is a true and correct copy of the LME's Complaints Procedure.  Indeed, as I explained in my May 22 declaration at paragraph 70, the reason that the LME engaged Europe Economics to study warehouse queues in 2010 was because of complaints, both formal and informal, that the LME had received about delivery delays.  Any "complaints made against the LME, its personnel, its members *or its listed warehouses* which may involve breaches of statutory duty, the LME rules or the proper operation of the market" will be investigated by the LME in the first instance in accordance with the complaints procedure.  Ex. I, Complaints Procedure ¶ 1 (emphasis added).  "For complaints arising in connection with the performance of, or failure to perform, any of its *regulatory functions*, if the complainant is dissatisfied with the investigation of the complaint or with the reported outcome of the investigation, he may request that the complaint is referred to the LME's independent Complaints Commissioner."  Ex. I, Complaints Procedure ¶ 12 (emphasis added).  The Complaints Commissioner has a wide range of powers, including "to make a recommendation, if appropriate, that the [LME] makes a compensatory payment to the complainant and/or remedies the matter complained of."  Ex. I, Complaints Procedure ¶ 13.

**The FCA Actively Supervises The LME's Regulation Of Approved Warehouses And Its Adoption And Implementation Of The Load Out Rules**

34.     I described in my previous declaration how the FCA actively supervises the LME, including how it actively supervises the LME's regulation of approved warehouses.  May 22 Bradley Decl. ¶¶ 47-49.  I understand that at the hearing we offered to provide the Court with additional information regarding when the FCA began supervising the LME's regulation of approved warehouses and in particular the load-out rule.  I also understand that the Court has asked whether the FCA supervises the LME's changes to the Warehouse Agreement.

35.     The FCA, and its predecessor, the Financial Services Authority, have actively supervised the LME's regulation of its approved warehouses for at least the entire period during which the Recognition Requirements have been in force.  The FCA itself has confirmed its active supervision of the LME's regulation of approved warehouses in the letter that is attached as Exhibit G.  It states "the FCA, as part of its supervision of LME, expects the LME to ensure that its warehousing arrangements provide effective and efficient services for the receipt, holding, and delivery of metal related to the trading of LME contracts."  *Id.*  The letter further states that "the FCA expects the LME to at all times keep it informed of significant developments of progress with its plans and operational initiatives in relation to its warehousing arrangements." *Id.*

36.     Since at least 2006 when I joined the LME, one standing agenda item for the monthly "Regulatory Compliance" meeting between the LME and the FCA has been to discuss any changes to the LME's rules that govern approved warehouses, including changes to the Warehouse Agreement, as well as changes to the load-out rules.  Thus, the LME has consulted with the FCA about every material proposed change to the Warehouse Agreement and every proposed change to its load-out rules since at least 2006, including the changes to the load-out rules that I discussed in paragraphs 70-80 of my May 22 declaration.

37.     The regular and frequent meetings between the LME and the FCA give the FCA the forum to ask the LME questions about various issues, including proposals and consultations related to approved warehouses, and the supervisors do so.

38.     I understand that the Court has asked when the LME began discussing with the FCA the proposed changes to the load-out rules that became the subject of the LME's July 2013 market consultation.

39.     On November 16, 2012, in response to the FCA's request, the LME provided the FCA a spreadsheet listing the length of queues at a selection of warehouses, shown quarterly since March 2011.  Per the FCA's request, this spreadsheet was updated and sent to the FCA on a regular basis until just this month because the length of queues at particular locations is now made public on the LME's website.

40.     On December 4, 2012, the possible introduction of minimum load-out rates per warehouse rather than per location was part of the agenda for a meeting between the LME and the FCA.  The LME representatives explained why this proposal was not a feasible option, primarily because of the logistical difficulties it would create for warehouse companies.

41.     At a standing meeting held on January 7, 2013, "Update on 15 November 2012 Notice on the consultation on proposed delivery out rate changes" was an agenda item.

42.     On April 10, 2013, at a standing monthly FCA meeting, the LME outlined its plans for the proposed LILO consultation.  And, on May 8, 2013, "Consultation, Complaints and Rule Changes" was an agenda item at a regular FCA meeting.

43.     Apart from the standing monthly meetings, the LME met with the FCA to discuss the LILO proposal.  For example, on June 6, 2013, the LME met with the FCA specifically to focus on a possible consultation on linked load-in and load-out rates.  The LME subsequently sent the FCA the proposed consultation notice for the LILO rule and met with the FCA to discuss it on June 18, 2013.  After the consultation had closed, during October and November 2013, the LME discussed the consultation and proposed rule change further with the FCA: indeed, the LME had to delay sending out the results of the consultation to the market (*i.e.,* the notice that the LME would be implementing the LILO rule) because it was waiting for the FCA's approval.

44.     I understand from the hearing that the Court asked whether there is any publicly available information that would indicate when meetings or discussions with the FCA have occurred, beyond the public record that there are at least four meetings a year.  I am not aware of any such public information.  It is my understanding that the FCA does not publish the specific details about its interactions with RIEs because of confidentiality and market confidence issues.  See  *http://www.fca.org.uk/about/governance/transparency/confidential-information*.     However, the FCA's letter at Exhibit G confirms their close and active supervision of the LME.

45.     Beginning at least as early as January 2011, the LME regularly and frequently provided the FCA with reports concerning, among other things, warehousing issues.  In fact, the LME and the FCA met nearly every month—and sometimes multiple times per month—during the past three and a half years to discuss warehousing issues.  These meetings include standing monthly meetings, warehouse specific meetings (monthly, quarterly, and biannually), and meetings between the FCA and the CEO of the LME.  The agenda items for these meetings range from the load-in/load-out rules and related consultations to the LME's ongoing review of changes to load-in load-out rules, and from the Europe Economics study that plaintiffs reference in their complaints to this class action litigation itself.  Often as an attachment to the agendas circulated before the meetings, and in response to requests from the FCA, the LME provided data analyses regarding warehouse queues, load out rates, stock levels, and warrant cancellations.  In other words, the LME provided the FCA with comprehensive warehousing information so that the FCA could monitor—and actively supervise—the LME's regulatory conduct with respect to warehousing.

46.     Enclosed as Exhibit J is a chart of examples of meetings with the FCA where LME representatives and the FCA discussed warehousing issues.  To my knowledge, there were

at least 52 such meetings since January 2011.  *Id.*  The LME does not take minutes of its meetings with the FCA.

47.    The LME has a very open relationship with the FCA and makes every effort to engage with the FCA and provide the information and documents that it requires to carry out its regulatory function and to adequately supervise the LME in the carrying out of its regulatory functions.

48.    I understand that the plaintiffs have argued that the FCA has no control over the appointment of any officers or directors of the LME.  That is not correct.  The FCA conducts "Significant Influence Function" interviews of individuals proposed for appointment to key LME positions, namely its CEO, Head of Regulation and Compliance and members of the Board of Directors.  *http://www.fca.org.uk/firms/being-regulated/approved/approved-persons/sif*.   If the FCA is not satisfied with the proposed appointments, it has the power to cause the LME to refuse the appointments.  *Id.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information and belief, pursuant to 28 U.S.C. § 1746.

Executed on June 10, 2014

_Mark Bradley_
Mark Brendan Bradley

# EXHIBIT A

date

name
address

Dear

Thank you for your enquiry concerning the process for applying for listing as an LME approved Warehouse Company. Please find herewith the following documents:

1. Draft Warehouse Agreement, to be completed by the applicant warehouse company.

2. The terms and conditions applicable to all LME listed warehouse companies.

3. Draft Schedule A, to be completed by the applicant warehouse company.

4. Draft Schedule B, which relates to details of individual warehouses

5. LME prescribed form of indemnity.

6. The current disciplinary procedures handbook.

7. The statement of financial information, to be completed by the applicant warehouse company.

8. A pro-forma insurance certificate, to be written by the applicant warehouse company's insurance company on its own headed paper.

9. Capital adequacy requirements for LME listed warehouse companies.

When submitting these forms, you should also write to the LME providing the following information:

1. Details of the company's activities, particularly in respect of metals. If the applicant is part of a group structure, it should provide details of the activities undertaken by other companies within the group. You should note that, as a guideline, **the Exchange has determined that an applicant for listing should be able to demonstrate at least one year's relevant experience in the storage of metals, in particular LME metals,** and that at the time of application the applicant employs sufficient suitably qualified staff to support the proposed LME related business activities.

2. A list of directors and/or relevant senior managers, giving their names with a brief history of their activities and their present responsibilities within the company.

3. Confirmation that the company or its owner or controller or any affiliate has not had any application for listing rejected by any other Exchange or similar body.

**Please note that for all companies applying for a warehouse in the EU it is compulsory that you have AEO status.**

The LME, as part of the listing application process, may well request further information from the applicant regarding its past, present and future activities and such other information as the LME in its absolute discretion considers appropriate. Failure to provide relevant information or the provision of inaccurate or misleading information may delay or terminate consideration of the application.

When considering the application, the Exchange will take into account whether, in its opinion, the applicant is owned and/or controlled by a person who is suitable to own and/or control an LME listed warehouse company, after taking into account all or any of the factors that result from the due diligence process.

The Exchange's decision concerning the application will be conveyed in writing to the applicant.

Yours sincerely,

**Robert Hall**
**Head of Physical Operations**

# EXHIBIT B

**The London Metal Exchange**

and

**The Warehouse Company named in Schedule A**

**WAREHOUSE AGREEMENT**

**This Agreement is made on the date stated at the end between:**

(1) **The London Metal Exchange** ("the **Exchange**") of 56 Leadenhall Street, London EC3A 2DX; and

(2) **The Warehouse Compan**y named in Schedule A to the attached terms and conditions (the "**Warehouse**").

**Whereas:**

(A) The Warehouse wishes to become a listed LME warehouse, has complied with the pre-conditions specified in this Agreement (incorporating the attached terms and conditions, as amended from time to time in accordance therewith) (this "**Agreement**") and by executing this Agreement agrees to comply with its terms and the other requirements set out herein.

(B) The Exchange by executing this Agreement agrees to accept the Warehouse as a listed warehouse for the purpose of its Rules on the terms and conditions set out herein and therein.

**It is agreed** as follows:

**1      Agreement to become a listed Warehouse**

The Warehouse, having completed and signed the questionnaires set out in Schedules A and B and complied with all other pre-conditions to listing as set out in this Agreement, seeks application for listing as a Warehouse by the Exchange. On the Exchange executing this Agreement and thereby accepting such application, the Warehouse agrees to comply with all of the terms of this Agreement, the LMEsword Regulations and Operating Procedures and Exchange notices issued pursuant thereto. This Agreement shall supersede all previous agreements between the Exchange and the Warehouse which shall cease to have any force or effect, provided that such cessation shall be without prejudice to any pre-existing rights, obligations or liabilities and notices issued by the Exchange pursuant to any former agreement shall remain in full force and effect.  This Agreement is in standard form and is required to be signed in its standard form by all warehouse companies wishing to become or remain listed as LME Warehouses.  This Agreement, when signed by the Exchange, shall supersede any previous agreements on the subject.

**2      Accuracy of Information**

The Warehouse undertakes that all information provided to the Exchange in connection with its application for listing, including without limitation the information set out in Schedules A and B, has been given after due and careful enquiry and is materially true, accurate, complete and is not misleading in any material aspect.

**3      Acceptance**

Following the Exchange's accepting the application by executing this Agreement the Exchange shall deliver one fully executed version of this Agreement to the Warehouse and notify it of the warehouses which shall be authorised warehouses for the purposes of this Agreement.

**In witness** whereof this document has been executed the day and year set out below.

SIGNED ……………………………………………………………………………………..

for an on behalf of the Warehouse Company named in Schedule A to the attached terms and conditions

Dated  …………………………….


SIGNED  …………………………………………………………………………………...

for and on behalf of the London Metal Exchange

Dated …………………………….

which shall be the date of this Agreement and the date the Warehouse shall be deemed listed.

# EXHIBIT C

**Terms and conditions applicable to all LME listed warehouse companies**

## 1      Conditions for and entitlements of listing

### 1.1      Application

To become a Warehouse, a warehouse company shall:

**1.1.1**      execute the Agreement of which these terms and conditions form a part;

**1.1.2**      duly complete the forms prescribed by the Exchange attached as Schedule A and B hereto and pay any initial listing fees prescribed by the Exchange; and

**1.1.3**      comply with regulation 2.2 of the LMEsword Regulations.

### 1.2      Capital

**1.2.1**      Each Warehouse must be adequately capitalised at all times at levels determined from time to time by the Exchange and notified to all Warehouses by way of periodical circulars.

**1.2.2**      The Exchange shall assess whether a Warehouse's available capital is adequate by using the most recent audited accounts of the Warehouse and applying generally accepted accounting principles to determine the extent to which net assets exceed net liabilities. The Exchange shall, from time to time, publish the basis on which it determines capital adequacy for Warehouses. In assessing whether a Warehouse's available capital is adequate, the Exchange shall, at its discretion, disregard what are, in its view, immaterial or temporary failures to meet the capital adequacy requirements.

**1.2.3**      In the event that the Exchange is not satisfied with the financial status or the insurance arrangements of any Warehouse, it may require a performance bond issued by a bank or insurance company as it considers suitable for such sums and on such terms and conditions as it may determine. However, where the deficiencies in the financial status or the insurance arrangements of any Warehouse are, in the view of the Exchange, not likely materially to prejudice the Warehouse's ability to perform its obligations as an LME listed warehouse company and are capable of remedy, the Exchange may allow 7 Business Days for the Warehouse to rectify its financial status and/or insurance arrangements before requiring such a performance bond.

### 1.3      London Agent

**1.3.1**      Each Warehouse must appoint and maintain at all times an agent in or, in the opinion of the Exchange, sufficiently proximate to the City of London (a "London Agent") to act on its behalf, to carry out certain of its obligations under this Agreement and the LMEsword Regulations, and, if the Warehouse is not incorporated in England and Wales, also to act as its agent for service of process.

