UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
IN RE ALUMINUM WAREHOUSING                                 :
ANTITRUST LITIGATION                                       :  MDL No. 2481
                                                           :  Master Docket No.
This Document Relates To:                                  :  13 MD 2481 (KBF)
                                                           :
*Agfa Corporation and Agfa Graphics, N.V.*                 :
*v. The Goldman Sachs Group, Inc., et al.*,                :
Case No. 1:14-cv-0211-KBF (S.D.N.Y.)                       :
                                                           :
and                                                        :
                                                           :
*Mag Instrument, Inc. v. The Goldman Sachs*                :
*Group, Inc.*, Case No. 1:14-cv-00217-KBF                  :
(S.D.N.Y.)                                                 :
                                                           :
-----------------------------------------------------------X

# JOINT SUPPLEMENTAL SUBMISSION OF MAG AND AGFA
# IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS

At oral argument on Defendants' motions to dismiss, the Court expressed specific interest in hearing argument from Mag and Agfa in relation to the Section 1 claim they both assert. *See* June 20, 2014 Transcript of Proceedings ("Transcript"), at 9:1-14. As the hearing unfolded, however, Mag and Agfa had limited opportunity to address Section 1 and the arguments made by Defendants about it. Accordingly, Mag and Agfa make this supplemental submission in order to address three points: first, any ostensible lack of queues at JPMorgan/Bath warehouses is not fatal to the Section 1 claim as pleaded; second, contrary to Defendants' assertions, Mag and Agfa *do* allege that Defendants engaged in conduct against their economic self-interest; and, finally, the horizontal restraint at issue is appropriately evaluated under the per se rule.

## I. THE LACK OF A QUEUE IN ANY GIVEN WAREHOUSE DOES NOT UNDERMINE PLAUSIBILITY PER *TWOMBLY*

At argument, JPMorgan and Henry Bath emphasized the lack of a specific allegation in the Mag/Agfa complaints that there are queues at any Bath warehouses. *See* Transcript at 103:19-22. JPMorgan/Bath argues that without a queue, there is no parallel conduct. *Id.* at 101:17-22; 103:9-16. But JPMorgan/Bath's premise (asserted lack of queues) supports neither its specific argument (asserted lack of parallel conduct) nor the conclusion that JPMorgan/Bath was not complicit.

Mag and Agfa allege that all Defendants initiated (and exacerbated) queues at key chokepoints in several regions, most notably Detroit and Vlissingen. Mag Compl., ¶¶ 17-22, 61-62; Agfa Compl., ¶¶ 18-23, 62-63. Defendants acknowledged at argument that Mag's and Agfa's Section 1 conspiracy claim was "international in dimensions." Transcript at 122:10 (Counsel for Goldman/Metro). Mag and Agfa allege that all Defendants executed this plan through various parallel means, including by agreeing to treat the minimum load-out rate as a de facto maximum rate. Other plaintiffs have alleged, and Mag and Agfa easily could amend to allege, that JPMorgan specifically fed the queue at Vlissingen through the cancellation in December 2011 of warrants for

1

500,000 tonnes of aluminum it had stored at Pacorini's warehouses there. *See* Commercial End Users Corrected Consolidated Class Action Complaint [Dkt. #242], ¶¶ 143-145. *See also* Mag Compl., ¶¶ 58-59; Agfa Compl., ¶¶ 59-60 (discussing warrant cancellation activity). This instantly caused a queue in Vlissingen, one that would grow to over 700 days. Once queues were created and fed at these chokepoint locations, the damage was done to the physical aluminum price, as the resulting increased rents and delivery delays are factors included in the relevant premium components. *See* Mag Compl., ¶ 41; Agfa Compl., ¶ 42. It is sufficient, then, under Mag's and Agfa's allegations that JPMorgan/Bath contributed to the queues at the chokepoint warehouses even if it did not itself operate those warehouses, or did not itself also directly benefit from the increased rents collected there, because JPMorgan to be sure benefited on the financial end. Nor is it true that any purported lack of a queue undoes all allegations of parallel conduct. Mag and Agfa allege that all Defendants agreed to treat the minimum load-out rate as a de facto maximum rate, *e.g.*, Mag Compl., ¶¶ 66-69; Agfa Compl., ¶¶ 67-70, and that alone is parallel conduct.

## II.  PLAINTIFFS PROPERLY ALLEGE CONDUCT AGAINST DEFENDANTS' ECONOMIC SELF-INTEREST

Defendants argue that all of their conduct is explainable as natural economic phenomena, and that Mag and Agfa allege no conduct against Defendants' own economic self-interest. In fact, however, the Court may reasonably infer that any financial firm defendant that owns aluminum in the queue of any warehouse is acting against its economic self-interest in not taking action either to shorten the queues or to seek legal relief from the warehouse operators. Defendants vertically integrated their operations not only to trade aluminum, but also to own the facilities to store it. As noted above, JPMorgan cancelled warrants on 500,000 tonnes of aluminum in Pacorini's Vlissingen warehouse. The Court reasonably may and, respectfully, ought to infer that

storage of aluminum in a competitor's warehouse—and willingness to pay outsize rents for that storage—is an act against economic self-interest.

