UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 25, 2014
```

-----------------------------------------------------X
                                :

IN RE ALUMINUM WAREHOUSING    :       13-md-2481 (KBF)
ANTITRUST LITIGATION           :    and all related cases
                                :
                                :    OPINION & ORDER

-----------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On August 16, 2013, the first of what would become a large number of lawsuits alleging federal antitrust and analogous state law claims was filed against the London Metal Exchange Limited[1] (the "LME"), Glencore Xstrata plc[2] ("Glencore"), the Goldman Sachs Group, Inc. ("Goldman Sachs"), JP Morgan Chase & Co. ("JP Morgan"), and a variety of commodity trading and metals mining companies along with several metals warehousing companies.[3]  The United States Judicial Panel on Multidistrict Litigation issued orders transferring all of these actions to this Court.  (See ECF Nos. 1, 6, 232, 551.)

Plaintiffs allege a conspiracy to restrain the output of aluminum among the LME, owners and operators of metal storage warehouses, and metals traders including Glencore, Goldman Sachs, and JP Morgan.  According to plaintiffs, these

---

[1] Plaintiffs have also sued LME Holdings Limited and Limited Metal Exchange Limited.

[2] Plaintiffs have also sued Glencore Ltd. and Glencore Xstrata Inc.

[3] These defendants include GS Power Holdings LLC; Henry Bath & Son Limited; Henry Bath LLC; Hong Kong Exchanges and Clearing Limited; Lime Holdings Limited; MCEPF Metro I, Inc.; Metro International Trade Services, L. L. C.; MITSI Holdings LLC; Nems (USA) Inc.; Pacorini Metals AG; and Pacorini Metals USA, LLC.

defendants devised a scheme to slow the movement of aluminum out of LME-approved warehouses, which caused aluminum prices to increase in two ways. First, the scheme constrained the overall supply of aluminum, which, as dictated by the law of supply and demand, led directly to an increase in its price. Second, the scheme caused LME-warehoused aluminum to be stored for longer periods of time, which increased its storage costs, thereby increasing the Midwest Premium, a typical pricing component of aluminum in, inter alia, the United States. Plaintiffs allege that they were therefore forced to purchase aluminum at inflated prices.

All defendants have moved to dismiss all claims, and all plaintiffs have opposed. The instant decision concerns only one of the many pending motions,[4] specifically, the LME's motion to dismiss all claims against it on the basis that it is immune under the Foreign Sovereign Immunities Act ("FSIA"), and therefore this Court lacks subject-matter jurisdiction as to claims against it. The instant motion does not address the merits of plaintiffs' claims, and has nothing to do with, for instance, whether plaintiffs have stated or could state an antitrust claim against the LME.

Instead, the issue before this Court is a narrow one: whether the LME is an "organ" of the United Kingdom, even though it is privately owned by Hong Kong Exchanges and Clearing Limited and was previously owned by, inter alia, various investment banks and trading companies. If it is, the Court must then determine

---

[4] The Court will address the other pending motions separately.

whether the LME's alleged conduct falls within the "commercial exception" of the FSIA.

For the reasons set forth below, the Court GRANTS the LME's motion to dismiss based on sovereign immunity. The Court itself initially found this result somewhat surprising and counterintuitive. Nevertheless, it is dictated by the prevailing case law.

## I.    RELEVANT FACTS

The facts relevant to this motion include not only those alleged in the second corrected consolidated amended complaint (ECF No. 271 ("CAC")),[5] but also those the parties have submitted in connection with this motion. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."). The Court takes all uncontroverted facts in the complaint as true and draws all reasonable inferences in favor of the plaintiff. See Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

---

[5] There are a number of complaints asserted against the LME in these consolidated and coordinated actions. (See ECF Nos. 226 (Amended Complaint relating to Mag Instrument, Inc. v. The Goldman Sachs Grp., Inc.), 227 (Consumer End-Users' Consolidated Amended Class Action Complaint), 242 (Commercial End Users' Corrected Consolidated Class Action Complaint), 271 (CAC), 272 (Amended Complaint relating to Agfa Corp. & Agfa Graphics, N.V. v. The Goldman Sachs Grp., Inc.); Eastman Kodak Co. v. The Goldman Sachs Grp., Inc., No. 6:14-cv-06429-MAT (W.D.N.Y.) ECF No. 1 (case transferred to this Court on August 19, 2014, see No. 14-cv-6849 ECF No. 6).) The LME's motion to dismiss pertains to all of these complaints. (See ECF No. 320.) In the instant opinion, the Court resolves the LME's motion to dismiss as to all claims against it. Because the allegations against the LME are consistent across all of the complaints, the Court will cite to the second corrected consolidated amended complaint for ease of reference.

The LME is headquartered in London, England and "is the world center for trading metals." (CAC ¶¶ 124, 125.)  The LME provides a platform for trading industrial metal contracts, and over 80% of the world's non-ferrous metals futures transactions are carried out on the LME's trading platforms.  (Id. ¶ 124; Declaration of Mark S. Bradley, ECF No. 387 ¶¶ 2-3 ("Bradley Decl.").)[6]  "The LME brings together industrial and financial participants to create a market for buyers and sellers, and provides producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of rising and falling world metal prices." (CAC ¶ 124.)

The LME groups its members into five categories, each of which corresponds with a different set of responsibilities and obligations.  (Bradley Decl. ¶ 4.) Goldman Sachs, Glencore, and JP Morgan each fall into different categories.  (Id. ¶¶ 5-7.)

