**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  | : |  |
|---|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | : | MDL No. 2481 |
|  | : |  |
| This Document Relates To: | : | Master Docket No. 13-md-2481-KBF-RLE |
|  | : |  |
| Direct Purchaser Plaintiffs (14 Civ. 3116) | : |  |
|  | : |  |
| AGFA corporation, et al. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0211) | : |  |
|  | : |  |
| Mag Instrument Inc. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0217) | : |  |
|  | : |  |
| Eastman Kodak Company v. The Goldman Sachs Group, Inc. et al. (14 Civ. 6849) | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT**
**(1) OPPOSITION TO THE FIRST LEVEL PURCHASERS AND MAG AND AGFA'S**
**MOTION FOR LEAVE TO AMEND, AND**
**(2) MOTION TO DISMISS KODAK'S COMPLAINT**
**FOR LACK OF ANTITRUST STANDING**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................2

I.     THE PROPOSED AMENDED COMPLAINTS STILL DO NOT ALLEGE
       THAT ANY PLAINTIFF HAS SUFFERED ANTITRUST INJURY ..............................3

       A.     This Court Gave Specific Guidance To Plaintiffs On The Allegations
              That They Must Make To Plead Antitrust Injury, But Plaintiffs Ignored It ...........3

       B.     Plaintiffs' Proposed New Allegations Do Not Satisfy
              The "Inextricably Intertwined" Test ......................................................................5

II.    PLAINTIFFS STILL HAVE NOT ADEQUATELY ALLEGED THAT THEY
       ARE EFFICIENT ENFORCERS OF THE ANTITRUST LAWS ...................................17

       A.     It Remains Clear That Plaintiffs Lack Standing Because Their Alleged
              Injuries Are Indirect And Remote........................................................................18

       B.     Plaintiffs Essentially Admit That There Are More Efficient Enforcers
              Of The Antitrust Laws ........................................................................................21

       C.     Plaintiffs' Alleged Injury Remains Speculative .................................................22

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Aluminum Warehousing Antitrust Litigation*,
No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)........................ *passim*

*Associated General Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983)................................................................................................17, 18

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)........................................................................................................7

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982)..................................................................................................3, 13

*Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc.*,
429 U.S. 477 (1977)........................................................................................................5

*Caruana v. General Motors Corp.*,
204 F. App'x 511 (6th Cir. 2006) ................................................................................13

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
724 F.2d 290 (2d Cir. 1983)......................................................................................3, 13

*In re Crude Oil Commodity Futures Litigation*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012)............................................................................14

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) .............................................................................9

*Daniel v. American Board of Emergency Medicine*,
428 F.3d 408 (2d Cir. 2005).....................................................................................17, 22

*de Atucha v. Commodity Exchange, Inc.*,
608 F. Supp. 510 (S.D.N.Y. 1985).........................................................................14, 20

*Fattoruso* v. *Hilton Grand Vacations Co., LLC*,
873 F. Supp. 2d 569 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 26 (2d Cir. 2013).........................2

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
711 F.3d 68 (2d Cir. 2013)....................................................................2, 3, 5, 17

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003) ...........................................................................14

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)............................9, 21

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ...............................................................................................3, 17, 22

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013)..............................................................................3, 8, 9

*Loeb Industries, Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ...............................................................................16, 17, 23, 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................................................................11

*National ATM Council, Inc. v. Visa Inc.*,
   922 F. Supp. 2d 73 (D.D.C. 2013) .........................................................................................10

*Norris v. Hearst Trust*,
   500 F.3d 454 (5th Cir. 2007) ..................................................................................................13

*Ocean View Capital, Inc. v. Sumitomo Corp. of America*,
   No. 98-civ-4067 (LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999)................................20

*Paycom Billing Services, Inc. v. MasterCard International, Inc.*,
   467 F.3d 283 (2d Cir. 2006)................................................................................................3, 17

*Port Washington Teachers' Association v. Board of Education of Port
   Washington Union Free School District*,
   478 F.3d 494 (2d Cir. 2007)....................................................................................................11

*Province v. Cleveland Press Publishing Co.*,
   787 F.2d 1047 (6th Cir. 1986) ............................................................................................4, 12

*Reading Industries, Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980)......................................................................................................20

*Sanner v. Board of Trade*,
   62 F.3d 918 (7th Cir. 1995) ....................................................................................................15

*Serpa Corp. v. McWane, Inc.*,
   199 F.3d 6 (1st Cir. 1999).......................................................................................................13

*Sigmapharm, Inc. v. Mutual Pharmaceutical Co.*,
   454 F. App'x 64 (3d Cir. 2011), *cert. denied*, 133 S. Ct. 110 (2012).....................................12

*Virgin Atlantic Airways Ltd. v. British Airways Plc*,
   257 F.3d 256 (2d Cir. 2001).....................................................................................................8

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010).........................................................................................................12

**RULES**

Fed. R. Civ. P. 12.......................................................................................................................1

Fed. R. Civ. P. 12(b)..................................................................................................................1

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1, 2

Fed. R. Civ. P. 15.......................................................................................................................1

# INTRODUCTION[1]

The Court previously dismissed all antitrust claims of the First Level Purchasers ("FLPs") and Mag and Agfa because, among other reasons, they failed to plead antitrust standing. The Court concluded that no plaintiff had alleged the requisite antitrust injury and that none had demonstrated that it was an efficient enforcer of the antitrust laws. Nothing has changed. The proposed amended complaints filed by the FLPs, Mag, Agfa and Kodak[2] still do not plead antitrust standing. Accordingly, the FLPs' and Mag and Agfa's request to amend their complaints is futile under Rule 15, and Kodak's complaint fails to state a claim under Rule 12.[3]

The Court gave plaintiffs specific guidance on what they had to plead to allege antitrust injury as a matter of law. It said that plaintiffs must allege that their injuries were "inextricably intertwined" with the antitrust injury that allegedly occurred in the market in which the reduction in competition supposedly occurred, here the purported market for LME-approved warehouse services. To be "inextricably intertwined," the Court said, plaintiffs had to allege that defendants used them as the fulcrum, conduit or market force to inflict the purported injury on users of LME-approved warehouse services. Plaintiffs again have failed to do so. In fact, it is clear from the proposed complaints that defendants could have completed their alleged anticompetitive scheme even if plaintiffs had never made the aluminum purchases that they claim hurt them.

