**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | MDL No. 2481 |
| This Document Relates To: | Master Docket No. 13-md-2481-KBF-RLE |
| Direct Purchaser Plaintiffs (14 Civ. 3116) | |
| AGFA corporation, et al. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0211) | |
| Mag Instrument Inc. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0217) | |
| Eastman Kodak Company v. The Goldman Sachs Group, Inc. et al. (14 Civ. 6849) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DEFENDANTS' JOINT**
**(1) SUR-REPLY IN OPPOSITION TO THE FIRST LEVEL PURCHASERS AND MAG AND AGFA'S MOTIONS FOR LEAVE TO AMEND, AND**
**(2) REPLY IN SUPPORT OF THEIR MOTION TO DISMISS KODAK'S COMPLAINT FOR LACK OF ANTITRUST STANDING**

## INTRODUCTION

Plaintiffs simply refuse to grapple with this Court's August 29th opinion on antitrust standing. They accuse defendants of "ask[ing] three self-serving questions and proceed[ing] to answer them in their favor." IP Reply at 38. But it was the Court, not defendants, that posed the three questions. And, to date, only defendants have answered them.

Plaintiffs dodge the Court's questions because they have no answers that would grant them antitrust standing. Plaintiffs devoted virtually their entire opening briefs to arguing that they met the "inextricably intertwined" test for antitrust injury because they had pled that defendants' conduct "caused" their injuries. After defendants explained in opposition that this Court correctly held that "inextricably intertwined" does not merely mean "caused by," but rather requires plausible allegations that defendants used the plaintiffs as the "fulcrum, conduit or market force" to injure participants in the restrained market, plaintiffs switched fields in their reply briefs.

Now plaintiffs argue that they do not need to meet the "inextricably intertwined" standard—a tacit admission that they cannot—because they allege that defendants' conspiracy indirectly raised the spot price of primary aluminum and they are consumers in the primary aluminum market. But that is the same theory of antitrust injury that they argued during the first round of motion to dismiss briefing eight months ago. Now, just like then, they contend that they have suffered antitrust injury because the anticompetitive "mechanism" of the conspiracy occurred in one market—the warehouse services market—and caused their alleged injury in another market—the physical market. IP Reply at 38. As detailed in defendants' opposition brief, plaintiffs do not allege that defendants engaged in anticompetitive conduct in any market other than the warehouse services market; all of what they allege defendants did in other markets

is competitively neutral, if not procompetitive.  *See* Defendants' Joint Opposition Brief at 6-9 (ECF No. 650) ("Defs. Opp.").  Nothing in plaintiffs' proposed fourth amended complaint alters this conclusion.

This Court correctly held that this "anticompetitive-conduct-in-one-market-causing-injury-in-another-market" theory works only if plaintiffs' injury results from the defendants using them as the "fulcrum, conduit or market force" to injure competitors or participants in the market where the anticompetitive "mechanism" supposedly occurred—here, the warehouse services market.  Plaintiffs have offered no reason why the Court should reverse itself.

### I.   PLAINTIFFS' REPLIES CONFIRM THAT THEY HAVE NOT ALLEGED ANTITRUST INJURY

#### A.   Plaintiffs Concede That They Have Not Alleged That Defendants Used Them As A Fulcrum Or Conduit To Injure Competition In The Allegedly Restrained Market For Warehouse Services

Plaintiffs sprinkle the words "inextricably intertwined" throughout their reply briefs.  *See, e.g.*, FLP Reply at 8, 9; IP Reply at 39, 40.  They say, for example, that the "price for physically delivered aluminum and the LME-certified warehousing market are inextricably intertwined."  IP Reply at 40, citing the Senate Report.  But their use of "inextricably intertwined" in this manner is meaningless for purposes of antitrust standing.  Under this Court's August 29th opinion and other precedent, it does not matter that there is a supposed link between things that happen in the warehousing market and the price of physical aluminum.  For purposes of antitrust injury, the only relevant question is whether plaintiffs were "'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'"  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *18 (S.D.N.Y. Aug. 29, 2014) (quoting *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986)); *id.* at *21.  No plaintiff argues that defendants

2

used it as the requisite fulcrum or conduit; instead, all plaintiffs argue in reply that they do not have to meet this test. *See* IP Reply at 37 (arguing that IPs do not need to meet the inextricably intertwined test); FLP Reply at 38 n.31 (arguing that the Court was wrong to rely on *Province v. Cleveland Press* for the inextricably intertwined standard).[1]  Plaintiffs have thus abandoned any argument that their proposed amendments support antitrust injury on an inextricably intertwined theory.

