UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

:
:
:
IN RE ALUMINUM WAREHOUSING        :
ANTITRUST LITIGATION              :
                                  :
                                  :
                                  :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 3, 2015

13-md-2481 (KBF)
and all related cases

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

In this large multidistrict litigation ("MDL"), plaintiffs assert an array of antitrust and state competition law claims relating to conduct alleged to have raised the price of aluminum.  Plaintiffs allege that load-out delays at aluminum warehouses certified by the London Metal Exchange ("LME") increased the price of a premium partially derived from the cost of storing aluminum.

Following initial amendments to several coordinated complaints, now before the Court are as many motions to dismiss and oppositions to plaintiffs' motions for leave to amend as there are defendants.[1]  Each motion posits numerous bases for

---

[1] For purposes of filing complaints and briefing the instant motions, plaintiffs are separated into two general groups: (1) the "Direct Purchaser Plaintiffs," who the Court has previously termed the "First Level Purchasers" or "FLPs," filed the proposed "Third Amended Complaint" ("TAC") and a consolidated motion to amend in support thereof (ECF No. 610); and (2) Agfa Corporation, Agfa Graphics, N.V. (collectively, "Agfa"), Mag Instrument, Inc. ("Mag"), and Eastman Kodak Company ("Kodak"), filed the proposed "Joint Amended Complaint" ("JAC") and consolidated motion to amend in support thereof (ECF No. 608).

The two groups of plaintiffs' procedural postures differ slightly.  On August 29, 2014, this Court dismissed the FLPs' initial complaint, as well as that filed individually by Mag and Agfa.  (ECF No. 571.)  As Kodak did not file its initial pleading until July 29, 2014 (14-cv-6849 ECF No. 1), its complaint was not addressed by the initial round of briefing; it was able to amend as of right, and has done so in the JAC.  Mag and Agfa, whose time to amend as of right has passed, joined with Kodak in the JAC but recognize that as to them, the JAC is a proposed amendment.  In all events, whether cast as a filed amended complaint or a proposed amended complaint, the standard the Court applies to all of the motions addressed herein is the same.  Moreover, the JAC and the TAC

dismissal.  The instant Opinion & Order grapples only with those parties who have asserted a lack of personal jurisdiction over foreign entities.

For the reasons set forth below, this Court lacks personal jurisdiction over defendants LME Holdings Limited ("LME Holdings"), Hong Kong Exchanges and Clearing Limited ("HKEx"), Henry Bath & Son Ltd., and Glencore plc (collectively referred to herein as the "four foreign defendants") and dismisses them from this action.  The Court will issue separate Opinions & Orders as to the remaining defendants.

## I.   LEGAL STANDARDS

Whether this Court has personal jurisdiction over the four foreign defendants is governed by a combination of state law, federal statute, and principles of due process.  State law determines whether this Court is able to exercise specific or general jurisdiction; federal statute—particularly Rule 4(k) of the Federal Rules of Civil Procedure or § 12 of the Clayton Act—may provide a basis for personal jurisdiction over a foreign person in the absence of contacts with a particular state.[2]

---

largely contain similar allegations, with the notable exception that the JAC asserts claims under § 1 of the Sherman Act, while the TAC asserts claims under both § 1 and § 2.

[2] Federal Rule of Civil Procedure 4(k)(2) "provides for personal jurisdiction in a case (1) 'aris[ing] under federal law,' (2) where a defendant is not subject to the general jurisdiction of any one state, and (3) where 'exercising jurisdiction [would be] consistent with the United States Constitution and laws.'"  In re "Angeln" GmbH & Co. KG, 510 Fed. App'x 90, 91-92 (2d Cir. 2013) (summary order) (quoting Fed. R. Civ. P. 4(k)(2)).  Rule 4(k)(2) thus establishes that the Court may only exercise personal jurisdiction over a defendant if doing so is consistent with the Due Process Clause of the Fifth Amendment.  See Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008).

Section 12 of the Clayton Act provides that a court may exercise personal jurisdiction over a defendant if the defendant "is an inhabitant," "may be found," or "transacts business" in the district where the action is brought.  15 U.S.C. § 22.  For practical purposes, this conception of jurisdiction is equivalent to that provided for by New York law.  See N.Y. C.P.L.R. 302.

In all events, the Court must determine whether the assertion of personal jurisdiction comports with principles of due process.

The TAC and JAC both assert a combination of federal and state law claims. The federal claims raise federal questions, and thereby implicate Rule 4(k) of the Federal Rules and/or § 12 of the Clayton Act as possible bases for jurisdiction. However, irrespective of the basis for a given assertion of personal jurisdiction, the Court must always engage in a due process inquiry.  See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1339 (2d Cir. 1972) ("Since we hold that Congress meant § 27 [of the Securities Exchange Act] to extend personal jurisdiction to the full reach permitted by the due process clause, it is unnecessary to discuss the applicability of the New York statutes, which could reach no further."), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010): see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 169-70 (2d Cir. 2013) (a determination of state-law jurisdictional questions must be followed by a due process analysis).

A.    Due Process Constraints on Jurisdiction

Whether the exercise of personal jurisdiction comports with due process depends on "whether the defendant purposefully established 'minimum contacts' in the forum State."  Asahi Metal Indus., Co., Ltd. v. Superior Court of Cal., 480 U.S. 102, 109 (1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). Minimum contacts must have a basis in "'some act by which the defendant purposefully avails itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws.'"  Id. at 109 (quoting

Burger King, 471 U.S. at 475.)  Further, "'[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State.'"  Id. (emphasis in original) (quoting Burger King, 471 U.S. at 475).  Thus, minimum contacts must be based on "an act of the defendant."  Id.  The mere placement of a product in the stream of commerce, without more, is insufficient—"[a]dditional conduct of the defendant" is required to establish "an intent or purpose to serve the market in the forum State."  Id. at 111-12.

Practically, case law has developed a two-step process for determining whether due process is satisfied.  Under the first step, similar to the state law jurisdictional inquiry relevant to general or long-arm jurisdiction, the Court considers whether the defendant's "minimum contacts" with the forum are sufficient to justify the Court's exercise of either "general" or "specific" jurisdiction.  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127-28 (2d Cir. 2002).

A court may exercise general jurisdiction over a foreign corporation where that corporation's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home [there]."  In re Roman Catholic Diocese of Albany, N.Y., Inc., 745 F.3d 30, 38 (2d Cir. 2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)); accord Sonera Holding B.V. v. Cukurova Holdings A.S., 750 F.3d 221, 225 (2d Cir. 2014) ("[G]eneral jurisdiction extends beyond an entity's state of incorporation and principal place of

business only in the exceptional case where its contacts with another forum are so substantial as to render it 'at home' in that state.")  If the forum is the corporation's principal place of business or its place of incorporation, the exercise of general jurisdiction is appropriate.  See Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014).

Even if a defendant is not sufficiently present in a state such that a court's exercise of general jurisdiction would be appropriate, a court may nonetheless be able to exercise specific jurisdiction over a defendant.  Specific jurisdiction exists when a defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being hailed into court there."  Licci, 732 F.3d at 170 (quoting Bank Brussels Lambert, 305 F.3d at 127); see also World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there" is relevant to the Court's due process analysis).  Where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," the Second Circuit uses an "effects test" to establish personal jurisdiction, by which "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum."  Licci, 732 F.3d at 173 (citing Calder v. Jones, 465 U.S. 783, 789 (1984)).

