UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 26, 2015

13-md-2481 (KBF)
and all related cases

CORRECTED[1]
OPINION & ORDER

KATHERINE B. FORREST, District Judge:

    In August 2013 plaintiffs filed the first of what would be a large number of

lawsuits alleging anticompetitive conduct impacting aluminum pricing.  (See, e.g.,

14-cv-217 ECF No. 1.[2])  Numerous actions were filed in various jurisdictions across

the country and eventually brought together in this District pursuant to an order of

the U.S. Judicial Panel on Multidistrict Litigation.  (ECF No. 1.)

    This Court dismissed an initial set of pleadings in August and September

2014.  (ECF Nos. 571 ("1st MTD Op."), 583, 586.)  Certain plaintiffs—indirect

purchasers—were dismissed because it was impossible for them to establish

antitrust standing.  (See 1st MTD Op. at 33-50.)  The remaining plaintiffs then filed

amended and proposed amended pleadings.  Four plaintiffs who are self-styled

"Direct Purchaser Plaintiffs," to whom the Court has referred as the "First Level

Purchasers" or "FLPs," filed the Third Amended Complaint (the "TAC").  (ECF No.

631 ex. A ("TAC").)  The remaining plaintiffs, Agfa Corporation, Agfa Graphics, N.V.

---

[1] This Opinion & Order has been corrected in order to fix several typos, including instances on pages
31, 33, and 34 in which the Court referred to "defendants" when it meant to state "plaintiffs."

[2] Unless otherwise specified by reference to a specific docket number, all citations in parentheses
refer to the main docket in this case, 13-md-2481.

(collectively, "Agfa"), Mag Instrument, Inc. ("Mag"), and Eastman Kodak Company ("Kodak"), filed the Joint Amended Complaint (the "JAC").[3]  (ECF No. 608 ("JAC").)  All defendants moved to dismiss and opposed the amendments.  (ECF Nos. 650, 652, 654, 657-59, 662.)

    Two recent decisions of this Court granted the motions to dismiss of four foreign defendants[4] due to a lack of personal jurisdiction, and certain other defendants[5] whose only tie to the events at issue was alleged to be a corporate affiliation with another defendant.  (ECF Nos. 728, 731.)  Now pending before the Court are defendants' motions to dismiss the JAC (ECF No. 649, 654) and plaintiffs' motions for leave to amend their complaint (ECF Nos. 608, 631.)  This Opinion & Order addresses claims against the following defendants: Goldman, Sachs & Co.; Goldman Sachs International; Metro International Trade Services LLC ("Metro"); J. Aron & Company ("J. Aron"); Mitsi Holdings LLC ("Mitsi"); Burgess-Allen Partnership Ltd. ("BAP"); Robert Burgess-Allen; JPMorgan Securities plc; Henry Bath LLC; Glencore AG; Glencore Ltd.; and Pacorini Metals USA LLC ("Pacorini USA").[6]

    Each defendant seeks its own dismissal as well as the dismissal of each claim against it, essentially for the same reasons as during the initial round of motions to

---

[3] Plaintiffs filed the JAC and the TAC in connection with two consolidated motions to amend in support thereof.  (ECF Nos. 608, 631.)

[4] The four foreign defendants were: LME Holdings Limited; Hong Kong Exchanges and Clearing Limited; Henry Bath & Son Ltd.; and Glencore plc.  (ECF No. 578 at 2.)

[5] These other defendants were: The Goldman Sachs Group, Inc.; JPMorgan Chase & Co.; and Pacorini Metals AG.  (ECF No. 579 at 6-7.)

[6] See notes 7 & 12-15, infra.

dismiss.  However, with the benefit of the limited discovery permitted by the Court since its initial decisions, plaintiffs have now added sufficient factual detail to their complaints and have sharpened their story and substantive claims to overcome these arguments, such that they have now stated a plausible claim under § 1 of the Sherman Act (and certain related state law claims) against defendants.  The § 2 monopoly claim asserted in the TAC remains legally deficient, as are certain of the TAC's § 1 and other state law claims.

Accordingly, for the reasons set forth below, defendants' motions to dismiss the JAC are DENIED and plaintiffs' motion for leave to amend the JAC is GRANTED; plaintiffs' motion for leave to amend the TAC is GRANTED IN PART and DENIED IN PART.  In sum, no defendant who is the subject of this Opinion & Order is dismissed entirely; the Court does, however, dismiss certain claims, specifically the FLPs' claim under § 2 of the Sherman Act as well as the FLPs' random state law claims that do not substantively mirror its remaining claim under § 1 of the Sherman Act.

I.    THE HEART OF PLAINTIFFS' ALLEGATIONS

Plaintiffs have spent thousands of pages assembling (or, trying out) various versions of claims that defendants have engaged in anticompetitive conduct.  To put it in colloquial terms, they alleged they "smelled a rat" but could neither identify its whereabouts nor its destination.  The cats prowled, seeking the hole from which the alleged rat emanated and into which it may have crept.  The metaphorical cats have now pointed to a point of origin and destination.  Whether there is in fact a rat at

all, or whether any rodent has, could or would take up the position indicated remains a question for another day.

Needless to say, it should never take thousands of pages to state a claim. Were it not for the legal standards governing when enough is deemed enough (which allow for more than what this Court might otherwise be inclined to tolerate), the trees felled in an effort to state a claim might be leafing even now.

Plaintiffs' initial pleadings alleged a conspiracy by operators of warehouses approved by the London Metal Exchange ("LME")[7] to delay the loading out of aluminum stored in those warehouses.  (See ECF Nos. 226, 271-72; 14-cv-6849 ECF No. 1.)  According to the initial pleadings, these delays restrained the supply of aluminum, thereby increasing its price.  Plaintiffs generally cast these allegations as a conspiracy to fix the price of aluminum—notwithstanding that defendants do not sell aluminum and could not, strictly speaking, fix its price.  (See, e.g., ECF No. 226 ¶¶ 47, 117, 124; ECF No. 271 ¶¶ 90, 94; ECF No. 272 ¶¶ 48, 127, 134.)  The FLPs (but not Mag, Agfa and Kodak) also alleged that certain defendants had together monopolized various markets.  (ECF No. 271 ¶¶ 91, 335-41, 407-413.) These initial pleadings focused on the creation and maintenance of warehouse queues as the core of the allegedly unlawful conduct, but failed to adequately explain how and why the defendant financial institutions participated in or

---

[7] The TAC names the LME as a defendant.  (TAC ¶¶ 74-75.)  However, the Court dismissed the LME from this action without leave to replead in an Opinion & Order dated August 25, 2014.  (ECF No. 564.)  The TAC also names as defendants LME Holdings Ltd. ("LME Holdings") (TAC ¶¶ 74, 77) and Hong Kong Exchanges & Clearing Ltd. ("HKEx") (TAC ¶¶ 74, 78).  On March 3, 2015, the Court denied plaintiffs' motions for leave to amend their complaints to the extent that they seek to join LME Holdings and HKEx as defendants.  (ECF No. 728.)  Accordingly, the LME, LME Holdings, and HKEx have all been dismissed from this action.

benefitted from the conduct.  Even as to Metro, the primary alleged wrongdoer, the creation and maintenance of queues was painted in terms that were economically profit-maximizing.  What warehouse, paid for a term of storage, would not want the longest legally permissible terms possible?   For similar reasons, the inclusion of defendant warehouse companies which were not alleged to themselves have had queues was inadequately explained.  How, indeed, would such a warehouse have benefitted from queues it did not have, but which its competitors did?  And what were the financial institutions doing in the case?  How were they a part of the alleged conspiracy?  Plaintiffs' theories left much to the imagination.

For a variety of reasons—including incomplete and implausible theories and a lack of relevant factual allegations—this Court dismissed all of plaintiffs' claims, but granted the FLPs, Mag, and Agfa[8] leave to seek to amend.  (1st MTD Op.)  Plaintiffs then filed motions presenting more factually detailed and substantively focused proposed pleadings, and Kodak filed its amended complaint as of right.

The FLPs have been particularly unclear as to what they want to allege.  They alleged a set of theories in a short-lived proposed Second Amended Complaint (ECF No. 618 ex. 1), another set in the TAC, and yet another in a proposed Fourth Amended Complaint (the "FAC") (ECF Nos. 688, 690-91).  This Court has noted the additional materials that the FLPs propose to include in the FAC; defendants have

---

[8] Kodak filed its complaint later than the other plaintiffs and was not included in this initial round of motion practice.

not yet had an opportunity to respond to this additional material, and accordingly, the Court here focuses on the TAC when evaluating the FLPs' claims.[9]

As explained above, Mag, Agfa, and Kodak have filed the JAC.  The JAC, and the briefing in support of the JAC, does a far better job of articulating and supporting clear theories of anticompetitive conduct than the TAC.  For this reason, the Court has used the JAC as its primary reference point for claims which overlap with those of the FLPs, though ultimately each complaint and all claims raised therein must rise or fall on their own merits.  In large part—with the notable exception of the FLPs' monopolization claim under § 2 of the Sherman Act (and a couple of alternative versions of a Section 1 claim)—the JAC and the TAC both allege a singular core claim directed at the same conduct.  In sum, the primary theories alleged in both the JAC and the TAC are now as follows:

Defendants consist of two groups: financial institutions with commodities trading arms that trade financial instruments (such as warrants) tied to physical metals, and operators of warehouses that store metals.  Working together, these entities allegedly engaged in a conspiracy to increase the financial institutions' commodities trading profits and warehouse companies' revenues.  This was effected—at least in part—by using the financial firms' ability to obtain, retain, and strategically settle aluminum warrants along with their affiliated warehouses' ability to store or agreeing to accommodate storage requests for aluminum. According to plaintiffs, the effect of these concerted actions was to raise the Platts

---

[9] The Court has considered whether these additional materials and allegations would alter its conclusions as to the claims it dismisses herein; they do not.

Midwest Premium, which is commonly used as a component of the stated price in contracts for the purchase of aluminum.  (See JAC ¶ 2; TAC ¶¶ 468, 471.)  These claims are premised on a description of price setting as follows:

The spot metal price for physically delivered aluminum has two standardized components: the LME cash price[10] and a regional premium (for example, the Platts Midwest Premium).  (JAC ¶ 118; TAC ¶ 176.)  Together, these components are referred to as the "all-in" price for physical delivery of primary aluminum.  (JAC ¶ 118; TAC ¶ 176.)  The LME cash price is determined by daily open outcry by the marginal buyer and seller at a specific moment in time using standardized LME contracts covering spot material located in LME warehouses.  (JAC ¶ 119.)[11]  The LME thus provides for a price discovery mechanism for a standard aluminum contract throughout the world.  (JAC ¶ 119; TAC ¶ 177.)  The LME cash price is a global price, and does not include the costs of delivery from a seller to a purchaser.  (JAC ¶ 119; TAC ¶ 177.)  To cover the costs of delivery to a customer, contracts incorporate various regional premiums.  (JAC ¶ 120; TAC ¶ 178.)  The regional premiums are compiled based on reporting of the preponderance of physical

---

[10] The TAC at times refers to the LME cash price as the "LME Settlement Price."  (See TAC ¶ 176.)

