**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION** | 13 MD 2481 (KBF) |
| | Hon. Katherine B. Forrest |
| This Document Relates To: | |
| Direct Purchaser Plaintiffs (14 Civ. 3116) | **THIRD AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

| | | |
|---|---|---|
| Linda P. Nussbaum | Christopher Lovell | David Mitchell |
| Peter A. Barile III | Gary S. Jacobson | Carmen Medici |
| GRANT & EISENHOFER P.A. | LOVELL STEWART HALEBIAN | ROBBINS GELLER RUDMAN |
| 485 Lexington Avenue | JACOBSON LLP | & DOWD LLP |
| New York, NY 10017 | 61 Broadway | 655 West Broadway |
| | New York, NY 10006 | San Diego, CA 92101 |

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the*
*Proposed Direct Purchaser Plaintiff Class*

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS .............................................1

   A.    Section 2 Violations ...........................................................................................1

            Metro's Maximum Load-Out Agreement With The LME .........................5

            Metro's Re-warranting And Aluminum Shuffling Agreements. ................5

            Anticompetitive Effects And Injuries To Competition...............................9

            Restraining 80% Of The Entire Annual Production Of Aluminum
            In The U.S. In Load-Out Delays Of Up To 700 Days. .............................11

            Regression Analysis Shows That Metro's Growing Percentage
            Concentration In The LME Aluminum Warehouse Services Market
            And The Increasing Load-Out Delays In Detroit Caused
            The Midwest Premium To Triple And The Rotterdam Premium
            And Other Premiums To Increase...............................................................11

            Producers, Consumers And The Press All Agree That, As Economic
            Principles Dictate, Metro's Restraints Of Such Large Quantities Of
            Aluminum And Other Unlawful Conduct Have Made Aluminum Prices
            Higher Than They Would Be Absent Such Restraints .............................13

            The Direct Benefits To Defendants From The Increase In The Midwest
            Premium And The Other Anticompetitive Effects. ...................................14

            The Increases In The Midwest Premium That Benefitted Defendants,
            Directly Injured Plaintiffs And Class Members........................................17

   B.    Section 1 Violations .........................................................................................18

            Second Claim ............................................................................................18

            Third Claim................................................................................................19

            Fourth Claim For LME Combination ........................................................20

C.     State Law Claims ...............................................................................22

II.     JURISDICTION AND VENUE ..................................................................22

III.    PARTIES ....................................................................................................23

    A.     Plaintiffs ..........................................................................................23

    B.     Defendants .......................................................................................31

         1.     London Metal Exchange Defendants.....................................31

         2.     Goldman Defendants .............................................................41

         3.     JP Morgan Defendants...........................................................43

         4.     Glencore Defendants..............................................................46

         5.     Other Defendants ..................................................................51

    C.     Coconspirators ................................................................................51

IV.    FACTUAL ALLEGATIONS .....................................................................57

    A.     The Two Relevant Markets...............................................................57

         1.     Aluminum Production.............................................................59

         2.     The Pricing of Physical Aluminum........................................63

         3.     The Relevant Product Market of Warehousing Services for
               Aluminum in LME Certified Warehouses .................................67

         4.     The Market For LME Aluminum Warehouse Services Determines
               The Amount of Aluminum Released from LME Warehouses to the
               Primary Aluminum Market .......................................................71

         5.     LME Aluminum Forward Contracts........................................74

    B.     The Maximum Load-Out Restraint and Agreement ...............................76

C.   Metro Violates LME Rules and Makes Illusory Warrant Cancellation And Aluminum Shuffle Agreements in Order to Greatly Increase the Load-Out Queue and Create a "Critical Mass" To Monopolize The Market ....................................................................................................84

   1.   With The LME's Knowledge, Metro Anticompetitively And Restrictively Violated The LME Minimum Load-Out Rule By Failing To Load-Out The Minimum Required Daily Amount Of Aluminum ...............................................................................84

   2.   Metro-Burgess-Allen Agreement...............................................86

   3.   Metro's 100,000 ton agreement with DB Energy ......................87

   4.   Metro's 440,000 Tons In Agreements With Red Kite ...............90

   5.   Metro's 186,000 Ton Agreement With DB Energy And Glencore Greatly Lengthens The Queue Through A More Complicated Rewarranting Deal .....................................................92

   6.   Metro Admitted To Goldman Sachs & Co. and Mitsi that Large Cancellations Provided a Self-Perpetuating Market Power for the Cancelling Warehouse ..........................................95

D.   Metro Exercises Its Increased Market Power to Make Increasingly Large Incentive Payments to Restrain Increasingly Large Amounts of Aluminum ...........................................................................................95

   1.   Metro Knew Full Well That, in Metro's Words, "The Metal We Get Is Withheld from Consumers and Makes the [Midwest] Premium Go Up".........................................................................95

   2.   Only Through Such Foreclosure of Plaintiffs and Inflation of the Midwest Premium Was Metro Able To Acquire Its 80-99% Share and Monopoly Power in the LME Aluminum Warehouse Market ..................................................................107

E.   Metro, Goldman, the LME, and Other Persons Benefit From the Higher Midwest Premium, LME Rents and Incentive Payments ...................109

F.     Goldman's Knowledge and Acts ........................................................113

    1.    The LME Prohibits Certain Communications between Warehouse Companies and Other Entities ................................................................113

    2.    Goldman's Knowledge of the Incentive Payments to Smelters.........................................................................................................116

    3.    Goldman's Knowledge of the Incentive Payments to Other Persons to Bring Aluminum or Keep Aluminum in the Metro Warehouses............120

    4.    Goldman's Knowledge of the Deutsche Bank Deal and the Large Cancellations.....................................................................121

    5.    With Such Knowledge, the Other Goldman Defendants Continued to Support, Finance, and Very Materially and Knowingly Assist Metro and its Monopolization Of LME Warehousing Services Of Aluminum, Violations of the Antitrust Laws, and Knowing Inflation of the Midwest Premium and Midwest Transaction Prices ...............................121

        (a)    Goldman Intent And Modus Operandi ........................................121

        (b)    Goldman Facilitated Metro's Aluminum Shuffling Deals...........124

        (c)    Goldman and the LME...............................................................124

        (d)    Goldman itself viewed the minimum load-out rule as a maximum load-out rule................................................................125

        (e)    Goldman's Influence on the Europe Economics' Recommendations....................................................................125

        (f)    Goldman jointly lobbied with the LME in defense of the LME rules...........................................................................................127

G.     Metro, the LME and Others Work Together To Minimize Changes In The Maximum Load-Out Restraint......................................................128

    1.    Public Complaints about the Maximum Load-Out Restraint .................128

2.  With Such Knowledge, the LME Worked In Parallel with Metro and Other Defendants to Continue the Maximum Load-Out Restraints, Avoid Alleviation Thereof, and Continue to Injure Class Members ....................................................................................130

H.  Anticompetitive Effects and Injuries to Competition ...........................................133

I.  Standing ................................................................................................................134

V.  CLASS ALLEGATIONS .................................................................................................138

VI.  CLAIMS FOR RELIEF ...................................................................................................141

AS AND FOR A FIRST CLAIM FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT AGAINST METRO, BURGESS-ALLEN, MITSI HOLDINGS LLC, J. ARON, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., GOLDMAN SACHS INTERNATIONAL, LME HOLDINGS LIMITED, HKEx, AND THE LME.........................141

AS AND FOR A SECOND CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST METRO, BURGESS-ALLEN, MITSI HOLDINGS LLC, J. ARON, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., GOLDMAN SACHS INTERNATIONAL, LME HOLDINGS LIMITED, HKEx, GLENCORE, AND THE LME ...................................................................................................................142

AS AND FOR A THIRD CLAIM FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AGAINST ALL DEFENDANTS ...................................................................149

The Entry of Banks and Traders into Warehousing........................................................150

Ignoring LME Information Barriers, Defendants' Trading and Warehousing Operations Work Together to Effectuate the Conspiracy.................................................153

Goldman and Metro Straddle the Information Barrier .........................................153

Goldman Exercises Complete Control over Metro, Using Metro as an Extension of Its Trading Arm ...........................................................................160

Defendants Agree Not to Compete Against Each Other in the Market for the LME-Certified Warehouses in the United States and Throughout the World...........................169

As Part of Their Agreement Not to Compete, the Defendants Agree to Treat the LME's Minimum Load-Out Rule as a Maximum ...............................174

Defendants Work Together to Shift Aluminum Among Their Warehouses in Order to Concentrate the Stock at Key Warehouse Locations ...........................179

The Defendants Offer Payments for Owners to Store Aluminum in Their Key Warehouse Locations.......................................................................................185

Defendants Further Evade the Ineffective Minimum Load-Out Rules by Shifting Inventory among Warehouses................................................................187

Defendants Worked Together Strategically to Cancel Warrants........................189

Defendants' Conspiracy Directly Causes Regional Premiums, Including the Midwest Premium, to Reach Unprecedented Highs ......................................................193

The LME Studies the Excessive Queues ...........................................197

Defendants Worked to Thwart Any LME Rules Changes to Load-Out Rules....200

Defendants Profit from Their Conspiracy to Manipulate Spot Prices, Including Regional Premiums, in Multiple Ways...........................................................204

The Conspiracy Allowed the Defendants' Warehousing Operations to Increase Their Published Rents and FoT Rates.................................................204

The Defendants' Trading Operations Profit by Selling Aluminum with Artificially Increased Premiums .........................................................206

Defendants Profit from the Increase in Contango................................................209

Purchasers of Aluminum Have Complained About Defendants' Practices and Government Inquiries Are Ongoing ...........................................................................................210

Defendants Change Their Practices or Plan to Exit the Market Immediately After Facing Scrutiny of These Practices.............................................................................212

AS AND FOR A FOURTH CLAIM FOR VIOLATION OF SECTION 1 OF THE

SHERMAN ACT AGAINST ALL DEFENDANTS FOR THE LME COMBINATION ..........214

AS AND FOR A FIFTH CLAIM AGAINST ALL DEFENDANTS VIOLATION OF THE
MICHIGAN ANTITRUST REFORM ACT, MCL §§ 445.773, *et seq*. .....................................216

AS AND FOR A SIXTH CLAIM AGAINST ALL DEFENDANTS VIOLATIONS OF NEW
YORK DONNELLY ACT NEW YORK GENERAL BUSINESS LAW § 340, et seq. ............217

AS AND FOR A SEVENTH CLAIM AGAINST ALL DEFENDANTS VIOLATION OF
CERTAIN OTHER STATE ANTITRUST STATUTES ............................................................218

AS AND FOR AN EIGHTH CLAIM AGAINST DEFENDANTS VIOLATION OF
CERTAIN STATE UNFAIR TRADE PRACTICES ACTS.......................................................220

AS AND FOR A NINTH CLAIM AGAINST DEFENDANTS FOR UNJUST
ENRICHMENT ...........................................................................................................................224

VII.    PRAYER FOR RELIEF ..................................................................................................226

VIII.   DEMAND FOR JURY ....................................................................................................227

Plaintiffs Ampal, Inc., Custom Aluminum Products, Inc., Claridge Products and Equipment, Inc., and Extruded Aluminum Corporation, bring this action under Sections 1 & 2 of the Sherman Antitrust Act, Sections 4 and 16 of the Clayton Antitrust Act, antitrust laws of the States of New York and Michigan, and other state laws, for treble damages, declaratory and injunctive relief, costs of suit, and other relief, on behalf of themselves, and on behalf of a Class of those similarly situated under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs allege monopolization and restraint of trade in the LME Aluminum Warehouse Services Market and the Primary Aluminum Market, (as those two related relevant markets are defined below), from at least November 1, 2009, through the present, and, based upon personal knowledge, information, belief, and investigation of counsel, allege:

## I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.   Between November 2009 and the present ("Class Period"), Defendants violated Sections 1 and 2 of the Sherman Antitrust Act and the State laws alleged herein.[1]

### A.   Section 2 Violations

2.   There are two relevant markets here.   One is the market of "services for aluminum stored in LME warehouses in North America" (referred to as the "LME Aluminum

---

[1] The information in this Complaint is based upon counsel's investigation.  This includes limited and very incomplete document discovery from Defendant Metro International Trade Services, L.L.C. ("Metro") or the Goldman Defendants (approximately 10% of the documents produced to the government have been produced to the Plaintiffs).  The investigation of counsel is also based upon statements by United Company Rusal PLC ("Rusal") and by Alcoa Inc. that the restraints alleged herein inflated the all-in price for physical aluminum; statements by Defendant London Metal Exchange ("LME") that the so-called incentive payments had the anticompetitive effects of lengthening the amount of time it takes to load-out aluminum from warehouses and that the long load-out queues have been causing increases in the MW or Midwest Premium price component for physical aluminum, and many other statements by Defendants. Plaintiffs' information also includes the publicly available information about aluminum physical and forward contract prices; data on aluminum load-in and aluminum load-outs from the LME; other statistics; news articles; Congressional testimony; economic analysis; other expert analysis; and other sources of information.

Warehouse Services Market"). The second is the market for primary aluminum in North America (United States and Canada) (referred to as the "Primary Aluminum Market"). *See* "IV.A" ("The Two Relevant Markets").

3.     The LME Aluminum Warehouse Services Market provides and controls the release of the physical aluminum to owners that have taken delivery in satisfaction of an LME aluminum forward contract long position. This aluminum and source of aluminum constitute one part of the physical aluminum in the Primary Aluminum Market. The cost of purchasing this physical aluminum on the LME long position is the LME price, plus any warrant trading costs, plus the costs to the owner to move the aluminum from the LME warehouse to its factory or facility. Although small in volume, this method of purchasing aluminum in the Primary Aluminum Market acts as an important price discipline and check on prices in the remainder of the Primary Aluminum Market.

4.     In the remainder of the Primary Aluminum Market, physical aluminum is purchased at the Midwest Transaction Price or another all-in price. This "all-in price" is the LME price plus the Midwest premium or another premium. *See* "IV.A."

5.     The LME has long recognized that the Midwest premium and other prices in the Primary Aluminum Market are directly and strongly affected by the operation of LME warehouses in the LME Aluminum Warehouse Services Market. *E.g.,* https://www.lme.com/en-gb/pricing-and-data/pricing/convergence/.

6.     (a) In order to minimize and channel the effects on prices in the Primary Aluminum Market of its warehouse operations in the LME Aluminum Warehouse Services Market, the LME has repeatedly represented and continues expressly to represent: "The LME licenses warehouses to provide **a market of last resort and to ensure the LME price stays in**

**line with the physical/spot price**." *Id.*  The LME's foregoing representation is sometimes referred to as the "LME Charter."  Under the LME Charter, prior to the Class Period, the LME had obtained 99% of the aluminum forward and futures contract trading business in the U.S. and put out of business in 2008 the NYMEX aluminum futures contract.

(b) Sourcing physical consumption needs for aluminum through taking delivery on LME long positions "ensures the LME price stays in line with the physical/spot price," in the words of the LME Charter.  The competition provided by taking delivery on LME long positions tends to make the Midwest or other premium as small as possible, and the LME price "in line with the physical/spot price."

(c) In order to load the LME warranted aluminum that is received in delivery on a long position (or is otherwise covered by an LME warrant), out of the LME warehouse and ship it to their plant, the industrial consumer-recipient of the LME warrant must first cancel the LME warrant.  Upon cancellation, the aluminum covered by the warrant is then scheduled for load-out by the LME warehouse.  The time required to load-out the aluminum may be one day or a longer period.  With Metro's Detroit LME warehouses during the Class Period, the amount of the delay depended not on the efficiency of its load-out services, but on the number (and total tonnage) of other scheduled load-outs existing as at the time of the cancellation and Metro's anticompetitive, restrictive and exclusionary conduct alleged herein.

7.      (a) During 2003, the LME created a minimum load-out rule for each LME warehouse company of 1,500 tons per day in each location (location means each city or greater metropolitan area **not** each warehouse).  On its face, this minimum load out rule appeared to be somewhat procompetitive.  It prevented LME warehouse companies from restricting output below a specified minimum. This appeared to enable the beneficiaries of the rule ---

prominently including industrial or other consumers of aluminum --- to receive LME aluminum load-outs and deliver such aluminum on a more timely schedule.  This timeliness and lack of friction of delivery furthered the LME Charter by, among other things, providing an alternative to the purchase of aluminum via paying the Midwest premium.  *See* ¶¶3-4 *supra*.  This tended to act as a check on the Midwest premium and, in the words of the LME Charter, "ensure the LME Price stays in line with the physical spot price."

(b) However, the specific "one size fits all" minimum of 1,500 tons per **location** was unreasonably low for all the reasons alleged herein.  ¶¶222-226, 233, 248, 397.  This includes that a company that had dozens of warehouses and extraordinarily large warehouse capacity in one location needed to load-out only the same amount as a company that had only one warehouse in such location. ¶¶222-224, 231.  Metro was such a company because it had 27 warehouses in the Detroit location that had the capacity to overwhelm the minimum load-out. ¶¶5-6, 8-11, 16, 222-236, 362, 446.

8.      During the Class Period, Metro violated Section 2 of the Sherman Antitrust Act, and other laws by attempting and agreeing to monopolize, and monopolizing the LME Aluminum Warehouse Services Market.  Metro's agreements were with Defendants Burgess-Allen, Mitsi Holdings LLC, J. Aron, other Goldman personnel and companies, and the LME. Through anticompetitive, restrictive and exclusionary agreements and conduct, Metro gained the following monopoly power in the LME Aluminum Warehouse Services Market: (i) Metro's Detroit warehouses alone provided the aluminum warehouse services for and held as much as **84**% of the aluminum stored in LME warehouses in North America (Canada and U.S.), and (ii) Metro serviced **99%** of the warrants delivered in the United States and Canada on LME aluminum forward contracts.  ¶¶10(b), 317-318, 439.

9.      In acquiring such monopoly power, Metro engaged in the following restrictive, exclusionary, and anticompetitive conduct.

**A. Metro's Maximum Load-Out Agreement With The LME**. Metro agreed with the LME to convert the minimum load-out into a maximum load out agreement between Metro and the LME. ¶¶224(a), 445.  This agreement continued during at least 2009 to 2013. There were ongoing conversations and dealings between, on the one hand, Metro, its parent Mitsi Holdings, or other Goldman entities, and, on the other hand, top level LME officials, including LME CEO Martin Abbott, to implement and perform this agreement.  ¶¶221-244.

B. **Metro's Re-warranting And Aluminum Shuffling Agreements**. (i) Metro made anticompetitive agreements with Defendants Burgess-Allen, Glencore (as alleged in ¶¶110-127, 280-286), and co-conspirators DB Energy, Red Kite, and other persons presently unknown to Plaintiffs.  Metro and Burgess-Allen called these agreements the "smart ass plan." ¶¶16, 245-279.  Such plan and agreements directly caused load-out delays of 398 business days or approximately 602 calendar days from Metro's Detroit warehouses.  They did so through illusory cancellations of LME warrants and either no actual movement out of or the shuffling of aluminum out of and then back into Metro's LME Detroit warehouses.  This includes 817,000 tons of cancellations by DB Energy, Red Kite, and Glencore alone.  *See* ¶5(c) (cancellation of the warrant places the cancelling party into the load out queue).  At least 767,000 tons of these cancellations were re-warranted pursuant to agreements in which the cancelling parties were to be paid, in the words of a Deutsche Bank internal email, for "moving [aluminum] between Metro warehouses in Detroit." GS-METRO-00000309.

(ii) As Metro's Chief Commercial Officer, Michael Whelan, informed Defendants Goldman Sachs & Co. and Mitsi Holdings LLC, on September 19, 2012, extremely large

cancellations of LME warrants in one company's warehouses in one location could overwhelm the LME load-out rule for that location.   GS-METRO-00005560.   This provided that warehouse company with a "critical mass" of load-out delays in that location and resulting large prospective rental revenues and profits.  *Id.*  These profits confer on such warehouse company the ability to make high incentive payments that other LME warehouses could not match in order to attract further metal into its warehouses in that location.   (Metro was speaking in this email of Glencore's New Orleans warehouses and zinc. Glencore/Pacorini had 31 warehouses in New Orleans and large holdings of zinc. But the effects of large cancellations of LME zinc warrants in Glencore/Pacorini in New Orleans were the same as the effects of large cancellations in warehouses in the Detroit location. *See* ¶¶280-286)

(iii) These high incentive payments would bring in more metal and become a self-perpetuating market power with which other LME warehouses could not catch up.   GS-METRO-00005560; *see* ¶¶ 287, 313, 347, GS-METRO-00020303 (Metro refers to its long load-out queue as a "black hole.")  The increased amounts of metal held for increased amounts of time provided greater rental revenues and, accordingly, still greater ability to make even higher incentive payments that other LME warehouses could not begin to approach.  The many anticompetitive effects and blatant violations of the LME Charter resulting from Metro's foregoing conduct are summarized at ¶¶ 10-13 *infra*.

C.   Next, Metro systematically violated the LME minimum load-out rule by failing to load-out the minimum required daily amount of aluminum from its Detroit warehouses. Ex. A to Complaint, and ¶¶ 245-250.  This anticompetitively restrained a cumulative total 151,000 tons of aluminum from being loaded-out, per the shortfalls reflected during just a three year portion of the Class Period.  Ex. A hereto.  By intentionally and repeatedly violating the

LME's minimum load-out rule, Metro further anticompetitively restricted the output of primary aluminum from its warehouses. This increased the delays in loading out aluminum from its LME Detroit warehouses by 65 working days, or approximately 92 calendar days. The LME was fully aware of these further violations of the LME Charter and the LME's minimum output rule because these failures were reported by Metro to the LME. These violations injured competition and had the anticompetitive effects summarized at ¶¶ 10-13 below.

D.      (i) Fueled by the supra-competitive profits from its foregoing and other restraints, Metro violated the LME Charter by entering the Primary Aluminum Market as a purchaser of first resort. ¶¶9(D)(iii), 414, 456. Metro made large incentive payments to Alcoa and other producers of aluminum. By thus competing with Plaintiffs and Class members, Metro diverted aluminum away from them and into Metro's warehouses. This enabled Metro to continue to gain market share in and monopolize the LME Aluminum Warehouse Services Market.

(ii) But, in order to accomplish such anticompetitive objective, Metro had to and did directly inflate the Midwest premium price for aluminum. ¶¶288-316, 414. Thus, Metro's Chief Executive Officer, Chris Wibbelman, admitted to Jacques Gabillon in a February 11, 2011 email that "What is true though, is that the metal we get [from Alcoa] is withheld from consumers and makes the [MW] premium go up." GS-METRO-00020303. ¶¶ 288, 297. Goldman subsidiary Defendant Mitsi Holdings LLC had to approve and did approve all of Metro's incentive payments greater than $128 per ton, which amounted to 660,000 tons of aluminum. Metro's J. Aron subsidiary agreed with Metro to supply or help supply approximately 725,000 tons of the aluminum that Metro diverted into or retained in its Detroit warehouses by means of these incentive payments.

(iii)     When Metro went into the Primary Aluminum Market as a participant of first resort to divert aluminum produced by Alcoa and others away from industrial consumers and into Metro's Detroit warehouses, Metro did not offer merely the extraordinarily high incentive payments that other LME warehouse companies could not match.  Metro also offered a mix of other types of consideration to Alcoa and other aluminum producers.  In addition to Metro's extraordinary incentive payments, Metro offered the output restriction service.  Metro restrained what had been the producer's aluminum in a stockpile from which it could not be removed. Therefore, such aluminum would not compete with the producer's later-produced aluminum for the time that (1) the aluminum was LME warranted, plus (2) an additional, up to 700 days, of delayed load-out time after the warrant was canceled.  Third, (especially after Metro's Detroit load-out queues were already very long), Metro also offered the ability to the producer to store the aluminum for one or two months free rent and sell an LME forward contract on which it could deliver such stored aluminum.  This provided to Alcoa or another producer, the **deferred** LME forward contract price which was somewhat higher than the current LME price.

(iv) The reason that Metro could offer this valuable mix of consideration was that Metro was a member of the LME Combination (*see* ¶¶20-21, 628-636). As such, Metro anticompetitively violated the LME Charter to create these additional types of consideration to entice Primary Aluminum Market aluminum away from industrial consumers and into Detroit. Metro's additional forms of consideration further increased the Midwest Premium.  They forced industrial consumers, including Plaintiffs, to pay extra monies over and above Metro's extraordinary incentive payments in order to obtain physical aluminum during the Class Period. The direct victims of Metro's anticompetitive violations of the LME Charter to inflate the

8

Midwest Premium (and other premiums) were industrial consumers, including Plaintiffs, who paid such premium to purchase aluminum.

E.       There were many public complaints that Metro's long delays and other anticompetitive conduct were foreclosing industrial consumers from using the LME to source aluminum and greatly inflating aluminum prices including the Midwest Premium.  ¶¶239-244, 384-393.  Metro agreed and acted with Mitsi Holdings LLC, the LME and other LME members to block, delay and reduce any response by the LME to these public complaints in the form of changes to the LME load-out rule.  Metro stated that, if any changes in the rule occurred, Metro would make sure that what Metro called the "complainants" (i.e., industrial consumers and physical users of aluminum) did not benefit from such changes in the load-out rule.  ¶¶ 15, 377, 415.  Mitsi Holdings and other Goldman companies and personnel also agreed and worked with the LME and Metro to block delay and reduce the amount of these changes.  This includes through influencing Europe Economics and rejecting Europe Economics' recommendation.  This was all for the purpose of enabling Metro to continue to monopolize and cause the other anticompetitive effects which benefited Mitsi Holdings LLC, Goldman Sachs International, the LME, and the LME's top executives.  *See* ¶13 (alleging the benefits).

10.      (a) **Anticompetitive Effects And Injuries To Competition.**  There were many anticompetitive effects of the foregoing combination of Metro's foregoing anticompetitive agreements,   Metro's large bogus cancellation agreements, Metro's incentive payment agreements, and Metro's other violations of the minimum output rule and the LME Charter.  A first anticompetitive effect was the creation of bogus, long load-out delays from Metro's Detroit warehouses.  These long delays provided Metro with greater ability to make higher incentive payments to gain more market share by diverting increasing amounts of aluminum into its

9

Detroit warehouses.

(b) A second anticompetitive effect was that Metro's increasing market power provided Metro with an increasingly greater ability to make even higher incentive payments to further monopolize the LME Aluminum Warehouse Services market.  Through this positive feedback loop, Metro ultimately was able to ratchet up the nominal amount of Metro's incentive payments to divert aluminum into Detroit from $30-$50 per ton in 2009 to $240 per ton in 2013.  *See* ¶¶289-296.  Plus Metro provided to Alcoa and other producers the additional consideration alleged in ¶9(C)(iii).  Through this positive feedback loop and Metro's other anticompetitive agreements and steps, Metro gained control, in its LME Detroit warehouses alone, of the warehouse services for 84% of the aluminum in LME warehouses in the U.S. and Canada, and 99% of the LME warranted aluminum in the U.S. and Canada tendered in satisfaction of LME aluminum forward contracts.

(c) Another anticompetitive effect of the alleged anticompetitive conduct by Metro and other Defendants, was that the time from the cancellation of an LME warrant to the actual load-out of the aluminum from Metro's Detroit warehouses increased from one day in 2009 to almost 700 days in 2013.   This directly injured competition but produced supracompetitive revenues for Metro, Mitsi Holdings LLC, the LME and others.

(d) By 2011, another anticompetitive effect of the foregoing conduct and the long load-out delays, was that industrial consumers had been foreclosed and excluded from practicably and timely acquiring physical aluminum through taking deliveries on LME long positions.  This further directly injured competition by eliminating the one alternative to and form of competition with the acquisition of aluminum by the payment of the Midwest Premium.  ¶¶3-4.

(e)     Other anticompetitive effects and injuries to competition from the foregoing were that they (a) restrained increasingly greater amounts of aluminum in Metro's LME Detroit warehouses which (b) caused the Midwest premium anomalously to increase to all time record levels when a record amount of supplies existed.  *See* ¶¶10-12.

11.     **Restraining 80% Of The Entire Annual Production Of Aluminum In The U.S. In Load-Out Delays Of Up To 700 Days.**  Specifically, in acquiring its monopoly, another anticompetitive effect of Metro's conduct was that it restrained as much as **1.56 million** tons of LME primary aluminum in its Detroit LME warehouses subject to delays in load-out of almost 700 days as of the end of 2013. Annual U.S. production of aluminum is 1.95 million tons.  Accordingly, Metro anticompetitively restrained aluminum constituting approximately **80%** of an entire year's U.S. production, for a duration of as long as 700 days.

12.     **(a) Regression Analysis Shows That Metro's Growing Percentage Concentration In The LME Aluminum Warehouse Services Market And The Increasing Load-Out Delays In Detroit Caused The Midwest Premium To Triple And The Rotterdam Premium And Other Premiums To Increase**. By obtaining such a large amount of aluminum and subjecting that aluminum to such long storage times in its LME Detroit warehouses, Metro monopolized the LME Aluminum Warehouse Services Market.   Also, Metro caused the Midwest premium price to triple (exactly at times that the Midwest premium price should have been decreasing, because of the ample visible aluminum supplies in the Midwest).  As Metro's CEO stated to the Chairman of Mitsi Holdings and Global Head of Global Commodities Principal Investments at Goldman Sachs: "What is true though, is that the metal we get [from Alcoa] is withheld from consumers and makes the [Midwest] premium go up."  *See, e.g.*, ¶10(D)(ii).

11



(b) Plaintiffs' regression analyses show that the length of the load-out delay in Metro's Detroit warehouses and the degree of concentration of Metro in the LME Aluminum Warehouse Services Market explain 92% of the increases in the Midwest premium.  ¶12.  Moreover, the Detroit queue length "Granger causes" the Midwest premium under the Nobel Prize winning work of Robert Engle and Clive Granger.  ¶¶12-13.

13.     In anticompetitively causing the Midwest Premium to increase in order to acquire and exercise its monopoly power, Metro caused other premiums in other countries to increase as well.  This includes the Japan Premium and the Rotterdam Premium prices paid in Japan and Europe, respectively.  Plaintiffs' regression analyses specifically show as follows.  Both the Midwest premium and the Detroit queue length Granger-cause the Rotterdam premium. The length of the queues in the Vlissingen warehouses held by Glencore/Pacorini does not Granger-

cause the Midwest premium.  In a regression of the Rotterdam premium on the Vlissingen queue, the $R^2$ is only 0.53.  ¶13.

14.     **Producers, Consumers And The Press All Agree That, As Economic Principles Dictate, Metro's Restraints Of Such Large Quantities Of Aluminum And Other Unlawful Conduct Have Made Aluminum Prices Higher Than They Would Be Absent Such Restraints.**  Another anticompetitive effect of both the long load-out delays and the diversion of increasing amounts of aluminum into Metro's warehouses trapped behind these long delays, was to inflate not just the Midwest Premium but the all-in prices of aluminum held or produced outside of Detroit Metro warehouses.  *See, e.g.*, ¶409 (aluminum producers Alcoa and Rusal opposed proposed changes in the LME load-out rules and in the practices of LME warehouses because such changes would reduce the all-in aluminum prices).  Stockpiling aluminum behind a restraint directly increases the price of the aluminum outside that restraint by making the available supply outside the restraint, less than it would be if that restraint were removed and the aluminum was released.  Reaching into the part of the market where the restraint does not apply, as Metro did, and diverting further aluminum from that market into the "black hole" (Metro's words (¶¶9(a), 313, 347)) of that restraint, had the anticompetitive effects of (i) further reducing the supply of aluminum but for such restraint, and (ii) accordingly, further increasing the price of the aluminum outside the restraint.  The direct and net effect of such a restraint and such activity was to inflate the all-in Midwest Transaction price and other all-in prices in the U.S. for aluminum.

15.     (a) The mainstream and financial press have investigated and chronicled the fact that a supply bottleneck in the Detroit warehouses of Metro has driven up the price of physical aluminum throughout the United States.  For example, one industry analyst voiced widespread

industry sentiment in lamenting the "anti-competitive situation" in Detroit that "makes a mockery of the market." ¶¶ 384-393. In July 2013, the New York Times reported that longer waits for aluminum in Metro warehouses "make aluminum more expensive nearly everywhere in the country." *Id*. ¶ 412.

(b) Similarly, a market analyst in 2011 stated that "without a doubt" the bottleneck was causing record high prices for delivery of aluminum in the U.S.    Novelis, the world's largest aluminum can manufacturer, noted in 2011 that the backlog to withdraw aluminum from "Detroit warehouses" was inflating prices by an estimated $20 to $40 per ton.    Coca-Cola complained in 2011 that Metro's warehousing activities had artificially inflated the price of physical aluminum. Alcoa and Rusal, two of the world's largest aluminum producers, acknowledged in 2012 that aluminum tied up in warehouses was driving up prices.    Even Defendant London Metal Exchange ("LME") has admitted that long queues in Metro warehouses played a "fundamental role" in causing the Midwest Premium price of aluminum in the U.S. to increase.

16.    **The Direct Benefits To Defendants From The Increase In The Midwest Premium And The Other Anticompetitive Effects.** (a)The increases in the Midwest Premium caused by Metro provided substantial financial benefits to Goldman's J. Aron subsidiary.  J. Aron's main aluminum purchaser and trader for most of the Class Period was Scott Evans. Evans and J. Aron continuously egged on and encouraged Metro to pay higher incentive fees and divert more physical aluminum into the Metro Detroit warehouses.  That is, Evans and J. Aron continuously encouraged Metro to engage in conduct that directly increased the Midwest Premium and increased the value of J. Aron's large holdings of physical aluminum and derivative positions.  ¶¶325-329.

(b)      Such anticompetitive conduct also benefited Metro in the form of, ultimately, higher rental revenues and profits.  But, in order to obtain those higher rental rates and revenues, Metro had to and did cause higher Midwest Premium prices.  This was the direct consequence of the means by which Metro diverted more aluminum from Alcoa and other primary producers away from Plaintiffs and other industrial consumers, and into Metro's output restriction stockpile in its Detroit LME warehouses.

(c)      The LME also benefited from the higher Midwest Premium and Metro's resulting monopolization of the LME Aluminum Warehouse Services market.  The LME received much higher rent from Metro's creation of a large stockpile subject to delays of 700 days before it could be loaded out.  If the aluminum in LME warehouses had been evenly distributed, no such power to make incentive payments and divert additional aluminum into the LME would have existed.  Moreover, any given amount of aluminum evenly distributed in different LME warehouse companies would have been quickly loaded out under the minimum load-out rule.  Only by restricting up to 84% of the total LME Aluminum Warehouse Services Market in Metro's Detroit warehouse, was the LME's per location load-out rule abused to create such long delays and high rents.  (The LME similarly benefited in the form of higher rents from the monopolization of the LME warehouse services market for zinc by Glencore in New Orleans. *See* ¶¶223, 230-231.)  The higher rents to the LME were especially important during 2010-2012. Defendant LME Holdings, which knew of all the LME's violations of the LME Charter and anticompetitive conduct and anticompetitive effects alleged herein, sought during 2010 to sell and did successfully sell itself in for what turned out to be in excess of $2.2 billion.  The consideration paid for LME Holdings resulted in large bonuses to the LME CEO Martin Abbott

and other top executives of the LME, and was a large motive for LME Holdings to participate in and permit the unlawful conduct as alleged herein.

(d)     This increase in the LME's rental revenues led to a higher sales price for the LME and helped ensure the sale of LME Holdings.  Thereby, it also directly benefited Defendant Goldman Sachs International which owned 9.5% of the LME Holdings at the time of the sale and received $202 million of the sales proceeds.  That is, the increases in the Midwest Premium which were necessary to divert aluminum and increase Metro's and the LME's rental revenues, also increased LME Holdings sales price and Goldman International's revenues from the sale of LME Holdings.

(e)     As the new owner of LME Holdings and the LME, Defendant HKEx benefitted from the increased rental revenues paid to the LME by Metro (and by the continuation of the violations of the LME Charter that produced long delays and higher LME warehouse rental revenues from various locations , including zinc in New Orleans and aluminum in Vlissingen in Europe).  HKEx had promised before its acquisition of LME Holdings was complete, to use a "bazooka" to correct the load-out queue problem.   HKEx abruptly reversed itself after its acquisition of LME Holdings was complete.  After the acquisition, HKEx was then benefiting from the high revenues received from these violations of the LME Charter.  HKEx then had Chris Evans of the LME and HKEx CEO Charles Li to make public statements supporting the continuation of the long queues.  Evans even blamed the victims (the industrial consumers) for complaining about such violations and their anticompetitive effects. *See* ¶¶80, 81, 224, 456-457. The LME, LME Holdings, and HKEx all had a strong financial interest in not only violations of the LME Charter.  They further benefitted from violations that produced uneven distribution of warehouse services that could overwhelm the maximum load-out agreement, e.g., the greater the

concentration or monopoly that Metro held over LME aluminum, the greater the amount of rental revenues that could be obtained by LME, LME Holdings, and HKEx.  Such three defendants' violations of the LME Charter and radical departures from what had been the LME's conduct before the Class Period, strongly indicate a specific intent to help Metro monopolize and continue its monopoly so as to maximize and continue the rent revenues for such Defendants. Only when the US Congress threatened to begin and began serious investigations did HKEx remotely begin arguably to disassociate itself from the anticompetitive conduct by proposing a change in the load-out rule. *See* ¶¶242-243, 407 *infra*.  LME Holdings and HKEx thereby knowingly participated in, furthered, adopted and agreed to the anticompetitive agreements and effects of the LME and joined in the unlawful agreements.

(f)      Defendants' Goldman Sachs & Co. and The Goldman Sachs Group, Inc. knew and were informed of the anticompetitive conduct.  *E.g.,* ¶¶239-240, 243, 245-316.  They stood to gain substantially from, ultimately, all of the above alleged benefits from such conduct that were received by the Metro subsidiary, the J. Aron subsidiary, and the Goldman Sachs International subsidiary.  ¶¶9, 16-18, 241, 322-335.

(g)      Defendant Burgess-Allen helped formulate the "smart ass plan" for the rewarranting agreements that caused the large cancellations and set Metro on its way to obtain its monopoly.  Burgess-Allen received large payments in the forms of fees and, effectively, shares of Metro's rental revenues from his anticompetitive agreement with Metro and his anticompetitive acts.

17.    **The Increases In The Midwest Premium That Benefitted Defendants, Directly Injured Plaintiffs And Class Members.**  In anticompetitively excluding Plaintiffs

from the LME (which was the portion of the Primary Aluminum Market where no Midwest premium applied) and directly causing large increases in the Midwest premium and the Midwest Transaction price, Metro directly caused damages to Plaintiffs on their purchases of primary aluminum during the Class Period.

### B. Section 1 Violations.

18.   **Second Claim.**  (a) Metro, Burgess-Allen, Mitsi Holdings, J. Aron, Goldman Sachs Group, Inc., Goldman Sachs & Co., Goldman Sachs International, the LME, LME Holdings, and HKEx, as well as their co-conspirators, violated Section 1 of the Sherman Act through their foregoing and the other anticompetitive agreements and conduct alleged herein. *See* Second Claim ¶¶444-460.  Such agreements were a *per se* violation of Section 1 that inflated prices and restricted output.  Also, for all the reasons previously alleged, such agreements had other anticompetitive effects, imposed unreasonable restraints of trade and involved comprehensive violations of the LME Charter.

(b)   There were no procompetitive effects of these agreements.  Any arguable procompetitive effects were greatly outweighed by the anticompetitive effects, and could have been accomplished by less restrictive means.

(c)   With knowledge of the foregoing agreements and their unreasonable anticompetitive effects, Mitsi Holdings, J. Aron, Goldman International, Goldman Sachs & Co. and Goldman approved, substantially associated themselves and agreed with Metro to help it perform such agreements in violation of Section 1. ¶¶17, 83-94, 297, 336-383.  They benefitted from the performance of such agreements.

(d) Although lower level LME executives (¶237) and longtime LME Warehouse Committee members (¶241) disagreed with Metro's assertions and its violations of the LME

18

Charter, the top level LME executives were in control of the LME.  They stood to receive large bonuses from the completion of the merger.  Thus, they caused the LME anomalously to agree with Metro to substantially further Metro's violations of the LME Charter, and Metro's anticompetitive conduct as well as, and the anticompetitive effects thereof.  Among other things, the LME perpetuated the 1500 ton load-out rule for as long as it could.  The LME influenced Europe Economics to reduce its recommended change in the rule.  The LME refused to implement Europe Economics' recommendation.  Until at least 2013, the LME Defendants consistently resisted the changes in the load-out rule, that were required to end the load-out delays.  All LME Defendants repeatedly made public statements that supported Metro's historically unprecedented and anomalous behavior, and otherwise furthered the LME's anticompetitive agreements with Metro and Mitsi.

(e) As previously alleged, the prospective LME merger created large financial incentives for the LME, its CEO and top officers to agree with Metro to the violations of the LME Charter and the resulting anticompetitive effects alleged herein.  Among other things, this was because the increases in Metro's rents from a much greater amount of aluminum restrained for much longer times, also supracompetitively increased the LME's share of Metro's rents.  This increase in the LME's rents increased the LME's projected sales value and made the LME more likely to consummate its merger transaction.

19.    **Third Claim**.   In the alternative or in addition, Plaintiffs have alleged an agreement among all Defendants, except the LME Defendants, to inflate physical aluminum prices, including the Midwest Transaction price and the Midwest premium.   In response to inquiries challenging Metro's innocence, Metro's CEO wrote a multi-faceted response that sought to deflect responsibility away from Metro in numerous ways including by stating:

"physical traders in conjunction with banks and producers hold [aluminum] stock and withhold metal sales to consumers in order to squeeze up the premiums."  GS-METRO-00032011.  As Plaintiffs allege in the alternative in their third claim for relief, Defendants acted to inflate aluminum prices through market allocation agreements, concerted squeezes of aluminum premiums, and other violative conduct.

20.  **Fourth Claim For LME Combination.** (a) The LME, LME Holdings, HKEx, Metro, the other Warehouse Defendants, the LME's agreements with its warehouse companies, the LME's agreements with and rules governing LME members, constituted a large combination or agreement that is referred to herein as the LME Combination.  The LME Combination had extraordinary market power that controlled 99% of the aluminum forward and futures contract trading in the United States during the Class Period.

(b) During various times prior to the Class Period when the LME Charter was observed, the LME Combination was not having unreasonable anticompetitive effects on physical aluminum prices.  LME forward contracts on aluminum then provided industrial and other consumers of primary aluminum with a means of hedging price and supply risks on physical aluminum.  ¶¶196, 317-321, 412.  This included a means of purchasing such aluminum based on the LME price and without paying the Midwest premium.  *Id*.

(c) Again, the LME Charter for its warehouses is as follows:  "The LME licenses warehouses to provide **a market of last resort and to ensure the LME price stays in line with the physical/spot price**." https://www.lme.com/en-gb/pricing-and-data/pricing/convergence/. The LME Charter thus has two parts; (1) the LME warehouses should act as market participants of last resort, and (2) they should act in a manner that tends to cause convergence of the LME price with the all-in transaction price.

(d) As a result of the alleged agreements and conduct, summarized at ¶¶4-17, Metro and the LME Combination systematically violated both aspects of the LME Charter.  For example, Metro anticompetitively entered the Primary Aluminum Market as a participant of first resort. Metro then used its status as a member of the LME Combination to provide a mix of consideration to aluminum producers and others.  Using these advantages from the LME Combination to overbid industrial consumers, Metro diverted aluminum away from industrial consumers (including Plaintiffs) to the LME Detroit warehousing.  ¶¶9-10, 14, 16, 325, 359, 414, 445, 456-458, 468. In the process, Metro knowingly directly and intentionally inflated the Midwest Premium and Midwest Transaction price.  The direct effects and direct victims of this price inflating conduct were industrial consumers including Plaintiffs; and as Metro knew, J. Aron and other Defendants were the direct beneficiaries of these increases in the Midwest premium.

(e) Each of the foregoing rendered and made the LME Combination an unreasonable violation of Section 1.

(f) Similarly, the LME Combination delayed for at least three years any amendment to the unreasonable load-out rule that would promptly end the violation of the LME Charter, and the price inflation and other anticompetitive effects thereof.

(g) For one of many other examples, the LME Combination violated the LME Charter by virtue of each of the violations of law and anticompetitive effects alleged in the First-Third Claims.

21.     The LME and other members of the LME Combination knew of these violations of the LME Charter, and the resulting anticompetitive effects including the price inflation.  They did not stop them. On the contrary, the LME actively assisted and profited from them and

overrode dissenting voices within the LME.  This conduct further rendered and made the LME Combination an unreasonable restraint in violation of Section 1. As a direct and foreseeable result of this violation, Plaintiffs paid inflated prices to purchase aluminum.

**C. State law Claims.**

22.     Plaintiffs also allege that Defendants' foregoing conduct violated other Federal and numerous State laws providing Plaintiffs and Class members with claims under such State laws.  ¶¶637-663.

## II.     JURISDICTION AND VENUE

23.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

24.     The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under the laws of the several states.

25.     This Court has subject matter jurisdiction over Plaintiffs' claims under the laws of the several states pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), in that this is a class action in which the members of the Class (as defined herein) exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of the Class are citizens of a state different from some Defendants.

26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

27.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

28.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airlines, wires, wireless spectrum, and the U.S. mail, to effectuate their illegal conspiracy to monopolize and otherwise restrain trade.

29.     Defendants' manipulation, conspiracy and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act.

30.     Defendants' conduct had a substantial effect on the intrastate commerce of each of the fifty United States and its territories.

31.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in this District.  The conspiracy to monopolize and otherwise restrain trade alleged herein was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

III.   **PARTIES**

A.     **Plaintiffs**

32.     Each Plaintiff named herein is a member of the Class.  A summary of the products, geography, pricing for purchases, as well as each Plaintiff's place within the chain of distribution and injuries suffered, follows.

1.     **Generally**

(a)     **Plaintiffs purchased in the Relevant Product Market**

33.     Each Plaintiff purchased primary aluminum as a First Level Purchaser or a Direct Purchaser, during the Class Period.

**(b)     Plaintiffs purchased in the Relevant Geographic Market**

34.     Each Plaintiff purchased primary aluminum for physical delivery within the United States, regardless of whether the primary aluminum purchased was imported or domestically sourced.

**(c)     Plaintiffs each paid for the Relevant Product in the Relevant Geographic Market under a standardized, industry dictated pricing scheme**

35.     During the Class Period, Plaintiffs purchased primary aluminum at a price that included: (1) the LME Price, as defined herein, and (2) the Midwest Premium.   Certain Plaintiffs paid the MW Transaction Price, which is the sum of the LME Price and the Midwest Premium, in connection with some purchases.

36.     No Plaintiff had a choice but to pay the LME Price plus the Midwest Premium or MW Transaction Price in order to purchase primary aluminum during the Class Period.   It is industry standard practice to price primary aluminum for physical delivery in this universally recognized way.   The Midwest Premium is an industry standard, published by Platts, a division of McGraw-Hill Financial.

37.     Platts' methodology is well-known, accepted, and virtually universally used by industry participants, including, in particular, Defendants.

38.     Platts' published price premiums are required in all, if not nearly all, primary aluminum purchases, including in purchases made by Plaintiffs.   Moreover, the Midwest Premium is not merely a price component added after Defendants' involvement has ceased; rather, it is a function of Defendants' ongoing conduct, and it is set and applied in real time.

**(d)     Plaintiffs were located nearest in the chain of distribution to the anticompetitive conduct and the anticompetitive effects alleged herein**

39.     Each named Plaintiff was either (1) the first purchaser of primary aluminum, as

defined herein, in the chain of distribution to pay the Midwest Premium or MW Transaction Price ("First Level Purchaser"); (2) a direct purchaser that purchased primary aluminum directly from a Defendant ("Direct Purchaser"); or (3) both a First Level Purchaser and a Direct Purchaser, during the Class Period.

40.     First Level Purchasers were closest to the anticompetitive effect—no other purchaser was the first in the chain to actually pay the Midwest Premium for the primary aluminum purchased, and, therefore, no other purchaser was the first to suffer the anticompetitive impact of a supra-competitive Midwest Premium.  Direct Purchasers, for their part, were the closest to the anticompetitive conduct—no other purchaser purchased primary aluminum directly from the parties that actually monopolized or restrained trade.  There was no intermediary between the Defendant as the seller, which overcharged the Direct Purchaser Plaintiff, and the Direct Purchaser Plaintiff, who overpaid the Defendant.

**(e)     Plaintiffs have antitrust injury and standing as a result of Defendants' violations of law**

41.     Each Plaintiff has suffered antitrust injury and each has antitrust standing to seek redress for Defendants' violations of law.  As alleged elsewhere, Defendants' violations of law directly, foreseeably, materially, and proximately caused the Midwest Premium to reach supra-competitive levels.  By reason of Defendants' violations of law, therefore, Plaintiffs suffered injury to their business and property in the form of overcharge damages, when, in purchasing primary aluminum, they paid supra-competitive Regional Premiums, including the Midwest Premium.

42.     Plaintiffs thus are the most efficient enforcers of the antitrust laws in that they, by definition, are the most directly affected by the inflation of the Midwest Premium to supra-competitive levels.  Plaintiffs are among the class of persons whose self-interest would motivate

them to vindicate the public interest in antitrust enforcement—and this is what they are now doing.

43.    Plaintiffs remain the most efficient enforcers even compared to primary aluminum producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust laws.  Simply put, as owners of large stocks of primary aluminum, the producers benefitted tremendously from Defendants' manipulation of the Midwest Premium, and profited more from contango financing the stocks they owned even if they were forced to pay inflated prices and higher storage rents.  Moreover, Defendants and their cohorts currently hold nearly all primary aluminum in the Metro Detroit queue; they hardly would bring suit against themselves.  Besides, without a demand for primary aluminum from purchasers like Plaintiffs, there would be no demand for aluminum mining or smelting by producers or for aluminum warehousing, trading, and financing by Defendants.  Defendants' entire scheme depends, as a matter of first principal, on those which are similarly situated to Plaintiffs, which put primary aluminum to productive use.  And, of those that do, Plaintiffs are more directly injured than any others.

### 2.    Ampal

44.    Plaintiff Ampal, Inc. ("Ampal") is a New Jersey corporation located in Flemington, New Jersey.

### (a)    Product

45.    Ampal purchased primary aluminum, including P1020, during the Class Period.

### (b)    Geography

46.    Ampal purchased primary aluminum for physical delivery in the United States.

### (c)    Pricing

47.    Ampal  purchased  primary  aluminum  at  prices  incorporating  the  Midwest

Premium or the MW Transaction Price.

### (d)   Chain of distribution

#### i.   Purchasing

48.   **First Level Purchaser.**  Ampal was the first party to pay the Midwest Premium on primary aluminum it purchases from primary aluminum producers, including Alcoa, Inc. ("Alcoa") and Rio Tinto Alcan, Inc. ("Rio Tinto Alcan" or "Alcan"), during the Class Period. By way of example, Ampal purchased primary aluminum, including P1020 in the form of sows, from Rio Tinto Alcan at a price incorporating the MW Transaction Price during 2011.

49.   **Direct Purchaser.**  Ampal also directly purchased primary aluminum from Glencore.  By way of example, Ampal purchased primary aluminum, including P-1020 in the form of T-bar, from Defendant Glencore Ltd. in 2013 at a price incorporating the MW Transaction Price.

50.   Ampal also purchased primary aluminum from Century Aluminum Company ("Century"), a company that Glencore exercises control over.  Defendant Glencore, specifically Defendant Glencore AG, owns 41% of Century, one of the largest domestic primary aluminum producers, holds three seats on Century's board, and, with little exception, has the exclusive U.S. distribution rights for nearly all of Century's domestically produced aluminum.

#### ii.   Manufacturing and sales

51.   From the primary aluminum it purchases, Ampal produces atomized aluminum powder, which it then sells to the chemical, metallurgical, explosives and coatings industries.

### (e)   Antitrust injury and standing

52.   Ampal was damaged in its business or property within the meaning of Section 4 of the Clayton Antitrust Act in the form of overcharge damages, in that it paid, both first and most directly, more than it otherwise would have by reason of the antitrust violations alleged

herein.  Ampal is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Antitrust Act, should the antitrust violations alleged herein continued unabated.

### 3.    Custom Aluminum

53.    Plaintiff Custom Aluminum Products, Inc. ("Custom") is an Illinois corporation located in South Elgin, Illinois.

### (a)    Product

54.    Custom purchased primary aluminum, including extrusion billet, as a First Level Purchaser, during the Class Period.

### (b)    Geography

55.    Custom purchased primary aluminum for physical delivery in the United States.

### (c)    Pricing

56.    Custom purchased primary aluminum at prices incorporating the Midwest Premium or the MW Transaction Price.

### (d)    Chain of distribution

### i.    Purchasing

57.    Custom was the first party to pay the Midwest Premium on purchases from primary aluminum producers, including Hydro Aluminum Metals USA, LLC ("Hydro") during the Class Period.  By way of example, Custom purchased primary aluminum, including extrusion billet, from Hydro at a price incorporating the MW Transaction Price during 2012-2014.

### ii.    Manufacturing and sales

58.    From the primary aluminum it purchases, Custom produces aluminum extrusions, which it then sells to the manufacturers of products with aluminum component parts.

**(e)**     **Antitrust injury and standing**

59.     Custom was damaged in its business or property within the meaning of Section 4 of the Clayton Antitrust Act in the form of overcharge damages, in that it paid, first and most directly, a higher Midwest Premium than it otherwise would have by reason of the antitrust violations alleged herein.  Custom is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Antitrust Act, should the antitrust violations alleged continue unabated.

**4.     Claridge**

60.     Plaintiff Claridge Products and Equipment, Inc. ("Claridge") is an Illinois corporation located in Harrison, Arkansas.

**(a)     Product**

61.     Claridge purchased primary aluminum, including extrusion billet, as a First Level Purchaser, during the Class Period.

**(b)     Geography**

62.     Claridge purchased primary aluminum for physical delivery in the United States.

**(c)     Pricing**

63.     Claridge purchased primary aluminum at prices incorporating the MW Transaction Price.

**(d)     Chain of distribution**

**i.     Purchasing**

64.     Claridge was the first party to pay the Midwest Premium on purchases from primary aluminum producers, including Alcan and Noranda, during the Class Period.  By way of example, Claridge purchased extrusion billet from Alcan at a price incorporating the MW Transaction Price during 2011 and 2014.  Claridge purchased primary aluminum, including

extrusion billet, from Noranda at a price incorporating the MW Transaction Price during 2011 and 2014.

### ii.      Manufacturing and sales

65.      From the primary aluminum it purchases, Claridge produces aluminum extrusions, which it then sells to the manufacturers of products with aluminum component parts.

### (e)      Antitrust injury and standing

66.      Claridge was damaged in its business or property within the meaning of Section 4 of the Clayton Antitrust Act in the form of overcharge damages, in that it paid, first and most directly, a higher Midwest Premium than it otherwise would have by reason of the antitrust violations alleged herein.  Claridge is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Antitrust Act, should the antitrust violations alleged continue unabated.

### 5.      Extruded Aluminum Corp.

67.      Plaintiff Extruded Aluminum Corp. ("Extruded") is a Michigan corporation located in Belding, Michigan.

### (a)      Product

68.      Extruded purchased primary aluminum, including extrusion billet, as a First Level Purchaser, during the Class Period.

### (b)      Geography

69.      Extruded purchased primary aluminum for physical delivery in the United States.

### (c)      Pricing

70.      Extruded purchased primary aluminum at prices incorporating the MW Transaction Price.

**(d)     Chain of distribution**

**i.     Purchasing**

71.     Extruded was the first party to pay the Midwest Premium on primary aluminum purchases from primary aluminum producers, including Noranda, during the Class Period.  By way of example, Extruded purchased primary aluminum, including extrusion billet from Noranda, at a price incorporating the MW Transaction Price in 2010, 2011, and 2013.

**ii.     Manufacturing and sales**

72.     From the primary aluminum it purchases, Claridge produces aluminum extrusions, which it then sells to the manufacturers of products with aluminum component parts.

**(e)     Antitrust injury and standing**

73.     Extruded was damaged in its business or property within the meaning of Section 4 of the Clayton Antitrust Act in the form of overcharge damages, in that it paid, first and most directly, a higher Midwest Premium than it otherwise would have by reason of the antitrust violations alleged herein.  Extruded is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Antitrust Act, should the antitrust violations alleged continue unabated.

**B.     Defendants**

**1.     London Metal Exchange Defendants**

74.     Plaintiffs name as Defendants herein the following entities within the LME corporate group: The London Metal Exchange (f/k/a The London Metal Exchange Limited),[2]

---

[2] The Court dismissed the LME under the Foreign Sovereign Immunities Act ("FSIA") on August 26, 2014.  (ECF 570.)  Plaintiffs' motion for reconsideration is under submission.  The LME is named as a defendant herein in an abundance of caution so as to preserve and not waive Plaintiffs' right to appeal that ruling.  *Cf. In re LIBOR-Based Financial Instruments Based Antitrust Litig.*, Case 1:11-md-02262-NRB, Second Consolidated Amended Complaint, (ECF 406), at ¶ 1, n.1 (Sept. 10, 2013).  Neither LME Holdings nor HKEx moved to dismiss on FSIA

LME Holdings Ltd., and Hong Kong Exchanges & Clearing Ltd.

75.    Defendant **The London Metal Exchange** ("the LME") is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom.  By its own admission, it is a "non-governmental corporate entity."[3]  According to its website, "[the LME] is the world centre for industrial metals trading and price-risk management."[4]  LME prices "are used as the global benchmark."[5]  On December 6, 2012, the stock of the LME's parent company, LME Holdings Ltd., was acquired by Hong Kong Exchanges and Clearing Limited which owns the HKEx Group, an integrated exchange group based in Hong Kong.

76.    The LME is the world's largest non-ferrous metals market and "a private trade association"[6] for Defendants here.  More than 80% of all global non-ferrous metal futures business is transacted through its trading platforms.  The non-ferrous metals exchanged through the LME are aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt, and molybdenum.  The LME handles total trading volumes of about $61 billion per day.  The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds, and traders, rather than users of aluminum.

---

grounds.  The Court denied as moot the motions to dismiss of LME Holdings and HKEx on personal jurisdiction grounds.

[3]      Corporate Disclosure Statement, In re Aluminum Warehousing Antitrust Litigation, MDL No. 2481, ECF 22 (Aug. 21, 2013).

[4]      LME Website, http://www.lme.com

[5]      LME Website, http://www.lme.com

[6] David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, THE NEW YORK TIMES (August 12, 2013) (emphasis added).

77.     Defendant **LME Holdings Limited** ("LME Holdings") is the corporate parent of the LME and is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom, the same address as the LME.

78.     Defendant **Hong Kong Exchanges & Clearing, Ltd.** ("HKEx") is a Hong Kong corporation located at One International Finance Centre, 1 Harbour View Street, Central, Hong Kong, China.

79.     (a) On December 6, 2012, HKEx acquired the LME for $2.2 billion.  HKEx, not the British government or any other government, therefore, owns and controls the LME. When HKEx agreed to purchase the LME, it knew what it was getting and paid for it handsomely, investing billions for the opportunity to profit from its ownership of the LME.



(b) At the time that LME Holdings was sold to HKEx, Goldman Sachs held 9.5% of its shares, a stake valued at $208 million.  Defendant JP Morgan owned even more LME Holdings stock, with approximately 1.4 million ordinary shares (10.9%), amounting to a value of $260 million of the $2.2 billion purchase price.

(c) As Category 1, 2, and 5 members of the LME, JP Morgan Securities plc, Goldman Sachs International, and Glencore UK Ltd. each own Class B shares of LME Holdings.  Other such shareholders include entities similarly hold Class B shares of Holdings, including: Bank of America, Citigroup, and Morgan Stanley.  In considering the allotment of such Class B shares of

LME Holdings, according to its Articles of Association, LME Holdings considers "the current and future interests of the [London Metal] Exchange and the HKEx Group as a whole."

80.     (a) HKEx assumed full control over the LME and its operations upon acquiring the LME.  In a Foreign Board of Trade submission to the CFTC, the LME represented that the HKEx's acquisition of the LME represented a "change of control" of the LME.  It submitted the "Control Structure of The London Metal Exchange Limited post Acquisition,"[7] reproduced here.

(b) In addition to becoming vicariously liable for the agreements acts, and practices of the LME and LME Holdings, HKEx joined the ongoing combination and conspiracy in restraint of trade when it acquired LME Holdings and the LME.  In October 2012, before HKEx's acquisition of the LME was completed, HKEx's CEO Charles Li promised to make "bazooka"-like changes to LME warehousing, stating:

> If people have to wait a year [to remove aluminum from the warehouse], that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable.

(c) However, HKEx did not end the continuing conspiracy to monopolize and restrain trade.  In January 2013, just weeks after the HKEx acquisition closed, Chris Evans, LME Head of Business Development, denied that the warehouse queues had any effect on aluminum prices and instructed dissatisfied consumers, who at this point were facing 16-month load out times and greatly inflated aluminum prices, simply to stop paying the higher aluminum prices if they had a problem.  According to Evans, it was not the LME's place to change its agreements to help reduce the queues.

---

[7]     Letter from London Metal Exchange to Commodity Futures Trading Commission, regarding Notification of Change of Control (Dec. 6, 2012).

(d) In January 2013, after the deal was finalized, CEO Charles Li stated: [8]

> Previously, I was quoted saying I would take a "bazooka" to the warehouse queue issue if getting access to metal were a big problem. But our assessment is that buyers have access, so we are not facing a fundamental problem with our market and a bazooka is unnecessary.
>
> * * *
>
> I had talked last year about a surgical operation if the price of metal was being distorted, but we've determined that this is not a problem either.
>
> * * *
>
> I view a persistently high premium as an unhealthy physical condition, such as swelling, that is not life threatening but is highly irritating and has the potential to cause long term harm. This can't be solved with either a bazooka or a surgical operation. Instead, a modest approach, such as "Chinese medicine", might be the cure.

(e) In March 2013, "Matt Chamberlain, who was hired by [HKEx] to run the consultation and implement the [warehouse] changes, described the plan to link delivery rates to inflows into warehouses with big queues as the 'Charles solution,'" referring to HKEx CEO Charles Li.[9]

81.    A July 1, 2013 email from Chamberlain (LME and HKEx) to Jacques Gabillon (GS) illustrates Goldman's control over the LME and the Warehousing Committee, even to the extent of how the warehouse operates.   Chamberlain emailed Goldman directly (without copying anyone from Metro) the slides for the LME presentation at the Warehousing Committee and stated, "**Clearly, we're looking for GS to be a key voice in the consultation process**."   Gabillon forwarded the LME's slides to additional Goldman employees, but not to Metro.  GS-METRO-00027916.

---

[8] Charles Li, LME Warehouse Queues: Perception and reality, HKEx Charles Li Direct Blog (Jan. 7, 2013).

[9] Melanie Burton and Polly Yam, *LME warehousing throws up roadblock for Charles Li*, Reuters (Mar. 31, 2014).

82.     (a) The LME is regulated by the CFTC.  For example, the LME currently is engaged in an extensive application process with the Commodity Futures Trading Commission to enjoy CFTC regulated Foreign Board of Trade status, showing that the LME is no sovereign organ and that it operates in interstate commerce.  The LME has applied to the Commodity Futures Trading Commission for registration as a Foreign Board of Trade ("FBOT") under the Dodd-Frank Consumer Financial Protection Act.[10]

(b) Under Dodd-Frank, the CFTC adopted rules and regulations requiring FBOT's that operate in U.S. commerce to register with the CFTC.  As part of the process, federal law mandates that the FBOT file with the CFTC a "valid and binding appointment of an agent for service of process in the United States,"[11] as part of a federally mandated detailed application and registration process.

(c) The LME has produced voluminous materials to the CFTC in the context of its FBOT application.  The LME submitted to the CFTC with its FBOT application a letter from the FCA as part of its application to the CFTC.[12]  The FCA letter to the CFTC letter did not mention in words or in substance that: (i) the FCA delegated regulatory power to the LME; (ii) the LME was an agent, instrumentality, or organ of the UK government; or (iii) the LME was not subject to U.S. regulation or jurisdiction.

---

[10] *See* http://sirt.cftc.gov/sirt/sirt.aspx?Topic=ForeignBoardsofTradeAD&Key=23619. *See also* ECF481 at 2-3. An FBOT is defined as any "board of trade, exchange or market located outside theUnited States, its territories or possessions, whether incorporated or unincorporated." 17 C.F.R. § 48.2(a).

[11] 17 C.F.R. § 48.8(a)(5)(ii).

[12] *See* FSA letter to CFTC (Aug. 3, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@otherif/documents/ifdocs/lmetab18.pdf.

(d) On September 26, 2014, United States Senators Sherrod Brown, Tammy Baldwin, and Elizabeth Warren, sent a letter to the CFTC asking it to thoroughly investigate the LME and its role in the aluminum warehousing conspiracy prior to approving the LME's application as a FBOT, demanding that the CFTC "us[e] their authority to conduct a thorough review of the ongoing issues destabilizing the aluminum market and ensure that the London Metal Exchange is operating above board before finalizing the LME's authority as a foreign board of trade."[13]

(e) The Senators' letter to the CFTC provided:

We write to express our deep concern with the ongoing irregularities in trading of aluminum contracts and the warehousing and physical delivery of aluminum to end users.  While we have raised aluminum market issues with you and your staff during hearings before the U.S. Senate Committee on Banking, Housing, and Urban Affairs and the Committee on Agriculture, Nutrition, and Forestry; in letters; and throughout the confirmation process for the newest Commissioners, our many concerns remain unresolved.  We urge you to immediately use the Commodity Futures Trading Commission's (CFTC) existing oversight tools to thoroughly examine aluminum markets used by U.S. participants and to allow sufficient time for Congress to make any necessary legislative fixes through the reauthorization of the Commodity Exchange Act (CEA) before authorizing foreign boards of trade (FBOT) through the CFTC's FBOT registration process.

First, we urge the Commission to ensure that the London Metal Exchange (LME), the largest exchange for aluminum futures, is operating in compliance with the CFTC's standards before approving its application for registration as an FBOT. We have serious concerns that aluminum contracts' storage and delivery provisions, as implemented and overseen by the LME, are vulnerable to manipulation and have resulted in an inefficient physical delivery settlement process which raises costs for consumers and erodes confidence in the LME. Problematic LME rules include:

- Insufficient warehouse load-out rules and practices for LME aluminum contracts that have resulted in end users waiting in queues for as many as 683 days to take delivery of aluminum, despite high levels of production and large amounts of aluminum waiting in storage for delivery;

---

[13] *See* http://www.brown.senate.gov/newsroom/press/release/in-letter-to-cftc-senators-call-for-investigation-of-aluminum-warehousing-practices.

- Inadequate rules requiring the institution of "Chinese walls" between their warehouse companies and trading operations to prevent conflicts of interest between their commercial investments and other financial activities - such measures may be useful in theory, but ineffective in practice;

- Rules preventing warehouse owners from storing their own metals in their warehouses, but allowing the parent company of a warehouse owner to store metals in a warehouse owned by one of its subsidiaries; and

- Overly restrictive LME rules that prohibit only "unreasonable" incentive payments, a vague term that is open to abuse. As the LME itself acknowledges, warehouse competition is conducted on the basis of high incentive payments, and such payments are "significantly . . . linked to the existence of [aluminum] queues[,]" yet it has taken no steps to address this structure.

We remain extremely concerned that these conditions are adversely affecting the ready supply and pricing of aluminum and threaten the entire aluminum market.

The FBOT registration process, as allowed by the Dodd-Frank Wall Street Reform and Consumer Protection (Dodd-Frank) Act and defined by the Commission's regulations, provides an opportunity for meaningful market oversight that protects U.S. end-users and consumers.  It is critical that the CFTC use this opportunity to examine the LME's practices and to work with the United Kingdom's Financial Conduct Authority (FCA), other regulatory authorities, and the LME to ensure that the LME meets the standards the CFTC set forth in its FBOT registration rule.

Second, if the CFTC is unable to work with the LME and the FCA to come to a resolution that fully addresses the delivery issues facing end users, Congress may be forced to legislate in this area.  In that event, we request that the CFTC refrain from approving LME's application for registration as an FBOT until Congress has had the opportunity to address distortions in aluminum futures trading and delivery by taking appropriate legislative action through the CEA reauthorization process.  It would also be useful for CFTC to suggest any legislative changes to the CEA that might improve the CFTC's authority and oversight concerning the LME and other FBOTs.

Finally, market observers and end users have reported that record queues and large stockpiles of aluminum built up in LME-approved warehouses have distorted the market and hurt end-users' and consumers' bottom lines.  These serious concerns deserve a full investigation by the CFTC to determine the full effects of the current load-out delays and storage fees and to determine whether

the sometimes mutual interests of futures traders and LME warehouse owners resulted in any activities that would be inappropriate under the CEA.

We ask that the CFTC immediately examine the effects that the current warehousing system - including its structure, regulation, and fee system - have on futures trading, U.S. manufacturers, and U.S. consumers in order to determine whether the LME and its U.S.-based warehouses are in compliance with all applicable U.S. trading laws.

The CEA and Dodd-Frank gave the CFTC important tools to ensure that commodity markets operated at home and abroad provide a safe and level playing field for U.S. traders and end users.  The CFTC should use all available tools to ensure that the aluminum market is once again an efficient place for price discovery that serves businesses and consumers.[14]

(f) Shortly after the Senator's letter was published, the LME's Chamberlain travelled to Washington "to plead the exchange's case" to the Senators.[15]  A spokeswoman for Senator Sherrod Brown confirmed the LME's visit.  Citing sources close to Congress and to the LME, Reuters reported:

Chamberlain's trip to the U.S. capital illustrates the pressure on the LME as it tries to fend off criticism over its handling of the years-long crisis.  "They (the LME) are saying 'we've done everything we can'. This (trip) was to convince senators and regulators that they've done a good job," said the source familiar with the situation.

83.    (a) HKEx has integrated the LME into the Global Markets division of its business.  Both HKEx CEO Charles Li and HKEx Chairman of the Board Chow Chung Kong are directors of both the LME and LME Holdings Limited.  Romnesh Lamba and Garry Jones, HKEx's Co-heads of Global Markets, both sit on the boards of the LME and LME Holdings Limited.

---

[14] *Id.*

[15] Douwe Miede, *LME takes battle to Washington after London warehouses win*, REUTERS (Oct. 17, 2014), *available at* http://www.reuters.com/assets/print?aid=USKCN0I609V20141017

(b) Since it purchased the LME in 2012, HKEx has used the LME as a mere department and held out the LME and LME Holdings interchangeably and otherwise dominated and controlled both.  HKEx has had the ability to make meaningful changes to improve the situation in the aluminum market.  The LME is governed by a set of sub-committees that report to the LME's board of directors either directly or indirectly through the executive committee.  HKEx, with control of four seats on the board of both the LME and LME Holdings Limited, could have eliminated the manipulation of aluminum storage.  Instead, HKEx let the aluminum market fester.

(c) LME Holdings' and LME's interlocking directors hold out the LME and LME Holdings interchangeably, both before and after the acquisition by HKEx.  LME Holdings and the LME have continuously shared directors and senior management both prior to and after the December 6, 2012, acquisition by HKEx, and continue to do so.  Most board members are (and were, during the entire proposed class period) identical between the companies, and both boards are chaired by Sir Brian Bender.  Both pre- and post-acquisition management refer to LME Holdings as LME.  The LME and LME Holdings have the same Chief Executive, and did so during the entire class period.

(d) LME Holdings and the LME are each other's agents and alter egos and LME Holdings is vicariously liable for all unlawful acts, practices, and agreements of the LME alleged herein.  LME Holdings owns and controls the LME.  LME Holdings has no other purpose than to own and operate the LME for HKEx as a mere department and pass-through entity owned and controlled by HKEx, with whom it also shares interlocking directorates.  The LME and LME Holdings are referred to herein collectively as "the LME."

84.    Plaintiffs hereby incorporates as if fully set forth herein all arguments and

supporting material on the record in this case supporting subject matter jurisdiction and personal jurisdiction over the LME, LME Holdings, and HKEx, including, but not limited to: ECF 367, ECF 368, ECF 390, ECF 391, ECF 481, ECF 482.

## 2. Goldman Defendants

85.    Plaintiffs name as Defendants herein the following entities within the Goldman corporate group:  The Goldman Sachs Group, Inc., Goldman, Sachs & Co., J. Aron & Company, Goldman Sachs International, Metro International Trade Services LLC, and Mitsi Holdings LLC.

86.    Defendant **The Goldman Sachs Group, Inc.** ("Goldman Sachs") is an international financial company headquartered at 200 West Street, #200, New York, New York 10282.  Goldman Sachs trades physical aluminum and other base metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.  Goldman Sachs has been the owner of Defendant Metro since at least February 2010 and it entered into an agreement to purchase Metro in at least November 2009.  J. Aron & Company ("J. Aron") is the commodities risk management business of Goldman Sachs acquired in 1981 and receives the full corporate guarantee of the Goldman Sachs Group.  The Goldman Sachs Group, Inc., owned a 9.5% equity stake in the LME.

87.    Defendant **Goldman, Sachs & Co.** is a New York corporation and the wholly-owned, principal operating subsidiary of The Goldman Sachs Group, Inc., with its headquarters located at 200 West Street, New York, New York 10282.

88.    Defendant **J. Aron & Company** ("J. Aron") is a New York corporation, commodities trading firm and wholly owned subsidiary of Defendant The Goldman Sachs Group, Inc. with its principal place of business located at 200 West Street, 29th Floor, New

York, NY 10282 and additional offices in London, Singapore, Tokyo, Sydney and Calgary.

89.     Defendant **Goldman Sachs International** is an international financial services provider headquartered at Peterborough Court, 133 Fleet Street London, EC4A 2BB, United Kingdom.   According to regulatory filings with the Securities and Exchange Commission, Goldman Sachs International is a "significant subsidiary" of Defendant The Goldman Sachs Group, meaning that The Goldman Sachs Group owns at least 99% of the voting securities of Goldman Sachs International.

90.     Goldman Sachs International is a Category 2 member of the LME.

91.     Goldman Sachs International is, by virtue of its total and complete ownership by The Goldman Sachs Group, simply a corporate alter ego of The Goldman Sachs Group, which is headquartered in this District.  Goldman Sachs International conducts substantial and ongoing business in this District in its own right by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York.  Attendant to this business, Goldman Sachs International is also a registered swap dealer with the CFTC.

92.     Defendant **Metro International Trade Services LLC ("Metro")** is a limited liability company organized under the laws of Michigan and headquartered at 6850 Middlebelt Road, Romulus, Michigan 48174.  It owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan; Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store, among other metals, aluminum.

93.     Defendant **Mitsi Holdings LLC** is a Delaware limited liability company and wholly-owned subsidiary of The Goldman Sachs Group, Inc. with its principal place of business located at 200 West Street, 29th Floor, New York, NY 10282.  Mitsi Holdings LLC is the parent

holding company of, with 100% ownership interest in, Defendant Metro International Trade Services LLC.

94.    The ownership structure extending from Goldman to Metro and from Goldman to Goldman Sachs International, as reflected in internal Goldman documents, is illustrated below:



### 3.    JP Morgan Defendants

95.    Plaintiffs name as Defendants herein the following entities within the JPMorgan corporate group:  JPMorgan Chase & Co., J.P. Morgan Securities plc, Henry Bath & Son, Ltd., and Henry Bath LLC.

96.    Defendant **JPMorgan Chase & Co.** ("JPMorgan") is an international financial company headquartered at 270 Park Avenue, New York, New York 10017, and conducts business within this District. JPMorgan engages in the storage, transportation, marketing, or

trading of commodities, including aluminum and other metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.  JPMorgan Chase & Co. was the largest LME shareholder with approximately 1.4 million ordinary shares, and had an 11% equity stake in the LME.

97.     Defendant **J.P. Morgan Securities plc** (f/k/a J.P. Morgan Securities Ltd.) ("JPMorgan Securities") provides securities brokerage services for JPMorgan, and is headquartered at 25 Bank Street, Canary Wharf, London E14 5JP, United Kingdom.  Formerly JPMorgan Securities Ltd., JPMorgan Securities is one of the firm's "principal operating subsidiaries" according to SEC filings, and is a wholly owned subsidiary of JPMorgan Chase Bank, N.A.

98.     JPMorgan Securities is a Category 1 member of the LME.

99.     JPMorgan Securities transacts directly with Metro regarding aluminum storage in the United States on a deeply involved and continuing basis – so much so that Peter Sellars, former head of the Global Commodities Group, communicated directly with Metro's Wibbelman about their business together.  According to documents produced by Goldman and Metro, some of the JPMorgan aluminum stored at Metro's Detroit warehouse was for the account of JP Morgan Chase Bank, N.A.

100.     Defendant **Henry Bath & Son, Ltd.** is a corporation organized under the laws of the United Kingdom, with its headquarters located in the United Kingdom.  Henry Bath & Son, Ltd. owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store, among other metals, aluminum.

101.     Defendant **Henry Bath & Son, Ltd.** is one of the oldest warehouse operators in

the world and a founding member of the London Metal Exchange.  It is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom.  The company also holds a seat on the LME Warehousing Committee, a select group charged with establishing the rules for LME regulated warehouses.  That seat is held by Graham Hawkins, General Manager of Henry Bath & Son, Ltd.

102.    Additionally, Plaintiffs allege that Henry Bath & Son, Ltd. is the direct corporate parent of Henry Bath LLC, and as the sole shareholder of Henry Bath LLC exercises complete control over the company and its operations, including its warehousing business.

103.    Henry Bath & Son, Ltd., reports income derived from Henry Bath LLC's U.S.-based warehousing operations in its own financial statements.  Henry Bath & Son, Ltd. includes Henry Bath LLC's U.S.-based income in its annual calculation of tax on profit on ordinary activities.   Henry Bath LLC is also included in Henry Bath & Son, Ltd.'s group-wide calculation of tangible assets and goodwill.

104.    JPMorgan acquired Henry Bath & Son, Ltd. on or about February 16, 2010, as part of a deal to acquire RBS Sempra Commodities.  This deal was announced the same week that Defendant Goldman Sachs announced its plan to purchase Defendant Metro, and just seven months before Defendant Glencore agreed to purchase Defendant Pacorini.

105.    Following the acquisition, JPMorgan acted quickly to expand its control over Henry Bath & Son, Ltd., integrating the warehousing company into its operations.  Henry Bath & Son, Ltd. became the metals warehousing "unit" of JPMorgan.  Peter Sellars, CEO of RBS Sempra Metals and Henry Bath & Son, Ltd., was installed as CEO of J.P. Morgan Metals Limited.  Sellars was joined by Sid Tipples, COO of RBS Sempra Metals, who became COO of J.P. Morgan Metals Limited.  Together, both Sellars and Tipples served as the sole directors of

Henry Bath & Son, Ltd. until 2012 when Blythe Masters, head of JPMorgan's commodities unit, Francis Dunleavy, head of JPMorgan's Principal Commodity Investment division, and Mike Camacho, head of JPMorgan's non-oil energy trading desk, were named directors of Henry Bath & Son, Ltd.

106.    By controlling all of Henry Bath & Son, Ltd.'s directors in addition to 100% of its stock, JPMorgan had complete control over Henry Bath & Son, Ltd., and its U.S.-based subsidiary, Henry Bath LLC, including all of its aluminum warehouses.

107.    Defendant **Henry Bath** LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, and is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom.  It owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store, among other metals, aluminum.

108.    JPMorgan sold the Henry Bath entities and warehousing business to Mercuria in a transaction that closed on or about October 3, 2014.

109.    Plaintiffs hereby incorporate as if fully set forth herein all arguments and supporting material on the record supporting personal jurisdiction over Henry Bath & Son Limited including, but not limited to: ECF 531, ECF 532, ECF 533.

### 4.    Glencore Defendants

110.    Plaintiffs name as Defendants herein the following entities within the Glencore corporate group: Glencore plc (f/k/a Glencore Xstrata, plc); Glencore International AG; Glencore AG; Glencore UK Ltd.; Glencore Ltd. (a/k/a Glencore US); Pacorini Metals AG; and Pacorini Metals USA, LLC.

111.     Defendant **Glencore plc** is a public limited company organized under the laws of Jersey and headquartered at Baarermattstrasse 3, CH-6340 Baar, Switzerland.

112.     It is the corporate successor to Glencore Xstrata plc, Glencore International plc, and Marc Rich & Co. prior to that.  *See Special Report: Glencore, The Biggest Company You Never Heard Of*, REUTERS (Feb. 25, 2011), at

http://www.reuters.com/assets/print?aid=USTRE71O1DC20110225.

113.     Glencore plc is a multinational commodities trading and mining corporation that engages, directly and through its wholly owned and controlled foreign and domestic subsidiaries, in the production, storage, transportation, marketing, or trading of aluminum and other metals, as well as trading derivative products that derive their value from the underlying asset prices of aluminum.

114.     Glencore plc has more than 90 offices in 50 countries, including the United States, and controls more than 150 mining and metallurgic sites, oil production assets, and agricultural facilities worldwide.[16]  Glencore, PLC does substantial business within the United States, deriving about one quarter of its $233 billion in revenue from sales in the Americas.[17]  Glencore, PLC also maintains more than one quarter of its $89 billion in non-current assets within the Americas.[18]  As of December 31, 2011, Glencore, PLC's global marketing network included offices in Clarksville, Tennessee, Houston, Texas, Pittsburgh, Pennsylvania, and

---

[16]     Glencore plc webpage titled "The Group," *available at* http://www.glencore.com/who-we-are/the-group/.

[17]     2013 Annual Report of Glencore Xstrata plc at 6, *available at* http://www.glencore.com/assets/Uploads/reports_and_results/glencore/2013/GLEN-2013-Annual-Report.pdf.

[18]     *Id*.

Wilmington, Delaware.[19]   (Defendants Glencore plc, Glencore Ltd., Glencore International AG, Glencore AG, Glencore UK Ltd., and Glencore Ltd. will sometimes be collectively referred to as "Glencore.")

115.   Defendant **Glencore International AG** is a Swiss corporation with a business address at Baarermattstrasse 3, CH-6341 Baar, Switzerland and wholly-owned subsidiary of Glencore plc.   It is described as the primary operating company of Glencore plc.   Metro communicates directly with Glencore International AG in Baar, Switzerland, including employees Martin Rellstab, Jose Maria Guerra, Myrtha Kuhn, Nicole Signer, Geanina Gabathuler, Corinne Amrein and Robin Scheiner.

116.   Defendant **Glencore AG** is an operating company of Glencore plc incorporated in Switzerland, with a business address at Baarermattstrasse 3, CH-6341 Baar, Switzerland.   It is a direct wholly-owned subsidiary of Glencore International AG.   Glencore AG's U.S. subsidiaries include two aluminum production companies.   Glencore AG is a customer of Metro, both in Detroit for storage of primary aluminum and in other locations such as New Orleans and Mobile for storage of zinc and steel.

117.   Glencore AG is the largest shareholder of Century Aluminum Company, one of the largest aluminum producers in the United States.[20]   It exercises significant control over Century Aluminum, occupying three seats on its board of directors,[21] supplying the plant with alumina, and purchasing *all* of the aluminum produced by the refinery.[22]   It also owns Allied

---

[19]     May 31, 2013 Prospectus of Glencore International plc, at 78.

[20] Century Aluminum Co., SEC Form 10-K/A (filed Apr. 30, 2014, for the period ending Dec. 31, 2013), *available* at
http://files.shareholder.com/downloads/CENX/3398202716x0xS949157-14-17/949157/filing.pdf

[21] *Id*. at 5-6.

[22] *Id*. at 38.

Alumina Inc. (Sherwin Alumina) in Texas.

118.     Glencore also owns about 8.75% of Russian aluminum and alumina producer United Company Rusal plc ("Rusal") and in April 2012 reached an agreement to sell a significant part of Rusal's  aluminum output—$43 billion of aluminum over seven years.  Rusal will sell about 14.5 million tons to Glencore over the duration of the seven-year agreement. Glencore accounted for about 45% of Rusal's aluminum sales in 2010.  Ivan Glasenberg, CEO of Glencore, is a Rusal director.

119.     Defendant **Glencore UK Ltd.** is an operating company engaged in commodities trading and wholly-owned subsidiary of Glencore International plc organized under the laws of United Kingdom with its principal place of business at 50 Berkeley Street, Westminster, London W1J 8HD, United Kingdom.

120.     Glencore UK Ltd. is a Category 5 member of the LME.

121.     Defendant **Glencore Ltd.** (a/k/a Glencore US) is a privately held company organized under the laws of the United Kingdom and headquartered at 301 Tresser Boulevard, Stamford, CT, 06901.  Glencore plc's CEO Ivan Glasenberg is one of Glencore, Ltd.'s four directors.  Arisotelis Mistakidis, a long-time Glencore senior executive in its metals trading business is another.  As of March 22, 2013, Messer's Glasenberg and Mistakidis were reported by Glencore to own more than 20% of the company's shares.  Glencore Ltd. is the metals trading instrumentality of Glencore, PLC (and its predecessors).

122.     Defendant **Pacorini Metals USA, LLC** is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.  It owns and operates LME-approved warehouses in the United States, including warehouses in Los Angeles, CA; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan;

Mobile, Alabama; and New Orleans, Louisiana that store aluminum.

123.    Defendant **Pacorini Metals AG** is a Swiss corporation located at Baarerstrasse 53/55, CH-6300, Zug, Switzerland.  It is a leading provider of LME-certified warehousing throughout the world, including the United States, where it operates through its wholly-owned subsidiary, Pacorini Metals USA LLC.  All rent paid to Pacorini Metals USA LLC is deposited in Credit Suisse AG in Zurich, Switzerland for the benefit of Pacorini Metals AG.[23]

124.    Non-defendant co-conspirator Pacorini Vlissingen BV ("Pacorini BV") is a *besloten vennootschap* (private limited liability company) organized under the laws of the Kingdom of the Netherlands and headquartered at Engelandweg 55 Port No. 1199 4389 PC, Vlissingen-Oost, Netherlands.  It owns and operates LME-certified warehouses in Rotterdam and Vlissingen in the Netherlands that store, among other metals, aluminum.

125.    Glencore has been the owner of Pacorini Metals USA LLC, Pacorini Metals AG, and Pacorini BV (collectively, "Pacorini") and has exercised control over their operations since at least September 2010.

126.    Defendants Goldman Sachs, JPMorgan, and Glencore through respectively, Metro, Henry Bath, Pacorini, and other entities, were engaged in the aluminum warehousing business.  Defendants Goldman Sachs, JPMorgan, and Glencore were also engaged in commodities trading and trading of derivative products that derive their value from the underlying asset prices of aluminum at all relevant times.

127.    Plaintiffs hereby incorporate as if fully set forth herein all arguments and supporting material on the record supporting personal jurisdiction over Glencore plc, including, but not limited to: ECF 540, ECF 541, ECF 544, ECF 545.

---

[23]    GS-METRO-00005892 (Rent Payment Bank Details 2013).

### 5. Other Defendants

128.    Defendant **Burgess-Allen Partnership Ltd.** ("BAP") is a private limited company started in June 2009 by Robert George Burgess-Allen with headquarters at 1 Royal Terrace, Southend-On-Sea, SS1 1EA, England.  Robert Burgess-Allen and Emily Ruth Villiers Burgess-Allen serve as Directors of the company, for a total of two employees.

129.    Defendant **Robert Burgess-Allen** is a citizen and resident of the United Kingdom.  Robert Burgess-Allen had a Metro email address in 2010 and worked with Metro during the class period.  Robert Burgess-Allen paid Metro rent fees during the class period. Metro paid Robert Burgess-Allen incentive fees during the class period.

130.    **Jane Doe Defendants.**  The Jane Doe Defendants are persons who, (a) entered agreements in restraint of trade with the other Defendants, (b) shipped aluminum directly to LME Detroit Warehousing in order, in whole or in part, to fix, maintain, or inflate the Midwest Premium, or (c) otherwise combined, conspired, or agreed with Defendants or others in order to inflate prices and/or restrain aluminum supplies and/or to profit therefrom.

131.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

132.    Whenever reference is made to any act of any corporation, limited liability company, or other entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, or control of the entity's business or affairs.

### C.    Coconspirators

133.    **International Commodity Services, Ltd.**, a/k/a "ICS," is a U.K. limited company located at The Houses, 16-18 Blackfriars Lane, EC4V 6EB, United Kingdom.

134.   ICS is an additional conspiratorial link both among all Defendants and between the physical and financial markets.

135.   The LME requires that each LME-approved warehouse company have an LME-approved "London Agent," [24] to, among other things, use the all-encompassing LMEsword® transactional database on its behalf.[25]   A London Agent is, therefore, in control of all highly sensitive financial and competitive warrant and warehousing transaction data of its warehouse, which includes not only warehouse data but also trading data.  ICS is a London Agent.

136.   In fact, ICS is the "London Agent" for Metro, for Pacorini, and for Henry Bath.[26]

137.   ICS is, therefore, in control of all Defendants' LMEsword® data, and, apparently, more, having a list of domestic and international bank account numbers and routing codes for Metro, Pacorini, and Henry Bath.[27]  What's more, Mike Dudley, the Chairman of ICS, who has had a "long and varied history in commodities," [28] held a seat on the Warehousing Committee for much of the Class Period.[29]

138.   On its website, ICS boasts that "many of our clients are abroad and distant from the Exchange. . . . To this end we make every attempt to meet regularly with our clients whether in London or at their offices around the world."[30]   ICS lists 4 of the 5 LME-approved

---

[24]   http://www.lme.com/glossary/l/london-agent/

[25]   http://www.lme.com/en-gb/trading/venues-and-systems/systems/lmesword/

[26]   *See*
http://www.lme.com/~/media/Files/Warehousing/Rent%20and%20FOT/Warehouse%20company%20bank%20details%202013.pdf (last visited Oct. 7, 2014 at 7:27 p.m.).

[27]
http://www.lme.com/~/media/Files/Warehousing/Rent%20and%20FOT/Warehouse%20company%20bank%20details%202013.pdf (last visited Oct. 7, 2014 at 7:27 p.m.).

[28]   http://www.intercs.co.uk/ics-team.html

[29]   GS-METRO-00020901.

[30]   http://www.intercs.co.uk/bespoke-consultancy-services.html

warehousing companies in Detroit as among its customers, including, Metro and Pacorini.[31]

139.   LME's Bradley has described the far-reaching presence of the "London Agent,"

without identifying ICS by name, in the aluminum warehousing and warranting process:

> **[T]he warehouse company will instruct the London agent, and the London agent is simply a separate entity that exists in London who has relationships with the warehouses, contractual relationships with the warehouses to act on their behalf within London, using the LMEsword system. So the warehouse will tell the agent the details, and the agent then has to create the warrant in sword.**
>
> **So they will input the details into LMEsword. They then print a physical warrant so every one electronic record in the LMEsword database is backed by a physical paper document. The printed warrant then goes to the LME member that has the sword account, and the LME member will then take that warrant. Once they've checked it, they'll check the details. They'll take it to the central depository where the paper warrants are held; a bit like a bank vault, if you will. And then the depository will -- once it's delivered to depository, it will then be lodged actually fully into the LMEsword system. So it becomes what we call a live LME warrant. It exists as an LME warrant now, and it is lodged within that system to that member's account.**
>
> **Now, if the LME member is the person who owns that metal, it doesn't go any further. But if it's a customer of that member, then it will then be allocated to a subaccount, customer account. So the LME, as part of its oversight of the LMEsword system and the warehousing network, we can see at any given time where all of these warrants are -- A, where they are in the world, but also, then, who they are and how they are allocated within the sword system.[32]**

140.   ICS, Defendants' common London Agent, was a part of the conspiracy from at

least early 2010.  In addition to Mike Dudley, the CEO of ICS, sitting on the LME Warehousing

Committee, Shon Loth,[33] an ICS executive, played a key role in acting as a go-between for

Goldman Sachs, Metro, and Europe Economics, when the load-out rule change was being

---

[31]   http://www.intercs.co.uk/client-list.php?reg=usa#.

[32]   Tutorial Hearing Tr., 41:22-42:24.

[33]   GS-METRO-00020901.

implemented. [34]

141.   **Charles Li** ("Li") is the CEO of HKEx and Chairman of the LME.[35]  One of his places of employment is located at One International Finance Centre, 1 Harbour View Street, Central, Hong Kong, China.  Li was instrumental in the acquisition of the LME, and he has actively participated in, managed, and directed the conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein, subsequent to the acquisition of the LME by HKEx.  In connection with his company's pending acquisition of the LME, Mr. Li stated that if there were delays, then "we have to get a bazooka out to solve the problem" in response to questions about the long delays in extracting aluminum from LME Detroit warehousing.

142.   **Matthew Chamberlain** ("Chamberlain") is the Head of Business Development of the LME and a member of the Management Committee of HKEx.  One of his places of employment is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom. Chamberlain was instrumental in the acquisition of the LME, and he has actively participated in and managed certain conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein, subsequent to the acquisition of the LME by HKEx.

143.   **Martin Abbott** ("Abbott") was CEO of the LME from October 2006 until shortly after its acquisition by HKEx.  During the period between the HKEx takeover and the end of his tenure at the LME, Abbott also was Co-Head of Global Markets of HKEx.  As the LME's CEO, he actively participated in, managed, and directed the conduct and affairs of the

---

[34]         *See, e.g.*, GS-METRO-00019182.

[35]         HKEx Group Organisation Structure, at
http://www.hkexgroup.com/eng/org/Documents/org_chart.pdf

LME, including in aluminum warehousing services and in the violations of law as alleged herein during the class period.   Metro's CEO, Chris Wibbelman praised Abbott on his leadership for having "**created the most successful structure for aluminum financing and trading that exists on the planet**."[36]

144.   Abbott resigned for undisclosed reasons in June 2013, subsequent to him receiving substantial payments resulting from the acquisition of the LME by HKEx.

145.   **Garry Jones** ("Jones") is CEO of the LME and Co-Head of Global Markets of HKEx, succeeding Abbott in September 2013.   His place of employment is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom.   While the CEO of the LME, Jones has actively participated in, managed, and directed the conduct and affairs of the LME, including in aluminum warehousing services and in the violations of law as alleged herein. Among his prior positions, Jones was the CEO of the brokerage division of ICAP plc from 2003-2007.

146.   **RK Capital Management LLP** and **Red Kite Group** (collectively "**Red Kite**"). **RK Capital Management LLP** is a limited liability partnership organized in England and Wales and authorized and regulated by the UK Financial Conduct Authority ("FCA") (FCA number 409049), located at 1 Bartholomew Lane, London, UNITED KINGDOM, EC2N 2AX. **Red Kite Group** is a leading metals investment group, which purchases, finances, transports, processes, and sells metals. Red Kite Group was founded in 2004 and has offices in Bermuda, Hong Kong, London, New York, Shanghai and Sydney.   Red Kite Group managed over $2.3 billion as of December 31, 2013.   Red Kite Group was a customer of Metro and Metro paid Red Kite Group incentive fees during the class period.

---

[36]      GS-METRO-00004240.

147.   **DB Energy Trading LLC** ("DB Energy") was incorporated in 2004 and is based in New York, New York.  DB Energy operates as a subsidiary of Deutsche Bank Americas Holding Corp.

148.   **Jacques Gabillon** is a Managing Director at Goldman Sachs International and the Global Head of Global Commodities Principal Investments.  He also serves as the Chairman of the Board and Board Member of Mitsi Holdings LLC, which holds ownership of Metro International Trade Services.

149.   **Christopher Wibbelman** is the President and CEO of Metro International Trade Services.

150.   **Michael Whelan** was the Vice President of Business Development for Metro International Trade Services.

151.   **Stephen Branton-Speak** is a former Partner at Goldman Sachs International who presided over the formation and management of the physical-metals trading desk within the Commodities Division of Goldman Sachs International.   He has been an LME Board member since 2009.  Gabillon, Branton-Speak, and others, acting as agents of Goldman Sachs International, engaged in numerous actions in the United States or designed to impact commerce in the United States in furtherance of the conspiracy.

152.   **Graham Hawkins** is General Manager of Henry Bath & Son, Ltd.  Henry Bath & Son, Ltd. worked closely with JPMorgan to manage its aluminum stockpile within the United States.   Internal emails reveal that Henry Bath & Son, Ltd. management, including Group General Manager Hawkins, were involved in the day-to-day business operations of Henry Bath LLC.  Hawkins, who served as JPMorgan's and Henry Bath & Son, Ltd.'s representative on the LME Warehousing Committee, was included on multiple emails involving Henry Bath LLC

and JPMorgan's business including: (1) the cancellation of warrants held by JPMorgan for aluminum stored in Defendant Metro's warehouses; (2) the subsequent load out and transfer of JPMorgan aluminum to Henry Bath warehouses in the United States; (3) disputes involving demurrage charges for not loading and returning railroad cars carrying JPMorgan aluminum on time; and (4) shipping and handling charges for loading and unloading JPMorgan aluminum. These emails demonstrate that Henry Bath & Son, Ltd. did not operate in complete isolation from its subsidiary Henry Bath LLC and parent Defendant JPMorgan, but was an active part of their business within the United States.

153.    **Peter Sellars** is the former head of the Global Commodities Group at JPMorgan and was also Chairman of the Board as well as a director of Henry Bath & Son, Ltd.

154.    **Blythe Masters** is the former Head of Global Commodities Trading at JPMorgan and member of the Board of Directors of Henry Bath & Son, Ltd.

## IV.    FACTUAL ALLEGATIONS

### A.    The Two Relevant Markets

155.    Aluminum is the most abundant metal found on Earth.  It accounts for over 8% of the Earth's crust.  Because aluminum is highly reactive, it does not exist in the environment in its free form.

156.    Aluminum is a lightweight, strong, corrosion resistant, conductive, and durable non-ferrous metal.  Its unique properties result in its use in the manufacture of a wide array of products, such as vehicles (e.g., airplanes and automobiles), packaging materials (e.g., beverage cans), construction materials (e.g., window frames and siding), and consumer products (e.g., iPads and flashlights).  These unique properties also mean that there are few substitutes for the product in most industrial applications.

157.    Given aluminum's unique properties and the high costs associated with

redesigning products and retooling factories to use a substitute for aluminum, if even possible, other products are not reasonably interchangeable for aluminum.  Accordingly, Plaintiffs allege that one relevant product market involves primary aluminum.

158.    Primary aluminum is created by large, integrated producers, which sell primary aluminum to two broad categories of customers:  (1) manufacturers, processors and brokers in the physical market that use aluminum in industrial processes and/or to fabricate finished products; and (2) traders, speculators and holders of aluminum stocks who buy aluminum hoping that they will be able to resell it in the future for a profit.  Manufacturers, processors and brokers, *i.e.*, purchasers of physical aluminum from producers, including Plaintiffs, directly compete with traders, speculators and stockholders for the same supply of primary aluminum.

159.    There are few substitutes for primary aluminum in most industrial applications. Other materials, such as glass, plastic, composites, copper, stainless steel and other metals, have some but only limited substitutability with primary aluminum.

160.    While there is some switching to copper in electrical applications, and to plastics in construction, such switching is limited.  In industrial uses, the choice of raw materials is made at product design stage.  It is very costly to make materials changes except when new products are introduced or, periodically, when existing models are redesigned.

161.    Demand for primary aluminum is inelastic, meaning that purchasers will not tend to switch from aluminum to another product in the face of a price increase.  "On the demand side, many end users, such as auto manufacturers, are reluctant to switch from aluminum to other materials unless the price increase is extreme. So prices can move a lot without much change in supply or demand."  Peter Orszag, *Milton Friedman Proved Wrong by Aluminum Market* (Apr 10, 2012) (available at http://www.bloomberg.com/news/2012-04-10/milton-

friedman-proved-wrong-by-aluminum-market.html). "The estimated long-run price elasticities of demand are inelastic for all examined mineral commodities [including aluminum]. Changes in prices have either a small impact or no impact on demand." Martin Stuermer, Industrialization and the demand for mineral commodities (Nov. 15, 2013) at 13 (available at http://www.iiw.uni-bonn.de/people/stuermer/papers/Martin%20Stuermer%20Industrialization%20and%20the%20demand%20for%20mineral%20commodities%20Working%20Paper%20Version.pdf).

162.    The supply of primary aluminum is relatively inelastic, meaning that increases or decreases in price will not result in a corresponding increase or decrease in supply. The major constraint on production arises not at the (bauxite) mining stage but at the smelting stage. Due to the cost structures of smelters, their elasticity is high as they get close to full production capacity, but effectively zero thereafter. Thus, because of the very high costs associated with re-starting idled capacity, producers tend to operate either at full capacity or not at all.

163.    Primary aluminum warranted to LME specifications is stored in LME warehouses located in the United States. Plaintiffs allege that a second relevant product market is that for aluminum warehousing services in LME warehouses.

### 1.    Aluminum Production

164.    Primary aluminum refers to the process by which new aluminum is made from the mining of bauxite ore.[37]  Bauxite ore is refined to extract alumina. Alumina is then shipped to a primary aluminum plant (or smelter) where aluminum is extracted from the alumina in electrolytic cells or pots by electrolytic reduction.

165.    At regular intervals, molten aluminum tapped from the cells or pots is

---

[37] In contrast, secondary aluminum production refers to the process by which existing aluminum is recycled into pure metal. This case is about primary aluminum.

transported to the cast house where it is alloyed in holding furnaces by the addition of other metals (according to the user's needs), cleaned of oxides and gases, and then cast into various shapes, such as sheet ingots, billets, sows, sheets, rolls, and other forms, depending on how it is to be further processed.

166.    For the vast majority of the primary aluminum they produce, the large integrated producers, such as Alcoa, Inc., UC Rusal, Rio Tinto Alcan, Inc. and Norsk Hydro ASA, do one of two things.  They either sell it (1) directly to industrial users, who process or fabricate the aluminum into other shapes before reselling it further, or (2) fabricate the primary aluminum themselves before selling it to an additional group of industrial users.  In this regard, the large integrated producers are both suppliers to and competitors with fabricators.  As discussed below, the vast majority of these sales, and specifically those made to Plaintiffs, are done pursuant to long-term (typically annual) supply contracts with pricing based on a formula consisting of an average monthly LME price plus regional premiums.

167.    Producers also sell a certain amount of primary aluminum to physical traders and financial buyers who typically store the aluminum in warehouses.  Often these sales will involve the use of an LME warehouse.

168.    Ability is limited and costs are high to increase the supply of aluminum in the U.S.  High initial capital investments and substantial sunk costs are natural barriers to entry or expansion of aluminum production in the U.S. and Canadian markets.  The ability to obtain additional imports from Canada is also limited, as the U.S. already consumes the majority of Canada's aluminum production (approximately 60-70%), and Canada has its own domestic demand for aluminum that must be satisfied.  In fact, aluminum imports from Canada to the U.S. declined between 2010 and 2012.

169.    The relevant geographic market is the United States and Canada.  A purchaser of aluminum may obtain primary aluminum from one of the following sources:  a producer, a trader or distributor, and/or from aluminum stock held in warehouses, including LME-registered warehouses.  The vast majority of primary aluminum supplied in the United States is either produced domestically or imported from Canada.  Thus, purchasers practically can turn to suppliers in the United States and Canada to meet their demand.

170.    The origin of aluminum imports into the United States is determined by relative transport costs to alternative destinations.  Canada's dominant share of U.S. aluminum imports results from its proximity to and economical transportation into the U.S., for example, to Detroit.  Wherever imported aluminum originates, producers have the same pricing basis and the same incentives – to sell to manufacturers, traders or to stockholders, but in any case to consumers, at the LME price plus the Midwest premium.

171.    In the Plaintiffs' alternative or additional third claim, Plaintiffs also allege horizontal agreements among all Defendants except the LME Defendants, that further limited the availability of foreign sources of aluminum by, for example, creating large stockpiles and long queues in Vlissingen, Netherlands.  In addition, Glencore controls a significant portion of the world's primary aluminum production, on its own, through 41% ownership of Century Aluminum and through its relationship with Rusal, which further placed it in a position to withhold primary aluminum from the U.S. market.  Rusal imports into the U.S. did not decline during the Class Period.

172.    About 44 million tons of aluminum were produced worldwide in 2011, with United States production accounting for about two million tons.[38]

---

[38] United States Geological Survey Resources Program, "Aluminum," January 2012.

173.    In that same year, primary aluminum consumption in the United States totaled about four million tons, mostly used for the manufacture of vehicles, packaging materials, and construction materials.[39]

174.    From 2008 through 2012, the relationship between global production and demand for aluminum was relatively stable, with the market tending toward surplus:

---

[39] *Id.*

| **Aluminum Production-Consumption Balance 2008-13 (Million Tons)** | | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013 (e)** |
| **Production** | 40 | 37.5 | 42.3 | 44.7 | 46.2 | 51 |
| **Consumption** | 37.6 | 35.4 | 41.3 | 42.8 | 45.8 | 50.4 |
| **Balance** | 2.4 | 2.1 | 1 | 1.9 | 0.4 | 0.6 |



175.   In summary, there has been no organic shortage during this period in the amount of aluminum produced.   To the contrary, there is a substantial over-supply of aluminum, especially considering the vast supplies of aluminum held in warehouses, as explained below.

### 2.    The Pricing of Physical Aluminum

176.   Nearly all industrial contracts for the physical delivery of primary aluminum express the price for aluminum using a formula with at least two standardized components: (1)

the "LME Settlement Price" and (2) a regional premium (e.g., the Midwest Premium in the United States).  Together, these components are generally referred to as the "all-in" price for physical delivery of primary aluminum.  Where shaping the aluminum into a particular form has occurred, additional fees and premiums are applied on top of the "all-in" price for aluminum.

177.    The daily LME Settlement Price is the cash offered price at the end of the LME's second morning ring trading session.  The LME thus provides a price discovery mechanism for a standard aluminum exchange contract throughout the world.  While the LME Settlement Price is a global price, it does not include the costs of delivery from a seller to a purchaser.

178.    To cover the costs of delivery to a customer, contracts for purchase and sale of physical aluminum incorporate various regional premiums.  The regional premiums, including the Midwest Premium, are compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot aluminum on a given day for delivery to relevant geographic points.  The premiums reflect current offers *for immediately available aluminum for delivery* from United States and foreign producers, traders, and holders of warehoused aluminum, and these offers incorporate the fluctuating delivery, storage, finance, and insurance costs incurred by these competing suppliers of aluminum.  The regional premiums are published by private companies, including Platts and Metal Bulletin.

179.    In the United States, the benchmark regional premium is the Midwest Premium. Notwithstanding the limitation implied by its name, the Midwest Premium is charged throughout the United States (and, sometimes, abroad).  The Midwest Premium represents the difference in price between what physical buyers and sellers agree to transact at for primary aluminum delivered to U.S. (Midwest) customers and the prevailing LME Settlement Price. That difference is influenced by a number of factors, including the cost of moving aluminum

from an LME warehouse to a Midwest customer. The Midwest premium was originally primarily a proxy for the freight charges but became a reflection of the available supply and demand of aluminum in the United States.

180.    Prior to and during the Class Period, the supply of aluminum in the Midwest United States greatly increased, which should have caused the Midwest premium to decrease.

181.    Because price is inversely related to supply, the Midwest premium tends to be low in times of plentiful supply of aluminum.  This occurred in times of very high supplies during the early 1990s.  *See* Chart below.  Those high supplies built up due to the collapse of the former Soviet Union.



182.    When economic conditions recovered, those supplies were released rapidly. *See* chart. There were no abuses then by LME warehouse companies.  Rather, long-time LME

warehouse companies worked to provide customer service, including load-outs of 10,000 tons per day by Steinweg.

183.    Although LME aluminum supplies did decrease in LME warehouses outside Detroit during the Class Period, they increased in Metro's LME Detroit Warehouses to all-time record levels (precisely when they should have been substantially decreasing).  These all-time record high aluminum supplies in Detroit during the Class Period should have produced for Plaintiffs and Class members the benefit of a low Midwest premium for primary aluminum. However, due to Defendants' unlawful conduct, the Midwest and other premiums tripled, reaching increasingly higher all-time record levels.

184.    The Chicago Mercantile Exchange ("CME"), which recently launched an exchange-traded product intended to allow market participants to hedge risks associated with fluctuations in the local market premium for aluminum in the U.S., bases its hedging product on the Midwest premium.[40]

185.    Other regional premiums include the "Rotterdam Premium" and the "Japan Premium."  The Rotterdam Premium, which is expressed as either "duty paid" or "duty unpaid" depending upon where the metal is designated for delivery, typically applies to aluminum that originates in Europe.  The Rotterdam Premium is also reported and published based on a similar survey of producers, traders, and consumers.  The Japan Premium is a comparable premium which typically applies to aluminum delivered CIF Main Japanese Port from sources worldwide.

186.    Because industrial contracts for physical delivery of aluminum express the price

---

[40] http://www.cmegroup.com/trading/metals/aluminum-futures.html

using the LME Settlement Price, which is a global benchmark price, plus a regional premium, the regional premiums tend to move together (up and down).   This arises from market expectations, LME warrant trading, and to a much lesser extent, physical aluminum movements. If they did not, an LME warrant in Vlissingen could be swapped for one in Detroit and a delivery of the warrant made.  Multi-national aluminum purchasers, traders, and arbitrageurs could exploit pricing differences in regional premiums by transporting aluminum from one region to another.  Also, if the Midwest Premium increased enough relative to the Rotterdam Premium and/or the Japan Premium, even a purchaser in Europe, like Vlissingen, or in Asia, like Johor, could take delivery and transport the aluminum to the United States at an "all-in" price better than that available in the United States.

187.   Because of market expectations and decisions by market actors, as has been previously alleged, the increases in the Midwest premium caused and explained much more of the increase in the Rotterdam premium than do the data increases in the supply of aluminum in Glencore/Pacorini's LME warehouses in Vlissingen.   The increases in aluminum stored in Vlissingen have virtually no explanatory power for the increases in the Midwest Premium.

### 3.   The Relevant Product Market of Warehousing Services for Aluminum in LME Certified Warehouses

188.   The LME certifies a global network of more than 700 metals warehouses, with close to 200 located in the United States.   Defendants Metro, Henry Bath, and Pacorini collectively own and operate more than 75% of the LME-certified warehouses in the United States.

189.   Although there are more than 700 LME-certified warehouses globally, these facilities are in just 38 locations spread across a mere 15 countries.  The LME describes these

locations as "areas of net consumption and logistical hubs for the transportation of material."[41]

190.    There are nine LME approved aluminum warehouse locations in the United States: Baltimore, Chicago, Detroit, Los Angeles, Mobile, New Orleans, Owensboro, St. Louis, and Toledo, as of 2014. *See* https://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses/

   a.    In Detroit, there are 37 warehouses.  Metro has 27.  Worldwide Warehouse Solutions has 5.  Pacorini has 2.  Scale has 1.  Whelan has 1.  BTG Pactual has 1.

   b.    In Baltimore, there are 14 warehouses. C. Steinweg has 4.  Pacorini Metals has 4. Edgemere Metals has 3.  CWT Commodities has 1.  Henry Bath has 1. SH Bell has 1.

   c.    In Chicago, there are 13 warehouses.  Pacorini has 5.  Metro has 4. Henry Bath has 3. SH Bell has 1.

   d.    In Los Angeles, there are 2 warehouses, both owned by Pacorini.

   e.    In Mobile, there are 17 warehouses.  Metro has 14.  Pacorini has 3.

   f.    In New Orleans, there are 53 warehouses.  Pacorini has 34.  Metro has 13. Henry Bath has 5. Worldwide Warehouse Solutions has 1.

   g.    In Owensboro, there are 2 warehouses. Pacorini has 1.  BTG Pactual has 1.

   h.    In St. Louis, there are 3 warehouses. Worldwide Warehouse Solutions has 2.  Metro has 1.

   i.    In Toledo, there are 5 warehouses. Metro has 3.  C. Steinweg has 2.

191.    Until 2009, Baltimore was the single largest storage place for aluminum.

192.    To become LME-certified, a warehouse operator must show adequate evidence of insurance and financial capacity.  The warehouses themselves must also meet requirements relating to proximity to highways, railroads, and/or waterways and the capacity to offload a

---

[41] https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last viewed on July 7, 2014).

specified daily minimum tonnage, as set forth below.

193.    The LME certifies, approves and makes agreements with the owners of its warehouses.  The LME receives a percentage believed to be 1.1% of the storage rental amounts collected by each LME-registered warehouse.  To become an LME-registered warehouse, the warehouse company, among other things, must agree to the terms and conditions of the LME Warehouse Agreement.  Those terms and conditions are identical for all LME-registered warehouses.

194.    The LME-certified warehouses are a critical part of the supply chain for aluminum in the United States (and indeed, globally) because of (a) the LME monopoly of aluminum forward and futures contract trading, and (b) the use of the LME price as one of the standard benchmarks in contracts for the purchase or sale of physical aluminum, and (c) the fact that it is only in LME warehouses that LME delivery warrants can be issued and canceled.

195.    To issue a warrant means that aluminum has been checked into such a warehouse for storage, and to cancel a warrant means that the aluminum has been earmarked for delivery from the warehouse.[42]   Thus, an LME warrant is a standardized document issued by the warehouse upon delivery of a lot of aluminum into the warehouse to indicate who has the right of possession of that lot of aluminum.  LME warrants are bearer documents of title, of a specified brand, of a specified metal (such as aluminum) in a specified location and warehouse and are the only standardized instruments of title for aluminum.  Because they are standardized, they are freely tradable and are the actual instrument that underpins a highly-leveraged volume

---

[42]

http://www.karvycomtrade.com/downloads/karvySpecialReports/karvysSpecialReports_
2009111811248.pdf (last viewed on March 11, 2014).

of LME paper futures transactions.[43]   Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of physical aluminum.   Without a link to timely-deliverable metal, the viability of the LME price discovery mechanism would be lost, and fabricators and purchasers consequently would see no value to LME pricing.   The LME itself describes its "functions of trading and price discovery [as] underpinned by a global network of approved warehouses and storage facilities as well as approved brands[,]" and notes that "While delivery occurs in only a very small percentage of LME trades, the possibility of physical settlement plays a vital role in creating price convergence and ensuring our prices closely align with that of the physical spot market."[44]

196.   Among industrial consumers, deliveries occurred prior to the Class Period on more than 1% of their LME forward contracts because of the practice of using the LME as a supply hedge and as a last resort to purchase limited amounts of their aluminum requirements especially when the price relationships made such purchases economic.   For example, whenever the LME price was significantly less than the all-in physical price, industrial consumers could economically purchase some limited portion of their primary aluminum requirements by taking delivery on an LME forward contract.

197.   However, Metro's long load-out delays starting during late 2010 and the increasing amounts of LME aluminum in Metro's Detroit warehouses gradually foreclosed the ability of industrial consumers to purchase aluminum via taking delivery on their LME forward contracts.

198.   In addition to price sensitivity, another reason for an industrial consumer to take

---

[43] *Id.*

[44] https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last viewed on July 7, 2014).

delivery on an LME contract long position was supply risk.  LME warehouses are vital links in the U.S. (and indeed, global) physical supply chain for this reason.  During any spot shortage or dislocation, the LME warehouses represent the supplier of last resort for consumers who need to keep their plants operating in order to stay in business.  Conversely, when spot surplus or dislocation from economic slowdown or recession occurs, LME warehouses represent the destination of last resort for producers who need to raise cash, and under such circumstances should represent the worst possible sales alternative for such producers.

199.    LME warrants are also critical to the financing of aluminum-related transactions. For the reasons set forth above, the LME warrant is considered first-class collateral.  The holder of an LME warrant can borrow money secured by that warrant on favorable terms.

**4.     The Market for LME Aluminum Warehouse Services Determines the Amount of Aluminum Released from LME Warehouses to the Primary Aluminum Market**

200.    The provision of LME warehouse services for the aluminum in LME warehouses includes, but is not limited to, loading aluminum into the warehouse, warranting the aluminum, loading the aluminum out of the warehouse, dealing with prospective and actual customers, and maintaining proper storage conditions.

201.    Plaintiffs disclaim any requirement to plead a definitive relevant market prior to obtaining full discovery.  The restraints of trade here directly inflated price, restricted supply, anti-competitively restrained free alienability of aluminum, and otherwise constitute a *per se* violation of Section 1.  Monopoly power is adequately alleged through the powers to control prices, or control output, or otherwise.

202.    The provision of warehouse services for the aluminum in LME warehouses is a relevant product market. The companies who own the LME certified warehouses in the nine locations above compete in this market to attract and service aluminum in LME warehouses.

203.   The market for warehouse services for LME aluminum in LME-registered warehouses plays a pivotal role in pricing of aluminum in the U.S. – Canada market for primary aluminum. This role arises from the fact that, since around 1983, almost all U.S. commercial aluminum transactions, and almost all global transactions excluding China, have been priced against LME Settlement Prices at or around the date of delivery. The price of aluminum in any location is therefore the LME Settlement Price for aluminum on (or around) the day in question plus a premium relating to the freight cost of delivering the aluminum to the customer, plus other possible negotiated premiums reflecting, for example, value-added products, credit risk, and payment terms.

204.   Pricing discretion will manifest itself in (relatively small) premiums or discounts specific to contracts and producer-consumer relationships. The Midwest premium measures the average premium that producers and traders in the market for primary aluminum impose on top of the LME Settlement Price. This is therefore equal, to a good approximation, to the full cost of purchasing exchange aluminum and taking delivery from Metro in Detroit.  The all-in price is therefore equal to the industry benchmark (LME Settlement Price plus Midwest premium), despite the fact that only a relatively small proportion of aluminum deliveries takes place from LME-registered warehouses.  For these reasons, abuses of market power in the market for aluminum warehouse services in LME-registered warehouses in the U.S. is directly experienced in the U.S. – Canada primary aluminum market, causing increases in the prices paid by consumers across the entire industry.

205.   That is, Metro's anticompetitive behavior in the LME Aluminum Warehouse Services Market directly affects prices and the output of aluminum into the Primary Aluminum Market.

206.    The impacts of Defendants' exercise of market power in the LME Aluminum Warehouse Services Market are directly felt in the U.S. – Canada primary aluminum market.

207.    By prolonging the queues and restraining load-out rates in the market for warehouse services of aluminum in LME-registered warehouses in the U.S. and Canada, and thereby hoarding aluminum in those warehouses, Defendants drastically curtailed the supply of a substitute for aluminum purchased from smelters or traders/merchants. It even foreclosed industrial consumers from taking deliveries on LME long positions and thereby avoiding the payment of the Midwest or other premium. Metro thereby removed a competitive price discipline on the Midwest premium.  Metro and the other Defendants thus increased the demand for primary aluminum from smelter output. This raised the price of such output in the Primary Aluminum Market. As aluminum smelters and traders/merchants arbitrage the costs of LME aluminum and non-LME aluminum, purchasers of non-LME aluminum will pay a price, including the Midwest premium, equivalent to the "all-in" price of LME-warranted aluminum. Purchasers in the primary aluminum market, including Plaintiffs, pay additional costs in purchasing primary aluminum whose price is based on the Midwest premium, including through purchase contracts referencing the Midwest premium in their pricing formulas.

208.    The area of effective competition is the United States and Canada.  Except for approximately 10% of the usage in the United States on an annual basis, LME-registered warehouses located outside of the United States and Canada are not significant competitors with the LME warehouses in the United States.  The cost of transport of aluminum to the United States from Europe or Japan or other markets is significant.  LME-registered warehouses in the United States generally do not face competition from LME warehouses in Europe or Asia. There are no LME-registered warehouses in Mexico or South America.

209.    Accordingly, the market of the U.S. and Canada is a relevant geographic market for aluminum warehouse services in LME-registered warehouses.

### 5.    LME Aluminum Forward Contracts

210.    The LME has provided for forward contract trading in aluminum since 1978. Prior to and after February 2010, the LME captured approximately 97-99% of the volume of aluminum forward and futures contract trading on organized exchanges in the United States to the point at which the NYMEX aluminum futures contract stopped trading in 2008, and was re-launched in 2013 (with very little activity).

211.    At the expiration of an LME aluminum forward contract, delivery of warrants for aluminum in an LME warehouse must be made by sellers (or "shorts") who have not liquidated (*i.e.*, traded out of their contract) to buyers (or "longs") who have not liquidated.  A warrant is the document of title to aluminum stored in an LME registered warehouse, and makes warranties about such aluminum.  Warrants take the form of centrally-maintained electronic records under the LME's SWORD system.  Each warrant is for a specific tonnage (25 metric tons +/- 1%) and a single LME registered brand, and is not interchangeable.

212.    To order the load-out of LME aluminum, the owner must first cancel the LME warrant.

213.    The LME aluminum forward contracts do require at expiration of trading, the long (the buyer) to pay for, and the short (the seller) to deliver warrants for aluminum in LME warehouses at specified times. But such physical warrant delivery occurs on less than 1% of the contracts traded.

214.    More than 99% of the LME aluminum contracts are satisfied or liquidated by offsetting trades.  That is, a person one contract long (buyer) sells one contract, and a person one contract short (seller), buys one contract for the same LME date.  Thereby, they "offset" or

"liquidate" or cancel their previous obligation to the LME clearing house.

215.    The difference between the purchase price and the sale price constitutes the loss or gain on the LME forward contract transaction.

216.    Price discovery for aluminum occurs through this trading on 99+% of the LME contracts traded.  There are approximately 255 trading days per year. The LME price discovery happens primarily through the trading process and expectations of macro-economic events, supply, demand, etc.

217.    With respect to the less than 1% of the LME aluminum forward contracts that result in deliveries, the short (seller) has the choice of what warrant to deliver.  There is an on-going swapping and trading of warrants for aluminum in different warehouses.  Further, deliveries are sometimes taken by longs in order to engage in "warrant sifting."  That is, some warrants that are more expensive in warrant trading are, from time to time, delivered in satisfaction of LME short positions.  Through the warrant sifting, warrant swapping, and other means, longs may receive delivery of warrants in respect of aluminum that satisfy their commercial local consumption needs for aluminum.

218.    The price of LME forward contracts is influenced, to some extent, by the least valuable warrant in all the LME warehouses because the short may choose to deliver that warrant.

219.    But LME forward contracts for aluminum are determined by many other influences.  These include the fundamentals of supply and demand, trading perceptions in the market, and other influences (including the bidding up of LME prices by longs to liquidate through trading and avoid the least valuable warrant).

220.    In the instance of industrial consumers and producers, the incidence of taking or

making delivery on LME forward contracts was higher than the market average of deliveries until the Class Period. However, during the Class Period, the anticompetitive conduct alleged herein excluded and foreclosed industrial consumers from taking delivery on LME forward contracts and purchasing primary aluminum market physical aluminum in this manner.

### B.    The Maximum Load-Out Restraint and Agreement

221.    The stage for Metro's conduct began to be created in November 2003. In that month, the LME created a minimum rate of load-outs from LME warehouses of 1,500 metric tons ("mt") per day **per location**.  *See* LME Notice: 03/364: 363.

222.    The use of a one size fits all, absolute number such as 1,500 metric tons per day, applied to a "per location" metric, was contrary to commercial reality, and contrary to the minimum load-out in other warehouse regimes. Per location means per general city area, regardless of whether someone has 27 warehouses in the area, as Metro did in Detroit, or just one.   This per location metric was obviously contrary to the scaled percentage method of establishing minimum load-outs that was used in other warehouse regimes.   Such metric also unreasonably failed to require net load-out by, for example, subtracting load-ins from the amount of the load-outs in order to determine the effective, net load-out rate.

223.    (a) Regarding commercial reality, large warehouse operations typically hold and may load-out more aluminum than smaller ones.   The per location metric of the rule was unreasonable because Metro had far larger operations in Detroit than anyone else had anywhere else in North America except for one, Glencore in New Orleans. Metro internally told Mitsi Holdings and Goldman Sachs that Glencore/Pacorini exploited the load-out restraint to create self-perpetuating market power in its New Orleans LME warehouses in zinc.   In fact, Glencore/Pacorini had 34 warehouses in New Orleans, the only LME warehouse owner to hold more warehouses in one location than Metro in Detroit.

(b) As a partial result of their respective abilities to overwhelm the minimum load-out rule in zinc and aluminum, respectively, the holdings of zinc in Glencore/Pacorini's LME warehouses in New Orleans increased to more than 80% of the total zinc held in LME warehouses in the United States and Canada while the aluminum in Metro's LME warehouses increased to more than 84% of the aluminum in LME warehouses in the United States and Canada.

224.    (a) Metro, through its President and CEO, Chris Wibbelman, stated to the LME on or about June 10, 2011 and again on or about September 30, 2011, that Clause 4.2 of the LME Warehousing Agreement between the LME and Metro "requires any change to the minimum load-out rates to be agreed between the warehouse operator and the LME.  It is accordingly not open to the LME unilaterally to impose changes to the minimum load-out rates."  *E.g.,* GS-Metro-00001631.  Under Metro's construction of the agreement, the LME agreement with Metro was an unreasonable restraint of trade for all the reasons previously alleged with respect to the minimum load-out restraint, as well as the fact that the LME had additionally agreed with Metro, which had 27 warehouses in the Detroit location alone, not to change the minimum load-out rule without Metro's consent.  Also, if Metro's construction of the agreement is correct, then in dealing with Europe Economics and others in connection with the minimum load-out rule, the LME was constrained as follows.  It had to seek a result that would be agreeable to Metro rather than in the best interests of the participants in the LME markets and in the fulfillment of the LME Charter.

(b) In that regard, the LME further agreed with Metro to make public statements after the change in the minimum load-out rule was announced.  These statements were to the effect that Metro would be increasing its rent at the time that the increase in the minimum load-out

rule took effect. Metro's rents increased from 35 cents in 2008 to 48 cents in 2013, including as follows. The storage rental charge per ton per day at the LME Detroit Warehouses have increased from 35 cents to 38 cents in 2009, to 40 cents in 2010, to 41 cents in 2011, to 45 cents in 2012, and to 48 cents in 2013.   These rents are approximately three or more times the competitive rental rates for storing aluminum in non-LME warehouses.   Because the LME was constrained to obtain Metro's consent, the statements of the LME, including its CEO Martin Abbott, implying that the increases in the rent by Metro at the time of the increase in the minimum load-out were made as part of the LME's agreements with Metro and helped Metro increase its rental revenues and the LME to increase its revenues at a time that the LME was seeking a buyer.

225.    Regarding other warehouse regimes, many of them employ a scaled percentage approach rather than a one size fits all absolute number.  These include:

a.    The Commodity Credit Corporation of the US Department of Agriculture. It requires a minimum percentage of the capacity of each warehouse to be loaded out each day.  7 C.F.R. §1423.11 Delivery and Shipping Standards for Cotton Warehouses.

b.    This percentage --- 4.5% --- would have required that Metro's Detroit warehouse load out a minimum of 45,000 – 65,000 tons or more per day during the Class Period.

c.    The NYMEX.  It provides that the NYMEX aluminum futures contract requires a minimum guaranteed daily load-out rate of 2% of total aluminum inventory. NYMEX Rulebook 703: Designation and Obligations of Metal Service Providers. The NYMEX warehouses include many LME Warehouses.

d.    This 2% daily load-out requirement would have required Detroit Metro warehouses to load-out a total of 20,000 – 30,000 tons per day.

e.    Also, the NYMEX rule provides:

The Facility … shall not constrain or promote the movement of Registered metal and Eligible metal into or out of the Facility by: 1. Giving Exceptional inducements or imposing unreasonable charges for depositing, storage or removal of metal into or out of the Facility.

Metro extensively violated the prohibition that applies in the NYMEX.

226.    The LME's one size fits all absolute number for minimum load-outs was very unreasonable. The appropriateness of a percentage minimum load-out is very clearly reflected in other facts.   First, the amounts of aluminum and other metals in warehouses fluctuated greatly. They had been far higher prior to 2003 than they were in 2003 at the time that the rule was passed.   Specifically on June 9, 2003, there were 5,575 mt of primary aluminum in Detroit LME warehouses. But earlier there had been far more.

227.    When the high supplies of aluminum moved into LME warehouses during 1993-1994, they were released in an orderly manner without abuse by warehouse companies.   Rather, long-time LME warehouse companies worked to provide customer service and ship out 10,000 tons of aluminum or more per day. They did not make agreements to restrain supplies, inflate prices and increasingly inflate storage revenues through increasingly inefficient services.

228.    Indeed, according to one former warehouse supervisor of Metro, had the company not placed a limit on the amount of aluminum delivered each day, Metro could have shipped out during the Class Period 10,000 tons of aluminum per day from its Metro warehouses.   See LME Warehousing Committee minutes reflecting the feasibility for aluminum warehouses to load in or out up to 10,000 tons of metal per day (ECF No. 415, redacted letter attaching GS-METRO-00001545).

229.    According to one member (who worked for an aluminum smelter/producer) of the LME Warehouse Committee at the time the minimum rule was enacted, this minimum load-out rule was **not** intended to be the sharp end of the spear that would end commercial reasonableness of the LME warehouse load-outs in times of high supplies or otherwise.

230.    However, again, Metro had 27 warehouses in Detroit, which was far more than

all but one company had in all other locations.

231.   Thus, the following was highly foreseeable to the LME, Metro and the other Defendants when this minimum load out rule was passed.  If aluminum stocks ever did increase, the minimum load-out rule could be abused by the company, such as Metro, with 27 warehouses or an extraordinary amount of warehouse capacity in one location. That abuse could create a snowball of increasing amounts of storage and increasing amounts of delays in taking aluminum out of storage.

232.   During the recession of 2008-2009, the amounts of aluminum in LME warehouses soared to all-time record levels that were more than twice as high as those of 1994.

233.   Under the LME minimum load-out rule, there apparently was a commercial reasonableness requirement on LME warehouses in respect of load-outs above 1,500 tons per day.  If so, then the warehouses' conduct with respect to load-outs above those amounts was constrained by their agreements and understandings with the LME.  Alternatively, each LME warehouse owner had total absolute monopolistic discretion over the output from its warehouses at each location in excess of 1,500 tons per day.

234.   From 2010 forward, Metro did not follow commercial reasonableness in Detroit and instead consistently made a daily load-out equal to or less than the required minimum.

235.   That is, Metro made the minimum into the maximum (or more than the maximum).

236.   EITHER the LME had agreed that Metro could load-out from its warehouse in Detroit a maximum of 1,500 tons per day, or Metro exercised its discretion and power so as to restrict output to 1,500 tons per day.  OR both of the foregoing occurred.

237.   Martin Ford, the LME's Deputy Head of Market Surveillance, explained to

Goldman's Victoria Attwood Scott: "Apparently the warehouse community views these figures as limits rather than minimums because it is naturally in their interest to hold the material rather than issue it.  Furthermore, they are able to take in 20,000 tons per day if necessary." GS-METRO-00014822.

238.   The LME thus was aware of and complicit in the agreement to use the minimum load-out rule as the maximum load-out rate: "Martin Abbott was supporting strongly the current system and believed that the LME had the right rules in regarding warehousing." GS-METRO-00004622.

239.   There were repeated and ongoing public complaints from 2010 forward that the LME and Goldman Defendants were inflating aluminum prices and restraining supplies.  Based upon the repeated public complaints and other information, the LME and Goldman Defendants had complete notice and knowledge that they were inflating aluminum prices, restraining supplies and injuring the persons who paid those inflated prices.

240.   With such notice and knowledge, the LME and Goldman Defendants have, in order to mutually profit themselves and their owners or affiliates, specifically intended to continue and they did agree to inflate prices, restrain supplies, provide inefficient low quality services, and injure persons, like Plaintiffs, who have paid such inflated prices.

241.   (a) In response to these public complaints, a number of long-time LME warehouse operators were uncomfortable during the Class Period with the long times it took to extract aluminum from certain LME warehouses, with the tactics of those warehouses, and with the lack of response.

(b) Offers of logistical services or other assistance were made to reduce the waiting times, and the high amounts of supplies restrained in warehouses, and ameliorate the

complaints.  This included during meetings of the LME Warehouse Committee which advises the LME Executive Committee.

(c) These offers were rejected by the LME CEO as "unnecessary" and because the LME "had things under control."

(d) Plaintiffs have good grounds to believe and do allege that the LME's rejection of long-time warehouses' concerns and offers to help reduce the highly anomalous restraints of aluminum supplies were made pursuant to the agreements alleged herein between the Goldman and LME Defendants.

(e) Pursuant to these unlawful agreements, Metro continued to engage in increasingly anticompetitive conduct in order to generate increasingly greater supra-competitive revenues.

(f) The LME, which had earlier never achieved more than $15,000,000 in profits in a year, also received higher rental revenues and was able to sell itself for $2.2 billion in the latter part of 2012.

(g) Martin Abbott, who had stifled dissent on the LME warehousing committee and overrode junior executives at the LME who recognized the perversion of the minimum load-out rule into a maximum load out rule, received an extraordinarily large bonus, the amount of which is not presently known to Plaintiffs, after the successful sale of the LME.

(h) The Goldman and other Defendants benefited from the sale of the LME through their ownership of LME shares, with Goldman and JPMorgan receiving $208 million and $260 million respectively.

242.    However, after the successful completion of the sale of the LME and the commencement of governmental administrative or Congressional investigations, the LME

reversed many of its false statements.  These included the statement by Chris Evans in New York in early 2013 that industrial consumers of aluminum who did not like the high Midwest premium should stop buying LME aluminum.

243.    (a) Goldman and the LME substantially reversed course after they apprehended that the U.S. Congress was going to investigate.  The LME then said that the minimum or maximum load-out agreement should be revised substantially and was causing increases in the Midwest premium.  Goldman then said it would stop making the abusive incentive payments. Knowing full well that the anticompetitive conduct of Metro, the LME, and Goldman had excluded industrial consumers from purchasing aluminum through deliveries on the LME, Goldman offered to waive the queue for any industrial consumer with aluminum in Detroit as of July 2013.  Goldman, as it well knew, later reported that there were no industrial consumers.

(b) Goldman Sachs & Co. and Goldman Sachs Group, Inc., through Gary Cohn, the President and Chief Operating Officer for The Goldman Sachs Group, Inc., and responsible official for both Defendants, made statements on or about July 31, 2013, designed to minimize their liability through apparent cooperation.   For example, Mr. Cohn stated:

> "In recent weeks, there has been additional focus on metals warehouses as certain end users have complained about the long wait times to get aluminum out of LME storage."

http://www.goldmansachs.com/media-relations/in-the-news/current/goldman-sachs-physical-commodities-7-31-13.html

> Admitting that "consumers should not have to wait unusually long times to get the metal they store in warehouses," Goldman claimed that it would be "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."

Goldman's Chief Operating Officer, Gary Cohn, stated on CNBC: "We feel horrible for consumers if they can't get metal."

See http://www.cnbc.com/id/100928939  (transcript);
http://video.cnbc.com/gallery/?video=3000187032&play=1  (video).

(c) But Goldman Sachs & Co. and Goldman Sachs Group, Inc., through Gary Cohn or anyone else, failed to disclose at this time that the situation was much worse than Mr. Cohn's statements implied. In fact, there were no industrial consumers holding aluminum in the LME Detroit warehouses and had not been any such consumers since 2011.  This was because industrial consumers had been totally foreclosed and excluded by the conduct of Metro and the other Defendants from acquiring the aluminum through long positions on LME aluminum forward contracts.

244.    The minimum load-out rule is sometimes hereinafter referred to as the maximum load-out restraint or maximum load-out agreement. The injuries to competition and inflations of the Midwest premium caused by Metro's violations largely arose from Metro's abuses of such restraint through the monopolization and agreements in unreasonable restraint of trade alleged herein.

### C.    Metro Violates LME Rules and Makes Illusory Warrant Cancellation and Aluminum Shuffle Agreements in Order To Greatly Increase the Load-Out Queue and Create a "Critical Mass" To Monopolize the Market

#### 1.    With The LME's Knowledge, Metro Anticompetitively And Restrictively Violated The LME Minimum Load-Out Rule By Failing To Load-Out The Minimum Required Daily Amount Of Aluminum

245.    In order to avoid anticompetitive restrictions within its large combination of warehouses, the LME rules mandated that Metro had to load-out from its Detroit warehouses a minimum of 1,500 tons per day through March 31, 2012, when the amended rule required

Metro to load out 3,000 tons a day.

246.    Metro anticompetitively and restrictively violated the LME minimum load-out rule by failing to load-out the minimum required daily amount of aluminum from its Detroit warehouses.  Metro's consistent and systematical restrictions of output to less than even the LME prescribed minimum occurred on the 341 business days alleged in Exhibit A hereto which is an excerpt from the LME's Official Daily Stock Data including only those days in 2011 through 2013 when Metro's Detroit warehouses failed to load-out the minimum tonnage.

247.    Metro's anticompetitive restriction on output greatly increased Metro's "critical mass" of load-out delays by at least 65 business days or approximately 92 calendar days. Restricting output from the warehouse to less than the minimum tonnage required under the load-out rule was an unreasonable restraint of trade, especially in the circumstances alleged herein.

248.    For another specific example, on March 5, 2010, Shon Loth of International Commodity Services informed Mr. Prichard and Mr. Wibbelman of Metro that Robert Hall of the LME told him that "there have been three more informal complaints about deliveries in North America (at least one if not two are aimed at Metro)." GS-METRO-00046201. Mr. Loth explained that "The complaints seem to originate around the waiting time being quoted to take delivery, apparently 2 / 3 months. **Of course when you look at the cancelled stock, this does not appear consistent with the 1,500m / day delivery standards**." *Id*. [emphasis added].

249.    Further, Mr. Loth suggested that (1) "we should work to empower the Exchange, such that they defend our position in routine enquiries, and we avoid all the little investigations" and (2)"…**we can get Robert [Hall's] team to work for us** and **repel these issues** before they escalate to Excom or result in investigations." GS-METRO-00046201. [emphasis added].

250.    In May 2010, Loth explained that the LME had a policy to "discourage formal complaints" so as to avoid having to disclose complaints to the FSA as the LME would otherwise be required to do.   GS-METRO-0029728.   *Id*.   In further communications about additional "informal complaints against Metro," among Loth, Wibbelman and Pritchard, Loth stated that "we should resist any attempts" by the LME to "increase the delivery out tonnage." *Id*.

## 2. Metro-Burgess-Allen Agreement

251.    Metro further violated the LME minimum load-out rule by making anticompetitive agreements with Defendant Burgess-Allen and co-conspirators DB Energy, Red Kite, and other persons presently unknown to Plaintiffs.   Metro and Burgess-Allen called these agreements the "smart ass plan."

252.    Specifically, on August 4, 2010, Metro, per its CEO, Chris Wibbelman, and Defendant Mr. Burgess-Allen of Burgess-Allen Partners ("BAP") discussed the merits and profit potential of illusory, strategic warrant cancellations followed by re-warranting of the same aluminum after a decent interval.   In this email chain, Messrs. Wibbelman and Burgess-Allen discussed their "smart ass plan":

> **[I, Robert Burgess-Allen will] cancel 180k [tons of LME warrants] on Sept. 18. I will tie your Outbound [loud-out queue] up for 6 months.**
>
> **On March 18, 2011 [*i.e.*, 6 months after September 18], I will deliver it back to you [Metro] for $100.**
>
> **In the interim you move it to a deliverable facility**
>
> **I'll [Robert Burgess-Allen] pay logistics and full rent.**
>
> **\*\*\*\***
>
> **I just moved your bucket forward [lengthened the rental streams by] 6 months and made you $12m [$12,000,000] as a guaranteed forward revenue increase as a minimum.**

GS-METRO-00030837.

253.    Shortly after the anticompetitive "smart ass" scheme was formulated by Metro and Burgess-Allen, it was apparently then discussed during a meeting of the Board of Directors of Mitsi Holdings LLC on September 8, 2010.  GS-METRO-00004626.  Mitsi Holdings LLC is an indirect subsidiary of the Goldman Sachs Group which wholly and directly owns Metro International Trade Services LLC and its LME warehouses.  Jacques Gabillon, the Chairman of Mitsi Holdings LLC, was the head of Goldman's global commodities principal investments group and an officer of other Goldman Sachs subsidiaries at the time.

254.    According to minutes of the meeting on September 8, 2010, Mr. Gabillon "informed [Mitsi's] Board that a new contract with Robert Burgess-Allen [] was being put in place" whereby Burgess-Allen "would represent Metro exclusively" on all metals deals with customers in London and Europe and that Burgess-Allen's contributions to Metro were what Mr. Gabillon described as "valuable."  GS-METRO-00004626.

### 3. Metro's 100,000 ton agreement with DB Energy

255.    One part of proposed "smart ass plan"  – for a 180,000 ton warrant cancellation deal on September 18, 2010 – was ultimately arranged as a 100,000 ton deal between Metro and Deutsche Bank Energy Trading LLC ("DB Energy") that resulted in the cancellation of 100,000 tons of warranted aluminum on or about September 17, 2010.  GS-METRO-00032947-960.

256.    On September 15, 2010, Deutsche Bank's Evan Richards sent an email to Adam Luckie, Vice President at Deutsche Bank AG's London Branch, discussing the proposed terms of a deal with Metro that involved, in the words of Richards, "moving [aluminum] between Metro warehouses in Detroit."   GS-METRO-00000309. A written contract memorializing the final terms of the transaction was made on or about September 17, 2010 between Metro and DB Energy.   GS-METRO-00032947-32960 ("DB Energy Agreement"); GS-METRO-00000309-

312.

257.    This agreement offered Deutsche Bank significant incentives for, in DB's words, "moving aluminum between Metro warehouses in Detroit," and penalized Deutsche Bank for failing to do so. GS-METRO-00000310.

258.    Pursuant to this agreement, DB Energy agreed to:

  a. cancel 4,000 lots of Detroit aluminum warrants (each lot is 25 tons – thus, 4,000 lots equals 100,000 tons), and

  b. request the maximum number of trucking slots at the earliest possible date (i.e., place the cancelled aluminum in the Detroit queue).

259.    Although the Agreement called for the aluminum to be placed in the outbound queue in Detroit, the length of the queue, coupled with the punitive terms of the Agreement, discouraged and/or outright prevented DB Energy from actually removing any aluminum from the warehouse during the Financing Period.  For example, the Agreement mandated that DB pay a $65 per ton fee (or $6.5 million) for each ton of aluminum transferred out of the warehouse in a third party sale during the Financing Period.  GS-METRO-00032951; GS-METRO-00000312. The length of the queue also served to prevent DB Energy from physically removing the aluminum before the agreement expired on February 16, 2011. This boundary was expressly recognized in the Agreement.  GS-METRO-00032951 (The Agreement stated that "although [trucking] slots will be requested as of the Effective Date, the goods will be in the queue to exit the initial warehouse and *no firm time for such exit can be given as of the date of this Agreement*").

260.    Pursuant to the Agreement, in order for DB Energy to take advantage of the incentives and avoid the penalties, DB was expected to arrange for the aluminum to be re-warranted by February 16, 2011 (*i.e.,* approximately 150 days after the large cancellation).  GS-METRO-00000312; GS-METRO-00032948, 953.  Metro promised to pay DB $42.95 per ton

for each ton of aluminum re-warranted under the Agreement.  GS-METRO-00032953; *see also* GS-METRO-00033090 (Comments from Metro employee Gabriella Vagnini in deal schedule showing that Metro ultimately paid a $4.5 million FOT incentive fee to re-warrant this metal). Metro also agreed that it would cover all the relevant shipping and logistics fees in relation to the re-warranted shipments.  *See* GS-METRO-00032953.

261.    Beginning in January 2011, DB Energy began shipping its aluminum from one Metro warehouse to a second Metro location in Detroit in order to have such metal re-warranted. GS-METRO-00006104.  Between January 6 and March 11, 2011, DB Energy had 26,325 tons (26.3%) re-warranted in its own name and the remaining 73,675 tons re-warranted in the name of various other third party producers and financiers.  *Id.* As of September 30, 2012, more than two years after the initial cancellation, at least 27,425 tons of the initial 100,000 tons of aluminum (27.4%) were still tied up in Metro's Detroit warehouse.  GS-METRO-00038889.

262.    This cancellation had all the desired effects, both on the market and Metro's profitability, that were outlined in the "smart ass" scheme:

263.    **First,** it greatly increased the amount of cancelled warrants awaiting load-out from Metro's Detroit warehouses from 25,500 to 124,000 tons, net of new warrants,

264.    **Second,** it extended the amount of time it took to load-out U.S. primary aluminum from Metro's Detroit warehouses from 17 days to 83 business days (*i.e.* a 388% increase),

265.    **Third,** it substantially increased Metro's prospective rental revenue stream.

266.    By agreeing to shuttle aluminum in-and-out of its own warehouses, Metro, together with DB Energy, restrained trade by depleting the LME's daily load-out quota in Detroit, thereby delaying the release of aluminum to manufacturers and others who had a viable

need for such metal. In addition to being a significant player in the primary aluminum and commodities markets generally, Deutsche Bank served as one of the investment bank advisors on Goldman Sachs' purchase of Metro.  GS-METRO-00041487.  DB was therefore familiar with Metro's business model.  DB well knew that by cancelling warrants, placing aluminum in the queue, then subsequently re-warranting the same aluminum, it was restricting others from loading primary aluminum out for consumption and helping Metro increase its load-out queue and its rental revenue stream.

267.   Metro's rental revenues increased despite the lack of any change in supply or demand in the economy and without any increase in the skill, efficiency, quality of service or output by Metro.  On the contrary, this agreement restricted output, imposed a deadweight loss on the economy of higher shipping costs in order to shuffle 100,000 tons of primary aluminum in-and-out of Metro's warehouses, and significantly enhanced Metro's market power in the LME aluminum services market.  These effects rendered the Metro-DB Energy agreement an unreasonable restraint of trade.

### 4. **Metro's 440,000 Tons In Agreements With Red Kite**

268.   Between February 2011 and at least mid-2013, Metro repeated the exact same anticompetitive pattern of pre-agreements to cancel and re-warrant aluminum with another storage customer, the metals merchant and hedge fund Red Kite Group ("Red Kite").  *See, e.g.,* GS-METRO-00010240-244 (July 10, 2013 email between Metro employees summarizing the outcome of the five (5) Red Kite transactions). In five (5) separate deals during that period, Metro and Red Kite agreed in restraint of trade to cancel warrants on at least 531,958 tons of aluminum held in Metro's Detroit warehouses (approx. 21,278 warrants), thereby placing them into the Detroit queue.  *Id.*

269. Similar to the DB Energy Agreement, these deals included significant incentives for Red Kite to re-warrant the aluminum within 12 months of the date of cancellation, as well as substantial penalties if Red Kite failed to do so. *Id.*

270. For example, in February 2011, Red Kite agreed to cancel 100,000 tons (4,000 warrants) of aluminum in return for reduced rent and FOT worth $39 per ton, or $3.9 million. *Id.*

271. Following this initial deal, Metro significantly ratcheted up the incentives it offered to Red Kite. In two separate deals struck in February and October-November 2012, Metro offered Red Kite incentives of $125 and $196 per ton, respectively, in return for Red Kite cancelling at least 281,957 tons of aluminum and re-warranting within 12 months of each agreement. *Id.* By July 2013 Metro had incurred expenses of at least $51.1 million to reward Red Kite for re-warranting its previously cancelled tonnage in Metro warehouses.

272. The incentives and penalties included in the Red Kite agreements had the desired effect of influencing Red Kite to re-warrant the aluminum. By July 2013 Red Kite had re-warranted all but 50,000 tons of the same aluminum in Metro's warehouses. GS-METRO-00010241-242.

273. By entering agreements and making transactions in substance that were not true economic market activities, Metro violated the LME minimum load-out rule and transformed the LME into a restraint of trade on the output of aluminum.

274. For example, Plaintiffs have good grounds to believe and do allege that, following Red Kite's 100,000 ton cancellation in January 2011, the Detroit queue increased by approximately 88 business days on February 28, 2011.

275. Then in 2012, Red Kite and Metro executed four extremely large cancellation

deals which directly impacted the queue. Between January and November 2012, Red Kite cancelled warrants on at least another 431,958 tons of aluminum. GS-METRO-00010240-244. These cancellations further lengthened the LME aluminum queue as follows:

276.   Metro Deal No. DET-1452. Red Kite cancelled 100,000 tons in January 2012 (65% of total cancellations in Detroit in January 2012). This increased the queues by approximately 67 days.

277.   Metro Deal No.'s DET-1454 & 1459. In two separate transactions, Red Kite cancelled another 150,000 tons in February 2012 (60% of total cancellations in Detroit in February 2012). This increased the queues by approximately 65 days.

278.   Metro Deal No. DET-1500. In an agreement which was modified (upward) at least once, between late-October and December 2012 Red Kite cancelled more than 183,000 tons of aluminum. This increased the queues by approximately 59 days.

279.   Plaintiffs have good grounds to believe and do allege that three of the five Red Kite deals, causing cancellations of warrants on at least 250,000 tons of aluminum, were executed between January and February 2012 with the intent of clogging the queue in advance of the LME's April 1, 2012 doubling of the minimum daily load-out quotas. GS-METRO-00010240-243; Red Kite is a sophisticated hedge fund. It knew that, by cancelling warrants and then re-warranting the same aluminum it was lengthening the queues and helping Metro increase its rental revenue. This agreement by Red Kite and Metro had the same anticompetitive effects as the Metro DB Energy agreement.

### 5.   Metro's 186,000 Ton Agreement With DB Energy And Glencore Greatly Lengthens The Queue Through A More Complicated Rewarranting Deal

280.   In April 2013, Metro and Glencore agreed to an asymmetrical swap of aluminum in which Glencore promised to ship aluminum it held in the Detroit queue to another of Metro's

Detroit warehouses (at Metro's discretion) and to re-warrant that same LME aluminum in DB's name after or as that aluminum had proceeded through to the end of the long load-out queue from such warehouses, and had been loaded-out and shuttled for a decent interval to another Metro warehouse in Detroit.  *See, e.g.,* GS-METRO-00027606 (Email from Michael Whelan to numerous Metro employees, including CEO Wibbelman, stating "all 91,000 mt for Glencore scheduled to ship outbound in May/June will do so as scheduled **but will go to other Metro locations in Detroit (we of course decide)** and remain off warrant until June/July 2013 at which point the material will be rewarranted").   This effectively achieved Metro's anticompetitive objectives of increasing the critical mass of its Detroit stockpile, increasing the delays in load-out therefrom, preventing people who truly wanted to load-out aluminum from doing so promptly, and discouraging other warrant holders from even attempting such load-outs.

281.    Pursuant to this agreement, Metro/DB provided Glencore with **86,000** tons of LME warranted aluminum located in Metro's Baltimore, Maryland and Mobile, Alabama LME warehouses, and Glencore provided Metro with **186,000** tons of cancelled-warrant metal that Glencore was storing in and that was awaiting load-out from Metro's LME Detroit warehouses.  *E.g.,* GS-METRO-00009827; GS-METRO-00008821.   This part of the transaction was negotiated directly between Metro and Glencore.  GS-METRO-00027606.  Plaintiffs have good grounds to believe and do allege that the "Glencore" involved in this 186,000 ton deal was Glencore US or Glencore Ltd., both of whom were customers of Metro (GS-METRO-00024941); to any extent it was a different Glencore entity, it was one of the Glencore Defendants named and defined herein as Glencore.

282.    Metro arranged for such Glencore owned aluminum in Detroit to be purchased

and held by "DB," which Plaintiffs infer is DB Energy or another Deutsche Bank entity.  *E.g.,* GS-METRO-00009827;  GS-METRO-00008821.   Pursuant to Metro's arrangement, "DB" merely stepped in and purchased the aluminum in Detroit and sold the aluminum in Mobile/Baltimore, thereby consummating the swap as the Detroit purchaser and Baltimore/Mobile provider.  *E.g.,* GS-METRO-00009827; GS-METRO-00008821.

283.   This deal involved a web of agreements which included the agreements from Metro's deal numbers DET-1520, 1524-25, 1529-30BA, and 1540 with Glencore.  This deal also included the associated purchase by DB of what was or had been Glencore's cancelled warrant aluminum proceeding through the load-out queue from Metro's Detroit LME warehouses.  Also included in this deal was the agreement by Glencore and/or DB to re-warrant what had been Glencore's cancelled warrant aluminum proceeding through the LME Detroit queue.  *E.g.,* GS-METRO-00009839; GS-METRO-00009809.

284.   The purposes and effects of this deal were to unreasonably restrain trade in multiple ways. These included the following.  Metro added to the LME **warranted** aluminum in Metro's Detroit warehouses.  But at the same time, Metro caused this aluminum to soak up the full or almost full load-out time from Metro's Detroit warehouses so as to prolong the time that it took everyone else to obtain aluminum by the amount of time that this aluminum remained in the load-out queue (and any additional dislocation time).  Also, the consideration paid by Metro to effectuate these restraints continued: (a) to exploit the maximum load-out agreement; (b) to put upward pressure on the Midwest premium, (c) to widen (rather than narrow) the difference between the LME price and the all-in Midwest Transaction price, (d) to prevent persons who truly wanted to load-out aluminum from Metro's Detroit warehouses from doing so on a timely basis, (e) to discourage others from even attempting to do so, and (f) to maintain the long delays

in Detroit that prevented and foreclosed industrial consumers from sourcing and taking deliveries of LME aluminum on LME long positions.

285.   Plaintiffs have good grounds to believe and do allege that Metro's control of aluminum in its warehouses and insertion of nominee owners was contrary to the letter or spirit of the LME rules governing such warehouses.

286.   Plaintiffs have good grounds to believe and do allege that Metro made financial inducements to other customers to rewarrant aluminum for the same anticompetitive objects as alleged above.

### 6.   Metro Admitted To Goldman Sachs & Co. and Mitsi that Large Cancellations Provided a Self-Perpetuating Market Power for the Cancelling Warehouse

287.   In an email from Metro's Chief Commercial Officer Michael Whelan to various Goldman officials (including Jacques Gabillon) on September 19, 2012, Metro admitted that the cancellation of just 100,000 warrants could provide an LME warehouse with a "critical mass" of load-out delays and prospective large rent payments on the metal restrained by such delay. GS-METRO-00021386.   This "critical mass" enabled such LME warehouse to pay high incentive fees to bring more metal into its warehouses.   Other LME warehouses could not afford to match these payments. *Id.*   The more the LME warehouse paid and restrained the more they could afford to pay.   This perpetuated and increased their market power over other LME warehouses and thus their rental income.

### D.   Metro Exercises Its Increased Market Power to Make Increasingly Large Incentive Payments to Restrain Increasingly Large Amounts of Aluminum

### 1.   Metro Knew Full Well That, In Metro's Words, "The Metal We Get Is Withheld from Consumers and Makes the [Midwest] Premium Go Up"

288.   In a February 11, 2011 email from Chris Wibbelman of Metro to Jacques

Gabillon of Goldman Sachs Group Inc., (and, Chairman of Mitsi Holdings LLC). Wibbelman and Metro stated: "What is true though, is that the [primary aluminum] metal we get [from Alcoa or others in the primary aluminum market] is withheld from consumers and makes the [MW] premium go up…."  GS-METRO-00020303.

289.    In order to increase the amount of the "metal we get" at Metro that "is withheld from consumers and makes the [MW] premium go up," Metro entered a web of agreements in order to make increased incentive payments.

290.    A dominant purpose of these incentive payment agreements was, after Metro received heavy inflows of aluminum during the 2008-2009 recession, to attract primary aluminum into the Metro warehouses in order to expand the length of the queue for load-outs of aluminum and thereby increase Metro's prospective rental revenues.

291.    Metro well knew that increasing its incentive payments would increase the Midwest premium but did so for the anticompetitive purpose of further prolonging the queue in Detroit.

292.    (a) For example, on August 4, 2010, Rob Burgess-Allen emailed Chris Wibbelman stating that "[MW] Premiums will come down if the contangos are going to retract for non Detroit."  GS-METRO-00030840.

293.    (b) Wibbelman responded "Unless Metro keeps bidding them up."  GS-METRO-00030840.

294.    (c) Burgess-Allen then wrote "The only way you can justify paying up is in place like Detroit or perhaps Mobile  If we could get another 500k in there then **it will become another Detroit** and we can drop it into the system and get full rent – that I like."  GS-METRO-00030840 (emphasis added).

295.     During an economic recovery, throughout history, warehouses are sources of primary aluminum for consumers as the warehouse stocks return and the economy strengthens. But Metro made increased incentive payments that were intended to and did prevent and restrain this supply of aluminum from flowing to the consumer.   On the contrary, Metro's payments caused smelters and others to send aluminum **into** Metro.   This continued to exploit the unreasonable restraint on load-outs by increasing the queue length at Metro's Detroit warehouses from 30 days in mid-2010 to 690 days.

296.     Examples of these increased incentive payments include the following[45]:

| Deal No. | Customer | Proposed Date | Tonnage Contracted | Incentive | Total Estimated Incentive |
|----------|----------|---------------|--------------------|-----------|--------------------------|
| DET-1334 | J. Aron | 23-Jul-10 | 12,507 | $79.00 | $988,053.00 |
| DET-1334A | J. Aron | 23-Jul-10 | 11,703 | $99.00 | $1,158,597.00 |
| DET-1336 | J. Aron | 17-Aug-10 | 20,000 | $118.00 | $2,360,000.00 |
| DET-1337 | J. Aron | 7-Sep-10 | 12,000 | $90.00 | $1,080,000.00 |
| DET-1323 | JB Comm (overseas) | 10-Sep-10 | 10,052 | $115.50 | $1,161,006.00 |
| DET-1340 | J. Aron | 20-Sep-10 | 43,000 | $125.00 | $5,375,000.00 |
| DET-1342 | Deutsche Bank | 1-Oct-10 | 100,000 | $45.00 | $4,500,000.00 |
| DET-1343 | Glencore | 12-Oct-10 | 55,000 | $100.00 | $5,500,000.00 |

---

[45]     This chart is for illustrative purposes only as it includes incentive payments made to Red Kite, Deutsche Bank and Goldman Sachs that have also been alleged elsewhere throughout this complaint.

| DET-1345 | J. Aron | 18-Oct-10 | 13,500 | $110.00 | $1,485,000.00 |
| DET-1347 | J. Aron | 18-Oct-10 | 24,000 | $95.00 | $2,280,000.00 |
| DET-1349 | J. Aron | 19-Oct-10 | 6,000 | $110.00 | $660,000.00 |
| DET-1339 | Mitsubishi | 10-Nov-10 | 5,000 | $118.25 | $591,250.00 |
| DET-1355 | Mitsubishi | 18-Nov-10 | 5,000 | $119.25 | $596,250.00 |
| DET-1355A | Mitsubishi | 18-Nov-10 | 500 | $104.25 | $52,125.00 |
| DET-1358 | J. Aron | 29-Nov-10 | 4,040 | $124.00 | $500,960.00 |
| DET-1358A | J. Aron | 29-Nov-10 | 3,960 | $124.00 | $491,040.00 |
| DET-1359 | J. Aron | 29-Nov-10 | 40,000 | $124.00 | $4,960,000.00 |
| DET-1360 | Mitsubishi | 29-Nov-10 | 5,000 | $119.75 | $598,750.00 |
| DET-1361 | Mitsubishi | 20-Dec-10 | 5,000 | $120.00 | $600,000.00 |
| DET-1362 | Glencore | 4-Jan-11 | 925 | $125.00 | $115,625.00 |
| DET-1363 | Mitsubishi | 10-Jan-11 | 17,500 | $121.00 | $2,117,500.00 |
| DET-1364 | J. Aron | 10-Jan-11 | 17,500 | $124.00 | $2,170,000.00 |
| DET-1365 | JB Comm (overseas) | 23-Jan-11 | 2,000 | $123.00 | $246,000.00 |
| DET-1444 | Mitsubishi International Corp. | 16-Dec-11 | 100,000 | $130.00 | $13,000,000.00 |
| DET-1448 | J. Aron & Company | 5-Jan-12 | 14,916 | $127.00 | $1,894,332.00 |

| DET-1450 | JB Commodities (Overseas) Ltd | 6-Jan-12 | 5,020 | $127.25 | $638,795.00 |
|---|---|---|---|---|---|
| DET-1452S | Red Kite Master Fund Ltd. | 18-Jan-12 | 100,005 | $95.00 | $9,500,506.07 |
| DET-1453 | Mitsubishi International Corp. | 18-Jan-12 | 10,100 | $127.25 | $1,285,225.00 |
| DET-1454N | Red Kite Master Fund Ltd. | 1-Feb-12 | 50,000 | $100.00 | $5,000,000.00 |
| DET-1455 | Mitsubishi International Corp. | 1-Feb-12 | 10,027 | $129.60 | $1,299,499.20 |
| DET-1456 | J. Aron & Company | 7-Feb-12 | 20,000 | $130.00 | $2,600,000.00 |
| DET-1458 | Sumitomo Corp. | 13-Feb-12 | 10,090 | $128.25 | $1,294,042.50 |
| DET-1467 | Sumitomo Corp. | 8-May-12 | 6,076 | $174.00 | $1,057,224.00 |
| DET-1468 | Sumitomo Corp. | 8-May-12 | 10,071 | $174.50 | $1,757,389.50 |
| DET-1469B | Mitsubishi International Corp. | 29-May-12 | 2,150 | $163.00 | $350,450.00 |
| DET-1469R | Mitsubishi International Corp. | 29-May-12 | 1,500 | $178.00 | $267,000.00 |
| DET-1470 | Mitsubishi International Corp. | 30-May-12 | 13,000 | $193.00 | $2,509,000.00 |
| DET-1471 | Mitsubishi International Corp. | 6-Jun-12 | 1,150 | $181.50 | $208,725.00 |
| DET-1475 | Sumitomo Corp. | 27-Jun-12 | 2,000 | $191.00 | $382,000.00 |
| DET-1476 | Mitsubishi International Corp. | 27-Jun-12 | 2,100 | $192.00 | $403,200.00 |
| DET-1479 | J. Aron & Company | 12-Jul-12 | 4,500 | $80.00 | $360,000.00 |

| DET-1481 | J. Aron & Company | 23-Jul-12 | 10,107 | $192.00 | $1,940,544.00 |
|---|---|---|---|---|---|
| DET-1482 | Sumitomo Corp Glbl Comm, Ltd UK | 9-Aug-12 | 1,316 | $191.00 | $251,356.00 |
| DET-1483D | Mitsubishi International Corp. | 15-Aug-12 | 2,928 | $184.00 | $538,752.00 |
| DET-1483N | Mitsubishi International Corp. | 15-Aug-12 | 2,344 | $184.00 | $431,296.00 |
| DET-1484 | Sumitomo Corp. | 29-Aug-12 | 3,608 | $195.00 | $703,560.00 |
| DET-1486 | J. Aron & Company | 31-Aug-12 | 15,000 | $192.00 | $2,880,000.00 |
| DET-1488 | Sumitomo Corp. | 4-Sep-12 | 1,650 | $180.00 | $297,000.00 |
| DET-1489 | Sumitomo Corp. | 6-Sep-12 | 5,016 | $195.50 | $980,628.00 |
| DET-1454SS | Red Kite Master Fund Ltd. | 11-Sep-12 | 49,859 | $125.00 | $6,232,387.88 |
| DET-1444SN | Mitsubishi International Corp. | 12-Sep-12 | 5,000 | $145.35 | $726,750.00 |
| DET-1444SO | Mitsubishi International Corp. | 12-Sep-12 | 14,844 | $135.18 | $2,006,611.92 |
| DET-1444XN | Mitsubishi International Corp. | 12-Sep-12 | 1,250 | $144.98 | $181,225.00 |
| DET-1482SU | Sumitomo Corp Glbl Comm, Ltd UK | 12-Sep-12 | 3,676 | $206.00 | $757,256.00 |
| DET-1484B | Sumitomo Corp. | 13-Sep-12 | 2,420 | $180.00 | $435,600.00 |
| DET-1491 | Mitsubishi International Corp. | 13-Sep-12 | 5,000 | $195.45 | $977,250.00 |

| DET-1470S | Mitsubishi International Corp. | 14-Sep-12 | 249 | $198.18 | $49,346.82 |
| DET-1471S | Mitsubishi International Corp. | 14-Sep-12 | 350 | $186.68 | $65,338.00 |
| DET-1492 | J. Aron & Company | 17-Sep-12 | 5,045 | $195.00 | $983,775.00 |
| DET-1493 | J. Aron & Company | 20-Sep-12 | 4,000 | $180.00 | $720,000.00 |
| DET-1494B | J. Aron & Company | 28-Sep-12 | 5,950 | $180.45 | $1,073,677.50 |
| DET-1494R | J. Aron & Company | 28-Sep-12 | 4,050 | $195.45 | $791,572.50 |
| DET-1495 | J. Aron & Company | 16-Oct-12 | 5,000 | $195.00 | $975,000.00 |
| DET-1496 | Mitsubishi International Corp. | 17-Oct-12 | 1,450 | $195.45 | $283,402.50 |
| DET-1497 | JB Commodities | 24-Oct-12 | 5,000 | $195.45 | $977,250.00 |
| DET-1498 | Sumitomo Corp. | 26-Oct-12 | 2,600 | $195.45 | $508,170.00 |
| DET-1499 | JB Commodities AG | 1-Nov-12 | 2,000 | $186.05 | $372,100.00 |
| DET-1500 | Red Kite Master Fund Ltd. | 5-Nov-12 | 181,958 | $196.00 | $35,663,670.00 |
| DET-1501 | Sumitomo Corp. | 6-Nov-12 | 3,899 | $195.45 | $762,059.55 |
| DET-1502 | J. Aron & Company | 12-Nov-12 | 10,050 | $195.50 | $1,964,775.00 |
| DET-1503 | JB Commodities (Overseas) Ltd | 13-Nov-12 | 1,985 | $195.45 | $387,968.25 |
| DET-1503DF | JB Commodities (Overseas) Ltd | 13-Nov-12 | 1,025 | $208.05 | $213,251.25 |

| DET-1504 | Glencore Ltd. | 19-Nov-12 | 4,880 | $    - | $    - |
|----------|---------------|-----------|-------|--------|--------|
| DET-1505 | Deutsche Bank AG | 19-Nov-12 | 10,100 | $35.95 | $363,095.00 |
| DET-1506NG | Glencore Ltd. | 21-Nov-12 | 35,000 | $    - | $    - |
| DET-1507 | Mitsubishi International Corp. | 28-Nov-12 | 2,100 | $195.45 | $410,445.00 |
| DET-1508 | J. Aron & Company | 28-Nov-12 | 5,601 | $195.00 | $1,092,195.00 |
| DET-1509 | Mitsubishi International Corp. | 30-Nov-12 | 10,005 | $195.45 | $1,955,477.25 |
| DET-1510SX | Sumitomo Corp. | 5-Dec-12 | 450 | $146.00 | $65,700.00 |
| DET-1511 | JB Commodities (Overseas) Ltd | 10-Dec-12 | 10,000 | $195.45 | $1,954,500.00 |
| DET-1498DJ | Sumitomo Corp. | 14-Dec-12 | 5,400 | $201.05 | $1,085,670.00 |
| DET-1501DJ | Sumitomo Corp. | 14-Dec-12 | 6,101 | $201.05 | $1,226,606.05 |
| DET-1483DJ | Mitsubishi International Corp. | 15-Dec-12 | 2,264 | $190.30 | $430,839.20 |
| DET-1496D | Mitsubishi International Corp. | 15-Dec-12 | 1,250 | $201.75 | $252,187.50 |
| DET-1444DF | Mitsubishi International Corp. | 16-Dec-12 | 9,065 | $144.18 | $1,306,991.70 |
| DET-1444DJ | Mitsubishi International Corp. | 16-Dec-12 | 10,000 | $136.30 | $1,363,000.00 |
| DET-1500RW | Red Kite Master Fund Ltd. | 17-Dec-12 | 75,000 | $  - | $  - |
| DET-1512 | Koch Supply & Trading LP | 17-Dec-12 | 3,750 | $    - | $    - |

| DET-1513 | J. Aron & Company | 19-Dec-12 | 5,600 | $195.00 | $1,092,000.00 |
| DET-1514 | J. Aron & Company | 26-Dec-12 | 20,000 | $195.00 | $3,900,000.00 |

297.     According to Metro, "GS," which Plaintiffs believe to be Mitsi Holdings LLC or another Goldman Sachs Defendant, had to approve each and every incentive payment in excess of $128 per ton. Plaintiffs have good grounds to believe, and do allege (a) that there were at least 61 deals involving, in aggregate, at least 660,000 tons of primary aluminum for which the incentive payment was in excess of $128 per ton, and (b) that Mitsi Holdings LLC or another Goldman Sachs subsidiary had to approve and did approve these Midwest premium-inflating incentive payments.  Mitsi Holdings or the other Goldman subsidiary did so knowing full well that such incentive payments furthered Metro's unreasonable restraints of trade and inflated the prices that industrial consumers, such as Plaintiffs, were paying for aluminum. GS-METRO-00027563.   For one example of such knowledge, Metro's Chief Executive Officer, Chris Wibbelman, admitted to Jacques Gabillon in a February 11, 2011 email "What is true though, is that the metal we get [from Alcoa] is withheld from consumers and makes the [MW] premium go up." GS-METRO-00020303.

**Alcoa**

298.     The supra-competitive profits that Metro made from the load-out rule were shared by Metro with Alcoa and other producers.

299.     Thus, on August 5, 2010, Wibbelman emailed Chen-ryung Leo stating that "Alcoa at least is perpetually increasing expectations ($135-138) [$135 per ton was the amount of the incentive payment Alcoa was seeking] even with seeming to have no market creating this level.  (They are looking into our pockets to see what we will earn)."  GS-METRO-00030835.

300.    The methods of the sharing of Metro's profits from its load-out restraints were through increasing incentive payments directly or indirectly to Alcoa and then providing the output restriction.

**July 2010: Alcoa-Metro Deal DET-1334**

301.    On July 2, 2010, the Midwest premium was $146/mt and the "opening stock" of primary aluminum in Detroit warehouses was 542,100 tons.

302.    On or about July 23, 2010, Chris Wibbelman of Metro proposed deal number DET-1334.  GS-METRO-00033090.  The deal was between Metro and J. Aron to bring into Metro's Detroit warehouses 12,507 tons of aluminum.  GS-METRO-00033090.  Pursuant to such deal Metro paid an incentive of $79.00/mt. GS-METRO-00033090.  Metro's Gabriella Vagnini described DET-1334 as "[t]his is the Alcoa we're doing for Mitsubishi."  GS-METRO-00033090; *see also* GS-METRO-00033090 (stating "(Mitsubishi/Alcoa) We did trucking on this, transload, truck to rail, can only do 400mt/day and problem with certs.").

303.    On or about July 23, 2010, Chris Wibbelman of Metro proposed another deal, related to DET-1334, labeled DET-1334A.  GS-METRO-00031022 (stating that deal number DET-1334 was a deal that Wibbelman did on July 23, 201 for 24,000 tons thus implying that the 24,000 tons was split between DET-1334 and DET-1334A); GS-METRO-00033090.  The deal was between Metro and J. Aron to bring into Metro's Detroit warehouses 11,703 tons of aluminum.    GS-METRO-00033090.    Pursuant to such deal Metro paid an incentive of $99.00/mt. *See* GS-METRO-00033090.  Metro's Gabriella Vagnini also described DET-1334A as "[t]his is the Alcoa we're doing for Mitsubishi."  GS-METRO-00033090.

**August 2010: Alcoa-Metro Deal DET-1336**

304.    On August 2, 2010, the Midwest premium was $146/mt and the "opening stock"

of primary aluminum in Detroit warehouses was 930,975 tons.

305.   On August 17, 2010 Thanos Dimou of Goldman emailed Tanya Rich of Metro and Anna Chadderton stating "there is another deal where this time we buy 20k MT P1020A (SOWS) from ALCOA…What do you require in terms of information from ALCOA?"  GS-METRO-00031023.  Pursuant to this email chain the terms of this new deal were that Metro was to pay an incentive of $115/mt, Metro would start receiving the aluminum in September 2010, "[a]ll to warrant in Dec[ember]," "[d]elivered," "[n]o rent share," and the intermediary was J. Aron.  GS-METRO-00031022.

306.   However, Metro's deal book shows that the incentive payment was actually $118/mt *not* $115/mt.  GS-METRO-00033090 (showing "Alcoa" deal DET-1336, proposed on August 17, 2010 for 20,000 tons with Metro paying $118.mt, and "(Alcoa) not to warrant till Dec. good").

**September 2010: Alcoa-Metro Deal DET-1340**

307.   On September 2, 2010, the Midwest premium was $139/mt and the "opening stock" of primary aluminum in Detroit warehouses was 922,925 tons.

308.   On or about September 20, 2010, Chris Wibbelman of Metro proposed deal number DET-1340.   GS-METRO-00033090.   The deal was between Metro and Alcoa's intermediary J. Aron to bring into Metro's Detroit warehouses 43,000 tons of aluminum.  GS-METRO-00033090.   Pursuant to such deal Metro paid an incentive of $125.00/mt.   GS-METRO-00033090. Metro's Gabriella Vagnini labeled this deal as "Alcoa" and noted that "(Alcoa) Rec. in Oct. they are slow on shipping shipping 5 rail cars/day. 1/11-Peter only warranted 975 lots…why?"  GS-METRO-00033090.

**February 2011: Alcoa-Metro Deal DET-1367**

309.     On February 2, 2011, the Midwest premium was $139/mt and the "opening stock" of primary aluminum in Detroit warehouses was 1,008,850 tons.

310.     On February 11, 2011 Jacques Gabillon of Goldman forwarded to Chris Wibbelman of Metro an inquiry by another Goldman employee asking "Not paying up for new [aluminum]?"  GS-METRO-00020305.

311.     Wibbelman responded stating the he was "holding to 125.5.  The highest ever by 50 cents.  We can go up…I could look silly if I lose 90,000 tons for a few bucks.  But we are being worked by Alcoa.  and by [Goldman].  And by all of the other customers.  It is hard to hold firm.  Caving is easy."  GS-METRO-00020304.  In other words, [Alcoa and Goldman were "working" Metro to continue to bid up the incentive because it makes the premium go up].

312.     Wibbelman further stated to Gabillon that "Midwest US is 6.35 cents/lb….But the premium will go down if we force it there."  GS-METRO-00020304.  Thus, Metro is (a) acknowledging to Goldman that it has the power to force the Midwest premium down (b) that it is aware of the impact of its incentive capability, and (c) that the premium would soften if Metro decided not to give in to Alcoa and Goldman's demands for a higher incentive.

313.     Gabillon responded by asking Wibbelman "what would happen practically" if Metro bid 100?  "Who would get it?  Is there another bid?  GS-METRO-00020303.  Wibbelman responded by stating that "[n]o warehouse can bid that much but us…black hole and all."  GS-METRO-00020303.  That is, Wibbelman is stating that Alcoa does not have an equivalent alternative because only Metro can afford to make the highest incentive payments.  This due to their warehouse "black hole" *i.e.*, the long wait in the warehouse after someone cancels a warrant.

314.     Gabillon states that "[w]e should really stay firm."  GS-METRO-00020303.

Wibbelman concludes his discussion with Gabillon by stating "What is true though, is that the metal we get is withheld from consumers and makes the premium go up…which provides a competitive alternate customer." *See* GS-METRO-00020303.

315.  Wibbelman in fact did do this deal with Alcoa at a reduced volume. *See, e.g.*, GS-METRO-00033090 (showing a February 2011 deal between Mark Askew of Metro and "Alcoa" at Detroit for aluminum with a freight allowance (incentive payment) of $125.50); GS-METRO-00036898 (showing deal number DET-1367, issued February 24, 2011, with customer J. Aron for aluminum with a freight allowance (incentive payment) of $125.50); GS-METRO-00033670 (showing deal number DET-1367 proposed by "M. Askew" and the customer as "J. Aron").

316.  The Alcoa deal discussed between Wibbelman and Gabillon became deal number DET-1367 on or about February 24, 2011.  *See* GS-METRO-00036898.  The deal started at 15,000 tons in February 2011. GS-METRO-00036898.  This represented a minimum incentive payment of $1,882,500.00.  GS-METRO-00020935.  In March 2011, 5,000 tons of aluminum were added.  GS-METRO-00036898.

**2.  Only Through Such Foreclosure of Plaintiffs and Inflation of the Midwest Premium Was Metro Able To Acquire Its 80-99% Share and Monopoly Power in the LME Aluminum Warehouse Market**

317.  The result of Metro's lengthening of the load-out delays that funded Metro's inexorable market share gain to 84-99%, was to foreclose and prevent industrial consumers of primary aluminum from continuing to take delivery on LME long contract positions as a means to purchase primary aluminum.  Purchasing some limited portion of their primary aluminum in that manner had enabled industrial consumers to hedge their supply risks and purchase aluminum without paying the Midwest or other premium.  Instead, such industrial consumers purchased the primary aluminum at the LME price.  They then paid the costs of retrieving the

same from the LME warehouse and shipping to their facility.  But they did not pay the Midwest or other premium. Purchasing limited amounts of their needs as a last resort in this way had enabled industrial and other consumers both to hedge supply risks and exercise a competitive price discipline on the Midwest premium that encouraged the convergence of the all-in physical price and the LME price.

318.    This purchase through delivery on LME long positions was also facilitated by the presence of an active warrant trading and swapping market prior to the Class Period.  But Metro's 84-99% concentration in LME warrants greatly reduced the amount of such warrant trading, and rendered it far more costly and, ultimately, undependable.

319.    The industrial and other consumers typically could not make the upfront payments required to purchase warrants and then also endure long delays of uncertain duration before they could obtain the aluminum, extrude or add value to it, sell their product and receive payment.  By as early as 2011 (the exact time is unknown to Plaintiffs), the long load-out delays, increasing rent at Metro, and costs and uncertainty of attempted warrant swapping, had prevented substantially all industrial consumers from sourcing their aluminum and hedging their supply risks through deliveries on LME long positions.

320.    By foreclosing industrial consumers from purchasing in the LME part of this relevant market, Metro injured competition, and pushed part of industrial consumer demand into or towards the Primary Aluminum Market. The payment of the Midwest premium or another premium was standard in the Primary Aluminum Market.

321.    However, in order to acquire its monopoly, Metro had necessarily and admittedly inflated the Midwest Premium through its incentive payments and further inflated same through its hoarding of increased amounts of aluminum for increased periods of time.    In

anticompetitively acquiring its monopoly power in this manner, Goldman directly and proximately injured Plaintiffs and Class members who paid the Midwest premium and other premiums to acquire primary aluminum.

>   **E.    Metro, Goldman, the LME, and Other Persons Benefit From the Higher Midwest Premium, LME Rents and Incentive Payments**

322.    By and through Metro's aforementioned web of agreements in restraint of trade, Metro, Goldman/J. Aron, the LME, and other Defendants and co-conspirators directly benefitted as a result of the corresponding increases in LME rents, the Midwest Premium, and/or incentive payments paid by Metro to co-conspirators and others.   Metro's substantial increase in incentive payments made to customers in an effort to hoard primary aluminum in its warehouses also impacted the premium by increasing the queue and thus delaying the load-out of aluminum to industrial concerns manufacturers and others.

323.    **First**, by entering into various warrant cancellation agreements with DB Energy, Red Kite and others, Metro unreasonably extended the queue, which had a direct and material upward impact on the Midwest Premium. The premium is the price one must pay to avoid the queue.   And the queues exist in two places—Detroit Metro and Pacorini Vlissingen.   "With Detroit and Vlissingen there are currently only two locations in the global LME system that deliver out metal on a regular basis," according to Metro's CEO Chris Wibbelman in a letter he sent to the LME.  GS-METRO-00002428.

324.    A prime example of how Metro viewed its ability to impact the premium in this manner can be found in an email from Metro's CEO to Goldman/MITSI employee Jacques Gabillon: "[T]he metal we get is withheld from consumer and makes the premium go up."  GS-METRO-00020303; *see also GS*-METRO-00001316-23

325.    In   exercising   its   self-perpetuating   market   power   provided   by   its   foregoing

agreements for large (but substantively illusory) cancellations, Metro was repeatedly encouraged to continue this behavior by Scott Evans of Goldman/J. Aron and to make increasingly higher incentive payments.  *See e.g.,* GS-METRO-00020303; GS-METRO-00004634; GS-METRO-00021944.  Evans urged Metro to make increasingly higher payments to Alcoa and others to divert their original production of primary aluminum into what was the output restriction of Metro's long queues in Detroit.  Goldman/J. Aron had large holdings of physical aluminum.

326.    Plaintiffs have good grounds to believe and do allege that Goldman's J. Aron subsidiary had derivatives contracts on the Midwest premium, all of which stood to gain from increases in the Midwest premium.

327.    (a) In his employment prior to working for Goldman's J. Aron subsidiary, Scott Evans was an aluminum purchaser and trader for Mitsubishi.  At Mitsubishi, Scott Evans was regularly responsible for physical aluminum and derivative positions that profited from increases in the Midwest premium.  This is sometimes called being "long the Midwest premium."  Plaintiffs have good grounds to believe, and do allege that Goldman's J. Aron was "long the Midwest premium" and benefitted from the increases therein caused by Metro. Again, Metro was being harangued and egged on by Scott Evans to make higher incentive payments.

(b) J. Aron separately and additionally benefitted through its large holdings of physical aluminum; in Metro's Detroit warehouses alone, J. Aron held and apparently owned at least 725,000 tons of physical aluminum (in at least 62 different deal numbers) which, in the aggregate, stood to gain approximately $160 million from an increase in the Midwest premium of 10 cents a pound.  *See, e.g.,* GS-METRO-0039332 (Plaintiffs analyzed and aggregated data from Metro's monthly "Dealbooks" from April 2010 through June 2013); GS-METRO-

00027563; GS-METRO-00008821.

328.    On another occasion, Metro's CEO Chris Wibbelman was chastised by Jacques Gabillon of Goldman and MITSI for attempting to load-out primary aluminum in accordance with the LME rules.  GS-METRO-00037162 ("It started with a call today with Jacques chewing me out for (perhaps) scheduling appointments outbound at the 3000MT/Day past the date when the level goes down to 2500 MT/Day once our stock (LME plus cancelled) goes below 900,000").

329.    J. Aron's Scott Evans had a reputation for trading "long" the premium in derivatives transactions.  That is, his derivatives positions would gain from increases in the Midwest premium.  In addition, Goldman (through J. Aron) owned large quantities of physical aluminum which also directly stood to benefit from increases in the Midwest premium.

330.    **Second**, this anticompetitive behavior also significantly increased Metro's rental revenues despite the lack of perceptible changes in supply or demand in the economy and without any increase in the skill, efficiency, quality of service or output by Metro.

331.    An example of how important the warrant cancellations and off-warrant benefits can be found in Mitsi's Board minutes from 2012 which show that Metro believed "off-warrant deals represent a commercial instrument for Metro to retain metal that would have otherwise moved to other storage operations.    GS-METRO-00006064-065.  Metro's CEO Chris Wibbelman also stated on another occasion that: "There is a big downside to losing our stock advantage in Detroit which we believe can never be recreated once lost."   GS-METRO-00026078-079.

332.    In an email chain between Wibbelman and Gabillon, Wibbelman said: "Anything we move to Detroit would gain greater rent and lengthen the Detroit queue but it would be

expensive." GS-METRO-00004633–635.

333.   **Third**, Metro's co-conspirators benefitted from Metro's enhanced incentive payments.   *See* Section IV.C. *supra*.

334.   **Fourth**, Metro provided Goldman/J. Aron with valuable trading benefits and other favorable treatment which would not have been forthcoming in the absence of their relationship.   This took numerous forms, including paying higher freight incentives to J. Aron than to other traders or producers; the ability to close aluminum transactions faster and for greater tonnage (57% of the total inbound Detroit aluminum tonnage from January 2011 until February 29, 2012), based on "the efficiency of rapid close verbal confirmations [between Metro and J. Aron] for high volume transactions which have allowed them to be first and fast mover"; paying to J. Aron a "courtesy" incentive of $142/mt for metal delivered without finalization of a proper contract or issuance of a deal number, in violation of protocol; allowing J. Aron to be late to pay accounts due; and other benefits.   In addition, Metro allowed J. Aron to cancel certain warrants in Mobile such that it could get into the queue in advance of a backwardation and ahead of a prospective "long," saving J. Aron significant sums for LME rent and also allowing it to export the metal "for presumably a ($200+) larger premium than it paid or would have received with later delivery."   On another occasion, "J. Aron had an urgent physical short, Metro agreed to accommodate J. Aron's need to satisfy its customers by allowing J. Aron to release 4,000 MT from its financing commitment by agreeing to replace the metal into Detroit.   J. Aron exceeded the 4,000 MT agreement by releasing an additional 525MT . . . .   If Metro had not released the Rotterdam 4,525 MT to J. Aron, the Contango was sufficiently wide such that Metro could have earned gross revenue in Rotterdam of $84/mt by

financing the Rotterdam aluminum for one year forward."[46]

335.  **Finally**, the LME knew that paying incentive payments could affect the price of aluminum to purchasers, but did nothing about it.  The LME's Warehousing Committee acknowledges incentive payments have the potential to undermine the proper economic functionality of the aluminum market.  For instance, in one Warehousing Committee Bulletin, Tom Hine, General Counsel and Head of Enforcement of LME, wrote that "an 'exceptional' inducement given by a warehouse could have the ability to distort the ordinary flow of material into and out of warehouses in accordance with economic supply and demand.  Equally, an 'unreasonable' charge made by a warehouse, for example in relation to the withdrawal of material from the warehouse, could have a distorting effect on the market. GS-METRO-00024146.

### F.  Goldman's Knowledge and Acts

#### 1.  The LME Prohibits Certain Communications between Warehouse Companies and Other Entities

336.  It is a violation of LME rules for a warehouse company to reveal Confidential Information to other entities.  Specifically, LME Notice 98/362, A350, R020, W071 (Oct. 13, 1998) ("1998 Notice") set out "Members' and Warehouse Companies' Obligations" as follows.[47]

---

[46]      GS-METRO-00037180-83; GS-METRO-36811-15; GS-METRO-00036894-96.

[47] On or about November 17, 2011 the LME issued Notice 11/334, A326, W173 which restated and made some modifications to the 1998 Notice.  Notice 11/334, A326, W173, p. 1 (Nov. 17, 2011) ("2011 Notice").

The 2011 Notice modified the "Members' and Warehouse Companies' Obligations" from the 1998 Notice.  2011 Notice, p. 3.  Namely, it prohibited a "Warehouse Company" from "dealing directly or indirectly in LME Contracts, and should maintain the confidentiality of price sensitive and customer confidential information."  *Id.*  The definition of "Confidential Information" was not modified.  *Compare* 1998 Notice, p. 3 *with* 2011 Notice, pp. 1-2.  The 2011 Notice also modified the 1998 Notice's section entitled "Members and Related Warehouse

> **Under the terms of the Conditions and Obligatory Procedural Notes for warehouse companies, a warehouse company is prohibited from revealing Confidential Information to other entities.  This prohibition is an important part of the Exchange's rules and practices designed to ensure the orderliness of its market.**
>
> **A member which encouraged or facilitated a warehouse company to breach these prohibitions would itself be in breach of its obligation to observe high standards of integrity and fair dealing and high standards of market conduct under Regulation 9.6 of Part 2 of the LME's Rules and Regulations.**
>
> **Equally, a member which took advantage in its trading of Confidential Information would be in breach of Regulation 9.6.**

1998 Notice, pp. 3-4.

337.   "Confidential Information" means, in respect of a warehouse company's business, any of the following, ahead of general publication by the LME:

(i) stock figures for LME deliverable metal;

(ii) all information relating to proposed or actual shipments of LME deliverable metal to be made or received by that warehouse company (including, in respect of shipments to be made by that warehouse company, any information of a commercially sensitive nature given to that warehouse company by the shipper, his agent or the recipient of that shipment, such as the identity of the customer, customs information, etc.);

(iii) all information related to the issuance, holding and cancellation of LME warrants by that warehouse company; and

---

Companies."  *See id.*  The new requirements set out in the 2011 Notice became effective on April 1, 2012.  2011 Notice, p. 1.

On or about July 2, 2014 the LME issued Notice 14/202, A195, W098 which restated, and made a number of modifications to, the existing requirements relating to information barriers and superseded the 2011 Notice.  Notice 14/202, A195, W098, p. 1 (Jul. 2, 2014) ("2014 Notice").

The "Requirements in relation to Confidential Information" from the 2011 Notice *was* modified and included a requirement that "[a]ll Warehouse Personnel must be made aware of their responsibilities under the Market Abuse Regime, in particular not to disclose or deal in the possession of, or on the basis of, Confidential Information…."  2014 Notice, pp. 4-5.

114

(iv) any other information in relation to specific LME brands which a warehouse company acquires through its warehousing activities.

1998 Notice, p. 3.

338.    Additionally, in a section entitled "Members and Related Warehouse Companies" the LME stated that

The risk that Confidential Information may pass between a warehouse company and a member is increased if they are both companies in the same group.  A member must not unfairly take advantage of its group relationship with a related warehouse company by utilizing Confidential Information in a way which would jeopardise the proper functioning of the metals market, or breach any of the Financial Services Authority's Statements of Principle…along with the LME's own Rules and Regulations.

1998 Notice, p. 4.

339.    "Related warehouse company" is defined as "a warehouse company which is a subsidiary or holding company of a member, or a subsidiary or holding company of one of a member's subsidiaries or holding companies…."  1998 Notice, p. 3.

340.    Goldman-Metro's repeated violations of the 1998 Notice's prohibition on a warehouse company revealing Confidential Information to other entities reflects Goldman's complete knowledge of (a) Metro's anticompetitive activities, (b) the anticompetitive effects of such activities, and (c) its own knowing participation in such activities.  The violations pertained to the proposed or actual shipments of LME deliverable metal to be made or received by the warehouse company, including the identity of the customer, to another entity, especially where the information has been passed between companies in the same group, allowing the member to take unfair advantage of its group relationship in a way which would jeopardize the proper functioning of the market.  Goldman-Metro also violated the prohibition against a member's facilitation of a warehouse company's breach of these prohibitions.

341.    Goldman had full knowledge of the anticompetitive acts and both financed and

took separate actions to further the anticompetitive acts.  Also Goldman through its J. Aron division and other part of its business, greatly profited from increases in the Midwest Premium caused by the anticompetitive conduct.

### 2.      Goldman's Knowledge of the Incentive Payments to Smelters

342.    On March 26, 2010, Wibbelman informed Gabillon, Managing Director at Goldman that "[t]oday's Detroit rail report shows 50 en route….up from 26.  Good sign."  GS-METRO-00029264.   Gabillon asked whether that was "under the 50$/t incentive?"  GS-METRO-00029264.   Wibbelman stated that he "meant that the rail traffic on the old deals picked up again.  The deals that we have been short shipped on.  This is not a new deal.  We will have to see if it is a trend that builds or just a one time increase.  Though it does look like there are producer surpluses coming available for Q2….and even q3…but they will want a lot…"  GS-METRO-00029263.

343.    Gabillon then told Wibbelman that he was "really interested by [Wibbelman's] view on [aluminum] freight incentive for q2 and q3 into detroit."  GS-METRO-00029263. Wibbelman stated that he believed "the expectations from the producer may be $100.  We will not have to pay that much, as we will give away contango to get it down.  Question is, how much.  I think they have peaked though.  We were lagging and, lost some deals. But, I believe, the high priced offers may have capacity/capability constraints…They are still high though. We could bulldog and stay low, or go lower, lose some deals and wait to see if it comes back to us at a lower number. So, I have done a little of that, but have not wanted to be out of the ballbark low so that they take offense."  GS-METRO-00029263.

344.    On July 21, 2010, Wibbelman emailed Gabillon in which he discussed the deal statuses and business opportunities relating to three clients – Alcoa, Mitsubishi and Glencore. GS-METRO-00030736-737.  Wibbelman reported to Gabillon that Alcoa rejected an incentive

offer from Goldman and wanted a higher incentive, a deal opportunity in which Mitsubishi wanted an incentive of $80.00 for 24000 MT in Chicago, and a potential deal in which "Glencore has approached [Goldman] about taking back Metal that it has removed from Metro if Metro were willing to pay $125/MT…"  GS-METRO-00030736.  Wibbelman then gives Gabillon recommendations and strategies for ways to approach all three customers.  GS-METRO-00030736.

345.   On August 5, 2010, Wibbelman emailed Scott Evans of Goldman's subsidiary, J. Aron, and mentioned reasons why J. Aron should not "be very aggressive for the 10,000 tons of Glencore material that came out of Metro warehouses previously."  One reason was "[t]o memorialize a structure where Glencore is able to get incentives from us at the same time they are destocking us will make it permanent and require Metro to act similarly with respect to Pacorini metal.  This could turn the LME warehousing business upside down (and the forward curve literally)."  GS-METRO-00030793.  Moreover, Wibbelman commented that if J. Aron purchased the warrants, Metro would be presumed to be involved by the market:

> **Likewise, for [Goldman] to purchase warrants from other LME warehouses (whether or not intended for Metro) will provide an inevitable blow-back for Metro who will be assumed to be involved or at least providing the backstop to the transaction.  Trading companies with warehouse interests will retaliate against Metro. … It may be inevitable, the apple cart may have already tipped ¾ of the way over.  And this may be worth doing for 1,000,000 metric tons or more, but it is not necessarily worth doing at low levels without taking a deep breath and making sure of the knock on affects.**

GS-METRO-00030793.

346.   When producers like Alcoa did not get the level of incentive payment they wanted from Metro, they would "call Goldman directly" to get their price.  GS-METRO-00048504.  For one example, on August 12, 2010, Stephen Branton-Speak, the Global Head of Goldman's Global Metals Trading business and an LME Board member, emailed Metro's CEO

stating "sounds like we need this Alcoa deal, might wanna sharpen your pencil there sir" regarding a potential warehousing deal with Alcoa. GS-METRO-00030975.

347. On February 11, 2011, as previously alleged herein regarding the Alcoa-Metro Deal DET-1367, Gabillon and Wibbelman discussed previous deals, specific current customers who were "working" Metro to continue to bid up the incentive to make the premium go up, Metro's "black hole" and its influence over the Midwest Premium due to withholding aluminum from consumers. *See* GS-METRO-00020303-305.

348. On May 4, 2011, Wibbelman emailed Gabillon concerning a prospective deal with a specific customer, Alcoa, as well as his dealings with J. Aron, another Goldman entity. Wibbelman requested "guidance on my authority to incentivize this 40kmt [for Alcoa] up to $145." Wibbelman then mentions that the J. Aron employee, Scott Evans, is "pushing saying it is the last trench and we will lose if we don't book." GS-METRO-00004634.

349. Gabillon asked Wibbelman which material the deal was for, and why the freight allowance went from "125 to 145 in a few weeks." GS-METRO-00004633. Wibbelman explained that Alcoa caused this freight allowance to increase, but that Glencore might buy, thus naming specific Metro customers: "Alcoa. We won't get at anything less. Premiums are at 9+. Glencore may buy to protect premium." GS-METRO-00004633.

350. Later, Gabillon responded and asked about how the deal with Alcoa went. In his email Gabillon stated, "Did we do the 125 with Alcoa? For which volume? Is it clear they will deliver on the 125 before they deliver on the 145?" GS-METRO-00004633.

351. On May 19, 2011, Chris Wibbelman of Metro forwarded an email to Michael Whelan. GS-METRO-00021943. The forwarded email, also dated May 19, 2011, was sent by Wibbelman to Gabillon and Greg Agran of Goldman. GS-METRO-00021944. Wibbelman

informed Gabillon and Agran of Scott Evans' anger over an incentive that got lowered and reiterated the "Chinese Wall" policy of Metro and Goldman.   GS-METRO-00021944. Regarding "scott," who is presumably Scott Evans of J. Aron, Wibbelman stated, "Just a warning that scott [Evans] is fighting mad that we lowered his number from $144 to $130 in a week." Wibbelman then stated the Chinese Wall policy, stating, "The guidance I was given was not to give GS the best price every time to (1) keep the other customers from turning against us; and (2) comply with the stand alone investment regime under which gs bought Metro." GS-METRO-00021944.

352.    In response to this forwarded email, Whelan responded to Wibbelman stating that "Scott [Evans]" felt Goldman should be able to have commercial discussions with Metro and that Metro should give Goldman the "best" deals.  Evans believed that Goldman could have assisted Metro when Metro had to unload metal into the market, a poor financial move for Metro, but instead used the Chinese Wall as an excuse:

> **Scott is not comfortable (and frankly it is not all that clear) on why we can't and don't have more commercial discussions. I think his stance is that we should be showing GS the best numbers on the lion's share of business…Scott has a certain opinion (right or wrong) that GS could have helped with this situation where we had to dump a huge amount of metal back into the market – which at this moment is not looking like all that great a move….**

GS-METRO-00021943.

353.    Whelan then gave his view that the commercial discussions between Goldman and Metro were not a violation, that he understood both sides of the Chinese Wall argument, and that certain advantages should be given to GS and Scott due to their Goldman connection:

> **While I am choosing not to take sides in this I could argue both sides.  If GS wants to grow in the physical market then Metro should be the vehicle to help gain that market share.  It isn't a Chinese wall violation at all to discuss commercial deals…But I do feel like we hide behind the Chinese wall to the extreme and to fault to show that it does in fact exist. I don't think we have**

> **enough commercial contact with GS that is not in any way a violation of the chinese wall and in certain cases it may hurt us. While I do agree with the idea that we should spread the best numbers around so that we continue to have counter party's to play with - I am however of the opinion that GS and Scott in particular should be given advantages because of the long standing relationship.**

GS-METRO-00021943.

### 3.    Goldman's Knowledge of the Incentive Payments to Other Persons to Bring Aluminum or Keep Aluminum in the Metro Warehouses

354.    On July 20, 2010, Gabillon was having dinner with "scott" – presumably Scott Evans of J. Aron.  GS-METRO-00049477.  During this dinner Wibbelman called "scott" which prompted an email from Gabillon to Wibbelman in which he asked "You called scott while I am having dinner with him???"  GS-METRO-00049477.  Wibbelman responded joking about the insignificance of the Chinese Wall to him stating "[t]here is a large bread basket that constitutes a Chinese Wall."  GS-METRO-00049477.  Gabillon responded "[m]assive basket but wine flowing courtesy of steve…Negotiating freight incentive right now!"  GS-METRO-00049477.

355.    On May 27, 2011 at 14:13, Chris Wibbelman emailed Jacques Gabillon and discussed Metro's profits. Wibbelman stated, "So, we make $158/mt less but we still make $327. So we can watch Scott's head explode when I tell him our incentives are now Negative $28/MT."  GS-METRO-00021387.

356.    In the same email chain, Chris Wibbelman emailed Gabillon and copied Grebien Ingmar, Executive Director of Goldman Commodities Principal Investments, discussing an analysis, apparently related to the previously referenced proposed deal, of "how profitability decays depending on which month the metal is received in going forward.  (Closer to the implementation date)."  GS-METRO-00021386.

357.    Jacques Gabillon responded to both Grebien and Wibbelman recommending another way to run the analysis: "We should run the analysis in terms of irr, not $/t Also think

rent share should be back, risk sharing." GS-METRO-00021386. Wibbelman responded to Grebien and Gabillon, discussing rent and Metro's investments: "We can do that but since the interest cost is negligible and the chance of earning back our investment is near certain, I am not sure it helps in Detroit. IRR and Rent share in areas where no critical mass for sure." GS-METRO-00021386.

### 4. Goldman's Knowledge of the Deutsche Bank Deal and the Large Cancellations

358. As already alleged in detail herein, Goldman had knowledge of and facilitated various aluminum shuffling agreements between Metro and its customers including, but not limited to, an agreement with DB Energy which resulted in the cancellation of 100,000 tons of warranted aluminum on or about September 17, 2010 and an agreement with Red Kite which resulted in the cancellation of more than 500,000 tons of aluminum. Both deals included significant incentives for both DB Energy and Red Kite to re-warrant the aluminum, as well as substantial penalties if they failed to do so.

### 5. With Such Knowledge, the Other Goldman Defendants Continued to Support, Finance, and Very Materially and Knowingly Assist Metro and Its Monopolization of LME Warehousing Services of Aluminum, Violations of the Antitrust Laws, and Knowing Inflation of the Midwest Premium and Midwest Transaction Prices

#### (a) Goldman Intent and Modus Operandi

359. Goldman's Mitsi Holdings LLC or another Goldman Sachs subsidiary had to approve, and did approve each and every incentive payment made by Metro in excess of $128 per ton, knowing full well that these Midwest premium-inflating payments were injuring industrial consumers in order to divert more aluminum into Metro's Detroit warehouses for longer periods of restraint. *See* ¶¶297, 327 *supra* (alleging the details and documents).

360. During 2010, Goldman, directly through Gabillon and Victoria Atwood Scott, as

well as through Metro's London Agent, ICS, met with members of the LME, including Hall, Abbott, and O'Hegarty to try to exert pressure over the LME and convince them not to change the minimum load-out rule.

361.    On June 29, 2010, Shon Loth told Wibbelman about an upcoming meeting involving Robert Hall of the LME, "Martin" [Abbott] and Jacques Gabillon of Goldman. Loth listed strategies to defend Metro's 1500 mt per day preferred load-out including: (1) "appeal to Martin as GS, member and shareholder." Loth stated finally that Gabillon could "In a very gentle but clear way he can point out that Metro would not support a change and would be required to review the legal framework around any significant change to the warehouse contract. While being gentle it is important to be clear and firm as we are currently struggling to maintain the status quo." GS-METRO-00017529.

362.    What Metro called the meetings of "Goldman Sachs" held by Gabillon of Mitsi Holdings with Martin Abbott, CEO of the LME, resulted in the report that Martin Abbott was supporting strongly the current system of load-outs.  The longer that Mitsi Holdings or the other Goldman Defendants could agree with the LME and influence it to avoid a change in the rule, the further that Metro could overwhelm the rule and restrain a greater amount of aluminum for a longer amount of time and higher supra-competitive rent revenues.

363.    As public complaints about long Detroit load-out queues and resulting inflation of the Midwest premium increased, Gabillon again met with Martin Abbott on or around July 11, 2011 to work with Abbott not to change the minimum load-out rule or to minimize any change therein.

364.    Gabillon followed up the meeting with an email to Martin Abbott at the LME, stating, "Thanks for your time (and the tea!) this morning. Following our discussion please find

attached an internal discussion paper on loading out rates. The attachment, titled "Discussion Points LME Loading Out Rates," includes a section called "Higher Outbound Rates Could Harm The Market" was designed to and did aid the LME in influencing Europe Economics to advise against any change in the load-out rule or the most minimal change possible. See ¶¶375 and 374-379 *infra* regarding the attempts by Metro, Mitsi, and Goldman to influence the LME and Europe Economics.

365.   Probative of Goldman's motive and intent is the revelation that Goldman actually engaged in an aluminum cornering scheme more than 20 years ago, during the early 1990's recession following the 1989 stock market crash.[48]   The scheme was run by two young Goldman executives who now run the company.   The mastermind of Goldman's first foray in aluminum hoarding was Gary Cohn, the current Goldman President and COO and right hand to CEO Lloyd Blankfein.

366.   As reported in a recent book published by CNBC investigative journalist Kate Kelly, for Cohn, "the aluminum warehouse trade was something of a déjà vu."   In the early 1990s Cohn and Blankfein both worked for Goldman physical commodity trading subsidiary J. Aron.   Starting with a "riskless" $300 million "experiment" authorized by Blankfein, Cohn embarked on a strategy to stockpile aluminum, including securing a seat on the LME for Goldman and by buying up aluminum from producers for the purpose of locking it away in storage.   Goldman's aluminum cache, which it stored outdoors, was so large at the time that its "reflection of the sun was creating confusion for local air traffic controllers."[49]   It was around that time that Cohn made partner.

---

[48] *See* Kate Kelly, THE SECRET CLUB THAT RUNS THE WORLD: INSIDE THE FRATERNITY OF COMMODITY TRADERS 144-50 (2014).

[49] *Id*. at 149-50.

**(b)**     **Goldman Facilitated Metro's Aluminum Shuffling Deals**

367.    As already alleged in detail herein, Goldman had material knowledge of and facilitated various aluminum shuffling agreements between Metro and its customers including, but not limited to, agreements with DB Energy and Red Kite which resulted in the cancellation of more than 600,000 tons of warranted aluminum.

**(c)**     **Goldman and the LME**

368.    As stated in July 2010 by Wibbelman to Gabillon in advance of a meeting Gabillon was to have with Abbott:

> **I think you should emphasize that he (martin abbott) has created the most successful structure for aluminum financing and trading that exists on the planet and that some care should be taken before blowing it up.**

GS-METRO-00004240 (emphasis added).

369.    Goldman and Metro lobbied the LME privately as part of their "strategy for defending 1500mt /day" and "struggling to maintain the status quo." GS-METRO-00017529. One strategy was to appeal to the LME CEO "as GS, member _**and**_ shareholder," and to stress the "LME stock levy – ie _**don't mess with it**_." GS-METRO-00017529 (emphasis added).

370.    Goldman directly sought to influence the LME.  "JG informed that there had been two discussions between Goldman Sachs and the LME on this topic [1500 load out] since the last board meeting. JG had meet[ing] over lunch with Martin Abbott, CEO of the LME, and VAS had meet[ing] with Diarmuid O'Hegarty, Deputy CEO of the LME."  GS-METRO-00004622.

371.    Goldman has substantial sway over the LME's rulemaking process.  For instance, on July 2, 2013, Executive Director of Global Commodities, Ingmar Grebien, Metro President and CEO Chris Wibbelman and Jacques Gabillon, Managing Director of Goldman Commodity Principal Investments Group, met with the LME to discuss changes to the load out

rules in Goldman's offices.  In an email after the meeting, the LME was deferential to Goldman and agreed to some of Goldman's proposals and agreed to raise other issues at future LME meetings.  GS-METRO-00028054.  Throughout the rule-making process for the new load-in rates, Goldman and Metro provided steady input to the LME, which was always considered and frequently accepted.  *Id.*;  GS-METRO-00010154;  GS-METRO-00006333;  GS-METRO-00028207; GS-METRO-28189.

### (d)  Goldman itself viewed the minimum load-out rule as a maximum load-out rule

372.    As already alleged herein, (a) Goldman understood that it was "industry practice" to treat the minimum as a maximum and regarded the 1,500 ton requirement as the "max possible outflow" (*see* GS-METRO-0001109 at 001116; GS-METRO-00021541); (b) at least one time, Wibbelman did not immediately reduce the amount of metal that was scheduled to be loaded out, and he was chastised by Mitsi Chairman Jacques Gabillon (*see* GS-METRO-00037162); and (c) Martin Ford, the LME's Deputy Head of Market Surveillance explained to Goldman that the "the warehouse community views [the minimum load-out] figures as limits rather than minimums" because it is in the warehouse's interest to hold material.  GS-METRO-00014822.

373.    Thus, the LME was aware of and complicit in the agreement to use the minimum load-out rule as the maximum load-out rate.  *See* GS-METRO-00004622.

### (e)  Goldman's Influence on the Europe Economics' Recommendations

374.    Internal Mitsi Holdings (Goldman) and Metro emails show that prior to the LME implementing any changes in light of the Europe Economics report, Goldman called for a letter to, and a meeting with, the LME to try to convince them not to implement all the Europe Economics recommendations.  Among the arguments proposed by Goldman was to claim that

"3,000t cannot be met by lack of trucks [and] anything else you guys can come up with." GS-METRO-00021470.  Metro's CEO responded: "Detroit can get cleaned out by rail even if no trucks are available." GS-METRO-00021470.

375.    Nevertheless, Goldman decided that "we should delay them and swamp them with practical details of why this is problematic," (GS-METRO-00021470) and did meet with Martin Abbott for tea, furnishing the LME with a report on load-out rates.  GS-METRO-00001316.  The report was, as planned, Goldman and Metro spin designed to delay and swamp the LME.  GS-METRO-00001317.  It argued that loading out aluminum was "physically constrained," but, of course, failed to disclose what Metro's CEO had acknowledged—Metro could "clean out" its Detroit warehouses by rail if it really wanted to meet demand rather than continue to restrain supply. GS-METRO-00001317.

376.    Goldman steered Europe Economics away from confronting premiums head on.  Noting that Europe Economics was "very focused on physical premia and the impact of the LME," Gabillon indirectly suggested to the LME CEO that Europe Economics might be straying from its "**narrow mandate**." GS-METRO-00020312.

377.    On May 27, 2011, the date of the LME announcement of the Europe Economics study and possible changes to the load out rule, the CEO of Metro, Chris Wibbelman, emailed Jacques Gabillon of Goldman Sachs and admitted an intent to block the Europe Economics recommendations: "Part of our job is to make sure the changes to [sic] not benefit the complainants.  And to highlight and to perhaps create negative consequences."  GS-METRO-00021386.

378.    Indeed, Wibbelman previously echoed this intent to Mike Dudley of the International Commodity Services Limited when he pointed out that "the people complaining

will not benefit from a change as **[Goldman Sachs]**…and a couple others take market actions to shape the landscape" and that warehouse companies view the load-out requirements as a contract and not a rule.  GS-METRO-00033241 (emphasis added).

379.    The discussion between Metro and Goldman on "how we should respond to LME/EE recommendation," included talking to Europe Economics and to the press, and gathering competitors' and producers' support behind them.    The response to Europe Economics would be "what is wrong with report? Link between premium and queues? Arb between future and physical market?"  The response to the press was that it was now "**time to tell our story, undermine the whole process**." GS-METRO-00006763.

>                    **(f)    Goldman jointly lobbied with the LME in defense of the LME rules**

380.    Goldman's direct participation in the scheme is further demonstrated by its joint lobbying with the LME in defense of the LME's rules.

381.    In July of 2013, CEO of Mitsi Jacques Gabillon alerted Martin Abbott of the LME that there was going to be a Senate hearing where the LME's aluminum warehousing business would be discussed.  Gabillon suggested that "it would be helpful if we were able to find an expert who would be able to provide broader context to the broader operation of the market, the warehouses and the exchange." GS-METRO-00028178.

382.    The next day, Abbott emailed Gabillon to discuss preparing for the Senate hearing: "While we agree that it would be better for a witness to present the 'real' warehousing situation to the Sub-Committee, it will be in practice difficult to get aligned (legally and otherwise) to field an LME representative in time…If possible it would be great to have a call tomorrow (Weds) with your govt affairs team / regulatory lawyers to compare notes…" GS-METRO-00028220.

383. The LME and Goldman worked together to prepare for and lobby Senate staffers before the hearing (GS-METRO00028227; GS-METRO-00028294; GS-METRO-00006370), and Goldman and the LME jointly lobbied Congress in July 2013. GS-METRO-00028294. Emails between a Goldman Sachs Government Affairs executive and the LME Head of Business Development, Matt Chamberlain, among others, including Mark Bradley, the LME Head of Market Surveillance show the degree to which Goldman and LME were aligned and also that they made efforts to conceal the true nature of their relationship. The LME's Chamberlain states in one email:

> **Many thanks Amy- think we're good from our side. The participants would be me, plus our general counsel Tom Hine, and our compliance colleague Mark Bradley (both cc'd). Just for good order- ideally, I think we would be better to separate out the GS and LME components of the call, in two regards:**
>
> **\*\*\***
>
> **Clearly we don't want to be seen as advocating any GS·specific position - although our interests are clearly aligned in advocating LME storage, I think important that·as a market operator·we're not seen as being too closely aligned with any one individual member**
>
> **Obviously we're not looking to "dis-intermediate" GS (especially since we're grateful that you brought it to our attention!); but just wanted to make sure we don't create an impression of alignment where that wouldn't be appropriate.**
>
> **One way of doing this would be for us to have a separate call with the Senator's staff, either within your current slot, or a separate time if you'd rather that we scheduled it separately. Happy to discuss best approach here.**

G. **Metro, the LME and Others Work Together To Minimize Changes In The Maximum Load-Out Restraint**

1. **Public Complaints about the Maximum Load-Out Restraint**

384. Market participants at first privately and then publicly began to complain.

385.    By 2011, a senior analyst in the metals industry told Reuters "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate...the infrastructure is there."

386.    "I think it makes a mockery of the market. It's a shame," Robin Bhar, a veteran metals analyst at Credit Agricole in London said in June 2011. "This is an anti-competitive situation. It puts (some) companies at an advantage, and clearly the rest of the market at a disadvantage. It's a real, genuine concern. And I think the regulators have to look at it."

387.    Nick Madden the chief procurement officer for Atlanta-based Novelis, the world's largest aluminum can manufacturer noted in 2011, "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate and so we feel there's a lot more they can do on the output side to push up the (load out) rates."

388.    "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal…in Detroit warehouses," said Madden.

389.    Madden then estimated that the U.S. benchmark physical aluminum price is $20 to $40 per ton higher because of the backlog at the Detroit warehouse.  That premium was then forcing U.S. businesses to fork out millions of dollars more for the 6 million tons of aluminum they use annually.

390.    On June 21, 2011, Jorge Vazquez, a senior vice president at Harbor Intelligence, publicly addressed the Defendants' restrained, restricted and anticompetitively slow rate of load-outs of aluminum from the Detroit Warehousing.

391.    Specifically, Mr. Vazquez stated that "one of the factors that, without a doubt, is

behind record high Midwest premiums" was such slow rate of load-outs.

392.    "This situation has been organized artificially to drive premiums up," said Dave Smith, Coca-Cola's procurement manager.  "It takes two weeks to put aluminum in, and six months to get it out."

393.    **In 2011 Coca-Cola Co.** lodged a complaint with the **LME**.  This complaint was in response to **Goldman's** creation of supply bottlenecks to artificially raise the price of aluminum in the open market.

> **2.    With Such Knowledge, the LME Worked In Parallel with Metro and Other Defendants to Continue the Maximum Load-Out Restraints, Avoid Alleviation Thereof, and Continue to Injure Class Members**

394.    If for any reason the LME maximum load-out agreements were not unreasonable when made, they became unreasonable during the Class Period as the injuries to competition and anticompetitive effects occurred.

395.    Rather than acting promptly to ameliorate such anticompetitive effects, the LME consistently acted to prevent the amelioration of such injuries to competition and the increases in the Midwest premium until well after the sale of the LME had been completed.  By then, the LME's CEO Martin Abbott, and other top executives, had received their substantial bonuses from this sale.

396.    For example, as previously alleged (see ¶¶374-379), in response to the widespread public complaints during 2010-11, the LME retained Europe Economics to analyze problems with queues and delays in receiving metals from the LME Detroit warehouses and related issues.

397.    In order to end these problems, Europe Economics specifically and explicitly recommended that the LME amend the minimum load out rule so as to require that a minimum of 1,500 tons per day per 300,000 tons of metal in the warehouse location, be required to be

loaded out.  For LME Detroit Warehousing for 2011-12, this would have required 6,000-7,500 tons per day minimum.

398.    As a result of the Mitsi, Goldman, LME, and Metro lobbying, the Europe Economics recommendation was too low.  Among other things, the LME's paid consultant, in part, was telling the LME what it wanted to hear.

399.    But, at least, the LME's own paid consultant, Europe Economics, recommended that the agreement between and among the LME and Goldman and other warehouse owners be substantially amended in order to make the minimum load-out rule scale upwards commensurate to the scale upwards in the amount of metal in storage.

400.    However, during 2010-2012, Defendants were engaged, among other things, in efforts to sell the LME. Defendants had mutual self-interests to maintain and increase their respective revenues from LME warehouse storage rates.  Thereby Defendants would BOTH inflate their projected warehousing revenues and the projected consideration that should be paid for the sale of the LME.

401.    Accordingly, Defendants agreed not to implement the LME's own paid consultants' proposed solution to the problem.

402.    Instead, Defendants agreed to undertake a delayed amendment that would permit the high storage rent continue and, indeed, increase.  Effective April 1, 2012, the LME and Goldman agreed to change the minimum (actually, maximum) load-out to 3,000 tons per day for LME Detroit Warehousing.

403.    This was less than one half of the unreasonably low amount that the LME's paid consultants recommended. As numerous analysts and participants contemporaneously predicted, this agreed upon small change was so far behind the curve that it would not, and it did not

reduce the queues.  *See* below.

404.    For example, in 2011, a senior executive at a metals brokerage told Reuters "the recommendations won't change anything. The problem will still be there six, nine months down the line."

405.    Such conduct by the LME during the Class Period was highly unusual and constituted a highly anomalous change in the way that the LME Combination acted.  This highly unusual conduct caused the highly anomalous and all time record prices.  It ran in parallel with the anticompetitive, highly unusual conduct of Metro and the Goldman Defendants.   The LME had numerous communications with Metro and the Goldman Defendants.

406.    Plaintiffs have good grounds to believe, and do allege that, during the Class Period, the LME agreed with Metro and the Goldman Defendants to engage in anticompetitive conduct knowing full well that the consequences of such conduct would be, and would continue to be, the all-time record Midwest prices.   The LME even went so far, at the apex of its participation and its performance of such agreement, to say in New York in or about February 2013 as follows.   Industrial or other consumers of aluminum who did not like paying high aluminum prices in the divergence of physical aluminum from LME prices should simply stop purchasing aluminum.

407.    This caused the industrial and other consumers to turn to Congress.   Shortly before Congressional hearings began, the LME reversed itself, its former CEO Martin Abbott "resigned," and the LME admitted that its maximum load-out agreement was improperly causing inflated Midwest premium prices and had to be changed in order to stop same.  Abbott received a large bonus after the successful merger of the LME, and consistently disagreed with

LME Warehouse Committee members and other LME employees during late 2010-2013 who thought that the long load-out delays were an abuse or perversion of the LME Charter and practices. *See* ¶¶182, 228, 237, 241.

### H. Anticompetitive Effects and Injuries to Competition

408.   Defendants' violations inflated the prices of millions of dollars' worth of aluminum in the Primary Aluminum Market as well as other parts of the world, and restrained up to 1.56 million tons of aluminum subject to load-out delays from Metro's Detroit LME warehouses of as long as 700 days.

409.   Alcoa as well as Russian aluminum producer Rusal both said that the LME warehouse restraints caused the all-in physical price for aluminum to be higher.

410.   Through its anticompetitive agreements and conduct which violated the LME Combination's "last resort" charter, Metro acquired

(i)     an 84% share of warehouse services for the primary aluminum stored in LME warehouses in the United States and Canada,

(ii)    approximately a 99% share of the warehouse services for LME warrants delivered on LME forward contracts for primary aluminum in the United States and Canada,

(iii)   the power to greatly restrict and restrain the load-out (or output) of the primary aluminum in LME warehouses into the remainder of the market for Primary Aluminum Market, and

(iv)    the power to inflate prices in such market through such output restraints as well as by competing with Plaintiffs and others in such market for primary aluminum for the anticompetitive purpose and effect of restraining yet more primary aluminum in Metro's Detroit warehouses for yet longer periods of time.

411.   Further, Metro's violative conduct and agreements also ended LME forward contracts' role as a practicable source of aluminum for industrial and other consumers.  Metro thereby deprived such consumers of an alternative source of primary aluminum.  Metro destroyed what had been this pro-competitive form of price-discipline on the MW premium.

412.   Metro likewise also greatly reduced the ability of consumers to hedge the price risks of physical aluminum through LME forward contracts. As The New York Times put it, given the industry-standard (and below-described) "formula used to set the price of aluminum on the spot market, the [warehouse-related] delays also increase the prices nearly all manufacturers pay for aluminum even when they buy metal that was not stored in a warehouse." David Kocieniewski, U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses, THE NEW YORK TIMES (Aug. 12, 2013) (emphasis added). As The New York Times correctly explains, that aluminum purchasers nonetheless would have been injured by price-inflated, antitrust injury-inflicting aluminum because what happens in the LME warehouses is inextricably intertwined with the price for physically delivered aluminum, an element of which is the Platts Midwest Premium.

## I.   Standing

413.   **Standing to claim as a consumer.**  Plaintiffs and Class Members were also at least potential consumers of the primary aluminum provided by Metro's load-out services either from deliveries of LME contract long positions or by purchases of the primary aluminum being loaded out of Metro's Detroit warehouses.  By creating long load-out delays, Metro prevented industrial or other consumers from using the LME long positions at all to purchase primary aluminum.  Metro further greatly reduced and delayed the amount of aluminum available to Plaintiffs and Class Members to consume from Metro's load-out services in Detroit warehouses.  This also contributed to and caused Plaintiffs and Class Members to pay high Midwest

Premiums, other premiums, and all-in transaction prices.

414. **Standing to claim against a competitor who engages in anticompetitive conduct for an anticompetitive purpose.**   Exactly contrary to the LME charter for its warehouses to operate as a market of last resort, Metro entered the Primary Aluminum Market in the United States and Canada as a market participant of first resort.  Becoming a competitor of Plaintiffs and other first level purchasers, Metro made high incentive payments which necessarily inflated the Midwest Premium in order to divert aluminum into the output restriction in its Detroit warehouses, and thereby anticompetitively increased both its restrained aluminum and its monopoly power.

415. The Goldman Defendants benefited from the increases in the Midwest Premium and Plaintiffs were consumers/competitors of the Goldman Defendants.   Increases in the Midwest Premium directly benefited the Goldman Defendants through their ability to sell their physical aluminum at a higher Midwest Premium and also on their derivative positions pegged to the Midwest Premium.  Plaintiffs and Class members were injured as potential consumers of the Goldman Defendants' aluminum and/or in competing as purchasers against the Goldman Defendants as sellers in physical aluminum transactions and prices.  Further, Metro and the Goldman Defendants influenced the LME and others at the LME to minimize the changes in the load-out rule and make sure that the "complainants" *i.e.*, Class members who were first purchasers of aluminum and complained about the maximum load-out restraint, did not benefit from whatever changes were made.  This intent to injure Plaintiffs further confers standing.

416. **Direct injuries from the anticompetitive acts by which Metro obtained its monopoly.**  In order to self-perpetuate its market power and obtain its monopoly, Metro had necessarily to foreclose Plaintiffs and Class members from the LME forward contract market

and inflate the Midwest Premium.   That is, Metro's anticompetitive steps directly injured Plaintiffs before or as part of obtaining Metro's monopoly and causing its increased rent revenues.   Metro directly injured Plaintiffs when Metro anti-competitively increased (a) the amount of aluminum on which Metro was receiving rent, (b) the length of time during which Metro was receiving rent, and (c) aluminum prices.

417.   **"Inextricably Intertwined."**   The direct effects of creating prolonged load-out delays and thus a bottleneck in the LME-approved warehousing market included at least: (1) higher rental fees incurred to store aluminum at Metro warehouses; and (2) higher prices for primary aluminum.   These injuries, though distinct, are "inextricably intertwined"; they are inevitable results of Defendants' anticompetitive conduct.   Both injuries are actionable under the antitrust laws.   Plaintiffs here seek to vindicate the latter.

418.   During the relevant period, Plaintiffs have suffered antitrust injury from Defendants' conduct alleged herein in the form of inflated regional premiums, including the Midwest Premium, and have thereby been injured in their business or property.

419.   Plaintiffs paid the Midwest Premium and the "all-in" Midwest Transaction price and were the first purchasers to pay the Midwest premium and the "all-in" Midwest Transaction price in primary aluminum directly from Defendants, smelters or merchants in the U.S. - Canada Primary Aluminum Market.

420.   Despite the massive quantities of aluminum stored in LME warehouses, aluminum is not immediately available to purchasers of aluminum because of queues.[50]   And because of the direct pricing link between what happens in the LME warehouses and the broader physical market for aluminum, the industry-standard published regional premiums (i.e.,

---

[50] Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

the Midwest Premium), which are a stated component of the spot metal price for physically delivered aluminum, have risen to unprecedented levels.  Other regional premiums applicable around the globe have risen in tandem.

421.    The anticompetitive effects of Defendants' exercise of market power in the LME-registered warehouse services market are thus directly transmitted to the Primary Aluminum Market.  This directly and foreseeably caused a rise of prices in the Primary Aluminum Market, an injury to competition which is inextricably intertwined with the injury caused by Defendants in the warehouse services market.

422.    The Midwest Premium and Midwest Transaction prices paid by Plaintiffs were directly inflated by Defendants' violations, in the aluminum warehouse market for LME-registered warehouses, of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1-2 and of other laws.

423.    Plaintiffs and other purchasers in the Primary Aluminum Market were necessary to the completion of Defendants' anticompetitive scheme.  Plaintiffs' overpayment of the anticompetitive prices for primary aluminum ensured and provided the market opportunity that enabled the Trading Defendants to successfully arbitrage the difference between current aluminum prices and higher prices in the future.

424.    Plaintiffs' injury is concrete and not speculative, being tied as it is to artificially-inflated pricing component benchmarks such as the Midwest Premium and other regional premiums.  Additionally, Plaintiffs will be able to demonstrate the amount of anticompetitive overcharges they paid by reason of Defendants' abuses of market power.

425.    Moreover, Defendants' concerted scheme to withhold aluminum from the market for physical delivery as aforementioned caused injury – including "squeeze[ing] up the

premiums" for delivery of physical aluminum, restraining supplies in LME warehouses for unreasonably long times, foreclosing Plaintiffs from sourcing aluminum from the LME, and the other injuries previously alleged – to competition of the sort the antitrust laws exist to prevent. Thus, Plaintiffs are efficient enforcers of the antitrust laws in that, by paying artificially inflated aluminum prices directly to integrated producers of aluminum or Defendants, Plaintiffs have suffered the most direct injury.

## V.    CLASS ALLEGATIONS

426.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following Class of persons:

> **All persons who from November 1, 2009 forward (a) made a first level direct purchase of aluminum pursuant to a contract with a price term based, in any part, on the Midwest Transaction Price, or other "all-in" price used in the United States, or the Midwest Premium, the Platts MW Premium or similar terminology or other regional premium used in the U.S., including but not limited to an averaging over a period of days of any such premium or adjusting for a grade or type of aluminum or (b) purchased aluminum directly from a Defendant.**

Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.[51]

427.    As used in this complaint, (a) a "first level purchase of aluminum" means a purchase of aluminum at the first level of sale outside the producer, *e.g.,* a purchase from a smelter or affiliate of a smelter, and (b) whenever the Midwest Transaction Price is used, this includes similar terms such as Platts Metals Week Midwest Transaction Price, The Metals Week U.S. Transaction Price, the Midwest Daily Transaction Price, and whenever the Midwest Premium or the Platts MW Premium is used, this includes similar terms such as "Platts Metals

---

[51] Plaintiffs reserve the right to amend the definition of the Class in the class motion or otherwise.

Week Premium."

428.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiffs, but can be readily ascertained.  Plaintiffs believe that there are hundreds of members of the Class.

429.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants monopolized, attempted to monopolize or conspired to monopolize the market for aluminum in the United States and Canada in violation of law;

b.    Whether Defendants made agreements in unreasonable restraint of trade;

c.    Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Premium, or Platts MW Premium portion thereof;

d.    Whether such violations inflated such prices of aluminum;

e.    Whether such inflation caused antitrust injury to the property of Plaintiffs and Class members;

f.    Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

g.    Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

430.    Plaintiffs' claims are typical of the claims of the other members of the Class it

seeks to represent.  Plaintiffs and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

431.   Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in complex antitrust class actions including those involving exchange markets.  Plaintiffs have no interests that are adverse to or in conflict with other members of the Class.

432.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

433.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.   It would do so without sacrificing procedural fairness or bringing about other undesirable results.

434.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.   Plaintiffs anticipate no difficulty in the management of this action as a class action.

## VI.    CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT AGAINST METRO, BURGESS-ALLEN, MITSI HOLDINGS LLC, J. ARON, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., GOLDMAN SACHS INTERNATIONAL, LME HOLDINGS LIMITED, HKEx, AND THE LME

435.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

436.    In violation of Section 2 of the Sherman Act, Metro monopolized, attempted to monopolize and conspired or agreed to monopolize the LME Aluminum Warehouse Services Market.

437.    As previously alleged, beginning by in or about November 2009 and continuing thereafter, Metro entered a series of anticompetitive agreements with Burgess-Allen, Mitsi Holdings LLC, J. Aron, Goldman Sachs Group, Inc., Goldman Sachs & Co., Goldman Sachs International, LME Holdings Limited, HKEx, and the LME, and took other restrictive and exclusionary steps.   As a result, Metro obtained monopoly power in the LME Aluminum Warehouse Services Market.

438.    As Defendants Burgess-Allen, the LME Defendants, and the Goldman Defendants all well knew and specifically intended, the purpose of the agreements that Metro made with each of them and the other persons were to achieve the anticompetitive effects alleged at ¶¶10-13 including monopolizing the LME Aluminum Warehouse Services market. Each of these Defendants stood to gain from such monopoly and each specifically intended to help and did materially help Metro to achieve monopoly power.

439.    As previously alleged, Metro intended to develop and did develop the market power to restrict output and set, control, and/or increase prices. Metro anticompetitively abused its monopoly power and discretion so as to impose the greatest restrictions on output that it

could.  In the process, Metro knowingly and directly inflated the Midwest premium and other aluminum prices to increasingly higher levels. Also, Metro also developed a market share of 84-99% of the services provided in the LME Aluminum Warehouse Services market.

440.   Metro did not obtain its monopoly power by reason of a superior product, business acumen or historic accident.

441.   As previously alleged, LME Holdings Limited and HKEx knowingly and materially helped the LME and Metro continue to violate the LME Charter so that Metro could monopolize the market. This allowed Metro to pay many times higher rental revenues to the LME Defendants than would be paid if the market were evenly distributed among LME warehouse companies.

442.   This conduct and its resulting impact on the market, occurred in or affected interstate commerce.  Defendants possessed or actually achieved a serious threat to possess monopoly power that, directly and proximately, restricted output and inflated aluminum prices.

443.   As a direct and foreseeable result that was proximately caused by Defendants' aforesaid conduct, Plaintiffs and Class members have been injured in their property. Plaintiffs had to pay artificially high prices for primary aluminum, including the Midwest Transaction price, and other all-in prices as well as the Midwest or Platts MW Premium and other premiums. Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue or reoccur in the future.

**AS AND FOR A SECOND CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST METRO, BURGESS-ALLEN, MITSI HOLDINGS LLC, J. ARON, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., GOLDMAN SACHS INTERNATIONAL, LME HOLDINGS LIMITED, HKEx, GLENCORE, AND THE LME**

444.   Plaintiffs incorporate by reference and reallege the preceding allegations as

though fully set forth herein.

445.    As previously alleged, in violation of Section 1 of the Sherman Act, from at least November 2009 until the present, Metro has made and performed a series of agreements in unreasonable restraint of trade for multiple anticompetitive purposes and with multiple anticompetitive effects.  These include agreements (a) to convert the LME minimum load-out rule to a maximum output restriction, (b) to delay load-outs from LME Detroit warehouses including through cancellations and re-warranting of the same aluminum, (c) to divert aluminum away from industrial consumers in the Primary Aluminum Market, and inflate the Midwest premium and other aluminum prices through incentive payment agreements, (d) to foreclose and exclude industrial consumers from a practicable means of purchasing aluminum through long positions on LME aluminum forward contracts, (e) to block, delay and reduce any change in the LME load-out rule, and anticompetitively prevent what Metro called "complainants" (*i.e.,* Class members) from receiving any benefits from any change in such rule.

446.    **Metro-LME**. From at least November 2009 until at least 2013, Metro made the agreements with the LME Defendants previously alleged.  These agreements also include an agreement to reject Europe Economics' recommended change in the load-out rule, to reduce the amount of the change in the rule, and to delay the implementation of such change sufficiently to allow Metro to do the following.  Metro would increase the aluminum restrained in its Detroit warehouses to levels, and arrange for cancellations and queue length that would be sufficient to overwhelm and "remain ahead" of the inadequately amended load-out rule.

447.    As previously alleged, LME Holdings Limited and HKEx knowingly and materially helped the LME and Metro continue to violate the LME Charter in order to further the anticompetitive effects of such agreements. This produced higher rental revenues for the

LME, which benefitted of LME Holdings Limited and HKEx.

448. **Mitsi**.  As previously alleged, from at least November 2009 until 2014, Metro informed Mitsi Holdings of Metro's anticompetitive agreements and activities and the resulting anticompetitive effects.  With knowledge of same, Mitsi furthered the agreements including by working and agreeing with the LME Defendants as alleged previously herein.

449. **Burgess-Allen.** From at least as early as July or August 2010 until the present, Metro made with Defendant Burgess-Allen and they performed what they called the "smart-ass plan" agreement.  Thereby, Burgess-Allen introduced persons, including DB Energy, who made agreements with Metro that lacked any pro-competitive purpose and even had no or virtually no economic or commercial substance except as follows.  By restricting the true aluminum output and lengthening the load-out queues from Metro's Detroit warehouses, this agreement increased Metro's revenues and prevented, delayed, and discouraged persons who truly wanted to load aluminum out of Metro's Detroit warehouses from doing so.  ¶¶251-284 *supra*.   Metro effectively shared with Burgess-Allen a portion of its increased rental revenues.

450. **Red Kite, DB Energy, and Glencore**[52]**.**  Including as part of the foregoing unlawful agreement, Metro made from at least September 2010 until at least September 2013 the previously alleged agreements with DB Energy, Red Kite, and Glencore. These agreements involved large cancellations of warrants and re-warranting same after such large cancellations had delayed other persons from loading aluminum out of Metro's warehouses.  ¶¶251-286 *supra*.  Metro effectively shared with DB Energy, Red Kite, and Glencore a portion of Metro's

---

[52] The Glencore Defendants named in this claim include all the Defendants defined as Glencore herein. See ¶¶110-127. Plaintiffs have good grounds to believe and do allege that either Glencore US or Glencore Ltd., made the 186,000 ton deal with Metro. But to any extent that it was not one of these Glencore companies, then it was one of the other Glencore entities named as Defendants herein that made this deal with Metro.

greater revenues resulting from the large cancellations and the lengthening of the queue. Glencore had a large financial interest in higher aluminum prices and a higher Midwest premium.

451.    **J. Aron**.    From at least early 2010 until 2014, Metro made and performed incentive payment agreements with J. Aron. Each knew and intended these would have the effect of inflating the Midwest premium which directly benefited J. Aron on its large holding of physical aluminum and its derivative positions.   J. Aron and Metro knew and intended that the diversion of aluminum produced by Alcoa and other producers away from industrial consumers and into the LME's Detroit warehouses would lengthen the queue in Detroit, increase Metro's market share, restrain load-outs of aluminum, and inflate aluminum prices. J. Aron agreed to and did work with Metro to accomplish such anticompetitive effects.

452.    As all Defendants named in this claim well knew and intended, the purpose of the agreements that Metro made with each of them and the other persons were to achieve the anticompetitive effects alleged at ¶¶10-14 including the inflation of the Midwest premium and the aluminum prices.

453.    Plaintiffs allege that each and all of the foregoing agreements were *per se* unlawful because of their intended effects of restricting output and/or inflating prices.

454.    Additionally, the foregoing agreements had the anticompetitive effects previously alleged.   None of such agreements had any procompetitive effects.   At most, any arguable pro-competitive effects were minimal.   Such effects were far outweighed by the anticompetitive effects alleged herein during the Class Period.   Any procompetitive effects could have been accomplished by less restrictive means.

455.    Such agreements had anticompetitive effects in both the LME Aluminum

Warehouse Services Market and the Primary Aluminum Market as previously alleged herein. All such agreements were performed in both such relevant markets. For two examples, the agreements were performed in the Primary Aluminum Market to the extent (a) that the primary aluminum in and being loaded out of Metro's LME Detroit warehouses constitutes a significant part of the Primary Aluminum Market, and (b) that the mix of consideration provided by Metro's incentive payment agreements frequently was paid for aluminum and inflated prices in parts of the Primary Aluminum Market other than LME warehouses.

456.    Mitsi Holdings had to and did (a) approve Metro's incentive payments in excess of $128 per ton in the Primary Aluminum Market, and (b) work with the LME to block, delay, and minimize any changes to the load-out rule. This includes by Metro's acts as a market participant of first resort in the Primary Aluminum Market to divert aluminum produced by smelters into Metro's Detroit warehouses.  The LME also profited from Metro's foregoing anticompetitive conduct in the Primary Aluminum Market.  Like Defendant Mitsi, the LME took affirmative steps to further same by making public statements supporting Metro's conduct and dismissing the resulting anticompetitive effects, including the inflation of the Midwest Premium and other aluminum prices.

457.    The LME – Metro agreements unreasonably and unnecessarily restrained trade, including but not limited by the following:

(a) **<u>Inefficiency Agreements</u>**.  The LME and Metro agreed to establish a load-out minimum on a per city rather than a per warehouse basis such that, in industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(b) The LME and Metro agreed further to establish the minimum load-out based upon an absolute number rather than percentage of capacity of the warehouses, or percentage of the supply in the warehouse basis.  Thus, in industrial centers the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(c) The LME and Metro agreed to establish a minimum load-out based upon a gross number rather than a net number that subtracted load-ins. Thus, the agreement could be perverted into self-perpetuating feedback loops of greater and greater backlogs and longer storage times.

(d) In times of high storage, the LME and Metro nonetheless agreed to transform the minimum load-out requirement, into a maximum load-out requirement.  Thereby, in commercial centers, the minimum load-out rule could be perverted into a means to create a self-perpetuating feedback loop of greater load-out backlogs and longer storage times, and yet higher incentive payments.

(e) The LME and Metro agreed to a maximum load-out rate that was $1/6^{th} - 1/20^{th}$ of an efficient rate of load-outs, such that Metro and the LME could be rewarded for extreme inefficiency with the longer duration of storage revenues from each customer.  The LME and Metro further agreed that the LME would make public statements justifying the queues.

(f) The LME, Metro and Burgess-Allen agreed to terms that allowed Metro to subvert even the extremely unreasonably low maximum load-out agreement, by allowing Metro to control warrant cancellations with certain co-conspirator warrant holders, shuffling aluminum

147

back and forth from warehouse to warehouse, and re-warranting the same aluminum for storage in Metro's Detroit warehouses.

(g) The LME and Metro agreed to storage rates that were much higher than competitive storage rates and further agreed that *quid pro quo* increases in storage rates to even higher supra-competitive levels would be made in order to compensate for any reduction in the extreme unreasonableness of the minimum (in reality, the maximum) load-out rate.

458.    In order to restrain aluminum supplies in LME Detroit Warehousing, Metro abused the LME Combination to offer a mix of consideration to overbid and drive up prices in the Primary Aluminum Market, including the Midwest Transaction Price and other all-in prices and the Midwest or Platts MW premium or other premiums.  As repeated public complaints told Defendants, Metro's and Burgess-Allen's diversion agreements and other steps were inflating the Midwest Premium to all time record levels in order to attract aluminum into LME Detroit Warehousing.  Metro's incentive agreements injured first level purchasers, including Plaintiffs, who paid inflated prices, in order to enable Metro to divert more aluminum into its Detroit LME Warehouses and restrain it there.  Plaintiffs and Class members are the direct victims of the anticompetitive abuses and agreements by which Metro inflated these prices.

459.    As previously alleged, the performance of these agreements injured competition in both the LME Aluminum Warehouse Services Market and the Primary Aluminum Market. The agreements foreclosed industrial and other users of aluminum, such as Plaintiffs, from sourcing aluminum on the LME.  They have ended LME forward contracts' role as a practicable source of aluminum for industrial and other consumers, including Plaintiffs. They have caused the Midwest premium in the primary aluminum market to reach supra-competitive levels.  They have destroyed what had been this procompetitive form of price-discipline on the MW

premium. Such agreements also greatly reduced the ability of aluminum consumers to hedge the price risks of physical aluminum through LME forward contracts.

460.   As a direct and foreseeable result of, and proximately caused by these anti-competitive agreements, Plaintiffs and Class members were injured in their property, including in that they had to pay supra-competitively high prices for aluminum.  This included Midwest Transaction Prices and other all-in prices, and the Midwest or Platts MW Premium or other premiums.  Absent injunctive relief, these violations may continue or reoccur in the future.

### AS AND FOR A THIRD CLAIM FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AGAINST ALL DEFENDANTS

461.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

462.   In the alternative or in addition, Plaintiffs allege this claim against all Defendants except the LME Defendants. As used in this claim, "Defendants" means all Defendants EXCEPT the LME Defendants.  Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro in November 2009, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

463.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing a supra-competitive Midwest Premium.  Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

**The Entry of Banks and Traders into Warehousing**

464.    The period following the financial crisis saw the entry of banks and traders into the aluminum warehousing business.  In November 2009, Defendant Goldman Sachs acquired Defendant Metro.[53]  In July 2010, Defendant JPMorgan acquired Defendant Henry Bath.[54]  In September 2010, Defendant Glencore acquired Defendant Pacorini.[55]

465.    As Blythe Masters, the head of JPMorgan's commodities business admitted, following JPMorgan's July 2010 warehouse purchases, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . .  We need to be active in the underlying physical commodity markets in order to understand *and make prices*."[56]  With this statement, JPMorgan admitted not only that it entered into the warehousing business so that it could "make prices" in the commodity, but also that it did so specifically in order to "be active" in the physical aluminum market.

466.    Indeed, the entry of these financial players into what had been a staid business caused a significant change in the behavior of the warehouses and the nature of the physical market for aluminum.  Defendant Metro CEO Wibbelman expressly noted in an August 12, 2010 email to Goldman's Stephen Branton-Speak, "It is a new world.  With Glencore owning pac[orini], traffi [Trafigura] owning Nems and jp owning Sempra, the world is different for

---

[53]    Javier Blas, <u>Goldman and JPMorgan enter metal warehousing</u>, Fin. Times (Mar. 2, 2010), http://www.ft.com/cms/s/0/5025f82a-262e-11df-aff3-00144feabdc0.html#axzz3EkiajSCd.

[54]    *Id.*

[55]    *Id.*

[56]    *Wall St falls out of love with commodities trading*, http://www.aluminiumleader.com/en/serious/news/2013/08/06/LME050813 (last viewed on Oct. 8, 2014) (emphasis added).

exposed tons in premium locations."[57]

467. Defendants and their co-conspirators created and profited from this market transformation by, among other things and as further described below, offering substantial incentives to store aluminum in their warehouses in order to create a critical mass of aluminum at the key chokepoints that still had aluminum under tradable warrants, strategically shifting aluminum stocks among their own warehouses and from competitor warehouses to those chokepoints, artificially restricting the removal of aluminum from those warehouses under the cover of LME rules, and engaging in strategic cancellations of warrants to exacerbate existing queues.

468. Defendants manipulate the supply of aluminum by purchasing inventories of aluminum, placing them under warrant at the LME warehouses, followed by dubious "transfers" to, in many cases, the Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum has reached the next warehouse.[58] Among other indicia of manipulation here is that the amount of aluminum warrants canceled far exceeds any legitimate need for physical aluminum. This diverted aluminum from actual aluminum users and created an artificial shortage of aluminum and thus, the higher Midwest Premiums complained of herein.

469. In the case of the current aluminum market, Defendants used the LME warehouses as the mechanism to facilitate their collusive agreement. Once aluminum was put into the LME warehouses, volumes of aluminum inventories could be verified as warrants can be confirmed. The speed at which the aluminum is removed from the warehouse is slowed, and

---

[57]     GS-METRO-00030984.

[58]     David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

at the same time, the collusive parties are able to lock in profits while not letting the aluminum actually reach the physical market due to a year or more delay in load out.  This also provided longer storage times and therefore, longer storage fees.

470.    The large volume of metal put into LME warehouses as compared with minimal increases in other non-LME market warehouses (Shanghai Exchange and Japan) only makes sense if the collusive parties were attempting to use this very transparent LME exchange and its warehouse system as the mechanism to coordinate their collusive agreement, to monitor the behavior of the collusive group, to limit the ability, and temptation, of the collusive group to cheat, and to lock in collusive profits.  All this is made possible by getting to the front of the load out queue while still holding the collusive group's metal off the physical market.  This allows prices to remain high even as the collusive group locked in their sales.  These features would not have been available to the collusive group if they had placed all or much of their inventories in non-LME warehouses.   Of course, Defendants' ownership interests in, and participation in, the LME also provided a convenient opportunity to conspire.

471.    The achieved price increases impacted those market participants who bought aluminum on the spot market, *i.e.*, the cash price plus the regional premiums, including the Midwest Premium.  Furthermore, the impact of this price increase spread to other parts of the world muted only to the extent that tariff barriers and transportation costs insulated those regions from increased inventories and the associated manipulated prices.  To the extent they have wound down this collusive restriction of the available aluminum on the market, the collusive group was able to lock in their profits by exiting together before most of the other holders of metal in the warehouses, leaving these slower market participants to take the comparative loss, while the collusive group gained.   At the same time, the restriction of

aluminum on the market and its reduced rate of release into the market made prices higher for all consumers of metal compared to what they would have been if the release had been timed to meet when the metal was demanded.

472.   Defendants' collusion is based on the specific features in the market and would not work in a market where the structure of the market could adjust quickly.   But quick adjustment to the structure of the market is not a feature of the aluminum market.   **Defendants Conspired to Increase Aluminum Spot Metal Prices, Specifically, Applicable Regional Premiums, by Moving Metal into Key Warehouses Which They Controlled**

### *Ignoring LME Information Barriers, Defendants' Trading and Warehousing Operations Work Together to Effectuate the Conspiracy*

#### Goldman and Metro Straddle the Information Barrier

473.   The degree of coordination between Defendants spans both vertical and horizontal junction points of the aluminum market.   First and most directly, coordination between commodities trading desks and their affiliated warehousing companies (*e.g.*, Goldman Sachs and Metro, JP Morgan and Henry Bath, Glencore and Pacorini) was both steady and wide-sweeping.[59]

474.   At all times material to this Complaint, the LME has had in effect certain "Information Barrier" rules relating to the sharing of confidential information between LME members and related warehouse companies.   Most significantly, these rules are designed to prevent the sharing of information relating to the identity of warehouse customers, sensitive pricing information, and certain non-public information about inbound and outbound metal at LME warehouses.   These rules applied to the Goldman-Metro relationship.

---

[59]      *See* GS-METRO-00046221-23 (email from Wibbelman to Gabillon of Goldman Sachs with "financing deal/commitment summary" for February and March).

475.    Goldman and Metro were aware of these rules.  On February 25, 2010, Metro sent to the LME its updated response to an LME survey dealing with warehouses having relations with Trading Companies.[60]   The submission included the Goldman/Metro holding structure, along with a description of the personnel involved in running Metro.  The submission obfuscated, or at least downplayed, the relationship between Goldman and Metro.  A diagram depicted Goldman Sachs Group holding Metro in a branch separate from the branch in which it holds Goldman Sachs International.   Metro's operations, however, were described as being coordinated through Goldman's London Global Commodities Principal Investments ("GCPI") team, a group that would include Francesco Ciardi; Jacques Gabillon; Ingmar Grebien; and Chen-ryun Leo.  This group would report to Greg Agran, who, the submission asserted, had no responsibility for metals sales and trading "and is not able to manage or influence risk management of that business."  Metals sales and trading, according to the submission, was part of Goldman's Commodities Division and was managed by Stephen Branton-Speak (Trading) and Leslie Biddle (Sales), who reported directly to the same person (Isabelle Ealet), to whom Agran reported.   The submission acknowledged that Branton-Speak was an LME board member, but, according to the submission, Branton-Speak removed himself "from any discussions involving Goldman Sachs International and will also remove himself from any discussions or decisions regarding Warehouses and/or specifically Metro."  The submission noted further that the LME was aware of Branton-Speak's relationship with Goldman Sachs International and Goldman Sachs International's relationship with Metro.  As suggested above, it is not at all apparent that Metro's holding was, in fact, a part of Goldman Sachs International.

476.    Goldman and Metro downplayed their relationship elsewhere as well.   They

---

[60]     GS-METRO-00013989-14006.

prepared talking points to be used by Wibbelman in relation to the acquisition, in which they chose their words carefully with an eye toward implying that Metro would be independent of Goldman, without quite saying as much.  For instance, according to a February 17-18, 2010 email exchange between, *inter alia*, Gabillon and Wibbelman, Gabillon instructed Wibbelman to tone down language about Metro being completely separate from Goldman:  "Entirely separately from Goldm [sic] is a bit strong, let's go with 'operate on a stand alone basis with independent management."[61]     Further, Metro's proposed statement that  "Goldman's Compliance officer will sit on the board to insure that the company is run independent of any other Goldman business" was, according to Goldman, to be "used [only] in last resort." "Generally we should say the least possible:  for instance let's not volunteer the info about Victoria on the board unless you are been asked.  We should not put anything in writing either." Goldman prepared a Q&A that indicated that Goldman's "own policies" prohibited the use of "information about [Metro's] activities to make more informed trades in metals[.]"  Another proposed Q&A acknowledged that Branton-Speak was on the board of the LME, but claimed that he was an independent (*i.e.*, non-Goldman) member and that "Stephen will not be involved in any discussions with respect to LME's relationship with Metro or other warehouses.  Stephen will not be on the board of Metro nor will he be involved in the day to day management of Metro."  Wibbelman predicted "a grilling on the kind of information conveyed.  I will make it seem aggregated, financial, after the fact and only to Chinese wall vetted accountants."[62]

477.   Far from having "independent management," however, the Metro board of directors was made up entirely of Goldman employees, including:  Agran (GCPI); Victoria

---

[61]     GS-METRO-0045867-70 at 69.

[62]     *Id*.

Attwood Scott (Compliance); Max Bulk (Operations); Gabillon; Philip Holzer (Securities Division); Bob Mancini (GCPI); Dermot McDonogh (Controllers); and Ken Murphy (Archon). Gabillon was the Chairman of the Metro Board.

478.   And, far from communications that were "aggregated, financial, after the fact and only to Chinese wall vetted accountants," Metro's dealings with Goldman traders were constant and routine; violations of the information barrier were commonplace.  Metro and Goldman regularly communicated about pricing details (including customer identification) for deals Metro took part in with non-Goldman customers, shipments of metal between warehouses, and the like.

479.   A June 8, 2010 email from Wibbelman to Gabillon suggests that Goldman needed to review inbound metal commitments and rental rate quotes before they could be finalized.  With the email, Metro sent to Goldman commitment summaries for inbound new metal with detailed quotes for rental fees.  Wibbelman described Metro's strategy as "[w]hat we have done and are doing instead is letting one proposal hit and getting permission from GS for additional headroom."[63]

480.   On July 12, 2010, Wibbelman emailed Goldman's Branton-Speak, suggesting that he had a meeting planned with Gabillon (apparently in London) and inquiring whether Branton-Speak had availability to meet as well.[64]  Branton-Speak suggested meeting times and also suggested that "Scott" (likely, Goldman trader Scott Evans) would be in town.  Wibbelman responded that he would like to meet with Evans on Sunday July 19.  He added:  "One topic for you to discuss with him in the context of your upcoming meeting . . . we have been engaging

---

[63]    GS-METRO-00048405-06 at 05.

[64]    GS-METRO-00049325-26.

the services of Michael Kagushev, a former Rusal employee to help us facilitate the sourcing of metal out of Russia and specifically Rusal.  (I know "facilitate" and "agent" are words that scare GS, but this is a very clean information conveying role).  Would like your collective view on whether in the context of Glencore's equity interest in Rusal, and the fact that Scott speaks fluent Russian, if you think it is worth retaining.  We sourced several ships in 2008 and even a couple stragglers in 2009 but nothing in some time with Glencore Hoovering up all of the metal."  Branton-Speak noted that "Scott has been asked to show a price for 5k a month, july-dec . . . come on, lets do a god damn deal??"[65]  Wibbelman responded that he had "Left him a message to call me."

481.   Not only did Metro and Goldman not adhere to the supposed information barrier, but they openly mocked it.  On July 20, 2010 (the day after Wibbelman had planned to meet in London with Scott Evans and with Branton-Speak) Wibbelman sent a cryptic email to Gabillon: "Second source confirms its Glencore."  This prompted the following exchange, as Gabillon apparently was with Evans at the very time:

Gabillon:  "You called Scott while I am having dinner with him ????"

Wibbelman:  "There is a large bread basket that constitutes a Chinese Wall."

Gabillon:  "Massive basket but wine flowing courtesy of steve . . . .  Negotiating freight incentive right now!"[66]

482.   Just a few days later, on July 23, 2010, Evans emailed Wibbelman (copying numerous Goldman personnel, including Branton-Speak):  "thanks for your support on this first transaction, looking forward to many more."  The email sets out details of a transaction to warrant for J. Aron & Co. for 24,000 tons of primary aluminum coming from Chicago, with

---

[65]      GS-METRO-00049325-26.

[66]      GS-METRO-00049477.  "Steve" is likely Branton-Speak.

specified freight incentives.[67]

483.    On August 2, 2010, Wibbelman emailed Goldman trader Evans to inform him of advance news that Pacorini had been acquired by Glencore, with an announcement "said to come today or tomorrow."  Wibbelman and Evans exchanged thoughts on offers in the market presently.  Evans informed Wibbelman "I haven't bid Glencore yet, but thinking we bid 85/mt." Wibbelman encouraged Evans to call Glencore.[68]

484.    Metro's ongoing dialog with Goldman traders must have been nearly constant. As part of an August 4, 2010 email discussion between Wibbelman and Robert Burgess-Allen, Wibbelman reported that "Scott and Michael are hammering me to pay up and get metal now."[69]

485.    On April 16, 2012, Wibbelman emailed Goldman's Gabillon and Owen West noting that Rio Tinto received $142 on a deal.  Using Rio Tinto's name in the communication was a violation of the information barrier, as was flagged by Goldman's Oliver Haynes.[70] Although this occasion was flagged, similar communications, including customer names and warehousing details, were commonplace.

486.    In November 2011, the LME issued a notice which restated and modified the information barrier requirements, effective April 1, 2012.  The new protocol introduced a requirement for warehouse companies that are "related" to a trading company to engage a professional accountant to carry out an annual audit of the warehouse company's compliance with the information barrier requirements, and to submit a report to the LME on such

---

[67]     GS-METRO-00030740-41 at 41.

[68]     GS-METRO-00049777-78.

[69]     GS-METRO-00030800-02 at 01.

[70]     GS-METRO-00036758-59.

compliance.  These new requirements applied to Metro due to its relationship with Goldman.

487.    Metro and Goldman knew that it would be difficult to obtain a passing audit of their compliance with the information barrier.  In a September 1, 2012 email chain between Wibbelman, Grebien, and other Metro employees, they discussed the hiring of the prospective auditor.  The email suggests that they did not think that all safeguards were followed in the past and that they wanted to hire a vendor to do the audit who would give them a pass.  Wibbelman wrote:  "I thought Crowe was the most likely to provide us with a clean audit.  And I thought and think that PWC is the most likely to fail us."[71]

488.    A July 29, 2013 email chain entitled "Metro Third Party Assurance of Information Barriers" further evidences Metro's and Goldman's own belief that their information barrier compliance was lacking.  There, Metro's Felch forwarded to Gabillon, Grebien, Campbell (Goldman) and Haynes (Goldman) the LME's response to Metro's audit submission (copying Wibbelman and Grupenhoff from Metro).  The letter from LME's Mark Bradley reads "I am writing to you to confirm receipt of the Metro . . . Assurance Report compiled by PWC which gives reasonable assurance under the ISAE 3000 standard that an information barrier policy and associated control measures are in place and are compliant to the requirements as set out in LME Notice 11/334 published 17 November 2011."[72]  Gabillon queries whether this is "Just a receipt confirmation?"  Grebien wonders: "The first paragraph mentions that the report gives reasonable assurance that Metro is compliant.  Can we interpret that as an endorsement maybe?"  Felch responds:  "It's carefully written.  While it implies an endorsement, it actually states that the PwC audit report is what makes the claim that we are in

---

[71]      GS-METRO-00005543-46 at 43.

[72]      GS-METRO-00028354-55; GS-METRO-00028360.

compliance.  So, they aren't stating themselves that we are in compliance, but they apparently have no comments, questions, or issues about the audit, either."  Metro and Goldman knew they were walking a very fine line here, and apparently were happy to get a "pass" even if they believed that the LME itself did not really weigh in.

### Goldman Exercises Complete Control over Metro, Using Metro as an Extension of Its Trading Arm

489.    Metro's constant communications with Goldman were necessitated, at least in part, because Goldman allowed Metro very little authority.  Indeed, Goldman made it clear to Metro that Metro had very limited authority to enter into even standard LME-warehousing transactions.  For instance, actions or items that required approval of the Board (controlled completely by Goldman) included:  any new LME warehouse agreement or change to the warehouse agreement; any new/material change to LME warehouse approval; any new/material change to sub-operator agreements; any new/material change to foreign trade zone ("FTZ") agreements; metal storage transactions; monthly commitments (freight incentive, rent discount) greater than $10 million; freight incentives higher than $90/ton; any discounted rate lower than $0.20/day for deals longer than one month; any rent prepayment with interest rate higher than 2% p.a.; any material contract greater than $1million in notional value; and any derivative or physical commodity contracts.[73]

490.    Consistent with this limited authority, documents produced by Defendants confirm that Metro frequently had to seek authorization from Goldman to execute routine warehousing transactions, including authority to offer specified incentives for storage deals. The Metro Board established a Commercial Sub-Committee that had to approve significant Metro deals.  Defendants' document production includes numerous "Commercial Committee"

---

[73]        GS-METRO-00045836-38.

deal summaries, including, *e.g.*, a spreadsheet attached to a January 9, 2013 David Stromberg (Goldman) email to Wibbelman, Whelan, and Grupenhoff, with copies to Gabillon and Grebien. That spreadsheet, like others tracking Metro's deals, was a summary of "Deals approved by Commercial Committee."[74]

491.   One example of Metro's lack of authority is evidenced by a May 4, 2011 email between Wibbelman and Gabillon about bidding for Alcoa aluminum at a $145 freight incentive, along with an analysis of a "decision to consolidate metal."  Wibbelman sought "guidance on my authority to incentivize this 40kmt up to $145.  Scott is pushing saying it is the last tranche and we will lose it if we don't book."[75]  "I have been holding off any increases till EE. [LME consultant Europe Economics]" Wibbelman added that "Glencore may buy to protect premium.  In the face of financing turmoil, money to us may be a stronger consideration than sensitivities over our impact on the market.  And we may benefit by a higher premium in the very short term." Ultimately, Gabillon gave in and authorized Wibbelman to make the bid.  Not only did Metro need authorization to stay competitive in the market, but it was receiving market intelligence from Goldman's trading desk and the statement that "we may benefit by a higher premium in the very short term" suggests that Metro itself benefitted from the elevated premiums.

492.   In an October 25-26, 2011 email chain entitled "Authority Approval Request," Metro's Wibbelman sought Goldman authority "to rent deal all or substantially all of our

---

[74]     GS-METRO-00026830-31.  *See also* GS-METRO-00046221-23 (email from Metro CFO Grupenhoff to Gabillon of Goldman Sachs with "financing deal/commitment summary" for February and March).

[75]     GS-METRO-00004633-35.

Mobile Aluminum to JPMorgan."[76]

493.  According to a June 18, 2012 email, Wibbelman sought blanket authority from Gabillon and Owen West for freight incentive deals up to $185/mt.  Wibbelman noted that the market was at $180, but Metro's spot authority was only up to $120, which took Metro's marketing arm completely out of the game.  "If it were my company, I would give authority to . . . ."  Gabillon responded that it was very unlikely they would give blanket approval, and that he also planned to discuss "unauthorized trades at the board following a conversation with Victoria [Attwood Scott].  In the meantime I would like to understand how these trades were done, and would like to talk to whoever transacted (Michael I assume?)."[77]  Not only was Metro under Goldman's thumb for authority, but when it made unauthorized deals, Gabillon communicated that there would be repercussions.

494.  Consistent with the notion that Metro had very little authority to act on its own, Goldman regularly modeled data and deals to evaluate the profitability of potential Metro transactions and called the shots on day-to-day activities, including decisions relating to warehousing.

495.  For instance, Goldman created detailed analyses of the Metro Detroit queue in order to evaluate the profitability of freight incentive deals over time and to evaluate how long metal would have to stay in-warehouse (*i.e.*, how long the Detroit Queue needed to be) in order to become profitable under prevailing load-out rules.

496.  On August 28, 2010, Goldman's Francesco Ciardi sent Wibbelman and Robert Burgess-Allen a spreadsheet model dealing with "discussions around the DB deals."  "The

---

[76]      GS-METRO-00005125-27 at 27.

[77]      GS-METRO-00037336-37.

Detroit tab aims to calculate how long it will take before metal which flows out of Detroit and sits off warrant attracting low rent, is re-warranted.  We calculate the total cost of removing the metal from the warehouse, and compare this to the contango earned off warrant net of financing costs, to find the minimum payback time from the trader's perspective, and thus the date at which Metro can expect the metal to be rewarranted."  "The HB Chicago and HB Detroit tabs try to solve for the maximum warrant premium that Metro would be able to pay for metal out of each of these locations under varying outflow assumptions."  Goldman's Chen Leo then responded, noting "we are calculating the breakeven period that the trader needs to earn the contango over in order to cover the costs in Section 4."  He concluded that "Total time needed to earn \$42/mt from financing trade . . . .  Sep 2010 till Oct 2011."  "On 50kt, you need to give free rent till Jul 2011 for the trader to break even.  I think this sort of makes sense and ties in with the fact that the cancelled warrants queue never really went above 80kt and this max cancelled warrants number is prob reduced now that the contango has flattened."[78]

497.    Goldman viewed Metro as an extension of its trading desk.  When producers like Alcoa did not get the level of incentive payment they wanted from Metro, they could just "call Goldman directly" to get their price.[79]  In what appears to be one example, on August 12, 2010, Branton-Speak emailed Wibbelman "sounds like we need this Alcoa deal, might wanna sharpen your pencil there sir."[80]

498.    In an August 16, 2010 email from Wibbelman to Goldman's Evans, Wibbelman wrote "There is no reason to maintain the levels we have crept up to.  Except of course to make

---

[78]    GS-METRO-00031094-95.

[79]    GS-METRO-00048504.

[80]    GS-METRO-00030975-76 at 75.

you happy."[81]

499.    In an October 19-20, 2010 exchange entitled "St. Pete Analysis and Summary," Gabillon, Agran, and Wibbelman discussed the specifics of a potential deal.  Wibbelman began "As you are aware, Metro is in a position to provide a freight incentive number along with capacity and capability which would allow J. Aron to bid on 460,000 MT of primary aluminum from Russia."  Wibbelman commented on "a few soft issues to consider," including ". . . a political consideration as to whether the action of incentivizing a large quantity of metal from Russian into Detroit could have an adverse impact on the politics of the 1500/MT/Day standard."[82]  Gabillon responded that the deal appeared to work in Detroit, assuming no change to the "outbound level."  But, given the ongoing LME study, "What happens if the outbound level (or any other relevant parameters) get changed despite our expectation that nothing will change.  Who takes this risk?  GS trading desk, Metro or Rusal? (btw GS metal desk or Metro *is the same thing* for GS Group)."  As far as the corporate parent was concerned, apparently Metro and the Goldman trading desk were one-and-the-same.  Gabillon reiterated this:  doing the deal, Goldman's metal trading desk would "shift the risk onto Metro (*which [is] the same for GS Group*)."[83]

500.    On February 11, 2011, Branton-Speak initiated an email chain ("Not paying up for new Ali?") with Gabillon about a deal Metro was not paying enough to win.  Branton-Speak asked whether Gabillon was "Happy to lose this one?" prompting Gabillon to forward the email to Wibbelman who said he was holding at 125.5 (50 cents above highest ever).[84]  "Scott said

---

[81]    GS-METRO-00050319-23 at 20.

[82]    GS-METRO-00031580-82.

[83]    GS-METRO-00031611-13 at 11 (emphasis added).

[84]    GS-METRO-00020303-05 (emphasis added).

that on several previous deals too, and we got it at my number.  I could look silly if I lose 90,000 tons for a few bucks.  But we are being worked by Alcoa.  ***And by GS***.  And by all other customers.  It is hard to hold firm."  Gabillon then passed along that "Steve saying he is going to pass then, whatever that means."  Wibbelman noted that the "Midwest [premium] US is 6.35 cents/lb so, 139 days with 30 days credit and credit risk.  But the premium will go down if we force it there.  Also, Metal Bulletin and Europe Economics would notice 130.  Steve can always buy it and earn contango until he delivers it to us.  (Which I know is not as good for us but points out that I am not the only one letting it go for a few dollars)."  Gabillon asks what would happen if Metro just bid $100.  "They would sit on it and wait for spot commitments.  By selling, premiums would come down though.  No warehouse can bid that much but us . . . ."  Wibbelman later comments:  "What is true though, is that the metal we get is withheld from consumers and makes the premium go up . . . which provides a competitive alternate to customer."  This shows not only illicit communication between Goldman's traders and Metro (with specific communication about whether or not a deal would be transacted based on what should be confidential pricing information), but also that Metro knows very well what the Midwest Premium measures at for any given time and how its freight incentive interacts with this premium.  Metro knows that metal it gets is "withheld from consumers and makes the premium go up."

501.    Metro, too, viewed that Goldman was calling the shots even on day-to-day warehousing concerns.  According to a May 10, 2011 email forwarded by Askew to other Metro employees, a customer (Koch) was complaining about Metro charging a $30/mt "re-warranting" fee in Detroit for metal that apparently had been cancelled (with rents and FOT paid), but which

was not scheduled to load out until December 2011.[85]  Wibbelman responded that "GS wants to stick with the $30 fee."

502.    Metro came under fire with the LME in relation to the re-warranting charge practice. On May 17, 2011, Wibbelman and Gabillon discussed the issue, with Wibbelman saying: "I think we may want to consider defending this $20/mt rewarranting fee quite hard because if the rules change and cancellations go up, there could be a lot of revenue created if the market gets tight and goes flat or into a back."  Gabillon responded:  "This is our intention."[86] So, not only did Wibbelman make clear at Metro that "GS" had decided exactly what re-warranting charge Metro should enforce in this particular situation, but Gabillon reinforced that it was Goldman's "intention" and thus Goldman's decision to defend this charge.

503.    On July 19, 2011, Wibbelman emailed Whelan and Prichard, bemoaning that Gabillon had him "on hold for sending the JPM letter until JPM legal and compliance weighs in.  Really can't blow my nose without permission anymore."[87]  As discussed below, it is reasonable to infer that a proposed "JPM letter," from Metro but controlled by Goldman as to which JPM legal and compliance must weigh in, deals with an agreement between the Defendants.

504.    In relation to a January 2013 Metro "Authority Request," Grebien responded that West and Gabillon approved subject to the caveat that "the full tonnage [of the proposed deal be] delivered."  Wibbelman responded "We understand the restriction but it is not necessarily how the business works."  Later, Whelan responds (presumably to Wibbelman only) "I miss the days when we did deals that made sense because they made sense . . . we created this business

---

[85]    GS-METRO-00021026-27.

[86]    GS-METRO-00021160.

[87]    GS-METRO-00021946.

166

and the value in it . . . not them," prompting Wibbelman to agree:  "It is really silly."[88]

505.   Metro also provided Goldman's J. Aron with valuable trading benefits and other favorable treatment which would not have been forthcoming in the absence of their relationship. This took numerous forms, including paying higher freight incentives to J. Aron than to other traders or producers; the ability to close aluminum transactions faster and for greater tonnage (57% of the total inbound Detroit aluminum tonnage from January 2011 until February 29, 2012), based on "the efficiency of rapid close verbal confirmations [between Metro and J. Aron] for high volume transactions which have allowed them to be first and fast mover"; paying to J. Aron a "courtesy" incentive of $142/mt for metal delivered without finalization of a proper contract or issuance of a deal number, in violation of protocol; allowing J. Aron to be late to pay accounts due; and other benefits.  In addition, Metro allowed J. Aron to cancel certain warrants in Mobile such that it could get into the queue in advance of the a backwardation and ahead of a prospective "long," saving J. Aron significant sums for LME rent and also allowing it to export the metal "for presumably a ($200+) larger premium than it paid or would have received with later delivery."  On another occasion, "J. Aron had an urgent physical short, Metro agreed to accommodate J. Aron's need to satisfy its customers by allowing J. Aron to release 4,000 MT from its financing commitment by agreeing to replace the metal into Detroit.  J. Aron exceeded the 4,000 MT agreement by releasing an additional 525MT . . . .  If Metro had not released the Rotterdam 4,525 MT to J. Aron, the Contango was sufficiently wide such that Metro could have earned gross revenue in Rotterdam of $84/mt by financing the Rotterdam aluminum for one year forward."[89]

---

[88]   GS-METRO-00005854-58.

[89]   GS-METRO-00037180-83; GS-METRO-36811-15; GS-METRO-00036894-96.

506.    When Wibbelman conveyed to Gabillon a recitation of these simmering disputes, he was careful to note "Money has not been lost to any outside party.  It remains in GS.  Metro has been operating to try to facilitate JA's business, though they do not recognize that at present.  Metro and JA have benefitted from the efficiency of rapid close verbal confirmations for high volume transactions which have allowed that to be first and fast movers . . . ."[90]  Even so, "If it were not an internal dispute, Metro would have already used its significant commercial leverage to offset the invoices from other amounts owing and would have charged rents, fees and pounced on many opportunities to realize revenue from inventory in storage and other contract failures of J Aron.  The fact that this is internal to GS is the only reason why this remains [unresolved]."[91]  Wibbelman apparently viewed – and believed Gabillon would view – the dispute as one where "GS" had not lost anything.  Even so, Metro's restraint in seeking retribution from J. Aron was yet another benefit conferred for the good of the group.

507.    Gabillon apparently attempted to mediate the dispute with Goldman's traders.  On June 28, 2012, Gabillon asked Wibbelman to spell out the status of the compromise offers so that Gabillon could confer with Agran.  Agran agreed in part with a recommendation made by Gabillon and then proposed "On Rotterdam let Scott cancel the material.  Its 6 months of lost rent at 22c for 8k MT."  Gabillon confirmed that "Chris and I are fine . . . .  ***We will need to make sure that Scott works to the benefit of GS at large and stop moaning about everything***."  After Gabillon forwarded this to Wibbelman as "your eyes only," Wibbelman asked about one specific of the deal where Metro was to get 4500 mt in Detroit (in lieu of what was lost in Rotterdam).  Wibbelman noted that "They took the stuff from Rotterdam and sold it into Poland

---

[90]    GS-METRO-00037120-23 (emphasis added).

[91]    GS-METRO-00036940.

for a high premium.  Problem is that the Detroit Premium has skyrocketed since they made the deal and you can't really hedge premium."[92]  Not only does this highlight the depth of the interaction between Goldman's trading arm and those charged with warehouse operations, but it also shows that Goldman sells metal to physical users and reaps payment for the regional premiums in doing so.

508.    On information and belief, adherence to the information barrier was no more robust by JPMorgan and Henry Bath.  The mere fact that Peter Sellars was both Head of Global Metals of the Global Commodities Group at JPMorgan and also Chairman of the Board as well as a director of Henry Bath & Son, Ltd., suggests (at best) a blurring of the lines between trading and warehousing.  According to documents produced by Goldman and Metro, it was common for JPMorgan personnel, along with Henry Bath personnel and even Henry Bath & Son Ltd. personnel, to be email chains about simple rent pay-ups or metal releases.

509.    As reflected in Metro board meeting minutes from September 8, 2010, Metro and Goldman were concerned about Glencore and Pacorini's adherence to any information barrier rules.  It was noted there that "Glencore was not an LME member and may therefore be under less scrutiny regarding Chinese Wall and compliance procedures.  Glencore might use this position to create synergies between their trading franchise and their newly acquired warehousing business."[93]

**Defendants Agree Not to Compete Against Each Other in the Market for the LME-Certified Warehouses in the United States and Throughout the World**

510.    The Defendants agreed that their warehousing operations would not compete against each other.   A January 5, 2012 Metro email reveals an understanding between

---

[92]       GS-METRO-00037203-06 (emphasis added).

[93]       GS-METRO-0004622.

Goldman/Metro and Glencore/Pacorini to allocate the key aluminum warehousing cities of Detroit and Vlissingen between themselves.[94]  In the email, Metro's Wibbelman, Whelan, and Felch discuss that a company called Lutheran Brothers had been leasing up space in Detroit. They discuss that Lutheran Brothers traditionally worked with Pacorini.  They also discuss that it was becoming difficult to obtain more FTZ (Foreign Trade Zone) sites in Detroit.  Whelan writes in response to this discussion:

> **Pac[orini] is offering us [Metro] space in Detroit so it would not seem like they would be taking on additional space.  They [Pacorini] have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago.  Besides they know we would retaliate incrementally in some place like Vlissingen.  I will call Mario [Casciano, of Pacorini] and ask him who leased the building in Detroit.[95]**

511.    This email demonstrates that even though Metro was running out of warehousing space in the key Detroit location, its competitor (Pacorini) was offering to lease Metro space rather than compete against it.  Furthermore, the email reveals that had Glencore had the desire to compete, it would have done so long ago.  This demonstrates that the agreement involves not only Pacorini, but also Glencore, and that the agreement had been in place for some time.  The email also demonstrates that coconspirators were willing to retaliate against each other for violations of the conspiratorial agreement.  Here, Metro (and Goldman) would retaliate against Glencore and Pacorini in Vlissingen.  Finally, the email demonstrates communications between executives at competitors – Whelan and Mario Casciano – to determine who might be infringing on Metro's Detroit turf.

512.    Metro's Wibbelman also spoke to his competitors at Pacorini on behalf of Goldman.  On January 18, 2011, Wibbelman writes "I asked Mario if he would rewarrant and

---

[94]        GS-METRO-00005231-34.

[95]        GS-METRO-00005231-34 at 32.

refund fot if we could get any of this unwound (currently only cwt being unwound).  And I asked Mario about the gap rent."[96]   Wibbelman then reported directly to Scott Evans at Goldman Sachs' trading desk that "Mario would refund the FOT and 'discuss' gap rent.  I would propose you pay half of the gap rent for anything rewarranted."[97]

513.    Sharing among the Defendants what should have been competitive freight incentive information apparently was not uncommon.  On another occasion in 2010, Wibbelman commented to Metro's Askew that "Mario [Casciano, of Pacorini] told me he got a big slug into balt at $85 plus 6mo free.  Which he said is the cost of doing business."[98]

514.    Later that same year, Pacorini's Casciano told Metro's Whelan that Whelan owed him $5,000 because he (Casciano) "Gave it to Landwerlin to indemnify him for lost revenue and in an effort to keep all drivers away from the other broker."[99]  According to another Metro document, Joe Landwerlin is a Pacorini Metals employee.[100]

515.    On January 5, 2012, Wibbelman informed Whelan and others that he "Heard from SBS [Goldman trader Stephen Branton-Speak] that he has heard of a huge warrant swap involving JP and G involving Detroit."[101]  It is unclear how much Branton-Speak knows about collaboration between JPMorgan and Glencore, or how he knows about it, but it is clear that Branton-Speak is not supposed to be involved in day-to-day Metro operations.  Nonetheless, this email suggests an ongoing dialog with Wibbelman.

516.    Metro also gave JP Morgan preferential treatment in its warehousing queues, and

---

[96]    GS-METRO-00032344-45 at 45.

[97]    GS-METRO-00032320.

[98]    GS-METRO-00046108-11 at 08.

[99]    GS-METRO-00031089.

[100]    *See* GS-METRO-00032880.

[101]    GS-METRO-00005231-34 at 32.

in September 2010 loaded out aluminum owned by JP Morgan by moving its position in the queue ahead of metal warranted to other owners.[102]  This was not only against the interest of others in the queue, but apparently also against the interest of Metro itself – according to Metro's CFO David Grupenhoff, the change cost Metro approximately $295,000 in lost rent (from JP Morgan) and offsetting payments to the warrant-holders who lost their place in the queue.[103]

517.    Documents produced by Metro also indicate an understanding with JPMorgan's Henry Bath warehousing operations not to compete against each other.  At the March 11, 2010 Board meeting of MITSI Holdings LLC, Wibbelman reported that he did not believe that Peter Sellars had taken "a predatory view of the warehouse business in the past" and hoped it "would continue when he became the Global Head of Metals at JPM."[104]  Sellars would also serve as the Chairman of the Board of Henry Bath and Son Ltd. (the parent company of Defendant Henry Bath LLC).  Wibbelman's views would soon prove true.

518.    On July 7, 2010, Sellars emailed Wibbelman about a loading out dispute at Metro's New Orleans location.[105]  Metro had refused to load trucks that had missed their appointed time slots (prompting the JPMorgan trader  to say "Metro talks about cooperation between our companies, but has a strange way of showing it.").  Sellars forwards the email to Wibbelman confirming that he expected different treatment after a recent "brief chat" they had and an upcoming dinner to discuss the "overall situation."  Sellars then writes that "As you are well aware this is material sold to the fabrication industry by my traders . . . we do NOT take

---

[102]    GS-METRO-00031294-302.

[103]    GS-METRO- 00031346.

[104]    GS-METRO-00004627-32 at 31.

[105]    GS-METRO-00049217.

material for re-warehousing."  Despite acquiring the Henry Bath warehouses, Sellars, the head of JPMorgan metals and Chairman of warehouse competitor Henry Bath, was emphatic to point out to the CEO of Metro that JPMorgan was "NOT" taking the metal to re-warehouse in its own facility.  Instead, JPM pointed out that it was selling the metal to fabricators, where it presumably was able to charge a premium.  Sellars concludes "I don't really care what your rules are for anyone else . . . ."  The upshot of this communication was that Sellars did not want Metro to retaliate, as it was not "destocking" Metro's warehouse; rather, it was selling this material to fabricators.

519.    Later in October 2010, Wibbelman and Evans discuss Goldman/Metro acquiring metal from a Henry Bath warehouse.[106]  Wibbelman writes "I am concerned if this comes from a warehouse other than HB, since JPM and GS could set off a warehouse war between Metro and, say, Steinweg or CWT."  Notably, Wibbelman was not concerned that taking metal out of Henry Bath would set off a warehouse war.  Wibbelman was only concerned if they took the metal from a non-conspirator, such as Steinweg, who was a large independent warehousing company.

520.    As also discussed below, Metro discussed an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result being that the premium will go "raging higher."[107]

521.    Additionally, Defendant JP Morgan was storing aluminum it owned in warehouses owned by Defendant Metro, and paying the associated storage fees at "full retail" prices, despite the fact that JP Morgan actually owns its own warehousing subsidiary in

---

[106]    GS-METRO-00031544.

[107]    GS-METRO-00021326.

Defendant Henry Bath.[108]  This is at least against JP Morgan's own economic self-interest, and at most, a bold attempt to transfer funds to a firm it (through Henry Bath or directly with Defendant Goldman Sachs, which owns Metro) should be competing with for the very service for which JP Morgan is paying.

522.    In addition to these examples, the LME Warehousing Committee presented an opportunity for Defendants to both conspire regarding load-out rates and, indeed, to write the recommended regulations that would ultimately be promulgated by the LME to govern their business.[109]  Tellingly, the Warehousing Committee membership for the period of time material to this Complaint consisted of: Chris Wibbelman (Metro); Chris Jonker (C. Steinweg Group); David Lilley (RK Capital Management); Fabian Somerville-Cotton (HSBC); Frans Pettinga (Koch Industries); Gonzalo Cuadra (Chile Copper Ltd.); Gordon Brown (Mitsubishi); Graham Hawkins (Henry Bath); Mike Dudley (International Commodity Services); Sergio Garbin and Peter Waszikis (Pacorini Metals); Shon Loth (Noble); Thorleif Schjelderup (Hydro); and Brian Smith (Barclays Capital).[110]

### *As Part of Their Agreement Not to Compete, the Defendants Agree to Treat the LME's Minimum Load-Out Rule as a Maximum*

523.    In November 2003, the LME adopted a rule requiring each warehousing company be able to load out a minimum of 1,500 MT per day per location.  At the time of the

---

[108]     GS-METRO-00018180-81 (discussing rent payments due to Metro from JP Morgan in July 2010).

[109]     *See* GS-METRO-00001087-91 at 88 (noting that the LME Warehousing Committee is responsible for "making recommendations to the Executive Committee on warehousing related policy issues.").

[110]     *See, e.g.*, GS-METRO-00017360, GS-METRO-00004322, GS-METRO-00001078, GS-METRO-00001968, GS-METRO-00003078, GS-METRO-00003623 (Exemplars of Committee meeting minutes and email communications to Committee members from 2009-2013).

rule's adoption, LME aluminum stocks were greater than 1,000,000 MT, but nowhere near the levels of 2009-2013.  This rule was adopted before LME-warehouse companies were controlled by traders and banks, and there were apparently no concerns with this rule as warehouse companies acted to provide customer service in the form of loading out metal.

524.    Despite the huge quantity of aluminum stored in the LME warehouses, the loading out rate prior to April 2012 was, on most days, barely above the then-required minimum under LME rules, 1,500 tons per day per company per city for the largest warehouses.  The loading out rate after April 2012 (after the LME rule change discussed below) was barely above the new required minimum of 3,000 tons per day.  The purported minimum LME aluminum loading out rate therefore operated as a *de facto* uniform or maximum loading out rate, as illustrated by this chart for the Detroit warehouses:



525.   Notably, this limit was ***per company*** and not ***per warehouse***.  If a company

owned multiple warehouses in one city (for example, Metro's several warehouses in Detroit),

all those warehouses together would need to load out only 1,500 tons per day.

526.   An internal Goldman document confirms that Goldman, Metro, and the entire

industry treated this minimum requirement as an effective maximum.   According to that

document, "(i) it is industry practice to consider the minimum shipping quantity as an effective

maximum quantity that will be shipped on a given day . . . and (ii) management's intention is

not to ship more than the minimum required quantity per day."[111]  The LME acknowledged that

warehouses in the system treated this as a maximum.   According to a June 2013 email from

Robert Hall (LME operations) to Metro's Wibbelman and Prichard, Trafigura was complaining

about the shipping dates Metro had assigned it for a pending release.   Hall asked Metro to

---

[111]     GS-METRO-00001109-17; *see also* GS-METRO-00001330-40 (July 14, 2011).

"confirm that this is a tentative date because the shipping date may move forward as opposed to back depending on how much you will be required to deliver out by the time of the shipment date?"  The LME apparently knew that the shipping date could move forward (if other shipments canceled), but that the date ultimately would be dictated by the minimum amount Metro would be required to ship.  Indeed, LME's Martin Abbott confirmed in an interview with Dow Jones Newswires that "The warehouse system was designed so that consumers can take material out as a market of last resort, with 1,500 tons a day agreed because there isn't a consumer in the world who can use 1,500 tons of anything in a day[.]"[112]  The minimum load-out, 1,500 tons is an "agreed" maximum rate.

527.    Metro consistently sought to ensure that it did not load out more aluminum from its Detroit warehouse than was necessary.  Even after the minimum threshold increased for warehouses about the 900,000 threshold, Metro's Prichard carefully tracked and forecast when Metro would cross back under the threshold (and thus, have a lower load-out requirement).  He sent a detailed summary to Wibbelman, noting, "Our objective is to make certain that we do not ship out more than required based on the location stock level."[113]  Goldman was critical of Metro when Gabillon believed the minimum had been exceeded.

528.    The minimum load-out was far less than the amount the warehouses owned by the Defendants could load out if they were attempting to operate their warehouses with the goal of efficiency, rather than market manipulation.  It has been estimated that each warehouse using

---

[112]    Andrea Hotter, *LME CEO:  Raiding Warehouses, Bank Financing Causing Bottleneck*, DOW JONES NEWSWIRES (July 5, 2011).  *See* GS-METRO-00006913-6918 at 6914.

[113]    GS-METRO-00038199-201.

only two forklifts could load out as much as 1,920 tons per day.[114]   Thus, for example, the Metro warehouses in Detroit (which, by one count, number 27) could collectively deliver far more than this minimum.

529.   With respect to Metro Detroit in particular, there were no logistical hurdles to loading out more than the minimum required.   Wibbelman confirmed as much in a June 5, 2011 email to Gabillon regarding a proposed "Response to LME/EE":  "Detroit can get cleaned out by rail even if no trucks are available."[115]

530.   As a result of the warehouses' excessively (and intentionally) slow loading-out rates, lengthy and persistent queues of over one year developed for delivery of aluminum as shown in the following chart.   ("Implied queue" is calculated by dividing the quantity of aluminum covered by canceled warrants by the minimum load-out rate.)



---

[114]   Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

[115]   GS-METRO-00021469-71 at 70.

531.    Defendants were well-aware of the relationship between the LME load-out requirement and the premium.  On June 21, 2010, for instance, Wibbelman emailed Metro's Askew, telling Askew to convey a message to Martin Abbott at an upcoming steel conference: "That, outbound shipment at the scale indicated would be detrimental to the LME warehouse system and the LME's market share and success.  Detrimental to the producers, detrimental to the premium, detrimental to the price, detrimental to the contango, detrimental to the amount of stock on LME (so detrimental to transparency and liquidity)."[116]  With this, Wibbelman specifically notes that a higher load-out requirement will push down the premium and will diminish traders' opportunities for contango trades.  Missing from the list of parties that would be injured through higher load-outs was the consumer of physical aluminum.

### *Defendants Work Together to Shift Aluminum Among Their Warehouses in Order to Concentrate the Stock at Key Warehouse Locations*

532.    In addition to agreeing not to compete against each other in the market LME-certified warehouse services for aluminum, Defendants' trading arms work with each other's warehouse operations, to keep metal from becoming immediately available to the spot market.

533.    Defendant Goldman's documents recognize that the Midwest Premium started to rise when aluminum stopped flowing out of non-Detroit locations.  In other words, when the only source for available metals was in Detroit, a person wanting that metal had to go through the queue.  Given the length of the queue, it was not a viable option for a purchaser who needed spot metal from a warehouse to buy metal from Detroit.  As a result, the premiums spiked up. The document specifically notes, "US Midwest premiums started to rise quickly in Mar 11 when Baltimore and Chicago (non-Metro locations) stopped flowing out.  One can assume that

---

[116]    GS-METRO-00030459.

most metal outside of Detroit has not been tied-up in financing deals." [117]

534.    In fact, Defendants engaged in deals with each other to further tie up aluminum not already in Detroit.  For example, in or around October 2011, JPM and Metro entered into a rent deal concerning JPM's aluminum stored at Metro's Mobile location.  On October 25, 2011, Wibbelman requested authority from Goldman's Jacques Gabillon and Greg Agran to approve a rent deal with JPM.  At the time, JPM owned nearly all of Metro's 160,000+ MT of aluminum.  JPM had apparently been moving some of its metal to its Henry Bath location, but chose, instead, to enter a rent deal with Metro.  This deal insured the aluminum would not be available to the market.  It also furthered the goal of keeping aluminum from being readily accessible to the spot market.

535.    It is also interesting to note that JPM kept its metal in a competitor's warehouse rather than move it to its own location in New Orleans or Baltimore, particularly since JPM seemed to be the only company storing metal in Mobile.  It could have presumably moved the aluminum to its own warehouse (and paid less rent) while at the same time preventing its warehouse competitor from collecting any rent from its Mobile operations.  Instead, JPM stored over 150,000 MTs of aluminum with its competitors, which is about 7.5% of the U.S. annual domestic production – no small amount.

536.    During the times material to this complaint, Defendant Metro has frequently dealt directly with Defendants Glencore and JP Morgan.  This includes both the storage of aluminum owned by those Defendants at Metro warehouses as well as entering into sweetheart transactions designed to allow those Defendants to take metal from Metro warehouses without being subject to the Metro queues.

---

[117]    GS-METRO-00001317-23 at 21.

537.   Metro's Wibbelman noted at one point that "Glencore does transactions with Metro directly not involving their own warehouse company."[118]

538.   Documents produced by Metro and Goldman establish that Glencore has been storing aluminum at Metro's Detroit warehouse at least back to early 2010, and likely well before that.  According to a May 26, 2010 email from Metro's Tanya Rich to Glencore's Zach Mayer demonstrates that Glencore stored metal at Metro Detroit.[119]  Later, a November 1, 2010 email from Glencore's Tony DiCenso to Metro's Tanya Rich suggested that Glencore hoped to re-warrant certain of its aluminum in the Detroit outbound queue.[120]

539.   Documents produced by Metro and Goldman establish that JP Morgan has been storing aluminum at Metro's Detroit warehouse at least back to early 2010.  In March 2010, a representative of JP Morgan Global Commodities Group coordinated JP Morgan's request for pre-payment on 4000 Metro aluminum warrants in Detroit.[121]   A July 24, 2010 email from Metro's David Grupenhoff refers to rent pay-ups due for July and August.  Robert Burgess-Allen indicates that $829,000 is due from JP Morgan the next day.[122]  A March 4, 2011 release instruction to Detroit Metro instructed that 606 LME aluminum warrants presented by JP Morgan Chase Bank NA were to be released to the order of JP Morgan Chase Bank NA.  Some of these warrants were as old as April 2010; others were from February 2011.[123]  Metro's corresponding invoice, for over $2 million, showed some of these now-canceled warrants as

---

[118]     GS-METRO-00028150-51.

[119]     GS-METRO-0004180-81.

[120]     GS-METRO-00031695-96.

[121]     GS-METRO-00046523-25; 00046518-19.

[122]     GS-METRO-00028280-82.

[123]     GS-METRO-00020500-511.

having been issued in 2008 and later.[124]  As noted above, JP Morgan's storage of metal with Metro prompted Peter Sellars to contact Metro's Wibbelman directly.

540.    In September 2010, JP Morgan raised a dispute with Metro as to its access to 5000 mt of aluminum it cancelled in the Detroit queue.  Metro discussed internally, with guidance from Goldman's Gabillon, what the incremental cost to Metro would be of moving JP Morgan's metal, or a portion of it, ahead of some metal owned by Deutsche Bank also in the queue.  They decided that the cost to Metro of doing so was $295,000, which Gabillon labeled "not small."  Ultimately, Metro agreed to advance the load-out date for at least the first portion of the JP Morgan metal.[125]  This establishes not only that JP Morgan paid to store metal in Metro's warehouses, but also that Metro dealt directly with JP Morgan and did JP Morgan the favor of moving it ahead of another metal owner in the queue.

541.    On September 23, 2010, Goldman trader Scott Evans emailed Metro about a deal where Glencore wanted to swap aluminum in Metro's Detroit warehouse for aluminum Metro had in Chicago.  The deal ultimately was booked, with Evans suggesting to Metro that "you" get a $27/mt freight benefit from this.[126]  According to emails confirming the deal, the $27/mt freight differential savings were split so that Glencore got $13/mt and the rest was split $7/mt for Goldman's J. Aron and $7/mt for Metro.[127]

542.    In August 2011, Metro employees had direct communications with JP Morgan personnel (Martin Stanley) and Henry Bath personnel (including Graham Hawkins) about a

---

[124]    GS-METRO-00020515-35.

[125]    GS-METRO-00031366-74.

[126]    GS-METRO-00031364.

[127]    GS-METRO-00031471-72.

load-out of a "large warrant cancellation."[128]

543.   A September 20, 2011 email chain between Martin Stanley (JP Morgan) and Metro's Prichard and others, which also copied Henry Bath's Graham Hawkins and Amanda England, concerned JP Morgan's cancellation of 600 warrants of aluminum at Metro's Mobile warehouse for transfer to Baltimore.   Metro was allowed to choose the warrants based on convenience.[129]   Metro again thanked JP Morgan for allowing it to pick the warrants for another phase of this move around October 14, 2011,[130] and October 21, 2011.[131]   In all, JP Morgan moved 100,000 tons of aluminum, 600 lots at a time.   There apparently was an additional movement from Metro's New Orleans warehouse to Henry Bath's Baltimore warehouse.[132]

544.   On October 25, 2011, Metro's Wibbelman sought Goldman authority to "rent deal all or substantially all of our Mobile Aluminum to JPMorgan."[133]   On October 28, 2011, JPMorgan's Martin Squires wrote to confirm the terms of the deal.[134]

545.   Metro continued to invoice JP Morgan Securities Ltd. for Detroit aluminum storage rent throughout 2012.[135]   And as late as July 2013.[136]

546.   In April 2013, Metro and Glencore engaged in discussions regarding a "Possible Glencore Detroit for Mobile/Baltimore Swap."   Metro ultimately wound up engaging in

---

[128]      GS-METRO-0003473-74, 00034362.

[129]      GS-METRO-00034759-64.

[130]      GS-METRO-00034929-33.

[131]      GS-METRO-00034956-61.

[132]      GS-METRO-00034807-14.

[133]      GS0METRO-00005122-24.

[134]      GS-METRO-00022386-37.

[135]      *See*, *e.g.*, GS-METRO-00025927; GS-METRO-00026881.

[136]      GS-METRO-00010401-02 (Detroit aluminum storage invoice in amount of $1,976,363.94 to JP Morgan Chase Bank NA).

numerous "swap" deals with Glencore, which allowed Glencore access to releasable metal from certain locations in exchange for its own metal that was stuck subject to the Detroit queue. These swaps reflect agreements between Metro and Goldman that exacerbate the queue in Detroit while allowing Glencore to avoid its pernicious effects.   In this way, Metro and Goldman got what benefited them (queue manipulation in Detroit, without any actual load-out), by agreement with Glencore which got what benefited it (free access to metal that it could sell at the very premium it was increasing), all at the expense of anyone who purchases aluminum at the spot price (*i.e.*, including the regional premium).[137]   On June 27, 2013, Wibbelman forwarded a summary of all "Glencore Aluminum Transactions/Deals" to Glencore's Patrick Wilson.   Wibbelman's cover email said "Take care and thanks again for being a great counterparty and for inviting me to the baseball game."[138]

547.   Additional documents produced by Metro and Goldman show Metro's analysis of the incremental value to Metro of all metal in Detroit – including Metro's physical move of aluminum from Mobile to Detroit, Metro's swaps with Glencore, and an additional swap with Noble.[139]

548.   In July 2013, Glencore's Patrick Wilson proposed a swap of Mobile aluminum with Metro.   Wilson noted that Glencore had 80,000 mt in the Detroit queue scheduled to come out shortly, but that he would like to swap it to Metro for tonnage in Mobile.   "We have done two swaps in the past.   One at $32 and one at $20.   That means we gave Metro detr units at whse and Metro gave us mobile units FOT and then paid glencore $20 or $32.   We would like

---

[137]      GS-METRO-000-09807; *see also* GS-METRO-00027598-601; GS-METRO-00027627-28; 00027634-36; 00027642-44.

[138]      GS-METRO-00027777-80.

[139]      GS-METRO-00010104; see also GS-METRO-00010128.

to do that swap again and would be willing to split the difference between those 2 numbers. Therefore metro would pay us $26.  That is a savings in freight for you guys of, we believe, no less than $30 if you were to ship the units yourself."[140]

549.    By keeping or depositing their own metal at warehouses owned by their ostensible competitors and paying rent to their ostensible competitors, rather than to themselves, in order to do so, metal owners like JPMorgan and the other trader defendants acted against their economic self-interest.

### The Defendants Offer Payments for Owners to Store Aluminum in Their Key Warehouse Locations

550.    The Defendants also ensured that their inventories remain high by paying aluminum producers and traders to deposit aluminum in their warehouses, and aluminum warrant owners to continue to store their aluminum in the Warehouse Defendants' warehouses. Such payments indicate market manipulation in the current context.

551.    As reported by *The New York Times*, Defendant Metro has offered owners incentive payments of up to $230 a ton to continue to store their aluminum at Metro warehouses.[141]

552.    And Defendant Glencore has engaged in the same conduct in Vlissingen. According to Reuters, quoting a London-based trader, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen.  Then they deliver it to the market and whoever holds it can't actually get it out for a year."[142]

---

[140]     GS-METRO-00028192-93.

[141]     David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[142]     Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

553. These incentive payments have, moreover, been paid by the strategic chokepoint warehouses, *e.g.*, Metro in Detroit and Pacorini in Vlissingen, as a means to attract metal to **particular** warehouses where existing and growing queues were thereby exacerbated in order to drive up the price of physical aluminum.

554. Defendants Goldman/Metro's documents demonstrate they understood that they could pay higher incentives to attract metal into warehouse locations with queues. Metro differentiated among its warehouse locations when deciding how much it could or would pay as a freight incentive or other warranting specifics. It is reasonable to assume the other Defendants, who were experienced traders and warehouse operators, would have the same understanding.

555. Defendants actually met and discussed their inducements payments on at least one occasion as part of an LME warehouse committee meeting on March 13, 2012. The LME warehouse committee minutes noted that "exceptional inducements" could "have the effect of constraining the market." The minutes further state "A discussion followed regarding inducements and what was an acceptable level, however no consensus was reached and differing opinions were given as to why inducements occurred and at what level." Thus, using the LME, Defendants were able to freely discuss what inducement they were paying at what locations to further their ability to move metal into key locations.

556. The LME later acknowledged that payment of incentives is one way that warehouses might create, or attempt to create, queues. In its April 7, 2014 LME memorandum entitled "Further Updates on Warehouse and Physical Network Reforms," LME stated its position that "warehouses must not intentionally create or cause, or attempt to create or cause, a queue (including by, but not limited to, the payment of inducements)."

557.   According to the same memorandum, as of July 1, 2013, there were five warehouses with queues:  Impala Antwerp; Pacorini Johor; Pacorini New Orleans; Metro Detroit; and Pacorini Vlissingen.  As noted above, by March 31, 2014, the queues at Metro Detroit and at Pacorini Vlissingen had actually *increased* to 625 days and 610 days, respectively.

558.   In its Summary Public Report of the LME Warehousing Consultation dated November 2013 (after its acquisition by non-defendant, Hong Kong Exchange), the LME stated that it "considers the fundamental role of the queues is to increase premiums, it must follow the most logical course of action is to address the existence of those queues."[143]

### *Defendants Further Evade the Ineffective Minimum Load-Out Rules by Shifting Inventory among Warehouses*

559.   Although the inadequate load-out rules (both before and after April 2012) would by themselves be sufficient to create a backlog given Defendants' hoarding of aluminum and the manipulation of the cancellation process by Defendants and their co-conspirators, the Defendants evaded even those minimal rules by shifting inventories of aluminum from one LME-certified warehouse to another (or to non-certified warehouses) so as to appear to comply with the load-out rules while maintaining inventories.

560.   A *New York Times* article, which was based on an extensive investigation and contains quotes from individuals with direct knowledge of Metro's practices in Detroit, describes those practices:

> **Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses.  Two or three times a day, sometimes more, the drivers make the same circuits.  They load in one warehouse.  They unload in**

---

[143] www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/13%20326%20 0A312%20W125%20RESULT%20OF%20CONSULTATION%20ON%20CHANGES%20TO %20LME%20POLICY%20REGARDING.pdf

**another.  And then they do it again.**

561.    One former Metro forklift driver, Tyler Clay, described this process as a "merry-go-round of metal."[144]

562.    The result is that, despite the LME's load-out rules, "nearly all of the metal that Metro moves is not delivered to customers . . . .  Instead, it is shuttled from one warehouse to another."[145]

563.    This "merry-go round" is not the result of ineptitude; rather, it is a strategy by Defendants to create an artificial scarcity of aluminum available for physical delivery, thereby impacting the wider aluminum market, including the market for aluminum futures.[146] Furthermore, according to *The New York Times*' sources, "the longer waiting times are part of the company's strategy and help Goldman increase its profits from the warehouses."[147]

564.    In addition to shifting aluminum between LME-certified warehouses, Defendants have also moved aluminum to non-LME warehouses which they own or control.  According to the *Wall Street Journal*, as of October 2013, some 7 million to 10 million tons of aluminum are being housed in facilities known within the industry as "shadow warehouses."[148]   The movement of aluminum from LME warehouses into shadow warehouses satisfies the LME's load-out requirements without ever releasing any aluminum into the market.  This further restricts supply and drives up prices.

---

[144]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[145]    *Id.*

[146]    *Id.*

[147]    *Id.*

[148]    Tatyana Shumsky, *Millions of Tons of Metals Stashed in Shadow Warehouses*, THE WALL STREET JOURNAL (December 23, 2013).  Available at http://online.wsj.com/news/articles/ SB10001424052702304244904579276830893405644.

565.     Representative shuffling of aluminum include deals with other parties, such as Deutsche Bank.  In or about September 2010, Metro entered into an agreement with Deutsche Bank, the purpose of which was "moving ali [aluminum] between Metro warehouses in Detroit."[149]   Under the agreement, Metro paid Deutsche Bank an incentive fee to cancel a staggering 100,000 MT of aluminum, place it in the queue, and move it between Metro's Detroit warehouses only to eventually rewarrant the metal in Detroit.  The true purpose of the deal was to lengthen and tie up Metro's Detroit queues.

566.     Metro consummated similar deals with a company called Red Kite.[150]  Like the Deutsche Bank deal, the purpose and effect of these deals was to move aluminum around Detroit for purposes of lengthening Metro's queues.  Metro and Red Kite eventually would cancel over 500,000 MTs of warrants.  Metro performed the logistics of moving the metal to an off-LME warehouse storage site, only to guarantee Red Kite an incentive to re-warrant the metal (and charge it a "break fee" if it did not re-warrant the metal as agreed).  Notably, the vast majority of this aluminum would simply be re-warranted in Detroit.  On other occasions, Metro agreed with metal owners to store metal at non-LME warehouses pursuant to the agreement that it would be "subject to" the Detroit queue, *even though it was not warranted metal*.

### Defendants Worked Together Strategically to Cancel Warrants

567.     Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and exploded at the end of 2011, once the scheme set forth above was fully in place.

---

[149]     GS-METRO-00000309.

[150]     GS-METRO-00010240-244.



568.   According to the trade publication *American Metals Market* in a February 4, 2011 report, "[a] sharp increase in canceled aluminum warrants in London Metal Exchange-registered warehouses in Detroit is part of a 'revenue game' and not a true reflection of physical demand, market sources told *AMM* Friday.  Canceled warrants in Detroit jumped by nearly 45,000 tons overnight to 79,125 tons Thursday, rekindling the finger-pointing that followed September's 100,000 ton increase and igniting chatter from traders about the real motives behind the move.  A number of traders said the cancellations could be little more than 'warehousing games,' where one player cancels warrants to increase the queue at a warehouse[.]"[151]

---

[151]    Anne Riley, *Detroit aluminum warrant cancellations said 'a revenue game,'* Amm. Com (Feb. 4, 2011).

569.    In September 2010, as alleged above, Metro was involved in creating large warrant cancellations at its Detroit warehouse.  That same month, JPMorgan cancelled warrants in Detroit.  The purpose and effect of these cancellations was to lengthen the queue.  Similarly, in December 2011, JPMorgan canceled warrants for 500,000 tons of aluminum that it had stored in Pacorini's (its competitor) Vlissingen warehouse.   As intended, JPMorgan's warrant cancellations instantly caused a large queue in Vlissingen – one that would grow to over 700 days.  The impact of JPMorgan's cancellation is visually striking:



570.    The amount of aluminum warrants canceled far exceeds any legitimate need for physical aluminum.  The surge in cancelled warrants was a sea change in the LME system. Previously, cancelled warrants represented a tiny percentage of total stocks and were tonnages destined for nearby consumer deliveries or, more likely, being readied to move to other warehouses under incentive schemes.   With warehouses now under trader control, traders started to make use of the restricted load-out spigot to cancel significant amounts of warrants so they could isolate consumers from spot in-LME warehouse metal and push premiums higher.

The traders progressively cancelled many more warrants than they needed for their spot commitments to give themselves places in the queue in each forward month for metal they owned and financed so that:  (1) the premiums would continue to rise; and (2) at the end of each queue time period, they would have metal available for load-out to sell at inflated premiums. Consumer customers who could not afford to finance a year's worth of supplies were excluded from access to reasonably priced spot metal.

571.    As one example of the magnitude of Defendants' conspiracy, from January through June 30, 2011 (mere months after Goldman Sachs' purchase of Metro), Metro warehouses in Detroit took in 364,175 tons of aluminum and delivered out 171,350 tons.[152] That represented 42% of inventory arrivals globally and 26% of the metal delivered out, according to LME data.[153]  Before Goldman Sachs bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories.[154]  Since Goldman Sachs' acquisition of Metro, the wait has grown to more than 16 months, according to *The New York Times*.[155]  As of March 31, 2014, the queue at Metro Detroit was reported as 625 days, as compared with 575 days as of June 30, 2013.

572.    These same issues have been reported in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, is the dominant operator).  Queues of about a year have been reported for aluminum stored in Vlissingen.  Glencore has created those queues

---

[152]    Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, Reuters (July 29, 2011).

[153]    *Id.*

[154]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[155]    *Id.*

through a deliberate effort to hoard aluminum in those warehouses by payment of incentives.[156] As of December 2012, the Vlissingen LME warehouses stored more aluminum (1.44 million tons) than the LME Detroit warehouses (1.42 million tons).[157]  As of March 31, 2014, the queue at Pacorini Vlissingen was reported as 610 days, as compared with 518 days as of June 30, 2013.

573.   As demonstrated below, LME European warehouse aluminum stocks were steadily declining from a high in September 2009 through January 2011, before Defendants' scheme to hoard aluminum in Vlissingen took place.  After that, LME stocks rose well past the levels that occurred as a result of the "Great Recession."



**Defendants' Conspiracy Directly Causes Regional Premiums, Including the Midwest Premium, to Reach Unprecedented Highs**

574.   As shown in the following charts, the Midwest Premium fluctuated between four

---

[156]   Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

[157]   Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*, BLOOMBERG (Dec. 14, 2012).

and eight cents per pound ($90-$180 per ton) during the period 2004 through 2008, which was characterized by robust aluminum consumption and LME Cash Prices which peaked at about $3,000 per ton.  In the period between 2008 and 2010, during the financial crisis, recession, and subsequent tepid recovery, the Midwest Premium reflected downward market pressure and fluctuated between three to six cents per pound ($65-$130 per ton) at a time when the LME Cash Price was also much lower, fluctuating between $1,300-$2,200 per ton.

575.    Starting in February 2011, a markedly different pattern emerged.  Economic conditions were still poor then and there was a huge global surplus of aluminum.  Accordingly, the LME Cash Price began a decline from $2,600 to a recent low of $1,730.  The Midwest Premium, however, moved in the opposite direction.  Beginning in February 2011, the Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to rise during 2011 through 2013 to the then-current all-time record of 12 cents per pound ($265 per ton) in July 2013.  In January 2014, the Midwest Premium surged to more than 20 cents per pound.  The Midwest Premium was a little over 3% of the LME Cash Price at the height of the bull market in 2008, but is now over 14% of the LME Cash Price – at a time when global surpluses of aluminum have never been higher.

576.   The following chart demonstrates the impact of cancelled warrants and regional premiums:



577.    Other industry-standard published regional premiums charged for delivery to or from other parts of the world moved in tandem with the Midwest Premium.



578.    This increase in the Midwest Premium and other regional premiums has been, and is, borne by purchasers of aluminum, and, as set forth below, is the result of Defendants' anticompetitive conduct.  Until very recently, no major financial institution offered a hedge for aluminum purchasers against rising regional premiums (including the Midwest Premium) – even though, as explained before, Defendants Goldman Sachs and JPMorgan (among other major investment banks) are active participants in the market for commodities-related derivative instruments.

579.    Now, however, that the federal government is known to be investigating the manipulation of the aluminum market that is the subject of the instant Complaint, JPMorgan has announced its intention (shortly following the publication of the before-cited investigative piece

by *The New York Times*) to exit the commodities business entirely,[158] and Goldman Sachs (also immediately following publication of the investigative piece by *The New York Times*) has belatedly instituted corrective actions concerning its aluminum warehousing practices,[159] it is apparently economically viable for hedge writers to offer hedge positions to aluminum purchasers concerning the Midwest Premium and other premiums.  This presumably is because hedge position writers now may have some assurance (where before they had none because of the pervasiveness of the instant conspiracy) that the regional premiums will not always move only in one direction (namely, up).  On August 9, 2013, CME Group, "the world's leading and most diverse derivatives marketplace," announced that it recently wrote a derivatives "contract [that] is the first Exchange product that enables the aluminum Midwest premium to be managed."[160]  That aluminum purchasers, uniformly during almost the entire period of time material to this Complaint, could not obtain hedge or similar risk management protection against rising Midwest Premium levels indicates both the uniformity and depth of the antitrust injury inflicted on Plaintiffs by Defendants' conduct here.

### The LME Studies the Excessive Queues

580.    Based on numerous complaints about warehouse queues for aluminum in the United States and elsewhere, the LME commissioned a study by Europe Economics, a leading consultancy.

---

[158]    Steve Hargreaves, *JPMorgan to exit commodities business*, CNN MONEY (July 26, 2013).

[159]    *See Goldman outlines proposal to address aluminum warehouse queues*, Platts (July 31, 2013) ("In light of the concerns that end-users have raised about their access to aluminum they are holding in warehouses, Goldman 'is contacting end-users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products,' the company said.").

[160]    Press Release, CME Group announces the first Aluminum Midwest Premium contract traded (Aug. 9, 2013).

581.    The full report, entitled "Assessment of Warehouse Minimum Loading out Rates" has not been disclosed by the LME on the grounds that it contains proprietary information.  The executive summary of the report, however, was released on May 27, 2011.

582.    Tellingly, Europe Economics admitted in the executive summary that "[b]roader issues surrounding allegations of manipulation and the entrance of large financial players are beyond the scope of this report."[161]

583.    Europe Economics also acknowledged that the excessive queues were regarded as damaging "on the grounds that *they inhibited arbitrage between the LME and the physical market, increased physical premiums* and damaged the reputation of the LME," the queues that occurred in 2010 "*were of an unprecedented length*," and that "*premiums have increased in conjunction with the emergence of long queues*" such that premiums were "*greatly in excess of the cost of arbitraging between locations*."[162]  Thus, the LME recognizes that Defendants' actions broke the LME price convergence by inhibiting arbitrage.

584.    In the executive summary, Europe Economics recommended that the loading out requirement be increased to 1,500 tons per 300,000 tons of stock but admitted that even this requirement could result in queues of up to 200 days, which is "still longer than desirable for the LME system."[163]

585.    In a separate recommendation section from the report that was also released, Europe Economics opined that, given this potential maximum queue, "[i]t would be irresponsible for the LME as a regulator to maintain such a policy were lengthy, persistent

---

[161]    Europe Economics, *Assessment of Warehouse Minimum Loading Out Rates*, Executive Summary, at 1.

[162]    *Id.* at 1-2.

[163]    *Id.* at 5.

queues to remain."[164]

586.    The LME eventually changed its loading out requirements such that larger warehouse companies (those with over 900,000 tons of metal stored) were required to load out 3,000 tons per day, effective April 2012.[165]  This was in fact less than the recommendation of Europe Economics as presented in the executive summary.   Under that recommendation, a warehouse company with over 900,000 tons stored would be required to load out 4,500 tons per day.  Europe Economics had acknowledged that, even under its more aggressive proposal, it was possible that unacceptably long queues would remain.

587.    The LME's new load-out requirement was still far less than the warehouses could load out if they were operating efficiently.

588.    Again, the purported minimum load-out rate (to the extent that was even complied with at all) acted as a *de facto* uniform or maximum load-out rate, as illustrated in the chart above.   In addition, this rule change did little to solve the problem of persistent and lengthy queues:

---

[164]    European Economics, *Assessments of Warehouse Minimum Loading Out Rates, Recommendations*, at 1.

[165]    Again, this requirement applies to the company as a whole in a particular location and not to each warehouse the company operates in that location.



589. The LME load-out rules (both those in effect prior to April 2012 and those in effect after) were, and are, an agreement among and between Defendants those nominally-competing warehouse operators who are members of the LME, including the Defendants which operate warehouses, and the other Defendants in this matter, who, as noted before, until quite recently exercised actual ownership and effective control over the LME as concerns the matters at issue here; all such LME members are bound by the LME rules; and all of the LME-member Defendants here used their influence as members of the LME to shape those rules to their benefit and to the detriment of Plaintiff.

590. As applied from September 2010 to the present, the LME load-out rules have had an anticompetitive effect and have unreasonably restrained trade in aluminum and function as a restriction on output.

### *Defendants Worked to Thwart Any LME Rules Changes to Load-Out Rules*

591. Metro worked with other market participants to influence the LME as well as the Europe Economics consultation commissioned by the LME. For instance, Metro personnel regularly strategized with personnel from ICS, the official LME clearing agent for most of the

LME warehouses, including Metro, Henry Bath, and Pacorini.

592.    On May 7, 2010, Metro's Prichard exchanged emails (on which Wibbelman was copied) with ICS's Shon Loth concerning formal complaints made to the LME about Metro load-outs.  Prichard defended Metro's approach and efforts, blaming shippers and the LME:  "If the complaint is that it takes too long to schedule/ship released metal out of Detroit, this is not a failure on Metro's part but a general LME issue and should be addressed accordingly.  As we clearly demonstrated to Alan and John, we schedule shipments of a minimum of 1500 MT/Day, have all the labor and resources allocated to fulfill this obligation . . . ."[166]  This prompted Loth to respond "Nice response and totally clear that we should resist any attempts to force warehouses to over schedule, or to increase the delivery out tonnage."[167]

593.    The very next month, Loth and Wibbelman had an email exchange entitled "Delivery Rates," where Loth set out suggestions that Wibbelman might convey to Goldman's Gabillon prior to Gabillon's upcoming meeting with the LME's Martin Abbott.  Loth's "thoughts on Jacques' lunch" included reference to "the imminent complaint against you."  "In terms of strategy for defending 1500 mt/day I have detailed below some thoughts.  (This is not my strategy but just a run through of the issues) . . . appeal to Martin as GS, member and shareholder.  Stressing the role in providing warehouse space, liquidity to the contract, LME

---

[166]    In light of Metro and Goldman's concerted and directed efforts to "feed Detroit," all the while shuffling aluminum into canceled and then off-warrant status but also swapping canceled in-queue metal for metal elsewhere, it should not go unsaid that Prichard in a June 2013 email to LME bemoaned the difficulty of managing the very queue Metro had created.  "Because of the numerous, releases in the queue and the fact that the queue is over 18 months out, [updating the outbound schedule in priority sequence] becomes a lengthy and involved process, speed contingent upon customer availability and response time. If we are able to contact 4 customers a day and get their confirmed response, it takes a month to complete an update." Wibbelman concurred:  "Everytime once cancelled warrant is rewarranted it sets off a chain reaction of rescheduling.  Crazy system."  GS-METRO-00027731-36.

[167]    GS-METRO-00029727-28.

stock levy – ie don't mess with it . . . .   In a very gentle but clear way he can point out that Metro would not support a change and would be required to review the legal framework around any significant change to the warehouse contract.   While being gentle it is important to be clear and firm as we are currently struggling to maintain the status quo."[168]

594.   During December 2010 and January 2011, Metro and Goldman apparently engaged in coordinated attempts to influence the LME-commissioned Europe Economics study on load-outs.   In one email exchange, Angus Walker, apparently a consultant working on the consultation proposes that "In the Wibbelman version the only thing that stands between the LME and its fatal enfeeblement – at least in major metals – is the provision of liquidity by Warehouses who have not been captured into a permanent game of engineering regional and global squeezes."[169]   Wibbelman responds with 11 numbered points, painting a picture of the market that included a clear statement of his understanding that traders, banks, and producers work together to withhold metal from consumers in order to increase premiums:

**(3) That the secondary market of traders, banks and investors holding (LME Hedged) metal and warrants regularly sell metal and warrants for location premiums and other opportunities that may arise.**

**(4) The fact that only a few out of many LME warehouse companies have regularly shipped outbound during the period of the past couple years.  (As I said, the data on this would provide a lot of insight, for example as Metro has been the only one to ship out of Detroit significantly even though there are two other LME warehouse companies in Detroit).**

**…**

**(6) That the availability of liquid and available warrants is the key to the liquidity of the LME futures markets.  If an entity holds them away from the market, then the market flattens and even backwardates . . . .**

**(7) That free floating warrants means outbound shipping.  So if you get info**

---

[168]      GS-METRO-00017529 (June 29, 2010 email).

[169]      GS-METRO-00032011-13.

**on what warehouse locations and companies are shipping out, then you will
know whose warrants are freely available to the market and whose are not.**

**…**

**(9) That physical traders in conjunction with banks and producers hold stock
and withhold metal sales to consumers in order to squeeze up the premiums.**

**…**

**(11) And that the 1500 agreement between warehouses and the LME is the
only glue holding it all together for the LME . . . in my opinion.  And is
perhaps the only tool that restricts someone . . . perhaps the very large banks
and traders from, taking up all of the available stock gaining control of the
entire market . . . and from benefiting from the movements of the forward
market that would be caused by it.[170]**

595.    On January 26-27, 2011, Gabillon inquired of Wibbelman "Did you talk to
Angus since my meeting with them?"  Wibbelman responded in the affirmative, adding "they
thought your explanation of infinite queues was very clever . . . .  I will continue my dialog with
him.  And recruiting others to approach him.  For you, I would say continue to work Martin
[Abbott] as possible."[171]

596.    A March 8, 2011 Wibbelman email to Dudley of ICS underscores the above and
further reveals the Defendants' efforts to work in concert.[172]  At this time, the first draft of the
Europe Economics report had just been released.  Mike Dudley of ICS was scheduled to have
lunch with LME chief Martin Abbott.  Wibbelman emailed Dudley in advance of his meeting
with Abbott, "a couple of side points . . . not sure if you make them but just so you know, (i) *the
people complaining will not benefit from a change as GS, Glencore and a couple of others
take market actions to shape the landscape*; and (ii) Warehouse companies view the 1500

---

[170]        *Id*.  Emphasis added.

[171]        GS-METRO-00006686.

[172]        GS-METRO-00033241-45 at 42.

obligation as a contract not a rule that can be changed unilaterally."[173]  Wibbelman is essentially stating that no matter what the LME does regarding its load-out rules, the Defendants will act in concert to withhold metal.

597.    On July 1, 2013, the LME published its notice of consultation on the LILO proposal.  Gabillon forwarded the LME Notice to Michael Camacho: "Mike, Quite surprising in the context of our conversation last week . . . the LME will never stops surprising us." Camacho replaced Sellars as JPMorgan's Global Head of Metals.  He also was a member of the Board of Henry Bath and Son Ltd. and reported directly to Blythe Masters.

**Defendants Profit from Their Conspiracy to Manipulate Spot Prices, Including Regional Premiums, in Multiple Ways**

### *The Conspiracy Allowed the Defendants' Warehousing Operations to Increase Their Published Rents and FoT Rates*

598.    LME warehouses generally earn revenue in two ways.[174]  First, warehouses earn rent for each day they store metal within their warehouse.  Second, warehouses charge FoT ("Free on Truck") rates, which are essentially delivery-out charges relating to the release of the metal from their warehouse.

599.    Warehouses set their maximum daily rent and FoT rates on an annual basis.  The annual period runs from April 1 to March 31.  Warehouses must submit their rents and FoT rates to the LME by December 1 of the preceding year.  The LME then publishes this information.  Each warehouse thus knows its competitors' annual maximum daily rent and FoT rates.

600.    Warehouses with queues are incentivized to publish higher rents and FoT rates,

---

[173]        GS-METRO-00033241.

[174]        *See* ECF No. 384 (Summary Public Report of the LME Warehousing Consultation (Nov. 2013)) at 9.

because the existence of a queue guarantees metal must be stored for a minimum amount of time.  In contrast, warehouses without queues should be incentivized to publish lower rents and FoT rates in order to attract metal.  Nevertheless, the rents for all three defendant warehouses have largely moved in lock step as shown below:

*Table 1.  Published rental rate for primary aluminum (per ton per day) by location, warehouse company, and year*

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 RENT | 2010/11 RENT | 2011/12 RENT | 2012/13 RENT | 2013/14 RENT |
|---|---|---|---|---|---|---|---|
| Baltimore | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| Baltimore | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Chicago | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| Chicago | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Chicago | Pacorini | USD | N/A | 0.40 | 0.41 | 0.45 | 0.47 |
| Detroit | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Detroit | Pacorini | USD | N/A | 0.40 | 0.41 | 0.45 | 0.47 |
| Mobile | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Mobile | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.47 |
| New Orleans | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| New Orleans | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| New Orleans | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Johor | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| Johor | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Johor | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Rotterdam | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| Rotterdam | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| Vlissingen | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |

*Table 2. Published FOT rate by location, warehouse company, and year*

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 FOT | 2010/11 FOT | 2011/12 FOT | 2012/13 FOT | 2013/14 FOT |
|---|---|---|---|---|---|---|---|
| Baltimore | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| Baltimore | Pacorini | USD | 31.75 | 33.00 | 33.00 | 36.50 | 39.50 |

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 FOT | 2010/11 FOT | 2011/12 FOT | 2012/13 FOT | 2013/14 FOT |
|---|---|---|---|---|---|---|---|
| Chicago | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| Chicago | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| Chicago | Pacorini | USD | N/A | 33.00 | 33.00 | 36.50 | 38.50 |
| Detroit | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| Detroit | Pacorini | USD | N/A | 33.00 | 33.00 | 36.50 | 38.50 |
| Mobile | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| Mobile | Pacorini | USD | 31.75 | 33.00 | 33.00 | 36.50 | 38.50 |
| New Orleans | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| New Orleans | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| New Orleans | Pacorini | USD | 31.75 | 33.00 | 33.00 | 37.25 | 39.90 |
| Johor | Henry Bath | MR | 110.00 | 110.00 | 112.50 | 120.00 | 130.00 |
| Johor | Pacorini | MR | 112.00 | 112.50 | 113.00 | 126.00 | 133.00 |
| Johor | Metro | MR | 111.00 | 112.00 | 113.00 | 120.00 | 135.00 |
| Rotterdam | Henry Bath | Euro | 22.00 | 22.50 | 22.50 | 23.75 | 27.00 |
| Rotterdam | Pacorini | Euro | 22.00 | 22.50 | 22.50 | 25.50 | 27.75 |
| Vlissingen | Pacorini | Euro | 22.00 | 22.50 | 22.50 | 26.00 | 27.95 |

601.    Thus, warehouses benefit from the existence of queues in the system by being able to charge higher rents.

602.    While a benefit to be sure, Defendants were not simply interested in higher daily rents and FoT charges for their warehouse operations.  Defendants' trading arms wanted to manipulate the spot metal price, including the premiums, so they could reap extraordinary profits.

### The Defendants' Trading Operations Profit by Selling Aluminum with Artificially Increased Premiums

603.    In addition to operating warehouses, Defendants sell aluminum to industrial users on both an annual and spot basis.  Consistent with industry practice in the United States, Defendants charge the Metals Week U.S. Transaction Price, which includes the Midwest

Premium.  Defendant Glencore Ltd. sells aluminum to industrial users in the United States and charges them the Midwest Premium.  JPM sells aluminum to industrial consumers, such as the fabrication industry.  Goldman Sachs does the same.

604.    By artificially driving up the Midwest Premium, Defendants stood to reap additional profits on these spot transactions, because Defendants generally do not pay the Midwest Premium to acquire this aluminum.  Rather, they acquire this aluminum by acquiring LME warrants or engaging in supply transactions with aluminum producers, which often involve their LME warehouse operations.  Defendants can sell either metal that has worked its way through the queue,  metal that is in one of their warehouses without a queue, or even metal that is held off-warrant.[175]   Thus, increases to the Midwest Premium allow Defendants to sell the aluminum for more, providing them with yet another motive to conspire.

605.    It is apparent that Metro also profited from increased premiums.  In a May 24-25, 2011 email entitled "Ali Premiums," Robert Burgess-Allen, who consults with Metro on aluminum deals, inquired with Wibbelman about a potential transfer of Toledo metal to Detroit in exchange for a $20 release fee.  He notes that if the release to Detroit does not occur, "that material is worth whatever we start bidding the MWP to be so even at a conservative $160 which equals a equiv warrant premium for Toledo of $100-120.  We still take the $20 to the broker / the $35 cost of roll and bank the $45/65 profit . . . .  I am ever concerned that the big picture is being missed here – *if we want to sell premium we have to almost act as physical traders.  We are in effect gaining premium on something we are not technically entitled to*.  If we don't want to sell and want to contango finance without paying a $20 fee – this is possible

---

[175]    Defendants can also sell their warrant for metal stored in a location without a queue for additional premia in the OTC market.

but it will take us 18 months to break even . . . ."[176]   This communication makes clear that Metro and Goldman have eliminated the line between trader and warehouseman, and Metro is no longer satisfied with mere rent deals that take a period of time to become profitable. Burgess-Allen continues "If we lock Mobile / Long Beach in US with JP which is highly possible the premium for the US material will go raging higher and we may be told that $20 simply does not cut it. We will not be getting premium returns from JPM . . . .  If the answer is to be NO on any more sale premium being agreed up front then at least lets make that decision and get the bad news out there.   Everyone wants resolved before month end including settlement . . . .   I know you know all this – I also know you agree – I don't mean to keep pointing out the same facts its just seems so bizarre that we for the first time in years when called upon to be as decisive as we have always been pre GS . . . are faltering.  Not what Metro are known for I think you would agree."   Not only was Metro acting as a trader, but it was contemplating an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result being that the premium will go "raging higher."[177]

606.   Six weeks later, Wibbelman emailed Whelan and Prichard, noting that "Jacques has me on hold for sending the JPM letter until JPM legal and compliance weighs in.  Really can't blow my nose without permission anymore."[178]   Apparently Metro was in direct communication with JPMorgan (rather than communication with or through Henry Bath).  It is reasonable to infer, particularly in light of this timeline and the Burgess-Allen communication referenced above, that a "JPM letter" implicating the review of JPMorgan legal and compliance

---

[176]      GS-METRO-00021326 (emphasis added).

[177]      *Id.*

[178]      GS-METRO-00021946 (July 19, 2011 email, later forwarded by Whelan to his personal email account).

departments dealt with some form of agreement between the defendants, and one at least questionable legality.

607.    A number of other documents produced by Metro and Goldman create a reasonable inference that Metro profited, or may have profited, from elevated premiums in other ways. Some documents appear to suggest that Metro itself owned metal, perhaps through an entity referred to as Metal Store LLC. Some documents show Metro employees using email addresses with a domain name @metalstore.com for purposes of certain shipments, and yet blind-copying Metro email addresses as well. In another context, Wibbelman proposed to Goldman's Gabillon in June 2012, a deal relating to Metro's opportunity to "save" 112,000 mt of aluminum in Mobile. Wibbelman proposed a structure where "We will be using an agreement that makes it clear that the rolls are our option and that the premium for the material would be ours under a break fee."[179] Two years earlier, in March 2010, Wibbelman and Robert Burgess-Allen had communicated about arranging a "formal presentation to G [Goldman] regarding merits of Detroit rental deal" and "discussion about formal way to recoup potential premiums that are available in future agreed sales via break fees with Financiers."[180] These emails suggest that Metro itself was acting to profit from the regional premiums, perhaps by "acting like physical traders."

### Defendants Profit from the Increase in Contango

608.    Furthermore, when a commodities market is in contango (when the futures price is higher than the expected spot price), a holder of the commodity has an opportunity for profit if storage and financing costs for holding the commodity are less than the difference between the expected spot price and the futures price. Where, as here, the same or related parties can

---

[179]    GS-METRO-00037390-95.

[180]    GS-METRO-00046676-77.

simultaneously: (1) hold; (2) store; and (3) finance the commodity, there is a ripe opportunity – which the data shows was seized by Defendants – for aluminum market manipulation and collusion at the expense of bona fide purchasers of physical aluminum.  Defendants' use of incentives for storage of aluminum in their warehouses also encourages such manipulation by lowering carrying costs.

609.    The trading arms of the bank defendants, along with Glencore's trading operation, engage in futures transactions in the LME forward contract market.  As discussed above, traders and banks have seized on the opportunity to purchase aluminum during the times material to this Complaint and to sell it forward for a future profit, due to the prevailing market contango.  In order to take the future short (selling) position in the LME market, there must be corresponding long (buying) positions.  Many of these long positions reflect the hedging positions of industrial users of aluminum who know that they will need a quantity of aluminum on future dates but seek price protection against inflation of the LME cash price.  When Defendants conspired to increase the regional premiums and thus, the futures price for aluminum, Defendants profited and Plaintiffs were injured in this way.

**Purchasers of Aluminum Have Complained About Defendants' Practices and Government Inquiries Are Ongoing**

610.    As a result of the conduct set forth above, large purchasers of aluminum have made formal complaints to the LME and other authorities.

611.    For example, Coca Cola filed a complaint with the LME in June 2011, accusing Goldman Sachs of creating supply bottlenecks at the Detroit warehouses to artificially raise the price of aluminum.  In that complaint, Coca Cola stated that it takes more than seven months to

access aluminum from the Detroit warehouses.[181]

612.    More recently, the Beer Institute, a trade group representing beer brewers, filed another complaint with the LME.  According to a statement released by the Beer Institute in conjunction with the complaint, Defendants' rules and practices "are interfering with normal supply and demand dynamics" and have "led to a complete disconnect between LME aluminum prices and actual aluminum prices and prevent brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[182]

613.    The now-owner of the LME, HKEx Group, had such concerns about the warehouse backlogs that it at one time threatened to scuttle its proposed purchase because of this issue.  Prior to the acquisition being consummated, HKEx's CEO, Charles Li, stated that the problem caused him "sleepless nights."[183]

614.    Defendants' conduct has also sparked government investigations.  In May 2011, the Science and Technology Committee of the House of Commons of the Parliament of the United Kingdom reported a concern that "the ownership of metals storage warehouses by a dominant dealer on the London Metals Exchange" (apparently referring to JPMorgan) may be anticompetitive and referred this concern to the Office of Fair Trading.[184]

615.    *The Wall Street Journal* recently reported that the CFTC and the DOJ have begun investigations of price manipulation and collusion involving the metals warehousing

---

[181]    Dustin Walsh, *Aluminum Bottleneck: Coke's complaint: 12% of global stockpile held here, boosting prices*, CRAIN'S DETROIT BUSINESS (June 26, 2011).

[182]    Joe Richter and Agnieszka Troskiewicz, *Beer Companies Press LME to Cut Aluminum Warehouse Backlogs*, BLOOMBERG (June 23, 2013).

[183]    LME Week: Charles Li signals ownership of LME, its problems and its future, METAL BULLETIN (Oct. 18, 2012).

[184]    www.parliament.uk, Science and Technology Committee, "Fifth Report: Strategically important metals," ¶¶79-81 (May 2011).

industry and that the CFTC has sent evidence preservation notices to some warehouse owners.[185]

616.    On November 15, 2013, *Law360* reported that U.S. Assistant Attorney General William Baer confirmed to a subcommittee of the House Judiciary Committee the existence of an investigation into anti-competitive aluminum warehousing agreements among banks like Goldman and JPMorgan.[186]

617.    As recently as August 8, 2014, Reuters reported that the U.S. Senate Permanent Subcommittee on Investigations was continuing a probe into potential abuses in energy and metals markets.   According to the story, spokespersons for Goldman Sachs and JPMorgan declined comment.[187]

**Defendants Change Their Practices or Plan to Exit the Market Immediately After Facing Scrutiny of These Practices**

618.    In the face of the media and regulatory scrutiny set forth above, and perhaps even more significantly, the purchase of the LME by an exchange operator that is not beholden to LME members, many of the Defendants have agreed to change their practices or, in the case of JPMorgan, planned to exit the warehousing business altogether.

619.    In late July, 2013, it was widely reported that JPMorgan was planning on exiting the physical commodities business, including metals warehouses, based, in part, on increased

---

[185]    Jamila Trindla and Tatyana Shumsky, *U.S. Probes Metals Warehouse Firms*, THE WALL STREET JOURNAL (July 25, 2013).

[186]    Alex Lawson, *DOJ Probing Goldman, JPMorgan Aluminum Storage Deals*, LAW360 (Nov. 15, 2013).

[187]    Patrick Rucker, *Goldman, JPMorgan in Senate's crosshairs for commodities holdings*, REUTERS (Aug. 8, 2014).

regulatory scrutiny.[188]   JPMorgan has now exited both the aluminum warehousing business and the physical commodities trading market.[189]

620.    On July 31, 2013, Goldman Sachs issued a statement in response to *The New York Times* article cited in this Complaint and announced several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues.  Of course, these steps could have, and should have, been taken several months ago, when complaints about excessive queues first surfaced.  It is significant that Goldman Sachs only announced these steps after its practices were widely exposed by *The New York Times*.  Goldman has now announced that it plans to exit the aluminum warehousing business.[190]

621.    Most importantly, only a few months after it came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing excessive queues to load out more aluminum than they load in.[191]   Again, there is no legitimate reason why this obvious action could not have been taken when the complaints about the excessive queues first surfaced.

622.    The contract, combination or conspiracy has had the following effects, among

---

[188]     *See, e.g.*, *JPMorgan Mulls Physical Commodities Exit Amid U.S. Review*, REUTERS (July 26, 2013).

[189]     *See* Dmitry Zhdannikov and Chris Peters, *JPMorgan sells physical commodities unit to Mercuria for $3.5 billion*, REUTERS (Mar. 19, 2014), http://www.reuters.com/article/2014/03/19/us-jpmorgan-mercuria-idUSBREA20lg20140319.

[190]     *See* Josephine Mason, Exclusive: *Goldman puts Metro metals warehousing unit up for sale*, REUTERS (May 20, 2014).

[191]     *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, BLOOMBERG (July 1, 2013).

others:

623.    Prices charged to Plaintiffs for purchases of aluminum, particularly the Midwest Premium and other regional premium price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

624.    Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the U.S. and Canadian market for primary aluminum.

625.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

626.    Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

627.    As a direct and foreseeable result of, and proximately caused by these anti-competitive agreements, Plaintiffs and Class members were injured in their property, including in that they had to pay supra-competitively high prices for aluminum, including Midwest Transaction Price, Midwest Premium or Platts MW Premium prices.  Absent injunctive relief, these violations may continue or reoccur in the future.

### AS AND FOR A FOURTH CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST ALL DEFENDANTS FOR THE LME COMBINATION

628.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

629.    **LME Combination.**    The LME Combination, as defined in ¶20, constituted a large combination or agreement of extraordinary market power.  During the Class Period, the LME Combination controlled 97-99% of the aluminum forward and futures contract trading in the United States and had put out of business and terminated the NYMEX aluminum futures

contract.  After the elimination of the NYMEX contract, there was no effective competition for the LME Combination in aluminum futures or forward contracts.

630.    During various times prior to the Class Period when the LME Charter was observed, the LME Combination was not having unreasonable anticompetitive effects on physical aluminum prices.  LME forward contracts on aluminum then provided industrial and other consumers of primary aluminum with a means of hedging price and supply risks on physical aluminum.  ¶¶196, 317-321, 412.  This included a means of purchasing such aluminum based on the LME price and without paying the Midwest premium.  *Id*.

631.    Again, the LME Charter for its warehouses is as follows:  "The LME licenses warehouses to provide **a market of last resort and to ensure the LME price stays in line with the physical/spot price**."    https://www.lme.com/en-gb/pricing-and-data/pricing/convergence/.   The LME Charter thus has two parts; (1) the LME warehouses should act as market participants of last resort, and (2) they should act in a manner that tends to cause convergence of the LME price with the all-in transaction price.

632.    During the Class Period, however, the LME Charter was violated in multiple ways.  *See* ¶¶ 20-21, 435-359, 628-636.

633.    These systematic violations of the LME Charter transformed the LME Combination into a combination in unreasonable restraint of trade.  Such violations of the LME Charter include but are not limited to the following: (a) the failure to amend the unreasonable minimum load-out rule and the affirmative acts by which such rule was converted into a maximum output restriction that could be "gamed" through anticompetitive contracts by Metro; (b) the mix of consideration that Metro offered participants in the Primary Aluminum Market when it entered that market as a participant of first resort to divert aluminum into the LME,

abused the LME Combination's power and to inflate prices; and (c) all the unlawful activity alleged in the Third Claim.

634.    All Defendants knew of these violations of the LME Charter and knew of the resulting unreasonable restraints on trade.  They failed to stop same. This constitutes a further violation of Section 1.

635.    Defendants' conduct constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

636.    As a direct and foreseeable result of, and proximately caused by these anti-competitive agreements, Plaintiffs and Class members were injured in their property. Plaintiffs had to pay supra-competitively high prices for aluminum, including Midwest Transaction Price, Midwest Premium or Platts MW Premium prices.  Absent injunctive relief, these violations may continue or reoccur in the future.

## AS AND FOR A FIFTH CLAIM AGAINST ALL DEFENDANTS VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MCL §§ 445.773, *et seq.*

637.    Plaintiffs incorporate by reference the preceding allegations.

638.    The aforementioned acts and practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Michigan Compiled Laws §§ 445.773, et seq.

639.    It is appropriate to apply Michigan antitrust law to direct purchases of aluminum in all fifty states because illegal agreements were made, the overt acts in furtherance thereof, and other anticompetitive conduct and overcharges occurred in Michigan.

640.    Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class of aluminum purchasers.  Much of the illegal conduct was focused in Michigan and key parties and witnesses to this unlawful conduct reside and do

business in Michigan.  A primary anticompetitive effect of the conspiracy was to hoard up to 74% of the London Metal Exchange physical aluminum in Canada and the U.S. within warehouses that were located in Michigan.  Additionally, Defendant Metro International Trade Services LLC is headquartered in Michigan.

641.   This conduct and its resulting impact on the market occurred in or affected Michigan intrastate commerce.

642.   As a direct and proximate result, Plaintiff and members of the Class have been injured in their business and property in that they had to pay artificially high price premiums for primary aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

### AS AND FOR A SIXTH CLAIM AGAINST ALL DEFENDANTS VIOLATIONS OF NEW YORK DONNELLY ACT NEW YORK GENERAL BUSINESS LAW § 340, et seq.

643.   Plaintiffs incorporate by reference the preceding allegations.

644.   The aforementioned acts and practices by Defendants were and are in violation of New York's Donnelly Act, New York General Business Law § 340, et seq.

645.   It is appropriate to apply New York antitrust law to direct purchases of aluminum in all fifty states because the illegal agreements, overt acts in furtherance thereof, and other anticompetitive conduct and overcharges were also made or occurred in New York.

646.   Key Defendants reside and conduct significant business in New York. Defendants Goldman Sachs and JPMorgan are headquartered in New York.  In addition, key third party aluminum producer Alcoa is headquartered in New York, NY.

647.   Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class of aluminum purchasers and had a significant impact on the

intrastate commerce of New York.  By way of example, many Plaintiffs and members of the

Class paid to Alcoa, in New York, prices for primary aluminum that were artificially inflated by

the unlawful actions of Defendants Goldman and JPMorgan, also in New York.

648.    As a direct and proximate result, Plaintiff and members of the Class have been

injured in their business and property in that they had to pay artificially high price premiums for

primary aluminum.  Unless injunctive relief, including structural injunctive relief, is granted,

these violations may continue to reoccur.

### AS AND FOR A SEVENTH CLAIM AGAINST ALL DEFENDANTS VIOLATION OF CERTAIN OTHER STATE ANTITRUST STATUTES

649.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth

herein.

650.    The conduct, combination, conspiracy, and overt acts in furtherance thereof,

monopolized and restrained trade as alleged above, materially and proximately injured

aluminum purchasers, by the inflation of the Midwest Premium and by other anticompetitive

effects alleged herein nationwide, and, therefore, in the commerce of the following states:

Alabama; Arizona; Arkansas; California; District of Columbia; Hawaii;  Illinois; Iowa; Kansas;

Maine; Minnesota; Mississippi; Nebraska; Nevada; New Mexico; North Carolina; North

Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont;

West Virginia; Wisconsin; and Wyoming.

651.    Defendants' intentional and purposeful anticompetitive acts that are described

above, including but not limited to collusion to limit production, including "squeeze[ing] up the

premiums" for delivery of physical aluminum, restraining supplies in LME warehouses for

unreasonably long times, foreclosing Plaintiffs from sourcing aluminum from the LME, and the

other injuries previously alleged, caused and were intended to cause Plaintiffs to pay

supracompetitive prices for aluminum in the jurisdictions listed below and are in violation of the following state antitrust statutes:

    a.      Ala. Code. § 6-5-60(a).

    b.      Arizona Revised Statutes § 44-1401, et seq.

    c.      Ark. Code. Ann. §§ 4-75-211, et seq.

    d.      California Cartwright Act, California Business and Professions Code § 16700, et seq.

    e.      District of Columbia Code § 28-4501, et seq.

    f.      Hawaii Revised Statutes § 480-1, et seq.

    g.      Illinois Antitrust Act, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011 et seq.

    h.      Iowa Competition Law, Iowa Code § 553.1, et seq.

    i.      Kansas Statutes Annotated § 50-101, et seq.

    j.      Maine Revised Statutes, tit. 10, § 1101, et seq.

    k.      Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, et seq.

    l.      Mississippi Code Annotated § 75-21-1, et seq.

    m.      Nebraska Revised Statutes § 59-801, et seq.

    n.      Nevada Revised Statutes § 598A.010, et seq.

    o.      New Mexico Antitrust Act, New Mexico Statutes Annotated § 57-1-1, et seq.

    p.      North Carolina General Statutes § 75-1, et seq.

    q.      North Dakota Uniform State Antitrust Act, North Dakota Century Code § 51-08.1-01, et seq.

r.     Oregon Revised Statutes § 646.705, et seq.

s.     Gen. Laws of Rhode Island Annotated, RI ST § 6-36-1, et seq.

t.     Code of Laws of South Carolina Annotated, S.C. Code Ann. § 39-3-10, et

seq.

u.     South Dakota Codified Laws § 37-1-3.1, et seq.

v.     Tennessee Code Annotated § 47-25-101, et seq.

w.     Utah Code Annotated, §§ 76-10-3101, et seq.

x.     Vermont Statutes Annotated, tit. 9, § 2451, et seq.

y.     West Virginia Antitrust Act, West Virginia Code § 47-18-1, et seq.

z.     Wisconsin Wyo. Stat. Ann. § 40-4-101, *et seq*. Statutes § 133.01, et seq.

aa.     Wyo. Stat. Ann. § 40-4-101, et seq.

652.    Plaintiffs and Class members in each of the above-referenced states paid supra-competitive, artificially inflated prices for aluminum.  As a direct and proximate result, Plaintiffs and Class members have been injured in their property in that they paid more for aluminum than they otherwise would have paid absent the unlawful conduct of the Defendants, and each of them, directly or indirectly and through affiliates they dominated and controlled. Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

## AS AND FOR AN EIGHTH CLAIM AGAINST DEFENDANTS
## VIOLATION OF CERTAIN STATE UNFAIR TRADE PRACTICES ACTS

653.    Plaintiffs incorporate by reference and reallege each of the preceding allegations as if fully set forth herein.

654.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices, or conduct that is immoral, unethical or oppressive, or conduct

causing substantial injury to Class members.  More particularly, Defendants' deceptive practices as alleged herein, including without limitation collusion to limit production, including "squeeze[ing] up the premiums" for delivery of aluminum, restraining supplies in LME warehouses for unreasonably long times, foreclosing Plaintiffs from sourcing aluminum from the LME, and the other injuries previously alleged caused and were intended to cause Plaintiffs to pay supracompetitive prices for aluminum in the jurisdictions below.

655.    Defendants' deceptive and anti-competitive conduct as set forth above caused and was intended to cause supracompetitive prices in the jurisdictions States listed below.  By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the class are entitled to relief under, the following State consumer protection and unfair competition laws:

    a.        Alaska Stat. § 45.50.531.

    b.        Ariz. Rev. Stat. §§ 44-1521 *et seq*.

    c.        Arkansas Code §§ 4-88-101 *et seq*.

    d.        California Bus & Prof. Code §§ 17200 *et seq*.

    e.        Conn. Gen. Stat. § 42-110, et seq.

    f.        D.C. Code Ann. §28-3901 *et seq*.

    g.        Florida Stat. §§ 501.201 *et seq*.

    h.        Hawaii Rev. Stat. § 480-2.

    i.        Kan. Stat. Ann. §§ 50-623 *et seq*.

    j.        Mass. Gen. Laws chapter 93A §§ 1 *et seq*.

    k.        Mich. Comp. Laws § 445.901.

    l.        Minn. Stat. §§ 325F.69 *et seq*.

    m.        Miss. Code §§ 75-24-1 *et seq*.

n.      Mo. Ann. Stat. 407.020.

o.      Nebraska Rev. Stat. §§ 59-1601 *et seq.*

p.      Nev. Rev. Stat. §§ 598.0903 et seq.

q.      New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

r.      New Mexico Stat. Ann. §§ 57-12-1 *et seq.*, specifically by engaging both

in unfair and deceptive trade practices and

unconscionable trade practices.

s.      N.Y. Gen. Bus. Law § 349 *et seq.*  Specifically: (a) Defendants engaged in

commerce in New York; (b) Defendants and their co-conspirators secretly

agreed to raise prices for aluminum sold to New York Class members by

direct agreement and through artificial supply restraints on the entire

aluminum market; (c) New York Class members were targets of the

conspiracy; (d) The secret agreements were not known to New York Class

members; (e) Defendants: (i) made public statements about the prices of

aluminum that Defendants knew, or should have known, would be seen by

New York Class members; (ii) such statements either omitted material

information that rendered the statements made materially misleading or

affirmatively misrepresented the real cause of price increases for

aluminum; and (iii) Defendants alone possessed material information that

was relevant to New York Class members, but failed or refused to provide

such information; (f) Due to Defendants' unlawful trade practices in the

State of New York, there was a broad effect on New York Class members

such that New York Class members have been injured because they paid

more for aluminum than they would have paid absent Defendants'
unlawful trade practices, acts, and conduct; (g) Due to Defendants'
unlawful trade practices in the State of New York, New York  Class
members who purchased aluminum were misled to believe that they were
paying a fair price for aluminum, or that the price increases for aluminum
were imposed for valid business reasons. Similarly situated New York
Class members potentially were affected by Defendants' unlawful
conduct; and (h) Defendants' violations adversely affected the public
interest in the State of New York.

t.      North Carolina Gen. Stat. §§ 75-1.1 *et seq*.

u.      Rhode Island Gen. Laws §§ 6-13.1-1 *et seq*., specifically: (a) Defendants
engaged in commerce in Rhode Island; (b) Defendants and their co-
conspirators unscrupulously and secretly agreed to raise prices for
aluminum by direct agreement on prices Defendants charged Defendants'
customers located in Rhode Island and through artificial supply restraints
on the entire aluminum market; (c) (d)(i) Defendants made public
statements that Defendants knew, or should have, known, would be seen
by Rhode Island Class members; (ii) such statements created a likelihood
of confusion or misunderstanding with respect to price movements of
aluminum; and (iii) such statements either omitted material information
that rendered such statements materially misleading and confusing, or
affirmatively deceived Rhode Island Class members about the real cause
of aluminum price movements; (e) Because of Defendants' unlawful and

unscrupulous trade practices in Rhode Island, Rhode Island Class

members were misled or deceived to believe that they were paying a fair

price for aluminum; (f) Defendants knew, or should have known, that their

violations with respect to pricing aluminum would have a broad affect,

causing Rhode Island Class members to be injured by paying more for

aluminum than they would have paid absent Defendants' unlawful trade

practices and acts; and (g) Defendants' violations described above

adversely affected public policy in Rhode Island.

v.      S.C. Code Ann., §§ 39-5-10, *et seq*.

656.    As a direct and proximate result, Plaintiffs and Class members have been injured

in their property in that they paid more for aluminum than they otherwise would have paid

absent the unlawful conduct of the Defendants, and each of them, directly or indirectly and

through affiliates they dominated and controlled.    Unless injunctive relief, including structural

injunctive relief, is granted, these violations may continue to reoccur.

### AS AND FOR A NINTH CLAIM AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

657.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations

as though fully set forth herein.

658.    In the alternative or in addition to the foregoing claims, Plaintiffs are entitled to

recovery under State law for unjust enrichment and disgorgement of profits under common law

principles of unjust enrichment in each of the fifty States, excluding Ohio and Indiana, and

including Puerto Rico and the District of Columbia.

659.    The unlawful conduct includes violations of the previously alleged statutes as

well as the prohibition in the Commodity Exchange Act, 7 U.S.C §1 *et seq.*, including Section

224

9(a) thereof, 7 U.S.C. §13, against manipulation of the price of a commodity in interstate commerce.

660.    Aluminum is a commodity in interstate commerce.  Each Defendant unjustly enriched itself from its intentional manipulation of aluminum prices through its conduct and omissions alleged herein.  Each Defendant intentionally inflated the prices of aluminum to artificially high levels knowing that Defendants had the ability to cause and that they were causing artificially high aluminum prices as well as unprecedented divergence between the LME "all-in" price and the inflated Midwest Transaction Price or other "all-in" prices.  To benefit themselves from the inflated Midwest Transaction Price, inflate aluminum prices, inflated rents, or the other financial motives previously alleged, Defendants intentionally manipulated the price of aluminum.

661.    To any extent that any Defendant did not engage in unlawful conduct, it is inequitable that that Defendant keeps its ill-gotten gains from the conduct alleged herein.  Such conduct was inequitable in that it repudiated the historical LME Charter and transformed the LME Combination and each Defendant's conduct into a means to profit from inflating the price of aluminum and causing it diverge from the LME price.  This repudiation of custom and the extreme inefficiency involved in Defendants' profits and gains, make it inequitable for them to retain such ill-gotten and unjust enrichment.  Plaintiffs' and the Class' detriment, and Defendants' unjust enrichment, were related to and flowed from the unlawful, inequitable, or wrongful conduct alleged herein, including, without limitation, Defendants' unlawful and anti-competitive acts described above.

662.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits from conduct which directly injured Plaintiffs and Class

members.  Plaintiffs and the Class accordingly are entitled to disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

663.    Under common law principles of unjust enrichment in the jurisdictions identified herein, Plaintiffs and the Class have no adequate remedy at law to seek restitution.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

(B)     For an order enjoining Defendants' challenged conduct, and declaring and adjudging that such conduct is unlawful;

(C)    For a judgment awarding Plaintiffs and the Class damages or unjust enrichment monetary relief against Defendants, as a result of Defendants' unlawful conduct alleged herein, including treble damages and all other available damages whether punitive, exemplary or otherwise;

(D)    That this Court declare, adjudge, and decree that Defendants have committed violations of State antitrust laws alleged herein and award treble damages;

(E)    For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)    For any other and further relief as the Court may deem just and proper.

## VIII.   DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury on all issues so triable as well as those issues which an advisory jury may be appropriate.

 DATED: April 9, 2015

Respectfully submitted.

__/s/__Christopher Lovell_____
Christopher Lovell
Gary S. Jacobson
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN & JACOBSON L.L.P.
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
          bjaccarino@lshllp.com
          gsjacobson@lshllp.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel:    (646) 722-8500
Fax:    (646) 722-8501
Email: lnussbaum@gelaw.com
          pbarile@gelaw.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

David Mitchell
Carmen Medici
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

Telephone:  (619) 231-1058
Fax: (619) 231-7423
Email: davidm@rgrdlaw.com
        cmedici@rgrdlaw.com

 *Interim Co-Lead Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct Purchaser Class*

Samuel H. Rudman
ROBBINS GELLER RUDMAN &
DOWD L.L.P.
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

*Interim Co-Lead Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct Purchaser Class*

Robert J. Bonsignore
BONSIGNORE, LLC
193 Plummer Hill Road
Belmont, NH 03220
(781) 856-7650
rbonsignore@class-actions.us

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

John G. Emerson
EMERSON POYNTER LLP
The Rozelle-Murphy House
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
Fax: (501) 907-2556
john@emersonpoynter.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Solomon B. Cera
Gold Bennett Cera & Sidener, LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230

Fax: (415) 777-5189
sbc@gbcslaw.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
310 Clifton Avenue
Minneapolis, MN 55403
1-612-338-4605
Fax: (612)-338-4692
Email: vesades@heinsmills.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Dean M Harvey
Eric B. Fastiff
Lin Y Chan
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415)-956-1000
Fax: (415)-956-1008
Email: dharvey@lchb.com
Email: efastiff@lchb.com
Email: lchan@lchb.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Geoffrey Milbank Horn
Gerald Lawrence
Peter Dexter St. Philip , Jr.
Raymond Peter Girnys
Vincent Briganti
LOWEY DANNENBERG COHEN & HART, P.C.
White Plains Plaza
One North Broadway
Suite 509
White Plains, NY 10601
(914) 997-0500
Fax: (914) 997-0035
Email: ghorn@lowey.com

Email: glawrence@lowey.com
Email: pstphillip@lowey.com
Email: rgirnys@lowey.com
Email: vbriganti@lowey.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Peter George Safirstein
MORGAN & MORGAN, P.C.
28 West 44th St., Ste 2001
New York, NY 10036
(212) 564-1637
Fax: (212) 564-1807
Email: psafirstein@forthepeople.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

Alyson L. Oliver
OLIVER LAW GROUP, P.C.
950 W. University Drive
Suite 200
Rochester, MI 48307
248 327-6556
Fax: 248-436-3385
Email: notifications@oliverlg.com

*Member of Plaintiffs' Steering Committee for the
Direct Purchaser Plaintiffs*

David P. Germaine
John Paul Bjork
Joseph M Vanek
VANEK, VICKERS & MASINI, P.C.
55 W. Monroe, Suite 3500
Suite 4050
Chicago, IL 60606
(312)224-1500
Fax: (312)-224-1510
Email: dgermaine@vaneklaw.com
Email: jbjork@vaneklaw.com
Email: jvanek@vaneklaw.com

*Member of Plaintiffs' Steering Committee for the Direct Purchaser Plaintiffs*

# Exhibit A

| Date | Country | Location | Opening Stock | Delivered In | Delivered Out | Closing Stock | Open Tonnage | Cancelled Tonnage |
|---|---|---|---|---|---|---|---|---|
| 1/4/2011 | USA | Detroit | 943,625 | 0 | 1,150 | 942,475 | 868,350 | 74,125 |
| 1/5/2011 | USA | Detroit | 942,475 | 4,500 | 1,250 | 945,750 | 872,650 | 73,100 |
| 1/6/2011 | USA | Detroit | 945,750 | 2,000 | 1,325 | 946,425 | 904,925 | 41,500 |
| 1/7/2011 | USA | Detroit | 946,425 | 0 | 1,275 | 945,150 | 904,925 | 40,225 |
| 1/10/2011 | USA | Detroit | 945,150 | 27,700 | 1,275 | 971,575 | 932,225 | 39,350 |
| 1/11/2011 | USA | Detroit | 971,575 | 18,325 | 1,450 | 988,450 | 950,550 | 37,900 |
| 1/12/2011 | USA | Detroit | 988,450 | 3,750 | 1,125 | 991,075 | 954,300 | 36,775 |
| 1/13/2011 | USA | Detroit | 991,075 | 2,525 | 1,425 | 992,175 | 956,325 | 35,850 |
| 1/14/2011 | USA | Detroit | 992,175 | 0 | 1,400 | 990,775 | 956,325 | 34,450 |
| 1/17/2011 | USA | Detroit | 990,775 | 20,125 | 1,100 | 1,009,800 | 976,450 | 33,350 |
| 1/18/2011 | USA | Detroit | 1,009,800 | 0 | 0 | 1,009,800 | 975,750 | 34,050 |
| 1/19/2011 | USA | Detroit | 1,009,800 | 0 | 1,000 | 1,008,800 | 975,550 | 33,250 |
| 1/20/2011 | USA | Detroit | 1,008,800 | 0 | 900 | 1,007,900 | 975,350 | 32,550 |
| 1/21/2011 | USA | Detroit | 1,007,900 | 0 | 1,100 | 1,006,800 | 975,350 | 31,450 |
| 1/24/2011 | USA | Detroit | 1,006,800 | 0 | 1,125 | 1,005,675 | 975,350 | 30,325 |
| 1/25/2011 | USA | Detroit | 1,005,675 | 875 | 1,075 | 1,005,475 | 976,225 | 29,250 |
| 1/26/2011 | USA | Detroit | 1,005,475 | 0 | 1,150 | 1,004,325 | 976,025 | 28,300 |
| 1/27/2011 | USA | Detroit | 1,004,325 | 0 | 1,050 | 1,003,275 | 976,025 | 27,250 |
| 1/28/2011 | USA | Detroit | 1,003,275 | 0 | 1,125 | 1,002,150 | 970,825 | 31,325 |
| 1/31/2011 | USA | Detroit | 1,002,150 | 8,725 | 1,025 | 1,009,850 | 979,550 | 30,300 |
| 2/1/2011 | USA | Detroit | 1,009,850 | 0 | 1,000 | 1,008,850 | 979,350 | 29,500 |
| 2/2/2011 | USA | Detroit | 1,008,850 | 625 | 1,125 | 1,008,350 | 974,100 | 34,250 |
| 2/3/2011 | USA | Detroit | 1,008,350 | 0 | 0 | 1,008,350 | 929,225 | 79,125 |
| 2/4/2011 | USA | Detroit | 1,008,350 | 33,800 | 900 | 1,041,250 | 963,025 | 78,225 |
| 2/7/2011 | USA | Detroit | 1,041,250 | 0 | 1,125 | 1,040,125 | 963,025 | 77,100 |
| 2/8/2011 | USA | Detroit | 1,040,125 | 44,225 | 1,075 | 1,083,275 | 1,006,950 | 76,325 |
| 2/9/2011 | USA | Detroit | 1,083,275 | 0 | 1,175 | 1,082,100 | 1,006,950 | 75,150 |
| 2/10/2011 | USA | Detroit | 1,082,100 | 0 | 1,025 | 1,081,075 | 956,900 | 124,175 |
| 2/11/2011 | USA | Detroit | 1,081,075 | 0 | 1,050 | 1,080,025 | 906,950 | 173,075 |
| 2/14/2011 | USA | Detroit | 1,080,025 | 9,450 | 1,075 | 1,088,400 | 916,175 | 172,225 |
| 2/15/2011 | USA | Detroit | 1,088,400 | 1,500 | 1,225 | 1,088,675 | 917,650 | 171,025 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2/16/2011 | USA | Detroit | 1,088,675 | 0 | 900 | 1,087,775 | 917,650 | 170,125 |
| 2/17/2011 | USA | Detroit | 1,087,775 | 0 | 1,075 | 1,086,700 | 917,650 | 169,050 |
| 2/18/2011 | USA | Detroit | 1,086,700 | 1,875 | 1,075 | 1,087,500 | 919,525 | 167,975 |
| 2/21/2011 | USA | Detroit | 1,087,500 | 0 | 1,125 | 1,086,375 | 919,275 | 167,100 |
| 2/22/2011 | USA | Detroit | 1,086,375 | 0 | 0 | 1,086,375 | 919,275 | 167,100 |
| 2/23/2011 | USA | Detroit | 1,086,375 | 225 | 1,375 | 1,085,225 | 919,500 | 165,725 |
| 2/24/2011 | USA | Detroit | 1,085,225 | 0 | 1,300 | 1,083,925 | 919,500 | 164,425 |
| 2/25/2011 | USA | Detroit | 1,083,925 | 0 | 1,300 | 1,082,625 | 919,500 | 163,125 |
| 2/28/2011 | USA | Detroit | 1,082,625 | 0 | 1,300 | 1,081,325 | 919,475 | 161,850 |
| 3/1/2011 | USA | Detroit | 1,081,325 | 2,100 | 1,175 | 1,082,250 | 921,575 | 160,675 |
| 3/2/2011 | USA | Detroit | 1,082,250 | 0 | 1,425 | 1,080,825 | 921,575 | 159,250 |
| 3/4/2011 | USA | Detroit | 1,079,275 | 1,475 | 1,400 | 1,079,350 | 899,825 | 179,525 |
| 3/7/2011 | USA | Detroit | 1,079,350 | 825 | 1,125 | 1,079,050 | 876,850 | 202,200 |
| 3/8/2011 | USA | Detroit | 1,079,050 | 0 | 1,125 | 1,077,925 | 876,525 | 201,400 |
| 3/9/2011 | USA | Detroit | 1,077,925 | 0 | 1,375 | 1,076,550 | 876,525 | 200,025 |
| 3/14/2011 | USA | Detroit | 1,075,275 | 43,925 | 1,125 | 1,118,075 | 916,400 | 201,675 |
| 3/15/2011 | USA | Detroit | 1,118,075 | 0 | 1,125 | 1,116,950 | 916,400 | 200,550 |
| 3/16/2011 | USA | Detroit | 1,116,950 | 0 | 1,475 | 1,115,475 | 916,400 | 199,075 |
| 3/17/2011 | USA | Detroit | 1,115,475 | 0 | 1,450 | 1,114,025 | 916,400 | 197,625 |
| 3/23/2011 | USA | Detroit | 1,109,575 | 0 | 1,475 | 1,108,100 | 906,850 | 201,250 |
| 3/24/2011 | USA | Detroit | 1,108,100 | 0 | 1,475 | 1,106,625 | 906,350 | 200,275 |
| 3/25/2011 | USA | Detroit | 1,106,625 | 0 | 1,000 | 1,105,625 | 894,900 | 210,725 |
| 3/28/2011 | USA | Detroit | 1,105,625 | 50 | 1,125 | 1,104,550 | 894,950 | 209,600 |
| 4/28/2011 | USA | Detroit | 1,113,425 | 0 | 1,475 | 1,111,950 | 811,125 | 300,825 |
| 5/12/2011 | USA | Detroit | 1,098,400 | 0 | 1,475 | 1,096,925 | 811,200 | 285,725 |
| 5/13/2011 | USA | Detroit | 1,096,925 | 54,975 | 1,475 | 1,150,425 | 866,175 | 284,250 |
| 6/29/2011 | USA | Detroit | 1,139,425 | 0 | 1,475 | 1,137,950 | 920,175 | 217,775 |
| 7/4/2011 | USA | Detroit | 1,134,925 | 0 | 1,450 | 1,133,475 | 920,175 | 213,300 |
| 7/5/2011 | USA | Detroit | 1,133,475 | 0 | 0 | 1,133,475 | 920,175 | 213,300 |
| 7/12/2011 | USA | Detroit | 1,127,450 | 0 | 1,375 | 1,126,075 | 920,175 | 205,900 |
| 7/13/2011 | USA | Detroit | 1,126,075 | 0 | 1,400 | 1,124,675 | 920,175 | 204,500 |
| 7/14/2011 | USA | Detroit | 1,124,675 | 9,625 | 1,425 | 1,132,875 | 929,800 | 203,075 |
| 7/15/2011 | USA | Detroit | 1,132,875 | 0 | 1,375 | 1,131,500 | 929,800 | 201,700 |

| 7/19/2011 | USA | Detroit | 1,155,575 | 0 | 1,475 | 1,154,100 | 955,375 | 198,725 |
|---|---|---|---|---|---|---|---|---|
| 7/20/2011 | USA | Detroit | 1,154,100 | 0 | 1,475 | 1,152,625 | 955,375 | 197,250 |
| 7/21/2011 | USA | Detroit | 1,152,625 | 0 | 1,425 | 1,151,200 | 955,375 | 195,825 |
| 7/22/2011 | USA | Detroit | 1,151,200 | 0 | 1,450 | 1,149,750 | 955,375 | 194,375 |
| 8/10/2011 | USA | Detroit | 1,131,550 | 0 | 1,475 | 1,130,075 | 955,375 | 174,700 |
| 8/15/2011 | USA | Detroit | 1,127,000 | 26,425 | 1,475 | 1,151,950 | 981,400 | 170,550 |
| 8/17/2011 | USA | Detroit | 1,150,400 | 0 | 1,450 | 1,148,950 | 981,400 | 167,550 |
| 8/24/2011 | USA | Detroit | 1,142,950 | 0 | 1,175 | 1,141,775 | 948,425 | 193,350 |
| 8/26/2011 | USA | Detroit | 1,139,950 | 0 | 1,175 | 1,138,775 | 948,400 | 190,375 |
| 8/31/2011 | USA | Detroit | 1,135,475 | 0 | 1,175 | 1,134,300 | 923,400 | 210,900 |
| 9/2/2011 | USA | Detroit | 1,132,525 | 0 | 1,325 | 1,131,200 | 923,400 | 207,800 |
| 9/6/2011 | USA | Detroit | 1,129,700 | 0 | 0 | 1,129,700 | 923,400 | 206,300 |
| 9/9/2011 | USA | Detroit | 1,126,975 | 7,500 | 1,150 | 1,133,325 | 930,900 | 202,425 |
| 9/13/2011 | USA | Detroit | 1,131,475 | 0 | 975 | 1,130,500 | 930,625 | 199,875 |
| 9/15/2011 | USA | Detroit | 1,128,050 | 0 | 1,400 | 1,126,650 | 930,050 | 196,600 |
| 9/16/2011 | USA | Detroit | 1,126,650 | 0 | 1,400 | 1,125,250 | 930,050 | 195,200 |
| 9/20/2011 | USA | Detroit | 1,150,700 | 0 | 1,250 | 1,149,450 | 957,000 | 192,450 |
| 9/22/2011 | USA | Detroit | 1,147,600 | 0 | 1,200 | 1,146,400 | 956,850 | 189,550 |
| 9/23/2011 | USA | Detroit | 1,146,400 | 0 | 1,275 | 1,145,125 | 956,750 | 188,375 |
| 9/26/2011 | USA | Detroit | 1,145,125 | 0 | 1,475 | 1,143,650 | 956,750 | 186,900 |
| 9/28/2011 | USA | Detroit | 1,141,775 | 0 | 1,375 | 1,140,400 | 956,750 | 183,650 |
| 9/29/2011 | USA | Detroit | 1,140,400 | 0 | 1,475 | 1,138,925 | 956,750 | 182,175 |
| 9/30/2011 | USA | Detroit | 1,138,925 | 0 | 1,450 | 1,137,475 | 956,650 | 180,825 |
| 10/6/2011 | USA | Detroit | 1,132,825 | 0 | 1,100 | 1,131,725 | 956,350 | 175,375 |
| 10/11/2011 | USA | Detroit | 1,147,400 | 0 | 0 | 1,147,400 | 974,850 | 172,550 |
| 10/12/2011 | USA | Detroit | 1,147,400 | 0 | 975 | 1,146,425 | 974,850 | 171,575 |
| 10/13/2011 | USA | Detroit | 1,146,425 | 0 | 725 | 1,145,700 | 974,850 | 170,850 |
| 10/14/2011 | USA | Detroit | 1,145,700 | 10,125 | 775 | 1,155,050 | 984,975 | 170,075 |
| 10/17/2011 | USA | Detroit | 1,155,050 | 22,025 | 825 | 1,176,250 | 1,007,000 | 169,250 |
| 10/18/2011 | USA | Detroit | 1,176,250 | 0 | 475 | 1,175,775 | 1,007,000 | 168,775 |
| 10/19/2011 | USA | Detroit | 1,175,775 | 0 | 225 | 1,175,550 | 1,007,000 | 168,550 |
| 10/21/2011 | USA | Detroit | 1,173,850 | 0 | 750 | 1,173,100 | 1,006,600 | 166,500 |
| 10/24/2011 | USA | Detroit | 1,173,100 | 0 | 900 | 1,172,200 | 1,006,600 | 165,600 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/26/2011 | USA | Detroit | 1,170,475 | 0 | 1,225 | 1,169,250 | 1,006,600 | 162,650 |
| 10/28/2011 | USA | Detroit | 1,167,750 | 0 | 950 | 1,166,800 | 1,006,600 | 160,200 |
| 10/31/2011 | USA | Detroit | 1,166,800 | 0 | 1,150 | 1,165,650 | 1,006,600 | 159,050 |
| 11/1/2011 | USA | Detroit | 1,165,650 | 0 | 1,075 | 1,164,575 | 1,006,600 | 157,975 |
| 11/2/2011 | USA | Detroit | 1,164,575 | 0 | 1,300 | 1,163,275 | 1,006,600 | 156,675 |
| 11/8/2011 | USA | Detroit | 1,157,400 | 0 | 1,375 | 1,156,025 | 1,006,600 | 149,425 |
| 11/9/2011 | USA | Detroit | 1,156,025 | 0 | 1,425 | 1,154,600 | 1,006,600 | 148,000 |
| 11/14/2011 | USA | Detroit | 1,151,275 | 28,100 | 0 | 1,179,375 | 1,034,300 | 145,075 |
| 11/16/2011 | USA | Detroit | 1,177,500 | 0 | 1,450 | 1,176,050 | 1,034,100 | 141,950 |
| 11/17/2011 | USA | Detroit | 1,176,050 | 0 | 1,250 | 1,174,800 | 1,034,100 | 140,700 |
| 11/18/2011 | USA | Detroit | 1,174,800 | 0 | 1,275 | 1,173,525 | 1,034,100 | 139,425 |
| 11/21/2011 | USA | Detroit | 1,173,525 | 0 | 1,400 | 1,172,125 | 1,033,700 | 138,425 |
| 11/22/2011 | USA | Detroit | 1,172,125 | 15,525 | 1,175 | 1,186,475 | 1,049,225 | 137,250 |
| 11/25/2011 | USA | Detroit | 1,182,975 | 0 | 0 | 1,182,975 | 1,048,825 | 134,150 |
| 11/28/2011 | USA | Detroit | 1,182,975 | 0 | 0 | 1,182,975 | 1,048,825 | 134,150 |
| 12/1/2011 | USA | Detroit | 1,179,950 | 0 | 1,475 | 1,178,475 | 1,048,825 | 129,650 |
| 12/5/2011 | USA | Detroit | 1,175,875 | 0 | 1,475 | 1,174,400 | 1,048,825 | 125,575 |
| 12/8/2011 | USA | Detroit | 1,170,875 | 0 | 1,425 | 1,169,450 | 1,048,825 | 120,625 |
| 12/13/2011 | USA | Detroit | 1,265,775 | 0 | 1,000 | 1,264,775 | 1,148,825 | 115,950 |
| 12/14/2011 | USA | Detroit | 1,264,775 | 0 | 1,150 | 1,263,625 | 1,148,825 | 114,800 |
| 12/15/2011 | USA | Detroit | 1,263,625 | 0 | 1,325 | 1,262,300 | 1,148,825 | 113,475 |
| 12/19/2011 | USA | Detroit | 1,314,900 | 28,875 | 1,100 | 1,342,675 | 1,232,225 | 110,450 |
| 12/20/2011 | USA | Detroit | 1,342,675 | 10,400 | 1,400 | 1,351,675 | 1,242,625 | 109,050 |
| 12/21/2011 | USA | Detroit | 1,351,675 | 0 | 1,350 | 1,350,325 | 1,242,625 | 107,700 |
| 03-Jan-2012 Total | USA | Detroit | 1,373,925 | - | - | 1,373,925 | 1,249,650 | 124,275 |
| 04-Jan-2012 Total | USA | Detroit | 1,373,925 | - | 1,450 | 1,372,475 | 1,249,650 | 122,825 |
| 05-Jan-2012 Total | USA | Detroit | 1,372,475 | - | 1,625 | 1,370,850 | 1,249,650 | 121,200 |
| 06-Jan-2012 Total | USA | Detroit | 1,370,850 | - | 1,450 | 1,369,400 | 1,149,650 | 219,750 |
| 09-Jan-2012 Total | USA | Detroit | 1,369,400 | - | 1,525 | 1,367,875 | 1,149,525 | 218,350 |
| 10-Jan-2012 Total | USA | Detroit | 1,367,875 | - | 1,525 | 1,366,350 | 1,149,375 | 216,975 |
| 11-Jan-2012 Total | USA | Detroit | 1,366,350 | - | 1,475 | 1,364,875 | 1,149,375 | 215,500 |
| 12-Jan-2012 Total | USA | Detroit | 1,364,875 | - | 1,525 | 1,363,350 | 1,139,375 | 223,975 |
| 13-Jan-2012 Total | USA | Detroit | 1,363,350 | 800 | 1,475 | 1,362,675 | 1,137,975 | 224,700 |

| 16-Jan-2012 Total | USA | Detroit | 1,362,675 | 8,075 | 1,500 | 1,369,250 | 1,118,050 | 251,200 |
|---|---|---|---|---|---|---|---|---|
| 17-Jan-2012 Total | USA | Detroit | 1,369,250 | - | - | 1,369,250 | 1,118,050 | 251,200 |
| 18-Jan-2012 Total | USA | Detroit | 1,369,250 | - | 1,450 | 1,367,800 | 1,106,400 | 261,400 |
| 19-Jan-2012 Total | USA | Detroit | 1,367,800 | - | 1,475 | 1,366,325 | 1,006,400 | 359,925 |
| 20-Jan-2012 Total | USA | Detroit | 1,366,325 | - | 1,575 | 1,364,750 | 1,001,400 | 363,350 |
| 23-Jan-2012 Total | USA | Detroit | 1,364,750 | - | 1,400 | 1,363,350 | 1,001,400 | 361,950 |
| 24-Jan-2012 Total | USA | Detroit | 1,363,350 | - | 1,350 | 1,362,000 | 1,001,400 | 360,600 |
| 25-Jan-2012 Total | USA | Detroit | 1,362,000 | - | 1,425 | 1,360,575 | 1,001,400 | 359,175 |
| 26-Jan-2012 Total | USA | Detroit | 1,360,575 | - | 1,375 | 1,359,200 | 1,001,400 | 357,800 |
| 30-Jan-2012 Total | USA | Detroit | 1,360,025 | 100 | 1,375 | 1,358,750 | 1,002,250 | 356,500 |
| 31-Jan-2012 Total | USA | Detroit | 1,358,750 | 5,350 | 1,300 | 1,362,800 | 1,007,600 | 355,200 |
| 01-Feb-2012 Total | USA | Detroit | 1,362,800 | - | 1,400 | 1,361,400 | 957,600 | 403,800 |
| 02-Feb-2012 Total | USA | Detroit | 1,361,400 | - | 1,325 | 1,360,075 | 907,600 | 452,475 |
| 03-Feb-2012 Total | USA | Detroit | 1,360,075 | - | 1,350 | 1,358,725 | 907,600 | 451,125 |
| 06-Feb-2012 Total | USA | Detroit | 1,358,725 | - | 1,350 | 1,357,375 | 907,600 | 449,775 |
| 07-Feb-2012 Total | USA | Detroit | 1,357,375 | - | 1,300 | 1,356,075 | 883,575 | 472,500 |
| 08-Feb-2012 Total | USA | Detroit | 1,356,075 | - | 1,325 | 1,354,750 | 883,575 | 471,175 |
| 09-Feb-2012 Total | USA | Detroit | 1,354,750 | - | 1,425 | 1,353,325 | 883,575 | 469,750 |
| 10-Feb-2012 Total | USA | Detroit | 1,353,325 | 38,325 | 1,300 | 1,390,350 | 921,900 | 468,450 |
| 13-Feb-2012 Total | USA | Detroit | 1,390,350 | 52,850 | 1,350 | 1,441,850 | 974,750 | 467,100 |
| 14-Feb-2012 Total | USA | Detroit | 1,441,850 | - | 1,250 | 1,440,600 | 974,750 | 465,850 |
| 15-Feb-2012 Total | USA | Detroit | 1,440,600 | - | 1,350 | 1,439,250 | 974,750 | 464,500 |
| 16-Feb-2012 Total | USA | Detroit | 1,439,250 | - | 1,800 | 1,437,450 | 974,750 | 462,700 |
| 17-Feb-2012 Total | USA | Detroit | 1,437,450 | - | 1,025 | 1,436,425 | 974,750 | 461,675 |
| 20-Feb-2012 Total | USA | Detroit | 1,436,425 | - | 1,600 | 1,434,825 | 927,450 | 507,375 |
| 21-Feb-2012 Total | USA | Detroit | 1,434,825 | - | - | 1,434,825 | 927,450 | 507,375 |
| 22-Feb-2012 Total | USA | Detroit | 1,434,825 | - | 1,200 | 1,433,625 | 927,450 | 506,175 |
| 23-Feb-2012 Total | USA | Detroit | 1,433,625 | - | 1,275 | 1,432,350 | 897,925 | 534,425 |
| 24-Feb-2012 Total | USA | Detroit | 1,432,350 | - | 1,150 | 1,431,200 | 897,925 | 533,275 |
| 27-Feb-2012 Total | USA | Detroit | 1,431,200 | 1,725 | 1,000 | 1,431,925 | 899,550 | 532,375 |
| 28-Feb-2012 Total | USA | Detroit | 1,431,925 | - | 2,125 | 1,429,800 | 849,250 | 580,550 |
| 29-Feb-2012 Total | USA | Detroit | 1,429,800 | - | 1,325 | 1,428,475 | 849,350 | 579,125 |
| 01-Mar-2012 Total | USA | Detroit | 1,428,475 | - | 925 | 1,427,550 | 849,350 | 578,200 |

| 02-Mar-2012 Total | USA | Detroit | 1,427,550 | - | 1,700 | 1,425,850 | 849,350 | 576,500 |
|---|---|---|---|---|---|---|---|---|
| 05-Mar-2012 Total | USA | Detroit | 1,425,850 | - | 1,325 | 1,424,525 | 849,350 | 575,175 |
| 06-Mar-2012 Total | USA | Detroit | 1,424,525 | - | 1,400 | 1,423,125 | 849,350 | 573,775 |
| 07-Mar-2012 Total | USA | Detroit | 1,423,125 | - | 1,075 | 1,422,050 | 824,350 | 597,700 |
| 08-Mar-2012 Total | USA | Detroit | 1,422,050 | - | 1,425 | 1,420,625 | 791,725 | 628,900 |
| 09-Mar-2012 Total | USA | Detroit | 1,420,625 | - | 1,075 | 1,419,550 | 791,725 | 627,825 |
| 12-Mar-2012 Total | USA | Detroit | 1,419,550 | - | 1,600 | 1,417,950 | 791,725 | 626,225 |
| 13-Mar-2012 Total | USA | Detroit | 1,417,950 | - | 1,425 | 1,416,525 | 791,725 | 624,800 |
| 14-Mar-2012 Total | USA | Detroit | 1,416,525 | - | 1,375 | 1,415,150 | 791,725 | 623,425 |
| 15-Mar-2012 Total | USA | Detroit | 1,415,150 | - | 1,950 | 1,413,200 | 791,725 | 621,475 |
| 16-Mar-2012 Total | USA | Detroit | 1,413,200 | 4,375 | 1,375 | 1,416,200 | 795,600 | 620,600 |
| 19-Mar-2012 Total | USA | Detroit | 1,416,200 | 13,950 | 1,525 | 1,428,625 | 809,550 | 619,075 |
| 20-Mar-2012 Total | USA | Detroit | 1,428,625 | 12,500 | 1,450 | 1,439,675 | 822,050 | 617,625 |
| 21-Mar-2012 Total | USA | Detroit | 1,439,675 | - | 1,525 | 1,438,150 | 822,050 | 616,100 |
| 22-Mar-2012 Total | USA | Detroit | 1,438,150 | - | 1,675 | 1,436,475 | 822,050 | 614,425 |
| 23-Mar-2012 Total | USA | Detroit | 1,436,475 | - | 1,475 | 1,435,000 | 822,050 | 612,950 |
| 26-Mar-2012 Total | USA | Detroit | 1,435,000 | - | 1,400 | 1,433,600 | 822,050 | 611,550 |
| 27-Mar-2012 Total | USA | Detroit | 1,433,600 | - | 1,475 | 1,432,125 | 822,050 | 610,075 |
| 02-Apr-2012 Total | USA | Detroit | 1,427,275 | - | 1,550 | 1,425,725 | 822,050 | 603,675 |
| 03-Apr-2012 Total | USA | Detroit | 1,425,725 | - | 1,525 | 1,424,200 | 822,050 | 602,150 |
| 04-Apr-2012 Total | USA | Detroit | 1,424,200 | - | 1,950 | 1,422,250 | 822,050 | 600,200 |
| 05-Apr-2012 Total | USA | Detroit | 1,422,250 | - | 1,500 | 1,420,750 | 822,050 | 598,700 |
| 10-Apr-2012 Total | USA | Detroit | 1,420,750 | - | 2,850 | 1,417,900 | 822,050 | 595,850 |
| 11-Apr-2012 Total | USA | Detroit | 1,417,900 | - | 1,300 | 1,416,600 | 822,050 | 594,550 |
| 12-Apr-2012 Total | USA | Detroit | 1,416,600 | - | 1,375 | 1,415,225 | 822,050 | 593,175 |
| 13-Apr-2012 Total | USA | Detroit | 1,415,225 | - | 2,175 | 1,413,050 | 822,050 | 591,000 |
| 16-Apr-2012 Total | USA | Detroit | 1,413,050 | 42,425 | 1,675 | 1,453,800 | 824,475 | 629,325 |
| 17-Apr-2012 Total | USA | Detroit | 1,453,800 | - | 2,100 | 1,451,700 | 824,475 | 627,225 |
| 18-Apr-2012 Total | USA | Detroit | 1,451,700 | - | 2,050 | 1,449,650 | 824,450 | 625,200 |
| 19-Apr-2012 Total | USA | Detroit | 1,449,650 | - | 1,975 | 1,447,675 | 824,450 | 623,225 |
| 20-Apr-2012 Total | USA | Detroit | 1,447,675 | - | 2,600 | 1,445,075 | 824,450 | 620,625 |
| 23-Apr-2012 Total | USA | Detroit | 1,445,075 | - | 2,025 | 1,443,050 | 824,425 | 618,625 |
| 24-Apr-2012 Total | USA | Detroit | 1,443,050 | - | 2,075 | 1,440,975 | 824,125 | 616,850 |

| 25-Apr-2012 Total | USA | Detroit | 1,440,975 | - | 3,475 | 1,437,500 | 824,125 | 613,375 |
|---|---|---|---|---|---|---|---|---|
| 26-Apr-2012 Total | USA | Detroit | 1,437,500 | - | 2,700 | 1,434,800 | 824,125 | 610,675 |
| 27-Apr-2012 Total | USA | Detroit | 1,434,800 | - | 2,650 | 1,432,150 | 824,125 | 608,025 |
| 10-May-2012 Total | USA | Detroit | 1,404,050 | 7,275 | 2,500 | 1,408,825 | 809,200 | 599,625 |
| 15-May-2012 Total | USA | Detroit | 1,448,025 | - | 2,325 | 1,445,700 | 802,975 | 642,725 |
| 16-May-2012 Total | USA | Detroit | 1,445,700 | - | 2,375 | 1,443,325 | 772,975 | 670,350 |
| 18-May-2012 Total | USA | Detroit | 1,439,850 | - | 2,700 | 1,437,150 | 753,125 | 684,025 |
| 21-May-2012 Total | USA | Detroit | 1,437,150 | - | 2,975 | 1,434,175 | 723,125 | 711,050 |
| 22-May-2012 Total | USA | Detroit | 1,434,175 | - | 2,150 | 1,432,025 | 723,125 | 708,900 |
| 25-May-2012 Total | USA | Detroit | 1,425,675 | - | 2,950 | 1,422,725 | 723,425 | 699,300 |
| 28-May-2012 Total | USA | Detroit | 1,422,725 | - | 2,925 | 1,419,800 | 723,425 | 696,375 |
| 29-May-2012 Total | USA | Detroit | 1,419,800 | - | - | 1,419,800 | 723,425 | 696,375 |
| 30-May-2012 Total | USA | Detroit | 1,419,800 | - | 2,700 | 1,417,100 | 723,425 | 693,675 |
| 31-May-2012 Total | USA | Detroit | 1,417,100 | - | 2,850 | 1,414,250 | 723,425 | 690,825 |
| 07-Jun-2012 Total | USA | Detroit | 1,412,825 | - | 2,925 | 1,409,900 | 733,450 | 676,450 |
| 08-Jun-2012 Total | USA | Detroit | 1,409,900 | - | 2,375 | 1,407,525 | 721,900 | 685,625 |
| 12-Jun-2012 Total | USA | Detroit | 1,404,200 | - | 2,875 | 1,401,325 | 721,900 | 679,425 |
| 13-Jun-2012 Total | USA | Detroit | 1,401,325 | - | 2,450 | 1,398,875 | 630,500 | 768,375 |
| 14-Jun-2012 Total | USA | Detroit | 1,398,875 | - | 2,300 | 1,396,575 | 630,500 | 766,075 |
| 15-Jun-2012 Total | USA | Detroit | 1,396,575 | 14,950 | 2,950 | 1,408,575 | 645,450 | 763,125 |
| 09-Jul-2012 Total | USA | Detroit | 1,394,275 | - | 2,575 | 1,391,700 | 641,325 | 750,375 |
| 31-Jul-2012 Total | USA | Detroit | 1,363,425 | - | 2,975 | 1,360,450 | 610,800 | 749,650 |
| 02-Aug-2012 Total | USA | Detroit | 1,357,450 | - | 2,850 | 1,354,600 | 610,800 | 743,800 |
| 10-Aug-2012 Total | USA | Detroit | 1,339,375 | - | 2,975 | 1,336,400 | 605,500 | 730,900 |
| 14-Aug-2012 Total | USA | Detroit | 1,355,950 | - | 2,975 | 1,352,975 | 628,075 | 724,900 |
| 17-Aug-2012 Total | USA | Detroit | 1,346,975 | - | 2,950 | 1,344,025 | 628,075 | 715,950 |
| 20-Aug-2012 Total | USA | Detroit | 1,344,025 | - | 2,975 | 1,341,050 | 628,075 | 712,975 |
| 29-Aug-2012 Total | USA | Detroit | 1,323,125 | - | 2,975 | 1,320,150 | 627,075 | 693,075 |
| 31-Aug-2012 Total | USA | Detroit | 1,317,125 | - | 2,975 | 1,314,150 | 627,075 | 687,075 |
| 06-Sep-2012 Total | USA | Detroit | 1,308,100 | - | 2,950 | 1,305,150 | 627,075 | 678,075 |
| 07-Sep-2012 Total | USA | Detroit | 1,305,150 | - | 2,975 | 1,302,175 | 627,075 | 675,100 |
| 10-Sep-2012 Total | USA | Detroit | 1,302,175 | - | 2,975 | 1,299,200 | 627,075 | 672,125 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 18-Sep-2012 Total | USA | Detroit | 1,487,175 | 6,750 | 2,950 | 1,490,975 | 864,675 | 626,300 |
| 20-Sep-2012 Total | USA | Detroit | 1,491,725 | 3,475 | 2,850 | 1,492,350 | 872,150 | 620,200 |
| 21-Sep-2012 Total | USA | Detroit | 1,492,350 | 1,950 | 2,975 | 1,491,325 | 874,100 | 617,225 |
| 24-Sep-2012 Total | USA | Detroit | 1,491,325 | - | 2,950 | 1,488,375 | 874,100 | 614,275 |
| 12-Oct-2012 Total | USA | Detroit | 1,451,975 | 1,325 | 2,975 | 1,450,325 | 873,100 | 577,225 |
| 15-Oct-2012 Total | USA | Detroit | 1,450,325 | 8,225 | 2,900 | 1,455,650 | 881,325 | 574,325 |
| 16-Oct-2012 Total | USA | Detroit | 1,455,650 | - | 2,550 | 1,453,100 | 881,325 | 571,775 |
| 17-Oct-2012 Total | USA | Detroit | 1,453,100 | - | 2,450 | 1,450,650 | 781,325 | 669,325 |
| 18-Oct-2012 Total | USA | Detroit | 1,450,650 | - | 2,400 | 1,448,250 | 781,325 | 666,925 |
| 19-Oct-2012 Total | USA | Detroit | 1,448,250 | - | 2,275 | 1,445,975 | 781,325 | 664,650 |
| 22-Oct-2012 Total | USA | Detroit | 1,445,975 | - | 2,325 | 1,443,650 | 765,325 | 678,325 |
| 24-Oct-2012 Total | USA | Detroit | 1,440,000 | - | 2,850 | 1,437,150 | 765,325 | 671,825 |
| 25-Oct-2012 Total | USA | Detroit | 1,437,150 | - | 2,850 | 1,434,300 | 765,325 | 668,975 |
| 26-Oct-2012 Total | USA | Detroit | 1,434,300 | - | 2,525 | 1,431,775 | 765,325 | 666,450 |
| 29-Oct-2012 Total | USA | Detroit | 1,431,775 | - | 2,475 | 1,429,300 | 765,325 | 663,975 |
| 30-Oct-2012 Total | USA | Detroit | 1,429,300 | - | 2,725 | 1,426,575 | 765,325 | 661,250 |
| 01-Nov-2012 Total | USA | Detroit | 1,423,450 | - | 2,600 | 1,420,850 | 765,325 | 655,525 |
| 02-Nov-2012 Total | USA | Detroit | 1,420,850 | - | 2,075 | 1,418,775 | 765,325 | 653,450 |
| 05-Nov-2012 Total | USA | Detroit | 1,418,775 | - | 2,500 | 1,416,275 | 765,325 | 650,950 |
| 06-Nov-2012 Total | USA | Detroit | 1,416,275 | - | 2,375 | 1,413,900 | 765,325 | 648,575 |
| 07-Nov-2012 Total | USA | Detroit | 1,413,900 | - | 2,025 | 1,411,875 | 765,325 | 646,550 |
| 08-Nov-2012 Total | USA | Detroit | 1,411,875 | - | 1,825 | 1,410,050 | 721,475 | 688,575 |
| 09-Nov-2012 Total | USA | Detroit | 1,410,050 | - | 2,850 | 1,407,200 | 606,000 | 801,200 |
| 12-Nov-2012 Total | USA | Detroit | 1,407,200 | - | 1,275 | 1,405,925 | 581,000 | 824,925 |
| 13-Nov-2012 Total | USA | Detroit | 1,405,925 | - | - | 1,405,925 | 581,000 | 824,925 |
| 15-Nov-2012 Total | USA | Detroit | 1,401,225 | - | 1,500 | 1,399,725 | 581,000 | 818,725 |
| 16-Nov-2012 Total | USA | Detroit | 1,399,725 | 6,550 | 1,175 | 1,405,100 | 587,550 | 817,550 |
| 20-Nov-2012 Total | USA | Detroit | 1,461,825 | - | 2,475 | 1,459,350 | 647,275 | 812,075 |
| 22-Nov-2012 Total | USA | Detroit | 1,455,900 | - | 2,900 | 1,453,000 | 647,275 | 805,725 |
| 28-Nov-2012 Total | USA | Detroit | 1,459,975 | - | 1,450 | 1,458,525 | 683,625 | 774,900 |
| 30-Nov-2012 Total | USA | Detroit | 1,455,025 | - | 1,050 | 1,453,975 | 683,625 | 770,350 |
| 04-Dec-2012 Total | USA | Detroit | 1,450,850 | - | 2,200 | 1,448,650 | 683,625 | 765,025 |
| 05-Dec-2012 Total | USA | Detroit | 1,448,650 | - | 2,150 | 1,446,500 | 683,625 | 762,875 |

| 27-Dec-2012 Total | USA | Detroit | 1,476,650 | -      | 2,500 | 1,474,150 | 406,650 | 1,067,500 |
|-------------------|-----|---------|-----------|--------|-------|-----------|---------|-----------|
| 28-Dec-2012 Total | USA | Detroit | 1,474,150 | -      | 2,450 | 1,471,700 | 406,650 | 1,065,050 |
| 1/4/2013          | USA | Detroit | 1,465,425 | 0      | 2,475 | 1,462,950 | 406,650 | 1,056,300 |
| 1/8/2013          | USA | Detroit | 1,459,700 | 0      | 2,875 | 1,456,825 | 406,375 | 1,050,450 |
| 1/9/2013          | USA | Detroit | 1,456,825 | 0      | 2,625 | 1,454,200 | 406,650 | 1,047,550 |
| 1/10/2013         | USA | Detroit | 1,454,200 | 0      | 2,675 | 1,451,525 | 406,650 | 1,044,875 |
| 1/22/2013         | USA | Detroit | 1,446,050 | 0      | 0     | 1,446,050 | 421,800 | 1,024,250 |
| 1/23/2013         | USA | Detroit | 1,446,050 | 0      | 2,975 | 1,443,075 | 421,800 | 1,021,275 |
| 1/28/2013         | USA | Detroit | 1,436,600 | 5,700  | 2,875 | 1,439,425 | 427,500 | 1,011,925 |
| 2/5/2013          | USA | Detroit | 1,426,975 | 0      | 2,950 | 1,424,025 | 430,550 | 993,475   |
| 2/6/2013          | USA | Detroit | 1,424,025 | 0      | 2,700 | 1,421,325 | 430,550 | 990,775   |
| 2/8/2013          | USA | Detroit | 1,418,225 | 0      | 2,475 | 1,415,750 | 430,550 | 985,200   |
| 2/12/2013         | USA | Detroit | 1,413,400 | 0      | 2,825 | 1,410,575 | 431,725 | 978,850   |
| 2/14/2013         | USA | Detroit | 1,407,450 | 0      | 2,700 | 1,404,750 | 431,725 | 973,025   |
| 2/18/2013         | USA | Detroit | 1,401,450 | 10,225 | 2,550 | 1,409,125 | 441,950 | 967,175   |
| 2/19/2013         | USA | Detroit | 1,409,125 | 1,925  | 0     | 1,411,050 | 443,875 | 967,175   |
| 2/21/2013         | USA | Detroit | 1,416,225 | 0      | 2,925 | 1,413,300 | 452,375 | 960,925   |
| 2/25/2013         | USA | Detroit | 1,410,125 | 1,400  | 2,650 | 1,408,875 | 453,775 | 955,100   |
| 2/26/2013         | USA | Detroit | 1,408,875 | 0      | 2,900 | 1,405,975 | 453,775 | 952,200   |
| 2/27/2013         | USA | Detroit | 1,405,975 | 0      | 2,475 | 1,403,500 | 453,775 | 949,725   |
| 2/28/2013         | USA | Detroit | 1,403,500 | 0      | 2,050 | 1,401,450 | 453,775 | 947,675   |
| 3/4/2013          | USA | Detroit | 1,398,300 | 0      | 2,775 | 1,395,525 | 453,775 | 941,750   |
| 3/5/2013          | USA | Detroit | 1,395,525 | 0      | 2,875 | 1,392,650 | 453,775 | 938,875   |
| 3/8/2013          | USA | Detroit | 1,385,800 | 0      | 2,775 | 1,383,025 | 453,775 | 929,250   |
| 3/11/2013         | USA | Detroit | 1,383,025 | 0      | 2,650 | 1,380,375 | 453,775 | 926,600   |
| 3/14/2013         | USA | Detroit | 1,373,125 | 0      | 2,250 | 1,370,875 | 453,775 | 917,100   |
| 3/15/2013         | USA | Detroit | 1,370,875 | 0      | 2,025 | 1,368,850 | 453,775 | 915,075   |
| 3/18/2013         | USA | Detroit | 1,368,850 | 40,900 | 2,875 | 1,406,875 | 494,675 | 912,200   |
| 3/19/2013         | USA | Detroit | 1,406,875 | 275    | 2,375 | 1,404,775 | 494,950 | 909,825   |
| 3/20/2013         | USA | Detroit | 1,404,775 | 925    | 2,975 | 1,402,725 | 495,875 | 906,850   |
| 3/21/2013         | USA | Detroit | 1,402,725 | 0      | 2,400 | 1,400,325 | 495,875 | 904,450   |
| 3/22/2013         | USA | Detroit | 1,400,325 | 0      | 2,600 | 1,397,725 | 495,875 | 901,850   |
| 3/25/2013         | USA | Detroit | 1,397,725 | 9,675  | 2,925 | 1,404,475 | 505,550 | 898,925   |

| 3/26/2013 | USA | Detroit | 1,404,475 | 0 | 2,750 | 1,401,725 | 505,550 | 896,175 |
|---|---|---|---|---|---|---|---|---|
| 4/9/2013 | USA | Detroit | 1,372,775 | 0 | 2,975 | 1,369,800 | 505,550 | 864,250 |
| 4/30/2013 | USA | Detroit | 1,337,800 | 0 | 2,725 | 1,335,075 | 392,675 | 942,400 |
| 5/1/2013 | USA | Detroit | 1,335,075 | 0 | 2,950 | 1,332,125 | 392,675 | 939,450 |
| 5/2/2013 | USA | Detroit | 1,332,125 | 0 | 2,800 | 1,329,325 | 348,600 | 980,725 |
| 5/3/2013 | USA | Detroit | 1,329,325 | 0 | 2,775 | 1,326,550 | 348,600 | 977,950 |
| 5/13/2013 | USA | Detroit | 1,311,325 | 40,525 | 2,925 | 1,348,925 | 389,125 | 959,800 |
| 5/16/2013 | USA | Detroit | 1,347,900 | 0 | 2,825 | 1,345,075 | 394,125 | 950,950 |
| 5/20/2013 | USA | Detroit | 1,341,975 | 0 | 2,925 | 1,339,050 | 365,475 | 973,575 |
| 5/21/2013 | USA | Detroit | 1,339,050 | 0 | 2,975 | 1,336,075 | 365,475 | 970,600 |
| 5/22/2013 | USA | Detroit | 1,336,075 | 5,800 | 2,950 | 1,338,925 | 371,275 | 967,650 |
| 5/24/2013 | USA | Detroit | 1,335,925 | 0 | 2,925 | 1,333,000 | 360,725 | 972,275 |
| 5/28/2013 | USA | Detroit | 1,333,000 | 0 | 2,900 | 1,330,100 | 360,725 | 969,375 |
| 5/30/2013 | USA | Detroit | 1,327,050 | 0 | 2,950 | 1,324,100 | 360,725 | 963,375 |
| 6/3/2013 | USA | Detroit | 1,321,050 | 0 | 2,825 | 1,318,225 | 345,325 | 972,900 |
| 6/7/2013 | USA | Detroit | 1,309,100 | 0 | 2,950 | 1,306,150 | 345,325 | 960,825 |
| 6/10/2013 | USA | Detroit | 1,306,150 | 0 | 2,975 | 1,303,175 | 345,325 | 957,850 |
| 6/12/2013 | USA | Detroit | 1,300,150 | 0 | 2,975 | 1,297,175 | 345,325 | 951,850 |
| 6/19/2013 | USA | Detroit | 1,476,775 | 0 | 2,975 | 1,473,800 | 465,250 | 1,008,550 |
| 6/21/2013 | USA | Detroit | 1,470,700 | 0 | 1,375 | 1,469,325 | 465,250 | 1,004,075 |
| 6/24/2013 | USA | Detroit | 1,469,325 | 0 | 1,650 | 1,467,675 | 459,475 | 1,008,200 |
| 6/25/2013 | USA | Detroit | 1,467,675 | 0 | 2,950 | 1,464,725 | 459,475 | 1,005,250 |
| 6/26/2013 | USA | Detroit | 1,464,725 | 0 | 1,725 | 1,463,000 | 459,475 | 1,003,525 |
| 6/27/2013 | USA | Detroit | 1,463,000 | 0 | 2,450 | 1,460,550 | 428,200 | 1,032,350 |
| 6/28/2013 | USA | Detroit | 1,460,550 | 0 | 2,475 | 1,458,075 | 428,200 | 1,029,875 |
| 7/1/2013 | USA | Detroit | 1,458,075 | 0 | 2,475 | 1,455,600 | 428,200 | 1,027,400 |
| 7/5/2013 | USA | Detroit | 1,445,625 | 0 | 0 | 1,445,625 | 428,200 | 1,017,425 |
| 7/11/2013 | USA | Detroit | 1,434,825 | 0 | 1,700 | 1,433,125 | 443,600 | 989,525 |
| 7/12/2013 | USA | Detroit | 1,433,125 | 0 | 1,550 | 1,431,575 | 443,600 | 987,975 |
| 7/18/2013 | USA | Detroit | 1,476,975 | 0 | 2,900 | 1,474,075 | 524,325 | 949,750 |
| 7/19/2013 | USA | Detroit | 1,474,075 | 0 | 2,825 | 1,471,250 | 524,325 | 946,925 |
| 7/22/2013 | USA | Detroit | 1,471,250 | 5,000 | 2,225 | 1,474,025 | 529,325 | 944,700 |
| 7/23/2013 | USA | Detroit | 1,474,025 | 0 | 1,275 | 1,472,750 | 529,325 | 943,425 |

| 7/24/2013 | USA | Detroit | 1,472,750 | 0 | 900 | 1,471,850 | 529,325 | 942,525 |
|-----------|-----|---------|-----------|-----|-------|-----------|---------|---------|
| 7/25/2013 | USA | Detroit | 1,471,850 | 0 | 1,950 | 1,469,900 | 529,325 | 940,575 |
| 7/26/2013 | USA | Detroit | 1,469,900 | 0 | 1,825 | 1,468,075 | 529,350 | 938,725 |
| 7/29/2013 | USA | Detroit | 1,468,075 | 5,575 | 2,175 | 1,471,475 | 534,925 | 936,550 |
| 7/30/2013 | USA | Detroit | 1,471,475 | 6,075 | 2,200 | 1,475,350 | 541,000 | 934,350 |
| 7/31/2013 | USA | Detroit | 1,475,350 | 0 | 1,500 | 1,473,850 | 541,000 | 932,850 |
| 8/1/2013 | USA | Detroit | 1,473,850 | 0 | 2,225 | 1,471,625 | 541,000 | 930,625 |
| 8/2/2013 | USA | Detroit | 1,471,625 | 25 | 1,475 | 1,470,175 | 541,025 | 929,150 |
| 8/5/2013 | USA | Detroit | 1,470,175 | 0 | 2,175 | 1,468,000 | 541,025 | 926,975 |
| 8/6/2013 | USA | Detroit | 1,468,000 | 0 | 1,800 | 1,466,200 | 541,025 | 925,175 |
| 8/7/2013 | USA | Detroit | 1,466,200 | 0 | 1,400 | 1,464,800 | 541,025 | 923,775 |
| 8/8/2013 | USA | Detroit | 1,464,800 | 0 | 1,275 | 1,463,525 | 541,025 | 922,500 |
| 8/9/2013 | USA | Detroit | 1,463,525 | 0 | 1,575 | 1,461,950 | 541,025 | 920,925 |
| 8/12/2013 | USA | Detroit | 1,461,950 | 0 | 1,925 | 1,460,025 | 541,025 | 919,000 |

# Exhibit A

| Date | Country | Location | Opening Stock | Delivered In | Delivered Out | Closing Stock | Open Tonnage | Cancelled Tonnage |
|------|---------|----------|---------------|--------------|---------------|---------------|--------------|-------------------|
| 1/4/2011 | USA | Detroit | 943,625 | 0 | 1,150 | 942,475 | 868,350 | 74,125 |
| 1/5/2011 | USA | Detroit | 942,475 | 4,500 | 1,250 | 945,750 | 872,650 | 73,100 |
| 1/6/2011 | USA | Detroit | 945,750 | 2,000 | 1,325 | 946,425 | 904,925 | 41,500 |
| 1/7/2011 | USA | Detroit | 946,425 | 0 | 1,275 | 945,150 | 904,925 | 40,225 |
| 1/10/2011 | USA | Detroit | 945,150 | 27,700 | 1,275 | 971,575 | 932,225 | 39,350 |
| 1/11/2011 | USA | Detroit | 971,575 | 18,325 | 1,450 | 988,450 | 950,550 | 37,900 |
| 1/12/2011 | USA | Detroit | 988,450 | 3,750 | 1,125 | 991,075 | 954,300 | 36,775 |
| 1/13/2011 | USA | Detroit | 991,075 | 2,525 | 1,425 | 992,175 | 956,325 | 35,850 |
| 1/14/2011 | USA | Detroit | 992,175 | 0 | 1,400 | 990,775 | 956,325 | 34,450 |
| 1/17/2011 | USA | Detroit | 990,775 | 20,125 | 1,100 | 1,009,800 | 976,450 | 33,350 |
| 1/18/2011 | USA | Detroit | 1,009,800 | 0 | 0 | 1,009,800 | 975,750 | 34,050 |
| 1/19/2011 | USA | Detroit | 1,009,800 | 0 | 1,000 | 1,008,800 | 975,550 | 33,250 |
| 1/20/2011 | USA | Detroit | 1,008,800 | 0 | 900 | 1,007,900 | 975,350 | 32,550 |
| 1/21/2011 | USA | Detroit | 1,007,900 | 0 | 1,100 | 1,006,800 | 975,350 | 31,450 |
| 1/24/2011 | USA | Detroit | 1,006,800 | 0 | 1,125 | 1,005,675 | 975,350 | 30,325 |
| 1/25/2011 | USA | Detroit | 1,005,675 | 875 | 1,075 | 1,005,475 | 976,225 | 29,250 |
| 1/26/2011 | USA | Detroit | 1,005,475 | 0 | 1,150 | 1,004,325 | 976,025 | 28,300 |
| 1/27/2011 | USA | Detroit | 1,004,325 | 0 | 1,050 | 1,003,275 | 976,025 | 27,250 |
| 1/28/2011 | USA | Detroit | 1,003,275 | 0 | 1,125 | 1,002,150 | 970,825 | 31,325 |
| 1/31/2011 | USA | Detroit | 1,002,150 | 8,725 | 1,025 | 1,009,850 | 979,550 | 30,300 |
| 2/1/2011 | USA | Detroit | 1,009,850 | 0 | 1,000 | 1,008,850 | 979,350 | 29,500 |
| 2/2/2011 | USA | Detroit | 1,008,850 | 625 | 1,125 | 1,008,350 | 974,100 | 34,250 |
| 2/3/2011 | USA | Detroit | 1,008,350 | 0 | 0 | 1,008,350 | 929,225 | 79,125 |
| 2/4/2011 | USA | Detroit | 1,008,350 | 33,800 | 900 | 1,041,250 | 963,025 | 78,225 |
| 2/7/2011 | USA | Detroit | 1,041,250 | 0 | 1,125 | 1,040,125 | 963,025 | 77,100 |
| 2/8/2011 | USA | Detroit | 1,040,125 | 44,225 | 1,075 | 1,083,275 | 1,006,950 | 76,325 |
| 2/9/2011 | USA | Detroit | 1,083,275 | 0 | 1,175 | 1,082,100 | 1,006,950 | 75,150 |
| 2/10/2011 | USA | Detroit | 1,082,100 | 0 | 1,025 | 1,081,075 | 956,900 | 124,175 |
| 2/11/2011 | USA | Detroit | 1,081,075 | 0 | 1,050 | 1,080,025 | 906,950 | 173,075 |
| 2/14/2011 | USA | Detroit | 1,080,025 | 9,450 | 1,075 | 1,088,400 | 916,175 | 172,225 |
| 2/15/2011 | USA | Detroit | 1,088,400 | 1,500 | 1,225 | 1,088,675 | 917,650 | 171,025 |

| 2/16/2011 | USA | Detroit | 1,088,675 | 0 | 900 | 1,087,775 | 917,650 | 170,125 |
|---|---|---|---|---|---|---|---|---|
| 2/17/2011 | USA | Detroit | 1,087,775 | 0 | 1,075 | 1,086,700 | 917,650 | 169,050 |
| 2/18/2011 | USA | Detroit | 1,086,700 | 1,875 | 1,075 | 1,087,500 | 919,525 | 167,975 |
| 2/21/2011 | USA | Detroit | 1,087,500 | 0 | 1,125 | 1,086,375 | 919,275 | 167,100 |
| 2/22/2011 | USA | Detroit | 1,086,375 | 0 | 0 | 1,086,375 | 919,275 | 167,100 |
| 2/23/2011 | USA | Detroit | 1,086,375 | 225 | 1,375 | 1,085,225 | 919,500 | 165,725 |
| 2/24/2011 | USA | Detroit | 1,085,225 | 0 | 1,300 | 1,083,925 | 919,500 | 164,425 |
| 2/25/2011 | USA | Detroit | 1,083,925 | 0 | 1,300 | 1,082,625 | 919,500 | 163,125 |
| 2/28/2011 | USA | Detroit | 1,082,625 | 0 | 1,300 | 1,081,325 | 919,475 | 161,850 |
| 3/1/2011 | USA | Detroit | 1,081,325 | 2,100 | 1,175 | 1,082,250 | 921,575 | 160,675 |
| 3/2/2011 | USA | Detroit | 1,082,250 | 0 | 1,425 | 1,080,825 | 921,575 | 159,250 |
| 3/4/2011 | USA | Detroit | 1,079,275 | 1,475 | 1,400 | 1,079,350 | 899,825 | 179,525 |
| 3/7/2011 | USA | Detroit | 1,079,350 | 825 | 1,125 | 1,079,050 | 876,850 | 202,200 |
| 3/8/2011 | USA | Detroit | 1,079,050 | 0 | 1,125 | 1,077,925 | 876,525 | 201,400 |
| 3/9/2011 | USA | Detroit | 1,077,925 | 0 | 1,375 | 1,076,550 | 876,525 | 200,025 |
| 3/14/2011 | USA | Detroit | 1,075,275 | 43,925 | 1,125 | 1,118,075 | 916,400 | 201,675 |
| 3/15/2011 | USA | Detroit | 1,118,075 | 0 | 1,125 | 1,116,950 | 916,400 | 200,550 |
| 3/16/2011 | USA | Detroit | 1,116,950 | 0 | 1,475 | 1,115,475 | 916,400 | 199,075 |
| 3/17/2011 | USA | Detroit | 1,115,475 | 0 | 1,450 | 1,114,025 | 916,400 | 197,625 |
| 3/23/2011 | USA | Detroit | 1,109,575 | 0 | 1,475 | 1,108,100 | 906,850 | 201,250 |
| 3/24/2011 | USA | Detroit | 1,108,100 | 0 | 1,475 | 1,106,625 | 906,350 | 200,275 |
| 3/25/2011 | USA | Detroit | 1,106,625 | 0 | 1,000 | 1,105,625 | 894,900 | 210,725 |
| 3/28/2011 | USA | Detroit | 1,105,625 | 50 | 1,125 | 1,104,550 | 894,950 | 209,600 |
| 4/28/2011 | USA | Detroit | 1,113,425 | 0 | 1,475 | 1,111,950 | 811,125 | 300,825 |
| 5/12/2011 | USA | Detroit | 1,098,400 | 0 | 1,475 | 1,096,925 | 811,200 | 285,725 |
| 5/13/2011 | USA | Detroit | 1,096,925 | 54,975 | 1,475 | 1,150,425 | 866,175 | 284,250 |
| 6/29/2011 | USA | Detroit | 1,139,425 | 0 | 1,475 | 1,137,950 | 920,175 | 217,775 |
| 7/4/2011 | USA | Detroit | 1,134,925 | 0 | 1,450 | 1,133,475 | 920,175 | 213,300 |
| 7/5/2011 | USA | Detroit | 1,133,475 | 0 | 0 | 1,133,475 | 920,175 | 213,300 |
| 7/12/2011 | USA | Detroit | 1,127,450 | 0 | 1,375 | 1,126,075 | 920,175 | 205,900 |
| 7/13/2011 | USA | Detroit | 1,126,075 | 0 | 1,400 | 1,124,675 | 920,175 | 204,500 |
| 7/14/2011 | USA | Detroit | 1,124,675 | 9,625 | 1,425 | 1,132,875 | 929,800 | 203,075 |
| 7/15/2011 | USA | Detroit | 1,132,875 | 0 | 1,375 | 1,131,500 | 929,800 | 201,700 |

| 7/19/2011 | USA | Detroit | 1,155,575 | 0 | 1,475 | 1,154,100 | 955,375 | 198,725 |
|---|---|---|---|---|---|---|---|---|
| 7/20/2011 | USA | Detroit | 1,154,100 | 0 | 1,475 | 1,152,625 | 955,375 | 197,250 |
| 7/21/2011 | USA | Detroit | 1,152,625 | 0 | 1,425 | 1,151,200 | 955,375 | 195,825 |
| 7/22/2011 | USA | Detroit | 1,151,200 | 0 | 1,450 | 1,149,750 | 955,375 | 194,375 |
| 8/10/2011 | USA | Detroit | 1,131,550 | 0 | 1,475 | 1,130,075 | 955,375 | 174,700 |
| 8/15/2011 | USA | Detroit | 1,127,000 | 26,425 | 1,475 | 1,151,950 | 981,400 | 170,550 |
| 8/17/2011 | USA | Detroit | 1,150,400 | 0 | 1,450 | 1,148,950 | 981,400 | 167,550 |
| 8/24/2011 | USA | Detroit | 1,142,950 | 0 | 1,175 | 1,141,775 | 948,425 | 193,350 |
| 8/26/2011 | USA | Detroit | 1,139,950 | 0 | 1,175 | 1,138,775 | 948,400 | 190,375 |
| 8/31/2011 | USA | Detroit | 1,135,475 | 0 | 1,175 | 1,134,300 | 923,400 | 210,900 |
| 9/2/2011 | USA | Detroit | 1,132,525 | 0 | 1,325 | 1,131,200 | 923,400 | 207,800 |
| 9/6/2011 | USA | Detroit | 1,129,700 | 0 | 0 | 1,129,700 | 923,400 | 206,300 |
| 9/9/2011 | USA | Detroit | 1,126,975 | 7,500 | 1,150 | 1,133,325 | 930,900 | 202,425 |
| 9/13/2011 | USA | Detroit | 1,131,475 | 0 | 975 | 1,130,500 | 930,625 | 199,875 |
| 9/15/2011 | USA | Detroit | 1,128,050 | 0 | 1,400 | 1,126,650 | 930,050 | 196,600 |
| 9/16/2011 | USA | Detroit | 1,126,650 | 0 | 1,400 | 1,125,250 | 930,050 | 195,200 |
| 9/20/2011 | USA | Detroit | 1,150,700 | 0 | 1,250 | 1,149,450 | 957,000 | 192,450 |
| 9/22/2011 | USA | Detroit | 1,147,600 | 0 | 1,200 | 1,146,400 | 956,850 | 189,550 |
| 9/23/2011 | USA | Detroit | 1,146,400 | 0 | 1,275 | 1,145,125 | 956,750 | 188,375 |
| 9/26/2011 | USA | Detroit | 1,145,125 | 0 | 1,475 | 1,143,650 | 956,750 | 186,900 |
| 9/28/2011 | USA | Detroit | 1,141,775 | 0 | 1,375 | 1,140,400 | 956,750 | 183,650 |
| 9/29/2011 | USA | Detroit | 1,140,400 | 0 | 1,475 | 1,138,925 | 956,750 | 182,175 |
| 9/30/2011 | USA | Detroit | 1,138,925 | 0 | 1,450 | 1,137,475 | 956,650 | 180,825 |
| 10/6/2011 | USA | Detroit | 1,132,825 | 0 | 1,100 | 1,131,725 | 956,350 | 175,375 |
| 10/11/2011 | USA | Detroit | 1,147,400 | 0 | 0 | 1,147,400 | 974,850 | 172,550 |
| 10/12/2011 | USA | Detroit | 1,147,400 | 0 | 975 | 1,146,425 | 974,850 | 171,575 |
| 10/13/2011 | USA | Detroit | 1,146,425 | 0 | 725 | 1,145,700 | 974,850 | 170,850 |
| 10/14/2011 | USA | Detroit | 1,145,700 | 10,125 | 775 | 1,155,050 | 984,975 | 170,075 |
| 10/17/2011 | USA | Detroit | 1,155,050 | 22,025 | 825 | 1,176,250 | 1,007,000 | 169,250 |
| 10/18/2011 | USA | Detroit | 1,176,250 | 0 | 475 | 1,175,775 | 1,007,000 | 168,775 |
| 10/19/2011 | USA | Detroit | 1,175,775 | 0 | 225 | 1,175,550 | 1,007,000 | 168,550 |
| 10/21/2011 | USA | Detroit | 1,173,850 | 0 | 750 | 1,173,100 | 1,006,600 | 166,500 |
| 10/24/2011 | USA | Detroit | 1,173,100 | 0 | 900 | 1,172,200 | 1,006,600 | 165,600 |

| 10/26/2011 | USA | Detroit | 1,170,475 | 0 | 1,225 | 1,169,250 | 1,006,600 | 162,650 |
|---|---|---|---|---|---|---|---|---|
| 10/28/2011 | USA | Detroit | 1,167,750 | 0 | 950 | 1,166,800 | 1,006,600 | 160,200 |
| 10/31/2011 | USA | Detroit | 1,166,800 | 0 | 1,150 | 1,165,650 | 1,006,600 | 159,050 |
| 11/1/2011 | USA | Detroit | 1,165,650 | 0 | 1,075 | 1,164,575 | 1,006,600 | 157,975 |
| 11/2/2011 | USA | Detroit | 1,164,575 | 0 | 1,300 | 1,163,275 | 1,006,600 | 156,675 |
| 11/8/2011 | USA | Detroit | 1,157,400 | 0 | 1,375 | 1,156,025 | 1,006,600 | 149,425 |
| 11/9/2011 | USA | Detroit | 1,156,025 | 0 | 1,425 | 1,154,600 | 1,006,600 | 148,000 |
| 11/14/2011 | USA | Detroit | 1,151,275 | 28,100 | 0 | 1,179,375 | 1,034,300 | 145,075 |
| 11/16/2011 | USA | Detroit | 1,177,500 | 0 | 1,450 | 1,176,050 | 1,034,100 | 141,950 |
| 11/17/2011 | USA | Detroit | 1,176,050 | 0 | 1,250 | 1,174,800 | 1,034,100 | 140,700 |
| 11/18/2011 | USA | Detroit | 1,174,800 | 0 | 1,275 | 1,173,525 | 1,034,100 | 139,425 |
| 11/21/2011 | USA | Detroit | 1,173,525 | 0 | 1,400 | 1,172,125 | 1,033,700 | 138,425 |
| 11/22/2011 | USA | Detroit | 1,172,125 | 15,525 | 1,175 | 1,186,475 | 1,049,225 | 137,250 |
| 11/25/2011 | USA | Detroit | 1,182,975 | 0 | 0 | 1,182,975 | 1,048,825 | 134,150 |
| 11/28/2011 | USA | Detroit | 1,182,975 | 0 | 0 | 1,182,975 | 1,048,825 | 134,150 |
| 12/1/2011 | USA | Detroit | 1,179,950 | 0 | 1,475 | 1,178,475 | 1,048,825 | 129,650 |
| 12/5/2011 | USA | Detroit | 1,175,875 | 0 | 1,475 | 1,174,400 | 1,048,825 | 125,575 |
| 12/8/2011 | USA | Detroit | 1,170,875 | 0 | 1,425 | 1,169,450 | 1,048,825 | 120,625 |
| 12/13/2011 | USA | Detroit | 1,265,775 | 0 | 1,000 | 1,264,775 | 1,148,825 | 115,950 |
| 12/14/2011 | USA | Detroit | 1,264,775 | 0 | 1,150 | 1,263,625 | 1,148,825 | 114,800 |
| 12/15/2011 | USA | Detroit | 1,263,625 | 0 | 1,325 | 1,262,300 | 1,148,825 | 113,475 |
| 12/19/2011 | USA | Detroit | 1,314,900 | 28,875 | 1,100 | 1,342,675 | 1,232,225 | 110,450 |
| 12/20/2011 | USA | Detroit | 1,342,675 | 10,400 | 1,400 | 1,351,675 | 1,242,625 | 109,050 |
| 12/21/2011 | USA | Detroit | 1,351,675 | 0 | 1,350 | 1,350,325 | 1,242,625 | 107,700 |
| 03-Jan-2012 Total | USA | Detroit | 1,373,925 | - | - | 1,373,925 | 1,249,650 | 124,275 |
| 04-Jan-2012 Total | USA | Detroit | 1,373,925 | - | 1,450 | 1,372,475 | 1,249,650 | 122,825 |
| 05-Jan-2012 Total | USA | Detroit | 1,372,475 | - | 1,625 | 1,370,850 | 1,249,650 | 121,200 |
| 06-Jan-2012 Total | USA | Detroit | 1,370,850 | - | 1,450 | 1,369,400 | 1,149,650 | 219,750 |
| 09-Jan-2012 Total | USA | Detroit | 1,369,400 | - | 1,525 | 1,367,875 | 1,149,525 | 218,350 |
| 10-Jan-2012 Total | USA | Detroit | 1,367,875 | - | 1,525 | 1,366,350 | 1,149,375 | 216,975 |
| 11-Jan-2012 Total | USA | Detroit | 1,366,350 | - | 1,475 | 1,364,875 | 1,149,375 | 215,500 |
| 12-Jan-2012 Total | USA | Detroit | 1,364,875 | - | 1,525 | 1,363,350 | 1,139,375 | 223,975 |
| 13-Jan-2012 Total | USA | Detroit | 1,363,350 | 800 | 1,475 | 1,362,675 | 1,137,975 | 224,700 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 16-Jan-2012 Total | USA | Detroit | 1,362,675 | 8,075 | 1,500 | 1,369,250 | 1,118,050 | 251,200 |
| 17-Jan-2012 Total | USA | Detroit | 1,369,250 | - | - | 1,369,250 | 1,118,050 | 251,200 |
| 18-Jan-2012 Total | USA | Detroit | 1,369,250 | - | 1,450 | 1,367,800 | 1,106,400 | 261,400 |
| 19-Jan-2012 Total | USA | Detroit | 1,367,800 | - | 1,475 | 1,366,325 | 1,006,400 | 359,925 |
| 20-Jan-2012 Total | USA | Detroit | 1,366,325 | - | 1,575 | 1,364,750 | 1,001,400 | 363,350 |
| 23-Jan-2012 Total | USA | Detroit | 1,364,750 | - | 1,400 | 1,363,350 | 1,001,400 | 361,950 |
| 24-Jan-2012 Total | USA | Detroit | 1,363,350 | - | 1,350 | 1,362,000 | 1,001,400 | 360,600 |
| 25-Jan-2012 Total | USA | Detroit | 1,362,000 | - | 1,425 | 1,360,575 | 1,001,400 | 359,175 |
| 26-Jan-2012 Total | USA | Detroit | 1,360,575 | - | 1,375 | 1,359,200 | 1,001,400 | 357,800 |
| 30-Jan-2012 Total | USA | Detroit | 1,360,025 | 100 | 1,375 | 1,358,750 | 1,002,250 | 356,500 |
| 31-Jan-2012 Total | USA | Detroit | 1,358,750 | 5,350 | 1,300 | 1,362,800 | 1,007,600 | 355,200 |
| 01-Feb-2012 Total | USA | Detroit | 1,362,800 | - | 1,400 | 1,361,400 | 957,600 | 403,800 |
| 02-Feb-2012 Total | USA | Detroit | 1,361,400 | - | 1,325 | 1,360,075 | 907,600 | 452,475 |
| 03-Feb-2012 Total | USA | Detroit | 1,360,075 | - | 1,350 | 1,358,725 | 907,600 | 451,125 |
| 06-Feb-2012 Total | USA | Detroit | 1,358,725 | - | 1,350 | 1,357,375 | 907,600 | 449,775 |
| 07-Feb-2012 Total | USA | Detroit | 1,357,375 | - | 1,300 | 1,356,075 | 883,575 | 472,500 |
| 08-Feb-2012 Total | USA | Detroit | 1,356,075 | - | 1,325 | 1,354,750 | 883,575 | 471,175 |
| 09-Feb-2012 Total | USA | Detroit | 1,354,750 | - | 1,425 | 1,353,325 | 883,575 | 469,750 |
| 10-Feb-2012 Total | USA | Detroit | 1,353,325 | 38,325 | 1,300 | 1,390,350 | 921,900 | 468,450 |
| 13-Feb-2012 Total | USA | Detroit | 1,390,350 | 52,850 | 1,350 | 1,441,850 | 974,750 | 467,100 |
| 14-Feb-2012 Total | USA | Detroit | 1,441,850 | - | 1,250 | 1,440,600 | 974,750 | 465,850 |
| 15-Feb-2012 Total | USA | Detroit | 1,440,600 | - | 1,350 | 1,439,250 | 974,750 | 464,500 |
| 16-Feb-2012 Total | USA | Detroit | 1,439,250 | - | 1,800 | 1,437,450 | 974,750 | 462,700 |
| 17-Feb-2012 Total | USA | Detroit | 1,437,450 | - | 1,025 | 1,436,425 | 974,750 | 461,675 |
| 20-Feb-2012 Total | USA | Detroit | 1,436,425 | - | 1,600 | 1,434,825 | 927,450 | 507,375 |
| 21-Feb-2012 Total | USA | Detroit | 1,434,825 | - | - | 1,434,825 | 927,450 | 507,375 |
| 22-Feb-2012 Total | USA | Detroit | 1,434,825 | - | 1,200 | 1,433,625 | 927,450 | 506,175 |
| 23-Feb-2012 Total | USA | Detroit | 1,433,625 | - | 1,275 | 1,432,350 | 897,925 | 534,425 |
| 24-Feb-2012 Total | USA | Detroit | 1,432,350 | - | 1,150 | 1,431,200 | 897,925 | 533,275 |
| 27-Feb-2012 Total | USA | Detroit | 1,431,200 | 1,725 | 1,000 | 1,431,925 | 899,550 | 532,375 |
| 28-Feb-2012 Total | USA | Detroit | 1,431,925 | - | 2,125 | 1,429,800 | 849,250 | 580,550 |
| 29-Feb-2012 Total | USA | Detroit | 1,429,800 | - | 1,325 | 1,428,475 | 849,350 | 579,125 |
| 01-Mar-2012 Total | USA | Detroit | 1,428,475 | - | 925 | 1,427,550 | 849,350 | 578,200 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 02-Mar-2012 Total | USA | Detroit | 1,427,550 | - | 1,700 | 1,425,850 | 849,350 | 576,500 |
| 05-Mar-2012 Total | USA | Detroit | 1,425,850 | - | 1,325 | 1,424,525 | 849,350 | 575,175 |
| 06-Mar-2012 Total | USA | Detroit | 1,424,525 | - | 1,400 | 1,423,125 | 849,350 | 573,775 |
| 07-Mar-2012 Total | USA | Detroit | 1,423,125 | - | 1,075 | 1,422,050 | 824,350 | 597,700 |
| 08-Mar-2012 Total | USA | Detroit | 1,422,050 | - | 1,425 | 1,420,625 | 791,725 | 628,900 |
| 09-Mar-2012 Total | USA | Detroit | 1,420,625 | - | 1,075 | 1,419,550 | 791,725 | 627,825 |
| 12-Mar-2012 Total | USA | Detroit | 1,419,550 | - | 1,600 | 1,417,950 | 791,725 | 626,225 |
| 13-Mar-2012 Total | USA | Detroit | 1,417,950 | - | 1,425 | 1,416,525 | 791,725 | 624,800 |
| 14-Mar-2012 Total | USA | Detroit | 1,416,525 | - | 1,375 | 1,415,150 | 791,725 | 623,425 |
| 15-Mar-2012 Total | USA | Detroit | 1,415,150 | - | 1,950 | 1,413,200 | 791,725 | 621,475 |
| 16-Mar-2012 Total | USA | Detroit | 1,413,200 | 4,375 | 1,375 | 1,416,200 | 795,600 | 620,600 |
| 19-Mar-2012 Total | USA | Detroit | 1,416,200 | 13,950 | 1,525 | 1,428,625 | 809,550 | 619,075 |
| 20-Mar-2012 Total | USA | Detroit | 1,428,625 | 12,500 | 1,450 | 1,439,675 | 822,050 | 617,625 |
| 21-Mar-2012 Total | USA | Detroit | 1,439,675 | - | 1,525 | 1,438,150 | 822,050 | 616,100 |
| 22-Mar-2012 Total | USA | Detroit | 1,438,150 | - | 1,675 | 1,436,475 | 822,050 | 614,425 |
| 23-Mar-2012 Total | USA | Detroit | 1,436,475 | - | 1,475 | 1,435,000 | 822,050 | 612,950 |
| 26-Mar-2012 Total | USA | Detroit | 1,435,000 | - | 1,400 | 1,433,600 | 822,050 | 611,550 |
| 27-Mar-2012 Total | USA | Detroit | 1,433,600 | - | 1,475 | 1,432,125 | 822,050 | 610,075 |
| 02-Apr-2012 Total | USA | Detroit | 1,427,275 | - | 1,550 | 1,425,725 | 822,050 | 603,675 |
| 03-Apr-2012 Total | USA | Detroit | 1,425,725 | - | 1,525 | 1,424,200 | 822,050 | 602,150 |
| 04-Apr-2012 Total | USA | Detroit | 1,424,200 | - | 1,950 | 1,422,250 | 822,050 | 600,200 |
| 05-Apr-2012 Total | USA | Detroit | 1,422,250 | - | 1,500 | 1,420,750 | 822,050 | 598,700 |
| 10-Apr-2012 Total | USA | Detroit | 1,420,750 | - | 2,850 | 1,417,900 | 822,050 | 595,850 |
| 11-Apr-2012 Total | USA | Detroit | 1,417,900 | - | 1,300 | 1,416,600 | 822,050 | 594,550 |
| 12-Apr-2012 Total | USA | Detroit | 1,416,600 | - | 1,375 | 1,415,225 | 822,050 | 593,175 |
| 13-Apr-2012 Total | USA | Detroit | 1,415,225 | - | 2,175 | 1,413,050 | 822,050 | 591,000 |
| 16-Apr-2012 Total | USA | Detroit | 1,413,050 | 42,425 | 1,675 | 1,453,800 | 824,475 | 629,325 |
| 17-Apr-2012 Total | USA | Detroit | 1,453,800 | - | 2,100 | 1,451,700 | 824,475 | 627,225 |
| 18-Apr-2012 Total | USA | Detroit | 1,451,700 | - | 2,050 | 1,449,650 | 824,450 | 625,200 |
| 19-Apr-2012 Total | USA | Detroit | 1,449,650 | - | 1,975 | 1,447,675 | 824,450 | 623,225 |
| 20-Apr-2012 Total | USA | Detroit | 1,447,675 | - | 2,600 | 1,445,075 | 824,450 | 620,625 |
| 23-Apr-2012 Total | USA | Detroit | 1,445,075 | - | 2,025 | 1,443,050 | 824,425 | 618,625 |
| 24-Apr-2012 Total | USA | Detroit | 1,443,050 | - | 2,075 | 1,440,975 | 824,125 | 616,850 |

| 25-Apr-2012 Total | USA | Detroit | 1,440,975 | - | 3,475 | 1,437,500 | 824,125 | 613,375 |
|---|---|---|---|---|---|---|---|---|
| 26-Apr-2012 Total | USA | Detroit | 1,437,500 | - | 2,700 | 1,434,800 | 824,125 | 610,675 |
| 27-Apr-2012 Total | USA | Detroit | 1,434,800 | - | 2,650 | 1,432,150 | 824,125 | 608,025 |
| 10-May-2012 Total | USA | Detroit | 1,404,050 | 7,275 | 2,500 | 1,408,825 | 809,200 | 599,625 |
| 15-May-2012 Total | USA | Detroit | 1,448,025 | - | 2,325 | 1,445,700 | 802,975 | 642,725 |
| 16-May-2012 Total | USA | Detroit | 1,445,700 | - | 2,375 | 1,443,325 | 772,975 | 670,350 |
| 18-May-2012 Total | USA | Detroit | 1,439,850 | - | 2,700 | 1,437,150 | 753,125 | 684,025 |
| 21-May-2012 Total | USA | Detroit | 1,437,150 | - | 2,975 | 1,434,175 | 723,125 | 711,050 |
| 22-May-2012 Total | USA | Detroit | 1,434,175 | - | 2,150 | 1,432,025 | 723,125 | 708,900 |
| 25-May-2012 Total | USA | Detroit | 1,425,675 | - | 2,950 | 1,422,725 | 723,425 | 699,300 |
| 28-May-2012 Total | USA | Detroit | 1,422,725 | - | 2,925 | 1,419,800 | 723,425 | 696,375 |
| 29-May-2012 Total | USA | Detroit | 1,419,800 | - | - | 1,419,800 | 723,425 | 696,375 |
| 30-May-2012 Total | USA | Detroit | 1,419,800 | - | 2,700 | 1,417,100 | 723,425 | 693,675 |
| 31-May-2012 Total | USA | Detroit | 1,417,100 | - | 2,850 | 1,414,250 | 723,425 | 690,825 |
| 07-Jun-2012 Total | USA | Detroit | 1,412,825 | - | 2,925 | 1,409,900 | 733,450 | 676,450 |
| 08-Jun-2012 Total | USA | Detroit | 1,409,900 | - | 2,375 | 1,407,525 | 721,900 | 685,625 |
| 12-Jun-2012 Total | USA | Detroit | 1,404,200 | - | 2,875 | 1,401,325 | 721,900 | 679,425 |
| 13-Jun-2012 Total | USA | Detroit | 1,401,325 | - | 2,450 | 1,398,875 | 630,500 | 768,375 |
| 14-Jun-2012 Total | USA | Detroit | 1,398,875 | - | 2,300 | 1,396,575 | 630,500 | 766,075 |
| 15-Jun-2012 Total | USA | Detroit | 1,396,575 | 14,950 | 2,950 | 1,408,575 | 645,450 | 763,125 |
| 09-Jul-2012 Total | USA | Detroit | 1,394,275 | - | 2,575 | 1,391,700 | 641,325 | 750,375 |
| 31-Jul-2012 Total | USA | Detroit | 1,363,425 | - | 2,975 | 1,360,450 | 610,800 | 749,650 |
| 02-Aug-2012 Total | USA | Detroit | 1,357,450 | - | 2,850 | 1,354,600 | 610,800 | 743,800 |
| 10-Aug-2012 Total | USA | Detroit | 1,339,375 | - | 2,975 | 1,336,400 | 605,500 | 730,900 |
| 14-Aug-2012 Total | USA | Detroit | 1,355,950 | - | 2,975 | 1,352,975 | 628,075 | 724,900 |
| 17-Aug-2012 Total | USA | Detroit | 1,346,975 | - | 2,950 | 1,344,025 | 628,075 | 715,950 |
| 20-Aug-2012 Total | USA | Detroit | 1,344,025 | - | 2,975 | 1,341,050 | 628,075 | 712,975 |
| 29-Aug-2012 Total | USA | Detroit | 1,323,125 | - | 2,975 | 1,320,150 | 627,075 | 693,075 |
| 31-Aug-2012 Total | USA | Detroit | 1,317,125 | - | 2,975 | 1,314,150 | 627,075 | 687,075 |
| 06-Sep-2012 Total | USA | Detroit | 1,308,100 | - | 2,950 | 1,305,150 | 627,075 | 678,075 |
| 07-Sep-2012 Total | USA | Detroit | 1,305,150 | - | 2,975 | 1,302,175 | 627,075 | 675,100 |
| 10-Sep-2012 Total | USA | Detroit | 1,302,175 | - | 2,975 | 1,299,200 | 627,075 | 672,125 |

| 18-Sep-2012 Total | USA | Detroit | 1,487,175 | 6,750 | 2,950 | 1,490,975 | 864,675 | 626,300 |
|---|---|---|---|---|---|---|---|---|
| 20-Sep-2012 Total | USA | Detroit | 1,491,725 | 3,475 | 2,850 | 1,492,350 | 872,150 | 620,200 |
| 21-Sep-2012 Total | USA | Detroit | 1,492,350 | 1,950 | 2,975 | 1,491,325 | 874,100 | 617,225 |
| 24-Sep-2012 Total | USA | Detroit | 1,491,325 | - | 2,950 | 1,488,375 | 874,100 | 614,275 |
| 12-Oct-2012 Total | USA | Detroit | 1,451,975 | 1,325 | 2,975 | 1,450,325 | 873,100 | 577,225 |
| 15-Oct-2012 Total | USA | Detroit | 1,450,325 | 8,225 | 2,900 | 1,455,650 | 881,325 | 574,325 |
| 16-Oct-2012 Total | USA | Detroit | 1,455,650 | - | 2,550 | 1,453,100 | 881,325 | 571,775 |
| 17-Oct-2012 Total | USA | Detroit | 1,453,100 | - | 2,450 | 1,450,650 | 781,325 | 669,325 |
| 18-Oct-2012 Total | USA | Detroit | 1,450,650 | - | 2,400 | 1,448,250 | 781,325 | 666,925 |
| 19-Oct-2012 Total | USA | Detroit | 1,448,250 | - | 2,275 | 1,445,975 | 781,325 | 664,650 |
| 22-Oct-2012 Total | USA | Detroit | 1,445,975 | - | 2,325 | 1,443,650 | 765,325 | 678,325 |
| 24-Oct-2012 Total | USA | Detroit | 1,440,000 | - | 2,850 | 1,437,150 | 765,325 | 671,825 |
| 25-Oct-2012 Total | USA | Detroit | 1,437,150 | - | 2,850 | 1,434,300 | 765,325 | 668,975 |
| 26-Oct-2012 Total | USA | Detroit | 1,434,300 | - | 2,525 | 1,431,775 | 765,325 | 666,450 |
| 29-Oct-2012 Total | USA | Detroit | 1,431,775 | - | 2,475 | 1,429,300 | 765,325 | 663,975 |
| 30-Oct-2012 Total | USA | Detroit | 1,429,300 | - | 2,725 | 1,426,575 | 765,325 | 661,250 |
| 01-Nov-2012 Total | USA | Detroit | 1,423,450 | - | 2,600 | 1,420,850 | 765,325 | 655,525 |
| 02-Nov-2012 Total | USA | Detroit | 1,420,850 | - | 2,075 | 1,418,775 | 765,325 | 653,450 |
| 05-Nov-2012 Total | USA | Detroit | 1,418,775 | - | 2,500 | 1,416,275 | 765,325 | 650,950 |
| 06-Nov-2012 Total | USA | Detroit | 1,416,275 | - | 2,375 | 1,413,900 | 765,325 | 648,575 |
| 07-Nov-2012 Total | USA | Detroit | 1,413,900 | - | 2,025 | 1,411,875 | 765,325 | 646,550 |
| 08-Nov-2012 Total | USA | Detroit | 1,411,875 | - | 1,825 | 1,410,050 | 721,475 | 688,575 |
| 09-Nov-2012 Total | USA | Detroit | 1,410,050 | - | 2,850 | 1,407,200 | 606,000 | 801,200 |
| 12-Nov-2012 Total | USA | Detroit | 1,407,200 | - | 1,275 | 1,405,925 | 581,000 | 824,925 |
| 13-Nov-2012 Total | USA | Detroit | 1,405,925 | - | - | 1,405,925 | 581,000 | 824,925 |
| 15-Nov-2012 Total | USA | Detroit | 1,401,225 | - | 1,500 | 1,399,725 | 581,000 | 818,725 |
| 16-Nov-2012 Total | USA | Detroit | 1,399,725 | 6,550 | 1,175 | 1,405,100 | 587,550 | 817,550 |
| 20-Nov-2012 Total | USA | Detroit | 1,461,825 | - | 2,475 | 1,459,350 | 647,275 | 812,075 |
| 22-Nov-2012 Total | USA | Detroit | 1,455,900 | - | 2,900 | 1,453,000 | 647,275 | 805,725 |
| 28-Nov-2012 Total | USA | Detroit | 1,459,975 | - | 1,450 | 1,458,525 | 683,625 | 774,900 |
| 30-Nov-2012 Total | USA | Detroit | 1,455,025 | - | 1,050 | 1,453,975 | 683,625 | 770,350 |
| 04-Dec-2012 Total | USA | Detroit | 1,450,850 | - | 2,200 | 1,448,650 | 683,625 | 765,025 |
| 05-Dec-2012 Total | USA | Detroit | 1,448,650 | - | 2,150 | 1,446,500 | 683,625 | 762,875 |

| 27-Dec-2012 Total | USA | Detroit | 1,476,650 | - | 2,500 | 1,474,150 | 406,650 | 1,067,500 |
|---|---|---|---|---|---|---|---|---|
| 28-Dec-2012 Total | USA | Detroit | 1,474,150 | - | 2,450 | 1,471,700 | 406,650 | 1,065,050 |
| 1/4/2013 | USA | Detroit | 1,465,425 | 0 | 2,475 | 1,462,950 | 406,650 | 1,056,300 |
| 1/8/2013 | USA | Detroit | 1,459,700 | 0 | 2,875 | 1,456,825 | 406,375 | 1,050,450 |
| 1/9/2013 | USA | Detroit | 1,456,825 | 0 | 2,625 | 1,454,200 | 406,650 | 1,047,550 |
| 1/10/2013 | USA | Detroit | 1,454,200 | 0 | 2,675 | 1,451,525 | 406,650 | 1,044,875 |
| 1/22/2013 | USA | Detroit | 1,446,050 | 0 | 0 | 1,446,050 | 421,800 | 1,024,250 |
| 1/23/2013 | USA | Detroit | 1,446,050 | 0 | 2,975 | 1,443,075 | 421,800 | 1,021,275 |
| 1/28/2013 | USA | Detroit | 1,436,600 | 5,700 | 2,875 | 1,439,425 | 427,500 | 1,011,925 |
| 2/5/2013 | USA | Detroit | 1,426,975 | 0 | 2,950 | 1,424,025 | 430,550 | 993,475 |
| 2/6/2013 | USA | Detroit | 1,424,025 | 0 | 2,700 | 1,421,325 | 430,550 | 990,775 |
| 2/8/2013 | USA | Detroit | 1,418,225 | 0 | 2,475 | 1,415,750 | 430,550 | 985,200 |
| 2/12/2013 | USA | Detroit | 1,413,400 | 0 | 2,825 | 1,410,575 | 431,725 | 978,850 |
| 2/14/2013 | USA | Detroit | 1,407,450 | 0 | 2,700 | 1,404,750 | 431,725 | 973,025 |
| 2/18/2013 | USA | Detroit | 1,401,450 | 10,225 | 2,550 | 1,409,125 | 441,950 | 967,175 |
| 2/19/2013 | USA | Detroit | 1,409,125 | 1,925 | 0 | 1,411,050 | 443,875 | 967,175 |
| 2/21/2013 | USA | Detroit | 1,416,225 | 0 | 2,925 | 1,413,300 | 452,375 | 960,925 |
| 2/25/2013 | USA | Detroit | 1,410,125 | 1,400 | 2,650 | 1,408,875 | 453,775 | 955,100 |
| 2/26/2013 | USA | Detroit | 1,408,875 | 0 | 2,900 | 1,405,975 | 453,775 | 952,200 |
| 2/27/2013 | USA | Detroit | 1,405,975 | 0 | 2,475 | 1,403,500 | 453,775 | 949,725 |
| 2/28/2013 | USA | Detroit | 1,403,500 | 0 | 2,050 | 1,401,450 | 453,775 | 947,675 |
| 3/4/2013 | USA | Detroit | 1,398,300 | 0 | 2,775 | 1,395,525 | 453,775 | 941,750 |
| 3/5/2013 | USA | Detroit | 1,395,525 | 0 | 2,875 | 1,392,650 | 453,775 | 938,875 |
| 3/8/2013 | USA | Detroit | 1,385,800 | 0 | 2,775 | 1,383,025 | 453,775 | 929,250 |
| 3/11/2013 | USA | Detroit | 1,383,025 | 0 | 2,650 | 1,380,375 | 453,775 | 926,600 |
| 3/14/2013 | USA | Detroit | 1,373,125 | 0 | 2,250 | 1,370,875 | 453,775 | 917,100 |
| 3/15/2013 | USA | Detroit | 1,370,875 | 0 | 2,025 | 1,368,850 | 453,775 | 915,075 |
| 3/18/2013 | USA | Detroit | 1,368,850 | 40,900 | 2,875 | 1,406,875 | 494,675 | 912,200 |
| 3/19/2013 | USA | Detroit | 1,406,875 | 275 | 2,375 | 1,404,775 | 494,950 | 909,825 |
| 3/20/2013 | USA | Detroit | 1,404,775 | 925 | 2,975 | 1,402,725 | 495,875 | 906,850 |
| 3/21/2013 | USA | Detroit | 1,402,725 | 0 | 2,400 | 1,400,325 | 495,875 | 904,450 |
| 3/22/2013 | USA | Detroit | 1,400,325 | 0 | 2,600 | 1,397,725 | 495,875 | 901,850 |
| 3/25/2013 | USA | Detroit | 1,397,725 | 9,675 | 2,925 | 1,404,475 | 505,550 | 898,925 |

| 3/26/2013 | USA | Detroit | 1,404,475 | 0 | 2,750 | 1,401,725 | 505,550 | 896,175 |
|---|---|---|---|---|---|---|---|---|
| 4/9/2013 | USA | Detroit | 1,372,775 | 0 | 2,975 | 1,369,800 | 505,550 | 864,250 |
| 4/30/2013 | USA | Detroit | 1,337,800 | 0 | 2,725 | 1,335,075 | 392,675 | 942,400 |
| 5/1/2013 | USA | Detroit | 1,335,075 | 0 | 2,950 | 1,332,125 | 392,675 | 939,450 |
| 5/2/2013 | USA | Detroit | 1,332,125 | 0 | 2,800 | 1,329,325 | 348,600 | 980,725 |
| 5/3/2013 | USA | Detroit | 1,329,325 | 0 | 2,775 | 1,326,550 | 348,600 | 977,950 |
| 5/13/2013 | USA | Detroit | 1,311,325 | 40,525 | 2,925 | 1,348,925 | 389,125 | 959,800 |
| 5/16/2013 | USA | Detroit | 1,347,900 | 0 | 2,825 | 1,345,075 | 394,125 | 950,950 |
| 5/20/2013 | USA | Detroit | 1,341,975 | 0 | 2,925 | 1,339,050 | 365,475 | 973,575 |
| 5/21/2013 | USA | Detroit | 1,339,050 | 0 | 2,975 | 1,336,075 | 365,475 | 970,600 |
| 5/22/2013 | USA | Detroit | 1,336,075 | 5,800 | 2,950 | 1,338,925 | 371,275 | 967,650 |
| 5/24/2013 | USA | Detroit | 1,335,925 | 0 | 2,925 | 1,333,000 | 360,725 | 972,275 |
| 5/28/2013 | USA | Detroit | 1,333,000 | 0 | 2,900 | 1,330,100 | 360,725 | 969,375 |
| 5/30/2013 | USA | Detroit | 1,327,050 | 0 | 2,950 | 1,324,100 | 360,725 | 963,375 |
| 6/3/2013 | USA | Detroit | 1,321,050 | 0 | 2,825 | 1,318,225 | 345,325 | 972,900 |
| 6/7/2013 | USA | Detroit | 1,309,100 | 0 | 2,950 | 1,306,150 | 345,325 | 960,825 |
| 6/10/2013 | USA | Detroit | 1,306,150 | 0 | 2,975 | 1,303,175 | 345,325 | 957,850 |
| 6/12/2013 | USA | Detroit | 1,300,150 | 0 | 2,975 | 1,297,175 | 345,325 | 951,850 |
| 6/19/2013 | USA | Detroit | 1,476,775 | 0 | 2,975 | 1,473,800 | 465,250 | 1,008,550 |
| 6/21/2013 | USA | Detroit | 1,470,700 | 0 | 1,375 | 1,469,325 | 465,250 | 1,004,075 |
| 6/24/2013 | USA | Detroit | 1,469,325 | 0 | 1,650 | 1,467,675 | 459,475 | 1,008,200 |
| 6/25/2013 | USA | Detroit | 1,467,675 | 0 | 2,950 | 1,464,725 | 459,475 | 1,005,250 |
| 6/26/2013 | USA | Detroit | 1,464,725 | 0 | 1,725 | 1,463,000 | 459,475 | 1,003,525 |
| 6/27/2013 | USA | Detroit | 1,463,000 | 0 | 2,450 | 1,460,550 | 428,200 | 1,032,350 |
| 6/28/2013 | USA | Detroit | 1,460,550 | 0 | 2,475 | 1,458,075 | 428,200 | 1,029,875 |
| 7/1/2013 | USA | Detroit | 1,458,075 | 0 | 2,475 | 1,455,600 | 428,200 | 1,027,400 |
| 7/5/2013 | USA | Detroit | 1,445,625 | 0 | 0 | 1,445,625 | 428,200 | 1,017,425 |
| 7/11/2013 | USA | Detroit | 1,434,825 | 0 | 1,700 | 1,433,125 | 443,600 | 989,525 |
| 7/12/2013 | USA | Detroit | 1,433,125 | 0 | 1,550 | 1,431,575 | 443,600 | 987,975 |
| 7/18/2013 | USA | Detroit | 1,476,975 | 0 | 2,900 | 1,474,075 | 524,325 | 949,750 |
| 7/19/2013 | USA | Detroit | 1,474,075 | 0 | 2,825 | 1,471,250 | 524,325 | 946,925 |
| 7/22/2013 | USA | Detroit | 1,471,250 | 5,000 | 2,225 | 1,474,025 | 529,325 | 944,700 |
| 7/23/2013 | USA | Detroit | 1,474,025 | 0 | 1,275 | 1,472,750 | 529,325 | 943,425 |

| 7/24/2013 | USA | Detroit | 1,472,750 | 0 | 900 | 1,471,850 | 529,325 | 942,525 |
|-----------|-----|---------|-----------|------|-------|-----------|---------|---------|
| 7/25/2013 | USA | Detroit | 1,471,850 | 0 | 1,950 | 1,469,900 | 529,325 | 940,575 |
| 7/26/2013 | USA | Detroit | 1,469,900 | 0 | 1,825 | 1,468,075 | 529,350 | 938,725 |
| 7/29/2013 | USA | Detroit | 1,468,075 | 5,575 | 2,175 | 1,471,475 | 534,925 | 936,550 |
| 7/30/2013 | USA | Detroit | 1,471,475 | 6,075 | 2,200 | 1,475,350 | 541,000 | 934,350 |
| 7/31/2013 | USA | Detroit | 1,475,350 | 0 | 1,500 | 1,473,850 | 541,000 | 932,850 |
| 8/1/2013 | USA | Detroit | 1,473,850 | 0 | 2,225 | 1,471,625 | 541,000 | 930,625 |
| 8/2/2013 | USA | Detroit | 1,471,625 | 25 | 1,475 | 1,470,175 | 541,025 | 929,150 |
| 8/5/2013 | USA | Detroit | 1,470,175 | 0 | 2,175 | 1,468,000 | 541,025 | 926,975 |
| 8/6/2013 | USA | Detroit | 1,468,000 | 0 | 1,800 | 1,466,200 | 541,025 | 925,175 |
| 8/7/2013 | USA | Detroit | 1,466,200 | 0 | 1,400 | 1,464,800 | 541,025 | 923,775 |
| 8/8/2013 | USA | Detroit | 1,464,800 | 0 | 1,275 | 1,463,525 | 541,025 | 922,500 |
| 8/9/2013 | USA | Detroit | 1,463,525 | 0 | 1,575 | 1,461,950 | 541,025 | 920,925 |
| 8/12/2013 | USA | Detroit | 1,461,950 | 0 | 1,925 | 1,460,025 | 541,025 | 919,000 |