UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                                           :
IN RE ALUMINUM WAREHOUSING                                 :
ANTITRUST LITIGATION                                       :   MDL No. 2481
                                                           :   Master Docket No.
This Document Relates To:                                  :   13 MD 2481 (KBF)
                                                           :
*Agfa Corporation and Agfa Graphics, N.V.*                 :
*v. The Goldman Sachs Group, Inc.*,                        :
Case No. 1:14-cv-0211-KBF (S.D.N.Y.)                       :
                                                           :   JOINT AMENDED COMPLAINT
                                                           :   OF PLAINTIFFS AGFA
*Mag Instrument, Inc. v. The Goldman Sachs*                :   CORPORATION AND AGFA
*Group, Inc.*,                                             :   GRAPHICS, N.V., MAG
Case No. 1:14-cv-00217-KBF (S.D.N.Y.)                      :   INSTRUMENT, INC., AND
                                                           :   EASTMAN KODAK COMPANY
                                                           :
*Eastman Kodak Company v. The Goldman*                     :
*Sachs Group, Inc.*,                                       :
Case No. 1:14-cv-06849-KBF (S.D.N.Y.)                      :
                                                           :

-----------------------------------------------------------X

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 9

PARTIES AND RELEVANT ENTITIES ......................................................... 10

    Plaintiffs ........................................................................................................ 10

    Defendants ..................................................................................................... 14

    Co-Conspirators ............................................................................................ 22

    Other Relevant Entities ................................................................................ 22

FACTUAL ALLEGATIONS ............................................................................. 26

    The Aluminum Market .................................................................................. 26

        *Properties & Uses* ...................................................................................... 26

        *Aluminum Production* ................................................................................ 26

        *Aluminum Supply And Demand Are Inelastic* .......................................... 29

        *Relevant Aluminum Market for Purposes of the Complaint* ..................... 31

    Aluminum Pricing:  Spot Prices and Their Link to Long-Term Supply Contracts ............. 32

    LME-Certified Warehouses ........................................................................... 34

        *The LME's Global Network of Warehouses* ............................................. 34

        *The Relevant Market for LME-Certified Warehouses for Aluminum* ........ 37

    The Amount of Aluminum Stored in LME Warehouses Soars ...................... 38

    The Entry of Banks and Traders into Warehousing ...................................... 40

    Defendants Conspired to Increase Aluminum Spot Metal Prices, Specifically, Applicable Regional Premiums, by Moving Metal into Key Warehouses Which They Controlled ........ 42

        *Ignoring LME Information Barriers, Defendants' Trading and Warehousing Operations Work Together to Effectuate the Conspiracy* ................................ 42

        *Defendants Agree Not to Compete Against Each Other in the Market for the LME-Certified Warehouses in the United States and Throughout the World* ......... 56

        *As Part of Their Agreement Not to Compete, the Defendants Agree to Treat the LME's Minimum Load-Out Rule as a Maximum* ............................................. 60

        *Defendants Work Together to Shift Aluminum Among Their Warehouses in Order to Concentrate the Stock at Key Warehouse Locations* ..................................... 64

        *The Defendants Offer Payments for Owners to Store Aluminum in Their Key Warehouse Locations* ................................................................................. 70

        *Defendants Further Evade the Ineffective Minimum Load-Out Rules by Shifting Inventory Among Warehouses* ..................................................................... 73

        *Defendants Worked Together Strategically to Cancel Warrants* ................. 75

    Defendants' Conspiracy Directly Causes Regional Premiums, Including the Midwest Premium, to Reach Unprecedented Highs .......................................................... 79

*The LME Studies the Excessive Queues* .......................................................................... 82

*Defendants Worked to Thwart Any LME Rules Changes to Load-Out Rules* ................... 84

Defendants Profit from Their Conspiracy to Manipulate Spot Prices, Including Regional Premiums, in Multiple Ways ........................................................................................................ 88

*The Conspiracy Allowed the Defendants' Warehousing Operations to Increase Their Published Rents and FoT Rates* ...................................................................................... 88

*The Defendants' Trading Operations Profit by Selling Aluminum with Artificially Increased Premiums*............................................................................................................. 90

*Defendants Profit from the Increase in Contango* .......................................................... 93

Purchasers of Aluminum Have Complained About Defendants' Practices and Government Inquiries Are Ongoing ................................................................................................................ 94

Defendants Change Their Practices or Plan to Exit the Market Immediately After Facing Scrutiny of These Practices ........................................................................................................ 95

INJURY TO PLAINTIFFS.................................................................................................................. 97

CLAIMS FOR RELIEF ..................................................................................................................... 101

REQUEST FOR RELIEF .................................................................................................................. 104

DEMAND FOR JURY TRIAL ......................................................................................................... 105

Plaintiffs Agfa Corporation and Agfa Graphics, N.V. (together, "Agfa"), and Mag Instrument, Inc. ("Mag"), for their Second Amended Complaints, and Plaintiff Eastman Kodak Co. ("Kodak," and, together with Agfa and Mag, "Plaintiffs"), for their Amended Complaint against Defendants,[1] each with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:[2]

## INTRODUCTION

1.      This is an action brought to recover for injuries sustained by Plaintiffs as a result of Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, New York's Donnelly Law, N.Y. General Business Law §340 *et seq.*, and California's Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770.

2.      Plaintiffs allege that Defendants conspired to manipulate the spot price of physically delivered aluminum, particularly the components of that price that reflects so-called "regional premiums," such as the Platts Midwest Premium, by restricting the supply of aluminum immediately available to the spot market in key London Metal Exchange ("LME")-certified warehouse locations controlled by them.  Defendants' own words put it best.  Chris Wibbelman, the CEO of Defendant Metro, in a December 2010 email explained how Defendants working together as a cartel accomplished this: "***physical traders in conjunction with banks and producers hold [aluminum] stock and withhold metal sales to***

---

[1]      "Defendants" are The Goldman Sachs Group, Inc., Goldman Sachs International, Metro International Trade Services, Inc., JPMorgan Chase & Company, JPMorgan Securities plc, Henry Bath and Son, Ltd., Henry Bath LLC, Glencore Xstrata, PLC, Glencore Ltd., Pacorini Metals AG, and Pacorini Metals USA, LLC.

[2]      Plaintiffs' information and belief is based on their analysis of: (1) publicly available press releases, news articles, and other media reports; (2) preliminary production of internal documents provided by defendants Goldman Sachs and Metro and/or their affiliates to governmental regulators; and (3) data made publicly available by the LME.  Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to all the underlying facts relating to Defendants' improper activities.   Rather, that information lies exclusively within the possession, custody, or control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct.   Moreover, government investigations by the United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and the United Kingdom's Financial Conduct Authority ("FCA") concerning aluminum price manipulation could yield information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.  Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

*consumers in order to squeeze up the premiums*."[3]   Thus, Wibbelman, CEO of the dominant LME-warehouse operator in Detroit, the primary location for aluminum storage in the United States, confirmed in his own words the thrust of Plaintiffs' allegations.

3.      Defendants' conspiracy begins with them acquiring control of the LME warehousing system in 2010, including the key locations of Detroit and Vlissingen, Netherlands.   By controlling the LME warehousing system, Defendants were able to control the amount of aluminum immediately available for release into the spot market, and, thus, in the words of Blythe Masters, "make prices."

4.      According to the LME, "The LME licenses warehouses to provide a market of last resort and to ensure the LME price stays in line with the physical/spot price."   LME-certified warehouses currently store more than five million tonnes of aluminum – more aluminum than consumed in the United States in a year.   They are a substantial source of supply and the backbone of the LME's price discovery mechanism for the trade of aluminum, which is used throughout the world.   The warehouses should serve to keep the LME price in line with the physical spot metal price, because – *but for the situation created by Defendants* – industrial users of aluminum could, in an economically efficient way, purchase warrants and take delivery of metal directly from LME warehouses without having to pay regional premiums, such as the Platts Midwest Premium.

5.      Defendants' actions sought to break this link between the LME price and the physical spot metal market and therefore increased premiums.   Once they had control over LME warehouses, Defendants agreed not to compete with each other's LME warehouses and to hoard aluminum in key locations.   This agreement included allocating key locations, such as Detroit and Vlissingen to specific Defendants, not destocking each other's warehouses, and not providing faster load out services, specifically, agreeing to treat the LME's 1,500 MT minimum load out rule as a maximum, and otherwise working together to thwart any LME rule changes designed to increase load outs.

---

[3]      GS-METRO-00032011-13 at 11 (emphasis added).

6.      Again, Defendants' own words state it best. An internal Metro email notes that rather than compete against Metro in Detroit, "Pac[orini] is offering us [Metro] space in Detroit . . . ."[4]   The email goes further confirming an allocation between Goldman/Metro and Glencore/Pacorini concerning Detroit and Vlissingen, "They [Pacorini] have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago.  Besides they know we [Goldman/Metro] would retaliate incrementally in some place like Vlissingen."  The email demonstrates market allocation among Defendants.

7.      Other documents demonstrate that Defendants JPM and Henry Bath were part of the unlawful agreement concerning LME warehouses.  In a July 2010 email, Peter Sellars, JPM's global head of metals and chairman of its Henry Bath warehouses, wrote to Wibbelman (at Metro) about JPM's metal leaving Metro's warehouses, "this is material sold to the fabrication industry by my traders . . . we do NOT take material for re-warehousing."[5]  JPM effectively told Metro "don't retaliate or hold this metal hostage, as we are actually selling it."  Having vertically integrated by acquiring a warehousing company, one would expect JPM to move metal into its own warehouses.  Instead, the head of JPM's metals business and chairman of its warehouse business directly tells the CEO of its warehousing competitor (and, by extension, its financial competitor Goldman) that it was not doing that.  Indeed, other documents produced to date by Metro and Goldman make clear that JPM continued to pay warehousing rent to Metro throughout the time material to this Complaint.  In an October 2010 email, Wibbelman writes to Goldman trader Scott Evans: "I am concerned if this [metal] comes from a warehouse other than HB [Henry Bath], since JPM and GS [Goldman] could set off a warehouse war between Metro and, say, Steinweg or CWT."[6]  Notably, Wibbelman was not concerned that Goldman taking metal out of Henry Bath would set off a warehouse war.  Wibbelman was only concerned if Goldman or JPM took the metal from a non-conspirator, such as Steinweg, the largest independent warehousing company.

---

[4]      GS-METRO-00005231-34 at 32.

[5]      GS- METRO-00049217-18 at 17 (emphasis in original).

[6]      GS-METRO-00031544.

8.      With control of LME-warehouses, Defendants used both their warehouses and physical aluminum trading operations to funnel aluminum into certain key LME warehouses, specifically Detroit in the U.S. and Vlissingen in Europe.   Discovery to date demonstrates Defendants' view of their warehouse operations and physical metals trading operations as one and the same.   An October 19-20, 2010 email from Goldman's Jacques Gabillon to Wibbelman discussing a potential transaction involving Goldman's J. Aron metal trading business, Metro, and aluminum producer Rusal, states that so far as Defendant Goldman is concerned, "GS metal desk or Metro is the same thing."[7]

9.      Defendants swapped supplies of aluminum between and among warehouses in transactions with other banks, hedge funds, and traders, including Defendants themselves to limit aluminum outflows from LME warehouses.   For example, Defendants Metro and Goldman engineered deals to swap aluminum with Glencore.   Metro took Glencore's metal in the queue and gave Glencore metal in locations without queues, such as Baltimore and Mobile, such that Glencore could then immediately sell the aluminum, with premiums, to customers.[8]   Metro also did deals with JPM.[9]

10.      Defendants also restricted the supply of aluminum available for delivery by offering financial incentives for owners of aluminum to continue storing their aluminum in their warehouses, rather than releasing it into the market.   Defendants otherwise withheld aluminum from non-queue locations becoming available via rent deals, including amongst themselves.   As a result, the LME reported that on September 18, 2013, 99% of warrants used in LME settlement (*i.e.*, available metal) were from warehouses with queues.

---

[7]      GS-METRO-00031611-13 at 11.

[8]      *See, e.g.*, GS-METRO-00028192-93 (describing Glencore swap).

[9]      *See, e.g.*, GS-METRO-00024463-24466 (Metro email describing how "[in] the past JPM has been extremely cooperative under Neil Clifts [sic] supervision to differentiate between metal that we have brought to them and metal that they have brought to us under finance in that we can transfer/negotiate out what we bring in but not stock they have picked up from their own positions," noting that JPMorgan "ha[s] been bringing metal in themselves to us" and also remarking that JPMorgan and Metro "have not had a written agreement [concerning shuttling metal between each other's warehouses] per se as none was necessary in past . . . .  However, I could say that there has been an understanding that both would co-operate appropriately" in this regard).

4

11.     Once the aluminum was warehoused into Detroit and Vlissingen, Defendants' trading operations cancelled warrants for metal held there to increase dramatically their queue lengths.  For example, in December 2011, JPM canceled warrants for 500,000 tonnes of aluminum stored in Vlissingen.  JPM's warrant cancellations instantly caused a large queue in Vlissingen – one that grew to more than 700 days.

12.     To cancel a warrant is to request physical delivery of aluminum, but upon information and belief, these levels of warrant cancellations had nothing to do with the actual need for physical aluminum by Defendants and everything to do with price manipulation, including increasing regional premiums, including the Platts Midwest Premium.  The link between warrant cancellations and increased premiums is demonstrated below:



13.     An internal Goldman document prepared in July 2011 succinctly explains the effects of hoarding available aluminum into Detroit (and later Vlissingen):

> *US Midwest premium started to rise quickly in Mar 11 when Baltimore and Chicago (non Metro locations) stopped flowing out*.[10]

---

[10]     GS-METRO-00001317-23 at 21 (emphasis added).

14.     In other words, once Defendants moved the remaining available aluminum into their warehouses with queues, a customer had no choice but to go through the queues to procure metal.  As a result, immediately available aluminum plummeted and the Platts Midwest Premium spiked up.  In the July 11, 2011 cover email attaching the above-referenced document, Goldman's Gabillon writes to the LME's CEO Abbott that the amount of aluminum flowing out of Detroit to actual consumption fell from 17.6% in 2010 to 5.6% in 2011.[11]

15.     Defendants also attempted to manipulate the LME rule-making process to keep minimum load-out rules low.  On March 8, 2011, Wibbelman emailed about proposed LME rule changes, "a couple of side points . . . not sure if you make them but just so you know, (i) *the people complaining will not benefit from a change as GS, Glencore and a couple of others take market actions to shape the landscape* . . . ."[12]  Per Wibbelman, in the end, no matter what the LME did regarding its load-out rules, Defendants would act in concert to keep aluminum hoarded in their key warehouses.

16.     Defendants agreed to treat the LME's minimum daily load-out rule as a maximum.  An internal Goldman document labeled it "industry practice to consider the minimum shipping quantity as an effective maximum quantity that will be shipped on a given day," and confirmed that "management's intention is not to ship more than the minimum required quantity per day."[13]  Indeed, Metro and Goldman carefully tracked the requirement in order that they would not ship out more than required.

17.     Defendants benefitted from this conspiracy in multiple ways.  First, Defendants Glencore, JPM, and Goldman each physically trade metals.  As result of their actions, they were able to sell aluminum in the spot market and charge the inflated price, including the Platts Midwest Premium.  Additionally, they benefitted from the increased value of their holdings.  Second, Defendants' price manipulation increased the long-running financial contango, making certain financial transactions more profitable for Defendants.  Finally, Defendants' warehousing

---

[11]     GS-METRO-00001316.

[12]     GS-METRO-00033241-45 at 42 (emphasis added).

[13]     GS-METRO-00001109-17 at 16; *see also* GS-METRO-00001330-41 at 39.

operations benefited from the agreement by being able to charge supra-competitive rents and FoT ("Free on Truck") load-out charges.  Additionally, Defendant Metro took steps to "act as [a] physical trader[]" so that it could benefit from increased premiums.[14]

18.    How then were Plaintiffs injured?  The spot price for physically delivered aluminum has two components: (1) the "LME Cash Price"; and (2) a regional premium.  In the United States, the regional premium is known as the Platts Midwest Premium, and the overall spot price is sometimes referred to as the Midwest Transaction Price.  Aluminum procured from overseas for U.S. consumption may be priced under other comparable industry-standard premiums, including the Rotterdam Premium (sometimes called the European Community Duty Paid or Duty Unpaid Premium) or the CIF Japan Premium.  Just like other industrial users of aluminum, Plaintiffs purchased aluminum pursuant to supply agreements that specifically (and unavoidably) incorporated the spot metal price, *i.e.*, LME cash price plus the Platts Midwest Premium (or other regional premium).[15]

19.    As a result of Defendants' actions, industry-standard regional delivery premiums, including the Platts Midwest Premium, increased dramatically.[16]  As *The New York Times* put it, given the industry-standard (and below-described) "formula used to set the price of aluminum on the spot market, the [warehouse-related] delays also increase the prices nearly all manufacturers pay for aluminum ***even when they buy metal that was not stored in a warehouse***."[17]  As *The New York Times* correctly explains, aluminum purchasers nonetheless would have been injured by

_____

[14]    GS-METRO-00021326.

[15]    For example, it is estimated that 95% of Alcoa's shipments will be priced using regional premiums, such as the Platts Midwest Premium, Rotterdam Premium, or CIF Japan Premium.  *See* Oplinger, William, "Alcoa Presentation," Bank of America Merrill Lynch – Global Metals, Mining and Steel Conference, May 13, 2014.

[16]    The Platts Midwest Premium "was originally created to cover the freight from Baltimore to the Midwest.  It now incorporates supply and demand of the North American-specific market to complement the LME aluminum contract."  *See* Press Release, CME Group Announces the First Aluminum Midwest Premium Contracts Traded (August 9, 2013).  The Platts Midwest Premium should not be confused with the Platts Midwest Transaction Price; the latter is akin to an "all-in" aluminum price including both the LME cash price for the metal and the Platts Midwest Premium components. Other published, industry-standard premiums also relevant to this action include the Rotterdam Duty Paid (and Duty Unpaid) Premiums and the CIF Japan Premium.

[17]    David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, THE NEW YORK TIMES (Aug. 12, 2013) (emphasis added).

price-inflated, antitrust injury-inflicting aluminum because what happens in the LME warehouses is inextricably intertwined with the price for physically delivered aluminum, an element of which is the Platts Midwest Premium.

20.     Despite the massive quantities of aluminum stored in LME warehouses, aluminum is not immediately available to purchasers of aluminum because of queues.[18]  And because of the direct pricing link between what happens in the LME warehouses and the broader physical market for aluminum, the industry-standard, published regional premiums (including the Midwest Premium) which are a stated component of the price for the delivery of aluminum (in the case of the Midwest Premium, throughout the United States), have risen to unprecedented levels.  Other regional premiums applicable around the globe have risen in tandem.

21.     As set forth below, absent collusion, it defies economic explanation for purchasers of aluminum to experience such queues and to pay such high regional premiums (including the Midwest Premium) given the large quantities of aluminum that would – absent Defendants' conduct – be available for delivery.

22.     Defendants' concerted scheme to withhold aluminum from the spot market directly caused injury to competition of the sort the antitrust laws exist to prevent – namely, "squeeze[ing] up the premiums" for delivery of physical aluminum.   Moreover, it is clear from Mr. Wibbelman's statements as well as from a wealth of information discussed further below that what Defendants did collectively with LME-certified aluminum warehouses was inextricably intertwined with injuries suffered by Plaintiffs: in short, paying artificially inflated prices for physical delivered aluminum.

23.     Defendants' acts took place in substantial part in the United States, and were conducted by persons and entities subject to the laws of the United States, including its states and territories, and affected the pricing of millions, if not billions, of dollars' worth of aluminum purchased in the United States and around the world.   Plaintiffs buy aluminum pursuant to contracts which expressly incorporate the benchmark regional premiums, including the Platts

---

[18]     Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

Midwest Premium.  Defendants' illegal conduct in restraining the availability of aluminum stored in LME warehouses directly caused these premiums to increase, and thus, directly injured Plaintiffs who paid higher prices for aluminum they bought from producers.

24.     Defendants' conduct constitutes a violation of Section 1 of the Sherman Antitrust Act.  As a result, Plaintiffs are entitled to seek treble damages for harm suffered in the form of the increased price of physical aluminum from 2010 through the present.

## JURISDICTION AND VENUE

25.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331, 1337, Sections 4 and 16 of the Clayton Act, and 15 U.S.C. §§15(a) and 26.

26.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

27.     In addition to this Court's own exercise of personal jurisdiction and the propriety of venue here, as the MDL transferee Court, the Court may exercise personal jurisdiction and find appropriate venue as would exist in the transferor courts.

28.     This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this State and/or the states in which Plaintiffs filed their original complaints, and by virtue of Defendants' participation in the conspiracy described herein, all as further described below.  At all times material to this Complaint, Defendants Goldman and JPMorgan resided in, transacted business in, and committed acts in furtherance of the illegal conspiracy within this State and/or the states in which Plaintiffs filed their original complaints.  Those acts are attributable to all co-conspirators, as described herein.  Further, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in this state and/or the states within which Plaintiffs filed their original complaints, including injury to Plaintiffs.

29.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26 and 28 U.S.C. §1391(b), (c) and (d), because, at all times

material to this Complaint, each Defendant resided, transacted business, or could be found in this District and/or the districts in which Plaintiffs filed their original complaints.  Venue is further appropriate as to Plaintiff Agfa, as a substantial portion of the events complained of occurred in the district in which Agfa filed its complaint; venue is further appropriate as to Plaintiff Mag as a substantial portion of the events complained of occurred in the district in which Mag filed its complaint and because Mag's headquarters is in that district and a substantial portion of the affected commerce described herein was therefore carried out in that district; venue is further appropriate as to Plaintiff Kodak as Kodak's U.S. and global headquarters is in the district in which Kodak filed its complaint and a substantial portion of the affected interstate commerce described herein was therefore carried out in that district.

30.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES AND RELEVANT ENTITIES

**Plaintiffs**

31.    **Agfa:**  Plaintiff Agfa is an iconic multinational company that develops, produces, and distributes equipment and supplies for the newspaper, commercial printing, and graphics communications industries.  The company has a production facility in the United States.  Plaintiff Agfa Corporation is a business entity organized under the laws of Delaware and maintains its United States headquarters at 611 River Drive, Elmwood Park, New Jersey 07407.  Agfa Corporation is a wholly owned subsidiary of Plaintiff Agfa Graphics, N.V., a Belgian company.  At all times material to this Complaint, Agfa purchased high-grade quality lithographic aluminum coil directly from integrated producers including Alcoa, Hydro, and/or their respective affiliates.  Agfa uses this aluminum to produce lithographic printing plates.  Due to aluminum's unique properties, there are no reasonably available substitutes which could be used to produce Agfa's lithographic printing plates.  As further described below, Agfa's aluminum purchases are made pursuant to long-term global supply contracts which price aluminum based on the LME cash price (further described below) plus the applicable regional premium (including, at times, the Midwest Premium and the Rotterdam Premium).

