UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                         :
                         :
                         :
IN RE ALUMINUM WAREHOUSING   :       13-md-2481 (KBF)
ANTITRUST LITIGATION         :        14-cv-3116
                         :
                         :       OPINION & ORDER
                         :
------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 23, 2015

KATHERINE B. FORREST, District Judge:

      In this large multidistrict litigation ("MDL"), plaintiffs assert an array of

antitrust and state competition law claims relating to conduct alleged to have raised

the price of aluminum.  As this Court has set forth in its prior decisions in this

action, plaintiffs allege that load-out delays at aluminum warehouses certified by

the London Metal Exchange ("LME"), which were caused by defendants' warrant

cancellation activity, increased the price of a premium (the "Midwest Premium")

partially derived from the cost of storing aluminum.  Plaintiffs—which for purposes

of this decision consist only of the first-level purchasers ("FLPs")[1]—are currently on

their Third Amended Complaint ("TAC").  This Court has resolved all motions to

dismiss the TAC except for the motion that is the subject of this decision.  The sole

pending motion, brought by defendants Robert Burgess-Allen ("Burgess-Allen") and

Burgess-Allen Partnership Ltd. ("BAP") (collectively, the "BAP Defendants"), seeks

---

[1] The FLPs include Ampal, Inc., Custom Aluminum Products, Inc., Claridge Products and
Equipment, Inc., and Extruded Aluminum Corporation.  (Third Amended Complaint ("TAC") ¶¶ 2,
53, 60, 67, ECF No. 738.)  Each FLP purchased primary aluminum for physical delivery in the
United States and were the first parties to pay prices that incorporated the Midwest Premium for
that aluminum.  (TAC ¶¶ 46-48, 55-57, 62-64, 69-71.)

dismissal of the FLPs' claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). (ECF No. 823.)[2]  The FLPs assert a conspiracy claim under § 1 of the Sherman Act and state-law equivalents against the BAP Defendants.

For the reasons set forth below, this Court lacks personal jurisdiction over BAP.  BAP is therefore dismissed from this action on that basis.  While the Court believes that the evidence that has been presented to the Court is sufficient to support the Court's exercise of personal jurisdiction over Burgess-Allen, it nonetheless dismisses Burgess-Allen from this action because plaintiffs fail to plead a viable antitrust conspiracy claim against him.  Because plaintiffs have already had ample opportunity to amend and have not sought further leave to amend in opposing the BAP Defendants' motion, these claims are dismissed with prejudice.

I.    PROCEDURAL HISTORY[3]

In August 2013 plaintiffs filed the first of what would be a large number of lawsuits alleging anticompetitive conduct impacting aluminum pricing.  (See, e.g., 14-cv-217, ECF No. 1.)  Numerous actions were filed in various jurisdictions across the country and eventually brought together in this District pursuant to an order of the U.S. Judicial Panel on Multidistrict Litigation.  (ECF No. 1.)

---

[2] Unless otherwise specified by reference to a specific docket number, all citations in parentheses refer to the main docket in this case, 13-md-2481.  The Court notes that the BAP Defendants' motion is also docketed at ECF No. 290 in docket number 14-cv-3116.

[3] The Court refers to and incorporates by reference its prior decisions, which provide a thorough overview of the procedural history and factual allegations at issue in this action.  In particular, the Court refers to its prior decision addressing the bulk of defendants' motions to dismiss the TAC.  See In re Aluminum Warehousing Antitrust Litig. ("In re Aluminum"), No. 13-md-2481 (KBF), 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015).  The Court here only provides background to the extent necessary to decide the pending motion.

This Court dismissed an initial set of pleadings in August and September 2014.  (ECF Nos. 571, 583, 586.)  Four of the remaining plaintiffs (the FLPs), subsequently moved to file another amended complaint.  (ECF No. 631, Ex. A.)  On March 26, 2015, the Court granted in part and denied in part the FLPs' motion for leave to replead.  (ECF No. 733.)  The FLPs filed then filed the TAC on April 9, 2015.  (ECF No. 738.)

Burgess-Allen and BAP were not participants in the prior rounds of motions because of their late entry into this case.  BAP was not served with the Third Amended Complaint until April 23, 2015 (ECF No. 785), and Burgess-Allen did not waive service of summons until June 11, 2015 (ECF No. 815).  (The BAP Defendants had not been named as defendants in any of the prior complaints.)  The BAP Defendants filed their motion to dismiss on July 13, 2015.  (ECF No. 823.)  That motion became fully briefed on September 28, 2015.  (ECF No. 854.)

II.   FACTUAL BACKGROUND

At the outset, it is worth pausing to identify the universe of materials that the Court may consider as to defendants' two asserted grounds for dismissal.  As to the BAP Defendants' contention that this Court lacks personal jurisdiction over them, the Court may look beyond the pleadings to affidavits and supporting materials submitted by the parties.  Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001); Mantello v. Hall, 947 F. Supp. 92, 95 (S.D.N.Y. 1996) ("Because a motion to dismiss based on lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding

the motion." (quotation marks omitted)).  Thus, solely as to the issue of personal jurisdiction, the Court considers all of the parties' submissions.

As to defendants' Rule 12(b)(6) argument that the TAC fails to state a viable § 1 claim, however, the Court may only consider the factual allegations of the TAC and any documents incorporated by reference therein.  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002).  The Court accepts such facts as true for purposes of deciding the motion.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007)).

Remaining cognizant of the different factual material that it may consider, for the sake of efficiency, and in order to present the allegations as coherently as possible, the Court here recites the relevant factual background based on the entire record.  The Court reiterates that when addressing defendants' Rule 12(b)(6) argument, the Court does not consider any documents outside of the TAC that are not incorporated by reference therein.[4]

---

[4] Thus, for purposes of defendants' Rule 12(b)(6) argument, the Court does not consider the July 10, 2015 Declaration of Robert Burgess-Allen ("Burgess-Allen Decl.") or Exhibits 1, 2, 5, 8, and 10-20 of the August 28, 2015 Declaration of Linda P. Nussbaum ("Nussbaum Decl.").  The Court may, however, consider Exhibits 3, 4, 6, 7, and 9 of the Nussbaum Declaration, as these documents are incorporated by reference into the TAC.  (See TAC ¶¶ 252, 256, 520, 607.)

      1.    <u>Burgess-Allen and BAP</u>

The TAC alleges that defendant Robert Burgess-Allen is a resident and citizen of the United Kingdom.  (TAC ¶ 129.)  Burgess-Allen had an email address in 2010 with defendant Metro International Trade Services LLC ("Metro") and worked with Metro during the class period.  (TAC ¶ 129.)  Until as late as December 2009, Burgess-Allen served as Metro's Vice-President of Commodity Finance.  (<u>See</u> Nussbaum Decl., Ex. 1.)

Metro is a limited liability company organized under the laws of Michigan with headquarters in Michigan.  (TAC ¶ 92.)  It owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan; Chicago, Illinois, Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store, among other metals, aluminum.  (TAC ¶ 92.)  Metro is wholly owned by defendant Mitsi Holdings LLC ("Mitsi"), which itself is an indirectly wholly owned subsidiary of former defendant The Goldman Sachs Group ("Goldman").  (TAC ¶ 94.)  As set forth in this Court's prior decision regarding the most recent set of motions to dismiss, the TAC alleges that Metro was the "primary alleged wrongdoer" at the "true center of the conspiracy" and that Metro "made and performed a series of agreements in unreasonable restraint of trade for multiple anticompetitive purposes and with multiple anticompetitive effects."  <u>In re Aluminum</u>, 2015 WL 1378946, at *2, 5, 9.

