**Publicly Filed Version**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION** | 13 MD 2481 (KBF) |
| This Document Relates To: | Hon. Katherine B. Forrest |
|     Direct Purchaser Plaintiffs (14 Civ. 3116) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

| | | |
|---|---|---|
| Christopher Lovell | Linda P. Nussbaum | Patrick Coughlin |
| LOVELL STEWART HALEBIAN JACOBSON LLP | NUSSBAUM LAW GROUP P.C. | ROBBINS GELLER RUDMAN & DOWD LLP |
| 61 Broadway | 570 Lexington Avenue | 655 West Broadway |
| New York, NY 10006 | New York, NY 10022 | San Diego, CA 92101 |

*Interim Co-Lead Counsel for First Level Purchaser Plaintiffs and the*
*Proposed First Level Purchaser Plaintiff Class*

**Publicly Filed Version**

## TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………………...…1

II.     SUMMARY OF COMMON FACTS ................................................................3

      A.     Common Proof Will Establish the Conspiracy's Existence and Scope, and the Unlawful Acts in Furtherance Thereof.......................................................3

           1.     The Backdrop of Defendants' Conduct ......................................................3

           2.     A Conspiracy to Manipulate the Aluminum Market Is Hatched .................................................................................................4

           3.     The Banks Agree to the Scheme and the Groups Implement the Plan ...................................................................................6

                 a.     Defendants Coordinate Efforts to Concentrate LME Aluminum in Metro's Detroit Warehouses ...........................7

                 b.     Defendants Coordinate to Keep LME Aluminum Trapped in Metro's Detroit Warehouses ........................................................10

      B.     Common Qualitative Proof Will Establish the Causal Link Between Lengthy Queues and Inflated Aluminum Prices....................................................15

      C.     Common Quantitative Proof Will Establish Inflation of Aluminum Prices ..........18

III.    ARGUMENT ................................................................................................15

      A.     Rule 23(a) Is Satisfied ................................................................................15

           1.     Rule 23(a)(1): Numerosity ....................................................................15

           2.     Rule 23(a)(2): Commonality ..................................................................15

                  a.     Common Questions of Law .......................................................16

                  b.     Mixed Common Questions of Fact and Law ...............................17

            3.     Rule 23(a)(3): Typicality ......................................................................18

            4.     Rule 23(a)(4): Adequacy and Appointment of Counsel ...........................19

      B.     Rule 23(b)(3) Is Satisfied ..........................................................................20

           1.     Common Questions of Law and Fact Predominate ......................................

i

a.      Defendants' Conspiracy to Fix Aluminum Prices Is a Predominant Common Issue ...................................................22

b.      Antitrust Impact Is a Predominant Common Issue ......................25

i.      The Legal Prong of Antitrust Injury ..................................26

ii.      The Factual Prong of Antitrust Injury and The Method for Establishing Damages ........................................................26

(a)      Qualitative Evidence of Statements and Admissions ................................................26

(b)      Plaintiffs' Experts' Impact and Damages Analyses ................................................28

2.      A Class Action Is Superior to Other Methods for Adjudicating This Controversy ............................................................................30

IV.      CONCLUSION ........................................................................................35

## Table of Authorities

**Cases**                                                                    **Pages**

*Allen v. Dairy Farmers of America, Inc.*,
  No. 09-cv-230, 2012 WL 5844871 (D.Vt. Nov. 19, 2012)........................................24

*Amchem Prods, v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................17, 18

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
  133 S. Ct. 1184 (2013) .............................................................................................18

*Brunswick Com. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ....................................................................................................21

*Butler v. Sears*,
  702 F.3d 359 (7th Cir. 2012) ...................................................................................18

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013) ...............................................................................................24

*Cordes & Co., Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc*.,
  502 F.3d 91 (2d Cir. 2007) ............................................................................. passim

*Dial Corp. v. News Corp.*,
  No. 13 Civ. 6802, 2015 WL 4104624 (S.D.N.Y. June 18, 2015) ..............................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ..............................................................................................19

*FUJIFILM Manufacturing U.S.A., Inc. v. Goldman Sachs & Co., et al*.,
  No.15-cv-08307(KBF) (S.D.N.Y 2015) .......................................................................1

*Hyland v. HomeServices of America, Inc.*,
  No. 05 cv 612, 2012 WL 1575310 (W.D.Ky. May 3, 2012) ....................................13

*In re Air Cargo Shipping Services Antitrust Litig*.,
  MDL No. 1775, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .................................24

*In re Aluminum Warehousing Antitrust Litig*.,
  95 F.Supp.3d 419 (S.D.N.Y. 2015) ................................................................. passim

*In re Amaranth Natural Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ..............................................................................25

iii

*In re Auction Houses Antitrust Litig.*,
   193 F.R.D. 162 (S.D.N.Y. 2000) ........................................................................19, 29

*In re Buspirone Patent & Antitrust Litig.*,
   210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................26, 28

*In re Catfish Antitrust Litig.*,
   826 F.Supp. 1019 (N.D.Miss. 1993) ........................................................................21

*In re Currency Conversion Fee Antitrust Litig.,*
   264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................................21, 26, 28, 35

*In re Currency Conversion Fee Antitrust Litig.*,
   224 F.R.D. 555 (S.D.N.Y. 2004) ........................................................................30, 35

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) ........................................................................29, 30, 31

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ........................................................................28

*In re Flat Glass Antitrust Litig.*,
   191 F.R.D. 472 (W.D.Pa. 1999) ........................................................................28

*In re High Tech Employee Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................38

*In re Magnetic Audiotape Antitrust Litig.*,
   No. 99 Civ. 1580 (LMM), 2001 WL 619305 (S.D.N.Y. June 6, 2001) ........................................................................38

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D.N.J. 2003) ........................................................................28

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) ........................................................................42

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................28, 32

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) ........................................................................27

*In re Petrobras Sec. Litig.*,
   No. 14 Civ. 9662, 2016 WL 413122 (S.D.N.Y. Feb. 2, 2016) ........................................................................19

*In re Publication Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) ...................................................................................30

*In re Puda Coal Sec. Litig.*,
No. 11 Civ. 2598, 2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) ..............................19, 22, 23, 25

