# NUSSBAUM LAW GROUP, P.C.

570 Lexington Avenue, 19th Floor
New York, New York 10022
Telephone:  (212) 702-7053 / Fax:  (212) 681-0300

Bradley J. Demuth
Direct Dial:  (212) 702-7055
Email: bdemuth@nussbaumpc.com

April 21, 2015

*Via ECF*
The Honorable Katherine B. Forrest, U.S.D.J.
United States District Court
  for the Southern District of New York
500 Pearl Street, Room 1950
New York, NY 10007-1312

      Re:    *In re Aluminum Warehousing Antitrust Litig.*, 13-md-2481 (KBF) (S.D.N.Y.)

Dear Judge Forrest:

      I write on behalf of both the Class and Individual Plaintiffs ("Plaintiffs"), pursuant to Rules 34, 37, and 45 of the Federal Rule of Civil Procedure and Rule 2(F) of Your Honor's Individual Rules of Practice in Civil Cases, to request that the Court accept this letter seeking initial and immediate relief related to Defendant Metro's and Metro's former agent Robert Burgess-Allen's ("RBA") July 2013 spoliation of evidence. Specifically, in connection with RBA's April 27-28 deposition next week, plaintiffs seek an order compelling RBA's immediate production of the limited number of documents that RBA did not already destroy (relating to financial and travel records and personal diary entries). Because the full extent of the spoliation issues are not yet known, Plaintiffs reserve their right to seek additional and/or other relief, including the use of adverse inferences and possible sanctions.

      **A.  <u>Nature of the Dispute.</u>**

      RBA is an important witness in this case. He is the architect of the "Smart Ass Plan" to manipulate the price of physical aluminum by manipulating the warehousing load-out queue length through, among other things, use of strategic warrant cancellations followed by the re-warranting of the same aluminum. While currently a non-party, as this Court has previously determined, RBA acted as Metro's agent during the relevant period.[1] And during the relevant period, plaintiffs have

---

[1] Metro's corporate designee recently testified that RBA was never directly employed by Metro and always worked for Metro as a consultant. Ex. 1, 13:6-9; 17:7-10. But this testimony is at odds with the December 2009 organizational chart Metro produced which identifies RBA as (i) "VP., Commodity Finance" and (ii) among the six first-line senior Metro executives reporting directly to Metro's CEO, Chris Wibbelman. Ex. 2. Apparently, Metro believes that if RBA was merely always an agent, Metro would have had no obligation to seek preservation of any RBA documents.

discovered that RBA used at least three different email addresses in connection with his work for Metro: rba@metroftz.com, rba@bap.uk.com, and rburgessallen@btinternet.com. It now appears that all three sets of files have been improperly destroyed.

In October 2015, this Court granted RBA and Burgess-Allen Partnership's ("BAP") motion to dismiss, but observed that it would be "surprising, in light of defendants' argument (and the Court's determination) that Burgess-Allen was acting as an agent of Metro, if Metro lacked all access to relevant material in Burgess-Allen's possession." Oct. 23, 2015 Opinion & Order (ECF 860) at 38 n.20. The parties thereafter agreed that: (i) discovery of RBA's Metro custodial files (*i.e.*, emails sent to/from rba@metroftz.com) could be had through Rule 34; and (ii) discovery of BAP's custodial files (*i.e.*, emails sent to/from rburgessallen@btinternet.com or rba@bap.uk.com) could be had through a Rule 45 nonparty subpoena. Ex. 3, 11/6/15 B. Demuth email to R. Pepperman. On November 20, 2015, Plaintiffs served RBA and BAP with Rule 45 subpoenas seeking production of *Aluminum* documents. Ex. 4.

Unrelated but also on November 20, 2015, Metro produced for the first time the December 2010 Metro "Services Agreement" (the "Agreement") (attached hereto as Ex. 5), which RBA had referenced in (but did not produce with) his July 2015 Declaration in support of the Motion to Dismiss (ECF 291).[2] Under the Agreement – intended to run from December 2010 through December 2013 – <u>Metro owned</u> and <u>RBA/BAP was obligated to return</u>, all documents and information RBA used and/or created in the course of the agency. Ex. 5, 4(d), 5(a), 5(c), and "Exhibit A." On January 20, 2016, counsel for RBA (who also represents Metro) revealed for the first time that no discovery of RBA/BAP documents would be provided because "some time" after the Services Agreement "ended" on June 30, 2013,[3] RBA deleted and otherwise destroyed all of his Metro files and no back-ups of any kind exist. Ex. 3, 1/20/16 B. Demuth email to S. Han. According to Metro – *ex post facto* and notwithstanding the Agreement's express terms to the contrary – RBA's destruction of his Metro files was permissible both under the terms of the

---

But the law holds otherwise. *E.g.*, *Alter v. Rocky Point School Dist.*, 2014 WL 4966119, *9-10 (E.D.N.Y. Sept. 30, 2014) (finding documents maintained by key independent contractor subject to defendants' preservation obligations); *Siani v. State University of New York at Farmingdale*, 2010 WL 3170664, at *7 (E.D.N.Y. Aug. 10, 2010) (finding documents maintained by "key player" nonparties subject to defendants' preservation obligations).

