# NUSSBAUM LAW GROUP, P.C.

570 Lexington Avenue, 19th Floor
New York, New York 10022
Telephone: (212) 702-7053 / Fax: (212) 681-0300

Linda P. Nussbaum
Direct Dial: (212) 702-7054
Email: lnussbaum@nussbaumpc.com

April 28, 2016

***Via ECF***
The Honorable Katherine B. Forrest, U.S.D.J.
United States District Court
 for the Southern District of New York
500 Pearl Street, Room 1950
New York, NY 10007-1312

      Re:    *In re Aluminum Warehousing Antitrust Litig.*, 13-md-2481 (KBF) (S.D.N.Y.)

Dear Judge Forrest:

      I write in reply to the letter-brief ("Opposition") submitted on April 26 by Defendant Metro and its former agent and Vice President of Commodity Finance[1] Robert Burgess-Allen ("RBA") (together "Respondents") in opposition to Plaintiffs' motion.[2]

      Mr. Burgess-Allen, who reported directly to Metro's CEO, Chris Wibbelman, was a Metro agent from at least 2007 through June 2013 when his Services Agreement was prematurely terminated, just months after the commencement of the Senate Investigation into activities in which he played a crucial role.

      Metro made no efforts to archive Mr. Burgess-Allen's email, collect his phone and laptop for forensic testing when such collection was done in the Summer of 2013 or retrieve his Metro-related documents upon his termination, as required by the Services Agreement. Respondents do not deny that no effort was made to collect and examine (for file recoverability) RBA's computer on which RBA had stored the Metro files before he discarded it in November 2013. *See* RBA Declaration ¶ 16 & Ex. C. Respondents claim that RBA destroyed all of his Metro-related documents sometime before Metro's receipt of the CFTC litigation hold letter during the Summer of 2013. The practical result: all custodial RBA email files relating to this case, whether sent to/from rba@metroftz.com, rba@bap.uk.com, or rburgessallen@btinternet.com, no longer exist.

      Incredibly, this was <u>not</u> the first time Respondents had destroyed RBA's records with respect to his work at Metro. The first destruction occurred in December 2010 when Metro

---

[1] *See* Ex. 2 to Demuth letter dated April 21, 2016.
[2] While personal diaries were also requested and subject to the motion, Respondents now state for the first time in the Opposition that no such personal diaries exist. Opposition at 9.

decommissioned RBA's Metro email, instructed him to use his private email thereafter and entered into the Services Agreement, an exclusive agreement pursuant to which RBA was paid $240,000 a year plus "performance" bonuses to identify business opportunities.[3] This "decommissioning" took place just months after RBA, then Metro's Vice President of Commodity Finance, emailed Metro's CEO Chris Wibbelman with the "Smart Ass Plan" laying out the strategy for the merry-go-round deals to extend the Detroit queue and inflate the Midwest Premium.[4] The practical effect of the decommissioning and having him use his personal email going forward was that his emails were purged from Metro's system.[5]

Respondents cannot deny that evidence in this case was destroyed, although the story of their failure to preserve and collect has been a shifting one. Respondents go to great lengths seeking to justify the destruction by asserting their legal conclusion that they were under no duty to preserve the destroyed documents because the CFTC litigation hold letter did not arrive until July 15, 2013, approximately two weeks after RBA prematurely ended the Services Agreement. This claim is belied by the March 2013 Metro Board Script in which it is noted that the Board needed to take action with respect to the requests from the Senate Committee.[6]

Dennis McConnell, Metro's 30(b)(6) witness, testified on April 13, 2016 that when a Metro contractor or employee is terminated, their email box is archived for long term storage. In the case of RBA, who had a Metro email box from at least 2007 through the end of 2010, and had a "contact" in the Metro system and was included in various Metro distribution lists through July 2013 – that was not done. Instead Respondents removed RBA from their contacts and distribution lists in July 2013 and made no effort to preserve or archive any of his email. McConnell Tr. at 12.

