# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

April 26, 2016

**FILED UNDER SEAL**

<u>Via Email and Hand Delivery</u>

The Honorable Katherine B. Forrest,
   United States District Court,
      Southern District of New York,
         500 Pearl Street,
           New York, New York 10007-1312.

      Re:   *In re Aluminum Warehousing Antitrust Litig.*,
            13-md-2481(KBF)

Dear Judge Forrest:

      I write on behalf of defendant Metro International Trade Services LLC ("Metro") and non-party Robert Burgess-Allen in response to Bradley J. Demuth's April 21, 2016 letter. Although styled as a motion to compel, plaintiffs' letter is devoted almost entirely to leveling a baseless spoliation claim regarding the documents of Metro's former agent, Mr. Burgess-Allen. Nowhere does the letter adequately explain how the documents plaintiffs seek through the motion (Mr. Burgess-Allen's "(i) personal diaries, (ii) passports and other travel records, and (iii) bank statements, annual tax filings, Metro payment evidence, and other informative financial records") are relevant to this litigation. Plaintiffs' unfounded spoliation claim does not relieve them of their burden to demonstrate the relevance of the requested documents. Because plaintiffs have not satisfied that burden, their request should be denied.

      In light of the numerous inaccuracies in plaintiffs' letter—including the false accusation that "defense counsel has repeatedly obfuscated" during the discovery process—we set forth below the correct facts before addressing the specific document requests that are the subject of plaintiffs' motion to compel.

**FILED UNDER SEAL**

-2-

### A. Metro's Substantial Production of Information Relating to Mr. Burgess-Allen

Metro has already produced to plaintiffs more than 15,000[1] electronic documents involving communications with Mr. Burgess-Allen. Plaintiffs also have requested from Metro's co-defendants and certain third parties all correspondence with Mr. Burgess-Allen. In response to plaintiffs' claim that they need additional time to question him about their spoliation concerns, Mr. Burgess-Allen has agreed to sit for two full days of deposition on April 27 and 28, even though he is no longer a party to these actions. In addition, Metro has produced a Rule 30(b)(6) witness, Dennis McConnell, for a full day of testimony on various topics relating to Metro's document preservation, Mr. Burgess-Allen's emails and his compensation from Metro (as well as copies of Mr. Burgess-Allen's invoices to Metro).

Notwithstanding the substantial information plaintiffs already have received, or will receive at Mr. Burgess-Allen's deposition, they take issue that none of the thousands of emails involving Mr. Burgess-Allen that have been produced so far is "custodial" to Burgess-Allen—*i.e.*, the emails were not retrieved directly from his home computer or his Metro email account, but rather were collected from the email files of the various Metro employees who were also copied on these communications. In his role as Metro's agent, Mr. Burgess-Allen's general practice was to copy Metro employees on his Metro-related correspondence because he had no authority on his own to enter into any transactions on Metro's behalf. (Declaration of Robert Burgess-Allen, dated April 26, 2016 ("RBA Decl.") ¶ 12).[2] Plaintiffs have offered no reason—other than speculation that Mr. Burgess-Allen *might* have emailed alleged co-conspirators at their personal email addresses without copying Metro employees—to believe that Mr. Burgess-Allen had anything relevant on his personal computer that Metro or others have not already produced. To the extent that Mr. Burgess-Allen *might* have engaged in such communications, plaintiffs can seek relevant documents from these alleged co-conspirators.

### B. Mr. Burgess-Allen's Email Accounts

Mr. Burgess-Allen lives in the United Kingdom and resided there for the duration of his consultancy work for Metro. (*Id.* ¶¶ 1-2) He has never been a Metro employee.

---

[1] This number reflects a post-deduplication count.

[2] *See In re Celestica Inc. Sec. Litig.*, 2014 WL 1301881, at *2-3 (S.D.N.Y. Mar. 31, 2014) (denying spoliation sanctions requested by plaintiffs for deletion of emails from personal computer of defendant's Chairman because emails had addressors and addressees that would have made communications "available on servers other than [Chairman's] personal computer.").

