UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re ALUMINUM WAREHOUSING      : No. 13 MD 2481 (KBF)
ANTITRUST LITIGATION            :
                                : CLASS ACTION
————————————————————            :
                                :
This Document Relates To:       : PLAINTIFFS' REPLY MEMORANDUM IN
                                : FURTHER SUPPORT OF THEIR MOTION
*In re Aluminum Warehousing Antitrust* : FOR CLASS CERTIFICATION
*Litigation* (Direct Purchaser Plaintiffs), :
Case No. 1:14-cv-03116-KBF (S.D.N.Y.). :
                                :
———————————————————— x

**REDACTED**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................1

II. ARGUMENT ......................................................................................................7

    A. FLPs Present a Unified and Consistent Theory that Reflects the Factual Record ...................................................................................................7

    B. The Factual Record Is Adverse to Defendants, So They Ignore It and Attempt to Create Their Own Market Realities Through Expert Testimony ........12

        1. Defendants' "Availability" Argument Finds No Basis in the Reality of the Aluminum Market During the Class Period......................13

        2. Defendants' Argument that Higher Premiums Resulted in Lower LME Prices, Thereby Leaving the All-in Price Unchanged, Is Also Belied by the Record..................................................................19

            a. Increasing Queues Led to Higher Regional Premiums.................19

            b. The LME Price and MWP Were Distinct Components of All-In Prices and Driven by Separate Factors...............................21

    C. Defendants' Conduct Impacted All or Nearly All Class Members ......................25

        1. Common Proof Establishes Antitrust Impact for All Class Members ..................................................................................................25

            a. Antitrust Injury and Impact.........................................................26

            b. FLPs Have Presented Robust Common Evidence of Antitrust Impact ...........................................................................28

        2. Dr. Gilbert's Analyses Are Economically Sound and Reliable................29

            a. Economic Theory and Reality Support Dr. Gilbert's Analysis.......................................................................................29

            b. Dr. Gilbert's Econometric Analyses Are Reliable.......................32

                (1) The LME and All-In Price ...............................................32

                (2) The Japan Premium..........................................................34

                (3) First-Level Purchasers Pay the MWP ...............................35

**Page**

(4)     First-Level Purchasers Suffered Damages ........................ 36

3.     Dr. Gilbert's Analysis Is Consistent with FLPs' Theory of Liability ........ 37

D.     The Proposed Class Is Ascertainable ..................................................... 39

1.     Dr. Gilbert's Analysis Demonstrates the Class Is Ascertainable .............. 41

2.     Administrative Feasibility ........................................................ 43

3.     93% and Sheet ....................................................................... 44

4.     "Pursuant to a Contract" ........................................................ 45

5.     The Inclusion of a Regional Premium ..................................... 47

6.     The Court May Shape the Class Definition to Serve the Ends of
       Justice ................................................................................... 48

E.     Defendants Identify No Fundamental Intra-Class Conflict that Renders
       FLPs Inadequate Class Representatives Under Rule 23(a)(4) ............................. 48

1.     Speculation that Class Members Are "Potentially Implicated" in
       the Unlawful Conduct Does Not Raise a Fundamental Conflict .............. 50

2.     Defendants' Assertion that Class Members "Benefitted" From the
       Litigation Does Not Create Any Conflict Within the Class or
       Destroy Commonality ............................................................. 51

       a.     Any Benefits from Aluminum Sales or "Cash and Carry"
              Deals Are Legally Irrelevant ........................................ 51

       b.     Speculation that Some Class Members May Have
              Benefitted from the Conspiracy Does Not Raise a
              Fundamental Conflict .................................................. 55

       c.     Speculation that Class Members Have No Interest in
              Pursuing the Litigation Is Contrary to the Record and
              Defendants' Admissions .............................................. 56

3.     Defendants' Assertions of Conflicting Claims with Respect to the
       Same Aluminum Are Based on Mischaracterizations of the Record ........ 57

- ii -

**Page**

F.   Proceeding as a Class Action Is a Superior Means of Adjudicating the Class's Claims.........................................................................58

G.   Class Member Damages Are Not Speculative....................................61

III.   CONCLUSION..............................................................................64

1173128_1

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods. Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................................25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013)..............................................................................................13

*Astiana v. Ben & Jerry's Homemade, Inc.*,
   No. C 10-4387 PJH, 2014 WL 60097
   (N.D. Cal. Jan. 7, 2014) ...........................................................................................43

*Ault v. J.M. Smucker Co.*,
   310 F.R.D. 59 (S.D.N.Y. 2015) ...............................................................................43

*Bakalar v. Vavra*,
   237 F.R.D. 59 (S.D.N.Y. 2006) ...............................................................................41

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution*
   *Plan v. Bank of N.Y. Mellon Corp.*,
   287 F.R.D. 216 (S.D.N.Y. 2012) .............................................................................61

*Becnel v. KPMG LLP*,
   229 F.R.D. 592 (W.D. Ark. 2005) ...........................................................................61

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982)..................................................................................................27

*Brecher v. Republic of Argentina*,
   806 F.3d 22 (2d Cir. 2015)..................................................................................39, 40

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013)......................................................................................39

*Charron v. Wiener*,
   713 F.3d 241 (2d Cir. 2013)......................................................................................49

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)...................................................................................37, 62, 63

*Conwood Co. L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ....................................................................................63

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)........................................................................................28

Page

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006)..........................................................................................49

*Dumas v. Albers Med., Inc.,*
    No. 03-0640-CV-W-GAF, 2005 WL 2172030
    (W.D. Mo. Sept. 7, 2005) ...............................................................................................43

*Dunnigan v. Metro. Life Ins. Co.,*
    214 F.R.D. 125 (S.D.N.Y. 2003) ....................................................................................40

*Fears v. Wilhelmina Model Agency, Inc.,*
    No. 02 Civ. 4911, 2003 WL 21659373
    (S.D.N.Y. July 15, 2003) ................................................................................................26

*FTC v. Sysco Corp.,*
    113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................................................13

*Gelboim v. Bank of Am. Corp.,*
    823 F.3d 759 (2d Cir. 2016)............................................................................................27

*George v. China Auto Sys., Inc.,*
    No. 11-7533 (KBF), 2013 WL 3357170
    (S.D.N.Y. July 3, 2013) ..................................................................................................40

*Gortat v. Capala Bros., Inc.,*
    No. 07-CV-3629 (ILG), 2010 WL 1423018
    (E.D.N.Y. Apr. 9, 2010)..................................................................................................39

*Hanover Shoe v. United Shoe Machinery Corp.,*
    392 U.S. 481 (1968)..........................................................................................52, 53, 54

*Hart v. Rick's Cabaret Int'l Inc.,*
    73 F. Supp. 3d 382 (S.D.N.Y. 2014)...............................................................................62

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972).........................................................................................................52

*Hedges Enterprises, Inc. v. Cont'l Group, Inc.,*
    81 F.R.D. 461 (E.D. Pa. 1979).........................................................................................26

*Hickory Secs. Ltd. v. Republic of Argentina,*
    493 Fed. App'x 156 (2d Cir. 2012)..................................................................................62

1173128_1

Page

*Hicks v. T.L. Cannon Corp.*,
   35 F. Supp. 3d 329 (W.D.N.Y. 2014) .................................................................48

*Huebner v. Midland Credit Mgmt., Inc.*,
   14 Civ. 6046 (BMC), 2016 WL 3172789
   (E.D.N.Y. June 6, 2016) ......................................................................................41

*Hyderi v. Wash. Mut. Bank FA*,
   235 F.R.D. 390 (N.D. Ill. 2006).........................................................................28

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)................................................................................53, 54, 59

*In re Aftermarket Auto. Lighting Products Antitrust Litig.*
   09 MDL 2007-GW PJWX, 2011 WL 3204588
   (C.D. Cal. July 25, 2011) ....................................................................................25

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   MDL No. 1775, 2014 WL 7882100
   (E.D.N.Y. Oct. 15, 2014) ....................................................................................63

*In re Aluminum Warehousing Antitrust Litig.*,
   95 F. Supp. 3d 419 (S.D.N.Y. 2015)........................................................ *passim*

*In re Bromine Antitrust Litig.*,
   203 F.R.D. 403 (S.D. Ind. 2001).........................................................................26

*In re Carbon Black Antitrust Litig.*,
   CIV.A.03-10191-DPW, 2005 WL 102966
   (D. Mass. Jan. 18, 2005) .....................................................................................26

*In re Citric Acid Antitrust Litig.*,
   No. 95-1092, 1996 WL 655791
   (N.D. Cal. Oct. 2, 1996)......................................................................................26

*In re Commercial Tissue Prods.*,
   183 F.R.D. 589 (N.D. Fla. 1998) ........................................................................26

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ..............................................................................59

*In re Currency Conversion Fee Antitrust Litig.*,
   224 F.R.D. 555 (S.D.N.Y. 2004) ........................................................................63

- vi -

**Page**

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ............................................................................60

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .................................................................................62

*In re Electronic Books Antitrust Litig.*,
  No. 11 MD 2293 (DLC), 2014 WL 1282293
  (S.D.N.Y. Mar. 28, 2014) ...................................................................52, 54, 56

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009)........................................................................26, 27

*In re Facebook, Inc.*,
  312 F.R.D. 332 (S.D.N.Y. 2015) .....................................................40, 46, 59, 60

*In re Flat Glass Antitrust Litig.*,
  191 F.R.D. 472 (W.D. Pa. 1999) .............................................................................26

*In re Fosamax Prods. Liab. Litig.*,
  248 F.R.D. 389 (S.D.N.Y. 2008) ............................................................................50

*In re Indus. Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) ............................................................................26

*In re K-Dur Antitrust Litig.*,
  686 F.3d 197 (3d Cir. 2012)....................................................................................53

*In re Linerboard Antitrust Litig.*,
  321 F. Supp. 2d 619 (E.D. Pa. 2004) .....................................................................59

*In re Literary Works in Electronic Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)....................................................................................50

*In Re Med. X-ray Film Antitrust Litig.*,
  CV-93-5904, 1997 WL 33320580
  (E.D.N.Y. Dec. 26, 1997) .......................................................................................26

*In re MTBE Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) .....................................................................40, 60

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................53

1173128_1

**Page**

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ............................................................................37

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016) ..................................................................60

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009) ........................................................................62

*In re Phenylpropanolamine (PPA) Products Liab. Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) .............................................................44

*In re Plastic Cutlery Antitrust Litig.*,
    CIV. A. 96-CV-728, 1998 WL 135703
    (E.D. Pa. Mar. 20, 1998) ..............................................................................26

*In re Polyester Staple Antitrust Litig.*,
    MDL 3:03CV1516, 2007 WL 2111380
    (W.D.N.C. July 19, 2007) .............................................................................26

*In re Polyurethane Foam Antitrust Litig.*,
    314 F.R.D. 226 (N.D. Ohio 2014) ....................................................55, 56, 62

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    69 Fed. R. Serv. 3d 791 (M.D. Pa. 2007) ....................................................26

*In re Puda Coal Sec., Inc.*,
    No. 11 Civ. 2598 (KBF), 2013 WL 5493007
    (S.D.N.Y. Oct. 1, 2013) ................................................................................48

*In re Ready-Mixed Concrete Antitrust Litig.*,
    261 F.R.D. 154 (S.D. Ind. 2009) ..................................................................26

*In re Relafen Antitrust Litig.*,
    346 F. Supp. 2d 349 (D. Mass. 2004) ..........................................................53

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ........................................................................26

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    292 F.R.D. 544 (E.D. Tenn. 2013) ...............................................................53

*In re Smart Techs., Inc.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ...................................................................48

Page

*In re Teflon Prods. Liab. Litig.*,
  254 F.R.D. 354 (S.D. Iowa 2008) ..................................................................43

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2012 WL 253298
  (N.D. Cal. Jan. 26, 2012) ....................................................................25, 62

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .........................................................................28

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ...................................................................62

*In re Urethane Antitrust Litig. ("Urethane I")*,
  237 F.R.D. 440 (D. Kan. 2006) ....................................................................26

*In re Urethane Antitrust Litig. ("Urethane II")*,
  251 F.R.D. 629 (D. Kan. 2008) ..............................................................26, 55

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) .........................................................................50

*In re Vitamin C Antirust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) ..................................................................53

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................................59

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
  No. 04-5525, 2008 WL 1946848
  (E.D. Pa. May 2, 2008) ................................................................................55

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ....................................................................62

*Kleen Products LLC v. Int'l Paper*,
  No. 15-2385, __ F.3d. __, 2016 U.S. App. LEXIS 14282
  (7th Cir. Aug. 4, 2016) ................................................................................25

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1983) ........................................................................49

*Kohen v. Pac. Inv. Mgmt. Co., LLC & PIMCO Funds*,
  571 F.3d 672 (7th Cir. 2009) ................................................................42, 56

**Page**

*Kottler v. Deutsche Bank AG*,
   No. 05-CV-7773, 2010 U.S. Dist. LEXIS 30590
   (S.D.N.Y. Mar. 29, 2010) .................................................................................61

*Langbecker v. Electronic Data Systems Corp.*,
   476 F.3d 299 (5th Cir. 2007) .............................................................................53

*Marlo v. United Parcel Service, Inc.*,
   251 F.R.D. 476 (C.D. Cal. 2008) .......................................................................64

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
   246 F.R.D. 293 (D.D.C. 2007)......................................................................53, 63

*Pichardo v. Carmine's Broadway Feast Inc.*,
   No. 15-CV-3312 (RA)(SN), 2016 U.S. Dist. LEXIS 78276
   (S.D.N.Y. June 13, 2016).................................................................................42

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ........................................................................53

*Pollock v. Citrus Associates of the New York Cotton Exchange, Inc.*,
   512 F. Supp. 711 (S.D.N.Y. 1981).....................................................................54

*Public Empls. Ret. Sys. v. Merrill Lynch.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) .........................................................................60

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .............................................................................13

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)........................................................................27, 37

*Ruggles v. WellPoint, Inc.*,
   272 F.R.D. 320 (N.D.N.Y. 2011).......................................................................56

*Simington v. Lease Fin. Grp., LLC*,
   No. 10 Civ. 6052 (KBF), 2012 WL 6681735
   (S.D.N.Y. Dec. 14, 2012) ...........................................................................50, 53

*Srail v. Village of Lisle*,
   249 F.R.D. 544 (N.D. Ill. 2008).........................................................................56

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) .......................................................................39

- x -

Page

*Strax v. Commodity Exchange, Inc.*,
   524 F. Supp. 936 (S.D.N.Y. 1981)........................................................54

*Three Crown Ltd. Partnership v. Salomon Bros., Inc.*,
   No. 92 Civ. 3142 (RPP), 1995 WL 422467
   (S.D.N.Y. July 14, 1995) ..................................................................54

*Toney-Dick v. Doar*,
   No. 12 Civ. 9162 (KBF), 2013 WL 5295221
   (S.D.N.Y. Sept. 16, 2013)..................................................................48

*United States v. Carter*,
   173 Fed. App'x 79 (2d Cir. 2006)........................................................8

*Valley Drug Co. v. Geneva Pharmaceutics, Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ..................................................52, 53

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 339 (2011).....................................................................62, 64

## STATUTES, RULES AND REGULATIONS ##

Federal Rules of Civil Procedure
   Rule 23 .................................................................28, 48, 49, 58
   Rule 23(a)(4)..............................................................48, 49
   Rule 23(b)(2)...............................................................50
   Rule 23(b)(3)..............................................................*passim*
   Rule 23(b)(3)(A)............................................................59
   Rule 23(b)(3)(B)............................................................59
   Rule 23(b)(3)(C)............................................................59

Federal Rules of Evidence
   Rule 702 ..................................................................8

## SECONDARY AUTHORITIES

Alba Conte & Herbert B. Newberg,
   *Newberg on Class Actions* (4th ed. 2002)
   §8:12 .....................................................................48

**Page**

Alba Conte & Herbert B. Newberg,
*Newberg on Class Actions* (5th ed. updated June 2016)
§3:64 ...................................................................................................................55
§18:14 .................................................................................................................49
§18:15 .................................................................................................................48

Black's Law Dictionary (10th ed. 2014)..................................................................46

Charles A. Wright & Arthur R. Miller *et al.*,
*Federal Practice and Procedure* (3d ed. 1998)
§1759 ...................................................................................................................48
§1760 ...................................................................................................................39

5 James Wm. Moore, *et al.*,
*Moore's Federal Practice* (3d ed. 2011)
§23.25 ..................................................................................................................50

1 *McLaughlin on Class Actions* (11th ed. 2014)
§4:2 .....................................................................................................................40

## I.    INTRODUCTION

In opposition to Plaintiffs' ("FLPs") motion to certify a Rule 23(b)(3) damages class of first level primary aluminum purchasers, Defendants argue that FLPs' theory has shifted from the operative Third Amended Complaint ("TAC"). Not true. Defendants argue while the TAC asserted a restraint theory, FLPs' designated expert Dr. Christopher L. Gilbert, Ph.D. asserts "defendants raised prices by removing too much aluminum from those warehouses too soon." Defs' Brf. at 1-2.[1] Defendants simply mischaracterize Dr. Gilbert's conclusions. As detailed in his opening report, Dr. Gilbert examined the evidence in light of FLPs' TAC allegations and determined that, in fact, Defendants stockpiled aluminum in Detroit and Vlissingen and that the economic evidence suggests this was not the result of natural market forces. Gilbert Rpt., ¶¶10, 18.[2] Dr. Gilbert then examined the evidence of Defendants' queue management activities, including the merry-go-round transactions, and determined these transactions increased the Detroit queue length, resulting in an increased Midwest Premium ("MWP") and imposing additional costs on class members. *Id.*, ¶¶26-27. Dr. Gilbert noted that these load-out queues deny access to aluminum that would otherwise be available to consumers. *Id.*, ¶54. And while the large conspiratorial warrant cancellations increased load-outs, this material was generally not available to the market but was often redelivered into "GS Group Metro Warehouses instead of selling it to consumers." *Id.*, ¶27; Ex. 1, Gilbert Reply,[3] ¶¶53-58. Dr. Gilbert's conclusions are entirely consistent with the TAC.

Aside from mischaracterizing Dr. Gilbert's report and conclusions, Defendants completely ignore the record evidence that establishes the conspiracy. Defendants' opposition fails to discuss

---

[1]    *See* Defendants' Memorandum in Opposition to the First Level Purchaser Plaintiffs' Motion for Class Certification, dated July 8, 2016 ("Defs' Brf.").

[2]    Corrected Expert Report of Dr. Christopher L. Gilbert, Ph.D., dated May 4, 2016 ("Gilbert Rpt.").

[3]    Expert Reply Report of Christopher L. Gilbert, Ph.D., filed concurrently ("Gilbert Reply").

how they agreed: (1) **not** to destock each other; (2) to work together to build a critical mass of aluminum in Detroit; (3) to pay record incentives; (4) to engage in queue management, *i.e.*, manipulation that insiders admit distorted the market; (5) to treat the London Metal Exchange ("LME") minimum load-out rate as a maximum in order to inhibit market supply; (6) to engage in merry-go-round transactions where hundreds of thousands of metric tons of metal were shuffled around various Detroit warehouses; and (7) to execute other Defendant-related warrant cancellations that added and extended the record queue and restrained the aluminum market.  The now uncontested record for purposes of class certification establishes that Defendants agreed to – and engaged in – these supply restraints.  Defendants ignore this evidence for one reason – because there is no innocent explanation.

