**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

IN RE ALUMINUM WAREHOUSING     :
ANTITRUST LITIGATION              :       MDL No. 2481

This Document Relates To:         :      Master Docket No.
                                :      13-md-2481-KBF-RLE
                                :

*In re Aluminum Warehousing Antitrust Litigation* (Direct :
Purchaser Plaintiffs), Case No. 1:14-cv-03116-KBF  :
                                :
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>THEIR MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

 

August 17, 2016

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ...................................................................................................................4

    A.    This Court's *Aluminum I* Decision .........................................................5

    B.    The FLPs' Amended Complaint ..............................................................6

    C.    This Court's *Aluminum II* Decision ........................................................7

    D.    The Commercial and Consumer End Users' Appeals ............................9

ARGUMENT ....................................................................................................................11

I.    *McCready* Creates Only a Narrow Exception to the Market-Participant
Requirement for Antitrust Injury That Does Not Apply Here ............................12

II.    The Second Circuit's Decision Squarely Rejects the Theory of Antitrust Injury
Alleged by the FLPs in the TAC and Adopted by This Court in *Aluminum II*................17

III.    The Court Should Order Expedited Briefing on This Motion and Should Adjourn
Further Proceedings on the FLPs' Class-Certification and *Daubert* Motions..................21

CONCLUSION....................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*American Ad Mgmt., Inc.* v. *Gen. Tel. Co. of Calif.*, 190 F.3d 1051 (9th Cir. 1999) ...................13

*Blue Shield of Virginia* v. *McCready*, 457 U.S. 465 (1982) .................................................. *passim*

*Crimpers Promotions Inc.* v. *Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983) .....................15

*Hanover 3201 Realty, LLC* v. *Village Supermarkets, Inc.,* 806 F.3d 162
   (3d Cir. 2015)...........................................................................................................15, 16

*In re Aluminum Warehousing Antitrust Litig.*, 2016 U.S. App. LEXIS 14579
   (2d Cir. Aug. 9, 2016).............................................................................................. *passim*

*In re Aluminum Warehousing Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54643
   (S.D.N.Y. Apr. 25, 2016)..........................................................................................4, 20

*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419
   (S.D.N.Y. 2015)....................................................................................................... *passim*

*In re Aluminum Warehousing Antitrust Litig.*, 2014 U.S. Dist. LEXIS 121435
   (S.D.N.Y. Aug. 29, 2014).............................................................................................5, 6

*In re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522 (S.D.N.Y. 2012) ................. 11-12

*Kassner* v. *2nd Ave. Delicatessen, Inc.*, 496 F.3d 229 (2d Cir. 2007).........................................21

*Perfect Pearl Co.* v. *Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453
   (S.D.N.Y. 2012).............................................................................................................21

*Serpa Corp.* v. *McWane, Inc.*, 199 F.3d 6 (1st Cir. 1999)............................................................12

*Southaven Land Co.* v. *Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983)................. 13, 14-15

*VoiceAge Corp.* v. *RealNetworks, Inc.*, 926 F. Supp. 2d 524 (S.D.N.Y. 2013) ..........................12

*West Penn Allegheny Health System, Inc.* v. *UPMC*, 627 F.3d 85 (3d Cir. 2010) .......................13

### Other Authorities

Fed. R. Civ. P. 12(c) ..................................................................................................................11

28 U.S.C. § 1292(b) .....................................................................................................................9

6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE &
   PROCEDURE § 1522.2 (3d ed. Apr. 2016)...............................................................................21

Defendants submit this memorandum in support of their motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Under a straightforward application of the Second Circuit's ruling last week in *In re Aluminum Warehousing Antitrust Litigation*, 2016 U.S. App. LEXIS 14579 (2d Cir. Aug. 9, 2016), this case should be dismissed with prejudice because the Third Amended Complaint ("TAC"), the operative complaint in this action, fails as a matter of law to satisfy the essential element of antitrust injury.  The Second Circuit's decision makes clear that the theory of antitrust injury under which this case has proceeded misapplies *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465 (1982), and therefore is legally deficient.

In accordance with this Court's directive last week, Defendants have filed this motion "as soon as practicable."  (ECF 1046 at 3.)  With the class-certification hearing in this case less than a month away, Defendants ask that the Court order expedited briefing on this motion,[1] and they renew their request that the Court adjourn any further proceedings on the pending *Daubert* and class-certification motions until this motion is resolved to obviate unnecessary burdens on the parties and the Court.

## PRELIMINARY STATEMENT

The Second Circuit's decision squarely rejects the theory of antitrust injury on which this case has been premised from the outset.  The First Level Purchasers ("FLPs") have never contended that they participate in the markets for London Metal Exchange ("LME") (or any other) warehousing of aluminum or for trading aluminum warrants and futures.  Instead, they have argued that they suffered antitrust injury under *McCready* because their purchases of

---

[1] In its August 10, 2016 Order, the Court circled the phrase "that can be briefed on an expedited basis" and wrote "yes."  (ECF 1046 at 3.)

