UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

This Document Relates To:

*In re Aluminum Warehousing Antitrust Litigation* (Direct Purchaser Plaintiffs), Case No. 1:14-cv-03116-KBF

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL No. 2481

Master Docket No.
13-md-2481-KBF-RLE

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE
<u>ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

September 7, 2016

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

I. The Second Circuit's Decision Forecloses the FLPs' "Inextricably Intertwined" Theory of Antitrust Injury. ..................................................................................................1

II. The Second Circuit's Decision Forecloses the FLPs' "Supply Restraint" Theory of Antitrust Injury. ..................................................................................................3

    A. The TAC fails to allege antitrust injury consistent with the Second Circuit's decision. ..................................................................................................4

    B. The evidence proffered in support of the FLPs' "supply restraint" theory fails to overcome the Second Circuit's decision. ..................................................................................................9

CONCLUSION ..................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIU N. Am., Inc. v. Caisse Franco Neerlandaise de Cautionnements*,
  72 F. Supp. 2d 350 (S.D.N.Y. 1999) ................................................................................... 9

*In re Aluminum Warehousing Antitrust Litig.*,
  2016 U.S. App. LEXIS 14579 (2d Cir. Aug. 9, 2016) .................................................. *passim*

*In re Aluminum Warehousing Antitrust Litig.*,
  2016 U.S. Dist. LEXIS 54643 (S.D.N.Y. Apr. 25, 2016) .................................................. 13

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015) ............................................................................... 6, 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................ 9

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................................................ 8

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ..................................................................................................... 2, 12

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) .............................................................................................................. 9

*Enzo Biochem, Inc. v. Amersham PLC*,
  981 F. Supp. 2d 217 (S.D.N.Y. 2013) .............................................................................. 13

*Munoz v. City of New York*,
  2008 U.S. Dist. LEXIS 12305 (S.D.N.Y. Feb. 20, 2008) ................................................. 13

*Scott v. City of New York Dep't of Corr.*,
  641 F. Supp. 2d 211 (S.D.N.Y. 2009) .............................................................................. 13

*Southwick Clothing LLC v. GFT (USA) Corp.*,
  2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 15, 2004) ................................................ 13

*State Bank of India v. Walter E. Heller & Co.*,
  655 F. Supp. 326 (S.D.N.Y. 1987) ..................................................................................... 9

*W. World Ins. Co. v. Stack Oil, Inc.*,
  922 F.2d 118 (2d. Cir. 1990) .............................................................................................. 9

## INTRODUCTION

After devoting a year of this litigation to multiple amended complaints and challenges to the pleadings, this Court permitted the FLPs to proceed with this action based solely on an "inextricably intertwined" theory of antitrust injury that the Second Circuit now has rejected. Although the FLPs make a futile attempt to revive that theory at the end of their opposition, they largely shift their focus to an alternative theory of antitrust injury that they did not advance in the prior briefing, namely, that anticompetitive conduct in the warehouse services market allegedly created a "supply restraint" in the primary aluminum market in which they made their purchases. The Second Circuit's decision, however, forecloses that theory as well. As the Second Circuit explained, "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 2016 U.S. App. LEXIS 14579, at *25 (2d Cir. Aug. 9, 2016) ("*Aluminum IV*"). Here, the market that purportedly was directly restrained is the market for warehouse services, and it is undisputed that the FLPs never participated in that market. Accordingly, under the Second Circuit's decision, the FLPs "did not (and could not) suffer antitrust injury." *Id*. at *4. No amount of additional "evidence" can change that inevitable conclusion.

## ARGUMENT

### I. The Second Circuit's Decision Forecloses the FLPs' "Inextricably Intertwined" Theory of Antitrust Injury.

Only at the very end of their opposition do the FLPs make a half-hearted attempt to reconcile their "inextricably intertwined" theory of antitrust injury with the Second Circuit's decision. (Opp. 21-24.) They argue that the warehouse services market and the primary aluminum market "do not operate in a vacuum and in isolation" and that "[w]hat happens in one

1

segment of these interconnected markets necessarily *affects* the other." (*Id*. at 22.)[1] Without citing any supporting case law, the FLPs conclude that this "is just the type of interrelationship that *McCready* recognizes as conferring standing." (*Id*. at 24.)

