UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 5, 2016

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

13-md-2481 (KBF)
and all related cases

OPINION & ORDER

------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On August 9, 2016, the Second Circuit affirmed this Court's 2014 dismissal of indirect purchaser plaintiffs' (also referred to as the "Consumer and Commercial Plaintiffs") claims based, inter alia, on a lack of antitrust standing. In re Aluminum Warehousing Antitrust Litig. ("Aluminum III"), __ F.3d __, Nos. 14-3574 (L); 14-3581 (CON), 2016 WL 4191132 (2d Cir. Aug. 9, 2016).[1] The manner in which that appeal was briefed and argued, combined with the Second Circuit's rationale in its decision, cast serious doubt on the viability of the remaining claims of the first level purchaser plaintiffs ("FLPs") as plead in their third amended complaint (the "TAC"). (ECF No. 738.) Understandably, defendants have now moved to dismiss those claims. (ECF No. 1049.)

In opposition to this motion, plaintiffs argue that the Second Circuit's rationale is inapplicable to their facts but, even if they lack the type of indirect

---

[1] The Court assumes familiarity with the facts set forth in the Second Circuit's decision as well as the prior decisions of this Court, In re Aluminum Warehousing Antitrust Litig. ("Aluminum I"), No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) and In re Aluminum Warehousing Antitrust Litig. ("Aluminum II"), 95 F. Supp. 3d 419 (S.D.N.Y. 2015).

antitrust standing discussed in that decision, the factual record developed through discovery nonetheless supports direct standing. (ECF No. 1059 at 9-10.) This Court disagrees.

The rationale in the Second Circuit's <u>Aluminum III</u> decision is applicable here and requires that defendants' motion be GRANTED. The core of plaintiffs' claims in the TAC is the same as that which the Second Circuit considered in the indirect purchasers' complaints: that defendants' alleged shenanigans in connection with aluminum warehousing services caused a supply restraint that led to a higher Midwest Premium. The TAC contains a number of additional allegations as to how the anticompetitive conduct occurred, that is, who did what. But the core remains unchanged. Below, this Court describes how the FLP plaintiffs have cast their claims in the TAC and repeatedly described their claims in filings before the Court. With this as a backdrop, this Court then discusses the impact of the Second Circuit's decision at some length, and concludes with a discussion of why plaintiffs' argument that the factual record provides an alternative basis for antitrust standing is unpersuasive.

I. THE TAC

In response to this Court's decision in <u>Aluminum I</u>, the FLPs amended their complaint.[2] As their claims currently stand in the TAC, plaintiffs assert two

---

[2] The FLP plaintiffs filed their first amended complaint (the "FAC") on March 14, 2014. (ECF No. 235.) Shortly thereafter, they filed a second amended complaint (the "SAC") (ECF No. 271), which this Court construed in <u>Aluminum I</u>. Following the August 29, 2014 dismissal, the FLPs sought leave to file the TAC. (ECF No. 631.) This Court allowed the amendment and the TAC was filed on April 9, 2015. (ECF No. 738.) The Court construed the TAC in <u>Aluminum II</u>. The Court notes that the FLPs refer to a short order dated May 14, 2015 as "Aluminum III". (<u>See</u> ECF No. 1059 at 7 (quoting <u>In re Aluminum Warehousing Antitrust Litig.</u>, No. 13-md-2481 (KBF), 2015 WL 4646822, at

2

relevant markets, one for "primary aluminum" and the second for "aluminum warehousing services in LME [London Metal Exchange] warehouses." (TAC ¶¶ 157, 163.) In opposition to this motion, plaintiffs direct significant attention on their allegations of a "primary aluminum market". As described below, they assert that the factual record now demonstrates that plaintiffs and defendants directly compete in that market and that this direct competitive position supports antitrust standing. But the fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred (warehouse services) or the market(s) intended to be most directly affected (also warehouse services). The physical aluminum market is a secondary locale in this drama. The fact that plaintiffs happened to have alleged it as a "relevant market" in their TAC does not alter the fact that their core allegations assume anticompetitive conduct and effects as occurring first and foremost elsewhere.

