```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 30, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
AGFA CORPORATION and AGFA           :
GRAPHICS, N.V.                      :
                                    :
               Plaintiffs,          :        14-cv-0211 (KBF)
                                    :        14-cv-0217 (KBF)
        -v-                         :        14-cv-6849 (KBF)
                                    :        15-cv-8307 (KBF)
THE GOLDMAN SACHS GROUP, INC. et al.,:       16-cv-5955 (KBF)
                                    :
               Defendants.          :        OPINION & ORDER
------------------------------------------------------------------X
MAG INSTRUMENT INC.                 :
                                    :
               Plaintiff,           :
                                    :
        -v-                         :
                                    :
THE GOLDMAN SACHS GROUP INC. et al.,:
                                    :
               Defendants.          :
------------------------------------------------------------------X
EASTMAN KODAK COMPANY               :
                                    :
               Plaintiff,           :
                                    :
        -v-                         :
                                    :
THE GOLDMAN SACHS GROUP INC. et al.,:
                                    :
               Defendants.          :
------------------------------------------------------------------X
FUJIFILM MANUFACTURING U.S.A., INC.,:
                                    :
               Plaintiff,           :
                                    :
        -v-                         :
                                    :
GOLDMAN SACHS & CO. et al.,         :
                                    :
               Defendants.          :
------------------------------------------------------------------X

1

```
------------------------------------------------------------------X
REYNOLDS CONSUMER PRODUCTS LLC      :
and SOUTHWIRE COMPANY, LLC          :
                                    :
                Plaintiffs,         :
                                    :
        -v-                         :
                                    :
GOLDMAN SACHS & CO. et al.,         :
                                    :
                Defendants.         :
------------------------------------------------------------------X
```

KATHERINE B. FORREST, District Judge:

This Opinion & Order represents the next chapter in the saga known as the "Aluminum Antitrust Litigation". On August 9, 2016, the Second Circuit affirmed a prior decision of this Court dismissing claims by certain indirect purchasers who had been part of the coordinated multi-district litigation ("MDL"). In re Aluminum Warehousing Antitrust Litig. ("Aluminum III"), 833 F.3d 151 (2d Cir. 2016). Based on the rationale of that decision, the MDL defendants moved to dismiss the consolidated case brought by the self-denominated "First-Level Purchasers" ("FLPs") based on a lack of antitrust standing. (Case No. 13-md-2481, ECF No. 1049.) On October 5, 2016, the Court granted that motion. In re Aluminum Warehousing Antitrust Litig. ("Aluminum IV"), No. 13-md-2481 (KBF), 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016).[1]

Presently before this Court is the question of whether the remaining cases should be dismissed based on the rationale set forth in this Court's October 5

---

[1] The Court assumes familiarity with the facts set forth in the Second Circuit's August 9 decision and this Court's October 5 decision, as well as the prior decisions of this Court, In re Aluminum Warehousing Antitrust Litig. ("Aluminum I"), No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) and In re Aluminum Warehousing Antitrust Litig. ("Aluminum II"), 95 F. Supp. 3d 419 (S.D.N.Y. 2015).

decision. (See Case No. 13-md-2481, ECF Nos. 1084, 86; Case No. 16-cv-5955, ECF No. 67.) The actions at issue on the instant motions are: Agfa Corporation and Agfa Graphics, N.V. (together, "Agfa") (Case No. 14-cv-0211); Mag Instrument Inc. (Case No. 14-cv-0217) ("Mag"); Eastman Kodak Company ("Kodak") (Case No. 14-cv-6849); FUJIFILM Manufacturing U.S.A., Inc. ("Fujifilm") (Case No. 15-cv-8307); and Reynolds Consumer Products LLC ("Reynolds") and Southwire Company, LLC ("Southwire") (Case No. 16-cv-5955) (referred to collectively as "Additional FLPs", "Independent Purchasers" or "IPs"). The Agfa, Mag, Kodak and Fujifilm actions were part of the coordinated MDL (Case No. 13-md-2481) and had been consolidated for all purposes with the actions brought by the now dismissed FLPs. The Reynolds and Southwire action is a separate proceeding that was designated as related to the MDL.[2]

The Court has received significant briefing on this motion and held oral argument on November 10, 2016. As set forth below, the rationale set forth in the Second Circuit's August 9 decision and this Court's October 5 decision requires dismissal of these cases.

