16-4230 (L)
Eastman Kodak v. Bath

N.Y.S.D. Case #
13md2481 and
14-cv-3116(KBF)

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: May 3, 2018       Decided: August 27, 2019)

Docket Nos. 16-4230, 16-4233, 16-4235, 16-4243, 16-4305, 16-4308

_____

EASTMAN KODAK CO., AGFA CORP., AGFA GRAPHICS NV, FUJIFILM
MANUFACTURING U.S.A., INC., MAG INSTRUMENT INC., CLARIDGE PRODUCTS
AND EQUIPMENT, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED, CUSTOM ALUMINUM PRODUCTS INC., AMPAL INC., EXTRUDED
ALUMINUM CORP., REYNOLDS CONSUMER PRODUCTS LLC, SOUTHWIRE CO.,
LLC,

*Plaintiffs-Appellants,*

v.

HENRY BATH LLC, METRO INTERNATIONAL TRADE SERVICES, LLC, J.P. MORGAN
CHASE & CO., GOLDMAN SACHS & CO. LLC, GOLDMAN SACHS INTERNATIONAL,
JPMORGAN SECURITIES PLC, GLENCORE LTD., PACORINI METALS USA, LLC,
PACORINI METALS VLISSINGEN B.V., JPMORGAN CHASE BANK, N.A., GLENCORE
INTERNATIONAL AG, GLENCORE AG, J. ARON & CO. LLC, MITSI HOLDINGS
LLC, ACCESS WORLD (USA) LLC, HENRY BATH & SON LIMITED,

*Defendants-Appellees,*

GLENCORE XSTRATA PLC, GS POWER HOLDINGS LLC, MCEPF METRO I,
INCORPORATED, GOLDMAN SACHS GROUP, INC., PACORINI METALS AG,
LONDON METAL EXCHANGE LIMITED, LONDON METAL EXCHANGE LIMITED,

CERTIFIED COPY ISSUED ON 08/27/2019

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 27 2019

JOHN DOES 1–10, DOES 1–10, INCLUSIVE, UNIDENTIFIED PARTIES, JOHN DOES 1–50,

*Defendants.*

_____

Before:

LEVAL, LYNCH, and DRONEY, *Circuit Judges.*

Appeal by the plaintiffs from a judgment of the United States District Court for the Southern District of New York (Katherine B. Forrest, *J.*), for defendants in three consolidated antitrust actions. The district court granted summary judgment, ruling that this court's decision in *In re Aluminum Warehousing Antitrust Litig.* (*Aluminum III*), 833 F.3d 151 (2d Cir. 2016) compels the conclusion that these plaintiffs, like the plaintiffs in that case, failed to establish antitrust standing. We disagree. The circumstances of these plaintiffs are materially different. In addition, the district court erred in denying Reynolds and Southwire an opportunity to replead on the ground of futility.

The judgment is VACATED and the case REMANDED.

> PATRICK J. COUGHLIN, Robbins Geller Rudman & Dowd LLP, San Diego, CA (Steven F. Hubachek, Carmen A. Medici, *on the brief*), *for Direct Purchaser Plaintiffs-Appellants.*
>
> DEREK BRANDT, Brandt Law LLC, Edwardsville, IL (Walter W. Noss, Stephanie A. Hackett, Scott + Scott, Attorneys at Law, LLP, San Diego, CA, *on the brief*), *for Plaintiffs-Appellants Eastman Kodak Co., AGFA Corp., AGFA Graphics NV, Fujifilm Manufacturing U.S.A., Inc. and Mag Instrument Inc.*

2

Case 16-4339, Document 425, 08/27/2019, 2641379, Page3 of 31

ROBERT J. PALMERSHEIM, Honigman
Miller Schwartz and Cohn LLP,
Chicago, IL (David E. Koropp, Anand C.
Mathew, Matthew G. Mrkonic, *on the
brief*), *for Plaintiffs-Appellants Reynolds
Consumer Products LLC and Southwire Co.
LLC*.

RICHARD C. PEPPERMAN II, Sullivan &
Cromwell LLP, New York, NY (Suhana
S. Han, William H. Wagener, Sullivan &
Cromwell LLP, New York, NY; John M.
Nannes, John H. Lyons, Skadden, Arps,
Slate, Meagher & Flom LLP,
Washington, D.C.; Robert D. Wick,
Henry Liu, John Playforth, Covington &
Burling LLP, Washington, D.C.; Eliot
Lauer, Jacques Semmelman, Curtis,
Mallet-Prevost, Colt & Mosle LLP, New
York, NY, *on the brief*), *for Defendants-
Appellees*.

LEVAL, *Circuit Judge*:

The plaintiffs in three consolidated actions appeal from the grant of

summary judgment by the United States District Court for the Southern

District of New York (Katherine B. Forrest, *J.*) dismissing their complaints.

