**Robbins Geller
Rudman & Dowd LLP**

| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

October 4, 2019

VIA ECF

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

> Re:   *In re Aluminum Warehousing Antitrust Litig.*,
>        No. 13-MD-2481 (PAE) (S.D.N.Y.)

Dear Judge Engelmayer:

The parties respectfully submit this joint letter in response to the Court's September 16, 2019 Order.  Dkt. No. 1142.

## I.    Nature of the Claims and the Principal Defenses Thereto

### A.    Plaintiffs' Description of Their Claims

Plaintiffs assert a violation of §1 of the Sherman Act, 15 U.S.C. §1.  In reversing the District Court's October 6, 2016 Order, the Second Circuit recently summarized the "gist" of these actions in *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 89 (2d Cir. 2019) ("*Aluminum VI*").  In sum, Plaintiffs contend that Defendants fixed a component price of primary physical aluminum – regional premiums such as the Midwest Premium – by restricting the supply of primary aluminum in warehouses owned by Defendants.  Defendants' conduct in manipulating the Midwest Premium increased the overall price Plaintiffs paid for primary aluminum.  *Id.* at 89, 92.[1]

---

[1]   The Individual Plaintiffs ("IPs" further identified below) allege that in executing their scheme, Defendants also fixed other regional premiums that applied to certain of the IPs' aluminum purchases.  *See, e.g., Fujifilm Manufacturing U.S.A. Inc. v. Goldman Sachs & Co.*, No. 1:15-cv-08307 (KBF), Dkt. No. 35 (Amended Complaint), ¶2.  ("Defendants conspired to manipulate the spot price of physically delivered aluminum, particularly the components of that price that reflect so-called "regional premiums," such as the Platts Midwest Premium and the Rotterdam (or European Community) Premium by restricting supply of aluminum immediately available for

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 2

Plaintiffs are manufacturers that use primary aluminum to fabricate various aluminum products. Primary aluminum (as distinct from "secondary" recycled aluminum) is the form of aluminum produced by aluminum smelters from alumina refined from bauxite ore. The Second Circuit expressly found that Plaintiffs had plausibly alleged and supported their allegations that they "suffered harm because the defendants' manipulation of the Midwest Premium (designed to inflate the sale price of defendants' aluminum holdings) raised the prices that plaintiffs paid when they purchased aluminum." *Id.* at 95.

There are two categories of defendants: Financial Defendants and Warehousing Defendants. The Financial Defendants are JPMorgan Securities plc, Goldman Sachs & Co., LLC, and Glencore Ltd. Each of them traded in primary aluminum and in primary aluminum derivatives, including futures contracts that are linked to the price of primary aluminum on the London Metal Exchange ("LME"), the world's largest non-ferrous metals market. During the Relevant Period, February 2010 to March 2016, each sold primary aluminum in transactions that included the Midwest Premium as an element of the sale price. Each also owned one of the Warehousing Defendants, having purchased them in 2010 during an aluminum glut in the aftermath of the 2008 financial crisis. *See id.* at 92, 97 n.4.

The Warehousing Defendants are Henry Bath LLC, Metro International Trade Services, LLC and Pacorini Metals USA, LLC. Each of them owned and operated aluminum warehouses certified by the LME, and each of them was owned during the Relevant Period by one of the Financial Defendants, Henry Bath by JPMorgan, Metro by Goldman Sachs, and Pacorini by Glencore. *Id.* at 89. Thus, it was the three Financial Defendants calling the shots during the Relevant Period.

As the Second Circuit summarized: "The gist of the allegations is that the Financial Defendants, having acquired large positions in primary aluminum at low prices during the economic downturn following the 2008 market collapse in anticipation of future price increases, conspired with each other and with the Warehousing Defendants to inflate artificially the prices they would realize in the sale of these positions by manipulating the Midwest Premium." *See id.* at 89. This caused Plaintiffs to sustain the antitrust injury of paying inflated prices on their purchases of primary aluminum because the Midwest Premium was an important component of the prices paid by Plaintiffs. *See id.* at 92, 95.

The LME is the trading site for contracts in the sale of primary aluminum. Such contracts are settled in a variety of ways, including through cash payments reflecting the difference between

delivery from key London Metal Exchange ("LME")-certified warehouse locations controlled by them.").

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 3

contract price and market price, or by delivery of a "warrant," which is a document of title entitling the owner to a specified lot of aluminum in a specified warehouse.[2]

Under the conventions of the industry, the spot metal price for primary aluminum is composed of two components. The first price component, the LME Cash Price, represents the current value of the metal, and fluctuates in accordance with the daily intersection of supply and demand, without consideration of expenses that would be involved in making delivery to a purchaser. The second component, the benchmark regional premium, which in the United States is the Midwest Premium, reflects the costs associated with making deliveries, including transportation, insurance, and warehouse storage while awaiting delivery. *See Aluminum VI*, 936 F.3d at 91.

Transactions on the LME are primarily among traders, such as the Financial Defendants, who speculate on price movements resulting from changes in supply and demand and have no expectation of ever taking delivery of the metal. Thus, under normal circumstances the aluminum stored in LME warehouses is rarely delivered out. Purchasers of primary aluminum who need access to the physical metal for use in manufacturing generally acquire the product directly from producers, rather than through the LME. Nonetheless, one who has purchased metal through the LME, who is not merely speculating on price movement, but requires access to the physical metal, can cancel his warrant and thus cause the purchased lot of aluminum to be earmarked for delivery out of the warehouse. Accordingly, the stock of aluminum stored in LME warehouses does serve as a potential source of supply in the primary aluminum market. *See id*. at 91.

In the wake of the financial collapse of 2008, when industrial activity drastically slowed, demand for aluminum dropped, resulting in large surpluses and low prices. There developed a large supply in the stocks of physical aluminum stored in warehouses. Because traders anticipated that the condition of the market would improve over time, aluminum futures commanded higher prices than contracts for immediate acquisition (a condition known in the commodities markets as a "contango"). The Financial Defendants, seeing opportunities to purchase primary aluminum at low prices in anticipation of future resale at higher prices,[3] acquired substantial aluminum holdings.

---

[2]   For a more detailed discussion of the aluminum market during the Relevant Period, *see* The Senate Report of the United States Senate Permanent Subcommittee on Investigations, *Wall Street Bank Involvement with Physical Commodities* (Nov. 20 and 21, 2014) ("Senate Report").

[3]   In addition to profiting from an increase in the price of physical aluminum, the Financial Defendants, through their traders, were able to isolate the Midwest Premium (and benefit from its increase) with transactions in the futures market. *See id*. at 97 n.4. This meant that any increase in the Midwest Premium was pure profit to Defendants when they were trading the premium.

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 4

*Id.* at 91, 92.   Thereafter each of the Financial Defendants purchased one of the Warehousing Defendants.   Through these purchases, the Financial Defendants came to control 80% of the warehousing capacity of LME warehouses in the United States.  *Id.* at 92.

Because of the convention to use regional premiums, such as the Midwest Premium, as a component in the price of primary aluminum, the Financial Defendants were able to execute a scheme to artificially inflate the Midwest Premium, thereby artificially inflating the prices they could realize in later selling off their extraordinary large aluminum holdings, and profit from their futures positions.   Working together with the Warehousing Defendants they had recently acquired, the Financial Defendants conspired to inflate the Midwest Premium by artificially lengthening the delays involved in taking delivery from LME warehouses. *Id.* at 91-92.[4]  This scheme prominently included the conduct that came to be known as the "merry-go-round of metal" following a front page article in *The New York Times*[5] disclosing the practice and raising concerns about the integrity of the aluminum market.   Defendants' strategies to accomplish this involved numerous steps including the following: Defendants offered incentives to producers and each other to move even more aluminum into their warehouses in order to create a critical mass of aluminum at key chokepoints.   Defendants agreed to treat the minimum load-out rate set by the LME as the maximum rate of load-outs (effectively capping the number of lots that would be loaded out of their warehouses each day).   Most importantly, Defendants arranged and participated in needless cancellations of warrants for aluminum in their warehouses.  *Aluminum VI*, 936 F.3d at 92. Although the cancellations caused the aluminum to move into the load-out queue, the aluminum

---

[4]   Neither Defendants nor the LME disputed that the long queues adversely impacted the Midwest Premium.   However, they asserted that the "'effect of the queues is to increase this premium as a proportion of the "all-in" free metal price.'"  Dkt. No. 1013 at 13.   Prior to this litigation no market participant had argued that the LME price and the Midwest Premium were inversely related.  *See* Senate Report, Exs. 76, 78, 79.   In any event and contrary to Defendants' suggestion, the LME, far from being an independent organization, was under heavy influence by Defendants.   In addition to owning a portion of the LME for a period of time, in 2013, JPMorgan was appointed a member of a key advisory group that dealt directly with the LME Board. Senate Report at 315.   Another JPMorgan-affiliated entity was a "Category 1 ring-dealing member" and had special trading status on the LME floor.  *Id.* at 316.   And a former Goldman partner, who presided over the formation and management of the physical-metals trading desk, had been on the LME Board since 2009.

