EXHIBIT 4

# Expert Reply Report of J. Douglas Zona, Ph.D.

## I. INTRODUCTION

1.    My name is J. Douglas Zona.  I previously submitted an expert report in this matter on March 26, 2016 ("Zona Report")[1].  My credentials are set forth therein.  An updated copy of my CV, which includes my list of prior testimony, is attached hereto as Appendix A.

2.    I have been asked by the First Level Purchaser Plaintiffs ("Plaintiffs") in this matter to review the expert declarations of Mr. Kaplan[2] and Prof. Hausman[3] ("Defendants' Experts") and, as necessary in light of this review, provide updates or additional opinions. In doing so, I have also reviewed the additional materials cited herein.[4]

3.    I am being compensated for work on this matter at a rate of $650 per hour, plus reimbursement of expenses.  I have no financial interest in the outcome of this litigation.

## II. RESPONSES TO DEFENDANTS' EXPERTS

### A.  Defendants' Experts' Do Not Contest Most of the Opinions in the Zona Report

4.    Defendants' Experts in this case focus almost entirely on issues related to Dr. Gilbert's analyses of common impact and damages. In particular, they do not appear to contest my opinion that the economic analysis of the alleged conspiratorial misconduct in this case is a common issue subject to common proof.  Nor do they appear to contest the various economic analyses and opinions I set forth in the Zona Report regarding market definition, market power, and economic incentives.  More generally, Defendants' Experts do not contest my analyses and conclusions regarding the basic economics of the antitrust case here. Defendants' Experts also do not contest the economic evidence of the alleged misconduct, which is consistent with analysis of impact and damages.

---

[1] Expert Report of J. Douglas Zona, Ph.D. ("Zona Report"), filed on March 25, 2016.

[2] Declaration of David P. Kaplan, dated July 8, 2016 ("Kaplan Report").

[3] Declaration of Professor Jerry A. Hausman, dated July 8, 2016 ("Hausman Report").

[4] I have relied on the following additional materials: all materials listed in my previous report, Deposition of Christopher L. Gilbert, May 19, 2016, Deposition of Scott Evans, May 13, 2016, Videotaped Deposition of Robert G. Burgess-Allen, Vol. II, April 28, 2016, Videotaped Deposition of John Douglas Zona, May 24, 2016.

5.      In the few instances where they do address my analyses, Defendants' Experts have mischaracterized my opinions and testimony. For example, Prof. Hausman testified at deposition that he considered most of my opinions as "merits" issues and did not address them.[5]  My report assesses the feasibility of proving impact of the alleged misconduct on a class-wide basis using class-wide evidence.  I have shown that class-wide impact can be proven using the standard tools of industrial organization economics.

6.      As such, my following opinions are unchanged:

- LME warehouse services are a relevant antitrust product market; there are relevant geographic markets covering the United States, Europe and Asia (excluding China).

- Defendants collectively have market power in the markets for LME warehouse services.

- The economic evidence shows that Defendants used their collective market power to increase warehouse rents, decrease quality of services (e.g., through longer queues), and lock-in customers.

- The economic evidence shows that Defendants' conduct reduced competition in the markets for LME warehouse services.

## B.  Defendants' Experts' Statements Indicate Important Areas of Agreement with the Opinions in the Zona Report

7.      Defendants' Experts agree that primary aluminum is commonly sold in the United States with three price components based on the LME price, the Mid-West Premium and other value-added premium.[6]  Defendants' Experts agree with how the least valuable warrant policy works.[7]

---

[5] Videotaped Deposition of Jerry Hausman, PhD, taken July 28, 2016 ("Hausman Dep."), p. 42.

[6] See Hausman Report, pp. 8-9.

[7] See, e.g., Kaplan Report, pp. 21-23 and Hausman Report, p. 4.

8.      Defendants' Experts also appear to agree that, during the class period, almost all physically settled LME contracts were settled with warrants for aluminum stored in either Detroit or Vlissingen.[8]

9.      Mr. Kaplan appears to concede that the alleged misconduct would have raised prices to proposed class members.  Mr. Kaplan states that smelters would have benefited from the alleged misconduct because it would have increased prices to commercial purchasers (members of the class).[9] This statement only makes sense if the all-in price would have increased.

10.      Mr. Kaplan's own prior research confirms that assessing class-wide damages can be done on a class-wide basis with common proof.  Outside the litigation context, Mr. Kaplan co-authored a study in which he measured the impact of an anticompetitive restraint among producers of aluminum on United States customers of aluminum.[10]  The misconduct at issue occurred during a period in which production exceeded the demand of commercial customers, a situation analogous to the conspiracy period in this case.[11]  Mr. Kaplan estimated the percentage increase in the LME daily cash price that was caused by the restraint at issue (15-22%), and calculated damages by multiplying that percentage increase by the total market value of primary and secondary aluminum purchases in the United States ($8.8 billion).[12]  Mr. Kaplan thus concluded that "the cost that the [restraint] imposed on US customers" was "an additional annual expense of $1.3-1.9 billion."[13]  The study described this result as

---

[8]  Hausman Report, p. 6.

[9]  Kaplan Report, p. 66.

