UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | MDL No. 2481<br>Master Docket No.<br>13 MD 2481 (PAE) |
| This Document Pertains To:<br><br>DIRECT PURCHASER CASES | |

**DEFENDANTS' RESPONSE TO THE NEW "EXCESS LOAD-IN"
THEORY IN DR. CHRISTOPHER GILBERT'S SUR-REPLY REPORT**

Plaintiffs' sur-sur-reply fails to reconcile their "supply restraint" theory of liability with Dr. Gilbert's economic models of impact and damages.  Plaintiffs' liability theory asserts that Defendants raised aluminum prices by "hoarding" and "trapping" too much aluminum in LME warehouses in Detroit and Vlissingen.  (*See, e.g.*, Opp. 22; Sur-Reply 3.)  Consistent with that "supply restraint" theory, one would expect Dr. Gilbert to try to show that Defendants loaded too much aluminum *into* Detroit and Vlissingen LME warehouses and too little aluminum *out* of them.  But Dr. Gilbert's economic models purport to show exactly the opposite.  With respect to load-outs, Dr. Gilbert's models estimate that the alleged conspiracy caused an extra 1.8 million tons of aluminum to be loaded *out* of Detroit and Vlissingen LME warehouses.  (Opp. 14-16, 22-23; Sur-Reply 3-6; Hausman Reply ¶¶ 7, 71-72.)  With respect to load-ins, his models expressly assume that the alleged conspiracy made no difference, *i.e.*, that exactly the same amount of aluminum would have been loaded *into* those warehouses in the but-for world.  (Gilbert Rpt. 114 n.68.)  Furthermore, Dr. Gilbert agreed at his deposition that it was "reasonable" to assume that "the same amount of aluminum would have been loaded into Pacorini Vlissingen and Metro Detroit" in the but-for world.  (Ex. 3, Gilbert Dep. 105:9-106:25.[1])  Thus, according to Dr. Gilbert's models and his "reasonable" assumption that load-ins would be the same in the but-for world, the net effect of the alleged conspiracy was to *reduce* the amount of aluminum stored in Detroit and Vlissingen LME warehouses by approximately 1.8 million tons.  (Sur-Reply 3.)

Dr. Gilbert expressly confirmed at his deposition that his models estimate that the alleged conspiracy *reduced* the amount of aluminum held in Detroit and Vlissingen warehouses:

> Q.  So according to your work in Exhibit G3 of your report, if not for the alleged conspiracy, more aluminum would have stayed in the Metro Detroit warehouse for a longer period of time; correct?

---

[1]  Citations to "Ex." are to the exhibits accompanying the Declaration of John. S. Playforth.  Unless otherwise noted, emphasis is added, and citations and internal quotations are omitted.

> A. Correct.
>
> Q. And if not for the alleged conspiracy, you conclude that more aluminum would have stayed in the Pacorini Vlissingen warehouse for a longer period of time; correct?
>
> A. Correct.
>
> Q. And so according to your work in Exhibit G3, the effect of the alleged conspiracy was to *reduce the amount of aluminum inventory* in the Vlissingen and Detroit warehouses during the class period, correct? . . .
>
> A. Correct. (Ex. 3, Gilbert Dep. 107:2-20.)

In a belated attempt to reconcile the conflict between their liability theory and Dr. Gilbert's models, Plaintiffs attempt to execute a 180-degree about-face in their sur-sur-reply. Plaintiffs begin by repudiating Dr. Gilbert's assumption that load-ins would have stayed the same in the but-for world and pivoting to a contrary assumption that "the excess load-outs [estimated by Dr. Gilbert's models] were accompanied by excess load-ins." (Sur-Sur-Reply 3.) Plaintiffs go on to speculate that these purported excess load-ins might have exceeded Dr. Gilbert's estimates of excess load-outs, thus implying a net restraint of the aluminum supply. (*Id.* at 14-15.) For several reasons, Plaintiffs' last minute about-face fails to reconcile their supply-restraint theory of liability with Dr. Gilbert's projections that Defendants actually *expanded* the aluminum supply by reducing the amount of aluminum "hoarded" and "trapped" in Detroit and Vlissingen warehouses.

