UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

This Document Relates To:

Fujifilm Manufacturing U.S.A., Inc. v. Goldman
Sachs & Co., No. 15-cv-8307-PAE (S.D.N.Y.)

13-md-2481 (PAE)
15-cv-8307 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Fujifilm Manufacturing U.S.A., Inc. ("Fujifilm"), is one of several individual

plaintiffs in this multidistrict litigation ("MDL") who allege violations of Section 1 of the

Sherman Act, 15 U.S.C. § 1, in the form of a conspiracy to inflate aluminum prices.  Fujifilm's

amended complaint, Dkt. 35 ("AC"),[1] brings an antitrust claim against 6 sets of defendants, each

of which either traded primary aluminum on the London Metals Exchange ("LME") or stored

aluminum at warehouses certified by the LME.[2]  Fujifilm's AC added certain foreign affiliates of

the principal defendants in this MDL, including Glencore International AG ("GIAG") and

Pacorini Metals Vlissingen B.V. ("Pacorini Vlissingen").[3]  Before the Court are GIAG and

---

[1] Unless otherwise specified by reference to a specific docket number, all citations refer to the
*Fujifilm* docket, No. 15 Civ. 8307 (PAE).

[2] As the Second Circuit recently explained, "[t]he term 'primary aluminum' is used in the
industry to describe aluminum in the form produced at a smelter or primary aluminum plant, by
original producers, as distinguished from 'secondary aluminum,' which is reconstituted
aluminum scrap."  *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 88 (2d Cir. 2019).

[3] Pacorini Vlissingen is now known as "Access World (Vlissingen) B.V."  *See* No. 13 MD 2481,
Dkt. 1146 at 14.  However, for purposes of this motion, the Court uses that defendant's former
name, which was in use during the relevant period.

Pacorini Vlissingen's motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

For the following reasons, the Court denies those motions.

## I.     Background[4]

### A.     The Parties

Fujifilm is a South Carolina corporation with its principal place of business in Greenwood, South Carolina.  AC ¶ 34.  During the relevant period, Fujifilm purchased high-grade lithographic aluminum coil directly from integrated aluminum producers in connection with its manufacture of lithographic plates for use in the newspaper, commercial printing, and graphics communications industries.  *Id*.

There are 6 groups of defendants, three of which traded in primary aluminum and primary aluminum derivatives on the LME during the relevant period (the "Financial

---

[4] The Court here assumes familiarity with the history of this litigation and provides background only to the extent necessary to resolve the pending motions.  The Court's account of the factual allegations is drawn primarily from the AC.  On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials.  *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).  The allegations in the complaint are presumed true "to the extent they are uncontroverted by the defendant's affidavits," *MacDermid*, 702 F.3d at 727 (citation omitted), and all factual disputes are resolved in the plaintiff's favor, *see DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  Accordingly, in connection with GIAG's motion to dismiss, the Court has considered the declaration of John Burton in support of the motion, Dkt. 84 ("Burton Decl."); the declaration of Walter W. Noss, Esq., in opposition, Dkt. 106 ("First Noss Decl."), and the exhibits attached thereto; and the declaration of Eliot Lauer, Esq., in support, Dkt. 110 ("First Lauer Decl.").  In connection with Pacorini Vlissingen's motion, the Court has considered the declaration of Debby Dutour Geerling in support of the motion, Dkt. 95 ("Geerling Decl."); the declaration of Walter W. Noss, Esq., in opposition, Dkt. 125 ("Second Noss Decl."), and the exhibits attached thereto; and the declaration of Eliot Lauer, Esq., in support, Dkt. 127 ("Second Lauer Decl.").

Defendants"), and three of which stored aluminum at LME-certified warehouses (the "Warehousing Defendants").  *Id.* ¶¶ 40–69; *see Henry Bath*, 936 F.3d at 89.

The Financial Defendants are each affiliated with either Glencore Ltd., J.P. Morgan Chase Bank, N.A., or Goldman Sachs & Co.  Each group of Financial Defendants directly or indirectly acquired one of the Warehousing Defendants in 2010, during a glut in the aluminum market following the 2008 financial crisis.  *See* AC ¶¶ 40, 56, 67.

Defendant Glencore Ltd., which is headquartered in Stamford, Connecticut, both actively trades aluminum on the LME and sells large quantities of physical aluminum directly to large industrial users in the United States.  *Id.* ¶ 62.  Defendant GIAG, is a Swiss corporation, with its headquarters in Baar, Switzerland.  Burton Decl. ¶ 3; AC ¶ 60.  GIAG is an affiliate of Glencore Ltd.  AC ¶ 62.[5]

Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB"), is a federally-chartered national banking association headquartered in New York, New York.  *Id.* ¶ 48.  Defendant J.P. Morgan Securities plc ("J.P. Morgan Securities")—a wholly-owned subsidiary of JPMCB that provides securities brokerage services—is headquartered in London, United Kingdom.  *Id.* ¶ 49.[6]

Defendant Goldman Sachs & Co. is an international financial company headquartered in New York, New York.  *Id.* ¶ 40.  Defendant J. Aron & Company is a New York corporation with the same headquarters as Goldman Sachs & Co.  *Id.* ¶ 42.  Defendant Goldman Sachs

---

[5] Fujifilm also originally listed Glencore AG as a separate defendant, AC ¶ 61, but Glencore AG and Glencore Ltd. are different names used by the same company, *see* Dkt. 85 at 8; No. 13 MD 2481, Dkt. 896 at 2 n.1.  To the Court's knowledge, this fact is not in dispute.

[6] Where the AC and the parties' submissions in connection with this motion do not make clear to which J.P. Morgan entity they refer, the Court refers to JPMCB and J.P. Morgan Securities collectively as "J.P. Morgan."  Neither party has suggested that the distinction between these J.P. Morgan entities is relevant for purposes of deciding GIAG's or Pacorini Vlissingen's motions.

International is an international financial services provider headquartered in London, United Kingdom. *Id.* ¶ 41. Each of these entities within what Fujifilm describes as the "Goldman Sachs family of defendants," *id.* ¶ 44, is a subsidiary of non-party The Goldman Sachs Group, Inc. *Id.* ¶¶ 40–42.[7]

The Warehousing Defendants are Pacorini Vlissingen, Pacorini Metals USA LLC ("Pacorini USA," and, together with Pacorini Vlissingen, "Pacorini"), Henry Bath LLC ("Henry Bath"), and Metro International Trade Services LLC ("Metro"). *Id.* ¶¶ 46, 52, 64–65. Each of the Warehousing Defendants "owns and operates aluminum warehouses certified by the LME, and each of them was owned [directly or indirectly] during the relevant time by one of the Financial Defendants—Henry Bath by J.P. Morgan, Metro by Goldman Sachs, and Pacorini by Glencore." *Henry Bath*, 936 F.3d at 89.

