UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | MDL No. 2481 Master Docket No. 13 MD 2481 (PAE) |

This Document Relates To:

*In re Aluminum Warehousing Antitrust Litigation* (First Level Purchaser Plaintiffs), Case No. 1:14-cv-03116-PAE (S.D.N.Y.)

*Agfa Corporation and Agfa Graphics, N.V. v. The Goldman Sachs Group, Inc.* (Agfa), Case No. 1:14-cv-0211-PAE (S.D.N.Y.)

*Mag Instrument, Inc. v. The Goldman Sachs Group, Inc.* (Mag), Case No. 1:14-cv-00217-PAE (S.D.N.Y.)

*Eastman Kodak Company v. The Goldman Sachs Group, Inc.* (Kodak), Case No. 1:14-cv-06849-PAE (S.D.N.Y.)

*FUJIFILM Manufacturing U.S.A., Inc. v. Goldman Sachs & Co., et al.* (Fujifilm), Case No. 1:15-cv-08307-PAE (S.D.N.Y.)

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST THE
<u>FLPS' AND IPS' UMBRELLA CLAIMS</u>**

## TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................................ 1

I.      FLPs' Aluminum Purchases. .............................................................................. 2

        A.      Ampal Inc. ............................................................................................... 3

        B.      Claridge Products and Equipment, Inc. .................................................. 4

        C.      Custom Aluminum Products, Inc. ........................................................... 6

        D.      Extruded Aluminum, Inc. ........................................................................ 7

II.     IPs' Aluminum Purchases. .................................................................................. 8

        A.      Agfa Corp. and Agfa Graphics N.V. ...................................................... 9

        B.      Fujifilm Manufacturing U.S.A., Inc. ..................................................... 10

        C.      Eastman Kodak Company ....................................................................... 11

        D.      Mag Instrument Inc. ............................................................................... 13

III.    Additional Facts. ................................................................................................ 15

Pursuant to Local Rule 56.1(a), Defendants submit this statement of undisputed material facts in support of their motion for summary judgment against all claims of the First Level Purchasers' ("FLPs") and Individual Plaintiffs ("IPs") based on purchases from entities that are neither defendants nor alleged co-conspirators in the above-captioned action. Defendants accept these facts for purposes of this motion, but reserve the right to disprove them at subsequent stages of these proceedings.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     During the period at issue, the FLPs and IPs collectively purchased approximately 549,000 metric tons of aluminum. *See infra* ¶¶ 8, 34.

2.     During the period at issue, no FLP or IP purchased any aluminum from any Defendant or alleged co-conspirator, with the sole exception of Ampal Inc. ("Ampal"), which purchased approximately 2,200 tons of aluminum from defendant Glencore Limited ("Glencore") and alleged co-conspirator Century Aluminum ("Century").[1] *See infra* ¶¶ 7, 10–11, 34.

3.     As a result, more than 99 percent of the FLPs' and IPs' collective aluminum purchases were from entities that are neither defendants nor alleged co-conspirators. *See infra* ¶¶ 8, 34.[2]

---

[1]   Defendant Glencore Ltd. held a minority stake in Century during the period in question. Defendants believe that Plaintiffs have not adequately alleged that Century was a co-conspirator and in any event cannot show that Century (or Defendants) participated in any alleged conspiracy, but those issues are beyond the scope of Defendants' motion for summary judgment against the FLPs' and IPs' umbrella claims.

[2]   Many of Plaintiffs' aluminum purchases were from fabricators and therefore were not first-level purchases from smelters. *See infra* ¶¶ 4, 31. Claims based on such purchases have been dismissed from this litigation. *See* Class Cert Order, ECF No. 1274, at 27; *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *22–23 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Defendants reserve all rights with respect to such purchases.

**I.        FLPs' Aluminum Purchases.**

4.        During the class period, FLPs purchased most of their aluminum from producers or fabricators.  Ex. 1, Hausman Decl. ¶ 6 & tbls. 1–4; *see also* ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[3]

5.        The sellers from which FLPs purchased are known or identifiable.  Ex. 1, Hausman Decl. ¶ 6 & tbls. 1–4 (discussing the purchase data produced by Ampal, Claridge, Custom, and Extruded).

6.        FLPs allege that the parties that participated in the alleged conspiracy are Defendants, Burgess-Allen Partnership Ltd., Robert Burgess-Allen, Sierra Resources International, LLC, Max Sobol, Deutsche Bank, Red Kite, and Barclays Bank.  *See* Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 6.