**1.3.2**      A London Agent may be a person independent from the Warehouse or be a branch or affiliated company of the Warehouse.

**1.3.3**      The Warehouse must obtain the prior approval of the Exchange to the appointment, or any change in the appointment, of its London Agent from time to time.

**1.3.4**    Each Warehouse shall be responsible for all of the acts and omissions of its London Agent undertaken in its capacity as such. The Exchange and other persons shall be entitled to assume a Warehouse's London Agent acts with the full authority of the Warehouse until such time as the Exchange has received written notice from the Warehouse that the London Agent has ceased to act as such. This term shall not affect the rights and obligations of the Warehouse and its London Agent inter se.

## 1.4    LMEsword

Each Warehouse must comply, and procure that its London Agent complies, with the LMEsword Regulations and Operating Procedures, which shall insofar as they relate to the Warehouse or its London Agent be deemed to be incorporated into this Agreement.

## 1.5    Restrictions

**1.5.1**    An authorised warehouse may be used by only one Warehouse and to the extent that it is used for the storage of any metals which are permitted to be the subject of a Contract, may not also be used to store such metals which are deliverable on any other exchanges.

**1.5.2**    A Warehouse may not deal directly or indirectly in Contracts, and shall observe such other requirements contained in any Exchange notice relating to the separation of Warehouses from Members and the maintenance of confidentiality in respect of price sensitive and customer confidential information.

## 1.6    Description of Warehouse

Each Warehouse may, following its approval by the Exchange as a listed Warehouse, describe itself as an "LME listed warehouse company" and its authorised warehouse as "LME listed warehouses", for as long as it retains its listed status as provided for herein.

## 1.7    Availability of Rules

Warehouses shall be sent a copy of the Rules and LMEsword Regulations and Operating Procedures as amended from time to time. Warehouses shall ensure that their London Agent obtains and keeps up to date their own copies of such documents direct from the Exchange and is also provided with a copy of this Agreement. Where the Warehouse operates in more than one location it shall ensure that each location is kept up to date with changes to the Rules, the LMEsword Regulations and Operating Procedures and this Agreement.

# 2    Issue of Warrants

## 2.1    Metal delivery

**2.1.1**    When receiving metal for placing on Warrant, a Warehouse need not undertake an assay of the metal itself but must carefully undertake a visual inspection of the metal and all supporting documentation and, if the metal or the supporting documentation is in any way patently sub-standard or anomalous the Warehouse must not issue a Warrant until any such shortcoming has been remedied. Without limitation to the foregoing, metal will be deemed to be patently sub-standard if:

2.1.1.1   there is broken or visibly corroded strapping which could make the bundle of metal unsafe to handle;

2.1.1.2   there is visible contamination of metal;

2.1.1.3   there is inconsistent branding of metal (for instance, where all of the metal or some of the metal is patently not an LME brand or where different LME brands have been visibly mixed within a bundle); and

2.1.1.4   the supporting documentation and paperwork does not accord with the Rules.

For the avoidance of doubt, a Warehouse is not required to break bundles or inspect metal ingots hidden from view within bundles, unless there are visible signs indicating or suggesting a defect in quality within a bundle or the Warehouse is in any way aware that there is a defect within a bundle not apparent from a visual inspection.

2.1.2   All metal delivered for placing on Warrant must be weighed by Warehouse personnel on equipment which is regularly tested for accuracy in accordance with Clause 7.4.3.

2.1.3   Subject to Clause 2.1.1, no Warrant may be issued if the metal or supporting documentation does not conform to the relevant Special Contract Rules for Metals.

2.1.4   A Warrant may only be issued by the Warehouse or its London Agent when the metal in question is stored in an authorised warehouse of the Warehouse.

## 2.2   Form of Warrant

2.2.1   From the date prescribed by the Exchange, all Warrants must be issued in accordance with the LMEsword Regulations.

2.2.2   Each Warehouse shall ensure that the form of the Warrant is such that the requirements set out in the Special Contract Rules for Metals, this Clause 2.2 and Clause 2.3 are satisfied.

2.2.3   Each Warrant must have a clearly identifiable space for endorsements to allow for transfers of ownership to a named transferee and also have a clearly identifiable space for endorsement of rents paid to be marked on the Warrant.

2.2.4   Each Warrant must show the applicable rent rate and the date of commencement of the obligation to pay rent which must be the same as the date of issue of the Warrant.

2.2.5   Each Warrant must include a term stating that responsibility for insuring the metal subject to the Warrant is that of the holder of the Warrant.

2.2.6   Each Warrant should be numbered consecutively wherever practicable.

2.2.7   No Warrant may be issued by a Warehouse until the printed format which the Warehouse proposes to adopt has been delivered to and approved by the Exchange. Any proposed change to such format must similarly be approved by the Exchange prior to its use.

**2.2.8** Each Warrant must be signed by an authorised signatory of the Warehouse or its London Agent.

**2.2.9** Each Warrant shall state that the Warehouse's standard terms of business are available on request or are printed on the reverse side of the Warrant.

## 2.3 Legal status of Warrants

**2.3.1** Each Warrant must be transferable by delivery or by delivery and endorsement by the transferor and without requiring registration, attornment or notice to the Warehouse. A transferee of a Warrant shall be treated by the Warehouse as having the benefit of the contract of storage of the metal to which the Warrant relates and shall be bound by the Warehouse's standard terms of business insofar as they do not conflict with the Rules, the LMEsword Regulations or the Operating Procedures.

**2.3.2** Each Warrant must be a document of title (or local equivalent concept) established in accordance with the law of the country in which the Warehouse is situated, or in accordance with such other law recognised as applicable to the Warrant by such law.

**2.3.3** It must be a term of issue of each Warrant that the metal which it represents shall only be delivered up to the holder by the Warehouse on the Warrant being presented to the Warehouse or its London Agent or, in the event of a Warrant being lost, stolen, damaged or destroyed, against the provision of an indemnity substantially in the form prescribed by the Exchange from time to time and attached as the Appendix to Schedule A.

**2.3.4** Subject only to Clause 2.3.5, a Warrant must be unlimited as to duration and remain valid until presented for cancellation to the Warehouse or its London Agent or otherwise cancelled in accordance with this Agreement and the LMEsword Regulations.

**2.3.5** A Warehouse may have a right of retention in respect of metal under Warrant for unpaid rent in respect of the metal and other charges owed by the current holder of the Warrant but not otherwise and, in particular, without limitation, no person may have any right of retention in respect of charges owed by any other person.

**2.3.6** Nothing in Clause 2.3.5 shall require the Warehouse to oppose any legally enforceable court order in respect of metal which is binding on the Warehouse and which prevents it from delivering stored metal to the Warrant holder, provided that the Warehouse immediately notifies the Exchange of the existence of such a court order as soon as it becomes aware of the same.

## 2.4 Warehouse's liability to Warrant holders

The Warehouse is required to give undertakings to each Warrant holder from time to time in respect of the metal under relevant Warrant that:

**2.4.1** the Warehouse has complied with all applicable regulations (including, without limitation, Clause 2.1 of this Agreement) in receiving that metal and placing it on Warrant;

4

**2.4.2**  the Warehouse will comply with the requirements of this Agreement concerning the storage of metal; and

**2.4.3**  the Warehouse is not aware of any latent defects in the metal.

It is a requirement of this Agreement that the undertakings referred to in Clauses 2.4.1 to 2.4.3 above are incorporated without delay into the Warehouse's written contract of storage with each Warrant holder. Pending such incorporation, the relevant undertakings shall be deemed to be incorporated into each such contract of storage immediately upon such contract arising.

## 3    Replacement of Warrants

### 3.1    Entitlement to replace

A Warehouse shall issue a replacement Warrant in accordance with this Agreement and the LMEsword Regulations and Operating Procedures in the following circumstances:

**3.1.1**  where a Warrant has been lost, stolen, destroyed, or damaged, on completion of its normal procedures and against delivery to it of an indemnity in the form prescribed by the Exchange from time to time and attached as the Appendix to Schedule A;

**3.1.2**  where any details on a Warrant which are capable of amendment in accordance with the LMEsword Regulations and Operating Procedures ("Amendable Details") require amendment, following the amendment of the electronic details of the Warrant in LMEsword in accordance with the LMEsword Regulations and against delivery to it of the original Warrant; and

**3.1.3**  where the space on a Warrant for endorsement of rent paid up and/or for transfers is full and against delivery to it of the original Warrant.

### 3.2    Entitlement to move metal

A Warehouse may move metal under Warrant between its own authorised warehouses within the same listed location at its own risk and expense subject to complying with Clause 3.3.

### 3.3    Notification of the Exchange

**3.3.1**  On the day that a Warehouse or its London Agent is notified or becomes aware that (a) a Warrant has been lost, stolen, destroyed or damaged; or (b) the Amendable Details on a Warrant require amendment; or (c) a Warrant requires cancellation in accordance with Clause 4.3, it shall forthwith notify the Exchange by fax (or by such other means as the Exchange may prescribe from time to time) containing full details thereof, including the following:

**3.3.1.1**  the date and details of loss or damage to or other matter affecting the metal or Warrant;

**3.3.1.2**  the Warrant number(s);

**3.3.1.3**  date of the Warrant;

**3.3.1.4**  brand and shape of metal; and

**3.3.1.5**  the quantity of metal (if any) missing, damaged, or otherwise affected.

**3.3.2**   The Warehouse shall in addition take all such other steps, such as (without limitation) notifying police authorities and insurers, as is necessary to protect the holder of the Warrant in question (if applicable).

**3.3.3**   Where a Warrant that requires replacement or cancellation is not lodged with the Depository, the Warehouse shall take all reasonable steps to identify the holder of the Warrant and notify it of the event and require that the Warrant be delivered up for replacement.

**3.4   Liability for replacement Warrants**

**3.4.1**   Where a Warrant is being replaced due to a change to its Amendable Details, the Warehouse shall indemnify the person surrendering the Warrant in respect of any reasonable loss or damage they may suffer as a result of the Warehouse not properly cancelling and retaining the original Warrant in accordance with this Agreement.

**3.4.2**   The Warehouse shall be responsible for the cost of replacing Warrants other than in the case of Warrants which have been lost, stolen, destroyed or damaged where such costs shall be the responsibility of the holder.

**3.4.3**   The Warehouse shall take all reasonable steps to ensure that no duplicate Warrants issued by it are in circulation and, in particular, shall make a notification to the Exchange pursuant to Clause 3.3.1 above.

**4   Cancellation of Warrants**

**4.1   Process on replacement**

**4.1.1**   Where a Warrant is delivered to a Warehouse for replacement, the original Warrant must first be made properly null and void by being stamped "cancelled and replaced".

**4.1.2**   If the original of the Warrant has been lost, stolen or destroyed, a copy of the original must be duly marked and retained in lieu of the original.

**4.2   Process on cancellation and metal take-up**

Where a Warrant is delivered to a Warehouse for cancellation and metal take-up, the original must be made properly null and void by being stamped "cancelled". The Warehouse is required to expedite delivery from warehouses at the minimum rates published from time to time by the Exchange in accordance with Clause 9.11.1. For the avoidance of doubt, any change to the minimum rates would constitute a material increase in the obligations of a Warehouse which would require consultation and notification in accordance with Clause 9.11.4. The Warehouse shall prioritise all requests for cancellation strictly in the order in which they are received unless the Warrant holders seeking cancellation agree otherwise. The Warehouse shall use all reasonable endeavours to allocate to each Warrant holder seeking cancellation the delivery time that he has requested, unless that requested delivery time has already been allocated to another Warrant holder, in which case the Warehouse shall offer one or more alternative delivery times close to the time originally requested and shall allocate the delivery time which is acceptable to the Warrant holder. The Warehouse must prepare and maintain such documentation as is sufficient to evidence compliance with the aforesaid requirement (e.g. a schedule detailing (at least) the dates and times of receipt of

cancellation requests and the allocated dates and times of delivery) and shall provide a copy of the same to the Exchange if so requested. The Warehouse will, at all times, be responsible for ensuring that deliveries of metal are effected in accordance with the above requirements except where the person taking delivery of metal provides its own transport and fails, due to no fault of the Warehouse, to keep to the agreed delivery schedule, in which case the Warehouse and that person shall agree between them an alternative time for delivery.

**4.3  Warrants requiring cancellation**

Where a Warehouse or its London Agent is notified or becomes aware that any details on a Warrant which are not Amendable Details are incorrect, it shall:

4.3.1   notify the Exchange thereof in accordance with Clause 3.3;

4.3.2   take all reasonable steps to identify the holder of the Warrant and notify it of the event and require the Warrant to be delivered up for cancellation; and

4.3.3   on its being delivered to the Warehouse or London Agent, cancel the Warrant in accordance with the LMEsword Regulations and Operating Procedures and issue a new Warrant in respect of the relevant metal.

**4.4  Storage**

All cancelled Warrants (and a copy of the original in the event that it has been lost, stolen or destroyed) must be securely retained and be made available for inspection by the Exchange for five years or (if later) until any replacement Warrant is surrendered for cancellation and metal take-up.

# 5  Rent and FOT charges

**5.1  Calculation**

5.1.1   Calculations of rent due on Warrants must be on round tonnages and not actual weights.

5.1.2   Rent on metal under Warrant must accrue on a daily basis and rent accrued must be payable annually as at 31 March each year, or at such other times and for such other periods as the Exchange may prescribe, or upon cancellation of a Warrant whichever is the sooner.