Further, it is not Plaintiffs' pleading burden here to establish that everything Defendants did was against their self-interest. Acts against economic self-interest are only one of the plus factors Mag and Agfa allege. Viewed in context and on the whole, these factors more than suffice to nudge the claim across the line from conceivable to plausible, as they say – particularly in light of the fact that suspicious timing will support an inference of conspiracy and may also be considered a plus factor. *See In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 368-70 (S.D.N.Y. 2011). Just as Defendants all got into the aluminum warehousing business within a 9-month window of time, Mag Compl., ¶ 54; Agfa Compl., ¶ 55, they just as quickly sought to leave it once it was clear that the jig was up. *See* Mag Compl., ¶¶ 100-101; Agfa Compl., ¶¶ 101-102 (In July 2013, JPMorgan planned, and has since executed, its exit from the physical commodities business, including metals warehousing.). Since the time Mag and Agfa filed their amended complaints, Goldman has now also announced its plans to exit the warehousing industry.

## III.   THE PER SE RULE APPLIES TO MAG'S AND AGFA'S COMPLAINTS

At the hearing, the Court expressed a concern about whether it ultimately should apply a per se rule or instead a rule of reason analysis to Mag/Agfa's claims. Mag and Agfa allege only a Section 1 claim under the federal antitrust laws, and no Section 2 claim. Mag's and Agfa's Section 1 claim concerns an agreement between horizontal competitors to restrain aluminum supply in order to manipulate prices, including premiums. Mag and Agfa allege that Defendants agreed to treat the LME minimum load out rule as a cap, paid incentives to funnel aluminum to certain warehouses, and cancelled warrants, all of which resulted in the formation of queues at certain key

warehouse locations. Mag and Agfa allege that Defendants' conduct caused aluminum prices, including the relevant premium, to rise.[1]

Application of the per se rule is appropriate where the challenged practice, when adopted, could not reasonably have been believed to promote enterprise and productivity. *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010-11 (7th Cir. 2012). Defendants do not and cannot offer any explanation why the instant agreement among horizontal competitors to restrain aluminum supply alleged by Mag and Agfa promotes enterprise and productivity.

Furthermore, simply because Mag and Agfa allege that the LME is part of the instant conspiracy does not mandate a rule of reason analysis here. In *In re Insurance Brokerage Antitrust Litigation*, the Third Circuit noted that "defendants cannot escape the per se rule . . . simply because their conspiracy depended on the participation of a 'middle-man'...." 618 F.3d 300, 337 (3d Cir. 2010). Mag's and Agfa's claim is considerably less dependent on the actions of a middle man than in *Insurance Brokerage*. *See id*. at 344. While Mag and Agfa allege that the LME provided the opportunity and platform to conspire, the gravamen of Mag's and Agfa's allegations of conspiracy is an agreement and conduct between horizontal competitors, *e.g.*, restricting load outs, cancelling warrants, and offering incentives at key chokepoints in the supply chain, rather than a series of vertical agreements.[2] Mag's and Agfa's complaints are about a naked restraint among horizontal competitors that is primary and not ancillary to the conspiracy. And, most importantly, the agreement between Defendants actually

---

[1] Although not specifically alleged by Mag/Agfa, the LME submitted a document to the Court that supports Mag/Agfa's contention that queues cause the premiums to increase. The LME's Summary Public Report of the LME Warehousing Consultation dated November 2013, states the LME "considers the fundamental role of the queues is to increase premiums...." (Dkt. #384 at 6).

[2] For this reason, Mag and Agfa do not consider their allegations to state a traditional hub and spoke conspiracy and, thus, relegated arguments about hub and spoke conspiracies to a footnote. As described above, Mag and Agfa *do* in any event allege conduct against the self-interest of the spokes.

alleged by Mag and Agfa does not possess any "redeeming competitive virtues." None. *Insurance Brokerage*, 618 F. 3d at 345. Per se treatment by the Court is warranted.

## CONCLUSION

For all the foregoing reasons and the reasons in their Joint Opposition Brief, the Court should deny in their entirety Defendants' motions to dismiss as to Mag and Agfa.

DATED: July 2, 2014

Respectfully submitted,

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

   s/ Walter W. Noss
CHRISTOPHER M. BURKE (*pro hac vice*)
WALTER W. NOSS (*pro hac vice*)
KRISTEN M. ANDERSON (*pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619-233-4565

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444

SCHNEIDER WALLACE COTTRELL KONECKY LLP
TODD M. SCHNEIDER
JASON H. KIM
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: 415-421-7100

SCHNEIDER WALLACE COTTRELL KONECKY LLP
GARRETT W. WOTKYNS
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone:  480-428-0144

SIMMONS HANLY CONROY LLC
DEREK Y. BRANDT
JOHN R. PHILLIPS
One Court Street
Alton, IL  62002
Telephone:  618-259-2222

SIMMONS HANLY CONROY LLC
ANDREA BIERSTEIN
112 Madison Avenue, 7th Floor
New York, New York  10016
Telephone:  212-784-6400

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
707 Broadway, Suite 1000
San Diego, CA 92124
Telephone:  619-687-6611

 PEIFFER ROSCA ABDULLAH
CARR & KANE, L.L.P.
JOSEPH C. PEIFFER
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Telephone:  505-586-5259

*Counsel for Plaintiffs Mag Instrument, Inc. and Agfa Corporation and Agfa Graphics, N.V.*

NICOLL DAVIS & SPINELLA LLP
Christopher M. Santomassimo
95 Route 17 South, Suite 316
Paramus, NJ  07652
Telephone: 201-712-1616

*Counsel for Plaintiffs Agfa Corporation and Agfa Graphics, N.V.*

6

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice list, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

    s/ Walter W. Noss
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101