The LME's primary decision-making body is its Board of Directors.  (Bradley Decl. ¶ 9.)  The Board oversees 25 advisory committees, most of which report directly to the Board or to the LME's Executive Committee ("EXCOM").  (Id. ¶ 8.) Several of the advisory committees oversee the LME's operations; one such committee is the "Warehousing Committee." (Id. ¶ 10.)  The responsibilities of the Warehousing Committee include maintaining contact with warehousing industry

---

[6] Mark S. Bradley is the Head of Market Surveillance at the LME.  He has been employed by the LME since 2006.  Among his job responsibilities are ensuring that the LME is fulfilling its statutory and regulatory obligations to maintain an orderly market and to protect investors on the LME. Bradley is one of the LME's "liaison contacts" with the United Kingdom's Financial Conduct Authority.  (Bradley Decl. ¶ 1.)

and trade associations, apprising EXCOM of relevant issues in warehousing, and making recommendations to EXCOM regarding warehousing policy.  (Id. ¶11.) Committee decisions are by majority vote.  (Id. ¶ 12.)  The committee's chairman is appointed by EXCOM, and the committee's other members are employees of LME-approved warehouses.  (Id. ¶ 13.)  Employees of warehouse companies that are defendants in this action have never comprised a majority of the committee, and none of the non-LME defendants in this litigation have ever had a representative on EXCOM.  (Id. ¶¶ 14-15.)

The LME is a "recognized investment exchange" ("RIE"), as defined by the Financial Services and Markets Act 2000, as amended ("FSMA").  (Id. ¶ 16 & exs. B-D.)  RIEs are supervised by the Financial Conduct Authority (the "FCA"), which until 1997 was known as the Securities and Investment Board, and from 1997 until the passage of FSMA was known as the Financial Services Authority.  (Declaration of Nicholas David Ong-Seng, ECF No. 322 ¶ 6 ("Ong-Seng Decl.").)[7]  The FCA is "a statutorily created body that is charged with regulating the financial services industry in the United Kingdom," and it is accountable to the U.K. Parliament through the U.K. Treasury.[8]  (Id.)

To maintain its status as an RIE, the LME must meet certain "Recognition Requirements" adopted by the U.K. Treasury and implemented by the FCA.  (Id. ¶¶ 8-9; Bradley Decl. ¶ 17 & ex. E.)  Under the current Recognition Requirements, the

---

[7] Nicholas David Ong-Seng is LME's Managing Director: Regulation and Compliance.  (Id. ¶ 1.)

[8] No party has disputed that the FCA is an arm of the U.K. Government.

LME must maintain an orderly market and afford proper protection to investors, which it achieves by regulating the price-discovery and price convergence functions for metals traded on the exchange.  (Bradley Decl. ¶¶ 18-20.)  FSMA regulations also require the LME to make satisfactory arrangements for "securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange," and must provide for "the safeguarding and administration of assets belonging to [those parties]."  (Id. ex. D sched. 4(2)(d), (g).)

The LME's compliance with the Recognition Requirements is subject to review by the FCA, and if the FCA finds that the LME has failed to satisfy the Recognition Requirements, the FCA may revoke the LME's status as an RIE.  (Ong-Seng Decl. ¶ 13.)  However, under U.K. law, actions taken by the LME with respect to its regulatory functions are immunized against private suit absent a showing of bad faith.  (Id. ex. B § 291.)

The LME maintains a large network of storage units for its traded commodities, including aluminum.  (CAC ¶ 126.)  This network includes a number of approved warehouses that are located across the United States.  (Id.)

A.  The LME's Price Discovery Function

The LME is tasked with ensuring efficient price-discovery and price convergence functions for metals traded on the exchange.  With regard to price-discovery, contracts for metals traded on the LME are "aimed at providing the metals trade and industry with a global price reference."  (Bradley Decl. ¶ 21.)  The

LME does not itself trade metals contracts. (Id. ¶ 22.)  LME contracts are based on physical settlement by the transfer of ownership of metal stored in LME-approved warehouses.  (Id. ¶ 29.)

Price convergence "refers to keeping the LME price in line with the physical market price" (also known as the "spot price.")  (Id. ¶ 27.)  The "physical market is the place where metal manufacturers, such as miners, smelters and refiners, sell their metal to purchasers who in turn use that metal to make physical goods for sale."  (Id. ¶ 25.)  This metal is generally, though not always, separate from that which passes through the LME system.  Sellers in the physical market may choose to use the LME price "as a component in the price they wish to achieve when negotiating the sale of their metal to purchasers in the physical market."  (Id. ¶ 26.)  These sellers negotiate with buyers over an "all-in" price that includes the added costs of transport and delivery, which are also subject to negotiation.  (Id.)  The difference between the LME price and the all-in price is called the "premium."  (Id.)  When the costs of storing aluminum in a warehouse increase (as would be the case when aluminum is being stored for longer periods of time), the premium also increases.

When the forward price of aluminum is higher than the current price (which may occur during a construction downturn), the resulting market situation is referred to as a "contango."  (Id. ¶ 85.)  The existence of a contango allows arbitrage traders to profit by exploiting the difference between the current and future price.  (Id.)  Contangos typically lead aluminum to be stored for longer periods than would

otherwise be the case while would-be arbitrageurs await the expected eventual increase in the market price (that is, they are betting that the cost of financing today's purchase and storage of the aluminum will be less than the proceeds from its sale in the future).  (See id.)

B.  The Warehouse Arrangements

Metals are typically exchanged on the LME through the exchange of warrants, which are "bearer document[s] of possession"; each corresponds to a specific lot of metal at an LME-approved warehouse.  (Id. ¶¶ 37-39.)  LME warrants are issued by an approved warehouse company after the metal has been delivered to the warehouse.  (Id. ¶ 39.)