---

[1]     Defendants LME Holdings Limited, Hong Kong Exchanges and Clearing Limited, Glencore plc and Henry Bath & Son Ltd. are separately opposing leave to amend and/or moving to dismiss the Kodak complaint on the ground that the Court lacks personal jurisdiction over them. Those defendants join this opposition only in the alternative, in the event that the Court concludes that it has jurisdiction. They do not waive their jurisdictional arguments. *See* Fed. R. Civ. P. 12(b). All defendants are separately opposing leave to amend and/or moving to dismiss the Kodak complaint on alternative grounds as well.

[2]     This brief will refer to Mag, Agfa and Kodak as the Individual Plaintiffs or "IPs".

[3]     As the Court recognized in its October 14, 2014 Order (Doc. No. 615), Kodak is permitted to amend its complaint as of right so it does not need to seek leave to amend.

Under the law of this case, and numerous other decisions in this Circuit, that means that plaintiffs have not alleged antitrust injury.

But even if they had, all of their antitrust claims would still fail because plaintiffs have not sufficiently alleged that they are efficient enforcers of the antitrust laws. Their new complaints offer the same remote and indirect theory of liability as their prior complaints; it is still apparent that there are more efficient enforcers with respect to the alleged antitrust violations than these plaintiffs (namely, the actual users of defendants' warehouse services); and plaintiffs' theory of injury remains highly speculative.

## ARGUMENT

The Court must analyze whether it would be futile to allow the FLPs and Mag and Agfa to amend their complaints under the same standard that it uses to determine whether Kodak has stated a claim. That is because "[f]utility turns on whether an amended pleading could withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Fattoruso* v. *Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 582 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 26 (2d Cir. 2013). Here, none of the complaints states a claim under Rule 12(b)(6) because none pleads antitrust standing, a "threshold, pleading-stage inquiry." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *15 (S.D.N.Y. Aug. 29, 2014). As the Court previously recognized, "when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." *Id.*

This Court held that the test for antitrust standing has two principal elements, both of which plaintiffs must satisfy: (1) plaintiffs must have suffered antitrust injury, and (2) they must be "efficient enforcers" of the antitrust laws. *See, e.g.*, *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). If plaintiffs do not plausibly allege that they suffered an antitrust injury, they lack antitrust standing on that basis alone, and a court need not consider the

2

second part of the test—whether plaintiffs satisfy the "efficient enforcer" test.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 686 (S.D.N.Y. 2013) ("[P]laintiffs have not plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing.  We need not reach the *AGC* 'efficient enforcer' factors.").  Furthermore, even if plaintiffs sufficiently allege antitrust injury, a court still must dismiss antitrust claims where, as here, the plaintiffs allege indirect and remote injuries and thus are not efficient enforcers of the antitrust laws.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014); *Gatt*, 711 F.3d at 76; *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).

## I.    THE PROPOSED AMENDED COMPLAINTS STILL DO NOT ALLEGE THAT ANY PLAINTIFF HAS SUFFERED ANTITRUST INJURY

### A.    This Court Gave Specific Guidance To Plaintiffs On The Allegations That They Must Make To Plead Antitrust Injury, But Plaintiffs Ignored It

By now it is, or at least should be, clear that plaintiffs are not consumers or competitors of defendants in any sense relevant to the question of antitrust injury.  *In re Aluminum Warehousing*, 2014 WL 4277510, at *1 ("Plaintiffs are not, in short, competitors of defendants in any market.  Nor are they consumers of their products.")  Plaintiffs essentially concede as much; save for one footnote discussed below, the antitrust injury sections of their briefs are devoted entirely to arguing that they meet the "inextricably intertwined" standard for antitrust injury first announced by the Supreme Court in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), and subsequently clarified by the Second Circuit in *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983).[4]  This is the antitrust injury test that plaintiffs must meet because they are not consumers or competitors of defendants in the market where the

---

[4]       FLP Br. at 28-39; IP Br. at 13-20.

reduction in competition supposedly occurred. *In re Aluminum Warehousing*, 2014 WL 4277510, at *18.

This Court's opinion was clear about what it takes for a plaintiff to meet the "inextricably intertwined" test. The Court explained that the antitrust injury analysis must start with "understanding the market in which the actual antitrust injury is alleged to have occurred and to whom." *Id.* at *20. The Court "cannot determine that which constitutes 'antitrust' injury in the absence of knowing the type of competitive process alleged to have been interfered with." *Id.* After exhaustively analyzing all of the relevant cases, the Court held that, "[i]n order for plaintiffs to proceed on an 'inextricably intertwined' theory, they must allege with clarity what the relevant market is, what precise anticompetitive conduct occurred *in that market,* and how their injury was inextricably intertwined with *that* injury. In the absence of such allegations, plaintiffs have failed to adequately allege that they have antitrust standing." *Id.* at *21.

The Court was also clear about what types of injuries qualify as "inextricably intertwined" injuries. It held that "inextricably intertwined" means that "the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" *In re Aluminum Warehousing*, 2014 WL 4277510, at *18 (quoting *Province v. Cleveland Press Publ'g Co.,* 787 F.2d 1047, 1052 (6th Cir. 1986)); *id.* at *21. That is the law of the case.

Rather than acknowledge the Court's prior ruling, plaintiffs argue that "inextricably intertwined" simply means "caused by." FLP Br. at 29-30 ("The remaining question is whether Defendants' anticompetitive conduct in the LME Aluminum Warehouse Services [market] *caused* Plaintiffs' injury in the Primary Aluminum Market."); IP Br. at 14 ("The question is whether Defendants' anticompetitive conduct in the LME warehousing market *caused* Plaintiffs'

4

injury in the physical aluminum market.") (emphasis added). They argue that, as long as they plead that defendants' conduct ultimately caused their supposed injuries, they have alleged antitrust injury under the "inextricably intertwined" theory. *See id.* Plaintiffs are wrong.