### B. No Plaintiff Has Suffered Antitrust Injury As A Consumer Or Competitor In The Allegedly Restrained Market For Warehouse Services

In lieu of trying to meet the "inextricably intertwined" test, plaintiffs fall back to claiming that they have shown antitrust injury as consumers or competitors. They have not.

#### 1. The Court Has Already Rejected The Argument That Plaintiffs Suffered Antitrust Injury Based On Their Purchases Of Aluminum In The Physical Market

In their replies, both FLPs and IPs make an argument that should be familiar to the Court. They argue that they suffered antitrust injury as consumers in the market for physical aluminum because defendants' scheme was designed to (and allegedly did) inflate the Midwest Premium and plaintiffs purchased physical aluminum with a price that incorporated the inflated premium. IP Reply at 37-38; FLP Reply at 37-38.  FLPs try to up the ante a bit by arguing again (as before) that plaintiff Ampal made some of its purchases in the physical market from defendant Glencore,

---

[1] In their proposed Fourth Amended Complaint ("FAC"), but not in their reply, FLPs allege that they were "the means by which Defendants benefitted from" the alleged conspiracy because Platts calculates the Midwest Premium "on the basis of reported real-world transactions, i.e., physical aluminum purchases made by Plaintiffs and the members of the Class." FAC ¶ 651. But FLPs also allege that Platts calculates the Midwest Premium based on "spot transaction premiums" that a limited number of "traders, producers and consumers" report to Platts through "telephone surveys." *Id.* ¶ 124. No plaintiff alleges that it was ever part of a Platts' telephone survey (and certainly not all of them could have been), so none can premise its antitrust standing on that basis. In any event, participation in a Platts' survey would not make any plaintiff a "fulcrum, conduit, or market force" to injure competition in the warehouse services market.

Ltd. and some from Alcoa, a smelter that allegedly received incentive payments from Metro. *Compare* FLP Reply at 34-35; *with* Transcript of June 20, 2014 Argument ("June 20 Tr.") at 48 (making same argument).

This is the same antitrust injury theory that plaintiffs argued eight months ago during the first round of motion to dismiss briefing, and the Court correctly rejected it. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *20. Comparing plaintiffs' May 27, 2014 submissions and their most recent reply briefs confirms that they are simply asking the Court to reverse itself. For example, IPs argued on May 27th that they had suffered antitrust injury because they paid a higher price for physical aluminum as a result of conspiratorial conduct that spanned across different markets and involved (1) conspiring to manipulate the Midwest Premium by "agreeing to restrain the supply of aluminum in LME-certified warehouses controlled by them," (2) agreeing not to compete with each other by treating the LME's minimum load-out rule as a maximum and "shift[ing] aluminum around" to meet the load-out rules, (3) cancelling warrants, and (4) "profit[ing] handsomely" at both the warehouse level (in the form of increased rents) and the trader level (through financial trades). IP Br. at 18-20 (ECF No. 394); *see also* FLP Br. at 74-75 (making similar arguments) (ECF No. 402). That is the same theory that they are advancing now in their replies. IP Reply at 37-40; FLP Reply at 37-38.

The Court rejected this theory and held, consistent with decades of precedent, that *antitrust* injury must flow from "an *anti*competitive aspect of the challenged conduct." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *16 (emphasis added). Plaintiffs accuse defendants of inappropriately "dismember[ing] the conspiracy" into "separate parts" for their own benefit. IP Reply at 38. But defendants did exactly what the Court and relevant precedent require: they focused their antitrust injury analysis on the aspect of the challenged

4

conduct where entities that are supposed to compete with each other allegedly stopped doing so, and asked (1) in which market did that conduct occur and (2) whether plaintiffs have suffered a legally cognizable antitrust injury that flowed from *that* aspect of the challenged conduct.

It is plaintiffs, not defendants, that are trying to rewrite antitrust injury law. They want the Court to hold that they have suffered antitrust injury because the "mechanism" of the conspiracy occurs in one market, and supposedly causes injury in another market. IP Reply at 38. But this Court already held that this argument works only if defendants used plaintiffs as the "fulcrum, conduit or market force" to injure competitors or participants in the relevant market. *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *18. Here the only purported market even potentially relevant for this analysis is the warehouse services market.