If neither general nor specific jurisdiction can be established, Rule 4(k)(2) of the Federal Rules, which applies to a foreign defendant as to whom a plaintiff

asserts a claim based on a federal question, provides a conditional basis for jurisdiction—the condition being that the requirements of due process are met.

Assuming that the Court has either general or specific jurisdiction, or that Rule 4(k)(2) applies, it must then turn to the second step of the due process inquiry, under which the Court considers "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is <u>reasonable</u> to exercise personal jurisdiction under the circumstances of the particular case." <u>Id.</u> at 60 (quoting <u>Chloe v. Queen Bee of Beverly Hills, LLC</u>, 616 F.3d 158, 164 (2d Cir. 2010)) (emphasis added).

The Second Circuit has recited a five factor test for this "reasonableness" analysis: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." <u>Chloe</u>, 616 F.3d at 164-65 (citing <u>Asahi</u>, 480 U.S. at 113-14).

Two recent Supreme Court decisions are also relevant to this Court's due process analysis: <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 131 S.Ct. 2846 (2011), and <u>Daimler AG v. Bauman</u>, 134 S.Ct. 746 (2014).  In both cases, the events giving rise to the suit occurred outside of the United States:  In <u>Goodyear</u>, a bus with Goodyear tires crashed on a road outside of Paris, killing two minors, whose estates brought a design-defect suit in their state of residence, North Carolina.  131

S. Ct. at 2850.  In <u>Daimler</u>, plaintiffs were victims and estates of victims allegedly subject to tortious conduct in Argentina with which an Argentine Mercedes-Benz plant in Argentina allegedly collaborated; plaintiffs sued Mercedes-Benz USA and its German parent, Daimler, in California.  134 S. Ct. at 751-52.

In <u>Goodyear</u>, the Supreme Court asked whether general jurisdiction in North Carolina was reasonable under the Due Process Clause of the Fourteenth Amendment, and held that it was not.  131 S. Ct. at 2853, 2857.  The Court reiterated that <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement</u>, 326 U.S. 310 (1945), was and remains the "canonical opinion" in the area.  <u>Id.</u> at 2853.  The Court reiterated the holding of <u>International Shoe</u> that a state may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  <u>Id.</u> at 2853 (alteration in original) (quoting <u>Int'l Shoe</u>, 326 U.S. at 316).  Personal jurisdiction may exist where the defendant's contacts with the state are continuous and systematic, or if not, where acts within the state give rise to the suit itself.  <u>Id.</u>

Having reiterated these principles, the Court then found that as the accident had occurred outside of North Carolina (indeed, on another continent altogether), specific jurisdiction was unavailable.  <u>Id.</u> at 2851.  As for general jurisdiction, the Court found that despite the fact that some number of Goodyear tires were sold in North Carolina, the exercise of general jurisdiction would likewise be inappropriate.

Id. at 2854-57. These "attenuated connections to the State" fell "far short of the 'continuous and systematic general business contacts' necessary to empower North Carolina to entertain suit against [Goodyear or its U.S. subsidiaries] on claims unrelated to anything that connects them to the State.'" Id. at 2857 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)).

The Court also noted that respondents had only belatedly asserted a "single enterprise" theory, under which they sought to consolidate Goodyear USA's ties to North Carolina with those of several foreign Goodyear entities, essentially seeking to pierce the corporate veil for jurisdictional purposes. Id. at 2857. Because the plaintiffs failed to raise this argument sufficiently early in the proceedings, the Court declined to reach this contention. Id.

Daimler concerned the authority of a U.S. court to entertain a claim by foreign plaintiffs against a foreign defendant for foreign events (that is, events occurring outside the United States). 134 S. Ct. at 750. There, the question presented was whether the Due Process Clause of the Fourteenth Amendment precluded the district court from exercising personal jurisdiction over a defendant. Id. at 751. Plaintiffs, twenty-two residents of Argentina, sued Mercedes–Benz USA, LLC ("MBUSA") and its parent, DaimlerChrysler Aktiengesellschaft ("Daimler"), in California under, inter alia, the Alien Tort Statute, 28 U.S.C. § 1350. Id. at 750-51. Daimler moved to dismiss for lack of personal jurisdiction. Id. at 752. Plaintiffs asserted that while Daimler itself might not have contacts in the U.S., its indirect

subsidiary MBUSA had multiple California-based facilities and was the largest supplier of luxury vehicles to the California market.  Id.

The Supreme Court again relied on International Shoe's requirement that an assertion of general jurisdiction be based on continuous and systematic contacts with the forum state.  Id. at 754.  The Court reversed the Ninth Circuit's decision sustaining of the exercise of general jurisdiction over Daimler, which was based on an agency theory.  Id. at 758-59.  Under the Ninth Circuit's analysis, if the activities of the subsidiary were sufficiently important to the parent that the parent would step in to perform them if the subsidiary would not, and if general jurisdiction over the subsidiary was appropriate, then general jurisdiction over the parent was also therefore appropriate.  Id. at 759.  The Court rejected this approach as inconsistent with International Shoe, Burger King, and Goodyear.  Id. at 759-60.

B.      Conspiracy Jurisdiction

Plaintiffs also assert personal jurisdiction based on the defendants' involvement in the alleged conspiracy.  Here, the most instructive case from this District is In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), which arose under N.Y. C.P.L.R. 302(a)(2), New York's long-arm statute.  There, the district court found that in order to establish conspiracy jurisdiction, "[p]laintiffs must make a prima facie showing of conspiracy, allege specific facts warranting an inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in [the forum]."  In re Terrorist Attacks, 349 F. Supp. 2d at 805.  Plaintiffs here assert that this concept may reasonably be extended to cover their claims under both the

reasoning of <u>In re Terrorist Attacks</u> and Rule 4(k)(2).  By its terms, Rule 4(k)(2) applies to claims raising federal questions.  <u>See</u> Fed. R. Civ. P. 4(k)(2).  Plaintiffs argue that the purpose of Rule 4(k)(2) is to extend federal courts' jurisdiction to the full extent permitted by the Fifth Amendment.  According to plaintiffs, because federal courts have in some instances applied N.Y. C.P.L.R. 302(a)(2) to establish personal jurisdiction consistent with principles of due process, and because Rule 4(k)(2) enables Courts to maximally exercise their personal jurisdiction, it follows that Rule 4(k)(2) permits courts to exercise personal jurisdiction over a defendant on the basis of a conspiracy, based on their contacts with the United States as a whole—and regardless of whether a court could exercise general or specific jurisdiction over that defendant.  (<u>See</u> ECF No. 690 at 10 n.3.)

As a threshold matter, this Court rejects plaintiffs' proposed extension of the reach of Rule 4(k)(2) of the Federal Rules to any and all situations in which general or specific jurisdiction is lacking but somehow due process requirements are met.  If Congress had wanted such a general exception it could have so legislated in connection with Rule 4(k)(2).  It did not do so.  Nor does the Court find that the assertion of participation in a conspiracy generally can provide a standalone basis for jurisdiction subject only to the constraints of due process.  If that were the case, then allegations that a foreign parent participated in a conspiracy with a U.S. subsidiary would be sufficient for an assertion of jurisdiction over the parent.  This could potentially extend jurisdiction beyond that which Congress intended.