[11] Plaintiffs allege that the LME certifies a global network of more than 700 warehouses, with close to 200 located in the United States.  (JAC ¶ 127; TAC ¶ 188.)  Defendants Metro, Henry Bath LLC and Pacorini are alleged collectively to operate more than 75-80% of the LME certified warehouses in the United States and throughout the world.  (JAC ¶ 127; TAC ¶ 188.)  In the United States, LME warehouses are located in Detroit, Baltimore, Chicago, Los Angeles, Mobile, New Orleans, Owensboro, St. Louis, and Toledo.  (JAC ¶ 130; TAC ¶ 190.)  Defendants Metro and Pacorini are alleged to have warehouses in Detroit; Henry Bath is not.  (JAC ¶ 130; TAC ¶ 190(a).)  LME warehouses are alleged to be a critical part of the supply chain for aluminum in the United States because, inter alia, it is only in such warehouses that LME warrants can be issued and cancelled.  (JAC ¶ 131; TAC ¶ 194.)  An LME warrant is a standardized document issued by a warehouse upon delivery of a lot of aluminum into that warehouse, and it indicates who has the right of possession of that particular lot of aluminum.  (JAC ¶ 132; TAC ¶ 195.)

transactions between buyers and sellers of spot aluminum on a given day for delivery to relevant geographic points.  (JAC ¶ 120; TAC ¶ 178.)  Thus the regional premiums reflect current offers for immediately available aluminum for delivery from producers, traders and holders of warehoused aluminum.  (JAC ¶ 120.)  These offers incorporate the fluctuating delivery, storage, finance and insurance costs incurred by these competing suppliers or aluminum.   (JAC ¶ 120.)  The regional premiums are published by private companies including Platts and Metal Bulletin.  (JAC ¶ 120; TAC ¶ 178.)  There are other premiums including the Rotterdam Premium and CIF Japan Premium.  (JAC ¶ 122; TAC ¶ 185.)  Because industrial contracts for physical delivery of aluminum express the price using the LME cash price, which is allegedly a global price, regional premiums tend to move up and down together.  (JAC ¶ 123; TAC ¶ 186.)  If they did not, multinational aluminum purchasers, traders, and arbitrageurs could exploit pricing differences among regional premiums.  (JAC ¶ 123; TAC ¶ 186.)

The vast majority of primary aluminum is purchased by industrial users such as plaintiffs.  (JAC ¶ 124; TAC ¶ 166.)  Their purchases are made pursuant to long-term contracts which typically include annual supply arrangements.  (JAC ¶ 124; TAC ¶ 166.)  The JAC alleges that the aluminum purchased in this manner would not typically ever be stored in an LME warehouse, but its pricing would still incorporate the spot metal price, which is the LME cash price plus the regional premium.  (JAC ¶ 125.)  The JAC also alleges that the pricing of aluminum for long-term industrial contracts, such as those to which Mag, Agfa, and Kodak are parties,

is dependent upon the supply and demand in the LME warehouse system and immediate availability of aluminum for delivery. (JAC ¶ 125.) Agfa and Kodak also allege that as a result of recent sharp increases in regional premiums, they have sought to procure aluminum from suppliers via contracts that do not incorporate regional premiums as a component of pricing, and these efforts have been unsuccessful. (JAC ¶ 126.)

Warrants for aluminum traded on the LME are standardized and freely tradable. (JAC ¶ 133; TAC ¶ 195.) When a warrant nears expiration, a forward contract or futures contract price is alleged to move into line with prices for the physical commodity—a phenomenon known as price convergence. (JAC ¶ 134; see TAC ¶ 195.)

Mag, Agfa, and Kodak allege that from 1989 to 2008-2009, the LME warehouses fulfilled their represented mission of serving as a price-neutral storage place of last resort. (JAC ¶ 135.) These warehouses held primary aluminum that was available on a commercial basis to industrial and other consumers as a source of supply and received primary aluminum from producers and others. (JAC ¶ 136.) Thereby, the LME forward contracts achieved price convergence. (JAC ¶ 137.) That is, the LME price was equal to, or as equal as practicable with, the price of physical aluminum. (JAC ¶ 137.) The ability of industrial and other consumers to take delivery of and acquire primary aluminum through the LME gave them a way to obtain the primary aluminum they needed without paying the Midwest Premium and tended to cause price convergence. (JAC ¶ 139.) An active market existed for

the trading and swapping of warrants for LME aluminum—allowing for warrant holders to obtain warrants for physical aluminum at preferred warehouse locations. (JAC ¶ 139.)  This further allowed customers to obtain aluminum without having to pay the Midwest Premium and without experiencing significant delays.  (JAC ¶ 139.)

Plaintiffs allege that defendants' actions caused supplies of aluminum stored in U.S. LME warehouses to increase dramatically starting during the recession of 2008-2009.  (JAC ¶¶ 146-47; TAC ¶ 232.)  However, even though supplies were increasing, so too was the Midwest Premium.  (JAC ¶ 148; see TAC ¶¶ 567.)  This was, according to plaintiffs, due to artificiality created by defendants' delays in loading-out aluminum in the LME warehouses.  (See JAC ¶ 154; TAC ¶ 467.)

Plaintiffs do not allege that defendants have fixed a particular spot price for aluminum—but rather that they have taken a variety of actions that have caused the Midwest Premium to increase.  As cast, this conspiracy does not fit into a traditional horizontal or vertical schema.  Rather, affiliated entities are alleged to have worked with each other and with other co-conspirators at multiple levels, resulting in overlapping and mutually reinforcing actions.  The conspirators are not alleged all to have been equal participants, but all are alleged to have benefitted from participation.  For instance, the Goldman Sachs entities[12] and Metro are

---

[12] The Goldman Sachs entities are the Goldman Sachs Group Inc. ("Goldman Sachs") and those entities affiliated with Goldman Sachs that are named as defendants in the JAC and/or TAC, which includes Goldman, Sachs & Co. (TAC ¶ 87), Goldman Sachs International (JAC ¶ 52; TAC ¶ 89), Metro (JAC ¶ 55; TAC ¶ 92), J. Aron (TAC ¶ 88), and Mitsi (TAC ¶ 93).  The TAC also names as defendants alleged agents of Metro, BAP (TAC ¶ 88) and Robert Burgess-Allen (TAC ¶ 129).  On August 29, 2014, the Court dismissed all claims against Goldman Sachs and all entities affiliated with Goldman Sachs that were named as defendants in plaintiffs' initial pleadings.  (1st MTD Op.)

alleged to have been at the true center of the conspiracy, but as currently cast, they either needed or accepted the participation of other, third parties.

The structure of the alleged conspiracy consists of matching corporate groupings.  Each co-conspirator financial institution is alleged to have or have had its own affiliated warehouse company.  For instance, the Goldman Sachs entities were affiliated with Metro, the JPMorgan entities[13] with Henry Bath LLC, and the Glencore entities[14] with Pacorini.[15]  Thus, plaintiffs allege that the conspiracy was

---

On March 3, 2015, the Court granted Goldman Sachs' motion to dismiss and denied plaintiffs' motions for leave to amend their complaints to the extent that they seek to join Goldman Sachs as a defendant.  (ECF Nos. 729, 731.)  The following Goldman Sachs-related entities and agents have not to date been dismissed from this action (and remain in this action): Goldman, Sachs & Co.; Goldman Sachs International; Metro; J. Aron; Mitsi; BAP; and Burgess-Allen.

[13] The JPMorgan entities are JP Morgan Chase & Co. ("JPMorgan") and those entities affiliated with JPMorgan that are named as defendants in the JAC and/or TAC, which includes JPMorgan Securities plc (JAC ¶ 58; TAC ¶ 97), Henry Bath & Son Ltd. (JAC ¶ 61; TAC ¶ 100), and Henry Bath LLC (JAC ¶ 68; TAC ¶ 107).  On August 29, 2014, the Court dismissed all claims against JPMorgan and all entities affiliated with JPMorgan that were named as defendants in plaintiffs' initial pleadings.  (1st MTD Op.)  On March 3, 2015, the Court granted Henry Bath & Son Ltd.'s motion to dismiss the JAC and denied plaintiffs' motions for leave to amend their complaints to the extent that they seek to add Henry Bath & Son Ltd. as a defendant.  (ECF No. 728.)  On March 4, 2015, the Court denied plaintiffs' motions for leave to amend their complaints to the extent that they seek to join JPMorgan as a defendant, and granted Henry Bath & Son Ltd.'s motion to dismiss the JAC.  (ECF Nos. 729, 731.)  The following JPMorgan entities have not to date been dismissed from this action (and remain in this action): JPMorgan Securities plc and Henry Bath LLC.

[14] The Glencore entities are Glencore plc ("Glencore") and those entities affiliated with Glencore that are named as defendants in the JAC and/or TAC, which includes Glencore International AG (TAC ¶¶ 110, 115), Glencore AG (TAC ¶¶ 110, 116), Glencore, UK Ltd. (TAC ¶¶ 110, 119), and Glencore Ltd. (JAC ¶ 77; TAC ¶¶ 110, 121).  On August 29, 2014, the Court dismissed all claims against Glencore and all entities affiliated with Glencore that were named as defendants in plaintiffs' initial pleadings.  (1st MTD Op.)  On March 3, 2015, the Court granted denied plaintiffs' motions for leave to amend their complaints to the extent that they seek to join Glencore as a defendant.  (ECF No. 728.)  On March 4, 2015, the Court denied the FLPs' motion for leave to amend their complaints to the extent that they seek to join Glencore International AG and Glencore UK Ltd. as defendants.  (ECF Nos. 729, 731.)  The following Glencore entities have not to date been dismissed from this action (and remain in this action): Glencore AG and Glencore Ltd.

[15] Pacorini consists of the following two entities, which have been named as defendants in both the JAC and the TAC: Pacorini USA (JAC ¶ 78; TAC ¶¶ 110, 122) and its corporate parent Pacorini Metals AG (JAC ¶ 79; TAC ¶¶ 110, 123).  Pacorini USA is alleged to own and operate LME-certified warehouses in the United States.  (JAC ¶ 78; TAC ¶ 122.)  In the TAC, plaintiffs group "Glencore," Pacorini Metals USA LLC, Pacorini Metals AG, and non-defendant Pacorini BV into the single collective term "Pacorini."  (TAC ¶ 125.)  On March 4, 2015, the Court denied plaintiffs' motions for

both horizontal and vertical: the financial institutions are alleged to have engaged in a horizontal conspiracy with each other, and the warehouses are similarly alleged to have engaged in a conspiracy with other warehouses. But the alleged conspiracy is not solely vertical or solely horizontal—each corporate group interacted at various levels with the other corporate groups. The financial institutions are also alleged to have engaged in a vertical conspiracy with unaffiliated warehouses (for example, Goldman Sachs is alleged to have been in a conspiracy with warehouse operators Henry Bath LLC and Pacorini, which are not its corporate affiliates). (See JAC ¶¶ 2-3; TAC ¶ 473.) JP Morgan is alleged to have conspired with Metro. And on.

Schematically, the players in the conspiracy are alleged to be:



The alleged conspiracy includes interconnections between these entities, resulting in a webbed structure:

---

leave to amend their complaints to the extent they seek to join Pacorini Metals AG as a defendant. (ECF No. 729.) Pacorini USA has not to date been dismissed from this action (and remains in this action).



Plaintiffs allege that the co-conspirators worked with each other to restrain a very specific piece of the aluminum supply comprising only a small portion of the total amount of available physical aluminum:  aluminum traded by way of LME warrants.  The trading of LME aluminum warrants is associated with establishing the Midwest Premium, which, as previously explained, plays a role in price-setting for physical aluminum contracts.  This restraint is alleged to have led to increases in the spot price of physically delivered aluminum by way of increasing the Midwest Premium associated with an input into that price.  (JAC ¶¶ 2-5; see TAC ¶¶ 461-627.)  They allegedly did this by gaming the LME commodities trading system associated with the Midwest Premium.  (JAC ¶ 3; TAC ¶¶ 532-49.)  The key was that aluminum stored in LME-approved warehouses plays a unique role in setting the Midwest Premium.  (JAC ¶ 2; TAC ¶ 5.)  In a nutshell, the longer aluminum is stored in these LME warehouses, the higher the Midwest Premium.  (See JAC ¶ 2; TAC ¶¶ 9(E), 10(e), 12.)  As certain pricing of physical aluminum is contractually tied to the Midwest Premium.  Plaintiffs allege that as a result, the higher the Midwest Premium, the higher the contract price.

As cast, (and despite loose language to the contrary,) this conspiracy was not a traditional "price fix"—no price was fixed.  Instead, the conspiracy involved complicated interactions between participants who are alleged to have gained benefits primarily from trading activity.  That defendants obtained increased warehouse rental revenues as a result of their conspiratorial acts was a necessary outcome, but not a key driver of defendants' behavior.