10

32.     During the time material to this Complaint, a portion of Agfa's procurement of aluminum for U.S. consumption has been based on annual supply contracts with Alcoa.  Alcoa aluminum is sourced in the United States and Agfa's Alcoa contract specifically prices aluminum at a price set by the average Midwest U.S. Transaction Price.  The contract specifies that the Midwest U.S. Transaction Price is comprised of (1) the average LME cash price plus (2) the average Midwest Premium published by Platts.  So, by contract, Agfa's procurement of aluminum from Alcoa specifies pricing that is subject to the Midwest Premium.  On information and belief, it is not possible to procure aluminum from Alcoa in the United States, whether on a spot or long-term basis, without paying the Midwest Premium.

33.     Agfa procures additional aluminum for U.S. consumption from non-U.S. sources, including Hydro and Novelis.  That aluminum, which is sourced from Europe for delivery to the U.S., is the subject of annual supply agreements with Hydro and Novelis.  Both the Hydro and Novelis agreements specifically price aluminum under a formula comprised of (1) the LME cash price plus (2) the Rotterdam Premium.  So, by contract, Agfa's procurement of aluminum from European suppliers, for use in the U.S., is subject to the Rotterdam Premium.

34.     Pursuant to the same global supply contracts, Agfa procures aluminum for consumption in other parts of the world, including Europe, South Korea, and South America.  Those same global supply contracts price this non-U.S.-consumption aluminum in the same manner as set forth above, *i.e.*, as a function of (1) LME cash price plus (2) applicable regional premium.

35.     In the Alcoa and Hydro arrangements, Agfa was and is the first party in the purchasing chain to pay the applicable regional premium.  Upon information and belief, to the extent Agfa was not the first party to pay the applicable regional premium in its purchases from Novelis, Novelis passed the applicable regional premium fully on to Agfa.

36.     Upon information and belief, all or substantially all, of the aluminum purchased by Agfa was never stored in an LME-certified warehouse.

37.     While Agfa enters into hedging agreements for aluminum with either suppliers and/or banks, these hedges relate only to the LME cash price of the aluminum and not to any

premium. These hedges are effectuated on the LME futures market. As further discussed below, at least until very recently, there was no possibility to hedge for the applicable regional premiums.

38.    **Mag:**  Plaintiff Mag Instrument, Inc. is a corporation organized under the laws of California and headquartered at 2001 South Hellman Avenue, Ontario, California 91761. Mag designs, manufactures, and sells high quality, durable flashlights including the iconic and award-winning Maglite flashlight. All Mag flashlights are manufactured in the United States using aluminum. Between the costs of retooling and the fact that Maglite flashlights are closely associated with being made out of aluminum, *i.e.*, when consumers think Maglite, they think of aluminum flashlights and when consumers think of aluminum flashlights, they think of Maglite. There are no reasonable substitutes.

39.    During the time material to this Complaint, Mag purchased aluminum directly from Norsk Hydro North America, Inc., which is a producer and extruder of aluminum. Mag's purchases were pursuant to a long-standing supply agreement where pricing was calculated according to a fixed cost-plus formula using the then-current LME cash price for aluminum and the Midwest Premium.

40.    For all purchases made under this agreement, the price of each order was tied to an indexed price that incorporated both the LME cash price and the Midwest Premium.

41.    Upon information and belief, Mag was and is the first party in the purchasing chain to pay the Midwest Premium.

42.    Upon information and belief, all or substantially all the aluminum purchased by Mag was never stored in an LME-certified warehouse.

43.    **Kodak:**  Plaintiff Kodak is an iconic multinational technology company that, among other things, focuses on graphics and imaging solutions for businesses. Kodak is incorporated under the laws of New Jersey and maintains its United States and global headquarters at 343 State Street, Rochester, New York 14650. At all times material to this Complaint, Kodak (and, at times, its affiliates) purchased high quality lithographic aluminum coils directly from integrated producers including Alcoa, Bridgnorth, Hydro, and Xiashun, and/or their respective affiliates. Kodak uses this aluminum to produce lithographic printing plates. Due to aluminum's unique properties, there are no reasonably available substitutes which could be

used to produce Kodak's lithographic plates.  Kodak procures aluminum for use in the United States, Europe, Japan, and Asia.  As further described below, Kodak's aluminum purchases have incorporated the LME cash price plus the applicable regional premiums (including, at times, the Midwest Premium, the Rotterdam Premium, and the CIF Japan Premium).

44.     During the time material to this Complaint, a portion of Kodak's procurement of aluminum for U.S. consumption has been based on spot agreements and/or purchase orders made from Alcoa.  These procurements specifically price aluminum at a price set by the average Midwest U.S. Transaction Price, which is comprised of (1) the average LME cash price plus (2) the average Midwest Premium published by Platts.  So, Kodak's spot purchases of Alcoa aluminum have specifically incorporated the Midwest Premium.  On information and belief, it is not possible to procure aluminum from Alcoa in the United States, whether on a spot or long-term basis, without paying the Midwest Premium.

45.     Kodak procures additional aluminum for U.S. consumption from non-U.S. sources, including Hydro, Bridgnorth, and Xiashun.  That aluminum, which is sourced from Europe or China for delivery to the U.S., is the subject of annual supply agreements and/or purchase orders with those companies.  By contract, aluminum sourced in Europe (Hydro and Bridgnorth) is procured at a price comprised of (1) an average LME cash price plus (2) the average Rotterdam Premium.  So, by contract, Kodak's procurement of aluminum from European suppliers, for use in the U.S., is subject to the Rotterdam Premium.  The Xiashun aluminum is sourced in China and is the subject of annual supply agreements and/or purchase orders.  According to those agreements/orders, the Xiashun aluminum is procured at a price comprised of (1) an average LME cash price plus (2) the CIF Japan Premium.

46.     Pursuant to the same and other supply contracts, Kodak procures aluminum for consumption in other parts of the world, including Europe and Japan.  This aluminum is procured from Hydro, Bridgnorth, Novelis, and Japanese suppliers, including Mitsubishi and Sumitomo. At least some of this aluminum is procured from, and some of these agreements are with, integrated producers and pursuant to the same formula set forth above, *i.e.*, as a function of (1) LME cash price plus (2) the applicable regional premium.

13

47.     In the Alcoa, Hydro, and Xiashun arrangements, Kodak was and is the first party in the purchasing chain to pay the applicable regional premium.  Upon information and belief, to the extent Kodak was not the first party to pay the applicable regional premium in its purchases from Novelis and Bridgnorth, those companies passed the applicable regional premium fully on to Kodak.

48.     Upon information and belief, all or substantially all, the aluminum purchased by Kodak was never stored in an LME-certified warehouse.

49.     While Kodak enters into hedging agreements for aluminum with suppliers, these hedges relate only to the LME cash price of the aluminum and not to any premium.  These hedges are effectuated on the LME futures market.  As further discussed below, at least until very recently, there was no possibility to hedge for the applicable regional premiums.

**Defendants**

50.     **Goldman Sachs**: Defendant The Goldman Sachs Group, Inc. ("Goldman" or "Goldman Sachs") is an international financial company headquartered at 200 West Street, #200, New York, New York 10282.  Goldman Sachs trades physical aluminum and other base metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.  Goldman Sachs acquired Defendant Metro in February 2010.

51.     A key player at Goldman Sachs is Scott Evans, a senior trader for the physical metals desk within the Commodities Division of Goldman Sachs International and/or with Goldman's J.Aron & Co. trading division.  Evans was responsible for dealing directly with Metro on behalf of Goldman Sachs, and was also tasked with trading aluminum on behalf of Goldman Sachs.[19]  Evans received trading information from Metro, including advice on bids Goldman Sachs should place on Glencore metal.[20]

52.     **Goldman Sachs International**:  Defendant Goldman Sachs International is an international financial services provider headquartered at Peterborough Court, 133 Fleet Street

---

[19]     GS-METRO-00032200-02.

[20]     GS-METRO-00049777-78.

London, EC4A 2BB, United Kingdom.  According to regulatory filings with the Securities and Exchange Commission, Goldman Sachs International is a "significant subsidiary" of Defendant The Goldman Sachs Group, meaning that The Goldman Sachs Group owns at least 99% of the voting securities of Goldman Sachs International.  Goldman Sachs International is also a member of the LME.  Additionally, Plaintiffs allege:

53.     Key players at Goldman Sachs International include:   Jacques Gabillon, a Managing Director at Goldman Sachs International and the Head of Global Commodities Principal Investments.  He also serves as the Chairman of the Board and Board Member of MITSI Holdings LLC which holds ownership of Metro International Trade Services; Stephen Branton-Speak, a former Partner at Goldman Sachs International who presided over the formation and management of the physical-metals trading desk within the Commodities Division of Goldman Sachs International.  He has been an LME Board member since 2009.  Gabillon, Branton-Speak, and others, acting as agents of Goldman Sachs International, engaged in numerous actions in the United States or designed to impact commerce in the United States in furtherance of the conspiracy.

54.     Goldman Sachs International is, by virtue of its total and complete ownership by The Goldman Sachs Group, simply a corporate alter ego of The Goldman Sachs Group, which is headquartered in this District.  Goldman Sachs International conducts substantial and ongoing business in this District in its own right by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York.  Attendant to this business, Goldman Sachs International is also a registered swap dealer with the CFTC.

55.     **Metro**: Defendant Metro International Trade Services LLC ("Metro") is a limited liability company organized under the laws of Michigan and headquartered at 6850 Middlebelt Road, Romulus, Michigan 48174.  It owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan; Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store, among other metals, aluminum.

56.     Key players at Metro included:  Chris Wibbelman, the President and CEO of Metro International Trade Services; David Grupenhoff, the CFO of Metro International Trade

Services; Michael Whelan, the VP of Business Development for Metro International Trade Services; Curt Felch, the VP of Strategic Development for Metro International Trade Services; and Mark Askew, the VP of Marketing for Metro International Trade Services.

57.     **JPMorgan**: Defendant JPMorgan Chase & Co. ("JPM" or "JPMorgan") is an international financial company headquartered at 270 Park Avenue, New York, New York 10017, and conducts business within this District. JPMorgan engages in the storage, transportation, marketing, or trading of commodities, including aluminum and other metals for itself as a principal and for its clients by means of trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.  JPMorgan acquired Defendant Henry Bath in July 2010.

58.     **JPMorgan Securities plc**:   Defendant JPMorgan Securities plc ("JPMorgan Securities") provides securities brokerage services for JPMorgan, and is headquartered at 25 Bank Street, Canary Wharf, London E14 5JP, United Kingdom.  Formerly JPMorgan Securities Ltd., JPMorgan Securities is one of the firm's "principal operating subsidiaries" according to SEC filings, and is a wholly owned subsidiary of JPMorgan Chase Bank, N.A.  Additionally, Plaintiffs allege:

59.     Key players at JPMorgan Securities include:  Peter Sellars, Head of Global Metals of the Global Commodities Group at JPMorgan (J.P. Morgan Metals Group Ltd.) and a former LME Board member; Michael Camacho, a Managing Director at J.P. Morgan and CEO of EMEA Commodities for J.P. Morgan, a commodities trading arm covering Europe, the Middle East and Africa.  He was also a Director on the Board controlling Henry Bath & Son, Ltd.  He later replaced Peter Sellars, who retired in 2012, as the Head of Global Metals of the Global Commodities Group at J.P. Morgan (J.P. Morgan Metals Group Ltd.).  Sellars, Camacho, and others, acting as agents of JPMorgan and JPMorgan Securities, engaged in numerous actions in the United States or designed to impact commerce in the United States in furtherance of the conspiracy.

60.     JPMorgan Securities transacts directly with Metro regarding aluminum storage in the United States on a deeply involved and continuing basis – so much so that Peter Sellars, former head of the Global Commodities Group, communicated directly with Metro's Wibbelman

about their business together.  According to documents produced by Goldman and Metro, some of the JPMorgan aluminum stored at Metro's Detroit warehouse was for the account of JPMorgan Chase Bank, N.A.

61.     **Henry Bath & Son, Ltd.**:  Defendant Henry Bath & Son, Ltd. is one of the oldest warehouse operators in the world and a founding member of the London Metal Exchange.  It is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom.  As a founding member of the LME, it is one of only 11 "ring-dealing" members allowed to trade in open outcry auctions on the LME floor.  The company also holds a seat on the LME Warehousing Committee, a select group charged with establishing the rules for LME regulated warehouses. That seat is held by Graham Hawkins, General Manager of Henry Bath & Son, Ltd.  Additionally, Plaintiffs allege:

62.     Henry Bath & Son, Ltd. is the direct corporate parent of Henry Bath LLC, and as the sole shareholder of Henry Bath LLC exercises complete control over the company and its operations, including its warehousing business.

63.     Henry Bath & Son, Ltd., reports income derived from Henry Bath LLC's U.S.-based warehousing operations in its own financial statements.  Henry Bath & Son, Ltd. includes Henry Bath LLC's U.S.-based income in its annual calculation of tax on profit on ordinary activities.  Henry Bath LLC is also included in Henry Bath & Son, Ltd.'s group-wide calculation of tangible assets and goodwill.

64.     JPMorgan acquired Henry Bath & Son, Ltd. on or about February 16, 2010, as part of a deal to acquire RBS Sempra Commodities.  This deal was announced the same week that Defendant Goldman Sachs announced its plan to purchase Defendant Metro, and just seven months before Defendant Glencore agreed to purchase Defendant Pacorini.

65.     Following the acquisition, JPMorgan acted quickly to expand its control over Henry Bath & Son, Ltd., integrating the warehousing company into its operations.  Henry Bath & Son, Ltd. became the metals warehousing "unit" of JPMorgan.  Peter Sellars, CEO of RBS Sempra Metals and Henry Bath & Son, Ltd., was installed as CEO of J.P. Morgan Metals Limited.  Sellars was joined by Sid Tipples, COO of RBS Sempra Metals, who became COO of J.P. Morgan Metals Limited.  Together, both Sellars and Tipples served as the sole directors of

Henry Bath & Son, Ltd. until 2012 when Blythe Masters, head of JPMorgan's commodities unit, Francis Dunleavy, head of JPMorgan's Principal Commodity Investment division, and Mike Camacho, head of JPMorgan's non-oil energy trading desk, were named directors of Henry Bath & Son, Ltd.

66.     By controlling all of Henry Bath & Son, Ltd.'s directors in addition to 100% of its stock, JPMorgan had complete control over Henry Bath & Son, Ltd., and its U.S.-based subsidiary, Henry Bath LLC, including all of its aluminum warehouses.

67.     Henry Bath & Son, Ltd. worked closely with JPMorgan to manage its aluminum stockpile within the United States.  Internal emails reveal that Henry Bath & Son, Ltd. management, including Group General Manager Graham Hawkins, were involved in the day-to-day business operations of Henry Bath LLC.  Hawkins, who served as JPMorgan's and Henry Bath & Son, Ltd.'s representative on the LME Warehousing Committee, was included on multiple emails involving Henry Bath LLC and JPMorgan's business including: (1) the cancellation of warrants held by JPMorgan for aluminum stored in Defendant Metro's warehouses; (2) the subsequent load out and transfer of JPMorgan aluminum to Henry Bath warehouses in the United States; (3) disputes involving demurrage charges for not loading and returning railroad cars carrying JPMorgan aluminum on time; and (4) shipping and handling charges for loading and unloading JPMorgan aluminum.  These emails demonstrate that Henry Bath & Son, Ltd. did not operate in complete isolation from its subsidiary Henry Bath LLC and parent Defendant JPMorgan, but was an active part of their business within the United States.

68.     **Henry Bath**:  Defendant Henry Bath LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, and is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom.  It owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store, among other metals, aluminum.

69.     **Glencore**: Defendant Glencore Xstrata, PLC (and its predecessor Glencore International, PLC, collectively, "Glencore") is a public limited company organized under the

laws of the United Kingdom and headquartered at Baarermattstrasse 3, CH-6340 Baar, Switzerland.  Glencore is a commodities trading and mining company that engages in the production, storage, transportation, marketing, or trading of aluminum and other metals as well as trading derivative products that derive their value from the underlying asset prices of aluminum.  Glencore has been the owner of Pacorini USA, Pacorini AG, and Pacorini BV since September 2010.

70.     Glencore is active around the world and in the United States.  On its own website, found at www.glencore.com, Glencore holds itself out as an integrated global enterprise that both trades and warehouses aluminum in, and with effect on, the United States, including in New York, Michigan, and California.  It holds itself out as "one of the world's largest diversified natural resource companies and a major producer and marketer of more than 90 commodities." The website treats "Glencore" as a unitary global operation, offering no differentiation between "Glencore" and "Glencore plc."  In html viewing mode, the upper left-hand corner of each page of the website depicts the word "GLENCORE" and the bottom left corner depicts the indication "© GLENCORE 2014."  The "Contact Us" page makes clear that the "Glencore" referred to throughout the website is, in fact, defendant Glencore plc, located in Baar, Switzerland.

71.     The first numbered page of Glencore's 2013 Annual Report, which is available as a download from the Glencore website, describes Glencore in these words:

> We are a leading integrated producer and marketer of commodities, with worldwide activities in the marketing of metals and minerals, energy products and agricultural products and the production, refinement, processing, storage and transport of those products.
>
> We operate globally.  We market and distribute physical commodities sourced from third party producers as well as our own production to industrial consumers, such as those in the automotive, steel, power generation, oil and food processing industries.  We also provide financing, logistics and other services to producers and consumers of commodities.

Substantially the same information appears on page 4 of the Annual Report.

72.     In the Global Operations section of its website, Glencore touts that "[w]ith a strong footprint in both established and emerging regions for natural resources, our industrial and marketing activities are supported by a global network of more than 90 offices located in over 50 countries."  Glencore website users are encouraged to "[f]ind out more about our operations, and

see where our business operates using this interactive map."  Using the filter available on the Glencore Global Operations interactive map, one can view North American operations at no fewer than 12 sites, including in California and Michigan.  Also, by using the filter available on the Glencore Global Operations interactive map, one can view three general "offices" in the United States, in Pittsburgh, Baltimore, and Clarksville.  Finally, using the filter available on the interactive map to select only Pacorini Metals warehousing assets results in a depiction of seven U.S. Pacorini sites, including locations in Detroit, Michigan and in Los Angeles, California.  The unfiltered Global Operations map draws no distinction between Glencore's U.S. operations and its operations in other parts of the world.

73.     Glencore maintains a recruiting website page that covers much of the world and many of its subsidiaries, including Pacorini USA LLC and the United States.  Glencore is actively recruiting for positions in the United States.[21]

74.     Glencore acknowledges the value inherent in being the unified business enterprise it is.  Glencore's CEO, Ivan Glasenberg, recently remarked "'We're different from our peers.  We have the trading part of the business [. . .] it gives us an edge on our competitors.  It is the trading business that allows the company to have such a close eye on commodity prices.'"[22]

75.     Glencore is active in the United States.  Glencore has no fewer than 24 subsidiaries in, or registered in, Delaware alone.[23]  Glencore holds two live registered U.S. Trademarks.[24]  Glencore had 260 employees in the United States in May 2011.

---

[21]     *See*  Glencore  Jobs,  Posting  for  Logistics  Manager,  Pacorini  Metals, https://glencorejobs.nga.net.au/publicfiles/glencorejobs/jobs/65e20e60-9994-4676-aa47-a3640012659d/AD_Logistics_Manager_USA.pdf (describing a job posting based in "Louisiana, Texas, California, or Michigan").

[22]     Glencore Q4 2013 Earnings Call, SeekingAlpha, (March 4, 2014), available at http://seekingalpha.com/article/2066573-glencore-xstratas-ceo-discusses-q4-2013-results-earnings-call-transcript?part=single (last visited Oct. 9, 2014) (quoting Ivan Glasenberg, CEO of Glencore).

[23]     *Id.* at 8.

[24]     *Id.* at 6.

76.     Glencore has executive officers working directly in the United States, including Nicholas Wilson, whose LinkedIn page lists his position as former US Regional CFO of Glencore Xstrata plc and his location in that position as the greater New York area.[25]

77.     **Glencore, Ltd.**:   Defendant Glencore, Ltd. is a wholly owned subsidiary of Glencore, located at 301 Tresser Boulevard, Stamford, Connecticut 06901.  Glencore's CEO Ivan Glasenberg is one of Glencore, Ltd.'s four directors.  Aristotelis Mistakidis, a long-time Glencore senior executive in its metals trading business, is another.  As of March 22, 2013, Glasenberg and Mistakidis were reported by Glencore to own more than 20% of the company's shares.

78.     **Pacorini**: Defendant Pacorini Metals USA LLC ("Pacorini USA") is a limited liability company organized under the laws of Louisiana and headquartered at 5736 Citrus Boulevard, Suite 104, New Orleans, Louisiana 70123.   It owns and operates LME-certified warehouses in the United States, including warehouses in Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana that store, among other metals, aluminum.

79.     **Pacorini AG**:   Defendant Pacorini Metals AG ("Pacorini AG") is an entity organized under the laws of Switzerland and with its principal place of business in Zug, Switzerland.  It is owned and controlled by Glencore.  Pacorini AG is a leading provider of LME-certified warehousing throughout the world, including in the United States, where it operates through its wholly owned subsidiary, Pacorini USA, and in the Netherlands, where it operates through, among other entities, its wholly owned subsidiary, Pacorini Vlissingen BV.   Non-defendant co-conspirator Pacorini Vlissingen BV ("Pacorini BV") is a *besloten vennootschap* (private limited liability company) organized under the laws of the Kingdom of the Netherlands and headquartered at Engelandweg 55 Port No. 1199 4389 PC, Vlissingen-Oost, Netherlands.   It owns and operates LME-certified warehouses in Rotterdam and Vlissingen in the Netherlands that store, among other metals, aluminum.

_____

[25]   *See* Public LinkedIn Profile of Nicholas J. Wilson, *LinkedIn*, http://www.linkedin.com/pub/nicholas-j-wilson/13/57/4b9 (last visited Oct. 9, 2014).

80.     Glencore has been the owner of Pacorini USA, Pacorini AG, and Pacorini BV (collectively, "Pacorini") and has exercised control over their operations since September 2010.

81.     Defendants Goldman Sachs, JPMorgan, and Glencore through respectively, Metro, Henry Bath, Pacorini, and other entities, were engaged in the aluminum warehousing business. Defendants Goldman Sachs, JPMorgan, and Glencore were also engaged in commodities trading and trading of derivative products that derive their value from the underlying asset prices of aluminum at all relevant times.

82.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

**Co-Conspirators**

83.     Various other persons, firms, and corporations, unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

84.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

85.     Whenever reference is made to any act of any corporation, limited liability company, or other entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, or control of the entity's business or affairs.