According to the September 8, 2010 meeting minutes of Mitsi's Board of Directors, Metro was planning to enter into a new contract with Burgess-Allen

whereby Burgess-Allen "would represent Metro exclusively" on all metals deals with customers in London and Europe; Jacques Gabillon, Mitsi's Chairman, also noted that Burgess-Allen's contributions to Metro were "valuable." (TAC ¶¶ 253-54.) The TAC alleges that "Metro . . . violated the LME minimum load-out rule by making anticompetitive agreements with Defendant Burgess-Allen and co-conspirators DB Energy, Red Kite, and other persons presently unknown to Plaintiffs." (TAC ¶ 251.) The TAC alleges that Burgess-Allen received large payments from Metro in the form of fees and (effectively) shares of Metro's rental revenues from his agreement with Metro. (TAC ¶ 16(g).)

Defendant BAP is a private limited company founded in June 2009 by Burgess-Allen that is organized under the laws of the United Kingdom and has headquarters at 1 Royal Terrace, Southend-On-Sea, SS1 1EA, England. (TAC ¶ 128; Burgess-Allen Decl. ¶ 2, ECF No. 824.) Burgess-Allen and his wife Emily Ruth Villiers Burgess-Allen serve as Directors of the company and are BAP's only two employees. (TAC ¶ 128; Burgess-Allen Decl. ¶ 4.) BAP's business includes providing consulting services relating to warehousing, trading and financing of base metals. (Burgess-Allen Decl. ¶ 3.) Its Certificate of Incorporation makes no mention of Metro. (Nussbaum Decl, Ex. 2.) In December 2010, BAP entered into an agreement with Metro to provide consulting services relating to metal warehousing transactions, and Burgess-Allen performed services under that agreement until June 30, 2013. (Burgess-Allen Decl. ¶ 13.) Burgess-Allen performed services for Metro primarily from BAP's offices in England and the representatives of third-

party companies that he contacted on Metro's behalf were located in Europe.

(Burgess-Allen Decl. ¶ 14.)

>2.   The Alleged Scheme

While the TAC alleges a complex, multi-part scheme that involves

anticompetitive agreements among various combinations of the alleged

conspirators, only one component of the overall scheme is relevant to the BAP

Defendants and thus pertinent to this decision.  In relevant part, the TAC alleges

that Metro violated the LME minimum load-out rule by making anti-competitive

agreements with Burgess-Allen, DB Energy Trading, LLC ("DB Energy") a

Deutsche Bank subsidiary incorporated in Delaware and based in New York, the

Red Kite Group ("Red Kite"), a UK-based hedge fund with some operations in New

York, and other persons presently unknown to plaintiffs.  (TAC ¶¶ 146-47, 251.)[5]

That scheme is referred to as the "smart ass plan", which the TAC alleges was made

and performed by Metro and Burgess-Allen from as early as July or August 2010

until the present.  (TAC ¶¶ 251, 449.)  Describing the "smart ass plan", the TAC

further alleges that

> Burgess-Allen introduced persons, including DB Energy, who made
> agreements with Metro that lacked any pro-competitive purpose and
> even had no or virtually no economic or commercial substance except
> as follows.  By restricting the true aluminum output and lengthening
> the load-out queues from Metro's Detroit warehouses, this agreement
> increased Metro's revenues and prevented, delayed, and discouraged
> persons who truly wanted to load aluminum out of Metro's Detroit
> warehouses from doing so.  Metro effectively shared with Burgess-
> Allen a portion of its increased rental revenues.

---

[5] The TAC alleges that other conspirators in the overall scheme included affiliates of Goldman,
JPMorgan Chase & Co. ("JPMorgan"), and Glencore plc ("Glencore").  (TAC ¶¶ 85-127.)

(TAC ¶ 449 (citation omitted) (emphasis added).)

The TAC alleges that Burgess-Allen formulated the "smart ass plan" no later than August 4, 2010, when he discussed the merits and profit potential of illusory, strategic warrant cancellations followed by re-warranting of the same aluminum after a decent interval in an email titled "RBA's Smart Ass Plan 1" with Chris Wibbelman, Metro's President and CEO. (TAC ¶¶ 224, 252.)[6] After explaining the multi-step plan, Burgess-Allen stated, "Yes everyone will shout that they cant [sic] get metal in Detroit" and "At some point . . . other warehouse will get delivery in Detroit." (Nussbaum Decl., Ex. 3.) In his email, Burgess-Allen noted, "I could sell the above [plan] to any number of banks as BAP and charge you the privilege of moving your bucket." (Nussbaum Decl., Ex. 3.) In a prior email in the same chain, Burgess-Allen stated, "[BAP] will gladly destock [you're aluminum] and sell it back to you for a premium – ill [sic] even let you handle the logistics." (Nussbaum Decl., Ex. 3.) In another earlier email in the same chain, Burgess-Allen specifically referenced locations in the United States, stating, "The only way you can justify paying up is in places like Detroit or perhaps [M]obile" and "If we could get another 500k in there then it will become another Detroit and we can drop it into the system and get full rent – that I like." (TAC ¶ 294; Nussbaum Decl., Ex. 3.)[7]

---

[6] In March 2010, Burgess-Allen and Wibbelman had also communicated by email about arranging a "formal presentation to [Goldman] regarding merits of Detroit rental deal" and a "discussion about formal way to recoup potential premiums that are available in future agreed sales via break fees with Financiers." (TAC ¶ 607; Nussbaum Decl., Ex. 7.)

[7] In his communications with Wibbelman and other Metro employees, Burgess-Allen often used the collective "we", "us", or "our" when referring to Metro's point of view. (E.g., Nussbaum Decl., Ex. 3 ("Glencore is not our future for supplying metal"); Nussbaum Decl., Ex. 4 (May 24, 2011 email to Wibbelman in which Burgess-Allen wrote "I am ever concerned the big picture is being missed here – if we want to sell premium we have to almost act as physical traders. We are in effect gaining

One part of Burgess-Allen's "smart ass plan", which called for an 180,000 ton warrant cancellation deal on September 18, 2010, was ultimately arranged as a deal between Metro and DB Energy that resulted in the cancellation of 100,000 tons of warranted aluminum on or about September 17, 2010. (TAC ¶ 255.) Approximately one week before this transaction, Burgess-Allen had a September 7-10, 2010 email exchange with Evan Richards of Deutsche Bank—which Burgess-Allen ultimately forwarded to Wibbelman—negotiating the terms of a storage deal involving a reduced rent agreement for a financing period and moving aluminum between Metro warehouses in Detroit. (Nussbaum Decl., Exs. 8-9.) After the email chain was forwarded to him, Wibbelman asked Burgess-Allen if he would "take the first crack at reviewing for compliance with deal terms and make any other comments." (Nussbaum Decl., Ex. 10.) On September 15, 2010, Evan Richards sent an email to Adam Luckie, Vice President of Deutsche Bank AG's London Branch, discussing the proposed terms of a deal with Metro that involved "moving [aluminum] between Metro warehouses in Detroit." (TAC ¶ 256.)