*In re Visa Check/Mastermoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) ...........................................................................30, 36

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012) .............................................................................35

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002) ..............................................................................26

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007) .............................................................................36

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ...........................................................................24

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
103 F. Supp. 2d 268 (S.D.N.Y. 2000) .....................................................................32

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) .................................................................................19

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ...............................................................................25

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002) ...............................................................................24

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .................................................................................24

*North Carolina State Bd. of Dental Examiners v. FTC*,
135 S.Ct. 1101 (2015) ........................................................................................20

*Osberg v. Foot Locker, Inc.*,
No. 07 Civ. 1358, 2014 WL 5796686 (S.D.N.Y. Sept. 24, 2014) .............................19

*Pickett v. IBP, Inc.*,
2003 WL 24275809 (M.D. Ala. 2003) ....................................................................33

*Roach v. T. L. Cannon Corp.*,

778 F.3d 401, 402 (2d Cir. 2015) ..................................................................31

*Rosenfield v. Integrated Container Serv. Indus. Corp.*,
50 F.R.D. 237 (S.D.N.Y. 1970) ..................................................................36

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010) ..........................................................................32

*Shahriar v. Smith & Wollensky Rest. Group, Inc.*,
659 F.3d 234 (2d Cir. 2011) ........................................................................31

*Sykes v. Mel S. Harris & Assoc., LLC*,
780 F.3d 70 (2d Cir. 2015) ..........................................................................31

*Toney-Dick v. Doar*,
No. 12 Civ. 9162, 2013 WL 5295221 (S.D.N.Y. Sept. 16, 2013) ..................19, 21, 22

*United States v. Topco Assoc., Inc.*,
405 U.S. 596 (1972)....................................................................................20

**Statutes**

15 U.S.C. § 1 ...............................................................................................8

15 U.S.C. § 15 .............................................................................................8

**Rules**

Rule 23(b)(3)(A)-(D) ...........................................................................24, 25, 31

**Other Authorities**

A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed. 2002) ...........................................25

C.W.J. Granger, *Investigating Causal Relations by Econometric Models and Cross-Spectral Methods*, 37 Econometrica (1969) ...................................................................32

**Publicly Filed Version**

## I. INTRODUCTION

Plaintiffs respectfully submit this memorandum and the accompanying reports and declarations[1] in order to demonstrate that this action "may be maintained" as a class action under Rule 23 of the Federal Rules of Civil Procedure.

This Court earlier held that Plaintiffs plausibly alleged an agreement, conspiracy or combination among Defendants to inflate the Midwest transaction price for aluminum in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1 ("Sherman Act").   *In re Aluminum Warehousing Antitrust Litig.*, 95 F.Supp.3d 419, 439-40 (S.D.N.Y. 2015) ("*Aluminum Warehousing II*").   This Court similarly held that Plaintiffs plausibly alleged that this violation inflated the prices paid by Plaintiffs to purchase aluminum and that Plaintiffs have standing to sue for their resulting damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.   *Id. at* 440-44.

Plaintiffs demonstrate below that, in proving the allegations relied upon by the Court in upholding Plaintiffs' pleading of a Section 1 claim for damages, Plaintiffs will establish a *prima facie* claim for all Class members including the fact and amount of artificial impact on the Midwest transaction price (*see* Arg. Pt. III.B. *infra).*   Gilbert Report, ¶10; *see* §III, *infra.*   Even though extensive document production has not yet been received and no depositions have yet been taken, substantial common evidence already exists and will be submitted to demonstrate the existence and duration of the alleged conspiracy.   *See* §III.A, *infra.*

Extensive common qualitative evidence, admissions, and expert testimony likewise already exist and will be submitted to show impact and damages.   *See* §III, A. and B. *infra.* Clear

---

[1]   The reports are from Professor Christopher Gilbert ("Gilbert Report") dated March 24, 2016, Dr. J. Douglas Zona ("Zona Rep.") dated March 25, 2016, and Mark Bodner, dated March 25, 2016 ("Bodner Report"). The declarations are from Tom Krizanosky ("Krizanosky Decl.") dated March 25, 2016, and Susan R. Schwaiger ("Schwaiger Decl.") dated March 25, 2016.

quantitative evidence in a working expert model also has been submitted to show impact and damages.  *E.g.,* Gilbert Report ¶¶10(b), 53, 54, 67, 68; Appx. G.  For example, such quantitative evidence shows that Queue length (which was the time required to load aluminum out of certain London Metal Exchange ("LME") warehouses) had a direct and formulaic impact on the Midwest Premium.  *Id.*  Aggregate Class damages can therefore be determined using Professor Christopher Gilbert's econometric model, which isolates and estimates the impact of Defendants' alleged anticompetitive conduct on the Queue length and its consequent impact on the Midwest Premium.  This allows a straightforward determination of what Class members would have paid in a competitive market, absent Defendants' anticompetitive conduct. Gilbert Report ¶¶73-78 & Appx. G.  Moreover, it will be a straightforward and formulaic task to determine the allocation of damages among Class members.  Gilbert Report ¶¶48-49 & Appx. C.[2]

## II.    SUMMARY OF COMMON FACTS

This litigation's predominant legal and factual issues that are common to all Class members involve: (i) the existence, composition and scope of Defendants'[3] conspiracy to manipulate aluminum prices; (ii) the unlawful acts undertaken by Defendants in furtherance thereof; (iii) the causal link between Defendants' unlawful acts and the antitrust injury sustained by the class; and (iv) the inflation of aluminum prices.[4]

---

[2] ████████████████████████████████████████████████████████████████████████ Gilbert Report ¶ 49 & Appx. C ("██████████████████████████████████████████████████████████████████████████████.").

[3] As used herein, "Defendants" means Goldman, Sachs & Co. ("Goldman"), Goldman Sachs International, Metro International Trade Services LLC ("Metro"), J. Aron and Company, Mitsi Holdings LLC, JPMorgan Securities plc, Henry Bath LLC, Glencore Ltd. ("Glencore"), Pacorini Metals USA, LLC ("Pacorini") and, to the extent the motion for leave to amend is granted, JPMorgan Chase Bank, N.A., Glencore International AG, Glencore AG, Pacorini Metals Vlissingen BV.