[2] While his Declaration suggests that RBA and BAP has no connection whatsoever to the U.S., the Agreement expressly states that: "all matters relating to or arising under this Agreement shall be governed in all respects by the laws of the State of New York" and required RBA to "irrevocably consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the Borough of Manhattan, New York City, State of New York for the purposes of adjudicating any matter arising from or in connection with this Agreement." Ex. 5 at 14(c).

[3] The Agreement provides for early termination upon ninety-day written termination notice. Ex. 5, 2(b). Metro testified that RBA provided such notice in March 2013, Ex. 1, 130:1-131:10, but has not been able to locate that notice, Ex. 1, 200:10-14; 221:3-222:15; 280:5-8, despite plaintiffs repeated requests for its prompt production. Ex. 6.

Agreement and because it predated the CFTC's July 2013 litigation hold letter by two weeks. Ex. 1, 40:10-41:11; 125:13-25; 126:20-127:9; 245:3-8. Metro has, to date, made no attempt to preserve and or collect any documents or anything else from RBA. Ex. 1, 40:10-41:11; 42:10-17; 56:11-18; 57:3-15; 83:16-23; 90;8-13; 98:4-21; 143:1-5; 147:5-148:15; 149:7-151:1; 173-11; 181:13-22; 182:14-24; 215:3-216:22; 218:17-21; 226:7-18.[4]

As to RBA's Metro custodial files, Metro was required to, among other things, produce documents from RBA, as a Metro custodian, outside the January 1, 2010 to August 8, 2013 time period covered by its CFTC production. Ex. 7, 10/22/15 S. Han email to W. Noss. Metro thus had an obligation to produce all of its RBA custodial files (*i.e.*, emails sent to/from RBA's rba@metroftz.com email address) from the time period August 1 through December 31, 2009 and after August 8, 2013. To date, Metro has failed to produce a single document from RBA's Metro custodial files.

Rather than squarely address this deficiency, defense counsel has repeatedly obfuscated. First, defense counsel represented that it had produced all of its RBA Metro custodial files. But after plaintiffs demonstrated the falsity of that representation, Ex. 9, defense counsel pivoted, instead representing that "not all emails that were sent to or from Mr. Burgess-Allen's @metroftz.com address list him as a custodian [because] of the way in which these documents were collected," Ex. 10, apparently arguing, mistakenly, that Metro's happenstance production of documents responsive to agreed-upon search terms from custodians other than RBA that also include RBA as a sender or recipient somehow relieved Metro's custodial production obligations. When further pressed, defense counsel again pivoted, instead representing that: "in 2007, Metro configured its Exchange server such that emails sent to or from Mr. Burgess-Allen's @metrofitz.com account were automatically forwarded to his personal email account, @bap.uk.com. Metro has not identified any evidence suggesting that it was in possession of these emails, *i.e.*, that those emails were captured on its system." Ex. 11. Metro, however, testified that those modifications were not made until 2010, when it shut down RBA's metrofitz.com email. Ex. 1, 112:10-24; 119:23-120:19; 182:25-184:7.[5] But when presented with an email that was sent to RBA's metroftz.com address in May 2011, Ex. 12 (in response to a forwarded email from RBA concerning a media inquiry about the "long waiting times for LME cancelled warrants in Metro's Detroit location" Goldman's Gabillon asks "Why is rob still using his metro email address?"), Metro's spam filter explanation strains credulity. Ex. 1, 249:3-251:11; 272:10-25; 276:5-13. In any event, Metro's auto-forwarding modification to the rba@metroftz.com address apparently

---

[4] Metro has, with respect to other former employee custodians, collected and produced documents from computers that had been overwritten when re-issued to other employees. Ex. 13 at 5 & n.2. To date, neither Metro nor Sullivan & Cromwell's IT staff has made any effort to obtain Burgess-Allen's computer or otherwise determine whether and to what extent RBA's deleted files are recoverable.

[5] Metro also repudiated defense counsel's prior representation that RBA's metroftz.com email was decommissioned in August 2013. Metro instead testified that the rba@metroftz.com email was decommissioned in 2010, and that in July 2013 Metro removed the only RBA email contact left in its system – references to his rba@bap.uk.com email. Ex. 1, 7:25-9:10; 132:6-13.

means that, as a practical matter, RBA's destruction of the BAP custodial files also included destruction of the RBA Metro custodial files.

### B. Meet and Confer Process.

The parties have met and conferred numerous times on the issues. Counsel has been slow and vague in responding to Plaintiffs' spoliation concerns. Moreover, defense counsel's representations on the issues have been demonstrably false or otherwise contradicted by sworn deposition testimony. Rather than clarify and collaborate to properly address and remediate the issues, defense counsel has steadfastly repeatedly defended the conduct as permissible destruction of evidence and has, accordingly, impeded Plaintiffs' discovery efforts on the issues.