Mr. McConnell also testified that starting in November 2011, at the request of Goldman Sachs, a journaling process was put into place whereby any email that Metro sent or received was also sent to Goldman Sachs. Nevertheless, Metro made no effort to retrieve any of RBA's emails from Goldman Sachs. McConnell Tr. at 31, 37. The witness admitted that it is possible that there are emails that RBA either authored or was a recipient of that got swept up in the journaling process but were not produced. *Id.* at 39. In addition, Metro made no effort to collect RBA's laptop, computer, cell phone or any other devices for forensic testing (*id.* at 46-47) despite the fact that in August 2013 a forensic consultant collected such devices from other Metro employees and agents (*id.* at 45-49, 64-69, 97). In fact, Mr. McConnell testified that there were no communications with RBA relating to the Senate or CFTC investigation, or asking that he preserve documents, because he was a "consultant." *Id.* at 164-167.

Although Metro was aware as early as January 11, 2013 of the broad questionnaire that was issued to Goldman Sachs by the Senate,[7] it did nothing special to preserve documents, and

---

[3] *See* Ex. 5 to Demuth letter dated April 21, 2016.
[4] The email entitled "RBA's Smart Ass Plan 1" from RBA to Chris Wibbelman dated August 4, 2010 is attached hereto as Ex. 30.
[5] *See* McConnell Tr. at 124-128 attached hereto as Ex. 21.
[6] *See* Ex. 16 to Demuth letter dated April 21, 2016 at GS-METRO-00008431 ("Data request from the Senate Committee").
[7] *See* Ex. 14 to Demuth letter dated April 21, 2016.

sent no notification to employees not to delete texts or emails until it received the CFTC subpoena in late July 2013. McConnell Tr. at 68-70, 79.

## I. The Requested Financial and Travel-Related Documents Are Relevant.

Respondents state that "[n]owhere does [plaintiffs'] letter adequately explain how the documents [subject to the motion to compel] ... are relevant to this litigation." Opposition at 1. As plaintiffs' stated in their April 21 letter the "requested documents [are necessary because RBA destroyed the primary evidence and] are relevant insofar as they may help plaintiffs piece facts together (including, for example, the extent to which RBA received monies and other forms of compensation from Metro and/or Goldman after June 2013) and, given the false impression left by his Declaration, otherwise bear on RBA's credibility as a witness." RBA's basis for refusing to produce these documents – that they are "personal and confidential to Burgess-Allen" – is not a valid basis for withholding their production, particularly where the court, as in this case, has already entered protective orders providing for varying levels of confidential treatment of even the most sensitive personal information. In addition, the questions concerning RBA financial compensation and payments received from Metro multiplied when Mr. McConnell, the 30(b)(6) witness, revealed for the first time that RBA received ▉▉▉▉▉▉▉▉▉ in discretionary bonuses each year in 2010, 2011 and 2012, in addition to invoicing for a ▉▉▉ per month fee. McConnell Tr. at 171. No documents were produced supporting or evidencing such bonus payments and Mr. McConnell's only information with respect thereto was a compilation showed to him by counsel in preparation for his deposition and requested by plaintiffs, but never produced. *Id.* at 171-172.

Plaintiffs are entitled to test, through contemporaneous documentary evidence, the assertions made by Respondents that no payments of any kind were made by Metro or Goldman to RBA after the early June 2013 termination of the Services Agreement. No documents have been produced evidencing the more than ▉▉▉▉▉ in "discretionary" bonuses paid to RBA, and even the 30(b)(6) witness knew and saw nothing evidencing such payments other than a compilation he was shown by counsel shortly before the deposition. *Id.* at 170-172. RBA's previously filed Declaration (ECF 291), submitted in July 2015 in support of his motion to dismiss, was less than candid. In that Declaration, RBA made various representations giving the impression that he had no connection whatsoever to the United States, much less to the jurisdiction of the Southern District of New York. RBA also referenced and described but did not produce his December 2010 Metro Services Agreement (Respondents did not produce a copy of that Services Agreement to Plaintiffs until November 20, 2015 *after* the Court granted RBA's motion to dismiss in October). The Service Agreement expressly states that: "all matters relating to or arising under this Agreement shall be governed in all respects by the laws of the State of New York" and required RBA to "irrevocably consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the Borough of Manhattan, New York City, State of New York for the purposes of adjudicating any matter arising from or in connection with this Agreement."[8] Thus, the very contract which he cited but did not provide to the Court considering his motion to dismiss *expressly required* RBA (and his company, Burgess-Allen Partnership Ltd.) to submit to the jurisdiction of the Southern District of New York. This is precisely the kind of