**FILED UNDER SEAL**

-3-

(*Id.* ¶ 3) Mr. Burgess-Allen previously worked as an independent contractor for Metro and submitted invoices for this work. (*Id.* ¶¶ 5,7) As a consultant prior to Goldman Sachs' acquisition of Metro, Mr. Burgess-Allen was provided a Metro email address (@metroftz.com email) and a corresponding Microsoft Exchange mailbox. (Ex. 1, Rough Transcript of Dennis McConnell Deposition ("McConnell Tr.") 9:3-9:6)

After Goldman Sachs acquired Metro in February 2010, Metro entered into a formal services agreement with Mr. Burgess-Allen (the "Agreement"). Although negotiations commenced in late 2009, the Agreement was not executed until December 2010. As part of those negotiations, Mr. Burgess-Allen was advised that he could not use a Metro email account in connection with his work on behalf of Metro. (RBA Decl. ¶ 6)

In late 2010, Curt Felch, who oversaw Metro's information technology, disabled Mr. Burgess-Allen's Metro email account. (Ex. 1, McConnell Tr. at 110:5-111:1; Declaration of Dennis McConnell ("McConnell Decl.") ¶ 5) At that time, Metro was a small company and had no formal document preservation policy, (Ex. 1, McConnell Tr. at 122:9-19, 124:24-125:1), and there was no legal obligation to preserve documents at that time. No one backed up any emails then residing in Mr. Burgess-Allen's Metro email account. (*Id.* at 121:25-122:19) Once a Microsoft Exchange user account is disabled, Microsoft Exchange is configured to delete all emails in that account after 14 days, and it thus appears that all emails in Mr. Burgess-Allen's Metro email account (*i.e.*, Mr. Burgess-Allen's "custodial emails") were deleted in the normal course in 2010. (*Id.* at 111:6-145, 112:10-24) Accordingly, by the end of 2010, Metro did not possess any of Mr. Burgess-Allen's emails.

Although Mr. Burgess-Allen no longer had a Metro email account, Metro created an email "contact" that forwarded any email sent to his now-defunct Metro account to Mr. Burgess-Allen's personal email address, which at this time was rba@bap.uk.com. (*Id.* at 249:20-50:13; McConnell Decl. ¶ 5) This "contact" was put in place to ensure that anyone who had previously contacted Mr. Burgess-Allen at his Metro email address would not simply receive a bounce-back email, a process comparable to when someone moves to a new home and instructs the U.S. Post Office to forward mail sent to the old address to the new address. As a result of this "contact," individuals were still able to "send" emails to "rba@metroftz.com," even though that address was no longer associated with an inbox on Metro's Exchange server. Based on contemporaneous email correspondence, it appears that this "contact" was meant to be temporary (*see* Ex. A to McConnell Decl.), but it apparently remained activated for a few years. This explains

**FILED UNDER SEAL**

-4-

why there continued to be emails that appear to go to Mr. Burgess-Allen's Metro email address after December 2010.[3]

In early 2012, Metro's email system was added to Goldman Sachs' journaling system, which thereafter captured a copy of every email sent to or received by Metro's system. (Ex. 1, McConnell Tr. at 25:23-26:16) By this time, Mr. Burgess-Allen's email account at Metro no longer existed. Because emails sent to Mr. Burgess-Allen's Metro email address never landed in Metro's system but instead were automatically forwarded to his personal account, these emails were not captured by Goldman Sachs' journaling system. (McConnell Decl. ¶ 7) But the emails would continue to exist in the email accounts of any other Metro employee copied on the correspondence.