The key question at this litigation's class certification stage is whether all-in aluminum prices were impacted by Defendants' actions.  Defendants' executives repeatedly admitted that restraining supplies in the form of larger queues caused higher premiums.  *See* Ex. 76, SR[4] at 180.  Defendants argue, however, that there is an inverse relationship between the MWP and the LME price.  *Id.*  They assert that the "'effect of the queues is to increase this premium as a proportion of the 'all-in' free metal price.'"  Defs' Brf. at 13.[5]  But prior to this litigation, no market participant has agreed that the LME price and the MWP were in an inverse relationship.  In fact, just the opposite.  HARBOR Aluminum, whose clients include, *inter alia*, Alcoa,[6] Rio Tinto, Coca-Cola and General Electric, finds that Defendants' theory "does not reflect how the physical aluminum market actually works."

---

[4]    Ex. 76, United States Senate Permanent Subcommittee on Investigations *Wall Street Bank Involvement with Physical Commodities* (Nov. 20 and 21, 2014) ("SR").

[5]    Here, and throughout, unless otherwise noted, citations are omitted and emphasis is added.

[6]    Contrary to Defendants' argument, Alcoa also recognizes that the "LME and premium prices are not inversely related."  *See* Ex. 76, SR at 180.  Each "has its own drivers" and "move independently of each other."  *Id.*

Ex.[7] 78 at 14 (Written Statement of Jorge Vazquez, Founder and Managing Director of HARBOR Aluminum Intelligence LLC to the Permanent Subcommittee on Investigations Hearing on "Wall Street Bank Involvement with Physical Commodities" ("Vazquez Stmt.")); *accord* Ex. 76, SR at 180.  HARBOR went on to explain that "[t]he physical market ***first*** references its base price from the LME price, and then adds the physical premium that buyers and sellers negotiate outside of the Exchange."  Ex. 78 at 14 (Vazquez Stmt.).  Novelis Inc., the world's largest producer of flat rolled aluminum agrees, explaining that artificial inflation of the premium cost consumers billions.  Ex. 79 (Novelis' Stmt.).   When specifically asked about Goldman Sachs' inverse-relationship theory between the LME price and the MWP, both HARBOR and Novelis representatives concurred there was no objective data or analysis to support the theory and real-world events call it into question.  Ex. 75, Senate Hrg. Tr. at 60-61.[8]  Indeed, leading industry analyst Jorge Vazquez of HARBOR testified before the Senate Subcommittee that "the emergence of long queues led directly to higher premiums" and that "warehouse practices were 'being used as a platform to inorganically inflate aluminum premiums at the expense of the aluminum consumer and at the benefit of some warehouses, banks and trading companies.'"  Ex. 76, SR at 180.

FLPs' experts agree.  FLPs' expert Dr. Gilbert explained how the LME price is determined primarily by the non-commercial purchasers (financial firms) in the market, while the all-in price is determined primarily by the commercial purchasers (those who want aluminum for fabrication).  Ex. 1, Gilbert Reply, ¶¶10-21.  He concludes that "[t]here is nothing in either the theory or the actual operation of this marketplace that postulates or even suggests that by definition (as Dr. Hausman would have it) that as the Midwest Premium goes up, the LME price must go down."  *Id.*, ¶14.

---

[7]   All references to "Ex." and "Exs." are to the Declaration of Steven M. Jodlowski in Support of Plaintiffs' Reply Memorandum in Further Support of Their Motion for Class Certification, filed concurrently.

[8]   *See* Ex. 75 at 60-61, United States Permanent Subcommittee on Investigations Hearing Transcript, *Wall Street Bank Involvement with Physical Commodities (Day One)* (Nov. 20, 2014).

Using well established econometric analysis, FLPs' experts have determined that longer queues directly translated into a higher MWP.  Gilbert Rpt., ¶¶26-27; Ex. 1, Gilbert Reply, ¶¶5-29. The queue length had at most a transient effect (positive) impact on the LME price.  Gilbert Rpt., ¶59; Ex. 1, Gilbert Reply, ¶28.  Thus, the resulting price inflation of the MWP would **not** have been offset by a reduction in the LME price.  Gilbert Rpt., ¶57; Ex. 1, Gilbert Reply, ¶28; *see also id.*, ¶24 ("[Dr. Hausman] asserts that while the queues may have caused the proportion of the all-in price attributed to the MWP to increase, the queues simultaneously caused the LME price to decline in an equal and offsetting amount.  As described above, this explanation of the aluminum market does not comport with industry consensus or with economic theory once the important role of non-commercial purchasers is accounted for.  Neither do Dr. Hausman's econometric analyses support his claim.  Dr. Hausman's models, after correcting for his errors, demonstrate that longer queues at LME warehouses do inflate the MWP, do not reduce the LME price, and result in a higher all-in price for aluminum").

Next, Defendants argue that FLPs' theories of restraint make no economic sense in a market with surplus aluminum.  According to Defendants, regardless of the Detroit and Vlissingen queues, millions of tons of surplus aluminum remained available from other locations and until those other warehouse stocks were drawn down, Detroit and Vlissingen would have made no difference to all-in aluminum prices.  Defs' Brf. at 25.  Defendants are wrong about the state of aluminum market conditions during the Class Period.  These conditions actually tightened the market, paving the way for Defendants' manipulation.

With the recession that developed in 2008, an excess supply of aluminum did exist with respect to commercial demand.  However, as interest rates plunged and nearby prices relative to future prices remained under pressure due to weak user demand, in a bid to attract metals,

warehouses began offering incentives and discounted rent to store metals.  These factors combined to push the aluminum market into a contango where the spread between near-term and future prices exceeded an owner's costs to hold aluminum.  The record demonstrates that Defendants were aware, during the Class Period, that despite excess inventory, the contango environment combined with low interest rates and unprecedented warehouse deals were "███████████████████████████ ████████████████" thereby creating a "███████████████."[9]  Ex. 17 at 25-28.  As Goldman Sachs recognized when buying Metro, in a contango market, once metal is placed in a warehouse, it becomes "█████" and █████████."  Ex. 47 at 700, 713.  Large market participants benefited from these financing deals which reduced metal availability and resulted in higher aluminum premium costs for consumers.  Ex. 17 at 28.  In other words, the surplus from the commercial user's side was taken in by the non-commercial (financial) side, opening the door for Defendants' manipulative scheme.  By lengthening the queues, Defendants drove the MWP to record highs, artificially raising costs to class members during the Class Period.

Defendants next attack whether FLPs can satisfy Rule 23(b)(3)'s predominance requirement that all class members were, in fact, injured by the conspiracy.  Again ignoring the tremendous record evidence demonstrating that, indeed, Defendants entered into numerous agreements that inflated the MWP and, thereby, impacted all-in prices paid by class members, Defendants instead attack FLPs' experts.  But again, Dr. Gilbert's models are compatible with the TAC's allegations that queue lengthening restrained aluminum supply and raised the price for class members.  He examines the unprecedented queues and their impact on the MWP and, ultimately, the all-in price.  The queues, not "load-out rates," impacted the price.  Dr. Gilbert also concludes the MWP and the

---

[9]    Dr. Gilbert establishes:  "During times of surplus the non-commercial actor is the marginal purchaser of aluminum, with the consequence that the excess metal available during this time period was absorbed into non-commercial stocks. This aluminum is 'surplus' only in the sense that it exceeded commercial demand.  Non-commercial demand is real (as Dr. Hausman concedes), and Dr. Hausman is mistaken to conclude that aluminum consumed by non-commercials is freely available to the market."  Ex. 1, Gilbert Reply, ¶17.

LME price do *not* have an inverse relationship.  Each has its own drivers and the lengthening of the queues had but a transient relationship (positive) to the LME price.  As such, Defendants' lengthening of the queues and increasing the MWP were the components of establishing impact and damages.

Defendants also level a number of criticisms at the FLPs' class definition.  Although they do not accept these criticisms, to remove any doubt about them, the FLPs have revised their proposed class definition, causing many of Defendants' remaining arguments to fall away.  The FLPs seek to certify the following class:

> All persons who from February 2010 to March 25, 2016 made a first level purchase of a primary aluminum product with a price term based, in any part, on the Midwest Transaction Price, the Platts Metals Week US Transaction Price or other "all in" price used in the United States, or the Midwest Premium, the Platts MW Premium or similar terminology or other regional premium used in the U.S., including, but not limited to, an averaging over a period of days of any such premium or adjusting for a grade or type of primary aluminum product.  Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.  As used in this definition, "primary aluminum product" means T-bar, sow, standard ingot, foundry alloy T-bar or ingot, extrusion billet, slabs, sheet ingot, molten metal, or rod.

As explained below, the class is *ascertainable*, the FLPs are *adequate* class representatives, and the proposed action is *superior* to other available methods.  While there are hundreds of thousands of first level purchaser transactions during the Class Period, there are over 286 potential class members and 91% of class purchases are accounted for.  This is far more than the norm.  The alleged conflicts Defendants raise as to the proposed class representatives' adequacy are simply *not* conflicts.  There are transactions *not* covered by this action, but that does not put the representatives in conflict.  And as to any "benefit" from some of the Defendants' actions, this does not disqualify these representatives – they were not in league with the Defendants.  Finally, this action is superior to any other available method.  There need be only one trial for hundreds of first level purchasers

1173128_1

impacted by Defendants' illegal agreements that restrained the supply of aluminum to the market. The class members are ascertainable, their transactions identifiable and damages can be determined on a classwide basis.

## II.    ARGUMENT

### A.    FLPs Present a Unified and Consistent Theory that Reflects the Factual Record

FLPs' theory – that Defendants inflated the cost of aluminum paid by class members by causing inflation of the MWP component of aluminum's unique price-setting mechanism via manipulation of LME warehouse queues – is not new or changed.  Defendants repeatedly saying otherwise does not make it so.  FLPs' theory is the TAC's theory, and it is the very theory the Court upheld in simultaneously granting FLPs' motion to amend and file the TAC, and in denying Defendants' various motions to dismiss.  *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 439-44 (S.D.N.Y. 2015).

In short – forming the core facts common to all class members – FLPs allege that Defendants conspired to:

- Acquire control of LME warehouses in the face of a market in flux (*see, e.g.*, TAC, ¶¶464-472; Gilbert Rpt., ¶¶9(d), 17-22; Zona Rpt., ¶¶42-47[10]);

- Aggregate and trap vast quantities of LME-warranted aluminum in certain LME warehouses through, among other anticompetitive pacts, agreements not to destock or attract aluminum away from each other's warehouses, to treat the LME minimum load-out rules as a *de facto* maximum, and to divide the market (*see, e.g.*, TAC, ¶¶345, 510-522, 523-525, 559; Gilbert Rpt., ¶¶17-22); and, then,

- Execute a series of strategically planned, massive warrant cancellations in which vast quantities of aluminum were placed in specific load-out queues (including specific "merry-go-round" and shuffle transactions whereby significant amounts of aluminum were placed in the queue in order to significantly delay the loading out of other aluminum from the warehouses, only then to have these large cancellations placed back on warrant), and which had the effect of both vastly and unprecedentedly

---

[10]   Expert Report of J. Douglas Zona, Ph.D., dated March 25, 2016 ("Zona Rpt.").

increasing the time it would take otherwise available off-warrant aluminum to become available, and vastly increasing the MWP as wait and delivery costs rose dramatically (TAC, ¶¶9(B), 251-286; Gilbert Rpt., ¶¶23-39; Zona Rpt., ¶¶56-72).

That proof common to all class members demonstrates the conspiracy's existence, scope and impact is set forth in greater detail in the TAC and FLPs' Class Certification Memorandum.[11]  Class Cert. Mem. at 2-17.

In upholding the TAC, among other aspects of Defendants' wrongdoing, the Court specifically recognized that Defendants' conspiracy was based, at its core, on "strategically cancelling warrants . . . for the purpose of putting the aluminum associated with cancelled warrants into the load-out queues, thereby delaying load-outs of aluminum legitimately seeking to exit the warehouses." *Aluminum Warehousing*, 95 F. Supp. 3d at 434 (citing, *inter alia*, TAC, ¶¶10, 468). The Court recognized FLPs' allegations that the MWP was inflated "due to artificiality created by defendants' delays in loading-out aluminum in the LME warehouses." *Id*. at 431 (citing TAC, ¶467 (alleging that Defendants' conspiracy included "strategic cancellations of warrants to exacerbate existing queues")).  The Court also understood that "the effect of [defendants'] concerted actions was to raise the Platts Midwest Premium." *Id*. at 429-30 (citing TAC, ¶¶468, 471).

Of course, while they pretend otherwise, the contemporaneous record is replete with evidence that Defendants were intimately aware of the conspiracy.  Indeed, they were the ones that devised it and carried it out.[12]

Given the then-current aluminum market state of flux, Metro saw tremendous opportunities to manipulate the aluminum market and produce massive (legitimate and illegitimate) profits

---

[11]   Corrected Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, dated April 6, 2016 ("Class Cert. Mem.").

[12]   Perhaps the most striking – and telling – aspect of Defendants' class certification opposition is their and their experts' almost complete silence as to the record of actual facts in this action. *See United States v. Carter*, 173 Fed. App'x 79, 82 (2d Cir. 2006) (expert reports must be supported by and consistent with known available facts (citing Fed. R. Evid. 702)).

1173128_1

presented by combining a large financial institution's trading operations with LME warehouse

ownership. Thus, in August 2009, ████████████████████████████████████████

████████████████████ Ex. 39 at 55. In addition to ████████████████████████████

████████████████████████████████ (Ex. 33), ████████████████████████

████████████████ (Ex. 39 at 57) ████████████████████████████████████

████████████████████████ :

- ████████████████████████████████████████████████ Ex. 45;

- provides ████████████████████████████ Ex. 39 at 57;

- ████████████████████████████████████████████████████
  ████████████████," *id.*;

- ████████████████████████████████████████████████████
  ████████████ *id.*; and

- ████████████████████████████████████████████████████
  ████████████." *Id.*

████████████████████████████████████████████████

████████████ Ex. 39 at 55. Defendants then acted quickly and by early 2010, Goldman Sachs had

acquired Metro, JPMorgan acquired Henry Bath, and Glencore acquired Pacorini. With these

acquisitions, Defendants ultimately controlled over 83% of the U.S. LME warehousing market

during the Class Period. Zona Rpt., ¶31.

With Defendants' domination of LME warehouses, they also agreed not to compete. For

example, ████████████████████████████████████████████████████████

████████████████████████████████████████." Ex. 30 at 17. ████████████

████████████████████████████████████. Ex. 31 ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ That this was the case was then again

confirmed in 2012.  Ex. 22 at 32 ████████████████████████████████████

███████████████████; *see also* Ex. 63 at 16 ████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████.

      Another opportunity for market manipulation given the aluminum market's unique state at the time – and a significant aspect of the conspiracy challenged here – quickly surfaced in conjunction with Defendants taking control of the LME warehouses.  In summer 2010, Metro

████████████████████████████████████████████████████████████

█████████████████████████████████████.  Ex. 28; *see also* TAC, ¶¶252-286. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████ This, along with Defendants' collective treatment of the LME minimum load-out rule as a maximum, kept aluminum legitimately taken off warrant from flowing freely to consumers while, at the same time, increasing rents and, as discussed below, other greater and unlawful benefits.  *Id*.; *see also* Gilbert Rpt., App. A.  This plan was made even more conspicuously manipulative when massive amounts of aluminum were taken off warrant for the purpose of blocking the queue, only to have the aluminum largely or completely re-warranted either immediately or relatively soon after its extended load out.

- 10 -

With the "Smart Ass Plan" as framework, Defendants and their co-conspirators engaged in strategically coordinated queue manipulation, which had the effect of vastly inflating queues, and driving up the MWP, including a number of massive warrant cancellation deals during the Class Period involving Metro, Glencore, DB Energy, Red Kite, JPMorgan and Goldman Sachs.[13]  TAC, ¶¶251-286; Gilbert Rpt., ¶¶38-42; Ex. 76, SR at 194-212.   The U.S. Senate's Permanent Subcommittee on Investigations identified the cause of the dramatic increases in the MWP to be the Detroit queue increases (Ex. 76, SR at 178) which was caused by the "number of large warrant cancellations by a small group of financial institutions, including Deutsche Bank; Red Kite, a London hedge fund; Glencore, a commodities trading firm based in Switzerland; JPMorgan; and Goldman," including those in which Metro and Goldman Sachs worked in concert with "Deutsche Bank, Red Kite, and Glencore . . . [involving] 'merry-go-round' deals in which aluminum was loaded out of one Metro warehouse and loaded into another." *Id.* at 195 and 194-212 (detailing the September 2010 "Deutsche Back Merry-Go-Round Deal," "Four [2011-2013] Red Kite Merry-Go-Round Deals," the "Glencore Merry-Go-Round Deal" and JPMorgan's and Goldman's four massive 2012 "proprietary cancellations").[14]   These massive and illusory cancellations resulted in a queue length that created delays well over 600 calendar days in May 2014 from around 40 days in February 2010.[15]  Ex. 76, SR at 178, 193.

As the intended effects of Defendants' scheme took hold, the nearly universal consensus by industry participants and observers was that the lengthening queues were driving up the cost of

---

[13]  Since the class certification motion's filing, subsequently taken deposition testimony from **Defendants' own insiders** admit – though somewhat begrudgingly – that longer queues drove a higher MWP and, therefore, the total price paid by class members for primary aluminum. *See infra,* §II.B.2.a (discussing the testimony of Messrs. Askew, Evans and Goertzen).

[14]  Significantly, just a week ago on July 29, 2016, the LME announced that Metro has agreed to pay a $10 million fine to the LME for what the LME determined was wrongdoing in conjunction with Class Period merry-go-round deals. Ex. 73, July 29, 2016 LME Disciplinary Action Notice.  It is one of the largest, if not the largest, fines in LME history.

[15]  That these warrant cancellations were against Defendants' economic interests absent the conspiracy is demonstrated in the Gilbert Rpt., ¶¶25, 63, 68 and the Zona Rpt., ¶¶56-73.  Defendants' experts offer no contrary opinions.

aluminum, including Defendants' own contemporaneous observations and the Europe Economics report. *See* Class Cert. Mem. at 16. This was confirmed by Goldman's head metals trader Scott Evans, who admitted during his deposition that a "litany" of aluminum consumers complained to him that the lengthening Detroit queues were inflating aluminum prices. Ex. 86, Evans Dep. at 111:3-114:17. Likewise, industry publications and analyses repeatedly concluded lengthening queues were inflating aluminum prices. *See, e.g.*, Ex. 78 at 11-13 (Vazquez Stmt.), "HARBOR's mathematical studies confirm that the lengthening of the queue in LME Detroit (Metro) has been the main driver behind the unprecedented increase in Midwest premiums."[16] (*id.* at 13)); *accord* Ex. 1, Gilbert Reply, ¶7.

There simply is nothing new or changed about FLPs' theory. And, as demonstrated below, Defendants knew their queue manipulation would result in a dramatically inflated MWP. *See* §II.B.2, below.