physical aluminum at prices that supposedly incorporated an inflated Midwest Premium were "inextricably intertwined" with the purported injury inflicted in the alleged market for LME warehousing of aluminum.  The FLPs attempt to squeeze their antitrust claims into *McCready* by arguing that their aluminum purchases create demand for aluminum, without which there could be no aluminum warehousing and no trading of aluminum warrant and futures.  The TAC thus alleges that "Defendants' entire scheme depends, as a matter of first principal [sic], on those which are similarly situated to Plaintiffs, which put primary aluminum to productive use."  (TAC ¶ 43.)  "[W]ithout a demand for primary aluminum from purchasers like Plaintiffs," the FLPs allege, "there would be no demand for . . . aluminum warehousing, trading, and financing by Defendants." (*Id.*)

Although "Defendants contend[ed] (vigorously to be sure) that antitrust standing is lacking," this Court adopted the FLPs' reading of *McCready* in upholding the TAC.  *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 443 (S.D.N.Y. 2015) ("*Aluminum II*").  In words that closely track the allegations of antitrust injury in the TAC, the Court explained its ruling as follows:

> Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity.  Put another way, plaintiffs are central—they are the fulcrum—to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum.  As the real world buyers who—they allege—must pay prices for aluminum that incorporate Midwest Premium, they are necessarily directly impacted by the alleged conduct.  That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out.  Plaintiffs argue that at the very least they therefore fall within the scope of antitrust injury contemplated by *McCready*.  As now plead in the proposed pleadings, the Court agrees.

*Id.* at 442.

Relying on this Court's decision in *Aluminum II*, the Commercial and Consumer End Users (the "Commercials" and "Consumers") argued on appeal that they too could adequately plead antitrust injury in an amended complaint simply by adopting the FLPs' allegations in the TAC that this Court already had held were sufficient under *McCready*.  The Commercials and Consumers contended "that they suffered an antitrust injury because, under *McCready*, their role in creating demand for physical aluminum makes them 'inextricably intertwined' with the anticompetitive scheme."  *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *26.  Defendants responded that this Court had misapplied *McCready*'s "inextricably intertwined" standard in its *Aluminum II* decision.  (Copies of the sections of the parties' Second Circuit briefs that address antitrust injury are attached hereto as Exhibit 1.)

In its decision last week, the Second Circuit agreed with Defendants, holding that the Commercials and Consumers "failed to allege (*and could not allege*) antitrust injury."  *Id.* at *30 (emphasis added).  The Second Circuit expressly rejected the argument—originally made by the FLPs in the TAC—that *McCready*'s "inextricably intertwined" standard is satisfied by allegations that if Plaintiffs "did not exist, there would be no real world purchasers of aluminum, and without users of physical aluminum, there would be no market for aluminum futures or aluminum warehousing."  *Id.* at *27.  As the Second Circuit explained, "[t]his approach would limitlessly increase the universe of potential plaintiffs, and cannot be squared with *McCready* itself."  *Id.* at *27-*28.  The Second Circuit further rejected the assertion—also imported by the Commercials and Consumers from the TAC—that aluminum purchasers' injuries were "'a necessary step' in effectuating the alleged conspiracy to lengthen load-out queues or increase the Midwest Premium, or 'the very means' by which defendants did these things."  *Id.* at *27.  To the contrary, the Second Circuit held, "[a]ll of the alleged anticompetitive acts—cancelling

warrants, shuttling aluminum, and slowing load-outs—were within the defendants' power to do; they did not need or use injury to [aluminum purchasers] as a 'fulcrum' or 'conduit.'"  *Id.*

Defendants respectfully submit that the Second Circuit's opinion cannot be read as anything other than a clear rejection of the *McCready* theory of antitrust injury advanced by the FLPs in the TAC—and ultimately adopted by this Court in *Aluminum II*.  Notwithstanding the clear import of the Second Circuit's decision, in their letter to this Court last week, the FLPs assert without a word of explanation that "the Second Circuit's opinion leaves undisturbed this Court's earlier ruling finding the FLPs have suffered antitrust injury."  (ECF 1047.)  But there is absolutely nothing in the Second Circuit's reasoning that depends in any way on the relative position of aluminum purchasers in the supply chain.  Furthermore, any attempt by the FLPs to respond to the Second Circuit's decision by asserting a brand new theory of antitrust injury not based on *McCready* would come far too late in the day.  As this Court already held in its April ruling denying the FLPs leave to amend the TAC, "[t]he time for raising entirely new theories of the case has long since passed."  *In re Aluminum Warehousing Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54643, at *18 (S.D.N.Y. Apr. 25, 2016).

The Second Circuit's ruling controls this case:  because the FLPs' operative complaint alleges the same deficient theory of antitrust injury under *McCready* that the Commercials and Consumers sought to allege, the FLPs' antitrust claims fail as a matter of law, and this Court should enter judgments on the pleadings under Rule 12(c).

## BACKGROUND

This multidistrict litigation initially consisted of three putative class actions brought on behalf of three different groups of aluminum purchasers, each occupying a different level of the aluminum supply and distribution chain.  The three different groups referred to themselves as

- 4 -

(i) the First Level Purchasers, (ii) the Commercial End Users, and (iii) the Consumer End Users. Suing under federal and state antitrust laws, all three groups contended that they paid an artificially inflated price for aluminum because Defendants' anticompetitive conduct in the market for LME warehouse services increased the Midwest Premium, an alleged component of the price charged for aluminum in the United States.