This argument flies directly in the face of the Second Circuit's decision, which rejected the contention that antitrust injury can be established by showing that conduct in the warehouse services market "affects" the primary aluminum market. Just as the FLPs do in their opposition, the Commercial and Consumer End Users argued on appeal that Defendants "intended to corrupt the market for primary aluminum" and "that the injuries [plaintiffs] suffered by paying a higher Midwest Premium were 'inextricably intertwined' with that scheme." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *28. The Second Circuit squarely rejected that contention, stating: "Even assuming a plausible allegation that the defendants conspired to corrupt the primary aluminum market, the purported injuries of Consumers and Commercials were not 'the very means' by which the defendants achieved that illegal end . . . ." *Id*. The FLPs fail to satisfy *McCready*'s "inextricably intertwined" standard for precisely the same reason, and none of the irrelevant "evidence" that they cite in support of their "inextricably intertwined" theory, which simply purports to describe the relationship between the warehouse services and primary aluminum markets (Opp. 22-24), can establish otherwise.[2]

---

[1] Unless otherwise noted, emphasis is added and citations are omitted in this Reply.

[2] The FLPs assert in passing that they suffered antitrust injury "because the premium is set by Platts based upon a survey of the prices such as those the FLPs paid in the physical market." (Opp. 22.) They make no effort, however, to develop or support this theory, which is merely a variation on their (unsuccessful) theme that Defendants' alleged conduct in the warehouse services market had effects in the primary aluminum market. The remainder of the FLPs' "evidence" is discussed in Argument II.B.

**II. The Second Circuit's Decision Forecloses the FLPs' "Supply Restraint" Theory of Antitrust Injury.**

In a tacit admission of the weakness of their "inextricably intertwined" theory, the FLPs spend the first twenty pages of their opposition arguing that "there is no need to invoke" that theory because the TAC adequately alleges "traditional" antitrust injury. (Opp. 4, 7.) According to the FLPs, the TAC does so by alleging that Defendants created a supply restraint in the primary aluminum market – the same market in which they made their purchases. (*Id*. at 8-9.)

Contrary to the FLPs' assertion, they did not press this "supply restraint" theory of antitrust injury in the briefing that led to this Court's *Aluminum II* decision.[3] In any event, the FLPs' supply restraint theory is virtually identical to a theory of antitrust injury that the Commercials and Consumers advanced in the Second Circuit. That theory fails to establish antitrust injury here for the same reasons that it failed to do so there: the operative complaint does not allege that Defendants "directly restrained" the primary aluminum market, but only that Defendants *affected* that market by restraining competition in the warehouse services market. *See Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *25-*26. None of the "evidence" or "issues of fact" submitted with the FLPs' opposition cures this defect because none of it purports to show that Defendants engaged in anticompetitive conduct outside the warehouse services market.

---

[3] Although the FLPs assert that they raised their supply restraint theory of antitrust injury at page 34, footnote 9 of their memorandum in support of their motion for leave to file the TAC (Opp. 4), that footnote essentially concedes that the FLPs are neither consumers nor competitors in the directly restrained market for warehouse services: "Plaintiffs are neither competitors nor (for most of the Class Period) consumers in the LME Aluminum Warehousing Services [Market] (where most of the anticompetitive conduct has occurred)." Ex. 4, FLPs' Mem. in Supp. of Mot. for Leave to Amend, ECF No. 631, at 34 n.9 (filed under seal Oct. 29, 2014). In any event, footnote 9 merely argued that Metro "competed" with the FLPs to acquire primary aluminum, an argument that fails to establish antitrust injury for the reasons set forth *infra* at 7-8 & n.8. Although footnote 9 also makes a throw-away assertion that the FLPs are "potential" customers of LME warehouses, that assertion is not supported by the allegations of the TAC and is not renewed in the FLPs' opposition.

### A. The TAC fails to allege antitrust injury consistent with the Second Circuit's decision.

The FLPs contend that the TAC alleges "classic" antitrust injury because it alleges that Defendants "restrict[ed] the physical supply [of aluminum] available to the market." (Opp. 7-8.) The TAC, however, does not allege that Defendants "directly restrained" the primary aluminum market, but rather that Defendants directly restrained the warehouse services market and thereby generated warehouse queues that in turn *affected* the primary aluminum market. The TAC thus fails to establish antitrust injury under the Second Circuit's decision because it fails to allege that the FLPs participated "in the very market that the defendants directly restrained." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26.