For instance, the TAC alleges that a supply restraint for LME warehoused aluminum was caused by a bottleneck defendants created in LME aluminum warehouse services. (Id. ¶ 417.) The overly-long queue in loadouts from LME warehouses allegedly led to a higher "premium" (the "Midwest Premium"), associated with the costs of such warehouse services. According to the TAC, plaintiffs suffered injury in the primary aluminum market by paying prices for

---

*2 (S.D.N.Y. May 14, 2015).) The Court does not follow that labeling here because that order was not a dispositive ruling.

primary aluminum that embodied this higher Midwest Premium; based on this, plaintiffs argue that their injury was therefore "inextricably intertwined" with defendants' anticompetitive conduct in warehouse services. (Id. ¶ 417.) In this regard, plaintiffs allege:

> [t]he anticompetitive effects of Defendants' [conduct] in the LME-registered warehouse services market are . . . directly transmitted to the Primary Aluminum Market. This directly and foreseeably caused a rise of prices in the Primary Aluminum Market, an injury to competition which is inextricably intertwined with the injury caused by defendants in the warehouse services market.

(Id. ¶ 421.) Plaintiffs further allege:

> [They] and other purchasers in the Primary Aluminum Market were necessary to the completion of Defendants' anticompetitive scheme. Plaintiffs' overpayment of the anticompetitive prices for primary aluminum ensured and provided the market opportunity that enabled the Trading Defendants to successfully arbitrage the difference between current aluminum prices and higher prices in the future.

(Id. ¶ 423.) And:

> [W]ithout a demand for primary aluminum from purchasers like Plaintiffs, there would be no demand for aluminum mining or smelting by producers or for aluminum warehousing, trading and financing by Defendants. Defendants' entire scheme depends, as a matter of first principal [sic], on those which are similarly situated to Plaintiffs, which put primary aluminum to productive use.

(Id. ¶ 43.) These allegations set the stage for a consistent presentation of plaintiffs' claims over a number of filings throughout the litigation, both before and after discovery commenced.

## II.   PLAINTIFFS' DESCRIPTION OF THEIR CLAIMS

Plaintiffs have consistently identified the locus of defendants' anticompetitive conduct as in the aluminum warehousing services market. Early on in the

4

proceedings, in their opposition to Pacorini Metals AG's motion to dismiss the SAC, the FLPs argued:

> that the London Metal Exchange Defendants, Goldman Sachs Defendants, the Glencore Defendants, including Defendant Pacorini AG, and others conspired or agreed to inflate aluminum prices, restrain aluminum supplies in LME Detroit warehouses, and provide extremely inefficient, low quality load out and other services.

(ECF No. 550 at 7 (citations omitted).)

In their motion for leave to file the TAC, the FLPs asserted:

> Plaintiffs paid supra-competitive prices for physical aluminum in the U.S. market for primary aluminum as a direct, necessary and foreseeable result of Defendants' anticompetitive conduct in the U.S. market for warehousing services for exchange-traded-aluminum. Put simply, the defendants' hording [sic] of aluminum in Metro warehouses caused Plaintiffs to pay higher prices for physical aluminum.

(ECF No. 614 at 14.) In that same motion, they stated further, "The remaining question is whether Defendants' anticompetitive conduct in the warehouse services market caused Plaintiffs' injury in the market for primary aluminum." (Id. at 15.)

The FLPs maintained the same theory as the case proceeded to discovery. In a July 30, 2015 motion to compel the production of documents from a third party, plaintiffs alleged that the "[n]ature of the [d]ispute" is:

> [A] conspiracy where aluminum traders agreed among themselves and with their affiliate-warehouses to hoard aluminum. This allowed the traders to control the supply, and as a result, the price of the aluminum. During the Class Period, defendants used this ability to drive up the price of aluminum, damaging first-level purchasers of aluminum.

(ECF No. 838 at 1.)