---

[2] The Court's October 5 decision granting the motion to dismiss the FLPs' complaint initially terminated the Agfa, Mag, Kodak, Fujifilm and Reynolds and Southwire actions at issue here. See Aluminum III, 2016 WL 5818585, at *8. While the Court viewed all of the actions as essentially the same, the Agfa, Mag, Kodak, Fujifilm, Reynolds and Southwire plaintiffs correctly noted that they had filed separate complaints and were entitled to be separately heard. (Case No. 13-md-2481, ECF No. 1082; Case No. 16-cv-5955, ECF No. 67.) Thereafter, on October 24, 2016, the Court issued an order providing for additional and independent briefing and setting oral argument. (Case No. 13-md-2481, ECF No. 1088.) Oral argument was held over the course of several hours on November 10, 2016.

I.   DISCUSSION

There are three standalone complaints at issue on the present motions: a Joint Amended Complaint ("JAC") brought by Agfa, Mag and Kodak (Case No. 13-md-2481, ECF No. 745), a standalone complaint identical to the JAC in all material respects filed by Fujifilm (Case No. 13-md-2481, ECF No. 886),[3] and a more recently filed complaint by Reynolds and Southwire (Case No. 16-cv-5955, ECF No. 1) (referred to as the "R & S Complaint"). In addition, Reynolds and Southwire have separately moved to amend their complaint (referred to as the "R & S Proposed Amended Complaint."). (Case No. 16-cv-5955, ECF Nos. 67, 69.)

The issue before the Court on these motions concerns antitrust injury. As discussed below, the Court analyzes whether the JAC, R & S Complaint or R & S Proposed Amended Complaint have alleged sufficient facts to support such injury. This Court has already exhaustively reviewed the allegations and evidence proffered by the FLPs—and has already explained why the Second Circuit's August 9 decision required dismissal of their Third Amended Complaint ("TAC"). (Case No. 13-md-2481, ECF No. 738.) The reader is referred to this Court's October 5 decision generally. See Aluminum IV, 2016 WL 5818585. The complaints at issue here fare no better than the TAC: neither the existing complaints, nor the proposed amendment, have materially different allegations regarding antitrust injury. For instance, each focuses on anticompetitive conduct occurring in in the aluminum warehouse servicing and warrant trading markets, and no plaintiff competes in

---

[3] Given the similarity of allegations in the JAC and Fujifilm complaint, the Court refers to those separate complaints collectively as the "JAC".

either of those markets.  Although Reynolds and Southwire allege, in both the R & S Complaint and R & S Proposed Amended Complaint, that they made direct purchases of aluminum from certain defendants (see, e.g., R & S Compl. ¶¶ 41-42, R & S Proposed Am. Compl. ¶¶ 50-52), that does not remedy the essential defect.  The locus of the alleged anticompetitive conduct is not at the point of physical sale, but prior to that and in markets in which Reynolds and Southwire are neither competitors nor consumers.  Accordingly, each of the existing complaints is subject to dismissal, and the R & S Proposed Amended Complaint would be futile.

This Court begins its analysis by examining the extent to which the complaints at issue here are similar to the FLPs' complaint (the TAC) addressed by this Court's October 5 decision.  See Aluminum IV, 2016 WL 5818585.  The Court next describes the core allegations of antitrust injury rejected by the Second Circuit's August 9 decision.  See Aluminum III, 833 F.3d 151.  Since the allegations in the JAC, R & S Complaint and R & S Proposed Amended Complaint are very similar to those in the TAC, they too must be dismissed under the rationale of the Second Circuit's August 9 decision.

A. The Complaints at Issue[4]

    1.    The TAC, JAC and R & S Complaint

The TAC, JAC and R & S Complaints contain many materially similar allegations concerning, inter alia:

---

[4] This Court assumes familiarity with the relevant legal standard to state antitrust injury.  That standard is discussed at length in the Second Circuit's and this Court's recent decisions.  See id. at 157-58; Aluminum IV, 2016 WL 5818585, at *5 n.3.

- the aluminum warehousing services market generally (compare TAC ¶¶ 188-95 with JAC ¶¶ 127-33, 141 and R & S Compl. ¶¶ 56-57, 60; compare TAC ¶¶ 198-99 with JAC ¶¶ 142-43 and R & S Compl. ¶¶ 60-61);

- aluminum's physical properties (compare TAC ¶¶ 155-56 with JAC ¶¶ 98-99 and R & S Compl. ¶¶ 34-35);

- aluminum production (compare TAC ¶¶ 164-67 with JAC ¶¶ 100-03 and R & S Compl. ¶¶ 38-40; compare TAC ¶¶ 174-75 with JAC ¶ 105); and

- aluminum pricing (compare TAC ¶¶ 176-79 with JAC ¶¶ 118-21 and R & S Compl. ¶¶ 50-52; compare TAC ¶¶ 185-86 with JAC ¶¶ 122-23 and R & S Compl. ¶ 53).