The complaints allege violations of Section 1 of the Sherman Act, 15 U.S.C. §

1, through a conspiracy to inflate prices in the primary aluminum market. The

term "primary aluminum" is used in the industry to describe aluminum in

the form produced at a smelter or primary aluminum plant, by original

producers, as distinguished from "secondary aluminum," which is

reconstituted aluminum scrap.

I.      Parties

The plaintiffs are manufacturers that use primary aluminum in the

fabrication of their products. The plaintiffs allege that they purchased

primary aluminum for their needs mainly through long-term supply

contracts with aluminum producers. In accordance with industry standards,

the purchase prices provided in their long-term supply contracts included as

a price element the Platts Midwest Premium (hereinafter the "Midwest

Premium"), a figure which, as explained below, is based on the costs

associated with delivery of aluminum.

The plaintiffs in the three actions fall into three categories. In the

district court, these three categories were termed "Individual Plaintiffs"

("IPs"), "First Level Purchasers" ("FLPs"), and Reynolds Consumer Products

LLC and Southwire Company, LLC ("Reynolds/Southwire"). The IPs are

Eastman Kodak Company, Agfa Corporation, Agfa Graphics NV, Fujifilm

Manufacturing U.S.A. Inc., and Mag Instrument Incorporated. The FLPs are

1   Custom Aluminum Products Incorporated, Incorporated, Ampal

2   Incorporated, Extruded Aluminum Corporation, and Claridge Products and

3   Equipment, Inc. While we will at times use the designations "FLP," "IP," and

4   "Reynolds/Southwire" to make procedural distinctions between the three sets

5   of plaintiffs, we perceive no significant substantive difference between their

6   claims for purposes of their contentions in this appeal seeking relief from the

7   grant of summary judgment. All of them purchased primary aluminum at

8   prices that included the Midwest Premium, and all were first in line to pay

9   prices affected by the defendants' alleged inflation of the Midwest Premium.

10  *See* Brief of Appellant AGFA Corporation at 6; Fujifilm Amended Complaint

11  ¶ 32; IPs' Joint Amended Complaint ¶¶ 18, 31–47; Brief of Appellant Ampal

12  at 8; FLPs' Complaint ¶¶ 17, 32–40; Reynolds and Southwire Brief at 10–12;

13  Complaint of Reynolds/Southwire ¶¶ 1–5.

14      There are two categories of defendants: Financial Defendants and

15  Warehousing Defendants. The Financial Defendants are J.P. Morgan Chase &

16  Co., Goldman Sachs & Co., and Glencore Ltd. Each of them trades in primary

17  aluminum and in primary aluminum derivatives, including futures contracts

18  that are linked to the price of primary aluminum on the London Metals

1    Exchange ("LME"), the world's largest non-ferrous metals market. During the

2    relevant time, approximately from 2011 to 2014, each is alleged to have sold

3    primary aluminum in transactions that included the Midwest Premium as an

4    element of the sale price. Each also (directly or indirectly) owned one of the

5    Warehousing Defendants, having purchased them in 2010 during an

6    aluminum glut in the aftermath of the 2008 financial crisis.

7         The Warehousing Defendants are Henry Bath & Son Ltd., Metro

8    International Trade Services, LLC, and Pacorini Metals USA, LLC.  Each of

9    them owns and operates aluminum warehouses certified by the LME, and

10    each of them was owned during the relevant time by one of the Financial

11    Defendants—Henry Bath by J.P. Morgan, Metro by Goldman Sachs, and

12    Pacorini by Glencore.

13         The gist of the allegations is that the Financial Defendants, having

14    acquired large positions in primary aluminum at low prices during the

15    economic downturn following the 2008 market collapse in anticipation of

16    future price increases, conspired with each other and with the Warehousing

17    Defendants to inflate artificially the prices they would realize in the sale of

18    these positions by manipulating the Midwest Premium.

1     The plaintiffs allegedly were harmed by the defendants' manipulation

2  of the Midwest Premium because the manipulation required the plaintiffs to

3  pay artificially inflated prices in their purchases pursuant to their supply

4  contracts with aluminum producers.

5     II.     Procedural History

6     The complaints of these three plaintiff groups were part of a larger

7  group of related actions that were originally filed in various district courts

8  throughout the country and were consolidated for pretrial proceedings by the

9  United States Panel on Multidistrict Litigation before Judge Forrest in the

10 Southern District of New York. The other consolidated actions, brought by

11 groups identified as Commercial End Users and Consumer End Users, also

12 asserted liability based on the defendants' conspiratorial manipulation of the

13 Midwest Premium. Those plaintiffs, however, purchased aluminum

14 otherwise than in the primary aluminum market in which plaintiffs in this

15 case claim to have suffered injury. This court later concluded that those

16 plaintiffs "disavow[ed] participation in any of the markets in which the

17 defendants operate." *In re Aluminum Warehousing Antitrust Litig.* (*Aluminum*

18 *III*), 833 F.3d 151, 161 (2d Cir. 2016).