[5]   David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, N.Y. Times, July 20, 2013,       https://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html; *see also* Senate Report at 205-206.

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 5

was not made available to primary aluminum purchasers, but was "merry-go-round[ed]" back into Defendants' warehouses.

These activities were not unilateral activities undertaken separately. Defendants stored, cancelled and exchanged aluminum in and with competitor Defendants. As Defendants themselves (in the CEO of Metro's own words) described how they worked together: "physical traders in conjunction with banks and producers hold [aluminum] stock [and withhold metal sales to consumers] in order to squeeze up the premiums." *Id.* at 96. The Warehousing Defendants, working in tight connection with their Financial-Defendant-owners, even went so far as to store metal at competing warehouses (and paying rent to those competitors) and coordinate load-out requests in order to build queues. *See* Senate Report at 202-03. As detailed in the Senate Report, both JPMorgan and Glencore, despite owning their own warehouses, joined Goldman Sachs in storing metal at Goldman's Metro Detroit Warehouse and then canceling warrants for that metal increasing the queue and thus the Midwest Premium. *Id.* at 190-91.[6]

The consequences were precisely those contemplated by Defendants: the time it took to load-out aluminum from their LME warehouses increased from approximately six weeks in 2011 to nearly two years (approximately 625 days) by 2014. *Id.* at 91-92. These unprecedented delays in loadouts effectively rendered the large supplies of aluminum in the LME warehouses unavailable for commercial use in the primary aluminum market. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220, 224 (1940) (agreed-upon supply constraints by horizontal competitors in order to drive up price have long been deemed per se violations of the antitrust laws). And such unprecedented delays did in fact cause corresponding increases in the Midwest Premium (which more than tripled during this same time period), thereby increasing the price of aluminum to Plaintiffs as well as prospective profits for the Financial Defendants. *See Aluminum VI*, 936 F.3d at 96, 97.

Plaintiffs acquired the aluminum they needed for their operations mainly by purchase of primary aluminum from aluminum producers pursuant to long-term supply contracts.[7]     In

---

[6]    JPMorgan and Glencore engineered a similar scheme in Europe in which JPMorgan acquired a massive amount of aluminum, 860,000 tons (about 80% of annual U.S. production), in Glencore's Pacorini Vlissingen warehouse and then cancelled the warrants for that metal. Senate Report at n.2470. As the Second Circuit noted citing Glencore's global head of aluminum, the strategy was to get a critical mass of aluminum in a particular warehouse so that the cancellations would create a bottleneck effect to support the premiums. *Aluminum VI* at 96.

[7]    Several of the large primary purchasers of aluminum purchased directly, at the inflated price, from Defendants.

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 6

accordance with industry conventions, those contracts specified the spot metal price, including the Midwest Premium, as the price Plaintiffs would pay for ownership and delivery of each order of primary aluminum.  The effect of Defendants' actions on Plaintiffs was to require Plaintiffs to pay artificially inflated prices for the aluminum they purchased from producers.  *Id.* at 92, 95.

Collusion to manipulate a price – even if only a component of a larger price – is a violation of the antitrust laws.  *See, e.g., Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("the fixing of a component of price violates the antitrust laws").  Thus, if Plaintiffs prove that Defendants colluded to "'squeeze up the [Midwest] premium,'" they will have proven a violation of the antitrust laws.  *Aluminum VI*, 936 F.3d at 97.  The judicially recognized antitrust injury (*i.e.,* impact) from that violation is the payment of the collusively imposed price, in this case, the Midwest Premium.[8]  *Id*. at 95-97.

## B.      Defendants' Description of Their Principal Defenses to Plaintiffs' Claims

Judge Forrest and the Second Circuit each issued two opinions describing the allegations in these cases.[9]  Defendants provide a brief high-level factual overview below.

During the Great Recession that followed the 2008 financial crisis, a sharp drop in demand for aluminum led to a massive global surplus.  Although the economy began to recover in 2010, aluminum production continued to outpace consumption each year, resulting in a substantial over-supply and causing millions of tons of aluminum to flow into warehouses for storage.  Smelters sold surplus aluminum to traders and other financial buyers, which typically stored the aluminum in warehouses in the hopes of later selling it at a profit.

"In general, there are two types of warehouses that stockpile aluminum:  those that are affiliated with the London Metal Exchange . . . and those that are not."  *Aluminum III*, 833 F.3d at

---

[8]      Agreements among horizontal competitors to restrain the supply of a commodity are economically equivalent to horizontal price-fixing agreements.  *See id*. at 95, 96 (citing *United States v. Apple, Inc.*, 791 F.3d 290, 328 (2d Cir. 2015)) ("[A]ny conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se,' and the precise 'machinery employed . . . is immaterial.'").

[9]      *See In re Aluminum Warehousing Antitrust Litig.*, 2014 U.S. Dist. LEXIS 121435 (S.D.N.Y. Aug 29, 2014) ("*Aluminum I*"); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ("*Aluminum II*"); *In re Aluminum Warehousing Antitrust Litig*., 833 F.3d 151 (2d Cir. 2015) ("*Aluminum III*"); *Eastman Kodak Co. v. Henry Bath LLC*, 935 F.3d 86 (2d Cir. 2019) ("*Aluminum VI*").

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 7

154.  Aluminum stored in LME warehouses is used to support the trading of aluminum futures on the LME.  An LME futures contract requires the seller to deliver metal to the buyer on a specified date.  Aluminum futures can be "settled" by delivering a "warrant" associated with a specific lot of aluminum stored in an LME warehouse.  The seller decides which warrant to deliver and typically chooses to deliver the least valuable warrant.

A holder of an LME warrant can take delivery of the physical aluminum by "canceling" the warrant and instructing the LME warehouse operator to "load out the metal for pick up from its loading docks."  *Id*. at 155.  Assuming that there are sufficient warrant cancellations, the LME mandates that warehouse operators load out a minimum quantity of aluminum each day (*e.g*., 1,500 metric tons per day).  If the volume of warrant cancellations exceeds an LME warehouse's chosen load-out rate, a delivery "queue" forms, and the metal is loaded out over time based on the order in which the warrants were canceled.  *See id*. at 155-56.

During the Great Recession, large quantities of surplus aluminum flowed into the LME warehouses operated by Defendant Metro in Detroit, which is the most convenient point of entry to the United States for primary aluminum produced in Canada.  Defendant Goldman Sachs later acquired Metro in February 2010.  The aluminum stored in Metro's Detroit warehouses was owned by banks and other trading firms.  When warrant cancellations at Metro's Detroit warehouses exceeded Metro's load-out rate – the minimum rate required by LME rules – a substantial delivery queue formed at Metro's Detroit warehouses.