[10]  Richard S. Higgens, Mark Glueck, David P. Kaplan and Michael McDonald, "The Causes and Consequences of the Aluminum MOU," ("MOU Paper") in Economic Inputs, Legal Outputs: The Role of Economists in Modern Antitrust (1998).

[11]  Video Recorded Deposition of Mr. David Kaplan ("Kaplan Dep.") 74:3-14 ("Q: Is the oversupply of aluminum that you describe in your [MOU] paper comparable to the oversupply of aluminum in the United States following the 2008 financial crisis? . . . . A: I would agree that they're both periods of time in which there was an excess supply").  Dr. Kaplan also agreed that it is not "necessary to restrict production of a metal in order to increase the price of that metal."  Kaplan Dep. 75:13-20.

[12]  MOU Paper, p. 5.

[13]  MOU Paper, p. 5.

"conservative,"[14] and at his deposition Mr. Kaplan described it as "a reliable estimate" of damages to US customers of primary and secondary aluminum.[15]

11.     In his published investigation, Mr. Kaplan did none of the things he asserts must be done in this case to estimate impact or damages. He conducted no "fact-intensive individualized inquiries" of any kind. He did not address whether the aluminum was first purchased by the smelter by another entity. He did not determine, on an individual purchase-by-purchase basis, whether an increase in the LME daily cash price would have resulted in individual customers paying more for aluminum.[16] Instead, Mr. Kaplan assumed that "any change in the LME cash price that [he attributed to the misconduct] was passed on 100 percent to purchasers of aluminum",[17] and Mr. Kaplan made this assumption without conducting any pass-through analysis to confirm it.[18] Mr. Kaplan did not examine whether the increases in the LME daily cash price were offset by the Midwest Premium.[19] Mr. Kaplan did not identify or offset any benefits that customers of aluminum might have received from increases in aluminum prices. He used no smelter data of any kind, relying instead on published data from the Aluminum Association, Inc. and the Platt's Metals Week Price Handbook.[20]

12.     At his deposition, Mr. Kaplan attempted to distinguish his own prior research from his opinions in this case. According to Mr. Kaplan, his published analysis is a "totally different exercise" than the report he submitted in connection with this litigation.[21] He provided three reasons to ignore his published work. First, he characterized the results in his

---

[14] MOU Paper, p. 8, fn. 20.

[15] Kaplan Dep. 68:5.

[16] Kaplan Dep. 66:23-67:1 ("Q: Did you find it necessary to do a contract-by-contract analysis to determine the total cost of the MOU on U.S. customers? A: Not for the purposes of this analysis").

[17] Kaplan Dep. 70:10-17.

[18] Kaplan Dep. 105:1-5.

[19] Kaplan Dep. 68:18-22 ("Q: In this paper, did you examine whether the Midwest premium offset the increases in the LME daily cash price that you observed? A: I was only focused on the LME price.").

[20] MOU Paper, p. 1 and p. 8, fn. 20; Kaplan Dep. 68:23-70:5.

[21] Kaplan Dep. 105:11-12.

paper as merely looking at the "average effect" of the misconduct at issue.[22]  But Mr. Kaplan confirmed that measuring the "average effect" in no way made his measurement of total harm unreliable or inaccurate.[23]  Second, he said that his paper only examined the "LME price, not the Midwest premium price."[24]  But he did not merely measure the impact on the LME price: Mr. Kaplan provided a "conservative"[25] and "reliable"[26] estimate of harm to U.S. purchasers by looking at a measure of the price paid.[27]  Third, Mr. Kaplan attempted to distinguish his study because it concerned a production restraint.[28]  But Mr. Kaplan admitted that it is not necessary to restrict production in order to increase prices.[29]

### C.  Prof. Hausman's Claim Regarding Perfect Offset

13.    Defendants' Experts claim that warehouse queues did not raise all-in aluminum prices.  According to Prof. Hausman, "Although warehouse queues might rearrange the components of all-in aluminum prices as between the MWP and the LME price, it does not make economic sense that they would raise all-in aluminum prices…"[30].  Dr. Hausman proposes what I call the "Perfect Offset Hypothesis" – any increase in MWP caused by increasing queues is perfectly offset by a decrease in LME price.[31]

14.    Dr. Hausman teaches his MIT students that they should test whether their economic hypotheses are consistent with the experience of marketplace participants – which

---

[22] E.g., Kaplan Dep. 105:5-6.

[23] Kaplan Dep. 67:19-68:17.

[24] E.g., Kaplan Dep. 104:16-17.

[25] MOU Paper, p. 8, fn. 20.

[26] Kaplan Dep. 68:5.

[27] MOU Paper, p. 5.

[28] Kaplan Dep. 104:11-20.

[29] Kaplan Dep. 75:13-20.

[30] Hausman Report, pp. 11-12.

[31] "Queues therefore depress the LME price of aluminum relative to all-in prices". Hausman Report, Para. 31.

he refers to as the "Smell Test".[32]  Dr. Hausman's Perfect Offset Hypothesis does not pass Dr. Hausman's Smell Test.  The view in the aluminum industry is that increasing queues raised the Midwest Premium and the All-In Prices paid by aluminum purchasers.