*First*, it is far too late for Plaintiffs to try to suggest that "excess load-ins" resulted in a net supply restraint. Dr. Gilbert's opening expert report "reasonably" assumed that load-ins would have stayed the same in the but-for world (*supra* at 1), and his reply report likewise argued that it would be "superfluous" to model load-ins because "[n]either load-ins nor stocks play any role in my damages model." (Gilbert Reply ¶ 51 n.52.) Plaintiffs should not be permitted to repudiate their own expert's express assumptions and ambush Defendants with brand new factual assertions regarding "excess load-ins" in a sur-sur-reply. *See, e.g., Nunez v. N.Y. State Dep't of Corr. &*

*Comm. Supervision*, 2015 WL 4605684, at *5 n.2 (S.D.N.Y. 2015) ("the Court will not consider claims that are based on new factual allegations in Plaintiff's sur-reply"); *D'Amico Dry D.A.C. v. Primera Maritime (Hellas) Ltd.*, 2019 WL 1294283, at *3 (S.D.N.Y. 2019) ("The movants cannot rely on a new argument . . . raised for the first time in a reply brief . . . that actually contradicts the prior arguments that the movants made."); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *15 (N.D. Cal. 2010) ("the Court does not consider new arguments or evidence presented for first time in a reply").

*Second*, even if they were timely, Plaintiffs' new assertions of excess load-ins would not show a supply restraint. According to Dr. Gilbert's models, the alleged conspiracy caused 900,000 tons of extra load-outs from Metro Detroit and another 900,000 tons of extra load-outs from Pacorini Vlissingen. (Gilbert Sur-Reply ¶ 19; Hausman Reply ¶ 72 & n.72.) Dr. Gilbert now speculates that those 1.8 million tons of extra load-outs might have been offset by an even larger amount of extra load-ins, but that is plainly incorrect:

- Dr. Gilbert argues that Metro entered into "shuffle" deals in which aluminum was loaded out of its Detroit warehouses and then promptly loaded back into those warehouses (Gilbert Sur-Reply ¶¶ 17-19), but Metro's lone "shuffle" deal with another Defendant accounted for less than 100,000 tons of aluminum, and Metro's six "shuffle" deals in total accounted for less than 600,000 tons of load-ins. (Ex. 2 ¶¶ 3-4, 6.)

- Without citing any evidence, Dr. Gilbert speculates that certain Metro Detroit warrant cancellations by Goldman Sachs and JPMorgan might have been part of "shuffle" deals (Gilbert Sur-Reply ¶ 18), but incontrovertible evidence shows that none of this aluminum was "shuffled" and that Goldman Sachs and JPMorgan never entered into any "shuffle" deals. (Ex. 2 ¶¶ 4-5; *see also* Ex. 1 ¶ 7.)

- Once again without citing any evidence, Dr. Gilbert speculates that 18 Metro Detroit warrant cancellations of at least 50,000 tons "may" have been "shuffled" (Gilbert Sur-Reply ¶ 18), but none of this aluminum in fact was "shuffled" (Ex. 2 ¶¶ 3-4; Ex. 1 ¶ 8).

- With respect to Pacorini Vlissingen, Dr. Gilbert does not identify a single "shuffle" deal or a single warrant cancellation supposedly linked to an "excess load-in." (Ex. 1 ¶ 5.)

Dr. Gilbert thus identifies less than 100,000 tons of purported "excess load-ins" by Defendants

and less than 600,000 tons of "excess load-ins" altogether—far short of the 1.8 million tons of excess load-outs he estimates for Detroit and Vlissingen. (Gilbert Sur-Reply ¶ 19; Ex. 2 ¶¶ 4, 6.)

*Third*, Dr. Gilbert fails to provide any economic analysis that distinguishes between *excess* load-ins that supposedly resulted from the alleged conspiracy and *ordinary* load-ins that would have occurred even in the absence of the alleged conspiracy. When Dr. Gilbert discusses load-outs as opposed to load-ins, he admits that he needs an economic model to identify "excess" load-outs so that he does not "incorrectly attribute increases in queue length to Defendants' conduct that may be attributable to developments for which they were not responsible." (Gilbert Rpt. 110.) Although the same reasoning applies to load-ins, Dr. Gilbert never offers any economic model or economic analysis that purports to distinguish excess load-ins from ordinary load-ins. Instead, he offers only a few crude charts of actual-world load-ins that tell us *nothing* about the level of load-ins that would have occurred in the but-for world. (Ex. 1 ¶¶ 9-10.[2]) In addition, his sur-reply report concedes that Plaintiffs "have not made any allegation about the level of load-ins to LME warehouses over the Class period" and that he does not "deviate from a 'no change' assumption in relation to load-ins" in any of his economic modeling. (Gilbert Sur-Reply ¶ 72.) Dr. Gilbert also acknowledges that his speculation about excess load-ins is irrelevant to his estimates of impact and damages because load-ins do not "play any role in my damages model." (*Id*.)