Defendant Pacorini USA is a Louisiana limited liability company with headquarters in New Orleans, Louisiana. AC ¶ 64. Pacorini USA owns and operates LME-certified warehouses in the United States—including warehouses in Detroit, Baltimore, Chicago, Los Angeles, Mobile, and New Orleans—that store, among other metals, aluminum. *Id.* ¶ 64. Defendant Pacorini Vlissingen is a Dutch corporation with its headquarters in Vlissingen-Oost, Netherlands. Geerling Decl. ¶ 3. Pacorini Vlissingen owns and operates LME-certified warehouses in Vlissingen, Netherlands, that store, among other metals, aluminum. AC ¶ 65. Beginning in 2010, the Pacorini entities were owned by one or more of the Glencore entities. *See id.* ¶ 67; *see*

---

[7] Where the AC and the parties' submissions in connection with this motion do not make clear to which Goldman Sachs entity they refer, the Court refers to the three relevant entities collectively as "Goldman Sachs." Neither party has suggested that the distinction between these Goldman Sachs entities is relevant for purposes of deciding GIAG's or Pacorini Vlissingen's motions.

*also* Burton Decl. ¶ 18 ("GIAG is an indirect corporate owner of [Pacorini USA], but does not control nor is it involved in the day-to-day operations of [Pacorini USA].").

Defendant Henry Bath is a Delaware limited liability company headquartered in Baltimore, Maryland. AC ¶ 52. Henry Bath owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Baltimore, and New Orleans that store, among other metals, aluminum. *Id.* Beginning in 2010, J.P. Morgan entities owned Henry Bath's parent corporation, Henry Bath & Son, Ltd. *See id.* ¶¶ 52, 56–59.

Defendant Metro is a Michigan limited liability company headquartered in Romulus, Michigan. *Id.* ¶ 46. Metro owns and operates numerous LME-certified warehouses in the United States, including several metal-storage warehouses in or around Detroit, Chicago, New Orleans, and other cities. *Id.* Beginning in 2010, Goldman Sachs owned Metro. *Id.* ¶ 40.

## B.   The MDL

Fujifilm, like other individual plaintiffs in the MDL, made domestic aluminum purchases pursuant to long-term supply contracts with aluminum producers. *Id.* ¶ 34. In accordance with industry standards, the purchase prices charged to Fujifilm pursuant to these contracts included, as a component of price, the Platts Midwest Premium (the "Midwest Premium"), a regional benchmark based on the costs associated with delivery of aluminum. *Id.* ¶¶ 34–35, 105–08; *see Henry Bath*, 936 F.3d at 89, 91. Fujifilm also purchased aluminum from European suppliers pursuant to similar contracts, which used the Rotterdam Premium, rather than the Midwest Premium, as the relevant regional benchmark. AC ¶¶ 2, 23, 34, 36. Fujifilm further alleges that increases to the Rotterdam Premium would generally cause an increase to the Midwest Premium, and that defendants were aware of this relationship. *See id.* ¶ 110.

As the Second Circuit recently summarized, with regard to all plaintiffs' complaints in this MDL:

> [T]he gist of the allegations is that the Financial Defendants, having acquired large positions in primary aluminum at low prices during the economic downturn following the 2008 market collapse in anticipation of future price increases, conspired with each other and with the Warehousing Defendants to inflate artificially the prices they would realize in the sale of these positions by manipulating the Midwest Premium.

*Henry Bath*, 936 F.3d at 89.  Fujifilm allegedly suffered harmed as a result of defendants' conduct, by having to pay artificially inflated prices for aluminum under its long-term supply contracts with aluminum producers.  AC ¶¶ 23–28.  That is, although Fujifilm, like almost all other purchasers of primary aluminum for use in manufacturing, acquired aluminum directly from producers, rather than through the LME, Fujifilm alleges that the MDL defendants' conduct involving the LME increased a component of the price Fujifilm paid to primary aluminum producers.

### C.      GIAG and Pacorini Vlissingen's Contacts with the United States

GIAG, a Swiss corporation with headquarters in Switzerland, has never had offices or employees in the United States.  Burton Decl. ¶¶ 3–5.  It has never maintained books or records, had a bank account, or maintained a mailing address or telephone number anywhere in the United States.  *Id.* ¶¶ 6–9.  It has never paid income or property taxes or owned or leased real property anywhere in the United States.  *Id.* ¶¶ 10–11.  GIAG has never been registered to do business, conducted officer or board meetings, or had a registered agent for service of process anywhere in the United States.  *Id.* ¶¶ 12–14.  The same is true of Pacorini Vlissingen.  Geerling Decl. ¶¶ 6–16.

Fujifilm, however, alleges that GIAG and Pacorini Vlissingen each had several forms of contact with the United States.

### 1.    The December 2011 Aluminum Swap

Fujifilm alleges that GIAG stored "substantial quantities of aluminum" in the United

States, AC ¶ 60, including in connection with a December 2011 aluminum swap involving J.P.

Morgan and Pacorini Vlissingen, *id.* ¶¶ 65, 231–34.

Resolving all doubts in Fujifilm's favor, in December 2011, GIAG, Glencore Ltd., J.P.

Morgan, Pacorini Vlissingen, and others conspired to engineer a massive swap-and-cancellation

of aluminum warrants, which served to remove 860,000 tonnes of metal from available supply,

to build a massive queue at Pacorini Vlissingen, and to cause the Rotterdam Premium to rise

sharply. *Id.* ¶ 16.  Specifically, GIAG provided J.P. Morgan warrants[8] for approximately

860,000 tonnes of aluminum stored at Pacorini Vlissingen's LME-certified warehouse in

Vlissingen, and J.P. Morgan provided GIAG warrants for approximately 860,000 tonnes of

aluminum located in Metro's LME-certified warehouse in Detroit. *Id.* ¶¶ 16, 65, 231–34.[9]

GIAG thus, for at least a short period of time, acquired the rights to and stored 860,000 tonnes of

aluminum—representing about one-sixth of global LME aluminum stocks, *id.* ¶ 231—in Detroit.

Pursuant to the swap agreement, GIAG provided J.P. Morgan with incentives, including

favorable rent, in exchange for J.P. Morgan's cancelling 500,000 tonnes of the Vlissingen

---

[8] An LME warrant is a document of title entitling the owner to a specified lot of aluminum in a specified LME warehouse.  AC ¶¶ 5–6, 118.

[9] In general, when warrants are acquired through the global LME clearing system, the acquirer has no control over the location of the metal subject to those warrants.  First Lauer Decl., Ex. 5 ("Wilson Tr.") at 114–15.  If an acquirer does not want metal in a particular location, the acquirer has the option to "put back" those warrants into the LME clearing system.  *Id.*  To the extent GIAG obtained LME warrants for metal stored in the United States, company policy required that GIAG never take possession of the metal, and GIAG always redelivered the warrants to the LME or otherwise disposed of them before they were cancelled.  Burton Decl. ¶ 16.  At the time of GIAG's December 2011 swap agreement with J.P. Morgan, GIAG had an existing short position in aluminum on the LME.  *Id.* ¶ 17.  GIAG delivered the warrants it received from J.P. Morgan back into LME clearing to close out its short position, *id.*, just as GIAG had told J.P. Morgan it planned to do, First Lauer Decl., Ex. 1.

warrants it had acquired at Pacorini Vlissingen's warehouses "in one clip," in order to

re-warehouse the material at a Henry Bath facility in Rotterdam.  Second Noss Decl., Ex. 16.

J.P. Morgan also could not sell the aluminum to third parties until after it had re-warehoused the

material at its own facility in Rotterdam.  *Id.*  Pacorini Vlissingen facilitated the transfer of J.P.