---

[3]   All references to "Ex." are to the exhibits attached to the Declaration of John S. Playforth, dated September 2, 2020.

7.     With the exception of limited purchases by Ampal from Glencore and Century (*see infra* ¶ 10), FLPs did not purchase primary aluminum from any Defendant or alleged co-conspirator in this action (*see infra* ¶¶ 11, 17, 22, 28).

8.     Collectively, FLPs purchased approximately 208,000 metric tons of aluminum, of which approximately 2,200 metric tons—approximately 1 percent—was purchased from a Defendant or alleged co-conspirator.  *See infra* ¶¶ 9–10, 16, 21, 27.

### A.     Ampal Inc.

9.     From February 1, 2010, through March 25, 2016, Ampal claims to have purchased approximately ▆▆▆▆ metric tons of aluminum.  *See* Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Ampal purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 1 (summarizing Ampal purchase data produced at AMPAL0000560).

10.    During this period, Ampal claims to have purchased approximately 2,200 metric tons of aluminum, or around ▆▆▆▆ of its total aluminum purchases, from Glencore or Century. *See* Ex. 1, Hausman Decl. ¶ 6 & tbl. 1 (summarizing Ampal purchase data produced at AMPAL0000560).

11.    From February 1, 2010, through March 25, 2016, Ampal did not purchase aluminum from any Defendant or alleged co-conspirator other than Glencore and Century.  Ex. 1, Hausman Decl. ¶ 6 & tbl. 1; *see also* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆

12.    Ampal's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

13.     Ampal's purchases include spot purchases made without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. ██████████

████████████████████████████████████████████████████████

██████████████████████████████████████

14.     Ampal was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

15.     Ampal was able to, and did, negotiate with aluminum producers and suppliers as to price. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

**B.     Claridge Products and Equipment, Inc.**

16.     From February 1, 2010, through March 25, 2016, Claridge Products and Equipment, Inc. ("Claridge") claims to have purchased approximately ██████ metric tons of aluminum. Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying

Claridge purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 2 (summarizing Claridge purchase data produced at CLARIDGE0026501).

17.     From February 1, 2010, through March 25, 2016, Claridge did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 6 & tbl. 2 (summarizing Claridge purchase data produced at CLARIDGE0026501); █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

18.     In order to "hedge the price of aluminum," Claridge entered into fixed-forward sales made pursuant to contracts or agreements without a floating Midwest Premium or Midwest Transaction Price component. ███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

19.     Claridge ███████████████ aluminum on a spot basis, without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

20.     Claridge was able to, and did, negotiate with aluminum producers and suppliers as to price. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

C.    **Custom Aluminum Products, Inc.**

21.    From February 1, 2010, through March 25, 2016, Custom Aluminum Products, Inc. ("Custom") claims to have purchased approximately ▮▮▮▮ metric tons of aluminum.   Ex. 6, FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Custom purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 3 (summarizing Custom purchase data produced at CUSTOM0000063).

22.    From February 1, 2010, through March 25, 2016, Custom did not purchase any aluminum from any Defendant or alleged co-conspirator.   Ex. 1, Hausman Decl. ¶ 6 & tbl. 3 (summarizing Custom purchase data produced at CUSTOM0000063); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23.    Custom made some of its aluminum purchases pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.   ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

24.    Custom entered into spot purchases that were made without a written contract containing a Midwest Premium or Midwest Transaction Price component.   ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮   Custom was able to, and did, negotiate the terms of spot purchases.   ▮▮▮▮▮

25.    Custom was able to, and did, enter into contracts on behalf of customers hedging the Midwest Premium.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

26.    Custom was able to, and did, negotiate with suppliers as to price.   ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

**D.      Extruded Aluminum, Inc.**

27.      From February 1, 2010, through March 25, 2016, Extruded Aluminum, Inc.
("Extruded") claims to have purchased approximately ████ metric tons of aluminum. *See* Ex. 6,
FLPs' Resps. & Objs. to Contention Interrogs. at 9 (June 10, 2016) (identifying Extruded
purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 6 & tbl. 4 (summarizing
Extruded purchase data produced at EXTRUDED0005014).