5.1.3   Rent must be quoted in the Major Currency of the Contract to which the Warrant relates is traded.

5.1.4   Each Warehouse must fix its rent rates and FOT charges annually in respect of each 12 month period commencing 1 April by notification to the Exchange not later than 1 December in the preceding year. At any time within 10 Business Days of receiving such notification, the Exchange may, at its discretion, require the Warehouse to provide within 10 Business Days, a comprehensive, written explanation of the economic circumstances which, in the view of the Warehouse, necessitate the change in its rent rates and/or FOT charges. The Exchange shall publish the Warehouse's rent rates and FOT charges by 31 December provided that no change in rent rates or FOT charges shall become effective until the following 1 April.

**5.2     Payment**

Rent must be paid for metal under Warrant in stock at 31 March (or such other dates as the Exchange may prescribe) in each year by direct settlement between holders of Warrants and Warehouses.

**5.3     LMEsword**

Warehouses' other obligations in relation to rent shall be as set out in the LMEsword Regulations and the Operating Procedures.

# 6     Records

**6.1     Storage records for metal under Warrant**

6.1.1     Warehouses must have clearly organised systems for recording storage of metal under Warrant for use in their office and in each authorised warehouse.

6.1.2     Storage records must have a separate entry record for each lot and each such record must be numbered consecutively.

6.1.3     Storage records in respect of metal under Warrant must clearly identify the fact that the metal is under Warrant, include the Warrant number and note the authorised warehouse in which the metal is stored.

6.1.4     Metal under Warrant must be identifiable in an authorised warehouse by means of a label, or other marking method, as to lot or Warrant number.

**6.2     Warrant records**

6.2.1     Each Warehouse must maintain a Warrant register which shows the dates of issue and cancellation of each Warrant, any corresponding lot numbers and the details of the metal as shown on the Warrant. Each entry on the Warrant register must be initialled by an authorised person or, in the case of a register maintained on a computer, have noted next to each entry the initials or other identity of an authorised person.

6.2.2     To the extent that any Warehouse has pre-printed warrants in blank, these must be kept secure. The Warehouse must ensure that it, or its London Agent, maintains a written record of the number of unused blank Warrants at any given time and will provide a copy of that record to the Exchange on request.

6.2.3     A copy of each Warrant issued by or for a Warehouse must be kept secure.

**6.3     Stock records**

6.3.1     The stock of metal under Warrant of each Warehouse must be reported to the Exchange by the due completion of the form prescribed by the Exchange which must be faxed to the Exchange by 1200 hours London time each Business Day or delivered by such other means as the Exchange may prescribe and/or pursuant to LMEsword as the Exchange may from time to time prescribe in the LMEsword Regulations and Operating Procedures.

6.3.2     Until such time as stocks of metal are reported pursuant to LMEsword alone, metal taken off Warrant, but which is still on the Warehouse's premises, must be combined on the stock return with those stocks actually on Warrant rounded to the nearest complete Warrant lot and also separately identified on the return,

or shown in such other manner as prescribed by the Exchange by notice. If no stocks are held, a nil return must be submitted on each Business Day.

6.3.3    The Exchange may publish such information concerning stocks and queues at Warehouses as is considered necessary by the Exchange, acting reasonably, for the purposes of market transparency or other regulatory purposes. Aside from this, information concerning stocks and queues at Warehouses shall be treated as confidential by the Exchange save that the Exchange may make such disclosure as is required by law or regulation or that is requested by any regulatory authority or to another regulator with whom the Exchange has entered into a memorandum of understanding relating to the sharing of information for regulatory purposes on a confidential basis. In addition, the Exchange may publish such information together with that of other Warehouses without identifying the Warehouse by name and also make reference to such information, identifying the Warehouse, in any notice of a decision given under the Disciplinary Procedures in the event of a breach of this Agreement. Warehouses are prohibited from revealing their stock of metal under Warrant to any person except that this prohibition shall not apply to:

6.3.3.1    information supplied to a Warehouse's London Agent;

6.3.3.2    information disclosed pursuant to any legal or regulatory requirement;

6.3.3.3    information disclosed to a Warehouse's professional advisers and to its usual bankers;

6.3.3.4    historical information on aggregate stocks held by a Warehouse without differentiation between stocks held under LME Warrants and other stocks which is required to be disclosed to the shareholders of the Warehouse;

6.3.3.5    historical information on aggregate stocks held by a Warehouse without differentiation between stocks held under LME Warrants and other stocks which is required to be disclosed to a parent company of the Warehouse for the purpose of that parent company preparing its budgets and financial forecasts for the group; or

6.3.3.6    information which has already been published by the LME pursuant to clause 6.3.3.

## 6.4    Duty and Tax Records

6.4.1    Each Warehouse must maintain records on the duty and tax status of each lot of metal.

6.4.2    The Warehouse shall make the records specified in Clause 6.4.1, or information derived from such records, available on request and at no cost to Warrant holders and the Exchange.

# 7    Continuing Obligations

## 7.1    Insurance

7.1.1    Each Warehouse must maintain insurance in respect of all the types of risks marked with an asterisk in paragraph 9 of Schedule A at least at the levels from

time to time prescribed by the Exchange. Such insurance must be maintained at all times until the Warehouse is no longer listed.

**7.1.2** The Warehouse shall procure that the Exchange receives annually at renewal and/or at such other time as requested by the Exchange a certificate (or such other document as the Exchange may from time to time prescribe) evidencing that all the risks marked with an asterisk in paragraph 9 of Schedule A are protected and citing the maximum limit of cover per occurrence and the policy number. Any changes affecting the insurance cover are to be automatically notified to the Exchange by the insurance company. The Warehouse must ensure that its policy shows the Exchange as a notifiable party for amendments and renewal confirmations.

## 7.2 Security

**7.2.1** The Warehouse must at least maintain the level of security measures referred to in its response(s) to Schedule B, Section (C) (as the same may be amended in writing between the Warehouse and the Exchange from time to time) at all its authorised warehouses and must keep them clean, dry (except outside storage areas as permitted by the LME), free from contaminants and in good repair. Without prejudice to the requirements of Clause 7.3, in the event of any material change in the details relating to its authorised warehouses as set out in its response(s) to Schedule B, Section (C), or in the event that the Warehouse otherwise fails to comply with this Clause 7.2.1, the Warehouse must notify the Exchange of such change or failure within 5 Business Days of becoming aware of the same. In the event of any material change in the details relating to the Warehouse's authorised warehouses which could in the Exchange's reasonable view result in a degradation in the level of security as set out in the Warehouse's' response(s) to Schedule B, Section (C), or in the event that the Warehouse otherwise fails to comply with this Clause 7.2.1, the Exchange may, at its sole discretion, direct that any metal stored under Warrant in the authorised warehouse in question be relocated to another authorised warehouse, whether or not with the same Warehouse.

**7.2.2** Any costs arising from such relocation, including, but not limited to, costs relating to re-inspection and re-approval, shall be met by the Warehouse.

**7.2.3** The power of the Exchange under this Clause is without prejudice to its other powers under this Agreement, including the powers set out under the Disciplinary Procedures.

## 7.3 Monitoring and supply of information

**7.3.1** Each Warehouse must notify the Exchange of any facts, events or changes which are material to their listing as Warehouses within 5 Business Days  of becoming aware of the fact, event or change in question. This shall include, without limitation:

**7.3.1.1** any changes that materially affect the information given by the Warehouse in connection with its application for listing as a Warehouse, or such other material information as it may have given to the Exchange in writing from time to time;

**7.3.1.2** any changes affecting the Warehouse's ability to comply with its obligations hereunder or under the LMEsword Regulations.

**7.3.2** A Warehouse shall not make any changes, and shall not allow any changes which are within its power to prevent being made to be made, to any of its authorised warehouses where such changes would involve a material change to any of the details provided in the answers given in Schedule B, without obtaining the Exchange's prior written approval in accordance with procedures published by the Exchange from time to time. In the event that the Warehouse becomes aware of such a change which is beyond its power to prevent, it must nonetheless notify the Exchange of such change immediately.  The Exchange may, if it deems that the change materially affects the ability of the authorised warehouse(s) to operate, exercise its powers under this Agreement, including without limitation, those contained in Clause 9.2.

**7.3.3** Each Warehouse shall provide to the Exchange on request such information from their storage records, Warrant records and/or stock records relating to the types of metals deliverable on the Exchange, as the Exchange may reasonably request from time to time in connection with any enquiries being made or to be made by the Exchange in accordance with the Rules. All such information so supplied shall be treated as confidential by the Exchange and shall be restricted to those authorised staff and officers within the Exchange responsible for conducting such enquiries in accordance with the Rules, the Exchange's professional advisors and other regulators with whom the Exchange has entered into memoranda of understanding relating to the sharing of information for regulatory purposes on a confidential basis or other person to whom the Exchange is required to disclose it by law or regulation. The Exchange shall not be entitled to have access to legally privileged documents. A list of those persons within the Exchange who are authorised to obtain information from Warehouses in accordance with this Clause 7.3.3 will be circulated to all Warehouses and will be updated from time to time.

**7.3.4** Each Warehouse shall permit Exchange staff to conduct routine and other inspections of their premises used for the storage of LME metal, including access to each relevant authorised warehouse and their offices supporting the operating of such warehouses. Warehouses shall use reasonable endeavours to procure similar access to the offices of their London Agents supporting those operations. Each Warehouse shall co-operate   with the Exchange in the conduct of such inspections and give all reasonable assistance to the Exchange.

**7.3.5** The Exchange shall give reasonable notice of its intention to make inspections, except that no such notice will be required to be given where the Exchange deems it necessary or desirable in its absolute discretion for an immediate inspection to be undertaken by the Exchange or its appointed representatives.

**7.3.6** Each Warehouse shall provide the Exchange with details of its officers and employees authorised to act as its authorised signatories for the purposes of this Agreement and keep such details up to date at all times, notifying the LME of any changes thereto promptly.

**7.4      Periodical inspections**

**7.4.1**      From time to time, and at least every 12 months, each Warehouse must carry out a visual inspection of all metal under Warrant in their authorised warehouses and of all supporting documentation. Each Warehouse  shall make a notification to the Exchange without delay following the end of each calendar year, such notification to contain a record of all such inspections which have been carried out throughout the  previous year.

**7.4.2**      Full records of such inspections must be kept, showing at least:

**7.4.2.1**      the details of all issued Warrants at the time of the inspection;

**7.4.2.2**      the date of the inspection; and

**7.4.2.3**      the name and job title of the person undertaking the inspection, who must also acknowledge that he has carried out the inspection and be of suitable seniority.

Without prejudice to the annual notification requirement in Clause 7.4.1, copies of such records will be made available to the Exchange at any time on request.

**7.4.3**      All weighing equipment used for weighing metal under Warrant must be checked for accuracy at least quarterly by an accredited and responsible institution which is not affiliated to the Warehouse and any material inaccuracies detected by such institution must be rectified by the Warehouse immediately. Written evidence of such inspections must be retained and made available to the Exchange on request.

**7.5      Compliance with law**

**7.5.1**      Each Warehouse shall at all times comply with all applicable law, including (without limitation) local port conditions, local and national customs, local anti-corruption laws, taxation and other rules and regulations (where the aforesaid are not in conflict with the requirements of either this Agreement or of the LMEsword Regulations or of the Operating Procedures).

**7.5.2**      The Warehouse shall immediately notify the Exchange when it becomes aware that such law, customs or regulations conflict, or are likely to conflict, with the requirements of this Agreement, the LMEsword Regulations or the Operating Procedures. In the event of any such conflict, the Exchange shall, without prejudice to its rights under this Agreement, assess whether, in its reasonable opinion, such conflict is reconcilable and shall determine in its absolute discretion what action (if any) to take. Where the Exchange is of the view that failure immediately to resolve the conflict will not materially prejudice the Warehouse's ability to comply with the requirements of this Agreement, the LMEsword Regulations or the Operating Procedures, it shall consult with the Warehouse as to the remedial action to be taken. In the event of a conflict between this Agreement and the LMEsword Regulations or Operating Procedures or any notice issued by the Exchange, the terms of this Agreement shall prevail.

**7.5.3**      The Warehouse will not, and nor will any of its officers, employees, shareholders, representatives or agents, directly or indirectly, either in private business dealings or in dealings with the public sector, offer, give or agree to

offer or give (either itself or in agreement with others) any payment, gift or other advantage with respect to any matters which are the subject of this Agreement which (i) would violate any anti-corruption laws or regulations applicable to the Warehouse, (ii) is intended to, or does, influence or reward a person and acting in breach of an expectation of good faith, upholding or trust, or which it would otherwise be improper for the recipient to accept, or (iii) is made to a Public Official with the intention of influencing them and obtaining or retaining an exchange with conduct of terms ("**Corrupt Act**").

7.5.4    The Warehouse represents and warrants that it has not, and so far as it is aware its directors and officers have not:

(i)    engaged in, admitted to, or been found by a court in any jurisdiction to have engaged in any Corrupt Act; or

(ii)    been investigated by a regulatory or law enforcement agency in any jurisdiction as a suspect in connection with an investigation into the commission of any Corrupt Act.

7.5.5    The Warehouse further agrees and undertakes:

(i)    to properly and accurately record in its books and records all transactions which relate in any way to this Agreement; and

(ii)    to provide any such information as the Exchange may reasonably require by notice in writing in order to monitor the Warehouse's compliance with its obligations under Clauses 7.5.1 and 7.5.3 and 7.5.4; and

(iii)    to notify the Exchange immediately if, at any time, it becomes aware that any of the representations set out at under Clause 7.5.4 are no longer correct.

**7.6    Principles of Conduct**

The Warehouse shall adhere to the Principles of Conduct set out at Clause 11.

## 8    Enforcement and Discipline

The terms of the Exchange's handbook on enforcement and disciplinary procedures applicable to Warehouses, as amended by the Exchange from time to time and issued to Warehouses (the "Disciplinary Procedures") shall be deemed to be incorporated into this Agreement as if set out in full herein.