The LME does not itself own or operate warehouses for metals traded on the exchange, nor does it own the metal stored within those warehouses.  (Id. ¶ 36.) Instead, the LME has storage contracts with warehouses all over the world.[9]  (Id. ¶¶ 35-37.)  These warehouses issue and cancel warrants, and perform all of the required load-in and load-out procedures.  (Id. ¶¶ 35-39, 54.)

Warehouses seeking to join the LME's network must apply to the LME. (Supplemental Declaration of Mark Bradley, ECF No. 432 ¶ 4 ("Bradley Supp.").) When an entity inquires regarding the application process, it is informed that it will need to agree to "[t]he terms and conditions applicable to all LME listed warehouse

---

[9] The Terms and Conditions applicable to all LME-approved warehouses provide for the payment of an annual "listing fee" and stock levy to the LME.  (Id. ¶ 81.)  The stock levy is calculated off the percent of LME warranted stock stored at an LME-approved warehouse.  (See id. ¶¶ 81, 83-84.)

companies." (Id. ex. A.) In addition, LME provides the company with its "current disciplinary procedures handbook." (Id.)

To become an LME-approved warehouse, an entity must execute a standard form agreement with the LME (the "Warehouse Agreement"). (Id. ¶ 5.) The first paragraph of the Warehouse Agreement states, "This Agreement is in standard form and is required to be signed in its standard form by all warehouse companies wishing to become or remain listed as LME warehouses." (Id. ex. B.) The agreement expressly "incorporates and requires approved warehouses to abide by a set of Terms and Conditions as they may change from time to time." (Id. ¶ 6.) None of the terms and conditions is individually negotiated. (Id.; see also Bradley Decl. ¶ 50 & ex. N.) The Warehouse Agreement also requires warehouses to report their stock of warranted metal to the LME each business day. (Bradley Decl. ¶ 51.)

Before the LME makes any material change to the Warehouse Agreement, it publishes a notice consulting the approved warehouses about the proposed change, then receives and considers comments. (Bradley Supp. ¶ 18; Second Supplemental Declaration of Mark Bradley, ECF No. 463 ¶ 3 ("2d Bradley Supp.").) Among the types of changes subject to such notice, comment and consideration are changes relating to minimum load-out requirements. (See id. ¶¶ 4-5, 10.) If a party objects to a proposed rule change, or to the procedure used to adopt it, the party may challenge the rule in a "judicial review" proceeding in a U.K. court (which is a process of review for public bodies). (Bradley Decl. ¶ 66; Bradley Supp. ¶ 18.) If the U.K. court agrees that the LME failed to follow appropriate procedures, it may

quash the rule.  (Bradley Decl. ¶ 66.)  This occurred in 2014 in the case <u>R v. London</u>

<u>Metal Exch. ex parte United Co. Rusal PLC</u>, [2014] EWHC (Admin) 890 (Eng.).

(<u>See</u> Bradley Decl. ex. R.)

      The LME's Policy Regarding Approval of Warehouses also imposes conditions

on LME warehouses.  (<u>Id.</u> ¶ 54 & ex. F.)  These conditions include minimum daily

load-out rules.  (<u>Id.</u> ¶ 54 & ex. F § 2.3.4.1.)  They do not, however, include the rent

for storage at the warehouses.  Instead, the Warehouse Agreement requires each

warehouse annually to set its own rent rate for a period of 12 months commencing

April 1 and to notify the LME of the same.  (Bradley Supp. ex. C § 5.1.4.)  The LME

"may publish such information concerning stocks and queues at Warehouses as is

considered necessary by the [LME], acting reasonably, for the purposes of market

transparency or other regulatory purposes."  (<u>Id.</u> § 6.3.3.)  Each LME-approved

warehouse must also maintain "effective information barriers" between it and

entities that trade on the exchange, "as specified by the [LME] from time-to-time."

(<u>Id.</u> § 9.13.)

      The Warehouse Agreement further provides that "the terms of the

Exchange's handbook on enforcement and disciplinary procedures" are deemed

incorporated into the Agreement.  (<u>Id.</u> § 8.)  If a warehouse fails to fulfill its load-in

and load-out obligations, the LME reserves the right to investigate and the

"Disciplinary Procedures shall apply."  (<u>Id.</u> § 9.3.2.)  If an individual or entity

complains that a warehouse has failed to fulfill its obligations, the LME may

conduct an investigation, which could lead to disciplinary proceedings.  (Bradley

Decl. ¶¶ 56-59.)  If a warehouse is found to have engaged in the alleged acts, the LME's Disciplinary Committee may impose penalties including fines, or it may withdraw the LME's approval of the warehouse.  (Id. ¶ 60.)  There is a process for appeal.  (Id. ¶ 61.)  A warehouse company can also challenge the fairness of the LME's disciplinary and appeal process through a judicial review procedure in a U.K. court.  (Id. ¶ 62.)  This occurred in 2000, when an LME-approved warehouse challenged sanctions the LME imposed against it.  (See R v. London Metal Exch. ex parte Albatros Warehousing Ltd. BV, (unpublished Mar. 30, 2000), Bradley Decl. ex. Q.)

As an RIE, the LME is overseen by the FCA and must comply with the FCA's Sourcebook.  (See Bradley Supp. ex. E.)  This document requires RIEs to arrange for satisfactory procedures "to ensure that any rights arising in relation to the assets held . . . are held, transferred or acted upon in a timely and accurate manner . . . ." (Id. ex. E ¶ 2.11.3(4).)  Various requirements of the Warehouse Agreements correspond to the LME's obligations pursuant to the Recognition Requirements. (See Bradley Decl. ¶¶ 50-51, 55.)  The Recognition Requirements have been in force since 2001.  (Bradley Supp. ¶ 13.)  The current requirements are more detailed than those in place in 1986 at the time of the Albatros decision, which is discussed below. (Id. ¶ 15.)  The express obligations in the Recognition Requirements form the basis for the LME's position that its regulation of its approved warehouses are part of its public regulatory function.  (Id. ¶ 15.)