This Court has already held that "inextricably intertwined" *does not* merely mean "caused by." In fact, it *cannot* mean "caused by" because, as this Court recognized, it has long been the law that "[e]stablishing antitrust standing requires more than alleging an injury causally related to unlawful conduct." *In re Aluminum Warehousing*, 2014 WL 4277510, at *16; *see also Gatt*, 711 F.3d at 76 ("It is not enough for the actual injury to be 'causally linked' to the asserted violation.") (citing *Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc.*, 429 U.S. 477, 489 (1977)). The Court concluded that, "although causally related to an antitrust violation, injury does not constitute 'antitrust injury' unless it is attributable to an anticompetitive aspect of the challenged conduct." *In re Aluminum Warehousing*, 2014 WL 4277510, at *16. The "inextricably intertwined" inquiry therefore asks, "were plaintiffs manipulated or utilized by the defendants as a 'fulcrum, conduit or market force' to injure competitors or participants in the relevant product or geographic market?" *Id.* at *21. The answer here is no.

B. **Plaintiffs' Proposed New Allegations Do Not Satisfy The "Inextricably Intertwined" Test**

Because the antitrust injury analysis must begin with a focus on the specific market where plaintiffs claim that the competition-reducing conduct occurred, the Court instructed plaintiffs to pick which "horses (*i.e.* markets) to ride" and to "specify precisely what each horse looks like and what is involved in riding each." *In re Aluminum Warehousing*, 2014 WL 4277510, at *21. Plaintiffs picked two of the multiple horses that they were trying to ride in the

earlier versions of their complaints:[5]   (1) the alleged market for LME-approved warehouse services (the "warehouse services market")[6] and (2) the alleged market for primary aluminum.[7] All plaintiffs plead the same theory of antitrust injury based on these two purported markets: they allege that defendants' anticompetitive conduct in the warehouse services market caused regional premiums to rise and therefore caused them injury in the primary aluminum market when they purchased primary aluminum and paid an inflated regional premium.[8]

Having decided to ride the "warehouse services market" as the purported market in which the anticompetitive conduct they identify allegedly occurred, there remain only three issues to resolve:  (1) what precise anticompetitive conduct do plaintiffs allege occurred in that market, (2) who do plaintiffs allege that defendants injured by that conduct and (3) how do plaintiffs allege that their injury was "inextricably intertwined" with the injury to those other injured people? *Id.* at *21.  We address each, in turn.

***Question 1:  What precise anticompetitive conduct do plaintiffs allege occurred in the putative warehouse services market, i.e., how do plaintiffs claim that defendants supposedly harmed "the competitive process" in that market?***  Plaintiffs allege that defendants agreed to stop competing with each other in the market for warehouse services.  Specifically they allege that defendants did three anticompetitive things in that market:

---

[5]     Defendants do not concede that either of these alleged markets is a legally cognizable relevant market or that plaintiffs have plausibly alleged either to be so.  However, that is irrelevant for purposes of antitrust standing.

[6]     The FLPs call this the "LME Aluminum Warehouse Services Market" (FLP Br. at 2) and IPs call this the "LME-Certified Warehouses for Aluminum" market (IP Compl. ¶ 144).

[7]     The two groups of plaintiffs allege different geographic scopes of the primary aluminum market.  The FLPs allege that it is limited to the U.S. and Canada (FLP Compl. ¶ 169), whereas IPs allege that it is global (IP Compl. ¶ 117).  This distinction is not material for the antitrust standing arguments.

[8]     IP Br. at 15-18; FLP Br. at 31-36.

1.      They agreed to treat the LME's minimum load-out rule as a maximum and/or to evade the rule altogether, and therefore stopped competing with each other on the basis of load-out speed;[9]

2.      They stored metal in competitor-defendants' warehouses instead of in their own warehouses;[10] and

3.      They agreed not to compete for each other's existing warehouse stocks or in each other's warehouse locations;[11]

We pause here to explain why three other types of conduct that plaintiffs allege are not relevant to the antitrust injury analysis.  First, plaintiffs allege that some defendants offered to pay incentives to producers and traders to store their metal in defendants' warehouses.[12]  But paying incentives was not *anti*competitive conduct, so it is irrelevant to the antitrust injury inquiry.  *Cf. In re Aluminum Warehousing*, 2014 WL 4277510, at *33 (paying incentives was "perfectly consistent with the warehouses acting in their economic self-interest").  Plaintiffs allege that defendants paid those incentives in order to *compete* with them by persuading aluminum owners to deliver their metal into defendants' warehouses instead of to plaintiffs for use in physical goods.[13]  *E.g.*, FLP Br. at 34 & n.9 ("Plaintiffs directly compete with Defendants (including Metro) for supply of this primary aluminum.").  But antitrust injury must flow from a *reduction* in competition; it cannot flow from competition itself.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990) ("The antitrust injury requirement ensures that a

---

[9]      IP Compl. ¶¶ 210-218, 246-253; FLP Compl. ¶¶ 523-531, 559-566.

[10]     IP Compl. ¶¶ 222-236; FLP Compl. ¶¶ 535-549.

[11]     IP Compl. ¶ 5, 197-209; FLP Compl. ¶ 510-22.

[12]     IP Compl. ¶¶ 237-245; FLP Compl. ¶¶ 550-558.

[13]     *E.g.*, FLP Compl. ¶¶ 158, 207, 414-415.

plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").  The Second Circuit therefore has held that paying incentives to attract business is lawful and *pro-competitive*.  *See Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 265 (2d Cir. 2001).

Second, plaintiffs allege that defendants "worked together strategically to cancel warrants" in their warehouses.[14]  Although this conduct allegedly occurred in the warehouse services market, plaintiffs do not allege how this was competition-reducing activity, so it is likewise irrelevant to antitrust injury.  *Cf. In re Aluminum Warehousing*, 2014 WL 4277510, at *32 (cancelling warrants to further arbitrage opportunity was in defendants' "individual economic self-interest").  Because plaintiffs do not allege that any defendant ever competed with any other defendant with respect to warrant cancellations, their supposed working together "strategically" to cancel warrants did not result in a "failure of defendants to compete where they otherwise would have."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 688-89 (granting motion to dismiss because plaintiffs failed to allege that their injury flowed from defendants' failure to compete); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (same).

Finally, plaintiffs allege that defendants' trading arms profited from the contango by engaging in futures transactions in the LME forward contract market.[15]  Plaintiffs also allege that a Goldman Sachs subsidiary, J. Aron, traded derivatives contracts that somehow (plaintiffs do not specify) benefited from an increase in the Midwest Premium.[16]  Again, however, plaintiffs do not allege that this futures and derivatives trading was *anti*competitive behavior, and thus this

---

[14]    *E.g.*, IP Compl. ¶¶ 254-260; FLP Compl. ¶¶ 567-573.