There is no dispute that plaintiffs' proposed amended complaints continue to allege only that defendants stopped competing with each other in the purported market for warehouse services, and not in any other market. Their complaints are clear that all of the conduct that allegedly reflects a lack of competition among defendants took place only in the warehouse services market: defendants' treatment of the LME-load out rules, their storing of metal in competitor-owned warehouses instead of their own, and their alleged agreement not to compete for each other's existing warehouse stocks or in each other's warehouse locations. *See* Defs. Opp. at 6-9. IPs helpfully punctuate this point by making it its own section in their reply brief titled "Defendants Agree Not to Compete with Each Other," where they identify only alleged anticompetitive conduct in the warehouse services market. IP Reply at 33.

Plaintiffs are not consumers or competitors in the warehouse services market. And they have now effectively conceded that their injuries are not, in the legal sense, "inextricably

5

intertwined" with anyone that was allegedly injured in that market. They therefore have not suffered antitrust injury.

### 2. FLPs Have Not Suffered Antitrust Injury Based On The Theoretical Possibility That Some Of Them Supposedly Might Have Utilized LME Warehouse Services Under Different Circumstances

As a fallback, FLPs argue that they have suffered antitrust injury because they were "potential consumers" of LME warehouse services. They claim that, absent the alleged conduct, they theoretically *could* have been among the less than 1% of entities that take delivery on LME forward contract long positions. FLP Reply at 34, 37-38. But none of the named plaintiffs alleges that it actually *would* have been among that rare 1% or that it has ever used LME warehouse services in the past. As a result, this theory is far too speculative to be the basis for a plausible claim of antitrust injury. This omission is apparently not an oversight. Despite defendants' bringing this pleading deficiency to FLPs' attention in their opposition brief (Defs. Opp. at 10-11), FLPs do not even propose to cure it in their Fourth Amended Complaint. That is presumably because they have no Rule 11 basis to do so.

In any event, any plaintiff that bases its claims on the mere possibility that it *might have been* a consumer in the allegedly restrained market would lack Article III standing in the first instance. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *15 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); Defs. Opp. at 10.

### 3. Plaintiffs Did Not Suffer Antitrust Injury From Supposedly Competing With Metro For Aluminum From Smelters

It is surprising that FLPs continue to premise their antitrust injury argument on their allegation that they compete with Metro for purchases from smelters. FLP Reply at 34. This is another argument that they pursued eight months ago and that the Court rejected, and for good reason. *See, e.g.*, June 20 Tr. at 35 (arguing for antitrust standing as "competitors" of Metro).

6

To start, FLPs are *not* Metro's competitors. *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *1 ("Plaintiffs are not, in short, competitors of defendants in any market."). FLPs admit that Metro does not actually purchase aluminum from smelters; Metro just stores it for a time. FLPs do not allege that any smelter was ever short on supply of aluminum such that it had to choose between selling it to FLPs or keeping ownership of it and storing it at a Metro warehouse. To the contrary, FLPs allege that smelters had a glut of excess aluminum, far more than FLPs wanted to purchase, and chose to place some of it on warrant at Metro because Metro gave them a financial incentive to do so. In these circumstances, the mere fact that both FLPs and Metro happen to deal with the same smelters does not necessarily make them competitors for the smelters' aluminum.

But even if it did, IPs correctly point out that the Supreme Court and others have held repeatedly that competitors "who are seeking redress from competition itself" do not suffer antitrust injury. IP Reply at 40-41 (citing *Brunswich Corp. v. Pueblo Bowl-o-Matic, Inc.*, 429 U.S. 477 (1977); *Atl. Richfield v. USA Petroleum Co.*, 495 U.S. 328 (1990); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012)). There is no escaping the fact that the Second Circuit has concluded that incentive payments are a lawful means of discounting and that the procompetitive justification for them is "obvious." *See Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 265 (2d Cir. 2001). Therefore, even if FLPs were considered competitors of Metro in some legally relevant sense, they did not suffer antitrust injury from the alleged incentive agreements.