In cases in which plaintiffs allege the existence of a conspiracy, a court's assertion of jurisdiction based on the potential existence of that conspiracy (as found by a preponderance of the evidence as required by Rule 12(b)(1)) would in effect require the court to rule on the merits of the dispute, which would be inappropriate. The concept of "conspiracy jurisdiction" is better cast as an argument supporting general or long-arm jurisdiction.  In short, if an entity has in fact engaged in some affirmative act directed at the forum, it may be subject to jurisdiction for that reason.  The rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous "conspiracy jurisdiction" doctrine.

    C.    <u>Agency and "Mere Department" Jurisdiction</u>

Plaintiffs also assert that this Court may assert jurisdiction over defendants based on allegations that their U.S. subsidiaries are their agents.  Plaintiffs recognize that this theory has at the very least been called into doubt by <u>Daimler</u>. In fact, <u>Daimler</u> has foreclosed the establishment of jurisdiction based only on generalized facts such as those alleged here.

The Second Circuit has yet to address the reach of <u>Daimler</u>.  Before <u>Daimler</u>, the Second Circuit required that for a subsidiary to be an agent of a parent, the plaintiff must show that the subsidiary "'does all the business which [the parent corporation] could do were it here by its own officials.'" <u>Jazini v. Nissan Motor Co., Ltd.</u>, 148 F.3d 181, 184-85 (2d Cir. 1998) (quoting <u>Frummer v. Hilton Hotels Int'l, Inc.</u>, 19 N.Y.2d 533, 537, <u>remittitur amended</u>, 20 N.Y.2d 737 (1967)).  In <u>Jazini</u>, the Court held that plaintiffs' allegation that Nissan U.S.A. was able to act as would its

parent, Nissan Japan, if its parent were in the U.S., was insufficient to establish personal jurisdiction over Nissan Japan. Id. at 184. The Court found this statement conclusory and merely a statement of legal principle without factual basis. Id. The Court further found that a parent was not present in New York merely because its subsidiary made sales in the state. Id.

Before Daimler and Jazini, the key Second Circuit case regarding the propriety of a court's exercise of personal jurisdiction over a foreign parent company based on the conduct of its subsidiary was Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117 (2d Cir. 1984). See Jazini, 148 F.3d at 184-85. Beech Aircraft established a four-factor test for evaluating whether personal jurisdiction in such a scenario: (1) common ownership, (2) financial dependency, (3) the degree to which the parent interferes with the selection and assignment of executive personnel and fails to observe corporate formalities, and (4) the parent's degree of control over the marketing and operational policies of the subsidiary. Jazini, 148 F.3d at 184 (citing Beech Aircraft, 751 F.2d at 120-122.)

D.    Antitrust Jurisdiction

The FLPs assert Clayton Act § 12, 15 U.S.C. § 22, as a separate basis for personal jurisdiction over LME Holdings and HKEx. Section 12 states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transact business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. That provision consists of two parts: the first part provides for venue, and the second part provides for worldwide service of process when venue is properly laid. See Daniel v. Am. Bd. of Emergency Medicine, 428 F.3d 408, 422 (2d Cir. 2005). Accordingly, the second portion of § 12 may be invoked to establish personal jurisdiction "only when the action is brought in the district where the defendant resides, is found, or transacts business." Id. at 427 (quoting GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000)).

With these principles in mind the Court turns to the motions before it.

## II.   DISCUSSION

Only the four foreign defendants are the subject of this Opinion and Order. Two of them, Henry Bath & Son Ltd. and Glencore plc, are joined as defendants by all plaintiffs. Two others, LME Holdings and its current parent, HKEx, are joined as defendants only by the FLPs. As the briefing in connection with these motions is both complicated and important, the Court will spend a moment describing it.

In opposition to the motion by Henry Bath & Son, Ltd and Glencore plc, all plaintiffs rely on the memorandum filed jointly by Agfa, Mag and Kodak. (See ECF Nos. 691 at 60).

As stated above, Agfa, Mag and Kodak have not joined LME Holdings or HKEx as defendants in the JAC. In response to the motions by LME Holdings and

HKEx based on personal jurisdiction, the FLPs rely on the submissions they made previously in connection with the motions to dismiss the FLPs' Second Amended Complaint ("SAC").[3]  The Court did not address the arguments concerning personal jurisdiction in those submissions as it decided the motions on other grounds.  (ECF No. 571 at 81.)  Those submissions are found at ECF Nos. 390 and 481.  Notably, LME Holdings and HKEx have made additional factual allegations in connection with the motion practice currently before this Court.  As the FLPs chose not to make any additional submission in connection with the instant motions, to the extent the factual submissions by LME Holdings and HKEx differ from those filed in connection with the prior motion practice (and they do in certain respects), those allegations have gone unaddressed.

Plaintiffs' memoranda in opposition to the earlier motion to dismiss directly or implicitly addressed two declarations submitted in connection with that motion by Romnesh Lamba and Marco Castro.[4]  (ECF Nos. 329, 449.)  Both of those individuals as well as Nicholas David Ong-Seng have filed additional declarations in connection with the instant motions.  (ECF Nos. 660, 661, 663, 664.)  There are important additions in the factual assertions contained in the more recent declarations.  For instance, the most recent Castro declaration (for LME Holdings) contains new or different factual statements in ¶¶ 22, 25-26, 31, and 33-36.  (Compare ECF No. 329, with ECF No. 664.)  The most recent Lamba declaration (for HKEx) contains new or different factual statements in ¶¶ 3, 4, 25-26, 28-29, 31-

---

[3] This is the complaint addressed by the Court's August 29, 2014 decision.  (ECF No. 571.)

[4] Lamba also submitted a declaration in support of HKEx's reply brief.  (ECF No. 498.)

36.  (Compare ECF No. 449, with ECF No. 661.)  These factual statements are

therefore uncontested on this motion.

Based on its review of the totality of submissions on which the parties rely,

the Court assesses whether plaintiffs here have met their burden of demonstrating

personal jurisdiction over each of the four foreign entities.  See Penguin Grp. (USA),

Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010) ("A plaintiff bears the burden of

demonstrating personal jurisdiction over a person or entity against whom it seeks to

bring suit.").  "Each defendant's contacts with the forum . . . must be assessed

individually."  Calder v. Jones, 465 U.S. 783, 790 (1984).  "Where, as here, a court

relies on pleadings and affidavits, rather than conducting a full-blown evidentiary

hearing, the plaintiff need only make a prima facie showing that the court possesses

personal jurisdiction over the defendant."  Porina v. Marward Shipping Co., 521

F.3d 122, 126 (2d Cir. 2008) (internal quotation marks omitted).[5]  Plaintiffs'

pleadings "are construed in the light most favorable to the plaintiff and doubts are

resolved in the plaintiff's favor."  Banker v. Esperanza Health Sys., Ltd., 201 Fed.

App'x 13, 15 (2d Cir. 2006) (summary order) (quoting A.I. Trade Fin., Inc. v. Petra

Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)).  The Court "will not, however, accept

legally conclusory assertions or draw argumentative inferences."  In re Terrorist

Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005) (internal

quotation marks omitted).