The conspiracy is alleged to have coalesced in 2010 and 2011.  Plaintiffs allege that defendants used specific aspects of both their commodities trading and warehouse operations.  First, each of the financial institutions acquired LME-approved warehouses in or around 2010.  Then, the financial institutions worked with their affiliated warehouses to insure that stocks of aluminum were obtained and maintained at unusually high levels.  This was done by (1) slowing the pace of load-outs of aluminum from warehouses, which was achieved by using the 1500–metric ton daily requirement for load-outs set by the LME as a <u>de facto</u> maximum for each warehouse owner (versus each warehouse), and not loading out more than that; (2) increasing the amount of aluminum stored in their warehouses by offering producers of aluminum (such as Alcoa) financial incentives to store with them; and (3) entering into agreements with each other and third parties to shuffle aluminum around so as to meet the 1500–metric ton daily load-out requirement but without any other legitimate business purpose.  (JAC ¶¶ 5, 10, 210-12, 246; TAC ¶¶ 467-68; 523-25, 559.)

The financial institutions' commodities trading arms allegedly assisted in the stockpiling by (1) obtaining large numbers of aluminum warrants on behalf of themselves or on behalf of clients; (2) strategically cancelling warrants and working with third parties to cancel warrants, for the purpose of putting the aluminum associated with cancelled warrants into the load-out queues, thereby delaying load-outs of aluminum legitimately seeking to exit the warehouses; and (3) lobbying and pressuring the LME not to alter its rules regarding required load-out amounts.  (See JAC ¶¶ 11-15, 252-53; TAC ¶¶ 10, 360, 363, 468.)

As currently cast, the proposed complaints (particularly the JAC) now shed light on how and why the warehouse companies without queues in Detroit (specifically, Henry Bath LLC and Pacorini) can be part of a conspiracy that allegedly requires queues to succeed.  Plaintiffs now allege, based on a number of emails and documents, that the conspiracy relied on give-and-take between the trading arms of several financial institutions and their affiliated warehouse companies in different parts of the country (and, as alleged in the TAC, around the world).  Plaintiffs theorize that to drive trading profits, the various conspirators played different roles in different places to obtain what were perhaps different advantages.  In short, they were not all doing the same thing but were united in obtaining benefits from their combined endeavors.  Thus, while Pacorini and Henry Bath did not have warehouses with queues in the Detroit area, they (or their trading affiliates) are alleged to have assisted Metro in other ways; and the trading arms did likewise.  (See, e.g., JAC ¶¶ 60, 160, 179, 197, 205-06; TAC ¶¶ 99, 473,

492, 510, 518-19.)  For instance, Metro is alleged to have discussed an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result of higher premiums.  (JAC ¶ 207; TAC ¶ 520.)  JPMorgan is also alleged to have stored aluminum with Metro when to do so was contrary to its economic self-interest.  (JAC ¶¶ 208, 221-22, 226; TAC ¶¶ 521, 534-35, 539.)  In August 2011, Metro is alleged to have discussed a large warrant cancellation with JPMorgan and Henry Bath.  (JAC ¶ 229; TAC ¶ 542; see also JAC ¶ 230; TAC ¶ 543.)  In October 2011, Metro discussed with Goldman personnel giving all or substantially all of its aluminum stored in Mobile to JPMorgan.  (JAC ¶ 231; TAC ¶ 544.)

With regard to Glencore and Pacorini, plaintiffs allege that Metro sent an email referring to Pacorini and Glencore not "nitpick[ing]" them in Detroit due to concerns regarding retaliation elsewhere.  (JAC ¶ 197; TAC ¶ 510.)  Plaintiffs also allege that Metro discussed re-warranting and refunding in connection with metal movement with Pacorini.  (JAC ¶ 199; TAC ¶ 512.)  In addition, plaintiffs allege that the defendant warehouse companies ignored information barriers imposed by LME rule, and shared information internally and across companies.  (JAC ¶¶ 161-75, 202, 229; TAC ¶¶ 474-88, 515, 542.)  Metro and Glencore are alleged to have engaged in swap discussions which ultimately benefitted the conspiracy.  (JAC ¶¶ 233-36; TAC ¶¶ 546-49.)  In addition, plaintiffs allege that all of the defendant warehouse companies, controlled by their trading affiliates, worked together to treat the minimum load out requirement as a maximum, thereby assisting in

creating Metro's queues.  (JAC ¶¶ 210-11; TAC ¶¶ 523-24; see JAC ¶ 218; TAC ¶ 531.)

Plaintiffs allege that this scheme benefited defendants in numerous ways. First, Mag, Agfa, and Kodak allege that the higher storage costs associated with unduly prolonged storage pushed up the Midwest Premium, enabling defendants to sell aluminum in the spot market at an inflated price.  (JAC ¶ 17.)  Second, plaintiffs allege that the trading arms of the financial institutions benefitted from the increased value of their holdings and increasing the profitability of certain futures and spot market transactions.  (JAC ¶¶ 17, 289-96; TAC ¶¶ 602-09.)  Third, defendants' warehousing operations were able to charge supra-competitive rents. (JAC ¶ 17; TAC ¶¶ 598-602.)

Reduced to its core, plaintiffs' theory posits that while defendants' actions impact the pricing industrial players may pay for aluminum, such is not at the heart of their intended financial play.  Their goal, in other words, was not to fix the price of aluminum at a supra-competitive level or to fix the Midwest Premium at a particular level, but rather to be able to affect the price of (or inputs into the price) of aluminum in ways that made trades more profitable.[16]

But of course, commodities like aluminum are valuable primarily because they are used by real world users to make real world products, and so the

---

[16] Precisely how the trading operations obtained benefits is unclear—was it through, as plaintiffs allege, the exploitation of a contango?  (See, e.g., JAC ¶¶ 295-96; TAC ¶¶ 608-09.)  An ability to exploit differences between spreads or short and long positions?  An ability to use warrants to advantage other trading opportunities such as equities or derivative positions?  While the manifestation of the benefits is unclear, the economic plausibility of some advantage is sufficient at the pleading stage.  The Court notes that in the absence of demonstrated tangible benefits by alleged conspirators following discovery, the case may well be narrowed.

manipulation of a commodities market will necessarily result in real world effects. In this sense, plaintiffs' alleged payment of a higher Midwest Premium is theoretically necessary and central—but ultimately collateral damage. It is central and necessary because, as framed above, commodities can only be traded if they are used somewhere, by someone, to make real world goods or to provide real world services. It is collateral because impacting the price that real world users of aluminum may pay is not the focus of defendants' alleged financial play—it is merely the play's by-product. As alleged, the traders intend to impact other traders, but have to impact real world users in the process.

The law recognizes an important distinction between plausibility and probability at this stage of the case. In sum, and as discussed below, the allegations in the current proposed pleading are sufficient to support some—but not all—of plaintiffs' claims.[17]

## II.   MOTION TO DISMISS STANDARD

The Court undertakes its review of the proposed pleadings mindful of the standards governing a motion to dismiss under Rule 12(b)(6).[18] The Court

---

[17] Defendants frequently and correctly quote this Court's prior decision dismissing prior pleadings. The Court believes its recitation of the law as set forth in that opinion was correct. The primary difference between the prior pleadings and the TAC and JAC is the refinement of the presentation of the alleged conspiracy (particularly in the JAC and its supporting papers). The addition of theoretical underpinnings to how and why the trading arms work with the warehouses, as well as the proffered factual support, alters the landscape.

[18] As the Court has previously noted, Kodak is in a different procedural posture from the other plaintiffs. That difference does not have substantive significance for purposes of the instant motions. The JAC is in fact an amended pleading for Kodak and motions to dismiss it are therefore evaluated under Rule 12(b)(6). For the remaining plaintiffs, the pleadings are "proposed" and evaluated under the futility standard for amendments set forth in Rule 15 and interpreting case law. See Xiang Li v. Morrisville State Coll., 434 Fed. App'x 34, 35 (2d Cir. 2011) (summary order) (justice does not require a court to grant a plaintiff leave to amend a complaint under Rule 15(a)(2) "if amendment would be futile"). But at bottom, the 12(b)(6) standard and the Rule 15 futility standard are essentially the

approaches all motions with the following two principles in mind: that the Court must accept as true—for purposes of this motion only—the facts as alleged in the pleadings, and the Court must draw all inferences in plaintiffs' favor.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57).  Thus, if a fact (such as an email) is susceptible to two or more competing inferences, in evaluating these motions, the Court must draw the inference that favors the plaintiff so long as it is reasonable.  N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 121 (2d Cir. 2013).  "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an obvious alternative explanation."  Id. (internal quotation marks omitted).[19]

These standards do not require a court to accept conclusory assertions dressed up as facts.  Iqbal, 556 U.S. at 678.  Plaintiffs must allege sufficient factual content—which this Court must accept as true for purposes of this motion—to raise their asserted right to relief above the speculative level.  Twombly, 550 U.S. at 555.  A claim must have facial plausibility.  Iqbal, 556 U.S. at 678.

---

same.  Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).")  For convenience, and consistent with the manner of argument of the parties, the Court therefore refers to Rule 12(b)(6) and interpreting case law.

[19] Defendants assert that many of the quotes that plaintiffs set forth in the TAC and JAC are taken out of context, clearly misread the document, or support an opposite inference.  The Court has reviewed the materials submitted.  There is certainly support for defendants' positions in this regard, but the Court is mindful that at this stage plaintiffs are entitled to reasonable inferences being drawn in their favor.  Discovery may make clear that there either is or is not a triable issue as to the proffered interpretations.

A court must take care not to cloud its analysis of whether a claim is plausible with its views on whether ultimate success on that claim is probable.  See Twombly, 550 U.S. at 556; Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012).  "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible."  Anderson News, 680 F.3d at 184.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.[20]

Mag, Agfa, and Kodak are, therefore, entirely correct when they argue on these motions that when the Court evaluates the adequacy of the JAC, it must draw in plaintiffs' favor all competing inferences that can be drawn from the many emails and other materials cited therein.  Put another way, while there may be a myriad of explanations for the conduct described in emails, if the inference plaintiffs ask the Court to draw is not unreasonable, then that is the inference the Court must draw at this stage.  N.J. Carpenters, 709 F.3d at 121.  Mag, Agfa and Kodak are also correct when they argue that this Court may not weigh the evidence in the guise of a plausibility analysis.  See Twombly, 550 U.S. at 556; Anderson News, 680 F.3d at 184-85.  Instead, it is the Court's task here to ask whether the assembled facts "nudge[] [plaintiffs'] claims . . . across the line from conceivable to plausible."  Iqbal,

---

[20] If the Court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate.  Iqbal, 556 U.S. at 679-80 (quoting Twombly, 550 U.S. at 570).

556 U.S. at 679-80 (quoting <u>Twombly</u>, 550 U.S. at 570).  Once over the line, the

strength of the claims is a question for another day.  <u>See</u> <u>id.</u>

With these basic pleading principles in mind, the Court turns to the many

motions.[21]

## III.   PLAINTIFFS' SECTION 1 CONSPIRACY CLAIMS

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or

conspiracy, in restraint of trade . . . ."  15 U.S.C. § 1.  Since all contracts necessarily

restrain trade to some extent, this provision cannot be read literally: only

"unreasonable" restraints of trade are unlawful.  <u>Bus. Elecs. Corp. v. Sharp Elecs.</u>

<u>Corp.</u>, 485 U.S. 717, 723 (1988); <u>see also</u> <u>In re Publ'n Paper Antitrust Litig.</u>, 690

F.3d 51, 61 (2d Cir. 2012).  To run afoul of § 1, the unreasonable restraint must

result from an agreement between two or more entities.  <u>See</u> <u>Twombly</u>, 550 U.S. at

553-54; <u>Theatre Enters., Inc. v. Paramount Film Distrib. Corp.</u>, 346 U.S. 537, 540

(1954); <u>Anderson News</u>, 680 F.3d at 182.  A unilateral or independent business

decision that results in a restraint of trade is not a violation of § 1.  <u>Copperweld</u>

<u>Corp. v. Ind. Tube Corp.</u>, 467 U.S. 752, 775 (1984).