**Other Relevant Entities**

86.     **LME**: The London Metal Exchange Ltd. ("LME")[26] is a corporation organized under the laws of the United Kingdom and headquartered at 56 Leadenhall Street, London,

---

[26]     Plaintiffs initially proceeded against LME as a Defendant, *see, e.g.*, ECF No. 272 (Agfa Am. Compl.); ECF No. 226 (Mag Am. Compl.); 14-cv-06429 (W.D.N.Y.) ECF No. 1 (Kodak Compl.).  In light of and in deference to the Court's ruling on LME's Foreign Sovereign Immunities Act motion, ECF No. 564, Plaintiffs do not, in this Complaint, proceed against LME.

England.  On December 6, 2012, the stock of the LME's parent company, LME Holdings Ltd., was acquired by Hong Kong Exchanges and Clearing Limited which owns the HKEx Group, an integrated exchange group based in Hong Kong.

87.     The LME is the world's largest non-ferrous metals market and "a private trade association"[27] for Defendants here.  More than 80% of all global non-ferrous metal futures business is transacted through its trading platforms.  The non-ferrous metals exchanged through the LME are aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt, and molybdenum.  The LME handles total trading volumes of about $61 billion per day.  The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds, and traders, rather than users of aluminum.

88.     Until its acquisition by the HKEx Group in December 2012, the LME was owned, controlled, and governed by its members.  J.P. Morgan Securities PLC (a subsidiary of JPMorgan) is a "Category 1" member of the LME, Goldman Sachs International (a subsidiary of Goldman Sachs) is a "Category 2" member of the LME, and Glencore (UK) Ltd. (a subsidiary of Glencore) is a "Category 5" member of the LME.

89.     Prior to the acquisition, the members/shareholders of the LME were much more involved in the management of the LME than is typical of shareholders in a corporation.  Much of the work of the LME is conducted through committees of members and/or their affiliates.  For example, the LME's Warehousing Committee includes executives from Metro, Henry Bath, and Pacorini (or their affiliates).  During the times relevant to this Complaint, JPMorgan and Glencore affiliates sat on the LME's Aluminum Committee.  On April 3, 2014, the LME's newly formed "Physical Market Committee" held its inaugural meeting to discuss, among other topics, warehousing.

90.     As of the acquisition by the HKEx Group, JPMorgan and Goldman Sachs were the two largest shareholders in the LME, each owning approximately 10%.

---

Plaintiffs specifically reserve all appellate rights with respect to LME's amenability to suit.

[27]     David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, THE NEW YORK TIMES (August 12, 2013).

91.     The LME certifies and purports to supervise a global network of more than 700 warehouses for the storage of metals, including the Metro, Henry Bath, and Pacorini USA warehouses in the United States.

92.     **ICS**:  International Commodity Services Ltd., ("ICS") is a U.K. limited company located at The Houses, 16-18 Black Friars Lane, London EC4V 6EB, United Kingdom.

93.     The LME requires that each LME-approved warehouse company have an LME-approved "London Agent,"[28] to, among other things, use the all-encompassing LMESword® transactional database on its behalf.[29]  A London Agent is, therefore, in control of all highly sensitive financial and competitive warrant and warehousing transaction data of its warehouse, which includes not only warehouse data but also trading data.  ICS is a London Agent.  ICS is the London Agent for Metro, Pacorini, and Henry Bath.[30]

94.     ICS is, therefore, in control of all Defendants' LMESword data, and, apparently, more, having a list of domestic and international bank account numbers and routing codes for Metro, Pacorini, and Henry Bath.[31]  What's more, Mike Dudley, the Chairman of ICS, who has had a "long and varied history in commodities,"[32] held a seat on the Warehousing Committee for much of the time material to this Complaint.[33]

95.     In addition to Mike Dudley, the CEO of ICS, sitting on the LME Warehousing Committee,[34] Shon Loth, an ICS executive, played a key role in acting as a go-between for Goldman Sachs, Metro, and Europe Economics, when the load-out rule change was being implemented.[35]  For instance, ICS was tasked by Metro with "gaining intel and shaping

---

[28]     http://www.lme.com/glossary/l/london-agent/.

[29]     http://www.lme.com/en-gb/trading/venues-and-systems/systems/lmesword/.

[30]     *See*   http://www.lme.com/~/media/Files/Warehousing/Rent%20and%20FOT/Warehouse %20company%20bank%20details%202013.pdf (last visited Oct. 7, 2014 at 7:27 p.m.).

[31]     http://www.lme.com/~/media/Files/Warehousing/Rent%20and%20FOT/Warehouse%20 company%20bank%20details%202013.pdf (last visited Oct. 7, 2014 at 7:27 p.m.).

[32]     http://www.intercs.co.uk/ics-team.html.

[33]     GS-METRO-00020901-04 at 01.

[34]     GS-METRO-00020901-04 at 01.

[35]     *See, e.g.*, GS-METRO-00019182.

corrections for the second draft" of the Europe Economics Report.[36]  ICS agreed to do so: "I am of course aware of the ramifications of an adverse report and the need to shape it to achieve the desired results . . . so leave me to fly the flag over lunch and I will report back accordingly."[37]

96.     On June 17, 2010, Loth wrote to Wibbelman: "I am not sure if your Board meeting discussed ICS being able to assist you?  This debate over delivery rates will be over before we even start at this rate.  You were entirely accurate when you told Stephen [Branton-Speak of Goldman] that by the time it got to the LME Board, it will be a done deal.  I have plenty of ideas, but you will need to let me at it?"[38]  In October 2010, Wibbelman emailed aluminum producer Rio Tinto's Darren Colwell to tell him that he could expect a call from Loth, "[t]he purpose of [which] is to speak with you about the study being conducted by European Economics . . . .  He would ultimately like to put you in touch with the guy from European Economics for an off the record conversation but wants to brief you first."[39]

97.     On March 15, 2011, Dudley asked Wibbelman whether there were any issues he wanted to "raise discreetly" with Martin Abbott, of the LME.  In reply, Wibbelman requested "gaining intel and shaping corrections for the second draft" of the Europe Economics Report. Wibbelman pointed out to Dudley that "the people complaining will not benefit from a change as GS, Glencore and a couple others take market actions to shape the landscape" and "Warehouse companies view the 1500 obligation as a contract and not a rule that can be changed unilaterally."[40]

---

[36]     GS-METRO-00033241-45 at 42.

[37]     GS-METRO-00033241-45 at 41.

[38]     GS-METRO-00048721-22 at 21.

[39]     GS-METRO-00019182.

[40]     GS-METRO-00033241-45.

**FACTUAL ALLEGATIONS**

**The Aluminum Market**

*Properties & Uses*

98.     Aluminum is the most abundant metal found on Earth.  It accounts for over 8% of the Earth's crust.  Because aluminum is highly reactive, it does not exist in the environment in its free form.

99.     Aluminum is a lightweight, strong, corrosion-resistant, conductive, and durable non-ferrous metal.  Its unique properties result in its use in the manufacture of a wide array of products, such as vehicles (*e.g.*, airplanes and automobiles), packaging materials (*e.g.*, beverage cans), construction materials (*e.g.*, window frames and siding), and consumer products (*e.g.*, iPads and flashlights).  These unique properties also mean that there are few readily available substitutes for aluminum in most industrial applications.

*Aluminum Production*

100.     Primary aluminum[41] refers to the process by which new aluminum is made from the mining of bauxite ore.[42]  Bauxite ore is refined to extract alumina.  Alumina is then shipped to a primary aluminum plant (or smelter) where aluminum is extracted from the alumina into cells or pots by electrolytic reduction.

101.     At regular intervals, molten primary aluminum tapped from the cells or pots is transported to the cast house where it is alloyed in holding furnaces by the addition of other metals (according to the user's needs), cleaned of oxides and gases, and then cast into various shapes, such as extrusion ingots, sheet ingots, billets, sows, pigs, sheets, rolls, and other forms, depending on how it is to be further processed.

102.     For the vast majority of the aluminum they produce, the large integrated producers, such as Alcoa, Inc., UC Rusal, Rio Tinto Alcan, Inc. and Norsk Hydro ASA, do one of two things.  They either: (1) sell it directly to industrial users, who fabricate the aluminum

---

[41]     Primary aluminum is defined as "The weight of liquid aluminum as tapped from pots, excluding the weight of any alloying materials as well as that of any metal produced from either returned scrap of remelted material." E. Lee Bray, *2012 Minerals Yearbook, Aluminum [Advance Release]*, p. 5.21 (U.S. Department of the Interior, August 2013).

[42]     In contrast, secondary aluminum production refers to the process by which existing aluminum is recycled into pure metal.

into other shapes before reselling it further; or (2) fabricate the primary aluminum themselves before selling it to an additional group of industrial users.  In this regard, the large integrated producers are both suppliers to, and competitors with, fabricators.  As discussed below, the vast majority of these sales, and specifically those made to Plaintiffs, are done pursuant to long-term (typically annual) supply arrangements with pricing based on the "all-in" or spot price for aluminum.  As discussed throughout, the priced for this aluminum, when sold to Plaintiffs, specifically incorporates both the LME cash price and an applicable regional premium.

103.    Producers also sell a certain amount of primary aluminum to physical traders and financial buyers who typically store the aluminum in warehouses.  Most often, these sales involve the use of the LME warehouse system (discussed below) and for a primary aluminum product referred to as P1020 aluminum.  P1020 is 99.7% pure aluminum and is cast as standard ingots, t-bars, or sows.[43]  It is non-perishable and will not rust.  It is sometimes referred to as a remelt ingot because it can be readily re-melted in the cast house and fabricated into other forms of aluminum.  Importantly, it is the commodity grade aluminum and is the basis for the LME cash price, because it underlies all LME aluminum warrants.  It is the grade upon which all other aluminum is priced.

104.    Primary aluminum is manufactured in more than two dozen countries around the world.[44]  Worldwide, approximately 47.6 million metric tons of aluminum are produced each year.  The largest producers are China, Russia, Canada, the U.S., Australia, and the United Arab Emirates, which combined, produce over 32 million tons per year.[45]  China is the largest producer and consumer of primary aluminum.

105.    Dating back to the mid-2000s, there has been, and continues to be, a substantial over-supply of aluminum, especially considering the vast supplies of aluminum held in warehouses, as explained below.

---

[43]    The "1020" refers to the fact that there is a maximum of 0.10% silicon and 0.20% iron.

[44]    World Bureau of Metal Statistics primary aluminum production data. 2013, via Bloomberg LP, accessed Oct. 1, 2014.

[45]    World Bureau of Metal Statistics primary aluminum production data. 2013, via Bloomberg LP, accessed Oct. 1, 2014.

| Aluminum Production-Consumption Balance 2008-13 (Million Tonnes) | | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013 (e)** |
| **Production** | 40 | 37.5 | 42.3 | 44.7 | 46.2 | 51 |
| **Consumption** | 37.6 | 35.4 | 41.3 | 42.8 | 45.8 | 50.4 |
| **Balance** | 2.4 | 2.1 | 1 | 1.9 | 0.4 | 0.6 |



106.    The U.S. consumes approximately 5 million tons of primary aluminum per year with significant imports from Canada and Mexico, partially attributable to reduced trade barriers under NAFTA.   Domestic U.S. producers supply approximately 2 million tons of primary aluminum each year.[46]   The deficit of approximately 3 million metric tons is mostly satisfied through imports of primary aluminum with a small portion (less than 0.5 million tons) satisfied by

---

[46]    E. Lee Bray, *Mineral Commodity Summaries*, p. 2 *(*U.S. Geological Survey, February 2014).

processing scrap from recycling.[47]   The U.S. imports primary aluminum from more than two dozen countries.[48]

107.    Chinese-produced aluminum does not trade as freely as aluminum from most other countries.[49]   The Chinese market produces and consumes roughly 20 million tons of aluminum per year, or roughly 45% of world production.   In many respects, Chinese aluminum can been seen as being walled off from the rest of the world.

*Aluminum Supply And Demand Are Inelastic*

108.    The demand for aluminum is generally inelastic.[50]   This lack of sensitivity to price for many manufacturers is due to numerous factors, including the fact that, in many products, the specifications and design of the product does not easily allow for change of materials until the product is redesigned.   Such product cycles can last many years.   In addition, for those products with shorter redesign cycles, aluminum is often a small component of the cost of the product, making redesign or substitution, due to an increase in aluminum costs, less attractive.

109.    The long run demand elasticity of aluminum is low compared to most manufactured goods.   Aluminum does have substitutes, which makes it more elastic than some other minerals and metals, but research has found that the demand price elasticity for aluminum is still in the inelastic range. "The estimated long-run price elasticity of aluminum demand is significant and ranges between -0.7 and -0.8 . . . ."[51]   This means that as prices change, manufacturers who use aluminum will not substitute away from it enough to eliminate the profit opportunity achieved by raising the price.   From the demand side, an increase in price, if achievable, will increase profits to those with aluminum to sell.

---

[47]    E. Lee Bray, *2012 Minerals Yearbook, Aluminum [Advance Release]*, p. 5.19 (U.S. Department of the Interior, August 2013).

[48]    E. Lee Bray, *2012 Minerals Yearbook, Aluminum [Advance Release]*, p. 5.19 (U.S. Department of the Interior, August 2013).

[49]    Credit Suisse, Fixed Income Research, *Base Metal Cost Support: Where Is it and What Does it Mean?* (11 October 2011).

[50]    Christopher L. Gilbert, *Modeling Market Fundamentals: A Model of the Aluminum Market*, Journal of Applied Econometrics Vol. 10, pp. 385-410 (1995).

[51]    Martin Stuermer, *Industrialization and the demand for mineral commodities*, p. 16, University of Bonn, unpublished manuscript, 2013.

110.    The aluminum market adjusts slowly because of the very long lead times required to add aluminum production capacity.    Economists at the DOJ determined that it takes approximately six years for the aluminum industry to respond to shocks that would call for a restructure of the industry.  "The finding that the long run is six years or longer is more believable because it corresponds to the time that it takes to build a primary aluminum plant."[52]  So, while it may be the case that some short-term, and therefore less efficient, adjustments can be made to changes in prices, it is not possible for the aluminum market to return to a long-run equilibrium price in the short-run.  Therefore, aluminum prices will remain high if there is an unanticipated shortfall in available aluminum.  Thus, over the course of several years, six or more according to DOJ economists, aluminum supply price is inelastic in the U.S. and globally.

111.    The production of aluminum is inelastic over the span of six or more years.[53]  This is, in great part, because manufacturers tend to maintain active smelters running at high capacity.  Further, it takes about six years to bring a new smelter on-line.  At the same time, scrap aluminum has been found to be almost completely inelastic.[54]  This means the price change in the market due to demand shifts will have relatively little change on the volume of aluminum produced and, further, that change in the amount of aluminum material available on the market will cause a large change in price as the consumers have a low long-run elasticity, and the supply elasticity, although potentially high in the long-run, takes six or more years to achieve.

112.    Thus, although there is a significant international trade that is already functioning in aluminum, alterations in supply or available aluminum will have a significant impact on price for as long as six years.

113.    Another source of aluminum besides foundries is "secondary aluminum," which is from aluminum scrap.  This source of aluminum is also known to be highly inelastic as it is produced from the left-over portions of aluminum of manufactured products that use aluminum.

---

[52]    Luke Froeb and J. Geweke, *Long Run Competition in the Post-War U.S. Aluminum Industry*, INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION, 5, p. 77 (1987).

[53]    Luke Froeb and J. Geweke, *Long Run Competition in the Post-Ware U.S. Aluminum Industry*, INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION, 5, p. 77 (1987).

The volume in the scrap market is, therefore, more a function of the amount of aluminum used in manufacturing than the price of aluminum.[55]

114.    Therefore, while aluminum production around the world will eventually adjust capacity to price changes, this process takes a very long time.  During this period of adjustment of capacity, the supply of aluminum world-wide is relatively fixed, as those in the market will continue to supply aluminum as long as the cost of aluminum covers their variable cost for producing an additional unit of aluminum.  In many cases, shutdown and startup costs are large, making the decision to keep a smelter running a function not only the cost of the inputs directly attributable to output, but also the costs required to stop production and potentially restart.

115.    As discussed above, the elasticity of demand has been measured to be in the inelastic range, meaning that a constriction of supply will drive a price increase sufficient to make the constriction in sales profitable.  Also, as described, researchers have found that the supply of aluminum is relatively fixed over the span of about six years for various reasons, including the long time required to construct aluminum smelters.  Secondary aluminum sources also vary little with price due to their production by way of scrap from manufacture.  Therefore, a restriction of available aluminum will therefore cause a significant increase in market price.  Given the worldwide trade in aluminum, these price restrictions will run through the global market dampened to some extent by transportation costs.[56]

*Relevant Aluminum Market for Purposes of the Complaint*

116.    As alleged above, aluminum has unique properties coveted by manufacturers of products containing aluminum.  Aluminum products have specifications and designs that does not easily allow for change of materials until the product is completely redesigned.  This is an expensive and time-consuming process.  Thus, aluminum exhibits inelasticity in demand.  A small but significant increase in the price of aluminum does not lead to substitution.  Based on

---

[55]    Jerry Blomberg, *Essays on the Economics of the Aluminum Industry*, p. 24, Lueå University of Technology, 2007.

[56]    Lloyd T. O'Carroll, *Warehouse Financing Issues*, p. 15 (Platts Aluminum Symposium 2014).

these factors, Plaintiffs allege that primary aluminum can be considered a relevant product market.

117. Aluminum production occurs on a global basis. Available data indicates that aluminum is shipped throughout the globe. The U.S. imports substantial quantities of aluminum, primarily from Canada, which is part of NAFTA, but also from Europe and Asia. Plaintiffs Agfa and Kodak purchase aluminum globally for use in the United States, acquiring supply from the United States, Europe, and Asia. Costs to ship aluminum overseas are approximately five cents per pound. Plaintiffs, therefore, allege primary aluminum is a global market. Nevertheless, due to transport costs, duties, and tariffs, the majority of aluminum is largely produced and sold grouped in the following regions: North America, Europe, Asia, and China.

**Aluminum Pricing: Spot Prices and Their Link to Long-Term Supply Contracts**

118. The spot metal price for physically delivered aluminum has two standardized components: (1) the "LME Cash Price"; and (2) a regional premium, *e.g.*, the Platts Midwest Premium in the United States. Together, these components are generally referred to as the "all-in" price for physical delivery of primary aluminum. Platts combines these two components and publishes the Midwest Transaction Price ("MWTP"). Where shaping the aluminum into a particular form has occurred, additional fees and premiums are applied on top of the "all-in" price for aluminum.

119. The LME cash price is determined daily by open outcry by the marginal buyer and seller at a specific moment in time using standardized LME contracts covering spot material located in LME warehouses. The LME thus provides a price discovery mechanism for a standard aluminum exchange contract throughout the world. While the LME cash price is a global price, it does not include the costs of delivery from a seller to a purchaser.

120. To cover the costs of delivery to a customer, contracts incorporate various regional premiums. The regional premiums are compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot aluminum on a given day for delivery to relevant geographic points. Thus, the regional premiums reflect current offers *for immediately available aluminum for delivery* from producers, traders, and holders of warehoused aluminum, and these offers incorporate the fluctuating delivery, storage, finance,

and insurance costs incurred by these competing suppliers of aluminum. The regional premiums are published by private companies, including Platts and Metal Bulletin.

121.    In the United States, the benchmark regional premium is the Platts Midwest Premium. Notwithstanding the limitation implied by its name, the Midwest Premium is charged throughout the United States (and, sometimes, abroad). The Midwest Premium "was originally created to cover the freight from Baltimore to the Midwest. It now incorporates supply and demand of the North American-specific market to complement the LME aluminum contract."[57]

122.    Other regional premiums include the "Rotterdam Premium" and the "CIF Japan Premium." The Rotterdam Premium, which is expressed as either "duty paid" or "duty unpaid" depending upon where the metal is designated for delivery, typically applies to aluminum that originates in Europe (it is sometimes referred to as the European Community Duty Paid, or Duty Unpaid, Premium). The Rotterdam Premium is also reported and published based on a similar survey of producers, traders, and consumers. The CIF Japan Premium is a comparable premium which typically applies to aluminum that originates in Japan or certain other parts of the Far East.

123.    Because industrial contracts for physical delivery of aluminum express the price using the LME cash price, which is a global price, and a regional premium, the regional premiums tend to move together (up and down). If they did not, multi-national aluminum purchasers, traders, and arbitrageurs could exploit pricing differences in regional premiums by transporting aluminum from one region to another. For example, if the Midwest Premium increased enough relative to the Rotterdam Premium and/or the CIF Japan Premium, a purchaser for U.S. consumption could purchase aluminum from an LME warehouse in Europe, like Vlissingen, or in Asia, like Johor, and take delivery and transport the aluminum to the United States for less than paying the spot metal price (MWTP) available in the United States. Notably, a Defendant Metro document discusses high European premiums putting pressure on barge

---

[57]    http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID= 784335.

opportunities from a Canadian smelter, referencing the "swing tonnage" between North America and Europe.[58]

124.    The vast majority of aluminum is purchased by industrial users, such as Plaintiffs, pursuant to a long-term (typically, annual) supply arrangement, as opposed to on the spot market.   This aluminum does not enter LME-certified warehouses.   Instead, industrial purchasers, such as Plaintiffs, place periodic orders pursuant to the supply contract with the producer, who then arranges for the aluminum to be delivered to the purchaser's facilities.

125.    Although this aluminum does not enter LME-certified warehouses, its pricing is still referenced to and incorporates the spot metal price, *i.e.*, the LME cash price plus regional premium.   The pricing of aluminum for long-term industrial contracts, such as Plaintiffs', is dependent upon the supply and demand in the LME warehouse system and the immediate availability of aluminum for delivery.   Furthermore, as admitted by the LME, "Although physical aluminum will never pass through the LME network or LME warehouses, the balance of trade does impact LME volumes and prices through the hedge which will likely be transacted by the counterparties to hedge their LME price risk."   Long term, the price Plaintiffs pay is inextricably intertwined with the price of aluminum in the LME and on the spot market.

126.    Recently, as a result of the sharp increases in regional premiums that Plaintiffs contend are the result of Defendants' conduct, Plaintiffs Agfa Graphics and Kodak have sought to procure aluminum (including non-warehoused aluminum) from their suppliers without the regional premium component of the pricing.   Due to the prevailing and standardized use of regional premiums through most of the world as benchmarks for pricing physically delivered aluminum, Plaintiffs' efforts proved unsuccessful.

**LME-Certified Warehouses**

*The LME's Global Network of Warehouses*

127.    The LME certifies a global network of more than 700 metals warehouses, with close to 200 located in the United States.   Defendants Metro, Henry Bath, and Pacorini

---

[58]     GS-METRO-00030263-64 at 64.

collectively own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world.