The TAC alleges that there was a marked difference in the length of aluminum load-out times before and after the implementation of defendants' scheme; load-out times from Metro warehouses averaged only six weeks in 2010, but reached approximately 625 days in March 2014. (TAC ¶ 571.) The TAC alleges

premium on something we are not technically entitled to. If we don't want to sell and want to contango finance without paying a $20 fee – this is possible but it will take us 18 months to break even."); Nussbaum Decl., Ex. 7 (March 21, 2010 email to Wibbelman in which Burgess-Allen says "Unless we see a change in this picture we are probably safe to keep rolling in this manner."); Nussbaum Decl., Ex. 18 (March 2010 email from Burgess-Allen to Alyssa Abend of Metro stating, "Please find attached details of the rental pay up that we have arranged with Natixis." The "pay up" involves banks in Mobile, Long Beach and Toledo as well as a number of international locations.).)

that extended wait times led to higher storage costs, which in turn raised the Midwest Premium and thus the price of primary aluminum.  (TAC ¶¶ 10(e), 12(a).)

### 3.   Other Burgess-Allen Communications

Plaintiffs also offer several other email communications involving Burgess-Allen that reference aluminum deals with third-party entities (including Deutsche Bank, JPMorgan and others) that expressly reference actions, effects or events occurring within the United States.[8]  For instance, in a March 14, 2013 email to Burgess-Allen and a number of individuals with Metro email addresses, Michael Whelan (Metro's Vice President of Business Development), discussed an aluminum deal with Deutsche Bank and stated that Burgess-Allen "is also going to be working with DB to make sure they only cancel the units that are re-warrantable." (Nussbaum Decl., Ex. 11; TAC ¶ 150.)  As for communications with JPMorgan, plaintiffs highlight a May 24-25, 2011 email in which Burgess-Allen inquired with Wibbelman about transferring metal from Toledo to Detroit in exchange for a $20 release fee that would "bank . . . $45/$65 profit."  (TAC ¶ 605.)  In that email, Burgess-Allen also said "If we lock Mobile / Long Beach in US with JP[Morgan] which is highly possible the premium for the US material will go raging higher and we may be told that $20 simply does not cut it."  (TAC ¶ 605.)  Burgess-Allen also participated in an October 28, 2011 email chain with Martin Squires of JPMorgan

---

[8] In addition to communications regarding deals between Metro and outside parties, plaintiffs also present evidence that Burgess-Allen was involved in communications with Wibbelman and other Metro employees that expressly referenced activity in the United States.  (E.g., Nussbaum Decl., Ex. 16 (April 2011 email from Wibbelman to Burgess-Allen in which Wibbelman stated "Increase incentive level to get 200K additional new metal into Detroit."); Nussbaum Decl., Ex. 19 (September 2011 emails from Metro employees to Burgess-Allen asking, "Rob any update on what we can move to Detroit and when?," and "When do you think first metal can start moving out to Detroit?").)

in which they negotiated the terms of a rent deal for aluminum LME warrants stored in Metro's warehouse in Mobile; Burgess-Allen forwarded the chain to Wibbelman.  (Nussbaum Decl., Ex. 12.)  In December 2011, Burgess-Allen also participated in email communications with Whelan and Wibbelman regarding an aluminum warrant cancellation deal proposal with Red Kite.  (Nussbaum Decl., Exs. 13-14.)[9]

## III.   LEGAL STANDARDS

### A.   Personal Jurisdiction

#### 1.   Rule 12(b)(2) Standard

Based on its review of the totality of submissions on which the parties rely, the Court assesses whether plaintiffs here have met their burden of demonstrating personal jurisdiction over each of the BAP Defendants.  See Penguin Grp. (USA), Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010) ("A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.").  "Each defendant's contacts with the forum . . . must be assessed individually."  Calder v. Jones, 465 U.S. 783, 790 (1984).  "Where, as here, a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant."  Porina v. Marward Shipping Co., 521

---

[9] Plaintiffs also offer a May 2012 email that Burgess-Allen sent to a Wells Fargo employee—copying Whelan and Wibbelman—in which the participants discuss a potential aluminum transaction. Burgess-Allen suggested that he and the Wells Fargo employee had previously met in the United States.  (Nussbaum Decl., Ex. 5 ("I hope you are well – time has passed so quickly since we met in Charlotte!!").)  While this email exchange suggests that Burgess-Allen traveled to the United States for business-related purposes, there is no indication on the face of this email chain that his travel was related to the planning or implementation of the "smart ass plan."

F.3d 122, 126 (2d Cir. 2008) (internal quotation marks omitted).  The pleadings "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor."  Banker v. Esperanza Health Sys., Ltd., 201 Fed. App'x 13, 15 (2d Cir. 2006) (summary order) (quoting A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)).  The Court "will not, however, accept legally conclusory assertions or draw argumentative inferences."  In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005) (internal quotation marks omitted).

2.    Fed. R. Civ. P. 4(k)

The only statutory basis for personal jurisdiction that plaintiffs assert against the BAP Defendants is Rule 4(k) of the Federal Rules of Civil Procedure.[10] Rule 4(k) may provide a basis for personal jurisdiction over a foreign defendant in the absence of contacts with a particular state so long as the foreign defendant has sufficient contacts with the United States as a whole to satisfy due process requirements under the Fifth Amendment.  Porina, 521 F.3d at 127.  Rule 4(k)(2) "provides for personal jurisdiction in a case (1) 'aris[ing] under federal law,' (2) where a defendant is not subject to the general jurisdiction of any one state, and (3) where 'exercising jurisdiction [would be] consistent with the United States Constitution and laws.'"  In re Angeln GmbH & Co. KG, 510 Fed. App'x 90, 91-92

---

[10] New York's long-arm statute could also potentially serve as another basis for personal jurisdiction. Pursuant to that statute, a court may exercise personal jurisdiction over any non-domiciliary who "commits a tortious act without the state causing injury to a person or property within the state . . . if he expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. § 302(a).  Plaintiffs concede that "due process requirements to establish jurisdiction under New York's long-arm statute are identical to those under a Rule 4(k)(2) analysis."  (Opp. Br. 24 n.17.)  The Court therefore does not separately address whether plaintiffs have satisfied the requirements for jurisdiction under New York's long-arm statute, but notes that it believes such analysis would not, in any event, alter the result as to either of the BAP Defendants.

(2d Cir. 2013) (summary order) (quoting Fed. R. Civ. P. 4(k)(2)).  Rule 4(k)(2) thus establishes that the Court may only exercise personal jurisdiction over a defendant if doing so is consistent with the Due Process Clause of the Fifth Amendment, which requires that "the maintenance of the suit would not offend traditional notions of fair play and justice."  Porina, 521 F.3d at 127 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation marks omitted)); see also Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2853 (2011).

The TAC asserts a conspiracy claim under § 1 of the Sherman Act, 15 U.S.C. § 1, as well as equivalent state law claims.  The Sherman Act claim arises under federal law.  There is also nothing in the record to suggest that the BAP Defendants are subject to the general jurisdiction of any one State, and neither party argues otherwise.  See In re Roman Catholic Diocese of Albany, N.Y., Inc., 745 F.3d 30, 38 (2d Cir. 2014) (A court may exercise general jurisdiction over a foreign corporation where that corporation's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home [there]." (quoting Goodyear, 131 S. Ct. at 2851)).  The only prong in dispute, therefore, is whether the exercise of personal jurisdiction over the BAP Defendants is consistent with due process.