[4]    Plaintiffs moved for leave to amend their Third Amended Complaint to conform their allegations to the evidence produced thus far in discovery.  *See* Dkt. No. 892.  This motion relies on that same evidence, which consists of documents previously produced by Defendants in connection with the Senate investigation and in the course of their continuing document production.  A considerable amount of information, including documents from the 2009-2010 time period, and documents from Glencore and JPMorgan, has yet to be produced (or was only recently produced). Thus, plaintiffs will not have a complete picture of the full spectrum of misconduct until the end of discovery.

### A. Common Proof Will Establish the Conspiracy's Existence and Scope, and the Unlawful Acts in Furtherance Thereof

#### 1. The Backdrop of Defendants' Conduct

Between 2004 and 2008, demand for aluminum in the U.S. was robust. During that period, the Midwest Premium – one of the two key components of the all-in price for aluminum sourced in the United States – fluctuated between four and eight cents per pound ($90-$180 per metric ton). Ex. 24,[5] GS-METRO-00298894 at 41.

[redacted]

[redacted]. [redacted]

5 All references to "Ex." are to the exhibits attached to the Schwaiger Decl..

6 All references to the "Senate Report" can be found at ECF 640-1.

Customers could load out their aluminum within a few days or weeks.  Senate Report at 176.

*That changed in 2010*.

### 2.    A Conspiracy to Manipulate the Aluminum Market Is Hatched

It was in this oversupplied market that the conspiracy was born.  ███████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████ Metro's early search for a means to reach its goals set the stage for

Defendants' massive conspiracy.  ████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████.

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████.

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

### 3. The Banks Agree to the Scheme and the Groups Implement the Plan

The banks immediately recognized the potential of such a deal, and took it one step further.  Multiple banks could take control of nearly all LME warehouses, which would enable them to coordinate their efforts and better manipulate aluminum prices.  And so the scheme was put in motion.  ███████████████████████████████ ████████████████████████████████████  Over the following months, the LME warehousing market was taken over by Defendants.

███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[7]   All references to the "Zona Report" are to the Report of Dr. Zona, at Schweiger Decl.Ex. D.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

Almost immediately, Defendants moved to hoard and continually concentrate aluminum in Metro's Detroit operations and took a series of specific steps to ensure that the metal was trapped for as long as possible. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ And JPMorgan, seeking to capture the inflated value of aluminum, began acquiring massive amounts of physical aluminum, eventually acquiring so much that it breached the Federal Reserve's limit on Tier 1 capital.  Senate Report at 373-74.

**a. Defendants Coordinate Efforts to Concentrate LME Aluminum in Metro's Detroit Warehouses**

[redacted]

[redacted]

8 [redacted]



Zona Rep. ¶72.[9]

By August 2010, Glencore had acquired Pacorini. ████████████████
████████████████████████████████████████████████████████████

[redacted]

[redacted]

**b. Defendants Coordinate to Keep LME Aluminum Trapped in Metro's Detroit Warehouses**

Once nearly all of the LME aluminum in the U.S. was stockpiled in Metro's Detroit warehouses, it was important to keep it trapped there. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ In early 2010, Queue length at Metro's Detroit warehouse was 40 days.  As Defendants' measures took hold, the Queue length exploded upward to over 500 days by the end of December 2012, before peaking at nearly 650 days in late-2014. Senate Report at 179, 209.  This unprecedented Queue lengths did not begin to diminish until late 2014, by which time JP Morgan exited the aluminum warehousing business and Goldman Sachs – under pressure from the U.S. government, the industry and the LME – instituted corrective actions concerning its warehousing practices.  *Id.*

First, Defendants worked together to protect the lengthy Queues through the LME, which set the rules governing the warehouses.  As noted above, the LME had adopted a rule requiring each warehousing company be able to load out a minimum of 1,500 MT per day per location.  As part of their agreement, Defendants agreed to treat the LME *minimum* daily load-out rule as a *maximum*.  An internal Goldman document labeled it ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████. Further,

although the load-out rule was per location and per shed, Goldman *used a single exit Queue for all 24 of its Detroit warehouses*.[10]  Senate Report at 195.

Second, between 2010 and 2011, Defendants' trading operations coordinated large warrant cancellations for metal held in warehouses, particularly in Detroit, which further lengthened Queues.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████.  █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

      ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

But that was not all.  By early 2012, Defendants feared that the LME's new 3,000-metric

ton load-out rule might eliminate the long Queue.  ████████████████████████████

████████████████████████████████████   ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  These parallel, highly unusual steps greatly extended the

Queue length.

Third, Metro entered into a series of "merry-go-round" or "queue management"

agreements with counterparties, including Glencore.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[redacted]

[redacted]

11 [redacted]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

████████████████.   In fact, as it turns out, the measures were even more effective than Defendants anticipated, as discussed further below.

      **B.**    **Common Qualitative Proof Will Establish the Causal Link Between Lengthy Queues and Inflated Aluminum Prices**

From the start, Defendants' goal was clear: ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Virtually every participant in the aluminum market, including Defendants themselves, recognized that the scheme played out exactly as Defendants intended.

14

As the Detroit warehouse Queue grew, so did the Midwest Premium, which, in turn, inflated aluminum prices. ████████████████████████████████████████

████████████████████████████    ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████    Indeed, the rapid rise in the Midwest Premium mirrored the rise in the increase in the length of the Queues at Metro's Detroit warehouses, as reflected in the following chart:



Senate Report at 179.



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

Numerous economists reached the same conclusion. ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████. ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████  The United States Senate Subcommittee on

Investigations similarly found that "the increase in the Metro Detroit queue were highly

correlated with increases in the aluminum Midwest Premium over the same time period which,

in turn, became a growing component of the all-in price of aluminum."  Senate Report at 194.

Producers, purchasers, and market analysts also recognized that Queues were driving up prices.