### C. Metro and RBA Have Both Failed to Comply With Their Obligation to Preserve and Produce *Aluminum* Evidence.

The duty to preserve evidence arises when "the party has notice that the evidence is relevant to litigation [or] when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998). In *Kronisch*, the Second Circuit reversed the grant of summary judgment on the sole basis of an adverse inference arising from the CIA's destruction of records in 1973 concerning surreptitious LSD testing in the 1950s on unwitting subjects. Plaintiff, who alleged to have been one of those unwitting test subjects, sued after Senate hearings held in 1975 and subsequent Senate report in 1976 disclosed the existence of these secret CIA LSD tests. As established by *Kronisch*, preservation obligations are not process dependent; the adverse inference arising from spoliation was available notwithstanding that at the time of the destruction "no litigation, administrative action, or congressional investigation had commenced." *Id.* at 127.

Furthermore, a party's obligation to preserve evidence extends to evidence in the hands of former employees and independent contractors. *E.g.*, *Alter*, 2014 WL 4966119 at *9-10; *Siani*, 2010 WL 3170664 at *7. A "party's discovery obligations are not satisfied by relying on nonparties to preserve documents." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (approvingly cited by *Kronisch*, 150 F.3d at 126).

The present action was first filed on August 1, 2013. RBA apparently destroyed all Metro files sometime in the two weeks after his Services Agreement prematurely ended on June 30, 2013 but before the CFTC sent its litigation hold letter during the week of July 15, 2013. But Metro and RBA each knew that their *Aluminum* dealings were suspect and would be relevant to future litigation well before RBA destroyed the evidence in July 2013. Months before, in January 2013, the Senate served Goldman with a 20-Question investigation questionnaire which, as evidenced by the questions and further evidenced by Goldman's responses over the next several months, clearly implicated Metro's transactions, warehousing, and transportation of aluminum (which Burgess-Allen negotiated on Metro's behalf). Ex. 14, Questions 2, 11, 12, and 19; Ex. 15. Indeed, Metro's March 2013 Board meeting agenda identifies "request from Senate committee" as a topic. Ex. 16. And before that, in May 2011, RBA and Metro were both aware that the media was investigating the extended load-out queues at Metro caused by the warrant cancellations. Ex. 12.

This was precisely the "Smart Ass Plan" in action that RBA had written about in 2010. Ex. 17. Indeed, earlier discussions of the general concept in August 2009 lead to RBA's observation to Metro's CEO that "a good compliance team" would be required to "avoid the obvious conflicts of interest." Ex. 18. In sum, Metro and RBA both knew that the documents RBA generated in the course of his work for Metro would likely be subject to future litigation.[6] RBA's destruction of the evidence and Metro's complicity in that destruction (*i.e.*, its intentional failure to preserve) was improper. Under these circumstances, a *prima facie* case for spoliation is apparent. *See* Fed. R. Civ. P. 37(e).

### D. This Court Should Order RBA to Promptly Produce the Limited Number of Documents He Did Not Destroy.

Because RBA destroyed his Metro files, plaintiffs' ability to fully and fairly examine RBA on all the relevant issues has been severely prejudiced. In an effort to help mitigate some of that prejudice, Plaintiffs issued a second subpoena (attached hereto as Ex. 19) which requested, in pertinent part, production of RBA's (i) personal diaries, (ii) passports and other travel records, and (iii) bank statements, annual tax filings, Metro payment evidence, and other informative financial records. (RBA apparently also destroyed his phone records.) RBA refuses to produce these materials principally on the grounds that such documents are "personal and confidential to Burgess-Allen," Ex. 20, which, in light of the Court's protective orders already entered in this case, is a wholly improper basis to withhold production. The requested documents are relevant insofar as they may help plaintiffs piece facts together (including, for example, the extent to which RBA continued to receive monies and other forms of compensation from Metro and/or Goldman after June 2013) and, given the false impression left by his Declaration, otherwise bear on RBA's credibility as a witness. RBA, having destroyed the principal documentary evidence in which he was directly involved, should not now be permitted to avoid all document discovery, including production of the limited number of documents he has not destroyed.

Accordingly, Plaintiffs respectfully request the Court direct RBA to promptly produce the limited documents requested, and reserve for a later day (after the extent of the spoliation issues are fully discovered) the question of what further relief may be necessary.

Respectfully Submitted,

Bradley J. Demuth

---

[6] Indeed, if Metro's testimony is credited, RBA had for years operated as a Metro consultant using multiple emails but upon entering the December 2010 services agreement suddenly was to only use his offshore bap.uk.com email address. Ex. 1 176:17-178:6; 186:13-18; 195:18-198:18; 268:10-12. This new set-up was no doubt an effort, by design, calculated to maximize the opportunity to avoid discovery obligations in later U.S. litigation.