---

[8] Ex. 5 to Demuth letter dated April 21, 2016 at 14(c).

artful dodging that has continuously occurred with respect to RBA in this case. He should be ordered to immediately produce the requested financial and travel-related documents.

## II. Respondents' Duty to Preserve Was Triggered Well-Before RBA Destroyed the Metro Files and His Computer.

The duty to preserve is not process-dependent. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Even before the Senate started its investigation in January 2013, Respondents were themselves aware that their queue manipulation scheme would be subject to scrutiny and likely litigation – certainly by the time RBA sent his "Smart Ass Plan" in August of 2010 to Mr. Wibbelman, and many months before his Metro email account was "decommissioned" and purged in December of 2010. Respondents were on notice that their conduct was having unprecedented disruptive effects in the marketplace (as intended) such that they "should have known that the [documents they had generated and were generating] may be relevant to future litigation." *Id.* Respondents ignore this pre-2013 notice evidence.[9]

Instead, and contrary to *Kronisch* where the wrongful destruction of evidence occurred before any "litigation, administrative action, or congressional investigation had commenced," *id.* at 127, Respondents apparently argue (mistakenly) that only the Senate's investigation could have served as the requisite trigger and that it was too generalized an inquiry to put Respondents on notice. Opposition at 5 n.2. In November 2014, in opposing Plaintiffs' proposed amended pleadings in light of the November 2014 publication of the Senate investigation's report, Defendants argued that Plaintiffs' request should be denied because the Senate's investigation "cover[ed] no new ground on these issues and ha[d] no effect at all on . . . Plaintiffs' antitrust theories." ECF 642. Respondents do not deny that Metro knew as early as January 2013 that it was subject to the Senate's investigation. Ex. 16. Goldman responded to the Senate investigation's questionnaire with numerous letters sent to the Senate over the course of 2013, and first identified Metro in those responses in April 2013. Ex. 22. That questionnaire specifically dealt with the subject matter covered by the RBA Services Agreement. In fact, long before the Senate knew that RBA was the "genius" behind the "Smart Ass Plan," Mr. Wibbelman, CEO of Metro, and recipient of RBA's email knew it.[10]

Even if this Court were to determine that the Senate investigation, media reports and inquiries, and Respondents' contemporaneous consciousness of the market disruption their scheme would cause (not to mention regulatory preservation obligations in the ordinary course) were insufficient triggers to the duty to preserve, the fact remains that RBA discarded his computer in or after November 2013[11] – months after Metro concedes it was on notice, and months after Metro senior management had their laptops, cell phones, Ipads, etc. taken for forensic testing (McConnell

---

[9] RBA conceded during his testimony on April 27, 2016 that to the extent the media published complaints concerning the lengthening queues and possible investigations and/or litigation in 2011 and 2012, he would have been aware of those publications. RBA Tr. at 159:13-17 attached hereto as Ex. 23.

[10] The email entitled "RBA's Smart Ass Plan 1" from RBA to Chris Wibbelman dated August 4, 2010 is attached hereto as Ex. 30.

[11] See Burgess-Allen Declaration at ¶16.

Tr. at 43-47), Metro made no effort to prevent that destruction, which occurred well after the July CFTC litigation hold notice and the August 1, 2013 filing of this action.