In mid-2012, Metro hired Dennis McConnell, an experienced IT professional, who began instituting measures for Metro to capture and preserve all Metro electronic documents. (Ex. 1, McConnell Tr. at 25:23-26:16) When Metro changed vendors for blocking spam in October 2012, Mr. McConnell provided all Metro email addresses to the new vendor in order to ensure that email would continue to reach those Metro addresses. (*Id.* at 250:14-24) Because it was not an existing email account at that time, Mr. McConnell did not provide Mr. Burgess-Allen's Metro email address to the new vendor and, as a result, no one was able to send email to Mr. Burgess-Allen's Metro email address as of sometime in October 2012. (McConnell Decl. ¶ 6) The "contact" was effectively disabled at that time. (*Id.*)

### C.  Mr. Burgess-Allen's Termination of the Agreement

Mr. Burgess-Allen provided written notice terminating his Agreement on March 20, 2013 (RBA Decl. ¶ 8), and negotiated an effective termination date of June 30, 2013. (*Id.* ¶ 9) Contemporaneous documentation that has already been produced to plaintiffs refers to this notice, including the minutes of Metro's March 2013 Board meeting. (Ex. 2 at 5; McConnell Tr. at 263:8-25) After the termination of the Agreement, Mr. Felch asked Mr. McConnell on July 1, 2013 to remove Mr. Burgess-Allen from any distribution groups and to delete any forwarding rule that might have remained in place, which Mr. McConnell did that day. (Ex. 1, McConnell Tr. at 10:11-21; Ex. 3)

To ensure that Mr. Burgess-Allen did not retain any confidential Metro information after their consulting arrangement ended, the Agreement contained a

---

[3] Ex. 12 to plaintiffs' letter is an example of this occurrence. An individual at FastMarkets sent an email to Mr. Burgess-Allen's Metro email address. It was then forwarded to Mr. Burgess-Allen's personal email account at rba@bap.uk.com, and Mr. Burgess-Allen's response came from this personal account. In this email, Jacques Gabillon, Metro's Board Chairman, apparently was unaware that Mr. Burgess-Allen was still able to receive emails via his Metro email address.

FILED UNDER SEAL

-5-

provision that required Mr. Burgess-Allen to return to Metro any confidential information (including electronic documents) after the Agreement was terminated. Metro understood that this provision was designed to ensure that Mr. Burgess-Allen would not disseminate any confidential Metro information in his possession after his Agreement expired. (Ex. 1, McConnell Tr. at 125:13-25) Although Metro did not ask Mr. Burgess-Allen to return all copies of his Metro-related emails upon the termination of the Agreement, Metro assumed that Mr. Burgess-Allen would comply with his obligation not to disseminate any of Metro's confidential information. (*Id.* at 125:13-126:5) For his part, Mr. Burgess-Allen understood that this provision of the Agreement meant that he was not permitted to possess any Metro confidential information after the termination of the Agreement, and that he could satisfy this provision by deleting all of his Metro-related emails. (RBA Decl. ¶ 14)

To achieve this result, at some point after the termination of the Agreement, Mr. Burgess-Allen deleted <u>all</u> of his emails from his rba@bap.uk.com account then stored on his personal computer—not just those that were forwarded from his Metro email account or those relating to Metro's business. (*Id.* ¶ 15) Mr. Burgess-Allen does not recall exactly when he deleted these emails, except that it was after the termination of the Agreement with Metro. (*Id.*) In November 2013, Mr. Burgess-Allen purchased a new laptop computer, and thereafter disposed of the computer he had used for his work for Metro. (*Id.* ¶ 16) He does not possess any backups of the emails he had used during his work for Metro. (*Id.* ¶ 17)

### D. Metro's Document Retention Notice

On July 18, 2013, Metro received a document preservation notice from the CFTC concerning load outs and incentives. (Ex. 4) In response, Metro's CEO Chris Wibbelman sent a preservation notice to all senior officers at Metro. (Ex. 5) The following day, Mr. Felch responded with a detailed synopsis of Metro's electronic document retention procedures, noting that "all requirements to retain important documents have been in place for some time." (Ex. 6) On July 19, Metro's COO, Leo Prichard, whose department dealt with hardcopy records, sent a notice to all employees reporting to him who were likely custodians of hardcopy documents. (Ex. 7)[4]