**B.    The Factual Record Is Adverse to Defendants, So They Ignore It and Attempt to Create Their Own Market Realities Through Expert Testimony**

As noted above, although the record is mature, Defendants' opposition largely avoids it. Instead of grounding their opposition in the factual record, Defendants rely heavily on after-the-fact declarations by two economists, Dr. Jerry A. Hausman and David M. Kaplan. Relying on these experts, Defendants build the foundation of their opposition from two flawed assertions: (i) that it was "implausible" that they restrained aluminum supply because, they say, plenty of inventory outside of Detroit and Vlissingen was "available" to the market; and (ii) that the steep increase in the

---

[16]    The ability to control the MWP played a significant and undeniable role in Defendants' trading activities and profitability. Among other benefits of Defendants' scheme, Mr. Evans explained unequivocally that ▮▮▮▮ ▮ Ex. 86, Evans Dep. at 61:2-63:▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because of this fundamental truth, Evans adds, "▮▮▮▮▮▮▮▮▮▮▮." *Id.*

MWP was offset by a concurrent decrease in LME prices, leaving the all-in price unchanged and the class without impact.

Not only are these purely merits-based arguments inappropriate at class certification, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013), they are also wrong. Indeed, just as he recently did in another antitrust case, Dr. Hausman offers assertions that conflict with the fundamentals of the aluminum market during the relevant time period and, in many instances, directly contradict clear, unequivocal admissions from Defendants themselves. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 37 (D.D.C. 2015) (finding that the testimony of Dr. Hausman was "***inconsistent with business reality***"). "'Antitrust theory and speculation ***cannot trump facts***.'" *Id.* Indeed, this motion must be resolved on the basis of the record, not Dr. Hausman's unsupported concepts of "economic theory."[17] *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) ("In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient . . . .").

### 1. Defendants' "Availability" Argument Finds No Basis in the Reality of the Aluminum Market During the Class Period

Pointing to the existence of aluminum in warehouses without delivery queues, Defendants say that it was "implausible" that the lengthy queues in LME warehouses in Detroit and Vlissingen would have raised aluminum prices. Defs' Brf. at 25. However, Defendants' contention is directly at odds with the reality of commodities markets in general, and the aluminum market in particular, during the Class Period.

---

[17]     Moreover, Dr. Gilbert shows that Dr. Hausman's economic theory ignores the role and impact of a critical market participant (non-commercial purchasers) and therefore is wrong. Ex. 1, Gilbert Reply, ¶¶8-21. Dr. Gilbert establishes that once the non-commercial purchasers are considered, plaintiffs' claims are wholly consistent with economic theory, in accord with the views of virtually all informed observers of the market. *Id.*

As an initial matter, in commodities markets, it is common for trading on a centralized global exchange, such as the LME, to influence the *entire* market, even where the amount of material traded on the exchange is relatively small in proportion to the amount of material traded off-exchange. Ex. 79, App. 8 at Slide 9 (Novelis' Stmt. to Senate) (trading of corn, soy beans and wheat, which represent between 0.1% to 3.0% of the world's supply, on the Chicago Board of Trade, influences the entire market). As the LME proclaims in its marketing materials:



Ex. 58 at 51.

In this case there was more LME aluminum trapped behind queues than was necessary to influence aluminum prices. The amount of aluminum held in LME warehouses in Detroit and Vlissingen ████████████████████. Ex. 34; Ex. 18; Ex. 49. This amounted to more than 49% of total stocks of non-LME aluminum. *Compare id. with* Kaplan Decl.,[18] Exhibit 4 ██ ████████████████████.

In advancing their position, Defendants also assume that all of the global aluminum inventory held outside Detroit and Vlissingen was "available" to the consumption market. Defs' Brf. at 25. But even though a substantial amount of aluminum stock was held in warehouses without queues, it does not mean that such metal was accessible to the market, much less does it mean enough metal was accessible to the market to render it impossible for Defendants to distort prices by restricting supply.[19] To the contrary, despite the excess inventory, the contango environment,

---

[18]    Declaration of David P. Kaplan, dated July 8, 2016 ("Kaplan Decl.").

[19]    Ex. 2, Zona Reply, ¶¶20-23 ("The idea that aluminum was idle and available to discipline all-in prices is counter to statements made by the LME and Defendants in this case…. Prof. Hausman's suggestion that there was lots of available supply of physical aluminum is not consistent with these statements to the Court and other empirical analyses").

combined with ultra-low interest rates and unprecedented warehouse deals, was ███████████

████████████████████████████████ thereby creating ████████████████.” Ex. 17 at 25-

28;  Ex. 37 at 5984 ███████████████████████████████████████

█████████████████████████████████████████████████

█████████████ Defendants privately admitted as much: ████████████████

█████████████████████████████████████████████████

██████████████████████████████████████ Ex. 61 at 56; Ex. 79 at 12

(Novelis' Stmt. to the Senate) ("Recent changes in market fundamentals [] have left the free market

short of P1020 because surpluses are not accessible."); Ex. 55 at 05 ██████████████████

█████████████████████████████████████████████████

████████████████████████████████████ Ex. 54 at 30

████████ █ ████████████████████████ Dr. Gilbert shows that

economic theory is fully consistent with these universal observations of industry participants that

aluminum stored in warehouses – both LME and non LME – were not effectively available to

commercial purchasers.  Ex. 1, Gilbert Reply, ¶¶17-20.

This unique dynamic led to the tightness that emerged in 2008.  Before then, the aluminum

market displayed a normal forward curve – that is the spread between current prices and future

prices was either equal to or less than the cost for metal owners to finance and store the aluminum.

In this type of market, metal is readily available to consumers, as metal owners are incentivized to

release aluminum into the market.  Ex. 32 at 927; Ex. 86, Evans Dep. at 15:3-8 ████████████

█████████████████████████████████████████████████

In mid-2008, however, interest rates plunged to all-time lows; nearby aluminum prices

relative to future prices were under pressure due to weak user demand; and ███████████████

1173128_1

███████████████████████████████████████████████████████

█████████████████████. Ex. 17 at 25-28.  These three factors combined to push the

aluminum market into contango, where the spread between near-term prices and future prices

exceeded owners' costs to hold aluminum.  Ex. 86, Evans Dep. at 15:9-24 ████████████████

███████████████████████████████████████████████████████

████████████████.  When this happens, a market participant can buy aluminum on a spot basis,

sell it forward and store it for months or years – locking in a rate of return based upon the difference

between today's price and the price they will be paid when delivering into the contract months or

years later.  *Id*. at 16:10-16.  And that return grows larger the more aluminum you lock away in a

warehouse.  This unique dynamic is known as the "cash and carry" trade and, with the exception of a

short period in late 2010, it remained viable in the aluminum market for the entire Class Period.

Ex. 16 at 9998.

To capture the "cash and carry" arbitrage, financial institutions, hedge funds and traders

began swallowing up massive amounts of aluminum and tying it up in warehouse deals for periods

between 3 and 12 months.  JPMorgan, for example, acquired 3.3 million metric tons worth over $7

billion.  Zona Rpt., ¶¶52-53.  Goldman Sachs acquired 1.5 million metric tons worth $3 billion.

Ex. 76, SR at 169.  Producers, who traditionally supply most of the metal to consumers, were

likewise sending their new metal to warehouses, keeping it off-market.  Like traders, producers were

██████ with the carry trade, because they could continue production at a certain rate, obtain large

incentives from warehouses such as Metro to store it, and use the inventory as collateral for

financing deals.  Ex. 15 at 90.  By the start of the Class Period, ████████████████████████

████████████████████████ Ex. 32 at 945; Ex. 17 at 28 ████████████████

███████████████████████████████████████████████████████

███████████ Ex. 16 at 1000 ████ ██████████████████████████

████████████████

Defendants acknowledge the "cash and carry" dynamic, Defs' Brf. at 8-9, yet assume that massive amounts of aluminum was flowing into the consumption market.  Defendants postulate that, when premiums rise, warrant holders "will arbitrage the difference [between the premium and spot price] by cancelling the warrants and selling the formerly-warranted aluminum in the spot market."  Defs' Brf. at 12.  But other than a stray excerpt from Dr. Gilbert's testimony – which Defendants badly twist to create support for their position – Defendants and their experts provide no factual support for that assertion.  *See* Hausman Decl.,[20] ¶29.  While such arbitrage may have happened in other markets or during other time periods, it did not happen in the aluminum market during the period at issue, at least not on a large enough scale to deliver meaningful amounts of aluminum in to the market and prevent Defendants from squeezing supply.   In fact, the MWP steadily rose throughout the Class Period, indicating that no such arbitrage ever occurred.  Ex. 76, SR at 173.

Rather than flooding the consumption market with supply, the cash-and-carry trade did the opposite: it triggered the flow of massive amounts of LME and non-LME aluminum into warehouses, where it stayed.  Ex. 17 at 25-28; Ex. 86, Evans Dep. at 15:3-8 ██████████████ ████████████████████████████████████████████████████████ Ex. 33 at 2953 ████████████████████████████████ ").  As Goldman Sachs recognized when buying Metro, in a contango market, ████████████████████████████████████████████ Ex. 47 at 700, 713.   Indeed, █████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

---

[20]   Declaration of Professor Jerry A. Hausman, dated July 8, 2016 ("Hausman Decl.").

[redacted]. Ex. 17 at 27.

Owners of the remaining metal likewise had little incentive to release their metal into the market once it had been sent to a warehouse. Ex. 36 at 411 [redacted]. For them, it did not, as Defendants say, make economic sense to cancel warrants and sell into the spot market, as the incentives offered by the warehouses matched – and at times, exceeded – the premium a metal owner could obtain in the spot market. They simply left it in a warehouse and collected the return from the cash-and-carry trade. Ex. 78 at 5 (Vazquez Stmt.); Ex. 51 at 75 [redacted] Ex. 62 at 12 [redacted] one market analyst wrote, [redacted].” Ex. 17 at 31; Ex. 19 at 68, 71 [redacted]).[21]

Thus, until the contango became insufficient to cover carrying costs, owners continued rolling over their positions, renewing warehouse deals, and withholding metal from the market. Ex. 27 at 599 [redacted] This created what Morgan Stanley's Commodities Unit termed the "[redacted]" and

---

[21] Moreover, even if these owners could theoretically arbitrage their metal by selling in the spot market, they were not incentivized to do so, because rolling over a storage deal carried none of the financial or logistical burdens or costs of delivering the metal in the spot market. A metal owner would have to locate a buyer, negotiate a deal, and arrange for shipment of the metal purchased by the consumer once terms were agreed to – and they would have had to do this many times over with many different buyers to eventually sell off the stock that they could simply leave in the warehouse. Zona Rpt., ¶10; Gilbert Rpt., ¶15; *see also* Ex. 1, Gilbert Reply, ¶¶17-20.

a ███████████████," which continues unabated until metal begins flowing into the market.  Ex. 17 at 25-28; Ex. 32 at 27; Ex. 38 at 03 ████████████████████████

In short, though excess inventory existed, the aluminum market was, in reality, exceptionally tight.  Ex. 17 at 25-28; Ex. 37 at 5984.  When you combine the 31% of global aluminum stock trapped in queues in Detroit and Vlissingen, with the substantial amount of remaining aluminum tied-up in financing deals, it becomes obvious how Defendants could distort aluminum prices by jamming up the queues.

2.   **Defendants' Argument that Higher Premiums Resulted in Lower LME Prices, Thereby Leaving the All-in Price Unchanged, Is Also Belied by the Record**

a.   **Increasing Queues Led to Higher Regional Premiums**

Defendants concede, as they did in front of the Senate, that longer queues result in higher regional premiums, including the MWP.  Defs' Brf. at 13; Ex. 76, SR at 180.  As explained in FLPs' opening brief, Defendants also universally acknowledged as much during the Class Period, through e-mails and other internal correspondence such as those below:



- ███████████████████████). Ex. 25.

- ███████████████████ . . . ." Ex. 24 at 03.

- ██████████████████████ Ex. 48 at 13.

- ██████████████████████ Ex. 53 at 65.

- ██████████████████████ Ex. 53 at 65.



- ██████████████████████████████████████████████████████ Ex. 60 at 30.

- ██████████████████████████████████████████████████████ Ex. 65 at 60-61.

- ██████████████████████████████████████████████████████ Ex. 64 at 18.

- ██████████████████████████████████████████████████████ Ex. 66 at 77.
██████████" *Id.*

At deposition, several of Defendants' current and former executives testified that longer queues in Detroit "destabilized" and "dislocated" the market. Ex. 83, Askew Dep. at 133:1-8 (Mark Askew, former Vice President at Metro: ██████████████████████████████████████ ██████████████████████████████████████████████████████████ Ex. 88, Goertzen Dep. at 244:16-247:6 (Peter Goertzen, aluminum trader at Goldman Sachs: ███████████████████ ██████████████████████████████████████████████████████████ ██████████.

And Defendants were not alone in their view. ***Virtually every market participant recognized that longer queues were driving up regional premiums*** – precisely as FLPs' expert, Dr. Gilbert, confirmed through his multiple regression, cointegration and Granger causality analyses, and confirms in his reply report. Independent market analysts such as Morgan Stanley found in 2013 that ██████████████████████████████████████████████████████████ ██████████████████████████████.'' Ex. 17 at 31; *id*. at 27 ██████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████ The U.S. Senate Subcommittee on Investigations similarly found after a two-year investigation that "the increase in

the Metro Detroit queue were highly correlated with increases in the aluminum Midwest Premium over the same time period which, in turn, became a growing component of the all-in price of aluminum." Ex. 76, SR at 194.

### b. The LME Price and MWP Were Distinct Components of All-In Prices and Driven by Separate Factors

In their opposition, Defendants focus their attack on the relationship between the MWP and all-in prices. Echoing an argument Goldman Sachs unsuccessfully made to the Senate, Defendants attempt to sell the notion that when longer queues increase regional premiums, they also reduce LME prices to the exact same extent – leaving the all-in price unaffected. Defs' Brf. at 13, 18. In their view, warrants for LME aluminum trade at a discount due to the queues, and that discount is reflected in LME settlement prices. *Id.* at 13. Again, this conflicts with the realities of the aluminum market during the Class Period.

Defendants' argument fails to recognize that regional premiums and LME prices are distinct components of the all-in price. Regional premia – as its name suggests – reflect *local* market conditions. They include the cost of delivering the metal in a specific region, such as freight, insurance, storage and loading. Ex. 52 at 89; Ex. 77, Alcoa Inc., Form 10-Q at 57 (June 30, 2014) ("Each of the above three components has its own drivers of variability."). Regional premia are negotiated by local buyers and sellers in deals within a specific market, outside the exchange. *Id.* LME prices, on the other hand, are typically driven by *macroeconomic* factors, such as *global* production and use, expectations for *global* growth, *global* inventories, and the marginal cost of *global* production. *Id.* These prices are the result of negotiation between a handful of traders on the exchange in London. Ex. 78 at 11 (Vazquez Stmt.). Because LME prices and regional premiums have their own drivers, each component moves independently of the other. *Id.* Indeed, if, as Defendants say, LME prices account for movement in regional premia, there would be no need for

separate components in the first place.  The very reason regional premia exist is because they account for local factors not accounted for in the global LME price.

Moreover, given the small number of spot deals in relation to the heavy volume of LME trading, it would not make sense that spot trades were driving LME prices.  ██████████████

██████████████████████████████████████████████████████████████████████████████

██  Ex. 57 at 62; Ex. 78 at 11 (Vazquez Stmt.); Ex. 87, Gilbert Dep. at 311:9-23 ██████████

██████████████████████████████  ).  This disparity grows even larger when you consider that aluminum in only two (U.S. and Europe) of multiple premium regions, and accounting for one-third of global stocks, were affected by queues.  Ex. 34; Ex. 18; Ex. 49; Kaplan Decl., Exhibit 4.  The notion that such a relatively small number of local spot transactions concentrated in two regions were not only driving aluminum trading, but drove LME prices so significantly that it completely eliminated any impact and damages for the class, is nonsense.

The reason LME prices do not account for regional premia becomes even clearer when you consider who traded aluminum.  LME prices are established on a daily basis through the buying and selling of futures contracts on the LME.  Ex. 58 at 51-52.  The buyers and sellers of those contracts are, of course, traders, who do not intend to take delivery of that metal.  *Id*. at 51 ██████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████  ); Ex. 52 at 689 ██████████████████████████████████████████

██████████████████████████  Traders, therefore, have no reason to account for regional premia when executing trades, because they never pay it; only those who take delivery pay the premium.

That LME prices and regional premia do not move inversely is also borne out by their actual movement during the Class Period.[22]  For a significant portion of the Class Period, the MWP and LME price moved in the same – not ***opposite*** – direction.  Ex. 76, SR at 173.  LME prices and the MWP only began to move in different directions in early 2011, when two significant macroeconomic factors (the China economy slowed and Europe manufacturing activity contracted) turned negative, causing LME prices to fall.  *Id*.; Ex. 37 at 984.

Notably, until aluminum consumers began complaining about the queues, no one in the industry, including Defendants themselves, held the view that regional premia drove LME prices.  Although they attempt to tie the two components together here, during the Class Period, Defendants correctly treated LME prices and regional premia as independent components, with separate drivers, when analyzing aluminum prices.  In a September 2013 analyst note from its research department, JPMorgan, for example, s███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████. Ex. 52 at 689
████████████████████████████████████████

Notwithstanding the importance of the MWP to their business strategies, Defendants never projected, or even hinted, that LME prices and the MWP were inversely related ████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████ Ex. 42; Ex. 41; Ex. 40; Ex. 56; Ex. 50. ███████████████
███████████████████████████████████████████████████████████████████

---

[22]   Ex. 2, Zona Reply, ¶19 ("As I presented in my report, rather than rely solely on theoretical arguments, there is a simple test of this proposition.  If Prof. Hausman's Perfect Offset Hypothesis were true, then changes in LME prices and MWP would be perfectly negatively correlated.  This claim is unsupported by the data.").

███████████████████████████████████████████████

████████████████████████████

When Goldman Sachs and the LME pressed a similar argument – unsuccessfully – in front of the Senate, they "concede[d] that the queue has affected premium prices and the relative proportions of the all-in price attributable to the premium price versus the LME price." Ex. 76, SR at 180. But "they assert[ed] that the effect of the longer queue has been to drive the LME portion down and the premium portion up, leaving the all-in price substantially unchanged." *Id.* Calling this "the minority view," the Senate Report agreed that "there has been no empirical study or evidence or modeling that suggests changes in LME prices and the Midwest Premium are inversely related." *Id.*

To support their position here, Defendants cite a report issued by the LME in November 2013. That report, however, is of questionable value, for several reasons. Most notably, just months before the LME issued the November 2013 report, Nigel Dentoom, a member of the LME User Committee, stated that the queues in Detroit and Vlissingen were ***not*** a threat to LME prices. As he stated:



Ex. 92 at 73.

Yet, there are other reasons to question the findings in that report. First, the report was issued ***after*** this litigation had been filed and was prepared in response to the practices that gave rise to this litigation. Second, Defendants had a significant ownership stake in the LME and were members of several committees at the time the report was filed, including the Executive Committee

- 24 -

which prepared the report.  Ex. 19 at 62 ███████████████████████████████████████

█████████████████████████); Ex. 59 at 32 (███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████  Ex. 19 at 62.  In essence, Defendants are relying on their own work product, prepared by

them as they were facing this very litigation, as support for why this litigation is meritless.  It is no

surprise, then, that the report finds that Defendants' actions had no impact on prices.[23]  Defendants

cannot seriously suggest that the LME report is the type of independent, unbiased factual support

that undermines FLPs' theories, much less warrants denial of class certification.  In any event, all of

this evidence is evidence common to the class.  This issue will be a common issue to the class,

determined by common evidence.  The issue highlights rather than undermines class certification.