### A.    This Court's *Aluminum I* Decision

In August 2014, this Court dismissed the antitrust claims asserted in all three putative class actions on multiple grounds. *In re Aluminum Warehousing Antitrust Litig.*, 2014 U.S. Dist. LEXIS 121435 (S.D.N.Y. Aug. 29, 2014) ("*Aluminum I*"). The Court held that all three groups lacked antitrust standing because the complaints failed to allege either that Plaintiffs suffered antitrust injury or that they were "efficient enforcers" of the antitrust laws. *Id*. at *67-*92. The Court further concluded that all three complaints failed to plead a plausible antitrust conspiracy. *Id*. at *92-*119.

On the issue of antitrust injury, this Court rejected the contention by all three groups of Plaintiffs "that by paying a price for aluminum which incorporated an inflated Midwest Premium, they have alleged classic antitrust injury." *Id*. at *80. Because Plaintiffs were not competitors of Defendants or consumers of Defendants' products, the Court noted that Plaintiffs "proceed along the 'inextricably intertwined' theory" of *McCready*. *Id*. at *81. To plead antitrust injury under that theory, the Court held that Plaintiffs "must allege with clarity what the relevant market is, what precise anticompetitive conduct occurred in that market, and how their injury was inextricably intertwined with that injury." *Id*. at *83. The Court concluded that all three complaints lacked the requisite "clarity" for the Court to "determine whether plaintiffs' injury is 'inextricably intertwined' with anticompetitive injury." *Id*. at *82. The Court explained:

> By failing clearly or adequately [to] allege a market in which antitrust injury is experienced and by whom, plaintiffs fail to support their own antitrust injury. That they were harmed by paying higher prices they have alleged—and they have done so clearly.  But how that impacted competition and in which market is not. None of the complaints clearly refers to a market where antitrust injury is directly experienced or how.

*Id*. at *81-*82.  The Court thus ruled that "plaintiffs have failed adequately to support allegations of antitrust injury." *Id*. at *85.

The Court, however, gave one group of Plaintiffs—the FLPs—an opportunity to amend their complaint "to both adequately allege antitrust standing as well as address the other, more merits-based issues" raised by the Court.  *Id*. at *132.  By contrast, the Court denied the Commercials and Consumers leave to replead on the ground that "[t]here will always be others who are more directly injured than them, as well as others who will be more efficient enforcers of federal antitrust laws." *Id*.  The Court explained that "[t]here is no need . . . to unnecessarily add complexity to the discovery and fact-finding in this case by permitting these plaintiffs to pursue their claims when there are other, more efficient enforcers." *Id*.

The Commercials and Consumers appealed the dismissal of their actions, and their appeals were stayed pending this Court's ruling on the viability of the FLPs' amended complaint.

### B.    The FLPs' Amended Complaint

In response to the Court's *Aluminum I* decision, the FLPs' amended complaint—the TAC—alleges two separate relevant markets:   (i) the market for "primary aluminum," and (ii) the market for "aluminum warehousing services in LME warehouses."  (TAC ¶¶ 157, 163.) As they had in their original complaint, the FLPs once again attempted to plead antitrust injury by relying on *McCready*'s "inextricably intertwined" language.

The TAC alleges that Defendants' conduct created "a bottleneck in the LME-approved warehousing market" and that their injuries "are 'inextricably intertwined'" with the alleged

restraint of the warehousing market because "they are inevitable results of Defendants' anticompetitive conduct." (*Id.* ¶ 417.)  According to the TAC, "[t]he anticompetitive effects of Defendants' [conduct] in the LME-registered warehouse services market are . . . directly transmitted to the Primary Aluminum Market.  This directly and foreseeably caused a rise of prices in the Primary Aluminum Market, an injury to competition which is inextricably intertwined with the injury caused by Defendants in the warehouse services market." (*Id.* ¶ 421.) The TAC further alleges:

> Plaintiffs and other purchasers in the Primary Aluminum market were necessary to the completion of Defendants' anticompetitive scheme.  Plaintiffs' overpayment of the anticompetitive prices for primary aluminum ensured and provided the market opportunity that enabled the Trading Defendants to successfully arbitrage the difference between current aluminum prices and higher prices in the future.

(*Id.* ¶ 423.)  The TAC also asserts:

> [W]ithout a demand for primary aluminum from purchasers like Plaintiffs, there would be no demand for aluminum mining or smelting by producers or for aluminum warehousing, trading, and financing by Defendants.  Defendants' entire scheme depends, as a matter of first principal [sic], on those which are similarly situated to Plaintiffs, which put primary aluminum to productive use.

(*Id.* ¶ 43.)

## C.    This Court's *Aluminum II* Decision

In its *Aluminum II* decision, this Court began by underscoring that the FLPs fail to satisfy the traditional market-participant requirement of antitrust injury:

> Plaintiffs here are not competitors of any of these defendants:  they do not operate warehouses, and they do not have commodities trading arms.  Nor are they alleged to directly consume any of defendants' trading products or aluminum warehouse-related products or services.