The FLPs' allegations of a so-called "supply restriction" in the primary aluminum market cannot be distinguished from the arguments that the Commercials and Consumers asserted unsuccessfully in the Second Circuit. There, the Consumers argued that they "suffered a textbook antitrust injury" because "Defendants colluded to restrict the deliverable supply of aluminum, which . . . raised the price of primary aluminum, injuring consumer end users." (Ex. 1, Consumers' Br. at 30.)[4] The Commercials likewise argued that Defendants conspired to "drive up prices in the physical aluminum market, allowing them to realize a greater profit from sales of their aluminum holdings." (Ex. 2, Commercials' Br. at 8.) The Consumers and Commercials thus asserted that they had "alleged a classic supply restraint, giving rise to traditional antitrust injury" because "Defendants' practices artificially limited the supply of aluminum available to the market by trapping large quantities of it in LME warehouses." (Ex. 3, Joint Reply at 15.)

---

[4] All references to "Ex." are to the exhibits attached to the declaration of Henry Liu dated September 7, 2016.

The Second Circuit acknowledged these allegations that Defendants had "conspired to manipulate . . . the 'Midwest Premium'" and "intended to corrupt the market for primary aluminum," but nevertheless held that the Commercials and Consumers "failed to allege (and could not allege) antitrust injury." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *7, *28, *30. The Court reasoned that all of the anticompetitive conduct attributed to Defendants – cancelling warehouse warrants, delaying warehouse load-outs, offering warehouse incentive payments, and shuttling aluminum among warehouses – "took place (if at all) in the LME-warehouse storage market, *and that is where the direct, immediate impact would have been felt*." *Id*. at *26-*27. The Consumers and Commercials, however, did not allege that they had ever participated in the warehouse services market. *Id*. The Second Circuit thus concluded that the Consumers and Commercials at most had suffered "collateral damage" – not antitrust injury – because "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Id*. at *25, *29.

The same reasoning disposes of the supply restraint argument asserted by the FLPs. Although the FLPs contend that Defendants "restrict[ed] the physical supply [of aluminum] available to the market" (Opp. 8), they allege that Defendants did so solely through the "mechanism" of engaging in anticompetitive conduct in the warehouse services market. (*E.g.*, TAC ¶ 469 (asserting that "Defendants used the LME warehouses as the mechanism" of the alleged conspiracy).)[5] The FLPs allege, in other words, that they "paid supra-competitive prices

---

[5] *See also* TAC ¶ 205 ("anticompetitive behavior in the LME Aluminum Warehouse Services Market directly affects prices and the output of aluminum into the Primary Aluminum Market"); *id.* ¶ 206 ("The impacts of Defendants' exercise of market power in the LME Aluminum Warehouse Services Market are directly felt in the U.S.-Canada primary aluminum market."); *id.* ¶ 409 ("the LME warehouse restraints caused the all-in physical price to be higher"); *id.* ¶ 421 ("The anticompetitive effects of Defendants' exercise of market power in the LME-registered warehouse services market are thus directly transmitted to the Primary Aluminum Market.").

in the Primary Aluminum Market as a direct, necessary and foreseeable result of Defendants' anticompetitive conduct *in the LME Warehouse Services Market*." (Ex. 4, FLPs' Mem. in Supp. of Mot. for Leave to Amend, ECF No. 631, at 28 (filed under seal Oct. 29, 2014).) Significantly, the FLPs do *not* allege that Defendants engaged in any anticompetitive conduct outside the warehouse services market; nor do the FLPs allege that they ever participated in the warehouse services market. Thus, just like the Commercials and Consumers, the FLPs at most experienced "collateral damage" arising from anticompetitive conduct in a market in which they did not participate. *See In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 436, 443 (S.D.N.Y. 2015) ("*Aluminum II*") ("plaintiffs' injury is collateral damage"). This "collateral damage" fails as a matter of law to establish antitrust injury because the alleged injuries were not suffered "in the very market that the defendants directly restrained." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26.

Although the FLPs respond with three strained arguments as to why the Second Circuit's decision allegedly does not control their claims, none of those arguments has merit.