In a March 25, 2016 motion to extend the deadline to complete fact discovery, plaintiffs described the proof necessary to sustain their claims as follows:

5

> Detailed data regarding the warehousing of aluminum as well as Defendants' transactions for aluminum or aluminum-based financial products are vital to understanding Defendants' means and motive for effecting the alleged conspiracy.

(ECF No. 914 at 2.)

The FLPs have advanced the same arguments in support of class certification. In their opening memorandum on class certification, they argued:

> Plaintiffs' proof will overwhelmingly raise questions of fact common to Class members, as it will focus on such matters as whether Defendants agreed: (i) that their warehouse operations would not compete against each other; (ii) to pressure the LME not to change its load-out rules, and to use the minimum load-out rules as a maximum; (iii) to build queues in Detroit and Vlissingen; (iv) to shuffle stocks between Metro's Detroit warehouses; (v) to work together strategically to cancel warrants; and (vi) to meet and communicate concerning these and other aspects of their agreement.

(ECF No. 932 at 33.) In their reply on class certification, the FLPs stated:

> FLPs' theory—that Defendants inflated the cost of aluminum paid by class members by causing inflation of the MWP component of aluminum's unique price-setting mechanism via manipulation of LME warehouse queues—is not new or changed.

(ECF No. 1040 at 20.) And:

> From the very start of this case, Plaintiffs have alleged that the long queue in Detroit was the problem. This case is—and always has been—about the queue. Plaintiffs' theory of liability is the same as at the start of the case: the queue in Detroit caused Plaintiffs to pay more than they otherwise would have for physical aluminum.

(ECF No. 1040 at 50-51.)

In their reply on class certification, plaintiffs further argue that defendants engaged in seven anticompetitive acts, all of which occurred in the warehouse services market: agreements (1) not to destock each other, (2) to work together to build a critical mass of aluminum in Detroit, (3) to pay incentives, (4) to engage in

6

queue management, (5) to treat the LME's minimum load-out rule as a maximum, (6) to engage in "merry-go-round" transactions that shuttled aluminum between warehouses, and (7) to execute other defendant-related warrant cancellations that extended the queue. (ECF No. 1040 at 14-15.)

Similarly, plaintiffs' proposed expert, Dr. Douglas J. Zona, opined in support of class certification that "Defendants' coordinated conduct reduced competition in the markets for LME warehouse services, which had the effect of increasing the price of aluminum purchased by Plaintiffs and members of the proposed class." (ECF No. 920-4 ¶¶ 5, 92.) In a separate report plaintiffs submitted in support of class certification, Dr. Christopher L. Gilbert states that "by creating load-out queues, the collusive exercise of market power in the LME warehouse market by Defendants directly caused the Midwest Premium to rise". (ECF No. 960-1 ¶ 44.)

In sum, plaintiffs' claim is that traders and conduct in aluminum warehouse services caused a direct restraint in loadouts from those warehouses; a by-product of these alleged shenanigans was an increased Midwest Premium paid by buyers of physical aluminum. As the Second Circuit described it, the higher Midwest Premium constituted "collateral damage". Aluminum III, 2016 WL 4191132, at *8.

III. THE SECOND CIRCUIT'S AUGUST 9, 2016 DECISION

On August 9, 2016, the Second Circuit issued its Aluminum III decision. See 2016 WL 4191132. That decision affirmed this Court's determination that, inter alia, the indirect purchaser plaintiffs lacked antitrust standing. Id. at *1. The bases for the Second Circuit's decision are equally applicable to the claims brought

7

by the FLPs. Indeed, in their appellate briefing, the indirect purchasers relied on the similarities between their position and FLPs' theory of antitrust standing:

> Like the FLPs, Plaintiffs' injuries are "inextricably intertwined" with the defendants' alleged scheme. Like the FLPs, Plaintiffs' demand for aluminum created the market for aluminum sales. Plaintiffs purchase aluminum to use in their production processes, just as the FLPs do. Were it not for Plaintiffs' need to use aluminum to fashion the products they sell, it would not be possible for the financial institution defendants to trade aluminum as a commodity. Like the FLPs, Plaintiffs pay prices for aluminum that incorporate the Midwest Premium. Plaintiffs paid higher prices as a result of the Defendants' alleged conspiracy and were therefore "necessarily directly impacted by the alleged conduct," just as the FLPs were.