Many of these overlapping allegations are verbatim or near verbatim across the three complaints.

The JAC and R & S Complaint also contain similar allegations regarding aluminum supply and demand (compare JAC ¶ 108 with R & S Compl. ¶ 43; compare JAC ¶¶ 110-11 with R & S Compl. ¶ 44; compare JAC ¶ 113 with R & S Compl. ¶ 46) and the relevant market (except for its geographic boundaries) (compare JAC ¶¶ 116-17 with R & S Compl. ¶¶ 47-48).

The allegations of anticompetitive conduct set forth in the TAC at ¶¶ 464-627 are the same—down to the headings—as those in the JAC at ¶¶ 151-308.  The R & S Complaint sometimes alters the headings but retains the core of these allegations. (See R & S Compl. ¶¶ 66-154.)  For instance, the similarities span sections entitled:

"The Entry of Banks and Traders into Warehousing" (TAC ¶ 464 et seq.; JAC ¶ 151 et seq.; see also R & S Compl. ¶ 66 et seq.); "Defendants Conspired to Increase Aluminum Spot Metal Prices, Specifically, Applicable Regional Premiums, by Moving Metal into Key Warehouses Which They Controlled" (TAC ¶ 473 et seq., JAC ¶ 160 et seq.; see also R & S Compl. ¶ 72 et seq.); "Goldman Exercises Complete Control over Metro, Using Metro as an Extension of Its Trading Arm" (TAC ¶ 489 et seq.; JAC ¶ 176 et seq.); "Defendants Agree Not to Compete Against Each Other in the Market for the LME-Certified Warehouses in the United States and Throughout the World" (TAC ¶ 510 et seq.; JAC ¶ 197 et seq.; see also R & S Compl. ¶ 80 et seq.); "As Part of Their Agreement Not to Compete, the Defendants Agree to Treat the LME's Minimum Load-Out Rule as a Maximum" (TAC ¶ 523 et seq.; JAC ¶ 210 et seq.; see also R & S Compl. ¶ 84 et seq.); "Defendants Work Together to Shift Aluminum Among Their Warehouses in Order to Concentrate the Stock at Key Warehouse Locations" (TAC ¶ 532 et seq.; JAC ¶ 219 et seq.; see also R & S Compl. ¶ 114 et seq.); "The Defendants Offer Payments for Owners to Store Aluminum in Their Key Warehouse Locations" (TAC ¶ 550 et seq.; JAC ¶ 237 et seq.; see also R & S Compl. ¶ 92 et seq.), and on.

  A review of these allegations makes clear that the TAC, JAC and R & S Complaint identify the same anticompetitive conduct and assert the same theories. This Court already noted the similarities between the TAC and JAC in its Aluminum II decision, before the R & S Complaint was filed. See Aluminum II, 95 F. Supp. 3d at 429 ("the JAC and the TAC both allege a singular core claim directed at the same conduct"). Although the Court considered each complaint according to

its own allegations, see id. at 429, the allegations overlapped to such a degree that the Court's discussion analyzed them together instead of drawing distinctions, see id. at 430-36, 440-44.

The Court's description of the TAC and JAC at issue in Aluminum II extends to the R & S Complaint as well. All three complaints allege that the anticompetitive conduct occurred in the warehouse services market and that "the co-conspirators worked with each other to restrain a very specific piece of the aluminum supply comprising only a small portion of the total amount of available physical aluminum: aluminum traded by way of LME warrants." Id. at 433 (citations omitted). These three complaints also all assert that the "longer aluminum is stored in . . . LME warehouses, the higher the Midwest Premium." Id. at 434 (same).