1        The district court had earlier dismissed the actions of the Commercial

2    End Users and Consumer End Users on the ground that they were inefficient

3    enforcers who did not satisfy the requirements for antitrust standing. The

4    court noted that "[t]here will always be others who are more directly injured .

5    . . ." *In re Aluminum Warehousing Antitrust Litig.* (*Aluminum I*), No. 13-md-2481

6    (KBF), 2014 WL 4277510, at *21, *39. (S.D.N.Y. Aug. 29, 2014).[1] The district

7    court denied them leave to replead. In contrast, the district court granted the

8    FLPs and IPs leave to amend their complaints, finding—at least at first—that

9    their amended complaints stated claims for conspiracy to restrain trade in

10   violation of the Sherman Act. *In re Aluminum Warehousing Antitrust Litig.*

11   (*Aluminum II*), 95 F. Supp. 3d 419, 439–40 (S.D.N.Y. 2015).

12       Meanwhile, the Commercial End Users and Consumer End Users

13   appealed the district court's dismissal of their claims. This court, on that

14   appeal, affirmed the dismissals, also for failure to show antitrust standing,

15   but, as described below, based on an analysis that differed from the district

16   court's rationale. Our court reasoned on appeal that those plaintiffs did not

17   successfully allege antitrust injury because the injuries they alleged were in a

---

[1] In *Aluminum I*, the district court also initially dismissed the complaints of the IPs and the FLPs. *Aluminum* I, 2014 WL 4277510, at *40.

1    different market from any market allegedly restrained by the defendants.

2    *Aluminum III*, 833 F.3d at 161–62 ("Consumers and Commercials disavow

3    participation in any of the markets in defendants operate. . . . Whatever injury

4    Consumers and Commercials suffered, it was not 'inextricably intertwined'

5    with whatever injury the defendants allegedly intended to inflict.'") (citing

6    *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)).

7         On the basis of this court's *Aluminum III* ruling, and following a new

8    joint motion for judgment on the pleadings with respect to the FLPs by all

9    defendants, the district court then reconsidered the FLPs' claims.[2] *See* Notice

10   of Motion for Judgment on the Pleadings, *In re Aluminum Warehousing*

11   *Antitrust Litig.*, No. 1:13-md-02481 ("MDL Docket"), (S.D.N.Y., filed Aug. 17,

12   2019), ECF No. 1049. It concluded that our *Aluminum III* decision compelled

13   the grant of summary judgment to the defendants on the FLPs' claims. *In re*

14   *Aluminum Warehousing Antitrust Litig.* (*Aluminum IV*), No. 13-md-2481 (KBF),

15   2016 WL 5818585, at *8 (S.D.N.Y. Oct. 5, 2016). Although the Defendants had

---

[2] Because the FLPs relied on evidence outside the complaints, the district court converted the defendants' motion to dismiss the complaint under Fed. R. Civ. P. 12(c) to a motion for summary judgment under Fed. R. Civ. P. 56, giving the FLPs and the Defendants notice and opportunity to supplement their submissions. MDL Docket Nos. 1059, 1062.

1    not moved to dismiss the complaints of the IPs or of Reynolds/Southwire, the

2    district court also dismissed their complaints (without their having had notice

3    or opportunity to respond to the motion). *Id.*

4         The IPs and Reynolds/Southwire moved to reopen the ruling on the

5    basis of this lack of notice to them, and the district court granted the request.

6    *See Agfa Corp. v. Goldman Sachs Grp., Inc.* (*Aluminum V*), No. 14-cv-0211, 2016

7    WL 7009031, at *1 n.2 (S.D.N.Y. Nov. 30, 2016). Then, following briefing and

8    oral argument, the court once again dismissed their claims. *Id.* at *6. The FLPs,

9    IPs, and Reynolds/Southwire each then brought this appeal.

10        We disagree with the district court's view that *Aluminum III* compels

11   dismissal of these plaintiffs' claims. The circumstances of these plaintiffs

12   differ materially from those involved in *Aluminum III,* and the rationale of

13   *Aluminum III* does not apply to their complaints. In our view, they have

14   adequately pleaded antitrust injury. We therefore vacate the judgment of

15   dismissal.

16

17

18

BACKGROUND

I.     The Aluminum Market

Ⅰ. 1   According to the plaintiffs' allegations, the LME is the site of a vibrant

market for trading in contracts for the sale of primary aluminum. Such

contracts are settled in a variety of ways, including through cash payments

reflecting the difference between contract price and market price, or by

delivery of a "warrant," which is a document of title entitling the owner to a

specified lot of aluminum in a specified warehouse.