Defendants strenuously deny the existence of any conspiracy.  All of the alleged conduct challenged by Plaintiffs was independent, profit-seeking conduct, principally by a single Defendant – Metro.  Metro's offering of incentive payments to its customers as an inducement to store their aluminum in its Detroit warehouses – in effect, upfront rent rebates – involved vertical conduct by a single firm and was a procompetitive form of price discounting.  As Judge Forrest stated, incentive payments "are, on their face, perfectly consistent with the warehouses acting in their economic self-interest."  *Aluminum I*, 2014 U.S. Dist. LEXIS, at *117.  Similarly, Metro's loading out of aluminum from its Detroit warehouses at the minimum rate required by the LME and no faster was single-firm conduct consistent with Metro's economic self-interest.  As Judge Forrest observed, warehouses are "in the business of collecting rent for storage; and the longer the storage, the higher the rent.  In this sense it would be in [each warehouse's] economic self-interest to turn a minimum load-out rule into a maximum . . . ." *Id*. at *116.  Metro's transactions with certain of its customers whose aluminum was loaded out of one of its Detroit warehouses and moved into another warehouse in exchange for an incentive payment likewise constituted single-firm or vertical conduct, which related only to a fraction of the aluminum stored in Metro's Detroit warehouses.  Finally, the Financial Defendants' warrant cancellations also involved either unilateral or vertical conduct.  Like every other bank and hedge fund that held warrants for aluminum stored in Detroit,

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 8

the Financial Defendants cancelled their warrants to take advantage of an "arbitrage opportunity, on which it was in each's individual economic self-interest to capitalize." *Id.* Such warrant cancellations were procompetitive because they resulted in more aluminum being loaded out of Metro's Detroit warehouses and thus ameliorated any supposed supply restraint.

Defendants further note that, contrary to the impression created by Plaintiffs' description of their claims, each Defendant followed its own distinct course of conduct for its own independent reasons. For example, Metro is the only Defendant that ever had a significant aluminum queue in the United States; JPMorgan's former Henry Bath warehouse subsidiary never had a significant delivery queue at any time anywhere in the world; JPMorgan never moved any aluminum into Metro's Detroit warehouses (and in fact moved significant course of volumes of aluminum *out of* those warehouses); Goldman Sachs and JPMorgan never entered into any so-called "merry-go-round" transactions with Metro; Glencore simply engaged in certain rational and profitable aluminum transactions consistent with its position in global metals markets; and Plaintiffs do not even allege that Pacorini had any queues in Detroit. Moreover, numerous market participants, including many members of the proposed class, engaged in the same types of unilateral and vertical conduct that allegedly was undertaken by Defendants (*e.g.*, warrant cancellations, holding large quantities of aluminum in cash-and-carry trades, offering or accepting incentive payments in exchange for depositing aluminum at a warehouse).

Defendants also strenuously deny that any of the challenged conduct inflated the all-in price of primary aluminum. Plaintiffs assert that the price they paid for primary aluminum under their supply contracts with smelters included two floating price terms: (i) the "LME price" for aluminum, plus (ii) a "regional premium." The LME price is the settlement price of an LME futures contract. Sellers of LME futures contracts are free to use any warrant they choose to settle their futures contracts, and as a result, the LME price generally reflects the value of the least valuable warrants in the LME warehouse system. The "regional premium" is simply the difference between the all-in price of aluminum in a given region and the LME price. In North America, the applicable regional premium is the Midwest Premium published by Platts. Platts calculates the Midwest Premium by (i) estimating the all-in price for aluminum based on a survey of spot-market participants, and (ii) subtracting the LME price from the estimated all-in price.

In November 2013, the LME published a report that concluded that load-out queues at LME warehouses have no effect on the all-in price that purchasers pay for primary aluminum, but that queues do affect the apportionment of the all-in price as between the LME price and regional premiums.[10] According to that report, "the impact of queues . . . has been not to change the

---

[10]   *See* Dkt. No. 384 (Summary Public Report of the LME Warehousing Consultation (No. 2013))

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 9

absolute price of metal, *but rather to depress the LME price relative to the absolute price*, and consequently to increase the contribution of the premium to the absolute price."[11]   The LME report explains that load-out queues depressed the LME price of aluminum because LME futures during the relevant time period were settled with warrants for metal stored in the warehouses with the longest queues because those were the least valuable warrants at the time.  This caused the LME price to reflect the value of those queue-encumbered warrants:

> [T]he effect of queues is to create a discount between the free market price of metal, and the value of an LME warrant in a warehouse with queues.  By extension, this causes the LME price to trade at a discount to the free metal price.  This is then observed by the market as the free market price of metal trading at a premium to the reported LME price.  Although there will always be a premium due to the "in-warehouse" nature of the LME contract . . . , the effect of the queues is to increase this premium as a proportion of the "all-in" free metal price.[12]

Judge Forrest also expressly rejected the notion that Plaintiffs had alleged price fixing: "Plaintiffs do not allege that defendants have fixed a particular spot price for aluminum – but rather that they have taken a variety of actions that have caused the Midwest Premium to increase." *Aluminum II*, 95 F. Supp. 3d at 431; *see also id*. at 434 ("[T]his conspiracy was not a traditional 'price fix' – no price was fixed.").  As the Judge Forrest explained, Plaintiffs do not allege that Defendants agreed "to fix the price of aluminum at a supra-competitive level or to fix the Midwest Premium at a particular level."  *Id*. at 435.  Instead, Defendants allegedly engaged in conduct that created lengthy load-out queue at Metro's Detroit warehouses and that indirectly affected the Midwest Premium.

For these and other reasons, Defendants deny all liability on Plaintiffs' claims and oppose class certification in the putative class action.  Defendants' anticipated defenses include:

- First, there was no unlawful agreement among Defendants to lengthen the load-out queue at Metro's Detroit warehouses or otherwise to restrain the supply of primary aluminum. Instead, each Defendant engaged in its own distinct unilateral course of conduct, and numerous members of the proposed class engaged in the same types of lawful and profitable market conduct in which Defendants allegedly engaged.

---

[11]   *Id.* at 43 (emphasis added).

[12]   *Id.* at 5.

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 10

- Second, Plaintiffs cannot prove the elements of a rule-of-reason claim, which Judge Forrest held was "highly likely" to apply to Plaintiffs' allegations "involving both horizontal as well as vertical conduct." *Aluminum II*, 95 F. Supp. 3d at 448; *see also id.* at 449 (rule of reason "highly likely" to apply here because cases involve vertical and horizontal conduct in multiple markets and is "not of the type which the antitrust laws have routinely dealt with").

- Third, the aluminum delivery queue at Metro's Detroit warehouses did not inflate the all-in price of primary aluminum because any alleged increase in the Midwest Premium was offset by a corresponding decrease in the LME price.

- Fourth, Plaintiffs do not have antitrust standing for purchases of recycled or fabricated aluminum under the Second Circuit's *Aluminum III* decision, and have standing at most for purchases of aluminum from an alleged co-conspirator – *i.e.*, one of the Defendants – which would eliminate or substantially narrow these actions.

- Fifth, Plaintiffs cannot assert antitrust claims based on foreign purchases of aluminum under the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §6a.

- Sixth, a class cannot be certified under Rule 23 because (i) Plaintiffs have no common means of proving class-wide antitrust impact and thus individual issues predominate, (ii) the proposed class members are not ascertainable, (iii) intra-class conflicts preclude class certification, (iv) a class action is not a superior method of adjudication, (v) damages cannot be awarded on an aggregated basis, and (vi) the proposed class definition is overbroad in several important respects. *See* Dkt. No. 1013.

## II.   The Parties

### A.   Plaintiffs

The class-action Plaintiffs are referred to as the "First Level Purchaser" or "FLPs." The four named Plaintiffs are: (i) Ampal, Inc.; (ii) Custom Aluminum Products, Inc.; (iii) Claridge Products and Equipment, Inc.; and (iv) Extruded Aluminum Corporation. The named Plaintiffs allege that they made "first-level" purchases of primary aluminum (*i.e.*, were the first to pay the inflated price) from aluminum smelters (and, in the case of one named Plaintiff, from one of the Defendants) and seek to represent a class of FLPs of primary aluminum between February 2010 and March 2016.[13]

---

[13]   The proposed class definition is: "All persons who from February 2010 to March 25, 2016 made a first level purchase of a primary aluminum product with a price term based, in any part, on

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 11

The "Individual Plaintiffs" or "IPs" are four companies or groups of companies that purchased primary aluminum and brought their own individual actions:  (i) Agfa Corporation and Agfa Graphics, N.V. ("Agfa"); (ii) Mag Instrument, Inc. ("Mag"); (iii) Eastman Kodak Company ("Kodak"); and (iv) Fujifilm Manufacturing U.S.A., Inc. ("Fujifilm").