- "London Metal Exchange rules are creating delivery bottlenecks for aluminum that are boosting prices and causing seven-month delays at Detroit warehouses. … The higher premium *'implies consumers paying a higher price for aluminum'*."[33]

- "High premiums are 'in general, positive' for the company … High premiums are proving a boon to producers, currently accounting for around 10% of their revenues, up from around 3-4% previously."[34] Mr. Brandtzæg's comment implies that he sees high premiums as having fed through into the higher all-in price that producers receive.

- *The Financial Times* reported that producers were "struggling with low aluminium prices". It quoted a trading house executive as saying "At these levels the reason why many of these guys don't shut down is because they have a high premium".[35] Again the implication is that higher premiums are passed through into a higher all-in price.

- MillerCoors executive Tim Weiner stated that MillerCoors had paid "tens of millions of dollars in excess premiums over the last several years, with no end in sight."[36] Mr. Weiner's comments indicate that premium is being passed through into the all-in prices paid by aluminum consumers.

15.    These statements from industry participants appear to be exactly the types of information that Mr. Kaplan says provides a proper factual support for economists' opinions.[37]  Nowhere does Dr. Hausman attempt to reconcile these statements about the facts with his Perfect Offset Hypothesis.

---

[32] "Q: And you tell them that when they do econometric exercises or economic investigations, they should then check with marketplace participants to perform what you call the smell test?  A: Yes, to make sure they don't have crazy results."  Hausman Dep 66:5-11.

[33] http://www.bloomberg.com/news/articles/2011-06-21/aluminum-s-premium-gains-being-fueled-by-lme-warehouse-rules-harbor-says quoting Harbor Intelligence. (6/22/11) (emphasis added).

[34] Metal Bulletin quoting Norsk Hydro CEO Svein Richard Brandtzæg, (9/25/12).

[35] "Metals pricing under threat from warehousing rule change". Financial Times, 7/4/13.

[36] Metal Bulletin, 7/23/13, "LME warehouse system 'to cost aluminium consumers $3bn'". Reporting on testimony to a subcommittee of the US Senate Committee on Banking, Housing and Urban Affairs.

[37] David P. Kaplan, "The Nuts and Bolts of Antitrust Analysis: How to Develop the Facts", Managerial and Decision Economics, Vol. 17,179-192 (1996).

16.     Furthermore, as a matter of economic theory there is no necessary reason to expect perfect offset. As the following hypothetical example shows, the Perfect Offset Hypothesis is not expected to hold under plausible circumstances. If Metro were to divert 100,000 MTs from the spot market into its warehouses (and thereby take it off the spot market for some period of time), we would expect an increase in the All-In price and the MWP, with little change, if any, in the LME price. Mr. Kaplan estimated about a two percent increase in price with a one percent decrease in supply.[38] 100,000 MTs represents about two percent of annual North American aluminum supply.[39] So applying Mr. Kaplan's estimated 2 to 1 ratio, Metro's diversion to its warehouses would result in about a four percent increase in All-In price, and an approximate doubling in MWP (from 3-4 percent of price to 7 to 8 percent of price).

17.     Continuing with this hypothetical example, in order to keep the All-In price (and MWP) up, the Metro Aluminum must be kept off the spot market. Load-out restrictions and a queue at the Metro warehouse can slow the return of the aluminum to the spot market. With a 1,500 MT daily load out rate, it would take about three months to return all of the diverted 100,000 MTs to the spot market. Control of the queue through the least valuable warrant rules can ensure that aluminum will not flow from other LME warehouses either. With an expectation of continuing elevation in the MWP and the All-in price there is little incentive for owners of stored aluminum to sell into the spot market.

18.     One marketplace fact that is not fully discussed in the context of Perfect Offset Hypothesis is that the LME price is a worldwide price. A consequence of Prof. Hausman's claim that increases in MWP cause a perfectly offsetting decrease in worldwide LME price is that premia in other location would also rise, putting pressure on all-in prices at locations worldwide (and feedback to the LME price). In equilibrium, I would expect local premia to tend to move together, as market forces eliminate arbitrage opportunities and work out changes in LME price and local all-in prices. Contrary to Prof. Hausman's claims, his

---

[38] According to Mr. Kaplan's analysis of a production restriction, a ten percent reduction in capacity results in a 20 percent increase in price. The results are calculated observing that US production is 19 percent of the world (MOU Paper, p. 2.). US production is 4.2 million MTs, therefore world production is about 22 million MT. Restrictions involve 2.0 million MT, or about 10 percent. Kaplan and coauthors measure about 20 percent price increase from the production restriction.

[39] http://www.world-aluminium.org/statistics/  about 4.7 million MTs in 2010.

analysis of the relationship between the Japan and Mid-West premia does not prove the Perfect Offset Hypothesis.[40]  His subsequent econometric analysis assuming the Japan Premium is unrelated to the MWP is fundamentally flawed.

19.      As I presented in my report, rather than rely solely on theoretical arguments, there is a simple test of this proposition.  If Prof. Hausman's Perfect Offset Hypothesis were true, then changes in LME prices and MWP would be perfectly negatively correlated. This claim is unsupported by the data.[41]  LME prices and local premiums are largely uncorrelated with measured correlation coefficients small and positive (i.e., the opposite sign than is predicted by Prof. Hausman's theory).