For all these reasons, Plaintiffs cannot reconcile their supply restraint theory of liability with Dr. Gilbert's economic models estimating a large *expansion* of the supply of aluminum available outside of Detroit and Vlissingen LME warehouses. As a result, Dr. Gilbert's models

---

[2] Dr. Gilbert's load-in charts also contradict Plaintiffs' claims that "excess load-outs were accompanied by excess load-ins" (Sur-Sur-Reply 3) because for certain time periods, Dr. Gilbert estimates that there were more *excess* load-outs than there were *total* load-ins, *i.e.*, excess load-outs still would exceed purported excess load-ins in those periods even if *all* load-ins were treated as excess load-ins. (Ex. 1 ¶¶ 11-14 & Tbl. 1.)

4

violate the *Comcast* requirement that they must "measure damages resulting from the particular antitrust injury on which [Defendants'] liability in [the] action is premised," *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013), and Plaintiffs are left without any economically plausible model of impact or damages (*see* Opp. 14-16, 22-23; Sur-Reply 3-6; Hausman Rpt. ¶¶ 35-37; Kaplan Rpt. ¶¶ 48-50, 157-158; Hausman Reply ¶¶ 7, 71-72; Kaplan Reply ¶¶ 72-79).  In the absence of a viable means of modeling classwide impact and damages, individual issues will predominate over common issues at trial, and class certification should be denied.  *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."); *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. 2018) ("Absent a data-driven model, plaintiffs have failed to meet their burden under Rule 23."); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 626-27 (D.C. Cir. 2019) (rejecting plaintiffs' attempt to rely solely on "documentary evidence" and expert assertions that class members "must have been harmed" to try to prove classwide impact); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 54 (1st Cir. 2018) (rejecting plaintiffs' argument they need not rely on quantitative analysis because "at trial, they will prove classwide impact with the testimony of their expert . . . and with defendants' own documents and admissions"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496 (N.D. Cal. 2008) (rejecting plaintiffs' contention that "economic theory" was sufficient to demonstrate classwide injury).[3]

---

[3] Contrary to Plaintiffs' assertions, the Second Circuit did not hold that Plaintiffs "suffered antitrust injury based on [a] well-developed summary-judgment record." (Sur-Sur-Reply 1.)  The Court instead cautioned that its analysis "focus[ed] on the sufficiency of the plaintiffs' legal theory, rather than on their evidence."  *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 n.3 (2d Cir. 2019).  Moreover, the Court did not address whether common proof is sufficient to demonstrate antitrust impact for all class members; it held only that the *named plaintiffs* had adequately *alleged* antitrust injury through "allegations [] that the defendants restrained the market for sales of primary aluminum." *Id.* at 95.

December 20, 2019                   Respectfully submitted,

/s/ Robert D. Wick
Robert D. Wick (*rwick@cov.com*)
Henry Liu (*hliu@cov.com*)
John S. Playforth (*jplayforth@cov.com*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for Defendants Henry Bath LLC & JP Morgan Securities plc*


/s/ Richard C. Pepperman II (on consent)[4]
Richard C. Pepperman II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
William H. Wagener
(*wagenerw@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Goldman Sachs & Co. LLC, J. Aron & Company, Goldman Sachs International, Mitsi Holdings LLC and Metro International Trade Services LLC*

---

[4]  Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/  Boris Bershteyn (on consent)
Boris Bershteyn
(*boris.bershteyn@skadden.com*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone: 212-735-3834

*Attorneys for Defendant Access World (USA) LLC (f/k/a Pacorini Metals USA, LLC)*


s/  Eliot Lauer (on consent)
Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman
(*jsemmelman@curtis.com*)
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*