Morgan's 500,000 tonnes of aluminum to Rotterdam by loading out 1,500 tonnes per day—the

LME minimum load-out requirement.  Second Noss Decl., Ex. 17; *see* AC ¶ 7.  This massive

cancellation of Vlissingen warrants and ensuing load-out of aluminum lengthened the delay

involved in taking delivery of aluminum from Vlissingen- and Rotterdam-based LME

warehouses, thus increasing the regional premium.  *See* AC ¶ 7; Second Noss Decl., Ex. 16.

Fujifilm alleges that Pacorini Vlissingen participated at GIAG's direction—despite its managing

director Simon Yntema's characterizing the deal as "unacceptable" and "really pissing me off,"

Second Noss Decl., Ex. 19.[10]

## 2. Communications with Other MDL Defendants

Fujifilm alleges that GIAG and Pacorini Vlissingen's employees each communicated

with employees of the other MDL defendants concerning the storage of aluminum and

aluminum warrant cancellations in the United States and Europe.  AC ¶¶ 60, 183–84, 216; First

Noss Decl., Ex. 1.

For example, on August 18, 2010, GIAG's Robin Scheiner facilitated an agreement

involving Metro, Goldman Sachs, GIAG, Glencore Ltd., and other entities, pursuant to which

Glencore Ltd. agreed not to cancel warrants for 27,000 metric tons of aluminum stored at

Metro's Detroit LME warehouse until October of that year.  AC ¶ 216; First Noss Decl., Ex. 1.

---

[10] Fujifilm also cites emails that refer to "Glencore" holding metal in LME warehouses in the
United States.  *See* First Noss Decl., Ex. 6.  However, documents produced by Pacorini USA
show that Glencore Ltd., not GIAG, was the "Glencore" entity that held the relevant metal.  First
Lauer Decl., Ex. 2.

Scheiner directed Metro to "place [27,000 metric tons of previously cancelled aluminum] lots on warrant with immediate effect in the name of Glencore [Ltd.]."  First Noss Decl., Ex. 1. Referring to a discussion that had occurred during a telephone conference "between our Stamford office [*i.e.*, Glencore Ltd.] and Scott Evans from Goldman [Sachs]," Scheiner confirmed that Glencore entities would be reimbursed for costs "which we have paid for all the metal we will not end up removing from your warehouse."  *Id.*  Later that day, Matthew Lucke, a Glencore Ltd. trader, responded to the email thread, confirming that, "[a]s part of the deal," Glencore Ltd. would continue to store the 27,000 metric tons at Metro's warehouse for two additional months.  *Id.*

Fujifilm alleges that the August 2010 deal was part of a larger agreement between the MDL defendants not to "destock" each other's warehouses, AC ¶ 216, and that Scheiner's involvement was part of a larger pattern of Glencore Ltd.'s U.S.-based traders taking direction from the "boys of zug"—*i.e.*, GIAG traders based in Switzerland—on certain deals.  *Id.* ¶ 62. For example, in July 2010, a Pacorini Metals AG[11] executive emailed, among others, Pacorini Vlissingen's Simon Yntema, recapping a meeting the executive had just left with top GIAG officers regarding their plans for Glencore and Pacorini entities to create and maintain a "critical mass" of tonnage in both Dutch and U.S. warehouses that would create a "bottleneck effect" in those locations.  First Noss Decl., Ex. 2.  *See also* Second Noss Decl., Ex. 2 (June 2011 email to executives at Pacorini Metals AG and Pacorini Vlissingen stating that "we need to speak to Metro this week and tell them that we have turned down their metal [and] we expect them to do the same"); *id*., Ex. 21 (January 2012 internal Metro email noting that an unspecified Pacorini

---

[11] Pacorini Metals AG is a Swiss company and the parent of both Pacorini USA and Pacorini Vlissingen.  AC ¶ 66.

entity has "no desire to nitpick us in Detroit" and that an unspecified Glencore-Pacorini entity "know[s] we would retaliate incrementally in some place like Vlissingen").[12]

Fujifilm also notes that, during the relevant period, GIAG and Pacorini Vlissingen were corporate affiliates of, and communicated with, both Glencore Ltd. and Pacorini USA.  AC ¶¶ 61–63, 65–67; First Noss Decl., Exs. 4–8.  Fujifilm cites several emails in which GIAG personnel discuss with their counterparts at Glencore Ltd. or Pacorini USA the current aluminum holdings and trading strategies of various entities, including those of competitors.  *See* First Noss Decl., Exs. 2, 4–8.  Employees of Glencore Ltd. regularly consult with GIAG to obtain GIAG's knowledge of the global market.  First Lauer Decl., Ex. 6 (deposition of Glencore Ltd. trader Brian Brigham) ("[W]e talk to the guys at Glencore International and try to get their opinion because those guys have more of a world view.").  Fujifilm does not allege that GIAG or Pacorini Vlissingen failed to observe corporate formalities with or was an alter ego of any entity that transacted business in the United States.

### 3.     Travel to the United States

In July 2013, GIAG's Scheiner visited the United States.  In connection with the trip, Glencore Ltd. trader Patrick Wilson emailed Scheiner "to confirm the date for [Scheiner's] visit to [S]tamford, [Connecticut]," where Glencore Ltd. is headquartered, and to discuss changes that had been made to the rules applicable to LME warehouses.  First Noss Decl., Ex. 9.

---

[12] As to this last email, GIAG and Pacorini Vlissingen here validly point out that the context—a Metro employee discussing U.S. warehousing operations—makes it highly unlikely that either company is the specific "Glencore" entity discussed in the email, given that neither has U.S. operations.  Rather, this email almost certainly refers to Pacorini USA or Glencore Ltd. However, any "retaliat[ion]" in Vlissingen would necessarily have been directed at Pacorini Vlissingen and/or GIAG—tending to support Fujifilm's theory that GIAG and Pacorini Vlissingen's intended their activities to have effect across the Atlantic Ocean.

More notably, in November 2013, Pacorini Vlissingen manager Duncan Holterman traveled to the United States, where he met with Pacorini USA personnel.  *See* Second Noss Decl., Ex. 6.   Holterman visited to "to help the U.S. staff with the admin and the files administration [sic] with regard to deliveries in and deliveries out."  *Id.*, Ex. 7 ("Yntema Tr.") at 54; *see id.*, Ex. 6 (email from Pacorini USA employee suggesting Holterman visit to discuss: "Inventory volume; volumes in/out; operations size; challenges that you have faced over the past few years; what do you see happening in your business in the next few years").  Holterman, or one of his colleagues, shared a "queue manager" spreadsheet, used as a logistical tool to manage load-out of aluminum from warehouses, with Pacorini USA.  *Id.*, Exs. 3–5.  Pacorini Vlissingen's Yntema testified that the "intention of [Holterman's] trip" was "to help set up the warehouse-specific queue manager" for Pacorini USA.  Yntema Tr. at 56.[13]

### 4.    Other Conduct with Alleged Effects in the United States

Fujifilm further alleges that GIAG and Pacorini Vlissingen took actions in Europe that affected the Rotterdam Premium, the regional benchmark used as a component of price for aluminum purchased in Europe.  Fujifilm purchased aluminum from third parties in Europe subject to the Rotterdam Premium and imported that aluminum into the United States.  AC ¶ 36.