28.      From February 1, 2010, through March 25, 2016, Extruded did not purchase any
aluminum from any Defendant or alleged co-conspirator. Ex. 1, Hausman Decl. ¶ 6 & tbl. 4; ████

████████████████████████████████████

████████████████████████████████████

████████████

29.      Extruded's aluminum purchases include purchases that were made pursuant to
fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price
component. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

30.      Extruded was able to, and did, negotiate with aluminum sellers as to price. ████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

## II.   IPs' Aluminum Purchases.

31.   During the period in suit by the IPs, the IPs purchased all of their aluminum from producers or fabricators.  Ex. 1, Hausman Decl. ¶ 7 & tbls. 5–8; *see also* ████████████████

████████████████████████████████████████████████

██████████████████████████[4]; █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

32.   The sellers from which IPs purchased are known or identifiable.  *See* Ex. 1, Hausman Decl. ¶ 7 & tbls. 5–8 (discussing the purchase data produced by Agfa, Fuji, Kodak, and Mag).

33.   The IPs allege that the parties that participated in the alleged conspiracy are Defendants, Burgess-Allen Partnership Ltd., Sierra Resources International, LLC, Deutsche Bank AG, Deutsche Bank Energy Trading LLC, "other Deutsche Bank entities," Red Kite Capital Management LLP, Red Kite Group, and "other Red Kite entities."  *See* Ex. 32, Agfa's Resps. & Objs. to Contention Interrogs. at 4–6; Ex. 33, Fujifilm's Resps. & Objs. to Contention Interrogs.

---

[4]   Bridgnorth, a UK supplier, also supplied a small amount of lithographic coil to Agfa's Branchburg, New Jersey facility.  *See* Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing transactional data produced at AGFA_004647).

at 4–6; Ex. 34, Kodak's Resps. & Objs. to Contention Interrogs. at 4–6; Ex. 35, Mag's Resps. & Objs. to Contention Interrogs. at 4–6.

34.    Collectively, the IPs purchased approximately 342,000 metric tons of aluminum, none of which was purchased from a Defendant or alleged co-conspirator.  *See infra* ¶¶ 35–36, 39–40, 43–44, 49–50.

### A.    Agfa Corp. and Agfa Graphics N.V.

35.    From January 1, 2010, through June 30, 2015, Agfa Corporation[5] claims to have purchased approximately ███ metric tons of aluminum for its Branchburg, New Jersey facility.[6] *See* Ex. 32, Agfa's Resps. & Objs. to Contention Interrogs. at 9–10; Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing transactional data produced at AGFA_004674).

36.    From January 1, 2010, through June 30, 2015, Agfa did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 5 (summarizing Agfa purchase data produced at AGFA_0004674, 0076407–08 & 0200801):███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

---

[5]   Agfa Graphics, N.V. is the parent corporation of Agfa Corporation.  Agfa Corporation supplies Agfa Graphics' products to the U.S. market.  *See* Ex. 28, Agfa 30(b)(6) (Pellegroms) Dep. at 29–30.  Defendants refer to these two entities together as "Agfa."

[6]   Agfa's Branchburg, New Jersey facility was the only Agfa facility in the United States that bought aluminum, in the form of lithographic coil, during the relevant period.  *See* Ex. 28, Agfa 30(b)(6) (Pellegroms) Dep. at 84–85.  During the relevant period, Agfa also purchased lithographic coil at its facilities in Germany, the United Kingdom, Italy, South Korea, Brazil, and China.  *See id.* at 19–20, 82–84, 87–89.  Defendants contend that any claims based on Agfa's foreign purchases are barred by the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §6a, and reserve all defenses with respect to such purchases.  For purposes of the present motion, however, the relevant fact is none of Agfa's purchases— foreign or domestic—was made from any defendant or alleged co-conspirator.  *See infra* ¶ 36.

37.     Many of Agfa's purchase contracts lacked any Midwest Transaction Price and/or Midwest Premium term, instead incorporating European premium terms. ████████████

████████████████████████████████████████████████

██████████████████████████

38.     Agfa was able to, and did, negotiate with aluminum producers and suppliers as to price. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

**B.     Fujifilm Manufacturing U.S.A., Inc.**

39.     From January 1, 2010, through June 30, 2015, Fujifilm Manufacturing U.S.A., Inc. ("Fuji") claims to have purchased approximately ████ metric tons of aluminum.  *See* Ex. 33, Fuji's Resps. & Objs. to Contention Interrogs. at 9–10 (June 10, 2016) (identifying Fuji purchases for which damages are sought); Ex. 1, Hausman Decl. ¶ 7 & tbl. 6 (summarizing Fuji purchase data produced at FUJIFILM_000523–000526, FUJIFILM_069466).