## 9    General

**9.1    Fees**

9.1.1    Each Warehouse shall pay the Exchange the fees and levies prescribed by the Exchange from time to time. The Exchange shall provide all Warehouses with reasonable notice of changes in its prescribed fees and levies.

9.1.2    Each Warehouse shall be responsible for the cost of inspections undertaken by the Exchange in accordance with the terms of this Agreement except where the inspection is specific to a single Warehouse and is initiated by the Exchange in which case the Exchange shall be responsible for the cost thereof (but without

13

prejudice to the power of the Exchange to recover any such costs from a Warehouse pursuant to a sanction imposed under the Disciplinary Procedures).

**9.1.3**   Each Warehouse shall pay the fees prescribed by the LMEsword Regulations and Operating Procedures.

**9.1.4**   The Exchange shall consult with Warehouses if any proposed changes in its prescribed fees and levies or in the fees prescribed by the LMEsword Regulations and Operating Procedures would result in a material increase in such fees and/or levies. For these purposes, a "material increase" shall be any increase in the previously prescribed fee or levy of more than the greater of (a) 10 per cent or (b) the percentage figure equal to the aggregate of (i) the percentage increase in the retail prices index ("RPI") as published by the Office for National Statistics calculated by comparing the level of RPI (all items) for the month in which the previously prescribed fee or levy was fixed and comparing it to the level of RPI (all items) for the month in which the Exchange gives notice of its proposed increase and (ii) 5 per cent.

## 9.2   Withdrawal of right to store particular metal

Without prejudice to the other powers of the Exchange, the Directors may require a Warehouse to cease to store a metal of a particular type by giving the Warehouse 90 days' prior notice, or such shorter period as the Directors may consider in their sole discretion justified in the circumstances.

## 9.3   Liquidity

**9.3.1**   The proper functioning of the market through the liquidity and elasticity of stocks of metal under Warrant should not be artificially or otherwise constrained by Warehouses giving exceptional inducements or imposing unreasonable charges for depositing or withdrawing metals, nor by Warehouses delaying unreasonably the receipt or despatch of metal, save where unavoidable due to force majeure.

**9.3.2**   The Exchange reserves the right to investigate all charges levied including, for example, those for loading and unloading metal for Warrant purposes. In the event that a Warehouse fails to meet minimum loading standards and requirements from time to time laid down by the Exchange without justification, except in the case of force majeure, the Disciplinary Procedures shall apply.

**9.3.3**   Each Warehouse shall provide to the Exchange on request such information from their records as the Exchange may reasonably request from time to time in connection with any investigation being made or to be made by the Exchange under this clause 9.3. All such information so supplied shall be treated as confidential by the Exchange and shall be restricted to those authorised staff and officers within the Exchange responsible for conducting such investigations, the Exchange's professional advisors and other regulators with whom the Exchange has entered into memoranda of understanding relating to the sharing of information for regulatory purposes on a confidential basis or other person to whom the Exchange is required to disclose it by law or regulation. The Exchange shall not be entitled to have access to legally privileged documents. A list of those persons within the Exchange who are authorised to obtain information from Warehouses in accordance with this

Clause 9.3.3 will be circulated to all Warehouses and will be updated from time to time.

9.3.4    The Exchange shall have the power to compel Warehouses to provide any information in accordance with Clause 9.3.3, including, without limitation, details of all inducements paid to attract the load-in of metal, and details of the provenance of loaded-in metal, including information about metal which may have been held previously in that Warehouse, or in another facility operated by the same Warehouse or member of the Warehouse's group.  On the basis of such information, the Exchange may, at its discretion, impose additional load-out requirements on a Warehouse which the Exchange considers to have intentionally created or caused, or attempted to create or cause, a queue by the use of inducements or any other method.

## 9.4    Termination

9.4.1    Without prejudice to the provisions of Clause 8, this Agreement may be terminated, and the Warehouse delisted on a permanent basis, with or without notice, if:

9.4.1.1    the Warehouse commits a serious breach of this Agreement, the LMEsword Regulations or the Operating Procedures;

9.4.1.2    the Warehouse fails or ceases to satisfy the requirements of Clause 1.2 (capital) and/or becomes or is, in the opinion of the Exchange, likely to become insolvent;

9.4.1.3    the Warehouse breaches Clause 7.5 (compliance with law);

9.4.1.4    the Warehouse materially fails to meet any of its obligations to the holder for the time being of a Warrant and such obligations are not being disputed in good faith;

9.4.1.5    the Warehouse fails to pay a sum of £10,000 or more when it becomes due, or a lesser sum within 7 Business Days of it becoming due, to the Exchange under Clause 9.1 or in respect of a fine imposed on it under the Disciplinary Procedures; or

9.4.1.6    a Force Majeure occurs.

Any such termination and delisting will be effective upon by the Directors notifying the Warehouse accordingly.  Without prejudice to Clause 9.4.1.5, and except in the case of a Force Majeure under Clause 9.4.1.6, the Exchange may at its discretion grant to the Warehouse 7 Business Days within which to remedy a default under this Clause 9.4.1.

9.4.2    The Exchange may by notice served on a Warehouse by no later than 1 October in any year delist the Warehouse with effect from the following 1 January where the Exchange reasonably believes that the Warehouse is no longer engaged in LME warehousing business.

9.4.3    Without prejudice to any other of the Exchange's powers, a Warehouse, or the Exchange, may terminate this Agreement and delist the Warehouse in question by the service of six months' prior notice (or such other period as they may agree or as provided under Clause 9.11) on the other. On the expiry of such

notice, this Agreement shall be terminated and the Warehouse delisted. Subject thereto and the other powers of the Exchange hereunder, this Agreement shall be for an indefinite term.

9.4.4    On and following termination of this Agreement and the delisting of a Warehouse, the Warehouse shall not be entitled to any rebate of fees paid to the Exchange but shall remain liable for all pre-existing liabilities to the Exchange. In addition, the Warehouse shall remain subject to the obligations imposed by this Agreement as if it were a Warehouse until a period of five years after delisting has elapsed but shall not be entitled to any of the benefits conferred hereunder, including the right to describe itself as an LME listed warehouse company, and may not issue any further Warrants.

9.4.5    On delisting, a Warehouse must, at its own expense, relocate all metal under Warrant to another Warehouse's authorised warehouse(s) and arrange for the cancellation of all of its issued and current Warrants. The Exchange's prior approval must be obtained before any relocation arrangements are finalised and in giving such approval (which may not be unreasonably withheld or delayed) the Exchange shall have all due regard to the reasonable instructions of the holders of the Warrants in question, to the extent known to it.

**9.5    Notices**

9.5.1    All notices and other communications shall be in writing and in the English language.

9.5.2    Subject to Clause 9.5.5, all notices and other communications required to be served under this Agreement shall be served by fax or by electronic messaging (i.e. e-mail). Service will be deemed effective:

9.5.2.1    in the case of notices sent by fax, on the date and time that transmission is received by an employee of the recipient in legible form or, if that date is not a Business Day or, if the fax is sent after normal working hours, the next following Business Day the burden of proving receipt to be met by a transmission report generated by the sender's facsimile machine; and

9.5.2.2    in the case of notices sent by electronic messaging, on the date and at the time that the sender receives a valid "read receipt".

9.5.3    All notices and other communication required to be served on the Warehouse shall be deemed to be validly served thereon if served on the Warehouse's London Agent. A copy of each such notice and communication shall also be sent to the registered office of the Warehouse but failure to send such a copy shall not affect valid service if the notice or other communication has been served on the Warehouse's London Agent.

9.5.4    In the event of difficulty in using fax or electronic messaging to send notices under this Agreement, notices and other communications may be served in person or by courier, with such service deemed effective on the date of receipt, unless that date is not a Business Day in which case the notice shall be deemed given and effective on the first following day that is a Business Day.

16

**9.5.5**     Notices and other communications shall only be validly served by a Warehouse if they are signed by an authorised signatory notified to the Exchange in accordance with Clause 7.3.6. For the avoidance of doubt, the effect of this Clause 9.5.5 is that, unless the Exchange otherwise prescribes, notices and other communications to be served by a Warehouse may not be served by electronic messaging.

**9.5.6**     The Exchange shall not be liable for any actions taken or omitted to be taken in good faith on the basis of any notice or other communication however served which purports to have been given by or on behalf of a Warehouse. The Exchange shall not be under any duty to verify the genuineness of any signature nor the authority of the person which purports to sign a notice or other communication on behalf of a Warehouse.

**9.5.7**     Each party shall respond promptly to the communications of the other party, where such communications require a response.

## 9.6    Release

Any liability to the Exchange under this Agreement may in whole or in part be released, compounded or compromised or time or indulgence given by the Exchange in its absolute discretion as regards any Warehouse under such liability without in any way prejudicing or affecting its rights against any other or others of the Warehouses under the same or a like liability, whether joint and several or otherwise provided that a Warehouse's liability shall not be increased by such action, nor shall its right to claim compensation or contribution from any person be thereby reduced.

## 9.7    Waiver

No failure of the Exchange to exercise, and no delay by it in exercising, any right, power or remedy in connection with this Agreement (each a "Right") will operate as a waiver thereof, nor will any single or partial exercise of any Right preclude any other or further exercise of such Right or the exercise of any other Right. The Rights provided in this Agreement are cumulative and not exclusive of any other Rights (whether provided by law or otherwise). Any express waiver of any breach of this Agreement shall not be deemed to be a waiver of any subsequent breach.

## 9.8    Invalidity

If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, under any enactment or rule of law, such provision or part shall to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement shall not be affected.

## 9.9    Governing law and submission to the jurisdiction arbitration

**9.9.1**     This Agreement shall be governed by and construed in accordance with English law.

**9.9.2**     Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration, which rules are deemed to be incorporated by reference into this Clause. The LCIA Court shall appoint a sole arbitrator. The

place of arbitration shall be London. The language to be used in the arbitral proceedings shall be English.

**9.9.3** If the Warehouse is not incorporated in England and Wales, it hereby appoints its London Agent as its agent for service of process.

## 9.10    Exclusion of Liability

Neither the Exchange nor any of its Directors nor other officers of members of its Warehousing Committee shall have any liability for any damage, loss, expense or liability of any nature which a Warehouse may suffer or incur in respect of any act or omissions in relation to the provision of warehouse services to Members or its activities or status as a listed Warehouse except to the extent of losses or expenses attributable to its fraud, negligence or wilful default. The terms of this Clause 9.10 shall take precedence over Regulation 11.8.1 insofar as that Regulation relates to Warehouses and the Exchange.

## 9.11    Notices and Amendments

**9.11.1** The Exchange may issue notices from time to time concerning any matter relevant to the performance by a Warehouse of its obligations under this Agreement.

**9.11.2** Each Warehouse shall comply with the terms of any such notice.

**9.11.3** The Exchange may amend this Agreement from time to time. Unless it is considered to be an emergency and essential for the proper operation of the market, any such change shall, subject to Clause 9.11.4 below, only take effect after each Warehouse has been given 30 days' prior written notice of any proposed change.

**9.11.4** In the event that any such proposed change, or any proposed change to the LMEsword Regulations or Operating Procedures, or any proposed notice under Clause 9.11.1, would have the effect of materially increasing the obligations of any Warehouse, it shall only take effect after the Warehouse has been given 90 days prior written notice thereof. The Exchange undertakes to consult with the affected Warehouses in relation to the proposed change, where practicable for a reasonable period and in reasonable time prior to the start of that 90 day period, and shall have reasonable regard to representations received. In the event that the Warehouse does not wish to be bound by any such proposed change which has the effect of materially increasing the obligations of the Warehouse, it may serve notice of termination of this Agreement at any time prior to the expiry of such notice period, in which event such change shall not at any time take effect with respect to the Warehouse in question and the Warehouse shall be delisted with effect from the date 90 days after the day the notice of termination is served.

**9.11.5** Clauses 9.11.3 and 9.11.4 shall not apply to the Disciplinary Procedures

## 9.12    No Assignment

A Warehouse may not assign the benefit of this Agreement to any other person without the prior written consent of the Exchange.

**9.13    Information Barriers**

Each Related Warehouse shall maintain effective information barriers between it and the relevant Trading Company as specified by the Exchange from time-to-time. The Related Warehouse shall engage a firm of professional accountants in public practice, the choice to be agreed with the Exchange, to assure that the information barriers it has in place meet the criteria specified by the Exchange, under such assurance standard(s) and in such manner as the Exchange may specify from time to time.