In connection with this proceeding, the FCA submitted a letter to the LME stating its view that "the LME's regulation of its warehouses, including its regulation of metal load-out, is necessary for the LME to meet its regulatory obligations as an RIE." (Id. ¶ 16 & ex. G.)  In particular, that letter states,

> The LME's arrangements with its network of approved warehouses play an important role in the functioning of the LME's market. Therefore, the FCA, as part of its supervision of the LME, expects LME to ensure that its warehousing arrangements provide effective and efficient services for the receipt, holding, and delivery of metal related to the trading of LME contracts. This is important to enable the LME to meet its regulatory obligations as a RIE.

(Id. ex. G.)  The letter continues,

> Consequently, although the operation of RIE-approved warehouses is not, by itself, a FCA regulated activity, the FCA expects LME to have in place arrangements that ensure those warehouses which it approves operate in a way that ensures LME meets its regulatory obligations.

(Id.)  The FCA letter also indicates that it views its oversight as comprehensive in this regard:

> In its supervisory oversight of the LME, the FCA will therefore continue to fully engage with LME to monitor the impact of all measures announced by LME, including initiatives such as LME's new Linked Load-In and Load-Out rule, to ensure that such changes are consistent with LME's regulatory obligations under the Recognition Requirements.

(Id.)

The LME and FCA have met regularly and frequently since January 2011 regarding warehouse issues.  (Id. ¶ 45.)  They have met more than 50 times since

2011 regarding warehousing issues alone.  (<u>Id.</u> ex. J.)  The LME's load-in and load-rules were among the topics discussed at these meetings.  (<u>See id.</u> ¶ 45.)  The LME has provided the FCA with data analyses regarding warehouse queues, load out rates, stock levels and warrant cancellations.  (<u>Id.</u>)

     C.  <u>Warehouse Queues</u>

     Plaintiffs allege intentional delays in the defendant warehouses' "loading out" of aluminum.  (CAC ¶¶ 22-23, 48-49.)  A delay in loading out aluminum or any metal is known as a "queue."  (Bradley Decl. ¶ 68.)  The LME issued its first rule regarding minimum load-out rules in 2003.  (<u>Id.</u> ¶ 69.)  That rule remained unchanged until 2011.  (<u>Id.</u> ¶ 73.)

     Between March 2009 and August 2010, the LME received complaints regarding delays in warehouse load-outs.  (<u>Id.</u> ¶ 70.)  The LME commissioned a report and then held a consultation process for proposed changes to its minimum load-out rules.  (<u>Id.</u> ¶¶ 71-72.)  The LME then changed its load-out rules.  (<u>Id.</u> ¶ 79.)  Those changes were challenged by aluminum producer Rusal before a U.K. court, which quashed the LME's decision to implement its new rule.  <u>Rusal</u>, [2014] EWHC (Admin) at [104].

     On May 14, 2014, the U.K. Court of Appeal granted the LME permission to appeal the <u>Rusal</u> decision.  (<u>Id.</u> ¶ 80.)  The Court set forth its reasons for granting the appeal as (1) "[t]he judge's analysis, if correct, places onerous obligations on any public body conducting a consultation on complex issues in a politically sensitive area," (2) "[t]he public body must carry out its own preliminary assessment and

winnowing in order to provide proper focus for the consultation exercise, as the LME did in this case," and (3) "the grounds of appeal have a real prospect of success."  (Id. ¶ 80 & ex. BB.)

## II.    RULE 12(B)(1) STANDARDS

Determining the existence of subject matter jurisdiction is a threshold inquiry, and a case is properly dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the district court lacks the constitutional power to adjudicate the action.  See Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Makarova, 201 F.3d at 113.

"When considering a motion to dismiss for lack of subject matter jurisdiction . . . a court must accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).  "But, when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Id.  In addition, for jurisdictional purposes, the Court may resolve disputed factual issues by reference to evidence outside of the pleadings.  See Flores v. S. Peru Copper Corp., 343 F.3d 140, 161 n.30 (2d Cir. 2003) (citing Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998)).

III.    FSIA LEGAL STANDARDS

The LME argues that it is immune from this suit under the FSIA.  The FSIA codifies a "restrictive theory of sovereign immunity."  <u>Verlinden B.V. v. Cent. Bank of Nigeria</u>, 461 U.S. 480, 488 (1983).  The FSIA provides that a "foreign state shall be immune from the jurisdiction of the Courts of the United States" unless one of several statutorily defined exceptions applies.  28 U.S.C. § 1604.  Once a defendant makes a prima facie showing of immunity under § 1604, the burden shifts to the plaintiff to show why one of these statutory exceptions applies.  <u>See</u> <u>Virtual Countries, Inc. v. Republic of South Africa</u>, 300 F.3d 230, 241-42 (2d Cir. 2002); <u>accord</u> <u>Robinson v. Gov't of Malaysia</u>, 269 F.3d 133, 141 (2d Cir. 2001).  If the plaintiff makes a showing that an exception applies, the burden of proof then shifts back to the defendant to show by a preponderance of the evidence that the asserted exception does not apply.  <u>Adler v. Federal Republic of Nigeria</u>, 107 F.3d 720, 728 (9th Cir. 1997).

Thus, to determine that the LME is immune from this suit under the FSIA, the Court must determine (1) that it falls within the definition of a foreign state or, as discussed below, is an "organ" thereof, and (2) that it does <u>not</u> fall within any of the statutory exceptions.  In the case before this Court, the latter question centers on the "commercial activity" exception, codified at 28 U.S.C. § 1605(a)(2).