[15]    *E.g.*, IP Compl. ¶¶ 295-296; FLP Compl. ¶¶ 608-609.

[16]    *E.g.*, FLP Compl. ¶¶ 326-327; IP Compl. ¶ 192.

conduct is irrelevant to the antitrust injury analysis.  Moreover, plaintiffs allege that this trading conduct occurred in different markets—"the LME forward contract market" and whatever market they think that J. Aron traded derivatives in—not in the warehouse services market or even in the primary aluminum market.[17]  The Court told plaintiffs that they had to pick which horses/markets to ride for purposes of antitrust injury, and they did not pick the LME forward contract market or a derivatives market.  So whatever allegedly happened in those trading markets cannot form the predicate for their supposed antitrust injury.[18]  *In re Aluminum Warehousing*, 2014 WL 4277510, at \*21 ("By failing clearly or adequately [to] allege a market in which antitrust injury is experienced and by whom, plaintiffs fail to support their own antitrust injury.").

   ***Question 2: Whom do plaintiffs claim that defendants injured by engaging in the three types of anticompetitive conduct alleged: (a) refusing to compete on load-out speed, (b) storing metal in each other's warehouses and (c) warehouse market allocation?***  Plaintiffs allege that defendants' supposed failure to compete in warehouse services injured some of the users of LME-approved warehouse services.  Specifically, they argue that defendants injured some, but not all, of the owners of LME warrants whose aluminum was caught up in warehouse queues because defendants caused those customers to pay inflated warehouse rents.  *E.g.*, IP Br. at 17, 22; FLP Br. at 35.  As to the other warrant holders with metal in the queues, plaintiffs allege that they were in on, and benefitted from, defendants' supposed scheme, and thus those entities

---

[17]      IP Compl. ¶ 296.

[18]      Plaintiffs' own authority, *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F. Supp. 2d 880 (N.D. Ill. 2011), supports this conclusion.  *See* FLP Br. at 39; IP Br. at 22.  The court there denied standing to the group of plaintiffs who were claiming injury from defendants' conduct in a different market (the spot cheese market), and not from defendants' conduct in the market that was the subject of plaintiffs' monopolization claim (the milk futures market).  *In re Dairy Farmers*, 767 F. Supp. 2d at 907.

suffered no injury with which plaintiffs' injury could be inextricably intertwined.  *E.g.*, FLP Br. at 35.

It is important to note that no plaintiff alleges that it ever has been or ever tried to be a consumer of LME-approved warehouse services.  In a footnote in their brief, the FLPs halfheartedly argue that, in theory, they *could* have been "potential customers of Metro's warehousing services."  FLP Br. at 34 n.9.  They point to allegations in their proposed complaint that, prior to the alleged conspiracy, some unidentified "industrial consumers" purchased LME futures contracts as a supply hedge and, about 1% of the time, settled those contracts by taking physical delivery of the metal from the warehouse.  FLP Compl. ¶ 196.  The FLPs argue that the delays at Metro "foreclosed the ability of industrial consumers to purchase aluminum via taking delivery on their LME forward contracts."  *Id.* ¶ 197.  These allegations are not sufficient to plead that the FLPs suffered antitrust injury as potential customers of warehouse services.

First, no plaintiff alleges that it was one of those rare "industrial consumers" that actually purchased LME futures contracts and took physical delivery prior to the supposed conspiracy, and none alleges that, absent the alleged conspiracy, it ever would have done so.[19]  The FLPs merely argue that they theoretically *could* purchase LME futures contracts and take physical delivery on a long contract.  FLP Br. at 34 n.9.  Hypothetical and speculative allegations that a party theoretically *could* have suffered injury, not that it actually did so, are not enough to allege injury-in-fact under Article III of the Constitution, much less antitrust injury.  *See, e.g.*, *Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73, 84-86 (D.D.C. 2013) (plaintiffs did not allege injury-in-fact by claiming that they "may" have completed a transaction that resulted in

---

[19]     Agfa and Kodak allege that they hedge on the LME, but do not allege that they have ever or would ever take physical delivery on their long positions.  IP Compl. ¶ 296.  And, IPs do not even try to argue that they have alleged antitrust injury as "potential" customers of warehouse services.

their payment of an overcharge); *see also Port Wash. Teachers' Ass'n v. Bd. of Educ. of Port Wash. Union Free Sch. Dist.*, 478 F.3d 494, 498 (2d Cir. 2007) (to meet "[t]he irreducible constitutional minimum of standing . . . there must be an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical . . ." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted)).

In any event, plaintiffs do not premise their claimed injury or their antitrust standing on their inability to take delivery on a futures contract in the rare, 1% of circumstances when that occurs. FLP Br. at 41 n.15 (plaintiffs' theory of injury is "entirely distinct" from supposed injury to warehouse customers). Plaintiffs' claims are based on supposedly overpaying for their physical aluminum purchases by having to pay an artificially inflated Midwest Premium.

***Question 3: How do plaintiffs allege that their injury was "inextricably intertwined" with the injury to the non-conspiring users of warehouse services, i.e., how do plaintiffs claim that defendants used them as a fulcrum, conduit or market force to inflict that injury on those other people?*** They don't. And this is why all of their antitrust claims fail.