## II. PLAINTIFFS' REPLIES CONFIRM THAT THEY ARE NOT EFFICIENT ENFORCERS OF THE ANTITRUST LAWS

Plaintiffs spend little time in their replies trying to defend how they are efficient enforcers. They offer virtually no response to defendants' showing that their alleged injuries remain remote and speculative. And plaintiffs' only response to the admitted existence of more efficient enforcers (the owners of metal in the queues) is to argue that *DDAVP Direct Purchaser Antit. Litig.*, 585 F.3d 677 (2d Cir. 2009), makes these entities irrelevant. IP Reply at 42-43. To the contrary, *DDAVP* stated that "[i]nferiority to other potential plaintiffs can be relevant [to antitrust standing], but it is not dispositive," and concluded, in the specific circumstances of that case, that it was willing to overlook the other more efficient enforcers because of other elements that supported those plaintiffs' standing. 585 F.3d at 689. But more importantly, the Supreme Court's subsequent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), renders that analysis in *DDAVP* no longer good law. The Supreme Court held that courts cannot engage in this type of balancing of the efficient enforcer factors, and that the existence of more efficient enforcers *is* dispositive. *Id.* at 1392 (directness and efficient enforcer factors are not to be balanced, but are "requirements, which must be met in every case"); s*ee also* Defs. Opp. at 17.

## CONCLUSION

The Court should deny the motions of FLPs and Mag and Agfa for leave to amend their complaints to plead antitrust claims and should dismiss Kodak's antitrust claims with prejudice.

Dated: New York, New York
       January 30, 2015                                 Respectfully submitted,[2]

/s/ Margaret M. Zwisler                                 /s/ Robert D. Wick  (on consent)[3]
Margaret M. Zwisler (admitted *pro hac vice*)           Robert D. Wick (*rwick@cov.com*)
(*margaret.zwisler@lw.com*)                             Neil K. Roman (*nroman@cov.com*)
William R. Sherman                                      Mark D. Herman (*mherman@cov.com*)
(*william.sherman@lw.com*)                              Henry B. Liu (*hliu@cov.com*)
Jennifer L. Giordano                                    COVINGTON & BURLING LLP
(*jennifer.giordano@lw.com*)                            One CityCenter
LATHAM & WATKINS LLP                                    850 Tenth Street
555 Eleventh Street, N.W., Suite 1000                   Washington, DC 20001
Washington, D.C. 20004                                  Telephone: (202) 662-6000
Telephone: (202) 637-2200                               Facsimile: (202) 662-6291
Facsimile: (202) 637-2201

*Attorneys for Defendants LME Holdings*                 *Attorneys for Defendants Henry Bath, LLC,*
*Limited and Hong Kong Exchanges and*                   *Henry Bath & Son, Ltd. and JPMorgan Chase &*
*Clearing Limited*                                      *Co.*


/s/ John M. Nannes  (on consent)                        /s/ Richard Pepperman, II  (on consent)
John M. Nannes                                          Richard C. Pepperman, II
(*john.nannes@skadden.com*)                             (*peppermanr@sullcrom.com*)
John H. Lyons                                           Suhana S. Han (*hans@sullcrom.com*)
(*john.h.lyons@Skadden.com*)                            M. David Possick (*possickmd@sullcrom.com*)
SKADDEN, ARPS, SLATE,                                   Yavar Bathaee (*bathaeey@sullcrom.com*)
MEAGHER & FLOM LLP                                      SULLIVAN & CROMWELL LLP
1440 New York Avenue, N.W.                              125 Broad Street
Washington, D.C. 20005                                  New York, New York 10004
Telephone: (202) 371-7500                               Telephone: (212) 558-4000
Facsimile: (202) 661-9191                               Facsimile: (212) 558-3588

*Attorneys for Defendants Pacorini Metals*              *Attorneys for Defendants The Goldman Sachs*
*USA, LLC and Pacorini Metals AG*                       *Group, Inc., Goldman, Sachs & Co., J. Aron &*
                                                        *Company, Goldman Sachs International, Metro*
                                                        *International Trade Services LLC and Mitsi*
                                                        *Holdings LLC*

---

[2]   Defendants LME Holdings Limited, Hong Kong Exchanges and Clearing Limited, Glencore plc and Henry Bath & Son Ltd. are separately opposing leave to amend and/or moving to dismiss the Kodak complaint on the ground that the Court lacks personal jurisdiction over them. Those defendants join this brief only in the alternative, in the event that the Court concludes that it has jurisdiction. They do not waive their jurisdictional arguments.

[3]   Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

9

<u>/s/ Eliot Lauer (on consent)</u>
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
Chelsea McLean (*chelsea.mclean@curtis.com*)
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendants Glencore Ltd. and Glencore plc*