---

[5] In one of the previously submitted memoranda on which plaintiffs rely in opposition to this motion, they agree that this Court's consideration may include resolving disputed factual issues by reference to pleadings as well as additional documentation submitted by the parties.  (See ECF No. 390 at 2 n.3.)

Plaintiffs concede that each of the four foreign defendants are headquartered overseas.  Neither the JAC nor the TAC contains any allegations that these entities have an office or employees in the United States, or that they regularly conduct business here.  As to all four foreign defendants, plaintiffs argue that these companies have engaged in tortious conduct directed at the United States, and in particular at the states in which plaintiffs have brought state law claims, or that they are indistinguishable from affiliated companies who have contacts with the United States.  Plaintiffs assert that all defendants, including the four foreign defendants, have participated in an anticompetitive conspiracy that had foreseeable and intended effects throughout the United States.

Plaintiffs also make several arguments that are specific to each individual foreign defendant.  With regard to Henry Bath & Son Ltd. and Glencore plc, plaintiffs allege that these entities worked closely with and were financially and operationally integrated with their U.S. subsidiaries or affiliates.  In particular, an employee of Henry Bath & Son Ltd., Graham Hawkins, is alleged to have communicated with employees of its U.S. subsidiaries regarding the warehousing of aluminum.

With regard to LME Holdings, the FLPs (but not Agfa, Mag, or Kodak) argue that it is essentially indistinguishable from the London Metal Exchange (the "LME") and is present in New York; that the Court has jurisdiction pursuant to Rule 4(k) of the Federal Rules of Civil Procedure; that it played an essential role in

a conspiracy that had direct effects in the United States; and that the Court has "antitrust jurisdiction" over it under § 12 of the Clayton Act. (See ECF No. 390.)

HKEx (which, again, was joined only by the FLPs and not by Agfa, Mag, or Kodak) is alleged by the FLPs to have acquired LME Holdings along with the LME, to have operated LME Holdings as a "mere department," and to have had the ability to "make meaningful changes to improve the situation in the aluminum market" and failed to do so. (See TAC ¶ 83.)

For the reasons set forth below, these arguments and the others plaintiffs have raised are insufficient to establish personal jurisdiction over the four foreign defendants.

A.    Glencore plc[6]

Plaintiffs allege that this Court's exercise of personal jurisdiction as to Glencore plc is appropriate as a result of its participation in the alleged unlawful conspiracy. Plaintiffs allege that this conspiracy had direct effects in the United States, which they argue is sufficient to support this Court's exercise of personal jurisdiction. In particular, Agfa, Mag, and Kodak assert that Glencore "through unidentified affiliates," engaged in transactions with Goldman Sachs, Metro, JPMorgan Chase & Co. ("JPMorgan") and Henry Bath LLC "that contributed to queues in Detroit and Vlissingen." (ECF No. 690 at 15 (citing JAC ¶¶ 233, 235-36).)

In support of this assertion, plaintiffs allege the facts set forth below.

---

[6] The FLPs assert the Michigan, California and New York long-arm statutes as bases for jurisdiction over Glencore plc. (See TAC ¶ 127; ECF Nos. 540, 544). But the Court need only reach the individual long-arm tests if due process requirements are otherwise met—and they are not.

1.     <u>Facts relating to Glencore plc.</u>

Plaintiffs allege that Glencore plc is a public limited company organized under the laws of Jersey[7] and with its headquarters in Switzerland.  (JAC ¶ 69; TAC ¶ 111.)  It is the corporate successor to Glencore Xstrata plc and Glencore International plc.  (TAC ¶ 112; <u>see</u> JAC ¶ 69.)  It is "a multinational commodities trading and mining corporation that engages, directly and through its wholly owned and controlled foreign and domestic subsidiaries, in the production, storage, transportation, marketing, or trading of aluminum and other metals, as well as trading derivative products that derive their value from the underlying asset prices of aluminum." (TAC ¶ 113; <u>see also</u> JAC ¶ 69.)  Plaintiffs allege that Glencore plc has more than 90 offices in 50 countries, including in the United States, and that "Glencore" holds itself out as an "integrated global enterprise."  (JAC ¶¶ 70, 72; TAC ¶ 113-14.)  On its website, it claims to be "one of the world's largest diversified natural resource companies and a major producer and marketer of more than 90

---

[7] The JAC alleges that Glencore plc is organized under the laws of "the United Kingdom" (JAC ¶ 69), whereas the TAC alleges that it is organized under the laws of Jersey (TAC ¶ 111).

commodities."[8]  (JAC ¶ 70.)  In 2013, it derived one quarter of its $233 billion in

revenue from sales in the Americas. (TAC ¶ 114.)[9]

Although the Court generally accepts plaintiffs' allegations as true, the Court

"need not accept as true an allegation that is contradicted by documents on which

the complaint relies." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549,

555 (S.D.N.Y. 2004).  Both the JAC and the TAC cite Glencore's 2013 Annual

Report (see JAC ¶ 71; TAC ¶ 114), which makes clear that Glencore's global

footprint is based on the operations of a variety of affiliated entities and that

Glencore plc is, itself a holding company, see GlencoreXstrata, Annual Report 2013,

at 196-99, available at http://www.glencore.com/assets/investors/doc/

reports_and_results/2013/GLEN-2013-Annual-Report.pdf.  Thus, to the extent that

¶ 114 of the TAC alleges U.S. operations by Glencore plc itself, as opposed to those

---

[8] In their opposition to the instant motion to dismiss, Agfa and Mag refer to pages from what they assert is the Glencore plc website, as well as Glencore's 2013 Annual Report.  (See Declaration of Derek Y. Brandt, ECF No. 541.)  Some of these materials are mentioned in ¶¶ 70-71 of the JAC, but not all of them are.  Nonetheless, they are publicly available and the type of items as to which this Court may take judicial notice.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("[W]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991)) (internal quotation marks omitted)).  The Court notes both that Glencore has not contested the authenticity of these webpages, and that they ultimately do not alter the outcome of this motion.

[9] It appears that the FLPs also seek to join other Glencore entities such as Glencore International AG, Glencore AG, Glencore UK Ltd., and Glencore Ltd.  (See TAC ¶¶ 115-21.)  Glencore plc's brief is not directed at these entities.  (See ECF No. 657.)  The TAC alleges that Glencore International AG, a wholly owned subsidiary of Glencore plc, is a Swiss corporation with its offices in Switzerland.  (TAC ¶ 115.)  It is described as the primary operating company of Glencore plc.  (TAC ¶ 115.)  Glencore AG is also a Swiss corporation with its offices in Switzerland.  (TAC ¶ 116.)  It is a wholly owned subsidiary of Glencore International AG.  (TAC ¶ 116.)  It has two U.S. subsidiaries engaged in aluminum production.  (TAC ¶ 116.)  It is a storage customer of Metro.  (TAC ¶ 116.) Glencore AG is the largest shareholder of Century Aluminum Company, one of the largest aluminum producers in the United States.  (TAC ¶ 117.)  Glencore UK Ltd. is a wholly owned subsidiary of Glencore International plc, organized under the laws of the United Kingdom and its principal place of business in the United Kingdom.  (TAC ¶ 119.) It engaged in commodities trading.  (TAC ¶ 119.) Glencore U.K. Ltd. is a member of the LME.  (TAC ¶ 120.)

of its affiliates, this allegation is incorrect as demonstrated by the very document it cites as support.