Mag, Agfa, and Kodak allege in the JAC that the Goldman Sachs, JPMorgan

and Glencore entities and their respective warehouse operations conspired with

each other to restrain trade in violation of § 1.  (JAC ¶¶ 330-336.)  The FLPs allege

---

[21] The parties raise numerous arguments in their papers.  This Court has reviewed all of them and addresses herein only those that are required for resolution of the instant motions.  For instance, defendants argue that many alleged acts cannot themselves constitute violations of the antitrust laws.  In this Opinion, the Court is not ruling otherwise (though it does not address each act <u>seriatim</u>).  Instead, it bases its decision on the existence of a sufficient basis for plausibility for the pleadings to pass muster at this stage.

three separate § 1 violations in the TAC (TAC ¶¶ 444-636), only one of which, the Third Claim, is coherent.  That Third Claim also approximates the JAC's § 1 claim. Plaintiffs have also asserted claims based on the same allegations under New York's Donnelly Act, codified at N.Y. Gen. Bus. Law §§ 340 et seq., and California's Cartwright Act, codified at California Business and Professions Code §§ 16700 et seq. (JAC ¶¶ 337-50, TAC ¶ 651(d).)  In addition, the FLPs have asserted a claim under the Michigan Antitrust Reform Act (the "MARA"), codified at M.C.L.A. §§ 445.771 et seq. (TAC ¶¶ 637-42).

The FLPs' Second Claim is a porridge of conclusory statements sprinkled with various theories.  A failure to achieve comprehensibility results in a failure to achieve plausibility.  In this claim, plaintiffs allege that entities and people affiliated with Goldman Sachs conspired with the Glencore entities and entities affiliated with the LME (but not the JPMorgan entities).  (TAC ¶¶ 444-60.) Plaintiffs allege that "Metro has made and performed a series of agreements in unreasonable restraint of trade for multiple anticompetitive purposes and with multiple anticompetitive effects."  (TAC ¶ 445.)  Included among these are agreements Metro made with the LME to reject a recommended change in the load-out rule, to reduce the amount of change in the rule, and to delay any implementation of such a change.  (TAC ¶ 446.)

The FLPs allege that Metro conspired with its own agent, defendant Robert Burgess-Allen, to maintain and increase warehouse queues.  (TAC ¶ 449.)  Metro also agreed with the Glencore entities (as well as non-parties RK Capital

Management LLP and Red Kite Group (collectively "Red Kite") and DB Energy Trading LLC ("DB Energy")) to cancel large numbers of warrants for the purpose of maintaining the load-out queue (demonstrated by the subsequent re-warranting of the same aluminum).  (TAC ¶ 450.)  Metro made and performed incentive payment agreements with its sister company, J. Aron.  (TAC ¶ 451.)  These agreements are alleged to have "foreclosed industrial and other users of aluminum, such as Plaintiffs, from sourcing aluminum on the LME," to have "ended LME forward contracts' role as a practicable source of aluminum for industrial and other consumers, including Plaintiffs," to have "caused the Midwest Premium in the primary aluminum market to reach supra-competitive levels," and to have destroyed pro-competitive price discipline as well as aluminum consumers' ability to hedge the price risks of physical aluminum.  (TAC ¶ 459.)

In their Third Claim for relief, the FLPs allege that all defendants except for the LME-affiliated entities conspired to artificially raise prices "for purchases of aluminum for physical delivery by imposing a supra-competitive Midwest Premium."  (TAC ¶ 463.)  They also allege that the conspiracy allowed defendants' trading operations to engage in more profitable financial transactions. (TAC ¶¶ 603-09.)  As part of this claim, plaintiffs assert that these defendants agreed that their warehouse operations would not compete against each other (TAC ¶ 510), agreed to use the minimum load out rules as a maximum (TAC ¶¶ 523-24), offered incentive payments to induce storage (TAC ¶¶ 550-56), shifted inventory between warehouses

(TAC ¶¶ 559-66), and worked together strategically to cancel warrants (TAC ¶¶ 567-73).

In their Fourth Claim for relief, the FLPs allege a violation of § 1 by the "LME Combination," which consists of the LME, LME Holdings Limited, Hong Kong Exchanges and Clearing Limited ("HKEx"), Metro, Henry Bath LLC, and Pacorini.  (TAC ¶¶ 20, 628-36.)  According to the FLPs, the LME Combination systematically flouted the LME Charter, under which the LME has repeatedly assured that LME warehouses act as market participants of last resort and ensuring that the LME price stays in line with the physical/spot market price, and in doing so became "a combination in unreasonable restraint of trade."  (TAC ¶¶ 6, 631-33.)  The violations to which this claim refers include (1) the "failure to amend the unreasonable minimum load-out rule and the affirmative acts by which such rule was converted into a maximum output restriction that could be 'gamed' through anticompetitive contracts by Metro," (2) "the mix of consideration that Metro offered participants in the Primary Aluminum Market when it entered that market as a participant of first resort to divert aluminum into the LME, abused the LME Combination's power and to inflate prices," and (3) "all of the unlawful activity alleged in the Third Claim."  (TAC ¶ 633.)  The FLPs' state law claims rely upon the totality of the anticompetitive conduct alleged in their First through Fourth Claims. (See TAC ¶¶ 637, 643, 649, 653, 657.)

The FLPs' Third Claim for relief states an independent and cognizable claim, but the Second and Fourth claims do not.  The FLPs' Second Claim is nearly

incomprehensible and cannot withstand scrutiny as a standalone claim.  There are no facts sufficient to support a restraint on the actual physical supply of aluminum sourced from the LME itself.  (TAC ¶ 459.)  The LME does not "source" physical supplies of aluminum to purchasers such as the FLPs; it is a commodities trading platform.  The FLPs allege that they all purchased directly from producers and were not obtaining physical aluminum through the settlement of warrant positions.[22]  The FLPs' short reference to hedging in the Fourth Claim (TAC ¶¶ 20(b), 630) is without factual support sufficient to render it a plausible basis for any element of a claim.  The FLPs' Fourth Claim adds nothing substantive to the Third—the use or abuse of LME rules is inherent in the operations of the conspiracy alleged in the Third Claim; the Fourth Claim merely confuses the issues and is therefore dismissed as duplicative.

The Court now turns to those § 1 claims that remain.  In sum, both Mag, Agfa, and Kodak and the FLPs have stated plausible and cognizable claims under § 1, subject to the limitations set forth below.

A.    Antitrust Standing[23]

Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law."  Gatt Commc'ns Inc. v. PMC Assocs. L.L.C., 711 F.3d 68, 75 (2d

---

[22] One plaintiff, Ampal, states that it may have obtained aluminum directly from Glencore (TAC ¶ 49)—but it is not clear from the allegations in the TAC whether that was through a settled warrant, through owned physical stocks, or in some other manner.

[23] Plaintiffs must establish antitrust standing with respect to each antitrust claim pursued.  See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 436-38 (2d Cir. 2005) (antitrust standing inquiry is injury-specific).  Accordingly, the Court reviews standing with regard to the FLPs' § 1 and § 2 claims separately.

Cir. 2013) (quoting <u>NicSand, Inc. v. 3M Co.</u>, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); <u>see also</u> <u>Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.</u>, 467 F.3d 283, 290-95 (2d Cir. 2006) (dismissing a complaint under Rule 12(b)(6) for lack of antitrust standing).

Antitrust standing consists of three separate questions: have plaintiffs alleged injury in fact; have they alleged antitrust injury, and are they efficient enforcers of the antitrust laws?  <u>See</u> <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 535 n.31 (1983); <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007).

Plaintiffs in both the JAC and the TAC allege that they have paid prices for aluminum that are higher than they would have paid in the absence of defendants' actions.  (<u>See, e.g.</u>, JAC ¶¶ 18, 19, 313, 316, 318, 320, 325, 328; TAC ¶¶ 9, 14-15, 18-21, 42-43, 80, 130, 201, 227, 239-40, 244, 297, 321, 359, 408, 414, 418, 422, 425, 439, 442, 445, 451-53, 455-56, 458, 633, 647, 650, 652, 660-61.)  Whether this is true is not an issue currently before the Court.  Because this injury is concrete, particularized, and actual, each of the plaintiffs has sufficiently alleged that it has suffered injury in fact.  <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).

The Court next turns to whether the JAC and the TAC adequately allege antitrust injury in connection with their § 1 claims.  Antitrust injury is not simply the fact that a plaintiff may be able to allege some harm; rather, the issue is whether that harm is an "injury of the type the antitrust laws were intended to prevent."  <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977).

Further, the harm must be causally related to that which makes defendants' acts unlawful.  Id.  Taking these two aspects of antitrust injury together, it is clear that although an injury may be causally related to an antitrust violation, it is not sufficient to support "antitrust injury" unless it is attributable to an anticompetitive aspect of the challenged conduct.  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).  This requirement is derived from the principle that the antitrust laws were enacted for "the protection of competition, not competitors."  Brown Shoe Co. v. United States, 370 U.S. 294, 319 (1962); see also Gatt, 711 F.3d at 75 ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.").

The questions of antitrust injury and whether a plaintiff is an efficient enforcer of the antitrust laws are often analyzed together.  The Court is guided by the Supreme Court's decision in Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"), 459 U.S. 519.  In AGC, the Supreme Court identified several factors a court should consider in determining whether a plaintiff has antitrust standing: (1) the causal connection between the violation and the harm; (2) the presence of an improper motive; (3) the type of injury and whether it was one Congress sought to address; (4) the directness of the injury, (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment.  Id. at 537-44.

The Second Circuit has "distilled" the AGC factors "into two imperatives": first, that a plaintiff plausibly allege that he suffered antitrust injury, and, second, that he plausibly allege facts that support his suitability as a plaintiff to pursue the alleged antitrust violation—and that he would therefore be an "efficient enforcer" of the antitrust laws.  Gatt, 711 F.3d at 76; see also Port Dock, 507 F.3d at 121; Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443 (2d Cir. 2005).

Whether a plaintiff is an efficient enforcer of the antitrust law depends on a balancing of the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Gatt, 711 F.3d at 76 (quoting Paycom, 467 F.3d at 290-91); see also Port Dock, 507 F.3d at 121; Daniel, 428 F.3d at 443.

To determine if a pleading adequately alleges antitrust injury as well as whether each plaintiff is an efficient enforcer of the antitrust laws, this Court analyzes whether a plaintiff's alleged injury constitutes injury to a competitive process, and not just injury to a competitor.  Understanding where plaintiffs have positioned themselves in the competitive landscape is the most logical starting point for this question: are plaintiffs consumers of a product, and therefore injured when sellers engage in price fixing, allocating markets, or dividing customers, etc., because those actions have increased the prices the price paid?  Or, do plaintiffs

allege that they are competitors of a defendant, and injured when, for instance, they are deprived of customers as a result of an unlawful bargain struck between the defendants?  Or, do plaintiffs allege that they are neither consumers nor competitors but nonetheless have suffered an injury of the type the antitrust laws are intended to address?

In <u>Blue Shield of Virginia v. McCready</u> ("<u>McCready</u>"), 457 U.S. 465 (1982), the Supreme Court held that while plaintiff was not a competitor of the alleged conspirators, she had nevertheless suffered antitrust injury because "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict," <u>id.</u> at 484;[24] <u>see also</u> <u>Crimpers Promotions Inc. v. Home Box Office, Inc.</u>, 724 F.2d 290, 294 (2d Cir. 1983) (Friendly, J.) (plaintiff was trade show organizer, not direct participant in relevant market, but had antitrust standing); <u>Province v. Cleveland Press Publ'g Co.</u>, 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs who are not "direct participants in the relevant market" can establish standing by showing that their injury is "inextricably intertwined" with the injury inflicted on the relevant market).  "To be inextricably intertwined with the injury to competition, the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" <u>Province</u>, 787 F.2d at 1052 (quoting <u>Southaven Land Co. v. Malone & Hyde, Inc.</u>, 715 F.2d 1079, 1086 (6th Cir. 1983)) (finding plaintiffs' injury was not inextricably intertwined because their injury was "a result of—

---

[24] A more complete description of <u>McCready</u> is set forth in the Court's Opinion & Order dated August 29, 2014.  (1st MTD Op. at 35.)

rather than a means or the cause of—the harm").  The term "fulcrum" is defined as "the support about which a lever turns," or alternatively, "one that supplies capability for action."  Fulcrum, Merriam-Webster, http://www.merriam-webster.com/dictionary/fulcrum (last visited Mar. 25, 2015).