128.   Although there are more than 700 LME-certified warehouses globally, these facilities are in just 38 locations spread across a mere 15 countries.  The LME describes these locations as "areas of net consumption and logistical hubs for the transportation of material."[59]

129.   To become LME-certified, a warehouse operator must show adequate evidence of insurance and financial capacity.  The warehouses themselves must also meet requirements relating to proximity to highways, railroads, and/or waterways, and the capacity to offload a specified daily minimum tonnage, as set forth below.

130.   In the United States, LME-certified warehouse locations include Detroit, Baltimore, Chicago, Toledo, New Orleans, Mobile, and Los Angeles.  Defendant Metro operates in Detroit, Toledo, Chicago, Mobile, and New Orleans.  Defendant Pacorini operates in Detroit, Baltimore, Chicago, New Orleans, Mobile, and Los Angeles.  Defendant Henry Bath operates in Baltimore, Chicago, and New Orleans.

131.   The LME-certified warehouses are a critical part of the supply chain for aluminum in the United States (and indeed, globally) because, among other things, it is only in such warehouses that LME warrants can be issued and canceled.  To issue a warrant means that aluminum has been checked into such a warehouse for storage, and to cancel a warrant means that the aluminum has been earmarked for delivery from the warehouse.[60]

132.   An LME warrant is a standardized document issued by the warehouse upon delivery of a lot of aluminum into the warehouse to indicate who has the right of possession of that lot of aluminum.  LME warrants are bearer documents of title, of a specified brand, of a specified metal (such as aluminum) in a specified location and warehouse and are the only standardized instruments of title for aluminum.

---

[59]   https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last viewed on Oct. 8, 2014).

[60]   ECF No. 384 at 7-8.

133.   Because they are standardized, LME warrants are freely tradable and are the actual instrument that underpins a highly leveraged volume of LME paper futures transactions.[61] Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of physical aluminum.

134.   When, at their expiration, a forward contract or futures contract prices move into line with the prices for the physical commodity, it is referred to as "convergence."

135.   From 1989 until 2008-2009, the LME's warehouses fulfilled the LME's represented mission of a price-neutral storage place of last resort.

136.   In so doing, the LME warehouses both: (1) held primary aluminum that was available on a commercial basis to industrial and other consumers as a source of supply; and (2) received primary aluminum from producers and others.

137.   Thereby, the LME forward contracts achieved price convergence.  That is, the LME price was equal to or as equal as practicable with the price of physical aluminum.

138.   The ways in which this price convergence was achieved included the fact that the LME's warehouses provided industrial and other consumers who held LME aluminum forward contract long positions with the ability to take delivery on those long positions of LME aluminum, and smelters and other sellers of aluminum with the ability to make delivery on their short positions in LME forward contracts.

139.   The ability of the industrial and other consumers to take delivery of and acquire primary aluminum through the LME gave them a way to obtain the primary aluminum that they needed without paying the Midwest Premium and tended to cause convergence.  If warrants were received in warehouse locations that were not preferred by the consumer, an active market existed for the trading and swapping of warrants on LME aluminum and the industrial or other consumer could swap warrants to a preferred location and obtain the LME aluminum without paying the Midwest Premium and without significant delays.  In this and other ways, the price-neutral, last-

---

[61]   *Id.*

resort conduct of the LME warehouses achieved price convergence and made the LME forward contracts attractive both to industrial consumers and the producers of aluminum.

140.    The only difference between the LME price and the physical or spot price was the transportation and related costs to the point of delivery.  Those came to be referred to as the premium or, in most of the U.S., the MW or Midwest Premium.  While, as discussed herein, premiums have gone up dramatically, freight costs have not increased substantially over the time material to this Complaint.

141.    Without a link to timely-deliverable metal, the viability of the LME price discovery mechanism would be lost, and fabricators and purchasers consequently would see no value to LME pricing.  The LME itself describes its "functions of trading and price discovery [as] underpinned by a global network of approved warehouses and storage facilities as well as approved brands[,]" and notes that "While delivery occurs in only a very small percentage of LME trades, the possibility of physical settlement plays a vital role in creating price convergence and ensuring our prices closely align with that of the physical spot market."[62]

142.    LME warehouses are vital links in the U.S. (and indeed, global) physical supply chain for another reason.  During a deficit aluminum market, they represent the supplier of last resort for consumers who need to obtain physical aluminum; during a surplus aluminum market, as during the times material to this Complaint, they represent the destination of last resort for producers who need to keep their plants operating and raise cash.

143.    LME warrants are also critical to the financing of aluminum-related transactions.  For the reasons set forth above, the LME warrant is considered first-class collateral.  The holder of an LME warrant can borrow money secured by that warrant on favorable terms.

*The Relevant Market for LME-Certified Warehouses for Aluminum*

144.    As alleged above, an LME warrant for aluminum can only be issued for aluminum that has been placed in an LME-certified warehouse.  LME warrants allow persons to convert aluminum into tradable warrants exchangeable for cash or deliverable against trading

---

[62]    https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last viewed on Oct. 8, 2014).

positions.  Because this can only be done with an LME-certified warehouse, Plaintiffs allege a relevant product market for LME-certified warehouse services for aluminum.  Further, Plaintiffs allege that like the production of primary aluminum, which is designed to warehouse and trade, the LME-certified warehouse services market functions on a global basis with distinct regions in North America, Europe, and Asia.

**The Amount of Aluminum Stored in LME Warehouses Soars**

145.    The LME warrant-warehouse system properly served the aforementioned roles for close to 135 years.  During that time, the aluminum tonnage in the LME warehouses represented a very small percent of global aluminum supplies.  Nevertheless, LME's warehouses enjoyed a reputation of being a readily accessible and liquid market.

146.    From the end of 2008 to the present, however, the amount of aluminum held in LME warehouses worldwide soared, from about 1.1 million tonnes in July 2008 to about 5.5 million tonnes in April 2013, a five-fold increase:



147.    Aluminum stored in U.S. LME warehouses also rose from 2005 to 2012 as shown in the following table and chart:

**U.S. LME Warehouse Aluminum Stocks 2005-12 (000 Tonnes)**

| 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|------|------|------|------|------|------|------|------|
| 209 | 228 | 463 | 1290 | 2200 | 2230 | 2360 | 2300 |



148.    That inventories of aluminum were increasing or staying constant at the same time that, as discussed below, the Midwest Premium was also increasing, defies economic logic: the large inventories of aluminum stored in warehouses indicates that there is (or should be) an ample supply of aluminum available for immediate delivery – and this should, in turn, produce a corresponding decrease in the premiums for such delivery.  But this was obviously not so.

149.    Initially, the increase in aluminum held in the warehouses was a result of the global financial crises that began in 2008.  Demand for aluminum decreased sharply as a result of that crisis, which led to increasing inventories of aluminum being stored in warehouses rather than being sold to consumers.  The crisis also led to a contraction in the availability of financing for commodities-related transactions.  As a result, producers and others in the aluminum supply chain converted inventories of aluminum into cash and engaged in other transactions that resulted in large inventories of aluminum being held by traders and financial institutions.

150.    Although the heavily oversupplied global conditions that had initially, in 2008, led to the rapid increase in the amount of aluminum held in storage ended, the amount of aluminum held in storage in U.S. LME warehouses continued to rise or remain steady.

**The Entry of Banks and Traders into Warehousing**

151.    The period following the financial crisis saw the entry of banks and traders into the aluminum warehousing business.   In February 2010, Defendant Goldman acquired Defendant Metro.[63]   In July 2010, Defendant JPMorgan acquired Defendant Henry Bath.[64]   In September 2010, Defendant Glencore acquired Defendant Pacorini.[65]

152.    As Blythe Masters, the head of JPMorgan's commodities business admitted, following JPMorgan's July 2010 warehouse purchases, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . .   We need to be active in the underlying physical commodity markets in order to understand ***and make prices***."[66]   With this statement, JPMorgan admitted not only that it entered into the warehousing business so that it could "make prices" in the commodity, but also that it did so specifically in order to "be active" in the physical aluminum market.

153.    Indeed, the entry of these financial players into what had been a staid business caused a significant change in the behavior of the warehouses and the nature of the physical market for aluminum.   Defendant Metro CEO Wibbelman expressly noted in an August 12, 2010 email to Goldman's Stephen Branton-Speak, "It is a new world.   With Glencore owning pac[orini], traffi [Trafigura] owning Nems and jp owning Sempra, the world is different for exposed tons in premium locations."[67]

154.    Defendants and their co-conspirators created and profited from this market transformation by, among other things and as further described below, offering substantial incentives to store aluminum in their warehouses in order to create a critical mass of aluminum at the key chokepoints that still had aluminum under tradable warrants, strategically shifting

---

[63]    Javier Blas, *Goldman and JPMorgan enter metal warehousing*, FIN. TIMES (Mar. 2, 2010).

[64]    *Id.*

[65]    *Id.*

[66]    *Wall St falls out of love with commodities trading*, http://www.aluminiumleader. com/en/serious/news/2013/08/06/LME050813 (last viewed on Oct. 8, 2014) (emphasis added).

[67]    GS-METRO-00030984.

aluminum stocks among their own warehouses and from competitor warehouses to those chokepoints, artificially restricting the removal of aluminum from those warehouses under the cover of LME rules, and engaging in strategic cancellations of warrants to exacerbate existing queues.

155.    Defendants manipulate the supply of aluminum by purchasing inventories of aluminum, placing them under warrant at the LME warehouses, followed by dubious "transfers" to, in many cases, the Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum has reached the next warehouse.[68]   Among other indicia of manipulation here is that the amount of aluminum warrants canceled far exceeds any legitimate need for physical aluminum.   This diverted aluminum from actual aluminum users and created an artificial shortage of aluminum and thus, the higher Midwest Premium complained of herein.

156.    In the case of the current aluminum market, Defendants used the LME warehouses as the mechanism to facilitate their collusive agreement. Once aluminum was put into the LME warehouses, volumes of aluminum inventories could be verified as warrants can be confirmed. The speed at which the aluminum is removed from the warehouse is slowed, and at the same time, the collusive parties are able to lock in profits while not letting the aluminum actually reach the physical market due to a year or more delay in load out.   This also provided longer storage times and therefore, longer storage fees.

157.    The large volume of metal put into LME warehouses as compared with minimal increases in other non-LME market warehouses (Shanghai Exchange and Japan) makes sense if the collusive parties were attempting to use this very transparent LME exchange and its warehouse system as the mechanism to coordinate their collusive agreement, to monitor the behavior of the collusive group, to limit the ability, and temptation, of the collusive group to cheat, and to lock in collusive profits.   All this is made possible by getting to the front of the load out queue while still holding the collusive group's metal off the physical market.   This allows

---

[68]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

prices to remain high even as the collusive group locked in their sales.  These features would not have been available to the collusive group if they had placed all or much of their inventories in non-LME warehouses.  Of course, Defendants' ownership interests in, and participation in, the LME also provided a convenient opportunity to conspire.

158.    The achieved price increases impacted those market participants who bought aluminum on the spot market, *i.e.*, the cash price plus the regional premiums, including the Midwest Premium.  Furthermore, the impact of this price increase spread to other parts of the world muted only to the extent that tariff barriers and transportation costs insulated those regions from increased inventories and the associated manipulated prices.  To the extent they have wound down this collusive restriction of the available aluminum on the market, the collusive group was able to lock in their profits by exiting together before most of the other holders of metal in the warehouses, leaving these slower market participants to take the comparative loss, while the collusive group gained.  At the same time, the restriction of aluminum on the market and its reduced rate of release into the market made prices higher for all consumers of metal compared to what they would have been if the release had been timed to meet when the metal was demanded.

159.    Defendants' collusion is based on the specific features in the market and would not work in a market where the structure of the market could adjust quickly.  But quick adjustment to the structure of the market is not a feature of the aluminum market.

**Defendants Conspired to Increase Aluminum Spot Metal Prices, Specifically, Applicable Regional Premiums, by Moving Metal into Key Warehouses Which They Controlled**

*Ignoring LME Information Barriers, Defendants' Trading and Warehousing Operations Work Together to Effectuate the Conspiracy*

(a) Goldman and Metro Straddle the Information Barrier

160.    The degree of coordination between Defendants spans both vertical and horizontal junction points of the aluminum market.  First and most directly, coordination between commodities trading desks and their affiliated warehousing companies (*e.g.*, Goldman and Metro, JPMorgan and Henry Bath, Glencore and Pacorini) was both steady and wide-sweeping.[69]

---

[69]    *See* GS-METRO-00046221-23 (email from Wibbelman to Gabillon of Goldman with "financing deal/commitment summary" for February and March).

161.    At all times material to this Complaint, the LME has had in effect certain "Information Barrier" rules relating to the sharing of confidential information between LME members and related warehouse companies.   Most significantly, these rules are designed to prevent the sharing of information relating to the identity of warehouse customers, sensitive pricing information, and certain non-public information about inbound and outbound metal at LME warehouses.   These rules applied to the Goldman-Metro relationship.

162.    Goldman and Metro were aware of these rules.   On February 25, 2010, Metro sent to the LME its updated response to an LME survey dealing with warehouses having relations with Trading Companies.[70]   The submission included the Goldman/Metro holding structure, along with a description of the personnel involved in running Metro.   The submission obfuscated, or at least downplayed, the relationship between Goldman and Metro.   A diagram depicted Goldman Sachs Group holding Metro in a branch separate from the branch in which it holds Goldman Sachs International.   Metro's operations, however, were described as being coordinated through Goldman's London Global Commodities Principal Investments ("GCPI") team, a group that would include Francesco Ciardi; Jacques Gabillon; Ingmar Grebien; and Chen-ryun Leo.   This group would report to Greg Agran, who, the submission asserted, had no responsibility for metals sales and trading "and is not able to manage or influence risk management of that business."   Metals sales and trading, according to the submission, was part of Goldman's Commodities Division and was managed by Stephen Branton-Speak (Trading) and Leslie Biddle (Sales), who reported directly to the same person (Isabelle Ealet), to whom Agran reported.   The submission acknowledged that Branton-Speak was an LME board member, but, according to the submission, Branton-Speak removed himself "from any discussions involving Goldman Sachs International and will also remove himself from any discussions or decisions regarding Warehouses and/or specifically Metro."   The submission noted further that the LME was aware of Branton-Speak's relationship with Goldman Sachs International and Goldman Sachs International's relationship with Metro.   As suggested above, it is not at all apparent that Metro's holding was, in fact, a part of Goldman Sachs International.

---

[70]     GS-METRO-00013989-14006.

163.   Goldman and Metro downplayed their relationship elsewhere as well.   They prepared talking points to be used by Wibbelman in relation to the acquisition, in which they chose their words carefully with an eye toward implying that Metro would be independent of Goldman, without quite saying as much.   For instance, according to a February 17-18, 2010 email exchange between, *inter alia*, Gabillon and Wibbelman, Gabillon instructed Wibbelman to tone down language about Metro being completely separate from Goldman:   "Entirely separately from Goldm [sic] is a bit strong, let's go with 'operate on a stand alone basis with independent management."[71]   Further, Metro's proposed statement that "Goldman's Compliance officer will sit on the board to insure that the company is run independent of any other Goldman business" was, according to Goldman, to be "used [only] in last resort."   "Generally we should say the least possible:   for instance let's not volunteer the info about Victoria on the board unless you are been asked.   We should not put anything in writing either."   Goldman prepared a Q&A that indicated that Goldman's "own policies" prohibited the use of "information about [Metro's] activities to make more informed trades in metals[.]"   Another proposed Q&A acknowledged that Branton-Speak was on the board of the LME, but claimed that he was an independent (*i.e.*, non-Goldman) member and that "Stephen will not be involved in any discussions with respect to LME's relationship with Metro or other warehouses.   Stephen will not be on the board of Metro nor will he be involved in the day to day management of Metro."   Wibbelman predicted "a grilling on the kind of information conveyed.   I will make it seem aggregated, financial, after the fact and only to Chinese wall vetted accountants."[72]

164.   Far from having "independent management," however, the Metro board of directors was made up entirely of Goldman employees, including:   Agran; Victoria Attwood Scott (Compliance); Max Bulk (Operations); Gabillon; Philip Holzer (Securities Division); Bob Mancini (GCPI); Dermot McDonogh (Controllers); and Ken Murphy (Archon).   Gabillon was the Chairman of the Metro Board.

---

[71]     GS-METRO-0045867-70 at 69.

[72]     *Id*.

165.    And, far from communications that were "aggregated, financial, after the fact and only to Chinese wall vetted accountants," Metro's dealings with Goldman traders were constant and routine; violations of the information barrier were commonplace.  Metro and Goldman regularly communicated about pricing details (including customer identification) for deals Metro took part in with non-Goldman customers, shipments of metal between warehouses, and the like.

166.    A June 8, 2010 email from Wibbelman to Gabillon suggests that Goldman needed to review inbound metal commitments and rental rate quotes before they could be finalized.  With the email, Metro sent to Goldman commitment summaries for inbound new metal with detailed quotes for rental fees.  Wibbelman described Metro's strategy as "[w]hat we have done and are doing instead is letting one proposal hit and getting permission from GS for additional headroom."[73]

167.    On July 12, 2010, Wibbelman emailed Goldman's Branton-Speak, suggesting that he had a meeting planned with Gabillon (apparently in London) and inquiring whether Branton-Speak had availability to meet as well.[74]  Branton-Speak suggested meeting times and also suggested that "Scott" (likely, Goldman trader Scott Evans) would be in town.  Wibbelman responded that he would like to meet with Evans on Sunday [July 19].  He added:  "One topic for you to discuss with him in the context of your upcoming meeting . . . we have been engaging the services of Michael Kagushev, a former Rusal employee to help us facilitate the sourcing of metal out of Russia and specifically Rusal.  (I know "facilitate" and "agent" are words that scare GS, but this is a very clean information conveying role).  Would like your collective view on whether in the context of Glencore's equity interest in Rusal, and the fact that Scott speaks fluent Russian, if you think it is worth retaining.  We sourced several ships in 2008 and even a couple stragglers in 2009 but nothing in some time with Glencore Hoovering up all of the metal."  Branton-Speak noted that "Scott has been asked to show a price for 5k a month, july-dec . . . come on, lets do a god damn deal??"[75]  Wibbelman responded that he had "Left him a message to call me."

---

[73]    GS-METRO-00048405-06 at 05.
[74]    GS-METRO-00049325-26.
[75]    GS-METRO-00049325-26.

168.     Not only did Metro and Goldman not adhere to the supposed information barrier, but they openly mocked it.  On July 20, 2010 (the day after Wibbelman had planned to meet in London with Scott Evans and with Branton-Speak) Wibbelman sent a cryptic email to Gabillon: "Second source confirms its Glencore."  This prompted the following exchange, as Gabillon apparently was with Evans at the very time:

> Gabillon:  "You called Scott while I am having dinner with him ????"
>
> Wibbelman:   "There is a large bread basket that constitutes a Chinese Wall."
>
> Gabillon:  "Massive basket but wine flowing courtesy of steve . . . . Negotiating freight incentive right now!"[76]

169.     Just a few days later, on July 23, 2010, Evans emailed Wibbelman (copying numerous Goldman personnel, including Branton-Speak):  "thanks for your support on this first transaction, looking forward to many more."  The email sets out details of a transaction to warrant for J. Aron & Co. for 24,000 tons of primary aluminum coming from Chicago, with specified freight incentives.[77]

170.     On August 2, 2010, Wibbelman emailed Goldman trader Evans to inform him of advance news that Pacorini had been acquired by Glencore, with an announcement "said to come today or tomorrow."  Wibbelman and Evans exchanged thoughts on offers in the market presently.  Evans informed Wibbelman "I haven't bid Glencore yet, but thinking we bid 85/mt."  Wibbelman encouraged Evans to call Glencore.[78]

171.     Metro's ongoing dialog with Goldman traders must have been nearly constant.  As part of an August 4, 2010 email discussion between Wibbelman and Robert Burgess-Allen, Wibbelman reported that "Scott and Michael are hammering me to pay up and get metal now."[79]

172.     On April 16, 2012, Wibbelman emailed Goldman's Gabillon and Owen West noting that Rio Tinto received $142 on a deal.  Using Rio Tinto's name in the communication was

---

[76]     GS-METRO-00049477.  "Steve" is likely Branton-Speak.

[77]     GS-METRO-00030740-41 at 41.

[78]     GS-METRO-00049777-78.

[79]     GS-METRO-00030800-02 at 01.

a violation of the information barrier, as was flagged by Goldman's Oliver Haynes.[80]  Although this occasion was flagged, similar communications, including customer names and warehousing details, were commonplace.

173.    In November 2011, the LME issued a notice which restated and modified the information barrier requirements, effective April 1, 2012.  The new protocol introduced a requirement for warehouse companies that are "related" to a trading company to engage a professional accountant to carry out an annual audit of the warehouse company's compliance with the information barrier requirements, and to submit a report to the LME on such compliance.  These new requirements applied to Metro due to its relationship with Goldman.

174.    Metro and Goldman knew that it would be difficult to obtain a passing audit of their compliance with the information barrier.  In a September 1, 2012 email chain between Wibbelman, Grebien, and other Metro employees, they discussed the hiring of the prospective auditor.  The email suggests that they did not think that all safeguards were followed in the past and that they wanted to hire a vendor to do the audit who would give them a pass.  Wibbelman wrote:  "I thought Crowe was the most likely to provide us with a clean audit.  And I thought and think that PWC is the most likely to fail us."[81]

175.    A July 29, 2013 email chain entitled "Metro Third Party Assurance of Information Barriers" further evidences Metro's and Goldman's own belief that their information barrier compliance was lacking.  There, Metro's Felch forwarded to Gabillon, Grebien, Campbell (Goldman) and Haynes (Goldman) the LME's response to Metro's audit submission (copying Wibbelman and Grupenhoff from Metro).  The letter from LME's Mark Bradley reads "I am writing to you to confirm receipt of the Metro . . . Assurance Report compiled by PWC which gives reasonable assurance under the ISAE 3000 standard that an information barrier policy and associated control measures are in place and are compliant to the requirements as set out in LME Notice 11/334 published 17 November 2011."[82]  Gabillon queries whether this is "Just a receipt

---

[80]    GS-METRO-00036758-59.

[81]    GS-METRO-00005543-46 at 43.

[82]    GS-METRO-00028354-55 (email string between Goldman and Metro related to the forwarded content from LME); GS-METRO-00028358-60 (cover email received from the LME

confirmation?"  Grebien wonders: "The first paragraph mentions that the report gives reasonable assurance that Metro is compliant.  Can we interpret that as an endorsement maybe?"  Felch responds:  "It's carefully written.  While it implies an endorsement, it actually states that the PwC audit report is what makes the claim that we are in compliance.  So, they aren't stating themselves that we are in compliance, but they apparently have no comments, questions, or issues about the audit, either."  Metro and Goldman knew they were walking a very fine line here, and apparently were happy to get a "pass" even if they believed that the LME itself did not really weigh in.