> 3.    Due Process Constraints on Personal Jurisdiction

The due process inquiry consists of a two-step process.  The first step is "whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction."  Porina, 521 F.3d at 127.  Generally, that inquiry depends on "whether the defendant purposefully established 'minimum contacts' in the forum State."  Asahi Metal Indus., Co., Ltd. v. Superior Court of

13

Cal., 480 U.S. 102, 109 (1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)).  Where personal jurisdiction is asserted under Fed. R. Civ. P. 4(k)(2), however, the relevant inquiry is whether the defendant "has sufficient affiliating contacts with the United States in general, rather than with [the forum State] in particular."  Porina, 521 F.3d at 127.  If the defendant has sufficient minimum contacts with the forum, the second step is "whether the assertion of personal jurisdiction is reasonable under the circumstances."  Id. (quotation marks omitted).

Minimum contacts may be satisfied either on the basis of general jurisdiction or specific jurisdiction.  General jurisdiction arises out of the defendant's general business contacts with the forum while specific jurisdiction exists when the suit arises out of or is related to the defendant's contacts with the forum.  In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673-74 (2d Cir. 2013).  There is no dispute that the BAP Defendants lack sufficient contacts with the United States such that general jurisdiction may apply.  See Porina, 521 F.3d at 128 (General jurisdiction may be asserted where defendant had "continuous and systematic general business contacts with the United States." (quotation marks omitted)); see also Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014).  Specific jurisdiction exists when a defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013); see also World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (whether "the defendant's conduct and

connection with the forum State are such that he should reasonably anticipate being haled into court there" is relevant to the Court's due process analysis).

Where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," the Second Circuit uses an "effects test" to establish personal jurisdiction, by which "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Licci, 732 F.3d at 173 (citing Calder, 465 U.S. at 789).[11] "The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the [forum] seeking to assert jurisdiction over him." Eskofot A/S v. E.I. Du Pont De Nemours & Co., 872 F. Supp. 81, 87 (S.D.N.Y. 1996). Courts look to the quality and nature of the defendants' contacts with the forum under a totality of the circumstances test. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010).

Assuming that minimum contacts have been established, the Court then turns to the second step of the due process inquiry, under which the Court considers "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012) (quoting Chloe, 616 F.3d at 164) (emphasis added).  The Second Circuit has recited a five

---

[11] The only theory of specific jurisdiction that plaintiffs rely on is that the BAP Defendants' foreign conduct had effects within the United States.  Thus, this is the only basis for specific jurisdiction considered by the Court.

factor test for this "reasonableness" analysis: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Chloe, 616 F.3d at 173 (citing Asahi, 480 U.S. at 113-14). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp., 471 U.S. at 477; see also Chloe 616 F.3d at 165.

B.      Viability of Antitrust Conspiracy Claim

1.      Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570); see also Iqbal, 556 U.S. at 678 (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

The Court does not, however, credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id.  If the court can infer no more than "the mere possibility of misconduct" from the factual averments—in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

On a motion to dismiss, the Court accepts as true the factual allegations in the pleadings and draws all inferences in plaintiffs' favor.  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555-57).  If a fact is susceptible to two or more competing inferences, in evaluating a Rule 12(b)(6) motion, the Court must, as a matter of law, draw the inference that favors the plaintiff so long as it is reasonable. N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 121 (2d Cir. 2013).  "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an obvious alternative explanation." Id. (quotation marks omitted).  Where necessary, the Court may supplement the allegations in the complaint with facts from documents either referenced in the complaint or relied upon in framing the complaint.  See DiFolco, 622 F.3d at 111 ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

2.    Capacity to Conspire

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1. Since all contracts necessarily restrain trade to some extent, this provision cannot be read literally: only "unreasonable" restraints of trade are unlawful. Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012). To run afoul of § 1, the unreasonable restraint must result from an agreement between two or more entities. See Twombly, 550 U.S. at 553-54; Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954); Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012). An "agreement" for § 1 purposes is defined as "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" United States v. Apple, Inc., 791 F.3d 290, 317 (2d Cir. 2015) (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)).

Section 1 claims require an agreement, contract, or understanding in restraint of trade by separate economic entities. See 15 U.S.C. § 1. "The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135-36 (2d Cir. 2013). As a matter of law, only separate entities can conspire in violation of the antitrust laws. Copperweld Corp. v. Ind. Tube Corp., 467 U.S. 752, 768-69 (1984). The reasoning underlying this principle is that "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together

18

economic power that was previously pursuing divergent goals." Id. at 769; see also

Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1031 n.5 (2d Cir.

1979) ("Whether the two actors constitute distinct economic entities for purposes of

the Sherman Act is determined by the economic realities of their relationship.").

Thus, a corporate parent and its wholly owned subsidiary are incapable of

conspiring in violation of § 1 of the Sherman Act as a matter of law, and their

"coordinated activity . . . must be viewed as that of a single enterprise."

Copperweld, 467 U.S. at 767, 771; see also Capital Imaging Assocs., P.C. v. Mohawk

Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993) ("[A]n agreement

between a parent corporation and its . . . agents is not a concerted action for

purposes of the [Sherman] Act.").

 "[W]hen lower courts are faced with the question of whether an affiliated, but

not wholly owned, corporation can conspire with its parent in violation of § 1, they

must draw from the analysis in Copperweld without the benefit of a bright line

rule." In re Term Commodities Cotton Futures Litig., Master Docket No. 12 Civ.

5126(ALC)(KNF), 2014 WL 5014235, at *4 (S.D.N.Y. Sept. 30, 2014); see also

Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 201 F. Supp. 2d 236, 275 (S.D.N.Y.

2002) (noting that lower courts have held that affiliated corporations that are less

than wholly owned have been found incapable of conspiring under Copperweld),

rev'd on other grounds, 386 F.3d 485 (2d Cir. 2004); Shaw v. Rolex Watch, U.S.A.,

Inc., 673 F. Supp. 674, 677 (S.D.N.Y. 1987) (suggesting that Copperweld can apply

to non-wholly owned affiliates); VII Phillip E. Areeda & Herbert Hovenkamp,

Antitrust Law ¶¶ 1466-67 (3d ed. 2010) (suggesting that "two corporations could constitute a single economic unit for Sherman Act § 1 purposes even though they are not wholly owned in common").  The Supreme Court's reasoning in Copperweld focused on whether a parent and its subsidiary had a "complete unity of interest," such that they shared common objectives and their actions were "guided or determined not by two separate corporate consciousnesses, but one."  Copperweld, 467 U.S. at 771; see also Chicago Professional Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 95 F.3d 593, 598 (7th Cir. 1996) ("Copperweld . . . asks why the antitrust laws distinguish between unilateral and concerted action, and then assigns a parent-subsidiary group to the 'unilateral' side in light of those functions.  Like a single firm, the parent-subsidiary combination cooperates internally to increase efficiency.").

In a more recent decision, the Supreme Court further articulated this principle by putting it another way: entities can conspire under § 1 of the Sherman Act only if their competitive actions are determined by "independent centers of decisionmaking."  Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 196 (2010) (quoting Copperweld, 467 U.S. at 769).  In American Needle, the Supreme Court determined that the 32 teams in the National Football League, and a corporate entity that they formed to manage their intellectual property, had the capacity to conspire with each other for purposes of § 1 with respect to their licensing activities.  Id. at 186-87.  In concluding that the teams did not possess "either the unitary decisionmaking quality or the single aggregation of economic

power characteristic of independent action," the Court reasoned that each team is a "substantial, independently owned, and independently managed business" and the teams "compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel." Id. at 196-97.  As particularly relevant to the licensing activities at issue, the Court also observed that the teams "compete in the market for intellectual property." Id. at 197.  When considered in tandem, Copperweld and American Needle establish that a non-wholly owned affiliate cannot conspire with its parent in violation of § 1 of the Sherman Act if they are jointly controlled.