*Id*. at 179.  Indeed, there was near universal consensus that the growing Queues at Metro's

Detroit warehouses drove up the price of primary aluminum in the U.S.  All of this is evidence

common to the class. ██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

**C.** **Common Quantitative Proof Will Establish Inflation of Aluminum Prices**

16

Consistent with this qualitative evidence, plaintiffs have presented quantitative evidence of the inflation of aluminum prices.  Plaintiffs have presented the expert testimony of Professor Christopher L. Gilbert, an economist and econometrician with a particular expertise in metals. Gilbert Rep., ¶¶1, 3.  Dr. Gilbert undertook a variety of well-accepted statistical analyses

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

## III.   ARGUMENT

Plaintiffs can readily demonstrate the four elements of Rule 23(a): (i) numerosity of Class members;  (ii) commonality of claims or issues;  (iii) typicality of Plaintiffs' claims;  and (iv) adequacy of representation by Plaintiffs and class counsel.  In addition, as discussed below, plaintiffs can readily demonstrate the two elements of Rule 23(b)(3): "predominance" and "superiority."

### A.   Rule 23(a) Is Satisfied

#### 1.   The Class Definition Satisfies The Ascertainability Requirement.

Some courts have implied a requirement under Rule 23 that the members of the class be "ascertainable".  *Toney-Dick v. Doar*, No. 12 Civ. 9162, 2013 WL 5295221, at *9 (S.D.N.Y. Sept. 16, 2013) (Forrest, J.). That is, the class definition must be sufficiently clear that the members of the class may be identified.  Class members need not already be actually identified or ascertained at the time of the class motion; instead they must merely be capable of being

identified at a later time (*e.g.,* after trial has been completed.  *In re Methyl Tertiary Butyl Ether* (*"MTBE"*) *Products Liability Litig.,* 241 F.R.D. 185, 195-96 (S.D.N.Y. 2007).  Here, Plaintiffs' proposed definition of the Class clearly satisfies the ascertainability requirement.

> Plaintiffs' proposed Class is defined as follows:

> All persons who from February 2010 to March 25, 2016: (a) made a first level direct purchase of a primary aluminum product with a price term based, in any part, on the Midwest Transaction Price, the Platts Metals Week US Transaction Price or other "all in" price used in the United States, or the Midwest Premium, the Platts MW Premium or similar terminology or other regional premium used in the U.S., including but not limited to an averaging over a period of days of any such premium or adjusting for a grade or type of primary aluminum product; or (b) purchased a primary aluminum product directly from a Defendant.  Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.

> As used in this definition, "primary aluminum product" means (1) T-bar, sow, standard ingot, foundry alloy T-bar or ingot, extrusion billet, slabs, sheet ingot, molten metal, rod, or any other product which contains at least 93% primary aluminum, or (2) aluminum can sheet or aluminum automotive sheet which contain primary aluminum.

Primary aluminum and smelters from whom Class members make first level purchases of primary aluminum products are generally described in the Bodner Report at ¶¶2-23.  The smelters include Alcoa, Rio Tint Alcan, Rusal, and Century.  *Id.* ¶¶3, 13-23. The primary aluminum products specifically mentioned in the Class definition are also described in the Bodner Report.  ¶¶5-6, 8-11 and Exhibit C.[12]  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

---

[12] The amounts of primary aluminum contained in aluminum can sheet and aluminum automotive sheet are also described in the Bodner Report.  *Id.* ¶¶ 6, 9-11.

Certain aluminum producers have made partial productions of documents which, along with Class members' own records and any further discovery herein, will permit the persons who are actually members of the Class to be easily identified at the appropriate time.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████   The Class definition excludes Defendants from membership in the Class despite Defendants' large first level purchases (which total almost one year's domestic production of primary aluminum in the United States). However, the second prong of the Class definition captures the persons who "purchased a primary aluminum product directly from Defendant". These persons also may be easily identified from Defendants' records, Class members' own records, and/or other document production herein.

   **2.**  **Rule 23(a)(1): Numerosity.** Rule 23(a)(1) requires "the class [be] so numerous that joinder of all members is impracticable." Here, the Class includes, for example, hundreds of first-level aluminum purchasers, spread across the United States, who paid the Midwest Premium. Krizanosky Decl.[13] ¶ 4; Gilbert Rep. ¶ 48. Numerosity is easily satisfied. *Toney-Dick v. Doar*, No. 12 Civ. 9162, 2013 WL 5295221, at *6 (S.D.N.Y. Sept. 16, 2013) (Forrest, J.) (impracticability of joinder is presumed at a level of forty members) (citations omitted); *In re Petrobras Sec. Litig.*, No. 14 Civ. 9662, 2016 WL 413122, at *3 (S.D.N.Y. Feb. 2, 2016).

   **3.**  **Rule 23(a)(2): Commonality.** The liberally-construed standard of commonality only requires a single common question of law or fact. Fed. R. Civ. P. 23(a)(2); *In re Puda Coal Sec. Litig.*, No. 11 Civ. 2598, 2013 WL 5493007, at *15 (S.D.N.Y. Oct. 1, 2013)

---

[13] All references to "Krizanosky Decl." are to the Report of Mr. Krizanosky, at Schwaiger Decl. Ex. B.

(Forrest, J.) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376-77 (2d Cir. 1997); *Osberg v. Foot Locker, Inc*., No. 07 Civ. 1358, 2014 WL 5796686, at *3 (S.D.N.Y. Sept. 24, 2014) (Forrest, J.) ("Regardless of whether the answer to each of these inquiries is affirmative or negative, the answer is identical as to each member of the class.").

Actions involving price-fixing conspiracies have consistently been held to present common questions of law and fact.  *E.g.*, *In re Auction Houses Antitrust Litig*., 193 F.R.D. 162, 164 (S.D.N.Y. 2000) ("The existence of common questions of law or fact -- not least of them the existence and scope of the alleged conspiracy -- is obvious.").  This case is no exception.

        **a.**    **Common Questions of Law.**  As discussed below with respect to predominance under Rule 23(b)(3), there are many common questions of law raised by Plaintiffs' claim.  They include, for example, whether Defendants' alleged (or proved) conduct qualifies as a *per se* violation under the antitrust laws.  *In re Aluminum Warehousing Antitrust Litig*., 95 F.Supp.3d 419, 449 (S.D.N.Y. 2015) (the issue presented is "whether this alleged conspiracy is of the type the antitrust laws deem *per se* illegal.")