### III. Respondents' Destruction of Evidence Prejudices Plaintiffs.

Spoliation, by nature, is inherently prejudicial. Certainly, production of missing evidence from other sources may help to mitigate, but never fully eliminates, that prejudice. Respondents argue that no prejudice occurred because Goldman and Metro produced 15,000 documents involving RBA communications from custodians other than RBA (after contending for several weeks that all RBA custodial documents had been produced when none, in fact, existed). But this number is not particularly illuminating because, as a result of the destruction, no one knows the denominator of missing documents. Moreover, much of the misconduct occurred before November 2011, the date when Metro was added to Goldman's "journaling" retention system. For that pre-November 2011 period, Metro has produced less than 4,000 emails involving RBA communications. Assuming RBA sent and/or received only 25 emails 300 days out of the year (which given current email traffic trends, is a very conservative assumption), that would mean that Metro's production of RBA documents from other sources during the November 2009-2011 time period maybe covered 25% [4000/(25x600)] of the emails that would otherwise have been produced from RBA's custodial files.[12]

Respondents also argue, without citation to any authority, that spoliation remedies are inappropriate because Plaintiffs *may* obtain the missing documents from third-parties. Opposition at 2. But that argument is contrary to law. *E.g.*, *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (finding actionable spoliation where employee destroyed in December 1989 maintenance records for a bus that was sold with another copy of said maintenance records to a nonparty in 1987 after having been in the at-issue accident in 1986 and holding a "party's discovery obligations are not satisfied by relying on nonparties to preserve documents.").

### IV. The Evidence So Far Discovered Supports An Inference of Respondents' Intent to Deprive.

Respondents argue that a spoliation finding is inappropriate because there is "no evidence" demonstrating an intent to deprive Plaintiffs of the destroyed evidence's use in the litigation. Opposition at. 7 n.6. We disagree.

At the time of the execution of the 2010 Services Agreement, RBA's Metro email box was decommissioned and his email was purged. He was instructed to use his offshore bap.uk.com email address, the effect of which would make discovery of his communications in U.S. litigation more difficult. In addition, the Services Agreement made expressly clear that Metro owned and

---

[12] Respondents also argue (and RBA declares), that RBA's "general practice" was to always copy Metro employees on his Metro-related correspondence. But this general practice was not followed. Through the prism of what RBA forwarded to other custodians, RBA clearly engaged in significant correspondence with third-parties on which no Metro personnel was copied. *E.g.*, Ex. 24 GS-METRO-00038093; Ex. 25 GS-METRO-00047454; Ex. 26 00004256; Ex. 27 GS-METRO-0030299; Ex. 28 GS-METRO-00036482; Ex. 29 GS-METRO-00022067.

RBA was obligated to return, all documents and information RBA used and/or created in the course of his work under that Agreement. Nevertheless, Metro <u>never</u> requested that the material be returned. RBA, without any communication to Metro, simply took it upon himself to destroy his Metro files.[13] Metro's 30(b)(6) witness testified that Metro (i) never requested return of its files, (ii) never told RBA that he could destroy his files, (iii) never confirmed that RBA had destroyed the files rather than return them, and (iv) never requested examination of RBA's computer or phone. These facts supporting an inference of an intentional blind-eye are only further supported by the fact that Metro never took any action to preserve RBA's documents and materials at any time, and in fact, in its 2010 decommissioning purged many of his files just months after his devising the "Smart Ass Plan." The timing of the second destruction, after the commencement of the Senate Investigation and just days before the CFTC's July 2013 letter, is also suspect.

\* \* \*

In sum, the facts so far discovered demonstrate a *prima facie* case for spoliation.

Respectfully Submitted,

Linda P. Nussbaum

---

[13] According to his testimony of April 27, 2016, though RBA could not remember exactly when he destroyed his computer, he testified in detail how he erased all files from the computer, including his personal files, then removed the hard-drive and reduced the computer into its component parts, destroyed the frame of the computer and the hard drive, and then dropped the pieces in a computer recycling center because he "could not take a risk" that any of the information could be later retrieved. RBA Tr. at 113-117. RBA also destroyed his phones on which he received/sent emails. *Id.* at 118-124.