---

[4] Plaintiffs' argument that the Senate questionnaire sent to Goldman Sachs on January 11, 2013 triggered a preservation obligation for Metro has no merit. The duty to preserve documents arises "when the party has notice that the evidence is relevant to litigation . . . for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch* v. *United States*, 150 F.3d 112, 126 (2d Cir. 1998). A general concern over litigation does not trigger a duty to preserve evidence. *Realnetworks, Inc.* v. *DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526 (N.D. Cal. 2009). The questionnaire was part of the Senate's review of U.S. banks' involvement in physical commodities and broadly requested information relating to Goldman

FILED UNDER SEAL

-6-

It appears that nobody at Metro discussed sending Mr. Burgess-Allen a document retention notice at that time. Because Mr. Burgess-Allen's Agreement had already expired and his access to confidential Metro information had been eliminated, Metro did not believe that Mr. Burgess-Allen possessed any confidential information. (*Id.* at 42:21-25, 125:13-126:5) Although later retention notices were sent to broader distribution groups, Mr. Burgess-Allen was not identified as an individual who possessed potentially relevant documents not otherwise retained at Metro, and thus he was not a recipient of those later notices. Mr. Burgess-Allen was not identified by Metro's counsel as an individual with potentially relevant emails until emails involving him were reviewed in December 2013.

### E.   Metro's Good-Faith Efforts to Respond to Plaintiffs' Inquiries Relating to Mr. Burgess-Allen's "Custodial" Emails

In September 2013, a computer forensic firm, T&M, went onsite to Metro's office in Detroit and copied all of Metro's electronic databases (including the Exchange server and any backups), as well as all Metro-issued laptops, cellphones and iPads from senior employees. (*Id.* at 39:5-15, 78:16-79:2) The laptops of two recently departed employees, Mark Askew and Michael Whelan, had been recycled and provided to new employees. Those laptops nevertheless were copied by T&M, which attempted to recover any files associated with Messrs. Askew and Whelan, but none were found. (McConnell Decl. ¶ 2) T&M used standard electronic processes to deduce and assign custodian values to the electronic documents it collected. T&M identified about 16,000 emails whose metadata indicated that they were associated with Mr. Burgess-Allen. T&M therefore assigned a custodian value of "Robert Burgess-Allen" to those documents.[5]

Based on the incorrect belief that Metro was in possession of Mr. Burgess-Allen's custodial emails, Metro's counsel agreed to include him as an email custodian in Metro's production. Under this agreement, emails believed to be Mr. Burgess-Allen's were reviewed, and about 2,500 of them were produced to plaintiffs in 2015 and 2016. In

---

Sachs' involvement in 27 different types of commodities. The questionnaire sought general data related to inventory positions, storage, transportation and trading in each of the commodities. Such a far-ranging and generalized inquiry of which Metro was only an incidental part did not put Metro on notice of any potential litigation at that time. In fact, it was not until September 2013 — after the first complaint was filed — that detailed information relating to Metro was provided to the Senate subcommittee.

[5] Plaintiffs are well aware of the potential for errors in the custodian field—which is only populated by electronic discovery vendors during litigation—given that they themselves recently misidentified the custodian of more than a thousand electronic documents produced by plaintiff Agfa Graphics.

FILED UNDER SEAL

-7-

January 2016, Mr. Demuth informed Metro's counsel that, although many emails that included Mr. Burgess-Allen had been produced, none of those emails identified him as the "custodian." After researching this issue, Metro's counsel determined that a separate e-discovery vendor, FTI, had not populated the custodian value of those emails. In the process of correcting this deficiency, and in response to continued questions from plaintiffs, Metro's counsel undertook a further investigation of the Burgess-Allen "custodial" documents. As a result of this investigation, both Metro and its counsel learned for the first time in March 2016 that the documents identified by T&M as being from Mr. Burgess-Allen's account were not in fact from his account, but rather came from a saved Outlook file containing the results of an earlier search that had been run across all of Metro's emails for documents containing Mr. Burgess-Allen's email addresses. (McConnell Tr. at 52:18-22; McConnell Decl. ¶ 4)