### C.      Defendants' Conduct Impacted All or Nearly All Class Members

#### 1.      Common Proof Establishes Antitrust Impact for All Class Members

Horizontal conspiracies often involve differentiated products that are priced in a multitude of

ways, which can complicate the proof of common impact under Fed. R. Civ. P. 23(b)(3).[24]  This

case, however, poses no such challenges.  Aluminum industry convention dictates that purchasers of

primary aluminum in the United States pay a benchmark price: the MWP.  Not surprisingly, courts

that confront alleged conspiracies to fix benchmark or list prices almost universally find that there is

clear and common proof of antitrust impact.[25]

---

[23] ████████████████████████████████

████████████████████████████████████████████████████████████████████  *See, e.g.*, Ex. 25;
Ex. 44; Ex. 12; Ex. 13; Ex. 14.

[24]     *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 253298 (N.D. Cal. Jan. 26,
2012).  Even in cases like *LCD*, courts overwhelmingly certify horizontal conspiracy cases because "[p]redominance is a
test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods. Inc. v. Windsor*, 521 U.S.
591, 625 (1997).

[25]     *See, e.g., Kleen Products LLC v. Int'l Paper*, No. 15-2385, ___ F.3d. ___, 2016 U.S. App. LEXIS 14282, at *20-*21
(7th Cir. Aug. 4, 2016) (plaintiffs can demonstrate antitrust impact by showing that the conspiracy caused an increase to
the standard price); *In re Aftermarket Auto. Lighting Products Antitrust Litig.*, 09 MDL 2007-GW PJWX, 2011 WL

1173128_1

Like the question of conspiracy (which is ***the*** central issue in this case[26]) the question of antitrust impact is decidedly common for ***all*** class members. The existence of antitrust impact for each and every class member rises and falls with a single inquiry: did Defendants' conduct inflate the MWP?  It is the epitome of a common question and the proof offered by Plaintiffs to answer this question is equally common.

Defendants' response to this straightforward question of impact depends on two fictions. ***First***, Defendants suggest that any inflation in the MWP caused by their conduct was perfectly offset by a decline in the LME price.  ***Second***, Defendants suggest that class members do not, in fact, pay the MWP.  Neither of these claims is credible.

### a.      Antitrust Injury and Impact

Before turning to Defendants' incredible factual arguments, it is important to note one fact that Defendants appear to concede: the queue at Metro's Detroit warehouse caused the MWP to rise. *See, e.g.*, Defs' Brf. at 13.  Indeed, the centerpiece of Defendants' opposition to class certification is

---

3204588, at *5 (C.D. Cal. July 25, 2011) ("Here, by contrast, where the amounts paid by class members were based on published catalogue prices, the question of impact is, at least in theory, easily susceptible to common proof."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) (finding that "across-the-board list price increases" establish "common proof of impact to the class"); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 171-72 (S.D. Ind. 2009) (certifying class where "it is clear that Plaintiffs intend to prove at trial that Defendants conspired to set artificially high list prices."); *In re Urethane Antitrust Litig. ("Urethane II")*, 251 F.R.D. 629, 637-38 (D. Kan. 2008) ("evidence of a standardized pricing structure…provides generalized proof of class-wide impact"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 69 Fed. R. Serv. 3d 791 (M.D. Pa. 2007) (inflated list price establishes common impact); *In re Polyester Staple Antitrust Litig.*, MDL 3:03CV1516, 2007 WL 2111380, at *23 (W.D.N.C. July 19, 2007) (same); *In re Urethane Antitrust Litig. ("Urethane I")*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) (same); *In re Carbon Black Antitrust Litig.*, CIV.A.03-10191-DPW, 2005 WL 102966, at *17 (D. Mass. Jan. 18, 2005) (same); *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2003 WL 21659373, at *6 (S.D.N.Y. July 15, 2003) (same); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) (same); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 415 (S.D. Ind. 2001) (same); *In re Plastic Cutlery Antitrust Litig.*, CIV. A. 96-CV-728, 1998 WL 135703 (E.D. Pa. Mar. 20, 1998) (same); *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998) (same); *In Re Med. X-ray Film Antitrust Litig.*, CV-93-5904, 1997 WL 33320580, at *10 (E.D.N.Y. Dec. 26, 1997) ("numerous courts have held that common proof of impact can be established on the basis of evidence of a conspiracy to fix base prices"); *In re Citric Acid Antitrust Litig.*, No. 95-1092, 1996 WL 655791, at *7 (N.D. Cal. Oct. 2, 1996) ("list prices proved the fact of impact"); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("artificially inflated base price" establishes impact); *Hedges Enterprises, Inc. v. Cont'l Group, Inc.*, 81 F.R.D. 461, 475 (E.D. Pa. 1979) ("The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base"… and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage . . . .").

[26]     *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate").

*not* that queues had no effect on the MWP – and as described above, there is near universal consensus among market participants and observers that queues did have that effect. Rather, Defendants assert that increases in the MWP were erased by simultaneous declines in the LME price. Defendants are simply incorrect. But even if they are right, their argument has no bearing on the Court's predominance inquiry under Rule 23(b)(3).

The law is unequivocal that collusion to manipulate a price – even if only the component of a larger price – is a violation of the antitrust laws. *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("the fixing of a component of price violates the antitrust laws"). Thus, if Plaintiffs prove that Defendants colluded to lengthen the queue in Detroit and thereby "squeeze up the [Midwest] premium[]," there is no question that they will have proven a violation of the antitrust laws. Ex. 29 at 11. The antitrust injury (*i.e.*, impact) from that violation is the payment of the collusively imposed price, in this case, the MWP. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress"). Whether, as Defendants posit, a decline in the LME price offsets the collusive inflation to the MWP will determine whether class members suffered monetary damages. But that does not defeat the showing of classwide impact. *See, e.g.*, *EPDM Antitrust Litig.*, 256 F.R.D. at 88 ("It is important to note at the outset that 'impact' (or 'injury-in-fact') and 'damages' are two distinct elements of an antitrust claim – injury-in-fact is whether the plaintiffs were harmed and damages quantify by how much.").[27]

---

[27]    *See also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (it is "'well-established' in this Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)").

More important to the Court's inquiry under Rule 23, even Defendants' "perfect offset theory" is common to every class member. Ex. 2, Zona Reply,[28] ¶¶13-19.  The LME price, like the MWP, is a benchmark price; changes to it are the same for every class member.  Thus, to answer whether the all-in prices paid by class members were inflated by a supracompetitive MWP, or whether those prices were unaffected because of an offsetting decline in the LME price, requires the exact same inquiry and the exact same evidence *for each and every class member*.  Put another way, if each class member proceeded against these Defendants in an individual action, the evidence of whether there is antitrust injury would be exactly the same.  This is the very essence of predominance under Rule 23(b)(3).  *See, e.g.*, *Hyderi v. Wash. Mut. Bank FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006) ("At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis.").[29]

### b.   FLPs Have Presented Robust Common Evidence of Antitrust Impact

The record is replete with qualitative evidence that the queue in Detroit caused the MWP to rise.  *See supra*, §II.B.2.a. (cataloging evidence).  The record also is replete with qualitative evidence that the inflation to the MWP caused the all-in price of aluminum to rise.  *See supra*, §II.B.2.b. (cataloging evidence).  And finally, the record is replete with qualitative evidence that the Midwest Transaction Price is ██████████████████████████████████████

██████████████████████████████████████████████████████.[30]

---

[28]   Expert Reply Report of J. Douglas Zona, Ph.D., filed concurrently ("Zona Reply").

[29]   *See also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) ("The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."); *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) ("As we have explained, the legal question raised by the antitrust injury element here is common to the class. If the factual question – injury-in-fact – is also common, then the predominance requirement of Rule 23(b)(3) is likely met.").

[30]   Ex. 35 at 42.

This evidence, which includes industry documents and statements made in the ordinary course of business by smelters, large purchasers, small purchasers, industry experts and analysts, financial institutions and even Defendants themselves, is powerful and essentially unrebutted evidence of classwide impact.  Given this reality, Defendants not surprisingly prefer to focus on economic "theory" and dubious econometrics.  However, as even Defendants' expert, Dr. Hausman, admitted at his deposition, the lynchpin of Defendants' economic arguments – that queues cause the LME price to decline – is neither reliable nor correct.  *See* Ex. 89, Hausman Dep. at 278:8-280:5

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### 2.     Dr. Gilbert's Analyses Are Economically Sound and Reliable

Dr. Gilbert is a well-respected economist and expert with extensive experience in aluminum and other non-ferrous commodity metals.  He has published multiple articles on aluminum in peer-reviewed journals.  He is also an expert in futures markets and applied econometrics.  *See* Gilbert Rpt., Exhibit 1; Ex. 89, Hausman Dep. at 133:6-22 (████████████████████████████████

████████.  Dr. Gilbert has brought decades of experience and insight to bear on his analyses in this case.  His conclusions – which comport with the real world – are theoretically sound and econometrically reliable.

### a.     Economic Theory and Reality Support Dr. Gilbert's Analysis

As detailed throughout FLPs' filings in this case, and as noted by Dr. Gilbert, "[t]he predominant view in the aluminum industry is that Defendants' queue-building activities raised the Midwest Premium and the all-in prices paid by aluminum purchasers."  Ex. 1, Gilbert Reply, ¶7.  Smelters, sophisticated purchasers, and market analysts all believe that queues inflated the all-in price of aluminum.  *Id.*  Yet according to Defendants and Dr. Hausman, Dr. Gilbert – and virtually

every aluminum industry participant – is mistaken about how the market actually operates.  This does not pass the "smell test" and is a "crazy result."[31]  *See* Ex. 1, Gilbert Reply, ¶8 ("As a matter of economic theory, it would be surprising if sophisticated market actors were entirely mistaken about something as central as the price they pay or receive and which price directly and materially impacts their business operations.").

According to Dr. Hausman, the aluminum market is very simple.  There is more aluminum supply in the world than there is demand for physical aluminum from commercial users (*e.g.*, fabricators, manufacturers), so a queue at a single warehouse location in Detroit could not possibly have affected the price to obtain physical aluminum.  Hausman Decl., ¶¶26-27; Ex. 1, Gilbert Reply, ¶9 ("[Dr. Hausman's] view appears to be that since loadout queues do not affect either physical demand or supply, they cannot affect the all-in price.").  This simple description, however, ignores a fundamental market reality: demand from non-commercial actors (*i.e.*, financial players).  Ex. 1, Gilbert Reply, ¶9 ("But Dr. Hausman's modeling and analysis ignores a key part of the marketplace – the activities of non-commercial purchasers of aluminum.").  This demand is real.  Ex. 1, Gilbert Reply, ¶17; Ex. 2, Zona Reply, ¶¶20-23.

Dr. Gilbert and Dr. Hausman agree that during the Class Period the aluminum market was oversupplied.  The question, however, is what happens to the "surplus" aluminum?  As Dr. Hausman conceded at his deposition, when he discusses "demand" and "surplus" in his report he is exclusively referring to commercial demand.[32]  When pressed, Dr. Hausman acknowledged that noncommercial demand is real, but indicated that he had not considered and did not have an opinion about whether

---

[31]   Ex. 89, Hausman Dep. at 66:5-11 ("Q. And you tell them [your students at MIT] that when they do econometric exercises, or economic investigations, they should then check with marketplace participants to perform what you call the smell test?  A. Yes, to make sure they don't have crazy results.").

[32]   Ex. 89, Hausman Dep. at 191:23-192:9 ("Q. [I]s it correct that you are talking about it in terms of an oversupply measured against the demand of commercial purchasers?  A. Yes.  Q. You are not including in that the demand by the noncommercial purchasers?  A. Right.  Q. In fact, it is the noncommercial purchasers who, in fact, are then purchasing that supply of aluminum?  A. Yes, they are soaking up the excess.").

the available supply of aluminum exceeded the combined demand from commercial and non-commercial purchasers.[33]

Dr. Gilbert explains that once non-commercial demand is taken into account there are at least two important consequences that Dr. Hausman ignores. *First*, it is wrong to conclude that aluminum (including "dark" or off-warrant aluminum outside of LME warehouses) is unencumbered and freely available to the physical market. Noncommercial participants in the market, though not manufacturing anything, are nonetheless "using" the aluminum. Ex. 1, Gilbert Reply, ¶¶12, 17. To suggest otherwise is no different than suggesting that aluminum owned by Coca-Cola is "available" to Anheuser-Busch. Ex. 1, Gilbert Reply, ¶17 n.12. In market terminology, this aluminum is "tightly held." Ex. 1, Gilbert Reply, ¶19.[34] *See also* Ex. 2, Zona Reply, ¶¶20-23.

*Second*, Dr. Gilbert explains that in times of oversupply (as both experts agree was the situation during the relevant time period) the price of a warrant on a liquid futures exchange will be determined by the supply of and demand *for warrants*, not on the present availability of the underlying commodity. Ex. 1, Gilbert Reply, ¶13 ("[D]uring times of oversupply *the LME price is determined by the supply and demand for LME futures contracts*. Queues are irrelevant. There is no queue to buy or sell a warrant, and the vast majority of futures trades do not result in the delivery of physical aluminum.") (emphasis in original). This stands to reason.

The economic implication of this is clear: the queue at a warehouse will not have much (if any) effect on the price that a noncommercial trader is willing to pay for a LME warrant. Ex. 1,

---

[33]   Ex. 89, Hausman Dep. at 192:19-25 ("Q. Do you agree that both the commercial purchasers and the noncommercial purchasers of aluminum compete with each other to purchase aluminum? A. Well, they all create demand for aluminum. So, if you want to call that competition, I'm not going to disagree."); *id.* at 193:20-194:3 ("Q. Do you have an opinion about whether the supply of aluminum in the market exceeded the combined demand of both the commercial and noncommercial purchasers? A. No, but that is what price is cleared to do. Somebody has to buy the stuff or it is going to sit in the field in Pittsburgh, you know, outside of Alcoa's headquarters which they probably don't want.").

[34]   In addition, Dr. Gilbert explains that it would be unreasonable to assume that the substantial stocks of aluminum owned or controlled by these Defendants – who are alleged to have conspired to withhold aluminum from Plaintiffs – is freely available to the physical market. Ex. 1, Gilbert Reply, ¶19.

Gilbert Reply, ¶13 n.11 ("[E]conomic theory predicts that in times of surplus the LME price will not be much affected (if at all) by the loadout queue, by stock concentration or by payment of incentives."). In other words, economic theory predicts that a warehouse queue will have little or no impact on the LME price. *Id.* Stepping back from abstract theory, this conclusion is entirely sensible. The LME aluminum exchange is a highly liquid global market in which most transactions are by noncommercial investors who have no intention of taking delivery of physical aluminum. Why would we expect the queue in Detroit to affect the price that these investors are willing to pay for an LME aluminum warrant? We should not. Common sense (and economic theory) expect that the Detroit queue – which raises the cost of taking physical delivery of LME aluminum *in the U.S.* but does not impact the global supply of aluminum or the supply of LME warrants – will raise the Midwest Transaction Price (the price to obtain physical aluminum in the U.S., where there is a queue) but will not raise the worldwide LME price. Ex. 1, Gilbert Reply, ¶20.

### b.   Dr. Gilbert's Econometric Analyses Are Reliable

### (1)   The LME and All-In Price

As explained above, economic theory predicts that the LME price will not be impacted by the existence of a warehouse queue, but that regional premiums will be. In the aluminum industry, there is near universal consensus that the MWP and the LME price move independently. *See supra*, §II.B.2.a; Ex. 2, Zona Reply, ¶¶13-16. The lone exceptions are the Defendants, and even they only "discovered" this alternate view of the world once the Senate investigation and this litigation had commenced.[35] Defendants' expert Mr. Kaplan, who published an article about the LME price of aluminum outside the context of this litigation, did not mention the MWP or queues when he

---

[35] *See* Defs' Ex. 36, Declaration of Henry Liu in Support of Defendants' Opposition to the First Level Purchaser Plaintiffs' Motion for Class Certification; Ex. 43 at 32.

explored the determinants of the LME price.[36]   Ex. 80.   Defendants' only toe-hold in reality is Dr. Hausman's econometric modeling, which purports to show that queues cause the LME price to go down.[37]   Dr. Hausman, however, refused to vouch for the soundness of this analysis:



Ex. 89, Hausman Dep. at 278:8-281:3.

As Dr. Gilbert explains, the results from Dr. Hausman's modeling do not make economic sense.   Ex. 1, Gilbert Reply, ¶¶27-28.   While Dr. Hausman argues that his model "shows" that queues make the LME price go down, he does not discuss the anomalous results that his model reports.   For example, Dr. Hausman's model predicts that as the supply of aluminum increases, aluminum prices will rise.   Ex. 1, Gilbert Reply, ¶28.   Economic theory predicts that more supply should lead to ***lower*** prices.   *Id.*   When a regression model gives results that do not make economic sense, it is a red flag that the model is unreliable.   Ex. 1, Gilbert Reply, ¶27.   And that is the case with Dr. Hausman's.

---

[36]   Ex. 2, Zona Reply, ¶11 ("In his published investigation, Mr. Kaplan did none of the things he asserts must be done in this case to estimate impact or damages . . . .   Mr. Kaplan did not examine whether the increases in the LME daily cash price were offset by the Midwest Premium.").

[37]   As Dr. Gilbert observes in describing the economic implausibility of Dr. Hausman's model in this respect, the model also predicts that the queues cause the "all-in" price to go down, a claim that even the Defendants do not make and, of course, makes no sense – economically or otherwise.   Ex. 1, Gilbert Reply, ¶28.

In his initial report, Dr. Gilbert identified that demand for aluminum in North America increased during 2014 and early 2015.  This change in demand has econometric implications, which Dr. Hausman ignored.  Ex. 1, Gilbert Reply, ¶29.  Once this error is corrected, Dr. Gilbert concludes: "[T]he results from Dr. Hausman's proposed modification to my econometric model are entirely consistent with the opinion I express in my initial report: queues do not cause lower LME prices and do raise all-in prices."  *Id.*

### (2)     The Japan Premium

Dr. Hausman also suggests that the Japan Premium should be used as a control variable to investigate the causes of changes in the MWP.  Dr. Hausman posits that the conspiracy alleged by Plaintiffs did not affect Asia.  Hausman Decl., ¶67 n.80.  He also posits that queues in Detroit and Vlissingen did not impact the Japan Premium.  *Id.*, ¶¶67-69.  Dr. Hausman's assumptions are incorrect.  *See, e.g.*, Ex. 2, Zona Reply, ¶18 ("Contrary to Prof. Hausman's claims, his analysis of the relationship between the Japan and Mid-West premia does not prove the Perfect Offset Hypothesis. His subsequent econometric analysis assuming the Japan Premium is unrelated to the MWP is fundamentally flawed.").

Dr. Gilbert, however, takes Dr. Hausman's suggestion at face value and examines the inclusion of the Japan Premium in the cointegration analysis.  Dr. Gilbert identifies various and significant technical errors that Dr. Hausman has made.  Ex. 1, Gilbert Reply, ¶¶31-33.  Once these errors are corrected, Dr. Hausman's reported results again vanish.  *Id.*, ¶33 ("Dr. Hausman's use of the Japanese Premium does not comport with economic theory or proper econometric modeling.  His conclusions based on this analysis, namely that queues did not impact the Midwest Premium, should not be credited.").