95 F. Supp. 3d at 442 (footnotes omitted); *see also id*. at 443 ("Defendants argue that plaintiffs are neither competitors nor consumers and that their arguments to the contrary are unsupportable. They are correct on both scores.").[2]

The Court went on to state, however, that "*McCready* makes clear that the antitrust laws do not require a plaintiff [to] fit neatly into a box of competitor or consumer, so long as 'the injury [they] suffered was inextricably intertwined with the injury the conspirators sought to inflict.'" *Id*. at 443 (quoting *McCready*, 457 U.S. at 484). The Court held that the TAC adequately alleges antitrust injury under *McCready* because the FLPs' "purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out." *Id*. at 442. The Court explained:

> Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity. Put another way, plaintiffs are central—they are the fulcrum—to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum. As the real world buyers who—they allege—must pay prices for aluminum that incorporate Midwest Premium, they are necessarily directly impacted by the alleged conduct. That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out. Plaintiffs argue that at the very least they therefore fall within the scope of antitrust injury contemplated by *McCready*. As now plead in the proposed pleadings, the Court agrees.

*Id*. The Court repeated this reasoning elsewhere in its opinion:

> [C]ommodities like aluminum are valuable primarily because they [are] used by real world users to make real world products, and so the manipulation of a commodities market will necessarily result in real world effects. In this sense, plaintiffs' alleged payment of a higher Midwest Premium is theoretically necessary and central—but ultimately collateral damage. It is central and

---

[2] In a footnote, the Court summarily rejected the other undeveloped theories of antitrust injury that the FLPs attempted to plead in passing in the TAC (*see* TAC ¶¶ 413-416) without any supporting factual allegations. *See* 95 F. Supp. 3d at 442 n.25.

necessary because, as framed above, commodities can only be traded if they are used somewhere, by someone, to make real world goods or to provide real world services.  It is collateral because impacting the price that real world users of aluminum may pay is not the focus of defendants' alleged financial play—it is merely the play's by-product.

*Id*. at 436.

As the Court recognized, Defendants "vigorously" contested this theory of antitrust injury under *McCready*.  *Id*. at 443.  Defendants therefore asked this Court to certify its ruling on antitrust injury for interlocutory review under 28 U.S.C. § 1292(b) so that the Second Circuit could consider that threshold legal issue in this case at the same time it considered the appeals of the Commercials and Consumers.  The Court denied that motion, explaining:

> [P]laintiffs' injury is inextricably intertwined with the alleged anticompetitive conduct of the defendants (which consists of actions designed to interfere with and manipulate the market processes that determine the price of physical aluminum).  Supreme Court precedent dictates that that is sufficient for standing. So long as *McCready* is good law, and it currently is, the facts presented here support standing at the pleading stage.

(ECF 791 at 3.)

### D.    The Commercial and Consumer End Users' Appeals

Not surprisingly, this Court's decision in *Aluminum II* was the focal point of the parties' briefs in the Second Circuit on the issue of antitrust injury.  Although Defendants defended this Court's "efficient enforcer" ruling with respect to the Commercials and Consumers on appeal, Defendants also argued that the Commercials and Consumers did not and could not allege antitrust injury—and, in particular, that this Court had misapplied *McCready* in *Aluminum II*. (*See* Ex. 1, Defs.' 2d Cir. Br. at 28-44.)

The Commercials and Consumers likewise focused their antitrust injury arguments on this Court's *Aluminum II* decision, asserting that they should be permitted to amend their complaint on remand to make the same allegations of antitrust injury that this Court had upheld

in the FLPs' amended complaint.  In particular, they contended that they could allege antitrust

injury under *McCready* because:

> Like the FLPs, Plaintiffs' injuries are 'inextricably intertwined' with the
> defendants' alleged scheme.  Like the FLPs, Plaintiffs' demand for aluminum
> created the market for aluminum sales.  Plaintiffs purchase aluminum to use in
> their production processes, just as the FLPs do.  Were it not for Plaintiffs' need to
> use aluminum to fashion the products they sell, it would not be possible for the
> financial institution defendants to trade aluminum as a commodity.  Like the
> FLPs, Plaintiffs pay prices for aluminum that incorporate the Midwest Premium.
> Plaintiffs paid higher prices as a result of the Defendants' alleged conspiracy and
> were therefore "necessarily directly impacted by the alleged conduct," just as the
> FLPs were.

(Ex. 1, Commercials' 2d Cir. Br. at 22-23 (citations omitted).)[3]

In a lengthy discussion of antitrust injury in their joint reply, the Commercials and

Consumers argued that the Second Circuit "should not decide this issue . . . because Defendants

have interjected it in an attempt to circumvent the district court's denial of their request to file an

interlocutory appeal of the order denying their motions to dismiss in the FLP litigation."  (Ex. 1,

Pls.' Joint Reply at 23-24.)  "[I]n raising the antitrust injury issue here," the Commercials and

Consumers contended, "Defendants essentially ask the Court to review an interlocutory order in

another proceeding in which no final judgment has been entered and where the plaintiffs in that

other proceeding are not presently before the Court."  (*Id*. at 24; *see also id*. at 25.)

"Even if the Court were to review the district court's application of *McCready*," the

Commercials and Consumers asserted, "the court's holding that the FLPs alleged an antitrust

injury in their amended complaints was proper" under *McCready*.  (*Id*. at 26.)  They argued:

> Defendants' argument that the district court did not properly apply *McCready*
> addresses only one of at least two markets relevant to this analysis, the

---

[3] The Consumers likewise argued that "an antitrust claim may be asserted by a plaintiff other than
a market participant, where the plaintiff's injuries are inextricably intertwined with a market participant's
injury."  (Ex. 1, Consumers' 2d Cir. Br. at 31.)