*First*, the FLPs emphasize their allegations that Defendants owned and traded significant quantities of primary aluminum. (Opp. 11-13.) These allegations, however, fail to distinguish the FLPs from the Consumers and Commercials, who likewise asserted that Defendants have physical trading desks that owned and traded significant quantities of primary aluminum.[6] These

---

[6] *See, e.g.*, Ex. 2, Commercials' Br. at 8 ("[T]heir scheme to trap aluminum in their warehouses would drive up prices in the physical aluminum market, allowing them to realize a greater profit from sales of their aluminum holdings."); Ex. 3, Joint Reply at 17 ("[I]n December 2013 Defendants controlled between 35-45% of the global supply of physical aluminum. This is a more than sufficient quantity to affect the price of physical aluminum, as when 'demand elasticity is low, small reductions in output yield large increases in price.'"); Commercials' Corr. Am. Compl., ECF No. 242, ¶ 63 ("By both trading on the derivatives market and participating in the physical market, Goldman and JPM are able to manipulate the inventory and prices of aluminum . . . ."); *id*. ¶ 65 ("large traders with integrated financial and physical metals operations like Goldman, JPM and Glencore are able 'to control the supply of aluminum to

(*footnote continued*)

allegations, moreover, are entirely irrelevant under the Second Circuit's holding that antitrust injury exists only if the plaintiff was "a participant in the very market that is directly restrained," *i.e.*, "the market that is directly manipulated *by the collusive conduct*." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *23, *25. Although the FLPs allege that Defendants *participated* in the primary aluminum market (Opp. 8-9), they do not allege that Defendants *colluded* in that market. Instead, all of the conduct that the FLPs contend was collusive and anticompetitive – warehouse warrant cancellations, warehouse incentive payments, delayed warehouse load-outs, and transfers of aluminum between warehouses (*see* TAC ¶¶ 473-573) – consists of conduct that the Second Circuit regarded as occurring in the warehouse services market. *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26. Accordingly, the FLPs' allegations that Defendants engaged in various *non-collusive* conduct in the primary aluminum market does not transform that market into one that Defendants directly restrained.[7]

*Second*, the FLPs argue that some of the warehouse-related conduct alleged in the TAC – warrant cancellations and incentive payments in particular – should be viewed as occurring in the primary aluminum market. (Opp. 13-14.) The short answer is that the Second Circuit reached the opposite conclusion based on materially identical allegations. The Second Circuit was well

---

(*footnote continued*)

commercial users and, as a result, to control prices'"); *id*. ¶ 127 ("Defendants positioned themselves to profit from their scheme given their positions in the aluminum market. This included not only profits from storage fees but also, at a basic level, profiting from the increasing and unhedgeable Midwest Premium, by selling aluminum into the market at a higher premium than at which it was purchased."); *id*. ¶ 141 ("As a result of the cancellations, the Midwest Premium increased and the Warehousing Defendants' trading affiliates realized a resultant gain on their physical aluminum positions."); Consumers' Am. Compl., ECF No. 227, ¶ 81 ("By both trading on the derivatives market and participating in the physical market, Goldman Sachs and JPMorgan are able to manipulate the inventory and prices of aluminum . . . .").

[7] The FLPs' allegations that Glencore sold aluminum to Ampal are irrelevant for the same reasons: there are no allegations that Glencore *collusively* sold aluminum to Ampal.

aware of the aspects of warrant cancellations and incentive payments that the FLPs highlight in their opposition, *i.e.*, that warrants represent "physical aluminum," that warrant cancellations created "backlogs of physical aluminum" waiting to be loaded out of warehouses, and that incentive payments were used to attract physical aluminum to warehouses. *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *5, *9, *10-*11. The Second Circuit nonetheless held that warrant cancellations and incentive payments have their "direct, immediate impact" in the warehouse services market, not the primary aluminum market. *Id.* at *26. The FLPs essentially ask this Court to rule that the Second Circuit was *wrong* in holding that this conduct had no "direct, immediate impact" in the primary aluminum market, but any such argument should be presented to the Second Circuit or the Supreme Court, not to this Court.[8]