(ECF No. 1067-2 ("Commercials' Appeal Br.") at 22-23 (internal pagination) (internal citations omitted).) This was not a far-fetched analogy: while it is certainly true that the TAC has a number of differences from the complaint at issue on appeal Aluminum III, key facts are common to both cases. The Second Circuit viewed those facts as legally insufficient.

The Second Circuit summarized the indirect purchasers' claims as a conspiracy to manipulate the regional premium in the Detroit metro area (the Midwest Premium) "so that it no longer accurately reflected the cost of delivering, financing and insuring local, immediately available aluminum in the Midwest", and to affect this through manipulation of warehousing services. Aluminum III, 2016 WL 4191132, at *2. The Court described defendant corporate entities as having both trading arms and acquired warehousing operations, id., and that these two arms conspired to create unusually long queues for the removal of aluminum from the warehouses. Id. Because the Midwest Premium is based, inter alia, on the cost of warehouse storage, and that cost is directly related to the duration of such

8

storage, the longer queues "directly increased the Midwest Premium, which the plaintiffs claim they eventually paid downstream".  Id.

The Second Circuit further understood the conspiracy as involving an interplay between the trading arm and warehousing operations in which the warehousing operations would take possession of physical aluminum (sometimes paying incentives in order to do so) and store it in a warehouse certified by the London Metal Exchange ("LME-warehouse"); the trader defendants then cancelled warrants in a manner that created a glut of aluminum to be "loaded out" of the warehouse.  Id.  In addition, the Court discussed the indirect purchaser plaintiffs' allegations that aluminum warrants were cancelled only to be reissued to neighboring warehouses, that aluminum was shuttled from one warehouse to another, and that defendants manipulated an LME "minimum" load-out rule to become a maximum.  Id. at **2-3.  Together, these and related practices extended storage duration, driving up costs.  This description of the indirect purchaser plaintiffs' core factual assertions is virtually identical to that which plaintiffs assert in the TAC.

The Second Circuit then turned to the role of the indirect purchaser plaintiffs in the market(s) in which the scheme occurred.  The Court noted that "plaintiffs do not allege that they ever stored aluminum with the warehouse operator defendants, engaged in future trades with any of the trader defendants, or purchased aluminum that was ever present in any of the defendants' warehouses." Id. at *3.  As a result of their position outside of the direct warehousing and trading markets in which

9

defendants carried out their scheme, plaintiffs there, as here (until briefing on this motion), argued that they had antitrust standing because their purchases of aluminum created demand for physical aluminum that made them "'inextricably intertwined' with the anticompetitive scheme." Id. at *8. The Second Circuit understood the similarity between the indirect purchasers' argument on appeal and the theory of standing this Court upheld with respect to the FLPs in Aluminum II; the Second Circuit described the FLPs' argument as also asserting that their purchasers were also "inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out", id. at *3 (quoting Aluminum II, 95 F. Supp. 3d at 442).

It is clear based on the extensive briefing by the parties on the appeal, the oral argument, and the Court's decision, that the Circuit also analyzed whether repleading to mirror the allegations in the ongoing MDL (that is, the FLPs' TAC) would resolve any issues. Again, the Second Circuit found that it would not. On that basis, it affirmed this Court's denial of leave to replead. The Court turns now to a discussion of the Second Circuit's legal reasoning. Id. at *9.