In addition, the TAC, JAC and R & S Complaint all assert that Defendants engaged in the following seven anticompetitive acts in the warehouse services and warrant trading markets:

1. Defendants ignored London Metal Exchange ("LME") information barriers (compare TAC ¶¶ 473-509 with JAC ¶¶ 160-96 and R & S Compl. ¶¶ 8, 74-79);

2. Defendants agreed not to compete with each other's warehousing operations (compare TAC ¶¶ 510-22 with JAC ¶¶ 5, 197-209 and R & S Compl. ¶¶ 8, 80-82);

3. Defendants agreed to treat the LME's minimum daily load-out rule as a maximum (compare TAC ¶¶ 523-31 with JAC ¶¶ 16, 210-18 and R & S Compl. ¶¶ 84-91);

4. Defendants worked together to shift aluminum among their warehouses in order to concentrate stock at key locations (compare TAC ¶¶ 532-49 with JAC ¶¶ 9, 219-36 and R & S Compl. ¶¶ 114-25);

5. Defendants offered financial incentives to aluminum owners to store aluminum at key warehouse locations (compare TAC ¶¶ 550-58 with JAC ¶¶ 10, 237-45 and R & S Compl. ¶¶ 92-99);

6. Defendants evaded the LME's minimum daily load-out rule by shuttling aluminum between warehouses (compare TAC ¶¶ 559-66 with JAC ¶¶ 9, 246-53 and R & S Compl. ¶¶ 114-25); and

7. Defendants worked together to cancel warrants for aluminum stored at key warehouse locations (compare TAC ¶¶ 567-73 with JAC ¶¶ 11-12, 254-60 and R & S Compl. ¶¶ 100-13).

The three complaints further allege that the anticompetitive conspiracy involved a web of participation by both banks and affiliated warehouses. (TAC ¶ 221 et seq.; JAC ¶ 160 et seq.; R & S Compl. ¶¶ 9, 66 et seq.) Likewise, in all three complaints, plaintiffs assert that they are:

> the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their (and other similarly situated purchasers) need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity. Real world aluminum users such as Reynolds

9

and Southwire are the fulcrum to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum.

(R & S Compl. ¶ 10; see also TAC ¶¶ 33-34; JAC ¶¶ 31-49.)

  2. The R & S Proposed Amended Complaint

The R & S Proposed Amended Complaint alleges the same conduct as the TAC, JAC and R & S Complaint described above. (See R & S Proposed Am. Compl. ¶ 61 et seq.) Again, the locus of the anticompetitive conduct is in the warehouse services and warrant trading markets—and the restraining interaction is between warrant traders and warehouse operators. Reynolds and Southwire seek to distinguish the proposed amendment on the basis that they no longer allege the existence of a separate warehouse services market, and instead focus on the fact that they purchase physical aluminum directly from certain defendants "in a single primary aluminum market." (Case No. 16-cv-5955, ECF No. 68 at 12.) This focus does not resolve the issue. It nonetheless remains the case that, as before, all of the anticompetitive conduct at the heart of the proposed amendment occurs in the warehouse services and warrant trading markets—markets in which plaintiffs do not allege they participated.

B. The Second Circuit's August 9 Decision

The Second Circuit's August 9 decision forecloses not only the allegations in the TAC, see Aluminum IV, 2016 WL 5818585, but also the very similar allegations in the JAC, R & S Complaint and R & S Proposed Amended Complaint at issue here.

In its August 9 decision, the Second Circuit stated that as a matter of law, "Generally, only those that are participants in the defendant's market can be said to have suffered antitrust injury." Aluminum III, 833 F.3d at 158 (citations omitted). The Second Circuit further explained that no matter the theory of antitrust injury, a plaintiff must participate in the "the very market that is directly restrained." Id. at 161.  That is not the same as participating in a market in which a defendant also participates but does not restrain—even when the defendant's anticompetitive conduct makes its participation more profitable.  Rather than emphasizing the locus of defendants' general participation in related market areas, the Second Circuit's examination revolved around the locus of defendants' alleged anticompetitive conduct.  See id. at 162-63.

Plaintiffs here are similarly situated to the indirect purchasers examined by the Second Circuit.  Like the indirect purchaser plaintiffs, plaintiffs here "did not store aluminum in the defendants' warehouses; they did not trade aluminum futures contracts with the defendants; and they do not allege that any of the aluminum they purchased was ever stored in any of the defendants' warehouses, or was the underlying asset for any of the defendants' futures trades." See id. at 162; see also id. at 156.  Both the indirect purchaser plaintiffs and plaintiffs here "premise their claim to antitrust injury solely on their purchases of aluminum and aluminum products on the physical aluminum market, where prices were allegedly affected by the defendants' alleged anticompetitive behavior." Id. at 162.  This, however, was not enough for the Second Circuit, which concluded that the indirect purchasers did not participate in "the very market that the defendants directly

11

restrained." Id.  The Second Circuit's decision makes clear that as a matter of law, the antitrust injury must occur where the anticompetitive conduct occurs.  That is, being affected by the anticompetitive conduct is simply not enough.  Like the indirect purchasers, that is all that plaintiffs here are able to show.