Under the conventions of the industry, the spot metal price for primary

aluminum is composed of two components. The first price component, the

LME Cash Price, represents the current value of the metal, and fluctuates in

accordance with the daily intersection of supply and demand, without

consideration of expenses that would be involved in making delivery to a

purchaser. The second component, the benchmark regional premium, which

in the United States is the Midwest Premium (published daily by a private

company, Platts), reflects the costs associated with making deliveries,

including transportation, insurance, and warehouse storage while awaiting

delivery.

1        Transactions on the LME are primarily among traders, such as the

2   Financial Defendants, who speculate on price movements resulting from

3   changes in supply and demand and have no expectation of ever taking

4   delivery of the metal. Thus, under normal circumstances the aluminum stored

5   in LME warehouses is rarely delivered out. Purchasers of primary aluminum

6   who need access to the physical metal for use in manufacturing generally

7   acquire the product directly from producers, rather than through the LME.

8   Nonetheless, one who has purchased metal through the LME, who is not

9   merely speculating on price movement but requires access to the physical

10  metal, can cancel his warrant and thus cause the purchased lot of aluminum

11  to be earmarked for delivery out of the warehouse. Accordingly, the stock of

12  aluminum stored in LME warehouses can serve as a source of supply of last

13  resort.

14       In the wake of the financial collapse of 2008, when industrial activity

15  drastically slowed, demand for aluminum dropped, resulting in large

16  surpluses and low prices. *Aluminum III*, 833 F.3d at 155. There developed a

17  large supply in the stocks of physical aluminum stored in warehouses.

18  Because traders anticipated that the moribund condition of the market would

1   improve over time, aluminum futures commanded higher prices than

2   contracts for immediate acquisition (a condition known in the commodities

3   markets as a "contango"). The Financial Defendants, seeing opportunities to

4   purchase primary aluminum at low prices in anticipation of future resale at

5   higher prices, acquired substantial aluminum holdings.

6       In addition, in 2010, when the quantity of aluminum being stored in

7   LME warehouses was extremely high, each of the Financial Defendants

8   purchased one of the Warehousing Defendants. Through these purchases, the

9   Financial Defendants came to control 80% of the warehousing capacity of

10  LME warehouses in the United States.

11      Because of the convention to use the Midwest Premium as a price

12  element in sales of primary aluminum, the Financial Defendants allegedly

13  devised a conspiratorial plan to artificially inflate the Midwest Premium,

14  thereby artificially inflating the prices they could realize in later selling off

15  their large aluminum holdings.

16      Working together with the Warehousing Defendants they had recently

17  acquired, the Financial Defendants undertook to inflate the Midwest

18  Premium by artificially lengthening the delays involved in taking delivery

1    from LME warehouses. Their strategies to accomplish this included offering

2    incentives to producers to move even more aluminum into their warehouses;

3    agreeing to treat the minimum load-out rate set by the LME as the maximum

4    rate of load-outs (effectively capping the number of lots that would be loaded

5    out of their warehouses each day); and, most importantly, needlessly

6    canceling their warrants for aluminum they had purchased, causing

7    aluminum to be shuttled back and forth among the Defendant Warehouses.

8    The consequence was to cause long delays between cancellation of a warrant

9    and actual load-out of a covered lot. The plaintiffs allege that in this fashion,

10    the defendants increased delivery delays from about six weeks pre-2011 to

11    nearly two years (approximately 625 days) by 2014. This caused the Midwest

12    Premium to triple, from about 6.45 cents per pound in 2011 to 20 cents per

13    pound by 2014. Accordingly, because the Midwest Premium was a

14    component of the price the Financial Defendants would receive on selling

15    their aluminum holdings, that price increased to the same extent.

16        The plaintiffs acquired the aluminum they needed for their operations

17    primarily by purchase of primary aluminum from aluminum producers

18    pursuant to long-term supply contracts. In accordance with industry

14

1    conventions, those contracts specified the spot metal price, including the

2    Midwest Premium, as the price the plaintiffs would pay for ownership and

3    delivery of each order of primary aluminum—the inclusion of the Midwest

4    Premium as a component serving to compensate the producer–sellers for the

5    costs they incurred in making delivery to the plaintiffs. The effect of the

6    defendants' actions on the plaintiffs was to require them to pay artificially

7    inflated prices for the aluminum they purchased from producers under their

8    supply contracts.

9         The district court concluded that the allegations of the FLPs' complaint

10   suffered from the same defect as the allegations of the End Users in *Aluminum*

11   *III*—to wit, that the anticompetitive conduct alleged by the FLPs occurred in

12   the LME warehousing services market, not the market for primary aluminum,

13   in which the FLPs allegedly suffered injury. *Aluminum IV*, 2016 WL 5818585,

14   at *1–2. The district court recognized that the FLPs were alleging that

15   defendants manipulated the market for primary aluminum, which was the

16   market in which the plaintiffs suffered injury. Nevertheless, it concluded that

17   the alleged manipulation by the defendants occurred "first and foremost" in

18   the market for warehousing services, in which the plaintiffs alleged no injury.

1    *Id.* at \*1. In dismissing the complaints of the IPs and Reynolds and Southwire,

2    the district court found that they relied on the same rejected theory.

3    *Aluminum V*, 2016 WL 7009031, at \*6.

4                                   DISCUSSION

5            In assessing motions by defendants for summary judgment, as well as

6    motions to dismiss complaints for failure to state a claim, it is a court's

7    obligation to view the evidence and interpret the allegations in the light most

8    favorable to the plaintiffs, drawing reasonable inferences in their favor. *See*

9    *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113 (2d Cir.

10   2017); *Fink v. Time Warner Cable*, 714 F.3d 739, 740–41 (2d Cir. 2013). "To

11   survive a motion to dismiss, a complaint must contain sufficient factual

12   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

13   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

14   550 U.S. 544, 570 (2007)). "The same standard applicable to Fed. R. Civ. P.

15   12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for

16   judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d

17   905, 922 (2d Cir. 2010). "We review a district court's grant of summary

18   judgment de novo, 'resolv[ing] all ambiguities and draw[ing] all [reasonable]

1    factual inferences in favor of the party against whom summary judgment is

2    sought.'" *Nick's Garage, Inc.*, 875 F.3d at 113 (quoting *Johnson v. Killian*, 680

3    F.3d 234, 236 (2d Cir. 2012) (per curiam)).[3]

4    I.       Antitrust standing and the need for an antitrust injury

5    Section 1 of the Sherman Act prohibits "[e]very contract, combination

6    in the form of trust or otherwise, or conspiracy, in restraint of trade or

7    commerce . . . ." 15 U.S.C. § 1. Section 4 of the Clayton Act establishes a

8    private right of action for violation of federal antitrust laws, permitting "any

9    person who shall be injured in his business or property by reason of anything

---

[3] Although the district court had converted the defendants' motion for judgment on the pleadings against the FLPs to a motion for summary judgment (because the FLPs referred in their answering papers to factual matters outside the complaint), the district court's opinions dismissing the claims relied primarily on the conclusion that the plaintiffs' theory of antitrust injury was legally deficient—rather than on the inadequacy of the plaintiffs' evidence. "Where . . . the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114 (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)). Having moved against the FLPs for judgment on the pleadings and not for summary judgment (and having made no motion at all against the IPs and Reynolds/Southwire), defendants had not undertaken to demonstrate the satisfaction of either option. In ruling on the plaintiffs' appeal from the district court's grant of summary judgment against them, we, like the district court, will focus on the sufficiency of the plaintiffs' legal theory, rather than on their evidence.

1    forbidden in the antitrust laws" to sue in federal court and to recover treble

2    damages, costs, and attorney's fees. 15 U.S.C. § 15(a); *Gatt Commc'ns, Inc. v.*

3    *PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013). Section 16 of the Clayton Act

4    entitles "[a]ny person, firm, corporation, or association" to sue for injunctive

5    relief "against threatened loss or damage by a violation of the antitrust laws."

6    15 U.S.C. § 26. The Supreme Court has held, however, that a plaintiff seeking

7    to bring such a claim for treble damages or injunctive relief must establish

8    antitrust standing. In *Associated Gen. Contractors*, the Court explained that the

9    purpose of the Clayton Act's private right of action is not "to provide a

10   remedy in damages for all injuries that might conceivably be traced to an

11   antitrust violation," but only for injuries "of the type that the antitrust statute

12   was intended to forestall." *Associated Gen. Contractors*, 459 U.S. at 534, 540. The

13   Supreme Court has similarly instructed that a plaintiff who seeks only

14   injunctive relief under § 16 of the Clayton Act must demonstrate antitrust

15   standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986)

16   ("[U]nder both § 16 and § 4 the plaintiff must still allege an injury of the type

17   the antitrust laws were designed to prevent.").

1      To satisfy the antitrust standing requirement, a private antitrust

2   plaintiff must demonstrate that (1) it has suffered "a special kind of antitrust

3   injury," and (2) it is an "efficient enforcer" of the antitrust laws. *Port Dock &*

4   *Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (internal

5   quotation marks omitted) (citing *Associated Gen. Contractors*, 459 U.S. at 537–

6   45; *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290–91 (2d

7   Cir. 2006)). Here, the only issue on appeal is whether the plaintiffs have

8   suffered an antitrust injury. *See* Appellees' Br. at 37 n.11.

9      "We employ a three-step process for determining whether a plaintiff

10  has sufficiently alleged antitrust injury." *Gatt Commc'ns*, 711 F.3d at 78. "First,

11  the party asserting that it has been injured by an illegal anticompetitive

12  practice must 'identify[] the practice complained of and the reasons such a

13  practice is or might be anticompetitive.'" *Id*. (quoting *Port Dock*, 507 F.3d at

14  122) (alterations in original). Second, we consider how the practice identified

15  by the plaintiff put the plaintiff in a "'worse position.'" *Id*. (quoting *Brunswick*

16  *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977)). "Finally, we

17  'compar[e]' the 'anticompetitive effect of the specific practice at issue' to 'the

19

1    actual injury the plaintiff alleges.'" *Id*. (quoting *Port Dock*, 507 F.3d at 122)

2    (alterations in original).

3           An antitrust injury is commonly suffered by plaintiffs who participate

4    in the defendants' market. The Supreme Court, however, has also found

5    antitrust injury where a plaintiff, though "not an economic actor in the market

6    that had been restrained," nevertheless experiences injuries that are

7    "inextricably intertwined with the injury the conspirators sought to inflict."

8    *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479, 484 (1982).

9    II.     The market allegedly restrained by defendants' anticompetitive
10            conduct
11
12           The plaintiffs allege that the defendants' anticompetitive conspiratorial

13   objective was to raise the prices the Financial Defendants would receive in

14   selling off their stocks of physical aluminum in the primary aluminum market

15   by artificial upward manipulation of the price component consisting of the

16   Midwest Premium.

17          The Reynolds/Southwire complaint, for example, speaks of the

18   defendants' "concerted actions designed to artificially drive up the

19   standardized regional premiums applicable to primary aluminum pricing,"

20   Complaint of Reynolds/Southwire ¶ 7, while the IPs' similarly alleges the

defendants' ability "to sell aluminum in the spot market and charge the

inflated price, including the Platts Midwest Premium." IPs' Joint Amended

Complaint ¶ 17. And the FLPs also allege that defendants engaged in

concerted anticompetitive conduct with the goal of benefiting from an

increased Midwest Premium. FLPs' Complaint ¶¶ 16, 19, 152, 415.

III.    The district court erred in construing *Aluminum III* as compelling
        judgment for the defendants.

In *Aluminum III*, we affirmed the dismissal of the claims of the Consumer

and Commercial End User plaintiffs who purchased either reconstituted

aluminum or end products that contained aluminum. *Aluminum III*, 833 F.3d

at 163. The district court had dismissed these claims without leave to replead

on the theory that, unlike these plaintiffs, the Consumer and Commercial End

Users were so far removed from the defendants' actions that there "would

always be . . . other, more efficient enforcers who can adequately pursue [the]

relief" they sought. *Aluminum I,* 2014 WL 4277510 at *39. Our court affirmed

on the different ground that those plaintiffs could not successfully allege

antitrust *injury* because they were neither participants in the market

restrained by the defendants (the market for warehousing services) nor

claiming an injury "inextricably intertwined" with the objective of the

conspiracy. *Aluminum III*, 833 F.3d at 162–63. Given their remoteness from the

defendants' restraints, their alleged injury was merely "collateral damage." *Id.*

at 163.

Having at first sustained the sufficiency of the claims involved in this

appeal, the district court then reconsidered their viability and ruled that

*Aluminum III* compelled dismissal of their claims as well, because the injury

they suffered occurred in the market for the purchase of primary aluminum

while the market restrained by the defendants was "first and foremost" the

market for aluminum warehousing. *Aluminum IV*, 2016 WL 5818585, at *1, *8–

9.

We disagree. The plaintiffs in these cases allege that the injury they

suffered was in the very market that the defendants restrained. Their

allegations are that the defendants restrained the market for sales of primary

aluminum by artificial manipulation of a number (the Midwest Premium)

that serves as a price component for sales of the metal. The motivation of the

restraint was to enable the Financial Defendants to realize artificially inflated

prices in selling off their positions in primary aluminum. The plaintiffs

suffered harm because the defendants' manipulation of the Midwest

1    Premium (designed to inflate the sale price of defendants' aluminum

2    holdings) raised the prices that plaintiffs paid when they purchased

3    aluminum. The defendants allegedly restrained the market for purchase and

4    sale of primary aluminum, and the market in which the plaintiffs were

5    injured was the market for the purchase and sale of primary aluminum. The

6    observations this court made in *Aluminum III* about the difference in that

7    cases between the market alleged to have been restrained by the defendants,

8    and the market in which the plaintiffs suffered injury, have no application to

9    these complaints.

10        The precedents establish that an injury of the sort alleged in these

11   complaints is an antitrust injury. *See U.S. v. Socony-Vacuum Oil Co.*, 310 U.S.

12   150, 221 (1940) ("Any combination which tampers with price structures is

13   engaged in an unlawful activity."); *Gelboim v. Bank of America Corp.*, 823 F.3d

14   759, 771–72 (2d Cir. 2016) ("[T]he fixing of a component of price violates the

15   antitrust laws. . . . Generally, when consumers, because of a conspiracy, must

16   pay prices that no longer reflect ordinary market conditions, they suffer

17   injury of the type of the antitrust laws were intended to prevent and that

18   flows from that which makes defendants' acts unlawful." (internal quotation

1  marks omitted)); *U.S. v. Apple, Inc.*, 791 F.3d 290, 328 (2d Cir. 2015) ("[A]ny

2  conspiracy formed for the purpose and with the effect of raising, depressing,

3  fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se,

4  and the precise machinery employed . . . is immaterial." (internal quotation

5  marks omitted)).

6      It appears that the district court's grant of summary judgment was

7  based on a misreading of these plaintiffs' complaints. We disagree with its

8  conclusion that these plaintiffs failed to allege antitrust standing on the

9  ground that the defendants' restraints occurred in the warehousing market,

10  which was not the market in which the plaintiffs suffered injury. The

11  plaintiffs satisfied the requirements by pleading that the defendants

12  restrained the market for the sale of primary aluminum, and that the plaintiffs

13  were injured in making purchases in the market for the sale of primary

14  aluminum. Unlike the plaintiffs in *Aluminum III*, whose injury was an

15  "incidental byproduct" of the defendants' alleged violation, *see Aluminum III*,

16  833 F.3d at 162, these plaintiffs' injuries were a direct result of the defendants'

17  anticompetitive conduct. Because the defendants manipulated the Midwest

18  Premium, the plaintiffs were forced to pay a higher Midwest Premium.

1    Apparently recognizing that *Aluminum III*'s explanation of the

2    justification for the dismissal of those cases does not really fit the allegations

3    of these plaintiffs, the district court explained further that the difference was

4    irrelevant because the defendants' alleged inflation of a price element of

5    primary aluminum was accomplished "first and foremost" by inflicting a

6    restraint on the warehousing market. *Aluminum IV*, 2016 WL 5818585, at *1.

7    We disagree. The district court was perhaps correct as to "first," in a temporal

8    sense, but not as to "foremost."

9    The price manipulation that motivated the defendants was indeed,

10   according to the allegations, accomplished by *first* artificially causing a

11   bottleneck and a delay in warehouse deliveries, resulting in extended

12   warehousing and inflation in the costs of taking delivery from LME

13   warehouses. But the defendants' alleged anticompetitive purpose was not to

14   add delays and costs to warehouse customers demanding delivery of their

15   stock. The purpose was to inflate the prices of the metal, so that the

16   defendants' large stocks of aluminum would be re-sold at artificially inflated

17   prices because of their inflation of the Midwest Premium. The burden

18   inflicted by the defendants on the warehousing market was merely the means

1   to accomplish the defendants' anticompetitive objective. There is no rule in

2   antitrust law that defendants who undertake to restrain markets by concerted

3   anticompetitive actions can be liable to victims in only one market, much less

4   that they can be liable only in the market that is the first locus of restraint,

5   regardless of the identity of the market that motivated the restraint.

6         Furthermore, the district court's proposition that the defendants'

7   anticompetitive restraint occurred "foremost" in the warehousing market was

8   inconsistent with the pleadings and evidence. The main benefits the

9   defendants would derive *from the warehousing market* as a consequence of their

10  restraint would be the increased storage costs the Warehousing Defendants

11  would charge to customers who canceled warrants and demanded deliveries.

12  There was no basis to conclude that the benefit to the Warehousing

13  Defendants from such increased storage charges equaled, much less

14  exceeded, the benefits realized by the Financial Defendants in selling their

15  long positions at prices reflecting a Midwest Premium component that

16  exceeded the Midwest Premium at the time of their purchase. The allegations

17  and evidence suggested that LME warehouses are primarily used by traders

18  who do not demand delivery, so that the stocks held in the LME warehouses

1   rarely move out. *See* Summary Public Report of the LME Warehousing

2   Consultation, MDL Docket, ECF No. 459, at 12 ("On the LME, the vast

3   majority of contracts settle by offset (only 1.2% of trades in Jan-Sept 2013

4   settled by physical delivery) – most customers crystalizing their profits/losses

5   in a cash form."). Accordingly, the Financial Defendants' practice of

6   arbitrarily canceling warrants—which was significant enough to help drive

7   the Midwest Premium from \$0.06/pound to \$0.20/pound—may mean that the

8   Financial Defendants themselves were the LME warehouse customers who

9   suffered the most injury from increased delivery costs. We disagree with the

10  district court's conclusion that the plaintiffs suffered no antitrust injury

11  because the defendants' restraint was "foremost" to the warehousing market,

12  while the injury experienced by the plaintiffs was in the market for the

13  purchase and sale of aluminum.

14      In concluding that the defendants' restraint was foremost to the

15  warehousing market, the district court construed the complaints and the

16  evidence in the light least favorable to the plaintiffs. The complaints asserted

17  that the defendants' objective was to restrain the market for the purchase and

18  sale of aluminum by inflating the prices the defendants would realize in their

1   sales by reason of the inclusion of the inflated Midwest Premium as a price

2   element. Evidence adduced by the plaintiffs supported their contention that

3   the defendants' conspiratorial acts inflated a component of the price of

4   primary aluminum. For example, Metro CEO Chris Wibbelman stated in a

5   2010 email that "physical traders in conjunction with banks and producers

6   hold [aluminum] stock . . . in order to squeeze up the premiums."  Joint

7   App'x at 1192. An email from Glencore's global head of aluminum, Peter

8   Waszkis, described the strategy to get a "critical mass" of aluminum into a

9   particular warehouse and observed that "[t]he bottleneck effect" there would

10   "support premiums." *Id*. at 909. An email from Pacorini's CEO, Mario

11   Casciano, posited that "traders keep the bottleneck tight to inflate the

12   premium."[4] *Id*. at 951.

---

[4] Additional evidence underscores the extent to which maximizing profits from premiums was central to the defendants' business strategy. For example, an internal overview of J.P. Morgan's physical trading business states: "Physical Trading is driven by anticipation of market structures. Buy metal for low premiums in times of over-supply. Sell metal for high premiums in times of scarcity." *Id*. at 891. Scott Evans, a Goldman Sachs trader, said in his deposition that "the key to valuing [a] trade from a mark-to-market perspective is really the premium . . ." *id*. at 830, and that "the money you earn as a trader is primarily earned around the premium, being able to organize logistics, deliveries to customers, financing for those customers at an amount less than the premium rebates to you." *Id*. at 479. And Patrick Wilson, a Glencore trader, explained at his deposition that "the idea was always to try and buy at a cheaper premium than the premium you sell at. So once you purchase the aluminum at whatever premium it is, taking into account the cost

1    In short, we conclude that the district court erred in its grant of

2    summary judgment.

3    IV.    The denial of leave to Reynolds and Southwire to amend their
4           complaint on grounds of futility was error.
5
6    Reynolds and Southwire filed their complaint on July 26, 2016, after the

7    other plaintiffs had substantially completed discovery and after this court had

8    decided *Aluminum III*. *See* Reynolds/Southwire Complaint, *Reynolds Consumer*

9    *Prods. LLC et al v. Glencore AG et* al, 1:16-cv-05955 (S.D.N.Y., filed July 26,

10   2016), ECF No. 1; Joint Scheduling Order, MDL Docket (S.D.N.Y., filed June

11   13, 2016), ECF No. 990 (noting that, with limited exceptions, "fact discovery . .

12   . closed on May 13, 2016"). The defendants neither answered Reynolds and

13   Southwire's complaint nor moved to dismiss it. After ordering summary

14   judgment of dismissal of the Reynolds/Southwire complaint, the district court

15   denied the plaintiffs' motion for leave to amend on the ground that

16   amendment would be futile.  *Aluminum V,* 2016 WL 7009031, at *6.

---

associated with moving that from A to B, the payment–the financing costs, any sort
of insurance costs, you would try and sell it for a premium that would make all that
money back and give you a margin as well." *Id*. at 434.

1          A party is entitled to amend its complaint once as a matter of course.

2    Fed. R. Civ. P. 15(a)(1)(B). Though leave to amend "[g]enerally . . . should be

3    freely given," *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014), a district court

4    has discretion to deny it "for good reason, including futility, bad faith, undue

5    delay, or undue prejudice to the opposing party." *McCarthy v. Dun &*

6    *Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "When the denial of leave to

7    amend is based on a determination that amendment would be futile, a

8    reviewing court conducts a *de novo* review." *Nielsen*, 746 F.3d at 62 (quoting

9    *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (internal

10   ellipses omitted).

11         As explained above, the district court's grant of summary judgment

12   was based on an erroneous view of the applicability of the reasoning of

13   *Aluminum III.*  The court's conclusion that amendment of the complaint

14   would be futile was based on the same reasoning. Accordingly, we vacate the

15   denial of leave to amend. If on remand the Reynolds/Southwire plaintiffs

16   move again to file an amended complaint, the district court should consider

17   the motion on its merits, based on standards not inconsistent with this

18   opinion.

1                                    CONCLUSION

2            The district court's grant of summary judgment dismissing the

3    complaints is VACATED. The case is REMANDED for further proceedings

4    not inconsistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

31