Two additional primary aluminum purchasers, Reynolds Consumer Products LLC ("Reynolds") and Southwire Company, LLC ("Southwire"), later brought their own individual action in July 2016.

**B.     Defendants**

Defendants consist of three groups of trading firms and (at relevant times) their affiliated LME warehouse operators:  (i) Goldman Sachs and its former warehousing affiliate Metro; (ii) Glencore Ltd. and its warehousing affiliate Access World USA (f/k/a Pacorini Metals USA); and (iii) JPMorgan and its former warehousing affiliate Henry Bath.

**III.   Counsel for Each Party**

The court-appointed interim co-lead counsel for the FLPs are:  (i) Patrick Coughlin of Robbins Geller Rudman & Dowd LLP; (ii) Linda Nussbaum of Nussbaum Law Group, P.C.; and (iii) Christopher Lovell of Lovell Stewart Halebian Jacobson LLP.  Dkt. Nos. 216, 780.

The IPs are represented by: (i) Walter Noss of Scott + Scott; (ii) Derek Brandt of McCune Wright Arevalo, LLP; (iii) Allan Steyer of Steyer Lowenthal Boodrookas Alvarez & Smith, LLP; and (iv) Todd Schneider of Schneider Wallace Cottrell Konecky Wotkyns LLP.

Reynolds and Southwire are represented by: (i) Robert Palmersheim and Anand Mathew of Palmersheim & Mathew LLP; and (ii) Matthew Mrkonic of Honigman LLP.

---

the Midwest Transaction Price, the Platts Metals Week US Transaction Price or other 'all in' price used in the United States, or the Midwest Premium, the Platts MW Premium or similar terminology or other regional premium used in the U.S., including, but not limited to, an averaging over a period of days of any such premium or adjusting for a grade or type of primary aluminum product. Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.  As used in this definition, 'primary aluminum product' means T-bar, sow, standard ingot, foundry alloy T-bar or ingot, extrusion billet, slabs, sheet ingot, molten metal, or rod."  Dkt. No. 1040 at 6.

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 12

The Goldman Sachs and Metro Defendants are represented by Richard Pepperman of Sullivan & Cromwell LLP.

The JPMorgan and Henry Bath Defendants are represented by Robert Wick of Covington & Burling LLP.

Glencore Ltd. is represented by Eliot Lauer of Curtis Mallet-Prevost, Colt & Mosle LLP.

Access World USA (f/k/a Pacorini Metals USA) is represented by Boris Bershteyn of Skadden, Arps, Slate, Meagher & Flom LLP.

## IV.    History of the Litigation

### A.    The Initial Complaints

In 2013, four groups of Plaintiffs sued the LME, Defendants and various other affiliates of Defendants, alleging claims under the Sherman Act and state antitrust and unfair-competition laws. These original Plaintiffs consisted of: (i) three groups of Plaintiffs seeking to represent different putative classes of purchasers of aluminum at different points in the distribution chain (the FLPs, the Commercial End Users and the Consumer End Users); and (ii) the IPs (at that time, Agfa, Mag and Kodak, later joined by Fujifilm). The Commercial and Consumer End Users were so-called "indirect purchasers," asserting claims for damages under state antitrust laws.

### B.    *Aluminum I*

On August 29, 2014, Judge Forrest dismissed all claims asserted by the original Plaintiffs under Rule 12(b)(6) on the following grounds:  (i) Plaintiffs failed to allege antitrust injury; (ii) Plaintiffs failed to allege that they are "efficient enforcers" of the antitrust laws; (iii) Plaintiffs failed to plead a plausible antitrust conspiracy under §1 of the Sherman Act; (iv) the FLPs failed to plead a monopolization claim under §2 of the Sherman Act, 15 U.S.C. §2, against Goldman Sachs and Metro because the FLPs did not adequately allege a relevant market or market power; and (v) Plaintiffs' state-law claims failed for similar reasons. *Aluminum I*, 2014 U.S. Dist. LEXIS 121435; *see also In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 U.S. Dist. LEXIS 140765, at *18 (S.D.N.Y. Sept. 15, 2014) (providing "further detail on its rationale for dismissing plaintiffs' state law claims").

Judge Forrest dismissed the claims of the Commercial End Users and Consumer End Users with prejudice on the ground that they are not efficient enforcers of the antitrust laws and it would be futile to give them leave to amend given that their alleged injury was admittedly indirect. *See Aluminum*, 2014 U.S. Dist. LEXIS 140765, at *25-*26 (Commercial and Consumer End Users were

**Robbins Geller**
**Rudman & Dowd** LLP

October 4, 2019
Page 13

"far enough down the supply/distribution chain that they cannot plead around the issues created by the remoteness of their injury.").  By contrast, Judge Forrest gave the FLPs and IPs (Mag, Agfa and Kodak) leave to replead.

### C.    *Aluminum II*

The FLPs and IPs moved to file proposed amended complaints, which Defendants opposed and also moved to dismiss.  On March 26, 2015, Judge Forrest denied Defendants' motion to dismiss the proposed amended complaints filed by the FLPs and IPs.  She held that these Plaintiffs had adequately alleged: (i) that they suffered antitrust injury; (ii) that they are efficient enforcers of the antitrust laws; and (iii) a plausible conspiracy under §1.  *See Aluminum II*, 95 F. Supp. 3d at 428, 433-34, 442-43.  Judge Forrest dismissed the FLPs' §2 claims against Goldman Sachs and Metro.  *See id.* at 453-58.  Although Judge Forrest sustained certain of Plaintiffs' state-law claims, the FLPs and IPs later voluntarily dismissed their state-law claims without prejudice, leaving only their §1 conspiracy claim.  *See* Dkt. Nos. 875, 884.[14]

After Judge Forrest's decision, the FLPs and the IPs (Mag, Agfa and Kodak) filed their proposed amended complaints, which remain their operative pleadings today.  *See* Dkt. Nos. 738, 745.

### D.    **Fujifilm**

Seven months later, Fujifilm (represented by the same counsel who represents the other IPs) filed a separate complaint on October 21, 2015.  After receiving access to the discovery record, Fujifilm filed an amended complaint as-of-right that added new allegations and new Defendants on February 4, 2016.  *Fujifilm* Dkt. No. 35.

### E.    **Plaintiffs' Motion for Leave to Amend**

The IPs then moved for leave to file a joint amended complaint tracking the allegations of Fujifilm's first amended complaint.  Dkt. No. 888.  The FLPs likewise moved to amend their complaint to include similar allegations.  Dkt. No. 892.  Defendants opposed these proposed

---

[14]   On March 3, 2015, Judge Forrest dismissed the claims against four foreign entities for lack of personal jurisdiction.  *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219 (S.D.N.Y. 2015).  On March 4, 2015, Judge Forrest also dismissed the claims against three parent or affiliated corporations:  The Goldman Sachs Group, Inc., JPMorgan Chase & Co. and Pacorini Metals AG.  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 U.S. Dist. LEXIS 26412 (S.D.N.Y. Mar. 4, 2015).

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 14

amendments.  *See* Dkt. No. 896.  On April 25, 2016, Judge Forrest denied the IPs' and FLPs' motions for leave to amend.  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2016 U.S. Dist. LEXIS 54643 (S.D.N.Y. Apr. 25, 2016).

### F.      Close of Fact Discovery

Fact discovery in the actions filed by the FLPs and IPs closed on May 13, 2016, except for a limited number of depositions permitted to occur through June 13, 2016.  Dkt. Nos. 936, 990.

### G.      The FLPs' Motion for Class Certification

On March 25, 2016, the FLPs moved for class certification, accompanied by four expert declarations.  Dkt. Nos. 916-920.  Defendants filed their opposition, accompanied by two expert declarations, on July 8, 2016.  Dkt. Nos. 1013-1015.  On August 5, 2016, the FLPs filed a reply brief, together with two expert reply declarations and a *Daubert* motion seeking to exclude one of Defendants' experts.  *See* Dkt. Nos. 1037-1039, 1040-1041.  Although Judge Forrest scheduled a hearing on the FLPs' motion for class certification for September 8, 2016 (Dkt. Nos. 984, 1024), that hearing did not occur because of the intervening dismissal of the FLPs' action, as explained below.

### H.      Reynolds and Southwire

On July 26, 2016, after fact discovery had closed, Reynolds and Southwire filed a separate complaint against Defendants and certain additional entities (Glencore AG and Pacorini Metals Vlissingen B.V. (now known a Access World (Vlissingen) B.V.)), alleging antitrust claims under §1 of the Sherman Act, claims under state antitrust and unfair-competition laws, and a claim for unjust enrichment.  *See Reynolds Consumer Prods. LLC v. Glencore AG.*, No. 16-cv-05955 (KBF) (S.D.N.Y.); *Reynolds and Southwire* Dkt. No. 1.

### I.      *Aluminum III*

On August 9, 2016 – a month before the scheduled hearing on the FLPs' class-certification motion and shortly after Reynolds and Southwire commenced their action – the Second Circuit affirmed Judge Forrest's dismissal of the proposed indirect-purchaser class actions filed by the Commercial End Users and Consumer End Users.  *Aluminum III*, 833 F.3d 151.  Although Judge Forrest had dismissed those Plaintiffs' claims on efficient-enforcer grounds, the Second Circuit affirmed the dismissal on a different ground, holding that the Commercial and Consumer End Users had not adequately alleged antitrust injury.  *See id.* at 161-63.

**Robbins Geller**
**Rudman & Dowd LLP**

October 4, 2019
Page 15

### J.    *Aluminum IV and Aluminum V*

With the class-certification hearing fast approaching, Defendants moved for judgment on the pleadings against the FLPs based on *Aluminum III* on August 17, 2016.  Dkt. No. 1050.  Judge Forrest thereafter adjourned the class-certification schedule (Dkt. No. 1055) and converted Defendants' Rule 12(c) motion to a motion for summary judgment (Dkt. No. 1062).

On October 5, 2016, Judge Forrest dismissed the FLPs' action for lack of antitrust injury under *Aluminum III*.  She also dismissed the actions filed by the IPs and Reynolds and Southwire on the same ground.  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2016 U.S. Dist. LEXIS 138437 (S.D.N.Y. Oct. 5, 2016) ("*Aluminum IV*").

Judge Forrest later reopened the actions filed by the IPs and Reynolds and Southwire in order to give them an opportunity to address *Aluminum III*.  Dkt. No. 1088.  After briefing and argument, Judge Forrest held that those Plaintiffs also failed to plead antitrust injury under *Aluminum III*.  *AGFA Corp. v. Goldman Sachs Grp., Inc.*, No. 13-md-2481 (KBF), 2016 U.S. Dist. LEXIS 165563 (S.D.N.Y. Nov. 30, 2016) ("*Aluminum V*").

### K.    *Aluminum VI*

On August 27, 2019, the Second Circuit reversed the dismissal of the actions filed by the FLPs, IPs, and Reynolds and Southwire, holding that the FLPs and IPs had adequately alleged antitrust injury.  *Aluminum VI*, 936 F.3d at 97.  The Court also held that Reynolds and Southwire could refile their motion to amend their complaint.  *Id.* at 98.  The Second Circuit issued its mandate on September 17, 2019.  Dkt. No. 1143.

### V.    **Prior Discovery (Fact and Expert) and Any Consequential Discovery Motions**

On May 22, 2014, Judge Forrest entered a protective order and an order governing expert discovery.  Dkt Nos. 381, 383.

Judge Forrest heard and denied a discovery motion that sought an adverse inference for alleged spoliation by a former consultant to Metro.  Dkt. No. 976.  Other discovery motions involved motions to compel that were denied or resolved consensually.  *See, e.g.*, Dkt. Nos. 1002, 1004, 1011, 1027-1029.  There are no outstanding discovery motions.

Fact discovery closed in the FLP and IP actions on May 13, 2016 (except for certain fact depositions permitted to occur through June 13, 2016), and is now complete.  *See* Dkt. Nos. 936, 990.  The parties deposed 32 fact witnesses and produced millions of pages of documents.  The

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 16

parties also subpoenaed documents and data from various non-parties, including both aluminum producers and traders.

Expert discovery to date has been confined to class certification in the FLPs' action.   The FLPs submitted declarations from four experts (two economists, a statistician and an aluminum industry consultant), three of whom were deposed.   Defendants elected not to depose the FLPs' statistician.   Defendants submitted declarations from two economists, both of whom were deposed.   There is one pending *Daubert* motion:   The FLPs moved to exclude the testimony of one of Defendants' experts (David Kaplan) when they filed their class-certification reply.   Dkt. Nos. 1037-1039.   Judge Forrest adjourned the FLPs' class-certification motion before Defendants filed their opposition to the FLPs' *Daubert* motion.   Dkt. No. 1055.

## VI.     Description of Discovery Remaining

Fact discovery is closed in the actions filed by the FLPs and IPs.   Merits expert discovery has not begun in any of the actions.   No discovery has occurred in the action filed by Reynolds and Southwire.

## VII.     Existing Deadlines and Outstanding Motions

There are no existing deadlines, due dates or cut-off dates in this litigation.   There are two sets of outstanding motions as well as filings that will need to be made in the Reynolds and Southwire action:

**The FLPs' Class-Certification and *Daubert* Motions**.   The FLPs' motion for class certification is fully briefed, except that Defendants would like to file a sur-reply to address new issues raised in the FLPs' reply as well as new legal authority that has issued since the parties briefed class certification.   The FLPs will review Defendants' sur-reply if the Court grants Defendants' request and respond accordingly.   The FLPs' *Daubert* motion to exclude the testimony of Defendants' expert, David Kaplan, is not fully briefed, as Defendants have not yet filed their opposition.   Judge Forrest adjourned the proceedings on these two motions after Defendants moved for judgment on the pleadings in the FLPs' action based on *Aluminum III*.

**Personal-Jurisdiction Motions in *FujiFilm*.**   In the action filed by FujiFilm, Glencore International AG and Pacorini Metals Vlissingen B.V. (now known as Access World (Vlissingen) B.V.) filed motions to dismiss for lack of personal jurisdiction.   Those two motions are fully briefed.   *Fujifilm* Dkt. Nos. 83, 85, 109 and 121 (Glencore International AG) and 94, 96, 124 and 126 (Access World (Vlissingen) B.V.).

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 17

**Amended Complaint and Response in *Reynolds and Southwire***.  Defendants have not answered or otherwise responded to the complaint filed by Reynolds and Southwire on July 26, 2016.  *Reynolds and Southwire* Dkt. No. 1.  Before the dismissal of their case, those Plaintiffs proposed to file an amended complaint as-of-right.  *See Reynolds and Southwire*, Dkt. No. 69.  The Second Circuit held in *Aluminum VI* that Reynolds and Southwire should be permitted to refile their motion to amend their complaint.  936 F.3d at 98.

## VIII.   Issues Outstanding in the Litigation

**The FLPs' Class-Certification Motion**.  The first issue to address now that these cases have been remanded is the FLPs' pending motion for class certification.  *See Agfa Corp. v The Goldman Sachs Grp., Inc.*, No. 14-cv-00211-KBF (S.D.N.Y.); *Agfa* Dkt. No. 191 at 74 (Judge Forrest stating that, if the Second Circuit remands, "then we will pick up where we left off.").

Before proceedings on that motion were adjourned, Defendants had planned to move for leave to file a short sur-reply and supporting expert declaration to address a new class definition and other new issues presented by Plaintiffs' reply.  Briefing on the FLPs' *Daubert* motion also needs to be completed (no opposition has yet been filed).  The parties respectfully request that the Court set the following schedule on these two motions:  (i) Defendants will file their *Daubert* opposition and their sur-reply in opposition to class certification within two weeks of the November 4, 2019 conference; and (ii) Plaintiffs will file any reply in support of their *Daubert* motion, and a brief response to Defendants' sur-reply on class certification if they conclude they need one, within two weeks of Defendants' filings.

**Merits Expert Discovery**.  The parties propose the following schedule for merits expert discovery:  (i) the FLPs will serve merits expert reports two months after the Court's class-certification decision; (ii) Defendants will serve their merits expert reports three months thereafter; (iii) the FLPs will serve reply reports one month thereafter; and (iv) expert depositions will be completed one month thereafter.  These deadlines track the intervals that Judge Forrest previously had ordered.  *See* Dkt. No. 990.

**Individual Plaintiffs**.  The IPs propose to file a motion to amend their Joint Amended Complaint ("JAC").  Dkt. No. 745.  First, the IPs propose to remove foreign purchases that were not imported into the United States.  IP Kodak has a pending notice of claim in the United Kingdom for its foreign purchases.  Second, the IPs seek to amend the JAC to conform the Defendants across all IP actions (*i.e.*, to add some Defendants that are named as Defendants in Fujifilm's Amended Complaint).  *Fujifilm* Dkt. No. 35.  IPs submit that there is no undue delay or prejudice to conforming IPs' complaints for trial as the parties sought to be added as Defendants already appear as Defendants in other actions.  Given that the motions to dismiss for lack of personal jurisdiction filed by Defendants Glencore International AG and Pacorini Metals Vlissingen B.V. (now known as

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 18

Access World (Vlissingen) B.V.) were not ruled on, the IPs seek limited fact discovery from those two foreign Defendants in coordination with the discovery in the action filed by Reynolds and Southwire (described below), which also name these entities as Defendants.

The IPs request that the Court set an expedited briefing schedule for their motion to amend the JAC, and allow the IPs to take limited fact discovery from the two foreign Defendants while the FLPs' motion for class certification is pending. If these requests are granted, the IPs will agree to join the merits-expert schedule set forth above for the FLPs. If the IPs are not permitted to amend or seek limited fact discovery during the pendency of class certification, the IPs propose that their actions should proceed immediately to exchanging merits expert reports and summary judgment and should not be bound to the timing of the Court's decision on class certification. IPs Kodak, Agfa, and Mag all have *Lexecon* rights to try the cases in the respective originating districts.

Defendants oppose the IPs' request to take additional fact discovery from the two foreign Defendants and intend to oppose any motion for leave to amend. Fact discovery in the IPs' action is closed. Dkt. Nos. 936, 990. The IPs do not need to amend the JAC to drop their claims based on foreign purchases of aluminum because they can voluntarily dismiss those claims under Rule 41. The IPs previously moved for leave to add some Defendants that are named as Defendants in Fujifilm's Amended Complaint, and that motion was denied. *See Aluminum*, 2016 U.S. Dist. LEXIS 54643. The IPs have provided no reason why this Court should permit an untimely request to reconsider Judge Forrest's April 25, 2016 order denying leave to amend.

Defendants also oppose IPs' alternative request to expedite merits-expert reports and summary-judgment briefing if leave to amend and take additional fact discovery is denied. IPs' proposed schedule will result in uncoordinated and duplicative treatment of merits expert discovery and summary judgment issues.

**Reynolds and Southwire**. Reynolds and Southwire are prepared to file an amended complaint within 14 days of the Court's November 4, 2019 conference. Defendants request 45 days to answer or otherwise respond to that amended complaint. Once they sign the protective order, Reynolds and Southwire should be given access to the existing discovery record in this litigation. The parties will meet-and-confer and attempt to agree on targeted supplemental discovery relating to the Reynolds and Southwire action. They request that they be given 45 days after the November 4, 2019 conference in which to submit a joint letter either reporting their agreement or identifying any areas of disagreement. A separate schedule should be entered in this action, although Reynolds and Southwire will endeavor to complete discovery in a manner which will allow all cases to be synced up by the time the Court rules on class certification.

**Summary Judgment**. Defendants anticipate seeking summary judgment on at least some of the issues identified in §I.B., above.

**Robbins Geller**
**Rudman & Dowd** LLP

October 4, 2019
Page 19

## IX.  Length of Trial and Jury Demands

The parties estimate that a trial of each action should take roughly three weeks.  Each group of Plaintiffs has requested a jury trial.

## X.  Settlement Discussions (Subject to FRE 408)

No settlement demands, offers, or discussions have occurred to date, except that brief and unsuccessful settlement discussions occurred between Defendants and Reynolds and Southwire through the Second Circuit's court-appointed mediation program.

## XI.  Relationship Between the *Aluminum* and *Zinc* Actions

The *Aluminum* and *Zinc* actions share some similarities in that both actions involve storage of metals in LME warehouses and include some overlapping parties and counsel.  The actions differ in that they involve different metals and different legal theories and are in different procedural postures.  Judge Forrest dismissed the *Zinc* plaintiffs' antitrust conspiracy claim and also dismissed the Goldman Sachs, Metro, JPMorgan, and Henry Bath Defendants from *Zinc*.  She sustained, however, Plaintiffs' monopolization and attempted-monopolization claims under §2 of the Sherman Act against the Glencore and Pacorini (now Access World) Defendants.  *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016).  Whereas fact discovery is complete in *Aluminum* (except for targeted supplemental discovery in the Reynolds and Southwire action), very little fact discovery has occurred in *Zinc*.

**Robbins Geller
Rudman & Dowd LLP**

October 4, 2019
Page 20

### XII.    Other Information Useful to the Court

The parties will be available to answer any further questions the Court may have at the November 4, 2019 conference.

Respectfully submitted,

s/ Patrick J. Coughlin
ROBBINS GELLER RUDMAN
   & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
STEVEN M. JODLOWSKI
CARMEN A. MEDICI
ARTHUR L. SHINGLER III
LONNIE A. BROWNE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
(619) 231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
MARK DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000
(561) 750-3364 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
(631) 367-1173 (fax)

s/ Linda P. Nussbaum
NUSSBAUM LAW GROUP, P.C.
LINDA P. NUSSBAUM
BART COHEN
1211 Avenue of the Americas, 40th Floor
New York, NY  10036
Telephone:  (917) 438-9102
(212) 681-0300 (fax)

4837-7792-0936.v1

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 21

s/ Christopher Lovell
LOVELL STEWART HALEBIAN
  JACOBSON LLP
CHRISTOPHER LOVELL
BEN JACCARINO
500 Fifth Avenue, Suite 2440
New York, NY  10110
Telephone:  (212) 608-1900
(212) 719-4775 (fax)

Interim Co-Lead Counsel for First Level
Purchaser Plaintiffs and the Proposed First
Level Purchaser Class

s/ Walter W. Noss
SCOTT+SCOTT
ATTORNEYS AT LAW, LLP
WALTER W. NOSS
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone:  (619) 233-4565
(619) 233-0508 (fax)

McCUNE WRIGHT AREVALO, LLP
DEREK BRANDT
101 West Vandalia Street, Suite 200
Edwardsville, Illinois 62025
Telephone:  (618) 307-6115
(618) 307-6161 (fax)

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
TODD M. SCHNEIDER
JASON H. KIM
KYLE G. BATES
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
(415) 421-7105 (fax)

STEYER LOWENTHAL BOODROOKAS
  ALVAREZ & SMITH LLP
ALLAN STEYER
JILL M. MANNING
235 Pine Street, 15th Floor
San Francisco, CA  94104
Telephone:  (415) 421-3400
(415) 421-2234 (fax)

GARRETT W. WOTKYNS
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0144
(866) 505-8036 (fax)

4837-7792-0936.v1

# Robbins Geller
## Rudman & Dowd LLP

October 4, 2019
Page 22

Attorneys for Eastman Kodak Company,
Agfa Corporation, Agfa Graphics NV,
Fujifilm Manufacturing U.S.A., Inc. and
Mag Instrument Inc.

s/ Robert J. Palmersheim
PALMERSHEIM & MATHEW LLP
ROBERT J. PALMERSHEIM
ANAND C. MATHEW
401 N. Franklin Street, Suite 45
Chicago, IL 60654
Telephone:  (312) 705-3622
(312) 878-2890 (fax)

HONIGMAN LLP
MATTHEW G. MRKONIC
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
(313) 465-7615 (fax)

Attorneys for Reynolds Consumer Products
LLC and Southwire Company, LLC

s/ Robert D. Wick                                      s/ Richard C. Pepperman II
COVINGTON & BURLING LLP                  SULLIVAN & CROMWELL LLP
ROBERT D. WICK                                      RICHARD C. PEPPERMAN II
One City Center                                          125 Broad Street
850 Tenth Street, N.W.                              New York, New York  10004-2498
Washington, D.C.  20001                          Telephone:  (212) 558-4000
Telephone:  (202) 662-6000                      (212) 558-3588 (fax)

Attorney for Defendants Henry Bath LLC,      Attorney for Defendants Goldman Sachs &
Henry Bath & Son Ltd., JPMorgan Chase        Co. LLC, J. Aron & Company, Goldman
& Co., JPMorgan Chase Bank, N.A., and         Sachs International, MITSI Holdings LLC,
JPMorgan Securities PLC                                and Metro International Trade Services
                                                                         LLC

4837-7792-0936.v1

Robbins Geller
Rudman & Dowd LLP

October 4, 2019
Page 23

s/ Eliot Lauer
CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
ELIOT LAUER
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
(212) 697-1559 (fax)

Attorney for Defendant Glencore Ltd.

s/ Boris Bershteyn
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
BORIS BERSHTEYN
Four Times Square
New York, New York  10036-6522
Telephone:  (212) 735-3000
(212) 735-2000 (fax)

Attorney for Defendant Access World
(USA) LLC (f/k/a Pacorini Metals USA,
LLC)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 4, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Patrick J. Coughlin
PATRICK J. COUGHLIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  patc@rgrdlaw.com

**Mailing Information for a Case 1:13-md-02481-PAE In re: Aluminum Warehousing Antitrust Litigation**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Nathaniel Caleb Ament-Stone**
  nament-stone@curtis.com,jkiehl@curtis.com,jclyne@curtis.com

- **Kristen M. Anderson**
  kanderson@scott-scott.com

- **Randi Dawn Bandman**
  randib@rgrdlaw.com,SusanM@rgrdlaw.com

- **Kyle G. Bates**
  kbates@schneiderwallace.com,efilings@schneiderwallace.com,3005202420@filings.docketbird

- **Yavar Bathaee**
  yavar@piercebainbridge.com,s&cmanagingclerk@sullcrom.com,yavar-bathaee-3335@ecf.pacerpro.com

- **Justin W Batten**
  jbatten@scott-scott.com

- **Daniel E. Becnel , Jr**
  mmoreland@becnellaw.com

- **Boris Bershteyn**
  boris.bershteyn@skadden.com,bkeating@skadden.com,james.moore@skadden.com

- **Andrea B. Bierstein**
  abierstein@simmonsfirm.com,jlucena@simmonsfirm.com

- **John Paul Bjork**
  jbjork@vaneklaw.com

- **Jennifer Hilda Blecher**
  blecherj@sullcrom.com,s&cmanagingclerk@sullcrom.com,jennifer-blecher-0595@ecf.pacerpro.com,jennifer-blecher-4234@ecf.pacerpro.com

- **Thomas Kay Boardman**
  tboardman@scott-scott.com

- **Derek Y. Brandt**
  dyb@mccunewright.com,derek-brandt-8689@ecf.pacerpro.com,knw@mccunewright.com

- **Darryl Bressack**
  dbressack@finkandassociateslaw.com

- **Vincent Briganti**
  vbriganti@lowey.com

- **Lonnie A Browne**
  lbrowne@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **W. Joseph Bruckner**
  wjbruckner@locklaw.com,hnpotteiger@locklaw.com,lgn-wjbruckner@ecf.courtdrive.com

- **Christopher M. Burke**
  cburke@scott-scott.com,tturner@scott-scott.com,edewan@scott-scott.com,kanderson@scott-scott.com,efile@scott-scott.com

- **Erin C Burns**
  eburns@nastlaw.com,croberts@rodanast.com

- **Solomon B. Cera**
  scera@cerallp.com,pmarkert@cerallp.com,clc@cerallp.com,keg@cerallp.com,jrl@cerallp.com,cdirksen@cerallp.com

- **Lin Y Chan**
  lchan@lchb.com

- **Amber M Charles**
  acharles@cov.com,amber-charles-0692@ecf.pacerpro.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com,smiller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer L. Crose**
  jcrose@becnellaw.com

- **William T. Crowder**
  wcrowder@crowdermcgaha.com

- **Mark Aaron Cunningham**
  mcunningham@joneswalker.com

- **Gregory Lee Curtner**
  gcurtner@rshc-law.com,lmisisian@rshc-law.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com,9825585420@filings.docketbird.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,creynolds@rgrdlaw.com

- **John G. Emerson , Jr**
  jemerson@emersonfirm.com,tautry@emersonfirm.com

- **Vincent J. Esades**
  vesades@heinsmills.com,janderson@heinsmills.com,ikovarik@heinsmills.com

- **Craig M. Essenmacher**
  cessenmacher@lshllp.com

- **Josh Ewing**
  je@fbdlaw.com,lgt@fbdlaw.com

- **Eric B. Fastiff**
  efastiff@lchb.com

- **David H. Fink**
  dfink@finkandassociateslaw.com

- **James H. Forte**
  jforte@saiber.com,cjohnson@saiber.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **David P. Germaine**
  dgermaine@vaneklaw.com

- **Wesley B. Gilchrist**
  wgilchrist@lightfootlaw.com

- **Jennifer Lynn Giordano**
  jennifer.giordano@lw.com,jennifer-giordano-5192@ecf.pacerpro.com,NY-
  CourtMail@lw.com,allyson.maltas@lw.com,jeffrey.newhouse@lw.com,william.h.rawson@lw.com,washington-dc-litigation-services-
  5378@ecf.pacerpro.com,william.sherman@lw.com,christopher.fawal@lw.com,margaret.zwisler@lw.com

- **Raymond Peter Girnys**
  rgirnys@lowey.com

- **Joseph Goldberg**
  jg@fbdlaw.com,ftd@fbdlaw.com,sdr@fbdlaw.com,drt@fbdlaw.com,acs@fbdlaw.com

- **David A Goodwin**
  dgoodwin@gustafsongluek.com

- **Dean M. Googasian**
  dgoogasian@googasian.com

- **Troy T. Gorman**
  ttg@gormanlawgroup.com

- **Harold Gurewitz**
  hgurewitz@grplc.com

- **Harold Z. Gurewitz**
  hgurewitz@grplc.com

- **Daniel E. Gustafson**
  dgustafson@gustafsongluek.com

- **JEROME WAYNE HOFFMAN**
  jerome.hoffman@hklaw.com

- **Stephanie Ann Hackett**
  shackett@scott-scott.com,gfoster@scott-scott.com

- **David William Haller**
  dhaller@cov.com,maony@cov.com,david-haller-1782@ecf.pacerpro.com

- **Suhana S. Han**
  hans@sullcrom.com,suhana-han-1488@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **Dean M Harvey**
  dharvey@lchb.com,jmoorhead@lchb.com,btroxel@lchb.com,rbata@lchb.com

- **Mark David Herman**
  mherman@cov.com,jplayforth@cov.com,mark-herman-1632@ecf.pacerpro.com

- **Theodore M. Hess-Mahan**
  thess-mahan@hutchingsbarsamian.com

- **Geoffrey Milbank Horn**
  ghorn@lowey.com

- **William H. Horton**
  bhorton@gmhlaw.com

- **Thomas H. Howlett**
  thowlett@googasian.com

- **Benjamin Martin Jaccarino**
  bjaccarino@lshllp.com

- **Steven M Jodlowski**
  sjodlowski@rgrdlaw.com,e_file_sd@rgrdlaw.com,ckopko@rgrdlaw.com

- **Edith M. Kallas**
  ekallas@whatleykallas.com,ecf@whatleykallas.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Jason H Kim**
  jkim@schneiderwallace.com,6554119420@filings.docketbird.com

- **Eliot Lauer**
  elauer@curtis.com,jclyne@curtis.com,jsemmelman@curtis.com

- **Gerald Lawrence**
  glawrence@lowey.com

- **Roberta D. Liebenberg**
  rliebenberg@finekaplan.com

- **Gregory Bradley Linkh**
  glinkh@glancylaw.com,info@glancylaw.com,greg-linkh-2000@ecf.pacerpro.com

- **Henry Liu**
  hliu@cov.com,maony@cov.com,henry-liu-0751@ecf.pacerpro.com

- **Christopher Lovell**
  clovell@lshllp.com,kessenmacher@lshllp.com,gjacobson@lshllp.com,msrayle@sbcglobal.net,ekroub@lshllp.com,jkrisiloff@lshllp.com,cmooney@lshllp.com,mgalla

- **John H. Lyons**
  john.h.lyons@skadden.com

- **Jill M. Manning**
  jmanning@steyerlaw.com

- **Gerard V. Mantese**
  gmantese@manteselaw.com,bren@manteselaw.com

- **Steven A. Martino**
  stevemartino@taylormartino.com

- **Benjamin M. McGovern**
  benjamin.mcgovern@hklaw.com

- **Michael C McKay**
  mmckay@schneiderwallace.com,5256699420@filings.docketbird.com

- **Carmen A. Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com,karenc@rgrdlaw.com,LBrowne@rgrdlaw.com,ckopko@rgrdlaw.com

- **Azra Zahoor Mehdi**
  azram@themehdifirm.com

- **Eugene Mikolajczyk**
  genem@rgrdlaw.com

- **Douglas A. Millen**
  doug@fklmlaw.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com

- **Daniel Jay Mogin**
  dmogin@moginrubin.com,jchatfield@moginrubin.com,steven-ejercito-the-mogin-law-firm-pc-9884@ecf.pacerpro.com,sejercito@moginrubin.com,sbuack@moginrubin.com,ngeraci@moginrubin.com,nambrosetti@moginrubin.com,jwilliams@moginrubin.com

- **Matthew B. Moreland**
  mattmoreland@cox.net

- **NORANDA ALUMINUM, INC.**
  jforte@saiber.com

- **John M. Nannes**
  john.nannes@skadden.com,dlmlcwas@skadden.com,anjali.patel@skadden.com

- **Dianne M. Nast**
  dnast@nastlaw.com

- **Thomas Jerome Nolan**
  thomas.nolan@skadden.com

- **Walter W. Noss**
  wnoss@scott-scott.com,tterpening@scott-scott.com,shackett@scott-scott.com,esignaigo@scott-scott.com,edewan@scott-scott.com,aturner@scott-scott.com,efile@scott-scott.com

- **Linda P. Nussbaum**
  lnussbaum@nussbaumpc.com,sschwaiger@nussbaumpc.com,bcohen@nussbaumpc.com,hsandler@nussbaumpc.com,bdemuth@nussbaumpc.com,pmoran@nussbaum

- **Brian O. O'Mara**
  bomara@rgrdlaw.com

- **Alyson Louise Oliver**
  notifications@oliverlg.com

- **Richard C. Pepperman , II**
  peppermanr@sullcrom.com,richard-pepperman-4444@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **Adam James Pessin**
  apessin@finekaplan.com,akatzman@finekaplan.com,nblakeslee@finekaplan.com

- **John S. Playforth**
  jplayforth@cov.com,maony@cov.com,john-playforth-4484@ecf.pacerpro.com

- **Menachem David Possick**
  david.possick@nelsonmullins.com,david-possick-7249@ecf.pacerpro.com,mdpossick@gmail.com

- **Thomas F Quilling**
  tom@wassermanlaw.com

- **John D. Radice**
  jradice@radicelawfirm.com

- **Kevin E. Rayhill**
  krayhill@saverilawfirm.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,9858910420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com,mdearman@rgrdlaw.com

- **Peter George Safirstein**
  psafirstein@safirsteinmetcalf.com,sfeerick@safirsteinmetcalf.com,emetcalf@safirsteinmetcalf.com

- **Hugh Daniel Sandler**
  hsandler@krantzberman.com

- **Christopher M. Santomassimo**
  csantomassimo@ndslaw.com,jdisena@ndslaw.com,achan@ndslaw.com

- **Joseph Richard Saveri**
  jsaveri@saverilawfirm.com,dlockett@saverilawfirm.com,jday@saverilawfirm.com,hhaile@saverilawfirm.com,dvandemortel@saverilawfirm.com

- **Todd Michael Schneider**
  tschneider@schneiderwallace.com,efilings@schneiderwallace.com,2733686420@filings.docketbird.com

- **Max Raphael Schwartz**
  mschwartz@scott-scott.com,efile@scott-scott.com

- **David R. Scott**
  david.scott@scott-scott.com,ichilaia@scott-scott.com,efile@scott-scott.com

- **Jennifer Janine Scott**
  jscott@scott-scott.com

- **Jacques Semmelman**
  jsemmelman@curtis.com,jclyne@curtis.com

- **William R. Sherman**
  william.sherman@lw.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,NY-CourtMail@lw.com,william-sherman-3199@ecf.pacerpro.com

- **Arthur L. Shingler , III**
  ashingler@rgrdlaw.com

- **Michael L. Silverman**
  msilverman@fklmlaw.com

- **Thomas Michael Skelton**
  tskelton@lowey.com

- **Sylvia Sokol**
  ssokol@scott-scott.com,tpacht@scott-scott.com

- **Jessica A. Sprovtsoff**
  jsprovtsoff@schiffhardin.com

- **Peter Dexter St. Phillip , Jr**
  pstphillip@lowey.com,mail@lowey.com

- **Allan Steyer**
  asteyer@steyerlaw.com,amarshall@steyerlaw.com,cswaminathan@steyerlaw.com

- **Troy A. Terpening**
  tterpening@scott-scott.com

- **Patrick J Van Zanen**
  pvanzanen@schneiderwallace.com,1765978420@filings.docketbird.com

- **Joseph M Vanek**
  jvanek@vaneklaw.com

- **Tony Visage**
  tony.visage@bgllp.com

- **William Henry Wagener**
  wagenerw@sullcrom.com,s&cmanagingclerk@sullcrom.com,william-wagener-9498@ecf.pacerpro.com

- **Joe R. Whatley , JR**
  jwhatley@whatleykallas.com,ecf@whatleykallas.com

- **Robert D. Wick**
  rwick@cov.com,maony@cov.com,robert-wick-4631@ecf.pacerpro.com

- **Garrett W. Wotkyns**
  gwotkyns@schneiderwallace.com

- **Gabriel D. Zeldin**
  gzeldin@steyerlaw.com

- **Margaret M. Zwisler**
  margaret.zwisler@lw.com,NY-CourtMail@lw.com,new-york-ma-2860@ecf.pacerpro.com,margaret-zwisler-5429@ecf.pacerpro.com,jeffrey.newhouse@lw.com,stefanie.johnson@lw.com,william.h.rawson@lw.com,jennifer.giordano@lw.com,william.rinner@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Robert              J. Bonsignore
Bonsignore & Brewer
23 Forest Street
Medford, MA 02155

Patrick             E. Cafferty
Caffert Clobes Meriwether & Sprengel LLP, L.L.P.
30101 N. Main Street
Suite 565
Ann Arbor, MI 48104

Steven              A. Kanner
Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095

GEORGE              N MEROS                              , JR
GRAYROBINSON PA - TALLAHASSEE FL
301 S BRONOUGH ST STE 600
TALLAHASSEE, FL 32301

Reynolds Consumer Products LLC
,

Southwire Company, LLC
,

Vincent             Ward
Freedman Boyd Hollander Goldberg Urias & Ward P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
```