**D. Prof. Hausman's Claims Regarding the Role of Outside Exchange Warehouses**

20.      Prof. Hausman suggests that the supply of aluminum outside the exchange warehouses would have eliminated any effect of the queues on the All-in price.[42]  Prof. Hausman argues that there was a surplus of aluminum readily available to consumers so that the All-in price could not be inflated by increasing queue lengths. The idea that aluminum was idle and available to discipline All-in prices is counter to statements made by the LME and Defendants in this case. At the tutorial held in May of 2014, Mark Bradley, the LME's Head of Market Surveillance, explained:

> [T]he inflow post 2008, during the recession, was also at the time accompanied by near zero interest rates. Together with the increased access to this metal, as is now in the LME system, combined with zero or near zero interest rates, it meant that the LME metal became a more attractive lower-risk financial investment than say at the time equities or share trading did. There was a chance, obviously, the company you invested in would go fast, and you would lose all your money. With a commodity such as aluminum, in an LME-approved warehouse, it will retain a lot of its value, so it becomes a safer investment.

> There we saw increased financial flows of money into the market.[43]

---

[40] Hausman Report, Para. 68.

[41] Zona Report, Para. 87.

[42] Hausman Report, Para. 27.

[43] Dkt. No. 425 (May 28, 2014 Hrg. Tr.) p. 69.

21.     Counsel for Goldman Sachs explained that stored aluminum was part of trades and was unavailable to consumers:

> The surplus explains why at this point in time the aluminum stored in warehouses, whether they be LME warehouses or non-LME warehouses, are owned by financial players who have bought the aluminum and are paying for its storage and are paying for its storage and are seeking to resell it at some point in the future, when prices are higher. And the surplus is critical to understanding why all-in prices for aluminum are low today relative to historic norms.
>
> …
>
> The surplus of aluminum in a surplus market tends to be owned by financial players. The financial players will make decisions about where it is the most economically advantageous place to store their aluminum. Rent in unregulated, off-warrant storage tends to be lower. It tends to be much lower.[44]

22.     After the Court asked whether "it may be that the warehouse has the capacity to do long-term storage for a financing player who wants to hold aluminum in that same long-term storage keep its price for storage fees lower," Defendants responded:

> [W]ith respect to off-warrant storage, it's almost entirely the latter. It's almost entirely financial players that have what are called, I'll describe as cash-and-carry trades and have purchased the aluminum at cheap current spot prices and have sold it at higher future prices and are seeking to store their aluminum for the duration of that period at cheaper off-warrant storage.
>
> …
>
> [I]n a surplus market, where consumers can satisfy all their needs directly from producers, the surplus is owned by financial players"[45]

23.     Therefore, as the LME explained to the Court, aluminum in warehouses and off-warrant storage at the time was generally tied up in trades.  It was not generally available to readily flow to consumers.  Prof. Hausman's suggestion that there was lots of available supply of physical aluminum is not consistent with these statements to the Court and other empirical analyses.  Prof. Hausman's suggestion does not pass his Smell Test.

---

[44] Dkt. No. 425 (May 28, 2014 Hrg. Tr.) pp. 82; 86.

[45] Dkt. No. 425 (May 28, 2014 Hrg. Tr.) at 87-88.

### E. Mr. Kaplan's Claims Regarding Ascertainabilty", Class Conflict, and Antitrust Impact

24.      Mr. Kaplan seems to say that it will be difficult or impossible to determine on a class-wide basis:  a) who was a first purchaser of primary aluminum?; and b) what did they buy? [46]

25.      Mr. Kaplan implies that because smelters sometime buy aluminum from other smelters, not all items made by smelters will be first level purchases, so class members cannot be identified by only looking at the type of items purchased.  However, Mr. Kaplan overstates the relevance of this concern.  As Mr. Kaplan testifies, a single first level purchase is sufficient to identify a class member.[47]  Therefore, class members will be incorrectly identified by looking at items bought only if every item the individual purchased was derived from aluminum from another smelter (so that the customer in question never made a single first-level purchase of aluminum).  This possibility seems extremely unlikely.  I understand Dr. Gilbert has made some calculations to assess the likelihood, but even based only on the information Mr. Kaplan put together, inter-smelter or Defendant-to-smelter transaction volumes represent something on the order of a few percent of total sales.[48]  As an illustration using three percent, if a purchaser makes one purchase, then the probability they have a non-first-level item is three percent.  However, if they buy two items, then the probability that both are non-first-level items is less than one percent.  With three items purchased, the probability is less than one one-hundredth of a percent.

26.      Mr. Kaplan also claims "class conflict" may exist in this case for two basic reasons.  First, inter-smelter trades may cause multiple potential class members (the smelter and the customer) to claim first purchase.  As before, these seem to be at most a very small number of purchasers, who would purchase only items involved in inter-smelter or Defendant and smelter transactions.

---

[46] Kaplan Report, pp. 38-63.

[47] Kaplan Dep., p. 80.

[48] I am summing totals in Kaplan Report, Ex. 8-12 and 13, and compared to $35B.

27.      Second, Mr. Kaplan contends that some proposed class members "benefit" from the alleged misconduct, in the form of higher prices or profits, and/or lower costs.  Mr. Kaplan claims that benefits should be netted out from harm to determine overall damages.[49]  Because the types of potential benefits differ across proposed class members, Mr. Kaplan concludes that the interests of at least some proposed class members must be in conflict with one another.

28.      But as I understand it analysis of potential benefits is not appropriate in a case such as this, because the focus should be on the impact to the first level purchasers when they were overcharged as a result of the alleged misconduct.  To the extent the All-in price was increased on account of the alleged misconduct, then class members, who pay the All-in price or a price with a higher MWP as a component, paid more and were impacted.  Class-wide evidence indicates prices and premia were higher.  The industry participants indicate prices and premia were higher, empirical analysis indicates prices and premia were higher.  In these circumstances, all or substantially all class members were impacted, based on class-wide proof.

## III. SUMMARY OF CONCLUSIONS

29.      Based on my training and professional experience working on matters such as this, the relevant economic literature, my investigation into the economic evidence relevant to Plaintiffs' claims and my analyses to date, I have reached the following additional conclusions:

- Defendants' Experts have not refuted my conclusions about relevant markets and market power.

- Defendants' Experts have not refuted any of the class-wide evidence of effective agreement or otherwise refuted my economic conclusion that Defendants used their collective market power to increase warehouse rents, decrease quality of services (e.g., through longer queues), and lock-in customers.

---

[49] Kaplan Report, p. 77. "To determine whether PCMs were harmed by the alleged conspiracy, any claimed adverse impact to PCMs associated with higher aluminum prices allegedly paid by PCMs must be offset by any benefit enjoyed by these same customers as a result of the conduct at issue."

HIGHLY CONFIDENTIAL

- Defendants' Experts' claim of Perfect Offset is unfounded as both a theoretical and empirical matter.

- Class-wide proof shows that Defendants' conduct led to increases in prices paid for aluminum by all or substantially all class members.

J. Douglas Zona

5 Aug 2016

Date

HIGHLY CONFIDENTIAL

**Appendix A**

# J. DOUGLAS ZONA, Ph.D.

510.587.9396  .  Doug.Zona@SquareZResearch.com

### ACADEMIC BACKGROUND

| 1986 | **The State University of New York** | Stony Brook, New York |

*Ph.D., Economics*
Fields of concentration:  Microeconomic Theory, Industrial Organization
Dissertation:  "Bid-rigging and the Competitive Bidding Process:  Theory and Evidence"
Committee:  Robert H. Porter, Robert W. Rosenthal and Kenneth Hendricks

| 1984 | **The State University of New York** | Stony Brook, New York |

*M.A., Economics*

| 1983 | **The University of New Hampshire** | Durham, New Hampshire |

*B.A., Economics*

### ACADEMIC EXPERIENCE

| 2003 – 2005 | **New York University** | New York, New York |

*Graduate School of Arts and Science*
*Adjunct Professor of Economics*

### PROFESSIONAL EXPERIENCE

| | **Square Z Research LLC** | |
| 2013 – | *Economist* | Emeryville, California |

| | **CRA International, Inc.** | |
| 2010 – | *Senior Consultant* | |
| 2009 – 2010 | *Vice President* | Oakland, California |

| | **Berkeley Research Group  LLC** | |
| 2013- | *Contractor* | Emeryville, California |
| 2010 – 2013 | *Director* | |

| | **LECG, LLC** | |
| 2005 – 2009 | *Director* | Emeryville, California |

| | **Cornerstone Research, Inc.** | |
| 1999 – 2004 | *Vice President* | New York, New York |

| | **National Economic Research Associates** | |
| 1998 – 1999 | *Vice President* | White Plains, New York |
| 1991 – 1998 | *Senior Consultant* | |
| 1989 – 1991 | *Senior Analyst* | Cambridge, Massachusetts |

| 1988 – 1989 | **Cambridge Systematics** | Cambridge, Massachusetts |
| | *Associate* | |
| 1986 – 1988 | **American Telephone and Telegraph** | Bedminster, New Jersey |
| | *Staff Supervisor/Staff Manager* | |

## Honors and AWARDS

Peter J. Kalman Award for Academic Excellence, 1986.

Aninda K. Bose Memorial Award for "Alternating Patterns of Winners in Repeated Auctions," 1985.

Peter J. Kalman Award for Academic Excellence, 1985.

## BOOK CHAPTERS

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fifth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2008.

"Collusion," with R. Porter, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Simulation in Competitive Analysis," with G. Leonard, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, in *Empirical Industrial Organization* edited by Paul L. Joskow and Michael Waterson, Edward Elgar Publishing, Ltd., 2005.

Lessons from the MCI/WorldCom Transaction, in *Econometrics in Antitrust* edited by John Harkrider, ABA Section on Antitrust Law, 2005.

"Energy Trading Strategies in California: Market Manipulation?" with Michael DeCesaris and Greg Leonard, in *Obtaining the Best from Regulation and Competition*, edited by Michael A. Crew and Menahem Spiegel.  Boston, MA: Kluwer Academic Publishers, 2004.

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fourth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2004.

## PUBLICATIONS

"BRIEF OF ECONOMISTS AND OTHER SOCIAL SCIENTISTS AS AMICI CURIAE IN SUPPORT OF RESPONDENTS" (with co-signers) in TYSON FOODS, INC., Petitioner, v. PEG BOUAPHAKEO, et al., Individually and on Behalf of All Other Similarly Situated Individuals, in the U.S. Supreme Court, September 29, 2015.

"GUPPI, the new horizontal merger guidelines and assessing potential competitive effects," with Chris Pleatsikas, *Australian Journal of Competition and Consumer Law*, Vol. 20/2 June

2012.

"Structural Approaches to Estimating Overcharges in Price Fixing Cases," *Antitrust Law Journal*, 77  No. 2 (2011).

"Lessons from the Superior/ICG Merger," with D. Neher and D. Russo, *The George Mason Law Review*, 2005.

"Regulating access:  using economic principles to ensure fair and efficient competition," with P. Hinton, *The Electricity Journal,* August/September 1999, pp. 107-123.

"Ohio School Milk Markets:  An Analysis of Bidding," with R. Porter, RAND *Journal of Economics,* Summer 1999, pp. 263-288.

"Issues in Antitrust Economics Testimony after Daubert," with F. Dunbar, *PLI Course Handbook, Antitrust Litigation:  Strategies for Success,* November 1998, pp. 181-211.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with P.J. Hinton, R. Schmalensee and W.E. Taylor, *Journal of Regulatory Economics,* 13 (1998) pp. 183-196.

"Ohio School Milk Markets:  An Analysis of Bidding," with R. Porter, National Bureau of Economic Research Working Paper No. 6037, Cambridge, Massachusetts, May, 1997.

"An Analysis of the State of Competition in Long-Distance Telephone Markets," with W. E. Taylor, *Journal of Regulatory Economics,* 3 (1997) pp. 227-255.

"An Analysis of Asymmetric Demand Response to Price Changes:  The Case of Local Telephone Calls," with M. Bidwell, Jr. and B. Wang, *Journal of Regulatory Economics,* 8 (1995) pp. 285-298.

 "Competitive Analysis with Differenciated Products" with J. Hausman and G. Leonard, *Annales d' Economie et de Statistique,* 34 (1994) pp. 159-180.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, *Journal of Political Economy,* 3 (1993) pp. 518-538.

"A Proposed Method for Analyzing Competition Among Differentiated Products," with J. Hausman and G. Leonard, *Antitrust Law Journal*, 60 (1992) pp. 889-900.

"Detection of Bid-Rigging in Procurement Auctions" with R. Porter, National Bureau of Economic Research Working Paper No. 4013, Cambridge, Massachusetts, March 1992.

"Bid-Rigging and the Competitive Bidding Process:  Theory and Evidence," Ph.D. Dissertation, Department of Economics, State University of New York at Stony Brook, 1986.

**PAPERS AND PRESENTATIONS**

"Econometrics for Lawyers" with R. Shehadeh, presented for the ABA Section of Antitrust Law, various sessions, 2006.

"Bid-Rigging in School Milk Auctions:  Evidence from Ohio," with N. Moshkin and R. Porter, presented at Barcelona Economics Workshop on Auction Markets, July 2005.

"Toward a Structural Non-Parametric Model of Bidding Behavior," with N. Moshkin and R. Porter, presented at the International Industrial Organization Conference, Boston, April 5, 2003.

"The Merger Investigation in Superior Propane/ICG: Economics Gone Amuck," presented at the George Mason Law Review Annual Symposium, January 15, 2003.

"MCI Worldcom/Sprint Merger Investigation," presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, April 20, 2001.

"The Evolution of Competition in Local Exchange Markets: A Case Study," with W.E. Taylor, presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, January 8, 1999.

"Efficient Access to Competitors' Facilities, A Practical Approach," with P. J. Hinton, presented at the International Communications Forecasting Conference – 1998, St. Louis, Missouri, June 9-12, 1998.

"Efficient Access to Competitors' Facilities", presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition: Network Industries In Transition, 17th Annual Conference, Vergennes, Vermont, May 27-29, 1998.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with R. Schmalensee, W. E. Taylor, and P. J. Hinton, presented at the Rutgers 16th Annual Conference, Lake George, New York, May 21-23, 1997.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," With R. Schmalensee, W. E. Taylor, and P. J. Hinton, filed on behalf of The United States Telephone Association, March 7, 1997.

"An Analysis of Resale in Telecommunications," presented at the Rutgers 15th Annual Conference, Lake George, New York, May 29-31, 1996.

"Effects of Competitive Entry on Capital Recovery," with T. J. Tardiff, presented to The United States Telephone Association, Capital Recovery Seminar, Chicago, Illinois, October 19, 1995.

"Stranded Investment: Lessons from the Telephone Industry for the Electric Power Industry," with H. Ware, presented at the Rutgers 14th Annual Conference, Newport, Rhode Island, May 25, 1995.

"An Analysis of the State of Competition in Long-Distance Telephone Markets, " prepared for the Alliance for Competitive Communications, May 1995.

"Telecommunications and Antitrust," presented at the New York State Bar Association Annual Meeting of the Antitrust Law Section, New York, New York, January 26, 1995.

"An Analysis of Asymmetric Demand Response to Price Changes: The Case of Local Telephone Calls," with M. Bidwell and B. Wang, presented at the Rutgers 13th Annual Conference, Newport, Rhode Island, May 25, 1994.

"Rockets & Feathers: The Asymmetry of Response to Telephone Price Change," with M. Bidwell, presented at the Advanced Workshop in Regulation and Public Utility Economics Twelfth Annual Conference, Brewster, Cape Cod, Massachusetts, May 26-28, 1993.

"Company-Specific Estimates of the Pass-Through of Commodity Taxes: Theory and Evidence," with R. Schmalensee and M. Klass, presented to the U.S. Department of Commerce, March 12, 1993.

"Detecting Bid-Rigging," Seminar at the Economic Analysis Group of the Antitrust Division of the United States Department of Justice, Washington, D.C., January 18, 1993.

"Detecting and Proving Bid Rigging Using Bid Data," presented for the Joint Program of Economics and Sherman Act Section 1 Committees, Section of Antitrust Law, American Bar Association Annual Meeting, San Francisco, California, August 11, 1992.

"Passthrough of Commodity Taxes on Color Televisions in Taiwan: Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.

"Substitution Among Imperfect Substitutes," presented to The American Bar Association Section of Antitrust Law, The Cutting Edge of Antitrust: Market Power, at the Williard Intercontinental Hotel, Washington, D.C., October 17, 1991.

"Incentive Regulation and the Diffusion of New Technology in Telecommunications," with William E. Taylor and Charles J. Zarkadas, presented to the 19th Annual Telecommunications Policy Research Conference, Solomon's Island, Maryland, September 29, 1991.

"Merger Analysis with Differentiated Products" with J. Hausman and G. Leonard, presented at National Bureau of Economic Research Summer Institute Workshop on Plant and Firm Dynamics and Productivity, Cambridge, Massachusetts, July 11, 1991.

"On the Detection of Bid-Rigging in Procurement Auction Data," with R. Porter, presented at the April 1991 meeting of the National Bureau of Economic Research Industrial Organization Program in Cambridge, Massachusetts, April 19, 1991.

"Merger Analysis with Differentiated Products," with J. Hausman and G. Leonard, Seminar at the Economic Analysis Group of the Antitrust Division of the United States Department of Justice, Washington, D.C., April 17, 1991.

"The Total Bill Concept: Defining and Testing Alternative Views," with B. Jacob, presented at Bellcore/Bell Canada Industry Forum, Hilton Head, South Carolina, April 22-25, 1990.

"Two Stage Budgeting and the Total Bill Effect: An Application to AT&T's Inter- and Intra-State Long Distance Market," presented at the Bellcore/Bell Canada Industry Forum, Key Biscayne, Florida, January 1988.

## EXPERT REPORTS

"Declaration of J. Douglas Zona, Ph.D. in Support of Plaintiffs' Motion for Class Certification," Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, August 3, 2016.

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Plaintiffs in Re: Aluminum Warehousing Anititrust Litigation, United States District Court, Southern District of New York, Case No. 13 MD 2481, March 26, 2016 (Confidential)

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Whole Food Markets Group, Inc. in MARY GARRISON, and GRACE GARRISON, et al, v. Whole Food Markets Group, Inc. et al., United States District Court, Northern District of California, Case No. 3:13-CV-05222 VC and Case No. 3:14-CV-00334 VC, January 19, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation,

(Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 11, 2015 (Confidential)

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Defendant XPO Logistics, Inc." in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, July 20, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 3, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 19, 2014 (Confidential)

"Affidavit of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Cohen v. LG Chem, et al.) PROVINCE OF QUEBEC, DISTRICT OF MONTREAL, NO: 500-06-000632-121 and 9113-5699 QUEBEC INC., March 26, 2014

"Expert Declaration of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Wilson v LG Chem, et al.) ONTARIO SUPERIOR COURT OF JUSTICE, Court File No. CV-13-56893, March 17, 2014

"Expert Rebuttal Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, June 29, 2012

"Expert Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, May 15, 2012

"Declaration of J. Douglas Zona, Ph.D.," in *ADVANCED MICROTHERM, INC., et al V. NORMAN WRIGHT MECHANICAL*, et al. United States District Court, Northern District of California, San Jose Division, No. 04-CV-02266-JW., April 13, 2010.

"Expert Report of J. Douglas Zona," in *re Graphics Processing Units*, N.D. Cal., Case No.: M:07-CV-01826-WHA, September 19, 2008.

"Declaration of J. Douglas Zona in Support of Defendant Intel Corporation's Opposition to Plaintiffs' Motion for Class Certification," in Skold and Dossantos, et al., v. Intel, HP, et al., Superior Court of California for the County of Santa Clara, Case No. 1-05-CV-039231, September 28, 2007.

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn); *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ) (N.D. Cal.), May 22, 2006.

"Supplemental Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel tanker shipping pending before the Korea Fair Trade Commission, April 19, 2005.

"Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel

tanker shipping pending before the Korea Fair Trade Commission, December 20, 2004.

"Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:02CV00593 (JR) pending in the United States District Court for the District of Columbia, July 27, 2004

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn); *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ) (N.D. Cal.), February 16, 2004.

"Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:01CV01714 (JR) pending in the United States District Court for the District of Columbia, May 7, 2002

"Rebuttal Report of J. Douglas Zona," prepared for plaintiffs in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al*. Alameda County Superior Court Case No. 659087-3, March 19, 2002.

"Expert Report of J. Douglas Zona," prepared for plaintiffs in *Sorbates Indirect Antitrust Litigation-Wisconsin,* October 3, 2001.

"Rebuttal Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al*, U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, May 16, 2001.

"Declaration of J. Douglas Zona, Ph.D. Regarding Preliminary Damage Estimate," prepared on behalf of plaintiffs in *Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al.*, U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, March 1, 2001.

"Preliminary Expert Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, January 15, 2001.

"Affidavit of J. Douglas Zona, Ph.D., Regarding Class Certification," prepared on behalf of plaintiffs in Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, October 30, 2000.

"Declaration of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re: Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, September 15, 1999.

"Rebuttal Report of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re: Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, June 15, 1999.

"Analysis of Issues Raised by AT&T in AT&T v. NYNEX, FCC File No. E-96-27," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

"An Analysis of Interexchange Carrier Sent-Paid Payphone Fraud," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

"Expert Report of J. Douglas Zona," prepared for Defendant in *AT&T, Corp. v. American Teletronics Long Distance, Inc.,* U.S.D.C. District of New Jersey Civil Actions No. 94-14680, June 30, 1997. (Confidential)

"An Analysis of Resale in Long Distance Telecommunications Markets," with W. Taylor and T. Tardiff, prepared for plaintiff in connection with *Darren B. Swain, Inc. d/b/a U.S. Communications v. AT&T Corp., v. Mike Maxey, et al.*, U.S.D.C. N.D. Tx., Civil Action 394CV-1088D November 15, 1995.

"An Analysis of Long Distance Telecommunications Markets," with William E. Taylor and Timothy J. Tardiff, prepared for plaintiffs in *US WATS, Inc. and USW Corp. v. AT&T Corp.* U.S.D.C. E.D. Pa. No. 93-CV-1038, August 22, 1995. (Confidential)

"The Effect of Competitive Entry into Local Exchange and State Toll Markets on the Revenues of Southern New England Telephone," with Timothy J. Tardiff, prepared for *Southern New England Telephone*, February 27, 1995. (Confidential)

"An Economic Analysis of Ohio School Milk Markets: Damages" with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, December 1, 1994. (Confidential)

"An Analysis of Ohio School Milk Markets," with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, October 31, 1994. (Confidential)

"Passthrough of Commodity Taxes on Color Televisions in Taiwan: Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.

**TESTIMONY**

Deposition testimony in Re: Aluminum Warehousing Anititrust Litigation, United States District Court, Southern District of New York, Case No. 13 MD 2481, May 24, 2016

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 11, 2016

Depositition testimony in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, September 30, 2015

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, March 30, 2015

Deposition testimony in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, July 26, 2012

Deposition testimony in *Donald Michalco, et al. v. Comcast of Greater Florida/Georgia, Inc., et al.*, Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 02-03448 CV-B.

Deposition testimony in *re: Organic Peroxide Antitrust Litigation*, U.S. District Court for the

District of Columbia, Case No. 1:02CV00593 (JR)

Deposition and trial testimony in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al.*  Alameda County Superior Court, Case No. 659087-3

Deposition testimony in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726.

Deposition testimony in Charles Shaw, Bret D. Schwartz, And Steve Promislo, Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184.

Deposition and trial testimony in re:  *Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95CV193HLM.

Deposition testimony in *Darren B. Swain, Inc., et al.  v. AT&T Corp., v. Mike Maxey, et al.,* U.S. District Court, for the Northern District of Texas, Dallas Division, Civil Action No. 394CV-1088D.

Deposition testimony in *US Wats, Inc., et al. v. AT&T Corp.,* U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 93-CV-1038.

Deposition testimony in *State of Ohio v. Louis Trauth Dairy, Inc., et al.*, Case No. C-1-93-553 in the United States District Court, Southern District of Ohio, Western Division.

Deposition and trial testimony in *Dialogic Corporation v. VMX, Inc. and Rhetorex Inc.,* Civil Action No. 93-1712-(MLP), in the United States District Court for the District of New Jersey.


**REFEREE**

| | |
|---|---|
| Journal of Econometrics | Southern Economic Journal |
| RAND Journal of Economics | Journal of Law and Economics |
| Journal of Industrial Economics | American Economic Review |
| Journal of Regulatory Economics | Construction Management and Economics |

**OTHER PROFESSIONAL ACTIVITIES**

Audit and Evaluation Branch of Industry Canada – Member of Steering Committee to oversee an evaluation of the anti bid-rigging activities of the Canadian Competition Bureau. July 2007.