Additionally, Fujifilm alleges that changes to the Rotterdam Premium affect the Midwest Premium, and that GIAG and Pacorini Vlissingen were each aware of, and sought to take advantage of, the alleged relationship between the two benchmarks.  Fujifilm cites an email conversation in which GIAG and Glencore Ltd. personnel discussed worldwide trading

---

[13] Separately, Fujifilm notes that Yntema attended industry-wide conferences, which were also attended by competitors of Pacorini Vlissingen, including some competitors based in the United States.  Yntema Tr. at 42.  However, Yntema did not attend conferences in the United States; in fact, he has not visited the United States on behalf of Pacorini Vlissingen since 2010, including for industry conferences.  *Id.* at 42–43.

strategies, the queues for loading out aluminum from Netherlands- and Detroit-based LME warehouses, and the Rotterdam and Midwest Premiums.  *See* First Noss. Decl., Exs. 10–11.[14]  In particular, Glencore Ltd.'s Wilson emailed two GIAG traders regarding two points for discussion: "our plans . . . for Vlissingen" and "what we think will happen to incentives as that will have an impact on the Detroit queue and premiums."  *Id.*, Ex. 10; Second Noss Decl., Ex. 8. Wilson explained that, in asking about Vlissingen, he was "trying to get some information from some of our global guys as to what's going on in the global market."  Wilson Tr. at 318. Similarly, Wilson testified that his comment about incentives and the Detroit queue and premiums was intended to get information about whether competitor Metro was expected to increase or decrease their incentives, not about a relationship between Dutch activity and the Midwest Premium.  *Id.* at 318–19.

Fujifilm also alleges that, in each year from 2010 to 2014, Pacorini Vlissingen, led by managing director Yntema, rented and purchased additional warehouse space in Vlissingen. Yntema Tr. at 28–29; *see* Second Noss Decl., Exs. 12–13.  By August 2011, Vlissingen housed the second largest concentration of LME aluminum after Detroit, Second Noss Decl., Ex. 15, and by the end of 2012, Vlissingen had surpassed Detroit, *id.*, Ex. 14.  Fujifilm suggests that the growth of Pacorini Vlissingen's warehousing operations in the Netherlands had an impact in the United States both due to the alleged relationships between the Rotterdam Premium and the Midwest Premium and due to Fujifilm's purchase of aluminum subject to the Rotterdam Premium from third parties in Europe, which Fujifilm then imported into the United States.  *See* AC ¶ 36.  Fujifilm cites an April 5, 2011 email from a U.K.-based consultant to Pacorini Metals

---

[14] Fujifilm also relies on this email thread, between GIAG and Glencore Ltd. employees, to establish Pacorini Vlissingen's contacts with the United States.  *See* Second Noss Decl., Ex. 8. No Pacorini Vlissingen representatives were involved in the email thread.

AG to an employee of Pacorini USA—stating that, "we must monitor very closely the developments from 'both sides of the pond'"—as evidence that Pacorini Vlissingen intended its actions in the Netherlands to impact the Midwest Premium in Detroit.  Second Noss Decl., Ex. 20.  Fujifilm further alleges that, in late June 2012, Pacorini USA began implementing a queue management strategy based on that developed by Pacorini Vlissingen to manage aluminum cancellations in Vlissingen.  *See id.*, Ex. 3.

Further, in a May 29, 2012 email, Yntema wrote that Vlissingen would "automatically follow" if the LME mandated increased load-out rates in Detroit.  *See* Yntema Tr. at 87–88. Yntema explained that he thought that if the LME made a change to the warehouse load-out rules in Detroit, it would make similar changes in Vlissingen.  *Id.* at 88.

Fujifilm also cites Pacorini Vlissingen's communications with employees of aluminum producer Alcoa, Inc., and with metals traders from Mitsubishi and Goldman Sachs regarding the storage of aluminum in the United States and Europe.  In September 2013, Yntema was "approached" by Alcoa regarding the Pacorini Vlissingen's storage of Alcoa metal in "Rotterdam/Antwerp."  Second Noss. Decl., Ex. 26.  That metal would have been sourced "from Brazil," but the deal was never consummated.  Yntema Tr. at 125.  In May 2012, Glencore Ltd. trader Lucke sold a New York-based Mitsubishi trader aluminum that was then stored at a Vlissingen warehouse.  Second Noss. Decl., Ex. 25.

As to the storage of Goldman Sachs metal, Fujifilm cites three sets of emails.  In the first, Pacorini USA's Mario Casciano communicated with a New York-based Goldman Sachs trader with whom he was familiar about storing in Vlissingen 13,000 tonnes of aluminum shipped from Canada.  Second Noss Decl., Exs. 27–28; Yntema Tr. at 104, 124.  Casciano then "handed [the deal] over to [Pacorini Vlissingen]."  Yntema Tr. at 105.  In the second, Yntema and a New

York-based Goldman Sachs employee discussed shipping metal from Vlissingen to Rotterdam. Second Noss Decl., Ex. 29.  In the third, Yntema contacted Pacorini USA personnel about trying to secure, for Pacorini USA's Baltimore warehouse, aluminum that Goldman Sachs planned to move from Vlissingen to Baltimore.  *Id.*, Ex. 30; *see* Yntema Tr. at 114 (testifying that if Goldman is moving metal from Vlissingen to Baltimore, "it's normal that we try to get our hands on it, if Pacorini [USA], in Baltimore, to store it on behalf of Goldman Sachs").  Yntema explained that sometimes Pacorini Vlissingen's clients "required . . . storage space in Baltimore, and then if they have these questions, I can pass these on to our colleagues in Baltimore." Yntema Tr. at 47–48.[15]

> ### D.     Procedural Posture
>
> #### 1.     Relevant MDL Developments

In December 2013, this MDL was transferred to the Southern District of New York for consolidated or coordinated pretrial proceedings.  No. 13 MD 2481, Dkt. 1.  In March 2015, Judge Forrest, who previously presided over this MDL, issued four decisions resolving the second round of motions to dismiss filed by defendants in the MDL.  *See* No. 13 MD 2481, Dkts. 728–29, 731, 733.  Of these, Judge Forrest's March 4, 2015 Opinion and Order dismissed the claims against three parent or affiliated corporations—The Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., and Pacorini Metals AG—and denied the then-existing MDL plaintiffs' motions for leave to amend their complaints to the extent they sought to join GIAG, among others, as a defendant.  *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481

---

[15] Fujifilm also alleges that, in 2012, Yntema communicated with Pacorini Metals AG CEO Peter Waszkis regarding the transportation of *zinc* from Pacorini Vlissingen to Pacorini USA in New Orleans.  Second Noss Decl., Ex. 24.

(KBF), 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015); *see also* No. 13 MD 2481, Dkt. 776 (stipulation and order concerning dismissed parties and claims).

More than seven months later, on October 21, 2015, Fujifilm, represented by the same counsel who represent the earlier-filing individual plaintiffs, filed its initial complaint.  Dkt. 1. On February 4, 2016, after receiving access to the discovery record, Fujifilm filed an amended complaint as-of-right, which added new allegations and added GIAG and Pacorini Vlissingen, among others, as parties.  *See* AC.  On February 19 and February 23, 2016, the existing MDL plaintiffs moved for leave to file amended complaints that added the same parties and tracked the allegations of Fujifilm's AC, including allegations relating to the Rotterdam Premium. No. 13 MD 2481, Dkts. 887, 891.  On April 25, 2016, Judge Forrest denied these motions due to those plaintiffs' failure to show good cause for their delay in seeking amendment, thus preventing the other MDL plaintiffs from adding GIAG and Pacorini Vlissingen as defendants or adding conspiracy allegations regarding manipulation of the Rotterdam Premium.  *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481 (KBF), 2016 WL 1629350 (S.D.N.Y. Apr. 25, 2016); *see id.* at *8 ("The Court's denial of [the pre-Fujifilm] plaintiffs' motions for leave to amend will create a disparity between the allegations in Fujifilm's Amended Complaint on the one hand and the [other plaintiffs' operative complaints] on the other.  In light of how we have reached that disparity, however, the Court believes the most equitable and efficient course is to proceed with two different operative case theories in two parallel tracks.").

On September 24, 2019, the Judicial Panel on Multi-District Litigation reassigned the MDL to this Court, following the Second Circuit's August 27, 2019 decision reversing Judge Forrest's grant of summary judgment to defendants on grounds not relevant here.  *See* No. 13 MD 2481, Dkt. 1142.

### 2.   GIAG and Pacorini Vlissingen's Motions

On May 31, 2016, GIAG filed its motion to dismiss the AC for lack of personal jurisdiction, Dkt. 83, the declaration of John Burton, Burton Decl., and a brief in support of the motion, Dkt. 85.  On June 30, 2016, Fujifilm filed its opposition to GIAG's motion, Dkt. 121 ("Pl. GIAG Opp."), and the first declaration of Walter Noss, Esq., First Noss Decl., and exhibits attached thereto.  On July 1, 2016, GIAG filed its reply, Dkt. 109 ("GIAG Reply"), as well as the first declaration of Eliot Lauer, Esq., First Lauer Decl., and exhibits attached thereto.

On June 23, 2016, Pacorini Vlissingen filed its motion to dismiss the AC for lack of personal jurisdiction, Dkt. 94, the declaration of Debby Dutour Geerling, Geerling Decl., and a brief in support of the motion, Dkt. 96.  On August 3, 2016, Fujifilm filed its opposition to the motion, Dkt. 124 ("Pl. PV Opp."), and the second declaration of Walter Noss, Esq., Second Noss Decl., and exhibits attached thereto.  On August 15, 2016, Pacorini Vlissingen filed its reply, Dkt. 126 ("PV Reply"), as well as the second declaration of Eliot Lauer, Esq., Second Lauer Decl., and exhibits attached thereto.[16]

## II.   Applicable Legal Standards

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano*, 286 F.3d at 84; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84

---

[16] On April 14, 2020, the Court requested that the parties re-file each of these submissions in light of challenges presented by the COVID-19 pandemic, as well as the District's upgraded technological capacity (and the Court's correspondingly updated Individual Rules) relating to the electronic filing of documents under seal. Dkt. 171.  On April 17, 2020, the parties re-filed the documents.  *See* Dkts. 172–81.

(2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197

(2d Cir. 1990)).  "Each defendant's contacts with the forum . . . must be assessed individually."

*Calder v. Jones*, 465 U.S. 783, 790 (1984) (citation omitted).

"Where, as here, a district court in adjudicating a motion pursuant to Federal Rule of

Civil Procedure 12(b)(2) 'relies on the pleadings and affidavits, and chooses not to conduct a

full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal

jurisdiction.'" *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)

(quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).  "This showing

may be made through the plaintiff's 'own affidavits and supporting materials, containing an

averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'"

*Id.* (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  The Court

"construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all

doubts in their favor." *Dorchester*, 722 F.3d at 85 (quoting *S. New Eng. Tel.*, 624 F.3d at 138);

*see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).  Nevertheless,

the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept

as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d

at 673 (citations omitted); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59

(2d Cir. 2012).

## III.   Discussion

The Court first addresses the legal principles governing personal jurisdiction over

defendants such as GIAG and Pacorini Vlissingen, and then analyzes the jurisdictional

allegations as to each defendant.

### A.    Applicable Legal Principles Governing Personal Jurisdiction

To make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, a plaintiff must establish both "a statutory basis" for jurisdiction and that the exercise of such jurisdiction accords "with constitutional due process principles." *Cortlandt St. Recovery Corp. v. Deutsche Bank AG*, No. 14 Civ. 01568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015) (quoting *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014)).[17]

Fujifilm asserts that Federal Rule of Civil Procedure 4(k)(2) provides a statutory basis for the Court to exercise personal jurisdiction over GIAG and Pacorini Vlissingen.  Rule 4(k)(2) provides that:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2); *see Hartford Fire Ins. v. Co.*, No. 03 Civ. 2196 (SAS), 2003 WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (Rule 4(k)(2) allows courts to exercise personal jurisdiction if "(1) that plaintiff's cause of action arise[s] under the federal law; (2) that the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) that the defendant's total contacts with the *United States* as a whole are sufficient to confer the court with personal jurisdiction without offending due process" (quoting *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 434 (S.D.N.Y. 1996)).

---

[17] Procedurally proper service of process is also a prerequisite to the exercise of personal jurisdiction, but no party challenges service here.  *See Licci*, 673 F.3d at 59–60 (listing three requirements for personal jurisdiction: (1) the entity must have been properly served; (2) the court must have a statutory basis for exercising personal jurisdiction; and (3) the exercise of personal jurisdiction must comport with constitutional due process).

This rule "extends the reach of federal courts to impose jurisdiction over the person of all defendants against whom federal law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the United States." *Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) (quoting Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment). As the Second Circuit explained:

> Rule 4(k)(2) was specifically designed to "correct[ ] a gap" in the enforcement of federal law in international cases. The gap arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits . . . . The pre-1993 Rules, the Advisory Committee noted, left a significant lacuna "when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction."

*Porina*, 521 F.3d at 126–27 (2d Cir. 2008) (alterations in original) (citing Fed R. Civ. P. 4 advisory committee's note to 1993 amendment). Rule 4(k)(2) thus "fill[s] a gap in the enforcement of federal law for courts to exercise personal jurisdiction over defendants with sufficient contacts with the United States generally, but insufficient contacts with any one state in particular." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 807 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).

It is undisputed that Fujifilm's sole cause of action, under § 1 of the Sherman Act, arises under federal law, and that GIAG and Pacorini Vlissingen are not subject to the jurisdiction of the courts of general jurisdiction of any one state. GIAG Reply at 1–2 ("As neither party disputes that GIAG is not subject to jurisdiction in any state's courts, the relevant inquiry turns on whether the Court's exercise of Rule 4(k)(2) jurisdiction comports with due process."); *see*

PV Reply (addressing only due process analysis under Rule 4(k)(2)).[18]  Accordingly, the relevant inquiry here, for both statutory and constitutional purposes, is whether the Court's exercise of jurisdiction pursuant to Rule 4(k)(2) comports with due process.

The constitutional due process inquiry has two steps.  The Court must determine, first, whether the defendant has sufficient minimum contacts with the forum, and, if so, second, whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  In determining whether the exercise of personal jurisdiction pursuant to Rule 4(k)(2) comports with due process, the relevant forum for assessing minimum contacts is the United States as a whole.  *Porina*, 521 F.3d at 127; *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481 (KBF), 2015 WL 6472656, at *6 (S.D.N.Y. Oct. 23, 2015).

The nature of the minimum contacts inquiry turns on whether the plaintiff pursues a theory of general jurisdiction or specific personal jurisdiction.  *Porina*, 521 F.3d at 127–28.  A court may have general jurisdiction over a non-resident defendant based upon a defendant's "continuous and systematic general business contacts" to the forum state; in such circumstances, a court may exercise personal jurisdiction over a defendant in a suit unrelated to the defendant's

---

[18] Fujifilm suggests in passing that New York's long-arm statute, N.Y. C.P.L.R. § 302(a), could provide an alternative statutory basis for the exercise of personal jurisdiction.  *See* Pl. GIAG Opp. at 13; Pl. PV Opp. at 11.  Fujifilm argues that this Court's status as an MDL transferee court would allow it to consider and find—under New York's long-arm statute—that the moving defendants' contacts with the United States as a whole justified exercise of personal jurisdiction. *See id.* (citing *In re Auto. Parts Litig.*, No. 12 MD 2311 (MOB), 2015 WL 897857, at *4 (E.D. Mich. Mar. 2, 2015) ("[I]n multidistrict cases the United States serves as the appropriate forum for analyzing jurisdictional contacts, not the venue selected by the panel.")).  The Court need not address this unbriefed argument, in light of its finding, developed below, that an adequate factual basis for personal jurisdiction exists under Rule 4(k)(2), which all parties agreed supplies the proper test for personal jurisdiction in this case.

contacts with the state. *Metro Life Ins.*, 84 F.3d at 567–68 (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416 (1984)); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A court may have specific personal jurisdiction based on the defendant's contacts with the forum related to the particular lawsuit. *Porina*, 521 F.3d at 128 (citing *Helicopteros*, 466 U.S. at 414 n.8). That is, specific personal jurisdiction subjects a defendant to suits on only those claims that arise from the defendant's conduct in the forum. *Cortlandt*, 2015 WL 5091170, at *2; *see also Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). Here, Fujifilm pursues solely a theory of specific personal jurisdiction.

In assessing a defendant's minimum contacts, a court evaluates the "quality and nature" of the defendant's contacts. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).[19] The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" such that the defendant "should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474–75). The inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). The defendant's conduct in the lawsuit must create a "substantial connection" with the forum. *Id.* In evaluating this connection, the Court considers the contacts that the "defendant *himself* creates with the forum," not the plaintiff's connections to the forum. *Id.* (emphasis in original)

---

[19] In the Rule 4(k)(2) context, a foreign corporation may satisfy the minimum contacts test by: (1) transacting business in the United States, (2) doing an act in the United States, or (3) having an effect in the United States by an act done elsewhere. *Norvel Ltd. v. Ulstein Propeller AS*, 161 F. Supp. 2d 190, 206 (S.D.N.Y. 2001) (quoting *Eskofot A/S v. E.I. du Pont de Nemours & Co.*, 872 F. Supp. 81, 87 (S.D.N.Y. 1995)).

(citing *Burger King*, 471 U.S. at 475).  These due process limits on personal jurisdiction

"principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or

third parties."  *Id.* (citing *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92

(1980)).  They require, overall, "that a defendant be haled into a court in a forum . . . based on

his own affiliation with the [forum], not based on the 'random, fortuitous, or attenuated' contacts

he makes by interacting with other persons affiliated with the [forum]."  *Id.* at 286 (quoting

*Burger King*, 471 U.S. at 475).

Specific jurisdiction over a foreign defendant may also exist even if the relevant conduct

took place entirely outside the forum.  Under the so-called "effects test," personal jurisdiction is

"typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely

out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum

effects harmful to the plaintiff."  *Licci*, 732 F.3d at 173; *see also Best Van Lines*, 490 F.3d at 243

("in-state effects of out-of-state activity" is one of multiple "independent, if conceptually

overlapping, methods of demonstrating minimum contacts").  For such claims, "the exercise of

personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its

conduct at the forum."  *Licci*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)).

However, the mere "fact that harm in the forum is foreseeable . . . is insufficient for the purpose

of establishing specific personal jurisdiction over a defendant."  *Waldman v. Palestinian

Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (quoting *In re Terrorist Attacks*, 714 F.3d

at 674).

Once a plaintiff demonstrates the required minimum contacts between the defendant and

the forum, the Court then assesses the reasonableness of exercising personal jurisdiction over the

defendant, *i.e.*, whether the exercise of jurisdiction comports with "traditional notions of fair play

and substantial justice." *Metro. Life Ins. Co.*, 84 F.3d at 568 (citation omitted); *see also Burger King*, 471 U.S. at 476 ("[o]nce it has been that a defendant purposefully established minimum contacts within the forum," the Court may consider the contacts in light of the reasonableness factors). The Second Circuit has set out a five-factor test for this "reasonableness" analysis: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113–14 (1987)). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *see also Chloe*, 616 F.3d at 165.

The Court therefore first assesses whether each moving defendant has sufficient minimum contacts with the United States, *Porina*, 521 F.3d at 127, and then considers whether exercising jurisdiction would be reasonable, *Chloe*, 616 F.3d at 173.

### B.  GIAG Had Sufficient Minimum Contacts with the United States

GIAG engaged in sufficient relevant conduct within and directed at the United States to establish the requisite minimum contacts for the exercise of personal jurisdiction.

Although GIAG is headquartered overseas, lacks offices or employees in the United States, and does not regularly conduct business here, the totality of Fujifilm's allegations and evidence require the conclusion that senior GIAG executives and traders actively coordinated

23

and participated in the alleged U.S. conduct from which Fujifilm's Sherman Act claim arises.[20] Three episodes highlighted by Fujifilm are particularly salient.

First, a July 9, 2010 email recounting a meeting between top executives from GIAG and Pacorini Metals AG demonstrates GIAG's keen interest in the U.S. aluminum market and suggests that other Glencore-Pacorini entities, including U.S. subsidiaries, took direction from GIAG in organizing their U.S. activities.  At the meeting, GIAG's chief aluminum executive expressed his interest in "emulat[ing] . . . Detroit in NOLA [New Orleans]"—which would require "getting critical mass" of aluminum into Pacorini USA's warehouse in New Orleans. First Noss. Decl., Ex. 2 at 4–5.  The trans-Atlantic directive from GIAG was clear: "Lock up [aluminum in LME warehouses] and then once the full critical mass is in both locations [Vlissengen and New Orleans] look at unlocking – or not."  *Id.* at 5.  One week later, in an email with the subject line "Million Tons," the Pacorini Metals AG executive reported that the same GIAG aluminum executive wished to have "the whole million tons" of aluminum moved to New Orleans because "the million added to the 400k [tons that Pacorini USA already had] there would beautifully empower the bottle neck effect."  First Noss Decl., Ex. 3.

Second, in August 2010, GIAG's Robin Scheiner brokered a deal with representatives of Glencore Ltd., Metro, Goldman Sachs, and other entities that ensured Glencore Ltd. would continue to store 27,000 metric tons of aluminum at Metro's Detroit warehouse through October of that year.  Participating by email and phone, Scheiner took a lead role in working out the details of the agreement not to remove the aluminum Metro's warehouse.  Although Metro re-

---

[20] For the avoidance of doubt, the Court does not address whether defendants' conduct in aluminum financial markets did, as alleged, have anticompetitive effects in the market for primary aluminum in which Fujifilm was a purchaser.

warranted the metal "in the name of Glencore [Ltd.]," they did in response to Scheiner's explicit direction.  First Noss Decl., Ex. 1.

Third, as part of the December 2011 aluminum swap with J.P. Morgan, GIAG received warrants for approximately 860,000 tonnes of aluminum, representing about one-sixth of all LME aluminum worldwide, located in Metro's LME-certified warehouse in Detroit.  AC ¶¶ 16, 65, 231–34.  The negotiation and execution of the swap involved additional entities in the United States and Europe, including Glencore Ltd. and Pacorini Vlissingen.  *See id.*; Second Noss Decl., Exs. 16–17.  GIAG was far from a passive participant, allegedly pushing ahead with the swap through despite the protestations of Pacorini Vlissingen managing director Yntema, who viewed the deal as "unacceptable."  Second Noss Decl., Ex. 19.  To counter this, GIAG has submitted a declaration to the effect that company policy required that GIAG not take possession of physical metal in the United States, and has noted its trader's testimony that, in general, an acquirer of LME warrants has no control over the location of the metal subject to those warrants.  *See* Burton Decl. ¶ 16; Wilson Tr. at 114–15.  But those submissions are not fully responsive to Fujifilm's showing.  As to the company policy, the issues here are not merely whether GIAG took physical possession of the aluminum associated with the LME warrants it acquired— indeed, vanishingly few LME transactions ever result in the acquirer taking delivery of metal— but also whether GIAG acquired the rights to such U.S.-based metal, which it did.  And, as to an LME-trader's general lack of control over the location of the metal associated with warrants acquired through the global LME clearing system, the terms of the agreed-upon swap made clear that the "warrant quantity delivered by JP Morgan" would be over 860,000 tonnes of "*Detroit LME Warrants.*"  Second Noss Decl., Ex. 16 (emphasis added).  In other words, GIAG appears

to have had uncommon advance notice and control over the location of the metal for which it received warrants pursuant to the swap—and that metal was stored in Detroit.

Each of these incidents, at least as revealed by the materials before the Court, reflect senior GIAG executives and traders purposefully availing themselves of the privilege of conducting activities in the United States.  They are not fairly cast as mere "'random, fortuitous, or attenuated' contacts [made] by interacting with other persons affiliated with the" United States.  *See Walden*, 571 U.S. at 286 (quoting *Burger King*, 471 U.S. at 475).[21]  Fujifilm's allegations and declarations support its depiction of GIAG as a driving force behind these U.S.-centered aluminum transactions, not as merely a foreign affiliate of Glencore Ltd.  GIAG engaged in transactions with U.S. counterparties involving massive quantities of U.S.-based aluminum, stored in Detroit and New Orleans warehouses by U.S. entities, and allegedly directed at impacting the price of aluminum for U.S. buyers.  And, while GIAG largely lacked a physical presence in the United States, "a defendant's physical absence from a forum is insufficient to defeat personal jurisdiction."  *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 254 (S.D.N.Y. 2013) (citing *Burger King*, 471 U.S. at 475); *cf. In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at \*12 ("[W]hile Burgess-Allen may have physically operated entirely within

---

[21] The three highlighted transactions constitute acts of "purposeful availment," that is, acts by which "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Licci*, 732 F.3d at 170 (citation omitted).  This method of demonstrating minimum contacts—based on GIAG's choreography of transactions in the United States—is "independent, if conceptually overlapping," *Best Van Lines*, 490 F.3d at 243, with the "effects" or "purposeful direction" test, which inquires whether "the defendant took intentional, and allegedly tortious, actions expressly aimed at the forum."  *In re Terrorist Attacks*, 714 F.3d at 674; *see Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 589 (S.D.N.Y. 2017).  While GIAG's conduct, in totality, would likely satisfy the "effects" test, too, the Court need not definitely resolve this question, having found Fujifilm's showing sufficient to satisfy the "purposeful availment" test.  *See Chloe*, 616 F.3d at 172.

the United Kingdom and . . . generally dealt with customers of Metro located in London and Europe, he was also responsible for devising . . . a subset of the antitrust conspiracy alleged . . . , [which] contemplated that significant effects would occur in the aluminum market in the United States.").

The exercise of specific jurisdiction over GIAG in this case, measured by the standards applicable at this stage, thus comports with principles of due process.  *See, e.g.*, *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (KBF), 2013 WL 1155576, at *16–18 (S.D.N.Y. Mar. 13, 2013) (minimum contacts satisfied primarily by defendant's "actions with respect to the bonds," which were based in New York, even though "the structure of the transaction did not cause [defendant] to send personnel into New York"); *cf. In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536 (S.D.N.Y. 2008) (personal jurisdiction existed over foreign defendant based on allegations that defendant who manipulated New York Mercantile Exchange futures prices did so with knowledge that "trades would affect the price of natural gas futures within the United States," thus "constitut[ing] purposeful availment of the United States" (citations omitted)).  GIAG's "suit-related conduct"—namely its negotiation and execution of significant U.S.-based aluminum transactions in its own name and in the name of Glencore Ltd., which transactions allegedly contributed to increases in prices paid by Fujifilm— created a sufficiently "substantial" connection with the United States to justify the exercise of specific jurisdiction under the Due Process Clause.  *See Walden*, 571 U.S. at 284; *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 742 (S.D.N.Y. 2018).

## C.     Pacorini Vlissingen Had Sufficient Minimum Contacts with the United States

Pacorini Vlissingen also engaged in sufficient relevant conduct within and directed at the United States to establish the requisite minimum contacts for the exercise of personal jurisdiction.

27

Like GIAG, Pacorini Vlissingen played a role in both the December 2011 swap between GIAG and J.P. Morgan and the July 2010 Pacorini-Glencore efforts to create a critical mass of aluminum in Vlissingen and New Orleans.  *See* AC ¶ 7; First Noss Decl., Ex. 2; Second Noss Decl., Exs. 16–17, 19.  Further, the ostensible partition between Pacorini USA and Pacorini Vlissingen with respect to U.S. business activities was less definitive than Pacorini Vlissingen suggests.  For example, Pacorini USA's Mario Casciano negotiated with a New York-based Goldman Sachs trader to store in Pacorini Vlissingen's Dutch warehouses 13,000 tonnes of aluminum being shipped from Canada, Second Noss Decl., Exs. 27–28, and, in turn, Pacorini Vlissingen's Yntema, upon finding out that Goldman Sachs intended to move significant quantities of aluminum from Vlissingen to Baltimore, contacted Casciano and senior executives of Pacorini Metals AG, advising that "[i]f this would go to Baltimore, we should try to get our hands on it," *id.*, Ex. 30.

The case for sustaining personal jurisdiction against Pacorini Vlissingen is, if anything, stronger than that for GIAG.  Most notably, Duncan Holterman, in his 2013 trip to visit the United States on behalf of Pacorini Vlissingen, engaged in significant suit-related conduct.  Resolving all doubts in Fujifilm's favor, Holterman visited Pacorini USA facilities and met with Pacorini USA personnel, for the alleged purpose of improving Pacorini USA's techniques for loading out the bare minimum of aluminum allowed by LME rules.  *Id.*, Exs. 6–7.  For this purpose, Holterman, or one of his Pacorini Vlissingen colleagues, shared a "queue manager" spreadsheet, which Pacorini USA warehouses later used to organize their load-outs.  *Id.*, Exs. 3–5; *see also* Yntema Tr. at 56 (the "intention of [Holterman's] trip" was "to help set up the warehouse-specific queue manager" for Pacorini USA).  To be sure, Pacorini Vlissingen's declarations permit the inference that Holterman's trip served a purely administrative purpose.

But, viewed in the light most favorable to Fujifilm, Holterman's trip constitutes substantial

activity on U.S. soil furthering defendants' alleged antitrust conspiracy.[22]  A foreign company

could reasonably foresee being haled into U.S. court as a result of such activity.  Holterman's

trip, viewed in light of the totality of the jurisdictional allegations against Pacorini Vlissingen,

thus justifies the exercise of personal jurisdiction here.  *See, e.g.*, *Norvel*, 161 F. Supp. 2d at 206

(foreign defendant that attended limited meetings in, and shipped goods to, the United States

"has either transacted business or performed an act in the United States sufficient to satisfy the

minimum contacts analysis" under Rule 4(k)(2)).[23]

---

[22] For avoidance of doubt, as with GIAG, the Court's conclusion to this effect in denying a Rule 12(b)(2) motion does not require, and is not, a finding that the Pacorini warehouses' load-out rate bespoke anticompetitive activity, or that treating the LME-mandated minimum load-out rate as a maximum was inconsistent with independent, profit-maximizing activity.

[23] Although the AC asserts personal jurisdiction in part based on "the conspiracy described herein," AC ¶ 31, plaintiffs' briefs did not pursue the claim that personal jurisdiction could be found here based on co-conspirators' contacts with the United States.  At the time of the parties' briefing, the continuing vitality of the doctrine of conspiracy jurisdiction had come into question. *See, e.g.*, *Tymoshenko v. Firtash*, No. 11 Civ. 2794 (KMW), 2013 WL 1234943, at *2–4 (S.D.N.Y. Mar. 27, 2013) (stating that conspiracy jurisdiction "has been widely criticized by courts and scholars" and declining to consider co-conspirators' contacts for the purpose of establishing personal jurisdiction over a foreign defendant).  In 2018, however, the Second Circuit clarified this question, articulating a three-part test for finding minimum contacts on the basis of "conspiracy jurisdiction."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).  Under *Schwab*, "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Id.  But see, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *10–16 (S.D.N.Y. Mar 25, 2019) (on remand from *Schwab*, engaging in extensive analysis of the merits of the alleged conspiracy and concluding that the court lacked conspiracy jurisdiction); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 236–39 (S.D.N.Y. 2019).  Having independently found personal jurisdiction over GIAG and Pacorini Vlissingen, the Court has no occasion to resolve whether the *Schwab* test is met here.  It suffices to note that Fujifilm's allegations with respect to the conduct of these entities' conspirators, if considered, would tend to fortify the finding of personal jurisdiction.

**D.      Exercising Jurisdiction over GIAG and Pacorini Vlissingen Is Reasonable**

Having found that GIAG and Pacorini Vlissingen each had sufficient contacts with the United States, the Court assesses the reasonableness of exercising personal jurisdiction over each defendant based on consideration of: (1) the burden imposed on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Chloe*, 616 F.3d at 173 (citing *Asahi Metal*, 480 U.S. at 113–14). "While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* at 165 (quoting *Burger King*, 471 U.S. at 477). Notably, neither GIAG nor Pacorini Vlissingen has argued that exercising jurisdiction would be unreasonable if the Court found sufficient minimum contacts. The Court, too, does not find such exercise unreasonable.

As to the first factor, although the exercise of jurisdiction may impose some burden on GIAG and Pacorini Vlissingen, that factor does not weigh heavily both "in light of the conveniences of modern communication and transportation," *In re Aluminum Warehousing Litig.*, 2015 WL 6472656, at *13 (citing *Chloe*, 616 F.3d at 173), and because each party's affiliates are already deeply enmeshed in this litigation. As to the second, the United States has a substantial interest in adjudicating this case, given the allegedly significant effects that the alleged conspiracy had on the aluminum market in the United States. *Id.* With regard to the third and fourth, Fujifilm, a U.S. entity, is already litigating its claims against many of GIAG and Pacorini Vlissingen's alleged co-conspirators in this forum, and the exercise of jurisdiction over

GIAG and Pacorini Vlissingen would allow for the most efficient resolution of these claims.  *Id.*  And the fifth here is, at most, neutral.  *See id.*

Accordingly, having found that Fujifilm has made a prima facie showing that GIAG and Pacorini Vlissingen had sufficient minimum contacts with the United States, and upon consideration of the reasonableness factors, the Court holds that the exercise of personal jurisdiction over GIAG and Pacorini Vlissingen comports with traditional notions of fair play and substantial justice.  *See Chloe*, 616 F.3d at 173 (finding reasonableness inquiry satisfied and vacating district court's dismissal of out-of-forum defendant where first factor favored defendant, second and third favored plaintiff, and last two factors were neutral).

## CONCLUSION

For the foregoing reasons, the Court denies GIAG and Pacorini Vlissingen's motions to dismiss for lack of personal jurisdiction.

As Judge Forrest noted in denying the class plaintiffs' and other individual plaintiffs' motions for leave to amend their complaints to add, *inter alia*, GIAG and Pacorini Vlissingen as defendants, this "create[s] a disparity between . . . Fujifilm's [case] on the one hand and the [other plaintiffs'] on the other.  In light of how we have reached that disparity, however, the Court believes the most equitable and efficient course is to proceed with two different operative case theories in two parallel tracks."  *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 1629350, at *8.  This observation is today, at this later juncture, at least as apt, if not

more so.  For avoidance of doubt, GIAG and Pacorini Vlissingen are defendants in the *Fujifilm* and *Reynolds & Southwire* cases only.  *See* No. 15 Civ. 8307 (PAE); No. 16 Civ. 5955 (PAE).[24]

The Court directs GIAG and Pacorini Vlissingen to answer, or otherwise respond to, the AC by May 12, 2020.  The Court further directs counsel for GIAG, Pacorini Vlissingen, Fujifilm, and Reynolds Consumer Products LLC to meet and confer to discuss next steps by May 4, 2020.  The Court requests a joint letter, due May 12, 2020, from those parties setting forth a plan for what the Court is confident will be limited additional discovery relating to GIAG and Pacorini Vlissingen.

The motions at dockets 83 and 94 are closed.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated:  April 28, 2020
        New York, New York


---

[24] Counsel in the *Reynolds & Southwire* litigation agreed to be bound by the Court's resolution of this motion.  No. 13 MD 2481 (PAE), Dkt. 1155 at 53.  The Court accordingly expects GIAG and Pacorini Vlissingen to now appear and answer the complaint in that member case within this MDL, on the same schedule as applicable to Fujifilm's complaint.