40.     From January 1, 2010, through June 30, 2015, Fuji did not purchase any aluminum from any Defendant or alleged co-conspirator.  *See* Ex. 1, Hausman Decl. ¶ 7 & tbl. 6 (summarizing Fuji purchase data produced at FUJIFILM_000523–000526, FUJIFILM_069466);

████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████

41.     Many of Fuji's purchase contracts lacked any Midwest Transaction Price and/or Midwest Premium term, instead incorporating European premium terms. ███████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

42.     Fuji was able to, and did, negotiate with aluminum producers and suppliers as to price. ███████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

C.      **Eastman Kodak Company**

43.     From January 1, 2010, through June 30, 2015, Eastman Kodak Company ("Kodak") claims to have purchased approximately ███████ metric tons of aluminum for delivery to its plants located in the United States.  *See* Ex. 34, Kodak's Resps. & Objs. to Contention Interrogs. at 9–10 (June 10, 2016) (identifying Kodak purchases for which damages are sought); ECF No. 1192, Stipulation and Order Regarding Dismissal of Certain Claims Without Prejudice ("[T]he parties . . . stipulate and agree that the claims related to Kodak's [purchases for delivery to its plants located outside the U.S.] . . . are hereby dismissed without prejudice to their re-

assertion in tribunals outside the United States."); Ex. 1, Hausman Decl. ¶ 7 & tbl. 7 (summarizing Kodak purchase data produced at KODAK_001384–001390).

44.     From January 1, 2010, through June 30, 2015, Kodak did not purchase any aluminum from any Defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 7 (summarizing Kodak purchase data produced at KODAK_001384–001390); ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

45.     Kodak's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

46.     Kodak's purchases include spot purchases made without a written contract containing a floating Midwest Premium or Midwest Transaction Price component. ██████████

███████████████████████████████████████████████████████

██████████████████

47.     Kodak was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████
███████████████████████████████████████████

48.     Kodak was able to, and did, negotiate with aluminum producers and suppliers as to

price.   ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

### D.     Mag Instrument Inc.

49.     From January 1, 2010, through June 30, 2015, Mag Instrument, Inc. ("Mag") claims

to have purchased approximately ██████ metric tons of aluminum.[7]  *See* Ex. 35, Mag's Resps. &

Objs. to Contention Interrogs. at 9–10 (June 10, 2016) (identifying Mag purchases for which

damages are sought); Ex. 1, Hausman Decl. ¶ 7 & tbl. 8 (summarizing Mag purchase data

produced at MAG_005148).

50.     From January 1, 2010, through June 30, 2015, Mag did not purchase any aluminum

from any defendant or alleged co-conspirator.  Ex. 1, Hausman Decl. ¶ 7 & tbl. 8; ██████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

[7]  Mag produced usable transaction data only as to its purchases from Hydro.  Ex. 1, Hausman Decl. ¶ 8
& tbl. 8 ("Mag's purchases from other suppliers are not readily discernible from their data.").  ██████████
██████████████████████  The estimate of ██████ metric tons relates to Mag's purchases only from
Hydro.

51.     Mag's aluminum purchases include purchases that were made pursuant to fixed-price contracts, without a floating Midwest Premium or Midwest Transaction Price component.

52.     Mag was able to, and did, enter into transactions that had the effect of hedging future changes in the Midwest Premium.

53.     Mag was able to, and did, negotiate with aluminum producers and suppliers as to price.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

### III.   Additional Facts.

54.   The Midwest Transaction Price as reported by Platts is intended to reflect the "[d]aily all-inclusive or 'all-in' price for spot physical 99.7% high-grade P1020A aluminum." Platts Specifications Guide (August 2020) at 9.[8]  Platts describes that price as follows:

> The assessment takes into account all P1020 trading data obtained through the Platts daily survey of P1020 activity, giving priority to any spot physical all-in transactions, bids, or offers.  In the absence of all-in market information, Platts collects a wide range of other relevant market data, including, but not limited to, prevailing exchange-traded values plus applicable premiums for delivery to a typical-freight Midwest aluminum user.

*Id.* at 9; *see also* Class Cert. Order, ECF No. 1274, at 8 ("To calculate the MWP, Platts first surveys the all-in prices paid in physical transactions in the spot market for aluminum for delivery in the midwestern United States on a given day."); Zona Report, ECF No. 920-4, ¶ 10 ("The MW-TRP [*i.e.*, Midwest Transaction Price], which is developed and reported by Platts, is a measure of actual spot transaction prices for aluminum delivered to plants in the Midwest."); █████████████████████ ████████████████████████████████████████████████████ Ex. 54, PLATTS_ALUM00000001 ("Platts editors survey nearly all of the primary and secondary aluminum producers selling into the US sport market.").

55.   The Midwest Premium as reported by Platts approximates the difference between the Midwest Transaction Price and the LME daily cash settlement price for aluminum.  *See* Ex. 1,

---

[8]   *Available at* https://www.spglobal.com/platts/plattscontent/_assets/_files/en_our-methodology/methodology-specifications/nonferrous.pdf.

Hausman Decl. ¶ 10; Zona Report, ECF No. 920-4, ¶ 74 ("The [MWP] . . . measures the difference in value between the LME price and the local transaction reference price (e.g., [MWTP] in Detroit).").

56.    During the relevant period, the Midwest Premium ranged between approximately 5 percent and 23 percent of the Midwest Transaction Price.  Ex. 1, Hausman Decl. ¶ 11.

57.    A number of informed commentators disagree with Plaintiffs' contention that LME warehouse queues raise all-in purchase prices for aluminum.  For example:

    a.  The CRU group stated on November 27, 2013, that "the impact of premium inflation is not to increase the free market price but rather to cause the LME price to trade at a discount to the exogenously-set free market price."  Ex. 55, CRU, *Warehouse rule changes cut metal queues but the effect on premia is less clear* (Nov. 27, 2013).  The FLPs' class certification expert, Dr. Christopher Gilbert, described CRU as "a well-respected and reliable source of industry information."  Gilbert Reply, ECF No. 1041-1, ¶ 48 & n.44.

    b.  A book edited by Dr. Gilbert stated that "[t]he increase in premiums [attributable to longer queues] may not increase the overall price . . . if it simply reduces the portion of the price represented by the LME quotation."  Ex. 56, Robin G. Adams, Christopher L. Gilbert, and Christopher G. Stobart, Modern Management in the Global Mining Industry, at 112.

    c.  The LME stated in November 2013 that "the effect of queues is to create a discount between the free market price of metal, and the value of an LME warrant in a warehouse with queues.  By extension, this causes the LME price to trade at a discount to the free metal price.  This is then observed by the market as the free market price of metal trading at a premium to the reported LME price."  Ex. 57, LME, *Summary Public Report of the LME Warehousing Consultation* (Nov. 2013).

    d.  Europe Economics stated on February 20, 2007, that "removal of the FOT charge [*i.e.*, the charge for loading metal out of an LME warehouse] would add to the value of the warrant.  It would do so because the warrant holder would no longer be liable to pay this charge, and so the value of the warrant would be increased for each potential warrant purchaser by his estimate of the net present value of that future liability."  Ex. 58, Europe Economics, *A Review of the possible consequences of a change in contract terms from "in warehouse" to "FOT basis", with respect to all metals traded on the London Metal Exchange* (Feb. 20, 2007).  It also later stated in a report on the effects of minimum load-out rates that "long queues may have a significant impact on the value of warranted metal.  This is of particular concern because any warrants whose value is significantly lowered will be used to settle

Exchange contracts, and thereby set the LME price."  Ex. 59, Europe Economics, *Assessment of Warehouse Minimum Loading Out Rates (Executive Summary)*.

e.  Goldman Sachs stated on October 31, 2013, that "the queues have no impact on the physical market, including physical prices and aggregate fundamentals."  Ex. 60, Goldman Sachs, *The economic role of a warehouse exchange* (Oct. 31, 2013).

f.  The Financial Times stated on June 22, 2011 that "the length of the queue at Detroit has the effect of pushing down the price of warrants in Detroit.  And since it is the lowest value warrants that set the price on the LME (because these are the warrants that traders will deliver against short positions), the length of the queue also has the effect of, all other things being equal, pushing down the LME cash price."  Ex. 61, Financial Times, *Detroit delays complicate aluminum pricing* (June 22, 2011).

g.  Metal Bulletin stated on March 3, 2015, that queues have "caused the LME price to trade at a discount to the so-called 'all-in' price of aluminium, which is calculated by adding the premium in any given location to the LME price."  Ex. 62, Metal Bulletin, *LME warehousing policy: the proposals, the discussion and what it all means* (March 3, 2015).

h.  Alcoa stated on October 18, 2013, that "[c]ontrary to some market commentators' views, it is not the case that long queues have resulted in higher overall metal prices. In fact, the total price for delivered aluminium continues to be well below the prefinancial crisis levels."  Ex. 63, Alcoa, *Analysis of the Proposed Amendment to the LME Warehouse Rules* (Oct. 18, 2013).

i.  Rusal stated on March 31, 2014, that it "agrees with the LME's analysis that any rise in aluminium premiums would lead to a corresponding fall in the exchange price."  Ex. 64, Metal Bulletin, *LME needs to make sure market stays transparent – Rusal* (Mar. 31, 2014).

58.    A significant portion of smelter contracts with U.S. customers did not contain either a floating Midwest Premium or a floating Midwest Transaction Price as a reference price during the relevant period.  *See, e.g.*, Class Cert. Order, ECF No. 1274, at 9–10 ("However, many purchase contracts do not reference the MWTP or MWP at all, and those that do reference the MWTP or MWP do so in a variety of ways."); First Joint Letter, ECF No. 1254 at 1, 5–6 (FLP estimate that approximately 69% of Alcoa contracts during the relevant period incorporate the MWTP, close to zero percent incorporate the MWP, and the balance incorporate neither of those terms as reference prices); *id.* at  10 (FLP estimate that the percentage of Rio Tinto contracts that

contain the MWP or MWTP was generally similar to that of Alcoa contracts); *id.* at 17, 21 (substantial number of Rusal contracts do not contain either the MWP or MWTP); *id.* at Exs. 12–15, 24–32, 38–47 (exemplars of contracts that do not incorporate the MWP or MWTP); *supra* ¶¶ 12, 18, 19, 23, 29, 37, 41, 45, 51.

59. Most of FLPs' and IPs' contracts did not incorporate a floating Midwest Premium term during the relevant period. *See, e.g.*, *supra* ¶¶ 12, 18, 19, 23, 29, 37, 41, 45, 51 (identifying purchases and contracts that did not incorporate the Midwest Premium); ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

60. The smelter contracts with U.S. customers during the relevant period that did contain either a floating Midwest Premium or a floating Midwest Transaction Price as a reference price typically included at least one additional price component, such as a "shaping premium," "product premium," or "alloy premium." ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



61.     During the relevant period, sales by smelters Alcoa, Rio-Tinto Alcan, and Rusal to U.S. customers totaled more than ten million metric tons of primary aluminum.  Ex. 1, Hausman Decl. ¶ 12.

September 2, 2020                              Respectfully submitted,

                                              s/  Robert D. Wick
                                              Robert D. Wick (*rwick@cov.com*)
                                              Henry Liu (*hliu@cov.com*)
                                              John S. Playforth (*jplayforth@cov.com*)
                                              COVINGTON & BURLING LLP
                                              One CityCenter
                                              850 Tenth Street, N.W.
                                              Washington, D.C.  20001
                                              Telephone:  (202) 662-6000
                                              Facsimile:  (202) 662-6291

                                              *Attorneys for Defendants Henry Bath LLC, JP Morgan*
                                              *Securities plc, and JPMorgan Chase Bank, N.A.*

s/  Richard C. Pepperman II (on consent)[9]
Richard C. Pepperman II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
William H. Wagener (*wagenerw@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Goldman Sachs & Co. LLC, J. Aron & Company, Goldman Sachs International, Mitsi Holdings LLC and Metro International Trade Services LLC*

s/  Boris Bershteyn (on consent)
Boris Bershteyn (*boris.bershteyn@skadden.com*)
Julia K. York (*julia.york@skadden.com*) (pro hac vice)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: 212-735-3834

*Attorneys for Defendant Access World (USA) LLC (f/k/a Pacorini Metals USA, LLC)*

---

[9]   Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

s/  Eliot Lauer (on consent)

Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman (*jsemmelman@curtis.com*)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendants Glencore Ltd., Glencore
International AG, and Access World (Vlissingen) B.V.*