## 10    Interpretation

**10.1    Definitions**

In this Agreement, the following words and expressions shall, unless the context otherwise requires, bear the following meanings:

"Associated Party" has the meaning given in Clause 7.5.3;

 "Amendable Details" has the meaning given in Clause 3.1.2;

"authorised warehouse" means a warehouse operated by a Warehouse and which has been approved by the Exchange for the purpose of this Agreement;

"Business Day" has the meaning given in the Rules;

"Contract" has the meaning given in the Rules;

"Corrupt Act" has the meaning given in Clause 7.5.3;

"Depository" means the person appointed by the Exchange from time to time to act as such for the purposes of LMEsword;

"Directors" means the directors of the Exchange from time to time;

"Disciplinary Procedures" has the meaning given in Clause 8;

"the Exchange" means The London Metal Exchange;

"Force Majeure" means an event which is beyond the reasonable control of the Warehouse and which is, in the opinion of the Exchange, likely to render the Warehouse unable to perform its obligations under this Agreement either permanently or for more than 30 days or such other period of time that would, in the Exchange's view, have such a serious effect on the Warehouse that in business terms it would be tantamount to a permanent cessation, including, without limitation, any act of war, terrorism, insurrection, revolution, act of God or the imposition of legal, regulatory or tax restrictions in any relevant location;

"LME" means The London Metal Exchange;

"London Agent" has the meaning given in Clause 1.3.1;

"Major Currency" has the meaning given in the Rules;

"Member" means a member of the Exchange;

"Operating Procedures" means the manual issued by the Exchange pursuant to the LMEsword Regulations setting out detailed procedures and information relating to the operation of LMEsword;

"person" includes an individual, partnership, unincorporated association and body corporate;

"Public Official" has the meaning given in Clause 7.5.5;

"Related Warehouse" means a Warehouse which is associated with a Trading Company. For the purpose of this definition, a Warehouse is associated with a Trading Company where the Warehouse is a subsidiary or holding company of a Trading Company, or a subsidiary or holding company of one of a Trading Company's subsidiaries or holding companies or otherwise has a Close Connection with a Trading Company. The terms "holding company" and "subsidiary" have the meanings given to them in section 1159 of the Companies Act 2006. A Warehouse shall have a "Close Connection" with a Trading Company if any person or company either directly or indirectly holds or otherwise effectively controls 20% or more of the shares or voting rights in both the Warehouse and the Trading Company;

"Rules" means the rules and regulations issued by the Exchange (and incorporating the LMEsword Regulations) governing the London Metal Exchange administered by the Exchange as the same may be amended in accordance with Article 58 of the Articles of Association of the Exchange and a reference to a Rule shall be construed accordingly;

"Secretary" means any person appointed to perform the duties of Secretary of the Exchange;

"Special Contract Rules for Metals" means Part 6 of the Rules as the same may be amended from time to time;

"LMEsword" means the system for, inter alia, the electronic transfer of title to Warrants governed and constituted by the LMEsword Regulations;

"LMEsword Regulations" means the regulations governing the operation of LMEsword issued by the Exchange as amended from time to time in accordance with the terms thereof;

"this Agreement" means the agreement between each Warehouse and the Exchange incorporating these terms and conditions as amended from time to time in accordance herewith and incorporating the Disciplinary Procedures in accordance with Clause 8 hereof;

"Trading Company" shall mean any Member or non-Member company that enters into Contracts or trades metal that is deliverable against a Contract;

"Warehouse" means a warehouse company which is party to this Agreement, accepted as such by the Exchange and listed in Appendix III of the Rules;

"Warrant" means a warehouse warrant issued by a Warehouse in accordance with this Agreement in respect of metal for the time being dealt in on the Exchange.

## 10.2    Interpretation

**10.2.1**    Where this Agreement refers to a document or thing being "prescribed", that shall mean prescribed by the Exchange from time to time in a notice issued by it to Warehouses.

**10.2.2**    Words importing the singular shall, where the context permits, include the plural and vice versa. Words importing gender shall include each gender.

**10.2.3**   Where this Agreement refers to an act being undertaken by the Exchange, that act may be performed by the Exchange acting through the Directors of the Exchange or any duly authorised Committee of the Directors of the Exchange or duly authorised individual.

## 11   Principles of conduct

A Warehouse shall:

11.1   Conduct its business with due skill, care and diligence, observing high standards of conduct and safety, complying with the warehouse agreement, the LMEsword regulations, these principles, the common standards of working practice for warehouse companies, other requirements for warehouse companies set by the Exchange and relevant legislation.

11.2   At all times observe high standards of integrity and shall not enter into any arrangement or agreement that prohibits the provision of any information that the LME requests in its role as a Recognised Investment Exchange.

11.3   Maintain financial resources at or above the minimum level set by the LME to ensure continuity in the provision of services for owners of metal on LME warrant, and shall have in place a performance bond (if required by the Exchange) in the manner and of the amount prescribed by the Exchange.

11.4   Manage conflicts of interest fairly, both between itself and holders of metal on LME warrant and between holders of metal on LME warrant, ensuring fair and equitable treatment to all holders of metal on LME warrant at all times.

11.5   Ensure that all metal held on LME warrants is stored continuously in good delivery condition and that it is identified and stored so as to facilitate easy access and delivery without undue delay.

11.6   Deal with those placing metal on LME warrant, those holding LME warrants and those taking metal off LME warrant on a fair and equitable basis.

11.7   Organise and control its affairs in a responsible manner, keep proper records, have well-defined procedures for handling metal stored on LME warrant and for delivering it out expeditiously, and ensure that its employees or agents are suitable, adequately trained and properly supervised.

11.8   Pay due regard to the information needs of LME warrant holders by having transparency of: normal hours of work, all delivery in and delivery out charges, rent and rent payment dates, and total average daily delivery out volume rates by metal and mode of transport.

11.9   Arrange adequate protection for metal held on LME warrant by insuring it against unexplained losses and losses caused by error, negligence, or fraudulent actions of its servants or agents or its personnel.

11.10   Deal with the LME in an open and co-operative manner, keeping it informed promptly of anything concerning the suitability of its warehouses or its continued suitability as a warehouse company, or about metal stored with it or that it knows will be placed on or taken off LME warrant, that the LME, as a Recognised Investment Exchange, which

has responsibility for ensuring that its markets are proper and orderly and not subject to abuse, might reasonably expect to be disclosed to it.

# EXHIBIT D

***Status:*** *This is the original version (as it was originally made). This item of legislation is currently only available in its original format.*

# S T A T U T O R Y   I N S T R U M E N T S

# 2001 No. 995

# FINANCIAL SERVICES AND MARKETS

## The Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001

| | | |
|---|---|---|
| *Made* - - - - | | *9th April 2001* |
| *Laid before Parliament* | | *10th April 2001* |
| *Coming into force in accordance with regulation 2* | | |

The Treasury, in exercise of the powers conferred on them by sections 286(1), 426, 427 and 428(3) of the Financial Services and Markets Act 2000(**1**), and with the approval of the Secretary of State under section 286(2) of that Act, hereby make the following Regulations:

**Citation**

**1.** These Regulations may be cited as the Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001.

**Commencement**

**2.** These Regulations come into force on the day on which sections 290(1) and 292(2) of the Act (which relate to the making of recognition orders) come into force.

**Interpretation**

**3.** (1)  In these Regulations—

"the Act" means the Financial Services and Markets Act 2000;

"the Companies Act" means the Companies Act 1989(**2**);

"defaulter" and "default" are to be construed in accordance with section 188(2) of the Companies Act, and references to action taken under the default rules of an exchange or clearing house are to be construed in accordance with section 188(4) of that Act;

---

(**1**)  2000 c. 8.
(**2**)  1989 c. 40.

*Document Generated: 2014-04-02*

***Status:*** *This is the original version (as it was originally made). This*
*item of legislation is currently only available in its original format.*

**SCHEDULE**                                          Regulations 4 and 5.

# PART I

## Recognition requirements for investment exchanges

*Financial resources*

**1.** (1)  The exchange must have financial resources sufficient for the proper performance of its functions as a recognised investment exchange.

(2)  In considering whether this requirement is satisfied, the Authority may (without prejudice to the generality of regulation 6(1)) take into account all the circumstances, including the exchange's connection with any person, and any activity carried on by the exchange, whether or not it is an exempt activity.

*Suitability*

**2.** (1)  The exchange must be a fit and proper person to perform the functions of a recognised investment exchange.

(2)  In considering whether this requirement is satisfied, the Authority may (without prejudice to the generality of regulation 6(1)) take into account all the circumstances, including the exchange's connection with any person.

*Systems and controls*

**3.** (1)  The exchange must ensure that the systems and controls used in the performance of its functions are adequate, and appropriate for the scale and nature of its business.

(2)  Sub-paragraph (1) applies in particular to systems and controls concerning—

  (a)  the transmission of information;

  (b)  the assessment and management of risks to the performance of the exchange's functions;

  (c)  the effecting and monitoring of transactions on the exchange;

  (d)  the operation of the arrangements mentioned in paragraph 4(2)(d) below; and

  (e)  (where relevant) the safeguarding and administration of assets belonging to users of the exchange's facilities.

*Safeguards for investors*

**4.** (1)  The exchange must ensure that business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors.

(2)  Without prejudice to the generality of sub-paragraph (1), the exchange must ensure that—

  (a)  access to the exchange's facilities is subject to criteria designed to protect the orderly functioning of the market and the interests of investors;

  (b)  dealings in investments on the exchange are limited to investments in which there is a proper market;

Document Generated: 2014-04-02

***Status:*** *This is the original version (as it was originally made). This item of legislation is currently only available in its original format.*

(c) appropriate arrangements are made for relevant information to be made available (whether by the exchange or, where appropriate, by issuers of the investments) to persons engaged in dealing in investments on the exchange;

(d) satisfactory arrangements are made for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange (being rights and liabilities in relation to those transactions);

(e) satisfactory arrangements are made for recording transactions effected on the exchange, and transactions (whether or not effected on the exchange) which are cleared or to be cleared by means of its facilities;

(f) appropriate measures are adopted to reduce the extent to which the exchange's facilities can be used for a purpose connected with market abuse or financial crime, and to facilitate their detection and monitor their incidence; and

(g) where the exchange's facilities include making provision for the safeguarding and administration of assets belonging to users of those facilities, satisfactory arrangements are made for that purpose.

(3) In sub-paragraph (2)(c), "relevant information" means information which is relevant in determining the current value of the investments.

*Disclosure by issuers of securities*

**5.** (1) In this paragraph—

"admission to trading", "securities" and "regulated market" are to be construed in accordance with regulation 2 of the Traded Securities (Disclosure) Regulations 1994(**7**);

"the obligation of disclosure" means the obligation imposed by regulation 3 of those Regulations;

"issuer" means a person who is subject to that obligation whose securities are admitted to trading on a regulated market which the exchange regulates and supervises; and

"the relevant securities" means securities in relation to which the obligation of disclosure arises.

(2) The rules of the exchange must enable the exchange, in the event of a failure by an issuer to comply with the obligation of disclosure,—

(a) to discontinue the admission of the relevant securities to trading;

(b) to suspend trading in the relevant securities;

(c) to publish the fact that the issuer has failed to comply with the obligation of disclosure; and

(d) to make public itself any information which the issuer has failed to publish.

(3) This paragraph is without prejudice to the requirement in paragraph 4(2)(c) above.

*Promotion and maintenance of standards*

**6.** (1) The exchange must be able and willing to promote and maintain high standards of integrity and fair dealing in the carrying on of regulated activities by persons in the course of using the facilities provided by the exchange.

(2) The exchange must be able and willing to cooperate, by the sharing of information or otherwise, with the Authority, with any other authority, body or person having responsibility in the

---

(**7**) S.I. 1994/188.

*Document Generated: 2014-04-02*

***Status:*** *This is the original version (as it was originally made). This item of legislation is currently only available in its original format.*

United Kingdom for the supervision or regulation of any regulated activity or other financial service, or with an overseas regulator within the meaning of section 195 of the Act.

*Rules and consultation*

**7.** (1)  The exchange must ensure that appropriate procedures are adopted for it to make rules, for keeping its rules under review and for amending them.

(2)  The procedures must include procedures for consulting users of the exchange's facilities in appropriate cases.

(3)  The exchange must consult users of its facilities on any arrangements it proposes to make for dealing with penalty income in accordance with paragraph 8(3) below (or on any changes which it proposes to make to those arrangements).

*Discipline*

**8.** (1)  The exchange must have effective arrangements for monitoring and enforcing compliance with—

    (a)  its rules (including rules in relation to the provision of clearing services in respect of transactions other than transactions effected on the exchange); and

    (b)  the arrangements made by it as mentioned in paragraph 4(2)(d) above.

(2)  Arrangements made pursuant to sub-paragraph (1) must include procedures for—

    (a)  investigating complaints made to the exchange about the conduct of persons in the course of using the exchange's facilities; and

    (b)  the fair, independent and impartial resolution of appeals against decisions of the exchange.

(3)  Where arrangements made pursuant to sub-paragraph (1) include provision for requiring the payment of financial penalties, they must include arrangements for ensuring that any amount so paid is applied only in one or more of the following ways—

    (a)  towards meeting expenses incurred by the exchange in the course of the investigation of the breach in respect of which the penalty is paid, or in the course of any appeal against the decision of the exchange in relation to that breach;

    (b)  for the benefit of users of the exchange's facilities;

    (c)  for charitable purposes.

*Complaints*

**9.** (1)  The exchange must have effective arrangements for the investigation and resolution of complaints arising in connection with the performance of, or failure to perform, any of its regulatory functions.

(2)  But sub-paragraph (1) does not extend to—

    (a)  complaints about the content of rules made by the exchange, or

    (b)  complaints about a decision against which the complainant has the right to appeal under procedures of the kind mentioned in paragraph 8(2)(b) above.

(3)  The arrangements must include arrangements for a complaint to be fairly and impartially investigated by a person independent of the exchange, and for him to report on the result of his investigation to the exchange and to the complainant.

*Document Generated: 2014-04-02*

***Status:*** *This is the original version (as it was originally made). This
item of legislation is currently only available in its original format.*

(4)  The arrangements must confer on the person mentioned in sub-paragraph (3) the power to
recommend, if he thinks it appropriate, that the exchange—

    (a)  makes a compensatory payment to the complainant,

    (b)  remedies the matter complained of,

or takes both of those steps.

(5)  Sub-paragraph (3) is not to be taken as preventing the exchange from making arrangements
for the initial investigation of a complaint to be conducted by the exchange.

# PART II

## Recognition requirements for investment exchanges:
## default rules in respect of market contracts

*Default rules in respect of market contracts*

**10.**  (1)  The exchange must have default rules which, in the event of a member of the exchange
being or appearing to be unable to meet his obligations in respect of one or more market contracts,
enable action to be taken in respect of unsettled market contracts to which he is a party.

(2)  The rules may authorise the taking of the same or similar action in relation to a member
who appears to be likely to become unable to meet his obligations in respect of one or more market
contracts.

(3)  The rules must enable action to be taken in respect of all unsettled market contracts, other
than those entered into by a recognised clearing house for the purposes of or in connection with the
provision of clearing services for the exchange.

*Content of rules*

**11.**  (1)  This paragraph applies as regards contracts falling within section 155(2)(a) of the
Companies Act.

(2)  The rules mentioned in paragraph 10 must provide—

    (a)  for all rights and liabilities between those party as principal to unsettled market contracts
to which the defaulter is party as principal to be discharged and for there to be paid by
one party to the other such sum of money (if any) as may be determined in accordance
with the rules;

    (b)  for the sums so payable in respect of different contracts between the same parties to be
aggregated or set off so as to produce a net sum; and

    (c)  for the certification by or on behalf of the exchange of the net sum payable or, as the case
may be, of the fact that no sum is payable.

(3)  The reference in sub-paragraph (2) to rights and liabilities between those party as principal
to unsettled market contracts does not include rights and liabilities—

    (a)  in respect of margin; or

    (b)  arising out of a failure to perform a market contract.

(4)  The rules may make the same or similar provision, in relation to non-members designated
in accordance with the procedures mentioned in sub-paragraph (5), as in relation to members of the
exchange.

# EXHIBIT E

# Recognised Investment Exchanges

# Recognised Investment Exchanges

**REC 1**            **Introduction**

    1.1            Application
    1.2            Purpose, status and quotations


**REC 2**            **Recognition requirements**

    2.1            Introduction
    2.2            Method of satisfying the recognition requirements
    2.3            Financial resources
    2.4            Suitability
    2.5            Systems and controls and conflicts
    2.5A           Guidance on Public Interest Disclosure Act: Whistleblowing
    2.6            General safeguards for investors, provision of pre and post-trade information about share trading and suspension and removal of financial instruments from trading
    2.7            Access to facilities
    2.8            Settlement and clearing facilitation services
    2.9            Transaction recording
    2.10           Financial crime and market abuse
    2.11           Custody
    2.12           Availability of relevant information and admission of financial instruments to trading (UK RIEs only)
    2.13           Promotion and maintenance of standards
    2.14           Rules and consultation
    2.15           Discipline
    2.16           Complaints
    2.16A          Operation of a multilateral trading facility
    2.17           Recognition requirements relating to the default rules of UK RIEs


**REC 2A**           **Recognised Auction Platforms**

    2A.1           Introduction
    2A.2           Method of satisfying the RAP recognition requirements
    2A.3           Guidance on RAP recognition requirements
    2A.4           Power and procedure for RAP penalties and censures


**REC 3**            **Notification rules for UK recognised bodies**

    3.1            Application and purpose
    3.2            Form and method of notification
    3.3            Waivers
    3.4            Key individuals and internal organisation
    3.5            Disciplinary action and events relating to key individuals

PAGE
1

| | | |
|---|---|---|
| 3.6 | Constitution and governance | |
| 3.7 | Auditors | |
| 3.8 | Financial and other information | |
| 3.9 | Fees and incentive schemes | |
| 3.10 | Complaints | |
| 3.11 | Insolvency events | |
| 3.12 | Legal proceedings | |
| 3.13 | Delegation of relevant functions | |
| 3.14 | Products, services and normal hours of operation | |
| 3.14A | Operation of a regulated market or MTF | |
| 3.15 | Suspension of services and inability to operate facilities | |
| 3.16 | Information technology systems | |
| 3.17 | Inability to discharge regulatory functions | |
| 3.18 | Membership | |
| 3.19 | Investigations | |
| 3.20 | Disciplinary action relating to members | |
| 3.21 | Criminal offences and civil prohibitions | |
| 3.22 | Restriction of, or instruction to close out, open positions | |
| 3.23 | Default | |
| 3.24 | Transfers of ownership | |
| 3.25 | Significant breaches of rules and disorderly trading conditions | |
| 3.26 | Proposals to make regulatory provision | |

**REC 4 — Supervision**

| | |
|---|---|
| 4.1 | Application and purpose |
| 4.2 | The supervisory relationship with UK recognised bodies |
| 4.2A | Publication of information by UK RIEs and RAPs |
| 4.2B | Exercise of passport rights by a UK RIE |
| 4.2C | Control over a UK RIE |
| 4.2D | Suspension and removal of financial instruments from trading |
| 4.2E | Information: compliance of UK recognised bodies with EU requirements |
| 4.2F | Information gathering power on FCA's own initiative |
| 4.2G | Reports by skilled persons |
| 4.3 | Risk assessments for UK recognised bodies |
| 4.4 | Complaints |
| 4.5 | FCA supervision of action by UK RIEs under their default rules |
| 4.6 | The section 296 power to give directions |
| 4.6A | The section 192C power to direct qualifying parent undertakings |
| 4.7 | The section 297 power to revoke recognition |
| 4.8 | The section 298 procedure |
| 4.9 | Disciplinary measures |

**REC 5 — Applications for Recognition (UK recognised bodies)**

| | |
|---|---|
| 5.1 | Introduction and legal background |
| 5.2 | Application process |

**REC 6 — Overseas Investment Exchanges**

| | |
|---|---|
| 6.1 | Introduction and legal background |
| 6.2 | Applications |
| 6.3 | Recognition requirements |
| 6.5 | FCA decision on recognition |
| 6.6 | Supervision |
| 6.7 | Notification rules for overseas recognised bodies |
| 6.8 | Powers to supervise |

| | |
|---|---|
| **REC 6A** | **EEA market operators in the United Kingdom** |
| 6A.1 | Exercise of passport rights by EEA market operator |
| 6A.2 | Removal of passport rights from EEA market operator |

**Transitional Provisions and Schedules**

| | |
|---|---|
| TP 1 | Transitional provisions |
| Sch 1 | Record keeping requirements |
| Sch 2 | Notification requirements |
| Sch 5 | Rights of action for damages |
| Sch 6 | Rules that can be waived |

**Recognised Investment Exchanges**

# Chapter 2

# Recognition requirements

**2**

## 2.11    Custody

**2.11.1**    Schedule to the Recognition Requirements Regulations, Paragraph 4(2)(g)

**FCA**    **Without prejudice to the generality of sub-paragraph [4(1)], the [*UK RIE*] must ensure that-**

**where the [*UK RIE's*]*facilities*include making provision for the safeguarding and administration of assets belonging to users of those*facilities*, satisfactory arrangements are made for that purpose.**

**2.11.3**    **G**    In determining whether a *UK recognised body* has made satisfactory arrangements for the safeguarding and administration of assets belonging to the users of its *facilities*, the *FCA* may have regard to:

**FCA**

(1)    the level of protection which the arrangements provide against the risk of theft or other types or causes of loss;

(2)    whether the arrangements ensure that assets are only used or transferred in accordance with the instructions of the owner of those assets or in accordance with the terms of the agreement by which the *UK recognised body* undertook to safeguard and administer those assets;

(3)    whether the arrangements ensure that the assets are not transferred to the *UK recognised body* or to any other *person* to settle the debts of the owner (or other *person* with the appropriate rights over the assets) except in accordance with valid instructions from a *person* entitled to give those instructions, or in accordance with the terms of the agreement by which the *UK recognised body* undertook to safeguard and administer those assets;

(4)    whether the arrangements include satisfactory procedures to ensure that any rights arising in relation to the assets held as a result of any actions by the *issuers* of those assets (or other relevant persons) are held, transferred or acted upon in a timely and accurate manner in accordance with the instructions of the owner of those assets or in accordance with the terms of the agreement by which the *UK recognised body* undertook to safeguard and administer those assets;

(5)    whether there are adequate arrangements to ensure the proper segregation of assets belonging to the *UK recognised body* (or to *undertakings* in the same *group*) from those belonging to the users of its *facilities* for the safeguarding and administration of assets;

2

(6)   whether the arrangements include satisfactory procedures for the selection, oversight and review of *custodians* or sub-*custodians* used to hold the assets;

(7)   whether the agreements by which the *UK recognised body* undertakes to safeguard and administer assets belonging to users of its *facilities* include appropriate information regarding the terms and conditions of that service and the obligations of the *UK recognised body* to the user of the service and of the user of the service to the *UK recognised body*;

(8)   whether the records kept of those assets and the operation of the safeguarding services provide sufficient accurate and timely information:

   (a)   to identify the legal and beneficial owners of the assets and of any *persons* who have charges over, or other interests, in the assets;

   (b)   to record separately any additions, reductions and transfers in each account of assets held for safeguarding or administration; and

   (c)   to identify separately the assets owned by (or, where appropriate, on behalf of) different *persons*, including, where appropriate, the assets owned by *members* of the *UK recognised body* and their clients;

(9)   the frequency of reconciliation of the assets held by (or on behalf of) the *UK recognised body* with the accounts held with the *UK recognised body* by the users of its safeguarding and administration services and the extent of the arrangements for resolving a shortfall identified in any reconciliation; and

(10)  the frequency with which statements of their holdings are provided to the users of the safeguarding and administration services, to the owners of the assets held and other appropriate *persons* in accordance with the terms of the agreement by which the *UK recognised body* undertook to safeguard and administer those assets.

**2.11.4**    G

FCA

Where a *UK recognised body* arranges for other *persons* to provide services for the safeguarding and administration services of assets belonging to users of its *facilities*, it will also need to satisfy the *recognition requirement* in Regulation 6 of the *Recognition Requirements Regulations* (see  REC 2.2).

# EXHIBIT F

# Financial Services Act 1986

## CHAPTER 60

# ARRANGEMENT OF SECTIONS

## PART I

### REGULATION OF INVESTMENT BUSINESS

### CHAPTER I

### PRELIMINARY

Section
1. Investments and investment business.
2. Power to extend or restrict scope of Act.

### CHAPTER II

### RESTRICTION ON CARRYING ON BUSINESS

3. Persons entitled to carry on investment business.
4. Offences.
5. Agreements made by or through unauthorised persons.
6. Injunctions and restitution orders.

### CHAPTER III

### AUTHORISED PERSONS

*Members of recognised self-regulating organisations*

7. Authorisation by membership of recognised self-regulating organisations.
8. Self-regulating organisations.
9. Applications for recognition.
10. Grant and refusal of recognition.
11. Revocation of recognition.
12. Compliance orders.
13. Alteration of rules for protection of investors.
14. Notification requirements.

**A**

c. 60    *Financial Services Act 1986*

(6) The arrangements for monitoring may make provision for that function to be performed on behalf of the body (and without affecting its responsibility) by any other body or person who is able and willing to perform it.

### *Investigation of complaints*

5.—(1) The body must have effective arrangements for the investigation of complaints relating to—

    (*a*) the carrying on by persons certified by it of investment business in respect of which they are subject to its rules ; and

    (*b*) its regulation of investment business.

(2) Paragraph 4(4) above applies also to arrangements made pursuant to this paragraph.

### *Promotion and maintenance of standards*

6. The body must be able and willing to promote and maintain high standards of integrity and fair dealing in the carrying on of investment business and to co-operate, by the sharing of information and otherwise, with the Secretary of State and any other authority, body or person having responsibility for the supervision or regulation of investment business or other financial services.

Sections 36 and 37.

## SCHEDULE 4

### REQUIREMENTS FOR RECOGNITION OF INVESTMENT EXCHANGE

#### *Financial resources*

1. The exchange must have financial resources sufficient for the proper performance of its functions.

#### *Safeguards for investors*

2.—(1) The rules and practices of the exchange must ensure that business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors.

(2) The exchange must—

    (*a*) limit dealings on the exchange to investments in which there is a proper market ; and

    (*b*) where relevant, require issuers of investments dealt in on the exchange to comply with such obligations as will, so far as possible, afford to persons dealing in the investments proper information for determining their current value.

(3) In the case of securities to which Part IV of this Act applies compliance by The Stock Exchange with the provisions of that Part shall be treated as compliance by it with sub-paragraph (2) above.

(4) The exchange must either have its own arrangements for ensuring the performance of transactions effected on the exchange

*Financial Services Act 1986*     c. **60**     209

or ensure their performance by means of services provided under     Sch. 4
clearing arrangements made by it with a recognised clearing house.

(5) The exchange must either itself have or secure the provision
on its behalf of satisfactory arrangements for recording the trans-
actions effected on the exchange.

(6) Sub-paragraphs (2), (4) and (5) above are without prejudice
to the generality of sub-paragraph (1) above.

### *Monitoring and enforcement*

3.—(1) The exchange must have adequate arrangements and
resources for the effective monitoring and enforcement of compliance
with its rules and any clearing arrangements made by it.

(2) The arrangements for monitoring may make provision for that
function to be performed on behalf of the exchange (and without
affecting its responsibility) by any other body or person who is able
and willing to perform it.

### *Investigation of complaints*

4. The exchange must have effective arrangements for the investi-
gation of complaints in respect of business transacted by means of
its facilities.

### *Promotion and maintenance of standards*

5. The exchange must be able and willing to promote and maintain
high standards of integrity and fair dealing in the carrying on of
investment business and to co-operate, by the sharing of information
and otherwise, with the Secretary of State and any other authority,
body or person having responsibility for the supervision or regulation
of investment business or other financial services.

## SCHEDULE 5

### LISTED MONEY MARKET INSTITUTIONS

Section 43.

### PART I

#### TRANSACTIONS NOT SUBJECT TO MONETARY LIMIT

1. This Part of this Schedule applies to any transaction entered
into by the listed institution as principal (or as agent for another
listed institution) with another listed institution or the Bank of
England (whether acting as principal or agent) if the transaction falls
within paragraph 2 or 3 below.

2.—(1) A transaction falls within this paragraph if it is in respect
of an investment specified in sub-paragraph (2) below and—

    (*a*) in the case of an investment within any of paragraphs (*a*) to
        (*d*) of that sub-paragraph, the transaction is not regulated
        by the rules of a recognised investment exchange ; and

    (*b*) in the case of any other investment specified in that sub-
        paragraph, the transaction is not made on such an exchange
        or expressed to be as so made.

# EXHIBIT G



Direct line:  020 7066 2720
Email:  david.bailey@fca.org.uk

Garry Jones
CEO
London Metal Exchange
56 Leadenhall Street
London
EC3A 2DX

**Financial Conduct Authority**
25 The North Colonnade
Canary Wharf
London
E14 5HS

Tel: +44 (0)20 7066 1000
Fax:+44 (0)20 7066 1099
www.fca.org.uk

9 June 2014

Dear Mr Jones,

**FCA Supervision of London Metal Exchange Warehousing Arrangements**

I set out in this letter, the FCA's approach to its ongoing supervisory oversight of the LME with specific regard to the functioning of its warehousing arrangements.

The LME is a "recognised investment exchange" ("RIE"), recognised and supervised by the Financial Conduct Authority ("FCA"), under the UK Financial Services and Markets Act 2000, as amended ("FSMA")[1].  To remain recognised, an RIE must at all times ensure, and be able to demonstrate, that it continues to satisfy the requirements for investment exchanges under the UK FSMA (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001 ("Recognition Requirements")[2].  Under the Recognition Requirements, the LME must therefore, among other requirements, ensure that:

| | | |
|---|---|---|
| i) | the systems and controls used in the performance of its functions are adequate, and appropriate for the scale and nature of its business; |
| ii) | business conducted by means of its facilities is conducted in an orderly manner and so as to afford proper protection to investors; |
| iii) | it has effective arrangements for monitoring and enforcing compliance with its own rules; |
| iv) | it has made clear and transparent rules to ensure that all financial instruments admitted to trading on any regulated market operated by LME are capable of being traded in a fair, orderly and efficient manner (in accordance with Chapter V of EU Regulation 1287/2006/ EC (MiFID Regulation, where applicable)); and |
| v) | where LME's facilities include making provision for the safeguarding and administration of assets belonging to users of those facilities, satisfactory arrangements are made for that purpose. |

---

[1] FSMA: http://www.legislation.gov.uk/ukpga/2000/8/contents
[2] Recognition Requirements: http://www.legislation.gov.uk/uksi/2001/995/made

Registered as a Limited Company in England and Wales No. 1920623. Registered office as above.

In relation to requirement iv. above, the MiFID Regulation further requires LME, in assessing whether a transferable security is capable of being traded on its regulated market in a fair, orderly and efficient manner, to take into account whether the terms of the security are clear and unambiguous and allow for a correlation between the price of the security and the price or other value measure of the underlying.

In relation to requirement v. above, the FCA provides guidance , via the REC sourcebook[3], to make it clear that the FCA may, in determining whether an RIE has made satisfactory arrangements for safeguarding and administration of assets belonging to the users of its facilities, have regard to "...*whether the arrangements include satisfactory procedures to ensure that any rights arising in relation to the assets held as a result of any actions by the issuers of those assets (or other relevant persons) are held, transferred or acted upon in a timely and accurate manner in accordance with the instructions of the owners of those assets...*"

The LME's arrangements with its network of approved warehouses play an important role in the functioning of the LME's market.  Therefore, the FCA, as part of its supervision of LME, expects LME to ensure that its warehousing arrangements provide effective and efficient services for the receipt, holding, and delivery of metal related to the trading of LME contracts.  This is important to enable the LME to continue to meet its regulatory obligations as a RIE.  This would include obligations to ensure the fair, smooth and orderly functioning of its markets, the integrity of its markets, and the effectiveness of its price discovery arrangements.  Consequently, although the operation of RIE-approved warehouses is not, by itself, a FCA regulated activity, the FCA expects LME to have in place arrangements that ensure those warehouses which it approves operate in a way that ensures LME meets its regulatory obligations.

As also set out in the REC sourcebook, the FCA expects the LME to at all times keep it informed of significant developments of progress with its plans and operational initiatives in relation to its warehousing arrangements.  As part of this, it expects to arrange meetings with key individuals at LME for that purpose.  This is in order to provide the FCA with appropriate assurance that the Recognition Requirements will continue to be satisfied at all times.

In its supervisory oversight of the LME, the FCA will therefore continue to fully engage with LME to monitor the impact of all the measures announced by the LME, including initiatives such as LME's new Linked Load-In and Load-Out rule, to ensure that such changes are consistent with LME's regulatory obligations under the Recognition Requirements.

We would be content for you to share this letter with external parties, advising us when you plan to do so, in order to explain the FCA's regulatory role and interest in LME's warehousing arrangements.

Yours sincerely

David Bailey
Head, Market Infrastructure and Policy
Markets Division

---

[3] REC Sourcebook: http://www.fshandbook.info/FS/html/FCA/REC

# EXHIBIT H

***Status:*** *This version of this Act contains provisions that are prospective.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*



# Financial Services and Markets Act 2000

## 2000 CHAPTER 8

An Act to make provision about the regulation of financial services and markets; to provide for the transfer of certain statutory functions relating to building societies, friendly societies, industrial and provident societies and certain other mutual societies; and for connected purposes.                    [14th June 2000]

Be it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

---

**Annotations:**

**Modifications etc. (not altering text)**

C1    Act restricted (11.8.2001) by S.I. 2001/2659, **art. 2(4)(c)**
      Act excluded (1.12.2001) by S.I. 2001/2617, **arts. 2(b)**, 10(9); S.I. 2001/3538, **art. 2(1)**
      Act: specified provisions excluded (1.12.2001) by S.I. 2001/2957, **arts. 1**, 13(8)(b); S.I. 2001/3538, **art. 2(1)**
      Act restricted (1.12.2001) by S.I. 2001/3646, **arts. 2(7)(b)**, 4(6)(b), 6(4)(b), 7(4)(c), 8(4)(b), 9(4)(b)
      Act applied (with modifications) by S.I. 1994/188, **reg. 4** (as amended (1.12.2001) by S.I. 2001/3649, **arts. 1**, 454)
C2    Act modified (18.7.2002 for certain purposes and 21.8.2002 otherwise) by The Electronic Commerce Directive (Financial Services and Markets) Regulations 2002 (S.I. 2002/1775), regs. 1, **17**
C3    Act extended (E.W.S.) (1.1.2003) by 2000 c. 39, s. 15(2); S.I. 2002/2711, art. 2 (subject to arts. 3-5)
C4    Act: power to modify, exclude or apply conferred (N.I.) (10.8.2004) by Open-Ended Investment Companies Act (Northern Ireland) 2002 (c. 13 (N.I.)), **ss. 1(2)(l)(3)(b)(f)(4)**, 4; S.R. 2004/333, **art. 2**
C5    Act extended (18.2.2004) by The Insurers (Reorganisation and Winding Up) Regulations 2004 (S.I. 2004/353), **regs. 2(5)**, 3
C6    Act extended (5.5.2004) by The Credit Institutions (Reorganisation and Winding up) Regulations 2004 (S.I. 2004/1045), **reg. 2(5)**
C7    Act extended by The European Communities (Lawyer's Practice) Regulations 2000 (S.I. 2000/1119), reg. 14, Sch. 3 Pt. 1 (as amended (16.9.2004) by The European Communities (Lawyer's Practice) (Amendment) Regulations 2004 (S.I. 2004/1628), **reg. 6**)

*Status: This version of this Act contains provisions that are prospective.*
*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial
team to Financial Services and Markets Act 2000. Any changes that have already been made by the
team appear in the content and are referenced with annotations. (See end of Document for details)*

---

**Annotations:**

**Amendments (Textual)**
**F407**   Words in s. 295 substituted (1.4.2003) by Enterprise Act 2002 (c. 40), ss. 278, 279, **Sch. 25 para.
40(9)**; S.I. 2003/766, **art. 2**, Sch. (with art. 3)

**Commencement Information**
**I89**   S. 295 wholly in force at 1.12.2001; s. 295 not in force at Royal Assent see s. 431(2); s. 295 in force
for specified purposes at 18.6.2001 by S.I. 2001/1820, art. 2, **Sch.**; s. 295 in force in so far as not
already in force at 1.12.2001 by S.I. 2001/3538, **art. 2(1)**

**296   Authority's power to give directions.**

(1) This section applies if it appears to the Authority that a recognised body—

    (a)   has failed, or is likely to fail, to satisfy the recognition requirements; or

    (b)   has failed to comply with any other obligation imposed on it by or under this
Act.

[**F408**(1A) This section also applies in the case of a recognised body which is a recognised
investment exchange if it appears to the Authority that the body has failed, or is
likely to fail, to comply with any obligation imposed on it by any directly applicable
Community regulation made under the markets in financial instruments directive.]

(2) The Authority may direct the body to take specified steps for the purpose of securing
the body's compliance with—

    (a)   the recognition requirements; or

    (b)   any obligation of the kind in question.

[**F409**(2A) In the case of a recognised investment exchange other than an overseas investment
exchange, those steps may include—

    (a)   the granting to the Authority of access to the premises of the exchange for the
purpose of inspecting—

        (i) those premises; or

        (ii) any documents on the premises which appear to the Authority to be
relevant for the purpose mentioned in subsection (2);

    (b)   the suspension of the carrying on of any regulated activity by the exchange
for the period specified in the direction.]

(3) A direction under this section is enforceable, on the application of the Authority, by
an injunction or, in Scotland, by an order for specific performance under section 45
of the **M36**Court of Session Act 1988.

(4) The fact that a rule made by a recognised body has been altered in response to a
direction given by the Authority does not prevent it from being subsequently altered
or revoked by the recognised body.

*__Status:__ This version of this Act contains provisions that are prospective.*
*__Changes to legislation:__ There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

---

**Annotations:**

**Amendments (Textual)**
**F408**  S. 296(1A) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 7(a)**
**F409**  S. 296(2A) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 7(b)**

**Modifications etc. (not altering text)**
**C509**  S. 296 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(11); S.I. 2001/3538, **art. 2(1)**

**Marginal Citations**
**M36**  1988 c. 36.

---

## 297    Revoking recognition.

(1) A recognition order may be revoked by an order made by the Authority at the request, or with the consent, of the recognised body concerned.

(2) If it appears to the Authority that a recognised body—

    (a)   is failing, or has failed, to satisfy the recognition requirements, or

    (b)   is failing, or has failed, to comply with any other obligation imposed on it by or under this Act,

it may make an order revoking the recognition order for that body even though the body does not wish the order to be made.

[**F410**(2A) If it appears to the Authority that a recognised body which is a recognised investment exchange—

    (a)   has not carried on the business of an investment exchange during the period of twelve months beginning with the day on which the recognition order took effect in relation to it,

    (b)   has not carried on the business of an investment exchange at any time during the period of six months ending with the relevant day, or

    (c)   has failed, or is likely to fail, to comply with any obligation imposed on it by a directly applicable Community regulation made under the markets in financial instruments directive,

it may make an order revoking the recognition order for that body even though the body does not wish the order to be made.

(2B) The "relevant day", for the purposes of paragraph (b) of subsection (2A), is the day on which the power to make an order under that subsection is exercised.

(2C) Subsection (2A) does not apply to an overseas investment exchange.]

(3) An order under this section ("a revocation order") must specify the date on which it is to take effect.

*Financial Services and Markets Act 2000 (c. 8)*
*Part XVIII – Recognised Investment Exchanges and Clearing Houses*
*Chapter I – Exemption*
*Document Generated: 2014-04-03*

327

*Status: This version of this Act contains provisions that are prospective.*
*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Financial Services and Markets Act 2000. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

(4) In the case of a revocation order made under subsection (2) **[F411or (2A)]**, the specified date must not be earlier than the end of the period of three months beginning with the day on which the order is made.

(5) A revocation order may contain such transitional provisions as the Authority thinks necessary or expedient.

---

**Annotations:**

**Amendments (Textual)**
**F410**   S. 297(2A)-(2C) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 8(a)**
**F411**   Words in s. 297(4) inserted (1.4.2007 for certain purposes and 1.11.2007 otherwise) by The Financial Services and Markets Act 2000 (Markets in Financial Instruments) Regulations 2007 (S.I. 2007/126), regs. 1(2), 3(2), **Sch. 2 para. 8(b)**

**Modifications etc. (not altering text)**
**C510**   S. 297 amended (*temp.* from 3.9.2001 to 1.12.2001) by S.I. 2001/2659, **arts. 1(2)**, 3(11); S.I. 2001/3538, **art. 2(1)**

---

## 298   Directions and revocation: procedure.

(1) Before giving a direction under section 296, or making a revocation order under section 297(2) **[F412or (2A)]**, the Authority must—

   (a)   give written notice of its intention to do so to the recognised body concerned;

   (b)   take such steps as it considers reasonably practicable to bring the notice to the attention of members (if any) of that body; and

   (c)   publish the notice in such manner as it thinks appropriate for bringing it to the attention of other persons who are, in its opinion, likely to be affected.

(2) A notice under subsection (1) must—

   (a)   state why the Authority intends to give the direction or make the order; and

   (b)   draw attention to the right to make representations conferred by subsection (3).

(3) Before the end of the period for making representations—

   (a)   the recognised body,

   (b)   any member of that body, and

   (c)   any other person who is likely to be affected by the proposed direction or revocation order,

may make representations to the Authority.

(4) The period for making representations is—

   (a)   two months beginning—

      (i) with the date on which the notice is served on the recognised body; or

      (ii) if later, with the date on which the notice is published; or

   (b)   such longer period as the Authority may allow in the particular case.

(5) In deciding whether to—

   (a)   give a direction, or

**Status:**

This version of this Act contains provisions that are prospective.

**Changes to legislation:**

There are outstanding changes not yet made by the legislation.gov.uk editorial team to Financial Services and Markets Act 2000. Any changes that have already been made by the team appear in the content and are referenced with annotations.

**Changes and effects yet to be applied to :**

– s. 292(2)(b) words inserted by S.I. 2013/504 reg. 3(10)(b)
– s. 292(3)(c) words substituted by 2012 c. 21 Sch. 8 para. 8
– s. 292(3)(d) words substituted by 2012 c. 21 Sch. 8 para. 8
– s. 292(4) words substituted by 2012 c. 21 Sch. 8 para. 8
– s. 292(5)(c) words substituted by 2012 c. 21 Sch. 8 para. 8
– s. 292(6) inserted by S.I. 2013/504 reg. 3(10)(c)
– s. 292A(1) word substituted by 2012 c. 21 Sch. 8 para. 9
– s. 292A(3) word substituted by 2012 c. 21 Sch. 8 para. 9
– s. 292A(5) word substituted by 2012 c. 21 Sch. 8 para. 9
– s. 292A(6) word substituted by 2012 c. 21 Sch. 8 para. 9
– s. 293(1)-(3) words substituted by 2012 c. 21 Sch. 8 para. 10(2)
– s. 293(5) words substituted by 2012 c. 21 Sch. 8 para. 10(2)
– s. 293(6) words substituted by 2012 c. 21 Sch. 8 para. 10(3)(c)
– s. 293(6)(a) words inserted by 2012 c. 21 Sch. 8 para. 10(3)(a)
– s. 293(6)(b) words substituted by 2012 c. 21 Sch. 8 para. 10(3)(b)
– s. 293(7) words substituted by 2012 c. 21 Sch. 8 para. 10(4)(c)
– s. 293(7)(a) words inserted by 2012 c. 21 Sch. 8 para. 10(4)(a)
– s. 293(7)(b) words inserted by 2012 c. 21 Sch. 8 para. 10(4)(b)
– s. 293(9) words substituted by 2012 c. 21 Sch. 8 para. 10(5)
– s. 293A substituted by 2012 c. 21 Sch. 8 para. 11
– s. 294(1) words substituted by 2012 c. 21 Sch. 8 para. 12
– s. 294(2) words substituted by 2012 c. 21 Sch. 8 para. 12
– s. 294(4) words substituted by 2012 c. 21 Sch. 8 para. 12
– s. 294(6) words substituted by 2012 c. 21 Sch. 8 para. 12
– s. 295(1) words substituted by 2012 c. 21 Sch. 8 para. 13(2)
– s. 295(2) words substituted by 2012 c. 21 Sch. 8 para. 13(3)
– s. 295(3) words substituted by 2012 c. 21 Sch. 8 para. 13(4)
– s. 295(4) omitted by 2012 c. 21 Sch. 8 para. 13(5)
– s. 296 heading words substituted by 2012 c. 21 Sch. 8 para. 14(8)
– s. 296(1) words substituted by 2012 c. 21 Sch. 8 para. 14(2)
– s. 296(1A) words substituted by 2012 c. 21 Sch. 8 para. 14(3)(a)
– s. 296(1A) words substituted by 2012 c. 21 Sch. 8 para. 14(3)(b)
– s. 296(2) words substituted by 2012 c. 21 Sch. 8 para. 14(4)
– s. 296(2A) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(a)
– s. 296(2A)(a) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(b)(i)
– s. 296(2A)(a) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(b)(ii)
– s. 296(2A)(b) words substituted by 2012 c. 21 Sch. 8 para. 14(5)(c)
– s. 296(3) words substituted by 2012 c. 21 Sch. 8 para. 14(6)
– s. 296(4) words substituted by 2012 c. 21 Sch. 8 para. 14(7)
– s. 297(1) words inserted by S.I. 2013/504 reg. 3(12)(a)
– s. 297(1) words substituted by 2012 c. 21 Sch. 8 para. 15(2)
– s. 297(1A) inserted by S.I. 2013/504 reg. 3(12)(b)
– s. 297(2) words inserted by S.I. 2013/504 reg. 3(12)(c)
– s. 297(2) words substituted by 2012 c. 21 Sch. 8 para. 15(2)
– s. 297(2A) words inserted by S.I. 2013/504 reg. 3(12)(d)
– s. 297(2A) words omitted by 2012 c. 21 Sch. 8 para. 15(3)(a)(ii)
– s. 297(2A) words substituted by 2012 c. 21 Sch. 8 para. 15(3)(a)(i)
– s. 297(2A)(a) words inserted by 2012 c. 21 Sch. 8 para. 15(3)(b)
– s. 297(2A)(b) words inserted by 2012 c. 21 Sch. 8 para. 15(3)(b)
– s. 297(2A)(c) words substituted by 2012 c. 21 Sch. 8 para. 15(3)(c)
– s. 297(2C) words inserted by 2012 c. 21 Sch. 8 para. 15(4)
– s. 297(5) words substituted by 2012 c. 21 Sch. 8 para. 15(5)
– s. 297(6) inserted by S.I. 2012/916 reg. 2(10)
– s. 297(6) words substituted by 2012 c. 21 Sch. 8 para. 15(5)
– s. 298 applied (with modifications) by 1998 c. 40 s. 170B(9) (as inserted) by S.I. 2013/504 s. 170B(9)
– s. 298(1) words inserted by 2012 c. 21 Sch. 8 para. 16(a)
– s. 298(1) words substituted by 2012 c. 21 Sch. 8 para. 16(b)

# EXHIBIT I



# LONDON METAL EXCHANGE

## --------From Executive Director: Regulation and Compliance

To:        ALL MEMBERS, WAREHOUSE COMPANIES AND LONDON AGENTS

Ref:       01/492 : A492 : W83

Date:      17 December 2001

Subject:   **LME COMPLAINTS ARRANGEMENTS**

---

Under the Financial Services and Markets Act 2000 (FSMA), which came into force on 1 December 2001, all Recognised Investment Exchanges (RIEs) and Recognised Clearing Houses (RCHs) are required to appoint an independent Complaints Commissioner to oversee their complaints procedures.

2      The LME Board has approved the appointment of Dr Oonagh A McDonald CBE as the LME's Complaints Commissioner with effect from 1 December 2001 for a three year period.

3      Attached to this notice is the LME's new complaints procedure, which incorporates the role and powers of the LME's Complaints Commissioner as laid down in the FSMA.  In every other respect, the LME's complaints procedure remains unchanged from that issued on 27 October 1997 (Notice 97:356 W-076/97).

4      The LME will continue to investigate, in the first instance, all complaints about the LME.  Prior to the FSMA, if the complainant was dissatisfied with the conduct or outcome of the complaint handling, the complainant could refer the complaint to the Financial Services Authority.  Under the new procedures, claimants who are dissatisfied with the handling of their complaint by the LME for complaints arising in connection with the performance of, or failure to perform, any of its regulatory functions, will be able to refer the complaint to the LME's independent Complaints Commissioner.



5       I remain the LME's complaints officer.

6       This notice replaces 97:356 W-076/97, which can now be discarded.

**A WHITING**

cc:     Board directors



# LONDON METAL EXCHANGE

## COMPLAINTS PROCEDURE OF THE LONDON METAL EXCHANGE

### <u>Complaints</u>

The London Metal Exchange Limited ("LME") investigates complaints made against the LME, its personnel, its members or its listed warehouses which may involve breaches of statutory duty, the LME rules or the proper operation of the market in relation to:-

     (a)    the functions of the Exchange;

     (b)    business transacted on the Exchange;

     (c)    transactions cleared through the LME matching system;

     (d)    LME contracts;

     (e)    the conduct of LME members in carrying out LME business;

     (f)    the conduct of warehouses listed by LME in carrying out warehousing business in relation to metal on LME warrant, metal taken off LME warrant or metal due to be put on LME warrant;

     (g)    the suitability of a brand for listing by the LME; or

     (h)    LME warrants and the warranting of metal.

### <u>Registering a Complaint</u>

2     The complaint must be made in writing.  In the event that it is made by a company, it should be signed by a director or equivalent officer.

3     It should include sufficient information to allow the LME to properly identify the trade(s) or activity complained of, and establish the basis for any alleged loss by the complainant.  If insufficient information is provided, the LME may request further information. Where a complaint is made against more than one participant (for example, complaints against two members, or the LME and a member) separate complaints should be made against each



participant, although reference may be made to background material provided with the other complaint.

4    Any information with the complaint or obtained from the complainant in the course of a subsequent investigation may be disclosed to third parties such as other regulatory authorities as the LME considers appropriate but subject to its normal rules and procedures.

5    The complaint must be sent to:-

The Complaints Officer
The London Metal Exchange Limited
56 Leadenhall Street
London  EC3A 2DX

Marked "Complaint"

6    There is no filing fee.

7    The complaint will be investigated by the LME Compliance Department who may act in conjunction with the LME Warehousing Department and others as appropriate.  The investigation may involve other staff at the LME or outside professional assistance as appropriate.

8    The inquiry will be conducted independently of any LME personnel who may be involved in the subject of the complaint.

9    The LME will aim to complete its investigation within 3 months, or within such further period as the scope of the complaint would reasonably demand.

10    The LME will, insofar as it is consistent with its duties in operating the Exchange and its duties of confidentiality to members or warehouses listed by the LME, advise the complainant and any other relevant parties of the outcome of the investigation, and in particular whether it considers that there are good grounds for complaint against LME, its personnel, its members or warehouses listed by it, in relation to the business of the LME.  The LME will also advise the complainant of recommended action arising from the investigation of the complaint.

11    As a result of the LME Compliance Department's investigation, disciplinary proceedings may be instituted.

12    For complaints arising in connection with the performance of, or failure to perform, any of its regulatory functions, if the complainant is dissatisfied with the investigation of the complaint or with the reported outcome of the



investigation, he may request that the complaint is referred to the LME's independent Complaints Commissioner.

13    The LME's independent Complaints Commissioner has the following powers:-

(a)    to call on all appropriate documentation from all involved parties to form a view on the complaint;

(b)    to permit and/or request the complainant and the LME to provide written submissions in relation to any specific matters that arise;

(c)    to make further requests of all relevant parties and/or take whatever action is considered appropriate which might assist in considering the complaint;

(d)    to conduct the consideration of the issues as is seen fit;

(e)    to report on the result of his investigation to the LME and the complainant;

(f)    to make a recommendation, if appropriate, that the Exchange makes a compensatory payment to the complainant and/or remedies the matter complained of;

(g)    to be able to publish his report (or any part of it) if he considers that it (or any part) ought to be brought to the attention of the public;

(h)    to require the LME to inform the Complaints Commissioner and the complainant of the steps which it proposes to take in response to his report; and

(i)    to require the LME to publish the whole or a specified part of its response to the Complaints Commissioner.

1 December 2001

# EXHIBIT J

**Examples Of Meetings Between The LME And FCA Regarding Warehousing Issues**

|     | Date | Meeting |
| --- | --- | --- |
| 1. | January 4, 2011 | LME Monthly |
| 2. | February 1, 2011 | LME Monthly |
| 3. | March 1, 2011 | LME Monthly |
| 4. | April 5, 2011 | LME Monthly |
| 5. | May 3, 2011 | LME Monthly |
| 6. | June 10, 2011 | LME Monthly |
| 7. | July 5, 2011 | LME Monthly |
| 8. | July 8, 2011 | LME Quarterly |
| 9. | August 2, 2011 | LME Monthly |
| 10. | September 5, 2011 | LME Monthly |
| 11. | December 7, 2011 | LME Monthly |
| 12. | January 9, 2012 | LME Monthly |
| 13. | February 10, 2012 | LME Monthly |
| 14. | March 6, 2012 | LME Monthly |
| 15. | April 3, 2012 | LME Monthly |
| 16. | June 6, 2012 | LME Monthly |
| 17. | July 5, 2012 | LME Monthly |
| 18. | July 31, 2012 | LME Monthly |
| 19. | September 4, 2012 | LME Monthly |
| 20. | October 2, 2012 | LME Monthly |
| 21. | November 6, 2012 | LME Monthly |
| 22. | December 4, 2012 | LME Monthly |

| 23. | January 7, 2013 | LME Monthly |
|-----|-----------------|-------------|
| 24. | February 11, 2013 | LME Monthly |
| 25. | March 19, 2013 | LME Monthly |
| 26. | April 10, 2013 | LME Monthly |
| 27. | May 8, 2013 | LME Monthly |
| 28. | June 3, 2013 | Risk Assessment Meeting |
| 29. | June 6, 2013 | Risk Assessment Warehousing Meeting |
| 30. | June 10, 2013 | LME Monthly |
| 31. | July 15, 2013 | LME Monthly Meeting |
| 32. | August 21, 2013 | LME CEO Meeting |
| 33. | September 9, 2013 | LME Monthly |
| 34. | October 16, 2013 | LME Monthly |
| 35. | November 7, 2013 | LME CEO Meeting |
| 36. | November 11, 2013 | LME Monthly Meeting |
| 37. | November 27, 2013 | LME Bi-Annual<br>Physical Operations and Warehousing Meeting |
| 38. | December 5, 2013 | LME Bi-Annual<br>Physical Operations and Warehousing Meeting |
| 39. | December 9, 2013 | LME Monthly Meeting |
| 40. | January 8, 2014 | LME Monthly Meeting |
| 41. | January 20, 2014 | LME Monthly Warehousing Meeting |
| 42. | February 5, 2014 | LME Monthly Meeting |
| 43. | February 10, 2014 | LME CEO Meeting |
| 44. | February 11, 2014 | Agenda for Quarterly<br>Physical Operations and Warehousing Meeting |
| 45. | February 20, 2014 | LME CEO Meeting |

| 46. | March 17, 2014 | LME Monthly Warehousing Meeting |
|---|---|---|
| 47. | March 18, 2014 | Semi-Annual LME Chairman Meeting |
| 48. | April 9, 2014 | LME Monthly Meeting |
| 49. | April 10, 2014 | LME Monthly Warehousing Meeting |
| 50. | May 15, 2014 | LME Monthly Meeting |
| 51. | May 19, 2014 | LME Quarterly<br>Warehousing and Physical Operations Meeting |
| 52. | June 3, 2014 | LME Monthly Warehousing Meeting |