A.    <u>Definition of an "Organ" of a Foreign State</u>

The LME does not claim to be a foreign state.  Instead, it argues that it is an "organ" of a foreign state.  Under the FSIA, any entity "[w]hich is an organ of a

foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" qualifies as an "agency or instrumentality of a foreign state" and is therefore a "foreign state" presumptively immune from suit.  See id. §§ 1603(a)-(b), 1604.  The FSIA does not itself define the term "organ."  To determine whether an entity is an organ of a foreign state, the Court considers the following five factors (which are known as "Filler factors"):

> (1) whether the foreign state created the entity for a national purpose;
>
> (2) whether the foreign state actively supervises the entity;
>
> (3) whether the foreign state requires the hiring of public employees and pays their salaries;
>
> (4) whether the entity holds exclusive rights to some right in the [foreign] country; and
>
> (5) how the entity is treated under foreign state law.

Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004); see also Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846–47 (5th Cir. 2000).

No single Filler factor is dispositive or should be given particular weight.  See In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 85 (2d Cir. 2008), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010); Hausler v. JPMorgan Chase Bank, N.A., 845 F. Supp. 2d 553, 572–73 (S.D.N.Y. 2012).  Thus, a foreign state need not have any ownership interest in an entity for it to be an "organ" of that state.  See USX Corp. v. Adriatic Ins., Co., 345 F.3d 190, 209 (3d Cir. 2003)

("[S]ection 1603(b)(2) does not require a foreign state to have any ownership interest in an entity for it to be its organ.").

Courts must be mindful of the fact that the "instrumentality and its related government" frequently possess most of the information needed to establish organ status.  See Hausler, 845 F. Supp. 2d at 572; Weininger v. Castro, 462 F. Supp. 2d 457, 495 (S.D.N.Y. 2006).

    B.  The Commercial Activity Exception

Under the "commercial activity exception" to the FSIA:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Thus, the commercial activity exception may apply to actions based upon either the commercial activity of a foreign state or its organ in the United States, or an act, outside the territory of the United States, in connection with a commercial activity of a foreign state elsewhere, and that causes a direct effect in the United States.

In either instance, the starting point of the analysis is determining whether the action is based on "commercial activity," or whether an action is based on an act in connection with commercial activity.  The FSIA defines "commercial activity" as:

> [E]ither a regular course of commercial conduct or a
> particular commercial transaction or act.  The commercial
> character of an activity shall be determined by reference to
> the nature of the course of conduct or particular
> transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

The FSIA does not bar a suit based on the organ of a foreign state

participating in the marketplace in the manner of a private citizen or corporation.

Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).  Accordingly:

> [A] foreign government's issuance of regulations limiting
> foreign currency exchange is a sovereign activity, because
> such authoritative control of commerce cannot be exercised
> by a private party; whereas a contract to buy army boots or
> even bullets is a 'commercial' activity, because private
> companies can similarly use sales contracts to acquire
> goods.

Id.

To determine whether an activity is commercial under the FSIA, a court

must closely examine the specific acts that form the basis for suit or in connection

with which an act was undertaken.  For example, in Weltover, the Supreme Court

examined whether Argentina's issuance of bonds fell within the commercial activity

exception.  That case stemmed from a unilateral decision by Argentina to give itself

more time to repay bonds, which spurred aggrieved bondholders to sue for breach of

contract.  Id. at 610-11.  Argentina argued that the bonds at issue (which were

called "Bonods") differed from ordinary debt instruments in that they were created

by the Argentine Government to "fulfill its obligations under a foreign exchange

program designed to address a domestic debt credit crisis, and as a component of a

18

program designed to control that nation's critical shortage of foreign exchange."  Id.

at 616.  The Court rejected this argument, finding Argentina's purpose in issuing

the bonds to be "irrelevant."  Id. at 616-17.  Rather, all that mattered was the

nature of Argentina's acts: Argentina had entered the U.S. bond market just as a

private actor would, and so its bond sales in that market were "commercial activity"

within the meaning of the FSIA.  See id. at 617.  Argentina was thus not immune

from suit.  Id.

> In a more recent case, the Second Circuit stated,

>> The FSIA asks not whether the foreign government is
>> acting with a profit motive or instead with the aim of
>> fulfilling uniquely sovereign objectives.  Rather, the issue
>> is whether the particular actions that the foreign state
>> performs (whatever the motive behind them) are the type
>> of actions by which a private party engages in 'trade and
>> traffic or commerce.'

In re Terrorist Attacks, 538 F.3d at 91-92 (quoting Weltover, 504 U.S. at 614)

(emphasis in original).

> In De Letelier v. Republic of Chile, 748 F.2d 790 (2d Cir. 1984), the Second

Circuit reversed a finding of sovereign immunity with regard to LAN, Chile's

nationally owned airline, which had been implicated in the assassination of Chile's

former ambassador to the United States.  The Court noted that while LAN's

"carriage of passengers and packages is an activity in which a private person could

engage," those activities were not the basis for the suit at hand, which concerned

LAN's participation in the assassination plot itself.  See id. at 797.  Because private

individuals cannot lawfully assassinate people, the specific conduct at issue could

not be "commercial activity," and therefore LAN remained immune from suit under the FSIA.  Id. at 797-98.

In Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004), the Second Circuit found that an organ of Japan, the Tokyo Metropolitan Government ("TMG"), was not engaging in commercial activity by providing business assistance, including product promotion, to Japanese businesses seeking to engage in commerce in the United States.  In that case, a Japanese civil servant alleged she had been sexually harassed while employed in TMG's New York office.  Id. at 109.  Plaintiff argued that her suit fell within the commercial activity exception because her job duties were primarily "commercial" in nature, as they prominently included the sale and promotion of Japanese products.  Id.  The Second Circuit looked to the nature of TMG's actions and found that they were only superficially similar to actions typically undertaken by private parties.  See id. at 112.  While a private business might promote its products, promoting those of other businesses or of the Japanese business community more broadly is not something it would ordinarily do.  Id. at 112.  The Second Circuit emphasized that "the fact that a government instrumentality like TMG is engaged in the promotion of commerce does not mean that the instrumentality is thereby engaged in commerce."  Id. (emphasis in original).  Thus, TMG was not involved in a commercial activity, and it retained its immunity under the FSIA.  Id. at 112-13.[10]

_____

[10] Similarly, in EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d 635 (9th Cir. 2003), the Ninth Circuit found that the loan collection activities and administration of non-performing loans by the Resolution and Collection Corporation (the "RCC") were not commercial activities.  The Court noted that the RCC was created "expressly to perform a public function,"

Thus far, this Court's discussion of the commercial activity exception has assumed that the conduct at issue occurred in the United States.  However, as set forth above, the third clause of the commercial activity exception provides that an act taken in connection with commercial activity which had a direct effect in the United States may have occurred outside the United States.  For the third clause of the commercial activity exception to apply, two requirements must be met:  "(1) there must be an act outside the United States in connection with commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act."  Transatl. Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 387 (2d Cir. 2000).  With regard to the first requirement, an effect is direct if it follows as an immediate consequence of the act in connection with the defendant's commercial activity.  Weltover, 504 U.S. at 618; Virtual Countries, 300 F.3d at 236-37; accord Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 894-95 n.10 (5th Cir. 1998) ("[T]he third clause does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States.").  With regard to the second requirement, the term "'based upon' . . . implies a causal relationship," and thus, "at the least, the 'act that caused a direct effect in the United States' . . . must be a 'but for' cause" of the conduct at issue in the suit."  Transatl. Shiffahrtskontor, 204 F.3d at 390.

---

namely the revitalization of the Japanese financial system, and to that end the Japanese government permitted it to perform activities that other loan collectors were not allowed to perform, and fully indemnified it against business losses.  Id. at 640.

IV.    DISCUSSION

This motion has a non-merits-based focus.  At issue is the threshold question of subject matter jurisdiction: can this Court entertain this case against this defendant?  The outcome of this decision does not mean that the LME can or cannot be sued in a U.S. court by another party for another matter—the determination here is limited to the facts currently before this Court.

The record here compels the following determinations: (1) the LME is an organ of the U.K. Government; and (2) the LME was not engaging in commercial activity when it allegedly manipulated the load-out rules for aluminum.

A.    <u>The LME is an Organ of the U.K. Government</u>[11]

When first presented with this question and without the benefit of having carefully studied the case law in this area, the Court's initial reaction was that the LME was an unlikely candidate for an organ of the U.K. Government.  This view was based on the fact that the LME is a privately held and for-profit company and, while subject to extensive governmental regulation, is in that regard simply like many non-governmental entities.  However, the Court's review of the relevant case law provided a different yet certain answer.

As previously stated, because the Court is reviewing a jurisdictional motion, it may appropriately review the extensive record that the parties have submitted on this motion.  See <u>Makarova</u>, 201 F.3d at 113.  With regard to the <u>Filler</u> factors, that

---

[11] Plaintiffs do not contest that the LME is legally separate from the U.K. Government, is not a U.S. citizen, and was not created under the laws of a third country.  Thus, the only issue under § 1603 is whether the LME is an "organ" of the U.K. Government.  The Court focuses this portion of its opinion on that question.

record demonstrates by a preponderance of the evidence that, while not formed by

the U.K. Government, the LME is charged by statute with performing the decidedly

public function of market regulation (an analogous first factor); that the FCA, a

conceded agency of the U.K. Government, actively supervises it (the second factor);

and U.K. law treats the LME's activities with regard to warehousing load-out rules

and practices as part of its immunized public functions (the fifth factor).   The

record is equally clear that the U.K. Government does not require the LME to hire

public employees or pay their salaries (the third factor), nor is the LME the only

entity that enjoys the right to act as an RIE in the commodities trade (the fourth

factor).  Nevertheless, the Court's balancing of these factors tips decidedly in the

direction of finding the LME an organ of the U.K. Government.

   With regard to the first <u>Filler</u> factor, market regulation is a public function.

<u>See, e.g.</u>, <u>Peninsula Asset Mgmt. (Cayman), Ltd. v. Hankook Tire Co., Ltd.</u>, 476 F.3d

140, 143-44 (2d Cir. 2007) (entity responsible for regulating Korean financial

institutions performed "traditional government functions" and was an agency or

instrumentality of a foreign state under the FSIA).  The LME undisputedly

regulates metals commodities markets—indeed, as an RIE, it is required to do so

under the Recognition Requirements, which charge RIEs with protecting the

orderly functioning of the market and the interests of investors.  (Bradley Decl.

¶¶ 18-20.)  In fact, were the LME to fail to adequately regulate the market for

aluminum warrants, its status as an RIE could be revoked.  (Ong-Seng Decl. ¶ 13.)

With regard to the second <u>Filler</u> factor, the FCA actively supervises the LME—including, in particular, the LME's load-out rules for LME-approved warehouses. (Bradley Supp. ¶ 16 & ex. G.) As set forth above, the FCA has met with the LME over 50 times since 2011 to discuss issues relating to warehousing. (<u>Id.</u> ¶ 45.) Importantly, the FCA itself states that it actively supervises the LME. (Bradley Supp. ex. G.)

Whether an entity is immune under local law is relevant to the fifth <u>Filler</u> factor and therefore whether an entity is immune under the FSIA. <u>See, e.g.</u>, <u>Filler</u>, 378 F.3d at 217 ("how the entity is treated under foreign state law" is relevant to determining organ status); <u>Alperin v. Vatican Bank</u>, 360 F. App'x 847, 849-50 (9th Cir. 2009) (entity's immunity from suit under foreign state law relevant to establishing prima facie case that it was entitled to FSIA immunity). Actions taken by the LME with respect to its regulatory functions are immunized under U.K. law absent a showing of bad faith.[12] (Ong-Seng Decl. ex. B § 291.) Additionally and importantly, the U.K. judiciary, in the <u>Albatros</u> and <u>Rusal</u> decisions, has taken the position that the LME is a public body and that its warehousing rules are subject to judicial oversight. (<u>See</u> Bradley Decl. exs. Q, BB.)

The procedures through which aggrieved parties may complain about the LME's actions further confirm its status as a public body. According to the Exchange's handbook on enforcement and disciplinary procedures, if the LME

---

[12] Whether the LME is alleged to have acted in bad faith is irrelevant to the Court's analysis of the fifth <u>Filler</u> factor. What matters here is not whether the LME would be immune for its alleged conduct under local law, but whether as a general matter it enjoys a similar degree of immunity to that of an arm of the U.K. Government.

disciplines a warehouse, that warehouse has the right to challenge the fairness of the LME's disciplinary and appeal process through judicial review in a U.K. court. (Id. ¶¶ 60-62). Such judicial review is available because the judiciary views the LME as acting as a public body. (See id. ex. Q (Albatros decision).)

Plaintiffs argue that an analysis of the Filler factors should lead to the opposite conclusion. First, plaintiffs argue that the LME was not created "by" the U.K. Government for a national purpose. As a factual matter, they are undoubtedly correct. However, plaintiffs' reading of the first Filler factor is far too literal. In Filler, the Second Circuit presented factors potentially useful to a court's analysis of organ status. It is certainly appropriate, however, for this Court to extend Filler to its logical conclusion. Here, that means that the first Filler factor is satisfied whenever the entity in question is tasked by a foreign state with fulfilling a national purpose—regardless of whether the foreign state did so when the entity was first created or at a later time. Indeed, one can imagine a case in which an entity is created "by" a government to serve a national purpose (for example, a national telecommunications company or a national railway system) but then is transformed into a privately owned for-profit enterprise. In such a case, it would make little sense to determine that the first Filler factor favors organ status.

Plaintiffs also argue that the LME is merely one of many RIEs, and thus it lacks exclusive rights, which argues against organ status under the fourth Filler factor. That is so and the LME has not argued otherwise. However, because Filler requires a careful balancing of multiple factors, the fact that many companies hold

similar rights is not determinative. Furthermore, it would be odd for a court of the United States to second-guess another country's determinations as to how many entities it may require to serve a particular national interest.

Plaintiffs further argue that the LME is not charged with protecting investors or the orderly function of markets—that is the job of the FCA. This argument is unpersuasive. It is true that the FCA is tasked with that function, but that does not mean that the FCA cannot delegate or share that responsibility. Here, the FCA itself submitted a letter indicating its belief that the LME plays such a role. (Bradley Supp. ex. G.)

In addition, plaintiffs argue that the mere fact that the LME is regulated cannot be the basis for determining that it serves a national purpose. Strictly speaking, this is true—otherwise, taken to an extreme, virtually any corporation could lay claim to organ status on the grounds that it must comply with environmental regulations or other regulations that serve a public purpose. Regulation is only important insofar as it is necessary to ensure that the entity serves its national purpose. But the regulations to which the LME is subject do just that—they enable it to fulfill its role as a market regulator, which means that they are relevant under Filler.

Plaintiffs also argue that the FCA merely engages in passive oversight, akin to that found insufficient for establishing organ status by the Ninth Circuit in Board of Regents of the University of Texas System v. Nippon Telephone & Telegraph Corp., 478 F.3d 274, 279-80 (9th Cir. 2007). The facts before the Court

on this motion are far different from those in <u>Nippon</u>.  Here, the record

demonstrates that the FCA actively meets with the LME regarding the very

conduct at issue (specifically, warehousing rules and queues), and there have been

more than 50 such meetings in the past several years alone.  (Bradley Supp. ex. J.)

The FCA has also submitted a letter referring to its active oversight.  (<u>Id.</u> ex. G.).

Finally, plaintiffs point out that following the public revelation of the

warehouse queues that form the basis for their claims in this suit, the FCA stated

on July 11, 2013 that the "LME's warehousing arrangements are not directly

regulated by the FCA."  (<u>See</u> Declaration of Bonny E. Sweeney, ECF No. 368 ex. 16

("Sweeney Decl.").)  The FCA recently repeated this statement in a February 2014

publication.  (<u>See</u> <u>id.</u> ex. 17 at 4 ("The operation of warehouses licensed by RIEs is

not a regulated activity.").)  That position is not inconsistent, however, with active

supervision.  Supervision and oversight are not the same as regulation.  The former

involve the review of an entity's decisions and actions; the latter involves the setting

of rules as to what decisions and actions are permissible in the first place.

Regulation may, but need not, be combined with supervision, and supervision may

occur in the absence of regulation.

Here, the FCA both <u>regulates</u> the LME through the Recognition

Requirements and the FCA Sourcebook, and provides <u>supervisory oversight</u> of the

LME's warehousing arrangements.  Indeed, in the letter the FCA submitted to the

LME in connection with these proceedings, it stated that "the FCA expects LME to

have in place arrangements that ensure those warehouses which it approves

operate in a way that ensures LME meets its regulatory obligations," and that the FCA "monitor[s] the impact of all measures announced by LME . . . such as LME's new Linked Load-In and Load-Out rule, to ensure that such changes are consistent with LME's regulatory obligations under the Recognition Requirements." (Bradley Supp. ex. G.)  Plaintiffs' argument that the FCA has publicly disclaimed any responsibility for regulating or actively supervising the LME is therefore without merit.  This general oversight and regulation renders a particular focus on whether the FCA specifically regulates the warehouse rules themselves irrelevant.

Based on the Court's balancing of the <u>Filler</u> factors, as well as the principles underlying those factors, the Court finds that the LME is an organ of the U.K. Government.

B. <u>The Commercial Activity Exception</u>

What is the conduct in which the LME is alleged to have engaged that gives rise to plaintiffs' claims?  That answer is clear:  it is alleged to have entered into a conspiracy with a variety of entities to manipulate its own warehouse load-out rules in order to restrain aluminum output and increase the price of aluminum.[13]

The Court's determination of whether such alleged activity constitutes "commercial" activity begins with the language of § 1603.  The statute requires that the Court look to the nature of the activity—not its purpose.  Thus, the LME's

---

[13] Plaintiffs do not specifically allege where the conduct that forms the basis for their claims against the LME occurs, but they clearly allege that this conduct had direct effects on the aluminum market in the United States.  Therefore, regardless of where the LME decided to enter the conspiracy or set warehouse rules, one of the commercial activity exception's clauses will be satisfied, and the result will be the same.  Accordingly, the Court need only discuss whether the LME's setting of warehouse rules is commercial activity within the meaning of § 1603.

motivations for engaging in such behavior are of no concern to this Court.[14]  Put bluntly, under both the statute and Supreme Court precedent, whether the LME manipulated its load-out rules to make more money is irrelevant to whether its doing so was a "commercial" activity as defined by § 1603.

As set forth above, it is clear that the LME's warehouse rules serve a vital and necessary role in enabling the LME to regulate the aluminum market.  They store the aluminum, issue and cancel warrants, and perform the required load-in and load-out procedures.  (Bradley Decl. ¶¶ 35-39, 54.)  These activities are governed by the Warehouse Agreement, and failure to comply with the obligations therein can lead to a fine or delisting.  (Id. ¶ 60.)  The load-out rules—the manipulation of which plaintiffs allege is the means by which the antitrust conspiracy was effected—are a form of market regulation implemented by the LME, and are therefore regulatory, not commercial, in nature.

Further evidence of the regulatory nature of the alleged activity is the fact that the LME must announce any changes to such rules and allow for comment before implementation.  (Bradley Supp. ¶ 18; 2d Bradley Supp. ¶ 3.)  In the event a party feels aggrieved by a rule change, that party may appeal to a court of law (Bradley Decl. ¶ 66; Bradley Supp. ¶ 18), a process reserved for contesting rulemaking by public (versus private) bodies (see Rusal, Bradley Decl. ex. R).

---

[14] For this reason, whether the LME is alleged to have engage in the conduct at issue in bad faith is irrelevant to determining whether this conduct constitutes commercial activity under § 1603.

Plaintiffs argue that when the LME and defendants allegedly conspired to restrain output and thereby raise aluminum prices, they were not acting as a market regulator. Defendant LME counters that this is an inappropriate inquiry into "why" the alleged conduct was undertaken, that is, its "purpose," and the proper inquiry is into whether the nature of the alleged act was that of a private actor or market regulator. As set forth above, this Court agrees with the LME.

It is persuasive to this Court that there is an elaborate process that can and, in <u>Rusal</u> was, undertaken to raise complaints regarding load-out rules. In the context of this particular motion, it would be odd indeed for this Court to find that it had subject-matter jurisdiction and proceed with a legal determination as to the legality of practices regarding load-out obligations, when a U.K. court or the FCA may—on the basis that the LME is a public body—be conducting its own, independent review. Indeed, as the FCA stated in the letter it submitted in connection with this motion, it continues to monitor the situation.

Plaintiffs also argue that the LME's arrangements vis-à-vis warehouses are quintessentially commercial in nature. They argue that such arrangements are contractual and therefore necessarily commercial. This Court again disagrees. It is true that the arrangements are contractual—but not all contractual arrangements are commercial in nature. There are numerous instances in which a public organ might use a contractual arrangement to fulfill its public function. Here the contractual provisions at issue—specifically, those relating to load-out

requirements[15]—serve a regulatory purpose.  Indeed, these contractual provisions were not negotiated at arms-length, but rather were offered on a mandatory, "take it or leave it" basis, which further confirms that they are regulatory and not commercial in nature.

## V.   CONCLUSION

For the reasons set forth above, the LME's motion to dismiss on sovereign immunity grounds is GRANTED.  Leave to replead is denied. The basis for the Court's decision is both legal and factual, and the factual record here has been amply developed.  No amendment could change this Court's determination.

The Clerk of Court is directed to close the motion at ECF No. 320.

SO ORDERED.

Dated:        New York, New York
              August 25, 2014


_____
          KATHERINE B. FORREST
          United States District Judge

---

[15] Plaintiffs do not allege that the setting of rental rates gives rise to their claims.  Rather, their claims are based on the assertion that increases in the duration of aluminum storage at LME-approved warehouses caused output constraints and also unnecessarily increased the "all-in" price for aluminum.  Accordingly, the contractual provisions concerning rental rates are not directly at issue.