Plaintiffs repeat in various ways that the creation of the queues necessarily *caused* regional premiums to rise and therefore necessarily *caused* them to pay more for primary aluminum. For example, they say that an increase in the price of physical aluminum was a "consequence," "result" or "effect" of defendants' acts in the warehouse services market. *E.g.*, FLP Br. at 28, 32, 36; IP Br. at 18. Plaintiffs even go so far as to claim that defendants knew or should have known that their actions would result in higher prices for physical aluminum, *i.e.,* that it was "foreseeable" (*e.g.*, FLP Br. at 32, 33-34; IP Br. at 13, 17), and that J. Aron and other defendants wanted the Midwest Premium to rise either to benefit J. Aron's derivatives trading or

to increase the value of other defendants' holdings in physical aluminum stored at Metro or other warehouses (FLP Compl. ¶¶ 326-29).  But none of that is relevant to the antitrust injury inquiry. The relevant question, as the Court made clear, is whether plaintiffs allege that defendants used them as a fulcrum, conduit or market force to injure the users of warehouse services.  *In re Aluminum Warehousing*, 2014 WL 4277510, at *21 ("For this analysis the Court asks, were plaintiffs manipulated or utilized by the defendants as a 'fulcrum, conduit or market force' to injure competitors or participants in the relevant product or geographic market?").  There are no such allegations in any proposed complaint.  No plaintiff alleges that defendants used it in any way to inflict injury on users of warehouse services.  This is true even for plaintiff Ampal which claims to have purchased physical aluminum from Glencore.[20]

To the contrary, defendants could have completed and profited from a supposed scheme to eliminate competition in the warehouse services market and to overcharge warehouse customers waiting in load-out queues *if plaintiffs did not even exist*.  Plaintiffs did not need to make the physical aluminum purchases that they claim are the source of their injury in order for defendants to collect excessive rents for warehouse services.  Plaintiffs basically concede this point; they admit that their alleged "injury does not derive from the injury to warrant holders." FLP Br. at 41 n.15.  All of this means that plaintiffs' alleged injuries are not "inextricably intertwined" under the law of this case, and countless others.[21]

---

[20]     FLP Compl. ¶ 49.

[21]     *See, e.g.*, *Sigmapharm v. Mut. Pharm. Co.*, 454 F. App'x 64, 69-70 (3d Cir. 2011) (no antitrust injury because "defendants could have effectuated their conspiracy even if [plaintiff] did not exist"), *cert. denied,* 133 S. Ct. 110 (2012); *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs' alleged injuries were "tangential by-product" of alleged conspiracy, not the means by which it was carried out); *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 102 (3d Cir. 2010) ("the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their

As the Court recognized, but plaintiffs ignore, *McCready* and all of the cases in this Circuit that have found antitrust injury under an inextricably intertwined theory—including all of the Second Circuit cases on which plaintiffs themselves rely[22]—found standing only because "plaintiffs were necessary to the completion of the scheme."  *In re Aluminum Warehousing*, 2014 WL 4277510, at *21 n.28.

- *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982):  The Supreme Court held that McCready, a subscriber to the Virginia Blue plan, had suffered antitrust injury as a result of a conspiracy between the Blue plan and the Neuropsychiatric Society of Virginia to boycott psychologists by not reimbursing her and other subscribers for psychotherapy services provided by psychologists.  Thus, "[d]enying reimbursement to [McCready and other] subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends."  The scheme would work only if McCready and other subscribers stopped using psychologists.  *See In re Aluminum Warehousing*, 2014 WL 4277510, at *21 n.28 (confirming this reading of *McCready*).

- *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983):  The Second Circuit concluded that a company organized to hold a trade show to bring together cable programmers and local TV stations had standing to assert an antitrust claim against the two dominant cable programmers, HBO and Showtime, for orchestrating a successful boycott of

---

anticompetitive ends"); *Norris v. Hearst Trust*, 500 F.3d 454, 466-67 (5th Cir. 2007) (same); *Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 517 (6th Cir. 2006) (same); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 13 (1st Cir. 1999) (same).

[22]      IP Br. at 18-20; FLP Br. at 36-39.

its trade show. The Court found that defendants' boycott of plaintiff's show was the very means by which defendants sought to further their monopoly by keeping other programmers and TV stations apart. The injury that plaintiff suffered from its failed trade show was antitrust injury because it was necessary for defendants to boycott the trade show to effectuate their scheme. *See In re Aluminum Warehousing*, 2014 WL 4277510, at *19 (Second Circuit found antitrust injury in *Crimpers* because "scheme would not have been profitable had it not directly used plaintiff").

- *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003): The purpose of defendants' scheme to inflate the price of butter futures was to sell milk and cream to plaintiffs at inflated prices. To accomplish their goal, defendants first intentionally paid inflated prices for butter futures. Then, defendants overcharged plaintiffs to recoup the losses that they had intentionally incurred. If plaintiffs had never bought milk and cream from defendants, the entire scheme would have been pointless because defendants would have lost money by having overpaid for butter futures.

- *In re Crude Oil Commodity Futures Litigation,* 913 F. Supp. 2d 41 (S.D.N.Y. 2012): The purpose of defendants' scheme was to profit on futures trades. Plaintiffs were traders who purchased the offsetting side (either long or short) of defendants' trades. Because futures trading is a zero sum game ("each dollar gained by a long trader is lost by a short trader on the other side of the contract," *de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985)), defendants could not have completed their scheme unless

14

plaintiffs had purchased the offsetting positions. *See In re Aluminum Warehousing*, 2014 WL 4277510, at *21 (quoting *de Atucha*).

Despite all of this settled Supreme Court and Second Circuit law, as well as the unambiguous law of *this* case, plaintiffs continue to try to hang their hat on two Seventh Circuit cases, *Sanner v. Board of Trade*, 62 F.3d 918 (7th Cir. 1995), and *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477 (7th Cir. 2002). IP Br. at 19; FLP Br. at 37-38.

*Sanner*, of course, is a classic "inextricably intertwined" case. Defendants would have *lost* money on their scheme if they had not taken the action that injured plaintiffs. Plaintiffs, a group of soybean farmers, alleged that the Chicago Board of Trade conspired with futures traders to lower the futures price of soybeans. 62 F.3d at 927. Once the future prices fell, defendants' trading firms needed the physical/cash prices to fall as well "because these trading firms had obligations [from liquidating futures contracts] to supply customers with large amounts of soybeans [and would be] faced with losses from having to purchase at high cash prices (unless they could benefit from a price decline)." *Id.* Thus, defendants intentionally lowered the soybean cash price—the source of plaintiffs' alleged harm—so that they would not lose money on their scheme to manipulate futures prices. As the Seventh Circuit held, this made plaintiffs' injury "necessary to accomplish the [defendants'] allegedly anticompetitive scheme" within the meaning of *McCready*. *Id.* at 930. In contrast, FLPs and IPs do not allege that defendants would have *lost* money on their supposed scheme *unless* they inflated the Midwest Premium. To the contrary, plaintiffs allege that defendants profited from increased warehouse rents (and arbitrage trades based on the contango in aluminum prices) that have nothing to do with the Midwest Premium itself. What plaintiffs say happened to the Midwest Premium was not necessary for

defendants to complete the alleged scheme to harm competition in the warehouse services market.

That leaves *Loeb*.  Plaintiffs and defendants each have analyzed *Loeb* exhaustively for the Court.[23]   And the Court did its own analysis of *Loeb* before it dismissed plaintiffs' claims for failure to allege antitrust injury the first time.  *See In re Aluminum Warehousing*, 2014 WL 4277510, at *19.  As is apparent from the *Loeb* opinion, and as this Court's discussion of the case reflects, *Loeb* does not actually address antitrust injury.  The opinion skips over antitrust injury and focuses solely on the second aspect of antitrust standing, what the Second Circuit calls the "efficient enforcer" factors, *e.g.*, the directness of the injury, the presence of more efficient enforcers, the speculative nature of damages and the risk of duplicate recovery.  306 F.3d at 484.  The Seventh Circuit discussed *McCready* only in the context of its analysis of whether the *Illinois Brick* indirect-purchaser rule barred plaintiffs' claims.  *Id.* at 481.

*Loeb* thus offers no guidance on the question of antitrust injury, but it is clear in any event that the facts of *Loeb* are very different than the facts here.  In *Loeb,* plaintiffs paid the very same index price that the defendants allegedly fixed.  306 F.3d at 487-89.  Here, in contrast, plaintiffs do not allege that defendants fixed the regional premium that they paid; they allege that defendants engaged in anticompetitive conduct in the warehouse services market that supposedly had an indirect effect on the level of premiums.  That means *Loeb* does not support antitrust standing for the FLPs or IPs even if it were the law of this Circuit.  And *Loeb* is *not* the law of this Circuit; as this Court recognized, it is the Seventh Circuit's "interpretation of where to draw

---

[23]     *See* Defendants' Reply in Support of Their Joint Motion to Dismiss All Federal and State Antitrust Claims for Lack of Antitrust Standing at 10-13 (June 17, 2014) (ECF No. 455); Defendants' Joint Responses to Plaintiffs' Supplemental Submissions at Ex. A (July 10, 2014) (ECF No. 492).

the lines" on antitrust standing.  *In re Aluminum Warehousing*, 2014 WL 4277510, at *19.  *Loeb* does not trump Second Circuit law, or the law of *this* case, on where to draw those lines.

## II.   PLAINTIFFS STILL HAVE NOT ADEQUATELY ALLEGED THAT THEY ARE EFFICIENT ENFORCERS OF THE ANTITRUST LAWS

"A showing of antitrust injury is necessary, but not always sufficient to establish standing."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).  As the Court held, "[e]ven if plaintiffs can adequately allege antitrust injury . . . they have a separate obligation to support their role as efficient enforcers of the antitrust laws with specific allegations."  *In re Aluminum Warehousing*, 2014 WL 4277510, at *22.  Relying on *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Second Circuit has held that courts must consider four additional factors in determining whether plaintiffs are efficient enforcers:

> (1) the directness or indirectness of the asserted injury;
>
> (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;
>
> (3) the speculativeness of the alleged injury; and
>
> (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (quoting *Paycom*, 467 F.3d at 290-91); *see also AGC*, 459 U.S. at 540-45.

The Supreme Court has instructed courts not to balance these factors against each other.  Instead, the first two elements are "requirements, which must be met in every case."  *Lexmark*, 134 S. Ct. at 1392.  Where, as here, the alleged injury is indirect and plaintiffs are not directly connected to the purported violations, plaintiffs lack antitrust standing regardless how the other two factors play out.  *Id.*

17

The Court previously concluded that plaintiffs failed to allege that they were efficient enforcers of the antitrust laws because the complaints lacked the allegations necessary to determine whether plaintiffs' injuries were sufficiently direct, whether their alleged damages are speculative and whether there are other potential plaintiffs better positioned to enforce the antitrust laws. *In re Aluminum Warehousing*, 2014 WL 4277510, at *23. Plaintiffs' proposed amended complaints do nothing to cure these defects.

### A.     It Remains Clear That Plaintiffs Lack Standing Because Their Alleged Injuries Are Indirect And Remote

The purported "chain of causation" between defendants' supposed conduct and plaintiffs' purported injuries is just as indirect and remote and includes just as many "vaguely defined links" as the prior complaints. *AGC*, 459 U.S. at 540. In fact, plaintiffs' theory has not really changed at all:

- One or more warehouse defendants offered financial incentives to aluminum owners as an inducement to store their metal in those defendants' warehouses resulting in an increase in aluminum inventory.[24]

- The trading defendants purchased warrants on at least some of the aluminum in the warehouse defendants' warehouses and later "strategically" cancelled some of those warrants.[25]

- Some combination of defendants conspired to get the LME not to increase the minimum load-out rule for LME warehouses.[26]

---

[24]     FLP Compl. ¶¶ 550-558; IP Compl. ¶¶ 237-245.

[25]     FLP Compl. ¶¶ 567-573; IP Compl. ¶¶ 254-260.

[26]     FLP Compl. ¶¶ 369-371, 394-407; IP Compl. ¶¶ 276-283.

- The warehouse defendants then did not load out more aluminum than the LME's minimum load-out rule required, and may have loaded out less on certain days.[27]

- These events collectively caused a backlog or queue in getting aluminum out of some, but not all, defendants' warehouses; the owners could not get their aluminum out of certain warehouses quickly.[28]

- An independent third party not alleged to be a conspirator, Platts Metals Week, published something called the "Midwest Premium" based on an unidentified survey methodology.[29] Other private companies publish other "regional premiums" using their own unidentified methodologies.[30]

- When the queue increased at defendant Metro's Detroit LME warehouses, it indirectly caused Platts to report a higher Midwest Premium.[31]

- Other regional premiums moved "in tandem" with the Midwest Premium.[32]

- Aluminum smelters and producers chose to sell aluminum to IPs and FLPs in the physical market by pricing their aluminum in some manner that incorporates the Midwest Premium or another regional premium.[33]

- Plaintiffs were injured when they paid more for their aluminum than they would have paid if the Midwest Premium (or other applicable premium) were lower.[34]

---

[27]     FLP Compl. ¶¶ 523-529; IP Compl. ¶¶ 210-216.

[28]     FLP Compl. ¶ 530; IP Compl. ¶ 217.

[29]     FLP Compl. ¶¶ 37, 178; IP Compl. ¶¶ 118-120.

[30]     FLP Compl. ¶¶ 176-78, 185; IP Compl. ¶¶ 18-19, 121-22.

[31]     FLP Compl. ¶¶ 179-87, 574-78; IP Comp. ¶¶ 18-20, 121-25, 261-65.

[32]     FLP Compl. ¶ 186-87, 577; IP Compl. ¶ 264.

[33]     FLP Compl. ¶¶ 176-187; IP Compl. ¶¶ 118-126.

[34]     FLP Compl. ¶¶ 417-425; IP Compl. ¶¶ 313-321.

This long and attenuated chain is not remotely sufficient to allege the type of direct injury necessary to support antitrust standing, as multiple courts in this Circuit have found.  In *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 11-13 (2d Cir. 1980), for example, a refiner of copper scrap claimed that a conspiracy to fix the price of refined copper caused it to pay higher prices in the copper scrap market.  The Second Circuit held that plaintiff did not have standing to assert its claims because its theory of injury "depend[ed] upon a complicated series of market interactions between two sources of copper:  the refined copper market in which defendants acted and the copper scrap market in which [plaintiff] allegedly sustained injuries." *Id.* at 13.  Like plaintiffs' claims here, the alleged injury in *Reading* was too remote because there were too many steps in the "attenuated economic causality" chain, and "other market variables could have intervened to affect [the] pricing decisions" that resulted in the price ultimately paid by the refiner of cooper scrap.  *Id.* at 14.

The court reached the same conclusion in *de Atucha*, 608 F. Supp. at 515-16.  There, de Atucha purchased silver futures contracts on the LME and, three months later, sold those contracts for a loss.  De Atucha alleged that the price he paid for the futures contracts on the LME was artificially inflated because certain defendants conspired to restrain trade in the United States silver futures market.  *Id.* at 511-13.  The court concluded that the alleged injury was indirect and did not support standing because it depended on a complicated series of interactions between the market where the challenged conduct occurred—the United States silver futures market—and the market where de Atucha allegedly suffered an injury—his purchase of futures on the LME.  *Id.* at 518.

In *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-civ-4067 (LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999), the court likewise concluded that, because the plaintiff

copper manufacturer did not allege an injury "directly flowing from defendants' restraint of competition," its claim was not cognizable under antitrust law. *Id.* at *4. Similar to plaintiffs here, Ocean View did not allege that it participated in the market where the allege restraint occurred, but rather "allege[d] that [defendants' conduct in that other market] inflated the price of copper generally." *Id.* at *7. Ocean View alleged that "because the United States copper cash market is affected by the LME futures market, defendants' actions on the LME futures market had an adverse effect on it." *Id.* at *4. But Chief Judge Preska concluded that this "tenuous causal chain of events" was indirect and did not support standing. *Id.*; *see also Laydon*, 2014 WL 1280464, at *8-9 (plaintiffs did not have standing because they alleged no "*direct,* clearly traceable means by which Defendants' alleged manipulation of one benchmark led to a loss to him on contracts linked to an entirely separate benchmark") (emphasis added).

The indirect injuries and complicated chains of causation in these cases are more analogous to plaintiffs' allegations than *Loeb*. In that case, the Seventh Circuit found that the cathode purchaser plaintiffs had suffered sufficiently direct injuries because defendants conspired to fix the exact same Comex futures prices that those plaintiffs paid. 306 F.3d at 487, 489. *Loeb* does not support standing where, as here, the defendants are not accused of fixing the prices that plaintiffs paid, and where the alleged theory of injury is indirect as opposed to direct.

## B.   Plaintiffs Essentially Admit That There Are More Efficient Enforcers Of The Antitrust Laws

Plaintiffs essentially admit that there is an identifiable group of more directly injured persons whose self-interest would normally motivate them to vindicate the public interest in prosecuting the alleged antitrust violations in the warehouse services market: the owners of LME warrants whose metal is stuck in the queue at certain warehouses. IP Br. at 22; FLP Br. at 41.

21

Plaintiffs argue that this alternative group of potential plaintiffs is irrelevant because their supposed injury (inflated warehouse rents) is "entirely different" from the injury that plaintiffs claim to have suffered (higher prices for physical aluminum).  FLP Br. at 41 & n.15.  Plaintiffs miss the point.  The "efficient enforcer" question is about who is better positioned to prosecute the alleged antitrust violations.  Here, it's obvious: the users of defendants' warehouse services are clearly in a better position than plaintiffs to prosecute defendants' alleged anticompetitive conduct in the warehouse services market, and it would certainly be more efficient for them to do so than for plaintiffs.  The existence of these more efficient enforcers alone is sufficient to deny standing to plaintiffs on their antitrust claims.  *Lexmark*, 134 S. Ct. at 1392.[35]  The fact that none of these other potential plaintiffs have sued is meaningless for purposes of analyzing the FLPs and IPs' standing.  *Daniel*, 428 F.3d at 443 (fact that more efficient enforcers had not sued defendants "to date does not support recognizing plaintiffs' standing").

### C.      Plaintiffs' Alleged Injury Remains Speculative

The proposed complaints continue to allege purely speculative injuries.  The Midwest Premium is not the price that plaintiffs paid for aluminum; it is only a component of the all-in price that plaintiffs paid.[36]  And, as plaintiffs acknowledge, the premium is a relatively small component; the much larger component is the LME price.[37]  Although the proposed complaints cite a regression analysis purporting to demonstrate that there is a link between the queue at Metro's Detroit warehouses and the Midwest Premium, the complaints allege no regression analysis or any other fact to make it plausible that an increase in the Midwest Premium (much

---

[35]      In *Lexmark*, the Court referred to this standing element as "[t]he proximity or remoteness of the party to the alleged injurious conduct."  134 S. Ct. at 1392.

[36]      *E.g.*, IP Compl. ¶¶ 126, 313-321; FLP Compl. ¶¶ 417-425.

[37]      *E.g.*, IP Compl. ¶¶ 261-262; FLP Compl. ¶¶ 574-575.

less a queue-related increase in the premium) necessarily caused an increase in the all-in price that they paid.   To the contrary, their own allegations make clear that any alleged causal connection is entirely speculative.

Plaintiffs acknowledge that the Midwest Premium is "the difference in price between what physical buyers and sellers agree to transact at for primary aluminum delivered to U.S. (Midwest) customers and the prevailing LME Settlement Price" (FLP Compl. ¶ 179), and their allegations go on to make clear that queues effectively depress the LME price relative to the all-in price.  Plaintiffs cite the LME consultation report in support of their conclusion that queues raised the Midwest Premium (*see* FLP Compl. ¶ 558; IP Compl. ¶ 245), but the consultation report states that queues raise the premium by depressing the LME price relative to the all-in price:  "[T]he effect of queues is to create a discount between the free market price of metal, and the value of an LME warrant in a warehouse with queues.  By extension, this ***causes the LME price to trade at a discount to the free metal price***. … [T]he effect of the queues is to increase this premium as a proportion of the 'all-in' free metal price."[38]

Plaintiffs' allegations make clear why this is so.  Plaintiffs allege that the vast majority of aluminum is sold in the physical market directly between smelters and consumers and never passes through an LME warehouse.  According to plaintiffs, the LME futures price is able to "discover" this price to the extent that "arbitrage" is possible between the LME market and the physical market.[39]   As the complaints allege, however, queues interfere with this arbitrage mechanism and thus interfere with the price discovery process by impeding arbitrage and

---

[38]    Result of Consultation on Changes to LME Policy Regarding the Approval of Warehouses in Relation to Delivery Out Rates ¶ 6 (emphasis added), cited IP Compl. ¶245 and FLP Compl. ¶ 558, and available in full at http://www.lme.com/~/media/Files/Warehousing/ Warehouse%20consultation/13%20326%20A312%20W125%20RESULT%20OF%20CONSUL TATION%20ON%20CHANGES%20TO%20LME%20POLICY%20REGARDING.pdf.

[39]    *E.g.*, IP Compl. ¶¶ 4, 141; FLP Compl. ¶¶ 195, 216.

depressing the LME price.[40]  Aluminum at the back of the queue is used to settle LME futures contracts—and thus effectively becomes the driver of the LME price—because those are the least valuable warrants that sellers choose to deliver.[41]  Thus, as Plaintiffs acknowledge, the "LME Cash Price" has "decline[d] from $2,600 to a recent low of $1,730."[42]

Plaintiffs' allegations of injury are thus highly speculative:  as to any given purchase, plaintiffs' claim that they were injured by increased Midwest premiums depends on a showing that any such increase was not offset by a corresponding reduction in the LME price, which makes up a far larger component of the all-in price.

In arguing that their damages are not speculative, plaintiffs again rely on *Loeb*, which was a very different situation.  IP Br. at 21; FLP Br. at 40.  In *Loeb*, "the evidence show[ed] that as the Comex price increased, the premium also increased.  Thus, there [was] no possibility that the two components 'offset' or that the premium somehow compensated for the defendants' manipulated price inflation."  306 F.3d at 487-88; *see also id.* at 488 (noting that "the prices of cathode and cathode futures 'tend to move in lockstep'").  Further, unlike in *Loeb*, plaintiffs here are not claiming injury from the LME price (which is most of the price that they pay), but rather from the premium (a relatively small component of the price).  *See id.* at 487 (noting that plaintiffs "d[id] not seek recovery based on changes in premium prices").  For this reason, plaintiffs' claims are far more speculative than the claims in *Loeb*:  unlike in *Loeb*, the larger component of their price (the LME price) decreased, whereas the smaller component of the price (the premium) increased.  *See id.* at 495 ("[L]ike the cathode premium, the rod premium is a small fraction of the total price paid and tends to increase as the Comex price increases, so that it

---

[40]     *E.g.*, IP Compl. ¶ 270; FLP Compl. ¶ 583.

[41]     *E.g.*, FLP Compl. ¶ 218.

[42]     FLP Compl. ¶ 575; IP Compl. ¶ 262.

does not in some way offset the Comex inflation or render the injury indirect."); *id.* at 488 ("The presence of a small cathode premium does not negate the fact that the prices of cathode and cathode futures 'tend to move in lockstep.'").

## CONCLUSION

For the foregoing reasons, the Court should deny FLPs and Mag and Agfa's request for leave to amend their complaints to plead antitrust claims and should dismiss Kodak's antitrust claims with prejudice.

Dated:  New York, New York
      December 8, 2014               Respectfully submitted,

/s/ Margaret M. Zwisler               /s/ Robert D. Wick  (on consent)[43]
Margaret M. Zwisler (admitted *pro hac vice*)   Robert D. Wick (*rwick@cov.com*)
(*margaret.zwisler@lw.com*)           Neil K. Roman (nroman@cov.com)
William R. Sherman               Mark D. Herman (*mherman@cov.com*)
(*william.sherman@lw.com*)          Henry B. Liu (*hliu@cov.com*)
Jennifer L. Giordano             COVINGTON & BURLING LLP
(*jennifer.giordano@lw.com*)        One CityCenter
LATHAM & WATKINS LLP        850 Tenth Street
555 Eleventh Street, N.W., Suite 1000   Washington, DC 20001
Washington, D.C.  20004          Telephone:  (202) 662-6000
Telephone:  (202) 637-2200        Facsimile:  (202) 662-6291
Facsimile:  (202) 637-2201

*Attorneys for Defendants LME Holdings*   *Attorneys for Defendants Henry Bath, LLC,*
*Limited and Hong Kong Exchanges and*   *Henry Bath & Son, Ltd. and JPMorgan Chase &*
*Clearing Limited*                *Co.*

---

[43]     Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/ John M. Nannes  (on consent)
John M. Nannes
(*john.nannes@skadden.com*)
John H. Lyons
(*john.h.lyons@Skadden.com*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendants Pacorini Metals
USA, LLC and Pacorini Metals AG*

/s/ Eliot Lauer (on consent)
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
Chelsea McLean (*chelsea.mclean@curtis.com*)
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendants Glencore Ltd. and Glencore plc*

/s/ Richard Pepperman, II  (on consent)
Richard C. Pepperman, II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
Yavar Bathaee (*bathaeey@sullcrom.com*)
M. David Possick (*possickmd@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants The Goldman Sachs
Group, Inc., Goldman, Sachs & Co., J. Aron &
Company, Goldman Sachs International, Metro
International Trade Services LLC and Mitsi
Holdings LLC*