      2.   <u>Discussion.</u>

As this Court discussed above, there really is no separate doctrine supporting "conspiracy jurisdiction," and so jurisdiction is either appropriate under existing jurisdictional principles, or it is not. It would be odd indeed if plaintiffs' mere assertion of participation in a conspiracy—based on the factual allegations set forth above and conclusory statements that any entity with "Glencore" in its name is a conspirator, regardless of corporate formalities—were sufficient. A due process inquiry is always required.

Applying Supreme Court precedent and Second Circuit law, this Court finds that exercising personal jurisdiction over Glencore plc would be unreasonable. It is clear from the few facts plaintiffs have alleged regarding Glencore plc that standing alone it lacks even minimal contacts with the United States. Accordingly, the Court must analyze whether there are sufficient facts with regard to Glencore plc's participation in the conspiracy to support a determination that it took some purposeful action direct at the United States. The factual allegations in both the JAC and the TAC are insufficient in this regard.

Unlike <u>In re Magnetic Audiotape Antitrust Litigation</u>, 334 F.3d 204 (2d Cir. 2003), here there is no allegation that Glencore plc participated in any particular meeting at which the price fixing conspiracy was discussed. It is certainly true that Glencore plc owns companies that trade and warehouse aluminum—but those operations are not the operations of Glencore plc. Plaintiffs cannot rely on the fact

that Glencore plc is a parent of operating companies over whom this Court could properly exercise jurisdiction as a basis for jurisdiction over Glencore plc.  See Daimler, 134 S. Ct. at 760-62; Reiss v. Societe Centrale de Groupe des Assurances Nacionales, 246 F. Supp. 2d 273, 281 (S.D.N.Y. 2003).  To find that the acts of the subsidiary are attributable to the parent, plaintiffs would need to allege facts which support a disregard of corporate formalities. Instead, there is simply a website that touts the global reach of a family of companies.  If this were the law, no doubt since Daimler's website has similar descriptions of its reach as an overall family of companies, the Daimler case would have been decided differently.

B.     Henry Bath & Son Ltd.

Plaintiffs allege that, similar to Glencore plc, Henry Bath & Son Ltd.'s participation in the alleged conspiracy provides a basis for the exercise of personal jurisdiction.

1.     Facts relating to Henry Bath & Son Ltd.

Plaintiffs allege that Henry Bath & Son Ltd. it is a corporation organized under the laws of the United Kingdom, and headquartered in the United Kingdom. (JAC ¶ 61; TAC ¶ 100.)  The TAC also alleges that Henry Bath & Son Ltd. "owns and operated numerous LME-certified warehouses in the United States," including in Chicago. (TAC ¶ 100.)

Plaintiffs allege that Henry Bath & Son Ltd. holds a seat on the LME's Warehousing Committee.  (JAC ¶ 61; TAC ¶ 101.)  That committee is alleged to consist of a "select group charged with establishing the rules for LME regulated warehouses."  (JAC ¶ 61; TAC ¶ 101.)  Plaintiffs allege that Henry Bath & Son Ltd.

is the direct corporate parent and sole shareholder of Henry Bath LLC, a Delaware corporation and an operating subsidiary of Henry Bath & Son Ltd. that operates LME-certified warehouses in the U.S., including in Chicago.  (JAC ¶¶ 62, 66, 68; TAC ¶¶ 102, 106-07.)  Through its ownership of the LLC, Henry Bath & Son Ltd. allegedly "exercises complete control over the company and its operations, including its warehousing business."  (JAC ¶ 62; TAC ¶ 102.)  Henry Bath & Son Ltd. allegedly reports income from the LLC's U.S.-based warehousing business in its own financial statements; it includes the LLC's income in its calculation of tax on profits from ordinary activities; and the LLC is included in Henry Bath & Son Ltd.'s group-wide calculation of tangible assets and goodwill.  (JAC ¶ 63; TAC ¶ 103.)

JPMorgan acquired Henry Bath & Son Ltd. in February 2010.  (JAC ¶ 64; TAC ¶ 104.)  In 2012, the heads of JPMorgan's commodities unit, its principal Commodity Investment division, and its non-oil energy trading desk were named directors of Henry Bath & Son Ltd.  (JAC ¶ 65; TAC ¶ 105.)  By controlling Henry Bath & Son Ltd.'s directors and stock, JPMorgan allegedly had "complete control" over Henry Bath & Son Ltd. and the LLC, including all of its aluminum warehouses.  (JAC ¶ 66; TAC ¶ 106.)

Plaintiffs further allege that Graham Hawkins, General Manager of Henry Bath & Son Ltd. "worked closely with JPMorgan to manage its aluminum stockpile within the United States."  (JAC ¶ 67; TAC ¶ 152.)  They assert that he was included on multiple emails involving Henry Bath LLC regarding (1) cancellation of warrants by JPMorgan for aluminum stored at defendant Metro's warehouses, (2)

the subsequent load out and transfer of JPMorgan aluminum to Henry Bath warehouses, (3) disputes regarding demurrage charges, and (4) shipping and handling charges. (JAC ¶ 67; TAC ¶ 152.)  He also served as JPMorgan's and Henry Bath & Son Ltd.'s representative on the LME's Warehousing Committee.  (JAC ¶ 67; TAC ¶ 152.)

In October 2014, JPMorgan sold all of the Henry Bath entities. (TAC ¶ 108.)

2.   Graham Hawkins' declaration.

In support of Henry Bath & Son Ltd.'s opposition to plaintiffs' motion for leave to amend, Graham Hawkins, the Group General Manager of Henry Bath & Son Ltd. submitted a declaration.  (Declaration of Graham Hawkins, ECF No. 653 ("Hawkins Decl.").)  Plaintiffs refer to that declaration in reply to this motion and do not contest of any of the facts set forth therein.  In this declaration, Hawkins confirms that Henry Bath & Son Ltd. is organized and headquartered in the U.K. (Hawkins Decl. ¶ 2.)  It operates warehouses that store metals in Spain, the United Arab Emirates, and the U.K. (Hawkins Decl. ¶ 3.)  It does not operate any warehouses in the United States nor does it conduct business here. (Hawkins Decl. ¶¶ 7, 8.) It has not supplied goods or services to the United States, and it does not have a bank account or any other assets here. (Hawkins Decl. ¶ 11.)  It does not trade LME contracts.  (Hawkins Decl. ¶ 4.)

Henry Bath LLC, a wholly owned subsidiary of Henry Bath & Son Ltd., does, however, have a presence in the United States, as it is organized under the laws of Delaware and has its principal place of business in Baltimore.  (Hawkins Decl. ¶ 5.)

The LLC also operates LME-approved warehouses in Baltimore, Chicago, and New Orleans.  (Hawkins Decl. ¶ 5.)

Hawkins also states that the LLC is a separate and distinct legal entity from Henry Bath & Son Ltd. as well as its former indirect corporate parent, JPMorgan; its ultimate corporate parent is now Mercuria Energy Group, Ltd.  (Hawkins Decl. ¶ 6.)  According to Hawkins, U.K. accounting principles require that the parent, Henry Bath & Son Ltd., consolidate its financial statements with those of the LLC.  (Hawkins Decl. ¶ 12.)

3.    Discussion.

The core of plaintiffs' allegations as to Henry Bath & Son Ltd. is that it holds a seat on the LME's Warehousing Committee, the group that they assert establishes rules for LME warehouses.  (JAC ¶ 61; TAC ¶ 101.)  Graham Hawkins was allegedly Henry Bath & Son, Ltd's representative on that committee.  (JAC ¶ 67; TAC ¶ 152.)  According to plaintiffs, the LME's Warehousing Committee is the key instrumentality of the conspiracy—it is the fulcrum, the hub that connects the conspirators.  In this regard, plaintiffs assert that this committee established a minimum load out requirement that was treated industry-wide as a maximum.  (JAC ¶¶ 210-18; TAC ¶¶ 221-44.)  These assertions are not enough to support a prima facie case of jurisdiction over the U.K. Henry Bath.

First, there is no basis for general jurisdiction, as there are no factual allegations that Henry Bath & Son Ltd. was present in the United States.  The Hawkins declaration, the facts of which plaintiffs have not contested or raised specific issues concerning, states that corporate formalities between the U.S.-based

LLC and the U.K. parent company have been maintained.  Thus, that this Court may exercise personal jurisdiction over the LLC is not determinative of whether it may do so for Henry Bath & Son Ltd.

Plaintiffs' allegations that Mr. Hawkins' presence on the LME Warehousing Committee and his inclusion on emails relating to aluminum warehousing are similarly insufficient.  While plaintiffs have alleged that the LME Warehousing Committee was deeply involved in the conspiracy, that allegation is not enough to establish a prima facie case of jurisdiction over all members of that committee. Plaintiffs would need to allege more.  They would need to allege and have facts supporting Hawkins taking specific actions or being a participant in a particular meeting (as in In re Magnetic Audiotape) in which the unlawful conspiracy was furthered in some manner.  In the absence of such allegations, the Court is left simply with corporate affiliation with a U.S. defendant and membership in a committee that existed prior to the alleged conspiracy and had legitimate functions. That is, in short, membership alone cannot constitute the necessary purposeful availment of the laws of the U.S. or action directed at the U.S. to support jurisdiction.

Nor does the inclusion of Hawkins on certain emails alter that determination. It is to be expected that the general manager of a sizeable company in the business of aluminum warehousing in parts of the world other than the U.S. would be included on emails relating to that very topic.  That he was included on emails with affiliated companies on those topics is, therefore, not surprising.  Inclusion on

emails alone does not eliminate the corporate independence of affiliated entities. The fact that some recipients also happen to be located in the U.S. does not mean that all recipients have thereby subjected themselves to jurisdiction in the U.S.

Plaintiffs also allege that § 12 of the Clayton Act and/or Rule 4(k) of the Federal Rules provide a basis for jurisdiction.  For the same reasons as discussed directly above they do not.  Neither of those rules provide for an exercise of jurisdiction when to do so would be unreasonable, as it would be here.  Indeed, they provide the opposite.

### C.   LME Holdings and HKEx[10]

The FLPs assert that this Court has personal jurisdiction over LME Holdings based primarily on a series of allegations that it and the LME are indistinguishable—therefore, to the extent the LME is present in New York, or in the U.S., LME Holdings is too.  The indistinguishable nature of the entities— according to plaintiffs[11]—also renders jurisdiction under Rule 4(k) or § 12 of the Clayton Act appropriate.  In addition, plaintiffs assert that as LME Holdings is a participant in the alleged conspiracy, this Court may assert personal jurisdiction over them on that basis.  Finally, as all jurisdictional analyses come down to due process, plaintiffs argue that to the extent that the Court's exercise of jurisdiction would be consistent with due process of the LME, so too must it be with LME

---

[10] As set forth above, in opposition to LME Holdings' motion based on lack of personal jurisdiction, the FLPs refer to their prior briefing in connection with the Second Amended Complaint. (ECF No. 271.)  Also, as previously discussed, that briefing could not address additional factual allegations submitted only in connection with this motion, but for whatever reason, plaintiffs have not since made any additional submissions as to the issues addressed here.

[11] Although only the FLPs have joined LME Holdings and HKEx, the Court will refer to the FLPs in this section as "plaintiffs" for the sake of simplicity.

Holdings.[12]   Plaintiffs make a variety of allegations as to overlap between LME Holdings and HKEx, and their respective motivations to join in the alleged conspiracy.

The Court disagrees with the fundamental premise of plaintiffs' arguments with regard to LME Holdings: that their allegations are sufficient to establish that the LME and LME Holdings are indistinguishable.  Instead, as LME Holdings is a separate corporate entity, plaintiffs must separately establish a sufficient basis for this Court's exercise of personal jurisdiction.  See Calder, 465 U.S. at 790.  This they have not done.

Plaintiffs' allegations similarly fall short with regard to the HKEx. The allegations in the complaint, combined with the proffered factual declarations with which plaintiffs have not taken issue, provide no basis for an inference that HKEx, LME Holdings, and the LME have ignored corporate formalities or are in some way indistinguishable.  Indeed the facts before the Court on this motion demonstrate the opposite.

1.   Factual allegations concerning LME Holdings.

LME Holdings is the corporate parent of the LME.  (TAC ¶ 77.)  It is located at 56 Leadenhall Street, London, U.K., the same address as the LME.  (TAC ¶ 77.) The LME is the "world centre for industrial metals trading and price-risk management."  (TAC ¶ 75.)  More than 80% of all global non-ferrous metal futures

---

[12] The Court has not undertaken a due process analysis previously with regard to the LME; the basis for its dismissal of the LME was a lack of subject-matter jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA").  (ECF No. 564.)  LME Holdings has not moved for dismissal on the basis of sovereign immunity under the FSIA.

business is transacted through its trading platforms.  (TAC ¶ 76.)  The vast

majority of aluminum trading activity on the LME takes place among banks, hedge

funds, and traders, rather than users of aluminum.  (TAC ¶ 76.)

Plaintiffs allege that LME Holdings, HKEx, Metro, and other warehouse

defendants were part of the "LME Combination."  (TAC ¶ 20.)  The "LME

Combination" is alleged to have engaged in a variety of conduct and to have had a

99% share of "aluminum forward and futures contract trading" in the United States

during the class period.  (TAC ¶ 20.)  Plaintiffs allege that LME Holdings and the

LME are "each other's agents and alter egos."  (TAC ¶ 83(d).)  In support of this

allegation, plaintiffs allege that "LME Holdings has no other purpose than to own

and operate the LME for HKEx as a mere department and pass-through entity

owned and controlled by HKEx, with whom it also shares interlocking directorates."

(TAC ¶ 83(d).)  LME Holdings is alleged to have permitted and participated in the

LME's anticompetitive conduct.  (TAC ¶ 16(c).)

LME Holdings is not itself alleged to have any operations; it is not itself

alleged to have a "Warehousing Committee," to set rules for warehouse operations,

or to have personnel who directly participated in warehouse operations; it is not

alleged to certify—or participate in any way in the certification of—LME

warehouses.  In his declaration, Mr. Castro states that LME Holdings does not have

any contracts with warehouses in the United States, does not derive revenue from

any LME-approved warehouses in the United States, and has no employees at all,

let alone employees who perform any functions in connection with LME-approved warehouses in the United States.  (ECF No. 664 ¶ 23.)[13]

      2.    Factual allegations concerning HKEx.

HKEx is a Hong Kong corporation with its headquarters located in Hong Kong, China.  (TAC ¶ 78.)  On December 6, 2012, it purchased LME Holdings and its wholly owned subsidiary, the LME, for $2.2 billion.  (TAC ¶ 79(a), (b).)  Goldman received over $200 million for its 9.5% share of LME Holdings.  (TAC ¶ 79(b).)  HKEx acquired full control over the LME and its operations upon acquiring the LME.  (TAC ¶ 80(a).)  Plaintiffs allege that prior to its acquisition of LME Holdings, HKEx recognized the issues caused by delays in loading out aluminum at LME-certified warehouses in the U.S., but after the acquisition and once it was benefitting from the increased revenues attributable to such delays, it no longer perceived any such issues.  (TAC ¶¶ 16(e), 80(b)-(d).)  Plaintiffs further allege that since the acquisition, HKEx has used the LME "as a mere department" and held out the LME and LME Holdings interchangeably and "otherwise dominated and controlled both." (TAC ¶ 83(b).)  It controls four seats on the boards of directors of LME Holdings and the LME, and thereby "could have eliminated the manipulation of aluminum storage" if it chose to do so.  (TAC ¶ 83(b).)

Plaintiffs do not allege that HKEx ever set foot in the United States generally, or in connection with the anticompetitive conduct herein.  There are no

---

[13] Plaintiffs did not contest this factual statement in connection with this motion.

allegations that HKEx knew of the alleged anticompetitive conduct including agreeing to participate in any anticompetitive conspiracy.

###   3.   Overlap in personnel.

Plaintiffs allege that the LME, LME Holdings and HKEx have had overlapping directors and certain overlapping personnel.  Specifically, plaintiffs allege that at least since HKEx's acquisition in December 2012, the LME and LME Holdings have had four "interlocking directors": HKEx's CEO, Charles Li; HKEx's Chairman of the Board, Chow Chung Kung; HKEx's Co-Head's of Global Markets, Garry Jones; and Romnesh Lamba.  (TAC ¶ 83(a), (c).)  Plaintiffs allege that Li, who is based in Hong Kong, "was instrumental in the acquisition of LME, and he has actively participated in, managed, and directed the conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein, subsequent to the acquisition of the LME by HKEx."  (TAC ¶ 141.) Plaintiffs further allege in conclusory fashion that the interlocking directors have "h[e]ld out the LME and LME Holdings interchangeably, both before and after the acquisition by HKEx."  (TAC ¶ 83(c).)

Plaintiffs further allege that Matthew Chamberlain is the Head of Business Development of the LME and a member of the Management Committee of the HKEx.  (TAC ¶ 142.)  In almost precisely the same words as with regard to Li, plaintiffs allege that he "was instrumental in the acquisition of LME, and he has actively participated in and managed certain conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein, subsequent to the acquisition of the LME by HKEx."  (TAC ¶ 142.)

30

Plaintiffs also allege that Martin Abbott was CEO of the LME from 2006 until shortly after its acquisition by HKEx.  (TAC ¶ 143.)  Following the acquisition, he was Co-Head of Global Markets of HKEx.  (TAC ¶ 143.)  In the same words as used with regard to Li and nearly the same as those for Chamberlain, plaintiffs then allege that he "actively participated in, managed, and directed the conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein."  (TAC ¶143.)  Abbott left the LME in 2013.  (TAC ¶ 144.)  He was replaced as CEO of the LME by Garry Jones.  (TAC ¶ 145.)  As stated above, Jones is also Co-Head of Global Markets of HKEx.  (TAC ¶ 145.)  And again, in precisely those words used with regard to Li and Abbott and nearly the same as those for Chamberlain, he is alleged to have "actively participated in, managed, and directed the conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein."  (TAC ¶ 145.)  Plaintiffs also allege that the LME and LME Holdings shared senior management both before and after their acquisition by HKEx.  (TAC ¶ 83(c).)  Plaintiffs then state that in the remainder of the complaint "[t]he LME and LME Holdings are referred to herein collectively as 'the LME.'"  (TAC ¶ 83(d).)[14]

Plaintiffs infer from these facts that these directors and employees provide a direct link from the LME Combination to LME Holdings.  But plaintiffs do not

---

[14] This is particularly confusing in light of the fact that plaintiffs make additional specific allegations with regard to Mr. Abbott and his role as CEO of "the LME" in communications regarding warehouse rules.  (See, e.g., TAC ¶¶ 224(b), 238, 241(g), 381, 407, 596.)  In each of these instances, Mr. Abbott is described in his operational role, which would necessarily be with the LME, as LME Holdings had no operations.  (See Castro Decl. ¶¶ 4, 6.)  Similarly, there is an additional allegation regarding Mr. Chamberlain in his role as the LME's Head of Business Development.  (TAC ¶ 383.)

allege that any of these individuals played any role in the conspiracy apart from holding joint appointments to both or, post-acquisition, all three companies.  And plaintiffs allege that the LME, LME Holdings, and HKEx had a "strong financial interest in not only violations of the LME Charter," but also "further benefitted from violations that produced uneven distribution of warehouse services that could overwhelm the maximum load-out agreement."  (TAC ¶ 16(e).)

> 4.  Defendants' declarations.

Both LME Holdings and HKEx have provided declarations in support of their motions.  As set forth above, plaintiffs chose not to contest certain factual statements.

LME Holdings has provided declarations from Nicholas David Ong-Seng, Managing Director: Regulation and Compliance of the LME (ECF No. 663 ("LME Ong-Seng Decl.")) and from Marcos Castro, the corporate secretary of LME Holdings (ECF No. 664 ("Castro Decl.").)  HKEx has provided declarations from Romnesh Lamba, the Co-Head of Global Markets for HKEx (ECF No. 661 ("Lamba Decl.")) and Ong-Seng (ECF No. 660 ("HKEx Ong-Seng Decl.")).  In their papers on this motion, plaintiffs chose not to contest the facts set forth in these declarations.

Ong-Seng's declaration in support of LME Holdings states that: (1) the LME is a wholly owned subsidiary of LME Holdings; (2) it has over 300 employees dedicated to its work, none of whom are shared with LME Holdings; (3) the LME has its own internal policies; (4) it operates its day-to-day business without assistance from LME Holdings; (5) it has its own CEO, CFO, human resources department, finance department, legal department, regulation and compliance

department, company secretarial department, and other operations.  (LME Ong-Seng Decl. ¶¶ 18-22.)

Castro's declaration states that: (1) LME Holdings has always been an entity with the sole function of holding ownership of LME; (2) LME Holdings is incorporated and based in the U.K.; (3) it does not manufacture products or sell services anywhere; (4) it does not maintain an office or have employees or operations of any kind in the United States; (5) it lacks regular contacts with the United States; (6) it has no employees; (7) it does not derive revenue from LME-approved warehouses; (8) it maintains separate corporate formalities; (9) before its acquisition by HKEx, its board of directors was not identical to that of the LME; and (10) following HKEx's acquisition, the board is still not identical.[15]  (See generally Castro Decl.)

For HKEx, Lamba states that: (1) HKEx is not incorporated in the United States; (2) it does not have a principal place of business in the United States; (3) it does not transact business in the United States; (4) it has never owned a subsidiary in the United States; (5) it does not have personnel, real estate, operations, or a physical presence in the United States; (6) has never received income in the United States; and (7) following HKEx's acquisition of the LME, the entities have maintained separate corporate identities and operations.  (Lamba Decl. ¶¶ 6-8, 10-13, 16, 27.)[16]  In his declaration, Mr. Ong-Seng also sets forth facts supporting the

---

[15] Plaintiffs did not contest the factual assertions in ¶¶ 22, 25-26, 31, 33-36 of the Castro declaration submitted in connection with the pending motion.

[16] Plaintiffs did not contest the factual assertions in ¶¶ 12 and 27 of the Lamba declaration in connection with this motion.

corporate separateness of the LME and HKEx.  (See HKEx Ong-Song Decl. ¶¶ 19-24.)

    5.    Discussion.

Plaintiffs' factual allegations that the LME and LME Holdings are indistinguishable are conclusory and insufficient.  That certain officers of the operating company, the LME, may have served roles at the parent does not erase existing corporate formalities.  It is commonplace for executives to hold several roles at several affiliated companies.  But so long as separate corporate formalities are maintained, the mere fact that some employees of a parent are also officers of a subsidiary does not imply that the subsidiary is an agent of the parent.

The Castro and Ong-Seng declarations make clear that LME Holdings has maintained its corporate separateness from the LME, and that LME Holdings has no presence whatsoever in the U.S. itself.  Plaintiffs may not, therefore, rely on contacts that the LME (or its CEO, Mr. Abbott) may have had in the U.S. as a basis for jurisdiction over LME Holdings.  That Mr. Abbott is quoted and referenced in the business of warehousing is unsurprising as he was the CEO of the LME.  There is no factual basis to assume that he was acting in his capacity as CEO of LME Holdings when he made those statements.  Additionally, because LME Holdings is not present in the U.S., there is no basis for jurisdiction under § 22 of the Clayton Act or Rule 4(k) of the Federal Rules.  The fact that LME Holdings was acquired by HKEx does not alter this determination.

With regard to HKEx, plaintiffs essentially allege that it acquired an entity in the throes of an anticompetitive conspiracy, realized this and the great benefits

that could be reaped if this conspiracy were allowed to continue, and decided to permit the entity to continue along the shady path.  But taken into context with plaintiffs' other factual allegations, such an inference does not meet a threshold standard of plausibility.  Apart from the unsurprising overlap in personnel between HKEx and the LME, there are no facts supportive of this theory.

In addition, Castro's and Ong-Seng's declarations further confirm the corporate separateness of the LME and HKEx.  The facts set forth in those declarations also make it clear that plaintiffs' argument that HKEx runs the LME and LME Holdings as a "mere department" is implausible.  <u>Daimler</u> established that a parent-subsidiary relationship, even one in which the parent could or would perform functions of the subsidiary, is not enough to establish a basis for jurisdiction—there needs to be an independent determination that an exercise of jurisdiction would comply with due process.  Here, HKEx is far removed from the events before this Court.  They do happen to own an entity that plaintiffs allege was in the thick of things.  But that alone is not enough.

Under these circumstances, it would be unreasonable for this Court to exercise personal jurisdiction over HKEx.[17]

D.     <u>Jurisdictional Discovery</u>

As an alternative to dismissal, plaintiffs have requested jurisdictional discovery.  That request is denied.

---

[17] All of the foregoing analysis is equally applicable to the FLPs' proposed Fourth Amended Complaint (ECF No. 691), which was filed by the FLPs in connection with their reply brief in further support of their motion for leave to amend.  The additional allegations in the Fourth Amended Complaint would not change the Court's determinations as set forth herein.

As an initial matter, plaintiffs have had the benefit of the massive discovery conducted by various governmental agencies and the U.S. Congress, and they have pointed the Court to thousands of pages of such materials.  (See, e.g., ECF Nos. 640, 705.)  As plaintiffs recite in their papers, these materials are the distillation of significant investigatory work.  In addition, plaintiffs assert a large conspiracy with many participants.  They have had discovery from the alleged conspirators whose names are invoked most frequently, Goldman Sachs and its former subsidiary, Metro International Trade Services LLC ("Metro").[18]  The participation of these entities in discovery has the added benefit of discovery into the contacts, if any, of these entities with the four foreign defendants.  In short, this is far from a situation in which plaintiffs are required to guess at bases for jurisdiction.  Cf. Xiu Feng Li v. Hock, 371 Fed. App'x 171, 174-75 (2d Cir. 2010) (summary order) (affirming denial of jurisdictional discovery when plaintiff failed to establish a prima facie case of personal jurisdiction); Best Van Lines, Inc. v. Walker, 490 F.3d 239, 241 (2d Cir. 2007) (same).

Plaintiffs cite In re Magnetic Audiotape in support of their application for jurisdictional discovery.  There, the Second Circuit reversed a district court's dismissal of a foreign corporation without first allowing for limited jurisdictional discovery.  Id. at 206.  However in that case there was an allegation in the complaint itself, which specifically cited the minutes of a meeting, and which was unmentioned by the district court in its opinion denying jurisdictional discovery,

---

[18] In its April 28, 2014 Order, this Court declined to stay discovery as to the defendants affiliated with The Goldman Sachs Group, Inc. ("Goldman Sachs"): GS Power Holdings LLC; MCEPF Metro I, Inc.; Mitsi Holdings LLC; and Metro International Trade Services LLC.  (ECF No. 346.)

that an executive of the dismissed parent had been present at an in-person meeting at which a price-fixing conspiracy was allegedly discussed.  Id. at 208.  Defendants asserted that this was simply a courtesy meeting and that no price-fixing discussion in fact took place.  Id.  The Second Circuit stated that plaintiffs should at the very least have been allowed to further develop this point through discovery.  Id.

These facts are a far cry from those before this Court.  Plaintiffs here have recited no specific meeting at which any of the four foreign defendants participated concerning the alleged conspiracy.  Of course, plaintiffs have alleged that the defendants or their affiliates sat on the LME's Warehousing Committee.  But, as discussed below, this allegation is too generalized, and too devoid of meaningful context to provide a prima facie basis for jurisdiction.

III.   CONCLUSION

For all of the reasons set forth above, Glencore plc, Henry Bath & Son Ltd., HKEx, and LME Holdings are DISMISSED from this action due to lack of personal jurisdiction.  Plaintiffs' motions for leave to amend their complaints (ECF Nos. 608, 610, 631) are DENIED to the extent they seek to join LME Holdings, HKEx, Henry Bath & Son Ltd., and Glencore plc as defendants.  Henry Bath & Son Ltd.'s motion to dismiss the JAC (ECF No. 651) is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 651.

SO ORDERED.

Dated:      New York, New York
           March 3, 2015

_____
KATHERINE B. FORREST
United States District Judge