Plaintiffs here are not competitors of any of these defendants: they do not operate warehouses, and they do not have commodities trading arms.  Nor are they alleged to directly consume[25] any of defendants' trading products or aluminum warehouse-related products or services.[26]  Rather, the core of plaintiffs' claims is that they have suffered necessary yet collateral damage from defendants' scheme. Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity.  Put another way, plaintiffs are central—they are the fulcrum—to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum.  As the real world buyers who— they allege—must pay prices for aluminum that incorporate Midwest Premium, they are necessarily directly impacted by the alleged conduct.

---

[25] One of the FLPs, Ampal, Inc. ("Ampal"), alleges that it purchased aluminum directly from Glencore. (TAC ¶ 49.)

[26] In the JAC, Mag, Agfa, and Kodak assert that but for the defendants' anticompetitive conduct, they might consider purchasing and storing aluminum in an LME warehouse—that is, "but for" the conduct, some plaintiffs would be consumers of warehouse services.  (JAC ¶ 4.)  However, plaintiffs do not allege any facts to support this claim.  For instance, the JAC is devoid of factual allegations in which plaintiffs assert that on certain dates they considered purchasing and storing aluminum but load-out delays prevented them from doing so. In the TAC, plaintiffs allege that but for defendants' conduct they might have hedged certain transactions.  (See TAC ¶¶ 317, 319, 412.)  This assertion is similarly devoid of sufficient factual support. The Court assumes that these assertions were included in the JAC and the TAC to assist with standing arguments.  As the Court finds that plaintiffs have adequately plead standing for other reasons, it need not address these assertions.

That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out.  Plaintiffs argue that at the very least they therefore fall within the scope of antitrust injury contemplated by McCready.  As now plead in the proposed pleadings, the Court agrees.

Here as in McCready, it is "not a question of the specific intent of the conspirators," but rather, "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause."  457 U.S. at 479 (internal quotation marks omitted).  Taken as a whole, plaintiffs' allegation is that defendants' actions altered the normal competitive price setting dynamic of aluminum, resulting in an abnormally high Midwest Premium; and they were forced to pay that premium as part of their purchases of physical aluminum.  These allegations concern a dysfunction of the competitive process that—according to plaintiffs—would not have occurred but for defendants' actions.  Plaintiffs are the real world actors necessary for the effectuation of the conspiracy—the fulcrum, in the words of McCready.  These allegations are, at this stage, sufficient to support "injury of the type the antitrust laws were intended to prevent."  Brunswick Corp., 429 U.S. at 489.

Defendants contend (vigorously to be sure) that antitrust standing is lacking. The Court has examined these arguments with care.  Defendants argue that plaintiffs are neither competitors nor consumers and that their arguments to the contrary are unsupportable.  They are correct on both scores.  However, McCready

makes clear that the antitrust laws do not require a plaintiff fit neatly into a box of competitor or consumer, so long as "the injury [they] suffered was inextricably intertwined with the injury the conspirators sought to inflict." 457 U.S. at 484. That is the case here. Ultimately, this case does not fit into any traditional box and other antitrust cases involving commodities trading have not examined with precision market structure and anticompetitive acts analogous to those at issue here.[27] These are unusual facts for an antitrust case to be sure: where the commodity trading occurs at one level, warehousing is merely a means to an end, and the plaintiffs' injury is collateral damage. McCready also presented an unusual (and different) fact pattern and dictates that this Court examine whether plaintiffs have alleged facts that call for the application of analogous principles. They have.

Here, the structure of the parties and the coordination necessary to make the alleged conspiracy succeed is complex. According to plaintiffs, this case arises because traders have the financial ability to purchase and control warehouses, and to devise trading strategies that exploit the interplay between their affiliated operations. According to plaintiffs' theory, the winners and losers of defendants' scheme are not only the counterparties to their trades, but also those who actually need the physical commodity underpinning the trades. As now cast in their most recent proposed pleadings, this scheme is alleged to have substituted supply and

---

[27] The cases in which alleged purposeful commodity trading inefficiency has led to collateral damage in physical markets are Loeb Industries, Inc. v. Sumitomo Corp., 306 F.3d 469 (7th Cir. 2002); In re Crude Oil Commodity Litig., No. 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007); and Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003). This Court does not necessarily agree with the manner in which the courts in those cases described the anticompetitive condition, conduct or markets. Nevertheless, they are instructive.

demand based-pricing with pricing driven by the webbed conspiracy described above.  These allegations, taken in the light most favorable to plaintiff, are sufficient to support antitrust injury.  In short, if defendants have engaged in a conspiracy that caused dysfunction in the price-setting process, driving prices higher, and plaintiffs then paid those higher prices, then plaintiffs have suffered an injury of the type the antitrust laws were designed to prevent.  See Atl. Richfield, 495 U.S. at 337 (higher prices that do not work to a plaintiff's advantage cause plaintiff to suffer antitrust injury).

Defendants also argue that even if they are able to allege injury to the competitive process, plaintiffs have not alleged sufficient facts to demonstrate that they are efficient enforcers of the antitrust laws.  The complexity of the alleged scheme creates a fair amount of smoke around who plays what role and who is situated where.  However, at base, the same facts that support antitrust injury support plaintiffs' roles as efficient enforcers.  The following allegations support this determination.

First, each plaintiff is alleged to buy aluminum directly from a producer (and, in one instance, from one of the defendants[28]), and the contracts between the producer-seller and plaintiff-buyer allegedly contain provisions tying the contract prices to the Midwest Premium.  (JAC ¶¶ 32; 39, 44; TAC ¶¶ 35, 48, 57, 64, 71.) Mag, Agfa, and Kodak allege that in the United States it is not possible to negotiate spot or long-term aluminum contracts with major producer Alcoa that do not

---

[28] See note 25, supra.

incorporate the Midwest Premium.  (JAC ¶ 32, 44.)   Under these circumstances, conduct that causes the Midwest Premium to be higher than it would be otherwise harms these plaintiffs directly.

Second, according to plaintiffs, no buyer of aluminum other than plaintiffs is higher up or more direct in their respective distribution chains.  (JAC ¶¶ 35, 41, 47; TAC ¶¶ 39-40, 48-50, 57-58, 64, 71.)  Plaintiffs' allegations support directness as well as that damages would not be duplicative.  Indeed, plaintiffs are not affected through a chain of transactions, or through side-effects of others' economic activity; rather, they are the first parties in the distribution chain to be affected by fluctuations in the Midwest Premium, because they are both the first to buy aluminum and the first to do so at a price that incorporates the Midwest Premium.

Third and finally, plaintiffs' allegations support damages as non-speculative. Plaintiffs allege that their damages are defined by the amount by which the Midwest Premium was inflated.  (See JAC ¶¶ 24, 322; TAC ¶ 17.)  Again, whether damages will ultimately be found to have been incurred and, if so, whether any amount is determinable, are questions left for another day.  See Gatt, 711 F.3d at 76 (whether plaintiff is efficient enforcer is based in part on a prospective analysis of the difficulty of identifying and apportioning damages); Paycom, 467 F.3d at 291 (same).

Defendants argue that plaintiffs are not efficient enforcers of the antitrust laws because another group of potential plaintiffs is better positioned to prosecute the alleged antitrust violations: users of defendants' warehouse services.  But any

injury to these potential plaintiffs would concern inflated rents, inflated
warehousing fees, or delayed load-outs, and as such would be entirely different from
the injury alleged by plaintiffs here, which concern an inflated Midwest Premium.
Contrary to defendants' arguments, the <u>Gatt</u> inquiry is focused on who most directly
suffered the alleged injuries caused by the allegedly anticompetitive conduct—it is
not concerned with which market participants are most proximate to the allegedly
unlawful conduct itself.  Plaintiffs here are the most efficient enforcers of claims
that defendants' anticompetitive conduct caused injuries to economic actors who
paid prices in the primary aluminum market that incorporated the Midwest
Premium.

> B.    <u>Agreement Between Separate Entities</u>

Section 1 claims require an agreement, contract, or understanding in
restraint of trade by separate entities.  <u>See</u> 15 U.S.C. § 1.  As cast, various
conspirators acting to carry out the § 1 violation are affiliated with one another.  As
a matter of law, only separate entities can conspire in violation of the antitrust
laws.  <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752 (1984).  Thus, a
corporate parent and its wholly owned subsidiary are incapable of conspiring in
violation of § 1 of the Sherman Act as a matter of law.  <u>Id.</u> at 767, 771.  "The
coordinated activity of a parent and its wholly owned subsidiary must be viewed as
that of a single enterprise for purposes of § 1 of the Sherman Act."  <u>Id.</u> at 771.  "[A]n
agreement between a parent corporations and its . . . agents is not a concerted
action for purposes of the [Sherman] Act."  <u>Capital Imaging Assocs., P.C. v. Mohawk
Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 542 (2d Cir. 1993).

"[W]hen lower courts are faced with the question of whether an affiliated, but not wholly owned, corporation can conspire with its parent in violation of § 1, they must draw from the analysis in Copperweld without the benefit of a bright line rule." In re Term Commodities Cotton Futures Litig., Master Docket No. 12 Civ. 5126(ALC)(KNF), 2014 WL 5014235, at *4 (S.D.N.Y. Sept. 30, 2014); see also Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 201 F. Supp. 2d 236, 275 (S.D.N.Y. 2002) (noting that lower courts have held that affiliated corporations that are less than wholly owned have been found incapable of conspiring under Copperweld), rev'd on other grounds, 386 F.3d 485 (2d Cir. 2004); Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 677 (S.D.N.Y. 1987) (suggesting that Copperweld can apply to non-wholly-owned affiliates); VII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 1466-67 (3d ed. 2010) (suggesting that "two corporations could constitute a single economic unit for Sherman Act § 1 purposes even though they are not wholly owned in common").  The Supreme Court's reasoning in Copperweld focused on whether a parent and its subsidiary had a "complete unity of interest," such that they shared common objectives and their actions were "guided or determined not by two separate corporate consciousnesses, but one." Copperweld, 467 U.S. at 771.  In a more recent decision, the Supreme Court further articulated this principle by putting it another way: entities can conspire under § 1 of the Sherman Act only if their competitive actions are determined by "independent centers of decision-making." Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 196 (2010) (quoting Copperweld, 467 U.S. at 769).  Taken together, Copperweld

36

and <u>American Needle</u> establish that a non-wholly owned affiliate cannot conspire with its parent in violation of § 1 of the Sherman Act if they are jointly controlled. The same principles apply to agents. To the extent agents are merely carrying out the decisions of principals, they are not separate entities for purposes of Section 1.

Plaintiffs allege that each defendant is affiliated with at least one other entity: the Goldman Sachs entities are affiliated with J. Aron[29] and Metro; the JPMorgan entities are affiliated with Henry Bath & Son LLC; and the Glencore entities are affiliated with Pacorini. (<u>See</u> JAC ¶¶ 51, 62, 64-66, 79, 208; TAC ¶¶ 88, 102, 104-06, 125, 253, 521.) Plaintiffs also provide specific allegations that the financial-firm conspirators—Goldman Sachs, JPMorgan, and Glencore—each control the warehousing entities with which they are affiliated. For instance, both the JAC and the TAC allege that Goldman Sachs controlled Metro's entire board of directors (JAC ¶ 176; TAC ¶ 489), and both allege that Metro frequently had to seek authorization from Goldman to execute routine warehousing transactions, including authority to offer specified incentives for storage deals (JAC ¶¶ 177-94; TAC ¶¶ 490-507). The JAC and the TAC also both allege that by controlling all of Henry Bath & Son Ltd.'s directors and 100% of its stock, JPMorgan had complete control over Henry Bath & Son Ltd., and its wholly owned U.S.-based subsidiary, Henry Bath LLC, including all of its aluminum warehouses. (JAC ¶¶ 62, 65-66; TAC ¶¶ 102, 105-06.) And both complaints allege that Glencore controls the operations of all of the Pacorini entities, including Pacorini AG, which operates in the United

---

[29] In the JAC, J. Aron is alleged to be a trading division of Goldman Sachs (JAC ¶ 51), and it is not named individually as a defendant. The TAC alleges that J. Aron is a wholly owned subsidiary of Goldman Sachs and names it as an individual defendant. (TAC ¶ 88.)

States through its wholly owned subsidiary, Pacorini USA.  (JAC ¶¶ 79-80; TAC ¶¶ 123, 125.)

The FLPs also allege that defendants BAP and its director, Robert Burgess-Allen, were the sales agents of defendant Metro.  (See TAC ¶¶ 128-29, 254, 449.) BAP and Burgess-Allen are alleged to have not had any independent economic role in the conspiracy beyond that which it undertook while working on behalf of Metro—they are alleged only to have introduced customers to Metro and consulted on and negotiated transactions with or for Metro.  (See TAC ¶¶ 254, 449, 605.)

Plaintiffs have sufficiently alleged that the financial-firm co-conspirators had control over the warehousing defendants and agents affiliated with them. Accordingly, as a matter of law, each financial-firm co-conspirator cannot conspire with its agents or with the warehousing entities with which they are affiliated in violation of § 1 of the Sherman Act.  This conclusion is particularly relevant to the FLPs' Second Claim, which alleges that the Goldman Sachs entities conspired with each other, J. Aron, Burgess-Allen, HKex, Glencore, and the LME in violation of § 1. (TAC ¶¶ 444-457.)  The Goldman Sachs entities cannot conspire amongst themselves or with J. Aron as a matter of law.  Thus, based on the allegations in these pleadings, no agreement solely between members of the same corporate group states a claim.[30]

Notwithstanding the affiliations discussed above, plaintiffs have alleged sufficient facts to support an agreement between separate entities.  The

---

[30] This point may have more importance at a later stage of the case.  If discovery reveals that only related and controlled entities were involved in certain conduct, a Section 1 claim would not lie.

illustrations of the alleged conspiracy set forth earlier in this Opinion portray a web of alleged agreements or understandings between a number of entities from different corporate families. For instance, Metro and the Goldman Sachs entities are alleged to have had agreements or understandings with the JPMorgan entities and Henry Bath LLC, as well as the Glencore entities and Pacorini; and they with each other. The "web" of agreements or understandings alleged is sufficient to satisfy the separate entity requirement.

C.     Noerr-Pennington

Defendants separately assert that the FLPs' claims that Metro and the Goldman Sachs entities violated § 1 by lobbying the LME in an effort to change the minimum load-out rule are barred by the Noerr-Pennington doctrine, citing United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965). The Court construes this argument as addressing the FLPs' Fourth Claim, which alleges a conspiracy involving the LME Combination, as well as myriad allegations that defendants' actions with regard to the LME load-out rule plays a role in carrying out the overall conspiracy. Indeed, the load-out rule is cast as an enabling tool for the conspiracy.

The Court need not, at this stage, reach the legal question of whether Noerr-Pennington precludes a conspiracy claim based on certain lobbying efforts. As an initial matter, as set forth above, the Court has already determined that the FLPs' Fourth Claim has other fatal flaws (incomprehensibility among them). Defendants' actions vis-à-vis the load-out rule are therefore only relevant as one part of an alleged fabric of conspiratorial behavior. As there is sufficient alleged behavior

which is independent of any lobbying efforts, whether or not <u>Noerr-Pennington</u> might apply is a question for another day.

      D.    <u>Relevant Market</u>

Agreements that fall within the scope of § 1 are characterized as either "horizontal" or "vertical."  <u>See</u> <u>United States v. Topco Assocs., Inc.</u>, 405 U.S. 596, 608 (1972); <u>Anderson News</u>, 680 F.3d at 182.  A horizontal agreement is an "agreement between competitors at the same level of the market structure," while a vertical agreement is a "combination[] of persons at different levels of the market structure." <u>Topco</u>, 405 U.S. at 608.  The parties dispute whether the agreement plaintiffs allege is vertical, horizontal, or both.  They also dispute whether the agreement is a price-fixing agreement, or something else.  Both of these issues impact whether plaintiffs must allege a plausible relevant market.

Horizontal agreements between competitors are considered the most potentially pernicious and are generally treated as "per se" unlawful.  <u>See, e.g.</u>, <u>Topco</u>, 405 U.S. at 608, 611 (noting that horizontal agreements to engage in price fixing or market allocation are per se illegal under § 1 of the Sherman Act).  The per se rule is a presumption of unreasonableness based on "'business certainty and litigation efficiency.'" <u>Atl. Richfield</u>, 495 U.S. at 342 (quoting <u>Arizona v. Maricopa Cnty. Med. Soc'y</u>, 457 U.S. 332, 344 (1982)).  "It represents a 'longstanding judgment that the prohibited practices by their nature have a substantial potential for impact on competition.'"  <u>Id.</u> (quoting <u>FTC v. Superior Court Trial Lawyers Ass'n</u>, 493 U.S. 411, 433 (1990)) (internal quotation marks omitted).  Horizontal price fixing—that is, price fixing by competitors in the same market—is per se

illegal.  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223-24 (1940); Todd

v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001).

 To apply the per se rule, a court generally must have experience with the

type of restraint at issue in order to predict with confidence that it would be

condemned under the rule of reason; only when such predictability is present should

the court apply the per se rule.  Maricopa County Med. Soc'y, 457 U.S. at 344.  A

vertical restraint is not generally illegal per se unless it includes some agreement

on price or price levels.  Bus. Elecs., 485 U.S. at 735-36.  "Vertical restraints that do

not involve price-fixing are generally judged under the 'rule of reason, which

requires a weighing of the relevant circumstances of a case to decide whether a

restrictive practice constitutes an unreasonable restraint on competition.'"

Anderson News, 680 F.3d at 183 (quoting Monsanto Co. v. Spray-Rite Serv. Corp.,

465 U.S. 752, 761 (1984)).  "Any combination which tampers with price structures is

engaged in an unlawful activity."  Socony-Vacuum, 310 U.S. at 221.  Group efforts

to raise, lower, or stabilize prices directly interfere with the free play of market

forces and constitute unlawful price fixing.  Id.  "Where the means for price fixing

are purchases or sales of the commodity in a market operation or, as here,

purchases of a part of the supply of the commodity for the purpose of keeping it

from having a depressive effect on the markets, such power may be found to exist

though the combination does not control a substantial part of the commodity."  Id.

at 224.

Most antitrust claims are evaluated under the rule of reason.  Paycom, 467 F.3d at 289.  The "rule of reason" is the standard used to assess whether restraints not per se unlawful nonetheless violate § 1 of the Sherman Act.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86 (2007).  A rule of reason analysis requires a court to weigh all of the circumstances surrounding the challenged conduct to determine whether the alleged restraint is unreasonable, taking into account the nature of the specific business, the industry, the restraint's history, and whether the defendant has market power.  Id.; see also Gatt, 711 F.3d at 75 n.8.  Thus, to engage in a rule of reason analysis, the Court must determine what the relevant market is, and then examine that market.

The purpose of a rule of reason analysis is to enable a finder of fact to first determine whether a restraint imposes an unreasonable restraint on competition.  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); Paycom, 467 F.3d at 290.  As a threshold matter, a plaintiff must allege the plausible existence of a combination that causes an unreasonable restraint of trade.  The burden shifts to defendant to present the procompetitive value of the practice; if defendant carries that burden, then the burden shifts back to plaintiff, who must show that the same procompetitive effect could have been achieved by less restrictive means.  Virgin Atl. Airways Ltd., v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001).  Under a rule of reason analysis, plaintiff can only recover if the challenged conduct reduced competition, thereby harming consumers.  Id.  In a § 1 case, therefore, defining a relevant market is required in order for the finder of fact to be able to

assess whether the nature of conduct is consistent with a functional or dysfunctional competitive process.

Plaintiffs here allege a complicated scheme involving both horizontal as well as vertical conduct—with trading entities alleged to be in a conspiracy with each other as well as with their warehouse affiliates and those of others.  The market for LME-certified warehouse services for aluminum is one area in which conduct is alleged to have occurred, and the primary aluminum market is another area in which dysfunction in the competitive process is alleged to have played out (the primary aluminum market is the one in which plaintiffs are buyers; defendants are alleged to have created dysfunction in pricing through trading).  As described above, the scheme is atypical for an antitrust case with plaintiffs as neither competitors nor consumers in any relevant market.[31]  Moreover, despite the FLPs' allegations to the contrary, the conspiracy alleged is not a conspiracy to fix the price of physical aluminum—that is, "x" amount per metric ton.  The scheme is primarily aimed at increasing trading profits, which requires a necessary price impact—not a price fix.  Variations in price may have as much or more benefit to participants in such a scheme as a price certain.  A conspiracy to fix the price of aluminum would involve different players (for example, producers) in different markets.

Here, an impact on the price of aluminum is necessary to effectuate the conspiracy; such an impact can be achieved by increasing the Midwest Premium.  That premium is a component of the stated price in aluminum contracts—but there

---

[31] Nor is the scheme alleged a type of monopoly leveraging claim; such a claim would present additional issues.

are many other inputs as well.  The complexity here has implications for causation and proof of damage—issues for another day.  The relevant question now before the Court is whether this alleged conspiracy is of the type the antitrust laws deem per se illegal—a question to be asked for purposes solely of determining adequacy of pleadings, not on the merits.

The conspiracy here is certainly not of the type which the antitrust laws have routinely dealt with.  It is not one in which a single market may be examined for competitive or anticompetitive conduct.  The antitrust cases which have dealt with allegations of anticompetitive conduct by traders injuring users of commodities have struggled with fitting such claims into traditional rubrics.  (See section III.A. above.)  That alone is not, however, fatal at the pleading stage.  Rather, the Court must attend to whether each element has been plausibly alleged.  Here, a defined relevant market is one of those questions.  In the absence of familiarity with a type of business conduct and competitive impact, courts apply the rule of reason analysis.  That is highly likely to be necessary here and the pleadings should therefore provide proper notice of the markets alleged.[32]

The current pleadings allege two markets: a primary aluminum market (JAC ¶¶ 116; TAC ¶ 157), and a market for LME-certified warehouse services for

---

[32] If this Court were to agree with plaintiffs that the alleged restraints should be analyzed as per se violations of the antitrust laws, then plaintiffs' pleading burden as to market definition would be lower.  See State Oil, 522 U.S. at 10; see also Paycom, 467 F.3d at 289.

The Court also notes that "[i]n this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim."  Todd, 275 F.3d at 206; K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power.").

aluminum (JAC ¶ 144; TAC ¶¶ 203-04, 207, 209, 422).[33]  Neither pleading alleges a market for financial products.  Both pleadings now contain a number of paragraphs alleging, for each market, its particular product and geographic characteristics (JAC ¶¶ 98-107, 127-144; TAC ¶¶ 155-58, 164-67, 172-75, 188-200, 202-04) and facts regarding elasticities and substitutability (JAC ¶¶ 108-16, 144; TAC ¶¶ 157, 159-62, 208), including, for the primary aluminum market, domestic and foreign sources of supply (JAC ¶¶ 104, 106-07; TAC ¶¶ 168-70), the feasibility of transport (JAC ¶ 117; TAC ¶ 168-70) and pricing dynamics (JAC ¶¶ 118-26; TAC ¶¶ 176-87) (though plaintiffs differ somewhat in their views on these topics).

The FLPs also assert a monopolization claim, and the allegations in their proposed complaint are tailored to a national market for primary aluminum (which includes both the United States and Canada) (TAC ¶ 169); Mag, Agfa, and Kodak have alleged worldwide markets (JAC ¶ 117). They allege that primary aluminum is manufactured worldwide, that the U.S. is a net importer, and that there has been a global oversupply since the mid-2000s.  (JAC ¶¶ 104-06; TAC ¶¶ 174-75.)  The U.S. imports over 3 million metric tons from more than two dozen countries annually in order to meet domestic consumption requirements.  (JAC ¶ 106; TAC ¶ 166.)  Most aluminum is sold directly from producers such as Alcoa to industrial users.  (JAC ¶

---

[33] The JAC describes this market as the "market for LME-certified warehouse services for aluminum."  (JAC ¶ 144.)  The TAC uses four distinct terms to refer to this market: the "market for warehouse services for LME aluminum" (TAC ¶ 203); the "market for aluminum warehouse services in LME-registered warehouses" (TAC ¶¶ 204, 209); the "market for warehouse services of aluminum in LME-registered warehouses" (TAC ¶ 207); and the "aluminum warehouse market for LME-registered warehouses" (TAC ¶ 422).  The Court assumes for purposes of this motion that the JAC's term for this market, the "market for LME-certified warehouse services for aluminum," captures all of the TAC's conceptions of this market.

102; TAC ¶ 166.)  Producers also sell a certain amount of aluminum to traders and financial buyers who typically store it in warehouses.  (JAC ¶ 103; TAC ¶ 167.) Most often these sales involve the LME warehouse system, which operates worldwide.  (JAC ¶¶ 91, 103; TAC ¶¶ 167, 188.)

Plaintiffs allege that the demand for aluminum is generally inelastic.  (JAC ¶ 108; TAC ¶ 161.)  While there are some substitutes for certain applications, its price remains relatively inelastic.  (JAC ¶¶ 108-15; see TAC ¶¶ 161-62.)  There are lead times required to adjust production capacity, allowing prices to remain high if there is an unanticipated shortfall.  (JAC ¶¶ 110; see also TAC ¶¶ 162.)

Defendants argue that these markets are inadequately defined and not cognizable markets for antitrust purposes.  Defendants' arguments in this regard are better suited to a motion for summary judgment or class certification.  In its prior decision on earlier pleadings, this Court laid out certain necessary prerequisites to pleading a relevant market.  Plaintiffs have, in effect, checked the minimum boxes necessary to meet the required standard at the motion to dismiss stage.

Defendants' arguments reasonably follow traditional antitrust analysis: pleading relevant markets and measuring defendants' conduct and plaintiffs' harm in relation to those markets.  In this regard, a market for LME-certified warehouse services for aluminum would appear to require conduct to drive up the price of renting warehouse storage space or constrain the availability of warehouse services. This is not, however, what plaintiffs are alleging.  Instead, plaintiffs are alleging

that—somewhat akin to <u>McCready</u>—actions in the market for LME-certified warehouse services for aluminum (including, <u>inter alia</u>, delays in load-out services) necessarily caused dysfunction in the price setting of aluminum. Thus, defendants' argument that allegations regarding the market for LME-certified warehouse services for aluminum are implausible because they do not provide sufficient detail on the substitutability of off-warrant storage at non-LME warehouses or on aluminum transportation costs is like a ship passing in the night with plaintiffs' theory of the market. The substitutability at issue would be load-out services for aluminum stored at LME warehouses that would and could, in turn, impact the Midwest Premium. Whether a particular load of aluminum can be stored in warehouse x or y is not, therefore, the issue. It all comes back to the factors that affect the Midwest Premium. Plaintiffs have not done the world's greatest job in explicating how all of the parts fit together, but they have done enough. They have alleged that only LME-certified warehouses store the aluminum corresponding with the warrants, the settling of which impacts the Midwest Premium. Thus, substitutability in the sense in which defendants argue does not meet this claim head on. This is not a case in which "warehouse services," strictly speaking, are at issue (though periodically plaintiffs' allegations are confused on this point). Rather, the issue as cast better by the JAC is the use of the particular market for LME-certified warehouse services for aluminum insofar as the services offered therein (such as load-outs) are a necessary and clear component of the Midwest Premium.

Whether this market will survive the proverbial tire-kicking remains to be seen, but at this stage, the necessary allegations are present.

Defendants also argue that plaintiffs have failed to allege a plausible geographic market. In fact, both proposed pleadings now contain numerous allegations supporting their respective versions of the geographic market. (See JAC ¶ 117; TAC ¶ 208.) The Court views the JAC's allegations as more reasonable and more plausible—but it cannot now rule as a matter of law that what the TAC has asserted is either reasonable or plausible. Put differently, at this stage, plaintiffs need not show plausibility according to some sort of predominance (or probability) standard (that is, that their market is more likely than not correct). See Twombly, 550 U.S. at 556.

    E.    <u>Concerted Action</u>

In order for plaintiffs plausibly to allege coordinated conduct in violation of § 1, they must allege plausible allegations of concerted action. Allegations merely consistent with unilateral action are insufficient. See Twombly, 550 U.S. at 556-57; Copperweld, 467 U.S. at 768; Monsanto, 465 U.S. at 761; Anderson News, 680 F.3d at 183. "[T]here is a basic distinction between concerted and independent action . . . ." Monsanto, 465 U.S. at 761. Allegations must support a unity of purpose, common design and understanding, or a meeting of the minds in an unlawful agreement. Cf. Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946).

Plaintiffs need not, however, plead direct evidence of conspiracy. See Anderson News, 680 F.3d at 183. Conspiracies are rarely evidenced by explicit agreements—they must nearly always be proven through "'inferences that may

fairly be drawn from the behavior of the alleged conspirators.'" Id. (quoting

Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.

1976); see also Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136-37

(2d Cir. 2013) (in many antitrust cases, "smoking gun" evidence can be hard to come

by, and thus a complaint must set forth sufficient circumstantial facts supporting

an inference of conspiracy).

At the pleading stage, plaintiffs here must allege sufficient facts to support

(not "prove" or even "demonstrate") a plausible inference that defendants reached

an agreement; a complaint merely alleging parallel conduct alone is not sustainable.

Twombly, 550 U.S. at 556; see also Mayor & City Council of Balt., 709 F.3d at 135-

36 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage.");

Anderson News, 680 F.3d at 184.  In cases in which there is obvious parallel

conduct and the question is whether it is the product of coordinated or unilateral

decision making, a plaintiff must allege additional facts that point toward a meeting

of the minds.  Twombly, 550 U.S. at 557.

Even conscious parallelism in pricing among competitors is not itself

unlawful.  Id. at 553-54; In re Publ'n Paper, 690 F.3d at 62.  By engaging in

conscious parallelism, firms in a concentrated market may lawfully recognize

shared economic interests and, in effect, lawfully exercise market power by setting

their prices at a profit maximizing, supra-competitive level.  Brooke Grp. Ltd. v.

Brown & Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993).  "Plus-factors"

may provide the additional circumstances necessary to permit a fact-finder to infer

49

a conspiracy.  Examples of plus-factors are a common motive to conspire, actions taken against economic self-interest, and a high level of inter-firm communications. In re Publ'n Paper, 690 F.3d at 62; see also Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir. 1987) (suggesting that allegations that are consistent only with market actors who are aware of and anticipate similar actions by competitors would be insufficient to support the existence of a tacit agreement).[34]

In both the JAC and the TAC plaintiffs cite a number of emails and documents from which they assert support an inference of an existing conspiracy. (E.g., JAC ¶¶ 2, 6, 7-8, 15; TAC ¶¶ 473, 476, 479-85, 488, 510, 512-22, 526-27, 529, 531, 533, 537-49, 565-66, 592-96, 605-07.)  Plaintiffs cite documents which they assert show that Metro was at the heart of the alleged conspiracy and to have been more active than any other participant.  The law does not require that all conspirators have the same level of involvement in a conspiracy, nor that they be

---

[34] In Mayor & City Council of Baltimore, the Second Circuit reviewed whether allegations of certain parallel conduct in the auction rate securities market were sufficient to support a § 1 conspiracy. Plaintiffs alleged that defendant banks conspired with each other to simultaneously stop buying auction rate securities for their own proprietary accounts, causing auctions to fail and the market to collapse.  709 F.3d at 131-32.  The Court found that the allegations supported only parallel conduct. Id. at 138.

The Court began by noting that the crucial question in a § 1 case is whether the challenged conduct stems from an agreement, and that the existence of such an agreement is a legal conclusion to be determined by the court—and not a factual allegation.  Id. at 135-36 (citing Starr v. Sony BMG Music Entm't, 592 F.3d 314, 319 n.2 (2d Cir. 2010)).  The Court further stated that plaintiffs must allege additional circumstances supporting an inference of conspiracy; merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss because it would "risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy."  Id. at 136-37. The Court found that defendants' alleged actions—an en masse flight from a collapsing market in which they had significant downside exposure—made perfect sense in light of their business interests.  Id. at 138.  This made the case different from Starr, in which specific allegations supporting an inference that defendants' parallel conduct was against their own economic self-interest led the Second Circuit to conclude that plaintiffs had plausibly alleged an antitrust conspiracy.  See id. at 138-39 (citing Starr, 592 F.3d at 327.)  Accordingly, the Court affirmed defendants' motion to dismiss.  Id. at 140.

involved at precisely the same time or for the same duration.  See United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989).

Plaintiffs also cite documents they argue support an inference that Metro understood and intended that load-out delays would result in an increase in the Midwest Premium (e.g., JAC ¶¶ 187; TAC ¶¶ 291-94, 297, ), and that JPMorgan's commodities unit understood that as well (JAC ¶ 152; TAC ¶ 465.)

Defendants argue that there are few allegations tying JPMorgan and its affiliated warehouse company Henry Bath LLC to the conspiracy.  As to the number of allegations implicating JPMorgan, the Court agrees, but the documents to which plaintiffs cite in the current versions of their pleadings add to the allegations previously made.  The documents cited now support some inference that both these entities were connected to the alleged conspiracy and benefitting from it.  Whether these inferences will withstand the test of time, further context, and cross-examination remains to be seen.  For now, at the motion to dismiss stage, they are sufficient to support a conspiracy claim against Henry Bath LLC (JPMorgan having already been dismissed from this action).

Defendants urge this Court to look more closely at the documents, read them in context, and determine that such inferences would be unreasonable.  On a motion to dismiss, there is a limited extent to which a Court may evaluate the content of documents incorporated in the parties' pleadings.  To the extent that plaintiffs refer to a document, it then becomes incorporated by reference; and to the extent that the inference they ask the Court to draw is patently unreasonable, the Court need not

simply accept the inference as fair.  However, when two competing inferences are offered—even if one is stronger than the other—on a motion to dismiss, a Court cannot choose between them.  See Iqbal, 556 U.S. at 678; N.J. Carpenters, 709 F.3d at 121.

## IV.   THE FLPS' SECTION 2 MONOPOLIZATION CLAIMS

Only the FLPs allege claims pursuant to § 2 of the Sherman Act.  Section 2 provides, in pertinent part: "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony."  15 U.S.C. § 2.  A violator of § 2 may be held civilly liable to any party suffering "injur[y] in his business or property" as a result of such a violation.  15 U.S.C. § 15.  Under § 2, both the actions of a single firm to monopolize or to attempt to monopolize and conspiracies and combinations to monopolize or attempt to monopolize are unlawful.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993).  In addition to adequately pleading facts supportive of the elements of a § 2 claim, plaintiffs must also adequately allege antitrust standing.  See Port Dock, 507 F.3d at 121-22.

The FLPs assert that the Goldman Sachs entities have conspired with entities affiliated with the LME to monopolize the market for LME-certified warehouse services for aluminum in violation of § 2.  (TAC ¶¶ 435-43.)  The Court reads this claim as asserting both a § 2 conspiracy and a § 2 monopolization claim.  Both claims fail.

To state any claim under § 2, a plaintiff must allege plausible facts that a defendant possesses market power (sometimes referred to as "monopoly power") in a

relevant market, and the willful acquisition or maintenance of such power as "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 226 (2d Cir. 2006); PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). A firm possesses market power when it has the ability to raise price by restricting output.  PepsiCo., 315 F.3d at 107.  A plaintiff must also allege facts that the defendant has engaged in "'improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.'"  Heerwagen, 435 F.3d 227 (quoting PepsiCo, 315 F.3d at 108).

Market power may be proven directly by evidence of the control of prices or the exclusion of competition.  PepsiCo, at 107; Todd, 275 F.3d at 206 ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power."); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998) (market power "may be proven directly by evidence of the control of prices").  However, in most cases this type of direct evidence is absent.  "Indirect proof of market power, that is, proof that the defendant has a large share of the relevant market, is a surrogate for direct proof of market power."  Heerwagen, 435 F.3d at 227 (internal quotation marks omitted). "'In resolving market or 'monopoly' power issues, the courts have typically relied heavily on market definition and on the defendant firm's share of the market thus defined.'"  Id. at 227 (quoting 2A Phillip E. Areeda, Herbert Hovenkamp & John L.

Solow, Antitrust Law ¶ 515, at 114 (2d ed. 2002)).  Market power may be shown by one firm's large percentage share of a defined relevant market.  PepsiCo, 315 F.3d at 107; Tops Mkts., 142 F.3d at 98.  For instance, "a market share of over 70 percent is usually strong evidence of monopoly power."  Tops Mkts., 142 F.3d at 99 (internal quotation marks omitted).  A showing of market power is a substantive element of a monopolization claim, and "plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition."  Heerwagen, 435 F.3d at 229.

The relevant market is the "area of effective competition," which is determined by defining relevant product and geographic markets.  PepsiCo, at 105, 108; AD/SAT v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999).  A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); Todd, 275 F.3d at 200.  Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes.  PepsiCo, 315 F.3d at 105.  Cases are subject to dismissal when plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way.  See Todd, 275 F.3d at 200 nn.3-4 (collecting cases).

The court must also determine the boundaries of a relevant geographic market.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1967); United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995).  The geographic

market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product.  Tampa Elec., 365 U.S. at 327.  A geographic market is determined by "how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location."  Heerwagen, 435 F.3d at 227.  Factors relevant to geographic scope of a market "may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location, as well as the relative preferences of consumers with respect to travel and price."  Id. at 228. The geographic market for "goods sold nationwide is often the entire United States, though it need not be if purchasers cannot practicably turn to areas outside their own area for supply of the relevant product."  Id. (citing Standard Oil Co. v. United States, 337 U.S. 293, 299 n.5 (1949)).

Finally, to state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize a particular and defined market, and a dangerous probability of success.  See Spectrum Sports, 506 U.S. at 456; PepsiCo., 315 F.3d at 105; Tops, 142 F.3d at 99-100.  A plaintiff must also allege that anticompetitive conduct occurring in connection with obtaining or retaining a monopoly position is proximately related to plaintiffs' injuries.  See Litton Sys., Inc. v. Am. Tel. & Tel. Co., 700 F.2d 785, 802-03 (2d Cir. 1983)

(proximate cause required to establish monopolization charge); see also Lexmark Int'l Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1390 (2014) (a court should generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of that statute).

There are a number of reasons the FLPs' First Claim cannot withstand scrutiny under § 2.

First, the TAC alleges that Metro has a monopoly position.  It is therefore Metro's position in a defined market that determines the viability of a § 2 claim.[35] Metro is alleged to have, or be about to achieve, a monopoly position in the market for LME-certified warehouse services for aluminum.  (TAC ¶ 438.)  The FLPs allege that "Metro intended to develop and did develop the market power to restrict output and set, control, and/or increase prices."  (TAC ¶ 439.)  Further, Metro is alleged to have "abused its monopoly power and discretion so as to impose the greatest restrictions on output that it could."  (TAC ¶ 439.)  Finally, Metro is alleged to have "knowingly and directly inflated the Midwest premium and other aluminum prices to increasingly higher levels."  (TAC ¶ 439.)  The LME, LME Holdings Limited, and HKEx along with other Goldman Sachs entities are alleged to have knowingly assisted Metro in its violations of the LME Charter so that it could monopolize the market.  (TAC ¶ 441.)

The FLPs' § 2 claim is incompatible with its § 1 claim.  Moreover, in beefing up its § 1 claim between the prior pleadings and the instant ones, plaintiffs have

_____

[35] The Court notes that of the 146 LME-certified warehouses in the United States as of 2014, the warehouse defendants are alleged to own 123, or 84%.  (See TAC ¶ 190.)  The TAC is devoid of allegations regarding LME-certified warehouses not owned by defendants.

cast conduct in warehouse services by many firms as an adjunct to trading activity by many firms—and it is both pieces together that allegedly caused competitive harm.  The TAC does not support Metro and its Goldman financial affiliates alone being able to carry out the scheme (even assuming participation by the LME as alleged).  Indeed, as discussed above, plaintiffs have alleged that Goldman and Metro needed and used conspirators in areas outside of Detroit to assist in the scheme.  If, for instance, the JPMorgan entities and the Glencore entities and their affiliated companies were removed from this scheme, the FLPs would be proffering a different complaint that would require an altogether different analysis.

In addition, plaintiffs assert that Metro had or was on the cusp of achieving the ability to raise price or restrict output—that is, to exercise market power.  The allegations as to Metro do not support this assertion.  In this § 2 context in which the market alleged is the market for LME-certified warehouse services for aluminum, the "price" Metro can (even arguably) set concerns the cost of storage.  That is the market in which Metro is alleged to have a monopoly position.  Raising the price in this market would be raising the price for these services.  But that is not plaintiffs' theory as laid out elsewhere in its complaint, and it is not the injury that plaintiffs claim to have suffered; the FLPs' injury is having paid more for aluminum due to an inflated Midwest Premium, in turn caused by an interaction between warehouse services and trading firm conduct.

Further, Metro is not alleged to have owned any aluminum as to which it could have increased price.  Nor did it own aluminum warrants as to which it could

control supply.  At most, the allegations in the TAC support Metro's ability to slow-roll the supply of aluminum from its warehouses owned by others.

Even if the FLPs were able otherwise to allege plausible facts supportive of a § 2 claim, they do not have antitrust standing to pursue such a claim.  Limited solely to actions taken in the market for LME-certified warehouse services for aluminum, the FLPs' antitrust standing is based solely on injuries they have sustained in connection with Metro's monopoly (or near-monopoly) position in that market.  But the FLPs' allegations are not supportive.  As cast, the FLPs' injury does not come from actions in that market alone.  The FLPs themselves have not paid higher warehouse storage fees.  Instead, the FLPs' injuries come from a combination of actions relating to warehouse load-out delays and warrant trading—not solely the one and not solely the other.  This interaction is not part of the § 2 claim.

The FLPs also fail the efficient enforcer test in connection with their § 2 claim.[36]  It is only the combination of the coordinated actions of many different participants that spells out how plaintiffs' injury can be inextricably intertwined with the anticompetitive conduct.  Analyzed on its own, as injury based solely on the monopolization of the market for LME-certified warehouse services for aluminum, the FLPs are not efficient enforcers.  There are others more appropriately situated to pursue a monopoly claim in this market.  The FLPs are simply too remote from the market for LME-certified warehouse services for

---

[36] The Court here incorporates the legal standard for standing set forth above.

aluminum to have antitrust standing to pursue a claim based on anticompetitive conduct in that market.

In sum, for the foregoing reasons, the FLPs' § 2 claim must be dismissed.

V.    STATE LAW CLAIMS

Both the JAC and the TAC allege claims arising under the laws of various states.  The JAC's Second Claim and the TAC's Sixth Claim seek relief under New York's Donnelly Act (JAC ¶¶ 337-43; TAC ¶¶ 643-48); the JAC's Third Claim seeks relief under California's Cartwright Act[37] (JAC ¶¶ 344-50); and the TAC's Fifth Claim seeks relief under Michigan's MARA (TAC ¶¶ 637-42).  As explained in the Court's September 15, 2014 Memorandum Decision & Order (ECF No. 586 ("Prior State Law Op.")), the Donnelly Act and the Cartwright Act are modeled on § 1 of the Sherman Act, and the MARA is modeled on the Sherman Act generally (Prior State Law Op. at 4-6).  The requirements for establishing claims under these statutes are essentially the same as those for doing so under the Sherman Act.  (Prior State Law Op. at 4-7.)  Accordingly, because plaintiffs have established plausible claims for relief under § 1 of the Sherman Act, their analogous claims for relief under the Donnelly Act, the Cartwright Act, and the MARA are also plausible, and may go forward.  By the same token, because the FLPs have not alleged a plausible claim for relief under § 2 of the Sherman Act, to the extent that their claim under the MARA is predicated on unlawful monopolization, it must also be dismissed.

---

[37] The TAC lists the Cartwright Act as a cause of action without breaking out its elements or explaining how they are met.  (TAC ¶ 651(d).)  Accordingly, the Court dismisses the FLPs' Cartwright Act claim under the Rule 8 analysis listed below.

The FLPs, however, have not just asserted claims under state analogues for the Sherman Act; their Seventh and Eighth claims are a potpourri of antitrust, unfair competition, unfair trade practices, and unjust enrichment claims under the laws of 34 states and the District of Columbia.  (TAC ¶¶ 651, 655, 658.)  As explained in the Court's September 15, 2014 decision, a complaint that merely offers "a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Yet the FLPs simply provide lists of state causes of action, without even listing their elements or explaining how their factual allegations establish valid claims for relief under them.  This is insufficient to meet even the basic requirements of Rule 8, and accordingly, these claims must be dismissed.[38]  Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do.").

The FLPs' Ninth Claim for relief is an unjust enrichment claim.  (TAC ¶¶ 657-63.)  This claim is predicated on defendants' other federal and state law claims.  To the extent that the FLPs' unjust enrichment claim relies upon other claims that are being dismissed by this Court, it too must be dismissed.  (See Prior State Law Op. at 8 (collecting cases).)  However, although plaintiffs cannot ultimately recover under both the antitrust laws and state unjust enrichment law, there is no bar to pleading both claims simultaneously at the pleading stage.  In re Credit Default

---

[38] The TAC does list the elements of the causes of action under New York's and Rhode Island's consumer protection and unfair competition laws.  (TAC ¶ 655(s),(u).)  However, these lists are presented in precisely the formulaic, conclusory manner no longer permitted under Iqbal.  See 556 U.S. at 678.  Further, the TAC is devoid of the state-specific allegations regarding defendants' engagement in commerce, public statements, and effects on plaintiffs within those states required to establish that these claims are plausible.  These claims are therefore also properly dismissed.

<u>Swaps Antitrust Litig.</u>, No. 13md2476 (DLC), 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014).  Accordingly, the Court will permit the FLPs' unjust enrichment claim to go forward.

In sum, all of plaintiffs' state law claims are dismissed, excepting plaintiffs' Donnelly Act claims, Mag, Agfa, and Kodak's Cartwright Act claim, the FLPs' MARA claim to the extent it does not concern monopolization, and the FLPs' unjust enrichment claim to the extent it is not predicated upon other claims that are being dismissed by this Court.

## VI.    CONCLUSION

For all of the reasons set forth above, defendants' motions to dismiss the JAC are DENIED and plaintiffs' motion for leave to amend the JAC is GRANTED; plaintiffs' motion for leave to amend the TAC is GRANTED IN PART and DENIED IN PART.  The FLPs may assert the Third, Fifth, Sixth, and Ninth Claims for Relief stated in the TAC.  Mag, Agfa, and Kodak may assert all claims in the JAC.

Discovery in this matter shall proceed immediately. The parties are directed to confer on a schedule for the remainder of this case including fact and expert discovery, briefing on class certification with regard to the TAC,[39] final motions for summary judgment (this Court takes motions for summary judgment, in whole or in part, at any time), and trial.   The parties shall submit a joint proposed schedule within one week of the date of this Opinion.

---

[39] The JAC does not contain class allegations.

The Clerk of Court is directed to close the motion at ECF No. 654.

SO ORDERED.

Dated:       New York, New York
             March 26, 2015

_____
KATHERINE B. FORREST
United States District Judge