> (b) Goldman Exercises Complete Control over Metro, Using Metro as an Extension of Its Trading Arm

176.    Metro's constant communications with Goldman were necessitated, at least in part, because Goldman allowed Metro very little authority.  Indeed, Goldman made it clear to Metro that Metro had very limited authority to enter into even standard LME-warehousing transactions.  For instance, actions or items that required approval of the Board (controlled completely by Goldman) included:  any new LME warehouse agreement or change to the warehouse agreement; any new/material change to LME warehouse approval; any new/material change to sub-operator agreements; any new/material change to foreign trade zone ("FTZ") agreements; metal storage transactions; monthly commitments (freight incentive, rent discount) greater than $10 million; freight incentives higher than $90/ton; any discounted rate lower than $0.20/day for deals longer than one month; any rent prepayment with interest rate higher than 2% p.a.; any material contract greater than $1million in notional value; and any derivative or physical commodity contracts.[83]

177.    Consistent with this limited authority, documents produced by Defendants confirm that Metro frequently had to seek authorization from Goldman to execute routine warehousing transactions, including authority to offer specified incentives for storage deals.  The Metro Board established a Commercial Sub-Committee that had to approve significant Metro deals.  Defendants' document production includes numerous "Commercial Committee" deal summaries, including, *e.g.*, a spreadsheet attached to a January 9, 2013 David Stromberg (Goldman) email to

---

with the attached response letter.

[83]     GS-METRO-00045836-38.

Wibbelman, Whelan, and Grupenhoff, with copies to Gabillon and Grebien.  That spreadsheet, like others tracking Metro's deals, was a summary of "Deals approved by Commercial Committee."[84]

178.    One example of Metro's lack of authority is evidenced by a May 4, 2011 email between Wibbelman and Gabillon about bidding for Alcoa aluminum at a $145 freight incentive, along with an analysis of a "decision to consolidate metal."  Wibbelman sought "guidance on my authority to incentivize this 40kmt up to $145.  Scott is pushing saying it is the last tranche and we will lose it if we don't book."[85]  "I have been holding off any increases till EE [LME consultant Europe Economics]."  Wibbelman added that "Glencore may buy to protect premium.  In the face of financing turmoil, money to us may be a stronger consideration than sensitivities over our impact on the market.  And we may benefit by a higher premium in the very short term."  Ultimately, Gabillon gave in and authorized Wibbelman to make the bid.  Not only did Metro need authorization to stay competitive in the market, but it was receiving market intelligence from Goldman's trading desk and the statement that "we may benefit by a higher premium in the very short term" suggests that Metro itself benefitted from the elevated premiums.

179.    In an October 25-26, 2011 email chain entitled "Authority Approval Request," Metro's Wibbelman sought Goldman authority "to rent deal all or substantially all of our Mobile Aluminum to JPMorgan."[86]

180.    According to a June 18, 2012 email, Wibbelman sought blanket authority from Gabillon and Owen West for freight incentive deals up to $185/mt.  Wibbelman noted that the market was at $180, but Metro's spot authority was only up to $120, which took Metro's marketing arm completely out of the game.  "If it were my company, I would give authority to . . . ."  Gabillon responded that it was very unlikely they would give blanket approval, and that he also planned to discuss "unauthorized trades at the board following a conversation with Victoria

---

[84]    GS-METRO-00026830-31.  *See also* GS-METRO-00046221-23 (email from Metro CFO Grupenhoff to Gabillon of Goldman Sachs with "financing deal/commitment summary" for February and March).

[85]    GS-METRO-00004633-35.

[86]    GS-METRO-00005125-27 at 27.

[Attwood Scott].  In the meantime I would like to understand how these trades were done, and would like to talk to whoever transacted (Michael I assume?)."[87]  Not only was Metro under Goldman's thumb for authority, but when it made unauthorized deals, Gabillon communicated that there would be repercussions.

181.   Consistent with the notion that Metro had very little authority to act on its own, Goldman regularly modeled data and deals to evaluate the profitability of potential Metro transactions and called the shots on day-to-day activities, including decisions relating to warehousing.

182.   For instance, Goldman created detailed analyses of the Metro Detroit queue in order to evaluate the profitability of freight incentive deals over time and to evaluate how long metal would have to stay in-warehouse (*i.e.*, how long the Detroit queue needed to be) in order to become profitable under prevailing load-out rules.

183.   On August 28, 2010, Goldman's Francesco Ciardi sent Wibbelman and Robert Burgess-Allen a spreadsheet model dealing with "discussions around the DB deals."  "The Detroit tab aims to calculate how long it will take before metal which flows out of Detroit and sits off warrant attracting low rent, is re warranted.  We calculate the total cost of removing the metal from the warehouse, and compare this to the contango earned off warrant net of financing costs, to find the minimum payback time from the trader's perspective, and thus the date at which Metro can expect the metal to be rewarranted."  "The HB Chicago and HB Detroit tabs try to solve for the maximum warrant premium that Metro would be able to pay for metal out of each of these locations under varying outflow assumptions."  Goldman's Chen Leo then responded, noting "we are calculating the breakeven period that the trader needs to earn the contango over in order to cover the costs in Section 4."  He concluded that "Total time needed to earn $42/mt from financing trade . . . .  Sep 2010 till Oct 2011."  "On 50kt, you need to give free rent till Jul 2011 for the trader to break even.  I think this sort of makes sense and ties in with the fact that the

---

cancelled warrants queue never really went above 80kt and this max cancelled warrants number is prob reduced now that the contango has flattened."[88]

184.    Goldman viewed Metro as an extension of its trading desk.  When producers like Alcoa did not get the level of incentive payment they wanted from Metro, they could just "call Goldman directly" to get their price.[89]  In what appears to be one example, on August 12, 2010, Branton-Speak emailed Wibbelman "sounds like we need this Alcoa deal, might wanna sharpen your pencil there sir."[90]

185.    In an August 16, 2010 email from Wibbelman to Goldman's Evans, Wibbelman wrote "There is no reason to maintain the levels we have crept up to.  Except of course to make you happy."[91]

186.    In an October 19-20, 2010 exchange entitled "St. Pete Analysis and Summary," Gabillon, Agran, and Wibbelman discussed the specifics of a potential deal.  Wibbelman began "As you are aware, Metro is in a position to provide a freight incentive number along with capacity and capability which would allow J. Aron to bid on 460,000 MT of primary aluminum from Russia."  Wibbelman commented on "a few soft issues to consider," including ". . . a political consideration as to whether the action of incentivizing a large quantity of metal from Russian into Detroit could have an adverse impact on the politics of the 1500/MT/Day standard."[92]  Gabillon responded that the deal appeared to work in Detroit, assuming no change to the "outbound level."  But, given the ongoing LME study, "What happens if the outbound level (or any other relevant parameters) get changed despite our expectation that nothing will change. Who takes this risk?  GS trading desk, Metro or Rusal? (btw GS metal desk or Metro *is the same thing* for GS Group)."  As far as the corporate parent was concerned, apparently Metro and the Goldman trading desk were one-and-the-same.  Gabillon reiterated this: doing the deal,

---

[88]     GS-METRO-00031094-95.

[89]     GS-METRO-00048504.

[90]     GS-METRO-00030975-76 at 75.

[91]     GS-METRO-00050319-23 at 20.

[92]     GS-METRO-00031580-82.

Goldman's metal trading desk would "shift the risk onto Metro (**which [is] the same for GS Group**)."[93]

187.    On February 11, 2011, Branton-Speak initiated an email chain ("Not paying up for new Ali?") with Gabillon about a deal Metro was not paying enough to win.  Branton-Speak asked whether Gabillon was "Happy to lose this one?" prompting Gabillon to forward the email to Wibbelman who said he was holding at 125.5 (50 cents above highest ever).[94]  "Scott said that on several previous deals too, and we got it at my number.  I could look silly if I lose 90,000 tons for a few bucks.  But we are being worked by Alcoa.  **And by GS**.  And by all other customers.  It is hard to hold firm."  Gabillon then passed along that "Steve saying he is going to pass then, whatever that means."  Wibbelman noted that the "Midwest [premium] US is 6.35 cents/lb so, 139 days with 30 days credit and credit risk.  But the premium will go down if we force it there.  Also, Metal Bulletin and European Economics would notice 130.  Steve can always buy it and earn contango until he delivers it to us.  (Which I know is not as good for us but points out that I am not the only one letting it go for a few dollars)."  Gabillon asks what would happen if Metro just bid $100.  "They would sit on it and wait for spot commitments.  By selling, premiums would come down though.  No warehouse can bid that much but us . . . ."  Wibbelman later comments: "What is true though, is that the metal we get is withheld from consumers and makes the premium go up . . . which provides a competitive alternate to customer."  This shows not only illicit communication between Goldman's traders and Metro (with specific communication about whether or not a deal would be transacted based on what should be confidential pricing information), but also that Metro knows very well what the Midwest Premium measures at for any given time and how its freight incentive interacts with this premium.  Metro knows that metal it gets is "withheld from consumers and makes the premium go up."

188.    Metro, too, viewed that Goldman was calling the shots even on day-to-day warehousing concerns.  According to a May 10, 2011 email forwarded by Askew to other Metro employees, a customer (Koch) was complaining about Metro charging a $30/mt "re-warranting"

---

[93]     GS-METRO-00031611-13 at 11 (emphasis added).
[94]     GS-METRO-00020303-05 (emphasis added).

fee in Detroit for metal that apparently had been cancelled (with rents and FOT paid), but which was not scheduled to load out until December 2011.[95]  Wibbelman responded that "GS wants to stick with the $30 fee."

189.    Metro came under fire with the LME in relation to the re-warranting charge practice. On May 17, 2011, Wibbelman and Gabillon discussed the issue, with Wibbelman saying: "I think we may want to consider defending this $20/mt rewarranting fee quite hard because if the rules change and cancellations go up, there could be a lot of revenue created if the market gets tight and goes flat or into a back." Gabillon responded:  "This is our intention."[96] So, not only did Wibbelman make clear at Metro that "GS" had decided exactly what re-warranting charge Metro should enforce in this particular situation, but Gabillon reinforced that it was Goldman's "intention" and thus Goldman's decision to defend this charge.

190.    On July 19, 2011, Wibbelman emailed Whelan and Prichard, bemoaning that Gabillon had him "on hold for sending the JPM letter until JPM legal and compliance weighs in. Really can't blow my nose without permission anymore."[97]  As discussed below, it is reasonable to infer that a proposed "JPM letter," from Metro but controlled by Goldman as to which JPM legal and compliance must weigh in, deals with an agreement between the Defendants.

191.    In relation to a January 2013 Metro "Authority Request," Grebien responded that West and Gabillon approved subject to the caveat that "the full tonnage [of the proposed deal be] delivered."  Wibbelman responded "We understand the restriction but it is not necessarily how the business works."  Later, Whelan responds (presumably to Wibbelman only) "I miss the days when we did deals that made sense because they made sense . . . we created this business and the value in it . . . not them," prompting Wibbelman to agree:  "It is really silly."[98]

192.    Metro also provided Goldman's J.Aron with valuable trading benefits and other favorable treatment which would not have been forthcoming in the absence of their relationship.

---

[95]    GS-METRO-00021026-27.

[96]    GS-METRO-00021160.

[97]    GS-METRO-00021946.

[98]    GS-METRO-00005854-58.

This took numerous forms, including paying higher freight incentives to J.Aron than to other traders or producers; the ability to close aluminum transactions faster and for greater tonnage (57% of the total inbound Detroit aluminum tonnage from January 2011 until February 29, 2012), based on "the efficiency of rapid close verbal confirmations [between Metro and J.Aron] for high volume transactions which have allowed them to be first and fast mover"; paying to J.Aron a "courtesy" incentive of $142/mt for metal delivered without finalization of a proper contract or issuance of a deal number, in violation of protocol; allowing J.Aron to be late to pay accounts due; and other benefits.  In addition, Metro allowed J.Aron to cancel certain warrants in Mobile such that it could get into the queue in advance of the a backwardation and ahead of a prospective "long," saving J. Aron significant sums for LME rent and also allowing it to export the metal "for presumably a ($200+) larger premium than it paid or would have received with later delivery." On another occasion, "J. Aron had an urgent physical short, Metro agreed to accommodate J. Aron's need to satisfy its customers by allowing J. Aron to release 4,000 MT from its financing commitment by agreeing to replace the metal into Detroit.  J. Aron exceeded the 4,000 MT agreement by releasing an additional 525MT . . . .  If Metro had not released the Rotterdam 4,525 MT to J. Aron, the Contango was sufficiently wide such that Metro could have earned gross revenue in Rotterdam of $84/mt by financing the Rotterdam aluminum for one year forward."[99]

193.    When Wibbelman conveyed to Gabillon a recitation of these simmering disputes, he was careful to note "Money has not been lost to any outside party.  It remains in GS.  Metro has been operating to try to facilitate JA's business, though they do not recognize that at present. Metro and JA have benefitted from the efficiency of rapid close verbal confirmations for high volume transactions which have allowed that to be first and fast movers . . . ."[100]  Even so, "If it were not an internal dispute, Metro would have already used its significant commercial leverage to offset the invoices from other amounts owing and would have charged rents, fees and pounced on many opportunities to realize revenue from inventory in storage and other contract failures of

---

[99]     GS-METRO-00037180-83; GS-METRO-36811-15; GS-METRO-00036894-96.
[100]    GS-METRO-00037120-23.

J. Aron.  The fact that this is internal to GS is the only reason why this remains [unresolved]."[101]
Wibbelman apparently viewed – and believed Gabillon would view – the dispute as one where
"GS" had not lost anything.  Even so, Metro's restraint in seeking retribution from J.Aron was yet
another benefit conferred for the good of the group.

194.    Gabillon apparently attempted to mediate the dispute with Goldman's traders.  On
June 28, 2012, Gabillon asked Wibbelman to spell out the status of the compromise offers so that
Gabillon could confer with Agran.   Agran agreed in part with a recommendation made by
Gabillon and then proposed "On Rotterdam let Scott cancel the material.  Its 6 months of lost rent
at 22c for 8k MT."  Gabillon confirmed that "Chris and I are fine . . . .  ***We will need to make
sure that Scott works to the benefit of GS at large and stop moaning about everything***."  After
Gabillon forwarded this to Wibbelman as "your eyes only," Wibbelman asked about one specific
of the deal where Metro was to get 4500 mt in Detroit (in lieu of what was lost in Rotterdam).
Wibbelman noted that "They took the stuff from Rotterdam and sold it into Poland for a high
premium.  Problem is that the Detroit Premium has skyrocketed since they made the deal and you
can't really hedge premium."[102]  Not only does this highlight the depth of the interaction between
Goldman's trading arm and those charged with warehouse operations, but it also shows that
Goldman sells metal to physical users and reaps payment for the regional premiums in doing so.

195.    On information and belief, adherence to the information barrier was no more
robust by JPMorgan and Henry Bath.  The mere fact that Peter Sellars was both Head of Global
Metals of the Global Commodities Group at JPMorgan and also Chairman of the Board as well as
a director of Henry Bath & Son, Ltd., suggests (at best) a blurring of the lines between trading
and warehousing.  According to documents produced by Goldman and Metro, it was common for
JPMorgan personnel, along with Henry Bath personnel and even Henry Bath & Son Ltd.
personnel, to be email chains about simple rent pay-ups or metal releases.

196.    As reflected in Metro board meeting minutes from September 8, 2010, Metro and
Goldman were concerned about Glencore and Pacorini's adherence to any information barrier

---

[101]    GS-METRO-00036940.

[102]    GS-METRO-00037203-06 (emphasis added).

rules.  It was noted there that "Glencore was not an LME member and may therefore be under less scrutiny regarding Chinese Wall and compliance procedures.  Glencore might use this position to create synergies between their trading franchise and their newly acquired warehousing business."[103]

*Defendants Agree Not to Compete Against Each Other in the Market for the LME-Certified Warehouses in the United States and Throughout the World*

197.   The Defendants agreed that their warehousing operations would not compete against each other.   A January 5, 2012 Metro email reveals an understanding between Goldman/Metro and Glencore/Pacorini to allocate the key aluminum warehousing cities of Detroit and Vlissingen between themselves.[104]  In the email, Metro's Wibbelman, Whelan, and Felch discuss that a company called Lutheran Brothers had been leasing up space in Detroit.  They discuss that Lutheran Brothers traditionally worked with Pacorini.  They also discuss that it was becoming difficult to obtain more FTZ (Foreign Trade Zone) sites in Detroit.  Whelan writes in response to this discussion:

> Pac[orini] is offering us [Metro] space in Detroit so it would not seem like they would be taking on additional space.   They [Pacorini] have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago.  Besides they know we would retaliate incrementally in some place like Vlissingen.  I will call Mario [Casciano, of Pacorini] and ask him who leased the building in Detroit.[105]

198.   This email demonstrates that even though Metro was running out of warehousing space in the key Detroit location, its competitor (Pacorini) was offering to lease Metro space rather than compete against it.  Furthermore, the email reveals that had Glencore had the desire to compete, it would have done so long ago.  This demonstrates that the agreement involves not only Pacorini, but also Glencore, and that the agreement had been in place for some time.  The email also demonstrates that the co-conspirators were willing to retaliate against each other for violations of the conspiratorial agreement.  Here, Metro (and Goldman) would retaliate against

---

[103]   GS-METRO-0004622.

[104]   GS-METRO-00005231-34.

[105]   GS-METRO-00005231-34 at 32.

Glencore and Pacorini in Vlissengen.  Finally, the email demonstrates communications between executives at competitors – Whelan and Mario Casciano – to determine who might be infringing on Metro's Detroit turf.

199.    Metro's Wibbelman also spoke to his competitors at Pacorini on behalf of Goldman.  On January 18, 2011, Wibbelman writes "I asked Mario if he would rewarrant and refund fot if we could get any of this unwound (currently only cwt being unwound).  And I asked Mario about the gap rent."[106]  Wibbelman then reported directly to Scott Evans at Goldman Sachs' trading desk that "Mario would refund the FOT and 'discuss' gap rent.  I would propose you pay half of the gap rent for anything rewarranted."[107]

200.    Sharing among the Defendants what should have been competitive freight incentive information apparently was not uncommon.  On another occasion in 2010, Wibbelman commented to Metro's Askew that "Mario [Casciano, of Pacorini] told me he got a big slug into balt at $85 plus 6mo free.  Which he said is the cost of doing business."[108]

201.    Later that same year, Pacorini's Casciano told Metro's Whelan that Whelan owed him $5,000 because he (Casciano) "Gave it to Landwerlin to indemnify him for lost revenue and in an effort to keep all drivers away from the other broker."[109]  According to another Metro document, Joe Landwerlin is a Pacorini Metals employee.[110]

202.    On January 5, 2012, Wibbelman informed Whelan and others that he "Heard from SBS [Goldman trader Stephen Branton-Speak] that he has heard of a huge warrant swap involving JP and G involving Detroit."[111]  It is unclear how much Branton-Speak knows about collaboration between JPMorgan and Glencore, or how he knows about it, but it is clear that Branton-Speak is not supposed to be involved in day-to-day Metro operations.  Nonetheless, this email suggests an ongoing dialog with Wibbelman.

---

[106]    GS-METRO-00032344-45 at 45.

[107]    GS-METRO-00032320.

[108]    GS-METRO-00046108-11 at 08.

[109]    GS-METRO-00031089.

[110]    *See* GS-METRO-00032880.

[111]    GS-METRO-00005231-34 at 32.

203.    Metro also gave JPMorgan preferential treatment in its warehousing queues, and in September 2010 loaded out aluminum owned by JPMorgan by moving its position in the queue ahead of metal warranted to other owners.[112]  This was not only against the interest of others in the queue, but apparently also against the interest of Metro itself – according to Metro's CFO David Grupenhoff, the change cost Metro approximately $295,000 in lost rent (from JPMorgan) and offsetting payments to the warrant-holders who lost their place in the queue.[113]

204.    Documents produced by Metro also indicate an understanding with JPMorgan's Henry Bath warehousing operations not to compete against each other.  At the March 11, 2010 Board meeting of MITSI Holdings LLC, Wibbelman reported that he did not believe that Peter Sellars had taken "a predatory view of the warehouse business in the past" and hoped it "would continue when he became the Global Head of Metals at JPM."[114]  Sellars would also serve as the Chairman of the Board of Henry Bath and Son Ltd. (the parent company of Defendant Henry Bath LLC).  Wibbelman's views would soon prove true.

205.    On July 7, 2010, Sellars emailed Wibbelman about a loading out dispute at Metro's New Orleans location.[115]  Metro had refused to load trucks that had missed their appointed time slots (prompting the JPMorgan trader to say "Metro talks about cooperation between our companies, but has a strange way of showing it.").  Sellars forwards the email to Wibbelman confirming that he expected different treatment after a recent "brief chat" they had and an upcoming dinner to discuss the "overall situation."  Sellars then writes that "As you are well aware this is material sold to the fabrication industry by my traders . . . we do NOT take material for re-warehousing."  Despite acquiring the Henry Bath warehouses, Sellars, the head of JPMorgan metals and Chairman of warehouse competitor Henry Bath, was emphatic to point out to the CEO of Metro that JPMorgan was "NOT" taking the metal to re-warehouse in its own facility.  Instead, JPM pointed out that it was selling the metal to fabricators, where it presumably

---

[112]    GS-METRO-00031294-302.

[113]    GS-METRO- 00031346.

[114]    GS-METRO-00004627-32 at 31.

[115]    GS-METRO-00049217-18 at 17.

was able to charge a premium.  Sellars concludes "I don't really care what your rules are for anyone else . . . ."  The upshot of this communication was that Sellars did not want Metro to retaliate, as it was not "destocking" Metro's warehouse; rather, it was selling this material to fabricators.

206.    Later in October 2010, Wibbelman and Evans discuss Goldman/Metro acquiring metal from a Henry Bath warehouse.[116]  Wibbelman writes "I am concerned if this comes from a warehouse other than HB, since JPM and GS could set off a warehouse war between Metro and, say, Steinweg or CWT."  Notably, Wibbelman was not concerned that taking metal out of Henry Bath would set off a warehouse war.  Wibbelman was only concerned if they took the metal from a non-conspirator, such as Steinweg, who was a large independent warehousing company.

207.    As also discussed below, Metro discussed an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result being that the premium will go "raging higher."[117]

208.    Additionally, Defendant JPMorgan was storing aluminum it owned in warehouses owned by Defendant Metro, and paying the associated storage fees at "full retail" prices, despite the fact that JPMorgan actually owns its own warehousing subsidiary in Defendant Henry Bath.[118]  This is at least against JPMorgan's own economic self-interest, and at most, a bold attempt to transfer funds to a firm it (through Henry Bath or directly with Defendant Goldman Sachs, which owns Metro) should be competing with for the very service for which JPMorgan is paying.

209.    In addition to these examples, the LME Warehousing Committee presented an opportunity for Defendants to both conspire regarding load-out rates and, indeed, to write the recommended regulations that would ultimately be promulgated by the LME to govern their business.[119]  Tellingly, the Warehousing Committee membership for the period of time material

---

[116]    GS-METRO-00031544.

[117]    GS-METRO-00021326.

[118]    GS-METRO-00018180-81 (discussing rent payments due to Metro from JPMorgan in July 2010).

[119]    *See* GS-METRO-00001087-91 at 88 (noting that the LME Warehousing Committee is responsible for "making recommendations to the Executive Committee on warehousing related policy issues.").

to this Complaint consisted of: Chris Wibbelman (Metro); Chris Jonker (C. Steinweg Group); David Lilley (RK Capital Management); Fabian Somerville-Cotton (HSBC); Frans Pettinga (Koch Industries); Gonzalo Cuadra (Chile Copper Ltd.); Gordon Brown (Mitsubishi); Graham Hawkins (Henry Bath); Mike Dudley (International Commodity Services); Sergio Garbin and Peter Waszikis (Pacorini Metals); Shon Loth (Noble); Thorleif Schjelderup (Hydro); and Brian Smith (Barclays Capital).[120]

### As Part of Their Agreement Not to Compete, the Defendants Agree to Treat the LME's Minimum Load-Out Rule as a Maximum

210.    In November 2003, the LME adopted a rule requiring each warehousing company be able to load out a minimum of 1,500 MT per day per location.  At the time of the rule's adoption, LME aluminum stocks were greater than 1,000,000 minimum tonnes, but nowhere near the levels of 2009-2013.  This rule was adopted before LME-warehouse companies were controlled by traders and banks, and there were apparently no concerns with this rule as warehouse companies acted to provide customer service in the form of loading out metal.

211.    Despite the huge quantity of aluminum stored in the LME warehouses, the loading out rate prior to April 2012 was, on most days, barely above the then-required minimum under LME rules, 1,500 tonnes per day per company per city for the largest warehouses.  The loading-out rate after April 2012 (after the LME rule change discussed below) was barely above the new required minimum of 3,000 tonnes per day.  The purported minimum LME aluminum loading-out rate therefore operated as a *de facto* uniform or maximum loading out rate, as illustrated by this chart for the Detroit warehouses:

---

[120]    *See, e.g.*, GS-METRO-00017360, GS-METRO-00004322, GS-METRO-00001078, GS-METRO-00001968, GS-METRO-00003078, GS-METRO-00003623 (Exemplars of Committee meeting minutes and email communications to Committee members from 2009-2013).



212. Notably, this limit was **per company** and not **per warehouse**. If a company owned multiple warehouses in one city (for example, Metro's several warehouses in Detroit), all those warehouses together would need to load out only 1,500 tonnes per day.

213. An internal Goldman document confirms that Goldman, Metro, and the entire industry treated this minimum requirement as an effective maximum. According to that document, "(i) it is industry practice to consider the minimum shipping quantity as an effective maximum quantity that will be shipped on a given day . . . and (ii) management's intention is not to ship more than the minimum required quantity per day."[121]  The LME acknowledged that warehouses in the system treated this as a maximum. According to a June 2013 email from Robert Hall (LME operations) to Metro's Wibbelman and Prichard, Trafigura was complaining about the shipping dates Metro had assigned it for a pending release. Hall asked Metro to "confirm that this is a tentative date because the shipping date may move forward as opposed to back depending on how much you will be required to deliver out by the time of the shipment date?" The LME apparently knew that the shipping date could move forward (if other shipments canceled) but that the date ultimately would be dictated by the minimum amount Metro would be required to ship. Indeed, LME's Martin Abbott confirmed in an interview with Dow Jones

---

[121]     GS-METRO-00001109-17; *see also* GS-METRO-00001330-40 (July 14, 2011).

Newswires that "The warehouse system was designed so that consumers can take material out as a market of last resort, with 1,500 tons a day agreed because there isn't a consumer in the world who can use 1,500 tons of anything in a day[.]"[122]   The minimum load-out, 1,500 tons is an "agreed" maximum rate.

214.   Metro consistently sought to ensure that it did not load out more aluminum from its Detroit warehouse than was necessary.   Even after the minimum threshold increased for warehouses about the 900,000 threshold, Metro's Prichard carefully tracked and forecast when Metro would cross back under the threshold (and thus, have a lower load-out requirement).   He sent a detailed summary to Wibbelman, noting, "Our objective is to make certain that we do not ship out more than required based on the location stock level."[123]   Goldman was critical of Metro when Gabillon believed the minimum had been exceeded.

215.   The minimum load-out was far less than the amount the warehouses owned by the Defendants could load out if they were attempting to operate their warehouses with the goal of efficiency, rather than market manipulation.   It has been estimated that each warehouse using only two forklifts could load out as much as 1,920 tonnes per day.[124]   Thus, for example, the Metro warehouses in Detroit (which, by one count, number 27) could collectively deliver far more than this minimum.

216.   With respect to Metro Detroit in particular, there were no logistical hurdles to loading out more than the minimum required.   Wibbelman confirmed as much in a June 5, 2011 email to Gabillon regarding a proposed "Response to LME/EE":   "Detroit can get cleaned out by rail even if no trucks are available."[125]

217.   As a result of the warehouses' excessively (and intentionally) slow loading-out rates, lengthy and persistent queues of over one year developed for delivery of aluminum as

---

[122]   Andrea Hotter, *LME CEO:  Raiding Warehouses, Bank Financing Causing Bottleneck*, DOW JONES NEWSWIRES (July 5, 2011).  *See* GS-METRO-00006913-6918 at 6914.

[123]   GS-METRO-00038199-201.

[124]   Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, REUTERS (July 29, 2011).

[125]   GS-METRO-00021469-71 at 70.

shown in the following chart.  ("Implied queue" is calculated by dividing the quantity of aluminum covered by canceled warrants by the minimum load-out rate.)



218.    Defendants were well-aware of the relationship between the LME load-out requirement and the premium.  On June 21, 2010, for instance, Wibbelman emailed Metro's Askew, telling Askew to convey a message to Martin Abbott at an upcoming steel conference: "That, outbound shipment at the scale indicated would be detrimental to the LME warehouse system and the LME's market share and success.  Detrimental to the producers, detrimental to the premium, detrimental to the price, detrimental to the contango, detrimental to the amount of stock on LME (so detrimental to transparency and liquidity)."[126]  With this, Wibbelman specifically notes that a higher load-out requirement will push down the premium and will diminish traders' opportunities for contango trades.  Missing from the list of parties that would be injured through higher load-outs was the consumer of physical aluminum.

---

[126]      GS-METRO-00030459.

*Defendants Work Together to Shift Aluminum Among Their Warehouses in Order to Concentrate the Stock at Key Warehouse Locations*

219.    In addition to agreeing not to compete against each other in the market LME-certified warehouse services for aluminum, Defendants' trading arms work with each other's warehouse operations, to keep metal from becoming immediately available to the spot market.

220.    Defendant Goldman's documents recognize that the Midwest Premium started to rise when aluminum stopped flowing out of non-Detroit locations.   In other words, when the only source for available metals was in Detroit, a person wanting that metal had to go through the queue.   Given the length of the queue, it was not a viable option for a purchaser who needed spot metal from a warehouse to buy metal from Detroit.   As a result, the premiums spiked up. The document specifically notes, "US Midwest premiums started to rise quickly in Mar 11 when Baltimore and Chicago (non Metro locations) stopped flowing out.   One can assume that most metal outside of Detroit has now been tied-up in financing deals."[127]

---

[127]      GS-METRO-00001317-23 at 21.

The following appears as "Chart 4: US Physical Premium vs Outflows:

Chart 4: US Physical Premium vs Outflows



221.    In fact, Defendants engaged in deals with each other to further tie up aluminum not already in Detroit.  For example, in or around October 2011, JPM and Metro entered into a rent deal concerning JPM's aluminum stored at Metro's Mobile location.  On October 25, 2011, Wibbelman requested authority from Goldman's Jacques Gabillon and Greg Agran to approve a rent deal with JPM.  At the time, JPM owned nearly all of Metro's 160,000+ MT of aluminum. JPM had apparently been moving some of its metal to its Henry Bath location, but chose, instead, to enter a rent deal with Metro.  This deal insured the aluminum would not be available to the market.  It also furthered the goal of keeping aluminum from being readily accessible to the spot market.

222.    It is also interesting to note that JPM kept its metal in a competitor's warehouse rather than move it to its own location in New Orleans or Baltimore, particularly since JPM seemed to be the only company storing metal in Mobile.  It could have presumably moved the aluminum to its own warehouse (and paid less rent) while at the same time preventing its warehouse competitor from collecting any rent from its Mobile operations.  Instead, JPM stored over 150,000 MTs of aluminum with its competitors, which is about 7.5% of the U.S. annual domestic production – no small amount.

223.    During the times material to this Complaint, Defendant Metro has frequently dealt directly with Defendants Glencore and JPMorgan.  This includes both the storage of aluminum owned by those defendants at Metro warehouses as well as entering into sweetheart transactions designed to allow those defendants to take metal from Metro warehouses without being subject to the Metro queues.

224.    Metro's Wibbelman noted at one point that "Glencore does transactions with Metro directly not involving their own warehouse company."[128]

---

[128]    GS-METRO-00028150-51.

225.    Documents produced by Metro and Goldman establish that Glencore has been storing aluminum at Metro's Detroit warehouse at least back to early 2010, and likely well before that.  According to a May 26, 2010 email from Metro's Tanya Rich to Glencore's Zach Mayer demonstrates that Glencore stored metal at Metro Detroit.[129]  Later, a November 1, 2010 email from Glencore's Tony DiCenso to Metro's Tanya Rich suggested that Glencore hoped to re-warrant certain of its aluminum in the Detroit outbound queue.[130]

226.    Documents produced by Metro and Goldman establish that JPMorgan has been storing aluminum at Metro's Detroit warehouse at least back to early 2010.  In March 2010, a representative of JPMorgan Global Commodities Group coordinated JPMorgan's request for pre-payment on 4000 Metro aluminum warrants in Detroit.[131]  A July 24, 2010 email from Metro's David Grupenhoff refers to rent pay-ups due for July and August.  Robert Burgess-Allen indicates that $829,000 is due from JPMorgan the next day.[132]  A March 4, 2011 release instruction to Detroit Metro instructed that 606 LME aluminum warrants presented by JPMorgan Chase Bank NA were to be released to the order of JPMorgan Chase Bank NA.  Some of these warrants were as old as April 2010; others were from February 2011.[133]  Metro's corresponding invoice, for over $2 million, showed some of these now-canceled warrants as having been issued in 2008 and later.[134]  As noted above, JPMorgan's storage of metal with Metro prompted Peter Sellars to contact Metro's Wibbelman directly.

227.    In September 2010, JPMorgan raised a dispute with Metro as to its access to 5000 mt of aluminum it cancelled in the Detroit queue.  Metro discussed internally, with guidance

---

[129]    GS-METRO-0004180-81.

[130]    GS-METRO-00031695-96.

[131]    GS-METRO-00046523-25; 00046518-19.

[132]    GS-METRO-00028280-82.

[133]    GS-METRO-00020500-511.

[134]    GS-METRO-00020515-35.

from Goldman's Gabillon, what the incremental cost to Metro would be of moving JPMorgan's metal, or a portion of it, ahead of some metal owned by Deutsche Bank also in the queue. They decided that the cost to Metro of doing so was $295,000, which Gabillon labeled "not small." Ultimately, Metro agreed to advance the load-out date for at least the first portion of the JPMorgan metal.[135]  This establishes not only that JPMorgan paid to store metal in Metro's warehouses, but also that Metro dealt directly with JPMorgan and did JPMorgan the favor of moving it ahead of another metal owner in the queue.

228.   On September 23, 2010, Goldman trader Scott Evans emailed Metro about a deal where Glencore wanted to swap aluminum in Metro's Detroit warehouse for aluminum Metro had in Chicago.  The deal ultimately was booked, with Evans suggesting to Metro that "you" get a $27/mt freight benefit from this.[136]  According to emails confirming the deal, the $27/mt freight differential savings were split so that Glencore got $13/mt and the rest was split $7/mt for Goldman's J.Aron and $7/mt for Metro.[137]

229.   In August 2011, Metro employees had direct communications with JPMorgan personnel (Martin Stanley) and Henry Bath personnel (including Graham Hawkins) about a load-outs of a "large warrant cancellation."[138]

230.   On September 20, 2011 email chain between Martin Stanley (JPMorgan) and Metro's Prichard and others, which also copied Henry Bath's Graham Hawkins and Amanda England, concerned JPMorgan's cancellation of 600 warrants of aluminum at Metro's Mobile warehouse for transfer to Baltimore.  Metro was allowed to choose the warrants based on convenience.[139]  Metro again thanked JPMorgan for allowing it to pick the warrants for another

---

[135]   GS-METRO-00031366-74.

[136]   GS-METRO-00031364.

[137]   GS-METRO-00031471-72.

[138]   GS-METRO-00034373-75.

[139]   GS-METRO-00034759-64.

phase of this move around October 14, 2011,[140] and October 21, 2011.[141]  In all, JPMorgan moved 100,000 tons of aluminum, 600 lots at a time.  There apparently was an additional movement from Metro's New Orleans warehouse to Henry Bath's Baltimore warehouse.[142]

231.    On October 25, 2011, Metro's Wibbelman sought Goldman authority to "rent deal all or substantially all of our Mobile Aluminum to JPMorgan."[143]  On October 28, 2011, JPMorgan's Martin Squires wrote to confirm the terms of the deal.[144]

232.    Metro continued to invoice JPMorgan Securities Ltd. for Detroit aluminum storage rent throughout 2012.[145]  And as late as July 2013.[146]

233.    In April 2013, Metro and Glencore engaged in discussions regarding a "Possible Glencore Detroit for Mobile/Baltimore Swap."  Metro ultimately wound up engaging in numerous "swap" deals with Glencore, which allowed Glencore access to releasable metal from certain locations in exchange for its own metal that was stuck subject to the Detroit queue. These swaps reflect agreements between Metro and Goldman that exacerbate the queue in Detroit while allowing Glencore to avoid its pernicious effects.  In this way, Metro and Goldman got what benefited them (queue manipulation in Detroit, without any actual load-out), by agreement with Glencore which got what benefited it (free access to metal that it could sell at the very premium it was increasing), all at the expense of anyone who purchases aluminum at the spot price (*i.e.*, including the regional premium).[147]  On June 27, 2013, Wibbelman forwarded a

---

[140]    GS-METRO-00034929-33.

[141]    GS-METRO-00034956-61.

[142]    GS-METRO-00034807-14.

[143]    GS0METRO-00005122-24.

[144]    GS-METRO-00022386-37.

[145]    *See, e.g.*, GS-METRO-00025927; GS-METRO-00026881.

[146]    GS-METRO-00010401-02 (Detroit aluminum storage invoice in amount of $1,976,363.94 to JPMorgan Chase Bank NA).

[147]    *See, e.g.*, GS-METRO-00009807-09; GS-METRO-00027634-36.

summary of all "Glencore Aluminum Transactions/Deals" to Glencore's Patrick Wilson. Wibbelman's cover email said "Take care and thanks again for being a great counterparty and for inviting me to the baseball game."[148]

234.    Additional documents produced by Metro and Goldman show Metro's analysis of the incremental value to Metro of all metal in Detroit – including Metro's physical move of aluminum from Mobile to Detroit, Metro's swaps with Glencore, and an additional swap with Noble.[149]

235.    In July 2013, Glencore's Patrick Wilson proposed a swap of Mobile aluminum with Metro.  Wilson noted that Glencore had 80,000 mt in the Detroit queue scheduled to come out shortly, but that he would like to swap it to Metro for tonnage in Mobile.  "We have done two swaps in the past.  One at $32 and one at $20.  That means we gave Metro detr units at whse and Metro gave us mobile units FOT and then paid glencore $20 or $32.  We would like to do that swap again and would be willing to split the difference between those 2 numbers.  Therefore metro would pay us $26.  That is a savings in freight for you guys of, we believe, no less than $30 if you were to ship the units yourself."[150]

236.    By keeping or depositing their own metal at warehouses owned by their ostensible competitors and paying rent to their ostensible competitors, rather than to themselves, in order to do so, metal owners like JPMorgan and the other trader defendants acted against their economic self-interest.

*The Defendants Offer Payments for Owners to Store Aluminum in Their Key Warehouse Locations*

237.    The Defendants also ensured that their inventories remained high by paying aluminum producers and traders to deposit aluminum in their warehouses, and aluminum

---

[148]    GS-METRO-00027777-80.

[149]    GS-METRO-00010104; see also GS-METRO-00010128.

[150]    GS-METRO-00028192-93.

warrant owners to continue to store their aluminum in the Warehouse Defendants' warehouses. Such payments indicate market manipulation in the current context.

238.    As reported by *The New York Times*, Defendant Metro has offered owners incentive payments of up to $230 a ton to continue to store their aluminum at Metro warehouses.[151]

239.    And Defendant Glencore has engaged in the same conduct in Vlissingen. According to Reuters, quoting a London-based trader, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen.  Then they deliver it to the market and whoever holds it can't actually get it out for a year."[152]

240.    These incentive payments have, moreover, been paid by the strategic chokepoint warehouses, *e.g.*, Metro in Detroit and Pacorini in Vlissingen, as a means to attract metal to **particular** warehouses where existing and growing queues were thereby exacerbated in order to drive up the price of physical aluminum.

241.    Defendants Goldman/Metro's documents demonstrate they understood that they could pay higher incentives to attract metal into warehouse locations with queues.  Metro differentiated among its warehouse locations when deciding how much it could or would pay as a freight incentive or other warranting specifics.  It is reasonable to assume the other Defendants, who were experienced traders and warehouse operators, would have the same understanding.

242.    Defendants actually met and discussed their inducements payments on at least one occasion as part of an LME warehouse committee meeting on March 13, 2012.  The LME warehouse committee minutes noted that "exceptional inducements" could "have the effect of

---

[151]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[152]    Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

constraining the market."   The minutes further state "A discussion followed regarding inducements and what was an acceptable level, however no consensus was reached and differing opinions were given as to why inducements occurred and at what level."   Thus, using the LME, Defendants were able to freely discuss what inducement they were paying at what locations to further their ability to move metal into key locations.

243.    The LME later acknowledged that payment of incentives is one way that warehouses might create, or attempt to create, queues.  In its April 7, 2014 LME memorandum entitled "Further Updates on Warehouse and Physical Network Reforms," LME stated its position that "warehouses must not intentionally create or cause, or attempt to create or cause, a queue (including by, but not limited to, the payment of inducements)."[153]

244.    According to the same memorandum, as of July 1, 2013, there were five warehouses with queues:   Impala Antwerp; Pacorini Johor; Pacorini New Orleans; Metro Detroit; and Pacorini Vlissingen.   As noted above, by March 31, 2014, the queues at Metro Detroit and at Pacorini Vlissingen had actually *increased* to 625 days and 610 days, respectively.

245.    In its Summary Public Report of the LME Warehousing Consultation dated November 2013 (after its acquisition by non-defendant, Hong Kong Exchange), the LME stated that it "considers the fundamental role of the queues is to increase premiums, it must follow the most logical course of action is to address the existence of those queues."[154]

---

[153]    Available online at https://www.lme.com/~/media/Files/Notices/2014/2014_04/14%20121%20A117%20W056%20Update%20on%20Warehouse%20and%20Physical%20Network%20REforms.pdf.  Last accessed on Oct. 9, 2014.

[154]    Available online at https://www.lme.com/~/media/Files/Notices/2014/2014_04/14%20121%20A117%20W056%20Update%20on%20Warehouse%20and%20Physical%20Network%20REforms.pdf.  Last accessed on Oct. 9, 2014.

*Defendants Further Evade the Ineffective Minimum Load-Out Rules by Shifting Inventory Among Warehouses*

246.    Although the inadequate load-out rules (both before and after April 2012) would by themselves be sufficient to create a backlog given Defendants' hoarding of aluminum and the manipulation of the cancellation process by Defendants and their co-conspirators, the Defendants evaded even those minimal rules by shifting inventories of aluminum from one LME-certified warehouse to another (or to non-certified warehouses) so as to appear to comply with the load-out rules while maintaining inventories.

247.    A *New York Times* article, which was based on an extensive investigation and contains quotes from individuals with direct knowledge of Metro's practices in Detroit, describes those practices:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses.  Two or three times a day, sometimes more, the drivers make the same circuits.  They load in one warehouse.  They unload in another.  And then they do it again.

248.    One former Metro forklift driver, Tyler Clay, described this process as a "merry-go-round of metal."[155]

249.    The result is that, despite the LME's load-out rules, "nearly all of the metal that Metro moves is not delivered to customers . . . .  Instead, it is shuttled from one warehouse to another."[156]

250.    This "merry-go round" is not the result of ineptitude; rather, it is a strategy by Defendants to create an artificial scarcity of aluminum available for physical delivery, thereby impacting the wider aluminum market, including the market for aluminum futures.[157]

---

[155]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[156]    *Id.*

[157]    *Id.*

Furthermore, according to *The New York Times*' sources, "the longer waiting times are part of the company's strategy and help Goldman increase its profits from the warehouses."[158]

251.    In addition to shifting aluminum between LME-certified warehouses, Defendants have also moved aluminum to non-LME warehouses which they own or control.  According to the *Wall Street Journal*, as of October 2013, some 7 million to 10 million tonnes of aluminum are being housed in facilities known within the industry as "shadow warehouses."[159]  The movement of aluminum from LME warehouses into shadow warehouses satisfies the LME's load-out requirements without ever releasing any aluminum into the market.  This further restricts supply and drives up prices.

252.    Representative shuffling of aluminum include deals with other parties, such as Deutsche Bank.  In or about September 2010, Metro entered into an agreement with Deutsche Bank, the purpose of which was "moving ali [aluminum] between Metro warehouses in Detroit."[160]  Under the agreement, Metro paid Deutsche Bank an incentive fee to cancel a staggering 100,000 MT of aluminum, place it in the queue, and move it between Metro's Detroit warehouses only to eventually rewarrant the metal in Detroit.  The true purpose of the deal was to lengthen and tie up Metro's Detroit queues.

253.    Metro consummated similar deals with a company called Red Kite.[161]  Like the Deutsche Bank deal, the purpose and effect of these deals was to move aluminum around Detroit for purposes of lengthening Metro's queues.  Metro and Red Kite eventually would cancel over 500,000 MTs of warrants.  Metro performed the logistics of moving the metal to an

---

[158]    *Id.*

[159]    Tatyana Shumsky, *Millions of Tons of Metals Stashed in Share Warehouses*, The Wall Street Journal (December 23, 2013).   Available at http://online.wsj.com/news/articles/ SB10001424052702304244904579276830893405644.

[160]    GS-METRO-00000309.

[161]    GS-METRO-00010240-244.

off-LME warehouse storage site, only to guarantee Red Kite an incentive to re-warrant the metal (and charge it a "break fee" if it did not re-warrant the metal as agreed). Notably, the vast majority of this aluminum would simply be re-warranted in Detroit. On other occasions, Metro agreed with metal owners to store metal at non-LME warehouses pursuant to the agreement that it would be "subject to" the Detroit queue, *even though it was not warranted metal*.

> *Defendants Worked Together Strategically to Cancel Warrants*

254.    Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and exploded at the end of 2011, once the scheme set forth above was fully in place.



255.    According to the trade publication *American Metals Market* in a February 4, 2011 report, "[a] sharp increase in canceled aluminum warrants in London Metal Exchange-registered warehouses in Detroit is part of a 'revenue game' and not a true reflection of physical demand, market sources told *AMM* Friday. Canceled warrants in Detroit jumped by nearly 45,000 tonnes

overnight to 79,125 tonnes Thursday, rekindling the finger-pointing that followed September's 100,00-tonne increase and igniting chatter from traders about the real motives behind the move. A number of traders said the cancellations could be little more than 'warehousing games,' where one player cancels warrants to increase the queue at a warehouse[.]"[162]

256.    In September 2010, as alleged above, Metro was involved in creating large warrant cancellations at its Detroit warehouse.  That same month, JPMorgan cancelled warrants in Detroit.  The purpose and effect of these cancellations was to lengthen the queue.  Similarly, in December 2011, JPMorgan canceled warrants for 500,000 tonnes of aluminum that it had stored in Pacorini's (its competitor) Vlissingen warehouse.  As intended, JPMorgan's warrant cancellations instantly caused a large queue in Vlissingen – one that would grow to over 700 days.  The impact of JPMorgan's cancellation is visually striking:



257.    The amount of aluminum warrants canceled far exceeds any legitimate need for physical aluminum.  The surge in cancelled warrants was a sea change in the LME system.

---

[162]    Anne Riley, *Detroit aluminum warrant cancellations said 'a revenue game*,' AMM. COM (Feb. 4, 2011).

Previously, cancelled warrants represented a tiny percentage of total stocks and were tonnages destined for nearby consumer deliveries or, more likely, being readied to move to other warehouses under incentive schemes.  With warehouses now under trader control, traders started to make use of the restricted load-out spigot to cancel significant amounts of warrants so they could isolate consumers from spot in-LME warehouse metal and push premiums higher. The traders progressively cancelled many more warrants than they needed for their spot commitments to give themselves places in the queue in each forward month for metal they owned and financed so that:  (1) the premiums would continue to rise; and (2) at the end of each queue time period, they would have metal available for load-out to sell at inflated premiums. Consumer customers who could not afford to finance a year's worth of supplies were excluded from access to reasonably priced spot metal.

258.    As one example of the magnitude of Defendants' conspiracy, from January through June 30, 2011 (mere months after Goldman's purchase of Metro), Metro warehouses in Detroit took in 364,175 tonnes of aluminum and delivered out 171,350 tonnes.[163]   That represented 42% of inventory arrivals globally and 26% of the metal delivered out, according to LME data.[164]   Before Goldman bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories.[165]   Since Goldman's acquisition of Metro, the wait has grown to more than 16 months, according to *The New York Times*.[166]   As of March 31, 2014, the queue at Metro Detroit was reported as 625 days, as compared with 575 days as of June 30, 2013.

---

[163]    Pratima Desai, *et al.*, *Goldman's new money machine: warehouses*, Reuters (July 29, 2011).

[164]    *Id.*

[165]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[166]    *Id.*

259.   These same issues have been reported in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, is the dominant operator).   Queues of about a year have been reported for aluminum stored in Vlissingen.   Glencore has created those queues through a deliberate effort to hoard aluminum in those warehouses by payment of incentives.[167] As of December 2012, the Vlissingen LME warehouses stored more aluminum (1.44 million tonnes) than the LME Detroit warehouses (1.42 million tonnes).[168]   As of March 31, 2014, the queue at Pacorini Vlissingen was reported as 610 days, as compared with 518 days as of June 30, 2013.

260.   As demonstrated below, LME European warehouse aluminum stocks were steadily declining from a high in September 2009 through January 2011, before Defendants' scheme to hoard aluminum in Vlissingen took place.   After that, LME stocks rose well past the levels that occurred as a result of the "Great Recession."



---

[167]   Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

[168]   Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*, BLOOMBERG (Dec. 14, 2012).

**Defendants' Conspiracy Directly Causes Regional Premiums, Including the Midwest
Premium, to Reach Unprecedented Highs**

261.    As shown in the attached charts, the Midwest Premium fluctuated between four
and eight cents per pound ($90-$180 per tonne) during the period 2004 through 2008, which was
characterized by robust aluminum consumption and LME cash prices which peaked at about
$3,000 per tonne.   In the period between 2008 and 2010, during the financial crisis, recession,
and subsequent tepid recovery, the Midwest Premium reflected downward market pressure and
fluctuated between three to six cents per pound ($65-$130 per tonne) at a time when the LME
cash price was also much lower, fluctuating between $1,300-$2,200 per tonne.

262.    Starting in February 2011, a markedly different pattern emerged.   Economic
conditions were still poor then and there was a huge global surplus of aluminum.   Accordingly,
the LME cash price began a decline from $2,600 to a recent low of $1,730.   The Midwest
Premium, however, moved in the opposite direction.   Beginning in February 2011, the Midwest
Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to
rise during 2011 through 2013 to the then-current all-time record of 12 cents per pound ($265
per tonne) in July 2013.   In January 2014, the Midwest Premium surged to more than 20 cents
per pound.   The Midwest Premium was a little over 3% of the LME cash price at the height of
the bull market in 2008, but is now over 14% of the LME cash price – at a time when global
surpluses of aluminum have never been higher.

263.    The following chart demonstrates the impact of cancelled warrants and regional
premiums:



264.    Other industry-standard published regional premiums charged for delivery to or from other parts of the world moved in tandem with the Midwest Premium.



265.   This increase in the Midwest Premium and other regional premiums has been, and is, borne by purchasers of aluminum, and, as set forth below, is the result of Defendants' anticompetitive conduct.  Until very recently, no major financial institution offered a hedge for aluminum purchasers against rising regional premiums (including the Midwest Premium) – even though, as explained before, Defendants Goldman Sachs and JPMorgan (among other major investment banks) are active participants in the market for commodities-related derivative instruments.

266.   Now, however, that the federal government is known to be investigating the manipulation of the aluminum market that is the subject of the instant Complaint, JPMorgan has announced its intention (shortly following the publication of the before-cited investigative piece by *The New York Times*) to exit the commodities business entirely,[169] and Goldman Sachs (also immediately following publication of the investigative piece by *The New York Times*) has belatedly instituted corrective actions concerning its aluminum warehousing practices,[170] it is apparently economically viable for hedge writers to offer hedge positions to aluminum purchasers concerning the Midwest Premium and other premiums.  This presumably is because hedge position writers now may have some assurance (where before they had none because of the pervasiveness of the instant conspiracy) that the regional premiums will not always move only in one direction (namely, up).  On August 9, 2013, CME Group, "the world's leading and most diverse derivatives marketplace," announced that it recently wrote a derivatives "contract [that] is the first Exchange product that enables the aluminum Midwest premium to be

---

[169]    Steve Hargreaves, *JPMorgan to exit commodities business*, CNN Money (July 26, 2013).

[170]    *See Goldman outlines proposal to address aluminum warehouse queues*, Platts (July 31, 2013) ("In light of the concerns that end-users have raised about their access to aluminum they are holding in warehouses, Goldman 'is contacting end-users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products,' the company said.").

managed."[171]   That aluminum purchasers, uniformly during almost the entire period of time material to this Complaint, could not obtain hedge or similar risk management protection against rising Midwest Premium levels indicates both the uniformity and depth of the antitrust injury inflicted on Plaintiffs by Defendants' conduct here.

*The LME Studies the Excessive Queues*

267.   Based on numerous complaints about warehouse queues for aluminum in the United States and elsewhere, the LME commissioned a study by European Economics, a leading consultancy.

268.   The full report, entitled "Assessment of Warehouse Minimum Loading out Rates" has not been disclosed by the LME on the grounds that it contains proprietary information.  The executive summary of the report, however, was released on May 27, 2011.

269.   Tellingly, European Economics admitted in the executive summary that "[b]roader issues surrounding allegations of manipulation and the entrance of large financial players are beyond the scope of this report."[172]

270.   European Economics also acknowledged that the excessive queues were regarded as damaging "on the grounds that ***they inhibited arbitrage between the LME and the physical market, increased physical premiums*** and damaged the reputation of the LME," the queues that occurred in 2010 "***were of an unprecedented length***," and that "***premiums have increased in conjunction with the emergence of long queues***" such that premiums were "***greatly in excess of the cost of arbitraging between locations***."[173]   Thus, the LME recognizes that Defendants' actions broke the LME price convergence by inhibiting arbitrage.

---

[171]   Press Release, CME Group announces the first Aluminum Midwest Premium contract traded (Aug. 9, 2013).

[172]   Europe Economics, *Assessment of Warehouse Minimum Loading Out Rates*, Executive Summary, at 1.

[173]   *Id.* at 1-2.

271.     In the executive summary, European Economics recommended that the loading out requirement be increased to 1,500 tonnes per 300,000 tonnes of stock but admitted that even this requirement could result in queues of up to 200 days, which is "still longer than desirable for the LME system."[174]

272.     In a separate recommendation section from the report that was also released, European Economics opined that, given this potential maximum queue, "[i]t would be irresponsible for the LME as a regulator to maintain such a policy were lengthy, persistent queues to remain."[175]

273.     The LME eventually changed its loading out requirements such that larger warehouse companies (those with over 900,000 tonnes of metal stored) were required to load out 3,000 tonnes per day, effective April 2012.[176]   This was in fact less than the recommendation of European Economics as presented in the executive summary.  Under that recommendation, a warehouse company with over 900,000 tonnes stored would be required to load out 4,500 tonnes per day.  European Economics had acknowledged that, even under its more aggressive proposal, it was possible that unacceptably long queues would remain.

274.     The LME's new load-out requirement was still far less than the warehouses could load out if they were operating efficiently.

275.     Again, the purported minimum load-out rate (to the extent that was even complied with at all) acted as a *de facto* uniform or maximum load-out rate, as illustrated in the chart above.  In addition, this rule change did little to solve the problem of persistent and lengthy queues:

---

[174]     *Id.* at 5.

[175]     European Economics, *Assessments of Warehouse Minimum Loading Out Rates, Recommendations*, at 1.

[176]     Again, this requirement applies to the company as a whole in a particular location and not to each warehouse the company operates in that location.



276.    The LME load-out rules (both those in effect prior to April 2012 and those in effect after) were, and are, an agreement among and between Defendants those nominally-competing warehouse operators who are members of the LME, including the Warehouse Defendants, and the other Defendants in this matter, who, as noted before, until quite recently exercised actual ownership and effective control over the LME as concerns the matters at issue here; all such LME members are bound by the LME rules; and all of the LME-member Defendants here used their influence as members of the LME to shape those rules to their benefit and to the detriment of Plaintiff.

277.    As applied from September 2010 to the present, the LME load-out rules have had an anticompetitive effect and have unreasonably restrained trade in aluminum and function as a restriction on output.

*Defendants Worked to Thwart Any LME Rules Changes to Load-Out Rules*

278.    Metro worked with other market participants to influence the LME as well as the Europe Economics consultation commissioned by the LME.  For instance, Metro personnel regularly strategized with personnel from ICS, the official LME clearing agent for most of the LME warehouses, including Metro, Henry Bath, and Pacorini.

279.    On May 7, 2010, Metro's Prichard exchanged emails (on which Wibbelman was copied) with ICS's Shon Loth concerning formal complaints made to the LME about Metro load-outs.  Prichard defended Metro's approach and efforts, blaming shippers and the LME:  "If the complaint is that it takes too long to schedule/ship released metal out of Detroit, this is not a failure on Metro's part but a general LME issue and should be addressed accordingly.  As we clearly demonstrated to Alan and John, we schedule shipments of a minimum of 1500 MT/Day, have all the labor and resources allocated to fulfill this obligation . . . ."[177]  This prompted Loth to respond "Nice response and totally clear that we should resist any attempts to force warehouses to over schedule, or to increase the delivery out tonnage."[178]

280.    The very next month, Loth and Wibbelman had an email exchange entitled "Delivery Rates," where Loth set out suggestions that Wibbelman might convey to Goldman's Gabillon prior to Gabillon's upcoming meeting with the LME's Martin Abbott.  Loth's "thoughts on Jacques' lunch" included reference to "the imminent complaint against you."  "In terms of strategy for defending 1500 mt/day I have detailed below some thoughts.  (This is not my strategy but just a run through of the issues) . . . appeal to Martin as GS, member and shareholder.  Stressing the role in providing warehouse space, liquidity to the contract, LME stock levy – ie don't mess with it . . . .  In a very gentle but clear way he can point out that Metro would not support a change and would be required to review the legal framework around any

---

[177]    In light of Metro and Goldman's concerted and directed efforts to "feed Detroit," all the while shuffling aluminum into canceled and then off-warrant status but also swapping canceled in-queue metal for metal elsewhere, it should not go unsaid that Prichard in a June 2013 email to LME bemoaned the difficulty of managing the very queue Metro had created.  "Because of the numerous, releases in the queue and the fact that the queue is over 18 months out, [updating the outbound schedule in priority sequence] becomes a lengthy and involved process, speed contingent upon customer availability and response time. If we are able to contact 4 customers a day and get their confirmed response, it takes a month to complete an update."  Wibbelman concurred:  "Everytime once cancelled warrant is rewarranted it sets off a chain reaction of rescheduling.  Crazy system."  GS-METRO-00027731-36.

[178]    GS-METRO-00029727-28.

significant change to the warehouse contract.  While being gentle it is important to be clear and firm as we are currently struggling to maintain the status quo."[179]

281.    During December 2010 and January 2011, Metro and Goldman apparently engaged in coordinated attempts to influence the LME-commissioned Europe Economics study on load-outs.  In one email exchange, Angus Walker, apparently a consultant working on the consultation proposes that "In the Wibbelman version the only thing that stands between the LME and its fatal enfeeblement – at least in major metals – is the provision of liquidity by Warehouses who have not been captured into a permanent game of engineering regional and global squeezes."[180]  Wibbelman responds with 11 numbered points, painting a picture of the market that included a clear statement of his understanding that traders, banks, and producers work together to withhold metal from consumers in order to increase premiums:

> (3) That the secondary market of traders, banks and investors holding (LME Hedged) metal and warrants regularly sell metal and warrants for location premiums and other opportunities that may arise.
>
> (4) The fact that only a few out of many LME warehouse companies have regularly shipped outbound during the period of the past couple years.  (As I said, the data on this would provide a lot of insight, for example as Metro has been the only one to ship out of Detroit significantly even though there are two other LME warehouse companies in Detroit).
>
> …
>
> (6) That the availability of liquid and available warrants is the key to the liquidity of the LME futures markets.  If an entity holds them away from the market, then the market flattens and even backwardates . . . .
>
> (7) That free floating warrants means outbound shipping.   So if you get info on what warehouse locations and companies are

179    GS-METRO-00017529 (June 29, 2010 email).

180    GS-METRO-00032011-13.

shipping out, then you will know whose warrants are freely available to the market and whose are not.

…

(9) *That physical traders in conjunction with banks and producers hold stock and withhold metal sales to consumers in order to squeeze up the premiums*.

…

(11) And that the 1500 agreement between warehouses and the LME is the only glue holding it all together for the LME . . . in my opinion.  And is perhaps the only tool that restricts someone . . . perhaps the very large banks and traders from, taking up all of the available stock gaining control of the entire market . . . and from benefiting from the movements of the forward market that would be caused by it.[181]

282.    On January 26-27, 2011, Gabillon inquired of Wibbelman "Did you talk to Angus since my meeting with them?"  Wibbelman responded in the affirmative, adding "they thought your explanation of infinite queues was very clever . . . .  I will continue my dialog with him.  And recruiting others to approach him.  For you, I would say continue to work Martin [Abbott] as possible."[182]

283.    A March 8, 2011 Wibbelman email to Dudley of ICS underscores the above and further reveals the Defendants' efforts to work in concert.[183]  At this time, the first draft of the Europe Economics report had just been released.  Mike Dudley of ICS was scheduled to have lunch with LME chief Martin Abbott.  Wibbelman emailed Dudley in advance of his meeting with Abbott, "a couple of side points . . . not sure if you make them but just so you know, (i) *the people complaining will not benefit form a change as GS, Glencore and a couple of others take market actions to shape the landscape*; and (ii) Warehouse companies view the 1500

---

181    *Id*. (emphasis added).

182    GS-METRO-00006686.

183    GS-METRO-00033241-45 at 42.

obligation as a contract not a rule that can be changed unilaterally."[184]  Wibbelman is essentially stating that no matter what the LME does regarding its load-out rules, the Defendants will act in concert to withhold metal.

284.    On July 1, 2013, the LME published its notice of consultation on the LILO proposal.  Gabillon forwarded the LME Notice to Michael Camacho: "Mike, Quite surprising in the context of our conversation last week . . . the LME will never stops surprising us."  Camacho replaced Sellars as JPMorgan's Global Head of Metals.  He also was a member of the Board of Henry Bath and Son Ltd. and reported directly to Blythe Masters.

**Defendants Profit from Their Conspiracy to Manipulate Spot Prices, Including Regional Premiums, in Multiple Ways**

*The Conspiracy Allowed the Defendants' Warehousing Operations to Increase Their Published Rents and FoT Rates*

285.    LME warehouses generally earn revenue in two ways.[185]  First, warehouses earn rent for each day they store metal within their warehouse.  Second, warehouses charge FoT ("Free on Truck") rates, which are essentially delivery-out charges relating to the release of the metal from their warehouse.

286.    Warehouses set their maximum daily rent and FoT rates on an annual basis.  The annual period runs from April 1 to March 31.  Warehouses must submit their rents and FoT rates to the LME by December 1 of the preceding year.  The LME then publishes this information.  Each warehouse thus knows its competitors' annual maximum daily rent and FoT rates.

287.    Warehouse with queues are incentivized to publish higher rents and FoT rates, because the existence of a queue guarantees metal must be stored for a minimum amount of time.  In contrast, warehouses without queues should be incentivized to publish lower rents and FoT

---

[184]    GS-METRO-00033241.

[185]    *See* ECF No. 384 at 9 (Summary Public Report of the LME Warehousing Consultation) (Nov. 2013).

rates in order to attract metal. Nevertheless, the rents for all three defendant warehouses have largely moved in lock step as show below:

Table 1. *Published rental rate for primary aluminum (per ton per day) by location, warehouse company, and year*

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 RENT | 2010/11 RENT | 2011/12 RENT | 2012/13 RENT | 2013/14 RENT |
|---|---|---|---|---|---|---|---|
| **Baltimore** | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| **Baltimore** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Chicago** | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| **Chicago** | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Chicago** | Pacorini | USD | N/A | 0.40 | 0.41 | 0.45 | 0.47 |
| **Detroit** | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Detroit** | Pacorini | USD | N/A | 0.40 | 0.41 | 0.45 | 0.47 |
| **Mobile** | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Mobile** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.47 |
| **New Orleans** | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| **New Orleans** | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **New Orleans** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Johor** | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| **Johor** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Johor** | Metro | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Rotterdam** | Henry Bath | USD | 0.38 | 0.40 | 0.41 | 0.43 | 0.47 |
| **Rotterdam** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |
| **Vlissingen** | Pacorini | USD | 0.38 | 0.40 | 0.41 | 0.45 | 0.48 |

Table 2. *Published FoT rate by location, warehouse company, and year*

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 FOT | 2010/11 FOT | 2011/12 FOT | 2012/13 FOT | 2013/14 FOT |
|---|---|---|---|---|---|---|---|
| **Baltimore** | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| **Baltimore** | Pacorini | USD | 31.75 | 33.00 | 33.00 | 36.50 | 39.50 |
| **Chicago** | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| **Chicago** | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| **Chicago** | Pacorini | USD | N/A | 33.00 | 33.00 | 36.50 | 38.50 |
| **Detroit** | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| **Detroit** | Pacorini | USD | N/A | 33.00 | 33.00 | 36.50 | 38.50 |
| **Mobile** | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |

| LOCATION | WAREHOUSE COMPANY | CURRENCY | 2009/10 FOT | 2010/11 FOT | 2011/12 FOT | 2012/13 FOT | 2013/14 FOT |
|---|---|---|---|---|---|---|---|
| Mobile | Pacorini | USD | 31.75 | 33.00 | 33.00 | 36.50 | 38.50 |
| New Orleans | Henry Bath | USD | 32.00 | 33.00 | 33.00 | 35.00 | 39.00 |
| New Orleans | Metro | USD | 32.10 | 32.95 | 32.95 | 35.95 | 39.95 |
| New Orleans | Pacorini | USD | 31.75 | 33.00 | 33.00 | 37.25 | 39.90 |
| Johor | Henry Bath | MR | 110.00 | 110.00 | 112.50 | 120.00 | 130.00 |
| Johor | Pacorini | MR | 112.00 | 112.50 | 113.00 | 126.00 | 133.00 |
| Johor | Metro | MR | 111.00 | 112.00 | 113.00 | 120.00 | 135.00 |
| Rotterdam | Henry Bath | Euro | 22.00 | 22.50 | 22.50 | 23.75 | 27.00 |
| Rotterdam | Pacorini | Euro | 22.00 | 22.50 | 22.50 | 25.50 | 27.75 |
| Vlissingen | Pacorini | Euro | 22.00 | 22.50 | 22.50 | 26.00 | 27.95 |

288.    Thus, warehouses benefit from the existence of queues in the system by being able to charge higher rents.

*The Defendants' Trading Operations Profit by Selling Aluminum with Artificially Increased Premiums*

289.    While a benefit to be sure, Defendants were not simply interested in higher daily rents and FoT charges for their warehouse operations.  Defendants' trading arms wanted to manipulate the spot metal price, including the premiums, so they could reap extraordinary profits.

290.    In addition to operating warehouses, Defendants sell aluminum to industrial users on both an annual and spot basis.  Consistent with industry practice in the United States, Defendants charge the Metals Week U.S. Transaction Price, which includes the Midwest Premium.  Defendant Glencore Ltd. sells aluminum to industrial users in the United States and charges them the Midwest Premium.  JPM sells aluminum to industrial consumers, such as the fabrication industry.  Goldman does the same.

291.    By artificially driving up the Midwest Premium, Defendants stood to reap additional profits on these spot transactions, because Defendants generally do not pay the Midwest Premium to acquire this aluminum.  Rather, they acquire this aluminum by acquiring LME warrants or engaging in supply transactions with aluminum producers, which often involve

their LME warehouse operations.   Defendants can sell either metal that has worked its way through the queue, metal that is in one of their warehouses without a queue, or even metal that is held off-warrant.[186]   Thus, increases to the Midwest Premium allow Defendants to sell aluminum for more, providing them with yet another motive to conspire.

292.   It is apparent that Metro also profited from increased premiums.   In a May 24-25, 2011 email entitled "Ali Premiums," Robert Burgess-Allen, who consults with Metro on aluminum deals, inquired with Wibbelman about a potential transfer of Toledo metal to Detroit in exchange for a $20 release fee.   He notes that if the release to Detroit does not occur, "that material is worth whatever we start bidding the MWP to be so even at a conservative $160 which equals a equiv warrant premium for Toledo of $100-120.  We still take the $20 to the broker / the $35 cost of roll and bank the $45/65 profit . . . .   I am ever concerned that the big picture is being missed here – *if we want to sell premium we have to almost act as physical traders.  We are in effect gaining premium on something we are not technically entitled to*.  If we don't want to sell and want to contango finance without paying a $20 fee – this is possible but it will take us 18 months to break even . . . ."[187]   This communication makes clear that Metro and Goldman have eliminated the line between trader and warehouseman, and Metro is no longer satisfied with mere rent deals that take a period of time to become profitable.   Burgess-Allen continues "If we lock Mobile / Long Beach in US with JP which is highly possible the premium for the US material will go raging higher and we may be told that $20 simply does not cut it. We will not be getting premium returns from JPM . . . .   If the answer is to be NO on any more sale premium being agreed up front then at least lets make that decision and get the bad news out there. Everyone wants resolved before month end including settlement . . . .   I know you know all this –

---

[186]   Defendants can also sell their warrant for metal stored in a location without a queue for additional premia in the OTC market.

[187]   GS-METRO-00021326 (emphasis added).

I also know you agree – I don't mean to keep pointing out the same facts its just seems so bizarre that we for the first time in years when called upon to be as decisive as we have always been pre GS . . . are faltering.  Not what Metro are known for I think you would agree."  Not only was Metro acting as a trader, but it was contemplating an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result being that the premium will go "raging higher."[188]

293.    Six weeks later, Wibbelman emailed Whelan and Prichard, noting that "Jacques has me on hold for sending the JPM letter until JPM legal and compliance weighs in.  Really can't blow my nose without permission anymore."[189]    Apparently Metro was in direct communication with JPMorgan (rather than communication with or through Henry Bath).  It is reasonable to infer, particularly in light of this timeline and the Burgess-Allen communication referenced above, that a "JPM letter" implicating the review of JPMorgan legal and compliance departments dealt with some form of agreement between the defendants, and one of at least questionable legality.

294.    A number of other documents produced by Metro and Goldman create a reasonable inference that Metro profited, or may have profited, from elevated premiums in other ways.  Some documents appear to suggest that Metro itself owned metal, perhaps through an entity referred to as Metal Store LLC.  Some documents show Metro employees using email addresses with a domain name @metalstore.com for purposes of certain shipments, and yet blind-copying Metro email addresses as well.  In another context, Wibbelman proposed to Goldman's Gabillon in June 2012, a deal relating to Metro's opportunity to "save" 112,000 mt of aluminum in Mobile.  Wibbelman proposed a structure where "We will be using an agreement

---

[188]    *Id.*

[189]    GS-METRO-00021946 (July 19, 2011 email, later forwarded by Whelan to his personal email account).

that makes it clear that the rolls are our option and that the premium for the material would be ours under a break fee."[190]   Two years earlier, in March 2010, Wibbelman and Robert Burgess-Allen had communicated about arranging a "formal presentation to G [Goldman] regarding merits of Detroit rental deal" and "discussion about formal way to recoup potential premiums that are available in future agreed sales via break fees with Financiers."[191]   These emails suggest that Metro itself was acting to profit from the regional premiums, perhaps by "acting like physical traders."

*Defendants Profit from the Increase in Contango*

295.    Furthermore, when a commodities market is in contango (when the futures price is higher than the expected spot price), a holder of the commodity has an opportunity for profit if storage and financing costs for holding the commodity are less than the difference between the expected spot price and the futures price.   Where, as here, the same or related parties can simultaneously: (1) hold; (2) store; and (3) finance the commodity, there is a ripe opportunity – which the data shows was seized by Defendants – for aluminum market manipulation and collusion at the expense of bona fide purchasers of physical aluminum.   Defendants' use of incentives for storage of aluminum in their warehouses also encourages such manipulation by lowering carrying costs.

296.    The trading arms of the bank defendants, along with Glencore's trading operation, engage in futures transactions in the LME forward contract market.   As discussed above, traders and banks have seized on the opportunity to purchase aluminum during the times material to this Complaint and to sell it forward for a future profit, due to the prevailing market contango.   In order to take the future short (selling) position in the LME market, there must be corresponding long (buying) positions.   Many of these long positions reflect the hedging positions of industrial

---

190    GS-METRO-00037390-95.
191    GS-METRO-00046676-77.

users of aluminum who know that they will need a quantity of aluminum on future dates but seek price protection against inflation of the LME cash price. As reflected above, Agfa and Kodak are such hedgers. When Defendants conspired to increase the regional premiums and thus, the futures price for aluminum, Defendants profited and Plaintiffs were injured in this way.

**Purchasers of Aluminum Have Complained About Defendants' Practices and Government Inquiries Are Ongoing**

297. As a result of the conduct set forth above, large purchasers of aluminum have made formal complaints to the LME and other authorities.

298. For example, Coca Cola filed a complaint with the LME in June 2011, accusing Goldman Sachs of creating supply bottlenecks at the Detroit warehouses to artificially raise the price of aluminum. In that complaint, Coca Cola stated that it takes more than seven months to access aluminum from the Detroit warehouses.[192]

299. More recently, the Beer Institute, a trade group representing beer brewers, filed another complaint with the LME. According to a statement released by the Beer Institute in conjunction with the complaint, Defendants' rules and practices "are interfering with normal supply and demand dynamics" and have "led to a complete disconnect between LME aluminum prices and actual aluminum prices and prevent brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[193]

300. The now-owner of the LME, HKEx Group, had such concerns about the warehouse backlogs that it at one time threatened to scuttle its proposed purchase because of this issue. Prior to the acquisition being consummated, HKEx's CEO, Charles Li, stated that the problem caused him "sleepless nights."[194]

---

[192]   Dustin Walsh, *Aluminum Bottleneck: Coke's complaint: 12% of global stockpile held here, boosting prices*, CRAIN'S DETROIT BUSINESS (June 26, 2011).

[193]   Joe Richter and Agnieszka Troskiewicz, *Beer Companies Press LME to Cut Aluminum Warehouse Backlogs*, BLOOMBERG (June 23, 2013).

[194]   LME Week: Charles Li signals ownership of LME, its problems and its future, METAL BULLETIN (Oct. 18, 2012).

301.    Defendants' conduct has also sparked government investigations.  In May 2011, the Science and Technology Committee of the House of Commons of the Parliament of the United Kingdom reported a concern that "the ownership of metals storage warehouses by a dominant dealer on the London Metals Exchange" (apparently referring to JPMorgan) may be anticompetitive and referred this concern to the Office of Fair Trading.[195]

302.    *The Wall Street Journal* recently reported that the CFTC and the DOJ have begun investigations of price manipulation and collusion involving the metals warehousing industry and that the CFTC has sent evidence preservation notices to some warehouse owners.[196]

303.    On November 15, 2013, *Law360* reported that U.S. Assistant Attorney General William Baer confirmed to a subcommittee of the House Judiciary Committee the existence of an investigation into anti-competitive aluminum warehousing agreements among banks like Goldman and JPMorgan.[197]

304.    As recently as August 8, 2014, Reuters reported that the U.S. Senate Permanent Subcommittee on Investigations was continuing a probe into potential abuses in energy and metals markets.  According to the story, spokespersons for Goldman and JPMorgan declined comment.[198]

**Defendants Change Their Practices or Plan to Exit the Market Immediately After Facing Scrutiny of These Practices**

305.    In the face of the media and regulatory scrutiny set forth above, and perhaps even more significantly, the purchase of the LME by an exchange operator that is not beholden to

---

[195]    www.parliament.uk, Science and Technology Committee, "Fifth Report: Strategically important metals," ¶¶79-81 (May 2011).

[196]    Jamila Trindla and Tatyana Shumsky, *U.S. Probes Metals Warehouse Firms*, THE WALL STREET JOURNAL (July 25, 2013).

[197]    Alex Lawson, *DOJ Probing Goldman, JPMorgan Aluminum Storage Deals*, LAW360 (Nov. 15, 2013).

[198]    Patrick Rucker, *Goldman, JPMorgan in Senate's crosshairs for commodities holdings*, REUTERS (Aug. 8, 2014).

LME members, many of the Defendants have agreed to change their practices or, in the case of JPMorgan, planned to exit the warehousing business altogether.

306.    In late July, 2013, it was widely reported that JPMorgan was planning on exiting the physical commodities business, including metals warehouses, based, in part, on increased regulatory scrutiny.[199]  JPMorgan has now exited both the aluminum warehousing business and the physical commodities trading market.[200]

307.    On July 31, 2013, Goldman Sachs issued a statement in response to *The New York Times* article cited in this Complaint and announced several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues. Of course, these steps could have, and should have, been taken several months ago, when complaints about excessive queues first surfaced.  It is significant that Goldman Sachs only announced these steps after its practices were widely exposed by *The New York Times*.  Goldman has now announced that it plans to exit the aluminum warehousing business.[201]

308.    Most importantly, only a few months after it came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing excessive queues to load out more aluminum than they load in.[202]  Again, there is no legitimate reason why this obvious action could not have been taken when the complaints about the excessive queues first surfaced.

---

[199]    *See, e.g.*, *JPMorgan Mulls Physical Commodities Exit Amid U.S. Review*, REUTERS (July 26, 2013).

[200]    *See* Dmitry Zhdannikov and Chris Peters, *JPMorgan sells physical commodities until to Merduria for $3.5 billion*, REUTERS (Mar. 19, 2014).

[201]    *See* Josephine Mason, Exclusive: *Goldman puts Metro metals warehousing unit up for sale*, REUTERS (May 20, 2014).

[202]    *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, BLOOMBERG (July 1, 2013).

## INJURY TO PLAINTIFFS

309.  As previously alleged, Defendants' collusion and manipulation affected the pricing of millions of dollars' worth of aluminum in the United States and in other parts of the world.

310.  Agfa develops, produces, and distributes equipment and supplies for the newspaper, commercial printing, and graphics communications industries.  In conjunction with this, Agfa's business involves the use of large quantities of aluminum to produce lithographic printing plates.

311.  Mag designs, manufactures, and sells high-quality, durable flashlights.  These flashlights are manufactured in the United States using aluminum.

312.  Kodak develops, produces, and distributes equipment and supplies for use in graphics and printing solutions by businesses around the world.  In conjunction with this, Kodak's business involves the use of large quantities of aluminum to produce lithographic printing plates.

313.  Plaintiffs have suffered antitrust injury from Defendants' conduct alleged above in the form of inflated regional premiums, including the Midwest Premium.  These premiums are an element of the price paid by Plaintiffs for the purchase of aluminum for delivery.  While the "base" price (LME cash price or its equivalent) of aluminum has decreased during some of the relevant times, absent Defendants' conduct, the regional premiums (including the Midwest Premium) would have remained stable or, more likely, decreased in conjunction with the base price, thus resulting in lower net prices for Plaintiffs.  Instead, those premiums have soared.

314.  Plaintiffs' injuries arise from the competition-reducing aspect of Defendants' conduct.  In the absence of such conduct, the LME warehouses would compete with one another with respect to offering efficient storage services and would not effectively hoard large quantities of aluminum, thus withholding it from the market.  Aluminum would not stockpile at key chokepoint warehouses and freely tradable metal would be available from numerous warehouses, including without queues.  This, in turn, would avoid the artificial shortage of aluminum

available for immediate delivery and the corresponding artificial increase in the regional premiums (including the Midwest Premium).  In other words, Defendants' conduct impaired competition among suppliers of warehouse services and this, in turn, had a predictable and foreseeable effect on the market for aluminum for physical delivery because of the link between the LME warehouses and the larger aluminum market explained above.  Defendants' scheme worked only because the Warehouse Defendants were acting jointly.

315.   At all times material to this Complaint, Agfa has purchased aluminum directly from integrated producers Alcoa and Hydro, and/or from their respective affiliates.  Agfa's procurement, for deliveries both in the United States and abroad, is pursuant to global master supply agreements with those producers.

316.   During the times material to this Complaint, Agfa's aluminum purchases have explicitly incorporated pricing based on the LME cash price or its equivalent plus the applicable regional premium (at times, the Midwest Premium).

317.   At all times material to this Complaint, Mag has purchased aluminum directly from integrated producer Hydro and/or from its affiliates.  Mag's procurement is pursuant to a fixed cost-plus formula using the then-current LME cash price for aluminum and the Midwest Premium.

318.   During the times material to this Complaint, Mag's aluminum purchases have explicitly incorporated pricing based on the LME cash price or its equivalent plus the Platt's Midwest Premium.

319.   At all times material to this Complaint, Kodak has purchased aluminum directly from integrated producers Alcoa, Bridgnorth, Hydro, and Xiashun and/or from their respective affiliates.  Kodak's procurement, for deliveries both in the United States and abroad, is pursuant to global master supply agreements with those producers and/or spot agreements or purchase orders.

320.     During the times material to this Complaint, Kodak's aluminum purchases have explicitly incorporated pricing based on the LME cash price or its equivalent plus the applicable regional premium (at times, the Midwest Premium).

321.     Accordingly, when the industry-standard, published regional premiums (including the Midwest Premium) have been artificially inflated due to Defendants' conduct as described above, Plaintiffs have paid increased prices for aluminum, and have thereby been injured in their business or property.

322.     Plaintiffs are efficient enforcers of the antitrust laws in that by paying artificially inflated aluminum prices directly to integrated producers of aluminum, Plaintiffs have suffered the most direct injury.  As the first-level purchasers of aluminum from integrated suppliers and for their own industrial uses, Plaintiffs are the first payers of the inflated regional premiums, directly injured by inflated aluminum prices, and so are among the class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement. Additionally, although the integrated producers Plaintiffs purchased aluminum from are closer to the alleged conspiracy than are Plaintiffs, Plaintiffs remain the most efficient enforcers even compared to the producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust laws and the producers do not pay the premiums.  Simply put, as owners of large stocks of LME-approved aluminum, the producers benefitted tremendously from Defendants' manipulation of the regional premiums, and profited more from contango financing the stocks they owned even if they were forced to pay inflated prices and higher storage rents. Moreover, Plaintiffs' injury is concrete and not speculative, being tied as it is to artificially-inflated pricing component benchmarks such as the Midwest Premium and other regional premiums.  Finally, as the direct purchasers, from integrated suppliers, of aluminum for their own use, there is no difficulty identifying or apportioning Plaintiffs' damages in this action.

323.     As more fully described above, Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce, at least insofar as it has created an artificial shortage of aluminum supply and has artificially inflated the Midwest Premium and

other regional premiums as they apply to procurements for U.S. consumption.  These effects give rise to and have proximately caused injury to Plaintiffs in relation to purchases of aluminum at prices artificially inflated by Defendants' conduct.

324.   As described above, Plaintiff Agfa has, at times material to this Complaint, also purchased significant quantities of aluminum abroad pursuant to the same global supply agreements that govern its domestic procurement.   These non-domestic purchases also incorporate the LME cash price and applicable industry-standard published regional premiums as pricing components.

325.   Accordingly, the domestic effects of Defendants' conduct as described above, *i.e.*, the artificial inflation of the published regional premiums, also give rise to and have proximately caused injury to Agfa in relation to certain non-domestic purchases of aluminum as the regional premium benchmarks are incorporated into purchases made abroad.

326.   Accordingly, when the applicable regional premium has been artificially inflated due to Defendants' conduct as described above, Agfa has paid increased prices for aluminum in connection with certain non-domestic purchases, and has thereby been injured in its business or property.

327.   As described above, Plaintiff Kodak has, at times material to this Complaint, also purchased significant quantities of aluminum abroad pursuant to the same global supply agreements that govern its domestic procurement.   These non-domestic purchases also incorporate the LME cash price and applicable industry-standard published regional premiums as pricing components.

328.   Accordingly, the domestic effects of Defendants' conduct as described above, *i.e.*, the artificial inflation of the published regional premiums, also give rise to and have proximately caused injury to Kodak in relation to certain non-domestic purchases of aluminum as the regional premium benchmarks are incorporated into purchases made abroad.

329.   Accordingly, when the applicable regional premium has been artificially inflated due to Defendants' conduct as described above, Kodak has paid increased prices for aluminum in

connection with certain non-domestic purchases, and has thereby been injured in its business or property.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of Section 1 of the Sherman Act, 15 U.S.C. §1**
**(All Plaintiffs Against All Defendants)**

330.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

331.     Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro in 2010 and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

332.     The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Platts Midwest Premium.   Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

333.     Defendants' conspiracy, and the resulting impact on the market for aluminum, occurred in and affected interstate commerce.  Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

334.     The contract, combination or conspiracy has had the following effects, among others:

a.      Prices charged to Plaintiffs for purchases of aluminum, particularly the regional premiums, including the Platts Midwest Premium and other regional premium price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

b.      Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

335.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

336.    Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

**SECOND CLAIM FOR RELIEF**

**Violations of the New York Donnelly Act, General Business Law §340, *et seq.***

**(Plaintiffs Agfa Corporation, Agfa Graphics, N.V., and Kodak Against All Defendants)**

337.    To the extent not inconsistent with this Second Claim for Relief, Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

338.    Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, agreement, arrangement or combination whereby competition or the free exercise of activity in the conduct of business, trade, or commerce in the state of New York is or has been restrained, in violation of the Donnelly Act, N.Y. G.B.L. §340, *et seq*.

339.    The contract, agreement, arrangement, or combination consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Platts Midwest Premium.

340.    Defendants' contract, agreement, arrangement or combination, and the resulting impact on the market for aluminum, occurred in and affected commerce in the state of New York.  Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

341.    The contract, agreement, arrangement or combination has had the following effects, among others:

a.    Prices charged to Plaintiffs for purchases of aluminum, particularly regional premiums, including the Platts Midwest Premium and other regional price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

b.    Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

342.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

343.    Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of law alleged herein.

### THIRD CLAIM FOR RELIEF

### Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770
### (Plaintiff Mag Against All Defendants)

344.    To the extent not inconsistent with this Third Claim for Relief, Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

345.    Beginning at a time unknown to Plaintiff, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy to restrain trade in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§16700-16770).

346.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Platts Midwest Premium.

347.    Defendants' conspiracy, and the resulting impact on the market for aluminum, occurred in and affected commerce in California, including Plaintiff's purchases of aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators.   These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

348.    The contract, combination, or conspiracy has had the following effects, among others:

a.    Prices given to Plaintiff for purchases of aluminum, particularly the regional premiums, including the Platts Midwest Premium price term were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and

b.    Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

349.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury to its business or property.

350.    As a result of Defendants' violation of Cal. Bus. & Prof. Code, §16720, Plaintiff seeks treble damages, costs and reasonable attorneys' fees pursuant to Cal. Bus. & Prof. Code, §16750(a).

**REQUEST FOR RELIEF**

Plaintiffs  request the following relief:

A.    That  the  Court enter an  order declaring that Defendants' actions as set  forth in this Complaint, and in other respects, violate the law;

B.     That the Court award Plaintiffs damages in an amount according to proof against Defendants for Defendants' violation of 15 U.S.C. §1, to be trebled in accordance with those laws;

C.     That the Court award Plaintiffs Agfa and Kodak damages in an amount according to proof against Defendants for Defendants' violation of N.Y. G.B.L. §340 *et seq.*, to be trebled in accordance with those laws;

D.     That the Court award Plaintiff Mag damages in an amount according to proof against Defendants for Defendants' violations of Cal. Bus. & Prof. Code §§16700-16770, to be trebled in accordance with those laws;

E.     That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

F.     That the Court award such other equitable and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury of all issues so triable.

DATED: April 9, 2015                    Scott+Scott, Attorneys at Law, LLP


                                        s/ Walter W. Noss
                                        _____
                                        Christopher M. Burke (*pro hac vice*)
                                        Walter W. Noss (*pro hac vice*)
                                        Kristen M. Anderson (*pro hac vice*)
                                        707 Broadway, Suite 1000
                                        San Diego, CA 92101
                                        Telephone: 619-233-4565

                                        David R. Scott (DS 8053)
                                        Sylvia M. Sokol (*pro hac vice*)
                                        Thomas K. Boardman (*pro hac vice*)
                                        Scott+Scott, Attorneys at Law, LLP
                                        The Chrysler Building
                                        405 Lexington Avenue, 40th Floor
                                        New York, NY 10174
                                        Telephone: 212-223-6444

Derek Y. Brandt (*pro hac vice*)
John R. Phillips (*pro hac vice*)
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
Telephone:  618-259-2222

Andrea Bierstein
Simmons Hanly Conroy
112 Madison Ave., 7th Floor
New York, NY 10016
Telephone:  212-784-6400

Todd M. Schneider
Jason H. Kim
Schneider Wallace Cottrell Konecky Wotkyns LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone:  415-421-7100

Garrett W. Wotkyns
Schneider Wallace Cottrell Konecky Wotkyns LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone:  480-428-0144

Daniel J. Mogin
The Mogin Law Firm, P.C.
707 Broadway, Suite 1000
San Diego, CA 92124
Telephone:  619-687-6611

Joseph C. Peiffer
Peiffer Rosca Wolf Abdullah Carr & Kane, L.L.P.
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Telephone:  505-586-5259

*Counsel for Agfa Corporation and Agfa Graphics,*
*N.V.; Mag Instrument, Inc.; and Eastman Kodak*
*Company*

-and-

Christopher M. Santomassimo
Nicoll Davis & Spinella LLP
95 Route 17 South, Suite 316
Paramus, NJ 07652
Telephone:  201-712-1616

*Counsel only for Agfa Corporation and Agfa*
*Graphics, N.V.*

-and-

Allan Steyer
Steyer Lowenthral Boodrookas Alvarez & Smith
LLP
One California Street, 3rd Floor
San Francisco, CA 94111
Telephone: 415-421-3400

*Counsel only for Mag Instrument, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2015.

  /s/ Walter W. Noss
WALTER W. NOSS (*pro hac vice*)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA  92101