The principles set forth in Copperweld and American Needle also apply to agents.  To the extent that agents are merely carrying out the decisions of principals, they are not separate entities for purposes of § 1.  Cf. 10 Fletcher Cyclopedia Corporations, § 4884 (2015) ("Under the intracorporate conspiracy doctrine, a corporation cannot conspire with its officers, agents or employees when they are acting solely for the corporation in the scope of their employment.  This follows from the general rule that principals and agents are legally incapable of conspiring with one another because the acts of an agent are considered the acts of his principal.").

In Fuchs Sugars and Syrups, Inc. v. Amstar Corp., a decision that pre-dated Copperweld, the Second Circuit listed three factors relevant to determining whether a principal and agent constitute distinct economic entities for purposes of the Sherman Act.  These included "whether the agent performs a function on behalf of

21

his principal other than securing an offer from a buyer for the principal's product",

"the degree to which the agent is authorized to exercise his discretion concerning

the price and terms under which the principal's product is to be sold", and "whether

use of the agent constitutes a separate step in the vertical distribution of the

principal's product."   Fuchs, 602 F.2d at 1031 n.5.   In a case that post-dates

Copperweld, the Second Circuit reaffirmed the relevance of the Fuchs factors.

Belfiore v. New York Times Co., 826 F.2d 177, 182 (2d Cir. 1987) (stressing that the

"proper inquiry into capacity to conspire requires a thorough application of the

Fuchs principles to the facts" including "the number and nature of the agent's

functions", "whether the agent acts in its own interests or in the supplier's", and

"whether the alleged coconspirators are in reality under the control of a single

individual or entity").

IV.   DISCUSSION

    A.   Personal Jurisdiction

    While the parties treat BAP and Burgess-Allen identically for purposes of

their personal jurisdiction analyses, that approach is inconsistent with how these

defendants are treated in the TAC (and in the parties' other evidentiary material).

The TAC contains markedly different amounts of discussion of BAP the company

and Burgess-Allen the individual.   The Court therefore undertakes a separate

personal jurisdiction analysis as to each defendant.   Calder, 465 U.S. at 790 ("Each

defendant's contacts with the forum . . . must be assessed individually.").   As set

forth below, the Court's analysis leads to the conclusion that plaintiffs have not

made a prima facie showing that personal jurisdiction over BAP is proper, but have done so with respect to Burgess-Allen at this stage.

      1.   <u>BAP</u>

The Court must undertake a two-step inquiry to determine if the assertion of personal jurisdiction over BAP comports with due process.  The Court first assesses whether BAP has sufficient minimum contacts with the United States.  <u>Porina</u>, 521 F.3d at 127.  If that test is satisfied, the Court then considers whether exercising jurisdiction would be reasonable.  <u>Licci</u>, 673 F.3d at 60.  Without much difficulty, the Court concludes that the allegations in the TAC and plaintiffs' supporting materials are insufficient to satisfy either requirement as to BAP.

The TAC contains only sparse allegations relating to BAP; only two paragraphs refer to it.  In one instance, the TAC alleges that BAP is "a private limited company started in June 2009 by Robert George Burgess-Allen" that is headquartered in England.  (TAC ¶ 128.)  This paragraph also alleges that Burgess-Allen and Emily Ruth Villiers Burgess-Allen are the company's directors and its only two employees.  (TAC ¶ 128.)  In the other instance, the TAC merely identifies Robert Burgess-Allen as "Mr. Burgess-Allen of Burgess-Allen Partners (BAP)." (TAC ¶ 252.)  These scant allegations do not show that BAP, which the TAC alleges is headquartered in England, itself engaged in any conduct related to the alleged conspiracy, let alone that it "expressly aimed its conduct" at the United States such that it has minimum contacts with this forum.  <u>Licci</u>, 732 F.3d at 173.  Even if the existence of minimum contacts were conceded, the TAC is so lacking in information about BAP that it leaves the Court with little basis to find that the exercise of

jurisdiction over BAP would, in any event, be reasonable under the Second Circuit's five factor test.

Plaintiffs fare little better even when the Court considers the parties' extra-pleading evidentiary submissions. In his declaration submitted in support of the instant motion, Burgess-Allen attests that BAP has never maintained an office, telephone listing, fax number, mailing address or bank account in the United States and that it neither owns nor leases real or personal property in the United States. (Burgess-Allen Decl. ¶¶ 5-6.) The one fact that does lend any support to the proposition that BAP has contacts with the United States is Burgess-Allen's admission that in December 2010 BAP entered into an agreement with Metro, which is based in Michigan, to perform consulting services related to metal warehousing transactions. (Burgess-Allen Decl. ¶ 13.) Standing alone, however, that admission does not create sufficient minimum contacts with the United States for this Court to assert personal jurisdiction over BAP in this antitrust conspiracy suit. See In re Terrorist Attacks on Sept. 11, 2011, 538 F.3d 71, 95-96 (2d Cir. 2008), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010). Similarly, plaintiffs' additional submissions, which focus on Burgess-Allen rather than BAP, do not provide any basis to suggest that BAP—as opposed to Burgess-Allen himself—expressly aimed any conduct at the United States. Plaintiffs have failed to present evidence showing that BAP "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there." Licci, 732 F.3d at 170.

Because plaintiffs have not met their burden of making a prima facie showing that personal jurisdiction is proper, the Court dismisses BAP from this suit pursuant to Rule 12(b)(2).[12]

       2.   <u>Burgess-Allen</u>

As discussed above, the Court applies the two-step due process inquiry to determine if it may properly assert personal jurisdiction over Burgess-Allen.  The Court first considers whether Burgess-Allen has sufficient minimum contacts with the United States, <u>Porina</u>, 521 F.3d at 127; if so, the Court looks to whether the exercise of jurisdiction would be reasonable, <u>Licci</u>, 673 F.3d at 60.  Applying the Second Circuit's "effects test" for minimum contacts, the allegations in the TAC—when combined with the numerous email communications that plaintiffs have submitted in opposition to the BAP Defendants' motion—are sufficient to make a prima facie showing that Burgess-Allen expressly aimed his conduct which gives rise to plaintiffs' claims at the United States.

The evidence supports the inference that while Burgess-Allen may have physically operated entirely within the United Kingdom and that he generally dealt with customers of Metro located in London and Europe, he was also responsible for devising the "smart ass plan", a subset of the antitrust conspiracy alleged in the TAC.  (TAC ¶ 251.)  That plan contemplated that significant effects would occur in the aluminum market in the United States, particularly at Metro's LME-certified aluminum warehouses in Detroit, Michigan.  (TAC ¶ 449 ("By restricting the true

---

[12] The Court notes that even if it could properly exercise of personal jurisdiction over BAP, the Court would nonetheless dismiss plaintiffs' claims against it on the ground that the TAC does not sufficiently allege BAP's involvement in the conspiracy.

aluminum output and lengthening the load-out queues from Metro's Detroit
warehouses, this agreement increased Metro's revenues and prevented, delayed,
and discouraged persons who truly wanted to load aluminum out of Metro's Detroit
warehouses from doing so.").)  The Second Circuit has suggested that, at least at
this early stage, proof that the plaintiff actually formulated the anticompetitive
agreement having effects in the forum is not required to satisfy the effects test for
minimum contacts.  See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204,
208 (2d Cir. 2003) (noting that, at the motion to dismiss stage, minutes of meeting
where price-fixing activities took place showing that foreign defendant's executive
was in attendance arguably satisfied the effects test as to that defendant).  In
Burgess-Allen's August 4, 2010 email—in which he first shared the "smart ass plan"
with Wibbelman—Burgess-Allen explains the likely effects of his plan on Detroit
warehouses.  (Nussbaum Decl., Ex. 3 (stating "Yes everyone will shout that they
cant [sic] get metal in Detroit" and "At some point . . . other warehouse will get
delivery in Detroit.").)  This supports a determination, solely for purposes of
personal jurisdiction, that Burgess-Allen understood and intended that the "smart
ass plan" would primarily have effects within the United States.  The allegations in
the TAC and Burgess-Allen's email exchanges also support the inference that the
conspirators implemented the "smart ass plan" and that the plan did have actual
effects within the United States.  The TAC alleges that, pursuant to the "smart ass
plan", Metro and DB Energy arranged a deal that resulted in the cancellation of
100,000 tons of warranted aluminum, and plaintiffs' supporting emails show that

this deal involved moving aluminum between Metro warehouses in Detroit.  (TAC

¶¶ 255-56; Nussbaum Decl., Exs. 8-9.)

Even if Burgess-Allen's role in the DB Energy deal was not itself sufficient to

establish minimum contacts (although precedent suggests that it was, see Chloe,

616 F.3d at 166-67 (finding minimum contacts with New York satisfied where

defendant offered bags for sale to New York consumers on website and physically

shipped at least one counterfeit bag from California to a New York consumer)), the

TAC also alleges that implementation of the smart ass plan significantly increased

load-out times at Metro's Detroit warehouses, which increased storage costs and

ultimately the Midwest Premium and the price of warehoused aluminum in the

United States.  (TAC ¶¶ 10(e), 12(a).)  Such significant market-wide economic

effects strongly support the necessary showing of minimum contacts.

Plaintiffs have, furthermore, presented evidence that Burgess-Allen engaged

in several other communications related to aluminum deals between Metro and

third parties in which the participants explicitly contemplate that actions, events or

effects would take place within multiple regions of the United States.  For instance,

Burgess-Allen and Wibbelman discussed a deal that involved "transferring metal

from Toledo to Detroit" to obtain profit and in which Burgess-Allen said that "If we

lock Mobile / Long Beach in US with JP[Morgan] which is highly possible the

premium for the US material will go raging higher."  (TAC ¶ 605.)  Burgess-Allen

also communicated with Wibbelman and other Metro employees regarding moving

"metal" into and out of Detroit.  (Nussbaum Decl., Exs. 16, 19.)  Based on the

totality of the evidence submitted in relation to the BAP Defendants' motion, plaintiffs have easily made a prima facie showing that Burgess-Allen expressly aimed his conduct at the United States and that he at least had good reason to know that his conduct would have effects in the United States. See Licci, 732 F.3d at 173; Eskofot, 872 F. Supp. at 87.[13]

As to the reasonableness prong of the due process inquiry, this Court applies the Second Circuit's five factor test. See Chloe, 616 F.3d at 173. With regard to the first factor, while there will be some burden on Burgess-Allen if he would be required to travel from England to New York for trial, that fact provides only weak support in light of the conveniences of modern communication and transportation. See id. As to the second factor, given the allegedly significant market effects that Burgess-Allen's "smart ass plan" and the alleged conspiracy had on the aluminum market in the United States, the United States has a substantial interest in adjudicating this case. As to the third and fourth factors, given that the FLPs are U.S. entities and their claims against many of the other alleged conspirators is ongoing in this forum and in this Court, the FLPs have a strong interest in obtaining convenient and effective relief in the United States and the exercise of jurisdiction would allow for the most efficient resolution of plaintiffs' claims. The

---

[13] The Court rejects Burgess Allen's analogy to In re Terrorist Attacks on Sept. 11, in which the Second Circuit concluded that personal jurisdiction was lacking over four Saudi Arabian princes who donated funds to third-party charities they allegedly knew would pass on those funds to Al Qaeda, which would foreseeably use those funds to attack targets in the United States. See 538 F.3d at 95. In contrast to the defendants in that case, the record here suggests that Burgess-Allen had a far less attenuated connection to the alleged unlawful conduct as plaintiffs allege that he actually formulated the anticompetitive agreement. Furthermore, plaintiffs' evidence shows that Burgess-Allen took direct action in furtherance of the scheme and clearly understood that his conduct would have significant effects within the United States.

Court finds that the final factor, which looks to the shared interests of the States in furthering fundamental substantive social policies, does not tip in either direction. Having determined that plaintiffs have made a prima facie showing that Burgess-Allen had relevant minimum contacts with the United States, and upon consideration of the reasonableness factors, Burgess-Allen fails to make a compelling case that there exists other considerations that render the exercise of jurisdiction unreasonable.

B.  Viability of Conspiracy Claim against Burgess-Allen

Plaintiffs offer two theories to support their claim that Burgess-Allen was a participant in an anticompetitive agreement that may give rise to a § 1 claim. Plaintiffs primarily argue that Burgess-Allen conspired with Metro.  They contend that Burgess-Allen was sufficiently independent of Metro such that they had the capacity to conspire with each other consistent with Copperweld and its progeny. Plaintiffs' second theory is that their claim remains viable because the conspiracy involved not just Metro and Burgess-Allen as principal and agent, but also other co-conspirators including JPMorgan entities, DB Energy, Red Kite and Glencore.  As set forth below, the Court concludes that, for distinct reasons, the allegations are insufficient to state a viable § 1 claim against Burgess-Allen under either theory.[14]

---

[14] At the outset, the Court notes that the parties' respective invocations of the law of the case doctrine are misplaced.  See Rezzonico v. H & R Block, Inc., 182 F.3d 144, 148 (2d Cir. 1999) ("As most commonly defined, the doctrine of law of the case posits that when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case." (alterations omitted)).  On the one hand, plaintiffs seek to rely on this Court's prior ruling that the TAC satisfies the separate entity requirement by alleging a web of agreements or understandings between Metro and the Goldman Sachs entities and the JPMorgan entities, Henry Bath LLC, the Glencore entities and Pacorini.  In re Aluminum, 2015 WL 1378946, at *17.  That ruling, however, did not purport to apply to Burgess-Allen, who had not yet been served with the

1.    <u>Capacity to Conspire with Metro</u>

The TAC's allegations relating to Burgess-Allen are based entirely on actions taken pursuant to his agency relationship with Metro.[15]  In such a situation, <u>Copperweld</u> does not provide a bright-line rule as to his capacity to conspire with Metro.  <u>See</u> <u>In re Term Commodities Cotton Futures Litig.</u>, 2014 WL 5014235, at *4. Operating in his role as agent, Burgess-Allen is alleged to have, <u>inter alia</u>, devised and shared the "smart ass plan" with Wibbelman and strategized with Wibbelman and other Metro employees regarding pricing for incentives and re-warranting; Burgess-Allen is also alleged to have directly negotiated with Evan Richards of Deutsche Bank, on Metro's behalf, the terms of a storage deal involving a reduced rent agreement for a financing period and the transfer of aluminum between Metro warehouses in Detroit.  (TAC ¶¶ 252-256; Nussbaum Decl., Exs. 3, 4, 9.)  The question is thus whether, despite his alleged role in devising and implementing the "smart ass plan", the allegations of Burgess-Allen's status as Metro's agent are insufficient to support a capacity to conspire with Metro for purposes of § 1. Effectively, this turns on the allegations of the economic realities of their

---

TAC, made an appearance in this action, or moved to dismiss the TAC.  The BAP Defendants, in turn, rely on this Court's prior statement that "BAP and Burgess-Allen are alleged to have not had any independent economic role in the conspiracy beyond that which it undertook while working on behalf of Metro."  <u>Id.</u>  While the Court ultimately concludes that the statement remains accurate, the Court does not make that determination based on that prior statement.  That prior statement did not purport to be a definitive ruling on the sufficiency of the allegations of Burgess-Allen's role in the conspiracy and it was made without the benefit of any briefing directed to the question of the viability of the § 1 claim as to him.  The Court thus does not view either of its prior statements as dispositive of the BAP Defendants' motion.

[15] Plaintiffs make much of their contention that Burgess-Allen formed BAP and conceived of the "smart ass plan" prior to entering into a service agreement with Metro in December 2010, but the Court does not find this allegation to be material to Burgess-Allen's capacity to conspire.  It does nothing to alter the allegations of the nature, scope or economic realities of the agency relationship between Burgess-Allen and Metro that existed prior to the execution of the agreement.

relationship and whether Burgess-Allen's alleged role consisted of merely carrying

out Metro's decisions.  Fuchs, 602 F.2d at 1031 n.5; In re Aluminum, 2015 WL

1378946, at *16.  To resolve that question, the Court looks to the factors laid out by

the Second Circuit in Fuchs and Belfiore, and by drawing on the reasoning and

analysis underlying the Supreme Court's decision in Copperweld and its progeny.

In Fuchs, the Second Circuit considered whether sugar brokers were capable

of conspiring with a sugar refiner for purposes of § 1 of the Sherman Act, listing the

relevant factors as including "whether the agent performs a function on behalf of his

principal other than securing an offer from a buyer for the principal's product", "the

degree to which the agent is authorized to exercise his discretion concerning the

price and terms under which the principal's product is to be sold", and "whether use

of the agent constitutes a separate step in the vertical distribution of the principal's

product."  Fuchs, 602 F.2d at 1031 n.5.  The Court concluded that the broker at

issue acted solely as a conduit through which the refiner negotiated its distribution

of sugar such that the broker did not represent a separate and independent step in

the distribution process; as a result, the broker and refiner could not conspire with

each other under § 1.  Id.

As to the first Fuchs factor, the TAC alleges that Burgess-Allen's

responsibilities with Metro were broader than simply securing an offer from a buyer

for Metro's product, but the TAC's allegations support no more than that his role in

devising a component of Metro's strategy and negotiating on Metro's behalf was like

that of a Metro employee.  Those allegations suggest that, as least with respect to

his conduct related to the alleged anticompetitive scheme, Burgess-Allen had a

"complete unity of interest" and shared common objectives with Metro.  Copperweld,

467 U.S. at 771.[16]  The allegations indicate that his relationship vis-à-vis Metro was

one of internal cooperation.  See Chicago Professional Sports Ltd. P'ship, 95 F.3d at

598.  As to the second and third factors, the allegations relating to Burgess-Allen's

negotiation with Richards do not support the inference that he had the authority to

bind Metro to an agreement (thus he lacked discretion in setting deal terms), and

Burgess-Allen's alleged role did not add a separate step in the vertical distribution

of Metro's products or provision of services.[17]  The allegations support only that

Burgess-Allen's role was that of a conduit—there are no allegations that he made

any agreement on his own behalf.  Instead, the allegations involve him solely in

executing an agreement for Metro.  The materials incorporated by reference into the

TAC show that Burgess-Allen did not act independently or unilaterally; he sought

Wibbelman's approval for deal terms to the extent that he negotiated transactions

---

[16] Burgess-Allen's shared interest with Metro is further supported by his repeated use of the collective "we" when referring to Metro's point of view in communications to Metro employees, in those communications incorporated by reference into (or cited by) the TAC.  (E.g., Nussbaum Decl., Ex. 3 ("Glencore is not our future for supplying metal"); Nussbaum Decl., Ex. 4 (May 24, 2011 email to Wibbelman in which Burgess-Allen wrote "I am ever concerned the big picture is being missed here – if we want to sell premium we have to almost act as physical traders.  We are in effect gaining premium on something we are not technically entitled to.  If we don't want to sell and want to contango finance without paying a $20 fee – this is possible but it will take us 18 months to break even."); Nussbaum Decl., Ex. 7 (March 21, 2010 email to Wibbelman in which Burgess-Allen says "Unless we see a change in this picture we are probably safe to keep rolling in this manner.").)

[17] The Court notes that the principal-agent relationship at issue in Fuchs—that of a vertical producer/reseller—was different in kind from the planner and negotiator/service provider relationship alleged here.  It is thus uncertain the extent to which the Fuchs factors should govern.  But, to the extent these factors provide a guideline as to where the relevant lines should be drawn, they support a finding that Burgess-Allen was not an "independent center[ ] of decision-making" such that he would constitute an entity separate from Metro for purposes of § 1.  Am. Needle, 560 U.S. at 196.

for Metro.  See Bill's Birds Inc. v. Trademarking Res. Inc., 920 F. Supp. 2d 357, 365
(E.D.N.Y. 2013) (concluding that licensing agent lacked capacity to conspire with
principal where there was no allegation that agent had "any decision-making
capacity" or "any input in whether and under what terms a license would be
granted", and the agent was "merely the conduit of communication between
[principal] and its licensees or potential licensees.").

In Belfiore, although the Second Circuit affirmed the district court's grant of
summary judgment on the ground that there was insufficient evidence of the
alleged antitrust conspiracies (and thus did not reach the capacity to conspire
issue), it gave further guidance as to the factors set forth in Fuchs.  Belfiore, 826
F.2d at 182.  These factors include "the number and nature of the agent's functions",
"whether the agent acts in its own interests or in the supplier's", and "whether the
alleged coconspirators are in reality under the control of a single individual or
entity."  Id. (citations omitted).  Applying these factors here, the Court concludes
that, as with the Fuchs factors, the allegations of the TAC are insufficient to
support that Burgess-Allen had the capacity to conspire with Metro.  As to the first
factor, the allegations in the TAC and the documents incorporated therein show
that Burgess-Allen's role was to participate in strategy discussions and negotiate
transactions for Metro—responsibilities that do not show that he had an economic
role independent from Metro.  As to the other factors, the allegations support the
inference that Burgess-Allen's relevant conduct was done primarily for Metro's

benefit,[18] and although not necessarily under Metro's control in a literal sense, the allegations do nothing to refute the inference that Burgess-Allen operated at Metro's direction.  On balance, application of these factors support the conclusion that the allegations are insufficient to show that Burgess-Allen was a separate economic actor with separate economic interests that diverged from Metro such that their cooperation is the sort of anticompetitive conduct which § 1 seeks to prohibit.

For the foregoing reasons, the Court concludes that the allegations are insufficient to support a capacity to conspire by Burgess-Allen with Metro for purposes of § 1.

### 2.   Allegations of Agreement with Third Party Entities

Plaintiffs assert that even if Burgess-Allen lacked the capacity to conspire with Metro under Copperweld, their claims against him nonetheless survive on the ground that there are sufficient allegations in the TAC that Burgess-Allen also conspired with other entities unaffiliated with Metro.  The Court disagrees.

At the outset, the Court pauses to note that if plaintiffs' allegations plausibly supported this second theory, they would have a viable § 1 claim against Burgess-Allen.  Although Burgess-Allen lacks the capacity to conspire with Metro, that logic does not preclude a § 1 claim against Burgess-Allen to the extent that he also

---

[18] It cannot be the case that Copperweld bars a § 1 claim only when the agent acts solely for the benefit of the principal in situations in which he lacks his own, aligned selfish motivation.  Bill's Birds, 920 F. Supp. 2d at 365 (finding that licensing agent was not an independent, separate economic entity where evidence showed that it acted consistently to further the interests of its principal).  The conclusory allegation that Burgess-Allen received compensation when Metro also benefitted is not itself sufficient to find that Burgess-Allen was a separate economic actor in the conspiracy.  See Okusami v. Psychiatric Inst. of Washington, Inc., 959 F.2d 1062, 1065 (D.C. Cir. 1992) (finding lack of capacity to conspire where there was no allegation that individual defendant had economic interest independent of corporate defendants and allegations suggested individual's interests were "in harmony" with corporate defendants).

conspired with entities that have distinct economic identities from Metro.  Even where a principal and agent are incapable of conspiring with one another, they both remain capable of conspiring together with outside third parties.  See In re Aluminum, 2015 WL 1378946, at *17; see also Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F. Supp. 216, 223 (S.D.N.Y. 1993) (finding that even if Copperweld was extended to preclude a securities fraud and RICO conspiracy between a parent and subsidiary, summary judgment was inappropriate as to those conspiracy claims where plaintiffs pointed to additional third parties with whom a reasonable fact finder might find that defendants conspired).  That proposition is also implicit in decisions of the Supreme Court and the Second Circuit contemplating a § 1 claim in which a subset of the defendants were part of the same corporate family (or at least cases in which such defendants were included and none were dismissed on that basis).  Cf. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 102 S. Ct. 1935, 1946 (1982) (discussing justification for imposing liability on both agent and principal for antitrust violation); Williams v. Citigroup Inc., 659 F.3d 208 (2d Cir. 2011) (involving claims against two entities of Citigroup for entering into various anticompetitive agreements with third parties); In re Elevator Antitrust Litig., 502 F.3d 47 (2d Cir. 2007) (involving § 1 claim against multiple affiliates of multiple corporate families).

Turning to plaintiffs' relevant allegations of agreements with unaffiliated entities, the TAC alleges that Metro made "anticompetitive agreements with Defendant Burgess-Allen and co-conspirators DB Energy, Red Kite, and other

persons presently unknown to Plaintiffs." (TAC ¶ 251.)  While that allegation is adequate to tie <u>Metro</u> to unaffiliated entities at this stage, it does not plausibly show that Burgess-Allen himself entered into any agreements with any of those entities or any other third parties involved in this action.

As discussed above, the TAC's allegations relating to Burgess-Allen are based entirely on his actions taken on Metro's behalf.  For purposes of determining whether, by that conduct, the allegations plausibly show that Burgess-Allen entered into an agreement with a non-affiliate of Metro, his alleged role in Metro's internal strategy and planning is irrelevant; such actions could not plausibly create an agreement with a third party.  The question, then, is whether the allegations of Burgess-Allen's negotiations with DB Energy (or any other third party entity) are sufficient to support the inference that he was a party to the alleged anticompetitive agreement(s).  Upon review of the applicable record, the Court answers that question in the negative.

Plaintiffs do not identify any allegation in the TAC (or, for that matter, any extra-pleading material) plausibly showing that Burgess-Allen, acting on his own behalf, entered into an anticompetitive agreement with any entity unaffiliated with Metro.[19]  In fact, the allegations in the TAC belie such a claim.  In describing Burgess-Allen's work on behalf of Metro in relation to DB Energy, the TAC states that "Burgess-Allen <u>introduced persons</u>, including DB Energy, <u>who made</u>

---

[19] The Court notes that even if it could properly consider all of the extra-pleading materials submitted by the parties in resolving the 12(b)(6) component of defendants' motion, the Court would still conclude that plaintiffs have not plausibly shown that Burgess-Allen entered into an agreement with a third party entity unaffiliated with Metro.  Thus, any amendment to the TAC to incorporate the additional documents included in the Nussbaum Declaration would be futile.

agreements with Metro that lacked any pro-competitive purpose . . . ."  (TAC ¶ 449 (emphasis added).)  Thus, the TAC alleges that Burgess-Allen made an introduction, leading Metro itself to make an agreement with DB Energy; it does not allege that Burgess-Allen made an agreement himself.  Burgess-Allen's email exchange with Evan Richards of Deutsche Bank does not alter that view.  (See Nussbaum Decl., Ex. 9.)  Plaintiffs also assert that Burgess-Allen facilitated transactions with JPMorgan, but the allegations do not support the inference that Burgess-Allen had any decision-making authority or that he entered any agreement on his own behalf.  The crux of plaintiffs' allegations are not that Burgess-Allen himself entered into anticompetitive agreements with third parties, but rather that he served as a conduit or facilitator of anticompetitive agreements between Metro and various third parties.  That is insufficient to render him a conspirator with those entities under § 1.  See Apple, 791 F.3d at 317 (An "agreement" for § 1 purposes is defined as "a conscious commitment to a common scheme designed to achieve an unlawful objective." (quotation marks omitted)).

Finally, the Court notes that its determination that the allegations are insufficient to show that Burgess-Allen became a participant in the conspiratorial agreement in his role as Metro's agent also comports with basic contract law.  Contract doctrine teaches that an agent is not personally bound to a contract when the agent acts on behalf of a disclosed principal unless there is clear and explicit evidence of the agent's intention to be so bound.  Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 972 (2d Cir. 1987); Melnitzky v. Rose, 148 F. App'x 11, 12 (2d

Cir. 2005) (summary order).  In this instance, plaintiffs have failed to plausibly show that Burgess-Allen intended to be personally bound by the agreements he arranged on Metro's behalf.

Because plaintiffs do not state a viable antitrust conspiracy claim against Burgess-Allen, the Court dismisses the claims against him with prejudice.

V.      CONCLUSION

For the reasons set forth above, plaintiffs' claims against Robert Burgess-Allen and BAP are DISMISSED WITH PREJUDICE.[20]

The Clerk of Court is directed to close the motions at ECF No. 823 in 13-md-2481 and at ECF No. 290 in 14-cv-3116.

SO ORDERED.

Dated:        New York, New York
              October 23, 2015

_____
KATHERINE B. FORREST
United States District Judge

---

[20] The Court assumes that despite the dismissal of Burgess-Allen and BAP, plaintiffs will nonetheless seek discovery against them.  The Court notes that it would be surprising, in light of defendants' argument (and the Court's determination) that Burgess-Allen was acting as an agent of Metro, if Metro lacked all access to relevant material in Burgess-Allen's possession.