Relatedly, while Plaintiffs assert *per se* violations that require no market definition, to the extent plaintiffs' claims do not warrant *per se* treatment the class will have a common interest in establishing the relevant markets.  *Dial Corp. v. News Corp.*, 13 Civ. 6802, 2015 WL 4104624, at *3 (S.D.N.Y. June 18, 2015).  ████████████████████████████

████████████████████████████████████████

███████████████████████████ ██████████████████████████

███████████████████████████████████████

████████████████████████████████

Another common issue is whether Defendants agreed to inflate the Midwest Premium and, if so, whether their conduct stemmed from that agreement.  *In re Auction Houses,* 193 F.R.D. at 164.  Finally, the issues of whether Defendants' conduct caused "antitrust injury," and whether damages or other relief is warranted, are common to the Class.  *Cordes & Co., Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 95 (2d Cir. 2007).

    **b.**    **Mixed Common Questions of Fact And Law.**  Numerous mixed questions of law and fact common to all Class members also exist.  They include whether: (1) Defendants' conduct restrained supplies of aluminum; (2) such conduct inflated prices of aluminum, including the Midwest Premium, and (3) Plaintiffs and Class members were injured in fact thereby.  *E.g.*, *In re Currency Conversion Fee Antitrust Litig.,* 264 F.R.D. 100, 111 (S.D.N.Y. 2010) ("*Currency Conversion*"), citing *In re NASDAQ Market-Makers Antitrust Litig*., 169 F.R.D. 493, 509-10 (S.D.N.Y. 1996) ("allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)") (collecting cases)).  In addition, the definition of the relevant market for purposes of Plaintiffs' claim is a common issue and subject to class-wide determination.

    **4.**    **Rule 23(a)(3): Typicality.**  Typicality under Rule 23(a)(3) is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Toney-Dick v. Doar*, No. 12 Civ. 9162, 2013 WL 5295221, at *7 (S.D.N.Y. Sept. 16, 2013) (Forrest, J.) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig*., 574 F.3d 29, 35 (2d Cir. 2009).  The test for typicality is not demanding.  Minor factual variations among class members are not enough to defeat typicality.  So long as the same allegedly unlawful conduct was directed at or affected all class members,

typicality is usually satisfied.  *Toney-Dick* at *3 (citation omitted).  Thus, courts have generally found the typicality requirement to be satisfied in cases involving allegations of a price-fixing conspiracy.[14]

This element is met here as the claims of the class representatives are precisely the same claims of those of the proposed class.  The class representatives, like all class members, paid an inflated Midwest Premium when they purchased aluminum.  While the extent of each class member's damage may vary, all Class members were injured by the same overarching conspiracy.  To establish the existence of that conspiracy, all class members will offer the same proof.  This identity of proof applies across Defendants' queue management deals, all six merry-go-round agreements, all of the large inter-Defendant transactions, and through the literally scores of inter-Defendant emails and communications reflecting defendants' express agreement to limit competition.  Accordingly, Plaintiffs' claims are clearly typical of the claims of the Class.

5.     **Rule 23(a)(4):  Adequacy and Appointment of Counsel.**  The relevant inquiry for adequacy under Rule 23(a)(4) is whether "the interests of the named Plaintiffs are not antagonistic to other members of the class," and whether "Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation."  *Toney-Dick v. Doar*, No. 12 Civ. 9162, 2013 WL 5295221, at *8 (S.D.N.Y. Sept. 16, 2013) (Forrest, J.) (citation omitted),

In determining whether defendants' conspiracy inflated the Midwest Premium and aluminum prices, Plaintiffs' interests are fully aligned with the interests of other members of the

---

[14]    *E.g., Currency Conversion*, 264 F.R.D. at 111 (collecting cases); *see also In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 185 (D.N.J. 2003) (plaintiffs met the typicality requirement solely based on the fact that plaintiffs' main claim – that they were harmed by an illegal price-fixing conspiracy – was the same for all class members); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D.Pa. 1999) (defendants' alleged price-fixing conspiracy was an appropriate basis for a finding of typicality); *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1035 (N.D.Miss. 1993) ( "wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members").

Class.  Plaintiffs and each Class member have a unified interest (a) to prove the existence of the Defendants' unlawful agreement; and (b) to show, through historical facts, expert methodologies and other information, that defendants' succeeded, *i.e.*, Defendants' conduct did, in fact, cause increases in the Midwest Premium and aluminum prices.

The undersigned counsel have already been appointed to serve as interim class counsel and all three firms have demonstrated that they are highly capable and willing to vigorously, efficiently and expeditiously prosecute the action.  The resumes and biographies of these firms, which were previously lodged with the Court, reflect their substantial experience and success in prosecuting large, complex class actions similar to this case.  ECF Nos. 177, 178, 179 and 783. There is no question that plaintiffs and there counsel will capably represent the class here and satisfy all of the Rule 23(a)(4) criteria.

### B.   Rule 23(b)(3) Is Satisfied

Under Rule 23(b)(3), certification is appropriate if (i) questions of law and fact common to the class predominate over any questions affecting only individual members, and (ii) the class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).   Because plaintiffs' claim is based on a price-fixing conspiracy affecting all Class members, plaintiffs satisfy both predominance and superiority.

### 1.   Common Questions of Law and Fact Predominate

The Supreme Court served a reminder this week that a single common legal issue can be the "most significant" common question in the analysis of predominance. *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146, 2016 WL 1092414 at *7 (U.S. Mar. 22, 2016) ("most significant" common question in unpaid overtime case was common legal issue of whether time spent donning and doffing protective gear was compensable under the Fair Labor Standards Act).  The

predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)). "While predominance requires a more rigorous showing than does commonality, it 'does not require a plaintiff to show that there are no individual issues.'" *Tsereteli v. Residential*, 283 F.R.D. 199, 210 (S.D.N.Y. 2012) (citations omitted); *see also Cordes*, 502 F.3d at 108 ("Even if the district court concludes that the issue of injury-in-fact presents individual questions, . . . it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted."); *In re Puda Coal*, 2013 WL 5493007, at \*19 ("The existence of some individualized issues does not necessarily defeat predominance—it is a question of the balance."). Further, as the Supreme Court emphasized in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those *questions* will be answered, on the merits, in favor of the class." 133 S. Ct. 1184, 1191 (2013) (emphasis in original).

Here, Plaintiffs allege that Defendants conspired to fix aluminum prices by entering into a contract, combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. To prevail on this claim, Plaintiffs must establish: (1) a conspiracy to fix prices; (2) direct injury resulting from that conspiracy; and (3) quantification of damages. *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the

underlying causes of action."). Proof of these elements will predominantly—indeed *overwhelmingly*—raise questions of law or fact common to the Class, as such proof will focus on Defendants' conduct and its effect on aluminum prices.

### a. Defendants' Conspiracy to Fix Aluminum Prices Is a Predominant Common Issue.

This Court and many others have found that, in litigation involving a price-fixing conspiracy, the common legal and factual questions arising from proof of the conspiracy predominate, warranting class certification. *See Cordes*, 502 F.3d at 108 (Rule 23(b)(3)'s predominance element is "a test readily met in certain cases alleging . . . violations of the antitrust laws") (quoting *Amchem*, 521 U.S. at 625); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002) ("[C]ommon issues of fact and law . . . clearly predominate . . . [because] [p]roof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs"). This is because "allegations of the existence of a price-fixing conspiracy are susceptible to common proof." *Cordes*, 502 F.3d at 105; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (price fixing claims "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members."); 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1781 (3d ed. 2005) (noting that "whether a conspiracy exists is a common question" for predominance).

Trial in this action will be dominated by Plaintiffs' proof (and Defendants' defenses) regarding the central question of whether Defendants unlawfully conspired to inflate or manipulate aluminum prices. *In re Aluminum Warehousing*, 95 F.Supp.3d at 448-49. Plaintiffs' proof will overwhelmingly raise questions of fact common to Class members, as it will focus on such matters as whether Defendants agreed: (i) that their warehouse operations would not compete against each other; (ii) to pressure the LME not to change its load-out rules, and to use



the minimum load-out rules as a maximum; (iii) to build queues in Detroit and Vlissingen; (iv) to shuffle stocks between Metro's Detroit warehouses; (v) to work together strategically to cancel warrants; and (vi) to meet and communicate concerning these and other aspects of their agreement.  *See id.* at 439.  While discovery is ongoing, Plaintiffs already have identified a significant amount of common facts in the discovery record that establish the conspiracy's existence and operation.  *See* §II, *supra*.

In addition, Dr. Zona's and Dr. Gilbert's expert reports provide detailed Class-wide economic analyses of the various factors demonstrating ████████████████████████████████████████████████████████████████████████ Zona Rep. ¶42 ("█████████████████████████████████████████████████████████████████████████████████████████████."); ¶¶43-72 (████████████████████████████████████████████████████████); Gilbert Report ¶¶17-21 (██████████████████████████████); ¶¶26-30 (██████████████████████████████); ¶¶35-36 (██████████████████████████████); ¶39 ("████████████████████████████████████████████████████████████████████████████████████████████████████████").  Similarly, Plaintiffs will rely entirely on common proof to establish the competitive conditions for Defendants' conspiracy, including Defendants' ability and motive to collude.  *See* Zona Rep. ¶¶14-41 (████████████████████

████████████████████████████████████████

████████████████████████ ).

Common questions of law will predominate as well.  Whether Defendants' conduct violated the antitrust laws is certainly a question common to the Class.  So, too, is the issue of whether the *per se* rule or rule of reason applies to Plaintiffs' price-fixing claim.

In short, each Class member, if pursuing its claims separately, would be faced with proving numerous identical issues pertaining to Defendants' liability.  Each Class member would need to introduce precisely the same evidence, and make the same factual and legal arguments, to prove these claims whether there were a hundred trials or one unified action.  *See Currency Conversion*, 264 F.R.D. at 113-14; *In re Buspirone*, 210 F.R.D. at 43 ("[C]ommon issues of fact and law . . . clearly predominate . . . [because] [p]roof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs").

### b. Antitrust Impact Is a Predominant Common Issue.

There are two prongs that must be satisfied to meet the antitrust injury element, each of which is susceptible to being proved by evidence common to the Class.  "One prong is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact.'  The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Cordes & Co.*, 502 F.3d at 106 (quoting *Brunswick Com. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).

Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws.  *Amchem*, 521 U.S. 591, 625.  Consistent with this principle, federal district courts overwhelmingly find the question of impact in antitrust cases susceptible to common proof and

certify such cases for class treatment under Rule 23.  *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y. 2000) ("Price fixing conspiracies . . . almost invariably injure everyone who purchases the relevant goods and services.").  As discussed below, Plaintiffs have assembled quantitative and qualitative evidence common to the Class to demonstrate at trial the impact of Defendants' conduct on the Class members.

### i.  The Legal Prong of Antitrust Injury

The legal prong of the antitrust injury element requires plaintiffs to establish that "defendants engaged in an anti-competitive manipulation of the markets."  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 87 (D. Conn. 2009) ("*EDPM*") (citing *Cordes*, 502 F.3d at 105-07).  For class certification purposes, where, as here, plaintiffs have alleged only one type of injury—transacting in physical aluminum at prices manipulated and made artificial by Defendants' unlawful conduct—the legal question prong is common to the Class.  *See Cordes*, 502 F.3d at 107 (because each class member allegedly suffered the same type of injury, the legal question of whether such an injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, is a common one) (quotation marks and citation omitted)).

### ii.  The Factual Prong of Antitrust Injury

Proving fact of injury, or impact, will similarly raise legal and factual issues overwhelmingly common to the Class.  The factual prong of the antitrust injury element "requires that harm actually resulted from the antitrust violation – the 'injury in fact.'"  *EPDM*, 256 F.R.D. at 88.  Under Second Circuit precedent, antitrust causation requires a material cause and a "but-for" cause, but does not require a sole cause.  *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 66-67 (2d Cir. 2012) ("if an act is deemed wrongful because it is believed significantly to increase the risk of a particular injury, we are entitled—in the tort context at

least—to presume that such an injury, if it occurred, was caused by the act") (citation omitted).

Here, Plaintiffs will prove impact on a Class-wide basis by showing that Defendants' conspiracy caused the Class members to pay supra-competitive prices during the Class Period.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████

**(a)     Qualitative Evidence of Statements and Admissions.**

The findings contained in the Senate Report and results of discovery to date provide substantial and compelling evidence, common to all Class members, that Defendants' conduct inflated the aluminum prices paid by the Class.[15]  *See* §II, *supra*.  As explained above, virtually

---

[15] *See In re Air Cargo Shipping Services Antitrust Litig.*, 2014 WL 7882100, at *42, 43 ("expert testimony need not shoulder the plaintiffs' burden alone.  Instead, this testimony should be viewed in conjunction with the plaintiff's other evidence . . . . [T]he general thrust of the predominance inquiry . . . requires a 'holistic' and 'qualitative' analysis rather than the application of rigid categorical rules.") (citations and interior quotation marks omitted).  *See also In re High-Tech Employees Antitrust Litig.*, 985 F.Supp.2d 1167, 1184, 1217 (N.D.Cal. 2013) ("the Court notes that the importance of these statistical models is diminished in light of the extensive documentary evidence that supports Plaintiffs' theory of impact. In other contexts, courts have long noted that statistical and anecdotal evidence must be considered in tandem.") (citing *Coral Const. Co. v. King Cnty.*, 941 F.2d 910, 919 (9th Cir. 1991) ("[T]he combination of convincing anecdotal and statistical evidence is potent.")).

every participant in the U.S. aluminum market, including the largest and most sophisticated aluminum purchasers, the world's top aluminum producers, market observers and analysts, and the LME, recognized that the growing aluminum queues at Defendants' warehouses caused aluminum prices to spike.  *Id.*  Even Defendants themselves admitted that by withholding aluminum stock from the market they could "squeeze up the premiums" paid by class members. *Id.*

Because the Midwest Premium is akin to a benchmark or list price included in virtually all transactions for primary aluminum in the U.S., class-wide impact is susceptible to common proof.  In other words, if Plaintiffs establish that Defendants' conduct illegally inflated the Midwest Premium, it is clear that *all* class members would have been impacted.  Not surprisingly, courts that have confronted conspiracies to inflate benchmark or list prices overwhelmingly have found class-wide impact and certified the class under Rule 23(b)(3).  *See, e.g., EPDM*, 256 F.R.D. at 89 ("across-the-board list price increases" establish "common proof of impact to the class"); *In Re Med. X-ray Film Antitrust Litig.*, CV-93-5904, 1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997) ("Numerous courts have held that common proof of impact can be established on the basis of evidence of a conspiracy to fix base prices that served as a starting point for negotiations on individual sales."); *Kleen Products LLC v. Int'l Paper*, 306 F.R.D. 585, 595 (N.D. Ill. 2015) (appeal pending) ("Courts have long held that a plaintiff can demonstrate antitrust impact by showing that the conspiracy caused *an increase to the standard market price of the product at issue."); In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) ("The inference of class-wide impact is especially strong where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations.").

> **(b)**     **Plaintiffs' Experts' Antitrust Impact and Damages Analyses**

Plaintiffs' experts' analyses separately establish impact on the Class.  In contrast to many antitrust cases in which impact must be evaluated across heterogeneous products and disparate pricing structures, the question of impact is straightforward here.  If Defendants' conspiratorial conduct inflated the Midwest Premium and the Midwest Premium is paid by class members, clearly there is class-wide impact.  *See* Gilbert Report, ¶10(a) ("████████████████████████ █████████████████████████████████████████████████████████████████ ██████"); Zona Rep. ¶89 ("█████████████████████████████████████████████ ███████████████████████.").

Dr. Gilbert and Dr. Zona have undertaken a number of quantitative investigations, including multiple regression analyses reinforced by Nobel Prize-winning Granger causality methodology to examine this issue.[16]  Such regression modeling is a well-established tool for identifying and estimating the impact of collusion in antitrust cases on a class-wide basis.  *See, e.g., Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) ("Numerous courts have held that regression analysis is a reliable method for determining damages and a mainstream tool in economic study.") (internal quotations omitted).[17]

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[16] Clive W.J. Granger is a Nobel Prize winning economist.  He developed the "Granger Causality test," which is widely accepted by professional applied economists for analyzing time series data.  *See* C.W.J. Granger, *Investigating Causal Relations by Econometric Models and Cross-Spectral Methods*, 37 Econometrica 424 (1969).

[17]   *See also In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 384 n.122 (S.D.N.Y. 2010) (approving Granger Causality Test as method to show causation while certifying CEA manipulation class of NYMEX natural gas futures traders, stating "the proposed methods are sufficiently developed to permit the conclusion that they can be used to demonstrate liability on a class-wide basis."); see also Pickett v. IBP, Inc., 2003 WL 24275809, *4 (M.D. Ala. 2003) (overruling objection to expert's use of Granger Causality Test); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS [Dkt 1783] at *11 (N.D. Cal. Feb. 08, 2016) (granting renewed motion for class certification after plaintiffs' expert "performed a new 'Granger causality' analysis," finding "plaintiffs have now made an adequate showing of a methodology for proving antitrust injury to all or nearly all direct purchasers, on a class-wide basis.").



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

18 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

Importantly, plaintiffs' damages model comports with the Supreme Court's directive in

*Comcast Corp. v. Behrend* that "a model purporting to serve as evidence of damages in [a] class

---

[19]  "Damages in an antitrust class action may be determined on a classwide, or aggregate, basis . . . where the [evidence] . . . provide[s] a means to distribute damages to injured class members in the amount of their respective damages."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996). *See also In re Air Cargo Shipping Services Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100, at *62 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted in full*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis, without resorting to fluid recovery where [there are] means to distribute damages to injured class members in the amount of their respective damages.") quoting *In re NASDAQ*, 169 F.R.D. at 526.

action must measure only those damages attributable to that theory." [20]  133 S. Ct. 1426, 1433 (2013).  In finding that Plaintiffs here have alleged antitrust injury, this Court upheld plaintiffs' claim that "defendants' actions altered the normal competitive price setting dynamic of aluminum, resulting in an abnormally high Midwest Premium; and [Plaintiffs] were forced to pay that premium as part of their purchases of physical aluminum." *In re Aluminum Warehousing*, 95 F. Supp. 3d at 443.

This is exactly what plaintiffs' experts measured through accepted, reliable methods that rely on evidence common to the Class.[21]  In fact, Dr. Gilbert's development of an actual damages model exceeds Plaintiffs' burden, as it is widely recognized that, to demonstrate predominance on the issue of damages, "[p]laintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *In re Currency Conversion*, 224 F.R.D. at 565.

## 2.    A Class Action Is Superior to Other Methods for Adjudicating This Controversy

Superiority is demonstrated where class litigation will be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Considerations relevant to finding superiority include the following:

---

[20]    In *Comcast*, plaintiffs provided a damage model that measured the aggregate of four different theories of antitrust impact.  *Id*.  The district court found only one of those theories susceptible to class-wide proof—which plaintiffs' model indisputably "failed to measure." *Id*.  That is simply not the case here.

[21]    At the class certification stage, the question for the Court is "whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, *not* whether the evidence will be ultimately persuasive."  *In re Visa Check/Mastermoney*, 280 F.3d at 136 (citation omitted) (emphasis added); *see also Dial Corp. v. News Corp.*, 13 Civ. 6802, 2015 WL 4104624, at *6 (S.D.N.Y. June 18, 2015) ("To support class certification, Plaintiffs must advance a workable methodology to demonstrate that antitrust injury can be proven on a class-wide basis.") (citations omitted).  In other words, at this stage, Plaintiffs need not show that their expert's model "actually works," so long as it is "workable."  *In re Air Cargo Shipping Services Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100, at *42 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted in full*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015), citing *In re EPDM*, 256 F.R.D. at 100; *Allen v. Dairy Farmers of America, Inc.*, No. 5:09-ccv-230, 2012 WL 5844871, at *13 (D.Vt. Nov. 19, 2012) (same, citing *EPDM*).  *See also In re High Tech Employee Antitrust Litig.*, 289 F.R.D. 555 (N.D. Cal. 2013) (plaintiffs' regression analysis "established a plausible method for proving an estimate of damages" and satisfied their burden under Rule 23(b)(3) on the issue of damages).  Thus, the Court in *Comcast* criticized the court of appeals for "finding it unnecessary to decide 'whether [plaintiffs' expert's] methodology [was] a just and reasonable inference or speculative.'"  133 S.Ct. at 1433.

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003).

Given the size, complexity, and expense of this case, class treatment is clearly superior to any alternative method.  Courts have consistently found that a class action is the superior method for adjudicating antitrust price-fixing cases.

**Rule 23(b)(3)(A)**.  For all but a few Class members, a class action is the *only* option. The expense of antitrust litigation is well recognized; and, indeed, Class members' individual claims are likely to be "negative value" claims due to the high costs associated with prosecuting price-fixing cases.  *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) ("A class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action."); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) (same).  *See also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. 323, 350 (S.D.N.Y. 2002) (the "most compelling rationale for finding superiority in a class action [is] the existence of a . . . . true negative value claim such as those seen in antitrust cases") (citations omitted).  Aside from the four individual action plaintiffs, each of which is a substantial corporation, no class member has filed a separate action.  Thus, if this action is not certified as a class action, many individual class members with potentially meritorious claims will have no reasonable chance for redress for their injuries.

**Rule 23(b)(3)(B)**.  Similarly, the "extent" of any other litigation is limited to the individual direct actions brought by four plaintiffs – all of whom are not only asserting the same

claim as the Class, but coordinating with the Class to ensure that defendants are held liable for their misconduct. *See Rosenfield v. Integrated Container Serv. Indus. Corp.*, 50 F.R.D. 237, 238 (S.D.N.Y. 1970) (pending class action asserting non-identical claims would not prevent certifying another class action).

**Rule 23(b)(3)(C).** Judicial economy strongly favors concentrating this litigation in this District where the Court is familiar with the issues. *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 106 (S.D.N.Y. 2007) (allowing action to proceed under Rule 23(b)(3) "will prevent the duplication of effort and the possibility of inconsistent results").

**Rule 23(b)(3)(D).** No significant management issues arise from the nature of Plaintiffs' claim. As explained above, the issue of liability will turn on whether defendants' entered into a conspiracy to inflate aluminum prices. Nor will the issues of causation and damages give rise to, or otherwise create, manageability concerns. *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001).[22]

## IV. CONCLUSION

The Court should (a) certify the proposed Class; (b) appoint Plaintiffs as class representatives; and (c) appoint Lovell Stewart Halebian Jacobson LLP, Nussbaum Law Group P.C. and Robbins Geller Rudman & Dowd LLP as class counsel.

DATED: March 25, 2016

Christopher Lovell
Christopher Lovell
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677

---

[22] Even if damages were an individualized issue, which they are not, the Court could bifurcate liability and damages and certify a Rule 23(b)(3) class on the issue of liability under the Sherman Act, pursuant to Rule 23(c)(4). Fed. R. Civ. R. 23(b)(4). *See Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146, 2016 WL 1092414 at *6, 12 (U.S. Mar. 22, 2016) (use of bifurcation valuable in considering class certification).

Email: clovell@lshjllp.com

*Interim Co-Lead Counsel for
Direct Purchaser Plaintiffs and
the Proposed Direct Purchaser
Class*

Linda P. Nussbaum
NUSSBAUM LAW GROUP
 P.C.
570 Lexington Ave., 19th Floor
New York, NY 10022
Tel: (212) 702-7053
Fax: (212) 681-0300
Email: lnussbaum@nussbaumpc.com

*Interim Co-Lead Counsel for
Direct Purchaser Plaintiffs and
the Proposed Direct Purchaser
Class*

Samuel H. Rudman
ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

*Interim Co-Lead Counsel for
Direct Purchaser Plaintiffs and
the Proposed Direct Purchaser
Class*

Patrick Coughlin
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Tel: (619) 231-1058
Fax: (619) 231-7423
Email: patc@rgrdlaw.com
*Interim Co-Lead Counsel for*
*Direct Purchaser Plaintiffs and*
*the Proposed Direct Purchaser*
*Class*