In initially responding to plaintiffs' questions, Mr. Felch believed that a "transport rule" forwarding emails from Mr. Burgess-Allen's Metro email address to his personal account at rba@bap.uk.com had been instituted in 2007. (*Id.* ¶ 3 ) It was only during the preparation for Mr. McConnell's Rule 30(b)(6) deposition and after further research that Metro's counsel learned that the forwarding had been set up through creation of a contact and that it had been instituted in 2010. (*Id.* ¶ 5) Mr. McConnell affirmatively corrected the date of the implementation of this rule during his deposition. (McConnell Tr. at 183:22-184:19)

In sum, contrary to plaintiffs' claim of deliberate obfuscation, due to the passage of time and the lack of centralized written records, it has been a challenging process to reconstruct the history of Mr. Burgess-Allen's Metro email account. But Metro's counsel has attempted to respond to all of plaintiffs' questions fully and accurately.[6]

---

[6] To the extent that plaintiffs later seek sanctions for spoliation, there is no evidence (much less the requisite "clear and convincing" evidence) demonstrating that Metro intended to "deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *see McIntosh* v. *United States*, 2016 WL 1274585, at *31 (S.D.N.Y. Mar. 31, 2016); *CAT3, LLC* v. *Black Lineage, Inc.*, 2016 WL 154116, at *8 (S.D.N.Y. Jan. 12, 2016). First, Metro has produced a significant number of emails involving Mr. Burgess-Allen. *Cf. Thurmond* v. *Bowman*, 2016 WL 1295957, at *9 (W.D.N.Y. Mar. 31, 2016) ("I can fathom no reason why Thurmond would intentionally delete those three [online] posts while retaining and producing other similar posts. Thus, the record supports a finding that the posts were, at worst, negligently deleted."). Second, Mr. Burgess-Allen's deletion of all his emails at the time was consistent with his efforts to comply with the Agreement. *See Living Color Enterprises, Inc.* v. *New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016) (finding "nothing nefarious" regarding deletion of text messages because "it is common practice amongst many cell phone users to delete text messages as they are received or soon thereafter"). Finally, plaintiffs cannot show the requisite prejudice. "[N]o matter how inadequate a party's efforts at preservation may be . . . sanctions are not warranted unless there is proof that some information of significance has

**FILED UNDER SEAL**

-8-

### F. Plaintiffs' Motion to Compel

Through the instant motion, plaintiffs seek to compel production of the following three categories of documents for a more-than-six-year time period: "(i) personal diaries, (ii) passports and other travel records, and (iii) bank statements, annual tax filings, Metro payment evidence, and other informative financial records." (April 21 Letter at 5) These three categories of documents correspond to the following requests in plaintiffs' subpoena:

- "[a]ll personal diaries maintained by Burgess-Allen" (Request No. 7);

- "[a]ll documents reflecting any monies (and any other form of compensation) received from Metro (whether directly or indirectly), including all account statements, deposit records, wire transfer records, and/or pay receipts" (Request No. 8);

- "[a]ll personal bank account statements for each account in which Burgess-Allen holds [or held] an interest" (Request No. 9);

- "[a] copy of all annual tax returns filed by Burgess-Allen, including all annual tax returns filed (i) individually, (ii) with his business partner-spouse, and/or (iii) on behalf of [his company]" (Request No. 10);

- "[a] copy of all documents relating to any real property transaction(s) . . . in which Burgess-Allen holds [or held] an interest" (Request No. 11);

- "[d]ocuments sufficient to show all capital improvements over $US 10,000 made to any real property in which Burgess-Allen holds [or held] an interest" (Request No. 12); and

---

actually been lost." *Orbit One Commc'ns, Inc.* v. *Numerex Corp.*, 271 F.R.D. 429, 431 (S.D.N.Y. 2010). Plaintiffs have already received from Metro and others a significant number of emails involving Mr. Burgess-Allen. *See Celestica*, 2014 WL 1301881, at *2-3 (denying request for mandatory adverse inference for deletion of emails from personal computer of defendant's Chairman because emails had addressors and addressees that would have made communications "available on servers other than [Chairman's] personal computer"); *In re Pfizer Sec. Litig.*, 288 F.R.D. 297, 321 (S.D.N.Y. 2013) (plaintiffs were not prejudiced because documents that were missing from data "eRooms" could have been obtained in other custodial files).

**FILED UNDER SEAL**

-9-

- "Burgess-Allen's current passport and all expired passports" (Request No. 13) and "Burgess-Allen's travel records" (Request No. 14).[7]

In support of these requests, plaintiffs dedicate a single sentence of their five-page letter to attempting to explain the purported relevance of the requested documents. According to plaintiffs, "[t]he requested documents are relevant insofar as they may help plaintiffs piece facts together (including, for example, the extent to which RBA continued to receive monies and other forms of compensation from Metro and/or Goldman Sachs after June 2013) and given the false impression left by his Declaration, otherwise bear on RBA's credibility as a witness." (*Id.* at 5) That one-sentence explanation is an insufficient basis to compel the production of such highly personal documents from a non-party.

To start, plaintiffs ignore that Metro's 30(b)(6) designee, Mr. McConnell, already has testified that Metro did not make any payments to Mr. Burgess-Allen after the expiration of the Agreement in June 2013. (Ex. 1, McConnell Tr. at 77:13-16) Plaintiffs have identified no basis to question that testimony. Nor have they pointed to any facts suggesting that Goldman Sachs ever made any payments to Mr. Burgess-Allen. Plaintiffs also have not explained why the requested documents relating to real property transactions and capital improvements supposedly will can help them "piece facts together" relating to the period after the Agreement was terminated. And plaintiffs do not even come close to satisfying the showing of "compelling need" required for the production of tax returns, particularly from a non-party. *Sadofsky* v. *Fiesta Prods., LLC*, 252 F.R.D. 143, 149 (E.D.N.Y. 2008). By seeking such highly sensitive personal information, plaintiffs appear to be engaged in a fishing expedition designed to harass Mr. Burgess-Allen, a non-party who already has agreed to sit for two days of deposition testimony.

Plaintiffs also claim that Mr. Burgess-Allen's declaration in support of his motion to dismiss gave a "false impression" that he and his company have "no connection whatsoever to the U.S." (April 21 Letter at 2 n.2) As is evident from the Declaration itself, Mr. Burgess-Allen never made such a statement. Yet plaintiffs seek Mr. Burgess-Allen's current and expired passports in an apparent attempt to determine exactly how many times he visited the United States, even though that is not an issue in this litigation. Plaintiffs also do not explain why they seek Mr. Burgess-Allen's personal diaries. In any event, Mr. Burgess-Allen does not have any.

---

[7] Plaintiffs state that Mr. Burgess-Allen "also destroyed his phone records" (April 21 Letter at 5), which simply means that he did not save copies of his telephone bills after he paid them.

FILED UNDER SEAL

-10-

Under clearly established law, compulsion of evidence requires a showing of "the necessary linkage between the discovery sought and the claims brought and/or defenses asserted in the case." *Palm Bay Int'l, Inc.* v. *Marchesi Di Barolo S.p.A.*, 2009 WL 3757054, at *2 (E.D.N.Y. Nov. 9, 2009); *accord Evans* v. *Calise*, 1994 WL 185696, at *1 (S.D.N.Y. May 12, 1994). Rather than make a meaningful effort to make that showing, plaintiffs argue that Mr. Burgess-Allen, "having destroyed the principal documentary evidence in which he was directly involved, should not now be permitted to avoid all document discovery." (April 21 Letter at 5) As the cases plaintiffs themselves cite make clear, a claim of spoliation does not in any way decrease plaintiffs' burden to show that the discovery sought is relevant. *See Alter v. Rocky Point School Dist.*, 2014 WL 4966119, at *6 (E.D.N.Y. Sept. 30, 2014).

Because they have not shown that any of the requested documents are relevant, plaintiffs' motion to compel should be denied in its entirety.

Respectfully,

Suhana S. Han /JHB

Suhana S. Han

cc: All Counsel of Record (via ECF)