### (3)   First-Level Purchasers Pay the MWP

According to Goldman Sachs, the Midwest Transaction Price is the ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *See* n.25, *infra*.  And Goldman Sachs is not alone in this

belief.  Outside the context of this litigation, there is little question or doubt that "nearly all" physical

aluminum purchases – including by the proposed class – include the MWP.  Dr. Gilbert, in addition

to considering industry evidence about pricing conventions for physical aluminum, also reviewed

hundreds of contracts and analyzed more than 250,000 actual purchase transactions accounting for

approximately 75% of all class transactions.  Ex. 1, Gilbert Reply, ¶38.  "Viewing all of this

information together, it is clear that all or nearly all first level purchasers of aluminum pay the

Midwest Premium."  *Id.*

Dr. Hausman raises various criticisms of Dr. Gilbert's "pass-through" analysis.  Dr. Gilbert

responds to each criticism, and concludes that the criticisms are without merit.  Ex. 1, Gilbert Reply,

¶40; *id.*, App. C.  Dr. Gilbert explains the purpose of the pass-through analysis: "If we expect that

nearly all transactions incorporate the Midwest Premium we should also expect to see full pass

through of the Midwest Premium to the final transaction prices from smelters.  And that is what we

do see.  The pass through analysis is thus an econometric confirmation of what the industry and

record evidence indicate."  Ex. 1, Gilbert Reply, ¶40.  Importantly, as even Dr. Hausman concedes,

most transactions ***do*** include the MWP, Ex. 89, Hausman Dep. at 206:10-18, and he admits that he

made no effort to quantify the number of purchasers or transactions that did not include the MWP.

Ex. 89, Hausman Dep. at 205:4-206:13.  The overwhelming weight of evidence is that all or nearly

all purchases of primary aluminum from smelters do include the MWP.

### (4)     First-Level Purchasers Suffered Damages

In his initial report, Dr. Gilbert put forward a damages model that estimated the level of excess warrant cancellations that resulted from Defendants' alleged collusion.  The thrust of Dr. Hausman's and Mr. Kaplan's attack on Dr. Gilbert's damages model is that he purportedly failed to account for a 2012 LME rule change that increased the minimum load-out rate from warehouses. Hausman Decl., ¶100; Kaplan Decl., ¶¶186-189.  In fact, it is Defendants who are mistaken. Dr. Gilbert's model **does** apply the 2012 LME rule change to his counterfactual estimates, but does not apply a 2015 LME rule change (that relates to load-ins as well as load-outs).  Ex. 1, Gilbert Reply, ¶50.[38]  As Dr. Gilbert further explains, the 2015 rule change has very little or no consequence to the model estimates.  *Id.*  Thus, Defendants' central criticism of Dr. Gilbert's damages model is wholly without merit.[39]

The second criticism levelled by Dr. Hausman is also without merit.  Dr. Hausman suggests that Dr. Gilbert should have used the same benchmark period to estimate competitive levels of warrant cancellations in Detroit and Vlissingen.  Hausman Decl., ¶103-104.  But, that makes little sense as a matter of economic theory or econometric practice.  Economic analysis must take account of the real world.  Here, it is clear that the Vlissingen queue (and thus excess warrant cancellations in Vlissingen) did not begin until late 2011, whereas the Detroit queue emerged in 2010.  Accounting

---

[38]   During his deposition, Dr. Gilbert misspoke in response to one of Defendants' questions on this issue.  Had Dr. Hausman or Mr. Kaplan actually reviewed the materials provided by Dr. Gilbert, they should have seen that Dr. Gilbert did in fact apply the 2012 LME rule change.

[39]   It is clear from the record that the LME rule change was a direct response to the queue in Detroit.  Ex. 1, Gilbert Reply, ¶51.  Thus, there is good reason to believe that in the absence of Defendants' alleged conduct, the 2012 LME rule change never would have been implemented.  Accordingly, in the counterfactual competitive world, Dr. Gilbert would have been justified in ignoring the rule change.  As explained above, he did not do so.  As a result, his damages estimates are conservative.

for this reality is entirely appropriate, and is the type of thing that Dr. Hausman himself does when he estimates damages.[40]

### 3.    Dr. Gilbert's Analysis Is Consistent with FLPs' Theory of Liability

The Second Circuit has been very clear in its interpretation of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013): "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407. *See also In re Nexium Antitrust Litig.*, 777 F.3d 9, 23 (1st Cir. 2015) (interpreting *Comcast*: "the damages calculation must reflect the liability theory").

Here, Plaintiffs' proposed damages model expressly tracks their theory of liability. As noted by the Court in denying Defendants' motion to dismiss, Plaintiffs have accused these Defendants of "strategically cancelling warrants . . . for the purpose of putting the aluminum associated with cancelled warrants into the load-out queues, thereby delaying load-outs of aluminum." *Aluminum Warehousing*, 95 F. Supp. 3d at 434 (citing, *inter alia*, TAC, ¶¶10, 468). Dr. Gilbert's proposed damages model is focused precisely on this conduct. Ex. 1, Gilbert Reply, ¶55 ("Plaintiffs allege that the Defendants coordinated efforts to cancel aluminum warrants in order to create long queues at LME warehouses. My damages model expressly measures damages based on this conduct (and only on this conduct). If Plaintiffs prove that Defendants collusively cancelled warrants, my model reliably estimates damages arising therefrom.").

From the very start of this case, Plaintiffs have alleged that the long queue in Detroit was the problem. This case is – and always has been – about the queue. Plaintiffs' theory of liability is the

---

[40]    In a different price-fixing case where Dr. Hausman was working for a plaintiff, he used one conspiracy time period to estimate damages for domestic purchases and a different time period to estimate damage for foreign purchases. He did not think that the use of different conspiracy time periods rendered his estimates unreliable. Ex. 89, Hausman Dep. at 89:9-13.  Neither does the use of two different time periods render Dr. Gilbert's estimates unreliable.

- 37 -

same as at the start of the case: the queue in Detroit caused Plaintiffs to pay more than they otherwise would have for physical aluminum. To the extent these Defendants coordinated their efforts to build the queue through the collusive cancellation of warrants, Dr. Gilbert's model provides a reliable estimate of the amount of damages caused by those collusive warrant cancellations.

As Dr. Gilbert explains, Defendants appear not to appreciate what the queue is: warranted aluminum that has been cancelled and is waiting to be loaded out of the warehouse. Ex. 1, Gilbert Reply, ¶¶55-57. Queues get longer when more warrants are cancelled, which leads to more aluminum being loaded out of the warehouse. Dr. Gilbert estimates how much aluminum would have been loaded out of LME warehouses in a competitive environment and labels any amount above this an "excess loadout." From this, Defendants leap to the conclusion that since the conspiracy caused "excess loadouts," Dr. Gilbert is saying that the conspiracy caused *more* aluminum supply to be available to the market. Defs' Brf. at 25. In other words, Defendants argue that the queues were actually good for the Plaintiffs. This is absurd, and as Dr. Gilbert explains, not at all an accurate portrayal of his model (or the aluminum market). Ex. 1, Gilbert Reply, ¶57.

Defendants also are mistaken about the relevance of the queue in Vlissingen. Since the filing of the complaints in this case, more information has become available through the process of discovery. That is how litigation works. As Dr. Gilbert explains, "I understand that Plaintiffs have alleged a single conspiracy that implicates the coordinated cancellation of LME aluminum warrants in Metro's Detroit warehouse and in Pacorini's Vlissingen warehouse and my investigation of the factual record is consistent with this allegation." Ex. 1, Gilbert Reply, ¶60. At the time Plaintiffs filed the TAC, the data then available did not suggest to Dr. Gilbert that the queue in Vlissingen was relevant to any inflation of the MWP. Ex. 1, Gilbert Reply, ¶60 n.60. By the time of his initial

- 38 -

report at class certification, much more data was available, and the analysis changed. *Id.* There is no good economic reason to suppose that Vlissingen should not be considered in Dr. Gilbert's analysis. Ex. 1, Gilbert Reply, ¶61.[41] If the Court determines that there is a legal reason that Vlissingen should not be considered – which Plaintiffs dispute – Dr. Gilbert can calculate damages based exclusively on the Detroit queue. Ex. 1, Gilbert Reply, ¶¶59-61. But that is no basis for denying class certification.

### D.     The Proposed Class Is Ascertainable

Defendants inject needless confusion into the readily met ascertainability standard, seeking to focus the Court's attention away from what is a straightforward inquiry. Dr. Gilbert has demonstrated via record evidence that the determination as to who is a first level purchaser, and thus a readily identifiable member of the class, can be determined in a manner "'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"[42] *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quoting 7A Charles A. Wright & Arthur R. Miller *et al.*, *Federal Practice and Procedure* §1760 (3d ed. 1998)). After examining industry evidence, purchaser agreements and transaction records, Dr. Gilbert determined that "all or nearly all" class members had at least one first level purchase that was affected by an overcharge. Ex. 1, Gilbert Reply, ¶¶35-41.

In this Circuit, "'[t]he standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable.'" *Stinson v. City of New York*, 282 F.R.D. 360, 373-74 (S.D.N.Y. 2012) (citing *Gortat v. Capala Bros., Inc.*, No. 07-CV-

---

[41]    For these same reasons, Defendants' arguments against including the Vlissingen queue at §VI.3 of Defendants' opposition fail. Defs' Br., §VI.3.

[42]    Notably, in adopting the "administratively feasible" standard, the Second Circuit has not adopted the heightened ascertainability requirement adopted by some other Circuits, including the Third, Fourth and Eleventh Circuits. Instead, courts in this Circuit employ an analysis more similar to that used in the Sixth and Seventh Circuits. Defendants' suggestion that the Court rely on the non-controlling – and contradictory to Second Circuit precedent – *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), is misplaced.

3629 (ILG), 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010)).  "Class members need not be ascertained prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.'"  *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). Provided the class is defined in an objective manner, class members may be ascertained by submitting documentation at the claims stage to prove they are members of the class.  *See In re Facebook, Inc.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015); *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003) (even if some purchase information is unavailable, "the class can be identified through an examination of the individual files of the participants.  The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement").[43] "The possibility that damages may have to be determined on an individualized basis is not itself a bar to certification of a class."  *George v. China Auto Sys., Inc.*, No. 11-7533 (KBF), 2013 WL 3357170, at *5 (S.D.N.Y. July 3, 2013) (Forrest, J).

Defendants' claims that determining who the class consists of by using objective criteria would require "numerous fact-intensive inquiries" is untrue.  The class is ascertainable from the voluminous primary aluminum sales data that was produced by third parties.  What little that is not readily apparent from the data is apparent from the realities of the marketplace – where primary aluminum purchasers typically make dozens of purchases from multiple suppliers – rendering the chances of never having directly purchased any primary aluminum smelted by a producer

---

[43]  As the *Brecher* Court noted, "ascertainability does not require a complete list of class members at the certification stage."  806 F.3d at 25 n.2 (quoting 1 *McLaughlin on Class Actions* §4:2 (11th ed. 2014) ("The class need not be so finely described, however, that every potential member can be specifically identified at the commencement of the action; it is sufficient that the general parameters of membership are determinable at the outset.")).  Thus, contrary to Defendants' statements regarding the fact that the discovery period has closed, this does not limit the members of the class to only those for whom data was received. Defendants' statement also does not account for supplementation of data that might occur for time periods after the original productions.

- 40 -

infinitesimal.[44]   Finally, where some data may be missing, class members may easily submit documentation to prove their purchases of primary aluminum as part of the claims process.

### 1.    Dr. Gilbert's Analysis Demonstrates the Class Is Ascertainable

All parties agree, based on the Court's prior orders, that in order to demonstrate an aluminum purchaser is a member of the class, it must demonstrate that it made a first level purchase of primary aluminum during the Class Period.  *See* ECF No. 733 at 33-34; Defs' Brf. at 43; Kaplan Decl., ¶¶62-77.  Now, however, in an effort to muddy the waters, Defendants recast this as a requirement that every single piece of primary aluminum be meticulously accounted for and that damages for each unit of metal is appropriately apportioned to a particular class member.[45]  This is not the standard. Defendants' argument then follows that because sometimes some smelters purchase aluminum and then resell it, it is impossible to ascertain whether any given class member ever made a single first level purchase of aluminum.  To support this farfetched theory, Defendants fail to cite a single real-world example of any class member who did not make a first level purchase.  Likely because the odds against this are overwhelming, this theory has no connection to the real world.

In order to conclude that all or nearly all class members made first level purchases of aluminum, Dr. Gilbert examined the data produced by smelters in this litigation.  That data – 250,000 transactions for 286 unique customers, exclusively for purchases of primary aluminum – accounts for 91% of all class purchases.  Ex. 1, Gilbert Reply, ¶¶42-43.

---

[44]   *Bakalar v. Vavra*, 237 F.R.D. 59 (S.D.N.Y. 2006), a case seeking certification of a counter-claim-defendant-class related to an art collection looted by the Nazis, is also inapposite.  There, where there was "at most a 2.8 percent chance" that a piece of art was one identified by the plaintiffs as being in the class, and where even if the artwork could be identified there was no way to determine whether that piece of art was actually in an apartment in Vienna in 1938 that was looted by the Nazis, it would have been an "odyssey" to determine class membership.  *Id*. at 65.  Contrary to Defendants' assertions (Defs' Brf. at 44), these issues do not affect this proposed class of first level primary aluminum purchasers.

[45]   Defendants' citation to *Huebner v. Midland Credit Mgmt., Inc*., 14 Civ. 6046 (BMC), 2016 WL 3172789 (E.D.N.Y. June 6, 2016), while recent, is wholly unavailing.  In that case, assessing class certification in a Fair Debt Collection Practices Act, the court found the class could not be ascertained where one part of the definition required a determination as to whether putative class members had been subject to "probing" questions by a debt collector – a clearly impossible task calling for subjective determinations.  *See id*. at *8-*9.  Here, FLPs have data to support class membership.

In testing the data, as outlined in his Appendix D, Dr. Gilbert concludes that for the overwhelming majority of purchasers (approximately 88% of class members and 99.36% of the dollar volume of transactions), there is no possibility that all of the purchased metal was being resold from another smelter.  Ex. 1, Gilbert Reply, ¶45.  For the remaining 11% of purchasers (31 class members), there is only a very small possibility that they purchased only inter-smelter aluminum. *Id.*  Of those 31 customers, 30 had at least a 95% likelihood of being a first level purchaser and for more than half of them, the likelihood is 99.9999%.  *Id.*  Only 1 remaining customer, who made only one purchase of primary aluminum during the period, had odds below 95% of being a first level purchaser, and for it they were highly likely (92%) to have made a first level purchase.  *Id.*  Dr. Gilbert then concludes that Mr. Kaplan's concern (supported by no statistical analysis) was "highly speculative" and "very unlikely to be the case."  *Id.*

Dr. Gilbert's conclusion comports with common sense.  With less than 2.5% of transactions being smelter-to-smelter sales and each class member making nearly an average of 900 aluminum purchases, it would be hard to imagine that any statistically significant portion of the class did not make a first level purchase.[46]  *See, e.g.*, *Picardo v. Carmine's Broadway Feast Inc.*, No. 15-CV-3312 (RA)(SN), 2016 U.S. Dist. LEXIS 78276, at *32 (S.D.N.Y. June 13, 2016) ("Although 'a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant . . . [s]uch determinations are a matter of degree and will turn on the facts of the case.'"); *see also Kohen v. Pac. Inv. Mgmt. Co., LLC & PIMCO Funds*, 571 F.3d 672, 676 (7th Cir. 2009) ("PIMCO argues that before certifying a class the district judge was required to determine which class members had suffered damages.  But putting the cart before the

---

[46]   Ex. 1, Gilbert Reply, App. D; *see also* Ex. 2, Zona Reply, ¶25.

- 42 -

horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification.").

### 2.    Administrative Feasibility

As noted above, the FLPs have revised their proposed class definition to address Defendants' concerns.

The revised definition is consistent with the class of purchasers for whom Dr. Gilbert calculated damages in his opening report. *Compare* Gilbert Rpt., ¶6 ("Plaintiffs and the proposed class are first-level purchasers of primary aluminum in the United States between February 2010 and the present.") *with* Ex. 1, Gilbert Reply, ¶¶45-48.  In his original report, he demonstrated that there was a methodology using classwide evidence that could measure damages common to all class members.  This methodology used transaction-level primary aluminum sales data from North American smelters.  With the exception of correcting some errors, and gathering and synthesizing additional data, Dr. Gilbert's model remains unchanged.  Dr. Gilbert has demonstrated with certainty that nearly every member of the class can be identified as a first level purchaser of primary aluminum in the United States.[47]  Ex. 1, Gilbert Reply, ¶45.

Defendants also rely on out-of-circuit cases, claiming Plaintiffs have failed to offer an administratively feasible method for identifying the primary aluminum content of each aluminum purchase.  *See* Defs' Brf. at 47-48 (citing *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014)) (class not certified where impossible to determine whether plaintiff purchased product containing specific chemical); *Dumas v. Albers Med., Inc.*, No.

---

[47]    Defendants rely on *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 64-65 (S.D.N.Y. 2015), a consumer class action related to olive oil labeling.  In *Ault*, unlike the instant case, the plaintiff only had data identifying a small percentage of the potential class and would have to rely on self-identification for the vast majority of class members. Here, by contrast, Plaintiffs' expert has data representing 91% of the transactions during the Class Period by volume. Ex. 1, Gilbert Reply, ¶¶38-39; *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 362 (S.D. Iowa 2008), another consumer case, is also off base. There, membership in the class in part relied on whether a class member remembered if they had purchased defendant's cookware and thus the court could not determine who was in the class "without resort to speculation."  No such problems exist here.

03-0640-CV-W-GAF, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) (named plaintiff unable to determine whether he purchased the subject product and determination of class membership could require testing of pills to determine whether counterfeit); *In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 214 F.R.D. 614, 617 (W.D. Wash. 2003) (case not manageable where court found majority of the proposed class would have to rely on memory in order to determine whether they were purchaser of specific product).

Despite Defendants' efforts to confuse the issues, membership in the class does not depend on the types of complex tests or individual issues addressed in their cases.

### 3.    93% and Sheet

FLPs no longer seek to use these terms in their class definition. Dr. Gilbert's damages model did not and does not calculate damages for purchasers of these products. Importantly, in his initial and in his reply reports, Dr. Gilbert did not and does not limit the class based on the 93% figure Defendants attack but, rather, relies on the smelter's definition of primary aluminum – a definition that matches industry participants' nomenclature, the current class definition and Defendants' expert Kaplan's academic works. *See, e.g.*, Ex. 91, Miller Dep. at 39:6-9 ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓); Ex. 90, Kaplan Dep. at 60:9-23 (discussing a paper written by Kaplan entitled "The Causes and Consequences of the Aluminum MOU" and his description of the aluminum industry therein: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓); Ex. 3 at 47-48 (letter memorializing Alcoa Inc.'s sale of "Primary aluminum Extrusion log" to Superior Extrusion, Inc. during 2012 and incorporating Alcoa's "Standard Terms and Conditions for Selling Aluminum Primary and Secondary Products"); Ex. 4 at 33-35 (Alcoa's "Standard Terms and Conditions for Selling Aluminum Primary and Secondary Products" revised

March 2012 whereby 

); Ex. 7 at 36-37 (contract dated December 30, 2010 for Century's sale of

to Glencore Ltd. – Aluminum Department in 2011 with

the quality of the subject metal described as "Primary Unalloyed Aluminum meeting P1020A,"

"Primary Unalloyed Aluminum meeting P0610A," "Primary Alloyed Extrusion Billet," and

"Primary Foundry Alloy" and each having a pricing term incorporating the Midwest Premium);

Ex. 67 at 59 (September 18, 2014 revision to sale contract between Alcan Primary Products

Company LLC and Kaiser Aluminum Fabricated Products LLC for "Primary Aluminum Remelt

ingot P0405A, P0506A, P1020A, P1525A," with origin of "Primary aluminum as per Aluminum

Association specification" at a price incorporating the MWP); Ex. 68 at 95 (January 1, 2011 supply

agreement between Alcan Primary Products Corporation and Brazeway, Inc. for "Primary aluminum

extrusion billet" at a price incorporating the MWP); Ex. 69 at 22 (pricing confirmation for contract

between Rusal America Corp. and Zarabana Industries, Inc. for "Primary Aluminum Extrusion 6063

Billets" at price incorporating the MWP).[48]

### 4. "Pursuant to a Contract"

In a strange argument, Defendants attempt to create an ascertainability problem by alleging

that only certain contracts containing magic words written in a certain way are part of the class.

They call these "formal contracts." Defs' Brf. at 50. Without defining what these magic words are

---

[48]    At the same time, while the class definition has been revised to exclude sheet aluminum and the 93% limitation, as demonstrated above, this case has always been about ***primary*** aluminum. *See, e.g.*, TAC, ¶¶164-166; *see also Aluminum Warehousing*, 95 F. Supp. 3d at 430-31 (FLPs allege "[t]he vast majority of primary aluminum is purchased by industrial users such as plaintiffs"). Defendants admit that FLPs are "purchaser[s] of primary aluminum." *See, e.g.*, ECF No. 800 (Goldman Sachs and Metro's Answer to TAC), ¶¶48-49 (Ampal), ¶¶56-57 (Custom), ¶¶63-64 (Claridge), and ¶¶70-71 (Extruded). And primary aluminum is not limited to what Defendants call "LME-grade" aluminum. *See* Ex. 74, Platts Glossary of Terms and Definitions ("[P]rimary metal refers to metal produced from mined ore, as opposed to secondary metal, which is produced from secondary sources, mainly scrap."). Thus, Defendants "overbreadth" argument for limiting the class to transactions involving "LME grade" is too restrictive and reflects neither reality nor the scope of the injury their conduct has wrought.

- 45 -

or how they are supposed to be written, Defendants then come up with several types of contracts that are presumably not "formal" enough.[49]  Whatever this bizarre argument is, it misses the point. Defendants knew from the very beginning what a contract is,[50] on what transactions FLPs seek damages,[51] and were fully afforded the ability to – and did – test the bounds of these contracts in discovery.[52]  Despite their claims that class members are not ascertainable, and that the Court cannot feasibly determine when an individual falls in the class, Defendants – on their own – distinguish between different class members, identifying spot purchases, forward purchases and purchases with or without an express regional premium term.  *See* Ex. 1, Gilbert Reply, ¶39 (transactions of primary aluminum including the MWP are memorialized directly in writings or are evidenced by the data); *see also Facebook*, 312 F.R.D. at 353 ("It is disingenuous at best for Defendants to suggest the subclasses are unascertainable . . . while Defendants distinguish between retail and institutional investors on their own initiative in the same motion.").  In any event, including or not including this

---

[49]    As a preliminary matter, Defendants do not point to and the Court did not make any finding in its order denying leave to amend that the class was limited to purchases made pursuant to "formal contracts."

[50]    *See Contract,* Black's Law Dictionary (10th ed. 2014) (Defining a contract as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law.").

[51]    *See* TAC, ¶33 (in explaining that the "Plaintiffs purchased in the Relevant Product Market," stating "[e]ach Plaintiff purchased primary aluminum as a First Level Purchaser or a Direct Purchaser"); *id.*, ¶35 ("During the Class Period, Plaintiffs purchased primary aluminum at a price that included: (1) the LME Price, as defined herein, and (2) the Midwest Premium."); *id.*, ¶39 ("Each named Plaintiff was either (1) the first purchaser of primary aluminum, as defined herein, in the chain of distribution to pay the Midwest Premium or MW Transaction Price []; (2) a direct purchaser that purchased primary aluminum directly from a Defendant []; or (3) both . . . ."); *id.*, ¶41 ("By reason of Defendants' violations of law, therefore, Plaintiffs suffered injury to their business and property in the form of overcharge damages, when, in purchasing primary aluminum, they paid supra-competitive Regional Premiums, including the Midwest Premium."); *id.*, ¶157 (defining the relevant product market as the market for primary aluminum); *id.*, ¶164 n.37 ("This case is about primary aluminum.").

[52]    Defendants do not try to argue prejudice here and it is obvious why – they cannot. Throughout their brief and Mr. Kaplan's expert report, Defendants have a legion of specific examples of discovery taken where they challenge the bounds of the class. *See* Defs' Brf. at 50 n.22 & accompanying text (identifying deposition testimony from named plaintiffs discussing spot purchases of aluminum); *id.*, 50 n.23 & accompanying text (identifying named plaintiffs' deposition testimony discussing spot and forward purchases); *id.* at 52-53 n.28 & accompanying text (identifying deposition testimony from, and documents produced by, named Plaintiffs discussing their fixed price aluminum purchases, including spot and forward purchases of aluminum); *see also* Kaplan Decl., ¶¶54-56 (discussing spot sales); *id.*, ¶¶178, 180 (identifying and discussing certain fixed price contracts); *id.*, ¶194 n.546 (identifying "various agreements negotiated by defendants with customers to sell aluminum includ[ing] a fixed premium or a fixed price"); *id.*, ¶¶71, 79, 80 (same); *id.*, ¶¶141-146 (discussing swap contracts).

- 46 -

term does not prejudice Defendants, and they do not now make a contention of prejudice or surprise because they cannot – their attempted illusion was created solely for the purposes of a brief.

### 5.      The Inclusion of a Regional Premium

Defendants' final ascertainability argument begins with another faulty premise: that a regional premium is not included in every transaction for first level aluminum purchases, and that it is impossible to determine which of the purchases class members made that contain a regional premium element.   This is wrong for two reasons.   First, Dr. Gilbert demonstrates through econometric analysis that every transaction proposed to be in the class contains a regional premium element at a pass-through rate of almost exactly 1:1, and that all or nearly all class members pay the MWP.  Ex. 1, Gilbert Reply, ¶38.   If Defendants' experts attempted to rebut these analyses with serious statistical analyses, they were unreported.   *See* Ex. 90, Kaplan Dep. at 99:10-100:5 (Mr. Kaplan did not attempt to quantify whether first level purchasers paid the MWP in any way). Second, Dr. Gilbert has data for 91% of the first level aluminum sales in the U.S. during the Class Period, and confirmed, with the exception of one type of contract which he excludes from his analysis, that all or nearly all first level purchasers pay the MWP.  Ex. 1, Gilbert Reply, ¶¶38-39. Dr. Gilbert concludes that there are several types of contracts "[i]n some instances, the payment of the MWP is memorialized directly in a written contract produced by a smelter.   In other circumstances, the transaction data produced by a smelter indicates payment of the MWP.   In still other instances, the transaction information produced by smelters indicates a price that on further examination clearly includes the MWP."  Ex. 1, Gilbert Reply, ¶39.   Dr. Gilbert's analysis determines that all primary aluminum purchases – those pursuant to annual contracts, spot contracts and forward contracts – all contain a MWP term.

- 47 -

###### 6. The Court May Shape the Class Definition to Serve the Ends of Justice

"[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23." *See* 7A Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* §1759 at 130-31 (3d ed. 2005).  Courts in this Circuit recognize that "'[t]he fail-safe problem for class certification is more of an art than a science . . . and often should be solved by refining the class definition rather than flatly denying class certification on that basis.'" *Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 357 (W.D.N.Y. 2014); *see Toney-Dick v. Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 5295221, at *10 (S.D.N.Y. Sept. 16, 2013) (Forrest, J.); *In re Puda Coal Sec., Inc.*, No. 11 Civ. 2598 (KBF), 2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) (Forrest, J.); *In re Smart Techs., Inc.*, 295 F.R.D. 50 (S.D.N.Y. 2013) (Forrest, J.); *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §8:12, at 200 (4th ed. 2002) ("When a class definition is not acceptable, judicial discretion can be utilized to save the lawsuit from dismissal.").

##### E. Defendants Identify No Fundamental Intra-Class Conflict that Renders FLPs Inadequate Class Representatives Under Rule 23(a)(4)

Factors that have led to class denial for failure to meet the Rule 23(a)(4) prerequisite are of two kinds – those that reflect a plaintiff's position vis-a-vis the defendant, and those that stem from a plaintiff's relationship to other class members.  If a plaintiff alleges injury caused by the conduct also alleged to have injured the class, he or she is in the same position vis-a-vis the defendant as the class members and has standing to raise the class issues.  6 *Newberg*, §18:15, at 47 n.2 (5th ed. updated June 2016).  Thus, once a plaintiff demonstrates standing to sue, many supposed Rule 23(a)(4) problems are eliminated, including the so-called "membership in the class" requirement – *i.e.*, that the plaintiff has standing.  *Id.*

This Court has already determined that the FLPs have antitrust standing, *Aluminum Warehousing*, 95 F. Supp. 3d at 440-44, such that the "adequacy" requirement must be analyzed in terms of FLPs' relationships to absent class members, and whether they would "only benefit at the expense of the other members of the proposed class." But in arguing that FLPs are "inadequate," Defendants improperly focus not on whether FLPs have interests which would be benefitted only by harming those of absent class members, but on whether some absent class members might have conflicts with one another. Defs' Brf. at 54.[53] Defendants' arguments therefore misperceive the Rule 23(a)(4) analysis, and in any event fall far short of specifying the kinds of "fundamental conflicts" which Rule 23 seeks to identify.

In determining whether the adequacy requirement of Rule 23(a)(4) is satisfied, the court must determine whether FLPs have any "interests antagonistic to the interests of other class members." It must also determine whether FLPs "have an interest in vigorously pursuing the claims of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).[54] But even if a conflict is identified, it will not "necessarily defeat class certification – the conflict must be 'fundamental.'" *Id*. A "conflict" is "fundamental" when it goes "to the heart of the litigation, relating to the subject matter of the suit." 6 *Newberg*, §18:14 (discussing antitrust class actions); *Charron v. Wiener*, 713 F.3d 241, 249 (2d Cir. 2013).

The "heart" of this case is the existence of an unlawful agreement by Defendants to inflate the MWP. Defendants do not dispute that FLPs, and all class members, share a common interest in establishing Defendants' liability for their participation in that agreement. Because Defendants have

---

[53]    Of course, Defendants are interested, ***not*** in adequate representation, but in ***no*** representation and ***no*** class. "[A] court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be [and defendants' obvious desire is] to eliminate any class representation." *Kline v. Wolf*, 702 F.2d 400, 402 (2d Cir. 1983).

[54]    Defendants take no issue with FLPs' interest in continuing a vigorous pursuit of the litigation.

failed to demonstrate a fundamental conflict among representative Plaintiffs going to the subject matter of this action, their attempt to argue inadequacy is unavailing.

### 1. Speculation that Class Members Are "Potentially Implicated" in the Unlawful Conduct Does Not Raise a Fundamental Conflict

Defendants do not assert that any FLP is "potentially implicated" in unlawful conduct. Instead, Defendants assert that there are "many proposed class members" *other than FLPs* who are "potentially implicate[d]" in unlawful conduct.  This assertion rests on the TAC's reference to "unnamed 'Jane Doe Defendants' who may have joined in the alleged conspiracy."  Defs' Brf. at 54. But FLPs have not amended the TAC to name any of the proposed class members as Defendants (*id.* at 55-56), and FLPs have not sought an injunctive or declaratory relief class under Rule 23(b)(2).  As such, this is precisely the type of speculative conflict that has been repeatedly rejected as a barrier to class certification.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (a "fundamental" conflict may not be "'merely speculative or hypothetical'") (citing 5 James Wm. Moore, *et al.*, *Moore's Federal Practice* §23.25[2][b][ii] (3d ed. 2011)).

Unsurprisingly, Defendants offer no authority in support for their expansive interpretation of a disabling conflict.[55]  Rather, they cite a decision of this Court favorable to Plaintiffs.  In *Simington v. Lease Fin. Grp., LLC*, No. 10 Civ. 6052 (KBF), 2012 WL 6681735 (S.D.N.Y. Dec. 14, 2012), the Court denied certification of a claim for breach of contract *which was not pled*.  *Id.* at *8-*9. Similarly here, Defendants base their "conflicts" argument on allegations *not pled in the TAC*.

---

[55]  Defendants also cite *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), and *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 401 (S.D.N.Y. 2008), but neither applies here.  In *Literary*, plaintiffs sought certification of a class consisting of three distinct categories of claims.  654 F.3d at 249-52.  One of those categories, however, was worth considerably less than the other two.  As such, plaintiffs had no incentive to maximize the value of the claims in that category and could not serve as adequate representatives as to those claims. Moreover, despite the conflict, the court found that a class could have been certified, so long a sub-class was formed for the category of less valuable claims.  *Id.*  Similarly, in *Fosamax*, the named plaintiffs sought money damages for themselves but only medical monitoring for other class members. 248 F.R.D. at 401.  Here, FLPs and class members are part of the same group seeking the same type of relief stemming from the same conspiracy.

1173128_1

Moreover, the four instances of unlawful conduct in which Defendants say "proposed class members" may "potentially be implicated" are simply Mr. Kaplan's mischaracterization of the TAC's allegations and Dr. Gilbert's work:

"**Tainted warrant cancellations**." Defendants' first argue that Dr. Gilbert's finding of "excessive cancellations" implicates other "tainted" warrant cancellations. Whether warrant cancellations are collusive depends on whether there was an agreement, which will be the focus of the trial in this matter. There are no allegations that class members agreed with Defendants to coordinate warrant cancellations, and there is no basis for concluding that there was. Dr. Gilbert estimates a competitive level of warrant cancellations, which encompasses the expected non-conspiratorial level of cancellations by class members (and by Defendants, for that matter).

"**Acquiring and cancelling warrants for previously-shuffled aluminum**." Contrary to Defendants' argument, Dr. Gilbert has not asserted that Macquarie, Laurand, Trafigura, and Hunter Douglas participated in the allegedly conspiratorial transactions. Rather, Dr. Gilbert's Report identifies those companies as Red Kite's "cancellation counterparties," and states that they were "the company to which delivery was made." *See* Gilbert Rpt., Exhibit A1 (A3, A5, and A7 are similar exhibits for different cancellations).

"**Acquiring warehouse affiliates**" and "**Delivering aluminum to Metro**." As to these (and each of the four) kinds of conduct, Defendants make no attempt to explain why class members' aluminum warehousing activities *ipso facto* prove entry into joined Defendants' illicit agreements. The TAC does not plead that "proposed class members" who made incentive payments "to Metro" were participants in the conspiracy. *E.g.*, TAC, ¶553 ("These incentive payments have, moreover, been paid by the strategic chokepoint warehouses, *e.g.*, Metro in Detroit and Pacorini in Vlissingen, as a means to attract metal to ***particular*** warehouses where existing and growing queues were thereby exacerbated in order to drive up the price of physical aluminum.") (emphasis in original).

2.   **Defendants' Assertion that Class Members "Benefitted" From the Litigation Does Not Create Any Conflict Within the Class or Destroy Commonality**

a.   **Any Benefits from Aluminum Sales or "Cash and Carry" Deals Are Legally Irrelevant**

Defendants contend that some potential class members not only purchased, but also sold aluminum at prices incorporating the MWP and thus, they say, benefitted on such sales from the

- 51 -

increased premium.  Defs' Brf. at 58-59.  They also contend that certain class members profited from "cash and carry" trades.  *Id.* at 60.

To the extent that some class members are first level purchasers as well as sellers of scrap or secondary aluminum, trading firms and banks who later resold the aluminum at the MWP, Defendants concede that these entities are first level purchasers on a vertical aluminum distribution chain.  Defs' Brf. at 59 n.31.  As such, Defendants may not raise pass-on defenses.  *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968).  *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n.14 (1972) ("damages are established by the amount of the overcharge . . . courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way"); *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 WL 1282293, at *17 (S.D.N.Y. Mar. 28, 2014) ("an antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue").

Defendants cite several cases for the proposition that "Plaintiffs cannot adequately represent proposed class members that 'benefitted tremendously' from the challenged conduct."  Defs' Brf. at 58.  These cases, however, are inapposite.  *Valley Drug Co. v. Geneva Pharmaceutics, Inc.*, 350 F.3d 1181, 1190-91 (11th Cir. 2003), was a reverse payment case in which the direct purchasers maintained cost-plus contracts and "the specific nature of the product [drugs experiencing inelastic demand] and the industry involved [three national wholesalers with unique cost-plus sales contracts and over 50% of the claims experiencing unchallenged benefit from maintaining the status quo]" warranted examining whether there was a net benefit to certain class members.  There is no suggestion of cost-plus contracts here in which exceptions to the rule against pass-on defenses may

- 52 -

be warranted. *Hanover Shoe*, 392 U.S. at 494 (explaining narrow cost-plus exception).[56] Defendants' other cases are also inapposite and do not deal with antitrust issues.[57]

Of course, there is no logical conflict between the class members because the relief sought is for ***past*** harms based on the inflated MWP. Class members who incidentally benefitted from the rising MWP have nothing to lose from obtaining relief for being overcharged for their first-level aluminum purchases. In no way do such benefits remove any incentive to sue for the challenged conduct. *See Meijer*, 246 F.R.D. at 304 n.10 (no conflict where plaintiffs sought to recover for past anticompetitive acts because there would be no potential negative prospective impact on other putative class members). All first-level purchasers "'have exactly the same interests in maximizing recovery of overcharge damages on each qualifying direct purchase or assigned claim.'" *Id*. at 304. Any "alleged conflict 'relates only to the apportionment of damages as between [class members]. Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation.'" *Id*. (quoting *In re NASDAQ Market-Makers Antitrust Litig*., 169 F.R.D. 493, 513 (S.D.N.Y. 1996)).

---

[56]  Moreover, numerous courts have rejected the holding and reasoning of *Valley Drug*. *See, e.g.*, *In re K-Dur Antitrust Litig*., 686 F.3d 197, 223 (3d Cir. 2012) (rejecting *Valley Drug* because "requiring plaintiffs to show that no class member benefited from the challenged conduct in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*"); *In re Skelaxin (Metaxalone) Antitrust Litig*., 292 F.R.D. 544, 552-54 (E.D. Tenn. 2013) (collecting cases); *In re Vitamin C Antirust Litig*., 279 F.R.D. 90, 103 (E.D.N.Y. 2012) ("the *Valley Drug* Court failed to recognize that *Hanover Shoe*'s holding eradicates any possibility that a named plaintiff's downstream sales could create a conflict of interest with other class members"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 303 (D.D.C. 2007) (rejecting *Valley Drug* decision on ground it conflicts with the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick*); *see also In re Relafen Antitrust Litig*., 346 F. Supp. 2d 349, 369 (D. Mass. 2004) (implicitly rejecting argument that national wholesalers' overcharge claims were limited because of generic bypass). In sum, arguments that some class members actually benefitted from the rising MWP "are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs' interest" and those of absent class members. *Meijer*, 246 F.R.D. at 304.

[57]  *Langbecker v. Electronic Data Systems Corp*., 476 F.3d 299, 313, 315 (5th Cir. 2007) (impeaching plaintiffs' ERISA claims that the employee stock option plan made imprudent purchases of EDS stock were "thousands" of putative class members (and a representative plaintiff) who had purchased EDS stock ***after*** disclosure of fraud, releases given by 9,000 class members, and fundamental differences in the relief sought, with some plaintiffs seeking injunctive relief to dissolve the EDS Fund while others wanted to retain their interests therein); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1278-80 (11th Cir. 2000) (discriminatory treatment claim under the Packers and Stockyards Act required proof that other class members were favored, and thus such favored class members had not suffered discriminatory treatment); *Simington*, 2012 WL 6681735, at *13 (variations in leasing agreements meant that different plaintiffs would have different options and seek redress in different ways; "because [named plaintiffs'] interests ***are not even adequately aligned as to each other***, they cannot be said to adequately represent the interests of the class").

Defendants also cite *Three Crown Ltd. Partnership v. Salomon Bros., Inc.*, No. 92 Civ. 3142 (RPP), 1995 WL 422467 (S.D.N.Y. July 14, 1995), *Pollock v. Citrus Associates of the New York Cotton Exchange, Inc.*, 512 F. Supp. 711 (S.D.N.Y. 1981), and *Strax v. Commodity Exchange, Inc.*, 524 F. Supp. 936 (S.D.N.Y. 1981), for the proposition that consideration of benefits is not barred by *Hanover Shoe*. Defs' Brf. at 60 n.31. Defendants quote out of context from *Three Crown*, which considered a challenge to antitrust standing on a motion to dismiss where plaintiffs in repo transactions for U.S. Treasury notes had not dealt directly with any defendant. Defendants' arguments against overcharge liability based on *Hanover Shoe* and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), were inapplicable because there was no vertical distribution chain, and the court upheld standing under a "target area" test. *Three Crown*, 1995 WL 422467, at *4-*6 (citing to *Pollock* and *Strax*). Each of *Pollock* and *Strax* involved exchange-traded futures contracts, and each upheld antitrust standing where plaintiff "'was in direct contact with the defendant insofar as the parties were on opposite sides of the market.'" *Id*. at *5. *Three Crown* is inapposite here, where there was a vertical chain of distribution for resale of aluminum.

To the extent that class members made first level purchases not based on the MWP, such as purchases of aluminum scrap, or made sales of smelted aluminum, those purchases or sales occurred outside of the distribution chain and independent of the illegal conduct at issue here. Thus, as in *Electronic Books*, 2014 WL 1282293, at *19, the alleged "offsets do not directly relate to the transactions at issue here," and any imagined benefits are too remote under *Hanover Shoe* to be considered in damages calculations.[58]

---

[58] In *Electronic Books*, Apple argued that certain offsets, such as benefits from the launch of Amazon's self-publishing business and the increased availability of certain books, should reduce the amount of any damages it owed. *Id*. at *15-*19. The court, however, found that "an antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue." *Id*. at *17.

**b.      Speculation that Some Class Members May Have
Benefitted from the Conspiracy Does Not Raise a
Fundamental Conflict**

Even if it was appropriate to account for the "benefits" purportedly received by some class

members, it would still not raise a "fundamental conflict," as all class members have a right to

pursue overcharge damages.  Where, as here, plaintiffs seek to recover overcharges imposed by a

cartel, there is no conflict even if some class members benefitted from the misconduct.  *See, e.g.*, *In*

*re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa.

May 2, 2008) ("Regardless of whether some class members profited from the alleged activity in this

case, the controlling question is whether the class members suffered an overcharge: if an overcharge

occurred, ***all*** class members are entitled to recover, whether or not some plaintiffs experienced a net

benefit while others experienced a net loss . . . .   [B]ecause all class members have the right to

pursue overcharge damages, they have the same incentive to do so, and there is no conflict among

class members allegedly harmed by the same antitrust violation.") (emphasis in original); *Urethane*

*II*, 251 F.R.D. at 641-42, 644 (in a cartel overcharge case, there is no conflict of interest even if some

class members allegedly benefited in some manner by the higher prices).

Additionally, as in *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226 (N.D. Ohio

2014), the "benefits" identified by Defendants are speculative at best.  There, several representative

plaintiffs bought and sold in direct horizontal competition with Defendants.  *Id*. at 238.  The court

rejected benefits from alleged conspiratorial pricing as creating a disabling conflict, concluding,

among other things, that such arguments "are speculative, and are leveled in the face of a proposed

damages methodology that would first calculate classwide damages, and then award each

representative party and class member the full amount of damages to which the Sherman Act entitles

them, based on transaction-level data."  *Id*. at 239 (citing, *inter alia*, 1 *Newberg* §3:64, at 373 ("this

- 55 -

form of conflict should not preclude a finding of adequacy on merely speculative terms as, for example, it will almost always be the case that some member in a large class prefers the status quo for some reasons")).[59]   For these reasons, the Court should reject Defendants' argument that a conflict of interest exists here.

<div style="text-align:center">

c.      **Speculation that Class Members Have No Interest in Pursuing the Litigation Is Contrary to the Record and Defendants' Admissions**

</div>

Citing supposed benefits from aluminum sales and "cash and carry" trades, Defendants also speculate that certain class members "would have no interest in pursuing this litigation." Defs. Brf. at 58.  In particular, Defendants state that aluminum consumers such as Novelis, Aleris, and others would prefer to have higher MWPs, because they "likely sold far more aluminum than they purchased, often at prices referencing the Midwest Premium."  *Id.*  But Goldman Sach's head aluminum trader, Scott Evans, testified that ████████████████████████████████████ ██████████████████████████████████████████████████████████. Ex. 86, Evans Dep. at 111:3-114:17. ██████████████████████████████████████ ██████████████████████████████████████████████████████████. *Id.* And Novelis was just one of many aluminum consumers who complained to Defendants, the press, the Senate and/or the LME; consumers broadly opposed the practices challenged here. Ex. 21 at 29 ██████████████████████████████████████████████████████ ████████[60]

---

59      Moreover, "were these hypothetical conflicts to become conflicts in fact (*e.g.*, in the context of a class settlement), mechanisms exist for addressing this issue." *Id.* (citing *Kohen*, 571 F.3d at 680).

60      Even if some class members did not share the goals of the litigation, it would not serve as a basis to deny certification. *See e.g.*, *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 338 (N.D.N.Y. 2011) (adequate was satisfied in wage and hour case although some of the employee class members did not share the goals of the litigation); *Srail v. Village of Lisle*, 249 F.R.D. 544, 552 (N.D. Ill. 2008) ("a judge may not refuse to certify a class simply because some class members may prefer to leave the violation of their rights unremedied").

<div style="text-align:center">- 56 -</div>

**3.    Defendants' Assertions of Conflicting Claims with Respect to the Same Aluminum Are Based on Mischaracterizations of the Record**

Defendants' final argument – that named FLPs have conflicting claims – should be rejected because it is premised on a mischaracterization of FLPs' interrogatory responses.  Defs' Brf. at 61-62.

Selectively quoting from FLPs' Contention Interrogatory Responses, Defendants assert that "'FLPs seek recovery for every purchase of aluminum' that is reflected in the transaction data produced," and argue that because second level aluminum purchases are also included within that transaction data, there is a conflict among class members regarding proper apportionment of damages barring certification.   Actually, FLPs seek damages only on the primary aluminum purchases that are qualified first level under the class definition.  *See* Ex. 70 at 9 ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ ).  And those qualified transactions, as also noted in the same interrogatory response, are included among the transactions identified in the transaction data each FLP produced.  *See* Ex. 82.  Because Defendants concede, as they must, that FLPs, including Extruded and Custom, made at least some qualified first level purchases of primary aluminum, there is no conflict barring certification here.

Defendants' citation to certain testimony by Extruded and Custom does not change the result.  Neither witness is a lawyer or economist.  Defendants' counsel's inartful questioning on these issues – while calling for a legal conclusion from the witness – was also ambiguous and/or confusing.  From each FLP's point of view, Defendants' alleged conduct caused a rise in the MWP, a price component incorporated into virtually all of the aluminum FLPs purchased over the Class

- 57 -

Period, regardless of where in the distribution chain that purchase occurred.  *See, e.g.*, Ex. 85, Dillett Dep. at 48:20-23 (confirming that "defendants' ███████████████████████████████████████ ██████████████████████████████).  Accordingly, from each FLP's point of view, every purchase incorporating the MWP "damaged" the FLP in the literal or common sense.  But neither witness was asked a properly-framed question regarding whether FLPs sought damages in this legal action for any primary aluminum purchases that were not qualified as first level under the class definition.  On this issue, FLPs Interrogatory Responses – which were served long after the cited depositions and verified by each FLP, including each of the witnesses upon whose testimony Defendants rely – control.  In sum, FLPs seek damages only on the aluminum purchases that fall within the definition of the class, and Defendants have not shown any conflicting claims as to those purchases.[61]

### F.    Proceeding as a Class Action Is a Superior Means of Adjudicating the Class's Claims

Defendants assert that proceeding with a certified class is not superior.  In support, they rely on the relative size of some class members, the fact that a tiny fraction of the large number of primary aluminum purchasers injured by Defendants' misconduct initiated litigation individually, and repeating that individual issues predominate over those common to the class.  None of Defendants' arguments is persuasive, and there can be no serious dispute that a class action is the superior method of adjudicating the class's claims here.

Rule 23's underlying rationale is that class litigation is superior and more efficient when a central question of liability can be resolved in a single classwide trial, thus avoiding duplicative individual suits by hundreds of plaintiffs.  "'The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative

---

[61]    Defendants' further reference to Kaplan's Decl., ¶109, as evidence that the class conflict issue is not confined to Extruded and Custom, is puzzling since that paragraph relates only to damages sought by Agfa, Kodak and Mag Instruments, all of which are individual plaintiffs litigating their own claims outside the class.

available methods of adjudication.'"  *Facebook*, 312 F.R.D. at 351; Fed. R. Civ. P. 23(b)(3).  In

making this assessment, courts balance class members' interests in individually controlling separate

litigation, the extent and nature of any previously commenced individual litigation, the desirability of

concentrating the litigation in a single court, and the likelihood of class-action management

difficulties.  Fed. R. Civ. P. 23(b)(3)(A)-(D).[62]

According to Defendants, certain class members are "large" businesses with substantial

aluminum acquisitions, and along with the existence of the IP actions can individually litigate the

case.  But "economically viable" is not the standard and woefully short of a finding that proceeding

on a class basis is not superior.

As an initial matter, the presence of large businesses as members of a federal antitrust class is

not uncommon – it is expected.  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 629

(E.D. Pa. 2004) ("the class in this cases involves many of the largest corporations in America"); *In

re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 218 (5th Cir. 1981) (certified class contains

"many large corporations").  Indeed, under *Illinois Brick*, businesses are typically the only purchaser

group with federal antitrust standing.  431 U.S. 720.  The fact alone that some class members may

choose – for any reason – to seek individual relief, either by initiating an action like the IPs or opting

out of the class, does not answer the question.  If that were the case, the exception would swallow

the rule.  Indeed, "the interests of any class members in proceeding as separate actions can easily be

met through the opt-out process . . . [while] a class action achieves the benefit of allowing a class of

---

[62]    Defendants concede the substantial desirability of concentrating the litigation before this Court under Rule
23(b)(3)(C).  Indeed, Defendants leave Rule 23(b)(3)(C) out of their brief entirely, instead crafting a three-factor
superiority rule.  Defs' Brf. at 62.  But no factor is properly excluded from the balance.  And, here, that factor weighs
heavily in favor of class treatment.  It cannot be contested that judicial economy is served where, as here, the Court is
familiar with the issues and proceeding under Rule 23(b)(3) "'will prevent the duplication of effort and the possibility of
inconsistent results.'"  *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 106 (S.D.N.Y. 2007).

geographically and economically diverse plaintiffs to adjudicate their claims expeditiously and efficiently." *Facebook*, 312 F.R.D. at 352.

Moreover, "the 'existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability.'" *Facebook*, 312 F.R.D. at 352 n.13 (citing *Public Empls. Ret. Sys. v. Merrill Lynch.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011)).

Rather, this class consists of 286 class members of varying sizes and acquisitions. *See* Ex. 1, Gilbert Reply, ¶44; Krizanosky Decl., ¶4.[63]  And there is no basis for Defendants' speculation that other individual class members could or would bring their claims, especially given the considerable cost and complexity of an antitrust claim like this that relies on substantial and complicated discovery efforts and even more complex economic expert analysis – costs that will easily reach into seven and possibly more figures.  For all but a few, this class action is the only viable course of proceeding given the high cost of prosecuting this complex antitrust action and class members' attendant "negative value" claims. *See, e.g.*, *MTBE Prods.*, 209 F.R.D. at 350 (as in antitrust cases, the existence of "negative value claim[s]" is the "'most compelling rationale for finding superiority in a class action'"); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) (class adjudication is superior where "[m]any of the class members' claims will be small relative to the high costs of maintaining an antitrust action").  Indeed, the vast majority of class members have not filed an individual action.  Defendants' arguments "miss the point." *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 359 (S.D.N.Y. 2016).  Even a growing number of individual actions demonstrates the need for a class action. *Id.* at 363.

---

[63]    Declaration of Thomas A. Krizanosky in Support of First Level Purchaser Plaintiffs' Motion to Certify Class, dated March 25, 2016 ("Krizanosky Decl.").

Defendants' offerings in support of their "large class member" argument are entirely distinguishable.  Defendants reliance on *Kottler v. Deutsche Bank AG*, No. 05-CV-7773, 2010 U.S. Dist. LEXIS 30590 (S.D.N.Y. Mar. 29, 2010) is misplaced.  *Kottler* was a tax-shelter investment action on behalf of roughly 180 "high net-worth investors."  Unlike the antitrust claims asserted by the class here, the *Kottler* plaintiffs' claims derived from common law fraud, which requires proof of individual reliance and ***goes directly to liability itself***.  *Id.* at *8-*9, *13.  Because individualized representations were made to and varied between proposed class members, and because each class member also had individual investment expectations and strategies concerning the challenged tax shelter, the *Kottler* court found common questions did not predominate.  *Id*. at *11-*12. Accordingly, because individual trials were required in that case to prove liability itself, the *Kottler* court added that the class mechanism would, likewise, not be superior, noting that 25 of the roughly 180 "high net-worth investor" proposed class members had already brought individual suits.  *Id*. at *13 (similar fraud-based tax shelter claims in which putative class members had filed a "myriad of individual suits") (citing *Becnel v. KPMG LLP*, 229 F.R.D. 592, 598 (W.D. Ark. 2005)).[64]

Here, Defendants' conspiracy, including their queue manipulation and inflation of the MWP, did not change between class members.  Indeed, common fact and law questions concerning liability in this action affect all class members equally.  *See* Class Cert. Mem., §III.B.  Thus, the adjudicating the class's claims in this single action is without question superior.

## G.   Class Member Damages Are Not Speculative

Defendants rehash their same ascertainability and predominance arguments to assert that damages cannot be awarded solely on an aggregated basis.  Defs' Brf. at 64.  As explained in

---

[64]   Defendants' reliance on *Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216 (S.D.N.Y. 2012), is equally misplaced (nine sophisticated ERISA retirement funds – no less than four of which had already initiated individual actions – were insufficiently numerous to support class certification).  *Id.* at 223, 225-26, 227, 229.

§II.D.1, *infra.*, however, FLPs' expert Dr. Gilbert calculates classwide damages using primary aluminum transaction data from the six major smelters producing aluminum for North American consumption, including Alcoa, Rio Tinto Alcan, Hydro, Rusal, Century and Novelis – accounting for 91% of all such class period sales.  Ex. 1, Gilbert Reply, App. C.  In other words, the primary aluminum smelter data on which Dr. Gilbert calculates collective class damages overwhelmingly consists of the actual underlying individual transactions that make up those very sales (77%), with the remainder extrapolated from publicly available shipment and production reports.  Ex. 1, Gilbert Reply, App. E.  This is not the "speculative" rough estimate or bald aggregation Defendants claim.

As an initial matter, while not the case here, damages are available on an aggregated basis in class-action litigation where "there is an evidentiary basis on which a 'just and reasonable inference' as to such damages could be made."  *Hart v. Rick's Cabaret Int'l Inc.*, 73 F. Supp. 3d 382, 391 (S.D.N.Y. 2014); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257-59, 1269 (10th Cir. 2014) (upholding judgment after a classwide trial awarding aggregate damages to the class).  *See also Hickory Secs. Ltd. v. Republic of Argentina*, 493 Fed. App'x 156, 159 (2d Cir. 2012) ("Aggregate class-wide damages are not *per se* unlawful."); *Polyurethane Foam*, 314 F.R.D. at 268 (permitting approximation of aggregate damages as matter of just and reasonable inference in antitrust class action where damages "susceptible to computation using a 'mathematical or formulaic' calculation"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."); *TFT-LCD (Flat Panel)*, 2012 WL 253298, at *5 ("the use of aggregate damages in antitrust cases has been approved numerous times").[65]

---

[65]   *See also, e.g., Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167-69 (9th Cir. 2014) ("[s]ince *Dukes* and *Comcast* were issued, circuit courts . . . have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability"); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257 (10th Cir. 2014) (affirming class action verdict where the plaintiffs' expert used statistical extrapolation to approximate damages); *In re Deepwater*

Moreover, at the certification stage, a plaintiff need only establish that damages will be available at trial – not prove them on the merits.  *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100, at *61 (E.D.N.Y. Oct. 15, 2014) ("In sum, the plaintiffs' burden at trial will be to establish a just and reasonable inference of each class member's approximate damages by more than mere speculation or guess, and not to prove the precise damages for each plaintiff. At the class certification stage, they need only assure the court that this burden could be carried using predominately common proof, or if it cannot, that the need for individualized proof will not overwhelm the rest of the case."); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004) ("In considering certification, the inquiry focuses not on validity of the proposed methods for proving damages on a class-wide basis, but on the availability of those methods."); *Meijer*, 246 F.R.D. at 310 ("At the certification stage, the preliminary inquiry in assessing the proposed methods of proving damages [is] limited: The inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis.").

Here, however, FLPs far surpass the threshold for demonstrating class member damages at the certification stage.  Almost all Class Period class member primary aluminum purchases are accounted for.  Ex. 1, Gilbert Reply, ¶45.  And the *de minimus* additional transactions Dr. Gilbert identifies through reasonable and judicially acceptable means are based on the best available

---

*Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("[N]othing in *Comcast* mandates a formula for classwide measurement of damages in all cases . . . '[e]ven wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.'"); *Conwood Co. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (upholding verdict where plaintiff's expert used limited data, from one year, and a few states, to extrapolate to nationwide sales).

purchase volume data. *Id.*. Dr. Gilbert's damage calculation method is imminently reasonable and supports certification of the class.[66]

## III.   CONCLUSION

For the foregoing reasons, as well as the reasons providing in the opening brief, FLPs respectfully request that the Court certify this litigation for class treatment.

DATED: August 5, 2016                        Respectfully submitted,

                                    ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    PATRICK J. COUGHLIN


                                    PATRICK J. COUGHLIN

                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone: 619/231-1058
                                    619/231-7423 (fax)

                                    NUSSBAUM LAW GROUP, P.C.
                                    LINDA P. NUSSBAUM


                                    LINDA P. NUSSBAUM

                                    1211 Avenue of the Americas, 40th Floor
                                    New York, NY  10036
                                    Telephone: 212/702-7053
                                    212/681-0300 (fax)

---

[66]   Defendants' reliance on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 339 (2011), is misleading. Dr. Gilbert's methodology does ***not*** entail the "trial by formula" rejected by the court as a method for calculating damages. *Marlo v. United Parcel Service, Inc.*, 251 F.R.D. 476 (C.D. Cal. 2008), provides Defendants even less assistance. The *Marlo* plaintiffs could provide no non-speculative common proof in a California State wage-and-hour misclassification action from which classwide judgment of liability could be extrapolated. *Id.* at 486. Importantly, extrapolation as a means of proving elements of classwide claims is approved by the court. But more to the point, Dr. Gilbert's model does not rely on a small sampling and from that extrapolate classwide damages. Rather, his model predominately relies on individual class member data to calculate actual damage numbers for class members representing over 95% of the dollar value of all Class Period sales. Not the least bit speculative.

- 64 -

LOVELL STEWART HALEBIAN
  JACOBSON LLP
CHRISTOPHER LOVELL

_____
          CHRISTOPHER LOVELL

61 Broadway, Suite 501
New York, NY  10006
Telephone: 212/608-1900
212/719-4677 (fax)

Interim Co-Lead Counsel for First Level
Purchaser Plaintiffs and the Proposed First Level
Purchaser Class

- 65 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 5, 2016.

PATRICK J. COUGHLIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  patc@rgrdlaw.com

173128_1

**Mailing Information for a Case 1:13-md-02481-KBF In re: Aluminum Warehousing Antitrust Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kristen M. Anderson**
  kanderson@scott-scott.com,edewart@scott-scott.com,jscott@scott-scott.com,efile@scott-scott.com

- **Randi Dawn Bandman**
  randib@rgrdlaw.com,SusanM@rgrdlaw.com

- **Kyle G. Bates**
  kbates@schneiderwallace.com,efilings@schneiderwallace.com

- **Yavar Bathaee**
  bathaeey@sullcrom.com,sdcmanagingclerk@sullcrom.com

- **Daniel E. Beznel , Jr**
  remoreland@beznellaw.com

- **Eugene J. Benick**
  ebenick@finkelsteinthompson.com

- **Andrea B. Bierstein**
  abierstein@simmonsfirm.com,jlacerra@simmonsfirm.com

- **John Paul Bjork**
  jbjork@vancklaw.com

- **Jennifer Hilda Blecher**
  blecherj@sullcrom.com,sdcmanagingclerk@sullcrom.com

- **Thomas Kay Boardman**
  tboardman@scott-scott.com

- **Derek X. Brandt**
  derek@brandtlawllc.com,derek-brandt-brandt-law-llc-8689@ecf.pacerpro.com,ecf@brandtlawllc.com

- **Darryl Bressack**
  dbressack@finkandassociateslaw.com

- **Vincent Briganti**
  vbriganti@lowey.com

- **Lonnie A Browne**
  lbrowne@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **W. Joseph Bruckner**
  wjbruckner@locklaw.com,brpotteiger@locklaw.com

- **Christopher M Burke**
  cburke@scott-scott.com

- **Erin C Burns**
  eburns@nastlaw.com,croberts@rodanast.com

- **Keith Lawrence Butler**
  kbutler@stroagrandbutler.com

- **Chris W. Cantrell**
  ccantrell@archclamb.com

- **John Theodore Ceglia**
  jceglia@stroagrandbutler.com

- **Solomon B. Cera**
  scera@cerallp.com,pmarkert@cerallp.com,keg@cerallp.com,edeksen@cerallp.com,ktoeterllp.com,ldenler@cerallp.com

- **Lin Y Chan**
  lchan@lchb.com

- **Amber M Charles**
  acharles@cov.com

- **Edward W. Cielko**
  ecielko@ktmc.com,kmorrow@ktmc.com,jwotring@ktmc.com,rmachnick@ktmc.com,pleadings@ktmc.com,mgrandolfo@ktmc.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jennifer L. Crose**
  jcrose@breneflaw.com

- **William T. Crowder**
  wcrowder@crowdermcgaha.com

- **Mark Aaron Cunningham**
  mcunningham@joneswalker.com

- **Gregory Lee Gartner**
  gcartner@schiffhardin.com,dchapman@schiffhardin.com,lmiceian@schiffhardin.com,msosullivan@schiffhardin.com,edocket@schiffhardin.com

- **Joel Davidow**
  joel@cuneolaw.com,vicky@cuneolaw.com

- **Andrew Robert Dawes**
  ardawes@corrs.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_ffj@rgrdlaw.com,myrreynolds@rgrdlaw.com

- **Leighton Elizabeth Dellinger**
  ldellinger@pryorcashman.com

- **Bradley J. Demuth**
  bdemuth@nussbaumpc.com,lnussbaum@nussbaumpc.com

- **William J. Doyle , II**
  bill@doylelowther.com

- **John G. Emerson , Jr**
  jemerson@emersonfirm.com,nautry@emersonfirm.com

- **John Emerson - MDL NOT ADMITTED**
  jemerson@emersonpeyster.com

- **Vincent J. Esades**
  vesades@heinsmills.com,janderson@heinsmills.com,dcovitt@heinsmills.com

- **Craig M. Essenmacher**
  cessenmacher@lchb.com

- **Josh Ewing**
  jei@fbdlaw.com,jgi@fbdlaw.com

- **Eric B. Fastiff**
  efastiff@lchb.com

- **David H. Fink**
  dfink@finkandassociateslaw.com

- **James H. Forte**
  jhf@saber.com

- **Frederic Scott Fox , Sr**
  ffox@kaplanfox.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **David P. Germaine**
  dgermaine@vancklaw.com

- **Wesley B. Gilchrist**
  wgilchrist@lightfootlaw.com

- **Jennifer Lynn Giordano**
  jennifer.giordano@lw.com,jessica.bengels@lw.com,allyson.maltas@lw.com,jeffrey.newhouse@lw.com,william.h.rawson@lw.com,william.shuman@lw.com,christopher.hawal@lw.com,margaret.zwisler@lw.com,jason.grossman@lw.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,mcc@girardgibbs.com,amv@girardgibbs.com

- **Raymond Peter Girnys**
  rgirnys@lowey.com

- **Joseph Goldberg**
  jg@fbdlaw.com,email@fbdlaw.com,drt@fbdlaw.com

- **David A Goodwin**
  dgoodwin@gustafsongluek.com

- **Denn M. Gosgeniau**
  dgosgeniau@gosgeniau.com

- **Troy T. Gorman**
  tg@germanlawgroup.com

- **David J. Guin**
  davidg@gscattorneys.com

- **Harold Gurewitz**
  hgurewitz@grpllc.com

- **Harold Z. Gurewitz**
  hgurewitz@grpllc.com

- **Daniel E. Gustafson**
  dgustafson@gustafsongluek.com

- **JEROME WAYNE HOFFMAN**
  jerome.hoffman@hklaw.com

- **Stephanie Ann Hackett**
  shackett@scott-scott.com

- **David William Haller**
  dhaller@cov.com,nnonty@cov.com

- **Sukana S. Han**
  hans@sullcrom.com,sdcmanagingclerk@sullcrom.com,sull-vanadmin-7689@ecf.pacerpro.com

- **David F. Hassma**
  dhassma@manteaslaw.com

- **Dean M Harvey**
  dharvey@lchb.com,btreen@lchb.com,cbeltran@lchb.com

- **Mark David Herman**
  mherman@jcov.com,gtlayforth@jcov.com

- **Theodore M. Hess-Mahan**
  thess-mahan@hutchingsbursterian.com

- **Craig E. Hilborn**
  Craig@hilbornlaw.com

- **David M. Honigman**
  dhonigman@mantcuelaw.com

- **Geoffrey Milbank Horn**
  ghorn@lowey.com

- **William H. Horton**
  hhorton@gmhlaw.com

- **Phillip Timothy Howard**
  tim@howardjustice.com

- **Thomas H. Howlett**
  thowlett@goepjeam.com

- **Benjamin Martin Jaccarino**
  bjaccarino@lchb.com

- **Steven M Jodlowski**
  sjodlowski@rgrdlaw.com

- **Kimberly A. Justice**
  kjustice@jktme.com,dpetro@jctme,lrusso@jctme.com,ruwolf@jktme.com

- **Edith M. Kallas**
  ekallas@whatleykallas.com,itbielmann@whatleykallas.com,ecf@whatleykallas.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **John Anthony Kehoe**
  jkehoe@pomlaw.com

- **John Quinn Kerrigan**
  qkerrigan@jktme.com,oleuert@jktme.com

- **Jason H Kim**
  jkim@schneiderwallace.com

- **Charles Joseph LaDuca**
  chariel@cuneolaw.com,ecf@cuneolaw.com,dgorlov@cuneolaw.com

- **Eliot Lauer**
  elauer@curtis.com,mgemmel@curtis.com,jclyne@curtis.com,mclean@curtis.com,jsammelman@curtis.com

- **Gerald Lawrence**
  glawrence@lowey.com

- **Jonathan K. Levine**
  jk1@pritzkerlevine.com,sy2@pritzkerlevine.com

- **Yifei Li**
  evefyt.li@cunoolaw.com

- **Roberta D. Liebenberg**
  rliebenberg@finekaplan.com

- **Gregory Bradley Linkh**
  glinkh@glancylaw.com

- **Henry Liu**
  hliu@cov.com,tmamy@cov.com

- **Christopher Lovell**
  clovell@lshllp.com,ksissemacher@lshllp.com,gjacobson@lshllp.com,mueta@sc@sbcglobal.net,skroub@lshllp.com,jkrisloff@lshllp.com,cmooney@lshllp.com,mgallagher@lshllp.com,amiller@lshllp.com,lhscanner@lshllp.com,bjaccarino@lshllp.com,cessmmacher@lshllp.com,liuqaih@lshllp.com,phobbi@jphylaw.com,ezysterge@gmail.com,rmcgraib@lshllp.com,kandrews@lshllp.com

- **John H. Lyons**
  john.h.lyons@skadden.com

- **Jill M. Manning**
  jmanning@zreyerlaw.com

- **Alan Mcquearie Mansfield**
  amansfield@whatleykallas.com,sally@z2gca.com

- **Gerard V. Mantese**
  gmantese@manteaslaw.com,brett@manteaslaw.com

- **Steven A. Martino**
  stevenmartino@taylormartino.com

- **Benjamin M. McGovern**
  benjamin.mcgovern@hklaw.com

- **Michael C McKay**
  mmckay@schneiderwallace.com

- **Chelsea Rebekah McLean**
  chelsea.mclean@curtis.com,mgemmel@curtis.com

- **Michael Glenn McLellan**
  mmclellan@finkelsteinthompson.com

- **Carmen A. Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com,LBrown@rgrdlaw.com,ckopko@rgrdlaw.com

- **Azra Zahoor Mehdi**
  azram@themehdifirm.com

- **Joseph H. Meltzer**
  jmeltzer@ktme.com,kmarrone@jktme.com,jweiring@jktme.com,acioffo@jktme.com,pleadings@jktme.com,kjustice@jktme.com,siempert@jktme.com,triegler@jktme.com,qkerrigan@jktme.com

- **Eugene Mikolajczyk**
  gemem@rgrdlaw.com

- **Douglas A. Millen**
  doug@flfmlaw.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com,Slodlowski@rgrdlaw.com

- **Daniel Jay Mogin**
  dmogin@moginlaw.com,stevens@jercio-thewoogin-law-firm-pc-
  9884@ecf.pacerpro.com,ajarciao@moginlaw.com,jwilliams@moginlaw.com,ghatfield@moginlaw.com

- **Matthew B. Moreland**
  mattmoreland@cox.net

- **NORANDA ALUMINUM, INC.**
  jforte@author.com

- **John M. Nannes**
  john.nannes@skadden.com,dbrelewa@skadden.com,anjali.patel@skadden.com

- **Dianne M. Nast**
  dnast@nastlaw.com

- **Thomas Jerome Nolan**
  thomas.nolan@skadden.com,rebecca.isornotes@skadden.com

- **Walter W. Noss**
  wnoss@scott-scott.com,tterpening@scott-scott.com,tbackett@scott-scott.com,esignago@scott-scott.com,edewan@scott-scott.com,aturner@scott-scott.com,efile@scott-scott.com

- **Linda P. Nussbaum**
  lnussbaum@nussbaumpc.com,sschwaiger@nussbaumpc.com,bcohen@nussbaumpc.com,lsandler@nussbaumpc.com,bdenmeth@nussbaumpc.com,pmonas@nussbaumpc.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com

- **Alyson Louise Oliver**
  notifications@oliverlg.com

- **Julia Pazcoguro**
  jpazcozo@curtis.com

- **Patrick Wayne Pendley**
  cyarbrough@pbclawfirm.com,pwpendley@pbclawfirm.com

- **Richard C. Pepperman , II**
  peppermanr@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Jessica Ann Perez**
  jperez@pbclawfirm.com

- **Adam James Pessin**
  apessin@finekaplan.com,nblakeslee@finekaplan.com

- **John S. Playforth**
  jplayforth@jcov.com,tmamy@cov.com

- **Adam F. Polk**
  aap@girardgibbs.com

- **Menachem David Possick**
  possickmd@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Thomas F Quilling**
  tom@waaasermanlaw.com

- **John D. Radice**
  jradice@radicelawfirm.com

- **Kevin E. Rayhill**
  krayhill@saverilawfirm.com

- **Tiffany Hsiao Rohrbaugh**
  tiffany.rider@skadden.com,James.Attridge@skadden.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com,mdearman@rgrdlaw.com
- **Peter George Safirstein**
  psafirstein@safirsteinmetcalf.com,sfeerick@safirsteinmetcalf.com,emetcalf@safirsteinmetcalf.com
- **Christopher M. Santomassimo**
  csantomassimo@ndslaw.com,jdisena@ndslaw.com,achan@ndslaw.com
- **Joseph Richard Saveri**
  jsaveri@saverilawfirm.com,blang@saverilawfirm.com,dclevenger@saverilawfirm.com,plall@saverilawfirm.com
- **Todd M Schneider**
  tschneider@schneiderwallace.com
- **Todd Michael Schneider**
  tschneider@schneiderwallace.com,efilings@schneiderwallace.com
- **Max Raphael Schwartz**
  mschwartz@scott-scott.com,efile@scott-scott.com
- **David Gregory Scott**
  david@davidgscott.com,dscott@emersonfirm.com,tautry@emersonfirm.com
- **David R Scott**
  drscott@scott-scott.com
- **Jennifer Janine Scott**
  jscott@scott-scott.com
- **Jacques Semmelman**
  jsemmelman@curtis.com,nmazanitis@curtis.com,jclyne@curtis.com
- **Christina H. C. Sharp**
  chc@girardgibbs.com,mce@girardgibbs.com
- **William R. Sherman**
  william.sherman@lw.com
- **Arthur L. Shingler , III**
  ashingler@rgrdlaw.com
- **Michael L. Silverman**
  msilverman@fklmlaw.com
- **Abraham Singer**
  Abraham.Singer@kitch.com
- **Thomas Michael Skelton**
  tskelton@lowey.com
- **Kai Smith**
  ksmith@cov.com,maony@cov.com
- **Sylvia Sokol**
  ssokol@scott-scott.com,tpacht@scott-scott.com
- **Jessica A. Sprovtsoff**
  jsprovtsoff@schiffhardin.com
- **Peter Dexter St. Phillip , Jr**
  pstphillip@lowey.com,mail@lowey.com
- **Allan Steyer**
  asteyer@steyerlaw.com,lrorem@steyerlaw.com,amarshall@steyerlaw.com,cswaminathan@steyerlaw.com
- **Tammy Mcclendon Stokes**
  tammys@gseattorneys.com,twilson@gseattorneys.com
- **Brian R. Strange**
  lacounsel@earthlink.net
- **Brian Russell Strange**
  bstrange@strangeandbutler.com,gcarpenter@strangeandcarpenter.com,jhood@strangeandbutler.com
- **Troy A. Terpening**
  tterpening@scott-scott.com
- **Rosalee Belinda Connell Thomas**
  r_connell2004@yahoo.com,rbcthomas@finkelsteinthompson.com
- **Douglas G. Thompson**
  dthompson@finkelsteinthompson.com
- **Katherine Van Dyck**
  kvandyck@cuneolaw.com
- **Patrick J Van Zanen**
  pvanzanen@schneiderwallace.com
- **Joseph M Vanek**
  jvanek@vaneklaw.com
- **Tony Visage**
  tony.visage@bgllp.com
- **William Henry Wagener**
  wagenerw@sullcrom.com,s&cmanagingclerk@sullcrom.com
- **Charles R. Watkins**
  charlesw@gseattorneys.com
- **Kenneth A. Wexler**
  kaw@wexlerwallace.com,ecf@wexlerwallace.com
- **Joe R. Whatley , JR**
  jwhatley@whatleykallas.com,ecf@whatleykallas.com
- **Robert D. Wick**
  rwick@cov.com,maony@cov.com
- **S. Thomas Wienner**
  twienner@wiennergould.com
- **Garrett W Wotkyns**
  gwotkyns@schneiderwallace.com
- **Garrett W. Wotkyns**
  gwotkyns@schneiderwallace.com
- **Gabriel D. Zeldin**
  gzeldin@steyerlaw.com
- **Terrence Scott Ziegler**
  tziegler@ktmc.com,jwotring@ktmc.com,slempert@ktmc.com,cmurphy@ktmc.com,qkerrigan@ktmc.com,lrusso@ktmc.com
- **Margaret M. Zwisler**
  margaret.zwisler@lw.com,rachel.feld@lw.com,jessica.bengels@lw.com,margaret-zwisler-5429@ecf.pacerpro.com,jeffrey.newhouse@lw.com,stefanie.johnson@lw.com,william.h.rawson@lw.com,jennifer.giordano@lw.com,william.rinner@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Robert J. Bonsignore**
Bonsignore & Brewer
23 Forest Street
Medford, MA 02155

**Patrick E. Cafferty**
Caffert Clobes Meriwether & Sprengel LLP, L.L.P.
30101 N. Main Street
Suite 565
Ann Arbor, MI 48104

**James R. Hail - MDL NOT ADMITTED**
Doyle Lowther LLP
10200 Willow Creek Road
Suite 150
San Diego, CA 92131

**Steven A. Kanner**
Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095

**GEORGE N MEROS , JR**
GRAYROBINSON PA - TALLAHASSEE FL
301 S BRONOUGH ST STE 600
TALLAHASSEE, FL 32301

**Amanda Steiner**
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108

**Vincent Ward**
Freedman Boyd Hollander Goldberg Urias & Ward P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102