"warehouse market."  The FLP complaint, however, alleges at least two relevant markets:  a primary aluminum market and a market for LME-certified warehouse services for aluminum . . . .  When the proper multi-market lens is applied to the *McCready* analysis, it is clear, as the district court found in sustaining the FLPs' pleading, that Plaintiffs' injuries are inextricably intertwined with the injury inflicted on the affected markets.

(*Id*. at 28-29 (citations and emphasis omitted).)   The Commercials and Consumers further

asserted:

Plaintiffs' payment of the higher Midwest Premium was, as the district court found in sustaining the FLPs' complaint, "central and necessary" to Defendants' illicit trading scheme.  Thus, based on the FLPs' position in the competitive landscape in which Defendants' anticompetitive scheme occurred, the district court "agree[d]" that the FLPs "at the very least . . . fall within the scope of the antitrust injury contemplated by *McCready*."  The Commercial and Consumer End Users are also purchasers of aluminum who paid a price that included the collusively inflated Midwest Premium.

(*Id*. at 30 (citations and emphasis omitted).)

The Second Circuit elected not to decide the "efficient enforcer" issue, but rather affirmed the dismissal of the Commercials' and Consumers' actions on the "ground that they did not (and could not) suffer antitrust injury."  *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *4; *see also id*. at *15 ("[W]e conclude that Commercials and Consumers fail to satisfy the first requirement of antitrust standing:  that they suffered an antitrust injury.").  In so ruling, the Second Circuit adopted Defendants' reading of *McCready*'s "inextricably intertwined" language and rejected this Court's contrary reasoning that aluminum purchasers "suffered an antitrust injury because, under *McCready*, their role in creating demand for physical aluminum makes them 'inextricably intertwined' with the anticompetitive scheme."  *Id*. at *26.

## ARGUMENT

Federal Rule of Civil Procedure 12(c) "provides that 'a party may move for judgment on the pleadings' anytime '[a]fter the pleadings are closed—but early enough not to delay trial.'"  *In*

*re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522, 526 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 12(c)).  As this Court previously observed, "[m]otions for judgment on the pleadings are an underutilized tool for litigants whose claims are amenable to immediate resolution." *VoiceAge Corp.* v. *RealNetworks, Inc.*, 926 F. Supp. 2d 524, 525 (S.D.N.Y. 2013) (Forrest, J.). In deciding a Rule 12(c) motion, "a court applies the same legal standard as that applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Id.*

Although the Second Circuit noted that this Court's decision in *Aluminum II* denying Defendants' motions to dismiss the FLPs' amended complaint "is not the subject of this appeal," *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *12,[4] the Second Circuit's discussion of antitrust injury cannot be reconciled with, and rejects the reasoning of, this Court's ruling on that issue in *Aluminum II*.  Because the Second Circuit rejected as a matter of law the exact theory of antitrust injury under which this action has proceeded, judgment on the pleadings should be entered under Rule 12(c).

**I.     *McCready* Creates Only a Narrow Exception to the Market-Participant Requirement for Antitrust Injury That Does Not Apply Here.**

It is well settled that "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."  *Serpa Corp.* v. *McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999); *see also In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *15 ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury.").  As the Second Circuit put it, "[t]he upshot is that to suffer

---

[4] The Second Circuit described this Court's antitrust injury ruling as follows:  "[T]he district court concluded that the Purchasers, while not participants in any of the defendants' markets, had demonstrated they had antitrust standing because their purchases of aluminum are 'inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out.'" *Id.* at *12-*13 (quoting *Aluminum II*, 95 F. Supp. 3d at 442).

antitrust injury, the putative plaintiff must be a participant in the very market that is *directly restrained*." *Id*. at \*25 (emphasis added).

All of the Plaintiffs in this multidistrict litigation—the FLPs, Commercials and Consumers—"allege the following anticompetitive conduct:  the trader defendants cancelled warrants en masse; the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another; the warehouse operator defendants treated the minimum load-out requirement as a maximum; and the warehouse operator defendants offered incentive payments to attract more aluminum." *Id*. at \*26.  The Second Circuit held that "[a]ll of this conduct took place (if at all) in the LME-warehouse storage market, and that is where the *direct*, immediate impact would have been felt."  *Id*. at \*26-\*27 (emphasis added).   Like the Commercials and Consumers, the FLPs "do not and cannot allege that they participated" in that directly restrained market. *Id*. at \*27.

In *McCready*, the Supreme Court "carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants." *Am. Ad Mgmt., Inc.* v. *Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999); *accord In re Aluminum*, 2016 U.S. App. LEXIS 14579, at \*16.  *McCready*'s narrow exception applies only if plaintiffs' injuries were "the *means* by which the defendants seek to achieve their anticompetitive ends." *W. Penn Allegheny Health Sys., Inc.* v. *UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (emphasis added).  Antitrust plaintiffs thus must allege more than that their injury was proximately caused by an antitrust violation; under *McCready*, they must allege that defendants utilized them "as a fulcrum, conduit or market force to injure competitors or participants" in defendants' market.  *Southaven Land Co.* v. *Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983).  As the Second Circuit stated, "the plaintiff must be directly harmed

by the defendants' manipulative scheme in a certain market, and the injury that results must be one that operates as 'a fulcrum, conduit or market force,' *i.e.*, 'means' to inflict injury on participants in the defendants' market." *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *20.

The Second Circuit held that "*McCready* does not support Consumers' and Commercials' claim of antitrust injury, and neither do subsequent cases of this Circuit, or other circuits, or, indeed, later cases from the Supreme Court." *Id*. at *16.   In *McCready*, a subscriber to a Blue Shield health plan contended that she was denied reimbursement for a psychologist's services because of an alleged boycott agreement between Blue Shield and a psychiatrists' association to provide insurance coverage for psychiatrists but not for psychologists.   457 U.S. at 467-70. Plaintiff was not a competitor and arguably was not a consumer in defendants' market because her employer purchased the group health plan from Blue Shield.   *Id*. at 479-80, 483-84.   The Supreme Court nonetheless held that the plaintiff alleged antitrust injury because "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market."   *Id*. at 484.   As the Supreme Court explained, "[d]enying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends."   *Id*. at 479.   The subscribers' injury—denial of reimbursement for psychologists' services—"was a necessary step in effecting the ends of the alleged illegal conspiracy."   *Id*.   The Sixth Circuit succinctly summarized *McCready* as follows:

> Through economic incentives, the conspirators were alleged to have channeled "consumers" of psychotherapeutic services, such as McCready and her class, to effect an economic boycott of competitors of psychiatrists in the relevant market. This manipulation of a class of consumers of psychotherapeutic services served to "inextricably intertwine[]" their injuries with those injuries sought by the conspirators to be inflicted upon participants in the psychotherapy market.

*Southaven*, 715 F.2d at 1086; *see also In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *18 ("[T]he health insurance provider and group of psychiatrists accomplished their purported goal of harming the psychologists by inflicting direct harm on health insurance subscribers (like the plaintiff) who wanted to consult with psychologists.").[5]

After discussing *McCready*, the Second Circuit noted that it had decided *Crimpers Promotions Inc.* v. *Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983), "[s]hortly after *McCready*." *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *19.  In *Crimpers*, the Second Circuit held that the organizer of a trade show suffered antitrust injury from a successful boycott of its show by two dominant cable programmers that sought to prevent local cable television stations from interacting with producers of cable television programming at the trade show.  The Second Circuit explained:

> Just as the Blue Cross' refusal to honor McCready's bill for treatment by a psychologist was a means to defendants' objective to drive out psychologists in favor of psychiatrists, so the destruction of Crimpers' trade show, which was designed "to keep buyers and sellers of cable programming from transacting business face-to-face," was a means to eliminate competition by producers in dealing with television stations.

*Crimpers*, 724 F.2d at 292.

The Second Circuit next stated that its "sister circuits are in accord."  *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *20.  For example, the Second Circuit stated that "[t]he Third Circuit's recent decision in" *Hanover 3201 Realty, LLC* v. *Village Supermarkets, Inc.,* 806 F.3d 162 (3d Cir. 2015), "illustrates this [principle] well." *In re Aluminum*, 2016 U.S. App. LEXIS

---

[5] As the Second Circuit pointed out, "[t]o explain its reasoning, the Supreme Court offered the hypothetical of 'a group of psychiatrists conspir[ing] to boycott a bank until the bank ceased making loans to psychologists.'" *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *18 (quoting *McCready*, 457 U.S. at 484 n.21).  "Just as 'the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions,' the health plan subscriber should as well." *Id.* (same).

14579, at *23-*24.  The Third Circuit held that a plaintiff that is not a competitor or consumer in defendants' market does not fit within *McCready*'s narrow exception unless the plaintiff "was the very means by which Defendants" sought to inflict competitive injury on a participant in their market.  806 F.3d at 174.  In *Hanover 3201 Realty*, defendants allegedly sought to exclude a prospective competitor from their market by imposing costs not on the competitor itself, but on the firm, Hanover Realty, that was responsible for obtaining construction permits for the competitor.  *Id*.  The Third Circuit concluded that Hanover Realty had adequately alleged that its injury was "inextricably intertwined" with Defendants' anticompetitive conduct because "injuring Hanover Realty was the very means by which Defendants could get to [the competitor]."  *Id*.  As the court explained, "[f]orcing Hanover Realty to pay thousands of dollars in legal fees and to defend itself against alleged anticompetitive filings and imposing significant delays on the project *were the very means by which Defendants sought to keep a competitor out of the market*."  *Id*. at 176 (emphasis added).

The Second Circuit then summarized this case law applying *McCread*y as follows:  "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is *directly restrained*.  Usually, that market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant, but sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."  *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *25 (emphasis added); *see also id*. at *26 ("To fall within *McCready*, Consumers and Commercials had to participate in the very market that defendants *directly restrained*.") (emphasis added).   "Whatever injury Consumers and Commercials suffered," the Second Circuit held, "it was not 'inextricably intertwined' with

whatever injury the defendants allegedly intended to inflict" in the warehousing and financial trading markets.  *Id*. at *26; *see also id*. at *29-*30 ("[W]hatever injuries Consumers and Commercials suffered were not 'inextricably intertwined' with the defendants' alleged anticompetitive conduct.").  The Second Circuit thus ruled that the Commercials and Consumers "failed to allege (*and could not allege*) antitrust injury, a deficiency that is fatal to all of their federal and state antitrust-based claims."  *Id*. at *30 (emphasis added).  As explained below, that ruling applies with equal force to the FLPs' allegations of antitrust injury in the TAC.

## II.    The Second Circuit's Decision Squarely Rejects the Theory of Antitrust Injury Alleged by the FLPs in the TAC and Adopted by This Court in *Aluminum II*.

As aluminum purchasers that supposedly paid an inflated Midwest Premium, the FLPs rely on the same theory of antitrust injury under *McCready* and the same factual allegations that the Commercials and Consumers advanced in the Second Circuit, which compels the exact same result in this action.  Indeed, the Second Circuit's opinion—affirming the dismissal with prejudice of the claims of the Commercials and Consumers—makes it unmistakably clear that the FLPs "failed to allege (and could not allege) antitrust injury" under *McCready*.  *Id*.

*First*, like the Commercials and Consumers, the FLPs "did not store aluminum in the defendants' warehouses; they did not trade aluminum futures contracts with the defendants; and they do not allege that any of the aluminum they purchased was ever stored in any of the defendants' warehouses, or was the underlying asset for any of the defendants' futures trades." *Id*. at *25.[6]  The absence of these factual allegations—which is determinative under the Second Circuit's decision—is clear from the face of the TAC.  (*See* TAC ¶¶ 32-73.)  Like the

---

[6] *See also id*. at *11 ("The plaintiffs do not allege that they ever stored aluminum with the warehouse operator defendants, engaged in futures trades with any of the trader defendants, or purchased aluminum that was ever present in any of the defendants' warehouses.").

Commercials and Consumers, the FLPs instead "premise their claim to antitrust injury solely on their purchases of aluminum . . . on the physical aluminum market, where prices were allegedly affected by defendants' alleged anticompetitive behavior" in the putative market for LME warehousing of aluminum. *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *25-*26.  Like the Commercials and Consumers, the FLPs also allege (TAC ¶¶ 41-43, 417-425) "that they suffered an antitrust injury because, under *McCready*, their role in creating demand for physical aluminum makes them 'inextricably intertwined' with the anticompetitive scheme." *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *26.  The Second Circuit soundly rejected that theory of antitrust injury.

*Second*, the FLPs allege (TAC ¶¶ 221-321) the exact same anticompetitive conduct in the market for LME warehouse services that the Commercials and Consumers alleged:  namely, that "the trader defendants cancelled warrants en masse; the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another; the warehouse operator defendants treated the minimum load-out requirement as a maximum; and the warehouse operator defendants offered incentive payments to attract more aluminum." *Id*. at *26.[7]  As the Second Circuit held, "[a]ll of this conduct took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt." *Id*. at *26-*27. Like the Commercials and Consumers, the FLPs "do not and cannot allege that they participated in that market." *Id*. at *27.  Nor were the FLPs' alleged "injuries 'a necessary step' in

---

[7] *See also id*. at *9 ("The plaintiffs allege that the wholesale cancelling of warrants by the trader defendants created backlogs of physical aluminum at their affiliate warehouses; and that some traders directed the warehouses to reissue warrants to a neighboring warehouse for the aluminum that just got loaded-out, which led to a 'shuttling' of aluminum from one warehouse to another."); *id*. at *11 ("This slow loading out of aluminum, combined with the trader defendants' widespread warrant cancellation, allegedly lengthened delivery queues at LME-warehouses.").

effectuating the alleged conspiracy to lengthen load-out queues or increase the Midwest Premium, or 'the very means' by which defendants did these things." *Id*. As the Second Circuit explained in reasoning that applies equally in this case,

> All of the alleged anticompetitive acts—cancelling warrants, shuttling aluminum, and slowing load-outs—were within the defendants' power to do; they did not need or use injury to the [FLPs] as a "fulcrum" or "conduit." And none of these acts inflicted direct injury on [the FLPs] . . . .

*Id*. Instead, the FLPs' alleged injury "was a purely incidental byproduct of the alleged scheme." *Id*.; *see also id*. at *29 ("Injury to Consumers and Commercials remains collateral damage.").

*Third*, like the Commercials and Consumers, the FLPs (TAC ¶ 417) "in effect argue that the 'inextricably intertwined' exception is a 'but-for' cause test:  if [the FLPs] did not exist, there would be no real world purchasers of aluminum, and without users of physical aluminum, there would be no market for aluminum futures or aluminum warehousing." *Id*. at *27.  That is the theory of antitrust injury alleged in the TAC.  (*See* TAC ¶ 43 ("[W]ithout a demand for primary aluminum from purchasers like Plaintiffs, there would be no demand for . . . aluminum warehousing, trading, and financing by Defendants."); *id*. ¶ 423 ("Plaintiffs' overpayment of the anticompetitive prices for primary aluminum ensured and provided the market opportunity that enabled the Trading Defendants to successfully arbitrage the difference between current aluminum prices and higher prices in the future.").)  And that is the theory that this Court ultimately adopted in holding that the TAC adequately alleges antitrust injury.  *See Aluminum II*, 95 F. Supp. 3d at 442 ("Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the trading defendants to trade aluminum as a commodity.").  The Second Circuit now has expressly rejected that theory, holding that

- 19 -

"[t]his approach would limitlessly increase the universe of potential plaintiffs, and cannot be squared with *McCready* itself." *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at *27-*28.

*Fourth*, like the Commercials and Consumers, the FLPs allege (TAC ¶ 421) that Defendants "intended to corrupt the market for primary aluminum, and that the injuries [the FLPs] suffered by paying a higher Midwest Premium were 'inextricably intertwined' with that scheme." *Id*. at *28. As the Second Circuit held, however, "[t]his gets *McCready* backwards." *Id*. "Even assuming a plausible allegation that the defendants conspired to corrupt the primary aluminum market, the purported injuries" of aluminum purchasers "were not 'the very means' by which defendants achieved that illegal end." *Id*. The FLPs' injuries instead "remain[] collateral damage." *Id*. at *29. This Court recognized as much in *Aluminum II*, expressly holding that "the plaintiffs' injury is collateral damage." 956 F. Supp. 3d at 443. Under the Second Circuit's decision, such collateral damage fails as a matter of law to establish antitrust injury.

It is hard to see how anyone could "believe" that the Second Circuit's decision "leaves undisturbed" the theory of antitrust injury adopted in *Aluminum II*, as the FLPs contended in their letter to this Court last week. (ECF 1047.) Moreover, to the extent that the FLPs attempt to respond to the Second Circuit's decision by shifting to some other theory of antitrust injury, despite all of the time and resources spent in this MDL proceeding on the meaning of *McCready*'s "inextricably intertwined" standard, "[t]he time for raising entirely new theories of the case has long since passed." *In re Aluminum*, 2016 U.S. Dist. LEXIS 54643, at *18. "[T]hese actions went through multiple rounds of pleadings and two substantive rounds of motions to dismiss." *Id*. at *17. The FLPs should be held to the theories pleaded in their TAC.

In short, the Second Circuit squarely rejected the *McCready* theory of antitrust injury that the FLPs alleged in the TAC and that this Court adopted in *Aluminum II*. The FLPs thus have

"failed to allege (and could not allege) antitrust injury, a deficiency that is fatal to all of their [antitrust] claims." *In re Aluminum*, 2016 U.S. App. LEXIS 14579, at \*30.  This Court therefore should enter judgment on the pleadings under Rule 12(c).

### III.    The Court Should Order Expedited Briefing on This Motion and Should Adjourn Further Proceedings on the FLPs' Class-Certification and *Daubert* Motions.

As shown above, the Second Circuit's opinion requires dismissal of this action on the ground that the FLPs do not and cannot allege antitrust injury.  Given the strength of this motion, as well as the large expenditure of judicial and party resources that will be required to mount a live hearing on class certification in less than a month and to litigate the FLPs' pending *Daubert* motion, the Court should order expedited briefing on this motion and adjourn further proceedings on the FLPs' *Daubert* and class-certification motions until Defendants' motion is resolved.  The Court already indicated in its August 10, 2016 Order that briefing on this motion should be expedited by circling the phrase "that can be briefed on an expedited basis" and writing "yes." (ECF 1046 at 3.)  This Court also has clear discretion, inherently and under Federal Rule of Civil Procedure 16(b)(4), to modify its existing scheduling order if there is good cause.  *See Kassner* v. *2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 243 (2d Cir. 2007); *Perfect Pearl Co.* v. *Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012); *see also* 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1522.2 (3d ed. Apr. 2016) (noting Rule 16(b)(4)'s "liberal standard").  Good cause clearly exists here in view of the Second Circuit's recent decision.

### CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for judgment on the pleadings and dismiss this action with prejudice on the ground that the FLPs did not suffer antitrust injury under controlling Second Circuit precedent.  The Court also should order

expedited briefing on this motion and should adjourn any further proceedings on the FLPs'

pending *Daubert* and class-certification motions until Defendants' motion for judgment on the

pleadings is resolved.

Dated:  New York, New York            Respectfully submitted,
        August 17, 2016

/s/  Richard C. Pepperman II
Richard C. Pepperman II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
William H. Wagener (*wagenerw@sullcrom.com*)
Yavar Bathaee (*bathaeey@sullcrom.com*)
Jennifer H. Blecher (*blecherj@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Goldman, Sachs &*
*Co., J. Aron & Company, Goldman Sachs*
*International, Mitsi Holdings LLC and Metro*
*International Trade Services LLC*

/s/  Eliot Lauer
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
Chelsea McLean (*chelsea.mclean@curtis.com*)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

/s/  John M. Nannes
John M. Nannes (*john.nannes@skadden.com*)
John H. Lyons (*john.h.lyons@skadden.com*)
Tiffany Rider (*tiffany.rider@skadden.com*)
Anjali B. Patel (*anjali.patel@skadden.com*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 661-9191

*Attorneys for Defendant Access World (USA) LLC*
*(f/k/a Pacorini Metals USA, LLC)*


/s/  Robert D. Wick
Robert D. Wick (*rwick@cov.com*)
Henry Liu (*hliu@cov.com*)
John S. Playforth (*jplayforth@cov.com*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

David W. Haller (*dhaller@cov.com*)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York  10018
Telephone:  (212) 841-1057
Facsimile:  (646) 441-9057

*Attorneys for Defendants Henry Bath LLC &*
*JP Morgan Securities plc*