*Third*, the FLPs offer the conclusory assertion that the "allegations in the TAC are a far cry from the facts alleged in the [Commercial and Consumer] End Users' complaints." (Opp. 4.) But the Commercials and Consumers expressly argued to the Second Circuit that, if given leave to amend their complaints, they would adopt the exact same allegations of antitrust injury that appear in the TAC.[9] The Second Circuit nevertheless affirmed the denial of leave to amend on the ground that the Commercials and Consumers "could not allege" antitrust injury, even under state antitrust statutes enacted for the explicit purpose of allowing *indirect* purchasers to assert

---

[8] The FLPs' incentive arguments fail for an additional reason: the FLPs assert that Metro's incentive payments "directly compete with plaintiffs" for purchases of aluminum in the physical market (Opp. 13), but a claim of injury attributable to *increased* competition between Metro and the FLPs is not a permissible claim of antitrust injury because antitrust injury flows only from a *reduction* in competition. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

[9] *See* Ex. 2, Commercials' Br. at 16 ("[T]he FLPs successfully alleged an antitrust injury. Plaintiffs should be given leave to amend their complaint to include the same allegations of antitrust injury."); Ex. 3, Joint Reply at 2 (Commercials and Consumers should "be given leave to amend to include the same allegations of antitrust injury and conspiracy the FLPs asserted in their amended complaints.").

antitrust claims.[10] *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *30. In so ruling, the Second Circuit necessarily determined that the TAC fails as a matter of law to allege antitrust injury.

> **B.     The evidence proffered in support of the FLPs' "supply restraint" theory fails to overcome the Second Circuit's decision.**

Although the Court invited the FLPs to submit a "short piece arguing the effect of the Second Circuit's ruling" (ECF No. 1056), what the Court received instead was 3,456 pages of exhibits, a statement of purportedly undisputed facts, and a new declaration from the FLPs' economist. This gratuitous avalanche of "evidence" fails as a matter of law to salvage the FLPs' claim of antitrust injury because the proffered evidence does not show that Defendants engaged in anticompetitive conduct directly in the *primary aluminum market* as opposed to the *warehouse services market*. It therefore makes no difference whether the Court considers this motion under Rule 12(c) or Rule 56. The Court may grant judgment for Defendants under Rule 12(c) by exercising its discretion to exclude the proffered evidence as immaterial. *See, e.g.*, *State Bank of India v. Walter E. Heller & Co.*, 655 F. Supp. 326, 326-27 (S.D.N.Y. 1987) (court may exclude extrinsic evidence when evidence is immaterial to Rule 12(c) motion). Alternatively, the Court may grant judgment for Defendants under Rule 56 because "[f]actual disputes that are irrelevant or unnecessary will not be counted" on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[11]

---

[10] The Second Circuit's decision places no weight on the fact that the Commercials and Consumers are indirect purchasers, presumably because their status as indirect purchasers cannot deprive them of antitrust injury under state-law indirect purchaser statutes. Under such statutes, the mere fact that an indirect purchaser did not purchase at the top of the chain of distribution within a given market does not divest the purchaser of antitrust injury. *See generally California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989).

[11] *See also W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d. Cir. 1990) ("[T]he existence of disputed facts that are immaterial to the issues at hand is no impediment to summary judgment."); *AIU N. Am., Inc. v. Caisse Franco Neerlandaise de Cautionnements*, 72 F. Supp. 2d 350, 353 (S.D.N.Y. 1999) ("[The] factual questions which [Plaintiff] contends are disputed prove immaterial

(*footnote continued*)

The FLPs do not deny – nor could they – that their theory of the case continues to be that Defendants generated *warehouse* queues by engaging in anticompetitive conduct in the *warehouse services market*. Indeed, their recent class certification papers confirm as much:

> From the very start of this case, Plaintiffs have alleged that the long queue in Detroit was the problem. This case is – and always has been – about the queue. Plaintiffs' theory of liability is the same as at the start of the case: the queue in Detroit caused Plaintiffs to pay more than they otherwise would have for physical aluminum.

(Ex. 5, FLPs' Class Cert. Reply, ECF No. 1040, at 37-38.) The FLPs' expert submissions therefore focus solely and exclusively on anticompetitive conduct that allegedly occurred in the warehouse services market. For example, Dr. Zona contends that "Defendants' coordinated conduct *reduced competition in the markets for LME warehouse services*, which had the *effect* of increasing the price of aluminum purchased by Plaintiffs and members of the proposed class." (Ex. 6, Zona Report ¶¶ 5, 92 (Mar. 25, 2016).) Dr. Gilbert likewise contends that, "by creating load-out queues, the *collusive exercise of market power in the LME warehouse market* by Defendants directly caused the Midwest Premium to rise." (Ex. 7, Gilbert Report ¶ 44 (May 4, 2016).) Thus, the "FLPs' theory – that Defendants inflated the cost of aluminum paid by class members by causing inflation of the MWP component of aluminum's unique price-setting

---

(*footnote continued*)

and thus fail to preclude summary judgment."). The FLPs' statement of purportedly undisputed facts likewise is immaterial to the instant motion. Although Defendants vigorously dispute many of the allegations in the FLPs' statement of facts and reserve the right to respond to them if the case goes forward, the FLPs' asserted facts are not material to Defendants' motion. *See* Local Civ. R. 56.1(c) (statement of material facts are only "for purposes of the motion").

mechanism *via manipulation of LME warehouse queues* – is not new or changed." (Ex. 5, FLPs' Class Cert. Reply, ECF No. 1040, at 7.)[12]

None of the evidence proffered by the FLPs purports to convert this theory of anticompetitive conduct in the warehouse services market into a theory of anticompetitive conduct occurring directly in the primary aluminum market. To be sure, the FLPs cite evidence that Defendants engaged in certain trading conduct in the primary aluminum market (Opp. 11-12), but they cite no evidence that Defendants engaged in *anticompetitive* conduct in that market. For example, although the FLPs point to evidence that Defendants sometimes owned substantial inventories of aluminum, they identify no evidence that Defendants *collusively agreed* to hold those inventories of aluminum. To the contrary, the FLPs acknowledge that the steep contango in the futures market made it normal and natural for financial firms to acquire and hold large quantities of aluminum.[13] Similarly, although the FLPs cite evidence that Glencore owned a minority stake in Century Aluminum, they identify no evidence that Glencore entered into a *collusive agreement* to acquire its stake in Century. The FLPs' evidence therefore fails to make

---

[12] The FLPs punctuate this point by asserting in their class certification papers that Defendants engaged in seven anticompetitive acts, each of which took place solely in the warehouse services market: Defendants purportedly agreed "(1) ***not*** to destock each other; (2) to work together to build a critical mass of aluminum in Detroit; (3) to pay record incentives; (4) to engage in queue management, *i.e.*, manipulation that insiders admit distorted the market; (5) to treat the London Metal Exchange ("LME") minimum load-out rate as a maximum in order to inhibit market supply; (6) to engage in merry-go-round transactions where hundreds of thousands of metric tons of metal were shuffled around various Detroit warehouses; and (7) to execute other Defendant-related warrant cancellations that added and extended the record queue and restrained the aluminum market." Ex. 5, FLPs' Class Cert. Reply, ECF No. 1040, at 2 (emphasis in original); *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26-*27.

[13] *See, e.g.*, Ex. 8, FLPs' Letter Response Dated August 18, 2016, ECF No. 1053, at 8 (arguing that "the 'surplus' from the commercial users' side was taken in by the non-commercial financial side" as a result of contango); Ex. 5, FLPs' Class Cert. Reply, ECF No. 1040, at 15-16 (acknowledging "contango" incentivizes "financial institutions, hedge funds and traders" to "capture the 'cash and carry' arbitrage"); Pls. Ex. 1, Gilbert Report ¶ 25(ii) (Aug. 26, 2016) ("[cash-and-carry trades] are common among non-commercial agents (such as Defendants), particularly when the market is in contango").

the necessary showing that the primary aluminum market was "the market that [was] directly manipulated by the collusive conduct." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *23.[14]

The FLPs also assert that the evidence shows that Defendants deliberately inflated the Midwest Premium (Opp. 16-17), but even if that were true (and it is not), it would make no difference under the Second Circuit's decision. The Commercials and Consumers similarly argued that "defendants conspired to manipulate . . . the 'Midwest Premium,'" "intended to corrupt the market for primary aluminum," and "profit[ed] from sales of their aluminum holdings." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *7, *28; Ex. 2, Commercials' Br. at 8. But none of those arguments stopped the Second Circuit from concluding that the alleged injuries "remain[ed] collateral damage" because the injuries did not occur "in the LME-warehouse storage market" where "the direct, immediate impact [of the alleged misconduct] would have been felt." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26-*27, *29. Moreover, the law is clear that allegations that a defendant *intended* to cause a plaintiff's injury will not relieve the plaintiff of its obligation to allege and show that the defendant "directly" caused its injury. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) ("The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators.").

---

[14] The record compiled on the FLPs' motion for class certification further confirms that the FLPs are not contending that Defendants engaged in anticompetitive conduct directly in the primary aluminum market. In particular, the one and only form of conduct for which the FLPs have attempted to show classwide impact and damages consists of so-called "excess warrant cancellations." (Ex. 9, Gilbert Report ¶ 55 (Aug. 5, 2016) ("My damages model expressly measures damages based on this [warrant cancellation] conduct (and only this conduct).").) The Second Circuit unequivocally held, however, that any such excess warrant cancellations would have their "direct, immediate impact" solely in "the LME-warehouse storage market." *Aluminum IV*, 2016 U.S. App. LEXIS 14579, at *26-*27.

The FLPs' evidence therefore fails either to distinguish the FLPs from the Commercials and Consumers or to cure the fatal flaws in the TAC. The only way to cure those flaws would be to attempt a wholesale transformation of the theory of this case from one in which Defendants directly restrained the warehouse services market to one in which Defendants directly restrained the primary aluminum market. The FLPs, however, have submitted no evidence in support of such a radically revised theory of the case, and it is far too late for them to do so. *See, e.g., Munoz v. City of New York*, 2008 U.S. Dist. LEXIS 12305, at *19 (S.D.N.Y. Feb. 20, 2008) ("In general, plaintiffs are not permitted to raise new theories of their case in opposition to a motion for summary judgment."); *In re Aluminum Warehousing Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54643 (S.D.N.Y. Apr. 25, 2016) (denying the FLPs' prior motion for leave to amend as untimely); *Aluminum II*, 95 F. Supp. 3d at 449 (observing that a claim that Defendants directly restrained the primary aluminum market would be a vastly different claim that "would involve different players (for example, producers) in different markets.").[15]

Because the FLPs' claims fail as a matter of law under the Second Circuit's decision, judgment for defendants should be granted.

---

[15] *See also Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); *Scott v. City of New York Dep't of Corr.*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (limiting consideration to "far narrower" claims alleged in complaint rather than unpled claims raised in opposition to motion for summary judgment); *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 U.S. Dist. LEXIS 25336, at *20 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice on the ground that the FLPs' claim of antitrust injury fails as a matter of law under controlling Second Circuit precedent.

Dated:   September 7, 2016

Respectfully submitted,

s/ Robert D. Wick
Robert D. Wick (*rwick@cov.com*)
Henry Liu (*hliu@cov.com*)
John S. Playforth (*jplayforth@cov.com*)
Amber Charles (*acharles@cov.com*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

David W. Haller (*dhaller@cov.com*)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York  10018
Telephone:  (212) 841-1057
Facsimile:  (646) 441-9057

*Attorneys for Defendants Henry Bath LLC &*
*JP Morgan Securities plc*

s/ Richard C. Pepperman II (on consent)[16]
Richard C. Pepperman II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
William H. Wagener (*wagenerw@sullcrom.com*)
Yavar Bathaee (*bathaeey@sullcrom.com*)
Jennifer H. Blecher (*blecherj@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Goldman, Sachs & Co., J. Aron & Company, Goldman Sachs International, Mitsi Holdings LLC and Metro International Trade Services LLC*

s/  Eliot Lauer (on consent)
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
Chelsea McLean (*chelsea.mclean@curtis.com*)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

---

[16] Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/ John M. Nannes (on consent)
John M. Nannes (*john.nannes@skadden.com*)
John H. Lyons (*john.h.lyons@skadden.com*)
Tiffany Rider (*tiffany.rider@skadden.com*)
Anjali B. Patel (*anjali.patel@skadden.com*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile: (202) 661-9191

*Attorneys for Defendant Access World (USA) LLC (f/k/a Pacorini Metals USA, LLC)*