After setting forth the basic and well-known standards for antitrust standing[3] the Court discussed the Supreme Court's decision in Blue Shield of

---

[3] Antitrust standing is "'a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law.'" Gatt Commc'ns Inc. v. PMC Assocs. L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (quoting NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc., 467 F.3d 283, 290-95 (2d Cir. 2006) (dismissing a complaint under Rule 12(b)(6) for lack of antitrust standing). Antitrust standing consists of three separate questions: whether plaintiffs have sufficiently alleged injury-in-fact; whether they have sufficiently alleged antitrust injury, and whether they are efficient enforcers of the antitrust laws. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of

Virginia v. McCready, 457 U.S. 465 (1982). In McCready, the Supreme Court held that while plaintiff was not a competitor of the alleged conspirators, she had nevertheless suffered antitrust injury because "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict". 457 U.S. at 484. In that case, plaintiff McCready alleged that her health insurer, Blue Shield of Virginia, and an organization of psychiatrists conspired to exclude psychologists from eligibility for compensation under Blue Shield's insurance plans. Id. at 469-70. McCready sought reimbursement from Blue Shield for treatment by a psychologist. Id. at 467-69. However, Blue Shield only allowed her and other subscribers to choose between "visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment of a provider of their choice". Id. at 483. The Court found that McCready's injury "flow[ed] from that which makes defendants' acts unlawful" under the antitrust laws, and accordingly there was no persuasive rationale to deny McCready redress. Id. at 484-85.

Focusing on the facts of McCready, the Second Circuit noted that in that case, the plaintiff was a "participant in the market that was the target of the alleged scheme and in which she directly suffered harm". Aluminum III, 2016 WL 4191132, at *5.[4] The Court found the Supreme Court's analogy in McCready helpful in defining the parameters of its narrow holding: under the "hypothetical"

---

Carpenters, 459 U.S. 519, 535 n.31 (1983); Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007).

[4] The Second Circuit also distinguished Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290, 294 (2d Cir. 1983) (Friendly, J.).

11

of "'a group of psychiatrists conspir [ing] to boycott a bank until the bank ceased making loans to psychologists . . . the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrist's actions." Id. (quoting McCready, 457 U.S. at 484 n.21). In other words, the conspiracy alleged in McCready involved the health insurers and psychiatrists harming McCready in order to effectuate their scheme to squeeze out psychologists. The Court also referred to other circuit court decisions which had limited the reach of McCready to instances in which plaintiffs were "'directly targeted for harm by parties ultimately wishing to inflict a derivative harm on a competitor'". Id. at *6 (quoting Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162, 172 (3d Cir. 2015)). The Second Circuit then stated that the "thrust of McCready is that the plaintiff was a participant in 'the very market directly distorted by the antitrust violation'". Id. (citing SAS of P.R., 48 F.3d 39, 46 (1st Cir. 1995)). The Court further found that in both McCready and the Second Circuit's Crimpers case, plaintiffs were "participants in the market that was the immediate target of the alleged scheme, and that is where they directly suffered harm at the hands of the defendants". Id.

The Second Circuit determined that there can be no antitrust standing under a McCready theory unless the defendant conspirators intend to corrupt some market in which they do not participate. Id. at *8. In other words, the fact that anticompetitive effects may be felt incidentally in some other market—such as the physical aluminum market—is insufficient. Id. The market that defendants intended to corrupt was aluminum warehouse services. Id. The Court then held

12

that "[t]o fall within McCready [plaintiffs] had to participate in the very market that the defendants directly restrained" and that this was the "LME-warehouse storage market". Id. That is "where the direct, immediate impact would have been felt". Id.

The Court further considered and rejected arguments that the fact that the appealing plaintiffs created the "demand for physical aluminum made them inextricably intertwined" and a "necessary step" in effectuating the alleged scheme to lengthen the load-out queues. Id. The Court based this determination not on their market position but rather on the fact that "[a]ll of the alleged anticompetitive acts—cancelling warrants, shuttling aluminum, and slowing load-outs—were within the defendants' power to do; they did not need or use injury to the [plaintiffs] as the 'fulcrum' or 'conduit'". Id. Further, the plaintiffs' injury was "suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme". Id.

The Court noted that even if there was a plausible allegation that the defendants conspired to corrupt the physical aluminum market,

> the purported injuries of [plaintiffs] were not "the very means" by which the defendants achieved that illegal end; insofar as anyone's injury could be "the very means," it would be the injury suffered by the participants in the market for LME-warehouse storage.

Id. The Court then directly addressed the argument being made in the FLPs' brief in opposition to this motion:

> If the trader and warehouse operator defendants sought to increase the price for primary aluminum, and they could not do so directly, one alternative means at their disposal would be manipulating the LME-warehouse storage

> market. That is, after all, how [plaintiffs] allege the defendants increased the Midwest Premium, and thereby the price for primary aluminum. In such a scenario, injuring the participants in the LME-warehouse storage market by forcing them to pay higher storage costs might be deemed the "essential means" by which the defendants achieve their purported objective.

Id. The Court found that in this scenario, injury to the plaintiffs was "collateral damage" and insufficient to support standing. Id.

Based on the allegations in the TAC, it is evident that the general rationale of, as well as each of these statements by, the Second Circuit are equally applicable to the FLP plaintiffs' claims here and that McCready's "inextricably intertwined" basis for antitrust standing is inapplicable. Reliance on that case, therefore, cannot form the basis for antitrust standing in the context of the facts alleged before this Court.

In this regard, it is first notable that on the appeal to the Second Circuit, the parties briefed and argued the precise allegations set forth in the TAC and whether such allegations supported an "inextricably intertwined" theory of antitrust standing. While the Second Circuit was not directly considering the adequacy of the TAC, it nonetheless rejected the sufficiency of the type of allegations set forth in the TAC. The Second Circuit's description of the core allegations of the conduct at issue in the indirect purchasers' complaints—as described above—could be lifted out wholesale and applied to the TAC. Similarly, the Court description of plaintiffs' role in the markets in which "the scheme occurred" would be unchanged if applied directly to the TAC. The Court could state as easily here as it did with regard to the indirect purchasers' claims that "plaintiffs do not allege that they ever stored

aluminum with the warehouse operator defendants, engaged in future trades with any of the trader defendants, or purchased aluminum that was ever present in any of the defendants' warehouses". Id. at *3.

The Second Circuit's analysis of injury is also directly applicable to the facts alleged in the TAC: "[a]ll of the alleged anticompetitive acts . . . were within the defendants' power to do; they did not need or use injury to the [plaintiffs] as a 'fulcrum' or 'conduit'". Id. at *8. Without repeating that each portion of the rationale is equally applicable, it is plain from reading the decision that it is.

The FLPs argue that the TAC is sufficiently different from the indirect purchasers' complaints on appeal such that the Second Circuit's rationale is inapplicable here. That is incorrect. While it is certainly true that the allegations regarding how the conspirators interacted are different between the two complaints, the core assertion remains common.

## IV. THE FACTUAL RECORD[5]

In response to this motion, plaintiffs argue that the factual record, developed during discovery, provides a basis for direct antitrust standing. According to plaintiffs, it is now clear that both the FLPs and defendants are participants in the physical aluminum market and they no longer have to rely on the "inextricably

---

[5] Immediately following the Second Circuit's August 9 decision, defendants moved to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 1045; ECF No. 1049.) In response, plaintiffs submitted extensive facts that they argue support an alternative basis for finding antitrust standing. To avoid procedural impropriety (and not because the Court found the facts particularly useful), the Court converted the motion to one pursuant to Rule 56. (ECF No. 1062.) The parties were provided notice and given an opportunity to make any additional factual submissions they deemed necessary. (Id.) The outcome of this motion would be the same whether it is analyzed under Rule 12 or 56.

intertwined" language in McCready.[6]  Thus, according to plaintiffs, they have direct antitrust standing as defendants' competitor.[7]  This argument is ultimately not persuasive.[8]  Plaintiffs have designed the TAC around a core assertion that they pay a higher Midwest Premium because of shenanigans in aluminum warehouse services, caused by warrant traders complicit with the warehouses.  Their argument now that defendants also compete in physical aluminum purchases means only that defendants may also experience the anticompetitive effects of the conduct at issue.[9]  Thus, plaintiffs' argument undermines the alleged economic benefits of their alleged scheme:  on a corporate-wide basis, that which one arm is alleged to have done, the other arm would pay for.  Plaintiffs have not, and could not at this stage, alter their allegations of wrongdoing so significantly as to claim that somehow anticompetitive conduct in warehouse services advantages not only warrant traders but was

---

[6] Plaintiffs provide evidentiary support, which defendants do not contest on this motion, that defendants owned and/or from time to time acquired physical aluminum and thus participate in the physical aluminum market.

[7] The Court notes, though it is irrelevant to the outcome of this motion, that only certain defendants are even alleged to have owned physical aluminum.

[8] In terms of the McCready "inextricably intertwined" analysis, the factual record changes nothing: the FLP plaintiffs are neither competitors nor consumers in warehouse storage, which is the essential market in which the scheme occurs; nor are they the traders by which the scheme is effected.

[9] The FLPs' argument that the anticompetitive conduct at issue occurred in the physical aluminum market is inconsistent with the allegations in the TAC. Although warrant cancellations and incentive payments involve physical aluminum, all of the affected aluminum is stored in warehouses, and either purchased by traders (if stored in an LME warehouse) or producers (if stored in a non-LME warehouse). Aluminum III, 2016 WL 4191132, at *1.  This stored aluminum does not form the same market that the FLPs access. As a result, the FLPs' argument that "[t]he physical aluminum in warehouses is part of the overall physical market of aluminum—no matter where it is stored or how it is financed", (ECF No. 1059 at 8), stretches the definition of the relevant market to an insupportable level of generality.  Indeed, the Second Circuit expressly found that the warrant cancellations and incentive payments was anticompetitive conduct that "took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt". Id. at *8.

intended to directly benefit one segment of physical aluminum market participants. While this theory is possible to develop, it is not the theory on which this case has been litigated. Thus, plaintiffs' claims of direct standing would require a fundamental alteration in their theory of the case— and it is too late for that. See Enzo Biochem, Inc. v. Amersham PLC, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); Scott v. City of New York Dep't of Corr., 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (limiting consideration to "far narrower" claims alleged in complaint rather than unpled claims raised in opposition to a motion for summary judgment); Southwick Clothing LLC v. GFT (USA) Corp., 99-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers and hence such new allegations and claims should not be considered in resolving the motion.")

In addition, even if the FLPs' allegations were not procedurally deficient, they fail substantively. First, plaintiffs confuse the market where some competitive effects were felt (the buying and selling of physical aluminum) with what the Second Circuit and Supreme Court in McCready focused on, the locus of the anticompetitive conduct and where the effects of any restraint were experienced most directly. While the FLPs have submitted a number of documents purportedly showing that defendants owned and traded in aluminum (see, e.g., ECF Nos. 1060-1 ("Gilbert Decl.") ¶¶ 11-24, 1060-7 ("Evans Dep.") at 14:6-13, 73:10-75:5, 305:17-

17

306:25; 1060-8 ("Wibbelman Dep.") at 251:10-25; 1060-9 at 345:24-346:7), there is no allegation or evidence in the record that defendants engaged in any anticompetitive conduct outside of the aluminum warehouse services market. The scheme was allegedly effected through anticompetitive acts in warehouse storage services utilizing a futures trading operation. As the Second Circuit held in construing the indirect purchasers' complaint, profit by defendants or losses by plaintiffs subsequently experienced in physical aluminum is irrelevant to antitrust standing.

Furthermore, the indirect purchasers included similar arguments in their appeal to the Second Circuit, which that Court rejected. (<u>See, e.g.</u>, Commercials' Appeal Br. at 8 (internal pagination) ("[T]heir scheme to trap aluminum in their warehouses would drive up prices in the physical aluminum market, allowing them to realize a greater profit from sales of their aluminum holdings."); ECF No. 1067-3 ("Appellants' Reply Br.") at 17 (internal pagination) ("[I]n December 2013 Defendants controlled between 35-45% of the global supply of physical aluminum. This is a more than a sufficient quantity to affect the price of physical aluminum, as when demand elasticity is low, small reductions in output yield large increases in price.") (internal quotation marks and citation omitted); ECF No. 242 ("Commercials' Corr. Am. Compl.") ¶ 63 ("By both trading on the derivatives market and participating in the physical market, Goldman and JPM are able to manipulate inventory and prices of aluminum"); <u>id.</u> ¶ 65 ("large traders with integrated financial and physical metals operations like Goldman, JPM and Glencore are able to control the supply of aluminum to commercial end users and, as a result, to

control prices") (internal quotation marks omitted); id. ¶ 127 ("the Warehousing Defendants positioned themselves to profit from their scheme given their positions in the aluminum market.  This included not only profits from storage fees but also, at a basic level, profiting from the increasing and unhedgeable Midwest Premium, by selling aluminum into the market at a higher premium than at which it was purchased."); ECF No. 227 ("Consumers' Am. Compl.") ¶ 63 ("By both trading on the derivatives market and participating in the physical market, Goldman and JPM are able to manipulate the inventory and prices of aluminum").

The record evidence FLPs' cite suggesting defendants intended to inflate the Midwest Premium fare no better.  The briefing and argument before the Second Circuit demonstrates that the indirect purchasers also made this argument.  Specifically, the indirect purchasers argued that "Defendants conspired to manipulate . . . the Midwest Premium" (Aluminum III at *2), "Intended to corrupt the market for primary aluminum" (id. at *8), and "profit[ed] from sales of their aluminum holdings" (Commrecials' Appeal Br. at 8 (internal pagination).)  Those arguments were rejected by the Second Circuit, which recognized that the indirect purchasers' "core allegation is that from 2009 to 2012, the defendants conspired to manipulate the regional premium in the Detroit metro area (the 'Midwest Premium')".  Aluminum III at *2; see also id. at *8.

CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion to dismiss the TAC.  The Clerk of Court is directed to close the motion at ECF No. 1049 and to terminate the following actions:  13-md-2481, 14-cv-0211, 14-cv-0217, 14-cv-3116, 14-cv-6849, 15-cv-8307 and 16-cv-5955. [10]

SO ORDERED.

Dated:     New York, New York
           October 5, 2016

                                            KATHERINE B. FORREST
                                            United States District Judge

---

[10] This case is an example of the impact of Gelboim v. Bank of America Corp., 135 S. Ct. 897 (2015), which allows plaintiffs whose claims have been dismissed at the pleading stage in multi-district litigations ("MDL") to appeal their dismissal while the claims of other plaintiffs in the MDL proceed. In rendering its decision, the Second Circuit did no more than that which it was required to do.  But it is clear that the Supreme Court's Gelboim decision increases the procedural complexity district courts face in MDL proceedings.  The fundamental purposes of MDLs are to rationalize the consolidated proceedings and allow for efficient coordination of pre-trial matters, including a fact discovery program that may involve dozens of depositions, expert discovery, possible motions for class certification and summary judgment; finally, a trial date may be set for cases that remain in the MDL court for final disposition (rather than returning to a different, home court).  There are obvious practical implications that flow from these steps.  For instance, at the outset of a large MDL, district courts resolve motions to dismiss that define the scope of the proceedings.  Gelboim injects a significant amount of uncertainty and tactical maneuvering into this process and the case more generally.  The practical impact of Gelboim is to allow what are practically akin to interlocutory appeals of a district court's decisions on motions to dismiss.  A successful appeal may throw what had been a rational process into confusion:  suddenly, depending on the stage of the case, there may be arguments that numerous depositions need to be reopened, that new experts must be allowed, that summary judgment motions on similar issues may be argued again on a slightly different record that takes into account newly added discovery.  And any trial date could be thrown into question. The reality is that many MDLs eventually settle—and when they do, a component may be resolution of a potential appeal from a dismissed party.  Pre-Gelboim, this could occur without the added confusion created mid-way through a case with a decision on an appeal.  In this case, the opposite has occurred.  A "Gelboim Appeal" has caused a case nearing final procedural stages to come to a halt.  Perhaps this is the most just result.  But plaintiffs will undoubtedly appeal – and if successful, the parties will be picking up where they left off two years hence.