The Second Circuit's analysis focused on precisely the same conduct that forms the core of the JAC, R & S Complaint and R & S Proposed Amended Complaint here, inter alia, that:

- the trader defendants cancelled warrants en masse;
- the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another;
- the warehouse operator defendants treated minimum load-out requirement as a maximum; and
- the warehouse operator defendants offered incentive payments to attract more aluminum.

Id.  The Court summarized, "All of this conduct took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt.  [The indirect purchasers] do not and cannot allege that they participated in that market." Id.  Plaintiffs here are in precisely the same position vis-à-vis the locus of the anticompetitive conduct, as were the FLPs.

The Second Circuit also rejected the assertion that the indirect purchasers' alleged purchase of aluminum at inflated prices could somehow change the result.  It reiterated, "All of the alleged anticompetitive acts—cancelling warrants, shuttling aluminum, and slowing load-outs—were within the defendants' power to

do; they did not need or use injury to the [indirect purchasers] as a 'fulcrum' or 'conduit'." Id. The injury felt by these plaintiffs occurred down the distribution chain of a separate market. Id. Again, so too here. While the plaintiffs at issue here may be farther "up" the distribution chain, they, like the FLPs, are decidedly not participants in the markets in which the alleged anticompetitive conduct occurred.

In short, the fundamental mistake plaintiffs make here—and that Reynolds and Southwire do not correct in the R & S Proposed Amended Complaint—is to conflate experiencing some effect of anticompetitive conduct, on the one hand, with what constitutes antitrust injury as a matter of law, on the other. For purposes of the instant motions, the Court accepts that plaintiffs here paid higher prices as a result of the alleged conduct—but so too did the indirect purchasers. That is not enough. According to the Second Circuit, to state or show antitrust injury here—on these rather complicated facts—plaintiffs needed to be injured in the warehouse services or warrant trading markets that were allegedly being directly manipulated. See Aluminum III, 833 F.3d at 162.

Plaintiffs here assert they are positioned differently because they allegedly purchased physical aluminum directly from certain defendants that participate in the same market, i.e., the market for physical aluminum. (Case No. 13-md-2481, ECF No. 1086 at 1, 18; Case No. 16-cv-5955, ECF No. 68 at 5, 10.) In so arguing, plaintiffs attempt to distinguish themselves from the indirect purchasers (and the FLPs), who alleged suffered antitrust injuries that were "inextricably intertwined" with, but not felt in the same market as, the injuries of market participants. See

13

generally Aluminum IV, 833 F.3d at 158 (discussing Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) theory of antitrust injury).  In its August 9 decision, however, the Second Circuit made clear that regardless of whether an antitrust plaintiff invokes a "traditional" or "McCready" theory of antitrust injury, "The upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." Id. at 161.  Plaintiffs' alleged purchases of physical aluminum, even at inflated prices, do not change the fact that the anticompetitive conduct occurred in a different market that was not the same as, or "inextricably intertwined" with, the physical aluminum market in which they operate.

## II.  CONCLUSION

For the reasons set forth above, this Court DISMISSES the following actions: Agfa Corporation and Agfa Graphics, N.V. v. The Goldman Sachs Group, Inc., et al., Case No. 14-cv-211; Mag Instrument Inc. v. The Goldman Sachs Group, Inc. et al., Case No. 14-cv-217; Eastman Kodak Company v. The Goldman Sachs Group, Inc. et al., Case No. 14-cv-6849; FUJIFILM Manufacturing U.S.A., Inc. v. Goldman Sachs & Co. et al., 15-cv-8307; and Reynolds Consumer Products LLC and Southwire Company, LLC v. Glencore AG et al., Case No. 16-cv-5955.  In addition, as it would be futile to allow the amendment proposed by the Reynolds and Southwire plaintiffs (see Case No. 16-cv-5955, ECF Nos. 67, 69), that motion is also DENIED.

   The Clerk of Court is directed to terminate the motion at Case No. 16-cv-5955, ECF No. 67.

   SO ORDERED.

Dated:   New York, New York
         November 30, 2016

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge